UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

TELENOR MOBILE COMMUNICATIONS AS,

                              Petitioner,

              - against -

STORM LLC

                           Respondent.

------------------------------------------------------------------x

**07 Civ. 6929**

ECF Case

# MEMORANDUM OF LAW IN OPPOSITION TO PETITION TO CONFIRM AND IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD

LOVELLS LLP

Pieter Van Tol (PVT-2445)
Gonzalo S. Zeballos (GZ-5994)
Lisa J. Fried (LF-6968)
590 Madison Avenue
New York, New York 10022
Tel: (212) 909-0600
Fax: (212) 909-0660

*Attorneys for Respondent Storm LLC*

## Table of Authorities

**Page**

### Cases

*A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.,*
  No. 88 Civ. 4500 (MJL), 1989 WL 115941 (S.D.N.Y. Sept. 27, 1989) ...................... 13

*Ackermann v. Levine,*
  788 F.2d 830 (2d Cir. 1986) ...................................................................................... 8

*Almacenes Fernandez, S.A. v. Golodetz,*
  48 F.2d 625 (2d Cir. 1945) ...................................................................................... 14

*Arbitration between Promotora de Navegacion and Sea Containers, Ltd.,*
  131 F. Supp. 2d 412 (S.D.N.Y. 2000) ...................................................................... 20

*Bank of America v. Diamond State Ins. Co.,*
  No. 01 CIV. 0645 (LMM), 2001 WL 1029410 (S.D.N.Y. Sep. 7, 2001) .................... 16

*Buckeye Check Cashing, Inc. v. Cardegna,*
  126 S. Ct. 1204 (2006) ............................................................................................ 14

*Diapulse Corp. of America v. Carba, Ltd.,*
  626 F.2d 1108 (2d Cir. 1980) .................................................................................. 13

*Europcar Italia S.p.A. v. Maiellano Tours, Inc.,*
  156 F.3d 310 (2d Cir. 1998) ...................................................................................... 4

*First Options, Inc. v. Kaplan,*
  514 U.S. 938 (1995) ................................................................................................ 20

Goessel v. Club Med Sales, Inc.,
  209 A.D.2d 356 (N.Y. App. Div. 1994) .................................................................... 21

*Halligan v. Piper Jaffray, Inc.,*
  48 F.3d 197 (2d Cir. 1998) .................................................................................. 4, 12

*IFC Interconsult, AG v. Safeguard Int'l Partners, LLC,*
  438 F.3d 298 (3d Cir. 2006) ...................................................................................... 1

*In re Azores Int'l Shipping, Inc.,*
  No. 99 Civ. 850 (JSM), 1999 WL 493380 (S.D.N.Y. July 9, 1999) .......................... 16

*Interbras Cayman Co. v. Orient Victory Shipping Co.,*
   663 F.2d 4 (2d Cir. 1981) ........................................................................ 22

*Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.,*
   312 F.2d 299 (2d Cir. 1963) .................................................................... 21

*S.C. Chimexim v. Velco Enters. Ltd.,*
   36 F. Supp. 2d 206 (S.D.N.Y. 1999) ......................................................... 8

*Sarhank Group v. Oracle Corp.,*
   404 F.3d 657 (2d Cir. 2005) .................................................................... 20

*Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.,*
   547 F. Supp. 367 (S.D.N.Y. 1983) .................................. 9, 10, 11, 12, 13, 23

*Shaw Group, Inc. v. Triplefine Int'l Corp.,*
   232 F.3d 115 (2d Cir. 2003) .................................................................... 16

*Sphere Drake v. Clarendon Nat'l Ins. Co.,*
   263 F.3d 26 (2d Cir. 2001) ................................................ 2, 14, 15, 16, 17

*Stolt-Nielsen Transportation Group v. Edible Oil Trading Corp.,* No. 06 Civ.
   0703(NRB), 2007 WL 194182 (S.D.N.Y. Jan. 24, 2007) ........................... 20

*Thomson-CSF, S.A. v. American Arbitration Ass'n,*
   64 F.3d 773 (2d Cir. 1995) ................................................................ 20, 22

*Tray-Wrap, Inc. v. Six L's Packing Co., Inc.,*
   984 F.2d 65 (2d Cir. 1993) ..................................................................... 17

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,*
   363 U.S. 574 (1960)................................................................................ 17

## Statutes

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* .................................................. 1

Lovells

# Table of Contents

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT........................................................................................................4

I.     THE APPLICABLE LEGAL STANDARDS ...........................................4

II.    THE TRIBUNAL'S FAILURE TO RECOGNIZE VALID
UKRAINIAN JUDGMENTS EXPRESSLY INVALIDATING
THE SHAREHOLDERS AGREEMENT AND THE
ARBITRATION CLAUSE THEREIN CONSTITUTES
MANIFEST DISREGARD OF THE LAW AND VIOLATES
PUBLIC POLICY ...................................................................................5

     A.    The Ukrainian Courts Have Held Unequivocally That the
Shareholders Agreement and the Arbitration Clause Are
Null and Void....................................................................................5

     B.    The Tribunal Was Required, as a Matter of Law, to Follow
the Ukrainian Decisions....................................................................8

     C.    The Tribunal's Failure to Follow the Ukrainian Decisions
Constitutes Manifest Disregard of Controlling Law and
Violates Public Policy.....................................................................12

III.   THE TRIBUNAL ACTED IN MANIFEST
DISREGARD OF CONTROLLING LAW UNDER
WHICH STORM WAS ENTITLED TO A JURY TRIAL
ON THE CONTRACT FORMATION ISSUES .......................................13

IV.   THE TRIBUNAL'S FINDINGS AND THE
SWEEPING RELIEF REGARDING THE
NON-COMPETITION AND ARBITRATION
PROVISIONS IN THE AGREEMENT VIOLATE
THE NEW YORK CONVENTION AND THE FAA.............................18

     A.    The Tribunal Acted in Manifest Disregard of the Law,
Improperly Adjudicated a Subject Matter Not Capable
of Being Arbitrated and Violated Public Policy by Ordering
Divestiture......................................................................................19

Lovells

B.   The Tribunal Acted in Manifest Disregard of Law by
     Holding That Various Ukrainian Actions Breach the
     Arbitration Clause in the Shareholders Agreement ......................23

CONCLUSION...........................................................................................................25

Lovells

Respondent Storm LLC ("Storm") respectfully submits this memorandum of law, pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, dated June 10, 1958 (the "New York Convention"), and the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (the "FAA"), (a) in opposition to the petition (the "Petition") by petitioner Telenor Mobile Communications AS ("Telenor Mobile") to confirm the final award issued on August 1, 2007 (the "Final Award") in an arbitration between Storm and Telenor Mobile; and (b) in support of Storm's motion to vacate the Final Award.[1]

## Preliminary Statement

The Final Award[2] should be vacated because it violates the FAA and enforcement would be contrary to the New York Convention.

The fundamental problem with the Final Award is that the arbitral tribunal (the "Tribunal") ignored a series of judgments from the Ukrainian courts holding that an agreement among Telenor Mobile, Storm and CJSC Kyivstar G.S.M. ("Kyivstar") dated January 30, 2004 (the "Shareholders Agreement" or "Agreement") — including the agreement to arbitrate contained therein — is null and void as a matter of Ukrainian law. The law in this area is clear. The Tribunal was required to follow the Ukrainian judgments absent a demonstration that (a) the Ukrainian courts lacked jurisdiction; (b) there was fraud in the Ukrainian proceedings; or (c) it would violate New York's public policy to give deference to the foreign judgments. There was no such showing here. The Tribunal was well aware of the law regarding the recognition of

---

[1]    Petitions to confirm arbitral awards are treated as motions. *See, e.g., IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 307-08 (3d Cir. 2006) (noting that an "application to the District Court for confirmation of the arbitration award was a motion, not a pleading"); 9 U.S.C. § 6 ("Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions. . . ."). Local Civil Rule 7.1 states that all motions "shall be supported by a memorandum of law." Because Telenor Mobile did not file a separate memorandum of law, Storm will treat the Petition as a motion and brief in support.

foreign judgments, yet it improperly chose to ignore this precedent. The Tribunal's actions constitute manifest disregard of the law, and they require the vacatur of the Final Award.

The Tribunal's failure to follow the Ukrainian judgments is also a violation of public policy, which provides another established basis for vacatur of arbitral awards. It is well settled that an arbitral award is void as against public policy if its enforcement would require a party to violate the law. By ignoring the orders of the Ukrainian courts, the Tribunal has put Storm (a Ukrainian company) in such an untenable position. If Storm were to abide by the Final Award, it would contravene the Ukrainian judgments holding that the entire Shareholders Agreement is invalid and would expose itself to criminal sanctions in Ukraine. If, on the other hand, Storm were to honor the Ukrainian judgments, it would risk violating the Final Award. Storm made the Tribunal aware of this public policy exception, but to no avail.

Even assuming that the Tribunal was permitted to ignore the Ukrainian judgments, the Final Award should nevertheless be vacated for several other reasons. *First*, the Tribunal manifestly disregarded controlling Second Circuit authority, *Sphere Drake v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 30 (2d Cir. 2001), holding that a party that is entitled to a jury trial on contract formation issues if it has "some evidence" to support its challenge to the contract's validity. The Tribunal itself held in the early stages of the proceeding that *Sphere Drake* sets forth the controlling standard. However, after a series of hearings during which Storm demonstrated that it easily satisfies the very low "some evidence" threshold, the Tribunal decided to ignore *Sphere Drake*.

*Second*, as a remedy for the purported breach of the non-competition provision in the Shareholders Agreement, the Tribunal ordered that Storm must sell all of its shares in Kyivstar unless Storm's affiliates divest their holdings in certain companies. The Tribunal's divestiture

---

[2]     A copy of the Final Award is attached as Exhibit A to the Declaration of Gonzalo S. Zeballos, dated August 16, 2007 (the "Zeballos Decl."), submitted herewith.

Lovells

order is beyond the scope of the matters submitted in the arbitration.  The Shareholders

Agreement makes no mention of equitable relief for a breach of the non-competition provision

and Telenor Mobile requested damages for such a breach (which it then failed to prove).  The

Tribunal exceeded its powers in attempting to fix Telenor Mobile's failure to prove damages by

ordering Storm to sell its shares in Kyivstar.  In addition, because the Shareholders Agreement

contains a right of first refusal for Telenor Mobile, Storm's sale of shares opens up the

possibility that Telenor Mobile could take total control of Kyivstar.  The Shareholders

Agreement does not contemplate that harsh result, which would be an unfair windfall for Telenor

Mobile.  Finally, the Tribunal's alternative relief is nothing more than an attempt to bind non-

signatories without satisfying the strict requirements for involving such parties in an arbitration.

*Third*, the Tribunal held that various actions in Ukraine were brought in violation of the

arbitration clause contained in the Shareholders Agreement.  Storm, however, is not even a party

to several of those actions and is a plaintiff in only one (where the injunction that triggered

Telenor Mobile's application for relief before the Tribunal has been vacated).  Thus, the

Tribunal's ruling seeks to punish Storm for the actions of its affiliate, without the required

showing that Storm and Alpren acted in concert or may be considered alter egos.

Accordingly, Storm respectfully requests that the Court deny the Petition and vacate the

Final Award.

Lovells

## Argument

I.    **THE APPLICABLE LEGAL STANDARDS**

Telenor Mobile has moved for confirmation of the Final Award pursuant to the New

York Convention and the FAA.  (*See* Pet. at ¶¶ 25-35.)

The New York Convention states that recognition and enforcement of a foreign arbitral

award may be refused if:

- The parties to the arbitration agreement were, under the law applicable to them, under some incapacity, or the said award is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made (Article V(1)(a));

- The party against whom the award is invoked was unable to present his case (Article V(1)(b));

- The award deals with a difference not contemplated by or not falling within the terms of the submission of arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration (Article V(1)(c));

- The subject matter of the difference is not capable of settlement by arbitration under the law of the country where recognition and enforcement is sought (Article V(2)(a)); or

- The recognition or enforcement of the award would be contrary to the public policy of that country (Article V(2)(b)).

The FAA states that district courts may vacate arbitration awards where "the arbitrators

exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award

upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).  In addition to the

grounds enumerated in Section 10 of the FAA, the Second Circuit has long recognized that the

courts may grant vacatur if (a) the arbitrators manifestly disregard the law in rendering the

award, *see, e.g.*, *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 203-04 (2d Cir. 1998); or (b) the

award violates public policy, *see, e.g.*, *Europcar Italia S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d

310, 315 (2d Cir. 1998).

Lovells

As demonstrated below, each of the foregoing grounds provides a basis for the vacatur of the Final Award.

## II.    THE TRIBUNAL'S FAILURE TO RECOGNIZE VALID UKRAINIAN JUDGMENTS EXPRESSLY INVALIDATING THE SHAREHOLDERS AGREEMENT AND THE ARBITRATION CLAUSE THEREIN CONSTITUTES MANIFEST DISREGARD OF THE LAW AND VIOLATES PUBLIC POLICY

### A.    The Ukrainian Courts Have Held Unequivocally That the Shareholders Agreement <u>and</u> the Arbitration Clause Are Null and Void

The Ukrainian courts have issued several decisions (the "Ukrainian Decisions") that should dispose of this matter.  In an action brought by one of Storm's shareholders, Alpren Limited ("Alpren"), against Storm, Alpren argued that the General Director who purported to sign the Shareholders Agreement on behalf of Storm, Valeriy Nilov, lacked the authority under Ukrainian law to enter into the Agreement because Storm's shareholders had not given the requisite approval (during a "Meeting of Participants") for Mr. Nilov to bind the company, as required under Storm's Charter.  (Zeballos Decl., Ex. B at 2-3; Ex. C, ¶ 2.)[3]

Storm opposed the action in the trial court and argued, among other things, that Alpren's claims should be decided under the arbitration clause contained in the Shareholders Agreement.  (*Id.*, Ex. C, ¶ 6.)  The trial court held, in a decision dated April 25, 2006 (the "April 2006 Order"), that Mr. Nilov lacked authority because there was no evidence that the necessary Meeting of Participants ever took place.  As a result, the court concluded that the Shareholders Agreement was "null and void in full, <u>including the arbitration clause</u>, from the time of [its] execution."  (*Id*, Ex. B at 3 (emphasis added).)

Storm appealed from the April 2006 Order and, once again, argued that the dispute should be arbitrated.  (*Id.*, Ex. C, ¶ 7.)  Storm specifically referred to the ongoing arbitration in

---

[3]    Article V(1)(a) of the New York Convention provides that an arbitral award may not be enforced if there is an incapacity that renders the arbitration agreement void.  Because the Ukrainian decisions render the Shareholders Agreement void *ab initio*, the Final Award should be vacated pursuant to this clause.

Lovells

New York before the Tribunal. (*Id.*, Ex. C, ¶¶ 6-8.) The appellate court, in a decision dated May 25, 2006 (the "May 2006 Order"), affirmed the trial court, stating that "also valid is the local commercial court finding that, since the Shareholders Agreement, dated January 30, 2004[,] is meant to illegally take possession of [Storm's] funds, such agreement is [a] <u>null and void instrument, in its entirety, including its arbitration clause</u>." (*Id.*, Ex. D at 2-3 (emphasis added).)[4]

As a result of the appellate court's May 2006 affirmance, over Storm's opposition, Storm had no choice but to request that the Tribunal follow the decisions of the Ukrainian courts on contract validity. Storm presented evidence (including expert evidence) to the Tribunal regarding the propriety of the Ukrainian proceedings and the meaning of the Ukrainian orders. *See, e.g., Id.*, Ex. E, ¶¶ G-I; Ex. F, ¶¶ 20-27.

The Tribunal issued a Partial Final Award on October 22, 2006 (the "Partial Award"). (*Id.*, Ex. H.) In the Partial Award, the Tribunal stated that it was not following the April 2006 or May 2006 Orders because "the Ukrainian courts never addressed the severability of the arbitration clause from the rest of the Shareholders Agreement." (*Id.* at 13.) Prior to the issuance of the Partial Award, counsel for Storm had pointed out to the Tribunal that the Ukrainian courts must have considered severability because the April 2006 and May 2006 Orders noted that the Shareholders Agreement is null and void "in full" and "in its entirety," <u>including the arbitration clause</u>. (*Id.*, Ex. I at 98; Ex. E, ¶ N.) Counsel for Storm had also provided undisputed expert evidence to the Tribunal demonstrating that, under Article 216 of the Ukrainian Civil Code, the findings by the Ukrainian courts invalidating the Shareholders Agreement <u>required</u>, as a matter of law, the parallel conclusion that the arbitration clause is invalid. (*Id.*, Ex. E, ¶¶ N and O; Ex. F, ¶ 28). Article 216(4) expressly bars the use of provisions

---

[4]    Telenor Mobile learned of the April 2006 Order and the May 2006 Order shortly after the latter was issued, but it did not seek to intervene in the Ukrainian proceedings. It is undisputed that Telenor Mobile had a right to intervene and it has done so in other Ukrainian actions. (*See id.*, Ex. E, ¶¶ 48-49; Ex. F, ¶¶ 16-19.)

Lovells

like Article 21 of the UNCITRAL Rules, which states that the invalidation of the contract does not mean, *ipso jure*, that the arbitration clause is void. Article 216(4) provides that the parties may not agree to alter the consequences of a finding of nullity under Article 216. (*Id.*, Ex. E, ¶ N, n.8; Ex. F, ¶ 28.) The Tribunal ignored this evidence in the Partial Award.

In October 2006, in light of the Partial Final Award and the Tribunal's findings regarding severability, Storm applied to the Ukrainian trial court for a clarification of its previous orders. Storm asked the Ukrainian court the following questions:

> 1. The Court had ruled that the Shareholder Agreement, as an authority that violated public order, is a void authority in its entirety, including the arbitration clause, from the moment of its execution. Does this mean that said authority and the arbitration clause as its integral part do not and did not have any legal force, notwithstanding the so called independence of the arbitration clause, established by the UNCITRAL rules or any other statutes?
>
> …
>
> 3. Does the declaration of the Shareholder Agreement as a void authority preclude the application of the arbitration clause contained in its text?
>
> …
>
> 6. Can parties or any other persons voluntarily waive the application to them of the consequences of the invalidity of the void authority -- the Shareholder Agreement, and/or its integral part -- the arbitration clause?

(*Id.*, Ex. L.)[5]

The following month, the Ukrainian court responded to the application by re-affirming its earlier holding:

> [S]ince the Shareholders Agreement violated the public order of Ukraine and since the representative of one of the parties to the agreement — Storm LLC — was not authorized to execute the said Shareholders Agreement and the arbitration clause contained therein as its integral part, the arbitration agreement contained in the Shareholders Agreement in the form of an arbitration clause is also void/invalid. … [S]uch agreement is invalid in view of its being void, and the parties had no grounds whatsoever to perform any acts on the basis of such agreement, including to resort to arbitration in connection therewith.

---

[5]     Storm provided a copy of the application to the Tribunal on November 21, 2006. (*Id.*, Ex. L.)

Lovells

(*Id.*, Ex. K at 1-2.)  In the Clarification Order, the Ukrainian court specifically noted that "the referral of a dispute for arbitration by three arbitrators in accordance with the applicable UNCITRAL Rules under such agreement shall be treated as a violation of Clause 4 of Article 216 of the Civil Code of Ukraine," and "any agreements between the parties in connection [with a void transaction] shall not have any legal effect." (*Id.* at 2.)  Thus, the application and resulting Clarification Order make it clear that the Ukrainian court considered the severability issue, including the effect of Article 21 of the UNCITRAL Rules.

In the Final Award, the Tribunal first acknowledged that the Clarification Order refers to the UNCITRAL Rules and states that the continuation of the arbitration violates Article 216(4) of the Ukrainian Civil Code. (*Id.*, Ex. A at 27-28.)  Ignoring this finding, however, the Tribunal went on to insist in the Final Award that the Clarification Order "nowhere discussed the severability issue" (*Id.*, Ex. A at 27) and "provided no response to the key provisions of Article 21, which expressly recognizes the severability of the arbitration clause from the Shareholders Agreement." (*Id.*, Ex. A at 34.)

### B.    The Tribunal Was Required, as a Matter of Law, to Follow the Ukrainian Decisions

The courts have long held that "a final judgment obtained through sound procedures in a foreign country is generally conclusive as to its merits <u>unless</u> (1) the foreign court lacked jurisdiction over the subject matter or the person of the defendant; (2) the judgment was fraudulently obtained; or (3) enforcement of the judgment would offend the public policy of the state in which enforcement is sought." *Ackermann v. Levine*, 788 F.2d 830, 837-38 (2d Cir. 1986) (emphasis in original); *see also S.C. Chimexim v. Velco Enters. Ltd.*, 36 F. Supp. 2d 206, 211 (S.D.N.Y. 1999) (citing same factors and noting that recognition must offend "a strong policy of New York").

Lovells

Arbitration tribunals are similarly required to follow foreign judgments unless one of the foregoing exceptions applies. *See Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.*, 574 F. Supp. 367, 373 (S.D.N.Y. 1983) (denying confirmation and vacating award where arbitration panel disregarded Dutch order). *Sea Dragon* closely parallels this case. In *Sea Dragon*, the ship owner, Sea Dragon, Inc. ("Sea Dragon"), moved to confirm an arbitration award ordering Gebr. Van Weelde Scheepvaarkantoor B.V. ("Van Weelde") to pay Sea Dragon a portion of freight due under an affreightment contract. 574 F. Supp. at 369. In the arbitration, Van Weelde admitted the debt, but argued that the arbitral tribunal was precluded from rendering an award in favor of Sea Dragon because one of Van Weelde's creditors had obtained an order from the Dutch court in an unrelated proceeding that froze Van Weelde's funds. *See id.* The Dutch court's attachment order against Van Weelde covered the funds it owed to Sea Dragon under the affreightment contract. *Id.* The arbitration tribunal nevertheless issued an award in Sea Dragon's favor. *Id.*[6]

The court vacated the arbitral award, stating that:

> [T]he doctrine of comity, founded on diplomatic respect for valid foreign judgments[,] militates against disregard of the Dutch order. Comity is to be accorded a decision of a foreign court so long as that court is a court of competent jurisdiction and as long as the laws and public policy of the forum state and the rights of its residents are not violated. [Sea Dragon] claimed that the Dutch decree was obtained fraudulently, yet provided little evidence of such conduct before the arbitrators. Fraud, furthermore, was not a basis for the majority's decision. Moreover, such claims appropriately should have been raised in the [Dutch] court. Sea Dragon has not and did not challenge the Dutch court's jurisdiction nor [has it] demonstrated that the Dutch decree violates American law or policy. Absent any evidence to the contrary, it is the firm and established policy of American courts to respect a valid foreign decree.

*Id.* at 372 (internal quotation and citation omitted).

---

[6]    Among other things, the arbitration tribunal found that Van Weelde had assisted and cooperated with the party that obtained the attachment order. It did not find that the sequestration had been obtained through fraud. *See id.*

Here, as in *Sea Dragon*, there was no finding in the underlying arbitration that the Ukrainian courts lacked jurisdiction over Telenor Mobile or the subject matter, that the Ukrainian Decisions were procured through fraud or that recognizing the Ukrainian Decisions would violate New York public policy. To the contrary, the Tribunal stated that it was not "impugning the integrity of [the Ukrainian] courts or their decisions." The Tribunal added that it had "found no evidence of any impropriety or violations of any Ukrainian procedures." (Zeballos Decl., Ex. A at 25 (emphasis added).) Finally, recognition of the Ukrainian Decisions would not violate any public policy of New York, let alone a "strong" public policy. Under the circumstances, the Tribunal had no choice but to recognize the Ukrainian Decisions.

The Tribunal tried to justify its failure to follow the Ukrainian Decisions in three ways, but none of them provides a cognizable basis under the law for disregarding the foreign judgments. *First*, the Tribunal found that it had jurisdiction to hear the merits of the case — notwithstanding the Ukrainian Decisions — because "the record showed that the Ukrainian courts had never adequately addressed the severability of the arbitration clause from the rest of the Shareholders Agreement, or the separate validity of the arbitration clause." (*Id.*, Ex. A at 24.)[7] Setting aside the fact that the Tribunal misconstrued the Ukrainian Decisions, the Tribunal was not permitted to disregard the Ukrainian Decisions solely based on its own assessment of whether the Ukrainian courts had done their job properly. Arbitration tribunals (and U.S. courts) do not sit as appellate judges for foreign courts nor are they allowed to second-guess the decisions of foreign courts just because they would have reached a different result.

---

[7]    The Tribunal similarly stated that "the Ukrainian courts never gave meaningful consideration to whether the validity of the arbitration clause might be severable from the Shareholders Agreement." (*Id.*, Ex. A at 25-26.) As discussed above, there is no support for the Tribunal's statements. The doctrine of severability was addressed in the April 2006 and May 2006 Orders (in which the courts noted that arbitration clause itself is void), and was expressly dealt with in the Clarification Order. (*See supra* at 5-7.)

Lovells

*Second*, the Tribunal ruled that the Ukrainian Decisions "have no *res judicata* or collateral estoppel effect on Telenor" because Telenor Mobile was not a named party and did not have notice of the suits until after an appeal had been rendered. (*Id.*, Ex. A at 42.) Storm, however, did not argue that the Tribunal should give *res judicata* or collateral estoppel effect to the Ukrainian judgments. Instead, the Tribunal should have followed the Ukrainian Decisions under the well-established rule discussed in *Sea Dragon* and other cases for the recognition of valid foreign decrees. (*Id.*, Ex. E, ¶¶ H, I.)

*Third*, the Tribunal stated that Telenor Mobile's "absence" from the litigation leading up to the Ukrainian Decisions means that they "were not the product of an adversary proceeding, which further undermines their conclusive, or even persuasive, force." (*Id.*, Ex. A at 42.) As an initial matter, the allegedly non-adversarial nature of a foreign matter does not provide a basis for ignoring an otherwise valid foreign decree. Indeed, in *Sea Dragon* the court noted that the arbitrators had found that Van Weelde (the party seeking to take advantage of the Dutch order) had assisted and cooperated with the party that had obtained the attachment. 574 F. Supp. at 370. The court nonetheless held that the Dutch order must be recognized. Here, there is no evidence that Storm cooperated with Alpren in the Ukrainian litigation; to the contrary, the evidence submitted to the Tribunal demonstrates that Storm's representative in the proceedings never contacted Alpren with regard to the action. (Zeballos Decl., Ex. C, ¶ 9.)[8]

It is also incorrect to characterize the Ukrainian action as non-adversarial. Storm defended against Alpren's attempt to litigate the Agreement's validity by arguing, as has Telenor Mobile in this case, that the matter should be heard in arbitration. (*Id.*, Ex. C, ¶¶ 6-8.) However, once the Ukrainian orders became final, Storm was required to follow them. Lastly, the Tribunal

---

[8]    The cases cited by the Tribunal on the issue of non-adversarial actions are inapposite because they involve the question of whether the decision of a U.S. court would be given effect. (*Id.*, Ex. A at 42-43.) In this case, by contrast, the issue is whether a foreign court's judgment should be followed. The

Lovells

tries to downplay Telenor Mobile's right to intervene in the Ukrainian actions by stating that the appellate record would not be adequate because of Telenor Mobile's absence from earlier proceedings. (*Id.*, Ex. A at 43.)  Storm presented unrebutted expert testimony to the Tribunal showing that intervenors in Ukrainian proceedings may present new evidence and arguments. (*Id.*, Ex. F, ¶¶ 16-19.)  Storm also pointed out that Telenor Mobile itself had intervened in other Ukrainian proceedings and had presented new evidence well into the appellate process.  (*Id.*, Ex. G at 3, n.2.)

Under the circumstances, the Tribunal had no choice but to follow the Ukrainian Decisions.  Its failure to do so means that the Final Award must be vacated.

### C.    The Tribunal's Failure to Follow the Ukrainian Decisions Constitutes Manifest Disregard of Controlling Law and Violates Public Policy

In order to vacate an award because of manifest disregard of the law, the court must find that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case." *Halligan*, 148 F.3d at 202.  Here, the Tribunal was well aware of the cases, including *Sea Dragon*, that require arbitrators to follow foreign judgments. (Zeballos Decl., Ex. M.)  *Sea Dragon* itself held that the failure to respect a valid foreign decree constitutes manifest disregard of the law.  574 F. Supp. at 371-72.[9]

The *Sea Dragon* court also held that confirmation of the arbitration award under the circumstances would violate public policy:

> [T]he case at bar violates public policy and warrants deviation from the general rule of confirmation of arbitration awards.  By directing present payment to [Sea Dragon], the arbitration panel, in effect, directed [Van Weelde] to violate the Dutch decree.  As the dissenting arbitrator noted, the award "expose[d] [Van

_____

grounds for refusing to recognize such a decree do not include the non-adversarial nature of the proceeding (unless fraud is involved).

[9]       The Tribunal completely ignored *Sea Dragon*.  It is not mentioned anywhere (let alone distinguished) in the 68-page Final Award.

Lovells

Weelde] to the dilemma of conflicting orders — whether to pay as the Panel orders or to retain the funds as the Rotterdam court has decreed." It would be unfair to expose [Van Weelde] to the results of such a choice.

*Id.* at 372. *See also A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.*, No. 88 Civ. 4500 (MJL), 1989 WL 115941, at *2 (S.D.N.Y. Sept. 27, 1989) ("An arbitration award which compels a party to violate the decree of a foreign court satisfies [the public policy exception]."). *See generally Diapulse Corp. of America v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir. 1980) (stating that "an award may be set aside if it compels the violation of law").

The situation here is the same as in *Sea Dragon*. If the Final Award were confirmed, Storm would be exposed to conflicting orders because the Tribunal has upheld the validity of the Shareholders Agreement while the Ukrainian courts have held that the Agreement, including the arbitration clause, is null and void. In accordance with *Sea Dragon* (as well as Second Circuit precedent on the public policy exception), the Court should vacate the Final Award.

Moreover, by impermissibly choosing to disregard the Ukrainian orders, the Tribunal put Storm in the position of being unable to put on its case because of an existing Ukrainian court order enjoining Storm from participating in the Arbitration. (Zeballos Decl., Ex. W.) Under Article V(1)(b) of the New York Convention, an arbitral award may be vacated where one of the parties was "unable to present his case." Irrespective of the choice of law provisions in the arbitral award, "the law applicable to" Storm is the law of Ukraine. The injunction entered by the Ukrainian courts, in support of the Ukrainian judgments, precluded Storm from presenting its defense to the Tribunal.

## III.    THE TRIBUNAL ACTED IN MANIFEST DISREGARD OF CONTROLLING LAW UNDER WHICH STORM WAS ENTITLED TO A JURY TRIAL ON THE CONTRACT FORMATION ISSUES

Even if the Ukrainian Decisions were not binding on the Tribunal, the Final Award must be vacated as a result of the Tribunal's manifest disregard of clear Second Circuit precedent

Lovells

providing for a jury trial on the existence of the Shareholders Agreement, including the agreement to arbitrate, under the circumstances here.

It is well settled under Second Circuit law that a party challenging the existence or formation of an agreement from which the arbitration derives is entitled to have such issues decided in court, rather than by an arbitral tribunal, so long as the party (1) presents "some evidence" in support of its claim; and (2) has unequivocally denied that an agreement was made. *Sphere Drake*, 263 F.3d at 30 (citing *Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)). The *Almacenes Fernandez* court made it clear that the party challenging contract formation has the right "to a trial by jury." 148 F.2d at 628. *See also* Section 4 of the FAA, 9 U.S.C. § 4 (referring to right to jury trial regarding making of agreement).[10]

In *Sphere Drake*, the Second Circuit reversed in part the district court's holding that the arbitrators should determine the merits of whether a contract came into existence. Sphere Drake Insurance Limited ("Sphere Drake") argued that its agent, Euro International Underwriting Ltd. ("Euro"), lacked the requisite authority to enter into a series of 1997 reinsurance contracts and a 1998 reinsurance contract. The court found that because Sphere Drake came forward with "some evidence" challenging the authority of Euro to enter into the 1998 contract "it has put the making of the agreement, including the agreement to arbitrate, in sufficient issue as to warrant a trial on the question whether the arbitration clause in the 1998 contract is enforceable." 263 F.3d at 33. Thus, the Second Circuit ruled that a jury, rather than the arbitrators, would decide whether Euro had the authority to bind Sphere Drake.

---

[10]     In *Buckeye Check Cashing, Inc. v. Cardegna*, 126 S. Ct. 1204 (2006), the Supreme Court held that challenges to the validity of a contract, but not specifically the arbitration clause, should be considered by an arbitrator. *Id.* at 1209. On the other hand, challenges to the arbitration clause remain within the province of the court. *See id.* at 1208-09. Here, Storm has put the arbitration clause at issue because it relies on the Ukrainian Decisions holding that both the Shareholders Agreement and the arbitration provision are void.

Storm consistently argued throughout the arbitral proceedings that the Shareholders Agreement is void because its signatory to the agreement lacked the requisite authority for its execution (including the authority to agree to a severable arbitration clause). Over the course of the arbitration, the Tribunal repeatedly acknowledged *Sphere Drake* as the controlling standard for determining who should decide the merits of the contract formation issues. During the June 2006 hearing on contract formation, the Tribunal quoted the relevant sections from *Sphere Drake*. (Zeballos Decl., Ex. N at 27:3-19.) At the end of the hearing, the Tribunal ordered the parties to "fully understand" and brief the *Sphere Drake* case. It further instructed the parties to "provide evidence on the question of the alleged invalidity of the shareholders agreement, consistent with the language of *Sphere Drake Insurance*." (*Id.* at 77:12-22.) The Tribunal convened a second hearing for August 2006 to ascertain whether Storm had satisfied the "some evidence" standard. (*Id.* at 78:4-17; Ex. O at 12:10-23.) The Tribunal then held a third hearing in September 2006, again for the purpose of deciding whether the applicable *Sphere Drake* standard had been satisfied. (*Id.*, Ex. O at 280:3-20.)

Despite its own unequivocal statements that *Sphere Drake* controlled, the Tribunal disregarded the *Sphere Drake* standard in the Final Award and held that it should decide the issues regarding contract formation. (*Id.*, Ex. A at 22-26, 33-36.)[11] The sole basis for the Tribunal's conclusion is the fact that the severable arbitration clause in the Shareholders Agreement incorporates Article 21 of the UNCITRAL Rules. (*Id.*) Article 21 states that the Tribunal has the power to rule on objections by the parties that it lacks jurisdiction, including jurisdictional objections that challenge the validity of the underlying agreement or arbitration clause. (*Id.*, Ex. A at 23-25.) The Tribunal, however, ended its inquiry there and moved on to decide the merits of the issues.

Lovells

As Storm pointed out several times to the Tribunal (*see, e.g., id.*, Ex. I at 72:17-73:8), a proper determination should involve two steps. *First*, the Tribunal must decide, as a threshold matter, whether it has the power to consider its own jurisdiction. Storm agreed that the Tribunal has such power. *Second*, the Tribunal was required to apply the *Sphere Drake* standard to the question of whether it could go on to decide the merits of the contract formation issues or should defer those questions to a jury. The Tribunal improperly skipped the second step. Once the Tribunal found that it had the power under Article 21 to determine the jurisdictional question, it then adjudicated the merits of the contract formation issues without first deciding whether or not the *Sphere Drake* "some evidence" standard had been met.[12]

The Tribunal cited <u>no</u> authority for the proposition that the *Sphere Drake* standard does not apply when the arbitration clause is severable from the contract and the arbitrators are given the power to determine their jurisdiction. In the Final Award, the Tribunal relies on *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 123 (2d Cir. 2003) as its sole authority, but *Shaw* only states that the parties may give the arbitrators the power to determine their jurisdiction. *Shaw* did not involve contract formation issues and it nowhere states that arbitrators may ignore the *Sphere Drake* standard on the central question of whether a party is entitled to a jury trial regarding the <u>merits</u> of the contract formation issues. As discussed above, the issue in *Sphere Drake* (in contrast to *Shaw*) was under what circumstances a party is entitled to a jury

---

[11]     Indeed, the Tribunal did not even cite *Sphere Drake* in the section of the Final Award discussing contract formation. The case is mentioned once in the Final Award, but only with regard to choice-of-law issues. (*Id.*, Ex. A at 39.)

[12]     There can be no doubt that Storm would have satisfied the *Sphere Drake* standard. In *Sphere Drake*, for example, the Second Circuit held that a single affidavit fulfilled the standard. 263 F.3d at 32-33. Several other cases are in accord. *Bank of America v. Diamond State Ins. Co.*, No. 01 CIV. 0645 (LMM), 2001 WL 1029410, at *2 (S.D.N.Y. Sep. 7, 2001), *aff'd*, 38 Fed. Appx. 687, 2002 WL 1378683 (2d Cir. June 26, 2002) (argument in legal brief that agent lacked authority to enter into an agreement was sufficient to meet "some evidence" standard); *In re Azores Int'l Shipping, Inc.*, No. 99 Civ. 850 (JSM), 1999 WL 493380, at *2 (S.D.N.Y. July 9, 1999) (single affidavit from party that general manager did not have the authority to enter into an agreement was sufficient to merit a trial on the question of contract formation).

Lovells

trial rather than having another fact finder (such as the judge or arbitrators) decide the merits. Thus, the lesson from *Sphere Drake* and *Shaw* is that while the arbitrators may be given the power to decide their jurisdiction, they may not determine the merits of contract formation issues unless they have found that the "some evidence" standard from *Sphere Drake* was not met.

The *Sphere Drake* standard serves an important goal. It prevents a party from having to participate extensively in an arbitration where there are legitimate questions about whether the agreement to arbitrate is valid. Many cases have emphasized that it would be inappropriate to have arbitrators decide the merits if one of the parties never agreed to arbitrate. *See, e.g., United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ("A party cannot be required to submit to arbitration any dispute which he has not agree so to submit."). On the other hand, *Sphere Drake* does not allow the opposing party to impede arbitration by claiming, without evidence, that the agreement to arbitrate never came into existence. In order to obtain a jury trial on that issue, the party must provide "some evidence" in support of its contention. The Final Award, however, tramples on the protections afforded by *Sphere Drake.*

The Final Award also deprived Storm of the right to a jury trial, which must be preserved absent a showing that Storm unequivocally intended to waive it. *See, e.g., Tray-Wrap, Inc. v. Six L's Packing Co.*, 984 F.2d 65, 67-68 (2d Cir. 1993) (purported waivers of the fundamental right to a jury trial are "scrutinized with the utmost care" and are "not lightly to be inferred") (internal quotations omitted). Storm's agreement to allow the Tribunal to decide issues of jurisdiction, within the framework of applicable law (such as *Sphere Drake*), cannot be construed as a clear and unequivocal waiver of its right to a jury trial on the merits.

In sum, the FAA makes it clear that the Tribunal was not permitted to ignore the law — which it earlier recognized as the controlling standard — simply to avoid a result it did not like.

Lovells

## IV.    THE TRIBUNAL'S FINDINGS AND THE SWEEPING RELIEF REGARDING THE NON-COMPETITION AND ARBITRATION PROVISIONS IN THE AGREEMENT VIOLATE THE NEW YORK CONVENTION AND THE FAA

In the Final Award, the Tribunal concluded that Storm (a) breached the non-competition provision of the Shareholders Agreement (Section 6.02); and (b) breached the provision in the Shareholders Agreement (Section 12.01) requiring that the parties arbitrate their disputes relating to the Agreement. (Zeballos Decl., Ex. A at 55, 66.) In making the latter ruling, the Tribunal referred to the various actions pending in the Ukrainian courts. (*Id.*, Ex. A at 61-62.)

In determining that the Ukrainian actions constitute a breach of the arbitration clause in the Shareholders Agreement, the Tribunal referred to Storm's "steadfast efforts before this Tribunal to block the resolution on the merits of Telenor's claims, particularly when allied with [its] half-hearted opposition to the Ukrainian litigation brought by its affiliate, Alpern [sic, Alpren]." (*Id.*, Ex. A at 61.) The Tribunal did not find that Storm colluded with Alpren in those actions or that Storm and Alpren are alter egos. The Tribunal also stated that Storm had violated Section 12.01 of the Agreement "in connection with" the Ukrainian litigation involving Ernst & Young entities (the "E & Y Actions"). (*Id.*, Ex. A at 62.) The Tribunal's use of the vague phrase "in connection with" is telling. The Final Award nowhere states how two of the E & Y Actions, which were brought by <u>Alpren</u>, could amount to a violation of Section 12.01 by Storm. Once again, the Tribunal did not find that Storm and Alpren acted collusively or are alter egos.

With regard to the non-competition provision, the Tribunal stated that Storm acted "through its affiliates," which the Tribunal identified as "Alfa" and its subsidiary, Russian Technologies. (*Id.*, Ex. A at 55, 58-60.)[13] The relief ordered by the Tribunal for Storm's alleged violations of Section 6.02 of the Shareholders Agreement is extremely broad. The Final Award states that Storm must sell its shares in Kyivstar within 120 days of the award, "unless prior to

---

[13]    Earlier in the Final Award, the Tribunal stated that "Alfa" refers to the "Alfa Group Consortium." (*Id.* at 2-3.)

Lovells

that time Storm and any affiliated entities divest their holdings in Turkcell and Ukrainian High

Technologies that exceed five percent." (*Id.*, Ex. A at 67.)

### A.    The Tribunal Acted in Manifest Disregard of the Law, Improperly Adjudicated a Subject Matter Not Capable of Being Arbitrated and Violated Public Policy by Ordering Divestiture

The divestiture order is excessive and improper in a number of ways.  As an initial

matter, the order goes far beyond the language and intent of the Shareholders Agreement, as well

the relief that Telenor Mobile sought in the arbitration.  Section 6.02 of the Agreement states that

Storm and its affiliates will not compete with Kyivstar, but there is nothing in the clause

allowing for equitable relief in the event of a breach (as non-competition clauses often provide).

Section 6.02 thus contemplates that the remedy for a breach would be money damages.  It is

noteworthy that Telenor Mobile sought money damages in the arbitration for the breach of the

non-competition provision (*Id.*, Ex. A at 15) and included in its submission only a boilerplate,

cursory request referring to equitable relief.  Telenor Mobile, however, was unable to prove

money damages, as the Final Award recognizes.  (*Id.*, Ex. A at 66.)

Rather than denying relief to Telenor Mobile for its failure to prove damages, the

Tribunal imposed a draconian remedy on Storm and tried to order, in the alternative, two non-

signatories to sell their holdings.  Neither prong of the relief is permissible.  The Tribunal's order

fails to account for the fact that the Shareholders Agreement contains a right of first refusal (at

Section 4.05) that could be triggered upon the sale of Storm's Kyivstar shares.  Ordering Storm

to sell its shares to a third party is directly contrary to the parties' intent in entering into the

Shareholders Agreement because it would give Telenor Mobile an opportunity to take complete

control of the company.  There is no evidence that the parties contemplated such a situation, or

that it would be reasonable for them to foresee that the Tribunal would allow one of the

shareholders to take over Kyivstar.  Instead, it is clear that the parties anticipated a continuing

relationship through the Shareholders Agreement.  Furthermore, Storm's sale of the Kyivstar

Lovells

shares to Telenor Mobile (or any other party) would result in a violation of Ukrainian competition law. (*See generally* Khomyak Decl., *passim.*) The Tribunal's divestiture order, therefore, would drastically rewrite the contract between Storm and Telenor Mobile and compel violation of Ukrainian law.

The harsh relief in the first prong is an attempt by the Tribunal to force Alfa and Russian Technologies, two non-signatories, to take the action proposed by the second prong and thus effectively be bound by the Final Award.[14] The U.S. courts, however, permit arbitrators to bind non-signatories (either directly or indirectly) only in very limited circumstances under one of the following legal theories: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; and (e) estoppel. *See Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995). The standard for the foregoing theories is high. The Second Circuit has held that a "nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law." *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005). There must be "clear and unmistakable" evidence that the non-signatory intended to be bound. *See id.* (citing *First Options, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). *See also In re Arbitration between Promotora de Navegacion and Sea Containers, Ltd.*, 131 F. Supp. 2d 412, 416-17 (S.D.N.Y. 2000) (Lynch, J.) (noting that "an award will not be confirmed against a person who has not clearly and unambiguously demonstrated an intent to be bound by the arbitral proceeding") (internal quotation omitted). [15]

---

[14]    The Tribunal's order is particularly unfair in this respect because Alfa and Russian Technologies, as non-signatories, were not parties to the arbitration and could not defend themselves in that proceeding.

[15]    The Court cannot defer to the arbitrators' findings on this issue and must make "an independent inquiry." *Stolt-Nielsen Transportation Group v. Edible Oil Trading Corp.*, No. 06 Civ. 0703(NRB), 2007 WL 194182, at *2 (S.D.N.Y. Jan. 24, 2007). In addition, the Court "may not make such a determination on the basis of the briefings and affidavits alone if there are disputed issues of fact with respect to the making of an arbitration agreement." *Id.* Instead, there must be a trial in accordance with Section 4 of the FAA. *Id.*

Lovells

The Tribunal's failure to prove the applicability of theories set forth in *Thomson-CSF* requires vacatur. *See Sarhank*, 404 F.3d at 661-62 (holding that a failure to support one the applicable theories resulted in violation of Article V(2) of New York Convention and warranted vacatur.)  Several of these theories may be dealt with summarily.  The principle of "incorporation by reference" only applies if there is separate contract with the non-signatory that incorporates the arbitration clause. *Thomson-CSF*, 64 F.3d at 777.  There is no evidence of any such contract here.  The "assumption" theory is similarly inapposite, for it requires subsequent conduct by the non-signatory indicating that it assumed the obligation to arbitrate. *See id.* Neither Alfa nor Russian Technologies has engaged in conduct demonstrating that it intended to be bound by the arbitration clause.  In addition, there is no evidence that Alfa and Russian Technologies "knowingly exploit[ed]" the contract and "<u>directly</u> benefited" from it, which are the prerequisites for the application of the estoppel theory. *See id.* at 778-79 (emphasis in original) (noting that indirect benefits from the contract will not suffice for estoppel).

The fourth theory identified by the Second Circuit is alter ego/veil piercing.  The presumption is that the courts must honor corporate separateness. *See, e.g., Goessel v. Club Med Sales, Inc.*, 209 A.D.2d 356, 356 (N.Y. App. Div. 1994) ("In the absence of a clear indication of dominion and control, parent [and] subsidiary ... are treated separately and independently for purposes of assigning legal responsibility.").  In *Promotora*, the court observed that "[t]he question of alter ego is a uniquely fact sensitive one and courts in this Circuit are 'extremely reluctant' to disregard the corporate form." 131 F. Supp. 2d at 422.  The alter ego analysis is even more difficult in cases like this one because a motion to confirm "is generally an inappropriate occasion for a district court to consider an alter ego theory of liability." 131 F. Supp. 2d at 421 (citing *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.*, 312 F.2d 299 (2d Cir. 1963)).  The *Promotora* court rejected the application of an alter ego theory, stating that "alter ego was never submitted to the arbitrators" and "the evidentiary record is

21                                                                Lovells

consequently undeveloped on matters that would be critical to an expeditious alter ego analysis."
*Id.*

Here, the Final Award does not refer to veil piercing or alter ego, and it does not set forth any facts or evidence that would support the application of those principles. *See Thomson-CSF, S.A.*, 64 F.3d at 777-78 (setting forth various requirements for application of veil piercing/alter ego). Therefore, as in *Promotora* and similar cases, an alter ego or veil piercing theory cannot support confirmation of the Final Award.

The final available theory is agency. The Second Circuit has emphasized that there is a high standard of proof for agency issues. *See, e.g., Interbras Cayman Co. v. Orient Victory Shipping Co.*, 663 F.2d 4, 7 (2d Cir. 1981) (holding that district court relied on insufficient evidence of agency in ordering non-party to arbitrate and remanding for trial on issue). The Tribunal suggests that the reference to "affiliates" in the non-competition clause and the participation in the negotiations of certain unnamed "Alfa" representatives is sufficient to establish that Storm, as of January 2004, was acting as an agent for Alfa and Russian Technologies. (Zeballos Decl., Ex. A at 58-60.) These vague statements do not constitute the substantial showing required by the Second Circuit to bind non-signatories under an agency theory. Furthermore, other evidence undermines the application of the agency theory here. As the Tribunal itself noted (*Id.*, Ex. A at 63), the Shareholders Agreement only purports to bind the parties and expressly states that non-signatories are not bound:

> [T]his Agreement is binding upon, inures to the benefit of and is enforceable by
> the Parties and their respective successors and assigns. The terms and provisions
> of this Agreement are intended solely for the benefit of each Party and its
> successors and permitted assigns … .

(Shareholders Agreement at Section 13.05.) The term "Party," as defined in the Shareholders Agreement, does not cover Alfa or Russian Technologies. (*See id.* at 5.) Thus, the agency theory does not provide a legally cognizable basis for the relief that the Tribunal ordered.

The divestiture order must be vacated because it is far beyond the scope of what the parties contemplated in the arbitration (*see* Article V(1)(e) of New York Convention; Section 10(a)(4) of FAA) and it is in manifest disregard of the law on binding non-signatories in arbitrations.  The order also cannot be enforced on public policy grounds because it compels a violation of the law.  *See, e.g., Sea Dragon*, 574 F. Supp. at 372.

### B.    The Tribunal Acted in Manifest Disregard of Law by Holding That Various Ukrainian Actions Breach the Arbitration Clause in the Shareholders Agreement

The Ukrainian actions that are the subject of the Final Award consist of (a) the E & Y Actions; and (b) the Alpren litigation in which the Ukrainian Decisions were rendered.

The E & Y Actions involve two agreements (collectively, the "E & Y Agreements") between Kyivstar and two Ernst & Young entities (the "E & Y Entities") — neither of which are signatories to the Shareholders Agreement — for the provision of auditing services.  (Zeballos Decl., Ex. P & Q.)  The dispute over the E & Y Agreements has its genesis in the December 22, 2005 Order (the "December 2005 Order") by the Highest Commercial Court of Ukraine in which the court invalidated the procedures set forth in the Kyivstar Charter regarding the election of members to the Kyivstar Board.  (*Id.*, Ex. R.)  As a result of the December 2005 Order, the Kyivstar Board has not been able to approve the appointment of external auditors (such as the E & Y Entities).

Nevertheless, Trond Moe, a Telenor executive and purported Kyivstar board member, signed the E & Y Agreements on behalf of Kyivstar, purporting to hire E & Y for the provision of auditing services.  Storm, therefore, commenced an action in Ukraine on December 21, 2006 (the "First E & Y Action") seeking to invalidate the E & Y Agreements on the grounds that, as a matter of Ukrainian law, Mr. Moe lacked the requisite authority to enter into the E & Y Agreements.  (*Id.*, Ex. S at 3-4.)  The injunction issued in the First E & Y Action (which barred the E & Y Entities from performing their services under the E & Y Agreements) was vacated.

(*Id.*, Ex. T.)  Two other actions (the "Second E & Y Action" and "Third E & Y Action") ensued shortly thereafter, each filed by Alpren against the same Ernst & Young Entities.  (*Id.*, Exs. U & V.)

As noted above, the Ernst & Young Entities involved in the E & Y Actions are not parties to the Shareholders Agreement; thus, each one of the three E & Y Actions involves at least one non-signatory.  The Second and Third E & Y Actions do not involve any party that is a signatory to the Shareholders Agreement.  The Tribunal found that Storm violated Section 12.01 of the Shareholder Agreement, even though it is not involved in two of the E & Y Actions and it is only a defendant in the other action brought by Alpren regarding the validity of the Agreement.

In order to hold that the actions of Altimo in bringing the various actions may be imputed to Storm, the Tribunal was required to find that the two entities are alter egos or acted collusively.  The Tribunal did not even attempt to satisfy the rigorous standards for the alter ego theory, which are discussed above.  (*See supra* at 21.).  There is also no finding in the Final Award (or supporting evidence) that Storm colluded with Alfa and/or Russian Technologies. The Tribunal, therefore, acted in manifest disregard of the controlling law holding that (absent circumstances not present here) a company is not liable for the acts of its affiliate.

Lovells

**Conclusion**

For the foregoing reasons, Storm respectfully requests that the Court deny the relief

requested in the Petition in its entirety and grant Storm's motion to vacate the Final Award.

Dated: August 16, 2007

LOVELLS LLP

By: _____
    Pieter Van Tol (PVT-2455)
    Gonzalo S. Zeballos (GZ-5994)
    Lisa J. Fried (LF-6968)

590 Madison Avenue
New York, New York 10022
Telephone: (212) 909-0600
Facsimile: (212) 909-0660

*Attorneys for Respondent Storm LLC*