# EXHIBIT I

IN THE MATTER OF AN ARBITRATION UNDER
THE UNCITRAL ARBITRATION RULES BETWEEN

--------------------------------------

TELENOR MOBILE
COMMUNICATIONS, AS,

Claimant, VOLUME III

vs. TRANSCRIPT OF PROCEEDINGS

STORM, LLC,

Respondent.

--------------------------------------

Transcript of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before BONNIE ATELLA PRUSZYNSKI, a Certified Shorthand Reporter and Notary Public, held at the offices of Lovells, Esqs., 590 Madison Avenue, New York, New York, on Tuesday, September 5, 2006, commencing at 9:30 a.m.

BEFORE:

KENNETH R. FEINBERG, CHAIRMAN
WILLIAM R. JENTES, ARBITRATOR
GREGORY B. CRAIG, ARBITRATOR

A P P E A R A N C E S:

ORRICK, HERRINGTON & SUTCLIFFE, LLP
666 Fifth Avenue
New York, New York 10103-0001
(212) 506-5110
BY: ROBERT L. SILLS, ESQ.
-and-
ADAM S. ZIMMERMAN, ESQ.
-and-
ORRICK, HERRINGTON & SUTCLIFFE, LLP
Tower 42, Level 35
25 Old Broad Street
London, EC2N 1 HQ
DX: 557 London/City
BY: PETER O'DRISCOLL, ESQ.
Attorneys for Claimant

LOVELLS, ESQS.
590 Madison Avenue
New York, New York 10002
BY: PIETER VAN TOL, ESQ.
-and-
ERIC Z. CHANG, ESQ.
-and-
LISA J. FRIED, ESQ.
Attorneys for Respondent

ALSO PRESENT:

BJORN HOGSTAD, ESQ., Telenor

OLEKSIY V. DIDKOVSKIY, Partner
Shevchenko Didkovskiy & Partners

JAY K. MUSOFF, Partner, Orrick

CHAIRMAN FEINBERG: Good morning, everybody.

We are here from far flung locations to reconvene on this arbitration on the Motion to Dismiss. And in light of the arbitration panel's ruling concerning schedule, we are here today to hear from Storm, initially on whatever it wants to add to the record on the subject of the affidavit of David Wack and, as long as we have reconvened, on any other matters or loose ends or other issues that Storm and its counsel wish to raise.

After you conclude, we will ask Telenor, A, if they have any response today to the affidavit of David Wack or any other related matters. By the panel's recent order, we have given Telenor until the close of business on September 8, if it wishes to supplement the record in any manner on this pending motion, before we close the record on this motion and proceed to decide the

motion as a panel.

The second item we wish to cover today, once we conclude argument on the evidence offered by Storm, is to discuss on the record the question of a hearing date and any prehearing discovery.

And with that summary of the state of play, I call on Storm and its distinguished counsel to add anything that it wishes to add concerning the affidavit of Wack or other matters.

Pieter?

MR. VAN TOL: Thank you, Mr. Chairman.

With the tribunal's indulgence, what I would like to do is pick up on what I think you referred to as some loose ends from the last hearing and then go to the affidavits. But, of course, I am happy to deal with any questions that coming along as they come up.

At the last hearing, we focused very much on the issue of apparent authority, and the question of whether Telenor Mobile knew or should have known that there were limitations on Mr. Nilov's authority.

I won't rehearse, again, our arguments. You know what they are. It's that Telenor Mobile was in possession of Storm's charter. It knew from the 2002 transactions that an authorization was needed for any transaction involving the disposition of Kyivstar shares. Since the 2004 shareholders' agreement was the same in that respect, it's our position that Telenor Mobile knew or should have known that another authorization was needed.

Now, in response to that, Storm has claimed -- sorry, Telenor Mobile has claimed that Storm is essentially estopped from arguing that Mr. Nilov lacked authority or that Storm, through its actions, somehow ratified the 2004 shareholders' agreement.

I will deal with each of those in turn.

First, with regard to what we will loosely call estoppel. I noted from the tribunal's questions last time that you are somewhat troubled by the notion that Storm could argue that Telenor Mobile knew or

Proceedings

should have known of the limitations, while at the same time you queried whether Storm had the same information in its possession and shouldn't it have known or been aware that Mr. Nilov needed authority.

What I would like to do is reorient us on the law. The key prong of estoppel that's involved here is reasonable reliance, and that question only looks at the knowledge of the party raising the estoppel argument, which is Telenor Mobile.

It's essentially the same question that is raised by apparent authority. What did Telenor Mobile know?

Now, estoppel theory adds another layer, which is: Was it reasonable for Telenor Mobile to rely on Mr. Nilov's apparent authority in light of what it knew? And we submit that the answer is a no, for the reasons I have just articulated.

So, really, Storm's knowledge for purposes of the legal analysis, is not relevant here.

Now, I think it's clear from what we

Proceedings

have seen so far, particularly the new affidavits, that the main participants for Storm in 2004 were simply unaware that there was a need for another authorization from the meeting of participants. No one has suggested that they knew and somehow didn't want to get one.

It looks like, from what we know, that Mr. Khudyakov, and other people involved, simply didn't know until later that there needed to be a meeting of participants. That doesn't change the fact that such an authorization was needed, as the courts have found and as our expert, Mr. Maydanyk, has shown in his legal opinion.

I want to pause here and emphasize here why, though, Storm is even talking about this evidence. Because our view has been and still is that Sphere Drake does not require a searching analysis of the merits of each party's argument on estoppel or ratification, et cetera. All it requires by Storm is that Storm show there is some evidence that no contact was formed.

Proceedings

So, I don't have to, today, show you that Telenor Mobile's theory of estoppel is wrong. I also don't have to show you today or later that their ratification theory is wrong.

What Sphere Drake requires me to do is show that I have some evidence for saying Telenor Mobile's counterarguments are deficient. So long as I can do that, the issues of estoppel, ratification and anything else we can think of, need to be decided by a court.

And I note that if Telenor Mobile is arguing, again, how terribly unfair it all is, well, they had the opportunity to go the Ukraine courts. We have been over this, and I haven't heard yet an articulation from Telenor Mobile other than we are not sure Ukrainian courts are the best place to be. And then at the last hearing Mr. Sills mentioned that Telenor Mobile could be bound by the appellate record as it is in the Ukraine.

Well, we have seen, from the goings on

Proceedings

relating to the December 22 order, that that's not the case. Telenor Mobile has gone back and introduced new evidence in connection with that proceeding. As far as I'm aware, they can do the same with respect to our case. They have submitted no expert opinion saying that they are bound by the record, and that's a pretty thin reed to rely upon if you are going to say I'm going to ignore, basically, or ask the tribunal to disregard what's happened in Ukraine.

Now, I will turn briefly to ratification, because it's in many ways related to estoppel and can be dealt with fairly quickly.

Telenor Mobile, as a party arguing for ratification, has to show that Storm, first of all, knew that Mr. Nilov lacked authority; and, two, that it failed to repudiate the agreement in a timely manner.

Now, I take it from the last hearing that what Telenor Mobile is saying is that the events of 2004, the amendment to the charter and other events, show that there

Page 10

Proceedings

was ratification of the 2004 shareholders' agreement. But at the time of those events in 2004, Storm was not aware that Mr. Nilov had acted outside his authority. It was only after Alpha's purchase of the remaining shares in Storm through Alperin in the fall of 2004, that Alpha obtained all the records for Storm and realized something was amiss. As I understand it, the transaction went through sometime in the fall of 2004, and it wasn't during the due diligence period, but it was after all the records had been assembled that, sometime in 2005, likely early 2005, Alpha/Storm realized that Mr. Nilov had signed the 2004 agreement without authority.

And remember, it's not as if it's been from early 2005 until April 2006, when Storm first raises the issue of corporate governance. We have been arguing since March of 2005, as Mr. Sills has wanted to point out, that there are many issues about corporate governance relating to Kyivstar. Our representatives stopped attending

Page 11

Proceedings

corporate meetings. It's not as if Storm has pretended, since January 2004, that the shareholders' agreement is a good and extant agreement.

To the contrary, as soon as Alpha realized something was amiss, it started attacking the corporate governance issues any way it could. And this ultra virus argument is just the last, I hope, in a series of attacks on the same issues.

That's all I want to say on apparent authority. And I am about to move on to the standard, the Sphere Drake cases, that Mr. Jentes raised last time.

If the tribunal has any questions now on apparent authority, I am happy to take them; if not, I will move on to the legal standard.

CHAIRMAN FEINBERG: Go ahead.

MR. VAN TOL: Okay. At the last hearing, Mr. Sills brought up the case called Shaw in the Second Circuit. And I believe this has been distinguished already, but I just want to make sure we nail this.

Page 12

Proceedings

Shaw does not go to the same issue that is before the tribunal or is involved in this case. It did not go to the question of whether a contract was formed. It went to the issue of whether, I believe it was attorneys' fees, or whether a party was entitled to attorneys' fees, was an arbitrable issues.

Telenor Mobile has not cited any case and I am unaware of any case, where the courts have said if you have an arbitration agreement, and you cite the Uncitral rules, and you have a severability provision, and a party like Storm argues that there is no contract, that an arbitration tribunal may find that there is a separate agreement to arbitrate, and it may go ahead and decide the issue of contract formation. There is no authority that has been given to you for that proposition. Shaw doesn't stand for it and Sphere Drake in the Seventh Circuit actually supports the Sphere Drake in the Second Circuit case, which I thought we had all agreed was the standard. And that

Page 13

Proceedings

standard is: Where a party says no contact was formed, and it comes up with some evidence to back that up, the issue of contract formation is decided by someone other a tribunal.

Now, moving on to some of the things that were raised in the affidavits. One point quickly, and I want to make sure this came through in the David Wack affidavit, at the last hearing, I believe it was Exhibit K to the -- and I apologize for mispronouncing his name -- to the Lykke affidavit, there was a series of e-mails from Mr. Wack that talked about whether or not Mr. Nilov could sign the agreement himself or whether there needed to be a signature for a chief accountant at Storm.

Telenor Mobile has tried to make a lot of those e-mails, even suggesting that Mr. Wack was saying there that Mr. Nilov had authority for all time to bind Storm to any agreement, the 2002 voting agreement and the 2004 shareholders' agreement. Mr. Wack has told in his affidavit that he had a much

Proceedings

more limited purpose in his e-mails, which was simply to tell Telenor Mobile that it was his understanding that Mr. Nilov could sign as the general director.

Now, what that obviously assumes is that Mr. Nilov has authority to act and that, in turn, derives from the meeting of participants.

If you look at the e-mail chain in Exhibit K, this is from August of 2002. Clearly, between August 2002 and October 2002, someone advised the parties that there needed to be meeting of participants because there was one to give Mr. Nilov authority.

And it's our understanding that, for the 2002 transaction, Storm had separate Ukrainian counsel that did not participate in the 2004 transaction. Mr. Wack and Mr. Hudyakov go to great pains to tell the tribunal that Mr. Wack is not a Ukrainian law expert, he's a transactional lawyer. Any advice he's giving is merely passing on his understanding from Ukrainian counsel

Proceedings

and, in 2004, he was not imparting Ukrainian law advice to Mr. Hudyakov. It appears that Storm either did not have separate Ukrainian counsel in 2004, or is relying on Mr. Jamack, as the representative of the Kyivstar, to protect its interests on Ukrainian law. As I said earlier, this looks like a mistake; that's what ultra virus cases are about.

Now, just quickly, I would like to point out a few more things from the Wack affidavit and then move on briefly to the other affidavits with the understanding that the tribunal will rule on whether or not it's going to accept those affidavits, given that the original ruling was for us to submit something from Mr. Wack.

In the Wack affidavit, Mr. Wack recounts for the tribunal that the understanding of the parties in 2002 was that there -- there were conditions precedent to moving forward with the shareholders agreement, namely that the Omega transaction go through. I think that

Proceedings

is common ground now based on the Ekhougen testimony. He also testified that, looking at the changes to the termination provisions, that those were material and substantial changes.

And as I said a moment ago, when he was contacted by Mr. Khudyakov in January of 2004, what he was giving advice on was the provisions of the material breach amendment. He was not opining on Ukrainian law. And it appears that the need for another authorization for the meeting of participants somehow slipped through the cracks.

Now, moving on to what Mr. Hudyakov says, I think he fills in nicely a question that was outstanding from the last hearing, which is: Why is it that Storm wanted these changes to the breach, the material breach provisions?

And he tells you in plain terms that the Ukrainian partners of Storm at that time did not have a good relationship with Telenor Mobile. They didn't trust Telenor

Proceedings

Mobile. In fact, they used Mr. Hudyakov as their intermediary to talk to Telenor Mobile. And what they wanted those provisions for was for security to make sure that Telenor Mobile abided by its obligations.

Now, moving on, we also submitted the affidavit from Mr. Kosogov, who I think makes it plain that when he submitted the Certificate of Incumbency in January of 2004, at the request of Telenor Mobile, the one thing he was not saying is that there was a meeting of participants in either December 2003 or January 2004.

He has no information that there was such a meeting, which is consistent with what Mr. Wack says, with what Mr. Klymenko has said, with what every witness we ever has talked to has said.

What Mr. Kosogov was doing with the Certificate of Incumbency was relying on his knowledge of a general director's overall ability to act.

Moving on, we have the affidavit from

Proceedings

Mr. Ilyashev from Alperin, really saying that if you want see what arguments Alperin made, look at the statement that was submitted to the Ukrainian courts. But there is a very interesting point that was raised about arbitration, and whether the Ukrainian court was aware of the proceedings going on in New York. I think it's clear now, based on the Klymenko affidavit and Ilyashev affidavit, that the Ukrainian court was advised of the New York proceedings and that Alperin argued that Alperin was not a party to these proceedings. It had his own free-standing claim and they ought to be able to move forward in the Ukraine and that's exactly what the Court found.

Finally, we have the Maydanyk affidavit, and I will not go through that in detail, because it's voluminous, and I am sure the tribunal will have an opportunity to consider it. But the main point of that affidavit, and the reason we submitted it, is to show you that the decisions of the Ukrainian courts are not some outlier

Proceedings

decision that you can disregard for whatever reason. The Ukrainian courts had a good reason in coming to their conclusion, it is supported by Ukrainian law, and at a minimum, what the Maydanyk affidavit shows is that Ukrainian law is not straightforward on this point, it's complex, but there is evidence to support Storm's arguments.

And if it were really the case that Telenor Mobile had these great arguments about apparent authority, when it incepted and when that concept came into Ukrainian law, I would submit that they should have gone to the Ukrainian courts, as I have said many times, and gotten those issues hashed out there.

That's all I wanted to bring out for the tribunal's benefit this morning, of course, subject to anything that Mr. Sills raises or any questions that you may have.

CHAIRMAN FEINBERG: Mr. Sills.

MR. SILLS: Thank you, Mr. Chairman.

Let me turn, first, to tell the claim about Sphere Drake and the lack of the

Proceedings

authority.

The Second Circuit's decision in Sphere Drake does not say and cannot be made to say that a party opposing arbitration has to come up with a scintilla of evidence in order to defeat the arbitration agreement it made.

What Sphere Drake says is that, on a motion to compel arbitration, it will be treated as motion for summary judgment, and if the party opposing arbitration can produce enough evidence to overcome a prima facie showing, then there will be a hearing, an evidentiary hearing, on the question of whether or not there is or is not going to be an arbitration.

And I don't want to take up everyone's time, but Sphere Drake repeatedly says that that is the showing that has to be made, not to defeat arbitration, but in order obtain a full blown evidentiary hearing on the question of whether or not there will be an arbitration.

We have had that hearing, and now we

Proceedings

are having it for a second time, and there isn't any evidence sufficient to defeat the showing that Storm should be held to the agreement it made.

Now, as to the claim what was just quoted, that this panel lacks jurisdiction, and this ought to be heard in court, I count five places in the last transcript where this panel's jurisdiction was conceded. The first is at page 258, lines nine through 13.

You said, Mr. Feinberg, quote, you have just said on the record that you are not here challenging this tribunal's ability to determine jurisdiction?

And Mr. Van Tol responded: Correct.

The second is the following page, at page 259, lines eight and nine, where Mr. Van toll said, quote, I am saying you have the power -- there appears to be slightly garbled. I am saying you have to the power to determine your jurisdiction.

At page 260, again Mr. Van Tol said, quote, we say you have the power to determine your jurisdiction, that is

Proceedings

informed by Sphere Drake. That appears at lines 15 through 18.

A little while later in the hearing Mr. Jentes said, what, exactly, do you mean, we have jurisdiction?

And Mr. Van Tol responded as follows: it's within your power under the Uncitral rules. You do have the power to determine whether or not this case should go forward; in other words, you have the power to determine whether or not there was a contract.

Again, at pages 266 and 267, Mr. Van Tol said: This clause, the Uncitral clause, does not prohibit Telenor Mobile from proceeding, going to the Ukrainian court. It says you may determine your jurisdiction.

That's what Sphere Drake says. That was Storm's position at the last hearing. They were right then; they are wrong now.

The Uncitral clause is clear. The contract is clear. I had extended colloquy with Mr. Jentes at the last hearing concerning Judge Easterbrook's Seventh

Proceedings

Circuit decision in Sphere Drake, which makes it clear that parties can opt out of the usual rule that these matters are to be determined in court and expressly provide for determination before an arbitration tribunal and that is expressly what they did here. It's what they did by adopting the Uncitral rules in their entirety. They are incorporated by reference into this contract as surely as if they had been set out word for word.

I think this was gone into at great length last time. I don't think there can be any serious argument that this tribunal has the jurisdiction to determine its own jurisdiction.

As to the question of apparent authority that has been raised, the presentation that was made, in effect, stands the doctrine of apparent authority on its head. The whole reason for the doctrine of apparent authority under New York law, which, after all, governs here, is that one party doesn't act at its peril in dealing

Proceedings

with a corporation. If a corporation creates all the indicia of authority, whether or not it's followed its internal procedures becomes irrelevant.

Now, the affidavits -- and there is no particular burden on a party that has been assured, both formally and informally, that there is due authorization and there is authority, to sort of drill down and challenge that. The test is actual authority.

So, looking at these affidavits that have been submitted, we could have submitted these affidavits, because they actually lend substantial support to Telenor's case.

Mr. Wack doesn't really address the question of actual or apparent authority; in effect, he's running away from his own transaction saying he had very limited involvement.

I will note that the claim now that he didn't mean to say that Mr. Nilov could act without a power of attorney, that it was in some other context, just doesn't ring true.

Proceedings

When you look at the words of the e-mail he sent, it's true he was addressing the question of do we need two signatures or one signature, because it's common, as I understand it, in east European legal systems for certain contracts to require two signatures. But he didn't say one signature is enough. He said the only officer is Nilov. Nilov can act without a power of attorney.

Now, I don't understand how you could twist words, can act without a power of attorney, into saying only one signature is required. I know what the words say. I understand now why he's trying to run away from them, but I think the document speaks for itself.

The only other point he makes is to weakly endorse this claim that was floated at the last hearing that the 2004 shareholders' agreement was in some sense an agreement to agree. It's not. It was negotiated, it was annexed to the voting agreement, and the voting agreement has an

Proceedings

automatic three-day trigger.

Once Storm, that is Alpha, succeeds in buying the Omega shares, one it succeeds in getting the blocking position that Telenor agreed it could have by getting over the 40 percent limit, there would be an automatic obligation to negotiate -- not limit, excuse me, to sign the new shareholders' agreement.

It is true that there were provisions inserted at the request of Storm on termination. But there they are estopped and they can't profit from their own wrong. Having requested, over Telenor's objection, that the termination provisions be modified, and Telenor having agreed to that, and then having gone forward and signed the agreement, they can hardly be said now, as a matter of equity and good conscience, to set up their own request as a basis for walking away from their own agreement.

And there is certain irony here, since they now claim they weren't aware of the 2002 meeting that expressly authorized the

Proceedings

contract to be signed. It's a little unclear how they could have had this materiality argument that they have invented in mind, when they claim now not to be aware in 2002 that they had agreed to sign the shareholders' agreement.

And on that point, with respect to this Maydanyk legal opinion, I think it's described as, which I think is really nothing more than an unauthorized reply brief. He argues that any change, however slight or however formal, in his view required a new meeting. Well, that proves far too much.

Plus, I don't think it could seriously be argued that if the parties had simply executed the 2002 draft in 2004, in keeping with the express authorization, both by written polling and by a meeting in 2002, that there was lack of actual authority. But that seems to the current position that is being asserted, though it was not the position that was asserted at the last hearing.

Proceedings

The other thing that jumps off the page with Mr. Wack's affidavit, he says in paragraph ten, I do not recall a meeting of participants of Storm shareholders taking place in late December 2003 and early January 2004. And that's the same kind of careful wording we see in all of these affidavits. No one has said there was no meeting.

We don't have control over Storm's records. Each one of these affidavits says something like I'm unaware, I don't know. And here I think it's significant, not only what's been submitted, but what hasn't been submitted. It's another case of the dog that didn't bark.

We are here because we were told that Mr. Nilov was a critical witness, and his testimony needed to be obtained, and that it was more likely that his testimony could be obtained than Mr. Wack's.

Well, Mr. Nilov was there. He's the one that signed this document. He is an employee of the Alpha Group. He is a senior

Proceedings

officer of Alpha in charge of an entity called Alpha Capital, which is headquartered in Kiev. It's a matter of public record. It's available on the internet. He is a controlled witness.

And despite the proceedings having been held over so Mr. Nilov's testimony could be obtained, despite the fact that one would think that as a senior executive of the group that is making this claim, he would be willing to testify if he had favorable testimony to offer, at the end of the day, we have nothing from Mr. Nilov.

And that raises, as a matter of New York law and as matter of common sense, the presumption that were he to testify, his testimony would be unfavorable. Presumably unfavorable because Mr. Nilov knew he had authority to sign the agreement he signed.

When I turn to Mr. Khudyakov's affidavit, Mr. Khudyakov does say -- and I apologize because it's a little hard to read the fax that we received. He says he has recently been informed that these material

Proceedings

changes required a new authorization by Storm's meeting of participants. I wish to mention that at the time I did not ask for Mr. Wack's advice on this point.

Well, what Mr. Khudyakov said, his last word in the transaction -- can I have a copy his last e-mail, please?

And this is already in the record as Exhibit X to our evidentiary brief. And it says this: He's writing to Alexi Didkovskiy, the Ukrainian attorney for Telenor. "Storm reviewed the language of the new shareholders' agreement that you distributed yesterday and agreed to it. We are ready to sign it tomorrow. Please make the practical arrangements for the signing at Telenor (Ekhougen) and Kyivstar (Litovchenko). Also, I would appreciate it if you could coordinate it with Avdeev as well. Unfortunately, Nilov will be out of Kiev tomorrow and will not be able to sign any documents. I hope it is possible to let him sign the agreement on Monday. We could provide a fax copy of his signature tomorrow

Proceedings

if needed."

So, I suppose what Mr. Khudyakov is now saying is that when he said we are ready to sign it tomorrow, what he was really saying is we are ready to sign it tomorrow, but that is an empty and meaningless gesture.

When someone says, "we are ready to sign it tomorrow," that carries with it the sense that we are ready to sign it tomorrow with authority. And, again, when we look at the certificates that were delivered by Mr. Kosogov and by Mr. Tumanov, Tumanov having been the chairman at time of Storm, it doesn't say we had a meeting, it doesn't say you are invited to come conduct due diligence to satisfy yourselves that there is due authority. What it says is this: "I, Andre Kosogov, do hereby certify that Valerie Vladimirich Nilov, it says two, is duly authorized to sign behalf of Storm, b, the shareholders' agreement dated January 30, 2004, between and among Telenor, Storm and Kyivstar."

Proceedings

"Duly authorized" means all formalities have been taken care of, everything is in order. As Mr. Khudyakov said, we are ready to sign it tomorrow Ready to sign it doesn't mean we are ready to put a manual signature on it, but be on your guard. It doesn't mean we have got our fingers crossed behind our backs. It means after these discussions, after these negotiations that Storm initiated, we are ready to sign it. They delivered two certificates, not one but two; one from the Alpha side, one from Storm, itself, from its chairman, saying that Nilov was, in their words, "duly authorized."

And it's not our obligation to say what steps have you followed to assure us that your man is duly authorized? Did he have to sign something in green ink? Did he have to wear a funny hat to a meeting? Did there have to be a meeting of participants?

We are entitled, based on these documents, as well as on the representation in the shareholders' agreement, itself, that

Proceedings

this is the binding agreement of the parties, to assume that they it had followed their own routine and that's precisely what we did.

Now, Mr. Khudyakov also says that he gave -- I'm sorry. Mr. Kosogov says that he gave a certificate, based on his understanding of Ukrainian law and the general powers of the general director; in effect, the president of the company. He says, "I signed the certificate by relying on my knowledge of provisions of Ukrainian law, giving the general director of a Ukrainian company general authority to act on behalf of the company, including entering into agreements on behalf of the company."

Well, if he thought that, and I'm sure he did, we were entitled to think that as well. It is inconceivable that we were under a greater burden to test Mr. Nilov's authority than the people who were actually running Storm and providing us with the assurances that has these contracts were duly authorized.

Proceedings

And here, I think a key case is a recent Appellate Division decision in New York. It's a case called Odell versus 704 Broadway Condominium. It appears at 284 Appellate Division 2nd 52, and it's 728 New York Supp. 2nd 464.

I can distribute copies if you would like, Mr. Chairman. I have one for each member of the panel. And we can provide one to you as well, Pieter.

MR. VAN TOL: Thank you.

MR. SILLS: And this appears at tab 14 of the binder I have just distributed.

And this is a case where the president of a New York corporation had gone and executed a document, supposedly without authorization from the board of directors of the corporation.

Now, if you look at what appears as page four of the annex here. This is what the Appellate Division, the appellate court sitting here in Manhattan, had to say.

Several well settled principles bear mentioning --

Proceedings

MR. JENTES: Where are you?

MR. SILLS: On page four, towards the bottom of the first column.

The paragraph beginning "on the issue."

It says, "Several well settled principles bear mentioning. There is a general presumption that the president of a corporation is clothed with the powers which, of necessity, inhere in the position of chief executive." Quoting, the president or other general officer of a corporation has power, prima facie, to do any act which the directors could authorize or ratify. The true test of his authority to bind the corporation is whether at the time he is engaged in the discharge of the general duties of his office and in the business of the corporation.

Looking down to the next paragraph, and I think this is the key on the question of apparent authority. "Moreover, plaintiff could reasonably rely on the apparent authority of Leidersdorf, as board

Proceedings

president, to approve the construction. The rule is well settled that it will ordinarily be presumed that a president of a corporation has the power to make contracts pertaining to the business of the corporation and coming within the apparent scope of his authority. The president's apparent authority exists regardless of whether the president has actual authority to carry out such acts. Furthermore, a president of a corporation has apparent authority to act within the general scope of his office, and such acts are binding on the corporation against one who does not know of any limitation, and there must be a typo, it says or but should read on, the president's true authority. Mr. Leidersdorf, as president of the board, had the power, whether actual, implied or apparent, to approve of the proposed construction and to bind the entire board.

That is the rule in this state. That is the rule under New York law. New York law what is the parties expressly agreed

Proceedings

would govern here. Although I do note that, contrary to the position now being taken by Mr. Maydanyk, at the last hearing there was an express statement by Mr. Van Tol on the record that he and I agreed that Ukrainian and New York law on the question of apparent authority was the same. We still think it's the same.

Now, here the claim that is now -- and claim has been something of a moving target, but as I understand it, the claim is essentially that we had a copy of the charter, that there is a construction of the charter that suggests that there wasn't actual authority, and that despite the reams of paper that have been supplied to us to confirm that there had, in fact, been a grant of authority to Nilov, and that he was acting within the scope of his authority, that we, in effect, acted at our peril.

Well, here I think it's useful to take the two, Mr. Rabij's affidavit, which is in the record, and then this opinion that's been delivered of Mr. Maydanyk.

Proceedings

Well, if two Ukrainian lawyers are having this disagreement about whether or not this does or doesn't come within the scope of the charter, and whether or not the 2002 authorization rolls forward to 2004, then I don't see how anyone can say that in the face of the assurances that we were given, there wasn't apparent authority that somehow lept off the page on this charter. It certainly didn't leap off the page to Storm, which presumably has control of its own records and presumably was in the best position to say we should have had a meeting. For that matter, had they been dealing in good faith, if they, in fact, had believed that, they simply would have convened another meeting, because what they are now claiming is that they engaged in an elaborate charade. And that charade went for years.

Now, what we just heard was in that early 2005, they discovered this supposed infirmity in Mr. Nilov's authority. It is not true that there was an attack on the

Proceedings

shareholders' agreement because of Mr. Nilov's lack of authority in 2005. It is true there has been a relentless, unremitting attack in the Ukrainian courts on a whole series of agreements that Storm has made, because they don't seem to regard their agreements as worth the paper they are printed on. But the fact of the matter is that the first time a claim of Nilov's lack of authority was made was not in 2005. It was made secretly in 2006, in the Alperin case. We did not learn of this claim until we read in a press release in May of 2006 that Storm was pressing this claim against itself.

And I should mention a small point on that. There was some discussion last time about Mr. Marchenko, and when I look at Mr. Ilyashev's affidavit, he makes it clear that Mr. Marchenko is his partner. Mr. Marchenko represented Alperin at the trial, to the extent there was a trial. Mr. Ilyashev took over on appeal. Mr. Marchenko is, in fact, a lawyer, has

Proceedings

appeared for Storm. I understand that he appeared only this morning in a court in Karkov, which is a provincial city in Ukraine, where yet another one of these assaults in the Ukrainian courts is being mounted, and he appeared on behalf of Storm.

And I think that tells us something very important about the collusive nature of the Alperin case, that Mr. Ilyashev and his partners can appear on both sides of the supposed controversy.

In that regard, I would like to -- I would like to hand to the panel and, of course, to Mr. Van Tol, copies of powers of attorney that have been granted to the Ilyashev firm, copies of a print of the Ilyashev and Partners Web site, and a power of attorney granted by Storm to the Ilyashev firm, to a partner of the Ilyashev firm, a Mr. Zinchenko, who also appears on the Web site.

So, that it certainly appears that Storm's lawyers and Alperin's lawyers are one in the same.

Proceedings

Now, when I look at Mr. Ilyashev's affidavit, I'm struck by what wasn't argued in this Alperin case. There is an elaborate argument about how the contract should have been in Ukrainian and should have been filed, which I think is a matter of irrelevance, because New York law governs. And I think at the last hearing there was an extensive discussion about the Indosuez case. Indosuez, which is a New York Court of Appeals case, is conclusive that New York law and not foreign law governs on the question of apparent authority when the parties have elected New York law.

Now, Mr. Ilyashev says he argued that the shareholders' agreement was a sham deed. That seems to be a very envious argument that it's, as a matter of Ukrainian law, an amendment to the charter and, again, has to be in Ukrainian and has to be filed. Then he says, Mr. Nilov required an express authorization. But what's interesting is that no one, either from Alperin or Storm, mentioned the fact that there had been a

Proceedings

2002 meeting. No one mentioned these certificates.

I noted with interested that our new expert, Mr. Maydanyk, is of the opinion that the certificates, although they are formal and were given in order to induce reliance in a corporate transaction in which Storm acquired extremely valuable rights, are in his view a nullity, because they weren't -- there is no evidence that the certificates of incumbency were duly authorized.

So, they are -- I suppose there would be an infinite regression of asking who authorized the authorization of the authorization, which would destroy the doctrine of apparent authority. Apparent authority exists when authority is apparent. Here it was.

The rest of Mr. Ilyashev's affidavit seems to be an elaborate argument that Ukrainian law, not New York law, should govern. No one seems to have made any of these arguments.

And Mr. Klymenko, who also, as the

Proceedings

current director, you would think would have supplied an affidavit at least in this proceeding, saying there was no meeting. I have reviewed the corporate records and there is nothing there. From him, we also have -- he has supplied an affidavit, but although he presumably has control of the books and records of Storm, also has never said there is a lack of authority. Yet another controlled witness, who you would think would have offered testimony if he had favorable testimony to offer for Storm.

Finally, Mr. Kosogov, again, confirming that there was apparent authority, says "I did not check the provisions of Storm's charter," the task that they now claim should have been carried out by Telenor. And, again, as I think Mr. Rabij's affidavit makes clear, even had we done that, it would have seemed clear that the 2002 authorization was adequate. For that matter, we had no knowledge at time that there hadn't been a 2004 meeting or a unanimous written consent, which I think is

Proceedings

referred to as written polling in Ukrainian law, because we were told it was, again, in the words of both certificates, "duly authorized," that means all formal steps necessary to execute this document have been taken.

Contrary to what we were just told about the discovery of this problem in 2005, Mr. Kosogov says, "until recently I was not aware that a special resolution of Storm's participants was necessary to authorize Mr. Nilov to enter into the shareholders' agreement."

Well, the fact is there was a meeting. Mr. Nilov, as the general director of this company, had extremely broad powers. I think it's quite clear from Mr. Kosogov's affidavit, as well as what we heard last time, and what we saw in Mr. Rabij's affidavit, that the general director of a Ukrainian, LLC has extraordinarily broad powers, broader than the president or chief executive officer of a New York corporation. Telenor acted in an entirely correct and

Proceedings

responsible way.

As far as estoppel goes, it was in reliance on the promise to execute these agreements that Storm -- I'm sorry, that Telenor allowed Alpha and its controlled entity, Storm, to acquire a blocking position in what is a remarkably valuable company, worth many billions of dollars. They then performed under that contract.

And, again, the rule in New York is that once a contract has been fully executed in the sense that it's been performed, a company may not set up its own lack of authority to defeat a contract under which it's received benefits. They took those benefits, they operated under the contract and even after they claim that they discovered this technical infirmity in their agreement in 2005, they waited a year or a year-and-a-half before adding this to the attacks they were making on their own contract.

And, again, in the binder -- will you bear with me one second, Mr. Chairman?

Proceedings

If you look at tab one in the binder of cases we have distributed, it's a case called Congregation Yetev Lev Visotmar versus 26 Adar MV Corp.

And here, if -- directing the panel's attention to the second column on page three, it says the -- it's the paragraph beginning at the bottom of the column. "The defense of ultra virus cannot be wielded by a sword by a plaintiff to invalidate a contract that has already been fully performed by both parties," and goes on citing a number of cases.

So here what happened? There is a negotiated deal. Because Storm and Alpha were unable to purchase the Omega shares they had agreed to purchase, Telenor accommodated Storm. How did we accommodate them? We accommodated them by signing a voting agreement that has essentially the same substantive provisions as a bridge to the shareholders' agreement with a three-day trigger. As soon as they succeeded in wrinkling out the Omega problem, they would

Proceedings

sign the shareholders' agreement.

They bought the Omega shares eventually. We said, "We are ready to sign."

They kept telling us they weren't ready to sign and raised a new issue. We accommodated them. We negotiated over that issue.

Then a senior Alpha official, Mr. Khudyakov, said, "We are ready to sign," and that presumably means we are ready to sign with authority. And they did sign. Not once, not twice, but three times. We got a fax signature of Mr. Nilov, then he came physically to Mr. Didkovskiy's office and signed the document manually and put the stamp on it, which is an act of juridical significance in Ukraine to put the company seal on a document, and then he signed it a third time in Ukrainian.

Then the parties operated under that agreement. Shares were exchanged. They came to board meetings. They amended the charter of the company to conform to the

Proceedings

shareholders' agreement.

In 2005, it is true they began their assault on various agreements they had made, but they didn't mount this assault until a year-and-a-half later.

I think the record is absolutely clear that this is a valid, binding and enforceable agreement. They should be held to what they did, they should be held to what they said and we should get on with the merits of this case, which has been pending far too long, tied up on a preliminary question that never should have been brought.

CHAIRMAN FEINBERG: Let the record reflect what I think is obvious, that in addition to the Wack affidavit, the panel admits into evidence into the record on this motion the various other affidavits that have been proffered by Storm in the last few days.

MR. CRAIG: I have a question for you, Pieter.

I, too, was struck by the arguments

Proceedings

that you were making at the end of the session in our last meeting, which seemed to be inconsistent with the original brief that Storm submitted in support of its motion to dismiss.

If you look at that brief, the opening argument, which is repeated many, many times, is that the panel lacks jurisdiction to determine its own jurisdiction.

In fact, on page five, you say, "if the agreement containing the arbitration clause, or if the clause, itself, is found to be invalid, the panel ceases to have any power to issues rulings on the merits in the" -- and that whole argument is that the panel lacks jurisdiction to hear Telenor Mobile's claims in this arbitration.

You say in two or three places that were cited to just now, that we do have the power to determine whether or not this case should go forward. That is a quote from page 263. The panel does have the power to determine whether or not this case should go forward. We do have the power to determine

Proceedings

whether or not there was a contract.

Is that a change in Storm's position?

MR. VAN TOL: No, it's not. And I think it's sort of the tyranny of language. And I think it's actually put better in the Uncitral rules, where it says the arbitration tribunal shall have -- this is Article 21. I'm sorry.

The arbitration tribunal shall have the power to rule on objections that it has no jurisdiction. And then it goes on to say, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement.

The better way to say it is you have power to determine your jurisdiction or whether you have jurisdiction.

MR. JENTES: Including the validity of the arbitration clause; right?

MR. VAN TOL: Correct. And that's right.

What that turns on, though, is an analysis of the arguments under Sphere

Proceedings

Drake; in other words, if we thought that you didn't have the jurisdiction to even determine your jurisdiction, we wouldn't have brought the motion to dismiss before you. We would have gone to whatever court has competent jurisdiction.

And I apologize if it's unclear. I am -- I was trying to make it clear at the last hearing, and it is loose language and I apologize.

What I am saying is, as Uncitral says, you may look and see if you have jurisdiction. That depends on whether or not a contract was formed. But Sphere Drake tells us you are not doing a full-blown hearing on the merits, let's determine for all end of time whether or not there was a contract. You are analyzing it under the Sphere Drake standard. You are asking yourself has Storm shown me some evidence that there was not a contract? If that is the case, then the issue of contract validity and formation gets kicked to a court of competent jurisdiction.

Proceedings

CHAIRMAN FEINBERG: So, you are saying -- and I am just repeating what I think you just said. For us to decide the jurisdictional issue, requires us to decide under Sphere Drake the contractual issue.

MR. VAN TOL: Correct.

MR. CRAIG: What do you say about Mr. Sills' interpretation of Sphere Drake that kicks it into an evidentiary hearing, rather than to a court. If we find that there is some basis to believe that there was an invalid contract, that the thing to go forward is an evidentiary hearing here.

MR. VAN TOL: In a court. Sphere Drake is saying you have a right to a court hearing and a determination of whether there is contract, not a hearing before an arbitral tribunal.

MR. JENTES: It seems to me so circular. If we have jurisdiction under Article 21 to decide the validity of the arbitration clause, don't we go forward and decide that? Why should we be referring it

Proceedings

to somebody else? That's just so contrary to everything I have ever dealt with in international commercial arbitration, whether it's ICC, ICDR or Uncitral rules.

MR. VAN TOL: It comes down to, it comes down to the void versus voidable issue.

If we are arguing that we cannot be compelled to arbitrate, but we also agree under -- to be guided by the Uncitral rules, our only choice, and this what is we made the determination of early on, is to come to you, as the tribunal, and say we understand that Telenor Mobile wants to arbitrate, but we never agreed to either the agreement or the arbitrable clause within the agreement, and that's what the Ukrainian courts have found.

So, we go to you, and when the issue goes to you, you sit as a court would on a motion to compel arbitration. And what the Court says is, okay, let's use a summary judgment standard. And I just heard Mr. Sills agree with it.

Proceedings

He has a high burden. What he has to show is that there are no issues of fact here. I think at a minimum what we have established over these three hearings is that there is certainly an issue of fact on every one of the issues that have been raised.

On actual authority, we have findings of fact from the Ukrainian courts that were was no meeting of participants. Mr. Sills says we don't have the evidence that no such meeting took place. Well, he hasn't shown that it did take place.

We have Mr. Ekhougen from Telenor Mobile. He got a new power of attorney for the 2004 agreement. You have to ask yourself, why didn't he sit there and say, well, I wonder why, I wonder why Storm isn't getting new certificate of authority?

But point is that we are -- the summary judgment a standard applies, and we both agree it does. At a minimum, you have to find that there is an issue of fact for a court to determine.

Proceedings

MR. JENTES: I have got to tell you that I just don't read First Options that way. I don't read the Shaw case that way. I am prepared to get convinced otherwise.

It seems to me what will the whole Shaw approach, the whole First Options approach is there are certain issues for the arbitration panel to decide. And here we have, I think, the authority to decide whether or not there is a valid arbitration agreement. It's not for the courts; that's for us.

And Sphere Drake, in the CCA second, doesn't have anything to do with that. In other words, that standard seems to me to be only applicable if they didn't have an Uncitral type of rule, and Sphere Drake is an instance where there was no Uncitral type rules.

MR. VAN TOL: But we have agreed, and the contract combines Uncitral and New York law --

MR. JENTES: Let's put New York law aside for the moment, because speaking only

Proceedings

for myself, I think your affidavits have raised a question as to which law applies.

MR. VAN TOL: Okay. Setting that aside and going under the Uncitral rules, if I go back to Article 21, it says you have the power to rule on our objection.

Our objection is that you have no jurisdiction. It's the same as if you go to a federal court, and someone sues you and you appear, you make a limited appearance, and you say, "I'm appearing to fight your jurisdiction. You can determine this, but when I am doing this I am not submitting to your jurisdiction. I want you to find that you have no power over me." We are in the same boat.

MR. JENTES: See, that's where I disagree.

Let's assume we were sitting in the Southern District of New York, and we were with exactly the same proposition, and you told the Southern District of New York that it had to decide the kind of issues you have said we have to decide.

Proceedings

I think the Southern District of New York would say no, you are in the wrong, wrong location. Go to the arbitrable tribunal. They are the ones that have to decide this jurisdictional issue, including the validity of the arbitration clause.

And let me add the other Phillip to it. If you look at paragraph two of the Article 21, that is the one that provides for arbitrable, separation. Then it seems to me what it concludes is, even if we were to decide that the underlying contract were null and void, it would not entail ipso jure the invalidity of the arbitration clause. That seems to me to reinforce the fact that we are supposed to carve out the jurisdiction to rule on and decide whether or not there is a valid arbitration clause. We treat that as an independent issue from all of this stuff with regard to the validity of the underlying contract.

MR. VAN TOL: Even if you did that, assuming that's the case, you do so under the Sphere Drake standard; in other words,

Page 58

Proceedings

let me back up because you made two points. I think it's -- we can all agree that your ability to hear disputes between the parties is limited by the contract, and it's limited by the parties agreement --

MR. JENTES: Correct.

MR. VAN TOL: -- so I would have to respectfully disagree with you that if I went to a Court on the same facts, the Court would say, well, I'm uncomfortable, because I need -- I think it's clear evidence it says -- clear and unmistakable evidence that both parties have agreed to arbitrate all these issues that you now say are before me. That's what they did in Sphere Drake, and the Court said, as long as you can come up with some evidence that you didn't agree to arbitrate, whether we are talking about arbitrate under the whole agreement or an independent, severable arbitration clause, if you come up with some evidence to that effect, you, in this case Storm, are entitled to have a court determine that, either at a hearing or at a trial on the

Page 59

Proceedings

merits.

MR. JENTES: But then doesn't that run into a clear conflict from Uncitral? Then we are before the Southern District of New York. It's going to have a hearing and it's going to decide one way or the other. What's for the arbitration tribunal to decide?

Under your argument, that will have already have been tried, to a jury yet, in New York. What are we going to decide on our jurisdiction?

MR. VAN TOL: You could decide that it's collateral estoppel and you will follow what the court decided.

MR. JENTES: As a practical matter, that moots the whole point of the Uncitral rules. The whole point of the Uncitral rules is get it out of the courts; that seems to me to be clearly what's intended.

MR. VAN TOL: This feels like Socrates.

MR. JENTES: No, no. I agree. It's tough issues, really tough issues.

Page 60

Proceedings

MR. VAN TOL: We are not that far apart, because what I am saying under Uncitral, when they use the word "power" they are saying to Storm, go to the tribunal first and have the tribunal decide whether are you right in objecting to the validity of the contract.

Now, in doing so, you are guided by or controlled, I think the parties have agreed, by Sphere Drake. You are not sitting here with a clean slate. We have all agreed that the standard to be applied is: Is there some evidence that there is no contract?

Because the courts are very leary, Uncitral or not, of forcing a party that didn't agree to arbitrate to go to arbitration, because it's the idea that everyone has --

MR. JENTES: Unless they separately agreed, that's Easterbrook's statement, unless they separately agreed to arbitrate.

MR. VAN TOL: And there is no evidence here that there is such a separate agreement to arbitrate, and there is no case that

Page 61

Proceedings

Mr. Sills came up with that is on all fours, where there is Uncitral rules or there is a severability provision, and the court has said that's enough.

MR. CRAIG: Mr. Van Tal, that's why I took such comfort from your words the last time we were meeting on August 14th.

The chairman asked you the question: "If we rule for Telenor and find jurisdiction to arbitrate, you are going to the U.S. District Court or are you going to a Federal Court?"

And you say, "it depends on what you rule. If you rule simply that you have jurisdiction to determine the issue of contract formation, and for some reason you want to hear more about what happened in the Ukraine to satisfy yourself, then we will await your decision. We said earlier, when we say you are allowed to apply Ukraine law, we mean it literally. We want you to take the law that has been determined by the Ukraine and apply it here and say, sorry, no contract."

Proceedings

Now, I took that to mean that you said we had the authority to apply the facts as we find them, to look at the Ukraine law, the New York law, whatever we find is applicable; that we at least had the authority to determine our own jurisdiction.

MR. VAN TOL: You do. You do in light of and under the Sphere Drake standard.

CHAIRMAN FEINBERG: But you are also saying, I take it, that having exercised that jurisdiction, if we decide, having exercised that, to bootstrap that and say that the underlying contract is valid, you are going to run to the U.S. District Court to upset our ruling; in other words, you are going to say in the U.S. District Court, they had jurisdiction to decide the validity of the contract, but they decided it incorrectly.

MR. VAN TOL: That's right. Because -- and that's because we are in the unusual situation where we have a foreign court has already decided this issue. I mean, I think we can all agree that this

Proceedings

case is sui generis. But I mean, that is what separates it. There is a Ukrainian court saying no contract.

So it is not proper for you to sit and go back over the findings of fact of the Ukrainian court. All I have to do is say, is show that the Ukrainian court was not coming out of left field, there were no procedural irregularities, and under New York law and the New York convention, you have to follow what the Ukrainian court said.

CHAIRMAN FEINBERG: Aren't you going to be hard pressed to convince a federal court that the contract and the Uncitral rules permitted the panel to decide the validity of that contract, but they made a mistake in finding it valid and now we want to you upset it?

MR. VAN TOL: I'm not saying that you are deciding whether or not there is enough evidence of contract formation. That is a fine point. And I thank the arbitrators for that. I'm sorry if I have been unclear.

Proceedings

You are determining, as a threshold matter, has Storm shown me enough that there is no contract; or, conversely, it really should be stated affirmatively. It's Telenor Mobile's burden to show that there are no issues of fact, that if you were sitting as a court you would have to find as a matter of law that a contract exists.

MR. JENTES: Let me ask Mr. Sills a question that is closely related to this.

Let's assume that we basically followed the Uncitral rules. We address paragraph one of Article 21, and on paragraph two we sort of say, well, we are not going to get to that; that is, we don't get to the question as to whether or not there was valid shareholders' agreement or a valid voting agreement. We only focus on whether or not there was an arbitration agreement.

If we do that, what's the authority for the proposition that there was a valid arbitration agreement?

Can that be? You look puzzled.

Proceedings

MR. SILLS: I'm not grasping the question for some reason.

MR. JENTES: What I am trying to do is to sever the issue of whether or not there is a valid arbitration agreement from whether or not there is a valid underlying shareholders' agreement.

And let's assume for the moment, since that's the issue that Pieter has raised for us, we say, okay, we are only going to look at the question of whether or not there is a valid arbitration agreement. What, in a nutshell, do you maintain is the basis for a finding by us that there is a valid arbitration agreement?

MR. SILLS: It's Article 21 of the Uncitral rules. Those are a part. I think --

MR. JENTES: No, no. Let me be more precise.

Was there an agreement reached in 2002, written or oral, that there is an agreement to arbitrate? If not, was there an agreement reached in 2004 to arbitrate?

Proceedings

Was it oral, was it written, was it by a course of conduct?

I am not trying to be a law professor. I'm just trying to indicate if we go down the Uncitral route, and only focus on paragraph one, what do we rely on for the proposition there was an arbitration agreement?

MR. SILLS: On the 2004 shareholders' agreement that was signed by Mr. Nilov. And I know we went over this at the last hearing, but I think it bears repeating, Mr. Jentes.

The Uncitral rules have a strong severability provision in them. And by entering into an agreement -- maybe there is some common ground on this between Storm and Telenor.

If you refer to particular arbitration rules, they become part of the contract. I think that is undisputed. The Uncitral rules expressly provide that the arbitration clause is fully severable from the contract of which it forms a part, so that this

Proceedings

contract, the 2004 executed, in their words, duly authorized contract, it's as if it were two separate agreements.

And if, instead of signing the 2004 shareholders' agreement in the physical form in which we have it, Mr. Nilov had signed the 2004 shareholders' agreement in a separate piece of paper called arbitration agreement, it would be legally indistinguishable from what we have now. And there can't be any serious argument that Mr. Nilov, as the general director of a Ukrainian limited liability company, lacked authority to enter into an arbitration a agreement.

MR. JENTES: That is the key point. Is that -- what is the support for that proposition? In other words, let's assume for the moment that ultimately we decide he didn't have any authority to enter into the shareholders' agreement, but he did have authority to enter into the arbitration agreement.

MR. SILLS: Well, there is two. There

Proceedings

is the legal authority begins at least with Prima Paint and rolls forward, but even on the terms that have now been presented for the claim of lack of authority, there is absolutely nothing in the charter that suggests that Mr. Nilov lacked authority to agree to arbitrate rather than litigate a dispute.

CHAIRMAN FEINBERG: Let me make it easier.

Am I correct, Storm, you don't challenge the proposition that, under agreements entered into in the Ukraine and the Uncitral rules, we have jurisdiction to decide the validity of the underlying contract?

MR. VAN TOL: So long as you do so under Sphere Drake, I don't disagree with that.

CHAIRMAN FEINBERG: Right. You don't have to get into all that other arguments you are making. There is room here.

But what you say is, Storm, the only decision we can make that's legal, is,

Proceedings

having exercised that jurisdiction, to find that the underlying contract is invalid, and -- under Sphere Drake; and, therefore, we agree with Telenor. You have jurisdiction to decide that the underlying contract is invalid; that's your position in a nutshell.

MR. VAN TOL: That's close. If I could restate it though to pick up on the last point.

Let's assume, for purposes of argument, that there are two agreements; that there is a separate agreement to arbitrate, that Mr. Nilov had authority to sign an agreement to arbitrate under Uncitral.

Fine. Let's assume that for purposes of the argument.

If he had that, what then are you going to decide? You are going to decide whether or not a contract was validly formed.

MR. JENTES: Which contract now?

MR. CRAIG: The shareholder agreement.

Proceedings

MR. VAN TOL: I'm assuming for purposes of this argument that there is, and I'm not conceding that, but I'm assuming for these purposes. What are you going to decide? You are going to decide whether or not there was a 2004 shareholders' agreement. We will stop there.

There is a court finding from the Ukraine that there is no agreement, so you are bound by that either way.

CHAIRMAN FEINBERG: I understand that. But why are you hedging on assuming for a minute authority on arbitration? You have admitted we have jurisdiction to decide the validity of the contract. Why do you hedge on where that jurisdictional authority comes from?

You have even said that again today that we have jurisdiction. Now, what you are really saying is there is only one way under the law to exercise that jurisdiction; that is to strike down the shareholders' agreement.

But I want to make sure I understand

Proceedings

here that, once again I think for the tenth time, you agree that we have, under the Uncitral rules --

MR. VAN TOL: The power.

CHAIRMAN FEINBERG: -- the power to decide the validity of the underlying contract, shareholder agreement.

Where does that come from? Why do you say, well, let's put it aside for a minute. Let's make an assumption.

Where is that authority to decide?

MR. VAN TOL: You have the authority under the Uncitral rules to decide your jurisdiction.

CHAIRMAN FEINBERG: Right.

MR. VAN TOL: That comes from the contracts. We are assuming that Mr. Nilov had authority to at least sign that.

CHAIRMAN FEINBERG: When you say "assuming," do you agree that we have that jurisdiction? Not assuming that Mr. Nilov, you have admitted -- I don't mean to cross examine, but it's critical.

You have admitted last time and again

Proceedings

today we have the power to decide. What is the basis for that power in Storm's position?

MR. VAN TOL: It's got to be the arbitration clause.

CHAIRMAN FEINBERG: Of the shareholder agreement?

MR. VAN TOL: Correct.

CHAIRMAN FEINBERG: Okay. And we have that, that arbitration clause, we have actual power to decide.

And your gripe is, in your motion, go right ahead and decide, but there is only one way you can decide under the law of the Second Circuit; that's your position.

MR. VAN TOL: Right. And for -- just so I am clear, for two reasons though. One is a jurisdictional reason. You apply Sphere Drake. Mr. Sills agreed with that. It was his idea. I don't know if he's backing away it from, but he agreed Sphere Drake applies.

So, what you do, first, is you say do I have jurisdiction under Sphere Drake? If

Proceedings

the answer is no, dismiss.

Second, if you find you do have, that the Sphere Drake standard has been satisfied by Telenor Mobile, then we go on to the question of contract validity. And then, again, what I am saying is you are bound by finding of the Ukrainian court.

CHAIRMAN FEINBERG: That couldn't be clearer. To me that is very clear.

Mr. Sills, your position is very clear to me, and unless somebody has anything else to argue about this, is there anything else anybody wants to say about this? I mean, it couldn't be clearer, it seems to me. To me. I am not sure my fellow panelists agree.

Your clarification in the last five minutes is very important to me and I understand it, and I just want to make sure I understand it.

Is there anything else to be added now?

MR. JENTES: I do want to ask a question.

CHAIRMAN FEINBERG: Go ahead.

Page 74

Proceedings

MR. JENTES: We got up to it, but I didn't quite hear the answer.

Is there any dispute that Mr. Nilov could have entered into the arbitration agreement, even though there was no meeting of participants, no -- all the rest of the rigmarole.

MR. VAN TOL: I haven't seen anything in charter and that's the only corporate document I have. I haven't seen anything in charter that would bar him from doing so, so long as the agreement doesn't have to do with the transfer of Kyivstar shares.

My hesitation is: Is this truly severable? Is it so intimately --

MR. JENTES: I understand that.

MR. VAN TOL: -- interrelated? I want to preserve that argument.

Assuming there is -- you can cleave off a separate arbitration agreement, I don't think it falls within any of the limitations under Article 12.4.

MR. JENTES: Does it have to be in Ukrainian and registered?

Page 75

Proceedings

MR. VAN TOL: That I don't know. Again, here, I am guessing as a Ukrainian lawyer, but my understanding of that finding on the filing was because it had -- the shareholders' agreement affected the charter, the foundational document.

I don't see how, sitting here, how an agreement to arbitrate could affect a foundational document.

MR. CRAIG: I have one more question.

CHAIRMAN FEINBERG: Go ahead.

MR. CRAIG: This will be quick.

CHAIRMAN FEINBERG: No, no. I say go ahead out of frustration, not out of the number of questions, just the complexity of the issue.

MR. CRAIG: It has to do with whether or not there was a meeting of participants to consider the 2004.

Let's assume for the moment that we accept the notion that it was a new agreement, a new shareholders' agreement, referred to as NSA in some of these affidavits. What is the state of the record

Page 76

Proceedings

right now about whether or not there was a meeting of participants?

MR. VAN TOL: The state of the record is no one from my client has any information that were was a meeting of participants. There is nothing in the files.

MR. CRAIG: Is there no one in the Storm hierarchy that can testify that there was no such meeting?

MR. VAN TOL: The problem is tracking down any of the participants that would have been there. I don't think there is anyone. We don't control Mr. Nilov, so the best we can say is that anyone who would have been aware of it is unaware of it. Anyone who has looked at the files doesn't know of one, Mr. Wack doesn't know of one. Mr. Kosogov, who was closely involved in these matters, has no recollection of there being a meeting of participants.

Telenor Mobile hasn't come up with a scrap of evidence there was meeting of participants.

MR. CRAIG: I think I heard Mr. Sills

Page 77

Proceedings

make the affirmative contention that there was such a meeting.

MR. SILLS: No.

CHAIRMAN FEINBERG: Mr. Sills says its irrelevant based on apparent authority.

MR. SILLS: The actual authority for that matter.

MR. VAN TOL: Mr. Sills, to be clear, did say at the very first meeting that Mr. Wack would testify there was a meeting of participants.

MR. SILLS: In 2002, and there was.

MR. VAN TOL: He didn't say that then; we found out now. No one -- you know, look, there was a meeting of participants in 2002.

MR. JENTES: Where is Mr. Nilov?

MR. VAN TOL: He is not controlled by Alpha. If we had him under our control, we would have an affidavit from him today.

MR. JENTES: Where is he?

MR. VAN TOL: I don't know.

MR. SILLS: Mr. Jentes, we do know where he is.

Let me distribute, if I could, to the

Proceedings

panel --

MR. VAN TOL: Is this the same thing we saw last time from the internet?

MR. SILLS: I don't believe so.

CHAIRMAN FEINBERG: Yes.

MR. SILLS: Mr. Nilov works for Alpha Capital. Alpha Capital is a wholly owned by Alpha Group Consortium just as is Altimo. Altimo owns 100 percent of Storm.

The notion that he is not a controlled witness is fanciful. If this proceeding were in federal court in New York, and there were a jury, we would be entitled, as a matter of law, to a missing witness charge if Mr. Nilov weren't called to the stand on this issued. I don't think there can be any serious dispute about that.

MR. VAN TOL: If we were in court, we would have some authentication of this. I did the same internet search that Mr. Sills did and all I could find was 2002, 2003 documents.

I have no the evidence Mr. Nilov is currently in our control. If he were, I

Proceedings

would have him here.

CHAIRMAN FEINBERG: Anybody have anything else to add on the motion or is the record -- let me ask one logistical question of Mr. Sills.

Mr. Sills, on the basis of what's transpired today, are you prepared yet, and you are not obligated to, to let the panel and Storm know whether you are going to take advantage of the September 8 deadline to submit anything further on the motion?

MR. SILLS: If you could bear with me one second, Mr. Chairman.

CHAIRMAN FEINBERG: You are not obligated, Mr. Sills, to answer my question now, unless it's readily apparent. I'm not looking to -- you can leave the question open.

MR. SILLS: Mr. Chairman, our interest is in moving this case along. I think an extremely simple issue has been complicated in a variety of ways that the claim keeps morphing.

I'm glad to hear that we are back to

Proceedings

agreeing that this case can be decided. I think the record is largely closed.

The suggestion that was just made, that the document we just distributed is in some sense inauthentic, is a forgery, I think is offensive and unfounded. And I would like to, I would like, to the extent that there is any credence given to that, I would like to supplement the record on that point.

Other than that, we have no evidentiary submission we wish to make on the 8th, because I think the record is more than ample for the panel to make this decision.

CHAIRMAN FEINBERG: I suggest the following: Let's take a break for about 15 minutes while the panel convenes and I find out where my brethren are coming from. And then we should reconvene on the quite -- assuming that we take this all under advisement, on the second issue of discovery and scheduling.

So why don't we take a 15 minute break

Proceedings

and then we will reconvene here?

(Recess taken.)

CHAIRMAN FEINBERG: The panel has consulted and in terms of calendar, what about the following, in light of what the parties have told us today.

Can we accelerate proposed findings of fact and conclusions of law on the sole issue of the panel's jurisdiction to arbitrate? Can we accelerate those proposed findings no later than one week from today at 5 o'clock?

I'm not sure, on the basis of what I have heard today, that it requires even that long, but -- but on the single question or issue of authority to arbitrate, can we have any findings of fact or law -- in law to the panel no later than one week from today at 5 o'clock?

MR. SILLS: That is certainly acceptable to Telenor, Mr. Chairman.

MR. VAN TOL: It is to Storm, too.

CHAIRMAN FEINBERG: That will anticipate a partial decision by the panel

Proceedings

on the singular issue of jurisdiction to arbitrate this dispute. With the notion, I think I speak for my fellow panelists who will undoubtedly want to clarify this, but on the notion that the panel will shortly thereafter the 8th render a decision on this issue of jurisdiction to arbitrate the dispute; in other words, we will decide the motion proffered by Storm. And that's all we contemplate deciding.

Is that understandable? Comprehensible?

Then what we turn our attention to, assuming, assuming for a moment a big assumption that the Motion to Dismiss is denied, do we have an agreement among the parties on arbitration hearing dates and any pre-arbitration hearing discovery leading up to those dates? And where are we on that subject?

MR. SILLS: Mr. Van Tol and I did speak, as you had requested, and looking at our respective calendars, it struck us that the full hearing on the merits, although I

Proceedings

think we are in agreement that the issues are not entirely legal issues, largely legal issues calling for little, if any, testimony, could be accommodated during the second full week in November; that would be the week of the 13th, in the Wednesday, Thursday and Friday of that week work best for us personally.

CHAIRMAN FEINBERG: Is that is November 15, 16 and 17?

MR. SILLS: That is exactly right, Mr. Chairman.

MR. VAN TOL: With the only caveat from Storm, and Mr. Sills and I discussed that, if the non-compete issues appears to be more fact intensive than we anticipated, perhaps something to be discussed is the possible bifurcation of corporate governance from non-complete. But as I sit here today, I'm not sure the non-compete is going to require that much and I would like to try to adhere to the schedule that Mr. Sills articulated.

CHAIRMAN FEINBERG: It also implicit

Proceedings

in what both of you say, to the extent that are evidentiary, as opposed to legal issues, Mr. Sills, that you guys think that you can work out consensually any prehearing discovery related to those issues or should we turn our attention to that?

MR. SILLS: We haven't discussed it. I'm encouraged by the fact that we agreed on the schedule. Perhaps, if we could go off the record and discuss it informally, I would hope we could agree and just put the agreement on the record. Otherwise we could do it more formally.

MR. VAN TOL: I'm confident we will be able to work out a discovery schedule, if we don't want tie up the tribunal's time. I have never had difficulty with Mr. Sills in scheduling before and I don't see one now.

MR. SILLS: For example, we haven't discussed whether there would be depositions. I know that is an issue that different Uncitral panels have ruled on differently, at least in my experience. And there is, as I am sure the panel knows, in

Proceedings

Uncitral proceedings in particular and international arbitration, there is a lot of movement as to the content of discovery. I'm confident we will be able to work out timing.

CHAIRMAN FEINBERG: Well, when you say both sides seemed conspicuously confident about being able to work out discovery; therefore, what we might do, since you both seem rather confident as to the hearing date and any discovery that might be needed leading up to that hearing date, why don't you take it upon yourselves to work out -- I'm just suggesting my view -- working out whatever discovery schedule you can consent to, coming back to the chair only if there is a problem on any prehearing discovery.

MR. SILLS: I think that makes sense, and I'm confident we won't have to burden you with that. I think we will be able to work it out.

CHAIRMAN FEINBERG: Let me ask my fellow panelists whether the 15, 16 and 17th of November here in New York City is

Proceedings

workable?

MR. CRAIG: Fine with me.

MR. JENTES: Real problems, I'm sorry. I have a longstanding, very contentious arbitration scheduled to start on the 9th and it's supposed to run through the 17th. I don't know whether it will go forward all of that second week or not, but it so far has been very difficult.

This is not a happy thing. I am free the 20, the 21st and the 22nd, reminding you the 23rd of November is Thanksgiving. I then have an arbitration in Bermuda during the week of November 27th. I am then free the weeks of December 4th and the week of December 11th.

MR. SILLS: On the governance issues, that is the question of whether or not Storm should be obligated to conform to the promise in the shareholders' agreement that they attend shareholders and that their nominees attended Board of Directors meetings it seems to me there is, it's hard for me to say see what testimony there would

Proceedings

be on that. It's important to the company, to Telenor, to get this decided because of the potential paralysis of a very valuable operating company.

Is there any possibility that we could advance the hearing rather than delay it into October? It seems to me this is essentially going to be decided largely on papers and with a one-day argument, so if we could free up a day, say at the end of October, we could do it. Otherwise, we, I would think the first two days of Thanksgiving week, rather than that Wednesday, which would be tough on everybody, would work for me, though my preference would be to advance it rather than delay it.

MR. VAN TOL: My preference, subject to the tribunal's availability, would be to take those first two days, Monday and Tuesday --

CHAIRMAN FEINBERG: Full.

MR. VAN TOL: -- Thanksgiving week, cognizant that that may speed up things.

Proceedings

CHAIRMAN FEINBERG: It's the following week. Yes, it may very well speed up things. We might do it in Plymouth, Massachusetts.

MR. VAN TOL: Or we could go to Bermuda.

CHAIRMAN FEINBERG: Are you available?

MR. CRAIG: What.

CHAIRMAN FEINBERG: Monday and Tuesday.

MR. JENTES: No, I said 20, 21st and 22nd. Again, the alternative is November 6, 7 and 8.

MR. SILLS: November 6th, Mr. Jentes, is the hearing date set in a parallel arbitration between Force, another shareholders' agreement; that is in Geneva.

CHAIRMAN FEINBERG: Let's reserve Monday and Tuesday, I think it's November 20 and 21, for two days of hearing with the idea that we will conclude Tuesday, even if we have to go later, because Wednesday out of the question. And let's plan on that.

Let's plan on any discovery related to

Proceedings

that two-day hearing to be worked out consensually by the parties to come back to the chair to resolve any discovery disputes which the chair can then raise with his fellow panelists.

And does everybody understand the accelerated findings of fact, conclusions of law schedule by the close of business next Tuesday, one week from today, solely on the issue of jurisdiction to arbitrate?

MR. VAN TOL: Yes.

MR. SILLS: And just two clarifying questions.

Mr. Feinberg, I take it that there is no schedule now in place for proposed findings and conclusions on the question of contract validity as opposed to arbitrability?

CHAIRMAN FEINBERG: My answer to that is since we have worked out a hearing in November. Hopefully you guys can get together with each other and decide in conjunction with that hearing when you might get us something. I think probably --

Proceedings

MR. JENTES: Let me try to help a little bit.

What I envision the panel would enter, after you submit whatever you want to submit a week from now, would be either a final award, which will essentially grant the Motion to Dismiss, or it will be a partial final award, which will essentially deny the Motion to Dismiss and set the matter forward for a hearing on the merits and the ultimate decision on a final award.

MR. SILLS: I guess my question is, in thinking back to the argument that was being made by Storm, does the panel want to hear on the merits, for example, this claim that the Alperin order somehow governs here on the substantive question of contract validity? Or are we to address simply the question of whether or not panel has jurisdiction to resolve questions, including the applicability of this Ukrainian order?

MR. CRAIG: The latter.

CHAIRMAN FEINBERG: The latter.

MR. SILLS: So it's purely a

Proceedings

jurisdictional submission.

The other question is purely logistical. Given that we have now fixed this November 20 hearing, is it appropriate now to fix at least a preliminary schedule for the submission of trial briefs and witness statements?

MR. CRAIG: I was going to ask that same question.

CHAIRMAN FEINBERG: Although I had simply assumed that is precisely what you guys will work out, and unless we, unless we need that resolved -- I mean, based on the cooperative tone of your conversations, that's precisely what we are hoping you will work out, all of the pretrial dates leading up to the 20th.

MR. CRAIG: I would only suggest that you don't wait until November 19th to provide whatever your work product is on this.

CHAIRMAN FEINBERG: And I guess, in response to Bob's question, I guess proposed findings as to issues unrelated to a week

Proceedings

from today on jurisdiction, I guess are moot now, aren't they?

I mean assume, big assumption that we decide that we have jurisdiction, are those proposed findings, aren't those then going to be submitted after the hearing rather than before?

MR. SILLS: So, that the November 20 hearing will consider this claim that the contract isn't, doesn't exist?

CHAIRMAN FEINBERG: I guess. And that's an interesting question that we defer to you guys on what remains to be said that hasn't been said ad nauseum, frankly. But there may be additional evidence, depositions, documentation, whatever that you may want to raise.

MR. SILLS: I guess on that one, I thought the parties had agreed that, at least on that issue, the record was closed and we were now going to get to put a schedule in place on the merits. I think given the November 20 day, I mean we are certainly prepared to agree that on the

Proceedings

question of contractual validity and existence, that the record is closed and that this hearing is on other issues, but that there will be a single award. In effect, an omnibus ruling in effect at the end of that. I would hope that Storm would agree with that as well.

MR. VAN TOL: That's my understanding of what we are doing. We are going to jurisdictional issues first and then to the extent there are issues of contract validity that we want to make, that will be part of the final award by the panel.

MR. SILLS: But my question is different, Mr. Chairman.

There are other issues that, again, assuming that we prevail on the jurisdictional issue, for example, should Storm come to shareholders' meeting, should they, what is the appropriate remedy if they are competing in violation of the non-compete clause? Those haven't been addressed at all yet. But our view is that there has been enough ink spilled on the

Proceedings

question of whether or not the shareholders' agreement is a valid, subsisting, enforceable contract. That doesn't resolve the question of how it gets enforced, but it seems to me, in the interest of moving this along and not doing this for a fourth time, we should agree now that on those questions the record is closed and that evidentiary submission, if any, and the argument, which I think will take place on the 20th, is addressed to these other issues and that we don't have to do this one more time.

MR. VAN TOL: Well now I'm confused. Because I thought what we were going to do, what the tribunal was suggesting was that these findings of fact will go to the primary argument we have made, which that is there is no jurisdiction. The tribunal has no jurisdiction, that it should be decided by a court.

Our subsidiary argument is, even if you find you do have jurisdiction, you should follow the findings of the Ukrainian courts and find that no contracts exists. I

Proceedings

would like to raise that at the hearing, finally. To the extent that there is any funeral evidence limited to those points, that ought to come in.

CHAIRMAN FEINBERG: So what you are saying is you reserve the right, on November 20, assuming we rule motion denied, you want the reserve the right on the 20th to offer evidence, not only on other issues that Bob has just suggested -- remedy, for example -- but you want to keep the record open so that you can offer additional evidence on the question of the validity of -- or invalidity of the underlying shareholder agreement.

MR. VAN TOL: That's correct.

MR. SILLS: In that case, I am going to make an oral motion. I think there are two solutions. It's their motion, it's their burden, I don't -- let me start again.

I think the record should be closed on this point. If they, as one of the letters we saw said, work on Mr. Nilov and he now has a change of heart, and he would now like

Proceedings

to come to New York and testify, it seems me it's too late. We have been doing this for three months and it's their motion. They have had three shots at this. I think the proposed findings and conclusions that we will be submitting with respect to this November 20 hearing should include the question of contract validity.

I assume that the award that will be rendered after the November 20 hearing will address the question of whether there is a contract, which seems to me to be a necessary predicate to whether or not they are breaching the contract. And they are fully entitled to say whatever they want in their proposed findings or conclusions or any other briefing that the panel orders. But we do move that, on the question of contract validity and existence, that the panel declare, as it has the power to do under the Uncitral rules, that on that issue the evidentiary record is closed and that we are not going to be surprised by a new affidavit from Mr. Khudyakov or Mr. Nilov

Proceedings

showing up or yet another Ukrainian expert.

The claim is morphed enough. I think it's time to close the record on that issue and we would respectfully ask the panel to do so.

MR. VAN TOL: Well, I would oppose. I don't see any prejudice to Telenor Mobile. I'm not suggesting bringing in a witness on the 20th that they have had no notice of. I am not suggesting trial by surprise. I will make evidence available, just as Telenor Mobile has made evidence available in these hearings. I'm not suggesting another interim hearing. I'm simply saying that if more evidence comes to light, it should be before the tribunal on the 20th and 21st.

And I think under the FAA at least, the tribunal has an obligation to entertain evidence going to the ultimate issues.

CHAIRMAN FEINBERG: All right. What else?

MR. VAN TOL: I do -- I'm sorry to do this, but I have one clarification on what I said earlier, and it's really to make sure

Proceedings

that I parse this carefully, because I noticed the tribunal quite accurately pays attention to what we say and how we say it.

Earlier I said and I stand by it that I have no indication that Mr. Nilov lacked authority under the charter to enter into a separate arbitration agreement. What I would remind the tribunal, and this is already in the record so it's not new evidence, is that in both the April 25th decision and in the May 25th decision, the trial court in the first instance, and the appellate court, found that the shareholders' agreement, quote, should be rendered null and void in full, including the arbitration clause, end quote.

So, and then in the next paragraph it cites Article 216 of the Civil Code of the Ukraine, which essentially says if a transaction is invalid and it wipes out the whole agreement, the parties can't agree to resuscitate it.

So, we will be making the argument that under Ukrainian law what Mr. Nilov did

Proceedings

and what the courts found, the fact that he didn't have authority to enter into the agreement, notwithstanding the severability clause, wipes out the whole agreement. Not under the charter, but Ukrainian law, because it's in the two court findings. I have to make my record on that. That is part of the Court's finding. It went out of its way to include the arbitration clause.

CHAIRMAN FEINBERG: Anything else? I think before we, before everybody departs just to be safe, I think the panel would like another 15 minutes.

There is lunch anyway, I think, being served. I think that the panel would like to convene one more time.

MR. JENTES: Could I ask one question? And that is: Is Ukraine a -- I don't know whether they are a signatory the New York convention. Did they participate in Uncitral; in other words, are the Uncitral rules valid and enforceable in Ukraine?

MR. VAN TOL: I don't know. Let me confer with my colleagues.

Proceedings

I don't know. We would have to find out the answer for you.

CHAIRMAN FEINBERG: Do you know?

MR. SILLS: I do, Mr. Chairman. Ukraine has adopted the model law. I mean, they wouldn't adopt the rules, themselves.

MR. JENTES: No.

MR. SILLS: There is no jurisdiction that has done that. But Ukraine is a party to the New York convention. It's a party to the inter-European convention. And I am informed by European counsel that they have adopted, with slight variations that I don't think are relevant, the Uncitral model rule.

So that as a result, although it's, of course, the contract specifies New York law not Ukrainian law, but to the extent Ukrainian law were applicable on its face, Ukraine follows the conventional international arbitration regime.

CHAIRMAN FEINBERG: Before we have lunch, let me just confer for a second with my fellow arbitrators.

(Pause.)

Proceedings

CHAIRMAN FEINBERG: I just said a few minutes ago we would like to confer, we just did, and Bob's oral motion is denied.

If the parties wish to supplement that which has already been admitted into evidence, they have that option.

We are not seeking to rehash all of this, but if there is additional evidence beyond that which has already been admitted, we leave open that avenue if either party wishes to proceed.

Go ahead.

MR. CRAIG: Additional means not duplicative and not repetitive. Additional new evidence.

CHAIRMAN FEINBERG: Correct.

MR. JENTES: I would only emphasize evidence, not just argument or legal authority or anything like that.

MR. SILLS: And I take it, as the panel ruled at the first argument, the first hearing on this, that, Mr. Chairman, the panel will entertain a motion to subpoena any witness who provides an affidavit and

Proceedings

cause to him be brought here to be cross-examined, as I believe Article 75 of the CPLR requires?

CHAIRMAN FEINBERG: We will entertain it.

This proceeding, this hearing today is closed, is adjourned. There is no reason for anybody to stick round, I don't think, to await any further word from the panel today.

We will move forward towards November 20. And one week from today, we will receive whatever is submitted by both sides, and then we will render a decision shortly thereafter.

Adjourned.

(Time noted: 1:07 p.m.)

C E R T I F I C A T I O N

I, BONNIE ATELLA PRUSZYNSKI, a Registered Professional Reporter and Notary Public, within and for the State of New York, do hereby certify that I reported the proceedings in the within-entitled matter, on September 5, 2006, and that this is an accurate transcription of these proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of September, 2006.

______________________________

BONNIE ATELLA PRUSZYNSKI

**A**

**abided (1)**
17:6
**ability (3)**
17:24 21:14 58:4
**able (6)**
18:16 30:22 84:16
85:5,9,21
**above-entitled (1)**
1:14
**absolutely (2)**
48:7 68:6
**accelerate (2)**
81:8,11
**accelerated (1)**
89:8
**accept (2)**
15:16 75:22
**acceptable (1)**
81:22
**accommodate (1)**
46:19
**accommodated (4)**
46:19,20 47:8 83:5
**accountant (1)**
13:18
**accurate (1)**
103:9
**accurately (1)**
98:3
**acquire (1)**
45:7
**acquired (1)**
42:9
**act (10)**
14:7 17:24 23:25
24:23 25:10,13
33:15 35:14 36:13
47:18
**acted (3)**
10:5 37:21 44:25
**acting (1)**
37:20
**actions (1)**
5:17
**acts (2)**
36:11,14
**actual (9)**
24:11,18 27:21 36:10
36:20 37:16 54:9
72:12 77:7
**ad (1)**
92:15
**ADAM (1)**
2:7
**Adar (1)**
46:5
**add (5)**

3:11 4:10,11 57:8
79:4
**added (1)**
73:21
**adding (1)**
45:21
**addition (1)**
48:18
**additional (5)**
92:16 95:13 101:9,14
101:15
**address (4)**
24:17 64:13 90:19
96:12
**addressed (2)**
93:24 94:12
**addressing (1)**
25:3
**adds (1)**
6:16
**adequate (1)**
43:22
**adhere (1)**
83:23
**adjourned (2)**
102:8,17
**admits (1)**
48:19
**admitted (5)**
70:15 71:23,25 101:6
101:10
**adopt (1)**
100:7
**adopted (2)**
100:6,14
**adopting (1)**
23:8
**advance (2)**
87:7,17
**advantage (1)**
79:11
**advice (4)**
14:24 15:3 16:9 30:5
**advised (2)**
14:13 18:12
**advisement (1)**
80:23
**affect (1)**
75:9
**affidavit (30)**
3:13,19 4:11 13:10,13
13:25 15:13,19 17:9
17:25 18:10,11,19
18:23 19:6 28:3
29:22 37:23 39:20
41:3 42:20 43:3,7
43:20 44:19,21
48:18 77:20 96:25

101:25
**affidavits (13)**
4:18 7:3 13:8 15:14
15:16 24:6,13,15
28:9,12 48:20 56:2
75:25
**affirmative (1)**
77:2
**affirmatively (1)**
64:5
**ago (2)**
16:7 101:3
**agree (19)**
25:23 53:10,25 54:23
58:3,18 59:24 60:17
62:25 68:8 69:5
71:3,21 73:16 84:12
92:25 93:8 94:8
98:22
**agreed (19)**
12:25 26:6,17 27:6
30:15 36:25 37:6
46:18 53:16 55:21
58:14 60:10,12,21
60:22 72:20,22 84:9
92:20
**agreeing (1)**
80:2
**agreement (96)**
5:9,18 9:21 10:3,16
11:4,5 12:13,17
13:16,23,23,24
15:24 20:7 21:5
25:22,23,25,25
26:10,19,22 27:7
29:20 30:14,24
31:23 32:25 33:2
39:2 41:17 44:14
45:20 46:21,23 47:2
47:23 48:2,9 49:12
50:16 53:16,17
54:17 55:12 58:6,20
60:24 64:18,19,21
64:24 65:6,8,13,16
65:22,24,25 66:9,11
66:17 67:6,8,10,16
67:22,24 69:14,16
69:25 70:8,10,24
71:8 72:8 74:6,13
74:21 75:6,9,23,23
82:17 83:2 84:13
86:21 88:18 94:3
95:16 98:8,15,22
99:4,5
**agreements (8)**
33:17 39:6,8 45:5
48:4 67:4 68:14
69:13
**ahead (7)**

11:20 12:18 72:14
73:25 75:12,15
101:13
**Alexi (1)**
30:11
**allowed (2)**
45:6 61:21
**Alperin (11)**
10:7 18:2,3,13,13
39:12,22 40:10 41:4
41:24 90:17
**Alperin's (1)**
40:24
**Alpha (14)**
10:8 11:6 26:3 28:25
29:2,3 32:14 45:6
46:16 47:10 77:19
78:7,8,9
**Alpha's (1)**
10:6
**Alpha/Storm (1)**
10:15
**alternative (1)**
88:13
**Altimo (2)**
78:9,10
**amended (1)**
47:24
**amendment (3)**
9:24 16:10 41:20
**amiss (2)**
10:9 11:7
**ample (1)**
80:15
**analysis (3)**
6:23 7:21 50:25
**analyzing (1)**
51:19
**Andre (1)**
31:20
**annex (1)**
34:21
**annexed (1)**
25:24
**answer (6)**
6:20 73:2 74:3 79:16
89:20 100:3
**anticipate (1)**
81:25
**anticipated (1)**
83:17
**anybody (3)**
73:14 79:3 102:9
**anyway (1)**
99:15
**apart (1)**
60:3
**apologize (4)**

13:12 29:23 51:8,11
**apparent (25)**
4:22 6:14,19 11:12,17
19:12 23:18,21,23
24:18 35:23,24 36:7
36:9,12,20 37:7
38:9 41:14 42:17,17
42:18 43:15 77:6
79:17
**appeal (1)**
39:24
**Appeals (1)**
41:12
**appear (2)**
40:11 56:11
**appearance (1)**
56:11
**appeared (3)**
40:2,3,7
**appearing (1)**
56:12
**appears (10)**
15:3 16:12 21:20 22:2
34:5,13,20 40:21,23
83:16
**appellate (6)**
8:23 34:3,6,22,22
98:14
**applicability (1)**
90:22
**applicable (3)**
55:17 62:6 100:19
**applied (1)**
60:13
**applies (3)**
54:22 56:3 72:23
**apply (4)**
61:21,24 62:3 72:19
**appreciate (1)**
30:19
**approach (2)**
55:7,8
**appropriate (2)**
91:5 93:21
**approve (2)**
36:2,21
**April (2)**
10:19 98:11
**arbitrability (1)**
89:19
**arbitrable (4)**
12:9 53:17 57:4,11
**arbitral (1)**
52:20
**arbitrate (21)**
12:18 53:10,15 58:14
58:19,20 60:17,22
60:25 61:11 65:24

65:25 68:8 69:15,16 75:9 81:11,17 82:3 82:8 89:11
**arbitration (58)**
1:2,2 3:7,9 12:12,16 18:7 20:5,7,10,12 20:17,21,24 23:6 49:12,18 50:8,10,15 50:16,21 52:24 53:4 53:22 55:9,11 57:7 57:15,19 58:21 59:8 60:18 64:20,24 65:6 65:13,16 66:8,20,23 67:9,15,23 70:14 72:6,11 74:5,21 82:18 85:3 86:6,14 88:17 98:8,17 99:10 100:21
**ARBITRATOR (2)**
1:23,24
**arbitrators (2)**
63:24 100:24
**argue (2)**
5:25 73:13
**argued (4)**
18:13 27:17 41:3,16
**argues (2)**
12:15 27:12
**arguing (5)**
5:16 8:15 9:17 10:21 53:9
**argument (25)**
4:4 6:12 7:22 11:10 23:15 27:4 41:5,18 42:21 49:8,16 59:10 67:12 69:13,19 70:3 74:19 87:10 90:14 94:10,18,22 98:24 101:19,22
**arguments (8)**
5:3 18:3 19:9,11 42:24 48:25 50:25 68:22
**arrangements (1)**
30:17
**Article (9)**
50:9 52:23 56:6 57:10 64:14 65:17 74:23 98:19 102:3
**articulated (2)**
6:21 83:24
**articulation (1)**
8:18
**aside (3)**
55:25 56:5 71:10
**asked (1)**
61:9
**asking (2)**
42:14 51:20
**assault (2)**
48:4,5
**assaults (1)**
40:6
**assembled (1)**
10:14
**asserted (2)**
27:23,24
**assume (10)**
33:3 56:20 64:12 65:9 67:19 69:12,18 75:21 92:4 96:10
**assumed (1)**
91:12
**assumes (1)**
14:6
**assuming (13)**
57:24 70:2,4,13 71:18 71:21,22 74:20 80:22 82:15,15 93:18 95:8
**assumption (3)**
71:11 82:16 92:4
**assurances (2)**
33:24 38:8
**assure (1)**
32:18
**assured (1)**
24:8
**ATELLA (3)**
1:15 103:4,15
**attack (2)**
38:25 39:5
**attacking (1)**
11:8
**attacks (2)**
11:11 45:22
**attend (1)**
86:22
**attended (1)**
86:23
**attending (1)**
10:25
**attention (4)**
46:7 82:14 84:7 98:4
**attorney (7)**
24:24 25:11,14 30:12 40:16,19 54:16
**attorneys (4)**
2:12,18 12:7,8
**August (3)**
14:11,12 61:8
**authentication (1)**
78:20
**authority (78)**
4:22,25 5:16 6:6,14 6:19 9:20 10:5,17 11:13,17 12:20 13:22 14:7,16 19:12 20:2 23:19,21,23 24:3,10,12,18 27:21 29:20 31:12,19 33:15,22 35:16,23 35:25 36:8,9,10,13 36:18 37:8,16,19,20 38:9,24 39:3,11 41:14 42:17,18,18 43:10,16 45:15 47:13 54:9,20 55:10 62:3,7 64:22 67:15 67:21,23 68:2,5,7 69:15 70:14,17 71:12,13,19 77:6,7 81:17 98:7 99:3 101:20
**authorization (14)**
5:6,12 7:5,14 16:13 24:9 27:19 30:2 34:18 38:6 41:23 42:15,16 43:22
**authorize (2)**
35:15 44:12
**authorized (10)**
26:25 31:22 32:2,16 32:19 33:25 42:12 42:15 44:5 67:3
**automatic (2)**
26:2,8
**availability (1)**
87:20
**available (4)**
29:5 88:8 97:12,13
**Avdeev (1)**
30:20
**avenue (4)**
1:17 2:4,14 101:11
**await (2)**
61:20 102:10
**award (6)**
90:7,9,12 93:5,14 96:10
**aware (8)**
6:5 9:6 10:4 18:8 26:24 27:5 44:11 76:16
**a.m (1)**
1:19

**B**

**b (2)**
1:24 31:22
**back (9)**
9:4 13:4 56:6 58:2 63:6 79:25 85:17 89:3 90:14
**backing (1)**
72:22
**backs (1)**
32:9
**bar (1)**
74:12
**bark (1)**
28:17
**based (6)**
16:2 18:10 32:23 33:8 77:6 91:14
**basically (2)**
9:11 64:12
**basis (6)**
26:21 52:12 65:14 72:3 79:7 81:14
**bear (4)**
34:24 35:8 45:25 79:13
**bears (1)**
66:13
**began (1)**
48:3
**beginning (2)**
35:5 46:9
**begins (1)**
68:2
**behalf (4)**
31:22 33:16,17 40:7
**believe (6)**
11:24 12:6 13:11 52:12 78:5 102:3
**believed (1)**
38:17
**benefit (1)**
19:19
**benefits (2)**
45:16,17
**Bermuda (2)**
86:14 88:7
**best (4)**
8:20 38:13 76:14 83:8
**better (2)**
50:6,17
**beyond (1)**
101:10
**bifurcation (1)**
83:19
**big (2)**
82:15 92:4
**billions (1)**
45:9
**bind (3)**
13:22 35:16 36:22
**binder (3)**
34:14 45:24 46:2
**binding (3)**
33:2 36:14 48:8
**bit (1)**
90:3
**BJORN (1)**
2:22
**blocking (2)**
26:5 45:7
**blown (1)**
20:22
**board (6)**
34:18 35:25 36:19,22 47:24 86:23
**boat (1)**
56:17
**Bob (1)**
95:11
**Bob's (2)**
91:24 101:4
**BONNIE (3)**
1:15 103:4,15
**books (1)**
43:9
**bootstrap (1)**
62:13
**bottom (2)**
35:4 46:9
**bought (1)**
47:3
**bound (4)**
8:22 9:8 70:11 73:7
**breach (3)**
16:10,20,20
**breaching (1)**
96:15
**break (2)**
80:18,25
**brethren (1)**
80:20
**bridge (1)**
46:22
**brief (4)**
27:12 30:10 49:4,7
**briefing (1)**
96:18
**briefly (2)**
9:13 15:13
**briefs (1)**
91:7
**bring (1)**
19:18
**bringing (1)**
97:9
**broad (3)**
2:10 44:17,22
**broader (1)**
44:23
**Broadway (1)**
34:5
**brought (4)**
11:22 48:15 51:5 102:2

**burden (6)**
24:7 33:21 54:2 64:6 85:20 95:21
**business (4)**
3:22 35:19 36:6 89:9
**buying (1)**
26:4

**C**

**C (3)**
2:3 103:2,2
**calendar (1)**
81:5
**calendars (1)**
82:24
**call (2)**
4:9 5:22
**called (6)**
11:23 29:3 34:4 46:4 67:9 78:16
**calling (1)**
83:4
**Capital (3)**
29:3 78:8,8
**care (1)**
32:3
**careful (1)**
28:8
**carefully (1)**
98:2
**carried (1)**
43:18
**carries (1)**
31:10
**carry (1)**
36:11
**carve (1)**
57:17
**case (32)**
9:3,7 11:22 12:4,10 12:11,24 19:10 22:10 24:16 28:16 34:2,4,15 39:13 40:10 41:4,11,12 46:3 48:12 49:21,24 51:23 55:4 57:24 58:23 60:25 63:2 79:21 80:2 95:18
**cases (4)**
11:14 15:10 46:3,14
**cause (1)**
102:2
**caveat (1)**
83:14
**CCA (1)**
55:14
**ceases (1)**
49:14
**certain (3)**
25:7 26:23 55:8
**certainly (5)**
38:11 40:23 54:6 81:21 92:25
**certificate (5)**
17:11,22 33:8,12 54:20
**certificates (6)**
31:13 32:13 42:3,6,11 44:4
**Certified (1)**
1:15
**certify (2)**
31:20 103:6
**cetera (1)**
7:23
**chain (1)**
14:10
**chair (3)**
85:17 89:4,5
**chairman (63)**
1:22 3:4 4:14 11:20 19:22,23 31:15 32:15 34:9 45:25 48:16 52:2 61:9 62:10 63:14 68:10 68:21 70:12 71:6,16 71:20 72:7,10 73:9 73:25 75:12,14 77:5 78:6 79:3,14,15,20 80:17 81:4,22,24 83:10,13,25 85:7,23 87:23 88:2,8,10,19 89:20 90:24 91:11 91:23 92:12 93:16 95:6 97:21 99:11 100:4,5,22 101:2,17 101:23 102:5
**challenge (2)**
24:11 68:13
**challenging (1)**
21:14
**CHANG (1)**
2:16
**change (4)**
7:13 27:12 50:3 95:25
**changes (4)**
16:4,6,20 30:2
**charade (2)**
38:20,20
**charge (2)**
29:2 78:15
**charter (15)**
5:5 9:25 37:14,15 38:5,10 41:20 43:17 47:25 68:6 74:10,12 75:7 98:7 99:6
**check (1)**
43:16
**chief (3)**
13:17 35:12 44:23
**choice (1)**
53:12
**Circuit (5)**
11:23 12:22,24 23:2 72:16
**Circuit's (1)**
20:3
**circular (1)**
52:22
**cite (1)**
12:13
**cited (2)**
12:10 49:20
**cites (1)**
98:19
**citing (1)**
46:14
**city (2)**
40:4 85:25
**Civil (1)**
98:19
**claim (21)**
18:15 19:24 21:6 24:22 25:20 26:24 27:5 29:11 37:10,11 37:12 39:10,13,15 43:18 45:18 68:5 79:23 90:16 92:10 97:3
**Claimant (2)**
1:6 2:12
**claimed (2)**
5:14,14
**claiming (1)**
38:19
**claims (1)**
49:18
**clarification (2)**
73:17 97:24
**clarify (1)**
82:5
**clarifying (1)**
89:13
**clause (20)**
22:15,15,22 49:13,13 50:15,21 52:24 53:17 57:7,15,19 58:21 66:24 72:6,11 93:23 98:17 99:5,10
**clean (1)**
60:12
**clear (18)**
6:25 18:9 22:22,23 23:3 39:20 43:20,21 44:18 48:7 51:9 58:12,13 59:4 72:18 73:10,11 77:9
**clearer (2)**
73:10,15
**clearly (2)**
14:12 59:21
**cleave (1)**
74:20
**client (1)**
76:5
**close (5)**
3:21,24 69:9 89:9 97:4
**closed (7)**
80:3 92:21 93:3 94:9 95:22 96:23 102:8
**closely (2)**
64:11 76:19
**clothed (1)**
35:10
**Code (1)**
98:19
**cognizant (1)**
87:25
**collateral (1)**
59:15
**colleagues (1)**
99:25
**colloquy (1)**
22:23
**collusive (1)**
40:9
**column (3)**
35:4 46:7,9
**combines (1)**
55:22
**come (13)**
4:20 20:6 31:17 38:4 53:13 58:17,22 71:9 76:22 89:3 93:20 95:5 96:2
**comes (6)**
13:3 53:6,7 70:17 71:17 97:16
**comfort (1)**
61:7
**coming (6)**
4:20 19:4 36:7 63:9 80:20 85:17
**commencing (1)**
1:19
**commercial (1)**
53:4
**common (4)**
16:2 25:5 29:16 66:18
**COMMUNICATI...**
1:4
**company (12)**
33:11,15,16,17 44:17 45:9,14 47:19,25 67:14 87:2,5
**compel (2)**
20:10 53:22
**compelled (1)**
53:10
**competent (2)**
51:7,25
**competing (1)**
93:22
**complex (1)**
19:8
**complexity (1)**
75:16
**complicated (1)**
79:22
**Comprehensible (1)**
82:13
**conceded (1)**
21:10
**conceding (1)**
70:4
**concept (1)**
19:13
**concerning (3)**
3:9 4:11 22:25
**conclude (3)**
3:17 4:4 88:22
**concludes (1)**
57:12
**conclusion (1)**
19:4
**conclusions (5)**
81:9 89:8,17 96:6,17
**conclusive (1)**
41:12
**conditions (1)**
15:22
**Condominium (1)**
34:5
**conduct (2)**
31:17 66:3
**confer (3)**
99:25 100:23 101:3
**confident (5)**
84:15 85:5,8,11,20
**confirm (1)**
37:18
**confirming (1)**
43:15
**conflict (1)**
59:4
**conform (2)**
47:25 86:20
**confused (1)**
94:14
**Congregation (1)**

46:4
**conjunction (1)**
89:24
**connection (1)**
9:5
**conscience (1)**
26:20
**consensually (2)**
84:5 89:3
**consent (2)**
43:25 85:16
**consider (3)**
18:22 75:20 92:10
**consistent (1)**
17:17
**Consortium (1)**
78:9
**conspicuously (1)**
85:8
**construction (3)**
36:2,21 37:14
**consulted (1)**
81:5
**contact (2)**
7:25 13:2
**contacted (1)**
16:8
**containing (1)**
49:12
**contemplate (1)**
82:11
**content (1)**
85:4
**contention (1)**
77:2
**contentious (1)**
86:5
**context (1)**
24:25
**contract (60)**
12:5,16,19 13:5 22:13 22:23 23:10 27:2 41:5 45:10,12,15,17 45:23 46:12 50:2 51:15,19,22,23 52:13,19 55:22 57:13,22 58:5 60:8 60:14 61:17,25 62:14,19 63:4,16,18 63:23 64:4,9 66:21 66:24 67:2,3 68:17 69:3,7,22,24 70:16 71:8 73:6 89:18 90:18 92:11 93:12 94:4 96:9,13,15,20 100:17
**contracts (5)**
25:7 33:24 36:5 71:18 94:25
**contractual (2)**
52:6 93:2
**contrary (4)**
11:6 37:3 44:8 53:2
**control (6)**
28:11 38:12 43:8 76:14 77:19 78:25
**controlled (6)**
29:6 43:11 45:6 60:10 77:18 78:11
**controversy (1)**
40:12
**convene (1)**
99:17
**convened (1)**
38:18
**convenes (1)**
80:19
**convention (4)**
63:11 99:21 100:11 100:12
**conventional (1)**
100:20
**conversations (1)**
91:15
**conversely (1)**
64:4
**convince (1)**
63:15
**convinced (1)**
55:5
**cooperative (1)**
91:15
**coordinate (1)**
30:20
**copies (3)**
34:8 40:15,17
**copy (3)**
30:8,25 37:13
**Corp (1)**
46:5
**corporate (8)**
10:20,24 11:2,8 42:8 43:5 74:10 83:19
**corporation (13)**
24:2,2 34:16,19 35:10 35:13,17,20 36:5,7 36:12,15 44:24
**correct (9)**
21:16 44:25 50:22 52:7 58:7 68:12 72:9 95:17 101:17
**counsel (6)**
3:16 4:10 14:19,25 15:5 100:13
**count (1)**
21:8
**counterarguments (...**
8:9
**course (5)**
4:19 19:20 40:15 66:3 100:17
**court (44)**
8:13 18:8,11,17 21:8 22:17 23:5 34:22 40:3 41:11 51:6,25 52:11,16,17 53:21 53:23 54:25 56:10 58:10,10,17,24 59:16 61:4,12,13 62:15,17,24 63:4,7 63:8,12,16 64:8 70:9 73:8 78:13,19 94:21 98:13,14 99:7
**courts (17)**
7:14 8:17,20 12:12 18:5,25 19:3,15 39:5 40:6 53:18 54:10 55:12 59:20 60:15 94:25 99:2
**Court's (1)**
99:9
**cover (1)**
4:3
**CPLR (1)**
102:4
**cracks (1)**
16:15
**CRAIG (16)**
1:24 48:23 52:8 61:6 69:25 75:11,13,18 76:8,25 86:3 88:9 90:23 91:9,19 101:14
**creates (1)**
24:3
**credence (1)**
80:9
**critical (2)**
28:19 71:24
**cross (1)**
71:23
**crossed (1)**
32:9
**cross-examined (1)**
102:3
**current (2)**
27:22 43:2
**currently (1)**
78:25

**D**

**date (4)**
4:6 85:11,13 88:16
**dated (1)**
31:23
**dates (3)**
82:18,20 91:17
**David (3)**
3:13,19 13:10
**day (4)**
29:14 87:11 92:24 103:11
**days (4)**
48:22 87:13,21 88:21
**deadline (1)**
79:11
**deal (3)**
4:19 5:19 46:16
**dealing (2)**
23:25 38:16
**dealt (2)**
9:15 53:3
**December (5)**
9:2 17:15 28:6 86:16 86:17
**decide (39)**
3:25 12:18 52:4,5,23 52:25 55:9,10 56:24 56:25 57:6,13,18 59:7,9,12,14 60:6 62:12,18 63:17 67:20 68:16 69:6,21 69:21 70:6,6,15 71:7,12,14 72:2,12 72:14,15 82:9 89:23 92:5
**decided (9)**
8:13 13:5 59:16 62:19 62:24 80:2 87:3,9 94:20
**deciding (2)**
63:22 82:11
**decision (13)**
19:2 20:3 23:2 34:3 61:20 68:25 80:16 81:25 82:7 90:12 98:12,12 102:15
**decisions (1)**
18:24
**declare (1)**
96:21
**deed (1)**
41:17
**defeat (4)**
20:7,21 21:3 45:15
**defense (1)**
46:10
**defer (1)**
92:13
**deficient (1)**
8:10
**delay (2)**
87:7,18
**delivered (3)**
31:13 32:12 37:25
**denied (3)**
82:17 95:8 101:4
**deny (1)**
90:9
**departs (1)**
99:12
**depends (2)**
51:14 61:14
**depositions (2)**
84:22 92:17
**derives (1)**
14:8
**described (1)**
27:10
**despite (3)**
29:7,9 37:16
**destroy (1)**
42:16
**detail (1)**
18:20
**determination (3)**
23:6 52:18 53:13
**determine (19)**
21:15,22,25 22:9,12 22:18 23:16 49:10 49:21,24,25 50:18 51:4,17 54:25 56:13 58:24 61:16 62:7
**determined (2)**
23:5 61:23
**determining (1)**
64:2
**Didkovskiy (3)**
2:24,24 30:12
**Didkovskiy's (1)**
47:16
**different (2)**
84:23 93:16
**differently (1)**
84:24
**difficult (1)**
86:10
**difficulty (1)**
84:18
**diligence (2)**
10:12 31:18
**directing (1)**
46:6
**director (7)**
14:5 33:10,14 43:2 44:16,21 67:13
**directors (3)**
34:18 35:15 86:23
**director's (1)**
17:23
**disagree (3)**
56:19 58:9 68:19
**disagreement (1)**

38:3
**discharge (1)**
35:18
**discovered (2)**
38:23 45:19
**discovery (13)**
4:7 44:9 80:23 82:19 84:6,16 85:4,9,12 85:16,18 88:25 89:4
**discuss (2)**
4:5 84:11
**discussed (4)**
83:15,18 84:8,21
**discussion (2)**
39:18 41:10
**discussions (1)**
32:10
**dismiss (7)**
3:8 49:6 51:5 73:2 82:16 90:8,10
**disposition (1)**
5:8
**dispute (5)**
68:9 74:4 78:18 82:3 82:9
**disputes (2)**
58:4 89:4
**disregard (2)**
9:12 19:2
**distinguished (2)**
4:9 11:24
**distribute (2)**
34:8 77:25
**distributed (4)**
30:15 34:14 46:3 80:5
**District (7)**
56:21,23 57:2 59:5 61:12 62:15,17
**Division (3)**
34:3,6,22
**doctrine (3)**
23:21,22 42:17
**document (10)**
25:17 28:24 34:17 44:6 47:17,20 74:11 75:7,10 80:5
**documentation (1)**
92:17
**documents (3)**
30:23 32:24 78:23
**dog (1)**
28:16
**doing (8)**
17:21 51:16 56:14 60:9 74:12 93:10 94:7 96:3
**dollars (1)**
45:9
**draft (1)**
27:18
**Drake (30)**
7:20 8:7 11:14 12:22 12:23 19:25 20:4,9 20:19 22:2,19 23:2 51:2,15,20 52:6,10 52:17 55:14,18 57:25 58:16 60:11 62:9 68:19 69:4 72:20,23,25 73:4
**drill (1)**
24:10
**due (4)**
10:12 24:9 31:17,19
**duly (8)**
31:22 32:2,16,19 33:25 42:12 44:4 67:3
**duplicative (1)**
101:15
**duties (1)**
35:19
**DX (1)**
2:11

**E**

**E (3)**
2:3,3 103:2
**earlier (4)**
15:8 61:20 97:25 98:5
**early (5)**
10:15,19 28:6 38:23 53:13
**easier (1)**
68:11
**east (1)**
25:6
**Easterbrook's (2)**
22:25 60:21
**EC2N (1)**
2:10
**effect (7)**
23:20 24:19 33:11 37:21 58:23 93:6,6
**eight (1)**
21:18
**either (8)**
15:4 17:14 41:24 53:16 58:25 70:11 90:6 101:11
**Ekhougen (3)**
16:2 30:18 54:15
**elaborate (3)**
38:20 41:4 42:21
**elected (1)**
41:15
**emphasize (2)**
7:17 101:18
**employee (1)**
28:25
**empty (1)**
31:7
**encouraged (1)**
84:9
**endorse (1)**
25:20
**ends (2)**
3:15 4:17
**enforceable (3)**
48:9 94:4 99:23
**enforced (1)**
94:5
**engaged (2)**
35:18 38:19
**entail (1)**
57:14
**enter (7)**
44:13 67:15,21,23 90:4 98:7 99:3
**entered (2)**
68:14 74:5
**entering (2)**
33:16 66:17
**entertain (3)**
97:19 101:24 102:5
**entire (1)**
36:22
**entirely (2)**
44:25 83:3
**entirety (1)**
23:9
**entitled (6)**
12:8 32:23 33:19 58:24 78:14 96:16
**entity (2)**
29:2 45:7
**envious (1)**
41:18
**envision (1)**
90:4
**equity (1)**
26:20
**ERIC (1)**
2:16
**ESQ (7)**
2:6,7,11,15,16,17,22
**Esqs (2)**
1:17 2:14
**essentially (8)**
5:15 6:13 37:13 46:21 87:9 90:7,9 98:20
**established (1)**
54:5
**estopped (2)**
5:15 26:13
**estoppel (10)**
5:22 6:8,11,16 7:22 8:3,11 9:15 45:3 59:15
**et (1)**
7:23
**European (2)**
25:6 100:13
**events (3)**
9:24,25 10:3
**eventually (1)**
47:4
**everybody (4)**
3:5 87:16 89:7 99:12
**everyone's (1)**
20:18
**evidence (36)**
4:5 7:19,25 8:8 9:4 13:4 19:9 20:6,13 21:3 42:11 48:19 51:21 54:12 58:12 58:13,18,22 60:14 60:23 63:23 76:23 78:24 92:16 95:4,10 95:14 97:12,13,16 97:20 98:11 101:7,9 101:16,19
**evidentiary (9)**
20:15,22 30:10 52:10 52:14 80:13 84:3 94:9 96:23
**exactly (4)**
18:17 22:5 56:22 83:12
**examine (1)**
71:24
**example (4)**
84:20 90:16 93:19 95:12
**exchanged (1)**
47:23
**excuse (1)**
26:9
**execute (2)**
44:6 45:4
**executed (4)**
27:18 34:17 45:12 67:2
**executive (3)**
29:10 35:12 44:24
**exercise (1)**
70:22
**exercised (3)**
62:11,13 69:2
**Exhibit (3)**
13:11 14:11 30:10
**exist (1)**
92:11
**existence (3)**
50:14 93:3 96:20
**exists (4)**
36:9 42:18 64:9 94:25
**experience (1)**
84:24
**expert (5)**
7:15 9:7 14:23 42:5 97:2
**express (3)**
27:19 37:5 41:22
**expressly (5)**
23:5,7 26:25 36:25 66:23
**extant (1)**
11:4
**extended (1)**
22:23
**extensive (1)**
41:10
**extent (6)**
39:23 80:8 84:2 93:12 95:3 100:18
**extraordinarily (1)**
44:22
**extremely (3)**
42:9 44:17 79:22
**e-mail (3)**
14:10 25:2 30:8
**e-mails (3)**
13:14,20 14:2

**F**

**F (1)**
103:2
**FAA (1)**
97:18
**face (2)**
38:8 100:19
**facie (2)**
20:14 35:14
**fact (24)**
7:13 17:2 29:9 37:18 38:16 39:9,25 41:25 44:15 49:11 54:3,6 54:10,24 57:16 63:6 64:7 81:9,18 83:17 84:9 89:8 94:17 99:2
**facts (2)**
58:10 62:3
**failed (1)**
9:20
**fairly (1)**
9:16
**faith (1)**
38:16
**fall (2)**

10:7,11
**falls (1)**
74:22
**fanciful (1)**
78:12
**far (8)**
3:6 7:2 9:5 27:15 45:3 48:13 60:2 86:9
**favorable (2)**
29:13 43:13
**fax (3)**
29:24 30:25 47:15
**federal (4)**
56:10 61:13 63:15 78:13
**feels (1)**
59:22
**fees (2)**
12:7,8
**Feinberg (51)**
1:22 3:4 11:20 19:22 21:12 48:16 52:2 62:10 63:14 68:10 68:21 70:12 71:6,16 71:20 72:7,10 73:9 73:25 75:12,14 77:5 78:6 79:3,15 80:17 81:4,24 83:10,25 85:7,23 87:23 88:2 88:8,10,19 89:15,20 90:24 91:11,23 92:12 95:6 97:21 99:11 100:4,22 101:2,17 102:5
**fellow (5)**
73:16 82:4 85:24 89:6 100:24
**field (1)**
63:9
**Fifth (1)**
2:4
**fight (1)**
56:12
**filed (2)**
41:7,21
**files (2)**
76:7,17
**filing (1)**
75:5
**fills (1)**
16:17
**final (4)**
90:6,9,12 93:14
**finally (3)**
18:18 43:14 95:3
**find (15)**
12:17 52:11 54:24 56:15 61:10 62:4,5 64:8 69:2 73:3 78:22 80:19 94:23 94:25 100:2
**finding (6)**
63:19 65:15 70:9 73:8 75:4 99:9
**findings (14)**
54:9 63:6 81:8,12,18 89:8,17 91:25 92:6 94:17,24 96:6,17 99:7
**fine (3)**
63:24 69:18 86:3
**fingers (1)**
32:9
**firm (3)**
40:17,20,20
**first (18)**
5:21 9:18 10:20 19:24 21:11 35:4 39:10 55:3,7 60:6 72:24 77:10 87:13,21 93:11 98:13 101:22 101:22
**five (3)**
21:9 49:11 73:17
**fix (1)**
91:6
**fixed (1)**
91:4
**floated (1)**
25:20
**flung (1)**
3:6
**focus (2)**
64:19 66:6
**focused (1)**
4:21
**follow (3)**
59:15 63:12 94:24
**followed (4)**
24:4 32:18 33:3 64:13
**following (4)**
21:17 80:18 81:6 88:2
**follows (2)**
22:7 100:20
**Force (1)**
88:17
**forcing (1)**
60:16
**foreign (2)**
41:13 62:23
**forgery (1)**
80:6
**form (1)**
67:6
**formal (3)**
27:13 42:6 44:5
**formalities (1)**
32:3
**formally (2)**
24:8 84:14
**formation (5)**
12:19 13:5 51:24 61:17 63:23
**formed (5)**
7:25 12:5 13:3 51:15 69:23
**forms (1)**
66:25
**forward (13)**
15:23 18:16 22:10 26:18 38:6 49:22,25 52:14,24 68:3 86:8 90:10 102:12
**found (7)**
7:15 18:17 49:13 53:19 77:15 98:14 99:2
**foundational (2)**
75:7,10
**four (2)**
34:21 35:3
**fours (1)**
61:2
**fourth (1)**
94:7
**frankly (1)**
92:15
**free (3)**
86:11,15 87:11
**free-standing (1)**
18:15
**Friday (1)**
83:8
**FRIED (1)**
2:17
**frustration (1)**
75:15
**full (5)**
20:22 82:25 83:6 87:23 98:16
**fully (4)**
45:12 46:12 66:24 96:16
**full-blown (1)**
51:16
**funeral (1)**
95:4
**funny (1)**
32:21
**further (2)**
79:12 102:10
**Furthermore (1)**
36:11

**G**

**garbled (1)**
21:21
**general (13)**
14:5 17:23 33:10,10 33:14,15 35:9,13,18 36:13 44:16,21 67:13
**generis (1)**
63:2
**Geneva (1)**
88:18
**gesture (1)**
31:8
**getting (3)**
26:5,6 54:20
**give (1)**
14:15
**given (8)**
3:21 12:20 15:16 38:9 42:7 80:9 91:4 92:24
**giving (3)**
14:24 16:9 33:14
**glad (1)**
79:25
**go (33)**
4:18 8:16 11:20 12:2 12:4,18 14:21 15:25 18:19 22:10 49:22 49:24 52:14,24 53:20 56:6,9 57:4 60:5,17 63:6 66:5 72:13 73:5,25 75:12 75:14 84:10 86:8 88:6,23 94:17 101:13
**goes (4)**
45:3 46:13 50:12 53:21
**going (32)**
9:10,10 15:16 18:9 20:16 22:17 56:5 59:6,7,12 61:11,12 62:15,17 63:14 64:16 65:11 69:21 69:21 70:5,6 79:10 83:21 87:9 91:9 92:6,22 93:10 94:15 95:18 96:24 97:20
**goings (1)**
8:25
**good (6)**
3:4 11:4 16:24 19:3 26:20 38:16
**gotten (1)**
19:16
**govern (2)**
37:2 42:23
**governance (5)**
10:21,24 11:8 83:19 86:18
**governs (4)**
23:24 41:8,13 90:17
**grant (2)**
37:19 90:7
**granted (2)**
40:16,19
**grasping (1)**
65:2
**great (3)**
14:21 19:11 23:13
**greater (1)**
33:21
**green (1)**
32:20
**GREGORY (1)**
1:24
**gripe (1)**
72:13
**ground (2)**
16:2 66:18
**group (3)**
28:25 29:11 78:9
**guard (1)**
32:8
**guess (6)**
90:13 91:23,24 92:2 92:12,19
**guessing (1)**
75:3
**guided (2)**
53:11 60:9
**guys (4)**
84:4 89:22 91:13 92:14

**H**

**hand (2)**
40:14 103:11
**happened (3)**
9:12 46:15 61:18
**happy (3)**
4:19 11:17 86:11
**hard (3)**
29:23 63:15 86:24
**hashed (1)**
19:16
**hat (1)**
32:21
**head (1)**
23:22
**headquartered (1)**
29:3
**hear (7)**
3:10 49:17 58:4 61:18 74:3 79:25 90:15
**heard (7)**

8:18 21:8 38:22 44:19 53:24 76:25 81:15
**hearing (50)** 4:6,18,21 8:21 9:22 11:22 13:11 16:18 20:14,15,23,25 22:4 22:20,24 25:21 27:25 37:4 41:9 51:10,17 52:11,15 52:18,19 58:25 59:6 66:13 82:18,19,25 85:11,13 87:7 88:16 88:21 89:2,21,24 90:11 91:5 92:7,10 93:4 95:2 96:8,11 97:15 101:23 102:7
**hearings (2)** 54:5 97:14
**heart (1)** 95:25
**hedge (1)** 70:16
**hedging (1)** 70:13
**held (5)** 1:16 21:4 29:8 48:9 48:10
**help (1)** 90:2
**hereunto (1)** 103:10
**HERRINGTON (2)** 2:4,9
**hesitation (1)** 74:15
**hierarchy (1)** 76:9
**high (1)** 54:2
**HOGSTAD (1)** 2:22
**hope (4)** 11:10 30:23 84:12 93:7
**Hopefully (1)** 89:22
**hoping (1)** 91:16
**HQ (1)** 2:10
**Hudyakov (4)** 14:21 15:3 16:16 17:2

**I**

**ICC (1)** 53:5
**ICDR (1)** 53:5
**idea (3)** 60:18 72:21 88:22
**ignore (1)** 9:11
**III (1)** 1:6
**Ilyashev (9)** 18:2,11 39:24 40:10 40:17,18,19,20 41:16
**Ilyashev's (3)** 39:20 41:2 42:20
**imparting (1)** 15:2
**implicit (1)** 83:25
**implied (1)** 36:20
**important (3)** 40:9 73:18 87:2
**inauthentic (1)** 80:6
**incepted (1)** 19:12
**include (2)** 96:8 99:10
**including (6)** 33:16 50:13,20 57:6 90:21 98:16
**inconceivable (1)** 33:20
**inconsistent (1)** 49:4
**incorporated (1)** 23:10
**incorrectly (1)** 62:20
**incumbency (3)** 17:11,22 42:12
**independent (2)** 57:20 58:21
**indicate (1)** 66:5
**indication (1)** 98:6
**indicia (1)** 24:3
**indistinguishable (1)** 67:11
**Indosuez (2)** 41:10,11
**induce (1)** 42:7
**indulgence (1)** 4:15
**infinite (1)** 42:14
**infirmity (2)** 38:24 45:19
**informally (2)** 24:8 84:11
**information (3)** 6:4 17:16 76:5
**informed (3)** 22:2 29:25 100:13
**inhere (1)** 35:11
**initially (1)** 3:11
**initiated (1)** 32:11
**ink (2)** 32:20 93:25
**inserted (1)** 26:12
**instance (2)** 55:19 98:13
**intended (1)** 59:21
**intensive (1)** 83:17
**interest (2)** 79:20 94:6
**interested (1)** 42:4
**interesting (3)** 18:6 41:23 92:13
**interests (1)** 15:7
**interim (1)** 97:15
**intermediary (1)** 17:3
**internal (1)** 24:4
**international (3)** 53:4 85:3 100:21
**internet (3)** 29:5 78:4,21
**interpretation (1)** 52:9
**interrelated (1)** 74:18
**inter-European (1)** 100:12
**intimately (1)** 74:16
**introduced (1)** 9:4
**invalid (5)** 49:14 52:13 69:3,7 98:21
**invalidate (1)** 46:11
**invalidity (2)** 57:15 95:15
**invented (1)** 27:4
**invited (1)** 31:17
**involved (4)** 6:9 7:10 12:3 76:19
**involvement (1)** 24:21
**involving (1)** 5:7
**ipso (1)** 57:14
**irony (1)** 26:23
**irregularities (1)** 63:10
**irrelevance (1)** 41:8
**irrelevant (2)** 24:5 77:6
**issue (35)** 4:22 10:20 12:2,6,19 13:4 35:6 47:7,9 51:23 52:5,6 53:8 53:20 54:6,24 57:6 57:20 61:16 62:24 65:5,10 75:17 79:22 80:23 81:10,17 82:2 82:8 84:22 89:11 92:21 93:19 96:22 97:4
**issued (1)** 78:17
**issues (31)** 3:15 8:11 10:23 11:8 11:11 12:9 19:16 49:15 54:3,7 55:8 56:24 58:15 59:25 59:25 64:7 83:2,3,4 83:16 84:3,6 86:18 91:25 93:4,11,12,17 94:12 95:10 97:20
**item (1)** 4:3

**J**

**J (1)** 2:17
**Jamack (1)** 15:6
**January (6)** 11:3 16:8 17:11,15 28:7 31:24
**JAY (1)** 3:2
**Jentes (35)** 1:23 11:15 22:5,24 35:2 50:20 52:21 55:2,24 56:18 58:7 59:3,17,24 60:20 64:10 65:4,20 66:14 67:17 69:24 73:23 74:2,17,24 77:17,21 77:23 86:4 88:12,15 90:2 99:18 100:8 101:18
**Judge (1)** 22:25
**judgment (3)** 20:11 53:24 54:22
**jumps (1)** 28:2
**jure (1)** 57:14
**juridical (1)** 47:18
**jurisdiction (51)** 21:7,10,15,22,25 22:6 22:18 23:16,17 49:9 49:10,17 50:12,18 50:19 51:3,4,7,14 51:25 52:22 56:9,13 56:15 57:18 59:13 61:11,16 62:7,12,18 68:15 69:2,6 70:15 70:20,22 71:15,22 72:25 81:10 82:2,8 89:11 90:21 92:2,5 94:19,20,23 100:9
**jurisdictional (7)** 52:5 57:6 70:17 72:19 91:2 93:11,19
**jury (2)** 59:11 78:14

**K**

**K (3)** 3:2 13:11 14:11
**Karkov (1)** 40:4
**keep (1)** 95:12
**keeping (1)** 27:18
**keeps (1)** 79:23
**KENNETH (1)** 1:22
**kept (1)** 47:6
**key (4)** 6:8 34:2 35:22 67:17
**Khudyakov (9)** 7:10 16:8 29:22 30:6 31:3 32:4 33:6 47:11 96:25
**Khudyakov's (1)**

**kicked (1)** 51:24
**kicks (1)** 52:10
**Kiev (2)** 29:4 30:22
**kind (2)** 28:7 56:24
**Klymenko (3)** 17:18 18:10 42:25
**knew (8)** 4:23 5:5,11,25 6:19 7:7 9:19 29:19
**know (22)** 5:3 6:15 7:9,11 25:15 28:13 36:15 66:12 72:21 75:2 76:17,18 77:15,22,23 79:10 84:22 86:8 99:19,24 100:2,4
**knowledge (5)** 6:11,22 17:23 33:13 43:23
**known (4)** 4:24 5:11 6:2,5
**knows (1)** 84:25
**Kosogov (8)** 17:9,21 31:14,20 33:7 43:14 44:10 76:18
**Kosogov's (1)** 44:18
**Kyivstar (6)** 5:8 10:24 15:7 30:18 31:25 74:14

**L**

**L (1)** 2:6
**lack (7)** 19:25 27:21 39:3,10 43:10 45:14 68:5
**lacked (5)** 5:16 9:19 67:14 68:7 98:6
**lacks (3)** 21:7 49:9,17
**language (3)** 30:13 50:5 51:10
**largely (3)** 80:3 83:3 87:9
**late (2)** 28:6 96:3
**law (46)** 6:8 14:23 15:3,8 16:11 19:5,7,14 23:23 29:16 33:9,14 36:24,25 37:7 41:8 41:13,13,15,19 42:22,22 44:3 55:23 55:24 56:3 61:21,23 62:4,5 63:11 64:9 66:4 70:22 72:15 78:15 81:9,18,18 89:9 98:25 99:6 100:6,17,18,19
**lawyer (3)** 14:23 39:25 75:4
**lawyers (3)** 38:2 40:24,24
**layer (1)** 6:17
**leading (3)** 82:19 85:13 91:17
**leap (1)** 38:11
**learn (1)** 39:13
**leary (1)** 60:15
**leave (2)** 79:18 101:11
**left (1)** 63:9
**legal (11)** 6:23 7:16 11:18 25:6 27:9 68:2,25 83:3,3 84:3 101:19
**legally (1)** 67:10
**Leidersdorf (2)** 35:25 36:18
**lend (1)** 24:15
**length (1)** 23:14
**lept (1)** 38:10
**letters (1)** 95:23
**let's (16)** 51:17 53:23 55:24 56:20 64:12 65:9 67:19 69:12,18 71:10,11 75:21 80:18 88:19,24,25
**Lev (1)** 46:4
**Level (1)** 2:9
**liability (1)** 67:14
**light (5)** 3:8 6:19 62:8 81:6 97:16
**limit (2)** 26:7,9
**limitation (1)** 36:16
**limitations (3)** 4:25 6:2 74:23
**limited (7)** 14:2 24:20 56:11 58:5 58:5 67:14 95:4
**lines (3)** 21:11,18 22:3
**LISA (1)** 2:17
**literally (1)** 61:22
**litigate (1)** 68:8
**Litovchenko (1)** 30:19
**little (5)** 22:4 27:2 29:23 83:4 90:3
**LLC (2)** 1:9 44:22
**LLP (2)** 2:4,9
**location (1)** 57:4
**locations (1)** 3:6
**logistical (2)** 79:5 91:4
**London (1)** 2:10
**London/City (1)** 2:11
**long (7)** 3:13 8:10 48:13 58:17 68:18 74:13 81:16
**longstanding (1)** 86:5
**look (15)** 14:10 18:4 25:2 31:12 34:20 39:19 41:2 46:2 49:7 51:13 57:9 62:4 64:25 65:11 77:15
**looked (1)** 76:17
**looking (5)** 16:3 24:13 35:21 79:18 82:23
**looks (3)** 6:10 7:9 15:9
**loose (3)** 3:15 4:17 51:10
**loosely (1)** 5:22
**lot (2)** 13:19 85:3
**Lovells (2)** 1:17 2:14
**lunch (2)** 99:15 100:23
**Lykke (1)** 13:13

**M**

**Madison (2)** 1:17 2:14
**main (2)** 7:3 18:22
**maintain (1)** 65:14
**making (5)** 29:11 45:22 49:2 68:23 98:24
**man (1)** 32:19
**Manhattan (1)** 34:23
**manner (2)** 3:23 9:21
**manual (1)** 32:7
**manually (1)** 47:17
**March (1)** 10:22
**Marchenko (4)** 39:19,21,22,25
**Massachusetts (1)** 88:5
**material (4)** 16:5,10,20 29:25
**materiality (1)** 27:4
**matter (18)** 1:2,14 26:20 29:4,15 29:16 38:15 39:9 41:7,19 43:23 59:17 64:3,9 77:8 78:15 90:10 103:8
**matters (5)** 3:14,20 4:12 23:4 76:19
**Maydanyk (7)** 7:15 18:18 19:6 27:9 37:4,25 42:5
**mean (14)** 22:5 24:23 32:6,8 61:22 62:2,25 63:2 71:23 73:14 91:14 92:4,24 100:6
**meaningless (1)** 31:7
**means (5)** 32:2,9 44:5 47:12 101:14
**meeting (38)** 7:6,12 14:8,14 16:13 17:14,17 26:25 27:14,20 28:4,10 30:3 31:16 32:21,22 38:15,18 42:2 43:4 43:24 44:15 49:3 54:11,13 61:8 74:6 75:19 76:3,6,10,20 76:23 77:3,10,11,16 93:20
**meetings (3)** 11:2 47:24 86:24
**member (1)** 34:10
**mention (2)** 30:4 39:17
**mentioned (3)** 8:22 41:25 42:2
**mentioning (2)** 34:25 35:8
**merely (1)** 14:24
**merits (9)** 7:21 48:12 49:15 51:17 59:2 82:25 90:11,16 92:23
**mind (1)** 27:5
**minimum (3)** 19:6 54:4,23
**minute (3)** 70:14 71:10 80:25
**minutes (4)** 73:18 80:19 99:14 101:3
**mispronouncing (1)** 13:12
**missing (1)** 78:15
**mistake (2)** 15:9 63:19
**Mobile (31)** 1:4 4:23 5:4,11,14,25 6:12,15,18 8:14,19 8:22 9:3,17,23 12:10 13:19 14:3 16:25 17:2,4,6,12 19:11 22:16 53:15 54:16 73:5 76:22 97:8,13
**Mobile's (4)** 8:3,9 49:18 64:6
**model (2)** 100:6,15
**modified (1)** 26:16

**moment (6)**
16:7 55:25 65:9 67:20 75:21 82:15
**Monday (4)**
30:24 87:21 88:10,20
**months (1)**
96:4
**moot (1)**
92:2
**moots (1)**
59:18
**morning (3)**
3:4 19:19 40:3
**morphed (1)**
97:3
**morphing (1)**
79:24
**motion (23)**
3:8,24,25 4:2 20:10 20:11 48:20 49:5 51:5 53:22 72:13 79:4,12 82:10,16 90:8,10 95:8,19,20 96:4 101:4,24
**mount (1)**
48:5
**mounted (1)**
40:7
**move (6)**
11:13,18 15:13 18:16 96:19 102:12
**movement (1)**
85:4
**moving (8)**
13:7 15:23 16:16 17:8 17:25 37:11 79:21 94:6
**MUSOFF (1)**
3:2
**MV (1)**
46:5

**N**

**N (2)**
2:3 103:2
**nail (1)**
11:25
**name (1)**
13:13
**nature (1)**
40:9
**nauseum (1)**
92:15
**necessary (3)**
44:6,12 96:14
**necessity (1)**
35:11
**need (6)**
7:5 8:12 16:12 25:4 58:12 91:14
**needed (10)**
5:7,12 6:6 7:12,14 13:17 14:14 28:20 31:2 85:12
**negotiate (1)**
26:8
**negotiated (3)**
25:24 46:16 47:8
**negotiations (1)**
32:11
**never (4)**
43:9 48:14 53:16 84:18
**new (55)**
1:17,18 2:5,5,15,15 7:2 9:4 18:9,12 23:23 26:9 27:14 29:15 30:2,14 34:3 34:6,16 36:24,24 37:7 41:8,11,12,15 42:4,22 44:24 45:11 47:7 54:16,20 55:22 55:24 56:21,23 57:2 59:5,12 62:5 63:10 63:11 75:22,23 78:13 85:25 96:2,24 98:10 99:20 100:11 100:17 101:16 103:6
**nicely (1)**
16:17
**Nilov (42)**
5:16 6:6 9:19 10:4,16 13:15,21 14:4,7,16 24:23 25:10,10 28:19,23 29:14,19 30:21 31:21 32:15 37:19 41:22 44:13 44:16 47:15 66:11 67:7,13 68:7 69:15 71:18,22 74:4 76:14 77:17 78:7,16,24 95:24 96:25 98:6,25
**Nilov's (7)**
4:25 6:18 29:8 33:21 38:24 39:3,10
**nine (2)**
21:11,18
**nominees (1)**
86:23
**non-compete (3)**
83:16,21 93:23
**non-complete (1)**
83:20
**Notary (2)**
1:16 103:5
**note (3)**
8:14 24:22 37:2
**noted (3)**
5:22 42:4 102:18
**notes (1)**
1:13
**notice (1)**
97:10
**noticed (1)**
98:3
**notion (5)**
5:24 75:22 78:11 82:3 82:6
**notwithstanding (1)**
99:4
**November (17)**
83:6,11 85:25 86:13 86:15 88:13,15,20 89:22 91:5,20 92:9 92:24 95:8 96:8,11 102:13
**NSA (1)**
75:24
**null (2)**
57:14 98:16
**nullity (1)**
42:10
**number (2)**
46:14 75:16
**nutshell (2)**
65:14 69:8

**O**

**O (1)**
103:2
**objecting (1)**
60:7
**objection (3)**
26:15 56:7,8
**objections (2)**
50:11,13
**obligated (3)**
79:9,16 86:20
**obligation (3)**
26:8 32:17 97:19
**obligations (1)**
17:7
**obtain (1)**
20:22
**obtained (4)**
10:8 28:20,22 29:9
**obvious (1)**
48:17
**obviously (1)**
14:6
**October (3)**
14:13 87:8,12
**Odell (1)**
34:4
**offensive (1)**
80:7
**offer (4)**
29:13 43:13 95:10,13
**offered (2)**
4:5 43:12
**office (3)**
35:19 36:14 47:16
**officer (4)**
25:9 29:2 35:13 44:24
**offices (1)**
1:17
**official (1)**
47:10
**okay (5)**
11:21 53:23 56:4 65:11 72:10
**Old (1)**
2:10
**OLEKSIY (1)**
2:24
**Omega (5)**
15:25 26:4 46:17,25 47:3
**omnibus (1)**
93:6
**once (5)**
4:4 26:3 45:12 47:14 71:2
**ones (1)**
57:5
**one-day (1)**
87:10
**open (3)**
79:19 95:13 101:11
**opening (1)**
49:7
**operated (2)**
45:17 47:22
**operating (1)**
87:5
**opining (1)**
16:11
**opinion (5)**
7:16 9:8 27:9 37:24 42:5
**opportunity (2)**
8:16 18:21
**oppose (1)**
97:7
**opposed (2)**
84:3 89:18
**opposing (2)**
20:5,12
**opt (1)**
23:3
**option (1)**
101:7
**Options (2)**
55:3,7
**oral (4)**
65:23 66:2 95:19 101:4
**order (8)**
3:21 9:2 20:7,22 32:4 42:7 90:17,22
**orders (1)**
96:18
**ordinarily (1)**
36:3
**original (2)**
15:17 49:4
**Orrick (3)**
2:4,9 3:2
**ought (3)**
18:15 21:8 95:5
**outlier (1)**
18:25
**outside (1)**
10:5
**outstanding (1)**
16:18
**overall (1)**
17:23
**overcome (1)**
20:13
**owned (1)**
78:8
**owns (1)**
78:10
**o'clock (2)**
81:13,20
**O'DRISCOLL (1)**
2:11

**P**

**P (2)**
2:3,3
**page (12)**
21:11,17,18,23 28:3 34:21 35:3 38:10,11 46:7 49:11,23
**pages (1)**
22:14
**pains (1)**
14:21
**Paint (1)**
68:3
**panel (32)**
4:2 21:7 34:10 40:14 48:18 49:9,14,17,23 55:9 63:17 78:2 79:9 80:15,19 81:4 81:19,25 82:6 84:25 90:4,15,20 93:14 96:18,21 97:5 99:13

99:16 101:22,24 102:10
**panelists (4)** 73:16 82:4 85:24 89:6
**panels (1)** 84:23
**panel's (5)** 3:9,20 21:10 46:6 81:10
**paper (3)** 37:17 39:8 67:9
**papers (1)** 87:10
**paragraph (9)** 28:4 35:5,21 46:8 57:9 64:14,15 66:7 98:18
**parallel (1)** 88:16
**paralysis (1)** 87:4
**parse (1)** 98:2
**part (5)** 65:18 66:21,25 93:13 99:9
**partial (2)** 81:25 90:8
**participants (21)** 7:3,6,12 14:9,15 16:14 17:14 28:5 30:3 32:22 44:12 54:11 74:7 75:19 76:3,6,12,21,24 77:12,16
**participate (2)** 14:19 99:21
**particular (3)** 24:7 66:20 85:2
**particularly (1)** 7:2
**parties (19)** 14:13 15:21 23:3 27:17 33:3 36:25 41:15 46:13 47:22 58:4,6,14 60:10 81:7 82:18 89:3 92:20 98:22 101:5
**partner (4)** 2:24 3:2 39:21 40:20
**partners (4)** 2:24 16:23 40:11,18
**party (14)** 6:11 9:17 12:7,15 13:2 18:14 20:5,12 23:25 24:7 60:16 100:10,11 101:11
**party's (1)** 7:22
**passing (1)** 14:24
**pause (2)** 7:17 100:25
**pays (1)** 98:3
**pending (2)** 3:24 48:12
**people (2)** 7:10 33:22
**percent (2)** 26:7 78:10
**performed (3)** 45:10,13 46:13
**peril (2)** 23:25 37:21
**period (1)** 10:12
**permitted (1)** 63:17
**personally (1)** 83:9
**pertaining (1)** 36:6
**PETER (1)** 2:11
**Phillip (1)** 57:8
**physical (1)** 67:6
**physically (1)** 47:16
**pick (2)** 4:16 69:10
**piece (1)** 67:9
**Pieter (5)** 2:15 4:13 34:11 48:24 65:10
**place (7)** 8:20 28:6 54:13,14 89:16 92:23 94:11
**places (2)** 21:9 49:19
**plain (2)** 16:22 17:10
**plaintiff (2)** 35:23 46:11
**plan (2)** 88:24,25
**play (1)** 4:9
**please (2)** 30:8,16
**Plus (1)** 27:16
**Plymouth (1)** 88:4
**point (18)** 10:23 13:9 15:12 18:6 18:22 19:8 25:19 27:8 30:5 39:17 54:21 59:18,19 63:24 67:17 69:11 80:11 95:23
**points (2)** 58:2 95:4
**polling (2)** 27:20 44:2
**position (14)** 5:10 22:20 26:5 27:22 27:24 35:11 37:3 38:14 45:8 50:3 69:7 72:4,16 73:11
**possession (2)** 5:4 6:4
**possibility (1)** 87:6
**possible (2)** 30:23 83:19
**potential (1)** 87:4
**power (29)** 21:20,22,24 22:8,9,11 24:24 25:10,13 35:14 36:5,19 40:18 49:15,21,23,25 50:11,18 54:16 56:7 56:16 60:4 71:5,6 72:2,3,12 96:21
**powers (5)** 33:10 35:10 40:15 44:17,23
**practical (2)** 30:17 59:17
**precedent (1)** 15:23
**precise (1)** 65:21
**precisely (3)** 33:4 91:12,16
**predicate (1)** 96:14
**preference (2)** 87:17,19
**prehearing (3)** 4:7 84:5 85:18
**prejudice (1)** 97:8
**preliminary (2)** 48:13 91:6
**prepared (3)** 55:5 79:8 92:25
**PRESENT (1)** 2:20
**presentation (1)** 23:20
**presented (1)** 68:4
**preserve (1)** 74:19
**president (10)** 33:11 34:15 35:9,12 36:2,4,10,12,19 44:23
**president's (2)** 36:8,17
**press (1)** 39:14
**pressed (1)** 63:15
**pressing (1)** 39:15
**presumably (5)** 29:18 38:12,13 43:8 47:12
**presumed (1)** 36:4
**presumption (2)** 29:17 35:9
**pretended (1)** 11:3
**pretrial (1)** 91:17
**pretty (1)** 9:9
**prevail (1)** 93:18
**pre-arbitration (1)** 82:19
**prima (3)** 20:13 35:14 68:3
**primary (1)** 94:18
**principles (2)** 34:24 35:8
**print (1)** 40:17
**printed (1)** 39:9
**probably (1)** 89:25
**problem (4)** 44:9 46:25 76:11 85:18
**problems (1)** 86:4
**procedural (1)** 63:10
**procedures (1)** 24:5
**proceed (2)** 3:25 101:12
**proceeding (5)** 9:5 22:17 43:4 78:12 102:7
**proceedings (108)** 1:8,14 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,8,12 18:14 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1,7 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1,2 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:7,9
**produce (1)** 20:13
**product (1)** 91:21
**Professional (1)** 103:5
**professor (1)** 66:4
**proffered (2)** 48:21 82:10
**profit (1)** 26:14
**prohibit (1)** 22:16
**promise (2)** 45:4 86:21
**prong (1)** 6:8
**proper (1)** 63:5
**proposed (8)** 36:21 81:8,11 89:16 91:24 92:6 96:6,17
**proposition (6)** 12:21 56:22 64:23 66:8 67:19 68:13
**protect (1)** 15:7
**proves (1)**

27:14
**provide (5)**
23:5 30:25 34:10
66:23 91:21
**provides (2)**
57:10 101:25
**providing (1)**
33:23
**provincial (1)**
40:4
**provision (3)**
12:14 61:4 66:16
**provisions (9)**
16:5,10,21 17:5 26:11
26:16 33:13 43:17
46:22
**PRUSZYNSKI (3)**
1:15 103:4,15
**public (3)**
1:16 29:4 103:5
**purchase (3)**
10:6 46:17,18
**purely (2)**
90:25 91:3
**purpose (1)**
14:2
**purposes (5)**
6:23 69:12,18 70:3,5
**put (8)**
32:7 47:17,19 50:6
55:24 71:10 84:12
92:22
**puzzled (1)**
64:25
**p.m (1)**
102:18

**Q**

**queried (1)**
6:3
**question (48)**
4:6,23 6:10,13 12:4
16:17 20:15,23
23:18 24:18 25:4
35:22 37:7 41:14
48:14,23 56:3 61:9
64:11,17 65:3,12
73:6,24 75:11 79:5
79:16,18 81:16
86:19 88:24 89:17
90:13,18,20 91:3,10
91:24 92:13 93:2,15
94:2,5 95:14 96:9
96:12,19 99:18
**questions (8)**
4:20 5:23 11:16 19:21
75:16 89:14 90:21
94:8
**quick (1)**

75:13
**quickly (3)**
9:16 13:9 15:11
**quite (4)**
44:18 74:3 80:21 98:3
**quote (6)**
21:12,19,24 49:22
98:15,17
**quoted (1)**
21:7
**Quoting (1)**
35:12

**R**

**R (4)**
1:22,23 2:3 103:2
**Rabij's (3)**
37:23 43:20 44:20
**raise (4)**
3:16 89:5 92:18 95:2
**raised (9)**
6:14 11:15 13:8 18:7
23:19 47:7 54:8
56:3 65:10
**raises (3)**
10:20 19:21 29:15
**raising (1)**
6:11
**ratification (6)**
7:23 8:5,11 9:14,18
10:2
**ratified (1)**
5:18
**ratify (1)**
35:15
**reached (2)**
65:22,25
**read (5)**
29:23 36:17 39:14
55:3,4
**readily (1)**
79:17
**ready (13)**
30:16 31:4,6,9,11
32:5,6,6,12 47:4,7
47:11,12
**Real (1)**
86:4
**realized (3)**
10:9,15 11:7
**really (10)**
6:22 18:2 19:10 24:17
27:10 31:5 59:25
64:4 70:21 97:25
**reams (1)**
37:16
**reason (8)**
18:23 19:3,4 23:22

61:17 65:3 72:19
102:8
**reasonable (2)**
6:9,17
**reasonably (1)**
35:24
**reasons (2)**
6:21 72:18
**recall (1)**
28:4
**receive (1)**
102:14
**received (2)**
29:24 45:16
**Recess (1)**
81:3
**recollection (1)**
76:20
**reconvene (3)**
3:7 80:21 81:2
**reconvened (1)**
3:14
**record (31)**
3:12,23,24 4:6 8:23
9:9 21:13 29:4 30:9
37:6,24 48:7,16,19
75:25 76:4 79:5
80:3,10,14 84:11,13
92:21 93:3 94:9
95:12,22 96:23 97:4
98:10 99:8
**records (6)**
10:8,13 28:12 38:13
43:5,9
**recounts (1)**
15:20
**reed (1)**
9:9
**refer (1)**
66:20
**reference (1)**
23:10
**referred (3)**
4:17 44:2 75:24
**referring (1)**
52:25
**reflect (1)**
48:17
**regard (4)**
5:21 39:7 40:13 57:21
**regardless (1)**
36:9
**regime (1)**
100:21
**registered (2)**
74:25 103:4
**regression (1)**
42:14

**rehash (1)**
101:8
**rehearse (1)**
5:2
**reinforce (1)**
57:16
**related (5)**
3:20 9:15 64:11 84:6
88:25
**relating (2)**
9:2 10:24
**relationship (1)**
16:24
**release (1)**
39:14
**relentless (1)**
39:4
**relevant (2)**
6:24 100:15
**reliance (3)**
6:9 42:7 45:4
**rely (4)**
6:18 9:10 35:24 66:7
**relying (3)**
15:5 17:22 33:12
**remaining (1)**
10:6
**remains (1)**
92:14
**remarkably (1)**
45:8
**remedy (2)**
93:21 95:11
**remember (1)**
10:18
**remind (1)**
98:9
**reminding (1)**
86:12
**render (2)**
82:7 102:15
**rendered (2)**
96:11 98:16
**reorient (1)**
6:7
**repeated (1)**
49:8
**repeatedly (1)**
20:19
**repeating (2)**
52:3 66:13
**repetitive (1)**
101:15
**reply (1)**
27:11
**reported (1)**
103:7
**Reporter (2)**

1:16 103:5
**representation (1)**
32:24
**representative (1)**
15:6
**representatives (1)**
10:25
**represented (1)**
39:22
**repudiate (1)**
9:21
**request (3)**
17:12 26:12,21
**requested (2)**
26:15 82:23
**require (3)**
7:21 25:7 83:22
**required (4)**
25:15 27:14 30:2
41:22
**requires (5)**
7:23 8:7 52:5 81:15
102:4
**reserve (3)**
88:19 95:7,9
**resolution (1)**
44:11
**resolve (3)**
89:4 90:21 94:4
**resolved (1)**
91:14
**respect (5)**
5:10 9:6 27:8 50:13
96:7
**respectfully (2)**
58:9 97:5
**respective (1)**
82:24
**responded (2)**
21:16 22:7
**Respondent (2)**
1:10 2:18
**response (3)**
3:18 5:13 91:24
**responsible (1)**
45:2
**rest (2)**
42:20 74:7
**restate (1)**
69:10
**result (1)**
100:16
**resuscitate (1)**
98:23
**reviewed (2)**
30:13 43:5
**right (15)**
22:21 50:21,23 52:17

60:7 62:21 68:21 71:16 72:14,17 76:2 83:12 95:7,9 97:21
**rights (1)** 42:9
**rigmarole (1)** 74:8
**ring (1)** 24:25
**ROBERT (1)** 2:6
**rolls (2)** 38:6 68:3
**room (1)** 68:23
**round (1)** 102:9
**route (1)** 66:6
**routine (1)** 33:4
**rule (15)** 15:15 23:4 36:3,23,24 45:11 50:11 55:18 56:7 57:18 61:10,15 61:15 95:8 100:15
**ruled (2)** 84:23 101:22
**rules (24)** 1:2 12:13 22:9 23:9 50:7 53:5,11 55:20 56:5 59:19,20 61:3 63:17 64:13 65:18 66:15,21,23 68:15 71:4,14 96:22 99:23 100:7
**ruling (4)** 3:9 15:17 62:16 93:6
**rulings (1)** 49:15
**run (4)** 25:16 59:3 62:15 86:7
**running (2)** 24:19 33:23

S

**S (2)** 2:3,7
**safe (1)** 99:13
**satisfied (1)** 73:4
**satisfy (2)** 31:18 61:19
**saw (3)** 44:20 78:4 95:24
**saying (26)** 8:8 9:8,23 13:21 17:13 18:2 21:19,21 24:20 25:14 31:4,6 32:15 43:4 51:12 52:3,17 60:3,5 62:11 63:4,21 70:21 73:7 95:7 97:15
**says (32)** 13:2 16:17 17:18 20:9 20:19 22:18,19 28:3 28:12 29:24 30:11 31:9,19,21 33:6,7 33:12 35:7 36:17 41:16,22 43:16 44:10 46:8 50:7 51:12 53:23 54:12 56:6 58:13 77:5 98:20
**schedule (9)** 3:10 83:23 84:10,16 85:16 89:9,16 91:6 92:23
**scheduled (1)** 86:6
**scheduling (2)** 80:24 84:19
**scintilla (1)** 20:6
**scope (4)** 36:8,13 37:20 38:5
**scrap (1)** 76:23
**seal (1)** 47:20
**search (1)** 78:21
**searching (1)** 7:21
**second (16)** 4:3 11:23 12:24 20:3 21:2,17 45:25 46:7 55:14 72:16 73:3 79:14 80:23 83:6 86:9 100:23
**secretly (1)** 39:12
**security (1)** 17:5
**see (9)** 18:3 28:8 38:7 51:13 56:18 75:8 84:19 86:25 97:8
**seeking (1)** 101:8
**seen (4)** 7:2 8:25 74:9,11
**senior (3)** 28:25 29:10 47:10
**sense (6)** 25:22 29:16 31:11 45:13 80:6 85:19
**sent (1)** 25:3
**separate (10)** 12:17 14:18 15:4 50:15 60:24 67:4,9 69:14 74:21 98:8
**separately (2)** 60:20,22
**separates (1)** 63:3
**separation (1)** 57:11
**September (5)** 1:18 3:22 79:11 103:8 103:11
**series (3)** 11:11 13:14 39:6
**serious (3)** 23:15 67:12 78:18
**seriously (1)** 27:16
**served (1)** 99:16
**session (1)** 49:3
**set (6)** 23:11 26:20 45:14 88:16 90:10 103:10
**Setting (1)** 56:4
**settled (3)** 34:24 35:7 36:3
**Seventh (2)** 12:22 22:25
**sever (1)** 65:5
**severability (4)** 12:14 61:4 66:16 99:4
**severable (3)** 58:21 66:24 74:16
**sham (1)** 41:17
**shareholder (4)** 69:25 71:8 72:7 95:16
**shareholders (35)** 5:9,18 10:2 11:4 13:24 15:24 25:22 26:10 27:7 28:5 30:14 31:23 32:25 39:2 41:17 44:13 46:23 47:2 48:2 64:18 65:8 66:10 67:6,8,22 70:7,23 75:6,23 86:21,22 88:18 93:20 94:2 98:15
**shares (7)** 5:8 10:7 26:4 46:17 47:3,23 74:14
**Shaw (5)** 11:23 12:2,21 55:4,7
**Shevchenko (1)** 2:24
**Shorthand (1)** 1:16
**shortly (2)** 82:6 102:16
**shots (1)** 96:5
**show (10)** 7:24 8:2,4,8 9:18,25 18:24 54:3 63:8 64:6
**showing (4)** 20:14,20 21:4 97:2
**shown (4)** 7:16 51:21 54:13 64:3
**shows (1)** 19:6
**side (1)** 32:14
**sides (3)** 40:11 85:8 102:15
**sign (25)** 13:16 14:5 26:9 27:6 29:20 30:16,22,24 31:5,6,10,11,22 32:5,6,12,20 47:2,5 47:7,11,13,13 69:16 71:19
**signatory (1)** 99:20
**signature (7)** 13:17 25:5,8,14 30:25 32:7 47:15
**signatures (2)** 25:4,8
**signed (10)** 10:16 26:18 27:2 28:24 29:20 33:12 47:17,20 66:11 67:7
**significance (1)** 47:19
**significant (1)** 28:14
**signing (3)** 30:17 46:20 67:5
**Sills (57)** 2:6 8:21 10:22 11:22 19:20,22,23 34:13 35:3 52:9 53:25 54:11 61:2 64:10 65:2,17 66:10 67:25 72:20 73:11 76:25 77:4,5,7,9,13,23 78:5,7,21 79:6,7,13 79:16,20 81:21 82:22 83:12,15,23 84:4,8,18,20 85:19 86:18 88:15 89:13 90:13,25 92:9,19 93:15 95:18 100:5,9 101:21
**simple (1)** 79:22
**simply (9)** 7:4,11 14:3 27:17 38:17 61:15 90:19 91:12 97:15
**single (2)** 81:16 93:5
**singular (1)** 82:2
**sit (4)** 53:21 54:18 63:5 83:20
**site (2)** 40:18,22
**sitting (5)** 34:23 56:20 60:11 64:8 75:8
**situation (1)** 62:23
**slate (1)** 60:12
**slight (2)** 27:13 100:14
**slightly (1)** 21:21
**slipped (1)** 16:14
**small (1)** 39:17
**Socrates (1)** 59:23
**sole (1)** 81:9
**solely (1)** 89:10
**solutions (1)** 95:20
**somebody (2)** 53:2 73:12
**somewhat (1)** 5:24
**soon (2)** 11:6 46:24
**sorry (8)** 5:14 33:7 45:5 50:9 61:24 63:25 86:4 97:23
**sort (3)** 24:10 50:5 64:15
**Southern (4)**

56:21,23 57:2 59:5
**speak (2)**
82:4,23
**speaking (1)**
55:25
**speaks (1)**
25:17
**special (1)**
44:11
**specifies (1)**
100:17
**speed (2)**
87:25 88:3
**Sphere (30)**
7:20 8:7 11:14 12:22
  12:23 19:25 20:4,9
  20:19 22:2,19 23:2
  50:25 51:15,20 52:6
  52:9,16 55:14,18
  57:25 58:16 60:11
  62:9 68:19 69:4
  72:20,22,25 73:4
**spilled (1)**
93:25
**stamp (1)**
47:18
**stand (3)**
12:21 78:16 98:5
**standard (12)**
11:14,19 12:25 13:2
  51:20 53:24 54:22
  55:16 57:25 60:13
  62:9 73:4
**stands (1)**
23:21
**start (2)**
86:6 95:21
**started (1)**
11:7
**state (5)**
4:8 36:23 75:25 76:4
  103:6
**stated (1)**
64:5
**statement (3)**
18:4 37:5 60:21
**statements (1)**
91:8
**stenographic (1)**
1:13
**steps (2)**
32:18 44:5
**stick (1)**
102:9
**stop (1)**
70:8
**stopped (1)**
10:25

**Storm (72)**
1:9 3:11,15 4:5,9 5:13
  5:15,17,24 6:3 7:4
  7:18,24,24 9:18
  10:4,7,9,19 11:2
  12:15 13:18,22
  14:18 15:4 16:19,23
  21:4 26:3,12 28:5
  30:13 31:15,22,25
  32:11,14 33:23
  38:12 39:6,15 40:2
  40:7,19 41:24 42:8
  43:9,13 45:5,7
  46:16,19 48:21 49:5
  51:21 54:19 58:23
  60:5 64:3 66:18
  68:12,24 76:9 78:10
  79:10 81:23 82:10
  83:15 86:19 90:15
  93:7,20
**Storm's (11)**
5:5 6:22 19:9 22:20
  28:11 30:3 40:24
  43:17 44:11 50:3
  72:3
**straightforward (1)**
19:7
**Street (1)**
2:10
**strike (1)**
70:23
**strong (1)**
66:15
**struck (3)**
41:3 48:25 82:24
**stuff (1)**
57:21
**subject (4)**
3:12 19:20 82:21
  87:19
**submission (4)**
80:13 91:2,7 94:10
**submit (6)**
6:20 15:18 19:14
  79:12 90:5,5
**submitted (12)**
9:7 17:8,10 18:5,23
  24:14,14 28:15,16
  49:5 92:7 102:14
**submitting (2)**
56:14 96:7
**subpoena (1)**
101:24
**subsidiary (1)**
94:22
**subsisting (1)**
94:3
**substantial (2)**
16:6 24:16

**substantive (2)**
46:22 90:18
**succeeded (1)**
46:24
**succeeds (2)**
26:3,4
**sues (1)**
56:10
**sufficient (1)**
21:3
**suggest (2)**
80:17 91:19
**suggested (2)**
7:7 95:11
**suggesting (6)**
13:20 85:15 94:16
  97:9,11,14
**suggestion (1)**
80:4
**suggests (2)**
37:15 68:7
**sui (1)**
63:2
**summary (4)**
4:8 20:11 53:23 54:22
**Supp (1)**
34:7
**supplement (3)**
3:23 80:10 101:5
**supplied (3)**
37:17 43:3,7
**support (4)**
19:9 24:16 49:5 67:18
**supported (1)**
19:5
**supports (1)**
12:23
**suppose (2)**
31:3 42:13
**supposed (4)**
38:23 40:12 57:17
  86:7
**supposedly (1)**
34:17
**sure (13)**
8:19 11:25 13:9 17:5
  18:21 33:18 70:25
  73:16,19 81:14
  83:21 84:25 97:25
**surely (1)**
23:11
**surprise (1)**
97:11
**surprised (1)**
96:24
**SUTCLIFFE (2)**
2:4,9
**sword (1)**

46:11
**systems (1)**
25:7

**T**

**T (2)**
103:2,2
**tab (2)**
34:13 46:2
**take (16)**
9:22 11:17 20:18
  37:22 54:14 61:22
  62:11 79:10 80:18
  80:22,25 85:14
  87:21 89:15 94:11
  101:21
**taken (5)**
1:14 32:3 37:3 44:7
  81:3
**Tal (1)**
61:6
**talk (1)**
17:3
**talked (2)**
13:15 17:20
**talking (2)**
7:18 58:19
**target (1)**
37:11
**task (1)**
43:17
**technical (1)**
45:19
**Telenor (52)**
1:4 2:22 3:18,21 4:23
  5:4,10,14,25 6:12
  6:15,18 8:3,9,14,19
  8:22 9:3,17,23
  12:10 13:19 14:3
  16:25,25 17:3,6,12
  19:11 22:16 26:5,17
  30:13,18 31:24
  43:19 44:25 45:6
  46:18 49:17 53:15
  54:15 61:10 64:6
  66:19 69:5 73:5
  76:22 81:22 87:3
  97:8,12
**Telenor's (2)**
24:16 26:15
**tell (4)**
14:3,21 19:24 55:2
**telling (1)**
47:6
**tells (3)**
16:22 40:8 51:16
**ten (1)**
28:4
**tenth (1)**

71:2
**termination (3)**
16:4 26:13,16
**terms (3)**
16:22 68:4 81:5
**terribly (1)**
8:15
**test (3)**
24:11 33:21 35:16
**testified (1)**
16:3
**testify (5)**
29:12,17 76:9 77:11
  96:2
**testimony (10)**
16:3 28:20,21 29:8,13
  29:18 43:12,13 83:5
  86:25
**thank (4)**
4:14 19:23 34:12
  63:24
**Thanksgiving (3)**
86:13 87:14,24
**theory (3)**
6:16 8:3,5
**thin (1)**
9:9
**thing (5)**
17:13 28:2 52:14 78:3
  86:11
**things (4)**
13:7 15:12 87:25 88:4
**think (74)**
4:16 6:25 8:12 15:25
  16:17 17:9 18:9
  23:13,14 25:17 27:9
  27:10,16 28:14
  29:10 33:19 34:2
  35:22 37:8,22 40:8
  41:7,9 43:2,12,19
  43:25 44:18 48:7,17
  50:5,6 52:4 54:4
  55:10 56:2 57:2
  58:3,12 60:10 62:25
  65:18 66:13,22 71:2
  74:22 76:13,25
  78:17 79:21 80:3,7
  80:14 82:4 83:2
  84:4 85:19,21 87:13
  88:20 89:25 92:23
  94:11 95:19,22 96:5
  97:3,18 99:12,13,15
  99:16 100:15 102:9
**thinking (1)**
90:14
**third (1)**
47:21
**thought (5)**
12:24 33:18 51:2

92:20 94:15
**three (6)**
46:8 47:14 49:19 54:5 96:4,5
**three-day (2)**
26:2 46:23
**threshold (1)**
64:2
**Thursday (1)**
83:8
**tie (1)**
84:17
**tied (1)**
48:13
**time (28)**
5:23 6:3 10:3 11:15 13:22 16:23 20:19 21:2 23:14 30:4 31:15 35:17 39:10 39:18 43:23 44:20 47:21 51:18 61:8 71:3,25 78:4 84:17 94:7,13 97:4 99:17 102:18
**timely (1)**
9:21
**times (3)**
19:16 47:14 49:9
**timing (1)**
85:6
**today (19)**
3:10,18 4:4 8:2,4 70:19 72:2 77:20 79:8 81:7,12,15,19 83:20 89:10 92:2 102:7,11,13
**Tol (60)**
2:15 4:14 11:21 21:16 21:23 22:7,15 34:12 37:5 40:15 50:4,22 52:7,16 53:6 55:21 56:4 57:23 58:8 59:14,22 60:2,23 62:8,21 63:21 68:18 69:9 70:2 71:5,13 71:17 72:5,9,17 74:9,18 75:2 76:4 76:11 77:9,14,18,22 78:3,19 81:23 82:22 83:14 84:15 87:19 87:24 88:6 89:12 93:9 94:14 95:17 97:7,23 99:24
**told (6)**
13:25 28:18 44:3,8 56:23 81:7
**toll (1)**
21:19
**tomorrow (8)**
30:16,22,25 31:5,6,10 31:11 32:5
**tone (1)**
91:15
**tough (3)**
59:25,25 87:15
**Tower (1)**
2:9
**tracking (1)**
76:11
**transaction (9)**
5:7 10:10 14:18,20 15:25 24:20 30:7 42:8 98:21
**transactional (1)**
14:23
**transactions (1)**
5:6
**transcript (3)**
1:7,13 21:9
**transcription (1)**
103:9
**transfer (1)**
74:14
**transpired (1)**
79:8
**treat (1)**
57:20
**treated (1)**
20:11
**trial (6)**
39:23,23 58:25 91:7 97:11 98:13
**tribunal (25)**
9:11 11:16 12:3,16 13:6 14:22 15:15,20 18:21 23:7,15 50:8 50:10 52:20 53:14 57:5 59:8 60:5,6 94:16,19 97:17,19 98:3,9
**tribunal's (6)**
4:15 5:23 19:19 21:14 84:17 87:20
**tried (2)**
13:19 59:11
**trigger (2)**
26:2 46:24
**troubled (1)**
5:24
**true (8)**
24:25 25:3 26:11 35:16 36:18 38:25 39:4 48:3
**truly (1)**
74:15
**trust (1)**
16:25
**try (2)**
83:22 90:2
**trying (5)**
25:16 51:9 65:4 66:4 66:5
**Tuesday (6)**
1:18 87:22 88:11,20 88:22 89:10
**Tumanov (2)**
31:14,14
**turn (7)**
5:20 9:13 14:8 19:24 29:21 82:14 84:7
**turns (1)**
50:24
**twice (1)**
47:14
**twist (1)**
25:13
**two (22)**
9:20 25:4,7 31:21 32:12,13 37:23 38:2 49:19 57:9 58:2 64:15 67:4,25 69:13 72:18 87:13,21 88:21 89:13 95:20 99:7
**two-day (1)**
89:2
**type (2)**
55:18,19
**typo (1)**
36:16
**tyranny (1)**
50:5

**U**

**Ukraine (18)**
8:17,24 9:12 18:16 40:5 47:19 61:19,21 61:24 62:4 68:14 70:10 98:20 99:19 99:23 100:6,10,20
**Ukrainian (51)**
8:20 14:19,22,25 15:2 15:4,8 16:11,23 18:5,8,11,25 19:3,5 19:7,13,15 22:17 30:12 33:9,13,15 37:6 38:2 39:5 40:6 41:6,19,21 42:22 44:2,22 47:21 53:18 54:10 63:3,7,8,12 67:14 73:8 74:25 75:3 90:22 94:24 97:2 98:25 99:6 100:18,19
**ultimate (2)**
90:11 97:20
**ultimately (1)**
67:20
**ultra (3)**
11:9 15:9 46:10
**unable (1)**
46:17
**unanimous (1)**
43:25
**unauthorized (1)**
27:11
**unaware (4)**
7:4 12:11 28:13 76:16
**Uncitral (36)**
1:2 12:13 22:8,15,22 23:9 50:7 51:12 53:5,11 55:18,19,22 56:5 59:4,18,19 60:4,16 61:3 63:16 64:13 65:18 66:6,15 66:22 68:15 69:17 71:4,14 84:23 85:2 96:22 99:22,22 100:15
**unclear (3)**
27:3 51:8 63:25
**uncomfortable (1)**
58:11
**underlying (9)**
57:13,22 62:14 65:7 68:16 69:3,6 71:7 95:15
**understand (13)**
10:10 25:6,12,16 37:12 40:2 53:14 70:12,25 73:19,20 74:17 89:7
**understandable (1)**
82:12
**understanding (8)**
14:4,17,25 15:14,21 33:9 75:4 93:9
**undisputed (1)**
66:22
**undoubtedly (1)**
82:5
**unfair (1)**
8:15
**unfavorable (2)**
29:18,19
**Unfortunately (1)**
30:21
**unfounded (1)**
80:7
**unmistakable (1)**
58:13
**unrelated (1)**
91:25
**unremitting (1)**
39:5
**unusual (1)**
62:23
**upset (2)**
62:16 63:20
**use (2)**
53:23 60:4
**useful (1)**
37:22
**usual (1)**
23:4
**U.S (3)**
61:12 62:15,17

**V**

**V (1)**
2:24
**Valerie (1)**
31:21
**valid (14)**
48:8 55:11 57:19 62:14 63:19 64:18 64:19,23 65:6,7,13 65:15 94:3 99:23
**validity (20)**
50:14,20 51:24 52:23 57:7,22 60:7 62:18 63:18 68:16 70:16 71:7 73:6 89:18 90:19 93:2,12 95:14 96:9,20
**validly (1)**
69:22
**valuable (3)**
42:9 45:8 87:4
**Van (62)**
2:15 4:14 11:21 21:16 21:19,23 22:7,14 34:12 37:5 40:15 50:4,22 52:7,16 53:6 55:21 56:4 57:23 58:8 59:14,22 60:2,23 61:6 62:8 62:21 63:21 68:18 69:9 70:2 71:5,13 71:17 72:5,9,17 74:9,18 75:2 76:4 76:11 77:9,14,18,22 78:3,19 81:23 82:22 83:14 84:15 87:19 87:24 88:6 89:12 93:9 94:14 95:17 97:7,23 99:24
**variations (1)**
100:14
**variety (1)**
79:23
**various (2)**
48:4,20

**versus (3)**
34:4 46:5 53:7
**view (5)**
7:19 27:13 42:10
85:15 93:24
**violation (1)**
93:22
**virus (3)**
11:9 15:10 46:10
**Visotmar (1)**
46:4
**Vladimirich (1)**
31:21
**void (3)**
53:7 57:14 98:16
**voidable (1)**
53:7
**VOLUME (1)**
1:6
**voluminous (1)**
18:20
**voting (5)**
13:23 25:24,25 46:21
64:19
**vs (1)**
1:7

**W**

**Wack (18)**
3:13,19 4:11 13:10,14
13:21,24 14:20,22
15:12,18,19,19
17:18 24:17 48:18
76:18 77:11
**Wack's (3)**
28:3,22 30:5
**wait (1)**
91:20
**waited (1)**
45:20
**walking (1)**
26:21
**want (24)**
7:8,17 11:12,25 13:9
18:3 20:18 56:15
61:18,22 63:19
70:25 73:19,23
74:18 82:5 84:17
90:5,15 92:18 93:13
95:9,12 96:16
**wanted (4)**
10:22 16:19 17:4
19:18
**wants (3)**
3:11 53:15 73:14
**wasn't (4)**
10:12 37:15 38:9 41:3
**way (10)**

11:9 45:2 50:17 55:4
55:4 59:7 70:11,21
72:15 99:10
**ways (2)**
9:14 79:23
**weakly (1)**
25:20
**wear (1)**
32:21
**Web (2)**
40:18,21
**Wednesday (3)**
83:7 87:15 88:23
**week (15)**
81:12,19 83:6,7,8
86:9,15,16 87:14,24
88:3 89:10 90:6
91:25 102:13
**weeks (1)**
86:16
**went (6)**
10:10 12:5 38:20
58:10 66:12 99:9
**weren't (4)**
26:24 42:10 47:6
78:16
**WHEREOF (1)**
103:10
**wholly (1)**
78:8
**wielded (1)**
46:10
**WILLIAM (1)**
1:23
**willing (1)**
29:12
**wipes (2)**
98:21 99:5
**wish (5)**
3:16 4:3 30:3 80:13
101:5
**wishes (3)**
3:22 4:10 101:12
**within-entitled (1)**
103:7
**witness (10)**
17:19 28:19 29:6
43:11 78:12,15 91:8
97:9 101:25 103:10
**wonder (2)**
54:19,19
**word (5)**
23:11,12 30:7 60:4
102:10
**wording (1)**
28:8
**words (15)**
22:11 25:2,13,15

32:16 44:4 51:2
55:16 57:25 61:7
62:16 67:2,19 82:9
99:22
**work (12)**
83:8 84:5,16 85:5,9
85:14,22 87:16
91:13,17,21 95:24
**workable (1)**
86:2
**worked (2)**
89:2,21
**working (1)**
85:15
**works (1)**
78:7
**worth (2)**
39:8 45:9
**wouldn't (2)**
51:4 100:7
**wrinkling (1)**
46:25
**writing (1)**
30:11
**written (5)**
27:20 43:25 44:2
65:23 66:2
**wrong (6)**
8:4,6 22:21 26:14
57:3,4

**X**

**X (1)**
30:10

**Y**

**year (1)**
45:20
**years (1)**
38:21
**year-and-a-half (2)**
45:21 48:6
**yesterday (1)**
30:15
**Yetev (1)**
46:4
**York (40)**
1:18,18 2:5,5,15,15
18:9,12 23:23 29:16
34:4,7,16 36:24,24
37:7 41:8,11,12,15
42:22 44:24 45:11
55:22,24 56:21,23
57:3 59:6,12 62:5
63:11,11 78:13
85:25 96:2 99:20
100:11,17 103:6

**Z**

**Z (1)**
2:16
**ZIMMERMAN (1)**
2:7
**Zinchenko (1)**
40:21

**1**

**1 (1)**
2:10
**1:07 (1)**
102:18
**100 (1)**
78:10
**10002 (1)**
2:15
**10103-0001 (1)**
2:5
**11th (1)**
86:17
**12.4 (1)**
74:23
**13 (1)**
21:11
**13th (1)**
83:7
**14 (1)**
34:13
**14th (1)**
61:8
**15 (6)**
22:3 80:18,25 83:11
85:24 99:14
**16 (2)**
83:11 85:24
**17 (1)**
83:11
**17th (2)**
85:24 86:7
**18 (1)**
22:3
**19th (1)**
91:20

**2**

**2nd (2)**
34:6,7
**20 (10)**
86:12 88:12,20 91:5
92:9,24 95:8 96:8
96:11 102:13
**20th (5)**
91:18 94:11 95:9
97:10,17
**2002 (18)**
5:5 13:23 14:11,12,13
14:18 15:21 26:25

27:6,18,20 38:6
42:2 43:22 65:23
77:13,16 78:22
**2003 (3)**
17:15 28:6 78:22
**2004 (31)**
5:9,18 7:4 9:24 10:2,4
10:8,11,16 11:3
13:24 14:20 15:2,5
16:9 17:12,15 25:21
27:18 28:7 31:24
38:6 43:24 54:17
65:25 66:10 67:2,5
67:8 70:7 75:20
**2005 (10)**
10:14,15,19,22 38:23
39:3,11 44:9 45:20
48:3
**2006 (6)**
1:18 10:19 39:12,14
103:8,11
**21 (7)**
50:9 52:23 56:6 57:10
64:14 65:17 88:21
**21st (3)**
86:12 88:12 97:17
**212 (1)**
2:5
**216 (1)**
98:19
**22 (1)**
9:2
**22nd (2)**
86:12 88:13
**23rd (1)**
86:13
**25 (1)**
2:10
**25th (2)**
98:11,12
**258 (1)**
21:11
**259 (1)**
21:18
**26 (1)**
46:5
**260 (1)**
21:23
**263 (1)**
49:23
**266 (1)**
22:14
**267 (1)**
22:14
**27th (1)**
86:15
**284 (1)**
34:5

**3**

**30 (1)**
31:24
**35 (1)**
2:9

**4**

**4th (1)**
86:16
**40 (1)**
26:7
**42 (1)**
2:9
**464 (1)**
34:7

**5**

**5 (4)**
1:18 81:13,20 103:8
**506-5110 (1)**
2:5
**52 (1)**
34:6
**557 (1)**
2:11
**590 (2)**
1:17 2:14

**6**

**6 (1)**
88:13
**6th (1)**
88:15
**666 (1)**
2:4

**7**

**7 (1)**
88:14
**704 (1)**
34:4
**728 (1)**
34:6
**75 (1)**
102:3

**8**

**8 (3)**
3:22 79:11 88:14
**8th (3)**
80:14 82:7 103:11

**9**

**9th (1)**
86:6
**9:30 (1)**
1:19