# EXHIBIT O

1

2      IN THE MATTER OF AN ARBITRATION UNDER

       THE UNCITRAL ARBITRATION RULES BETWEEN

3      ---------------------------

       TELENOR MOBILE

4      COMMUNICATIONS, AS,

5              Claimant,

                                TRANSCRIPT OF

6          vs.                  PROCEEDINGS

7      STORM LLC,

8              Respondent.

       ---------------------------

9

10

11             TRANSCRIPT of the stenographic notes

12     of the proceedings in the above-entitled

13     matter, as taken by and before BONNIE ATELLA

14     PRUSZYNSKI, a Certified Shorthand Reporter and

15     Notary Public, held at the offices of Orrick,

16     666 Fifth Avenue, New York, New York, on

17     Monday, August 14, 2006, commencing at 9:35

18     a.m.

19

20     BEFORE:

21

22         KENNETH R. FEINBERG, CHAIRMAN

23         WILLIAM R. JENTES, ARBITRATOR

24         GREGORY B. CRAIG, ARBITRATOR

25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3     ORRICK, HERRINGTON & SUTCLIFFE, LLP
       666 Fifth Avenue
 4     New York, New York 10103-0001
       (212) 506-5110
 5     BY:  ROBERT L. SILLS, ESQ.
          -and-
 6        ADAM S. ZIMMERMAN, ESQ.
 7        -and-
 8     ORRICK, HERRINGTON & SUTCLIFFE, LLP
       Tower 42, Level 35
 9     25 Old Broad Street
       London, EC2N 1 HQ
10     DX: 557 London/City
       BY:  PETER O'DRISCOLL, ESQ.
11            Attorneys for Claimant
12
13     LOVELLS, ESQS.
       590 Madison Avenue
14     New York, New York 10002
       BY:  PIETER VAN TOL, ESQ.
15         -and-
          ERIC Z. CHANG, ESQ.
16        LISA J. FRIED, ESQ.
          Attorneys for Respondent
17
18
19   ALSO PRESENT:
20     BJORN HOGSTAD, ESQ.
         Telenor
21     OLEKSIY V. DIDKOVSKIY, Partner
         Shevchenko Didkovskiy & Partners
22
23     JAY K. MUSOFF, Partner
         Orrick
24
25
```

Page 3

```
 1
 2                   I N D E X
 3   WITNESS      DIRECT CROSS REDIRECT RECROSS
 4   Sigmund Ekhougen   29    90
 5
                     FOR       IN
 6   EXHIBITS         IDENTIFICATION  EVIDENCE
 7    I                  35
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2         CHAIRMAN FEINBERG:  Good morning,
 3   everybody, and thank you for all coming
 4   together today, and I thank everybody for
 5   their cooperation in e-mailing us, and
 6   keeping us up to speed on concerns and
 7   where we are, and what's going on, and we
 8   very much appreciate that.
 9      Why don't we start, before I go any
10   further, and just go around the table, and
11   everybody introduce themselves, with your
12   name, your affiliation, so we just know
13   who the players are.
14      I'm Ken Feinberg, and I'm one of the
15   three arbitrators.
16      ARBITRATOR JENTES:  Bill Jentes, I'm
17   another of the arbitrators.
18      MR. EKHOUGEN:  Sigmund Ekhougen.  I'm
19   a Telenor officer in the Ukraine.
20      ARBITRATOR JENTES:  Could you please
21   spell your name, please.  Great.
22      MR. SILLS:  I'm Robert Sills.  I'm a
23   partner with Orrick.  We represent the
24   plaintiff in this matter.
25      MR. MUSOFF:  Jim Musoff, also a
```

Page 5

```
 1         Proceedings
 2   partner with Orrick, and I also represent
 3   Telenor Mobile.
 4      MR. O'DRISCOLL:  Peter O'Driscoll.
 5   I'm a partner at Orrick based in London.
 6      MR. HOGSTAD:  Bjorn Hogstad, working
 7   out of Norway for Telenor.
 8      MR. DIDKOVSKIY:  I'm Oleksiy
 9   Didkovskiy.  I'm counsel for Telenor in
10   the Ukraine.
11      CHAIRMAN FEINBERG:  In the Ukraine.
12      MS. FRIED:  Lisa Fried.  I'm an
13   associate at Lovells.
14      MR. CHANG:  Eric Chang, I'm an
15   associate at Lovells.
16      MR. VAN TOL:  Pieter Van Tol, partner
17   at Lovells, acting for Storm in this
18   matter.
19      ARBITRATOR CRAIG:  I'm Gregory Craig,
20   and I'm the third arbitrator from Williams
21   & Connolly in Washington, D.C.
22      CHAIRMAN FEINBERG:  Let me suggest
23   that we are here on Storm's motion, so I
24   would like Storm to explain its motion,
25   why you brought the motion.
```

1        Proceedings
2        This is an evidentiary hearing.  It
3    is my understanding and the understanding
4    of the panel is that Storm will not have
5    live witnesses, at least today.
6        MR. SILLS:  That's correct.
7        CHAIRMAN FEINBERG:  They may or may
8    not have live witnesses on September 5th,
9    but as of today, I take it that Storm will
10   make its evidentiary submission on the
11   basis of sworn testimony, sworn
12   affidavits?
13       MR. SILLS:  That's correct,
14   Mr. Chairman.
15       CHAIRMAN FEINBERG:  Then I think we
16   should permit Storm to go forward with the
17   caveat, I guess, to ask up front from
18   Telenor whether Telenor, or Storm, for
19   that matter, have any objection to the
20   presence of a witness.
21       I take it you are a witness here
22   today, Mr. Ekhougen?
23       MR. EKHOUGEN: Yes.
24       CHAIRMAN FEINBERG:  Does Storm care
25   whether Mr. Ekhougen remains in the room?

1        Proceedings
2        MR. SILLS:  If I may, Mr. Chairman,
3    my recommendation is the following:
4    Mr. Sills and I have thought it best to
5    waive formal openings and instead go
6    straight to the testimony.
7        With the tribunal's indulgence, I
8    have about a minute of remarks that are in
9    anticipation of Mr. Ekhougen's testimony,
10   then it might be best to go straight to
11   testimony.  I can do cross-examination,
12   and we can actually do summations today if
13   Mr. Sills is ready, or we can talk about
14   that.  That's the game plan I would
15   propose, if it works for the tribunal.
16       CHAIRMAN FEINBERG:  Let me make sure
17   I understand.
18       Is it Storm's, other than about a
19   minute of an opening, it will await
20   summation, which at that time it plans in
21   the summation to highlight the sworn
22   testimony, is that its position?
23       MR. VAN TOL:  That's correct.
24       MR. SILLS:  Mr. Chairman, that would
25   not necessarily be Telenor's approach

1        Proceedings
2    here.  I think given the way in which the
3    case has been presented by Storm, and
4    given as you say that it's Storm's motion,
5    I mean, I am hardly in position to ask
6    Mr. Van Tol to speak for more than a
7    minute, but it seems to me that it's
8    appropriate, usually given the somewhat
9    unusual posture of this case, and as I
10   hope to explain, somewhat unusual
11   submission that's been made, I think it
12   would be helpful to the panel if the
13   parties were to expand somewhat more
14   extensively on their positions and what
15   they have claim to have proven and what
16   they hope to prove, not at great length,
17   but I think that would probably be in the
18   end more efficient.
19       CHAIRMAN FEINBERG:  I can hear from
20   my fellow panelists.  I don't really see
21   that it makes a whole lot of difference
22   whether it's called up front a submission
23   on the evidence or a summation and then
24   you have a chance to respond, I mean, I
25   don't, I am not sure it's going to make a

1        Proceedings
2    whole bit of difference in light of what I
3    am hearing but my panelists may have a
4    different view.
5        MR. VAN TOL:  Just to add,
6    Mr. Chairman, it would inform my summation
7    greatly if I could do it and refer to Mr.
8    Ekhougen's testimony in that summation.
9        CHAIRMAN FEINBERG:  You will have a
10   chance to have a summation no matter what.
11   I guess the question is whether or not as
12   part of your motion you should elucidate
13   somewhat and expand on the sworn
14   testimony, but I am not, to me, it's sort
15   of six of one, half a dozen of the other.
16       I don't know if my co-panelists feel
17   any differently, as long as we hear what
18   we have to say.
19       ARBITRATOR CRAIG:  I think, Storm,
20   should do what it wants to do.
21       MR. VAN TOL:  With the tribunal's
22   indulgence, if I could take a minute
23   before Mr. Ekhougen testifies.
24       For the reason I am about to touch
25   on, we believe Mr. Ekhougen's testimony is

1          Proceedings
2    actually unnecessary.
3          I want to emphasize our
4    cross-examination today is not a waiver of
5    your fundamental argument which is the
6    following in all the stacks of paper that
7    you have in front of you, Telenor Mobile
8    has supplied to us, there is not one scrap
9    of evidence showing that there was in fact
10   a meeting of participants in or around
11   January 2004, that authorized the
12   execution of the shareholders' agreement.
13         That shareholders' agreement was a
14   new shareholders' agreement.  It was not
15   the draft agreement that was damaged to
16   the voting agreement from 2002, many
17   months later, after lots of negotiation.
18         Now, the Ukrainian courts have said
19   they saw no evidence --
20         ARBITRATOR JENTES:  Could you be more
21   precise on what was just said?
22         MR. VAN TOL:  I think it will come
23   out in Mr. Ekhougen's testimony.
24         ARBITRATOR JENTES:  Right now I am
25   unclear.

1          Proceedings
2          MR. VAN TOL:  Certainly.  There was a
3    draft agreement attached to a draft
4    shareholders' agreement attached to the
5    2002 voting agreement.
6          Now, assuming there were resolutions
7    authorizing the voting agreement in 2002,
8    and I will come to that in a minute of
9    what our assumption is, we have to assume
10   for purposes of this hearing that there
11   were, in fact, such resolutions, those
12   resolutions do not authorize the
13   shareholders' agreement that was signed in
14   January 2004.
15         You are going to hear testimony today
16   that the agreement from January 2004 is
17   materially different from the agreement
18   that was appended to the voting agreement
19   from 2002.  It was the subject of heavy
20   negotiation, last-minute negotiation, and
21   in order to be signed up there needed to
22   be a new board resolution, there needed to
23   be new authority given to Mr. Nilov and
24   there wasn't any.
25         The Ukrainian court said there wasn't

1          Proceedings
2    any, we have asked everyone we can ask at
3    Alpha or Storm or anyone else, they have
4    no evidence.  Mr. Sills hasn't given you
5    evidence.  He's given you a lot of
6    information but there is not one document
7    says Nilov had the authority in
8    January 2004 because there was a meeting
9    of participants, that's really the issue.
10         Now, that means the Sphere Drake
11   standard is easily met because all we have
12   to do is come up with some evidence, some
13   evidence that what the Ukraine court found
14   was correct.  That puts the burden on
15   Telenor to show that there was no way the
16   Ukraine courts could have come to that
17   decision, and as we cited in our briefs,
18   here is actually a standard on motions to
19   compel arbitration which is functionally
20   what Telenor Mobile is doing here.
21         It's like summary judgment.  They
22   have to show there is no issue of fact.
23   None.
24         We would submit to the tribunal that
25   at a minimum there is an issue of fact

1          Proceedings
2    about whether or not there was a meeting
3    of participants in January 2004.
4          If that's the case, then it has to be
5    heard by a court.  The case law is clear
6    on that.  What Telenor Mobile is really
7    trying to do here, we submit to the
8    tribunal, is they are trying to have a
9    hearing on either the ultimate merits or
10   trying to use this tribunal as an
11   appellate panel.
12         It's --
13         ARBITRATOR JENTES:  What do you mean,
14   an appellate panel?
15         MR. VAN TOL:  By that I mean, Telenor
16   Mobile is asking this tribunal to revisit
17   the findings of fact and the conclusions
18   of law that were made by the Ukraine
19   courts.  And we would submit if that's
20   what they are trying to do, and their
21   brief reads like an appellate brief, they
22   should have gone to the Ukraine courts and
23   presented those arguments.
24         We have all heard that they had the
25   chance.  They have even gone back recently

Page 14

Proceedings

1     to a decision that was many months old and
2     asked the Court to revisit it.  They
3     haven't done so here, and you are to ask
4     yourself why.
5         ARBITRATOR CRAIG:  Does Storm concede
6     that Nilov had the authority in 2002 to
7     sign the shareholders' agreement, that
8     there was a meeting of participants, that
9     there was a polling of all at a meeting of
10    participants in October that authorized
11    the signing of the shareholders' agreement
12    in 2002?
13        MR. VAN TOL:  I wish I could give you
14    that representation today.  I haven't been
15    able to -- I was in contact with Storm, I
16    was unaware of it until I saw Mr. Sill's
17    papers.  I would like to proceed today on
18    the assumption there was a resolution, I
19    haven't seen anything indicating that what
20    Mr. Sills said about 2002 was wrong, I
21    have no information it's a forgery.
22        I have to say the circles on that are
23    a bit amorphous.  We haven't gotten all
24    the information.  All we have now on this

Page 15

Proceedings

1     in Telenor Mobile's version of the facts
2     and we are trying to find out how.
3         So, in brief answer to you question,
4     I cannot concede that today, I would like
5     to operate on the assumption that it
6     exists.
7         Now, what's important, and I am
8     almost --
9         ARBITRATOR JENTES:  Sorry to keep
10    interrupting your one minute.
11        MR. VAN TOL:  It's quite all right.
12        ARBITRATOR JENTES:  Aren't all the
13    documents that are in the submissions from
14    Telenor in the files of Storm?
15        MR. VAN TOL:  That's what I don't
16    know.  And this is complicated because
17    there is more that you will see from the
18    documents we are going to get to, there
19    was more than Storm involved in this
20    transaction.
21        There is an Alpha entity called Alfa
22    Bank.  There are other Alpha entities that
23    could have documents and that's what we
24    are currently trying to ascertain.

Page 16

Proceedings

1         I'm not doubting, for example, if
2     there is an e-mail from an Alfa Bank
3     person that is genuine or authentic.  I
4     have no basis to doubt that.
5         What I haven't been able to do in the
6     two business days since we have had
7     Mr. Sills' papers is to go to my client
8     and say please send me everything you have
9     on this issue of the 2002 resolutions.
10    And I would, I was surprised to actually
11    find it out in the submissions that we
12    received on Wednesday, I would have
13    thought that would have been Telenor
14    Mobile's initial reaction to our motion to
15    dismiss, but I think this is all, you
16    know, water under the bridge, because we
17    are going to show today that what happened
18    in 2002 has nothing to do with what should
19    have happened in January 2004, when there
20    was a new shareholders' agreement.
21        CHAIRMAN FEINBERG:  How are you going
22    to show that today?
23        MR. VAN TOL:  Through the testimony
24    of Mr. Ekhougen.

Page 17

Proceedings

1         CHAIRMAN FEINBERG:  Their witness?
2         MR. VAN TOL:  Yes.
3         CHAIRMAN FEINBERG:  Through
4     cross-examination of their witness, you
5     are going to demonstrate that the 2002 has
6     nothing to do with the 2004?
7         MR. VAN TOL:  Yes.
8         CHAIRMAN FEINBERG:  Without
9     presenting a live witness?
10        MR. VAN TOL:  Yes.
11        Now, what's interesting is that
12    Telenor Mobile has not cited a single
13    case, and we have weren't able to find one
14    where a tribunal like this one overturned
15    a prior court's determination that a
16    contract didn't exist.
17        CHAIRMAN FEINBERG:  Let me just
18    interrupt and just ask you whether you
19    can't resist, Pieter, I think you are
20    going from your one-minute evidentiary
21    introduction to sort of your summation at
22    lunchtime or whenever, if you are, that's
23    fine, because I think Robert wants that,
24    but I just want to remind you of your

Page 18

```
1           Proceedings
2  comment earlier.
3      MR. VAN TOL:  And I was actually
4  done.
5      My last line, Mr. Chairman, was in
6  short, gentlemen, my point is that the
7  direct examination of Mr. Ekhougen is
8  unnecessary, in that it's not going to --
9  he's not going to be able to tell you,
10  unless I am wrong, that there was meeting
11  of participants in January 2004, but I
12  think cross-examination will be useful
13  because we will show that there is a wedge
14  between what happened in 2002, and what
15  happened in 2004, and with that, I am
16  happy to turn the witness over.
17      ARBITRATOR JENTES:  One final
18  question, from me at least.
19      How do you expect to show that there
20  is a difference between the 2002, I gather
21  in your view, draft shareholders'
22  agreement and the one that was signed in
23  2004?
24      MR. VAN TOL:  Well, Storm's been --
25  I'm sorry, Telenor Mobile has been kind
```

Page 19

```
1           Proceedings
2  enough to do that for us because their
3  lawyer did a black line showing the
4  differences between what was proposed.
5  Basically it was close to the draft from
6  2002.
7      And when it was finally signed up, we
8  are going to see that in Exhibit W to
9  Telenor's brief, I'm going to go through
10  with Mr. Ekhougen who was involved in the
11  transactions that were their negotiations,
12  that authority to go forward were the
13  voting agreement that then contemplates a
14  later shareholders' agreement is not
15  authority to sign a completely different
16  document in 2004.
17      ARBITRATOR JENTES:  I'm sorry to be
18  so precise, but I am trying to find out in
19  the last statement you made, is he or
20  somebody else going to say, well, this was
21  a substantial difference and, therefore,
22  it was not authorized, or are you going to
23  argue from the black line version that we
24  are supposed to conclude as a matter of
25  law that it was substantially different.
```

Page 20

```
1           Proceedings
2      In other words, we are back to where
3  we have been all along as far as I think
4  the panel's concerned, what's the evidence
5  that we are dealing with.
6      MR. VAN TOL:  I'm hoping to establish
7  today with Mr. Ekhougen facts, and from
8  those facts I will ask the tribunal to
9  draw the factual conclusion that the
10  agreement, the draft agreement appended to
11  the 2002 voting agreement is not the same
12  as the agreement that was signed up in
13  January 2004, and that the power, any
14  certificate or power of attorney given to
15  Mr. Nilov in 2002.  It can't be effective
16  that many months later for a brand new
17  agreement.
18      ARBITRATOR JENTES:  But isn't a brand
19  new agreement, I mean, it's evident that
20  it's not brand new.  But what I am trying
21  to get it at is:  You have to show that it
22  was, I guess, so different that there
23  couldn't have been authority carrying
24  forward for two years.
25      What I am trying to find out is:  Is
```

Page 21

```
1           Proceedings
2  there going to be a witness that is going
3  to say that or is that something you are
4  arguing we should conclude?
5      MR. VAN TOL:  I think the documents
6  we will see today will show there are
7  material differences between the two.  I
8  think Mr. Ekhougen's testimony will show
9  it, and we will argue the differences that
10  can be drawn from those facts.
11      MR. SILLS:  Thank you, Mr. Chairman.
12      Well, I am glad to see that Storm has
13  apparently abandoned the principal or the
14  approach it took in the papers submitted
15  here arguing that no hearing was
16  necessary.  Now that I intend to pursue
17  evidentiary hearing that was ordered when
18  we were last here in New York, but to the
19  extent that Storm's case now focuses on
20  the differences between the document
21  approved in 2002, and the document signed
22  in 2004, I'm not sure what can be
23  established through cross-examination.
24      The text of the two documents, the
25  differences between the text of the two
```

1          Proceedings
2      documents is what it is.  And we would not
3      dispute that it's somewhat different.
4          What the evidence that we have
5      submitted shows and what Mr. Ekhougen's
6      testimony will again bring before the
7      tribunal is that not only were those
8      differences not substantial, and the
9      agreement is largely the same as the one
10     what was authorized, but these changes
11     were made at the express request and over
12     the initial objection of Telenor, and it
13     behooves, I think, and I am sure the
14     tribunal will conclude, Storm having put
15     in no evidence, still apparently not in
16     control of its own records to be waging
17     this war on an agreement it signed and
18     under which it lived for well over a year
19     to have requested that change and now
20     argue that because Telenor in the spirit
21     of the cooperation negotiated the one
22     substantive point for which a change was
23     requested by Storm, and then there was an
24     extensive record saying we are ready to
25     execute, Mr. Nilov is the appropriate

1          Proceedings
2      party, he's prepared to execute.
3          In fact, there is, as you know in the
4      record, evidence that Mr. Nilov was out of
5      Kiev on the date that the parties had
6      agreed to for signing, which in fact had
7      been extended at Storm's request.
8          We were asked if we would take a fax
9      signature, the document was then signed in
10     effect three times, by fax by Mr. Nilov,
11     then the English version of text was
12     signed by Mr. Nilov what he returned to
13     Kiev, and sometime later the Ukraine
14     version was signed.
15         I will note in the application that
16     Storm, an argument was made that the
17     contract should be in Ukrainian, not
18     surprising there, neither party there
19     pointed out that the contract was in
20     Ukrainian.
21         At the closing of this contract, two
22     certificates were delivered, one signed by
23     the chairman of Storm, attesting to the
24     fact Mr. Nilov had authority.
25         We have all agreed that Sphere Drake

1          Proceedings
2      sets out the appropriate standard here,
3      and I think rather than what Storm's
4      counsel says Sphere Drake means or what I
5      say it means, we ought to look to the
6      language of it.
7          CHAIRMAN FEINBERG:  Mr. Sills, let me
8      also ask you whether, are you summing up
9      now or do you have a witness right here?
10         MR. SILLS:  I have a witness and I
11     simply want to anticipate his testimony.
12     We will have a lot more to say on
13     summation.
14         MR. VAN TOL:  Perhaps I should have
15     said something when I was exposing or
16     revealing my cross-examination to the
17     witness.  I don't know if the witness
18     should be present for Mr. Sills' remarks
19     telling him what to say.
20         CHAIRMAN FEINBERG:  Go ahead.  You
21     just want to make a point and then have
22     the witness testify, is that it?
23         MR. SILLS:  I don't think that was
24     called for.  If Mr. Van Tol would like the
25     witness to leave, I have no objection.

1          Proceedings
2          CHAIRMAN FEINBERG:  What is it you
3      want to add, Mr. Sills, before we get on
4      to the direct examination of the
5      testimony?
6          MR. SILLS:  Only this, that the tests
7      of Sphere Drake, which is at page six of
8      the copies that is annexed to Storm papers
9      said this, the rule that an agent that has
10     been charged with negotiating the contract
11     on behalf of the principle acts outside
12     the scope of its agency and in the Court's
13     emphasis and the opposing party knows
14     this, the agent has both actual and
15     apparent authority and the agent is not --
16     there was an authorization, Mr. Nilov,
17     both as a matter of his office as general
18     director and as a matter of the express
19     authorization in 2002, had actual
20     authority.
21         We were told he had authority, and
22     there isn't a shred of evidence that has
23     been adduced that anyone ever advised
24     Telenor that Mr. Nilov was acting outside
25     of the scope of his authority for the very

1      Proceedings
2    good reason he was perfectly authorized.
3        ARBITRATOR JENTES:  Could I ask one
4    question of both sides?
5        What is the position of Storm as to
6    the controlling law governing this
7    question of whether the contract was void?
8    Mr. Sills has just referred to New York
9    law.  What's your position?  Is that the,
10   is that what controls here?
11       MR. VAN TOL:  No.  Our position, and
12   I am sure in my much anticipated summation
13   is that Ukraine law controls whether or
14   not there was a contract.
15       ARBITRATOR JENTES:  Do we know what
16   Ukrainian law says?  Is it the same as New
17   York law on the issues that Mr. Sills just
18   raised?
19       MR. VAN TOL:  All we know about
20   Ukrainian law is what is in Mr. Nilov's
21   affidavit, who is Telenor's expert
22   witness.
23       Now, what I will show in summation is
24   that even under that standard, if that is
25   the case, Telenor Mobile still can't show

1      Proceedings
2    that Mr. Nilov had all actual authority or
3    that he was allowed to rely on Mr. Nilov's
4    authority.
5        That is definitely part of our
6    presentation.  Even if you assume
7    Mr. Rabij is right --
8        ARBITRATOR JENTES:  As to Ukrainian
9    law?
10       MR. VAN TOL:  -- as to Ukrainian law,
11   because we have no evidence to rebut.
12   Even if you assume that, Telenor Mobile
13   can't make a showing.
14       MR. SILLS:  Our position is that New
15   York law governs, that the parties elected
16   New York law in the contract, the Indosuez
17   case which we cited and discussed at the
18   last hearing is absolutely clear on that
19   once the parties elected New York law in a
20   contract, New York law governs, and
21   Ukrainian law, the parties ousted
22   Ukrainian law, and it was an entirely
23   voluntary act.
24       Notwithstanding that, I'm glad to
25   hear that Mr. Rabij's testimony is the

1      Proceedings
2    only testimony on this point.
3        Ukrainian law is essentially the
4    same, so it's to some extent a false
5    conflict.  As Mr. Rabij points out, there
6    was actual authority from the 2002
7    authorization and from Mr. Nilov's status
8    as general director, which confers very
9    broad powers on him under Ukrainian law.
10       Ukrainian law also follows the same
11   principle that Sphere Drake does.  If an
12   agent author to have authority is acting
13   within the apparent scope of that
14   authority and the counterparty isn't aware
15   of any limitation, I believe it's Section
16   92 of the Ukrainian Civil Code, then the
17   lack of actual authority would be
18   irrelevant, so I think in some sense it's
19   a false conflict because as Mr. Rabij
20   points out, that is the only information
21   we have to that Ukrainian law and New York
22   law are essentially the same on this
23   point.
24       CHAIRMAN FEINBERG:  We have a witness
25   here, Mr. Sills.  Why don't we proceed?

1    Ekhougen/Direct-Sills
2        When the witness takes the oath, will
3    everybody please pay attention.
4        MR. SILLS:  We call Sigmund Ekhougen.
5    S I G M U N D   E K H O U G E N,
6    called as a witness, having been duly
7    sworn by a Notary Public, was examined
8    and testified as follows:
9        CHAIRMAN FEINBERG:  Proceed.
10       MR. SILLS:  Thank you, Mr. Chairman.
11   DIRECT EXAMINATION
12   BY MR. SILLS:
13       Q.  Mr. Ekhougen, could you please state
14   your name for the record?
15       A.  My name is Sigmund Ekhougen.
16       Q.  Mr. Ekhougen, are you a native
17   speaker of English?
18       A.  No.  My native language is Norwegian.
19       Q.  Do you believe yourself able to
20   testify in English?
21       A.  I do, but I must have the possibility
22   to ask some questions sometimes, to rephrase
23   questions.
24       CHAIRMAN FEINBERG:  Let me just say a
25   couple of suggestions.  Speak loudly,

Page 30

1    Ekhougen/Direct-Sills
2  speak slowly, and the only person more
3  than any other that you have to satisfy is
4  this woman right here.  So, if there is
5  problems, you will hear from her.
6       Speak in her direction, because she
7  is the one that has to transcribe this.
8       THE WITNESS:  I will.
9       ARBITRATOR JENTES:  You should also
10  understand, this is true of every witness.
11  If you don't understand a question fully,
12  ask and it can be explained to you or
13  expanded or restated.  That's your right
14  as a witness.
15       THE WITNESS:  I will do.
16  BY MR. SILLS:
17       Q.  Mr. Ekhougen, where do you live?
18       A.  I'm living in Norway, but I also have
19  a flat in Kiev.
20       Q.  By whom are you employed?
21       A.  I'm employed by Telenor Mobile, the
22  mother company of Telenor Mobile.
23       Q.  What is your current position with
24  Telenor?
25       A.  I'm the head of Telenor

Page 31

1    Ekhougen/Direct-Sills
2  representative office in Kiev.  We call it
3  representative office in Kiev.
4       CHAIRMAN FEINBERG:  The Ukraine.
5       Q.  For how long have you been country
6  manager in Ukraine?
7       A.  Since January 2003.
8       Q.  Could you briefly describe for the
9  panel your duties and responsibilities as
10  country manager for Telenor in Ukraine?
11       A.  As country manager, we are Telenor
12  representative on the ground in Kiev.  We are
13  talking care of our business in Kiev, in
14  Ukraine, and also taking care of governmental
15  relation and other sort of stuff in Kiev, in
16  Ukraine.
17       Q.  When did you first assume your
18  position for Telenor in Ukraine?
19       A.  I started as country manager in
20  January 2003, but previous, I have also been
21  expert to Kyivstar, I was vice president and
22  deputy general director in '98 and part of '99.
23       Q.  As the country manager in Ukraine,
24  can you estimate for the panel what percentage
25  of your time you spend working on Kyivstar

Page 32

1    Ekhougen/Direct-Sills
2  matters as opposed to matters involving some
3  other investment of the company?
4       A.  Kyivstar represents 95 or more
5  percentage of our investment in Ukraine, so I
6  spend as much of my time on Kyivstar matters.
7       Q.  Before you took over your duties and
8  responsibilities as country manager, was there
9  some other Telenor executive who was generally
10  responsible for --
11       A.  There was complimentary, there was a
12  previous country manager that left which took
13  over.
14       Q.  Who was he or she?
15       A.  His name was Hallvard Austlid.
16       Q.  Are you familiar with the Telenor
17  executive name Egil Hansen?
18       A.  He was working in M & A department in
19  Oslo, and I know he was negotiating the first,
20  the voting agreement.  But I have never been
21  working directly with Mr. Hansen.
22       MR. SILLS:  Could we go off the
23  record for just one second?
24       (Recess taken.)
25       Q.  Was Mr. Hansen, to your knowledge,

Page 33

1    Ekhougen/Direct-Sills
2  the Telenor executive responsible for
3  negotiating the 2002 voting agreement and the
4  draft shareholders' agreement?
5       A.  Yes.
6       Q.  Do you know why it is that Mr. Hansen
7  is no longer actively working at Telenor?
8       A.  He got cancer.  He got cancer and he
9  is retired.
10       Q.  When you took over your duties and
11  responsibilities, Mr. Ekhougen, in 2003, were
12  you aware of the voting agreement that had been
13  executed by the parties?
14       A.  Yeah.  I was told by Mr. Austlid and
15  I was shown the agreement, and I tried to
16  familiarize myself with the agreement as soon as
17  possible after taking over.
18       Q.  In your review of the voting
19  agreement, did you also review a shareholders'
20  agreement that was attached to it?
21       A.  Yes.
22       MR. SILLS:  Mr. Chairman, rather than
23  marking loose copies and having additional
24  exhibits, it seems to me in the keeping
25  with the spirit of arbitration, it would

Ekhougen/Direct-Sills

1    Ekhougen/Direct-Sills
2    be easiest if we referred to the documents
3    that have already been supplied to the
4    tribunal.
5        CHAIRMAN FEINBERG:  That will be
6    fine.  At the end of the hearing, just
7    make sure there is agreement on the record
8    as to which documents are marked as to
9    what exhibit.
10       MR. SILLS:  Thank you very much.
11       MR. VAN TOL:  If I could just ask
12   Mr. Sills, I am sure I will do the same
13   thing.  There are letters for both, what's
14   attached to our brief and what's attached
15   to the affidavit.  If we could all be
16   clear about whether we are talking to
17   something attached to the brief --
18       MR. SILLS:  That was my plan, but
19   then you --
20       MR. VAN TOL:  I figured it was.
21       **Q.  Let me place before you, Mr.**
22   **Ekhougen, what has been previously marked**
23   **as Exhibit 1 to the evidentiary brief in**
24   **opposition to Storm's motion to dismiss.**
25       **I ask you if you are familiar with**

1    Ekhougen/Direct-Sills
2    that.
3        A.  Yes.  This is the voting agreement as
4    I have it in my files.
5        **Q.  Directing your attention to the**
6    **portion of that document following page 44,**
7    **which is entitled Shareholders' Agreement, and**
8    **then there is a blank between and among,**
9    **Telenor, Storm and Kyivstar?**
10       A.  Yes.
11       **Q.  Is this the voting agreement to which**
12   **you previously referred?**
13       MR. VAN TOL:  I think you mean
14   shareholders' agreement.
15       MR. SILLS:  I'm sorry.
16       **Q.  The shareholders' agreement to which**
17   **you previously referred?**
18       A.  Yes, it is, as far as I can see.
19       MR. SILLS:  Mr. Chairman, I offer
20   Exhibit I to Telenor's brief in evidence.
21       MR. VAN TOL:  No objection from
22   Storm.
23       CHAIRMAN FEINBERG:  Admitted.
24       MR. SILLS:  Thank you.
25       (Exhibit I, received in evidence, as

1    Ekhougen/Direct-Sills
2    of this date.)
3        ARBITRATOR JENTES:  Gentlemen, to
4    save time on the offers, et cetera, is
5    there any objection from Storm to any of
6    the documents in the so-called evidentiary
7    brief, that is Exhibits A through EE, so
8    we don't have to go through the offer
9    every time.
10       MR. VAN TOL:  I don't believe there
11   is.  If something strikes me, I will bring
12   it up; otherwise, I think our operating
13   presumption should be on authenticity.  We
14   are fine.
15       MR. SILLS:  Thank you.
16       **Q.  Mr. Ekhougen, could you explain to**
17   **the panel, please, your understanding of the**
18   **relationship between the voting agreement, which**
19   **is the first part of Exhibit I, and the**
20   **shareholders' agreement, which is the second**
21   **part of Exhibit I?**
22       A.  As I said, I was not part of the
23   negotiations.  I have seen it only as a
24   document.  My understanding is the voting
25   agreement was to govern the relation between

1    Ekhougen/Direct-Sills
2    Storm and Telenor while dealing with a third
3    shareholder namely Omega, and that the
4    shareholders' agreement should be enforced when
5    Omega leaves the company.
6        **Q.  Can you explain to the panel your**
7    **understanding of the reason why the parties**
8    **agreed on this two-step process, that is, first**
9    **to enter into a voting agreement and then to**
10   **enter into a shareholders' agreement?**
11       A.  As far as I understood, Omega was
12   quite a troublesome partner, especially when it
13   comes to finance the company's operation, and
14   both Storm and Telenor agreed that they had to
15   get that partner out of the company.
16       **Q.  Was there anything between Storm on**
17   **the one hand and Telenor on the other regarding**
18   **the purchase of Omega's shares or its interest**
19   **in Kyivstar?**
20       A.  No.  One of the, I don't know if
21   obligation is the right expression, but one,
22   Telenor expected and had agreed with Storm that
23   they should buy up Omega's shares.
24       MR. SILLS:  Off the record for one
25   second.

Page 38

Ekhougen/Direct-Sills

1    Ekhougen/Direct-Sills
2    (Discussion held off the record.)
3    ARBITRATOR CRAIG:  Just to clarify,
4    Storm was to purchase Omega's shares?
5    THE WITNESS:  Storm or Alpha, as far
6    as I understand.  It could have been both,
7    or either, or Alpha affiliate.
8    **Q.  Mr. Ekhougen, is it your**
9    **understanding that there was an earlier 1998**
10   **shareholders' agreement in place at the time**
11   **that you took over your duties and**
12   **responsibilities?**
13   A.  Yes.  Actually, I was vice president
14   in the company when this agreement was signed in
15   '98.
16   **Q.  And who were the parties to that 1998**
17   **agreement?**
18   A.  In principle was Storm, Telenor,
19   Omega, and Sputnik, and if I remember right, it
20   was two or three Sputnik companies, I'm not
21   sure.
22   **Q.  What became of the Sputnik interest**
23   **in Kyivstar?**
24   A.  Now, we are asking questions from a
25   period where I am not working with Kyivstar, but

Page 39

1    Ekhougen/Direct-Sills
2    Sputnik interest was bought partly, as I
3    understand, partly by Telenor and partly by
4    Storm.
5    **Q.  Until Omega shares had been**
6    **purchased, would it have been possible as you**
7    **understand it to terminate the 1998**
8    **shareholders' agreement?**
9    A.  No.  It gave Omega sort of rights
10   that they were not willing to give away.
11   **Q.  And what is your understanding of the**
12   **agreement of the parties regarding execution of**
13   **the 200-, what we will call now the 2004**
14   **shareholders' agreement once the Omega shares**
15   **were purchased?**
16   A.  The agreement, the voting agreement
17   says that the shareholder, new shareholders'
18   agreement should be signed within, I think it
19   was, three working days after the closing of the
20   Omega deal.
21   ARBITRATOR CRAIG:  Did you mean the
22   2004 shareholders' agreement or the 2002
23   shareholders' agreement?
24   THE WITNESS:  I meant the 2004.
25   MR. SILLS:  Well, I guess it's our

Page 40

1    Ekhougen/Direct-Sills
2    position, Mr. Craig, that they are the
3    same, but, perhaps if we were to call it
4    the new shareholders' agreement.
5    ARBITRATOR CRAIG:  Fine.
6    CHAIRMAN FEINBERG:  It's your case.
7    Go ahead.
8    BY MR. SILLS:
9    **Q.  Mr. Ekhougen, did there come a time**
10   **when you began discussions with Alpha or Storm**
11   **of the progress that they were making in**
12   **purchasing Omega?**
13   A.  Yes.  Omega transaction was important
14   for the progress of the company, and we were not
15   involved in the Omega transaction.  I start
16   asking questions about the progress, I think in
17   spring of 2003, and I was told by the two Storm
18   members of the board, namely Yuri Tumanov and
19   Andrey Kosogov, that the correct one to discuss
20   this issue with was Andre Khudyakov.
21   ARBITRATOR JENTES:  Who is he?
22   THE WITNESS:  He was -- at that time
23   he was, we were told that he was the guy
24   in Alpha system in charge of taking care
25   of the day-to-day business with relation

Page 41

1    Ekhougen/Direct-Sills
2    to Kyivstar, and he was also participating
3    in all board meetings from the time I
4    started participating.  And I, I addressed
5    him and asked for a time schedule for the
6    -- for the Omega transaction.
7    ARBITRATOR CRAIG:  This was in 2003?
8    THE WITNESS:  This was before the
9    summer in 2003, yes.
10   **Q.  Did there come a time when**
11   **Mr. Kulikov informed you that Alpha was getting**
12   **close to a purchase of Omega?**
13   A.  After the summer, I got a timeline
14   from him, a time schedule, and that sort of,
15   it was changing a bit, but we still got
16   information that they were getting closer and
17   closed, and in November, mid-November, we got
18   the message that the deal was almost closed and
19   that we should prepare for closing of the
20   shareholders' agreement.
21   **Q.  Let me direct your attention to**
22   **Exhibit Q to the Telenor brief, if I could.**
23   A.  Yes.  This is the e-mail I wrote on
24   the 4th of November asking about the progress.
25   And where I got an answer from Mr. Khudyakov

Ekhougen/Direct-Sills

1        Ekhougen/Direct-Sills
2  about the progress, that it still needed some
3  weeks, but it also asked about the new
4  shareholders' agreement and he confirmed that we
5  agreed on some small technical changes in the
6  agreement, but otherwise they were prepared to
7  sign the agreement.
8      **Q.  What were those technical changes?**
9     A.  In 2003 -- no, in 2002, Kyivstar was
10  in quite a difficult financial situation and
11  Ericsson came up, and they offered vendor
12  financing, and this was reflected in the
13  proposed shareholders' agreement, but as
14  Kyivstar succeeded to get Euro bond later in
15  2002, this loan was repaid, and we had to make
16  those changes in the shareholders' agreement.
17      Otherwise, there were no other
18  changes and dates and things like that.
19      **Q.  Directing your attention to the**
20  **e-mail, which is on the top portion of the first**
21  **page, do you recall receiving this e-mail from**
22  **Mr. Khudyakov?**
23     A.  Yes.
24      **Q.  Now, did you respond to**
25  **Mr. Khudyakov's request to proceed to sign the**

1        **Ekhougen/Direct-Sills**
2  **2002 agreement with some technical changes?**
3     A.  I mean, they may -- that we agree on
4  the text, so I kept contact with him to progress
5  on the closing of the Omega deal.  But formally
6  the next, the next time we met was during a
7  board meeting in Kyivstar one month later in
8  early December 2003.
9      **Q.  Was that the meeting of**
10  **December 11th?**
11     A.  Yes.
12      **Q.  Who was present at that meeting?**
13     A.  From Storm was -- I was present,
14  Mr. Khudyakov was present, but from Storm the
15  two ordinary representatives, two ordinary
16  directors of the board, namely Mr. Tumanov and
17  Mr. Kosogov was present.  I don't remember.  It
18  was one of Telenor directors who was not
19  present.  So I was, I was representing Telenor
20  also in the board.
21      **Q.  Was there any discussion at this**
22  **board meeting about the progress of the Omega**
23  **transaction?**
24     A.  They have informed us that the Omega
25  transaction now was closed, but we were really

1        Ekhougen/Direct-Sills
2  surprised when, when the two Storm
3  representatives raised the question of making
4  changes to the draft of the shareholders'
5  agreement.
6      **Q.  Did anyone from Telenor at that**
7  **meeting suggest any changes to the shareholders'**
8  **agreement?**
9     A.  No.
10      **Q.  Do you recall what changes were**
11  **suggested or requested?**
12     A.  We asked to get it in writing, and I
13  think the proposal is enclosed here, it's too --
14  it's, they propose changes in two articles
15  regarding the termination clauses.
16      ARBITRATOR CRAIG:  Could I ask a
17  question about this document, are you
18  moving on?
19      MR. SILLS:  I am.
20      ARBITRATOR CRAIG:  Would it be
21  appropriate, Mr. Chairman, if we have
22  questions, go along?
23      Referring to your e-mail, there is a
24  second page that appears to be from you to
25  Mr. Khudyakov.

1        Ekhougen/Direct-Sills
2      THE WITNESS:  Yes.
3      ARBITRATOR CRAIG:  Is that, in fact,
4  an e-mail that you sent?
5      THE WITNESS:  That is an e-mail I
6  sent.
7      ARBITRATOR CRAIG:  In that e-mail,
8  you refer to at the top, I hope that
9  everything, that everything is developing
10  according to your roadmap.  In case
11  closing should take place this week and
12  termination of the existing shareholders'
13  agreement and signing of a new should take
14  place very soon, next week.
15      When you talk about the existing
16  shareholders' agreement in that e-mail
17  dated 2003, what shareholders' agreement
18  are you referring to?
19      THE WITNESS:  Shareholders' agreement
20  from '98.
21      ARBITRATOR CRAIG:  That is the 1998
22  one?  It's not the one that was --
23      THE WITNESS:  No, '98 agreement.  We
24  had to terminate that before we went into
25  the new one.

Page 46

Ekhougen/Direct-Sills

1

2  Q.  Maybe it would be helpful, Mr.
3  Ekhougen, if you would briefly summarize the
4  formal steps that the parties had agreed to take
5  with respect to the 1998 agreement, the voting
6  agreement, and the new shareholders' agreement.
7      What was the sequence in which those
8  agreements would be executed or terminated?
9      A.  I mean, as we said earlier, the first
10  step was sort of the closing of the Omega
11  transaction, then we should be informed in a
12  proper way about the transaction, about the
13  closing.  Then we had to terminate the existing
14  shareholders' agreement, and go into a new
15  shareholders' agreement as proposed in the
16  letter from -- in the voting agreement from
17  2002, and then we should finally do some share
18  transaction, get back to a level of 56.5 percent
19  to Telenor and 43.5 percent to Storm.
20      Q.  And what was your understanding of
21  the relationship between the voting agreement as
22  executed in 2002, and the new shareholders'
23  agreement?
24      MR. VAN TOL:  I think that has been
25  asked and answered already.

Page 47

Ekhougen/Direct-Sills

1

2      A.  The Telenor position the whole time
3  has been that we should execute the
4  shareholders' agreement as it was attached to
5  the -- to the voting agreement, except for those
6  technical changes, and that was, as I said, the
7  Ericsson debt, and actual dates and things like
8  that.
9      Q.  Let me direct your attention to
10  Exhibit S to the Telenor brief, if I could.
11      A.  Yes.
12      Q.  Do you recall receiving a copy of
13  this document?
14      A.  This letter is sent by me.
15      Q.  Do you recall receiving a copy signed
16  by Mr. Nilov?
17      A.  Yes.  The reason why, should I
18  explain the reason?
19      MR. SILLS:  Please.
20      A.  The reason was that it turned out
21  that two affiliates had bought Omega as is.
22  They would like to transfer the Omega shares to
23  Storm, and they asked for a waiver on the
24  three-day period, because they were not able to
25  do all this transaction within three-day period.

Page 48

Ekhougen/Direct-Sills

1

2      And as you may notice, this is dated
3  December 17th quite close to western
4  Christmas, and then there is two weeks of
5  Ukrainian or other documents, Christmas coming
6  after.  So we accepted the waiver and we have
7  decided to postpone or to prolong the period for
8  signing until the end of January.
9      Q.  By the way, you see that Mr. Nilov
10  signed this document?
11      ARBITRATOR CRAIG:  Are you talking
12  about S?
13      MR. SILLS:  Exhibit S, yes.
14      A.  Yes, yes, Mr. Nilov signed it as
15  general director of Storm.  Mr. Nilov always
16  signed relevant documents from Storm.
17      Q.  Did anyone suggest at the time he
18  signed this document that he lacked authority to
19  agree to this extension?
20      A.  No, none whatsoever.
21      Q.  Let me direct your attention to
22  Exhibit U to the Telenor brief.
23      A.  Yes.
24      Q.  Have you seen these documents before?
25      A.  Yes.  This are made regarding wording

Page 49

Ekhougen/Direct-Sills

1

2  of the shareholder agreement, but could I
3  comment on what's led up to this document?
4      Q.  I was about to ask.
5      A.  Because as I said, on the board
6  meeting, in December, 11th of December, the two,
7  the two Storm directors relate to the issue of
8  making changes in the new shareholders'
9  agreement.
10      We got, we got a written proposal and
11  I sent an answer after considering this
12  proposal.  I think that's all an exhibit here.
13  I am not sure.
14      You know better these numbers than
15  me.  It's Exhibit R.
16      I sent an answer to Storm where we
17  said that we did not appreciate this last-minute
18  request for changes, that to your position was
19  as we had agreed in the voting agreement that
20  the shareholders' agreement should be executed
21  as it was, but we said that we were willing to
22  negotiate later after signing of the agreement.
23      And then I proposed a meeting for --
24  we proposed a meeting in December to sign the
25  deal.

Ekhougen/Direct-Sills
1
2    **Q.   And after you had sent your letter**
3    **rejecting Storm's proposal to modify the**
4    **agreement, did Storm write back?**
5        A.   They did not address to me, but the
6    two Storm directors in Kyivstar board of
7    directors sent a letter to one of the directors
8    from Telenor and copied the three others urging
9    Telenor not to take my position but to be
10   willing to negotiate these termination clauses.
11       **Q.   Let me turn your attention to Exhibit**
12   **T to the Telenor brief, if I could.**
13       A.   Yes, this letter was never sent to
14   me, but I was, I got a copy from my colleagues
15   in Oslo.
16       **Q.   Who is Mr. Gustad to whom the letter**
17   **is addressed?**
18       A.   Mr. Gustad was the executive vice
19   president in Telenor in Oslo responsible for
20   Kyivstar from Oslo.  So, in a way you can say he
21   was my boss.
22       **Q.   And continuing with Exhibit T, who**
23   **are the two signatories to that letter,**
24   **Mr. Tumanov and Mr. Kosogov?**
25       A.   The two board, the two directors in

Ekhougen/Direct-Sills
1
2    Kyivstar board representing Storm.  Mr. Tumanov
3    was the chairman of Storm, and he was also the
4    chairman of Kyivstar, and Mr. Tumanov was
5    Alpha's representative in the Telenor, the
6    Kyivstar board of directors.
7        **Q.   Following this letter sent by these**
8    **two gentlemen to your colleagues in Oslo, did**
9    **Telenor in fact agree to negotiate with Storm**
10   **over Storm's request to change the draft**
11   **shareholders' agreement?**
12       A.   They send an answer before Christmas
13   stating that they're supporting my position that
14   we should sign the agreement as it was, but they
15   also said that they were willing to meet
16   representative for Storm after Christmas when
17   Mr. Gustad came to Kiev.
18       **Q.   Did there come a time when**
19   **negotiations over Storm or Alpha's request to**
20   **change the agreement actually began?**
21       A.   As this seemed to be very important
22   for Storm, Telenor started negotiating on the --
23   negotiating, making changes in this termination
24   agreement in approximately the 20th of January,
25   something like that.

Ekhougen/Direct-Sills
1
2        ARBITRATOR CRAIG:  Mr. Sills, could I
3    ask a question about the --
4        MR. SILLS:  Of course.
5        ARBITRATOR CRAIG:  There is a
6    reference about an attachment there which
7    has the suggested amendments to the new
8    shareholders' agreement that is attached
9    to this letter from Tumanov and Kosogov.
10       THE WITNESS:  Yes.
11       ARBITRATOR CRAIG:  But there is no
12   attachment here.  Does that attachment
13   appear somewhere else in that set of
14   exhibits?
15       CHAIRMAN FEINBERG:  Is that U and V?
16       ARBITRATOR CRAIG:  I'm looking for
17   sort of a list of the proposed amendments
18   that, being discussed in these e-mails,
19   and there was one I guess attached to this
20   e-mail.
21       MR. SILLS:  I don't know.
22       THE WITNESS:  I have it here, if you
23   have want it.
24       ARBITRATOR CRAIG:  If it's in
25   English.

Ekhougen/Direct-Sills
1
2        THE WITNESS:  It's in English, I did
3    not speak Ukraine.
4        MR. SILLS:  It is, if we could take
5    just a moment, we'll make copies and
6    distribute them.
7        ARBITRATOR CRAIG:  That would be
8    great.
9        CHAIRMAN FEINBERG:  Do you want to
10   continue and then come back to the --
11       ARBITRATOR CRAIG:  I just want to get
12   them.
13       CHAIRMAN FEINBERG:  Continue,
14   Mr. Sills.
15       MR. SILLS:  Thank you, Mr. Chairman.
16       **Q.   Directing your attention now to**
17   **Exhibit V.**
18       ARBITRATOR CRAIG:  V as is Victor?
19       MR. SILLS:  Yes.
20       **Q.   I apologize, Exhibit U, first.  You**
21   **have seen this document before?**
22       A.   Yes, I was copied on part of the
23   document.
24       **Q.   Okay.  And --**
25       A.   But this was kind of technical

14

Page 54

Ekhougen/Direct-Sills

1     discussion about the wordings among lawyers.
2
3          MR. VAN TOL:  Mr. Sills, may I just
4     interject?  I'm sure this is the case, are
5     the redactions on U and other documents,
6     are those for privilege reasons?
7          MR. SILLS:  No, those are simply the
8     headers when we printed them here, the
9     names of lawyers in our office appeared on
10    it and that's what been redacted.
11         MR. VAN TOL:  Understood.
12         MR. SILLS:  So it's more aesthetic
13    than a privilege matter.
14         MR. VAN TOL:  Okay.
15         **Q.  Who is the Aleksey Hudyakov referred**
16    **to in this document?**
17         A.  Who is he?
18         **Q.  Who is Mr. Hudyakov?**
19         A.  Aleksey Hudyakov was authorized by
20    the two Storm directors in Kyivstar board to
21    negotiate these technical changes.
22         **Q.  And who is the Oleksiy Didkovskiy**
23    **referred to here?**
24         A.  Didkovskiy is our Ukrainian legal
25    advisor.

Page 55

Ekhougen/Direct-Sills

1
2          ARBITRATOR CRAIG:  Telenor's?
3          THE WITNESS:  Telenor legal advisor.
4     Yes.  And he is present here.
5          ARBITRATOR CRAIG:  As far as you
6     know, this Mr. Hudyakov, was he a lawyer?
7          THE WITNESS:  I don't know.
8          ARBITRATOR JENTES:  But in any event,
9     he was in charge of handling the
10    negotiations as you understood it for the
11    Alpha group --
12         THE WITNESS:  For Storm.
13         ARBITRATOR JENTES:  For Storm.
14    Well, let me pursue my question
15    further.
16    I noticed in reaching these documents
17    that almost all the communications seemed
18    to be with Alpha or representatives of
19    Alpha.  Who did you understand was
20    involved in the negotiations?
21         THE WITNESS:  As I think I said, I
22    was told by the two Storm directors that I
23    should relate to Mr. Hudyakov.  I also see
24    that his e-mail address is Alpha Bank, but
25    he participated in all Kyivstar board

Page 56

Ekhougen/Direct-Sills

1
2     meeting representing Storm, but not
3     officially representing, but as non-voting
4     participant in the meeting.
5          ARBITRATOR JENTES:  All right.
6          MR. SILLS:  Maybe I could just follow
7     that up.
8          **Q.  Do you know or do you have an**
9     **understanding, Mr. Ekhougen, as to the**
10    **percentage ownership of Storm that various**
11    **companies in the Alpha group have in the**
12    **aggregate?**
13         A.  At that time we were told that Alpha
14    group at 50.1 percent in Storm.
15         **Q.  What percentage do they have today?**
16         A.  Different companies in Alpha group
17    has 100 percent.
18         **Q.  To your knowledge, does Storm conduct**
19    **any operations other than holding the shares of**
20    **the Kyivstar?**
21         A.  No, holding the shares of Kyivstar
22    was the only operation.
23         ARBITRATOR JENTES:  At the time you
24    were talking about when Alpha owned 50.1,
25    who owned the 49.9?

Page 57

Ekhougen/Direct-Sills

1
2          THE WITNESS:  Some Ukraine owners,
3     the existing Ukraine owners of Storm.
4     Storm was a Ukrainian company when the
5     company was founded in '98.  There is
6     also one attachment showing who the owners
7     are as part of the preparation for the
8     bond issue, but I don't know if that is
9     relevant.
10         ARBITRATOR JENTES:  I think we will
11    get to that.
12    So what we have just been handed now
13    is the attachment that Mr. Craig had asked
14    for, that is the attachment to U, I guess
15    it's T.
16         MR. SILLS:  I believe it's Exhibit T.
17         MR. VAN TOL:  Rather than make it a
18    new exhibit, maybe we could deem it to be
19    part of Exhibit T.
20         **Q.  Why don't we return that briefly.**
21    **Looking at the second portion of Exhibit T that**
22    **the parties and the panel now have, Mr.**
23    **Ekhougen, was this the proposal to amend the**
24    **shareholders' agreement made by Storm?**
25         A.  Yes.

15

1    Ekhougen/Direct-Sills
2        **Q.   Did Telenor have any role in drafting**
3    **this proposal?**
4        A.  No.
5        **Q.   Had Telenor suggested at any point**
6    **that the shareholders' agreement should be**
7    **amended or changed in any way?**
8        A.  No.  On the contrary, we, as I wrote
9    in my letter, this, we do not, we did not want
10    any change.  We would like to stick to the
11    original agreement.
12        **Q.   Could you turn to Exhibit V, as in**
13    **Victor.**
14        **Have you seen this document or these**
15    **e-mails before?**
16        A.   Yes.  I have been copied on some of
17    them, and I have seen them.
18        I have been copied on all of them,
19    actually.
20        **Q.   Were these documents sent between**
21    **representatives of Storm and Telenor in the**
22    **course of negotiating over Storm's proposed**
23    **changes to the shareholders' agreement?**
24        A.   Yes, this was in a -- firstly, we
25    checked that the last part of these were from

1    Ekhougen/Direct-Sills
2    Storm, but we said that we were willing to, to
3    negotiate on material breach as a reason for a
4    non-breaching shareholder to terminate the
5    contract.
6        And this was sort of the legal
7    discussion about what should be the limit, what
8    should be the definition on material breach.
9        **Q.   And then looking at Exhibit W, have**
10    **you seen this document before?**
11        A.   Yes.  I was copied on that document.
12        **Q.   And does this document show all the**
13    **changes between the shareholders' agreement**
14    **attached to the voting agreement and the 2004**
15    **agreement as changed to reflect the terms**
16    **requested by Storm?**
17        A.   Referring to the enclosed
18    shareholders' agreement where these changes are
19    marked.
20        ARBITRATOR CRAIG:  We are at W here?
21        MR. SILLS:  That's correct.
22        **Q.   Had any of the changes in there been**
23    **requested by Telenor?**
24        A.  No.  On the contrary.
25        **Q.   Look, if you would, at Exhibit X.**

1        **Ekhougen/Direct-Sills**
2        ARBITRATOR JENTES:  Before you leave
3    that, if I look at the table of contents
4    to W, does this tell me that the only
5    change to anything other than the
6    definitions are in Article 11?
7        MR. SILLS:  Are you addressing the
8    witness with that question?
9        ARBITRATOR JENTES:  The witness, yes.
10    If you know.
11        THE WITNESS:  Here are these
12    technical changes included already, so
13    they are not marked as changes.
14        ARBITRATOR CRAIG:  These are the ones
15    related to Ericsson?
16        THE WITNESS:  Yes, so we are here
17    comparing with the proposal where we have
18    proposed to sign in December, so this is
19    the Alpha or the Storm proposal, to change
20    this.
21        ARBITRATOR JENTES:  What I am trying
22    to get at is does this tell me that the
23    only changes were in Article 11 on page 28
24    of the draft?
25        THE WITNESS:  Yeah, and we also

1    Ekhougen/Direct-Sills
2    deleted then Article 808 as a consequence,
3    because that related to the same issues.
4        ARBITRATOR JENTES:  I see, so that is
5    on the table of contents page, little i?
6        THE WITNESS:  I am not sure.
7        ARBITRATOR JENTES:  Okay, I'm sorry,
8    you are not the lawyer, okay, all right.
9        ARBITRATOR CRAIG:  It appears at the
10    bottom of that page.
11        MR. SILLS:  I think this has to do
12    with the history and the way in which
13    different word processors black line
14    documents.
15        ARBITRATOR JENTES:  I'm just
16    wondering, I want to have a clear
17    understanding in lieu of what was argued
18    by Storm or presented by Storm earlier
19    today, that the only changes other than
20    the Ericsson changes are those that called
21    for the deletion of 8.08, and the
22    revisions to 11.01 and 11.02; is that it?
23        MR. VAN TOL:  That's our
24    understanding as well.
25        ARBITRATOR JENTES:  Okay.

Ekhougen/Direct-Sills

1    MR. VAN TOL: If that helps.
2    ARBITRATOR JENTES: Yes.
3    **Q. Look, if you would, at**
4    **Exhibit X to the Telenor brief.**
5    A. This is the e-mail that I received
6    from Hudyakov to me, where he confirms that they
7    are prepared to sign and he proposes a procedure
8    for signing.
9    The prolongation letter, I don't
10   remember the correct name, where we were willing
11   to extend the time for signing, said 31st of
12   January as the last day, so that's why this
13   meeting had to take place as scheduled here
14   without Nilov participating.
15   **Q. Mr. Ekhougen, who had requested the**
16   **execution to January 31st to sign the**
17   **shareholders' agreement?**
18   A. Storm.
19   **Q. Look at tab Y, if you would.**
20   A. Yes. It's a copy of the
21   shareholders' agreement signed on the 30th of
22   January by me and the president of Kyivstar,
23   Igor Lytovchenki.
24   We also have a copy of the same page

Ekhougen/Direct-Sills

1    with, that was sent to us the same day with
2    Valeriy Nolov's signature. But here on this
3    page that signature was added. This was a
4    Friday, and he added the signature on Monday.
5    **Q. As suggested in Exhibit X, had**
6    **Mr. Nilov previously supplied a fax signature in**
7    **order to have the document executed on the 29th?**
8    A. Yes.
9    **Q. So, this exhibit that we are now**
10   **looking at, was this the second time that**
11   **Mr. Nilov had signed the document?**
12   A. Yes, he signed this last
13   page on Friday, and then came to the lawyer's
14   office on Monday, and signed this, this page.
15   **Q. And looking at the signature on the**
16   **page, it appears that each party sealed the**
17   **document as well?**
18   A. Very important in Ukraine.
19   **Q. Could you expand on that and explain**
20   **why it's important in Ukraine?**
21   A. A signature is not binding without
22   company stamp and it has to be round.
23   **Q. And you recognize the stamp of Storm**
24   **on this document?**

Ekhougen/Direct-Sills

1    A. Yes.
2    **Q. At the time, at the time that this**
3    **signed and sealed document was delivered, were**
4    **any other documents delivered to Telenor in**
5    **conjunction with the closing?**
6    A. Our legal advisor, Olkesiy
7    Didkovskiy, got both the signature page and two
8    documents from Storm signed by Yuri Tumanov, as
9    chairman of Storm and Kosogov as board member or
10   director representing Storm and Kyivstar.
11   **Q. Directing your attention to Exhibit**
12   **AA, is that the certificate delivered by**
13   **Mr. Tumanov?**
14   A. Yes, it is.
15   **Q. And directing your attention to**
16   **Exhibit BB, BB, is that the certificate**
17   **delivered by Mr. Kosogov?**
18   A. Yes.
19   **Q. At the time that the executed**
20   **shareholders' agreement was delivered, did you**
21   **have any doubt in your mind about Mr. Nilov's**
22   **authority to sign it?**
23   A. No, no doubt whatsoever. We knew
24   Nilov asked the general director of Storm, he

Ekhougen/Direct-Sills

1    had been signing all kinds of Storm documents
2    earlier. I was told by out legal counselor that
3    these documents we got was sufficient to accept
4    his signature, and we also got the mail from
5    Hudyakov describing the procedure.
6    If I would have been in any doubt I
7    would not have signed this agreement, but it was
8    undoubtedly from my point of view that this was,
9    they were acting according to, to Storm's will.
10   **Q. Did Mr. Nilov say or do anything that**
11   **would have caused you to question his authority?**
12   A. No. Mr. Nilov only speaks Ukrainian,
13   so we always had to communicate through an
14   interpreter, but I was not present in the office
15   that Monday because I had to go home to Norway.
16   There was no reason to, as far as I
17   know, nothing.
18   **Q. Did any of your colleagues at Telenor**
19   **ever suggest to you that they had any concern or**
20   **question regarding Mr. Nilov's authority?**
21   A. No.
22   **Q. Did anyone at Storm or Alpha, acting**
23   **or purporting to act on Storm or Alpha's behalf**
24   **ever say or do anything to you in 2004 that**

17

Ekhougen/Direct-Sills

1  suggested that there was any question about
2  Mr. Nilov's authority to execute this agreement?
3
4      A.  On the contrary.
5      Q.  Could you expand on that a bit?
6      A.  I mean, we, we went on acting as this
7  based on the shareholders' agreement.  As I said
8  earlier, first thing we had to do was to buy
9  back some shares.  The next step, we had to
10  change the charter of the company because the
11  new shareholders' agreement and the new number
12  of shareholders and shareholding had to be
13  reflected in the charter.
14      Actually, it was also set in
15  Ukrainian legislation that made it necessary.
16  So we started working on the new charter.  The
17  new charter was approved by the board of
18  directors in Kyivstar, and Mr. Yuri Tumanov, the
19  Chairman of Storm, proposed these changes in the
20  charter, at a general meeting of shareholders
21  in April 2004.
22      At the same meeting, we also elected
23  additional board members to Kyivstar, because
24  according to the old charter, Kyivstar had 37
25  board members, two from Storm, one from Omega,

Ekhougen/Direct-Sills

1
2  and four from Telenor, the new board should
3  consist of nine members, five from Telenor and
4  four from Storm.  And these four members were
5  also elected on shareholders' meeting in April.
6      Actually, Mr. Hudyakov as we
7  mentioned earlier, was at that time elected
8  member of the board of directors of Kyivstar.
9      Q.  Look at DD to this brief, if you
10  would.
11      A.  Yeah, this, this is a copy of the
12  shareholder meeting, I mentioned.  I acted as
13  the secretary of meeting, Mr. Nilov acted as a
14  chairman of meeting, and as I said, Yuri Tumanov
15  as chairman of Kyivstar also participated in the
16  meeting, together with administration.
17      Q.  And does this document record
18  corporate action on the changes to the Storm
19  charter required by the shareholders' agreement?
20      A.  Sorry.  I don't get your question.
21      Q.  Does this document reflect action
22  taken at a shareholders' meeting to chair the
23  Kyivstar charter?
24      A.  Yes.
25      ARBITRATOR CRAIG:  Referring to DD?

Ekhougen/Direct-Sills

1
2      MR. SILLS:  Yes.
3      A.  We approved new charter.
4      Q.  And were these changes required by
5  the shareholders' agreement that had been signed
6  in January?
7      A.  Yes, some of them, some of the
8  changes were a result, most of the changes were
9  a result of the shareholders' agreement, but
10  there were also some changes, because as I said,
11  changes in Ukrainian legislation.
12      Q.  Did Storm vote in favor of those
13  changes?
14      A.  Yes.
15      Q.  Was there any suggestion at this
16  meeting that the shareholders' agreement was in
17  any way invalid or unauthorized?
18      A.  None whatsoever.
19      Q.  Mr. Ekhougen, what's the first time
20  that you recall hearing that Storm or Alpha was
21  challenging Mr. Nilov's authority to execute the
22  shareholders' agreement?
23      A.  Sometime during the spring, 2005.  We
24  were notified that Storm has filed a motion to
25  Ukrainian court claiming that it was not valid

Ekhougen/Direct-Sills

1
2  because it was some breach of Ukrainian
3  legislation.
4      Q.  When you say you were notified --
5      ARBITRATOR JENTES:  I'm sorry.  Did
6  you misspeak?  I think it's recorded as
7  2005.
8      THE WITNESS:  Yes, 2005.  Am I wrong?
9      Q.  Let me direct your attention to
10  Exhibit EE.  It's the very last exhibit to the,
11  the very last exhibit to the Telenor brief.
12      A.  EE.
13      Q.  Do you see it's a press release on
14  Altimo letterhead?
15      A.  That's about the shareholders'
16  agreement, but Alpha filed a claim in March 2005
17  that was later withdrawn.
18      Q.  Mr. Ekhougen, do you know if that
19  claim involved any assertion that Mr. Nilov
20  lacked authority as opposed to the fact that the
21  contract was allegedly not written in Ukrainian?
22      A.  No.
23      Q.  Okay.  What's the first time that you
24  recall hearing that a claim was being raised
25  that Mr. Nilov lacked authority to execute the

Ekhougen/Direct-Sills

1  shareholders' agreement?

2  A.  That was in May 2006, where we were,

3  we got a call from Telenor.  Telenor got a call

4  from some Russian journalist that had a Russian

5  press release stating this fact, that Nilov was

6  not authorized.  We got it translated and then

7  later, some days later we found the same press

8  release on Alpha's internet page, but we never

9  got it directly from Alpha or from Storm.

10  Q.  And did there come a time when

11  Alpha's or Storm's representatives stopped

12  attending board of directors' meetings for

13  Kyivstar?

14  A.  Last time they attended a board of

15  directors' meeting was in December 2004.

16  Q.  So, throughout 2005, they ceased

17  attending board of directors' meetings?

18  A.  Yes.

19  Q.  Throughout 2005, did anyone from

20  Alpha say or suggest that the reason its

21  representatives were not attending board

22  meetings as required by the shareholders'

23  agreement was that Mr. Nilov had not been

24  authorized to sign the shareholders' agreement?

Ekhougen/Direct-Sills

1  A.  No.

2  MR. SILLS:  Thank you very much, Mr.

3  Ekhougen.  That's all I have on direct

4  examination.

5  CHAIRMAN FEINBERG:  Mr. Ekhougen,

6  what is your opinion as to why there was

7  an attempt to terminate the shareholders'

8  agreement?

9  THE WITNESS:  Why?

10  CHAIRMAN FEINBERG:  It was under your

11  testimony binding and official, why, what

12  was the motivation to terminate the

13  agreement?

14  THE WITNESS:  I think we have, we are

15  actually very difficult to understand why

16  Storm are acting like they are doing, but

17  it seems like they, I mean, what we have

18  seen afterward, they want to have equal

19  rights or equal standing in Kyivstar even

20  if they have only 43 percent of the

21  shares.

22  CHAIRMAN FEINBERG:  What is the

23  business motivation as to why they want

24  that?

Ekhougen/Direct-Sills

1  THE WITNESS:  I don't know.

2  CHAIRMAN FEINBERG:  When you have

3  learned, when you learned in 2006 of the

4  argument being made by Storm, did you or

5  any of your colleagues attempt to get a

6  business explanation from Storm as to why

7  they were doing this?

8  THE WITNESS:  We have never got a

9  good explanation why they have never

10  participated in the shareholders' meeting

11  and the board meeting.  We have never

12  gotten an explain for why they wanted to

13  terminate the shareholders' agreement.

14  CHAIRMAN FEINBERG:  Did you attempt

15  to find out?

16  THE WITNESS:  I did not, but I mean,

17  there are communication between Telenor

18  and Storm Alpha on other levels than mine,

19  but I am not able to answer for what they

20  did, but there are contact or

21  communication.

22  CHAIRMAN FEINBERG:  Do my colleagues

23  have any questions?  Otherwise we can take

24  a brief break before the

Ekhougen/Direct-Sills

1  cross-examination.

2  ARBITRATOR JENTES:  I have a couple

3  of questions just to tie down things, if I

4  may.

5  If I look back at, I guess it's

6  Exhibit Y, which is, as I understand it,

7  the executed copy of the shareholders'

8  agreement of January 30th, 2004.

9  Am I correct that the only changes

10  that were made in that shareholders'

11  agreement versus the draft that had been

12  proposed, I guess back in 2002, was the

13  technical changes as you have referred to

14  having to do with Ericsson, and the

15  deletion of 8.08 and Article 11's changes?

16  THE WITNESS:  Yes.

17  ARBITRATOR JENTES:  In particular,

18  was there ever any discussion that you

19  were a party to that called for or

20  suggested on the part of Storm that there

21  be some changes in the dispute resolution

22  provisions that are in Article 12.01 that

23  starts on page 30?

24  THE WITNESS:  No, these termination

19

Page 74

1      Ekhougen/Direct-Sills
2  clause were the only thing that was
3  mentioned and as you -- as shown in this
4  letter from Storm or this amendment.
5      ARBITRATOR JENTES:  And again, just
6  so I am clear, if you look over on page
7  34, there are some provisions regarding
8  governing law being the State of New York
9  and in Section 13.06, and a provision
10  relating to severability in 13.07.
11      To your knowledge, was there ever any
12  suggestion by Storm that there needed to
13  be or should be some changes in those two
14  provisions?
15      THE WITNESS:  No.
16      ARBITRATOR JENTES:  If you look over
17  at page 43, about a third of the way down,
18  there is a listing of the beneficial
19  owners and description of ownership
20  interest in Storm.  What's happened to
21  that beneficial ownership as far as you
22  know?
23      In other words, to be precise, there
24  is references to a variety of companies
25  here who don't seem to be around anymore,

Page 75

1      Ekhougen/Direct-Sills
2  what happened to them, if you know?
3      THE WITNESS:  As far as we are told,
4  not official here but indirectly from
5  Storm, an Alpha company, could I ask for
6  help?  Acord, was that the name?
7      An Alpha company bought the shares of
8  these three companies, represented
9  49.39 percent of the shareholders.
10      ARBITRATOR JENTES:  Well, again, I am
11  only looking as to what you know or have
12  been told.
13      Currently, there is a reference to
14  Altimo being the parent of Storm.  Do you
15  understand that to be the case?
16      THE WITNESS:  Altimo, as far as I
17  understand, is sort of just a renaming of
18  Telecom.
19      ARBITRATOR JENTES:  And Altimo, to
20  your understanding, is that owned by Alpha
21  Group?
22      THE WITNESS:  Yes.  It's 100 percent
23  controlled by Alpha Group.
24      ARBITRATOR JENTES:  Where does
25  Alperin fit into this, as far as you know?

Page 76

1      Ekhougen/Direct-Sills
2      THE WITNESS:  One of the owners of
3  Altimo, as far as I know, but now I am
4  talking, I have seen no documentation of
5  what you are asking me about now, so this
6  is my impression.
7      ARBITRATOR JENTES:  So as far as your
8  understanding is concerned, after the
9  shareholders' agreement was executed in
10  January of 2004, there was a transfer of
11  the beneficial ownership in Storm to these
12  other Alpha entities, is that your
13  understanding?
14      THE WITNESS:  Yes.  I -- still I
15  think -- I know it was toward the end of
16  2004 or early in 2005, but I -- I expect
17  that counselor for Storm has the exact
18  date.  We have not, I have never seen any
19  sort of confirmation of that.
20      MR. SILLS:  Mr. Jentes, I don't mean
21  to interrupt, if you look at Exhibit H to
22  Mr. Rabij's affidavit, taken from various
23  official documents in Ukraine, there is a
24  description of the ownership chain and the
25  ownership changes in Storm, and two

Page 77

1      Ekhougen/Direct-Sills
2  different Alpha entities control
3  100 percent of the interest in Storm,
4  according to the amendment number three to
5  the charter.  It is a portion of Exhibit H
6  to Mr. Rabij's affidavit, I can show you
7  here, if you like.
8      ARBITRATOR JENTES:  It's in H?
9      MR. SILLS:  Yes, sir, here it is.
10      ARBITRATOR JENTES:  What's the page
11  number?
12      MR. SILLS:  The pages are not
13  numbered sequentially.  It lists the two
14  participants as Alpha and Alperin.  I
15  don't think this is a matter in dispute,
16  that it's 100 percent subsidiary of the
17  Alpha Group consortium owned through that
18  series of intermediary companies
19  organized, I believe, in Cyprus and
20  Gibralter.
21      MR. VAN TOL:  There is only an
22  objection.  There is no legal entity the
23  Alpha Group Consortium.  I don't think
24  that is something to be debated here.
25      ARBITRATOR JENTES:  What I am really

Page 78

Ekhougen/Direct-Sills

1 trying to tie down for my own purposes,
2 when did the claimant in the case that was
3 decided in April of this year, acquire its
4 shares and from whom?  Do we know that?
5 MR. VAN TOL:  I will find that out
6 for you.  When did Alperin --
7 ARBITRATOR JENTES:  What I am just
8 interested in, were they a bona fide
9 purchaser?  Were they a successor in
10 interest?  What are their rights?  How did
11 they get their rights and what are they, I
12 guess is what I am a little bit interested
13 in.
14 MR. VAN TOL:  We will find that out
15 for you.
16 MR. SILLS:  I believe, Mr. Jentes,
17 this exhibit to Mr. Rabij's affidavit
18 addresses that, because of the requirement
19 that amendments to corporate documents be
20 officially filed in Ukraine, this is dated
21 September 3, 2004, and it records Alperin
22 as a participant for the first time.
23 ARBITRATOR JENTES:  Okay.  Last
24 question.  When was the last time you had

Page 79

Ekhougen/Direct-Sills

1 any dealings Mr. Nilov, roughly?
2 THE WITNESS:  I'm not sure.  We met
3 him, I met him in the shareholder meeting
4 in April 2004.  I do not think I met him
5 after that.
6 ARBITRATOR JENTES:  So you didn't
7 have dealings with him after that?
8 THE WITNESS:  No.
9 ARBITRATOR JENTES:  According to
10 other evidence in here, he was replaced
11 someplace along the line by Mr. Klymenko?
12 THE WITNESS:  That is quite recently.
13 I'm not sure when.
14 ARBITRATOR JENTES:  Thank you.
15 CHAIRMAN FEINBERG:  Mr. Craig.
16 ARBITRATOR CRAIG:  I do have a couple
17 of questions.
18 Going back to Exhibit Q, if you
19 would, please.  This is an e-mail.  There
20 are two e-mails in this exhibit, but the
21 e-mail from Mr. Hudyakov to you states
22 that, and Khudyakov at this point is
23 speaking for Alpha Bank and for Storm's
24 interests?

Page 80

Ekhougen/Direct-Sills

1 THE WITNESS:  I understand he's
2 speaking for Storm.
3 ARBITRATOR CRAIG:  For Storm, okay,
4 the address says Alpha Bank, but you have
5 understood that Khudyakov at that pint was
6 speaking for Storm, correct?
7 THE WITNESS:  Yes.
8 ARBITRATOR CRAIG:  And he says in
9 that e-mail dated November 12, 2003, that,
10 "Our firm position," I'm quoting here, "is
11 that we do not want any further
12 negotiations over the agreement and should
13 sign the text that was agreed last year
14 with small technical changes reflecting
15 the Ericsson debt."
16 So it was your understanding, am I
17 correct, that as of November 12, 2003,
18 Storm did not want to change anything
19 significantly in the shareholders'
20 agreement?
21 THE WITNESS:  That's correct.
22 ARBITRATOR CRAIG:  But that position
23 changed in the following month?
24 THE WITNESS:  Yeah.

Page 81

Ekhougen/Direct-Sills

1 ARBITRATOR CRAIG:  And that prompted
2 your letter of December 17th?
3 THE WITNESS:  Yes.
4 ARBITRATOR CRAIG:  Saying we want to
5 go with the old shareholders' agreement;
6 is that right?
7 THE WITNESS:  Yes.
8 ARBITRATOR CRAIG:  Do you know why
9 their position changed?
10 THE WITNESS:  No.
11 ARBITRATOR CRAIG:  Did you ever ask
12 anybody as to the reason for the change of
13 position?
14 THE WITNESS:  We, I personally have
15 never got a good explanation why it
16 changed.  I'm not willing to speculate why
17 they wanted it.
18 ARBITRATOR CRAIG:  You opposed the
19 change of language or substance in the
20 earlier shareholders' agreement, did you
21 not?
22 THE WITNESS:  Yes.
23 ARBITRATOR CRAIG:  Why was that?
24 THE WITNESS:  Because, I mean -- I'm

21

1      Ekhougen/Direct-Sills
2  referring to this e-mail, and I'm
3  referring to the wording of the voting
4  agreement where we had already agreed that
5  we should sign this proposal shareholders'
6  agreement.
7      ARBITRATOR CRAIG:  Understood.
8  But Storm apparently changed its
9  position, and wanted to make
10  modifications; is that correct?
11      THE WITNESS:  Yes, but --
12      ARBITRATOR CRAIG:  Your position was
13  opposed to that.  You did not want to make
14  changes, correct?
15      THE WITNESS:  I did not agree that we
16  should make changes at that stage.  I said
17  also in the e-mail that if they don't like
18  to make changes, we were willing to meet
19  them afterward and discuss further
20  development.
21      At that time, we had three days to
22  sign the shareholders' agreement we had
23  discussed during the autumn, and they have
24  conformed that they will.  I saw no reason
25  we should suddenly start to negotiate.

1   Ekhougen/Direct-Sills
2      ARBITRATOR CRAIG:  Were you speaking
3  for Telenor?
4      THE WITNESS:  I was speaking for
5  Telenor.  This was confirmed by my boss in
6  Oslo.  They urge Telenor to negotiate and
7  referred to good partnership and things
8  like that.
9      ARBITRATOR CRAIG:  Now, when you look
10  at the position in opposition to the Storm
11  proposed amendments, were you in
12  communication with your bosses back in
13  Oslo?
14      THE WITNESS:  Yes.
15      ARBITRATOR CRAIG:  Did they tell you
16  that was Telenor's position to oppose
17  those changes?
18      THE WITNESS:  Yes.
19      ARBITRATOR CRAIG:  And why was that?
20      THE WITNESS:  As I said, we had
21  agreed in the voting agreement that the
22  shareholder agreement should be signed as
23  such, and this has been sort of the
24  position the whole autumn.  So, we did not
25  understand why suddenly we should go in to

1      Ekhougen/Direct-Sills
2  changes and especially changes that I
3  think was not really relevant to the
4  business part of this.
5      I mean, the shareholders' agreement,
6  the main idea is to sort of regulate the
7  cooperation between the shareholders,
8  establish a corporate governance and try
9  to increase shareholder value on the
10  common platform.
11      These changes that were introduced
12  might be important from a legal
13  perspective.  From a business perspective
14  they were, as far as I can see, not
15  relevant.
16      ARBITRATOR CRAIG:  Now, there came a
17  time when Telenor changed its position, is
18  that right, on the issue of negotiating
19  these changes?
20      THE WITNESS:  As you see from this
21  letter from Tumanov and Kosogov, they are
22  referring to the good partnership and
23  urged Telenor Mobile to be willing to
24  start negotiating, and that made a kind of
25  impression on Telenor, on my bosses in

1   Ekhougen/Direct-Sills
2  Oslo that they should open for discussion.
3      ARBITRATOR CRAIG:  And Telenor
4  changed its position on the issue of
5  negotiating changes in the shareholders'
6  agreement?
7      THE WITNESS:  As I said, we were
8  urged, and I mean if you read the letter,
9  they are saying they have ruined the good
10  partnership between Telenor and Alpha by
11  taking my position.
12      ARBITRATOR CRAIG:  Understood.  They
13  proposed enclosing the amendments that
14  they would like to see incorporated into
15  the shareholders' agreement.
16      THE WITNESS:  That was actually, that
17  was known, that was sent to me before I
18  sent the letter.
19      ARBITRATOR CRAIG:  I see, okay.
20      Was the substance of the proposed
21  amendments considered by Telenor and
22  rejected as part of the reason for not
23  agreeing to the amendments?
24      THE WITNESS:  It was rejected by me
25  in my letter and it was also rejected when

Ekhougen/Direct-Sills

1     Ekhougen/Direct-Sills
2 my boss send the letter. I don't remember
3 the number, but there was a letter sent
4 just before Christmas.
5     ARBITRATOR CRAIG: Was there
6 something about the amounts that Telenor
7 disliked in terms of the context or
8 rejected?
9     THE WITNESS: I mean, as I said, they
10 had, Telenor had the same position as me.
11 We could not see why we were in 12 hours
12 start to renegotiate an agreement that
13 everyone has confirmed that we agreed to.
14     ARBITRATOR CRAIG: I would like to
15 compare the proposed amendments that is
16 part of the -- with what ultimately ended
17 up in the new shareholders' agreement.
18     Were there changes made as a result
19 of negotiations between Storm and Telenor
20 in the proposed amendments?
21     THE WITNESS: Yes, there are two,
22 they are actually proposing two changes
23 but we ended up with one change regarding
24 the condition for a material breach.
25     ARBITRATOR CRAIG: But their

1     Ekhougen/Direct-Sills
2 proposal, if you look at it in the -- is
3 not exactly what ends up in the final
4 shareholders' agreement, is there --
5     THE WITNESS: No. There was a
6 negotiation.
7     ARBITRATOR CRAIG: There was a
8 negotiation.
9     Were you responsible for negotiating
10 on behalf of Telenor for that?
11     THE WITNESS: We agreed at one stage
12 that we were willing to agree on the term
13 material breach, then sort of it was more
14 or less a discussion between the lawyers,
15 what sort of is the definition of the
16 material breach.
17     Then we have also, we went into the
18 discussion where it comes to the size of
19 material breach, we discussed last
20 figures, I was part of that discussion,
21 yes.
22     ARBITRATOR CRAIG: Can you explain to
23 us today, what change, what the change was
24 in the shareholders' agreement before the
25 negotiation and what, just describe the

1     Ekhougen/Direct-Sills
2 change, how it ended up.
3     I take that back.
4     THE WITNESS: I didn't quite get you.
5     ARBITRATOR CRAIG: I don't blame you.
6     The shareholders' agreement that was
7 attached to the voting agreement was one
8 draft, and then the final shareholders'
9 agreement that was signed in 2004 resulted
10 in some changes relating to material
11 breach, correct, is that right?
12     THE WITNESS: Yes.
13     ARBITRATOR CRAIG: Can you describe
14 for us the nature of the change between
15 the 2002 draft and the final draft? Did
16 the 2002 draft deal with material breach?
17     THE WITNESS: No. You have to excuse
18 me not to be a lawyer, so, probably we
19 should all be lawyers. To my thinking the
20 reason for terminating the contract in the
21 original proposal was that it was
22 something criminal, some corruption
23 involved between the shareholders and the
24 company.
25     This material breach as an argument

1     Ekhougen/Cross-
2 for termination was new and introduced as
3 a result of this, this urgent request from
4 Alpha.
5     CHAIRMAN FEINBERG: Anything else,
6 Greg?
7     ARBITRATOR CRAIG: That's it.
8     CHAIRMAN FEINBERG: May I suggest
9 this? May we take a 15-minute break, and
10 then, Pieter, you will have a chance to
11 cross-examine.
12     How long will your cross-examination
13 go, Pieter? Do you have an idea?
14     MR. VAN TOL: About half hour, am
15 hoping.
16     CHAIRMAN FEINBERG: The goal will be
17 to complete the witness and over lunch to
18 prepare your arguments on the law with the
19 panel.
20     So why don't we break and reconvene
21 in 15 minutes at 11:10.
22     (Recess taken.)
23     CHAIRMAN FEINBERG: Let's reconvene.
24     Pieter, you have the floor for the
25 cross.

Ekhougen/Cross-Van Tol

1
2     MR. VAN TOL:  Thank you,
3  Mr. Chairman.
4  CROSS-EXAMINATION
5  BY MR. VAN TOL:
6     Q.  Good morning, Mr. Ekhougen.
7     A.  Good morning.
8     Q.  I would like to take you back to the
9  time when you took over responsibility for the
10  Kyivstar management.
11     I believe you testified that you
12  reviewed a copy of the voting agreement; is that
13  correct?
14     A.  I tried to get acquainted with all
15  relevant documents that was in the office, and
16  that was definitely one of those.
17     Q.  And the other document you mentioned
18  was a shareholders' agreement that was attached
19  to it, correct?
20     A.  Yep.
21     Q.  Now, did you also take a look at the
22  documents that were sent by Storm in connection
23  with the voting agreement transaction in 2002?
24     A.  No.
25     Q.  Were you aware that Mr. Nilov had

Ekhougen/Cross-Van Tol

1
2  sent, among other things, resolutions regarding
3  the voting agreement?
4     A.  What does that exactly mean?
5     Q.  Let me show you a document, that
6  might help.  In fact, I need to give you, I'm
7  going to give you a binder of documents.  And
8  with one exception, these are documents that are
9  attached to Telenor Mobile's briefs, so I will
10  refer to them as such as I go along.
11     If you could, could you turn to
12  Exhibit L?
13     ARBITRATOR JENTES:  This is the same
14  L that we have been looking at this
15  morning?
16     MR. VAN TOL:  That's right.  Exhibit
17  L to Telenor Mobile's brief.
18     A.  I'm not a lawyer, and as a lawyer I
19  relate to my legal advisor when it comes to
20  going through these kind of documents.  I don't
21  think I saw this document at that time.
22     Q.  Do you have any reason to doubt that
23  these documents were received by Telenor Mobile
24  in connection with the 2002 voting agreement
25  transaction?

Ekhougen/Cross-Van Tol

1
2     A.  No.
3     ARBITRATOR CRAIG:  Are we looking at
4  the same document?
5     MR. VAN TOL:  Exhibit L.
6     A.  This is a document from Storm, isn't
7  it?
8     ARBITRATOR JENTES:  This is
9  certificate of the senior officer of the
10  purchaser?
11     MR. VAN TOL:  That's correct.
12     Q.  Are you aware that Mr. Hansen has
13  testified that Exhibit L was received by Tom in
14  October 2002?
15     A.  No.  As I said, I was not part of
16  this business unit at all at that time.
17     Q.  Well, I take it you don't have any
18  reason to doubt Mr. Hansen's sworn testimony --
19     A.  No.
20     Q.  -- that these documents were
21  received?
22     A.  No, no.
23     Q.  So we have established that it was
24  received by Telenor Mobile in October 2002,
25  right?

Ekhougen/Cross-Van Tol

1
2     A.  Are you questioning me about
3  Mr. Hansen's testimony?   As I said, I was not
4  there when this was received.  I see it is here,
5  and I see it is in our binder, so I have no
6  reason to believe it was not received.
7     Q.  Okay.  Could you turn to the second
8  page of Exhibit L, and you will see that one of
9  the things that --
10     A.  The second page is in Ukrainian.
11     Q.  Not the third page, the second page.
12     Do you see up at the top it says,
13  "Storm's restated charter as proposed on
14  June 26th, 2002"?
15     A.  Um-hum.
16     Q.  And as you said, what follows is
17  Ukrainian.
18     Now, I have supplied you in that
19  binder at tab 11 and you will note it's the tab
20  on the bottom?
21     A.  Where?
22     Q.  If you don't mind, I'm going to come
23  around and show you -- maybe Mr. Sills can.
24     Tab 11 for the tribunal benefit was
25  attached to the Marta Khomyak affidavit and what

Ekhougen/Cross-Van Tol

1  it is is a translation of Storm's charter.
2  
3      A.  I never seen that.
4      MR. SILLS:  Could you bear with us at
5  a moment while we all get out this other
6  document, Mr. Van Tol?
7      ARBITRATOR JENTES:  You said it's 11?
8      MR. VAN TOL:  11, yes.
9      MR. SILLS:  Do you have an extra
10  copy, Mr. Van Tol?  Those are our papers.
11      THE WITNESS:  They don't include the
12  Storm papers.
13      ARBITRATOR JENTES:  Oh, I didn't know
14  that.
15      (Interruption in proceedings.)
16  BY MR. VAN TOL:
17      Q.  Before we get to that, Mr. Ekhougen,
18  I would like to take you back to the front page
19  of Exhibit L that we have been looking at.
20      You will see there is a, you will see
21  there is a sub paragraph E at the bottom and it
22  says that Mr. Nilov is attaching English
23  translations of unanimous written consent of the
24  participants of the purchaser.
25      Do you see that?

Ekhougen/Cross-Van Tol

1      A.  Yes.
2  
3      Q.  If you turn to that -- in that same
4  exhibit, if you turn to the second tab where I
5  have got a Post-It for you there, that second
6  Post-It?
7      ARBITRATOR JENTES:  For the panel,
8  where is that?
9      MR. VAN TOL:  That's a very good
10  question.  It's about --
11      ARBITRATOR JENTES:  What is it?
12      MR. VAN TOL:  I'm about to establish.
13  That is the resolutions from August 30th,
14  2002, relating to the voting agreement
15  transaction; right?
16      THE WITNESS:  As far as I can see,
17  it's in Ukrainian.
18      Q.  Do you see the -- keep going.  There
19  is an English translation behind that?
20      A.  Yes.
21      Q.  Have you seen those before today?
22      A.  No.
23      Q.  The only way I can describe it is --
24      ARBITRATOR CRAIG:  Let me see the
25  front page.

Ekhougen/Cross-Van Tol

1      MR. VAN TOL:  We are in L.
2      (Discussion held off the record.)
3      MR. VAN TOL:  I'm sorry.  These
4  documents aren't Bates stamp numbered.
5      Q.  Have you seen these resolutions
6  before today, Mr. Ekhougen?
7      A.  No.
8      Q.  Do you have any reason to doubt that
9  Telenor Mobile received them?
10      A.  No, if it's in Mr. Hansen's
11  testimony, I don't have any reason to believe
12  it's not true.
13      Q.  Do you know why Mr. Nilov sent
14  resolutions regarding the voting agreement to
15  Telenor Mobile in 2002?
16      A.  No.  As I said, I was not part of
17  this unit at that time.
18      Q.  Do you know if the resolution is
19  required by Storm's charter?
20      A.  No, I do not.
21      Q.  Have you ever checked to find out
22  whether the resolutions were required by Storm's
23  charter?
24      A.  As I have said earlier, I am not a

Ekhougen/Cross-Van Tol

1  lawyer, I am a businessman.  When I need legal
2  advice I ask my legal advisor if this and this
3  is okay.
4      Q.  Are you confident that someone in the
5  legal department at Telenor Mobile or some other
6  legal advisor has looked at the Storm charter at
7  some point in time?
8      A.  If it was a part of this closing in
9  2002, I am quite confident that I looked at it.
10      Q.  Now, staying with the resolutions,
11  the same page you are on, if you could look at
12  page two of the resolutions, there is a sub
13  paragraph C.  Do you see that?
14      It starts with the words, "The
15  execution, delivery and performance by the
16  company of the voting agreement."
17      Do you see that paragraph?
18      A.  Yes.
19      Q.  It goes on to say that the voting
20  agreement has to do with the voting disposition
21  of shares in Kyivstar, correct?
22      If you turn the page to page three,
23  there is a sub paragraph H.  Do you see that?
24      A.  Um-hum.

Page 98

1    Ekhougen/Cross-Van Tol
2    **Q.  That refers to the shareholders'**
3    **agreement, the draft of which is attached to the**
4    **voting agreement, correct?**
5    A.  Yeah, if you say so, yes.
6    **Q.  And then it goes on to say that that**
7    **has to also do with the voting and disposition**
8    **of shares in Kyivstar; right?**
9    A.  Yes.
10   **Q.  Okay.  So, we have established so far**
11   **that the voting agreement and whatever**
12   **shareholders' agreement that is going to be**
13   **entered into later has to do with the**
14   **disposition of shares in Kyivstar; right?**
15   A.  Not surprisingly, yes.
16   **Q.  Now, I'm sorry to take you down that**
17   **trail, but I want to return now to the**
18   **translation of the charter, which is that**
19   **Exhibit 11 to the Khomyak affidavit.  I hope**
20   **everyone is there, and I would like to draw your**
21   **attention to Section 12.4 of the charter.**
22       **Let me know, please, when you are at**
23   **Section 12.4.  Are you there?**
24   A.  Yes.
25   **Q.  It carries over from one page to the**

Page 99

1    Ekhougen/Cross-Van Tol
2    **next.  It's only three paragraphs.**
3       **Could you just please take a moment**
4    **to read that to yourself and let me know when**
5    **you are finished and I will ask you a question.**
6    A.  Yes.
7    **Q.  You will see, I want to draw your**
8    **attention to Section 12.42, which is two little**
9    **iis, do you see that it starts with the words,**
10   **disposal or encumbrance upon the Kyivstar**
11   **shares?**
12       A.  What does "encumbrance" mean?
13   **Q.  An encumbrance is something, a legal**
14   **obligation on something else.  Do you see that?**
15   **I'm not going to focus on that, I'm going to**
16   **focus on the disposal of the shares, if that**
17   **helps.**
18       **Do you see that?**
19       A.  I see the word, but as I said, I'm
20   not a lawyer, and if I should sort of prepare to
21   answer on details in a legal document I have not
22   seen I would ask my legal advisors to tell me
23   what it says.
24   **Q.  You can give me whatever answer you**
25   **like to my questions, that's fine.**

Page 100

1       Ekhougen/Cross-Van Tol
2       **You will see that the disposal of**
3    **Kyivstar shares is one of the things under 12.4**
4    **that requires a meeting of participants, right?**
5       A.  It says so, yes.
6    **Q.  So, now that we have seen that the**
7    **voting agreement from 2002 has to do with the**
8    **acquisition of Kyivstar's shares, we see the new**
9    **shareholder agreement has to do with the**
10   **acquisition of the Kyivstar shares, is it your**
11   **understanding that the reason Mr. Nilov got**
12   **resolutions in October 2002 was because of this**
13   **requirement in Section 12.4?**
14      A.  I'm not able to answer that.
15      MR. SILLS:  I'm going to object,
16   Mr. Chairman, on two separate grounds.  I
17   don't see how this witness can possibly
18   testify even as a matter of speculation as
19   to Mr. Nilov's motive or supplying or not
20   supplying some particular document,
21   especially when the witness has testified
22   he wasn't involved with corporate
23   governance or Telenor operation in the
24   Ukraine at the time.
25      Second, I think this is so far

Page 101

1       Ekhougen/Cross-Van Tol
2    outside the scope of direct, this is an
3    attempt to cross-examine a lay witness on
4    what appears to be a point of Ukrainian
5    law.
6       CHAIRMAN FEINBERG:  It goes to
7    weight.
8       Go ahead.
9       MR. VAN TOL:  Thank you.
10      I'm so -- could you read back his
11   response?
12      (Record read.)
13   **Q.  Did you know any other reason why**
14   **Mr. Nilov obtained the resolutions in**
15   **October 2002?**
16      A.  I think you should ask Mr. Nilov that
17   question.
18   **Q.  You are here, so I am asking your**
19   **understanding.**
20      **Let's move on to, I believe you**
21   **testified on direct that the entry into the new**
22   **shareholders' agreement was dependent on the**
23   **Omega share purchase; is that right?**
24      A.  Yes.
25   **Q.  So, if Storm or Alpha or some other**

26

Ekhougen/Cross-Van Tol

1 entity did not purchase the Omega shares, the
2 new shareholders' agreement wouldn't come into
3 existence; is that right?
4     A.  That's correct.  How I understand it.
5     Q.  And, for example, Omega could have
6 refused to sell its shares; is that right?
7     A.  Yes, of course.
8     Q.  And there never would have been a
9 shareholders' agreement; right?
10    A.  As we said earlier, I said earlier,
11 we were not able to get out of this, the '98
12 shareholder agreement because of Omega was not a
13 participate.
14    Q.  But the Omega purchase of the shares
15 was the condition for the entry into a new
16 shareholders' agreement; right?
17    A.  Yes.  As far as I understand.
18    Q.  Now, you have testified already about
19 some negotiations regarding the 2004
20 shareholders' agreement.  I would like to go
21 back over quickly some of the documents to make
22 sure we have got everything straight.
23        I would like to start with Exhibit Q,
24 that is Exhibit Q to the Telenor Mobile brief,

Ekhougen/Cross-Van Tol

1 and I want to draw your attention to your e-mail
2 of November 4th, 2003, the bottom e-mail.
3        Do you see in the last paragraph you
4 state that you have all the necessary POAs to
5 sign both agreements.
6        What did you mean there when you said
7 POA?
8     A.  If have power of attorney from the
9 chairman of Telenor Mobile to sign.
10    Q.  Now --
11    A.  And I think that is also one of the,
12 the amendment to these documents.
13    Q.  Now, to your understanding, was there
14 a separate power of attorney for a Telenor
15 Mobile representative in connection with the
16 execution of the 2002 voting agreement?
17    A.  2002 agreement?
18    Q.  Yes.
19    A.  I don't know anything about that.  I
20 mean, I'm talking about the 2004 shareholders'
21 agreement, and you have find it in the exhibit
22 set, my power of attorney.
23    Q.  We will get to that.
24        Let me tell you what your lawyers say

Ekhougen/Cross-Van Tol

1 in the brief.  October 2002, Telenor Mobile
2 delivered, among other things, a power of
3 attorney.
4        Do you have any reason to doubt the
5 veracity of that?  It's true, isn't it, that
6 there was a power of attorney?
7        CHAIRMAN FEINBERG:  If you know.
8     A.  I was not a part of this.  I was in
9 Russia at that time.
10        ARBITRATOR JENTES:  Could I help the
11 witness?
12        When he asks you a question and you
13 just don't know, don't be afraid to say,
14 "I don't know."  That ends the matter.
15        THE WITNESS:  Yes.  I don't know
16 because I was not there.
17        CHAIRMAN FEINBERG:  "I don't know,"
18 period.
19        ARBITRATOR JENTES:  "I don't know,"
20 period.
21 BY MR. VAN TOL:
22    Q.  So, you have no knowledge one way or
23 the other of whether there was a power of
24 attorney?

Ekhougen/Cross-Van Tol

1     A.  No.
2     Q.  Why did you obtain a power of
3 attorney in or around November 2003?
4     A.  Because we got the message from
5 Mr. Kodelko that they were prepared to sign.
6     Q.  To sign the new shareholders'
7 agreement?
8     A.  The new shareholders' agreement, yes.
9     Q.  Assume for a minute that there was a
10 power of attorney for Telenor Mobile from
11 October 2002.  I want you to assume that.  I
12 know you don't know, just assume it.
13        Someone at Telenor Mobile thought it
14 was necessary for you to get a new power of
15 attorney in the fall of 2003 to execute the new
16 shareholders' agreement; right?
17    A.  Yes.
18    Q.  Okay.  Without telling me, who told
19 you that?
20    A.  I suppose I was told that by a legal
21 advisor.  I got it from my boss in Oslo.
22        ARBITRATOR CRAIG:  You got it from
23 your boss in --
24        THE WITNESS:  In Oslo.

Page 106

Ekhougen/Cross-Van Tol

1        Ekhougen/Cross-Van Tol
2        **Q. Let's turn, because you mentioned it,**
3  **let's turn to Exhibit Z to the claimant's brief.**
4        **Now, that's the power of attorney**
5  **that you are referring to in Exhibit Q; right?**
6        A. Yes.
7        **Q. And you will see at the bottom that**
8  **the power of attorney was issued on October 27th**
9  **and was in effect until February 1st, 2004;**
10  **right?**
11       A. That's correct.
12       **Q. So, this power of attorney is not**
13  **unlimited, it doesn't give you powers to the end**
14  **of time; right?**
15       A. No.
16       **Q. And it was due to expire just a day**
17  **or so before the shareholders' agreement was**
18  **signed, correct?**
19       A. Yes.
20       ARBITRATOR CRAIG: Before.
21       MR. VAN TOL: I said a day or so
22  before.
23       **Q. I'm sorry. It was due to expire a**
24  **day or so before the shareholders' agreement was**
25  **signed?**

Page 107

1        Ekhougen/Cross-Van Tol
2       A. No, after. It expires after.
3       **Q. Thank you. You asked a better**
4  **question than I did.**
5       A. Sorry, thank you.
6       ARBITRATOR CRAIG: January 30th is
7  the date?
8       MR. VAN TOL: I think everyone gets
9  the point even if I don't.
10       **Q. Now, is it typical at Telenor Mobile**
11  **that powers of attorney as in this case will be**
12  **of limited time duration?**
13       CHAIRMAN FEINBERG: If you know.
14       A. I don't know what is the practice.
15       **Q. Okay. Have you ever gotten a power**
16  **of attorney at Telenor Mobile that was without a**
17  **time limitation?**
18       A. No. I have got for one year. I got
19  for two years, but not without limitation.
20       **Q. Now, you have testified earlier that**
21  **your initial reaction to the suggested changes**
22  **from Storm was to say no changes; right?**
23       A. I said no changes.
24       **Q. Okay. And at some point, though, you**
25  **were told by your superiors to go in and**

Page 108

1        Ekhougen/Cross-Van Tol
2  **negotiate with Storm over the terms of the**
3  **shareholders' agreement; correct?**
4       A. That's correct.
5       **Q. After your -- left me back up.**
6       **Turn, if you would, please, to**
7  **Exhibit R, and the next to the last paragraph of**
8  **your e-mail you say that Telenor is willing to**
9  **follow the agreed arrangements and execute the**
10  **new shareholders' agreement in line with the**
11  **draft that was attached to the voting agreement;**
12  **right?**
13       A. Yes.
14       **Q. Then you go on to say, "This does not**
15  **mean that you are unwilling to consider any**
16  **amendments"; right?**
17       A. At the late stage, I said yes.
18       **Q. So as of December 16th, 2003, Telenor**
19  **Mobile was willing to entertain amendments to**
20  **the shareholders' agreement?**
21       A. What I said was that in the eleventh
22  hour, we were not willing to open for new
23  negotiation, we would like to sign according to
24  the agreement, but, of course, we are willing at
25  any time to negotiate a shareholders' agreement.

Page 109

1        Ekhougen/Cross-Van Tol
2       **Q. Okay.**
3       A. If there are reasons for that.
4       **Q. Now, you don't say anywhere in this**
5  **document, unless I am wrong, that Telenor Mobile**
6  **has a valid enforceable existing agreement, and**
7  **it wants to go forward with that, you don't say**
8  **that, do you?**
9       A. No, I say what I said there.
10       **Q. I'm sorry. I didn't hear you.**
11       A. I say what is said in the letter,
12  they have proposed that we sign the draft
13  shareholders' agreement that was part of the
14  voting agreement.
15       **Q. But at no point did you or anyone at**
16  **Telenor Mobile go back to Storm and say there**
17  **will be no further negotiations because we have**
18  **a valid enforceable contract which is the draft**
19  **that was attached to the 2002 voting agreement?**
20       A. I don't think. We never say that we
21  are never willing to negotiate at all. We
22  were -- our point was we are in the 12th hour,
23  let's sign this agreement now. Time is running
24  out.
25       **Q. So the answer to my question is no**

Page 110

Ekhougen/Cross-Van Tol

1  one from Telenor Mobile ever said no changes, we
2  have an enforceable agreement?
3      A.  Well, what people in Telenor in a
4  general sense, I am not willing -- I am not able
5  to answer.
6      Q.  Are you not aware of anyone saying to
7  Storm we are unwilling to negotiate and we have
8  a valid enforceable contract?
9      A.  No.  You have seen also the letter
10 that was sent from Oslo, they say the same.
11 Let's sign this agreement as agreed, and then we
12 are willing to negotiate at any time.
13     Q.  Okay.  So the point is you were
14 willing to negotiate at any time over the
15 shareholders' agreement?
16     A.  That's what I said.
17     Q.  Now, if you would turn to Exhibit U,
18 which is a series of e-mails from January 22nd,
19 2004 and January 23rd, 2004.  If you turn to the
20 very last e-mail, it's an e-mail from
21 Mr. Didkovskiy to Mr. Hudyakov and Jmak.
22         Is that how you say his name?
23     A.  Jmak.
24     Q.  And there is a cc to you, correct?

*Lines 1-24 numbered in left margin.*

Page 111

Ekhougen/Cross-Van Tol

1      A.  It's actually the first e-mail.
2      Q.  Okay.  And Mr. Didkovskiy was the
3  lawyer for Telenor Mobile involved in these
4  negotiations; right?
5      A.  That's correct.
6      Q.  What involvement did he have in the
7  2002 voting agreement negotiations?
8      A.  Actually, I am not sure.  But I -- I
9  am not sure.
10     Q.  Have you ever seen his name attached
11 to any of the documents for the prior agreement?
12     A.  He has been Ukrainian legal advisor
13 for Telenor in Ukrainian since '98, so it's most
14 likely that he was part of this negotiations.
15     Q.  But you don't know that for a fact?
16     A.  No.  But I would be surprised if he
17 was not.
18     Q.  And why was Mr. Didkovskiy -- I can't
19 say his name.  Why was Mr. Didkovskiy involved
20 in January 2004 with these negotiations?  Why
21 was he involved?
22     A.  As I say, he was legal advisor to
23 Telenor in Ukraine, and we would like our legal
24 advisor to draft the final provision in this --

*Lines 1-24 numbered in left margin.*

Page 112

Ekhougen/Cross-Van Tol

1  change in the agreement.
2      Q.  Prior to that, you were handling the
3  negotiations about the technical amendments;
4  correct?
5      A.  I was handling the negotiation from a
6  business point of view, but Mr. Didkovskiy
7  always handled the legal, change of the legal
8  wording so he has been a part of the whole
9  process.
10     Q.  So, it's fair to say now in
11 January 2004 it's getting more complicated and
12 legally substantive Mr. Didkovskiy becomes
13 involved, right?
14     MR. SILLS:  Objection.
15     CHAIRMAN FEINBERG:  Go ahead.
16 Respond.
17     Objection overruled.
18     A.  Mr. Didkovskiy was involved in the
19 whole process, and I think if you have, if you
20 look at some of the other, you will find that
21 he's cc'd a lot of the other e-mails.
22     Q.  Now, he's doing a drafting of the
23 agreement; right?
24     A.  Drafting on this particular

*Lines 1-24 numbered in left margin.*

Page 113

Ekhougen/Cross-Van Tol

1  provision, yes.
2      Q.  From the e-mail just above that,
3  Mr. Jmak is also involved at this point, right?
4         I'm still at page two of this
5  exhibit, there is an e-mail, January 22nd, 2004.
6      ARBITRATOR CRAIG:  Is Jmak acting for
7  Storm?
8      MR. VAN TOL:  I'm about to establish.
9  No, he's Kyivstar.
10     Q.  He was with Kyivstar, right?
11     A.  No, Mr. Jmak is an independent lawyer
12 in Ukraine, at some stage was the legal advisor
13 for Storm when it was Ukrainian company, and he
14 was also, he was substitute to the board
15 representing Storm and Kyivstar.
16     Q.  Do you know why he is involved at
17 this point?
18     A.  I can tell you what I think.
19     Q.  That's all I can ask.
20     A.  As we have said earlier, at that time
21 Storm, we had Ukrainian ownership and Russian
22 ownership, half ownership, and Mr. Jmak was a
23 legal advisor for the Ukrainian part of Storm.
24     Q.  He's a lawyer providing also his

*Lines 1-24 numbered in left margin.*

Page 114

Ekhougen/Cross-Van Tol

1    Ekhougen/Cross-Van Tol
2  comments on what was going to be in the
3  shareholders' agreement, right?
4       A.  He, as you see, he has also --
5  Mr. Jmak as written an answer to this e-mail.
6       Q.  And Kyivstar was party to the 2004
7  shareholders' agreement; right?
8       A.  Yes.
9       Q.  It was not a party to the 2002 voting
10  agreement?
11      A.  Was it?  No, I don't think so.  As I
12  said, I was not a part of that discussion, but
13  they have not signed the agreement.
14      Q.  As far as you know, the voting
15  agreement was between Storm and Telenor Mobile?
16      A.  Yes.
17      Q.  And Kyivstar was a new party to the
18  agreement that was executed in January 2004?
19      A.  They were a party to the
20  shareholders' agreement, but not to the voting
21  agreement, yes.
22      Q.  Okay.  Now, we have seen already the
23  changes that were proposed by Storm and attached
24  to Mr. Didkovskiy's January 22nd, 2004 e-mail.
25  Those are the ones that had to do with the

Page 115

1    Ekhougen/Cross-Van Tol
2  termination for material breach; correct?
3       A.  Yes.
4       Q.  Now, in the prior version of the
5  shareholders' agreement, there was a termination
6  profession in Section 8.308, right?
7       A.  Hum.
8       Q.  And I think you testified earlier
9  that that had to do with things like people
10  accepting bribes or failure to file documents
11  with the Ukrainian government, right?
12      A.  I don't think 808 had to do with
13  that, but I think the termination agreement, the
14  termination -- the wording about termination had
15  to do with bribes earlier.
16      Q.  I understand.  Thank you for that.
17      Now, can we turn please to Exhibit W,
18  which has the black line version showing the
19  changes between one version of the shareholders'
20  agreement and another.
21      I would like you to turn to the
22  termination provisions, and you can use this
23  black line version the one with the lines.
24      Could your turn to termination
25  provision in Section 11.02?

Page 116

1    Ekhougen/Cross-Van Tol
2       A.  11.02, yes.
3       Q.  You will see in the first line there
4  is a reference to a material breach in case
5  there is a breach of Sections 2.05, 6.01 and
6  6.02, among others.
7       Do see that?
8       A.  Yeah.
9       Q.  Are you there?  You see that, right?
10      A.  Yes.
11      Q.  And you can check back, if you would
12  like, I am happy to do it with you, Section
13  2.05.
14      Has to do with the implementation
15  and compliance with the agreement?
16      A.  Yes.
17      Q.  Would you agree with me that is an
18  important provision of the shareholders'
19  agreement?
20      A.  Yes.
21      Q.  Let's look at 6.01.  6.01 has to do
22  with debt acquisition, right?
23      A.  Um-hum.
24      Q.  Do you see that?
25      A.  Yeah, yeah.

Page 117

1    Ekhougen/Cross-Van Tol
2       Q.  And will you agree with me that that
3  is an important provision, too?
4       A.  Yes.
5       Q.  Okay.  And Section 8.01 -- sorry, I'm
6  sorry, I apologize, Section 6.02.  Sorry.  I
7  made you backtrack.
8       That has to do with non-compete,
9  correct?
10      A.  Yes.
11      Q.  That is also an important provision
12  in this agreement, isn't it?
13      A.  Yes.
14      Q.  So, what Storm was proposing as a
15  material breach was a breach of one of these
16  several important provisions in the
17  shareholders' agreement; right?
18      A.  Yes.
19      Q.  And these more expensive termination
20  provisions that we saw, that we just looked at,
21  they weren't in the 2002 or the draft of the
22  shareholders' agreement that was attached to the
23  2002 voting agreement, were they?
24      A.  No.
25      Q.  Now, if you will look at Exhibit U,

Page 118

Ekhougen/Cross-Van Tol

1  the changes that Storm is proposing for the
2  material breach sections, they were not just
3  merely accepted by Telenor Mobile, were they?
4      A.  Sorry, what did you say now?
5      Q.  Let me phrase that again.
6          Telenor Mobile did not just merely
7  accept the changes that were contained in
8  Mr. Didkovskiy's January 22nd, 2004 e-mail, did
9  that?
10     A.  Our prime position was that we should
11 not make any changes.
12     Q.  But there is a negotiation reflected
13 in these e-mails or those provisions
14 regarding --
15     A.  Because they were talking about your
16 good relationship and good partnership and said
17 this was very important for those.
18     Q.  I am trying to get the facts,  Mr.
19 Ekhougen.
20         What I want to know is you were cc'd
21 on these e-mails, there is negotiation over
22 what's going to go in the material breach
23 provisions, right?
24     A.  Yes.

Page 119

Ekhougen/Cross-Van Tol

1      Q.  Okay.  And there was questions about
2  how to define material breach in terms of the
3  amount of money, right?
4      A.  Yes.
5      Q.  I believe Storm wanted a very low
6  level, something like 5 million, right?
7      A.  Yes, that's correct.
8      Q.  Telenor Mobile wanted having in the
9  order of 50 million, right?
10     A.  Yes.
11     Q.  And Telenor Mobile prevailed, it got
12 the $50 million threshold in the material
13 breach; right?
14     A.  Yes.
15     Q.  If you will look at Exhibit U, on the
16 front page there is an e-mail from Mr. Hudyakov
17 to various people, and in that first line it
18 refers to substantive comments that Alpha Bank
19 had on the document; right?
20     A.  Yeah, there is a suggestion, yes.
21     Q.  And he refers to them as substantive,
22 correct?
23     A.  What does actually substantive means?
24     Q.  It means something of substance,

Page 120

Ekhougen/Cross-Van Tol

1  important.
2      A.  Yeah, he referred to that, yeah.
3      Q.  Did anyone from Alpha ever tell you
4  that they considered the material breach
5  provisions to be merely technical in nature?
6      A.  No.  No, they did not.  They were
7  insistent to them.  They were insisting that
8  these were very important for them.
9      Q.  Okay.
10     A.  After first accepting the agreement
11 as it was.
12     Q.  I understand the chronology.
13         Do you have an understanding of why
14 Storm wanted these substantive changes to the
15 shareholder agreement?
16     A.  Actually, no.  I mean, first they
17 said that they agreed, and as far as I
18 understand, all important business issues over
19 the shareholders' agreement were in place and we
20 were willing to sign and they were willing to
21 sign, and then they obviously changed their
22 mind.
23     Q.  Did anyone from Storm ever tell you
24 that they wanted these provisions to make sure

Page 121

Ekhougen/Cross-Van Tol

1  that Telenor Mobile lived up to its obligations
2  under the new shareholders' agreement?
3      A.  No, not, no.
4      Q.  Now, you testified earlier about
5  certificates that Telenor Mobile received in
6  January 2004 from Mr. Tumanov and Mr. Kosogov.
7         Do you remember that?
8      A.  Yes.
9      Q.  Do you know who travelled those
10 certifieds?
11     A.  Who drafted these certificates?
12     Q.  Yes, who prepared them?
13     A.  No, I haven't the slightest idea.
14 These were papers from Storm.
15     Q.  Did this certificate come from
16 Telenor Mobile lawyers?
17     A.  They were sent to Oleksiy Didkovskiy,
18 to our Ukrainian lawyer.
19     Q.  What I am asking is the blank forms
20 before they were signed, were they made by
21 Telenor Mobile and sent to Storm, is that how it
22 worked?
23     A.  No, they were sent by Storm.
24     Q.  Now, at the time that Telenor Mobile

31

Page 122

Ekhougen/Cross-Van Tol

1   **Ekhougen/Cross-Van Tol**
2   **received those certificates, did it receive**
3   **copies of resolutions granting Mr. Nilov**
4   **authority to sign the versions of the**
5   **shareholders' agreement that had just been**
6   **negotiated?**
7       A.   I don't know exactly what document
8   you got from Storm.  As I said earlier, I asked
9   my legal advisor if we had got sufficient
10  documents to verify the signature of the Nilov
11  and he said yes.  But, indeed, the documents we
12  got do not have any sort of recognition of --
13      **Q.   You have never seen those**
14  **resolutions?**
15      A.   Yeah, I have seen it.
16      **Q.   From 2004, have you seen resolutions**
17  **by Storm's board authorizing Mr. Nilov to enter**
18  **into that transaction?**
19      A.   No.
20      **Q.   Did anyone from Storm ever tell you**
21  **in January 2004 that such resolutions were not**
22  **necessary?**
23      A.   They told us, Khudyakov told us that
24  they are prepared to sign, that Nilov was
25  authorized to sign and that they would send us

Page 123

Ekhougen/Cross-Van Tol

1   Ekhougen/Cross-Van Tol
2   the necessary documentation.
3       **Q.   I have a different question.**
4       **Focusing on the resolutions now, did**
5   **anyone from Storm tell you or anyone else at**
6   **Telenor Mobile, don't worry, we don't need**
7   **resolutions to sign this agreement?**
8       A.   I don't know what they told anyone
9   else in Telenor, but they did not tell me.  They
10  did not tell me at all what kind of documents
11  they were sending.  I asked my lawyer if we have
12  got enough documentation and he said yes.
13      **Q.   By the way, your lawyer, did you**
14  **provide him a copy of Storm's charter in**
15  **connection with the January 2004 agreement?**
16      A.   Storm's charter?
17      **Q.   Storm's charter.**
18      A.   I did not have Storm's charter at
19  that time.
20      **Q.   To your knowledge, did anyone at**
21  **Telenor Mobile give your lawyer a copy of**
22  **Storm's charter?**
23      A.   I don't -- I don't know.
24      **Q.   We have seen what Telenor Mobile had**
25  **in its files, correct?**

Page 124

Ekhougen/Cross-Van Tol

1   **Ekhougen/Cross-Van Tol**
2       A.   Pardon?
3       **Q.   Telenor Mobile had a copy of Storm's**
4   **charter in its file; right?**
5       A.   I don't know.
6       **Q.   We just established they got it in**
7   **October 2002?**
8       A.   Yeah.  Okay.  But I did not know.
9       **Q.   Who else from Telenor Mobile other**
10  **than you was involved -- in the business side**
11  **was involved in the negotiation of the**
12  **January 2004 agreement?**
13      A.   Mr. Khudyakov, who is mentioned in
14  one of the documents, was my boss in Oslo, but
15  the Telenor members, the Telenor directors and
16  the board were also involved.
17      **Q.   The agreement was signed on January**
18  **30th, 2004, correct?**
19      A.   Yes.
20      **Q.   And so it was signed one day before**
21  **the extension agreement was due to expire,**
22  **right?**
23      A.   Yep.
24      **Q.   And it was signed two days before**
25  **your power of attorney was about to expire,**

Page 125

Ekhougen/Cross-Van Tol

1   Ekhougen/Cross-Van Tol
2   **right?**
3       A.   Yes.
4       **Q.   It was a big rush to get it done**
5   **before those deadlines, wasn't it?**
6       A.   It was not a big rush, we extend the
7   period for six weeks and we like to keep the
8   pressure on the discussion.
9       **Q.   What kind of corporation documents of**
10  **Storm did you or your lawyers review before**
11  **entering into the transaction other the**
12  **certificates we have talked about already?**
13      A.   I don't know what kind of documents
14  my lawyer saw.  I did not go into the Storm
15  documents.
16      **Q.   Were you told by anyone at Storm that**
17  **there had been a meeting of participants around**
18  **January 2004 that authorized Mr. Nilov to enter**
19  **into the new shareholders' agreement?**
20      A.   No.
21      **Q.   Were you told by Storm that a meeting**
22  **of participants was not required?**
23      A.   No.
24          Was told by Khudyakov that they were
25  prepared to sign.

Page 126

Ekhougen/Cross-Van Tol

1
2    **Q.   Your understanding of the**
3    **shareholders' agreement, the 2004 shareholders'**
4    **agreement, is that it required shareholders to**
5    **purchase Kyivstar shares after an IPO, is that**
6    **right?**
7        A.   There is some provision on what
8    happens after an IPO, yes.
9        **Q.   And it says that, for example, Storm**
10   **as a shareholder must purchase Kyivstar shares,**
11   **right?**
12       A.   As far as I remember, the wording is
13   exactly the same as it was in the voting
14   agreement.
15       **Q.   Okay.   So they both require the**
16   **acquisition of shares by Storm, right?**
17       A.   If there was an IPO, yeah.
18       **Q.   Okay.   Let me just quickly ground**
19   **that out and make sure we are talking about the**
20   **same provision.**
21           **Could you turn to Exhibit Y and**
22   **specifically provision 2.03?**
23       A.   2 --
24       **Q.   2.03.   Do you see that?**
25           **And isn't it in 2.03B where there is**

Page 127

Ekhougen/Cross-Van Tol

1
2    **a requirement on the shareholders to purchase**
3    **Kyivstar shares?**
4        A.   Okay, yeah.
5        **Q.   That's it, right, that requires the**
6    **acquisition of shares?**
7        A.   Um.
8        **Q.   And do you recall we saw earlier that**
9    **Section 12.4 of the Storm charter said that**
10   **where there is an acquisition of shares, the**
11   **general director needs approval from the meeting**
12   **of participants, right?**
13       A.   But, yes, it's correct.   But this is
14   part, as far as I recollect, I mean, this is a
15   provision that was introduced in 2002.
16       **Q.   I understand your theory, but your**
17   **answer is yes, right, Section 12.4 of the Storm**
18   **charter requires a meeting of participants in**
19   **order for there to be an acquisition of shares?**
20       A.   Yeah, I think I remember that, yeah.
21       **Q.   And it specifically says Kyivstar,**
22   **right?**
23       A.   Kyivstar was the only assets that
24   Storm had.
25       **Q.   Okay.   Could you turn to page 36 of**

Page 128

1        **Ekhougen/Cross-Van Tol**
2    **Exhibit Y, which is the signature page.**
3        **I have got five minutes tops.**
4        **Sorry if I overran my estimate.**
5        **That last signature on the page for**
6    **Kyivstar, who is that?**
7        A.   Lytovchenki, the president of
8    Kyivstar.
9        **Q.   Mr. Ekhougen, if you know, what**
10   **authority did Mr. Lytovchenki have to sign the**
11   **2004 shareholders' agreement?**
12       A.   I can't answer that question.
13       **Q.   Do you know who would know?   Your**
14   **lawyers?**
15       A.   We have to go through the lawyers,
16   yes.
17       **Q.   Have you seen any documents**
18   **evidencing, showing Mr. Lytovchenki's authority**
19   **in connection with this agreement?**
20       A.   With this?
21       **Q.   Yes.**
22       A.   I can't, I -- no, I can't remember.
23   Maybe.
24       **Q.   Now, let me move on to a new area.**
25       ARBITRATOR JENTES:   Before you do --

Page 129

1    Ekhougen/Cross-Van Tol
2        MR. VAN TOL:   Yes.
3        ARBITRATOR JENTES:   Is there a
4    contention in this case, that is this
5    arbitration, that Mr. Lytovchenki didn't
6    have authority to sign on behalf of
7    Kyivstar?
8        MR. VAN TOL:   I can't say that yet
9    because I haven't seen any of the
10   documents associated with his authority,
11   whether he had authority or not.   I was
12   just asking the witness if he has seen
13   some documents.   I haven't, so in answer
14   to your question --
15       ARBITRATOR JENTES:   We are in an
16   arbitration, or at least a putative
17   incitral arbitration, and there is claims
18   and defenses and I am just wondering is
19   the position of Storm here that this
20   gentleman didn't have the authority to
21   sign on behalf of Kyivstar.
22       MR. VAN TOL:   I have to answer that
23   we don't know yet because it wasn't until
24   Wednesday of this past week that we knew
25   that the merits of contract formation was

Page 130

1  Ekhougen/Cross-Van Tol
2  going to be an issue.
3      We had focused on one of the issues,
4  which was was there a meeting of
5  participants, since we have seen no
6  evidence of that, and we have a court
7  ruling in the Ukraine saying that is
8  enough.
9      We haven't probed further, but with
10  the tribunal's permission we'll probe
11  further and present any evidence we can
12  present on the details of contract
13  formation. I don't know yet. I can't
14  answer that question without reviewing the
15  files and speaking to my client.
16      ARBITRATOR JENTES: Well, do I
17  understand correctly that Storm, neither
18  Storm nor Alperin made any claim in the
19  Ukrainian courts that this gentleman
20  didn't have the authority to sign on
21  behalf of Kyivstar?
22      MR. VAN TOL: As far as I'm aware,
23  there has been no such challenge in the
24  Ukrainian courts. Sorry I can't answer
25  further.

Page 131

1  Ekhougen/Cross-Van Tol
2  **Q. Mr. Ekhougen, to your knowledge,**
3  **Telenor Mobile did not take this shareholders'**
4  **agreement and file it with the Ukrainian**
5  **authority, did it?**
6  A. The shareholders' agreement?
7  **Q. Right.**
8  A. Not to my knowledge, the charter has
9  to be filed as far as I know, not the
10  shareholders' agreement.
11  **Q. As far as you know, the shareholders'**
12  **agreement in Ukrainian has not been filed with**
13  **the Ukrainian authorities?**
14  A. I have to answer I don't know.
15  **Q. Okay.**
16  A. As far as I know, no.
17  **Q. Okay. Now, I have the same question**
18  **for the voting agreement.**
19      **To your knowledge, was the voting**
20  **agreement ever filed in the Ukrainian language**
21  **with Ukrainian authorities?**
22  A. As I said previously, I was not
23  involved in the voting agreement. I don't know
24  what happened.
25  **Q. My last areas of questions have to do**

Page 132

1  **Ekhougen/Cross-Van Tol**
2  **with the Court decisions that have brought us**
3  **here today, the April and May 2006 decisions**
4  **invalidating the shareholders' agreement.**
5      **Why did Telenor Mobile not appeal**
6  **either one of those decisions?**
7  A. As far as I am -- I mean, now, we
8  have to, I have to rely on the advice we got
9  from our lawyer. We were not a part of this,
10  and we have -- this arbitration is empanelled to
11  decide on the shareholders' agreement as it said
12  in the shareholders' agreement.
13  **Q. Has anyone ever told you that you,**
14  **Telenor Mobile, has no right to intervene in the**
15  **Ukrainian proceeding?**
16  A. That we have no right to intervene in
17  the Ukrainian proceeding?
18  **Q. Right. Has anyone ever said that to**
19  **you?**
20  A. No.
21  **Q. Isn't it true that Telenor Mobile**
22  **recently went back to an appellate court in a**
23  **related matter and got it to reverse its**
24  **decision?**
25  A. Storm filed a fact-finding that came

Page 133

1  Ekhougen/Cross-Van Tol
2  up with the evidence they have a reason to
3  reopen the case. So the answer is yes.
4      MR. VAN TOL: Okay. Subject to any
5  recross, I am done.
6      MR. SILLS: Can I have just one
7  moment, Mr. Chairman?
8      Mr. Chairman, we have no redirect.
9      MR. VAN TOL: Then I have no recross.
10      CHAIRMAN FEINBERG: Any further
11  questions of this witness from the panel
12  before we dismiss the witness with thanks
13  for his being here today?
14      I have none.
15      ARBITRATOR CRAIG: With respect to
16  the amendments to the shareholders'
17  agreement that Storm proposed, you
18  testified earlier that I am trying, as
19  close to a quote, Storm insisted that it
20  was very important to them.
21      Do you remember that testimony.
22      THE WITNESS: Yes.
23      ARBITRATOR CRAIG: Did anyone from
24  Storm ever tell you why these changes were
25  important to them?

Page 134

1          Proceedings
2        THE WITNESS:  Not to my knowledge.
3    Not except what is written in the letter
4    from Storm.
5        ARBITRATOR CRAIG:  Do you have any
6    understanding as to why these particular
7    changes dealing with material breach were
8    important to Storm?
9        THE WITNESS:  No.  I was surprised
10    that there is an issue.
11        ARBITRATOR CRAIG:  You were
12    surprised?
13        THE WITNESS:  I was surprised that
14    this issue was raised by Storm.
15        ARBITRATOR JENTES:  You mean during
16    this negotiation that you have had with
17    their representative?
18        THE WITNESS:  After, after they have
19    told us that they have an issue, that we
20    agree, I was really surprised that they
21    have in the 12th hour came up with any
22    kind of proposal.
23        ARBITRATOR CRAIG:  That's between the
24    November and December communications;
25    correct?

Page 135

1          Proceedings
2        THE WITNESS:  It came up.  It came up
3    in, as I said, in a board meeting in
4    December where they, at the same time,
5    told us that the Omega deal, the Omega
6    transaction was closed, and we have,
7    according to the agreement, should sign.
8        ARBITRATOR CRAIG:  At the time they
9    raised that issue of changes in the
10    shareholders' agreement, did they explain
11    to you why it was important to them?
12        THE WITNESS:  No.  We had no more
13    explanation.  As I said, that was in this
14    letter that they said that this is
15    important.
16        CHAIRMAN FEINBERG:  Anything else?
17    Thank you very much.
18        Mr. Ekhougen, thank you for your
19    presence today as a witness.
20        We appreciate it very, very much.
21    And thank you for being here today.
22        Why don't we do this?  I take it,
23    Storm, you have no witnesses, live
24    witnesses to call today, and any
25    marshalling of evidence will be part of

Page 136

1          Proceedings
2    your summation when you move on the motion
3    after lunch?
4        MR. VAN TOL:  Correct.
5        CHAIRMAN FEINBERG:  And I take it you
6    have no further witnesses and that you,
7    too, will marshal your evidence on the
8    motion in opposition to the motion after
9    lunch?
10        MR. SILLS:  That's correct,
11    Mr. Chairman.
12        CHAIRMAN FEINBERG:  Why don't we
13    propose this, subject to either of my
14    colleagues suggesting a better way.
15        Why don't we reconvene at a one
16    o'clock, give each side as we did last
17    month up to 30 minutes to present whatever
18    arguments they want to make, whatever
19    evidence they want to marshal, subject to
20    the panel extending that time on rebuttal,
21    et cetera, if the issue is joined and
22    there is debate.
23        But up to 30 on the motion, Storm
24    going first and a 30-minute response from
25    Telenor.

Page 137

1          Proceedings
2        Storm, you need not reserve any time
3    for rebuttal, because we will see how that
4    goes.
5        MR. VAN TOL:  Okay.
6        CHAIRMAN FEINBERG:  Let me just, as
7    one arbitrator, and I would like to have
8    Bill and Greg if they want, make a
9    comment.
10        Let me, when you are having lunch
11    today and you are marshalling your facts
12    and your arguments.
13        I have one question that I request
14    each counsel focus on, at least one that I
15    am interested in.
16        Storm, in pursuant of your motion,
17    what evidence do you offer for the
18    proposition that Telenor -- that Storm
19    lacked apparent authority in moving
20    forward with the transaction.  Not actual,
21    apparent.
22        And, Storm, what evidence do you
23    offer for the proposition that Telenor
24    knew there was not even apparent
25    authority?

Page 138

Proceedings

1    Telenor, my question that I would
2 like you to focus on in part, at least in
3 your argument, what are we to do with the
4 Ukrainian court decisions?  Why aren't you
5 making your arguments here today to the
6 Ukrainian courts, or I guess even the
7 Southern District of New York, why are you
8 here asking us basically, I think either
9 Bill or somebody suggested that we are in
10 effect being asked to rule an appellate
11 court and upset apparently what is going
12 to in the Ukrainian courts, when as I
13 understand it, correct me if I am wrong,
14 in your argument, you haven't maintained
15 that the Ukrainian courts are unwilling or
16 unable to render a decision on anything
17 other than reasons on the merits.
18    So why are we at this date being
19 asked to substitute your opinion on
20 jurisdiction for rulings in the Ukrainian
21 courts?  Aren't you in the wrong forum?
22    And that's what I would like to sort
23 of pose to you guys as opposed to Storm.
24    I don't know if Bill or Greg have any

Page 139

Proceedings

1 other questions or to guide them over the
2 next hour or so in their lunch break as
3 they will get ready to marshal their
4 arguments.
5    ARBITRATOR JENTES:  My only comment,
6 Ken, would be that while a half an hour
7 ought to be allotted to both sides, I
8 personally have a lot of questions, and
9 consequently I think that both sides ought
10 to recognize that there is going to be
11 questioning from the panel and we are not
12 going to finish by 2 o'clock, that's all.
13 Both sides ought to recognize that as the
14 reality here.
15    CHAIRMAN FEINBERG:  Greg, anything?
16    ARBITRATOR CRAIG:  No.
17    CHAIRMAN FEINBERG:  We will reconvene
18 at one o'clock.
19    (Whereupon, a luncheon recess was
20 taken at 12:00 p.m.)
21
22                *  *  *

Page 140

Proceedings

1    CHAIRMAN FEINBERG:  Okay.  Now,
2 anyway, as I mentioned before lunch, let's
3 go to summary oral argument.  As I say, as
4 I mentioned, subject to Bill's gloss about
5 giving people plenty of time, let's take
6 the high road and give each side 30
7 minutes, which the chair will sort of at
8 its discretion coordinate or control,
9 extending 30 minutes in light of any
10 questions that the panel or others may
11 advance.
12    And with that thought, the first 30
13 minutes go to the movant, Storm.
14    Pieter.
15    MR. VAN TOL:  Thank you,
16 Mr. Chairman.
17    What I would like to do is I actually
18 re-ordered my presentation so I can deal
19 with the authority first.  I hope it's not
20 too scattered.
21    I would like to hit on the authority
22 issue that the Chair raised before.  I did
23 have an extended discussion on choice of
24 law.  I think I can greatly truncate it,

Page 141

Proceedings

1 because I think that Mr. Sills and I are
2 agreed, at least on apparent authority,
3 the law seems to be the same between
4 Ukraine and New York.
5    Let me start out by reference to the
6 Sphere Drake case.  Our stance on the
7 Sphere Drake case is that it sets forth
8 the evidentiary standard that we have to
9 meet on our motion to dismiss.
10    We have never taken the position that
11 Sphere Drake applies substantively to the
12 issue before the tribunal.  And it's
13 interesting that Telenor Mobile agreed
14 with us in the prior briefing and at the
15 last hearing Mr. Sills tried to
16 distinguish Sphere Drake as an agency
17 case, saying it didn't apply.
18    That's a minor point, but I will move
19 on.
20    The bigger point is that there are
21 two types of authority, as the tribunal is
22 well aware.  There is actual authority and
23 there is apparent authority.
24    Now, staying with choice of law, when

Page 142

Proceedings

1
2  it comes to actual authority, the cases
3  are clear that that turns on the company's
4  internal organization, which, again, is a
5  question for the law of the place of
6  incorporation.  It is not a question of
7  New York law.  It's a question of
8  Ukrainian law.
9      And not for now, but for the
10  tribunal's consideration whenever they
11  would like, I'm going to hand up the
12  Lehman Brothers versus Tootlers case, and
13  I would like to draw the tribunal's
14  attention to footnote four, where it makes
15  it express that where you are talking
16  about actual authority, you go to the law
17  at the place of incorporation.
18      Again, I don't want that to delay us,
19  because I think the Chairman made it clear
20  in his mind that he wants to hear about
21  apparent authority.  I will cover both,
22  but I will move on to apparent.
23      We maintain that it's a well-accepted
24  proposition that the Court will look at
25  where the transactions took place, and it

Page 143

Proceedings

1
2  won't just look at the choice of law
3  clause, and that if you look at the
4  transaction here it has absolutely no
5  nexus to New York, but given that there is
6  a false conflict, as Mr. Sills said, let
7  me go on to consider Ukrainian law.
8      And I think for that, we are going to
9  have to make reference to Mr. Rabij's
10  affidavit, which is supplied in connection
11  with this hearing.
12      The first point, though, I would like
13  to make is if we are going to be looking
14  at Ukrainian law, I would submit that the
15  place to start is the Ukrainian court
16  decisions.  I'm not a Ukrainian lawyer, I
17  have no reason to doubt Mr. Rabij's
18  expertise, just as I have no reason to
19  doubt our expert's opinion, but really
20  when you come down to it, you have to
21  assume that Ukrainian courts are the place
22  where Telenor Mobile should have gone to
23  make any of these apparent authority
24  arguments.
25      We have a decision from Ukrainian

Page 144

Proceedings

1
2  courts that Mr. Nilov lacked authority;
3  that ought to be the end of the matter.
4      But if we go through Mr. Rabij's
5  affidavit and the various arguments that
6  he makes, we will see that even if these
7  arguments had been raised in the Ukrainian
8  courts, they would have failed.
9      I am taking these not in the order he
10  makes them, but he does, Mr. Rabij does
11  make an argument that any limitation on
12  Mr. Nilov's powers would have been
13  effective under Ukrainian law only if
14  Telenor Mobile knew or should have known
15  about the limitation.  That is in
16  paragraph 31 of his affidavit.  He cites
17  the Ukrainian law and the Ukrainian law he
18  attaches seems to support that
19  proposition.
20      I think the record is as clear as it
21  is ever to going be after today, that
22  Telenor Mobile had actual knowledge of a
23  limitation on Mr. Nilov's powers.  We saw
24  that in connection with the 2002 voting
25  agreement, Storm sent Telenor Mobile their

Page 145

Proceedings

1
2  charter.  Their charter clearly lays out
3  that when it comes to transactions that
4  involve the acquisition of the Kyivstar
5  shares, there has to be a meeting of
6  participants.  It says it right there in
7  Section 12.4, subsection two, I believe,
8  the one we looked at with Mr. Ekhougen
9  earlier.
10      Further evidence of the requirement
11  is the fact that in 2002, October 2002,
12  Storm sent resolutions to Telenor Mobile
13  saying for this type of transaction, the
14  voting agreement that is described as
15  having to do with the disposal of shares,
16  you need a resolution, so they got one.
17  In that same document that I went through
18  with Mr. Ekhougen, you saw that it
19  described the shareholders agreements in
20  exactly the same way.
21      Everyone here describes the
22  shareholders' agreement as a bridge --
23  excuse me, the voting agreement, as a
24  bridge between the two shareholders'
25  agreements.  They have functionally at the

Page 146

1  Proceedings
2  bottom the same purpose, which is to
3  effect the purchase of shares.
4  And if that's the case, and I think
5  we have established that, you have to have
6  authority, you have to have resolutions,
7  you have to have a meeting of
8  participants. It's right in Storm's
9  charter. Storm gave that charter to
10 Telenor Mobile. That is actual authority.
11 I'm sorry. That is actual knowledge.
12 Now, even if we take Mr. Ekhougen at
13 his word, and he says I have never seen
14 this document before, this is the first
15 time I have seen it. He at least said
16 that it's his belief that someone at the
17 company would have seen it at some point,
18 and that imposes the second part of the
19 test, which is constructive knowledge.
20 Even -- you can't sit in Telenor
21 Mobile's position and say, yes, the
22 charter says that; yes, it's in my files;
23 but, you know, I just didn't realize it in
24 connection with the later agreement.
25 Telenor Mobile is charged with the

Page 147

1  Proceedings
2  knowledge that it had, which is that the
3  charter imposes a clear, unambiguous
4  limitation in this case.
5  Nothing in Mr. Ekhougen's testimony
6  contradicted our view that the case
7  involves an acquisition of shares. Under
8  those circumstances, it's clear that one
9  of limitation applies. And really what it
10 really sounds like happened is nobody
11 picked up on it.
12 You heard Mr. Ekhougen say there was
13 a last minute flurry of activity. There
14 were new parties involved. He's not aware
15 of the due diligence.
16 ARBITRATOR JENTES: Who are the new
17 parties?
18 MR. VAN TOL: The new party is
19 Kyivstar and the new lawyers are involved.
20 ARBITRATOR JENTES: Weren't Kyivstar
21 involved in the earlier versions, let me
22 put it that way, of the shareholders'
23 agreement?
24 MR. VAN TOL: Not -- it doesn't
25 appear that they were to the draft in

Page 148

1  Proceedings
2  2002.
3  ARBITRATOR JENTES: Well, they are
4  shown on the cover sheet as a party.
5  MR. VAN TOL: They didn't sign it, so
6  I guess --
7  ARBITRATOR JENTES: Nobody signed it,
8  but I mean, weren't they involved at that
9  point?
10 MR. VAN TOL: I don't know. I don't
11 know.
12 So what I should really focus on is
13 there are new lawyers involved,
14 apparently --
15 ARBITRATOR JENTES: What difference
16 does that make?
17 MR. VAN TOL: That's the key. The
18 difference it makes is in the earlier
19 transaction it looks like there was due
20 diligence done; in other words, Telenor
21 Mobile says, get me a certificate, get me
22 your charter. I want to see everything
23 that gives you the authority to sign.
24 Storm handed it over. That same
25 thing didn't happen again in connection

Page 149

1  Proceedings
2  with the January 2004 agreement.
3  ARBITRATOR JENTES: One thing that I
4  am puzzled about was didn't Storm know all
5  of that at the time it signed the
6  agreement in January of 2004?
7  MR. VAN TOL: That I don't know, what
8  I know is --
9  ARBITRATOR JENTES: How could they
10 not know, but you say that Telenor did
11 know?
12 I mean, as I understand your
13 argument, your argument is that Telenor
14 knew that there wasn't any authority
15 because it had access to the charter, et
16 cetera, et cetera.
17 Well, didn't Storm have all of that?
18 MR. VAN TOL: It did. But that's why
19 I have gone to the second prong of it,
20 which is should have known.
21 ARBITRATOR JENTES: They knew. Why
22 didn't they say something --
23 CHAIRMAN FEINBERG: Why didn't Storm
24 say something?
25 ARBITRATOR JENTES: -- Storm say

Page 150

1        Proceedings
2  something?
3        MR. VAN TOL:  All I can offer you,
4  given that we haven't had our own
5  witnesses here, if you will notice the
6  quality of this transaction versus the
7  other one.  In the other transaction, we
8  have clear evidence that Mr. Wack was
9  involved, Mr. Quire Sanders.  We have
10  evidence that Mr. O'Driscoll was involved.
11       This second transaction looks like an
12  affair that was conducted by lawyers in
13  Ukraine and lawyers in Russia, and I don't
14  know what they knew about the prior
15  transaction.
16       CHAIRMAN FEINBERG:  See, how does
17  that help you?  You don't know what your
18  client's internal documents would show.
19  You have mentioned a half a dozen times
20  today that you don't know.  And, really,
21  to what extent are you on the horns of a
22  dilemma here, when the arbitration panel
23  says isn't, in effect, isn't Storm
24  estopped?
25       Didn't they waive this shareholder,

Page 151

1        Proceedings
2  this meeting requirement in light of the
3  fact that they're pushing the very same
4  deal that gets signed as Telenor is in
5  2004?  How can you now say that, well,
6  there wasn't compliance, and I am not sure
7  what we knew or when we knew it, but I
8  know there is not compliance on the other
9  side.
10       MR. VAN TOL:  Well, Mr. Chairman,
11  what we are doing is, you are looking at
12  this case from the Sphere Drake standard,
13  which is there is a finding by the
14  Ukrainian court --
15       CHAIRMAN FEINBERG:  That's a
16  different argument.
17       MR. VAN TOL:  But that's what colors
18  that we look at.  We look at is there
19  evidence of a meeting of participants.
20       CHAIRMAN FEINBERG:  Do you know if
21  the Ukrainian court found, as matter of
22  Ukrainian law, that there was no apparent
23  authority?
24       MR. VAN TOL:  I don't know that.
25       CHAIRMAN FEINBERG:  You are sort of

Page 152

1        Proceedings
2  asking us to make certain suppositions
3  here, aren't you?
4        MR. VAN TOL:  Mr. Chairman, that
5  actually is the point.  You are not an
6  appellate panel.  These are the kinds of
7  things that Telenor Mobile should have
8  gone to the Ukraine to get satisfied.
9        CHAIRMAN FEINBERG:  Well, you will
10  recall, Pieter, I have asked Telenor
11  Mobile when it's their turn to comment on
12  it.
13       MR. VAN TOL:  I feel compelled to
14  comment on it because it is the point.  We
15  are having this great discussion that
16  really goes to the merits, and in two days
17  I haven't investigated all my client's
18  files?  I have got clients in a couple
19  countries, to try to assemble the files.
20       If we want to have a hearing on the
21  merits, so be it, but that's not what
22  Sphere Drake says.
23       ARBITRATOR JENTES:  I think we
24  understand that.  The problem I have is
25  you make these arguments about what

Page 153

1        Proceedings
2  Telenor knew or should have known, et
3  cetera, and my problem is why doesn't that
4  apply to Storm as well?
5        MR. VAN TOL:  That's what the cases
6  say.  Sphere Drake says, if I am opposing
7  arbitration, and I can come in and show
8  that the other guy either knew or should
9  have known that my agent lacked
10  authority --
11       ARBITRATOR JENTES:  I'm sorry to be
12  repetitive.
13       I just don't understand.  Every point
14  that you make to say they knew is all
15  drawn from Storm documents, isn't it?
16       MR. VAN TOL:  I understand.  That is
17  the way ultravirus works though.  If you
18  are able to satisfy these standards, as a
19  company, I may disavow the act of an
20  officer acting who is acting ultravirus.
21       ARBITRATOR JENTES:  You can take a
22  year or two years to do that?
23       MR. VAN TOL:  Whenever you discover
24  it.  As soon as we discovered it, we
25  brought it to the Ukrainian court's

Page 154

1    Proceedings
2  attention. We said there is no meeting of
3  participants.
4    ARBITRATOR JENTES: Who discovered
5  it?
6    MR. VAN TOL: It was done in the due
7  diligence by one of the Alpha companies
8  looking back at the books and records.
9  They said there is no evidence that there
10  is a meeting of participants and there
11  still isn't any evidence of it.
12    So you are allowed -- it happens all
13  the time. I shouldn't say all the time.
14  It happens. Companies say someone was
15  acting without authority. This agreement
16  is null and void. It's exactly what
17  happened here.
18    ARBITRATOR CRAIG: Why aren't you
19  estopped after a year and half in
20  complying with the agreement, relying on
21  terms of the agreement, making stock
22  purchases, why aren't you estopped from
23  making that argument?
24    MR. VAN TOL: That's an excellent
25  question.

Page 155

1    Proceedings
2    The case law on ramification and
3  estoppel is very clear. It says that the
4  party to be estopped must know that there
5  was a problem and doesn't it bring it up.
6  That's not us. It's not as if we sat on
7  it.
8    ARBITRATOR CRAIG: That makes his
9  question relevant, though.
10    MR. VAN TOL: I have never said it
11  wasn't relevant. It's highly relevant. I
12  was focusing on the first standard. But
13  the issue is: What ratification and
14  estoppel go to is so you don't sign an
15  agreement with your hands behind your
16  backs say ah-ha, I fooled these guys.
17  There is no evidence of that here. To the
18  contrary.
19    ARBITRATOR JENTES: Why? You wrote
20  all these affirmations, and sent them to
21  them at the time and said we have got the
22  authority to sign.
23    MR. VAN TOL: They were wrong.
24  Either a lawyer at Storm was wrong, or a
25  lawyer at Telenor was wrong, or it's a

Page 156

1    Proceedings
2  failure to do due diligence. Mistakes
3  like this happen all the time.
4    CHAIRMAN FEINBERG: They do?
5    MR. VAN TOL: That's why we have --
6    CHAIRMAN FEINBERG: Why aren't you
7  estopped because they were wrong?
8    MR. VAN TOL: That's precisely it.
9  They didn't know they were wrong.
10    As soon as Storm found out that there
11  was something wrong with this transaction,
12  it went to the proper place, which is the
13  Ukraine court, and got it straightened
14  out. If Telenor Mobile didn't like it, I
15  don't blame them.
16    ARBITRATOR JENTES: Yeah, them Storm
17  didn't go.
18    MR. VAN TOL: I'm sorry. Alperin. I
19  would have been in court if I were Telenor
20  Mobile at the drop of a hat, saying I am
21  going to sue you for breach of contract,
22  I'm going to sue you on estoppel and I'm
23  going to sue you on ratification.
24    CHAIRMAN FEINBERG: You don't think
25  that the parties at Storm that negotiated

Page 157

1    Proceedings
2  this deal were perfectly comfortable with
3  it and subsequent events led new
4  management to decide let's find a way to
5  upset the deal?
6    MR. VAN TOL: I don't know that.
7    CHAIRMAN FEINBERG: Yeah.
8    MR. VAN TOL: If I knew that, I would
9  tell you. I don't know that other than I
10  know that corporate formalities have to be
11  followed, and they have to be followed for
12  a very important reason.
13    CHAIRMAN FEINBERG: We understand
14  that corporate formalities have to be
15  followed. But we are troubled, at least I
16  am troubled by Bill's point. I'm troubled
17  by, we're going to show you, panel,
18  Telenor shouldn't benefit from this deal
19  when we knew about requirements and we
20  didn't require them either because of the
21  rush to get the deal done.
22    MR. VAN TOL: Well, there is two
23  issues there. One is there is no evidence
24  that we knew what was being done was
25  against the charter; that's one.

Page 158

Proceedings

1    Proceedings
2    The second one is I would feel the
3    same sympathy for Telenor Mobile if they
4    had no relief here.  If they were like,
5    oh, what am I going to do?
6    They have relief here.  We have said
7    it until we are blue and red in the face.
8    CHAIRMAN FEINBERG:  Isn't that your
9    primary argument?
10   MR. VAN TOL:  It is.  Our primary
11   argument is to this tribunal --
12   ARBITRATOR JENTES:  What if they went
13   to the Ukraine courts now, would you
14   oppose that?
15   MR. VAN TOL:  Probably on procedural
16   grounds, or we would say there is no new
17   evidence, but we would be in the same boat
18   as we are with them going back and having
19   revisited the December 22nd order.  That's
20   what they should be doing.
21   I continue to be mystified.  As a
22   lawyer, the first thing I would advise a
23   client who has a judgment against them in
24   a foreign country is not to say, let's
25   wait and arbitrate this.

Page 159

Proceedings

1    Proceedings
2    CHAIRMAN FEINBERG:  Why are you
3    mystified?  Don't you understand the
4    possibility at least that if they were to
5    go back to the Ukrainian court now, you
6    would be first one opposing that on the
7    ground that they waived their right now to
8    go back to the Ukrainian court.
9    Isn't that a fortiori what you
10   obviously would do?
11   MR. VAN TOL:  I am going to do that,
12   but if I were Telenor Mobile, if I were
13   Telenor Mobile, I wouldn't think, well,
14   this is a futile act.
15   They just won one.  I would be
16   feeling pretty good if I were Telenor
17   Mobile.
18   I would expect them to be before the
19   Court of Cascais or someone saying, you
20   know what, a wrong has been committed
21   here.
22   CHAIRMAN FEINBERG:  Okay.  Go ahead.
23   MR. VAN TOL:  I should go on to
24   quickly talk about Mr. Rabij's other
25   points, although the main one is the

Page 160

Proceedings

1    Proceedings
2    apparent authority.
3    Then he goes on to say, and this is
4    Telenor Mobile's big theory, apparently
5    the resolutions for 2002 for the voting
6    agreement were sufficient authority for
7    what came thereafter.  And that this
8    language enabling Mr. Nilov to take other
9    actions, that he can take that out how
10   many months later, more than a year later
11   for a document that we saw today is
12   materially different.
13   Storm had a reason for getting those
14   provisions.  They were worried that
15   Telenor Mobile was going to pull a fast
16   one.
17   CHAIRMAN FEINBERG:  If it wasn't
18   materially different, if it was
19   immaterially different, would you have a
20   different argument?
21   MR. VAN TOL:  I may.  Then you can
22   see -- but if I were Telenor Mobile I
23   would have said exactly what I asked Mr.
24   Ekhougen.  Why are you coming to me with
25   these changes?  We have a legally

Page 161

Proceedings

1    Proceedings
2    enforceable, binding agreement.
3    CHAIRMAN FEINBERG:  I understand
4    that.
5    Let's say that we conclude that the
6    changes are immaterial, not material,
7    would you then agree that there is no
8    reason to go for a purely pro forma
9    exercise to get approval?
10   MR. VAN TOL:  I don't think so,
11   Mr. Chairman, because it's more than that
12   the changes are material.  That was an
13   unenforceable agreement.
14   CHAIRMAN FEINBERG:  Regardless of
15   materiality?
16   MR. VAN TOL:  Exactly.
17   CHAIRMAN FEINBERG:  So you don't know
18   whether it's material or not is relevant
19   at all.
20   MR. VAN TOL:  I do think it is
21   relevant.  It is one of our arguments.
22   But you notice I asked Mr. Ekhougen two
23   areas, I said, what if the Omega deal went
24   bad, what would happen?  No deal.
25   It's unenforceable as a matter of

41

Page 162

1    Proceedings
2  law, you can't agree to agree.
3    First of all, it was contingent upon
4  an event that might not have happened.
5    And, secondly, I said in your view,
6  was it an enforceable agreement?
7    Everything they wrote back to Storm
8  was, come on, I thought we had this
9  agreed. Why are you doing this to me at
10  the last minute? They didn't run in and
11  say, tough, under Norwegian, Ukrainian,
12  some law I have an enforceable contract
13  and I am going to enforce it.
14    ARBITRATOR CRAIG: Why then did
15  Storm, pursuant to its charter, go to the
16  participants and seek ratification, if at
17  that time it wasn't an enforceable
18  agreement and the Nilov signature was not
19  a meaningful signature?
20    MR. VAN TOL: Why didn't it go and --
21    CHAIRMAN FEINBERG: Why did it in
22  2002?
23    It did, in fact, go to the
24  participants in August for a poll and then
25  in October for an actual meeting to ratify

Page 163

1    Proceedings
2  the poll. If that signature was not a
3  meaningful signature, why did Storm feel
4  the need to get ratification from the
5  participants.
6    MR. VAN TOL: That charter, that's
7  only for the voting agreement aspect of
8  it, it's not for the shareholders'
9  agreement. It's clear that the authority
10  is limited to go sign the voting agreement
11  and, you know, we have seen these. If
12  something comes up at the closing that you
13  are not sure of, deal with that.
14    There is that New York case that they
15  cite, Scientific Holding, where the Court
16  was, Judge Friendly was saying, I'm not
17  sure how much power a corporate officer
18  has to make material changes at a closing,
19  but we don't have that evidence. The
20  voting agreement looked pretty
21  straightforward. They got authority.
22  They signed it up. Any earlier draft
23  didn't change. It was done.
24    ARBITRATOR CRAIG: You are taking the
25  position that the ratification that

Page 164

1    Proceedings
2  occurred in 2002, August and October, by
3  the participants covered only the voting
4  agreement, did not cover the shareholders'
5  agreement?
6    MR. VAN TOL: That's exactly it.
7    ARBITRATOR JENTES: Even if it was an
8  attachment to the voting agreement?
9    MR. VAN TOL: Even though, because
10  these are the things where you say, you
11  know, we have all seen these in
12  agreements, later we are going to agree to
13  something in this form, because you want
14  to lay out what the general parameters of
15  the discussion are.
16    We have seen from today's testimony
17  there was no limit on renegotiating this.
18    ARBITRATOR JENTES: Wasn't there an
19  arbitration clause in the voting
20  agreement?
21    MR. VAN TOL: There was.
22    ARBITRATOR JENTES: Is that binding?
23    MR. VAN TOL: I don't think it is,
24  because don't forget the Ukrainian
25  court --

Page 165

1    Proceedings
2    ARBITRATOR JENTES: No, passing the
3  Ukrainian court for a moment.
4    MR. VAN TOL: I don't think we can.
5  It's not a valid agreement.
6    ARBITRATOR JENTES: No, no. I'm
7  going to come back to it, but I am just
8  looking on this question about what was
9  signed or not signed and Mr. Craig's
10  questions to you.
11    If he had the authority to sign the
12  voting agreement, and the voting agreement
13  had a provision for arbitration, why isn't
14  that binding?
15    MR. VAN TOL: That's not a binding
16  agreement under Ukrainian law. The
17  Ukrainian court found because it goes to a
18  foundational document or affects
19  foundational documents. This goes to the
20  whole limitation point and knowledge of a
21  limitation.
22    The Ukrainian court said, the trial
23  court said you have got to file this in
24  Ukrainian and register it in the Ukraine,
25  so that someone doing business with Storm

42

1          Proceedings
2    says, oops, these shareholder agreement
3    and the voting agreement, they can have an
4    effect on the charter.
5          The charter may not be as it seems.
6    That was the alternative basis for the
7    trial court's holding and it went out of
8    its way to say that reason alone knocks
9    out both the voting agreement and the
10   shareholders' agreement.
11         So, even with respect to that
12   agreement, all the corporate formalities
13   weren't followed.  That's what the
14   Ukrainian court found.
15         ARBITRATOR JENTES:  Back to your
16   materiality argument on what was done in
17   2004.
18         What is your view on the severability
19   clause?  And let me be precise.  If you
20   were in most U.S. courts, and you were to
21   come in with the provisions that are now
22   in 11, I think most U.S. courts would say,
23   oh, we will worry, we will do some changes
24   in the agreement, but we won't strike down
25   the agreement as a whole, including an

1          Proceedings
2    arbitration agreement, just on the basis
3    of this particular clause in Article 11.
4          MR. VAN TOL:  That might work if it
5    were some clause of lesser import.  I'm
6    not sure, but I have to look at the
7    severability provisions of the agreement.
8          It might work in that circumstance if
9    it's a, I don't know, who do the notices
10   go to.  That's why I asked Mr. Ekhougen at
11   the end and he agreed with me, each of
12   those material breaches went right to the
13   heart of the agreement.  It was you will
14   do these things, you will acquire debt,
15   you will not compete with me.  He agreed
16   with me that each one of those triggers --
17         ARBITRATOR JENTES:  The clauses that
18   you referred to are material.  Is the
19   Article 11 material, which is a little
20   different?
21         MR. VAN TOL:  It is because it cross
22   references those highly material points.
23   That's why it's in there.  It was
24   important enough for Storm that they
25   almost killed this deal.  You saw how

1          Proceedings
2    close it came.  They got done at the last
3    minute.
4          It wasn't, I don't like this word on
5    page 15.  It was I'm afraid that my
6    counterparty is going to do something bad,
7    and they had extensive negotiation about
8    what this --
9          ARBITRATOR JENTES:  What is the
10   remedy that's provided in Article 11 if it
11   was concerned about Telenor doing
12   something bad?
13         MR. VAN TOL:  The remedy was it was
14   considered a material breach of the
15   agreement and there is no agreement.
16         ARBITRATOR JENTES:  No.  It then goes
17   to arbitration.
18         ARBITRATOR CRAIG:  Who finds the
19   material breach?  That is the same.
20         ARBITRATOR JENTES:  Didn't it then go
21   to arbitration?
22         MR. VAN TOL:  I believe it did.
23         ARBITRATOR JENTES:  What I'm asking
24   about is, I keep coming back to whether or
25   not the arbitration clause is or is not

1          Proceedings
2    binding, not the agreement as a whole.
3          MR. VAN TOL:  The Ukrainian court
4    went out of its way to void both the
5    agreement and the arbitration clause.
6          ARBITRATOR JENTES:  Again, I'm
7    putting aside for the moment, because I
8    know we are going to get back to the
9    decision by the Ukrainian court, but I am
10   just focusing, if I put that to the side
11   for a moment --
12         MR. VAN TOL:  Here's my concern, and
13   this is really a concern that derives from
14   the fact that I might actually win.  It
15   could happen that we could win.  I'm
16   concerned that your award is going to be
17   unenforceable, because no matter what
18   happens in the United States, Mr. Sills
19   said at the last hearing when you asked
20   him, what are you going to do with this
21   award?
22         He said, I'm going to take it and I'm
23   going to enforce it in the Ukrainian.
24         We have attached to our experts
25   opinion, Professor Logush, a case on all

Page 170

```
 1              Proceedings
 2    fours.  It is our case.  A Ukrainian court
 3    said invalid, a U.S. arbitration panel
 4    ignored it, issued an award, the party
 5    went back to enforce it in the Ukrainian
 6    and the Court said strike it down.
 7        I don't want to waste our client's
 8    time, your valuable time, Mr. Sills' time
 9    for something that might be a nullity
10    issue.
11        CHAIRMAN FEINBERG:  Does your client
12    have assets in the United States?
13        MR. VAN TOL:  I don't know the answer
14    to that.  I don't believe Storm does.
15        CHAIRMAN FEINBERG:  Does its parent
16    or any of its subsidiaries?  I'm just
17    raising it, obviously.
18        MR. VAN TOL:  The only subsidiary I'm
19    aware of in the United States is something
20    called Alpha Capital, which is like a
21    correspondent bank.  It has nothing to do
22    with this transaction whatsoever.  There
23    would be no nexus to the United States to
24    enforce an award.
25        ARBITRATOR JENTES:  I diverted you
```

Page 171

```
 1              Proceedings
 2    from --
 3        MR. VAN TOL:  I think I have covered
 4    all my points in probably a way that I
 5    think is more satisfying to you.
 6        ARBITRATOR JENTES:  We have got to
 7    get to the decisions by the Ukrainian
 8    court.
 9        ARBITRATOR CRAIG:  Before we do that,
10    I have a couple of questions.  Your answer
11    to my question about the ratification --
12        MR. VAN TOL:  Oh, yes.
13        ARBITRATOR CRAIG:  -- and approval of
14    the voting agreement as opposed to the
15    shareholders' agreement.
16        If you look at Exhibit C, in the
17    Myron Rabij exhibits, this is the English
18    translation of the notice regarding
19    resolutions adopted by written polling,
20    dated August 30th, 2002, which by the way
21    I guess was sent to Telenor.
22        And it shows that there is, and I go
23    to page two of that, resolutions approved
24    through written polling:  One,
25    authorization, approval, ratification and
```

Page 172

```
 1              Proceedings
 2    confirmation of the following.  C, is the
 3    voting agreement --
 4        MR. VAN TOL:  Yes.
 5        ARBITRATOR CRAIG:  And H, by its very
 6    terms, is the shareholders' agreement.
 7        MR. VAN TOL:  Yes.
 8        ARBITRATOR CRAIG:  How can you argue
 9    that the ratification of the shareholders'
10    agreement didn't occur, particularly in
11    Exhibit D, which is the minutes of the
12    participants of the meeting that occurred
13    in October.
14        You go to item number seven, approval
15    of the resolutions adopted by written
16    polling on August 30th, 2002, and the
17    person who presented that to the
18    participants was a man by the name of
19    Nilov.
20        Now, it appears to me, and I, you may
21    know something I don't know, that these
22    two documents satisfy at least your
23    charter's obligations for the participants
24    to approve any kind of agreement of this
25    nature.
```

Page 173

```
 1              Proceedings
 2        MR. VAN TOL:  Well, it can't because
 3    they're talking about the form of the
 4    draft that is attached to the voting
 5    agreement, which we have just heard this
 6    morning was not what was approved or,
 7    sorry, was not what was signed in January
 8    of 2004.
 9        ARBITRATOR CRAIG:  Understood.  On
10    2004, there is a different modification,
11    but in 2002 was there not an approval and
12    modification of the shareholders'
13    agreement that was attached to the voting
14    agreement?
15        MR. VAN TOL:  There was a
16    ratification of an agreement to be entered
17    into.  It expressly says there that it's a
18    draft, to be entered into.
19        If you went to a court of law and
20    tried to enforce that, you would not be
21    able to.  It's not an enforceable contract
22    and Telenor Mobile never argued it did.
23        What it does there is it's saying
24    this, in form, this looks like the kind of
25    transaction we want to do.  But who knows,
```

1  Proceedings
2  for whatever reason, say there were other
3  changes made that the Storm shareholders
4  didn't like, you would have Nilov acting
5  ultravirus based upon on a resolution that
6  was passed many months before about a
7  draft. I'm unaware of any authority to
8  support that concept.
9      ARBITRATOR CRAIG:  Would you feel
10  that it's unfair for us to infer that
11  Mr. Nilov knew about the obligations to
12  have the participants ratify the
13  shareholders' agreement in 2004, since he
14  participated in precisely that process in
15  2002?
16      MR. VAN TOL:  Mr. Nilov might have
17  thought exactly what you are suggesting.
18  He may have thought I'm fine, I have got
19  approval.  That doesn't mean he did have
20  approval.  That's the whole point of an
21  ultravirus act.  An ultravirus act is not
22  an intentional, I'm going to ignore the
23  company's charter; I made a mistake.
24      ARBITRATOR CRAIG:  But if Mr. Nilov
25  didn't know, how can you expect Telenor

1  Proceedings
2  Mobile to know?  Should have known is the
3  phrase, should have known.  And your man
4  Nilov didn't know and was erroneous, how
5  can you hold Telenor responsible?
6      MR. VAN TOL:  For the reasons I
7  suggested earlier.  I asked Mr. Ekhougen
8  what went on, did your lawyers get a copy
9  of the charter?  At a bare minimum, a
10  lawyer would look at that and say, a
11  corporate lawyer would look at it and say
12  I am not sure we have authority here.
13  Let's either get a resolution or an
14  express statement from Storm that charter
15  provision doesn't apply.
16      CHAIRMAN FEINBERG:  But Storm has
17  lawyers, too, saying those things, and yet
18  the deal gets -- no one is arguing, I
19  don't think here, that the parties at the
20  time they made the deal didn't think there
21  was a deal.  The parties who signed the
22  deal thought there was a deal.
23      MR. VAN TOL:  I don't know what Storm
24  lawyers thought and saw --
25      CHAIRMAN FEINBERG:  Did your client.

1  Proceedings
2      MR. VAN TOL:  -- in connection with
3  the January 2004 agreement, because the
4  Storm lawyer won't talk to us.
5      CHAIRMAN FEINBERG:  Before, before we
6  ask to hear from Telenor, can we hear --
7  you may have other questions.
8      ARBITRATOR CRAIG:  No, no.  I'm fine.
9      CHAIRMAN FEINBERG:  Can we hear a few
10  words from you on your best argument in my
11  opinion, which is why aren't they in the
12  Ukrainian courts?  I think Bill referenced
13  that also.  Do you want to respond to
14  that?
15      MR. VAN TOL:  I do, but just quickly,
16  because I think I have articulated our
17  main points, which is let's go back to the
18  Sphere Drake standard.  We have to go back
19  there.
20      You saw in our brief it has been
21  satisfied on what can be charitably
22  described as the loosest grounds
23  imaginable.  Someone in a reply to a
24  demand says no, no contract.  Someone puts
25  in a self-serving affidavit from somebody

1  Proceedings
2  saying no meeting, no resolution.
3      Our affidavit isn't self-serving but
4  Mr. Klymenko and everyone else we have
5  talked to said they just have no evidence
6  of a meeting of participants.  That what's
7  the Ukrainian court was looking at it.
8      CHAIRMAN FEINBERG:  How do you know
9  that?
10      MR. VAN TOL:  It says so.  It says
11  there was no meeting of participants.  It
12  had the two agreements there.
13      ARBITRATOR CRAIG:  Did the Ukraine
14  court know about the 2002 ratification by
15  a meeting of participants?
16      MR. VAN TOL:  I don't know.  And I
17  have seen no evidence that it did.
18      But it also had second grounds, which
19  was apart from all that, this thing
20  doesn't comply with the formalities of
21  Ukrainian law.  And I come back to the
22  point that I have never heard a good
23  articulation from Telenor Mobile of why on
24  earth they don't go to a court.
25      That's what Sphere Drake tells you.

1          Proceedings
2    If you have got the slightest doubt about
3    whether or not there is an enforceable
4    contract, you have to go to court.
5        The last thing I will add on that is
6    it was interesting to see the cases.
7    There really is a standard for motion to
8    compel.  Very high on Telenor.  They have
9    to show that there is no issue of fact.
10       All these great questions that you
11   have all just asked me, they all have to
12   be resolved in Telenor Mobile's way in
13   order for you to go forward.  If not, we
14   run an extreme danger, as I said, of being
15   in the Western NIS Fund case, where we go
16   through all this and find out it's
17   another.
18       And subject to answering questions
19   now or later, that's all I have by way of
20   summation.
21       ARBITRATOR JENTES:  I have some
22   questions.
23       Let me deal with what happened before
24   the court of first instance in Ukraine.
25       When we were here the last time for

1          Proceedings
2    oral argument and presentation, I was very
3    interested in trying to find out what was
4    the factual basis for the
5    findings/conclusions that the Court of
6    first instance came to.
7        And in response, you provided this
8    declaration of Ms. Khomyak --
9        MR. VAN TOL:  Yes.
10       ARBITRATOR JENTES:  -- and the
11   written file.  And, in addition to that,
12   we got the affidavit of Mr. Klymenko.
13       Is that all the evidence that this
14   panel has of what was presented to the
15   Court?
16       MR. VAN TOL:  Yes.
17       ARBITRATOR JENTES:  Are you planning
18   to present anything more?
19       MR. VAN TOL:  Other than -- and I
20   don't know how far to go on this.  I can
21   submit affidavits from whomever I can find
22   involved in the transaction saying I am
23   unaware that there was a meeting of
24   participants because Mr. --
25       ARBITRATOR JENTES:  No, no.  I'm

1          Proceedings
2    sorry.
3        MR. VAN TOL:  Oh, about what happened
4    in the Ukrainian litigation?
5        ARBITRATOR JENTES:  Only as to what
6    happened in the Ukrainian court.
7        MR. VAN TOL:  Subject to there being
8    an affidavit from someone from Alperin,
9    although we have Alperin's statement of
10   claims, so we know what arguments they
11   made.  I think this is it.
12       ARBITRATOR JENTES:  Do we?  We know
13   what the written thing was.  Do we have
14   any knowledge at all as to what was said
15   at either the Court of first instance or
16   on appeal?
17       CHAIRMAN FEINBERG:  Was there any
18   brief submitted?
19       MR. VAN TOL:  No.  Other than the
20   statement of claim, I'm unaware of
21   anything else.
22       ARBITRATOR JENTES:  And we don't have
23   any evidence currently of what was said
24   during the, whatever it was, 15-minute
25   hearing the first time and the ten-minute

1          Proceedings
2    hearing the second time?
3        MR. VAN TOL:  We don't.  And I don't
4    think we will.  There is no transcript, is
5    that right?  No court transcript is kept
6    in the Ukraine.
7        So what we do, what is interesting
8    about the Klymenko affidavit, is that he
9    raised an arbitration argument.
10       ARBITRATOR JENTES:  No, no.  I want
11   to come back to how many --
12       MR. VAN TOL:  We know that, but we
13   know that he considered the issue of a
14   meeting of participants.  We know that he
15   looked in the files and couldn't find
16   anything.
17       ARBITRATOR JENTES:  I'm sorry.  I
18   want to be very precise.
19       Do we have any other evidence of what
20   happened before the court at the trial on
21   the first instance or the appeal?
22       MR. VAN TOL:  Subject to us
23   submitting something from Alperin, no.
24       ARBITRATOR JENTES:  Who appeared, if
25   you know, at the trial in the first

Page 182

```
 1              Proceedings
 2   instance other than Mr. Klymenko?
 3        MR. VAN TOL:  No one other than
 4   Mr. Klymenko.
 5        ARBITRATOR JENTES:  How about on
 6   behalf of the claimant?
 7        MR. VAN TOL:  I think it was a
 8   layperson as well, Mr. Marchenko.
 9        ARBITRATOR JENTES:  Who is
10   Mr. Marchenko?
11        CHAIRMAN FEINBERG:  No.  Excuse me,
12   Mr. Sills.  It wasn't Marchenko?  You are
13   nodding.
14        MR. SILLS:  I don't mean to
15   interrupt.
16        MR. VAN TOL:  R.V. Marchenko.
17        MR. SILLS:  They were represented by
18   counsel.
19        MR. VAN TOL:  Well, it says R.V.
20   Marchenko, acting on the basis of a power
21   of attorney.  That is not a lawyer; that
22   is a business person.
23        MR. SILLS:  I don't mean to
24   interrupt, but in civil law countries, an
25   attorney obtains a power of attorney to
```

Page 183

```
 1              Proceedings
 2   act on behalf of a client.  He is, in
 3   fact, a member of Magister and Partners,
 4   which is regular counsel for Storm.
 5        MR. O'DRISCOLL:  It is a law firm.
 6        MR. SILLS:  I'm sorry.  I didn't mean
 7   to interrupt.
 8        MR. VAN TOL:  Every hearing we get
 9   evidence from Telenor Mobile which is not
10   evidence.
11        ARBITRATOR JENTES:  That's why I am
12   directing my questions to you.
13        As far as you know, was there anybody
14   other than Mr. Marchenko there?
15        MR. VAN TOL:  Not that I know.
16        ARBITRATOR JENTES:  Who is
17   Mr. Marchenko, as far as you know?
18        MR. VAN TOL:  I don't know.
19        ARBITRATOR JENTES:  Do we have any
20   evidence that you know of as to who he
21   was?
22        MR. VAN TOL:  Not other than what I
23   have heard today, if that's evidence.  I
24   don't know who he is.
25        ARBITRATOR JENTES:  Could you look at
```

Page 184

```
 1              Proceedings
 2   the attachments to Ms. Khomyak's
 3   affidavit.
 4        MR. VAN TOL:  Yes, I have it.
 5        ARBITRATOR JENTES:  Okay.  Am I
 6   correct that if you look at tab three, got
 7   that one?
 8        MR. VAN TOL:  Yes.
 9        ARBITRATOR JENTES:  Is that the order
10   that the single judge issued when the
11   proceeding was started?
12        MR. VAN TOL:  That's my
13   understanding.
14        ARBITRATOR JENTES:  And if I look
15   back at tab two, is that the order that
16   was apparently dated April 17 of 2006?
17        MR. VAN TOL:  I don't know.  I don't
18   see a date on what's in tab three, so I
19   don't know.
20        ARBITRATOR JENTES:  No, I didn't
21   either, but it looks to me like it's the
22   first document.
23        MR. VAN TOL:  It should be because of
24   the title, yes.
25        ARBITRATOR JENTES:  About halfway
```

Page 185

```
 1              Proceedings
 2   down the judge has got an indication that
 3   there is an order obliging the claimant to
 4   provide the Court with a written
 5   confirmation that no commercial court or
 6   another authority, et cetera, is doing
 7   anything.
 8        Do you have any idea or knowledge as
 9   to why the judge asked that?
10        MR. VAN TOL:  My understanding is,
11   and again as Mr. Sills has already said,
12   I'm not a Ukrainian law expert.  We asked.
13   The Court has to satisfy there is no other
14   body, jurisdiction such as an arbitration
15   panel, that could hear the claim, which is
16   why Mr. Klymenko raised the fact that
17   there was an arbitration going on.
18        ARBITRATOR JENTES:  But this is
19   directed to the claimant.
20        MR. VAN TOL:  I understand.  But it's
21   also the claimant's ability, as there is
22   in this jurisdiction, for them to say I
23   don't think this arbitration tribunal has
24   any authority over the issues.  They are
25   Ukrainian law issues.
```

1          Proceedings
2      This arbitration is not about whether
3  or not the contract at the time, is the
4  contract is valid under Ukrainian law;
5  that is an issue of contract formation for
6  Ukrainian courts.
7      ARBITRATOR JENTES:  Well, let me ask
8  you to turn over to, I guess it's tab 20.
9      MR. VAN TOL:  And, also, I am sorry.
10  Mr. Chang pointed out if I could go back,
11  it says it's considering the case between
12  the same parties under the same cause of
13  action, that's obviously not, Alperin is
14  not a party to the arbitration agreement.
15      ARBITRATOR JENTES:  Now, could you
16  look at tab 20.
17      Am I correct that this was a
18  so-called application that was submitted
19  by Mr. Marchenko to the trial court, court
20  of first instance on April 21 of 2006?
21      MR. VAN TOL:  Yes.
22      ARBITRATOR JENTES:  And in that he
23  makes a series of statements, the first of
24  the which is that, quote, claimant is not
25  aware of any cases relating to this case,

1          Proceedings
2  which are pending before any bodies
3  authorized to consider commercial
4  disputes, or competent bodies, period, end
5  of quote.
6      Do you have any idea why
7  Mr. Marchenko made that statement to the
8  trial court?
9      MR. VAN TOL:  Not directly.  My
10  supposition would be just as I gave you.
11      ARBITRATOR JENTES:  But it doesn't
12  limit it to just parties.
13      MR. VAN TOL:  My answer went beyond
14  who the parties are.  My answer goes to is
15  the matter before the court something that
16  is subject to an arbitration?  It's not
17  under any version of Ukrainian law.  It's
18  something to be decided by Ukrainian
19  courts; that's our whole point.
20      ARBITRATOR JENTES:  We are going to
21  have a difference as to what this says,
22  but --
23      MR. VAN TOL:  In good faith a
24  Ukrainian lawyer could say to the
25  Ukrainian court, there is no competent

1          Proceedings
2  body out there hearing this issue that I
3  raised before you.  There wasn't.  We
4  weren't saying anything to this tribunal
5  at all yet.  There was no meeting of
6  participants.  That issue is before the
7  Ukrainian court, not this panel.
8      ARBITRATOR JENTES:  The second
9  statement, is, quote, the parties have not
10  entered into an arbitration agreement with
11  respect to this dispute, period, end of
12  quote.
13      MR. VAN TOL:  Same point.  It goes to
14  your question, what you were asking
15  earlier about severability.  We would say
16  not severable, because of its inherent in
17  the contract, you do not arbitrate the
18  question of contract formation.
19      ARBITRATOR JENTES:  Interesting.
20      MR. VAN TOL:  But I would submit, and
21  I know you know this, I would submit that
22  any question on that account was clearly
23  dealt with by the Ukrainian courts,
24  because of Mr. Klymenko raised it.
25      He said, what about this arbitration

1          Proceedings
2  agreement?  And as a non-lawyer he
3  probably thought, it looks like its
4  something to be arbitrated and the Court,
5  competent to hear that, rejected that
6  argument.
7      ARBITRATOR JENTES:  Well, let me get
8  to that.  If you go to Mr. Klymenko's
9  affidavit --
10      MR. VAN TOL:  Yes.
11      ARBITRATOR JENTES:  In paragraph six,
12  he says at the hearing, and he is
13  referring to the April 25th, 2006,
14  hearing, quote, I also informed the Court
15  of the existence of the New York
16  arbitration proceedings, which were
17  already underway.
18      Do you know what he said?
19      MR. VAN TOL:  I don't.
20      ARBITRATOR JENTES:  Did you ask him?
21      MR. VAN TOL:  We asked him whether or
22  not, what arguments he made, and he said
23  he made the argument that there was an
24  ongoing arbitration, and it should be
25  arbitrated.

Page 190

Proceedings

1
2 ARBITRATOR JENTES: Well, did you ask
3 him whether or not he told the Court of
4 the contentions and positions that had
5 been taken by Telenor in the New York
6 arbitration?
7 MR. VAN TOL: I don't know that. All
8 the court would have had would have been
9 the arbitration clause, itself, which it
10 could adjudge for itself.
11 ARBITRATOR JENTES: As far as you
12 know, it didn't know anything at all about
13 what was actually being argued and
14 presented to this panel?
15 MR. VAN TOL: What I have to said is
16 I don't know the answer one way or
17 another.
18 ARBITRATOR JENTES: Do you know
19 whether Mr. Marchenko said anything at all
20 about the New York proceeding during the
21 April 25th, 2006, hearing?
22 MR. VAN TOL: I don't know that.
23 While we are on the Klymenko
24 affidavit, it's appropriate, I should
25 point out that we did submit an errata

Page 191

Proceedings

1
2 sheet. We just had a typo. At the end,
3 Mr. Klymenko meant to say that he had no
4 contact with Alperin, otherwise it doesn't
5 make sense.
6 ARBITRATOR JENTES: Sure.
7 I take it from the completeness of
8 the set of documents that are attached to
9 Ms. Khomyak's affidavit, that no documents
10 were submitted to the court of first
11 instance in the Ukraine relating to the
12 New York arbitration and this panel's
13 activities?
14 MR. VAN TOL: I don't think there
15 was, but I believe at the time of
16 April 21st, 2006, I am trying to remember
17 where we were in procedural posture. I
18 don't think, I don't think Storm had yet
19 argued that there was -- that the case
20 should be dismissed on the grounds that
21 there was a -- or couldn't have argued
22 that the case should be dismissed on the
23 grounds that there was a prior Ukrainian
24 ruling, because there wasn't one yet.
25 So, reverting back to what

Page 192

Proceedings

1
2 Mr. Marchenko would have told the Court, I
3 don't know what he could have told the
4 Court other than a panel has been
5 convened, there has been an organizational
6 telephone meeting and there is going to be
7 a hearing on jurisdictional grounds, which
8 I think by that point were waiver and
9 estoppel, and the focus was not yet on
10 Ukrainian court decisions because we
11 didn't have them yet.
12 ARBITRATOR JENTES: But by that time
13 there was a demand for arbitration that
14 was about an inch thick, and I take it
15 that Mr. Klymenko had that document?
16 MR. VAN TOL: I don't know if he did.
17 I am trying to remember how he was
18 informed that there was an ongoing
19 arbitration. Maybe through that document.
20 He knew that there was an ongoing
21 arbitration obviously, because that's why
22 he raised the argument.
23 ARBITRATOR JENTES: In any event, he
24 chose not to make a written presentation
25 to the Court, the trial court?

Page 193

Proceedings

1
2 MR. VAN TOL: That is correct. He
3 did choose not to make a written
4 presentation.
5 ARBITRATOR JENTES: And he chose not
6 to present any of the documents that were
7 then extant in this New York arbitration?
8 MR. VAN TOL: Not exactly.
9 The voting agreement and
10 shareholders' agreement were already
11 before the Ukrainian court. Those are
12 documents in this case.
13 ARBITRATOR JENTES: Oh, no. I meant
14 he didn't submit the demand for
15 arbitration, for example.
16 MR. VAN TOL: I didn't see any
17 evidence that he did.
18 ARBITRATOR JENTES: After the first
19 hearing, did he come forward with any
20 other filings with the Court, as far as
21 you know, that related to this
22 arbitration?
23 MR. VAN TOL: No.
24 ARBITRATOR JENTES: So, by the time
25 that the issues related to jurisdiction

49

Page 194

1        Proceedings
2 that had been raised by your firm, he
3 didn't bring that to the attention of the
4 courts in the Ukraine?
5     MR. VAN TOL: Not to my knowledge.
6 But I don't know what he said at the oral
7 argument. He definitely -- in fact, he
8 made the arguments about the -- that was
9 the focus of the appeal. So, it could
10 have come up. I just don't know, absent a
11 transcript.
12     ARBITRATOR JENTES: In paragraph
13 eight of his affidavit, he said that he
14 had not been told by anyone at Storm that
15 there was a meeting of participants
16 granting Mr. Nilov that required
17 authority, as such I did not rely on this
18 argument at either the April 2006 hearing
19 or at the May 2000 hearing, and instead
20 focused on the jurisdictional argument.
21     MR. VAN TOL: Yes.
22     ARBITRATOR JENTES: So far as you
23 know, that's an accurate statement?
24     MR. VAN TOL: So far as I know.
25     ARBITRATOR JENTES: So, he didn't

Page 195

1        Proceedings
2 raise any of the factual materials that we
3 have heard today by way of the testimony
4 live, nor did he present to the Court in
5 the Ukraine any of the written materials
6 that you have and Mr. Sills presented to
7 the panel?
8     MR. VAN TOL: I'm sorry to answer it
9 this way, but I have to qualify it.
10     Mr. Klymenko was focused on the
11 meeting of participants for the
12 shareholders' agreement, so that would not
13 necessarily lead him to documents relating
14 to the voting agreement.
15     ARBITRATOR JENTES: I'm only trying
16 to find what got to the court in the
17 Ukraine, that is the courts in the
18 Ukraine. And I take it they didn't have
19 any of the materials that this panel has
20 been considering that was submitted by you
21 and Mr. Sills?
22     MR. VAN TOL: Other than the signed
23 voting agreement and the signed
24 shareholders' agreement, no.
25     ARBITRATOR JENTES: Okay. When

Page 196

1        Proceedings
2 Mr. Klymenko says in paragraph eight that
3 he hadn't been told by anyone at Storm
4 that there was a meeting of participants
5 granting Mr. Nilov the required authority,
6 do you know who Mr. Klymenko talked to at
7 Storm about that?
8     MR. VAN TOL: I don't know that.
9     ARBITRATOR JENTES: Do you know
10 whether he ever talked to Mr. Nilov?
11     MR. VAN TOL: I don't know. I don't
12 think Mr. Nilov was at Storm then, but I
13 don't know.
14     ARBITRATOR JENTES: Do you know
15 whether he ever talked to Mr. Wack?
16     MR. VAN TOL: I don't know that
17 either. He probably would have gotten the
18 response we got.
19     ARBITRATOR JENTES: That's all the
20 questions I have.
21     ARBITRATOR CRAIG: When did your law
22 firm first learn about the action brought
23 by Alperin against Storm in the Ukraine
24 court?
25     MR. VAN TOL: I don't know. It was

Page 197

1        Proceedings
2 around the time of the telephone
3 conference.
4     I didn't participate in it, Mr. Sear
5 did. If you know the date of that, it was
6 around then; that's all I know.
7     MR. SILLS: It was April 14th.
8     MR. VAN TOL: Of the Alperin action?
9     ARBITRATOR CRAIG: Yes. Of the
10 Alperin action.
11     MR. VAN TOL: That's my
12 understanding. It was around then,
13 precisely when, I don't know.
14     ARBITRATOR CRAIG: So, for purposes
15 of our understanding when Lovells learned
16 about this action, we could say it was
17 before April 25th; is that correct?
18     MR. VAN TOL: I think that's fair,
19 yes.
20     ARBITRATOR CRAIG: Did anyone in your
21 law firm communicate with Storm's counsel
22 in Kiev or Mr. Klymenko about this cause
23 of action in the Ukraine?
24     MR. VAN TOL: Not to my knowledge. I
25 didn't.

Page 198

Proceedings

1  ARBITRATOR CRAIG:  Did you discuss
2  this cause of action with anybody at Storm
3  in April?
4  MR. VAN TOL:  Maybe I misunderstand
5  your question.  Which cause of action,
6  this arbitration?
7  ARBITRATOR CRAIG:  No, the Alperin
8  cause of action.
9  MR. VAN TOL:  Yes, we must have, yes.
10  Again, I apologize, my participation
11  started, unfortunately for me, mid May
12  2006 or at least early May.
13  CHAIRMAN FEINBERG:  Okay.  Mr. Sills,
14  you might start off --
15  MR. SILLS:  Before we do that, could
16  we have a five-minute recess?
17  CHAIRMAN FEINBERG:  Yes.  That's a
18  very good idea.  We will take a ten-minute
19  break and then reconvene.
20  Mr. Sills, you might start off after
21  the ten-minute break, by simply explaining
22  why, instead of making these arguments to
23  us, even today you are not making these
24  arguments to a Ukrainian court.

Page 198

1            Proceedings
2      ARBITRATOR CRAIG:  Did you discuss
3  this cause of action with anybody at Storm
4  in April?
5      MR. VAN TOL:  Maybe I misunderstand
6  your question.  Which cause of action,
7  this arbitration?
8      ARBITRATOR CRAIG:  No, the Alperin
9  cause of action.
10      MR. VAN TOL:  Yes, we must have, yes.
11      Again, I apologize, my participation
12  started, unfortunately for me, mid May
13  2006 or at least early May.
14      CHAIRMAN FEINBERG:  Okay.  Mr. Sills,
15  you might start off --
16      MR. SILLS:  Before we do that, could
17  we have a five-minute recess?
18      CHAIRMAN FEINBERG:  Yes.  That's a
19  very good idea.  We will take a ten-minute
20  break and then reconvene.
21      Mr. Sills, you might start off after
22  the ten-minute break, by simply explaining
23  why, instead of making these arguments to
24  us, even today you are not making these
25  arguments to a Ukrainian court.

Page 199

1            Proceedings
2      MR. SILLS:  That's exactly where I am
3  going to start.
4      (Recess taken.)
5      MR. SILLS:  Thank you, Mr. Chairman.
6  Let me turn to the question that you
7  raised just before the recess.
8      And because I think it will be
9  helpful to look at the actual words of the
10  governing rules, I would like to hand to
11  the panel, and of course to Mr. Van Tol,
12  copies of the Uncitral rules that govern
13  this proceeding, because I will be
14  referring to them.
15      And I have marked with a green flag
16  the particular provision that I will be
17  discussing.
18      Let me begin first though,
19  Mr. Chairman, with the language of the
20  contract that the parties signed and this
21  is, after all, a case about enforcing the
22  written undertakings of commercial
23  parties.  And turn particularly to Article
24  12, the disputes resolution provision, and
25  let me begin at 12.01B of the contract.

Page 200

1            Proceedings
2      And what it says is this:  Except for
3  arbitration proceedings pursuant to
4  Section 12.01A, no action, lawsuit or
5  other proceeding, other than the
6  enforcement of an arbitration decision, an
7  action to compel arbitration or an
8  application for interim, provisional or
9  conservatory measures in connection with
10  the arbitration, shall be brought by or
11  between the parties in connection with any
12  matter arising out of or in connection
13  with this agreement.
14      As you know from the steelworkers
15  trilogy, that is the broadest possible
16  arbitration clause.
17      So, I suppose there are really
18  several questions.  Why did we come here?
19  Because we agreed to come here.
20      And I suppose in some sense no good
21  deed goes unpunished, but by bringing to
22  this tribunal this dispute, we have
23  honored the agreement that we had signed.
24      Now, looking back to Section 12.01A,
25  the parties accepted the Uncitral rules to

Page 201

1            Proceedings
2  govern this proceedings.
3      I don't think there could be any
4  serious dispute that in the Second Circuit
5  and in New York, as in every other court
6  in the United States, when there is a
7  reference to the rules of a particular
8  arbitration association, that incorporates
9  by reference of those rules in the
10  contract as if they had been set out
11  verbatim.
12      The best recent case I know of on
13  that is the decision of the Second Circuit
14  in the Shaw Group versus Triplefin
15  International which appears at 322 Fed 3d.
16  115.  Because this question hadn't been
17  raised previously, we had to address this
18  in our papers, but I do have copies of
19  that as well for the tribunal and a copy
20  for Mr. Van Tol.  But I think that is sort
21  of common currency in the world of
22  arbitration.
23      That being said, I would like to turn
24  to the Uncitral rules and, in particular,
25  to Article 21, Subsection two.

Page 202

1        Proceedings
2        What it says is this:  The arbitral
3    tribunal shall have the power to determine
4    the existence or the validity of the
5    contract of which an arbitration clause
6    forms a part.  For the purposes of Article
7    21, an arbitration clause which forms a
8    part of a contract and which provides for
9    arbitration under these rules shall be
10   treated as an agreement independent of the
11   other terms of the contract.
12       A decision by the arbitration
13   tribunal that the contract is null and
14   void shall not entail ipso jure the
15   invalidity of the arbitration clause.
16       That goes well beyond the Prima Paint
17   principle that governs all arbitrations
18   being conducted in the United States.
19   This is the deal that the parties made.
20   The agreement was that the arbitration
21   clause would be treated as severable.
22       In effect, it's as if Mr. Nilov had
23   signed a separate document agreeing to
24   arbitrate the dispute over the validity of
25   the contract, and if he had done that, if

Page 203

1        Proceedings
2    those were formal steps that had been
3    taken, I think not even Storm would have
4    challenged that.
5        But that's what this says.  This says
6    that the arbitration clause is fully
7    severable, that the arbitration clause is
8    a separate agreement.
9        It is impossible to point to any
10   provision of Ukrainian or other law that
11   would prevent Mr. Nilov from agreeing on
12   behalf the company to arbitrate a dispute,
13   and under this express language, this
14   tribunal and not a court, has the power to
15   determine its own jurisdiction, including
16   the question of whether the contract of
17   which the arbitration clause forms a part
18   is, itself, valid.
19       CHAIRMAN FEINBERG:  Let me ask you
20   something.  What happens if we agree with
21   you and we find jurisdiction, now what?
22       MR. SILLS:  Then we will move forward
23   on the merits.
24       CHAIRMAN FEINBERG:  You will?
25       MR. SILLS:  I would hope so.

Page 204

1        Proceedings
2        CHAIRMAN FEINBERG:  Let's say you
3    move forward on the merits, then what?
4        MR. SILLS:  Well, we anticipate
5    winning.
6        CHAIRMAN FEINBERG:  Then what?
7        MR. SILLS:  Then we would seek to
8    enforce that award.
9        CHAIRMAN FEINBERG:  Where?
10       MR. SILLS:  Well, I think we would
11   initially try to enforce it in the
12   Ukraine.  You raised this question before
13   and we have heard constantly from Storm
14   that it will attempt to thwart any award
15   in the Ukraine.
16       I think there are two answers.
17   First, Ukraine is a party to the New York
18   Arbitration Convention, it is a party to
19   the Inter European Arbitration Convention,
20   which in some ways is even stronger, and
21   it has recently adopted a domestic law
22   providing for the enforcement of foreign
23   arbitral awards.  All those are referred
24   to in our previous papers.
25       I'm not -- and I believe also

Page 205

1        Proceedings
2    Ukraine, Ukraine's post-Soviet history
3    isn't 20 years old.  It's a developing
4    legal culture.  Will they enforce it?  I
5    would hope so.
6        Do we have treaty and statutory
7    grounds on which we could attempt to
8    enforce it?  Yes.
9        Are there diplomatic channels
10   available for attempting to enforce an
11   award in favor of a Norwegian company in
12   the Ukraine?  There are.
13       If we lose, if Storm, in effect,
14   having agreed to arbitrate, says we didn't
15   really mean it because you can't enforce
16   an award against us, we would then seek to
17   enforce it against the assets of the Alpha
18   Group outside of Ukraine as you suggested
19   in one of your questions.  I hope it won't
20   come to that, but I think we have plenty
21   of resources.
22       Do they have funds in the United
23   States?  They do.  Do they have assets in
24   the United States and elsewhere in Europe?
25   They do.

Page 206

1          Proceedings
2     But I don't think it really comes
3  fairly from Storm.  For Storm to assert
4  that, having agreed to arbitrate, having
5  agreed to arbitrate in New York under New
6  York law, under the broadest possible
7  arbitration clauses we have just been
8  discussing, that it's all a meaningless
9  gesture because they intend to resort to
10 the Ukraine courts.
11    I have been doing this 30 years and
12 my ability to predict how a court will
13 act, even here in New York where I am
14 licensed, has turned out to be less than
15 perfect over time.
16    I don't think either Mr. Van Tol or I
17 is in a position to predict how a
18 Ukrainian court would deal with an award
19 from this tribunal a year or two from now.
20 Especially, given the fact that Ukrainian
21 legal culture, as I understand it, is very
22 much in flux.
23    CHAIRMAN FEINBERG:  I take it you are
24 somewhat reluctant, obviously, that's
25 putting it mildly, to resolve this claim

Page 207

1          Proceedings
2  now in the Ukrainian courts?
3     MR. SILLS:  Well, I would be
4  reluctant to do that for several reasons.
5     First, that is not the deal parties
6  made.  And Telenor at least is attempting
7  to abide by the agreement it made; that
8  this tribunal, here in New York, under New
9  York law is the appropriate forum.
10    And the fact that Storm violated the
11 agreement and has sought recourse in
12 Ukraine by our count nine times in a
13 variety of different procedural modes,
14 trying to attack the agreements it made,
15 doesn't mean that we should, in effect,
16 take the bait, go to Ukraine, and then
17 have them come here and say, see, they
18 have waived their right to arbitrate.
19 That is getting the case backward.
20    I think also the parties, when you
21 read the agreement, and I can't speak or
22 speculate about Storm or Alpha's motives.
23    The parties didn't have confidence in
24 Ukrainian justice, that is why they
25 elected arbitration in New York, and

Page 208

1          Proceedings
2  that's why they designated the federal and
3  state courts in New York City are the only
4  courts mentioned here, as the courts to
5  which they would submit in the event there
6  was a dispute outside the scope or outside
7  the competence of the arbitrable tribunal.
8     If we have had to, we would resort to
9  the Southern District.  I don't want to
10 attempt to mislead the tribunal.
11    We do have concerns about Ukrainian
12 justice and about the courts of justice in
13 Ukraine.  And I think the questions
14 Mr. Jentes was addressing, albeit
15 unanswered, concerning this proceeding or
16 so-called proceeding in Ukraine, which
17 seems to be the centerpiece now of the
18 motion to dismiss, although that motion
19 has certainly morphed over time,
20 highlights some of the problems.  The
21 hearing lasted, at most, 15 minutes.
22    CHAIRMAN FEINBERG:  Were you there?
23    MR. SILLS:  I was not there.  I heard
24 Mr. Jentes referring to it.
25    CHAIRMAN FEINBERG:  Was Telenor at

Page 209

1          Proceedings
2  that meeting?
3     MR. SILLS:  Telenor was not there
4  because we had no notice.  Telenor was not
5  a party to that proceeding.  That seems to
6  have been lost in the shuffle somehow in
7  the discussion.
8     Not only was Telenor not a party,
9  Telenor wasn't even notified after it was
10 begun.  I think Mr. -- implicit in
11 Mr. Craig's questions -- in fact, we
12 weren't notified after this first
13 so-called victory of Storm.  We learned
14 from a press release that a Ukrainian
15 court had granted this wide-ranging
16 relief.  And when I look at the papers
17 which have now finally been supplied,
18 which seem to constitute the records in
19 that case, the defense such as it is, is
20 put on by a layman.
21    We are not questioning that he had a
22 legal right to represent Storm.  Storm
23 seems to have done, to say the least, very
24 little to defend its own agreement in that
25 Ukrainian court.

Page 210

```
 1              Proceedings
 2      They sent a layman.  He showed up.
 3  He didn't put anything in writing.  He
 4  mentioned the fact that there was an
 5  arbitration, lost on what appears to be a
 6  decision that goes well beyond the scope
 7  of the pleadings.  The pleadings all seem
 8  to have to do with the claim that the --
 9  that the agreement should have been in
10  Ukrainian and should have been filed.
11      Now, Mr. Klymenko, you would think,
12  would have known there was an executed
13  Ukrainian copy of this document, but he
14  didn't mention that.
15      You would have that, given the fact
16  that he is the general director of the
17  company, that he would somehow have
18  control over his own company's books and
19  records, but he didn't know there was a
20  2002 meeting.
21      He doesn't seem to have mentioned the
22  fact that certificates attesting to the
23  actual authority of his predecessor, Mr.
24  Nilov, to execute this agreement, was
25  supplied in order to give comfort to
```

Page 211

```
 1              Proceedings
 2  Telenor that this agreement had been duly
 3  executed.
 4      He didn't seem to mention the fact
 5  that, although they claim to -- this is
 6  reflected in the transcript of the last
 7  hearing, the June 29th hearing.  The claim
 8  was that this alleged infirmity in the
 9  execution of the contract was discovered
10  in 2005, but they didn't crank up this
11  lawsuit until, I believe, April 2006 and
12  didn't announce it until Ukrainian justice
13  had run its course towards the end of May
14  2006.
15      He didn't mention the fact that they
16  had waited apparently about a year before
17  even commencing this proceeding.
18      They never mentioned the fact that
19  there was an ongoing proceeding in New
20  York in which jurisdictional questions had
21  been raised by Storm, I believe on the
22  same day that they commenced this
23  proceeding in Ukraine and represented to
24  the Ukraine court that there were no
25  related proceedings.
```

Page 212

```
 1              Proceedings
 2      And the fact is, and I don't think
 3  this is without real force, Alperin is the
 4  parent of Storm.  Storm is not an
 5  operating company.  Mr. Marchenko does
 6  appear on the internet as a Ukrainian
 7  lawyer.
 8      Storm is one of his regular clients.
 9  The fact is Storm was sued by itself.
10  This is a dog chasing its tail.  And the
11  notion that a carefully negotiated
12  agreement, involving billions of dollars
13  in assets, should be upset because of such
14  an absurd case, if it weren't so serious,
15  and if there weren't so much at stake, I
16  think would be laughable.
17      CHAIRMAN FEINBERG:  And the reason, I
18  take it, once you learned of the lawsuit
19  you didn't the next day run in the
20  Ukrainian courts is why?
21      MR. SILLS:  Well, we didn't run for
22  several reasons.  First, there had already
23  been an appeal, and as I understand
24  Ukrainian procedures, as would be the
25  case, assuming you could intervene on
```

Page 213

```
 1              Proceedings
 2  appeal in a case here in the United
 3  States, you are stuck with the record that
 4  has been made in the Court below.
 5      I mean, if you were to intervene in
 6  an American case following an appeal,
 7  assuming there were a vehicle for doing
 8  that and it's not entirely clear that we
 9  could.  But assuming that is true, you
10  couldn't make a new record.
11      Appellate courts, let alone the
12  supreme court, or the higher commercial
13  court of Ukraine, are not places in which,
14  as I understand it, you could make a new
15  record.
16      ARBITRATOR JENTES:  Even though you
17  weren't present?
18      MR. SILLS:  That's my understanding.
19      ARBITRATOR CRAIG:  Even though you
20  were in possession of a lot of evidence
21  that had not been brought to the attention
22  of the Ukrainian court?
23      MR. SILLS:  I don't believe there is
24  a procedural vehicle in Ukraine for
25  introducing that new evidence, and I am
```

1          Proceedings
2    quite certain we would have been met with
3    an objection, just as you heard that we
4    would now be told if we tried to intervene
5    that we had somehow waived our rights.
6          CHAIRMAN FEINBERG:  And you didn't
7    contemplate a new lawsuit?
8          MR. SILLS:  I want to be frank about
9    that, Mr. Feinberg.
10         If we were to contemplate a new
11   lawsuit, we would resort to an American
12   court, as the parties agreed we could in
13   the shareholders' agreement.  It expressly
14   provides for jurisdiction in New York, in
15   federal or state court.  It's in Article
16   12.01 -- excuse me.  It's in Article 12.2.
17         CHAIRMAN FEINBERG:  And I take it
18   that, at least in part, Mr. Sills, and I
19   don't think you have made this argument
20   quite as directly in the past, but if I
21   hear you correctly, and correct me, I'm
22   not trying to put words in your mouth.
23         You raise here with this tribunal
24   some question about the credibility or
25   legitimacy of the Ukrainian civil justice

1          Proceedings
2    system?
3          MR. SILLS:  I want to speak carefully
4    to this point, because there are many
5    courts in Ukraine and many judges, just as
6    there are anywhere else.
7          The cases, the relentless barrage of
8    litigation to which my client has been
9    subjected in the Ukraine on these issues,
10   does very little to inspire confidence in
11   the Ukrainian judicial system.
12         I can tell what the State Department,
13   in its official publication about Ukraine,
14   it's called Doing Business in Ukraine, and
15   it's available on the State Department Web
16   site, has to say about this.  This is a
17   quote.
18         "Frequently investment disputes
19   involve the lack of adequate rule of law,
20   fair and impartial dispute resolution
21   mechanisms, enforcement of domestic court
22   and international arbitration decisions.
23         "Another problem is poor corporate
24   governance, inadequate protection for
25   shareholder rights, inadequate disclosure,

1          Proceedings
2    asset stripping and voting fraud.
3          "Corruption lies at the heart of many
4    investor disputes.  Laws and regulations
5    are vague, with considerable room for
6    interpretation, providing officials at
7    every bureaucratic layer ample
8    opportunities for corruption.  Dispute
9    settlement remains weak.  U.S. businesses
10   consider the local and national court
11   systems unpredictable and try to avoid
12   them."
13         ARBITRATOR JENTES:  What is that
14   document?
15         MR. SILLS:  It's an official State
16   Department document called Doing Business
17   in Ukraine, a country commercial guide for
18   U.S. companies.  It's available on the
19   State Department Web site.
20         ARBITRATOR JENTES:  What is the date
21   of it?
22         MR. SILLS:  According to the one I
23   have before me, February 8, 2005.
24         ARBITRATOR JENTES:  Okay.
25         MR. SILLS:  And as -- I'm sorry.

1          Proceedings
2          ARBITRATOR JENTES:  Go ahead.
3          MR. SILLS:  Well-recognized
4    international agencies, such as
5    Transparency International, of which I am
6    sure the panel is familiar, have regularly
7    criticized the quality of justice in
8    Ukraine.
9          Are there exceptions to that rule?
10   Quite possibly.
11         Is it legitimate for the parties to
12   have concluded that, given these types of
13   concerns, would agree on arbitration?
14   They would agree on the broadest possible
15   arbitration?  That they would agree on a
16   mature legal regime, the laws of New York
17   as opposed to a developing legal regime,
18   the laws of Ukraine?
19         Those are all rational business
20   decisions and that's the deal the parties
21   made.
22         So, I suppose that other parties
23   might decide that resort to the Ukrainian
24   court system was a perfectly sound thing
25   to do.  That is not the agreement that the

Page 218

```
1              Proceedings
2    parties reached here.  The agreement that
3    the parties reached was that it would be
4    arbitrated and, by incorporation of the
5    Uncitral rules, agreed that even the
6    question of the existence of validity of
7    the contract would be arbitrated, because
8    of the severability provision in Article
9    21 of the Uncitral rules.
10       And I think that is common currency.
11   In international arbitration, it's common
12   for an arbitral tribunal, under the
13   Uncitral rules, or equally common under
14   the ICC rules which has a similar
15   provision, to have jurisdiction to
16   determine its own jurisdiction.
17       ARBITRATOR JENTES:  That's a little
18   different, as you well know.
19       But let me get back to the Second
20   Circuit's decision in the Sphere Drake
21   case that we keep returning to.
22       How do you get around what appears to
23   be the language of the Court that says,
24   both under the Federal Arbitration Act and
25   under the New York convention, it's the
```

Page 219

```
1              Proceedings
2    court that has to decide and, in fact, has
3    to give the party who is opposing the
4    contractual arrangement a trial, and at
5    least in that decision, a trial by jury
6    where the contention is made that it, that
7    the agreement is -- the overall agreement
8    is null and void.
9        How do we get around that?
10       MR. SILLS:  Around that, excuse me.
11   We get around it because the rules that
12   govern the Sphere Drake arbitrations are
13   different rules, because they don't have
14   the severability clause, because as the
15   case I just distributed says, there is a
16   presumption that the parties don't
17   delegate to the arbitrators the type of
18   decision that is put before you on this
19   motion, but the parties can agree to that.
20       And I think the way to think about it
21   is that assume --
22       ARBITRATOR JENTES:  Let me only ask,
23   interrupt in this respect.  Is there any
24   case that supports what you just said?
25       MR. SILLS:  Yes, there are.  There
```

Page 220

```
1              Proceedings
2    are numerous cases.  And, in fact -- I
3    apologize for the pile of paper here --
4    the case that I just distributed provides
5    exactly that.
6        The case is cited at pages 22 and 23
7    of our initial brief in opposition to this
8    motion.
9        ARBITRATOR JENTES:  Where in the case
10   that you just cited, the Shaw Group, does
11   it say what you said, which I gather is
12   that notwithstanding what it says in the
13   Federal Arbitration Act and the New York
14   convention, that if there is a
15   severability clause, that we can, in
16   effect, take over the ruling on the null
17   and void issue?
18       MR. SILLS:  If you bear with me one
19   second.
20       ARBITRATOR JENTES:  Sure.  Because I
21   think this is something, in fairness, this
22   is something the panel is very much
23   interested in hearing what the law has to
24   say.
25       MR. SILLS:  I think the discussion
```

Page 221

```
1              Proceedings
2    begins on page seven of the version we
3    gave out and continues over with a long
4    discussion of cases, from the Second and
5    other circuits, including Apollo Computer,
6    in which the presumption is against
7    arbitrators ruling on their own
8    jurisdiction, which I would agree is part
9    of the usual jurisprudence under both the
10   Arbitration Act and the New York
11   Arbitration Convention, can be overcome.
12       And that's the way in which this
13   court, this opinion we have before us, is
14   reading the First Options decision, Judge
15   Breyer's opinion in First Options in the
16   Supreme court.
17       And I suppose the way to think about
18   it is this:  If, after this dispute had
19   arisen, we had approached Storm and we had
20   said we think the right way to get this
21   question resolved is to arbitrate it in
22   New York, and they had signed a separate
23   agreement providing for the question of
24   the validity of the contract to be
25   arbitrated in New York, that would be
```

Page 222

| | Proceedings |
|---|---|
| 1 | Proceedings |
| 2 | enforceable. |
| 3 | Arbitrators rule all the time under |
| 4 | such submissions, and I don't think there |
| 5 | could be any serious suggestion that the |
| 6 | parties couldn't agree to submit the |
| 7 | question of the validity of the contract |
| 8 | to an arbitrable tribunal. |
| 9 | The way in which this contract was |
| 10 | drafted and agreed to by the parties |
| 11 | provides for exactly that, because Article |
| 12 | 21.2 of the Uncitral rules makes that |
| 13 | arbitration clause severable and |
| 14 | specifically enforceable, and that's -- |
| 15 | arbitration is, after all, and that's -- |
| 16 | arbitration, after all, is a matter of |
| 17 | contract. This is the contract the |
| 18 | parties made. |
| 19 | The parties agreed to this clause. |
| 20 | Unless we are yet again hearing that Storm |
| 21 | agreed to something, in effect, with its |
| 22 | fingers crossed behind its back because |
| 23 | they didn't really mean it. Because |
| 24 | that's what the Uncitral rules said at the |
| 25 | time this contract was signed and that's |

Page 223

| | Proceedings |
|---|---|
| 1 | Proceedings |
| 2 | what the Uncitral rules say today. |
| 3 | CHAIRMAN FEINBERG: And if I |
| 4 | understand you correctly, Bob, you are |
| 5 | saying here that even if, and you dispute |
| 6 | it vigorously, even if the 2004 |
| 7 | shareholder agreement is invalid, the |
| 8 | arbitration clause calling for arbitration |
| 9 | survives; is that your point? |
| 10 | MR. SILLS: That is exactly correct. |
| 11 | And that would be the case under |
| 12 | Prima Paint. That is the case under the |
| 13 | severability clause of the shareholders' |
| 14 | agreement. |
| 15 | It doesn't -- I mean, in the argument |
| 16 | before the break, we heard that the |
| 17 | severability clause somehow turned on the |
| 18 | materiality or importance of the clause. |
| 19 | It doesn't. |
| 20 | In fact, the severability clause |
| 21 | provides expressly that the invalidation |
| 22 | of the contract or any part of it in |
| 23 | another jurisdiction is without effect |
| 24 | here. |
| 25 | It, in effect, limits whatever effect |

Page 224

| | Proceedings |
|---|---|
| 1 | Proceedings |
| 2 | this self-inflicted wound in the Ukraine |
| 3 | might have to the Ukraine. But we don't |
| 4 | have to go that far. |
| 5 | Arbitration clauses are typically |
| 6 | regarded as severable, ever since the |
| 7 | Supreme Court's decision in Prima Paint. |
| 8 | The Uncitral rules make it express that |
| 9 | it's severable and they go beyond making |
| 10 | it simply severable, in the sense that the |
| 11 | arbitrators can't reach, under ordinary |
| 12 | severability principles, the question of |
| 13 | the validity of the contract in which the |
| 14 | arbitration clause is set forth. |
| 15 | Here the parties expressly agreed to |
| 16 | have this question arbitrated; that's why |
| 17 | we are here, and that's why we are not in |
| 18 | court. |
| 19 | And I think your question is the |
| 20 | right one, Mr. Chairman. We are adhering |
| 21 | to the contract. The contract said to |
| 22 | bring the dispute to this tribunal. We |
| 23 | have done that. |
| 24 | The contract says this tribunal can |
| 25 | rule on its own jurisdiction, including |

Page 225

| | Proceedings |
|---|---|
| 1 | Proceedings |
| 2 | the expertise of the existence of the |
| 3 | validity of the contract. We have done |
| 4 | that. |
| 5 | If we are wrong, we will resort to a |
| 6 | court here in New York, because that's the |
| 7 | deal the parties made. |
| 8 | CHAIRMAN FEINBERG: What do you mean |
| 9 | if we are wrong, we will resort to a |
| 10 | court? Are you saying -- what are you |
| 11 | saying? I would like to know what you |
| 12 | mean, if we are wrong. |
| 13 | MR. SILLS: I'm saying only, in |
| 14 | response to your question, and I think I |
| 15 | answered too broadly or I spoke too |
| 16 | broadly. |
| 17 | If we had to resort to a court, |
| 18 | although we don't believe we are required |
| 19 | to -- in fact, we believe we are required |
| 20 | to proceed before this tribunal as we are |
| 21 | doing -- we would follow what the contract |
| 22 | says and we would ask a New York court or |
| 23 | a federal court sitting in New York to |
| 24 | enforce this contract, which is subject to |
| 25 | New York law and provides for arbitration |

Page 226

1        Proceedings
2   in New York.
3        CHAIRMAN FEINBERG:  Well, I just --
4   again, it's on the record, and I maybe --
5   I want to make sure I understand what you
6   are saying.
7        Hypothetically, if this panel were to
8   rule that the issue of jurisdiction should
9   be resolved by the Ukrainian courts, are
10  you stating on the record that your next
11  course of action would not be to brief and
12  argue in the Ukrainian courts, but you
13  would go to the Southern District of New
14  York?
15       MR. SILLS:  Well, it's a possibility
16  I don't want to contemplate, but --
17       CHAIRMAN FEINBERG:  I thought that
18  was implicit in your statement.
19       MR. SILLS:  -- but the answer is we
20  would regard that as an interim award,
21  subject to revision under the -- even the
22  very limited scope of review of an
23  arbitral award under the Arbitration Act
24  and we would seek review in the Southern
25  District.

Page 227

1        Proceedings
2        CHAIRMAN FEINBERG:  You would seek
3   review?
4        MR. SILLS:  We would.  And we would
5   seek to have it set aside, because it's
6   our position that the tribunal has
7   jurisdiction.
8        If the tribunal has no jurisdiction,
9   it seems to me it's to up to the parties
10  to select a court, because the panel can't
11  have jurisdiction to tell us where to go
12  under an agreement that the panel
13  concludes doesn't exist.  So that any such
14  award I would think would be at war with
15  itself.
16       If you have jurisdiction to tell us
17  where to go, then you have jurisdiction to
18  decide whether or not the contract is
19  valid and enforceable, and there is no
20  need to tell us where to go.
21       ARBITRATOR CRAIG:  In light of recent
22  precedents, what comfort can you give the
23  tribunal, if we go down the path which you
24  want us go, which is to find jurisdiction,
25  hear the merits, give you the award, that

Page 228

1        Proceedings
2   all that effort won't be futile because it
3   will be unenforceable, certainly
4   unenforceable in the Ukraine, if the
5   Ukrainian courts agree to accept it -- and
6   may well be unenforceable in American
7   courts because the Ukraine opinion may be
8   brought here as a defense to the
9   enforcement of the arbitration award.
10       MR. SILLS:  Well, I think there are
11  two answers.  We had extended discussion
12  before about this.
13       I don't have any reason to believe it
14  wouldn't be enforced in the Ukraine.
15       ARBITRATOR CRAIG:  Isn't there legal
16  precedent to the contrary?
17       MR. SILLS:  Well, I think there, as I
18  read that case, there was an actual -- as
19  I read that case, the party seeking
20  enforcement in Ukraine had participated.
21       It was -- it wasn't the highly
22  unusual facts we have here, where one of
23  the parties arranged to have itself sued
24  by it parent and then suddenly showed up
25  and said see, there is a decision of a

Page 229

1        Proceedings
2   court of competent jurisdiction resolving
3   all these issues.
4        So, I think the case could be easily
5   distinguished.
6        Second, I don't know to what extent
7   that decision would be considered as
8   binding in other Ukrainian courts.
9        I know that Ukrainian law is
10  changing.  But, for example, we sought
11  relief under the non-compete provisions of
12  the shareholders' agreement, which are
13  identical to the non-compete provisions of
14  the voting agreement.
15       If we secure relief there, it's going
16  to be either specific relief for
17  divestiture or monetary relief.
18       And it's going -- and will it run
19  against not only Storm, but its parents?
20  It's going to depend on the form of
21  relief.  It's going to depend on --
22       ARBITRATOR CRAIG:  You are in the
23  Ukraine courts making arguments on the
24  non-compete?
25       MR. SILLS:  No, no.  We are before

Page 230

1          Proceedings
2   you, Mr. Craig.
3          ARBITRATOR CRAIG:  On the
4   non-compete?
5          MR. SILLS:  They are competing.  They
6   are operating at least one and we believe
7   two competing businesses in the Ukraine.
8          We can understand their enthusiasm
9   for raising a series of jurisdictional
10  arguments and not getting to the merits.
11  But could we enforce it in Ukraine?  Could
12  we enforce elsewhere in Europe against
13  assets of the Alpha Group?  Will Ukraine
14  courts simply thumb their noses at an
15  arbitral tribunal?
16         I can't answer those questions, but
17  it seems to me, it's beyond not graceful,
18  it's inappropriate for a party that agreed
19  to arbitration to turn around and say,
20  well, we can't arbitrate because we intend
21  to do everything we can to frustrate this
22  in our national courts.
23         We can enforce that decision here,
24  for example.  We could homologate the
25  award and reduce it to an American

Page 231

1          Proceedings
2   judgment.
3          Will the Ukraine court ignore an
4   American judgment?  I don't know the
5   answer to that.  I suspect no one around
6   this table does.
7          And then if the question is whether
8   the Ukraine court will refuse to enforce
9   an American judgment two or three or four
10  years from now?  I don't know the answer
11  to that either.
12         Alpha seemed prepared to take
13  reputational risks in signing agreements
14  and then turning its back on them.  Are
15  they prepared to take the reputational
16  risks of losing an arbitration and then
17  walking away from it?  Because at some
18  point they are going to run out of people
19  who will do business with them, who will
20  sign agreements that they won't honor, who
21  will arbitrate with them and then have
22  them hide behind national courts if they
23  think they can.
24         I don't know the answer to any of
25  those questions, but I know that the

Page 232

1          Proceedings
2   parties agreed to arbitrate all issues
3   here.  I know that they agreed on an
4   especially broad arbitration clause and I
5   think they should be held to their
6   bargain.  If we have problems enforcing an
7   award down the road, that is a problem we
8   are prepared to live with.
9          And it seems to me that's our
10  problem, but it's not a defense to going
11  forward.
12         CHAIRMAN FEINBERG:  What about the
13  quite separate issue posed by Storm that
14  you guys certainly should have known that
15  without ratification, the 2004 agreement
16  was null and void and that, you know, you
17  only have yourself to blame?
18         MR. SILLS:  I have a lot of trouble
19  getting my arms around that argument.
20         We, as part of the closing of the
21  signing of the 2004 contract, we were
22  given two certificates; one signed by the
23  chairman of Storm attesting to the fact
24  that Mr. Nilov had authority to sign that
25  agreement.  That is the sort of estoppel

Page 233

1          Proceedings
2   document that is given every day in a
3   corporate transaction.
4          It seems to me that for Storm to say,
5   well, now, we are told in the letter
6   forecasting what Mr. Nilov might say,
7   after six months presumably, is that he
8   thought he had authority.
9          We were told he had authority.  We
10  were told in the most formal possible
11  sense he had authority, and I don't want
12  to rehearse everything that is in our
13  brief, but there is a series of e-mails
14  talking about how Mr. Nilov has authority
15  including, for example, Mr. Wack's
16  statement in the papers, in the e-mails
17  that are attached to Mr. Lykke's
18  affidavit, he specifically says that
19  Mr. Nilov can sign documents without a
20  power of attorney.  That appears in --
21  it's Exhibit K to Mr. Lykke's affidavit.
22         And there is a series of e-mail
23  exchanges involving Mr. Wack.  And I can
24  understand why he doesn't want to come
25  here and testify there was a problem,

Page 234

1   Proceedings
2   because there wasn't a problem, and these
3   e-mails make it very clear.
4       ARBITRATOR CRAIG:  Exhibit what?
5       MR. SILLS:  K, on the second page of
6   that exhibit, the second e-mail from
7   Mr. Wack to a -- to Mr. O'Driscoll and a
8   number of others at Telenor.
9       Mr. Wack, the company's long-time
10  lawyer said this:  Storm only has one
11  officer, the general director, who is
12  authorized to sign documents on behalf of
13  Storm without a power of attorney.
14      We have Mr. Rabij's affidavit, which
15  is the only evidence on the question of
16  Ukrainian law that Mr. Van Tol addressed
17  or attempted to address, as to whether or
18  not the 2002 authorizations were good
19  enough for 2004 on the question of actual
20  authority, and he concludes that they are.
21      I don't see how someone, who is not a
22  Ukrainian lawyer, is in a position to
23  express an opinion on that, and the
24  Ukrainian lawyers' affidavit that we have
25  seen don't address that issue.

Page 235

1   Proceedings
2       In fact, Mr. Rabij concludes that
3   under Ukrainian charter and under
4   Ukrainian law there was actual authority,
5   even without a meeting.  And the scope of
6   the powers of a general director of a
7   Ukrainian limited liability company or
8   corporation, as I understand it, are
9   extraordinarily broad, broader than the
10  powers of the president of a New York or
11  Delaware corporation.
12      But even if there were some problem
13  with the actual authority, it brings us to
14  the question of apparent authority that
15  you had raised.  And there we have a
16  negotiated and executed document.  We have
17  repeated assurances that Mr. Nilov has
18  authority.
19      We are even told that because Nilov
20  is the right guy, can he sign by fax and
21  then resign, and he does.  He then comes
22  and signs the document in Ukrainian, which
23  he does.  A fact, by the way, that
24  Mr. Klymenko didn't see fit to bring to
25  the attention of the case -- of the court

Page 236

1   Proceedings
2   in the case he was supposedly defending.
3       And then the estoppel certificates
4   are delivered, two certificates expressly
5   attesting to Mr. Nilov's authority and
6   annexing to those certificates minutes
7   number 30, annexing the minutes of the
8   2002 meeting -- I'm sorry, of the 2002
9   unanimous written consent, the written
10  polling, which is at least an implicit
11  recognition on their part that they
12  thought it was authorized.
13      Then what happens?  After the deal is
14  signed and closed, the parties go ahead
15  and implement it.  The parties go ahead
16  and amend the charter, as required by the
17  agreement, shares are exchanged and they
18  go to meetings.
19      And it's -- I think one of your
20  questions before the luncheon recess,
21  asked, you know, why did they do this?
22      The answer is because they saw a
23  chance to get something for nothing.  They
24  own less than 50 percent of this company.
25  By waging this relentless legal attack, by

Page 237

1   Proceedings
2   inventing these claims of lack of
3   authority, they think they can get more of
4   an extremely valuable company.  This is
5   the largest mobile phone company in
6   Ukraine.  It has tremendous and growing
7   value.
8       I don't want to go into Alpha's
9   history of corporate raiding, but it's
10  fairly extensive.
11      ARBITRATOR JENTES:  I don't want to
12  break your thoughts, but I want to come
13  back.
14      I have now read the case that you
15  have handed out, the Shaw Group case and,
16  at least as I read that case, it's a
17  different kind of case from where we are
18  here and I am interested in your comment.
19      That's a case where there is no
20  challenge that there was no agreement.
21  The claim is that the agreement didn't
22  cover arbitration of the particular issue
23  that was thought to be involved in the
24  dispute, so that the issue was, as it was
25  in First Options, you know, who is going

Page 238

```
1              Proceedings
2   to decide the arbitrability issue.
3        And the Court, the Second Circuit
4   said, well, First Options tells us that
5   you can have an agreement that that's
6   going to be decided by the panel.  But I
7   don't read that as covering our case or
8   the kind of Sphere Drake kind of situation
9   where the challenge is the agreement was
10  void.
11       So, it's a fine point.
12       Unfortunately, it seems to me it is
13  the absolute crucial point here.  So I am
14  interested in that point.
15       And let me ask, I only want to put
16  out on the table the other problem, and
17  that is:  What are we to do with the
18  decision, both at the first instance trial
19  and on appeal by the Ukrainian courts,
20  that the agreement is null and void,
21  including the arbitration agreement?
22       Putting it bluntly, are we just to
23  thumb our nose at that and proceed?  How
24  do we deal with that?
25       MR. SILLS:  I wouldn't have put it
```

Page 239

```
1              Proceedings
2   quite that bluntly but the answer is, yes,
3   I would ignore it.
4        It is a collusive, meaningless
5   decision.  That is the argument we made
6   last time.  Having now seen the record in
7   this case, which we saw for the first time
8   on Wednesday, despite -- which we saw for
9   the first time on Wednesday.
10       ARBITRATOR JENTES:  So we should find
11  that it was a collusive decision, and what
12  is the evidence that we have that it is a
13  collusive decision?
14       MR. SILLS:  Well, I think the best
15  evidence is that this was a case brought
16  by Storm -- I'm sorry, against Storm by
17  its own corporate parent; that Storm put
18  up no defense, other than to send a layman
19  who said there is an arbitration
20  proceeding of some kind, and that to this
21  day no one seems to be able tell us what,
22  if any, evidence was presented, nor for
23  that matter can anyone tell us what
24  actually happened.
25       CHAIRMAN FEINBERG:  And with no
```

Page 240

```
1              Proceedings
2   notice to you.
3        MR. SILLS:  And with no notice to us,
4   not only of the commencement of the case,
5   of the supposed first judgment and of this
6   appeal.  We weren't parties.  We are not
7   bound, we, Telenor, are not bound by its
8   common currency.  We are not, cannot be
9   bound by a decision where we weren't
10  parties.
11       The notion that we should in effect
12  honor the violation of the agreement by
13  intervening at the second appellate stage
14  in Ukraine, and be stuck with the record
15  the that Mr. Kirilenko was kind enough to
16  make on our behalf strikes me as absurd.
17       So, I wouldn't say to thumb our
18  noses, because I don't think Ukrainian or
19  any other court deserves that, but I would
20  ignore it.
21       I think it's a fact of no juridical
22  jurisdiction or significance.  It's sort
23  of interesting, I think it teaches us
24  something about the course of Ukrainian
25  justice, but I don't think it stands for
```

Page 241

```
1              Proceedings
2   anything.
3        At a minimum, it hardly forecloses
4   us.  It's not res judicata.  We are not
5   collaterally estopped.  We weren't
6   parties.  We weren't made parties.  There
7   was clearly an intentional decision not to
8   make us parties, although we are the only
9   real party in interest.
10       It's between a corporate parent and
11  its direct subsidiary.  It wasn't
12  defended.  It was prosecuted by a regular
13  attorney for Storm, Mr. Marchenko.  His
14  biography and his law firm's Web site are
15  available online.  He is a lawyer.
16       Although Storm seems perfectly
17  capable of hiring lawyers, they chose to
18  send a layman.  I think it's safe to say
19  he didn't do a very good job.  It sort of
20  illustrates how right Justice Black was
21  about needing the guiding hand of counsel.
22  I don't know what more I can say about it.
23  It strikes us, it strikes me as almost
24  absurd.
25       And the notion that that case,
```

Page 242

```
1           Proceedings
2    brought by Storm against itself, should
3    somehow determine the course of these
4    proceedings, when the parties agreed that
5    this is where they would be conducted,
6    strikes me as running in reverse in
7    effect.
8        I mean, I -- as to your other
9    question, I think -- I don't mean to say
10   this case is the be all and end all.  And
11   we would be prepared to brief this.  It
12   seems to me it is a pure question of law.
13   It turns on the meaning of arbitrability.
14   And I think the way in which First Options
15   has been understood in the legal community
16   is that the parties can agree to confer on
17   the arbitrable tribunal as much or as
18   little jurisdiction as they can because
19   it's a matter of contract.
20       ARBITRATOR JENTES:  But it's only if
21   there is a contract; that is the problem
22   that I have.
23       MR. SILLS:  I don't think that's
24   exactly right, Mr. Jentes, with all
25   respect.  Because by creating a strict
```

Page 243

```
1           Proceedings
2    condition of severability under the
3    Uncitral rules, by saying, in effect, the
4    parties with one signature signed two
5    separate agreements -- and that's what I
6    think Article 21.2 says -- you would have
7    to show that the arbitration agreement,
8    that second, separate and separable
9    agreement is, itself, invalid.  They can't
10   show that.
11       No one has claimed that Mr. Nilov's
12   signature isn't Mr. Nilov's signature, and
13   as the general director of that company,
14   he could sign a separate agreement to
15   arbitrate.  So, I guess imagine
16   hypothetically that, simply as a drafting
17   matter, we have signed the shareholders'
18   agreement, and at the same time there had
19   been a two-page agreement called
20   arbitration agreement, and Mr. Nilov put
21   his signature and the company stamp on
22   that, and it provided exactly what is
23   provided in Article 12 of the
24   shareholders' agreement, and they came in
25   and said the shareholders' agreement, all
```

Page 244

```
1           Proceedings
2    these provisions about corporate
3    governance and changing the chart and the
4    IPO and everything else, it's all invalid.
5    Nilov didn't have permission and we told
6    you he didn't have permission.  It's a
7    nullable.
8        We would then invoke that second
9    agreement and say you have to come
10   arbitrate in New York before three
11   arbitrators as we agreed in a separate
12   arbitration agreement.
13       I don't think anyone would contend
14   that the fact that they were challenging
15   the substantive provisions of that first
16   agreement would some invalidate the second
17   agreement.  That is the exact effect of
18   incorporating the Uncitral rules into the
19   contract.
20       And what that case stands for, and
21   the reason I distributed it, is that when
22   you incorporate arbitration rules into a
23   contract, it is as if you had set them out
24   verbatim, as if there had been a separate,
25   initialed section there, and the
```

Page 245

```
1           Proceedings
2    arbitration clause survives under the
3    express terms that the parties agreed.
4        Would it be common under, say, a
5    standard AAA clause?  No.  But this is not
6    that.
7        And parties went to great length here
8    to take this case away from the courts, to
9    take the case, any possible dispute into
10   New York, and that's what they did.
11       And I think the fact that they did it
12   in a shorthand way, by incorporating the
13   Uncitral rules instead of having a second
14   agreement executed is legally meaningless.
15       It's Article 21.2 of the Uncitral
16   rules that govern here, and they are as
17   clear as could be, that this tribunal has
18   the power to rule on whether or not the
19   contract under which its jurisdiction is
20   invoked exists or is valid or is duly
21   authorized.
22       You know, I put to one side the fact
23   that after -- this case was brought in
24   February, and we have still haven't seen a
25   shred of evidence, other than the Alperin
```

Page 246

```
1            Proceedings
2   case, that suggests there is anything
3   wrong with this contract.
4       But I put that to one side, because
5   under Sphere Drake you have got to make a
6   preliminary showing that would be enough
7   to defeat a motion for summary judgment to
8   get a trial.
9       Well, this is that trial, we have had
10  it and I think the evidence is absolutely
11  clear that this contract was negotiated
12  between serious commercial parties, it was
13  agreed in 2002 that there would be a
14  three-day trigger, that as soon as Alpha
15  succeeded in buying the Omega shares,
16  leaving the only two shareholders, the
17  parties had the whole thing all arranged.
18      It was ready for a closing and it
19  wasn't some agreement to agree.  It said
20  three days after you buy the Omega shares,
21  we will cancel the 1998 agreement and we
22  will sign the new shareholders' agreement.
23      Then they came to us and asked for an
24  extension.  We gave it to them.
25      They came to us and suggested adding
```

Page 247

```
1            Proceedings
2   these termination provisions, and I
3   suppose in yet another good example of the
4   truism that no good deed goes unpunished,
5   we agreed, we negotiated.
6       The contract was changed, to the
7   extent it was changed, at their instance.
8   And it seems to me now that for Storm to
9   come before this tribunal and say that
10  Telenor, having acceded to their request,
11  their importuning really because it was
12  over Telenor's objection, that we add one
13  term to the contract which our witness
14  said he didn't view as a matter of
15  business significance, that they should
16  now say ah-ha, you see, we needed a second
17  authorization.
18      We didn't get it, although we told
19  you it was authorized, and then we lived
20  under the contract for a year, and we
21  didn't provide any kind of notice, it is
22  absurd.
23      And if you go way back to the
24  beginning, to 2002, and to Mr. Hansen's
25  affidavit, without Telenor's consent,
```

Page 248

```
1            Proceedings
2   Storm and Alpha could not have bought up
3   to 40 percent of the company.  And as a
4   matter of Ukrainian law, once you cross
5   that 40 percent threshold, you have the
6   power to prevent a quorum from occurring,
7   you have the power to block corporate
8   action.
9       Below that, you are a locked in
10  minority investor.
11      We agreed, Telenor agreed to let them
12  invest up to the 43.5 percent that they
13  currently hold, in reliance on their
14  promise to enter into the shareholders'
15  agreement.  And because they couldn't
16  enter into the shareholders' agreement,
17  because they were having trouble buying
18  out Omega, we entered into a voting
19  agreement.
20      The substantive terms of that
21  agreement are the same as the substantive
22  terms of the shareholders' agreement,
23  except for the clause that they asked for.
24      And that voting agreement, which was
25  purportedly invalidated by the Ukrainian
```

Page 249

```
1            Proceedings
2   court, there can't be any question about.
3   They had a unanimous written consent and
4   then they had a meeting, and then they
5   executed it, and put their stamp and seal
6   on it.
7       But, nonetheless, we hear that
8   Mr. Nilov wasn't authorized to execute
9   that either, which I think tells you
10  something about the quality of the defense
11  that was put on in that Ukrainian case.
12      It seems to me, this is a case that's
13  been going on far too long on very
14  preliminary questions.  The parties agreed
15  to have this dispute here.  They are in
16  grotesque violation of the substantive
17  provisions of this agreement.  They don't
18  come to shareholder meetings.  They don't
19  come to board of directors meetings.
20      It is a having a serious deleterious
21  effect on the company, because corporate
22  governance requires that shareholder and
23  directors meetings be held.  They are
24  competing with the company and at the same
25  time they are waging war on their own
```

Page 250

```
 1              Proceedings
 2   agreement in the Ukrainian courts.  And it
 3   seems to me it is time.
 4      This is at least their second effort
 5   and their third theory in an effort to get
 6   out from under the agreement they signed
 7   and it's time to move on to the substance
 8   of the this dispute.
 9      CHAIRMAN FEINBERG:  Thank you.
10      ARBITRATOR JENTES:  Let me ask this.
11      How long did it take you to get the
12   reversal of the December order?  How fast
13   did you move then?
14      MR. SILLS:  It was reversed in June,
15   at the end of June, June 27th.  I believe
16   it was a matter of a month or two from the
17   time the application was made.
18      ARBITRATOR JENTES:  And did you move
19   immediately after the December order?
20      MR. SILLS:  If you will bear with me
21   one second.
22      ARBITRATOR JENTES:  Sure.  Just
23   generally, how long did that take?
24      MR. SILLS:  It was filed, I think, in
25   the beginning of June based on another
```

Page 251

```
 1              Proceedings
 2   appellate decision that cast doubt on
 3   the -- it was, that was the new fact.
 4      So, it wasn't an immediate motion for
 5   rehearing as you might see in a federal
 6   court of appeals?
 7      ARBITRATOR CRAIG:  It was five months
 8   after.
 9      ARBITRATOR JENTES:  You got, I take
10   it, before the Cascais court within a
11   couple of weeks then?
12      MR. SILLS:  I believe that's right.
13      ARBITRATOR JENTES:  Sorry.
14      You moved to set aside the December
15   order five months after the December order
16   had been entered?
17      MR. SILLS:  I believe that's right.
18      And then Alpha immediately sought an
19   appeal.  They had gotten their appeal
20   accepted by the supreme court and some got
21   an order suspending the June 27th order.
22      ARBITRATOR JENTES:  I have another
23   question.  I hope I don't get too far
24   afield.
25      Are you up on the other Sphere Drake
```

Page 252

```
 1              Proceedings
 2   case in the Seventh Circuit?
 3      MR. SILLS:  I know the case.  I'm not
 4   sure -- I know the case.
 5      ARBITRATOR JENTES:  Well, the only
 6   reason --
 7      MR. SILLS:  Judge Easterbrook's case.
 8      ARBITRATOR JENTES:  I suspect that we
 9   are going to hear about it, because it's
10   fairly explicit on who has the authority
11   and Judge Easterbrook says as follows.  I
12   am at page four of the reprint, if you
13   have got it.
14      I will read you the language and then
15   I will give you it.
16      It says, "Many appellate courts have
17   held that the judiciary, rather than an
18   arbitrator, decide whether a contract came
19   into being, and then Judge Easterbrook
20   cites three different cases from the
21   Courts of the Third, the Eighth and the
22   Ninth Circuit."
23      And he says, most of these decisions
24   involve the same question as our case,
25   whether a dispute about an agent's
```

Page 253

```
 1              Proceedings
 2   authority to bind the principle to the
 3   contract is arbitrable.  Every appellate
 4   court that has addressed this question has
 5   answered, "No, unless...".
 6      The quote, unless, end of quote,
 7   clause reflects the fact that parties may
 8   agree separately to arbitrate disputes
 9   about whether they have agreed to the
10   contract's substantive promises, and then
11   he cites to First Option.
12      Then he goes on:  The approach of
13   Sandvik, that is the case from the Third
14   Circuit, and its predecessors is sound for
15   a person who has not consented or
16   authorized an agent to do so on his behalf
17   can't be packed off to a private forum.
18      Courts have jurisdiction to determine
19   their own jurisdiction, not only out of
20   necessity, (how else would jurisdictional
21   disputes be resolved?), but also because
22   their authority depends on statutes rather
23   than the parties' permission.
24      Arbitrators lack a comparable
25   authority to determine their own authority
```

Page 254

| | Proceedings |
|---|---|
| 1 | Proceedings |
| 2 | because there is a non-circular |
| 3 | alternative, (the judiciary), and because |
| 4 | the parties do control the existence and |
| 5 | limitations of an arbitrator's power.  No |
| 6 | contract, no power. |
| 7 | MR. SILLS:  I couldn't -- not that |
| 8 | any intelligent lawyer would disagree with |
| 9 | Judge Easterbrook, but -- |
| 10 | CHAIRMAN FEINBERG:  You would be |
| 11 | surprised. |
| 12 | MR. SILLS:  I tried, and it's a |
| 13 | losing fight. |
| 14 | I think that's a perfectly accurate |
| 15 | statement of the law, and I think the |
| 16 | language that's directly relevant here is |
| 17 | the unless that you read. |
| 18 | ARBITRATOR JENTES:  So we are back to |
| 19 | severability. |
| 20 | MR. SILLS:  "Unless" reflects that |
| 21 | fact that parties may agree separately to |
| 22 | arbitrate disputes about whether they have |
| 23 | agreed to the contract's substantive |
| 24 | promises, citing First Options. |
| 25 | And I think that is the way in which |

Page 255

| | Proceedings |
|---|---|
| 1 | Proceedings |
| 2 | First Options is read in every court of |
| 3 | appeals and so far as I know in every |
| 4 | state court, because they are, after all, |
| 5 | bound to the FAA as well. |
| 6 | That's what the parties did here. |
| 7 | That's the express and exact language of |
| 8 | Article 21 of the Uncitral rules.  And the |
| 9 | Second Circuit case, Judge Raggi's case, |
| 10 | makes it absolutely clear that by |
| 11 | referring to the rules, they are set out |
| 12 | verbatim in the contract, so that if this |
| 13 | language from Article 21.2 were set out |
| 14 | word for word as part of Article 28 -- I'm |
| 15 | sorry, part of Article 12 in the |
| 16 | shareholders' agreement, there wouldn't be |
| 17 | much of a discussion because could the |
| 18 | parties separately agree to arbitrate? |
| 19 | Yes.  And Judge Easterbrook says they |
| 20 | could. |
| 21 | Did they?  Yes, they did. |
| 22 | How did they do it?  They did it by |
| 23 | incorporating these rules by reference. |
| 24 | That's what these rules say, and they |
| 25 | expressly say this tribunal shall have the |

Page 256

| | Proceedings |
|---|---|
| 1 | Proceedings |
| 2 | power to determine the existence or the |
| 3 | validity of the contract of which an |
| 4 | arbitration clause forms a part for the |
| 5 | purposes of Article 21 of the Uncitral |
| 6 | Rules, of course.  An arbitration clause |
| 7 | which forms part of a contract and which |
| 8 | provides for arbitration under these |
| 9 | rules, which this one does, shall be |
| 10 | treated as an agreement independent of the |
| 11 | other terms of the contract. |
| 12 | That meets the conditions set by |
| 13 | Judge Easterbrook in that case.  I think |
| 14 | his summary of the law is, not |
| 15 | surprisingly, perfectly accurate, and we |
| 16 | come squarely within its terms. |
| 17 | ARBITRATOR JENTES:  Okay. |
| 18 | CHAIRMAN FEINBERG:  Panelists, any |
| 19 | other questions? |
| 20 | Pieter, do you have any rebuttal? |
| 21 | MR. VAN TOL:  I do.  But may I take a |
| 22 | quick five-minute break? |
| 23 | CHAIRMAN FEINBERG:  Let's take a |
| 24 | 10-minute break.  Then we will hear |
| 25 | rebuttal. |

Page 257

| | Proceedings |
|---|---|
| 1 | Proceedings |
| 2 | MR. VAN TOL:  Yes, brief. |
| 3 | (Recess taken.) |
| 4 | CHAIRMAN FEINBERG:  Let's ask, |
| 5 | Pieter, if he had any rebuttal, I will |
| 6 | exercise the prerogative of the Chair now |
| 7 | and keep any rebuttal or cross rebuttal or |
| 8 | re-rebuttal to a minimum.  So, go ahead, |
| 9 | Pieter. |
| 10 | MR. VAN TOL:  Just returning to the |
| 11 | jurisdictional point quickly, these are |
| 12 | great issues to kick around, but I think |
| 13 | one way to harmonize the cases is to |
| 14 | recognize that we have never challenged |
| 15 | the tribunal's jurisdiction to determine |
| 16 | its jurisdiction. |
| 17 | That's what's going on in these |
| 18 | clauses.  You shall have the power to |
| 19 | determine jurisdiction, but then what |
| 20 | happens is Sphere Drake kicks in. |
| 21 | Says where, in a case where you are |
| 22 | determining your jurisdiction, there is an |
| 23 | issue of contract formation, the person |
| 24 | opposing arbitration has to come up with |
| 25 | some evidence and, assuming they do, they |

Page 258

```
 1            Proceedings
 2  get their trial, their day in court.
 3  They're easily harmonized provisions.
 4      And to that extent, that's why we are
 5  here and that's why we are not in a court
 6  right now.
 7      CHAIRMAN FEINBERG:  Let me ask a very
 8  important question then for me.
 9      You have just said on the record that
10  you are not here challenging this
11  tribunal's ability to determine
12  jurisdiction.
13      MR. VAN TOL:  Correct.
14      CHAIRMAN FEINBERG:  But under the
15  case law, your position is the
16  arbitration -- the arbitrators have no
17  jurisdiction.
18      MR. VAN TOL:  Correct.  And it's
19  actually -- I'm sorry.  Go ahead.
20      CHAIRMAN FEINBERG:  We have heard
21  from Bob that if we were to rule that we
22  have no jurisdiction, I think Bob says
23  Telenor will run into the U.S. District
24  Court.
25      I take it from what you have just
```

Page 259

```
 1            Proceedings
 2  said, that if we were to rule that we do
 3  have jurisdiction, since you are not
 4  challenging our ability to rule in that
 5  regard, are you prepared to live with our
 6  decision?
 7      MR. VAN TOL:  No, for this reason.
 8      I am saying you have the power to
 9  determine your jurisdiction.  In making
10  that determination, you are bound by what
11  happened in the Ukraine.  That's the
12  distinction with the cases that Mr. Sills
13  has been talking about.
14      He hasn't shown you a case where
15  there was a determination by a court that
16  there was no contract and where the
17  severability idea was tossed out the
18  window.
19      CHAIRMAN FEINBERG:  I just want to
20  make sure I understand what you are
21  saying.
22      Now, you are saying on the record
23  that we are bound by the Ukraine, so
24  forget the law in the Second Circuit.  I
25  take it if we were to find that you have
```

Page 260

```
 1            Proceedings
 2  not carried your burden under case law,
 3  and we will exercise jurisdiction by
 4  meeting case law requirements, are you
 5  then saying since there are Ukraine
 6  decisions, it doesn't matter how you rule
 7  as a tribunal.
 8      We rely on those Ukrainian
 9  discussions and, therefore, you cannot
10  exercise a decision on the jurisdiction
11  other than consistent with Ukrainian case
12  law.
13      MR. VAN TOL:  That's half of it.
14      The other half is we start at Sphere
15  Drake.  We say you have the power to
16  determine your jurisdiction, whether you
17  have jurisdiction; that's informed by
18  Sphere Drake.
19      We pass the sum evidence test and it
20  has to be decided by a court because of
21  the Ukraine, that's one.
22      Assuming, we get beyond that and you
23  say no, no, we want to decide whether or
24  not there is jurisdiction.  It's our
25  position that your hands are tied because
```

Page 261

```
 1            Proceedings
 2  you have determined that New York law
 3  applies to these procedural matters.
 4      A New York court sitting as you do
 5  would say I have got a Ukrainian judgment.
 6  I'm allowed to ignore that judgment under
 7  three sets of circumstances: Procedural
 8  irregularly, due process problems, that's
 9  one; second, one of the parties in that
10  action, there is no personal jurisdiction
11  or there is no subject matter
12  jurisdiction; or, three, there is a public
13  policy reason for us to ignore it.
14      None of that is here.  So, you run
15  the risk of a manifest disregard of the
16  law if you don't follow it.
17      CHAIRMAN FEINBERG:  If we do that
18  what is Storm's next step?
19      MR. SILLS:  If you do not follow the
20  Ukrainian court, then we would have to go
21  to a U.S. court, whatever one has
22  competent jurisdiction, and say you have
23  manifestly disregarded regarded the law.
24      CHAIRMAN FEINBERG:  So if I
25  understand you correctly, if we rule for
```

66

Page 262

```
 1          Proceedings
 2   Telenor and find jurisdiction to
 3   arbitrate, you are going to the U.S.
 4   District Court or you are going to a
 5   federal court?
 6        MR. VAN TOL:  It depends on what you
 7   rule.  If you rule simply that you have
 8   jurisdiction to determine the issue of
 9   contract formation and for some reason you
10   want to hear more about what happened in
11   the Ukraine to satisfy yourself that those
12   three things I have identified aren't in
13   play, then no, we will await your
14   decision.
15        We said earlier, when we say you are
16   allowed to apply Ukraine law, we mean it
17   literally.  We want you to take the law
18   that has been determined by the Ukraine
19   and apply it here and say sorry, no
20   contract.
21        CHAIRMAN FEINBERG:  If we instead
22   rule that, on this record, we rule in
23   favor of exercising jurisdiction,
24   notwithstanding your argument about
25   Ukrainian courts, then you plan to go into
```

Page 263

```
 1          Proceedings
 2   federal court?
 3        MR. VAN TOL:  That's correct.
 4        ARBITRATOR JENTES:  What, exactly, do
 5   you mean, we have jurisdiction?
 6        MR. VAN TOL:  It's within your power
 7   under the Uncitral rules.  You do have the
 8   power to determine whether or not this
 9   case should go forward.
10        In other words, you have the power to
11   determine whether or not there was a
12   contract.  But that's informed by the
13   Sphere Drake standard which says, ah, but
14   if the person in my shoes opposing that
15   says I have got evidence that no contract
16   exists and it passes the sum evidence
17   test, then you have got to go to court.
18        That's the only way to, that's the
19   only way to reconcile these cases,
20   otherwise they are completely
21   irreconcilable.
22        As I said earlier, we haven't seen a
23   case from Mr. Sills where there is an
24   earlier judicial determination that there
25   is no contract and a U.S. court said the
```

Page 264

```
 1          Proceedings
 2   panel was completely right in going
 3   forward.
 4        Especially here where the Ukraine
 5   court went to the length to not only void
 6   the contract but to void the arbitration
 7   clause, effectively saying Nilov didn't
 8   have the authority to enter into the
 9   arbitration clause.
10        So, it's not like Mr. Sills' example
11   where we had here is your contract.  Here
12   is the separate agreement.  You don't have
13   authority for one, you have authority for
14   the other.  He had authority for neither.
15        ARBITRATOR JENTES:  If we have
16   jurisdiction to decide that we should go
17   forward, I think that's what you said, can
18   we decide that the Ukrainian courts did
19   not have a fully developed record and,
20   therefore, we are not going to follow that
21   decision?
22        MR. VAN TOL:  I have never seen a
23   case allowing for non-recognition of a
24   judgment on those grounds.  I have seen
25   cases, and we submit in our brief, I have
```

Page 265

```
 1          Proceedings
 2   seen cases lamenting for the judicial
 3   system is in another country saying it
 4   didn't look like it was a great trial, but
 5   then they say our hands are tied.  You
 6   have to follow what happened in the
 7   Ukraine.
 8        And I was struck by Mr. Sills about
 9   how poor the defense was for Mr. Klymenko
10   because one of the defenses he raised is
11   the one that Mr. Sills is raising, that it
12   should be determined by an arbitration
13   panel.  That is highly ironic.
14        And he is misrepresenting the record
15   when he continually says that the fact
16   that there was a contract in Ukrainian was
17   enough.
18        That is not enough.  The Ukraine
19   court said you need a contract in Ukraine
20   filed with the Ukrainian authorities so
21   that someone can see that there is a
22   limitation on the charter.
23        So, it's not true and there is no
24   evidence whatsoever for Mr. Sills that
25   this was at all collusive.  As I said at
```

Page 266

1    Proceedings
2    the first hearing, I have never heard of
3    collusion involving an appeal. Documents
4    were put before the Ukrainian court.
5    Absent some aberration in the procedure or
6    something else, you have to follow it.
7       And the last point I would like to
8    make, because I am cognizant of the late
9    hour --
10      ARBITRATOR CRAIG: What documents
11   were presented to the Ukrainian court?
12      MR. VAN TOL: The voting agreement
13   and the shareholders' agreement at a
14   minimum.
15      ARBITRATOR CRAIG: Anything else?
16      MR. VAN TOL: Not that I'm aware of
17   in terms of the documents. Again, I don't
18   know what was said by the parties or
19   handed up to the court, only what is in
20   the Court file.
21      Mr. Sills still hasn't given you an
22   answer to your question, which was why
23   don't you go to the Ukraine?
24      This clause, the Uncitral clause,
25   does not prohibit Telenor Mobile from

Page 267

1    Proceedings
2    going to the Ukrainian court. It says you
3    may determine your jurisdiction. It does
4    not stop him from trying to go to the
5    Ukrainian court and getting a resolution
6    of this matter.
7       CHAIRMAN FEINBERG: You may be right.
8    He's given us an answer. I'm not sure you
9    like it, but there is an answer on the
10   record.
11      MR. VAN TOL: If the answer is I'm
12   nervous about the Ukrainian court system,
13   that doesn't cut it. I mean, it's got to
14   protect his rights by going and making
15   sure that there is an adequate record in
16   the Ukraine.
17      And as I said in the main part of my
18   remarks, if a client came to me, I would
19   hope anyone would advise any client of
20   this. One, I have got a judgment against
21   me. The last thing I would tell them is
22   ignore it.
23      CHAIRMAN FEINBERG: Thank you.
24      Mr. Sills, do you have one or two
25   rebuttal points?

Page 268

1    Proceedings
2       MR. SILLS: Yes, I do.
3       Let me pick up on that very last
4    comment. There is no judgment against
5    Telenor. Telenor wasn't a party. The
6    case was concealed from Telenor. I don't
7    want to beat the horse any more about the
8    quality of Ukrainian justice or the
9    quality of this case or the apparent
10   inability of Storm to describe its own
11   Ukrainian litigation. I think the record
12   is fully developed on that.
13      As far as the interpretation of
14   Sphere Drake, Sphere Drake sets out a
15   party opposing arbitration had to make
16   some sort of evidentiary showing that
17   there is a problem with the arbitration
18   agreement and, if so, it's entitled to
19   trial.
20      If there is jurisdiction to hear
21   question one, then there is jurisdiction
22   to hear question two and we have heard it.
23      Finally, on this question of
24   registration in Ukraine, I think there is
25   dispositive -- this case is being heard by

Page 269

1    Proceedings
2    agreement of parties under New York law
3    without reference to any choice of law
4    doctrines.
5       And here the case that is precisely
6    on point is the decision of the New York
7    Court of Appeals in the Indosuez case,
8    which was annexed to our previous papers.
9    In Indosuez, the fact, the claim was
10   raised by a Russian party to a contract
11   that because, as allegedly required by
12   Russian law at that time, the accountant
13   general of the company had to sign, and no
14   one else could sign, that the contract was
15   invalid, a lack of authorization argument
16   with that.
17      And what the New York Court of
18   Appeals held was that, as a matter of New
19   York law, he had apparent authority, and
20   whether or not he had actual authority
21   under this supposed Russian legal
22   principle was irrelevant. And the same is
23   true here.
24      We don't require that contracts be
25   filed in Ukraine or elsewhere in New York.

Page 270

```
 1          Proceedings
 2  This is a perfectly valid, negotiated,
 3  executed contract with all the usual
 4  indicia of authority and authenticity.
 5  And the fact -- and I don't know that, in
 6  fact, it had to be filed in Ukraine.
 7      And the only evidence of that is this
 8  self, you know, this self-generated case
 9  that we have heard so much about.  But
10  even if that were true, it would be
11  irrelevant here because Indosuez is
12  dispositive on that point.  It's directly
13  on point, except that there the claim was
14  that the accountant general had to sign,
15  here the claim is it had to be filed with
16  some official in Kiev.  I think it's time
17  to get on to the merits.
18      CHAIRMAN FEINBERG:  Thank you all
19  very, very much.
20      The panel -- stick around.  The panel
21  will, I think, get together next door, and
22  decide how we are going to go forward,
23  what we are going to say.  Just stand by.
24      Very well done.
25      (Recess.)
```

Page 271

```
 1          Proceedings
 2      CHAIRMAN FEINBERG:  The panel has
 3  caucused.  I will ask my fellow
 4  arbitrators to comment if I misstate this
 5  because it is all oral, I have just
 6  scribbled down some notes.
 7      First, the parties are reminded,
 8  particularly Storm, that they have until
 9  5 p.m. on August 31st to contact the panel
10  and Telenor with information concerning
11  the September 5th availability of either
12  of the two witnesses, Wack or Nilov.
13      Just a reminder, that is not news.
14  That we want to hear from Storm whether
15  those two witnesses plan to attend the
16  September 5th hearing.
17      ARBITRATOR CRAIG:  Or file
18  affidavits.
19      CHAIRMAN FEINBERG:  Or file
20  affidavits.
21      If they do either, we will give
22  Telenor until 5 p.m. on September 2nd to
23  respond, either with a letter, witnesses
24  that it plans to call on September 5th in
25  response to those witnesses, affidavits,
```

Page 272

```
 1          Proceedings
 2  whatever.
 3      MR. SILLS:  Mr. Feinberg, I don't
 4  mean to interrupt, but I have an
 5  unbreakable --
 6      CHAIRMAN FEINBERG:  Whenever you say
 7  you don't mean to interrupt, you go right
 8  ahead --
 9      MR. SILLS:  You figured me out.
10  Mr. Feinberg, may I interrupt.
11      CHAIRMAN FEINBERG:  Go ahead.
12      MR. SILLS:  Mr. Feinberg, I have an
13  unbreakable personal commitment on
14  September 1st and September 2nd.  My
15  18-year-old son is going to college.
16      CHAIRMAN FEINBERG:  Depending on
17  where he's going -- off the record
18      MR. SILLS:  So if -- and it is Labor
19  Day weekend, those, September 2nd is a
20  difficult --
21      CHAIRMAN FEINBERG:  Wait a minute.
22  September 2nd is the Saturday, is that
23  right?
24      MR. SILLS:  I believe that's right.
25      CHAIRMAN FEINBERG:  We are meeting on
```

Page 273

```
 1          Proceedings
 2  5th.  What do you want?
 3      ARBITRATOR JENTES:  Could I suggest,
 4  can we move the Storm thing forward to a
 5  date a little bit earlier in August?
 6      MR. VAN TOL:  No, that's going to be
 7  problematic.  We were going to be
 8  stretched to make August 31st just because
 9  of vacations.
10      CHAIRMAN FEINBERG:  Well, what are
11  you proposing?
12      MR. SILLS:  Well, if they could, as
13  Mr. Jentes suggests, it's been a while,
14  either get it in earlier the week before
15  Labor Day, we will respond by the end of
16  that week or I know the 5th is reserved.
17      CHAIRMAN FEINBERG:  The 5th is
18  reserved.  We can't deal with the 5th.
19  The 4th won't help you, that is Labor Day.
20      MR. VAN TOL:  Can we move the 5th
21  back?
22      CHAIRMAN FEINBERG:  No.
23      MR. VAN TOL:  At all?
24      CHAIRMAN FEINBERG:  It will be too
25  difficult to schedule.
```

Page 274

```
 1         Proceedings
 2      MR. SILLS:  And over a holiday
 3   weekend, contact a witness.
 4      CHAIRMAN FEINBERG:  First of all, it
 5   may be moot.  Who knows.  All I can
 6   suggest, Bob, is we are all laboring under
 7   some real constraints here and,
 8   fortunately, here's my view, Orrick is a
 9   great big firm, great and big, and there
10   are other people, and hopefully you can
11   get us -- I mean, we will have to deal
12   with it.
13      MR. SILLS:  Well, under those
14   circumstances, and I am sure my colleagues
15   will not appreciate what I am about to
16   say, if they are going to take until the
17   31st, I frankly don't see why they need
18   that much time, could we have until the
19   4th.
20      CHAIRMAN FEINBERG:  Yes, but it
21   means, what about Bill's point?  Surely
22   you can move it back two days to the 29th
23   in order to accommodate Orrick and give
24   them until the 31st at five o'clock.  I
25   mean --
```

Page 275

```
 1         Proceedings
 2      MR. VAN TOL:  Well, I was actually --
 3   I had instructions from my client to try
 4   to get more time and I realize that is not
 5   going to happen, so I would be
 6   hard-pressed to go back and say less time,
 7   because, in particular, it's hard to get
 8   people in Russia during the last two weeks
 9   of August.
10      CHAIRMAN FEINBERG:  It's apparently
11   hard to get people in Russia any time.
12      MR. VAN TOL:  I will agree with that,
13   too.
14      CHAIRMAN FEINBERG:  I don't know what
15   else to say.
16      I really don't think it will be
17   productive to consider moving
18   September 5th.  That is a date that the
19   arbitrators have gone around and around on
20   and it's really a very -- window
21   September 5th, so I can only say that it's
22   August 31st, with a caveat, Pieter, that I
23   hope that you can notify the panel and the
24   other side by August 29th.
25      I mean, it's hard for me to believe
```

Page 276

```
 1         Proceedings
 2   that in those last 48 hours you are going
 3   to learn one thing or another.  So,
 4   hopefully, you will be able to notify the
 5   parties by August 29th so that Bob and
 6   Telenor can respond by the 31st rather
 7   than September 4th, which won't give
 8   anybody much time.  But in light of that,
 9   we will at least know that.
10      MR. VAN TOL:  Understood.
11      CHAIRMAN FEINBERG:  So, let me
12   continue then with the rest of the order.
13      By August 31st, will each side
14   provide the arbitrators with each side's
15   finding of fact concerning Storm's motion?
16      Both sides have done it orally,
17   frankly, in the course of the last four or
18   five hours, but will each side in writing,
19   in a memo not to exceed 25 pages, and my
20   view is brevity is a virtue, will each
21   side provide the arbitrators
22   simultaneously, exchanging whenever by
23   5 p.m. on the 31st, its proposed findings
24   of fact on Storm's motion?
25      Next, without in any way anticipating
```

Page 277

```
 1         Proceedings
 2   how the panel will rule, because the panel
 3   is undecided right now as to how to rule.
 4   Without in any way anticipating or sending
 5   any signal whatsoever, will the parties
 6   when we meet, if we meet on September 5th,
 7   provide hopefully a joint agreement on a
 8   prehearing schedule on the merits,
 9   including an end date for the hearing on
10   the merits.
11      Now, I want to emphasize don't read
12   anything into this on the jurisdictional
13   motion and how we are going to decide it.
14   The panel just feels that we want to, if
15   we decide to go forward, we want to be
16   ready, hopefully, with as much of a
17   consensual agreement on schedule as we can
18   possibly consensually agree upon.
19      And the parties have made it very
20   clear that based on our ruling, one or
21   both or somebody may be running into
22   federal court seeking a stay.  That may
23   be, but can we at least try and get
24   together with a prehearing schedule
25   consensual.
```

Page 278

Proceedings

1  And we have, the panel wants to
2  emphasize we are looking as a panel at a
3  prompt hearing.
4  So when the parties meet to try to
5  work out a prehearing schedule, the panel
6  wishes to emphasize promptness in terms of
7  getting to the merits of the dispute if
8  that is the way we so decide.
9  Have I left out anything?
10  ARBITRATOR JENTES: I would only
11  express my own views in this document that
12  we have asked for in the 25 pages, I think
13  you ought to give some consideration to
14  framing it as a partial award. It may not
15  be a format that the panel will end up
16  with, but I think we would appreciate
17  getting your thoughts on whether or not
18  that would be a possible format and then
19  what would be the support for the partial
20  award.
21  If it's not a partial award, then it
22  would be some kind of an order either
23  denying or granting the motion to dismiss
24  either way. We would be interested in how

Page 279

Proceedings

1  you would think of the procedural kind of
2  approach towards the ruling.
3  MR. VAN TOL: And picking up on that,
4  is it the tribunal's wish to see an
5  articulation of the legal standards as
6  well, or do you have enough law, do you
7  think, would you like us to encapsulate in
8  the planned award?
9  ARBITRATOR JENTES: Again, I'm
10  speaking for only myself, I think in 25
11  pages it ought to include a discussion of
12  the legal and evidentiary predicate for
13  any award or order that we would issue.
14  ARBITRATOR CRAIG: But since we are
15  talking format, and speaking for myself, I
16  would appreciate it if the proposed
17  finding of fact had a reference to the
18  exhibit or the documentation that supports
19  the finding so it's easy to refer back to
20  the materials that you have provided us.
21  And there is a traditional way for
22  preparing proposed findings of fact and
23  having discussions of the standards of law
24  that apply later on.

Page 280

Proceedings

1  MR. VAN TOL: Okay. Understood.
2  CHAIRMAN FEINBERG: Now, Storm
3  triggers a great deal of this. It is
4  entirely possible there will be no meeting
5  on September 5th. If Storm doesn't call
6  its two witnesses or advance any further
7  evidentiary proof and stands on the
8  record, then we have the findings of fact,
9  both sides have submitted that by
10  August 31st.
11  Robert can go to college without
12  worrying about September 2nd, and we will
13  not meet on September 5th, and instead the
14  panel will convene telephonically or in
15  person, and will render its decision
16  following the closing of the record.
17  So, September 5th keep open, but
18  Storm basically will decide whether or not
19  we are meeting on September 5th.
20  Anything else?
21  MR. SILLS: Mr. Feinberg, on the
22  first point, with Storm's insistence to
23  holding to that August 31st date, could we
24  ask for an indication at least if,

Page 281

Proceedings

1  understanding that it may not come to pass
2  by say the 29th as not as to actual
3  testimony but as to whether or not, and I
4  understand it's restricted to Mr. Nilov
5  and Mr. Wack, whether either or both of
6  those gentlemen will be providing evidence
7  in some way so that we can at least
8  prepare.
9  MR. VAN TOL: That was my intent,
10  that's how I took your order.
11  CHAIRMAN FEINBERG: The answer is
12  yes, yes.
13  Does anybody else, there are a lot of
14  people in this room and only a few have
15  said anything. Does anybody else, this is
16  your last opportunity before we adjourn.
17  Are we missing anything? Does
18  anybody not understand something? This
19  has been an extraordinary day for the
20  arbitrators listening to the very cogent
21  arguments and testimony.
22  ARBITRATOR CRAIG: Could I ask,
23  Mr. Sills, on behalf of Telenor, is
24  Telenor satisfied with the record in the

Page 282

1    Proceedings
2    event that Storm doesn't proffer any more
3    factual evidence, that you have had an
4    adequate opportunity to put your case on
5    in terms of evidence.
6    MR. SILLS: It's our position,
7    Mr. Craig, that both parties have had an
8    adequate opportunity and we certainly
9    think we have. So if they, as we hope
10   they will, elect not to present further
11   testimony on the 5th, we are not
12   going to be coming back to the panel
13   asking for permission to put in further
14   proof.
15   MR. VAN TOL: May I pick up on that,
16   so far we have been talking about Mr.
17   Wack and Mr. Nilov. What was always
18   before we received Telenor's submission
19   last Wednesday when we were quite
20   surprised to see extensive discussion of
21   negotiation around the voting agreement
22   and names of the other people.
23   If we are able to get forth witnesses
24   that we believe are going to be more
25   knowledgeable about those events, is it

Page 283

1    Proceedings
2    acceptable with the tribunal as long as we
3    provide notice that we provide evidence
4    from them instead of Mr. Nilov or
5    Mr. Wack.
6    CHAIRMAN FEINBERG: We will take that
7    under advisement.
8    MR. VAN TOL: I am merely checking, I
9    have no knowledge one way or the other
10   because we haven't had a chance to track
11   those individuals down.
12   ARBITRATOR CRAIG: We're looking
13   forward to the opportunity of asking you
14   the same question that I have just asked
15   Mr. Wills at some point.
16   Have you had an adequate opportunity
17   even though there has got to be a cutoff
18   at some point?
19   MR. SILLS: Is the proposal that's
20   just been made that some witness whose
21   identity we are now unaware might show up
22   in written form on the day before Labor
23   Day weekend and we would have until Labor
24   Day to pull together both a record about
25   that witness and any rebuttal?

Page 284

1    Proceedings
2    MR. VAN TOL: Well, Mr. Sills, that
3    is just what I did with your submission of
4    Wednesday.
5    CHAIRMAN FEINBERG: Excuse me, we
6    will take it under advisement. We
7    understand, Mr. Sills, you are not pleased
8    by that caveat.
9    On the other hand, we haven't granted
10   Pieter's request. We just said if that
11   actuality occurs, which Peter has
12   expressly said is purely hypothetical, we
13   will take it under advisement.
14   Anything else?
15   ARBITRATOR JENTES: When we adjourn
16   and go off the record, could we meet with
17   Bob and Pieter for a minute?
18   MR. SILLS: Of course.
19   ARBITRATOR JENTES: Off the record.
20   MR. VAN TOL: Absolutely.
21   CHAIRMAN FEINBERG: Also, will the
22   parties at some point fairly quickly let
23   the panel know where we will meet
24   September 5th, assuming we meet?
25   MR. VAN TOL: Do you want to keep

Page 285

1    Proceedings
2    ping-ponging?
3    MR. SILLS: Or sort of informal
4    agreement is that we will take turns
5    hosting, so I think it's Pieter's turn for
6    the 5th and subsequent hearing would be
7    here and so on.
8    MR. VAN TOL: The bar has been raised
9    a bit on the food.
10   CHAIRMAN FEINBERG: I am assuming
11   again, you will correct me after you
12   consult, we will begin at 9 a.m.
13   ARBITRATOR JENTES: Bear in mind
14   that this is right after the Labor Day
15   weekend.
16   MR. VAN TOL: Yes, understood.
17   ARBITRATOR JENTES: And that's why
18   the advance notice that Bob asked for is
19   really important for somebody like me
20   who's got to get into New York the night
21   before.
22   MR. VAN TOL: I agree, it will, the
23   last thing I want to do is inconvenience
24   Mr. Sills or anybody else. So I am
25   cognizant of that.

Page 286

```
1            Proceedings
2        CHAIRMAN FEINBERG:  This hearing is
3    adjourned and I thank, and the panel
4    thanks all participants.
5        (Time Noted:  4:15 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 287

```
1
2
3            C E R T I F I C A T I O N
4
5        I, BONNIE ATELLA PRUSZYNSKI, a
6    Registered Professional Reporter and Notary
7    Public, within and for the State of New York,
8    do hereby certify that I reported the
9    proceedings in the within-entitled matter, on
10   August 14, 2006, and that this is an accurate
11   transcription of these proceedings.
12        IN WITNESS WHEREOF, I have hereunto
13   set my hand this 22nd day of August, 2006.
14
15
16            BONNIE ATELLA PRUSZYNSKI
17
18
19
20
21
22
23
24
25
```

**A**

**AA (1)**
64:13
**AAA (1)**
245:5
**abandoned (1)**
21:13
**aberration (1)**
266:5
**abide (1)**
207:7
**ability (4)**
185:21 206:12 258:11
259:4
**able (15)**
14:16 16:6 17:14 18:9
29:19 47:24 72:20
100:14 102:12
110:5 153:18
173:21 239:21
276:4 282:23
**above-entitled (1)**
1:12
**absent (2)**
194:10 266:5
**absolute (1)**
238:13
**absolutely (5)**
27:18 143:4 246:10
255:10 284:20
**absurd (4)**
212:14 240:16 241:24
247:22
**acceded (1)**
247:10
**accept (3)**
65:4 118:8 228:5
**acceptable (1)**
283:2
**accepted (4)**
48:6 118:4 200:25
251:20
**accepting (2)**
115:10 120:11
**access (1)**
149:15
**accommodate (1)**
274:23
**account (1)**
188:22
**accountant (2)**
269:12 270:14
**accurate (3)**
194:23 254:14 256:15
287:10
**Acord (1)**
75:6
**acquainted (1)**

90:14
**acquire (2)**
78:4 167:14
**acquisition (9)**
100:8,10 116:22
126:16 127:6,10,19
145:4 147:7
**act (12)**
27:23 65:24 153:19
159:14 174:21,21
183:2 206:13
218:24 220:13
221:10 226:23
**acted (2)**
67:12,13
**acting (13)**
5:17 25:24 28:12
65:10,23 66:6 71:17
113:7 153:20,20
154:15 174:4
182:20
**action (16)**
67:18,21 186:13
196:22 197:8,10,16
197:23 198:3,6,9
200:4,7 226:11
248:8 261:10
**actions (1)**
160:9
**actively (1)**
33:7
**activities (1)**
191:13
**activity (1)**
147:13
**acts (1)**
25:11
**actual (22)**
25:14,19 27:2 28:6,17
47:7 137:20 141:23
142:2,16 144:22
146:10,11 162:25
199:9 210:23
228:18 234:19
235:4,13 269:20
281:3
**actuality (1)**
284:11
**ADAM (1)**
2:6
**add (4)**
9:5 25:3 178:5 247:12
**added (2)**
63:4,5
**adding (1)**
246:25
**addition (1)**
179:11
**additional (2)**

33:23 66:23
**address (6)**
50:5 55:24 80:5
201:17 234:17,25
253:4
**addresses (1)**
78:19
**addressing (2)**
60:7 208:14
**adduced (1)**
25:23
**adequate (5)**
215:19 267:15 282:4
282:8 283:16
**adhering (1)**
224:20
**adjourn (2)**
281:17 284:15
**adjourned (1)**
286:3
**adjudge (1)**
190:10
**administration (1)**
67:16
**Admitted (1)**
35:23
**adopted (3)**
171:19 172:15 204:21
**advance (3)**
140:12 280:7 285:18
**advice (2)**
97:3 132:8
**advise (2)**
158:22 267:19
**advised (1)**
25:23
**advisement (3)**
283:7 284:6,13
**advisor (13)**
54:25 55:3 64:7 91:19
97:3,7 105:22
111:13,23,25
113:13,24 122:9
**advisors (1)**
99:22
**aesthetic (1)**
54:12
**affair (1)**
150:12
**affidavit (25)**
26:21 34:15 76:22
77:6 78:18 93:25
98:19 143:10 144:5
144:16 176:25
177:3 179:12 180:8
181:8 184:3 189:9

190:24 191:9
194:13 233:18,21
234:14,24 247:25
**affidavits (5)**
6:12 179:21 271:18
271:20,25
**affiliate (1)**
38:7
**affiliates (1)**
47:21
**affiliation (1)**
4:12
**affirmations (1)**
155:20
**afield (1)**
251:24
**afraid (2)**
104:14 168:5
**afterward (2)**
71:19 82:19
**agencies (1)**
217:4
**agency (2)**
25:12 141:17
**agent (6)**
25:9,14,15 28:12
153:9 253:16
**agent's (1)**
252:25
**aggregate (1)**
56:12
**agree (28)**
43:3 48:19 51:9 82:15
87:12 116:17 117:2
134:20 161:7 162:2
162:2 164:12
203:20 217:13,14
217:15 219:19
221:8 222:6 228:5
242:16 246:19
253:8 254:21
255:18 275:12
277:18 285:22
**agreed (44)**
23:6,25 37:8,14,22
42:5 46:4 49:19
80:14 82:4 83:21
86:13 87:11 108:9
110:12 120:18
141:3,14 162:9
167:11,15 200:19
205:14 206:4,5
214:12 218:5
222:10,19,21
224:15 230:18
232:2,3 242:4
244:11 245:3
246:13 247:5
248:11,11 249:14

253:9 254:23
**agreeing (1)**
85:23 202:23 203:11
**agreement (370)**
10:12,13,14,15,16
11:3,4,5,7,13,16,17
11:18 14:8,12 16:21
18:22 19:13,14
20:10,10,11,12,17
20:19 22:9,17 32:20
33:3,4,12,15,16,19
33:20 34:7 35:3,7
35:11,14,16 36:18
36:20,25 37:4,9,10
38:10,14,17 39:8,12
39:14,16,16,18,22
39:23 40:4 41:20
42:4,6,7,13,16 43:2
44:5,8 45:13,16,17
45:19,23 46:5,6,6
46:14,15,16,21,23
47:4,5 49:2,9,19,20
49:22 50:4 51:11,14
51:20,24 52:8 57:24
58:6,11,23 59:13,14
59:15,18 62:18,22
64:21 65:8 66:3,7
66:11 67:19 68:5,9
68:16,22 69:16 70:2
70:24,25 71:9,14
72:14 73:9,12 76:9
80:13,21 81:6,21
82:4,6,22 83:21,22
84:5 85:6,15 86:12
86:17 87:4,24 88:6
88:7,9 90:12,18,23
91:3,24 95:14 96:15
97:17,21 98:3,4,11
98:12 100:7,9
101:22 102:3,10,13
102:17,21 103:17
103:18,22 105:8,9
105:17 106:17,24
108:3,10,11,20,24
108:25 109:6,13,14
109:19,23 110:3,12
110:16 111:8,12
112:2,24 114:3,7,10
114:13,15,18,20,21
115:5,13,20 116:15
116:19 117:12,17
117:22,23 120:11
120:16,20 121:3
122:5 123:7,15
124:12,17,21
125:19 126:3,4,14
128:11,19 131:4,6
131:10,12,18,20,23
132:4,11,12 133:17

135:7,10 144:25
145:14,22,23
146:24 147:23
149:2,6 154:15,20
154:21 155:15
160:6 161:2,13
162:6,18 163:7,9,10
163:20 164:4,5,8,20
165:5,12,12,16
166:2,3,9,10,12,24
166:25 167:2,7,13
168:15,15 169:2,5
171:14,15 172:3,6
172:10,24 173:5,13
173:14,16 174:13
176:3 186:14
188:10 189:2 193:9
193:10 195:12,14
195:23,24 200:13
200:23 202:10,20
203:8 207:7,11,21
209:24 210:9,24
211:2 212:12
214:13 217:25
218:2 219:7,7
221:23 223:7,14
227:12 229:12,14
232:15,25 236:17
237:20,21 238:5,9
238:20,21 240:12
243:7,9,14,18,19,20
243:24,25 244:9,12
244:16,17 245:14
246:19,21,22
248:15,16,19,21,22
248:24 249:17
250:2,6 255:16
256:10 264:12
266:12,13 268:18
269:2 277:7,17
282:21 285:4

**agreements (10)**
46:8 103:6 145:19,25
164:12 177:12
207:14 231:13,20
243:5

**ah (1)**
263:13

**ahead (12)**
24:20 40:7 101:8
112:16 159:22
217:2 236:14,15
257:8 258:19 272:8
272:11

**ah-ha (2)**
155:16 247:16

**albeit (1)**
208:14

**Aleksey (2)**

54:15,19

**Alfa (2)**
15:22 16:3

**alleged (1)**
211:8

**allegedly (2)**
69:21 269:11

**allotted (1)**
139:8

**allowed (4)**
27:3 154:12 261:6
262:16

**allowing (1)**
264:23

**Alperin (16)**
75:25 77:14 78:7,22
130:18 156:18
180:8 181:23
186:13 191:4
196:23 197:8,10
198:8 212:3 245:25

**Alperin's (1)**
180:9

**Alpha (47)**
12:3 15:22,23 38:5,7
40:10,24 41:11
55:11,18,19,24
56:11,13,16,24
60:19 65:23 68:20
69:16 70:10,21
72:19 75:5,7,20,23
76:12 77:2,14,17,23
79:24 80:5 85:10
89:4 101:25 119:19
120:4 154:7 170:20
205:17 230:13
231:12 246:14
248:2 251:18

**Alpha's (7)**
51:5,19 65:24 70:9,12
207:22 237:8

**alternative (2)**
166:6 254:3

**Altimo (5)**
69:14 75:14,16,19
76:3

**amend (2)**
57:23 236:16

**amended (1)**
58:7

**amendment (3)**
74:4 77:4 103:13

**amendments (13)**
52:7,17 78:20 83:11
85:13,21,23 86:15
86:20 108:16,19
112:4 133:16

**American (6)**
213:6 214:11 228:6

230:25 231:4,9

**amorphous (1)**
14:24

**amount (1)**
119:4

**amounts (1)**
86:6

**ample (1)**
216:7

**Andre (1)**
40:20

**Andrey (1)**
40:19

**annexed (2)**
25:8 269:8

**annexing (2)**
236:6,7

**announce (1)**
211:12

**answer (38)**
15:4 41:25 49:11,16
51:12 72:20 99:21
99:24 100:14
109:25 110:6 114:5
127:17 128:12
129:13,22 130:14
130:24 131:14
133:3 170:13
171:10 187:13,14
190:16 195:8
226:19 230:16
231:5,10,24 236:22
239:2 266:22 267:8
267:9,11 281:12

**answered (3)**
46:25 225:15 253:5

**answering (1)**
178:18

**answers (2)**
204:16 228:11

**anticipate (2)**
24:11 204:4

**anticipated (1)**
26:12

**anticipating (2)**
276:25 277:4

**anticipation (1)**
7:9

**anybody (8)**
81:13 183:13 198:3
276:8 281:14,16,19
285:24

**anymore (1)**
74:25

**anyway (1)**
140:3

**apart (1)**
177:19

**Apollo (1)**
221:5

**apologize (4)**
53:20 117:6 198:11
220:3

**apparent (15)**
25:15 28:13 137:19
137:21,24 141:3,24
142:21,22 143:23
151:22 160:2
235:14 268:9
269:19

**apparently (9)**
21:13 22:15 82:8
138:12 148:14
160:4 184:16
211:16 275:10

**appeal (2)**
132:5 180:16 181:21
194:9 212:23 213:2
213:6 238:19 240:6
251:19,19 266:3

**appeals (4)**
251:6 255:3 269:7,18

**appear (3)**
52:13 147:25 212:6

**appeared (2)**
54:9 181:24

**appears (9)**
44:24 61:9 63:17
101:4 172:20
201:15 210:5
218:22 233:20

**appellate (11)**
13:11,14,21 132:22
138:11 152:6
213:11 240:13
251:2 252:16 253:3

**appended (2)**
11:18 20:10

**application (4)**
23:15 186:18 200:8
250:17

**applies (3)**
141:12 147:9 261:3

**apply (6)**
141:18 153:4 175:15
262:16,19 279:25

**appreciate (6)**
4:8 49:17 135:20
274:15 278:17
279:17

**approach (4)**
7:25 21:14 253:12
279:3

**approached (1)**
221:19

**appropriate (6)**
8:8 22:25 24:2 44:21

190:24 207:9

**approval (8)**
127:11 161:9 171:13
171:25 172:14
173:11 174:19,20

**approve (1)**
172:24

**approved (5)**
21:21 66:17 68:3
171:23 173:6

**approximately (1)**
51:24

**April (15)**
66:21 67:5 78:4 79:5
132:3 184:16
186:20 189:13
190:21 191:16
194:18 197:7,17
198:4 211:11

**arbitrability (2)**
238:2 242:13

**arbitrable (4)**
208:7 222:8 242:17
253:3

**arbitral (5)**
202:2 204:23 218:12
226:23 230:15

**arbitrate (18)**
158:25 188:17 202:24
203:12 205:14
206:4,5 207:18
221:21 230:20
231:21 232:2
243:15 244:10
253:8 254:22
255:18 262:3

**arbitrated (6)**
189:4,25 218:4,7
221:25 224:16

**arbitration (99)**
1:2,2 12:19 33:25
129:5,16,17 132:10
150:22 153:7
164:19 165:13
167:2 168:17,21,25
169:5 170:3 181:9
185:14,17,23 186:2
186:14 187:16
188:10,25 189:16
189:24 190:6,9
191:12 192:13,19
192:21 193:7,15,22
198:7 200:3,6,7,10
200:16 201:8,22
202:5,7,9,12,15,20
203:6,7,17 204:18
204:19 206:7
207:25 210:5
215:22 217:13,15

218:11,24 220:13
221:10,11 222:13
222:15,16 223:8,8
224:5,14 225:25
226:23 228:9
230:19 231:16
232:4 237:22
238:21 239:19
243:7,20 244:12,22
245:2 256:4,6,8
257:24 258:16
264:6,9 265:12
268:15,17
**arbitrations (2)**
202:17 219:12
**arbitrator (277)**
1:23,24 4:16,20 5:19
5:20 9:19 10:20,24
13:13 14:6 15:10,13
18:17 19:17 20:18
26:3,15 27:8 30:9
36:3 38:3 39:21
40:5,21 41:7 44:16
44:20 45:3,7,21
48:11 52:2,5,11,16
52:24 53:7,11,18
55:2,5,8,13 56:5,23
57:10 59:20 60:2,9
60:14,21 61:4,7,9
61:15,25 62:3 67:25
69:5 73:3,18 74:5
74:16 75:10,19,24
76:7 77:8,10,25
78:8,24 79:7,10,15
79:17 80:4,9,23
81:2,5,9,12,19,24
82:7,12 83:2,9,15
83:19 84:16 85:3,12
85:19 86:5,14,25
87:7,22 88:5,13
89:7 91:13 92:3,8
94:7,13 95:7,11,24
104:11,20 105:23
106:20 107:6 113:7
128:25 129:3,15
130:16 133:15,23
134:5,11,15,23
135:8 137:7 139:6
139:17 147:16,20
148:3,7,15 149:3,9
149:21,25 152:23
153:11,21 154:4,18
155:8,19 156:16
158:12 162:14
163:24 164:7,18,22
165:2,6 166:15
167:17 168:9,16,18
168:20,23 169:6
170:25 171:6,9,13

172:5,8 173:9 174:9
174:24 176:8
177:13 178:21
179:10,17,25 180:5
180:12,22 181:10
181:17,24 182:5,9
183:11,16,19,25
184:5,9,14,20,25
185:18 186:7,15,22
187:11,20 188:8,19
189:7,11,20 190:2
190:11,18 191:6
192:12,23 193:5,13
193:18,24 194:12
194:22,25 195:15
195:25 196:9,14,19
196:21 197:9,14,20
198:2,8 213:16,19
216:13,20,24 217:2
218:17 219:22
220:9,20 227:21
228:15 229:22
230:3 234:4 237:11
239:10 242:20
250:10,18,22 251:7
251:9,13,22 252:5,8
252:18 254:18
256:17 263:4
264:15 266:10,15
271:17 273:3
278:11 279:10,15
281:23 283:12
284:15,19 285:13
285:17
**arbitrators (14)**
4:15,17 219:17 221:7
222:3 224:11
244:11 253:24
258:16 271:4
275:19 276:14,21
281:21
**arbitrator's (1)**
254:5
**area (1)**
128:24
**areas (2)**
131:25 161:23
**argue (5)**
19:23 21:9 22:20
172:8 226:12
**argued (5)**
61:17 173:22 190:13
191:19,21
**arguing (3)**
21:4,15 175:18
**argument (31)**
10:5 23:16 72:5 88:25
138:4,15 140:4
144:11 149:13,13

151:16 154:23
158:9,11 160:20
166:16 176:10
179:2 181:9 189:6
189:23 192:22
194:7,18,20 214:19
223:15 232:19
239:5 262:24
269:15
**arguments (19)**
13:23 89:18 136:18
137:12 138:6 139:5
143:24 144:5,7
152:25 161:21
180:10 189:22
194:8 198:23,25
229:23 230:10
281:22
**arisen (1)**
221:19
**arising (1)**
200:12
**arms (1)**
232:19
**arranged (2)**
228:23 246:17
**arrangement (1)**
219:4
**arrangements (1)**
108:9
**Article (23)**
60:6,23 61:2 73:16,23
167:3,19 168:10
199:23 201:25
202:6 214:15,16
218:8 222:11 243:6
243:23 245:15
255:8,13,14,15
256:5
**articles (1)**
44:14
**articulated (1)**
176:16
**articulation (2)**
177:23 279:6
**ascertain (1)**
15:25
**aside (3)**
169:7 227:5 251:14
**asked (31)**
12:2 14:3 23:8 41:5
42:3 44:12 46:25
47:23 57:13 64:25
107:3 122:8 123:11
138:11,20 152:10
160:23 161:22
167:10 169:19
175:7 178:11 185:9
185:12 189:21

236:21 246:23
248:23 278:13
283:14 285:18
**asking (14)**
13:16 38:24 40:16
41:24 76:5 101:18
121:20 129:12
138:9 152:2 168:23
188:14 282:13
283:13
**asks (1)**
104:13
**aspect (1)**
163:7
**assemble (1)**
152:19
**assert (1)**
206:3
**assertion (1)**
69:19
**asset (1)**
216:2
**assets (6)**
127:23 170:12 205:17
205:23 212:13
230:13
**associate (2)**
5:13,15
**associated (1)**
129:10
**association (1)**
201:8
**assume (9)**
11:9 27:6,12 31:17
105:10,12,13
143:21 219:21
**assuming (8)**
11:6 212:25 213:7,9
257:25 260:22
284:24 285:10
**assumption (3)**
11:9 14:19 15:6
**assurances (1)**
235:17
**ATELLA (3)**
1:13 287:5,16
**attached (25)**
11:3,4 33:20 34:14,14
34:17 47:4 52:8,19
59:14 88:7 90:18
91:9 93:25 98:3
108:11 109:19
111:11 114:23
117:22 169:24
173:4,13 191:8
233:17
**attaches (1)**
144:18
**attaching (1)**

94:22
**attachment (7)**
52:6,12,12 57:6,13,14
164:8
**attachments (1)**
184:2
**attack (2)**
207:14 236:25
**attempt (7)**
71:8 72:6,15 101:3
204:14 205:7
208:10
**attempted (1)**
234:17
**attempting (2)**
205:10 207:6
**attend (1)**
271:15
**attended (1)**
70:15
**attending (3)**
70:13,18,22
**attention (19)**
29:3 35:5 41:21 42:19
47:9 48:21 50:11
53:16 64:12,16 69:9
98:21 99:8 103:2
142:14 154:2 194:3
213:21 235:25
**attesting (4)**
23:23 210:22 232:23
236:5
**attorney (22)**
20:14 103:9,15,23
104:4,7,25 105:4,11
105:16 106:4,8,12
107:11,16 124:25
182:21,25,25
233:20 234:13
241:13
**Attorneys (2)**
2:11,16
**August (18)**
1:17 95:13 162:24
164:2 171:20
172:16 271:9 273:5
273:8 275:9,22,24
276:5,13 280:11,24
287:10,13
**Austlid (2)**
32:15 33:14
**authentic (1)**
16:4
**authenticity (2)**
36:13 270:4
**author (1)**
28:12
**authorities (3)**
131:13,21 265:20

**authority (91)**
11:23 12:7 14:7 19:12
19:15 20:23 23:24
25:15,20,21,25 27:2
27:4 28:6,12,14,17
48:18 64:23 65:12
65:21 66:3 68:21
69:20,25 122:4
128:10,18 129:6,10
129:11,20 130:20
131:5 137:19,25
140:20,22 141:3,22
141:23,24 142:2,16
142:21 143:23
144:2 146:6,10
148:23 149:14
151:23 153:10
154:15 155:22
160:2,6 163:9,21
165:11 174:7
175:12 185:6,24
194:17 196:5
210:23 232:24
233:8,9,11,14
234:20 235:4,13,14
235:18 236:5 237:3
252:10 253:2,22,25
253:25 264:8,13,13
264:14 269:19,20
270:4
**authorization (6)**
25:16,19 28:7 171:25
247:17 269:15
**authorizations (1)**
234:18
**authorize (1)**
11:12
**authorized (17)**
10:11 14:11 19:22
22:10 26:2 54:19
70:7,25 122:25
125:18 187:3
234:12 236:12
245:21 247:19
249:8 253:16
**authorizing (2)**
11:7 122:17
**autumn (2)**
82:23 83:24
**availability (1)**
271:11
**available (4)**
205:10 215:15 216:18
241:15
**Avenue (3)**
1:16 2:3,13
**avoid (1)**
216:11
**await (2)**

7:19 262:13
**award (21)**
169:16,21 170:4,24
204:8,14 205:11,16
206:18 226:20,23
227:14,25 228:9
230:25 232:7
278:15,21,22 279:9
279:14
**awards (1)**
204:23
**aware (11)**
28:14 33:12 90:25
92:12 110:7 130:22
141:23 147:14
170:19 186:25
266:16
**a.m (2)**
1:18 285:12

_____

**B**

**B (1)**
1:24
**back (48)**
13:25 20:2 46:18 50:4
53:10 66:9 73:6,13
79:19 83:12 88:3
90:8 94:18 101:10
102:22 108:5
109:16 116:11
132:22 154:8
158:18 159:5,8
162:7 165:7 166:15
168:24 169:8 170:5
176:17,18 177:21
181:11 184:15
186:10 191:25
200:24 218:19
222:22 231:14
237:13 247:23
254:18 273:21
274:22 275:6
279:20 282:12
**backs (1)**
155:16
**backtrack (1)**
117:7
**backward (1)**
207:19
**bad (3)**
161:24 168:6,12
**bait (1)**
207:16
**bank (7)**
15:23 16:3 55:24
79:24 80:5 119:19
170:21
**bar (1)**
285:8

**bare (1)**
175:9
**bargain (1)**
232:6
**barrage (1)**
215:7
**based (5)**
5:5 66:7 174:5 250:25
277:20
**basically (3)**
19:5 138:9 280:19
**basis (6)**
6:11 16:5 166:6 167:2
179:4 182:20
**Bates (1)**
96:5
**BB (2)**
64:17,17
**bear (4)**
94:4 220:18 250:20
285:13
**beat (1)**
268:7
**began (2)**
40:10 51:20
**beginning (2)**
247:24 250:25
**begins (1)**
221:2
**begun (1)**
209:10
**behalf (13)**
25:11 65:24 87:10
129:6,21 130:21
182:6 183:2 203:12
234:12 240:16
253:16 281:24
**behooves (1)**
22:13
**belief (1)**
146:16
**believe (30)**
9:25 28:15 29:19
36:10 57:16 77:19
78:17 90:11 93:6
96:12 101:20 119:6
145:7 168:22
170:14 191:15
204:25 211:11,21
213:23 225:18,19
228:13 230:6
250:15 251:12,17
272:24 275:25
282:24
**beneficial (3)**
74:18,21 76:11
**benefit (2)**
93:24 157:18
**best (5)**

7:4,10 176:10 201:12
239:14
**better (3)**
49:14 107:3 136:14
**beyond (6)**
187:13 202:16 210:6
224:9 230:17
260:22
**big (5)**
125:4,6 160:4 274:9,9
**bigger (1)**
141:21
**Bill (5)**
4:16 137:8 138:10,25
176:12
**billions (1)**
212:12
**Bill's (2)**
140:5 157:16 274:21
**bind (1)**
253:2
**binder (3)**
91:7 93:5,19
**binding (8)**
63:22 71:12 161:2
164:22 165:14,15
169:2 229:8
**biography (1)**
241:14
**bit (7)**
9:2 14:24 41:15 66:5
78:13 273:5 285:9
**Bjorn (2)**
2:19 5:6
**black (6)**
19:3,23 61:13 115:18
115:23 241:20
**blame (3)**
88:5 156:15 232:17
**blank (2)**
35:8 121:20
**block (1)**
248:7
**blue (1)**
158:7
**bluntly (2)**
238:22 239:2
**board (30)**
11:22 40:18 41:3 43:7
43:16,20,22 49:5
50:6,25 51:2,6
54:20 55:25 64:10
66:17,23,25 67:2,8
70:13,15,18,22
72:12 113:15
122:17 124:16
135:3 249:19
**boat (1)**
158:17

**Bob (7)**
223:4 258:21,22
274:6 276:5 284:17
285:18
**bodies (2)**
187:2,4
**body (2)**
185:14 188:2
**bona (1)**
78:9
**bond (2)**
42:14 57:8
**BONNIE (3)**
1:13 287:5,16
**books (2)**
154:8 210:18
**boss (6)**
50:21 83:5 86:2
105:22,24 124:14
**bosses (2)**
83:12 84:25
**bottom (6)**
61:10 93:20 94:21
103:3 106:7 146:2
**bought (4)**
39:2 47:21 75:7 248:2
**bound (6)**
240:7,7,9 255:5
259:10,23
**brand (3)**
20:16,18,20
**breach (24)**
59:3,8 69:2 86:24
87:13,16,19 88:11
88:16,25 115:2
116:4,5 117:15,15
118:3,23 119:3,14
120:5 134:7 156:21
168:14,19
**breaches (1)**
167:12
**break (10)**
72:25 89:9,20 139:3
198:20,22 223:16
237:12 256:22,24
**brevity (1)**
276:20
**Breyer's (1)**
221:15
**bribes (2)**
115:10,15
**bridge (3)**
16:17 145:22,24
**brief (29)**
13:21,21 15:4 19:9
34:14,17,23 35:20
36:7 41:22 47:10
48:22 50:12 62:5
67:9 69:11 72:25

91:17 102:25 104:2
106:3 176:20
180:18 220:7
226:11 233:13
242:11 257:2
264:25
**briefing (1)**
141:15
**briefly (3)**
31:8 46:3 57:20
**briefs (2)**
12:17 91:9
**bring (6)**
22:6 36:11 155:5
194:3 224:22
235:24
**bringing (1)**
200:21
**brings (1)**
235:13
**broad (4)**
2:9 28:9 232:4 235:9
**broader (1)**
235:9
**broadest (3)**
200:15 206:6 217:14
**broadly (2)**
225:15,16
**Brothers (1)**
142:12
**brought (10)**
5:25 132:2 153:25
196:22 200:10
213:21 228:8
239:15 242:2
245:23
**burden (2)**
12:14 260:2
**bureaucratic (1)**
216:7
**business (18)**
16:7 31:13 40:25
71:24 72:7 84:4,13
92:16 112:7 120:19
124:10 165:25
182:22 215:14
216:16 217:19
231:19 247:15
**businesses (2)**
216:9 230:7
**businessman (1)**
97:2
**buy (3)**
37:23 66:8 246:20
**buying (2)**
246:15 248:17

——————————

C

**C (6)**
2:2 97:14 171:16
172:2 287:3,3
**call (9)**
29:4 31:2 39:13 40:3
70:4,4 135:24
271:24 280:6
**called (10)**
8:22 15:22 24:24 29:6
61:20 73:20 170:20
215:14 216:16
243:19
**calling (1)**
223:8
**cancel (1)**
246:21
**cancer (2)**
33:8,8
**capable (1)**
241:17
**Capital (1)**
170:20
**care (4)**
6:24 31:13,14 40:24
**carefully (2)**
212:11 215:3
**carried (1)**
260:2
**carries (1)**
98:25
**carrying (1)**
20:23
**Cascais (2)**
159:19 251:10
**case (99)**
8:3,9 13:4,5 17:14
21:19 26:25 27:17
40:6 45:10 54:4
75:15 78:3 107:11
116:4 129:4 133:3
141:7,8,18 142:12
146:4 147:4,6
151:12 155:2
163:14 169:25
170:2 178:15
186:11,25 191:19
191:22 193:12
199:21 201:12
207:19 209:19
212:14,25 213:2,6
218:21 219:15,24
220:4,6,9 223:11,12
228:18,19 229:4
235:25 236:2
237:14,15,16,17,19
238:7 239:7,15
240:4 241:25
242:10 244:20
245:8,9,23 246:2

249:11,12 252:2,3,4
252:7,24 253:13
255:9,9 256:13
257:21 258:15
259:14 260:2,4,11
263:9,23 264:23
268:6,9,25 269:5,7
270:8 282:4
**cases (13)**
142:2 153:5 178:6
186:25 215:7 220:2
221:4 252:20
257:13 259:12
263:19 264:25
265:2
**cast (1)**
251:2
**caucused (1)**
271:3
**cause (5)**
186:12 197:22 198:3
198:6,9
**caused (1)**
65:12
**caveat (3)**
6:17 275:22 284:8
**cc (1)**
110:25
**cc'd (2)**
112:22 118:21
**ceased (1)**
70:17
**centerpiece (1)**
208:17
**certain (2)**
152:2 214:2
**certainly (2)**
11:2 208:19 228:3
232:14 282:8
**certificate (6)**
20:14 64:13,17 92:9
121:16 148:21
**certificates (10)**
23:22 121:6,12 122:2
125:12 210:22
232:22 236:3,4,6
**Certified (1)**
1:14
**certifieds (1)**
121:11
**certify (1)**
287:8
**cetera (6)**
36:4 136:21 149:16
149:16 153:3 185:6
**chain (1)**
76:24
**chair (4)**
67:22 140:8,23 257:6

**chairman (171)**
1:22 4:2 5:11,22 6:7
6:14,15,24 7:2,16
7:24 8:19 9:6,9
16:22 17:2,4,9,18
18:5 21:11 23:23
24:7,20 25:2 28:24
29:9,10,24 31:4
33:22 34:5 35:19,23
40:6 44:21 51:3,4
52:15 53:9,13,15
64:10 66:19 67:14
67:15 71:6,11,23
72:3,15,23 79:16
89:5,8,16,23 90:3
100:16 101:6
103:10 104:8,18
107:13 112:16
133:7,8,10 135:16
136:5,11,12 137:6
139:16,18 140:2,17
142:19 149:23
150:16 151:10,15
151:20,25 152:4,9
156:4,6,24 157:7,13
158:8 159:2,22
160:17 161:3,11,14
161:17 162:21
170:11,15 175:16
175:25 176:5,9
177:8 180:17
182:11 198:14,18
199:5,19 203:19,24
204:2,6,9 206:23
208:22,25 212:17
214:6,17 223:3
224:20 225:8 226:3
226:17 227:2
232:12,23 239:25
250:9 254:10
256:18,23 257:4
258:7,14,20 259:19
261:17,24 262:21
267:7,23 270:18
271:2,19 272:6,11
272:16,21,25
273:10,17,22,24
274:4,20 275:10,14
276:11 280:3
281:12 283:6 284:5
284:21 285:10
286:2
**challenge (3)**
130:23 237:20 238:9
**challenged (2)**
203:4 257:14
**challenging (4)**
68:21 244:14 258:10
259:4

**chance (6)**
8:24 9:10 13:25 89:10
236:23 283:10
**Chang (4)**
2:15 5:14,14 186:10
**change (19)**
22:19,22 51:10,20
58:10 60:5,19 66:10
80:19 81:13,20
86:23 87:23,23 88:2
88:14 112:2,8
163:23
**changed (11)**
58:7 59:15 80:24
81:10,17 82:8 84:17
85:4 120:22 247:6,7
**changes (70)**
22:10 42:5,8,16,18
43:2 44:4,7,10,14
47:6 49:8,18 51:23
54:21 58:23 59:13
59:18,22 60:12,13
60:23 61:19,20
66:19 67:18 68:4,8
68:8,10,11,13 73:10
73:14,16,22 74:13
76:25 80:15 82:14
82:16,18 83:17 84:2
84:2,11,19 85:5
86:18,22 88:10
107:21,22,23 110:2
114:23 115:19
118:2,8,12 120:15
133:24 134:7 135:9
160:25 161:6,12
163:18 166:23
174:3
**changing (3)**
41:15 229:10 244:3
**channels (1)**
205:9
**charge (2)**
40:24 55:9
**charged (2)**
25:10 146:25
**charitably (1)**
176:21
**chart (1)**
244:3
**charter (45)**
66:10,13,16,17,20,24
67:19,23 68:3 77:5
93:13 94:2 96:20,24
97:7 98:18,21
123:14,16,17,18,22
124:4 127:9,18
131:8 145:2,2 146:9
146:9,22 147:3
148:22 149:15

157:25 162:15
163:6 166:4,5
174:23 175:9,14
235:3 236:16
265:22
**charter's (1)**
172:23
**chasing (1)**
212:10
**check (1)**
116:11
**checked (2)**
58:25 96:22
**checking (1)**
283:8
**choice (4)**
140:24 141:25 143:2
269:3
**choose (1)**
193:3
**chose (3)**
192:24 193:5 241:17
**Christmas (5)**
48:4,5 51:12,16 86:4
**chronology (1)**
120:13
**circles (1)**
14:23
**Circuit (8)**
201:4,13 238:3 252:2
252:22 253:14
255:9 259:24
**circuits (1)**
221:5
**Circuit's (1)**
218:20
**circumstance (1)**
167:8
**circumstances (3)**
147:8 261:7 274:14
**cite (1)**
163:15
**cited (5)**
12:17 17:13 27:17
220:6,10
**cites (3)**
144:16 252:20 253:11
**citing (1)**
254:24
**City (1)**
208:3
**civil (3)**
28:16 182:24 214:25
**claim (15)**
8:15 69:16,19,24
130:18 180:20
185:15 206:25
210:8 211:5,7

237:21 269:9
270:13,15
**claimant (7)**
1:5 2:11 78:3 182:6
185:3,19 186:24
**claimant's (2)**
106:3 185:21
**claimed (1)**
243:11
**claiming (1)**
68:25
**claims (3)**
129:17 180:10 237:2
**clarify (1)**
38:3
**clause (38)**
74:2 143:3 164:19
166:19 167:3,5
168:25 169:5 190:9
200:16 202:5,7,15
202:21 203:6,7,17
219:14 220:15
222:13,19 223:8,13
223:17,18,20
224:14 232:4 245:2
245:5 248:23 253:7
256:4,6 264:7,9
266:24,24
**clauses (6)**
44:15 50:10 167:17
206:7 224:5 257:18
**clear (19)**
13:5 27:18 34:16
61:16 74:6 142:3,19
144:20 147:3,8
150:8 155:3 163:9
213:8 234:3 245:17
246:11 255:10
277:20
**clearly (3)**
145:2 188:22 241:7
**client (10)**
16:8 130:15 158:23
170:11 175:25
183:2 215:8 267:18
267:19 275:3
**clients (2)**
152:18 212:8
**client's (3)**
150:18 152:17 170:7
**close (5)**
19:5 41:12 48:3
133:19 168:2
**closed (5)**
41:17,18 43:25 135:6
236:14
**closer (1)**
41:16
**closing (14)**

23:21 39:19 41:19
43:5 45:11 46:10,13
64:6 97:9 163:12,18
232:20 246:18
280:17
**Code (1)**
28:16
**cogent (1)**
281:21
**cognizant (2)**
266:8 285:25
**collaterally (1)**
241:5
**colleagues (7)**
50:14 51:8 65:19 72:6
72:23 136:14
274:14
**college (2)**
272:15 280:12
**collusion (1)**
266:3
**collusive (4)**
239:4,11,13 265:25
**colors (1)**
151:17
**come (34)**
10:22 11:8 12:12,16
40:9 41:10 51:18
53:10 70:11 93:22
102:3 121:16
143:20 153:7 162:8
165:7 166:21
177:21 181:11
193:19 194:10
200:18,19 205:20
207:17 233:24
237:12 244:9 247:9
249:18,19 256:16
257:24 281:2
**comes (8)**
37:13 87:18 91:19
142:2 145:3 163:12
206:2 235:21
**comfort (2)**
210:25 227:22
**comfortable (1)**
157:2
**coming (5)**
4:3 48:5 160:24
168:24 282:12
**commenced (1)**
211:22
**commencement (1)**
240:4
**commencing (2)**
1:17 211:17
**comment (9)**
18:2 49:3 137:9 139:6
152:11,14 237:18

268:4 271:4
**comments (2)**
114:2 119:19
**commercial (6)**
185:5 187:3 199:22
213:12 216:17
246:12
**commitment (1)**
272:13
**committed (1)**
159:20
**common (7)**
84:10 201:21 218:10
218:11,13 240:8
245:4
**communicate (2)**
65:14 197:21
**communication (3)**
72:18,22 83:12
**communications (3)**
1:4 55:17 134:24
**community (1)**
242:15
**companies (9)**
38:20 56:11,16 74:24
75:8 77:18 154:7,14
216:18
**company (31)**
30:22 32:3 37:5,15
38:14 40:14 57:4,5
63:23 66:10 75:5,7
88:24 97:17 113:14
146:17 153:19
203:12 205:11
210:17 212:5 235:7
236:24 237:4,5
243:13,21 248:3
249:21,24 269:13
**company's (5)**
37:13 142:3 174:23
210:18 234:9
**comparable (1)**
253:24
**compare (1)**
86:15
**comparing (1)**
60:17
**compel (3)**
12:19 178:8 200:7
**compelled (1)**
152:13
**compete (1)**
167:15
**competence (1)**
208:7
**competent (5)**
187:4,25 189:5 229:2
261:22
**competing (3)**

230:5,7 249:24
**complete (1)**
89:17
**completely (3)**
19:15 263:20 264:2
**completeness (1)**
191:7
**compliance (3)**
116:15 151:6,8
**complicated (2)**
15:17 112:12
**complimentary (1)**
32:11
**comply (1)**
177:20
**complying (1)**
154:20
**Computer (1)**
221:5
**concealed (1)**
268:6
**concede (2)**
14:6 15:5
**concept (1)**
174:8
**concern (3)**
65:20 169:12,13
**concerned (4)**
20:4 76:8 168:11
169:16
**concerning (3)**
208:15 271:10 276:15
**concerns (3)**
4:6 208:11 217:13
**conclude (4)**
19:24 21:4 22:14
161:5
**concluded (1)**
217:12
**concludes (3)**
227:13 234:20 235:2
**conclusion (1)**
20:9
**conclusions (1)**
13:17
**condition (3)**
86:24 102:16 243:2
**conditions (1)**
256:12
**conduct (1)**
56:18
**conducted (3)**
150:12 202:18 242:5
**confer (1)**
242:16
**conference (1)**
197:3
**confers (1)**

28:8
**confidence (2)**
207:23 215:10
**confident (2)**
97:5,10
**confirmation (3)**
76:19 172:2 185:5
**confirmed (3)**
42:4 83:5 86:13
**confirms (1)**
62:7
**conflict (3)**
28:5,19 143:6
**conformed (1)**
82:24
**conjunction (1)**
64:6
**connection (13)**
90:22 91:24 103:16
123:15 128:19
143:10 144:24
146:24 148:25
176:2 200:9,11,12
**Connolly (1)**
5:21
**consensual (2)**
277:17,25
**consensually (1)**
277:18
**consent (4)**
94:23 236:9 247:25
249:3
**consented (1)**
253:15
**consequence (1)**
61:2
**consequently (1)**
139:10
**conservatory (1)**
200:9
**consider (5)**
108:15 143:7 187:3
216:10 275:17
**considerable (1)**
216:5
**consideration (2)**
142:10 278:14
**considered (5)**
85:21 120:5 168:14
181:13 229:7
**considering (3)**
49:11 186:11 195:20
**consist (1)**
67:3
**consistent (1)**
260:11
**consortium (2)**
77:17,23

**constantly (1)**
204:13
**constitute (1)**
209:18
**constraints (1)**
274:7
**constructive (1)**
146:19
**consult (1)**
285:12
**contact (6)**
14:16 43:4 72:21
191:4 271:9 274:3
**contained (1)**
118:8
**contemplate (3)**
214:7,10 226:16
**contemplates (1)**
19:13
**contend (1)**
244:13
**contention (2)**
129:4 219:6
**contentions (1)**
190:4
**contents (2)**
60:3 61:5
**context (1)**
86:7
**contingent (1)**
162:3
**continually (1)**
265:15
**continue (4)**
53:10,13 158:21
276:12
**continues (1)**
221:3
**continuing (1)**
50:22
**contract (84)**
17:17 23:17,19,21
25:10 26:7,14 27:16
27:20 59:5 69:21
88:20 109:18 110:9
129:25 130:12
156:21 162:12
173:21 176:24
178:4 186:3,4,5
188:17,18 199:20
199:25 201:10
202:5,8,11,13,25
203:16 211:9 218:7
221:24 222:7,9,17
222:17,25 223:22
224:13,21,21,24
225:3,21,24 227:18
232:21 242:19,21
244:19,23 245:19

246:3,11 247:6,13
247:20 252:18
253:3 254:6 255:12
256:3,7,11 257:23
259:16 262:9,20
263:12,15,25 264:6
264:11 265:16,19
269:10,14 270:3
**contracts (1)**
269:24
**contractual (1)**
219:4
**contract's (2)**
253:10 254:23
**contradicted (1)**
147:6
**contrary (5)**
58:8 59:24 66:4
155:18 228:16
**control (5)**
22:16 77:2 140:9
210:18 254:4
**controlled (1)**
75:23
**controlling (1)**
26:6
**controls (2)**
26:10,13
**convene (1)**
280:15
**convened (1)**
192:5
**convention (5)**
204:18,19 218:25
220:14 221:11
**cooperation (3)**
4:5 22:21 84:7
**coordinate (1)**
140:9
**copied (5)**
50:8 53:22 58:16,18
59:11
**copies (6)**
25:8 33:23 53:5 122:3
199:12 201:18
**copy (15)**
47:12,15 50:14 62:21
62:25 67:11 73:8
90:12 94:10 123:14
123:21 124:3 175:8
201:19 210:13
**corporate (17)**
67:18 78:20 84:8
100:22 157:10,14
163:17 166:12
175:11 215:23
233:3 237:9 239:17
241:10 244:2 248:7
249:21

**corporation (3)**
125:9 235:8,11
**correct (48)**
6:6,13 7:23 12:14
40:19 59:21 62:11
73:10 80:7,18,22
82:10,14 88:11
90:13,19 92:11
97:22 98:4 102:5
106:11,18 108:3,4
110:25 111:6 112:5
115:2 117:9 119:8
119:23 123:25
124:18 127:13
134:25 136:4,10
138:14 184:6
186:17 193:2
197:17 214:21
223:10 258:13,18
263:3 285:11
**correctly (4)**
130:17 214:21 223:4
261:25
**correspondent (1)**
170:21
**corruption (3)**
88:22 216:3,8
**counsel (7)**
5:9 24:4 137:14
182:18 183:4
197:21 241:21
**counselor (2)**
65:3 76:17
**count (1)**
207:12
**counterparty (2)**
28:14 168:6
**countries (2)**
152:19 182:24
**country (10)**
31:5,10,11,19,23 32:8
32:12 158:24
216:17 265:3
**couple (6)**
29:25 73:3 79:17
152:18 171:10
251:11
**course (12)**
52:4 58:22 102:8
108:24 199:11
211:13 226:11
240:24 242:3 256:6
276:17 284:18
**court (133)**
11:25 12:13 13:5 14:3
68:25 130:6 132:2
132:22 138:5,12
142:24 143:15
151:14,21 156:13

156:19 159:5,8,19
163:15 164:25
165:3,17,22,23
166:14 169:3,9
170:2,6 171:8
173:19 177:7,14,24
178:4,24 179:5,15
180:6,15 181:5,20
185:4,5,13 186:19
186:19 187:8,15,25
188:7 189:4,14
190:3,8 191:10
192:2,4,10,25,25
193:11,20 195:4,16
196:24 198:25
201:5 203:14
206:12,18 209:15
209:25 211:24
213:4,12,13,22
214:12,15 215:21
216:10 217:24
218:23 219:2
221:13,16 224:18
225:6,10,17,22,23
227:10 229:2 231:3
231:8 235:25 238:3
240:19 249:2 251:6
251:10,20 253:4
255:2,4 258:2,5,24
259:15 260:20
261:4,20,21 262:4,5
263:2,17,25 264:5
265:19 266:4,11,19
266:20 267:2,5,12
269:7,17 277:22
**courts (48)**
10:18 12:16 13:19,22
130:19,24 138:7,13
138:16,22 143:21
144:2,8 158:13
166:20,22 176:12
186:6 187:19
188:23 194:4
195:17 206:10
207:2 208:3,4,4,12
212:20 213:11
215:5 226:9,12
228:5,7 229:8,23
230:14,22 231:22
238:19 245:8 250:2
252:16,21 253:18
262:25 264:18
**court's (5)**
17:16 25:12 153:25
166:7 224:7
**cover (4)**
142:21 148:4 164:4
237:22
**covered (2)**

164:3 171:3
**covering (1)**
238:7
**co-panelists (1)**
9:16
**Craig (108)**
1:24 5:19,19 9:19
14:6 38:3 39:21
40:2,5 41:7 44:16
44:20 45:3,7,21
48:11 52:2,5,11,16
52:24 53:7,11,18
55:2,5 57:13 59:20
60:14 61:9 67:25
79:16,17 80:4,9,23
81:2,5,9,12,19,24
82:7,12 83:2,9,15
83:19 84:16 85:3,12
85:19 86:5,14,25
87:7,22 88:5,13
89:7 92:3 95:24
105:23 106:20
107:6 113:7 133:15
133:23 134:5,11,23
135:8 139:17
154:18 155:8
162:14 163:24
168:18 171:9,13
172:5,8 173:9 174:9
174:24 176:8
177:13 196:21
197:9,14,20 198:2,8
213:19 227:21
228:15 229:22
230:2,3 234:4 251:7
266:10,15 271:17
279:15 281:23
282:7 283:12
**Craig's (2)**
165:9 209:11
**crank (1)**
211:10
**creating (1)**
242:25
**credibility (1)**
214:24
**criminal (1)**
88:22
**criticized (1)**
217:7
**cross (5)**
3:3 89:25 167:21
248:4 257:7
**crossed (1)**
222:22
**cross-examination (...**
7:11 10:4 17:5 18:12
21:23 24:16 73:2
89:12 90:4

**cross-examine (2)**
89:11 101:3
**crucial (1)**
238:13
**culture (1)**
205:4 206:21
**currency (3)**
201:21 218:10 240:8
**current (1)**
30:23
**currently (4)**
15:25 75:13 180:23
248:13
**cut (1)**
267:13
**cutoff (1)**
283:17
**Cyprus (1)**
77:19

**D**

**D (3)**
3:2 29:5 172:11
**damaged (1)**
10:15
**danger (1)**
178:14
**date (12)**
23:5 36:2 76:18 107:7
138:19 184:18
197:5 216:20 273:5
275:18 277:9
280:24
**dated (6)**
45:17 48:2 78:21
80:10 171:20
184:16
**dates (2)**
42:18 47:7
**day (20)**
62:13 63:2 106:16,21
106:24 124:20
211:22 212:19
233:2 239:21 258:2
272:19 273:15,19
281:20 283:22,23
283:24 285:14
287:13
**days (8)**
16:7 39:19 70:8 82:21
124:24 152:16
246:20 274:22
**day-to-day (1)**
40:25
**DD (2)**
67:9,25
**deadlines (1)**
125:5

**deal (32)**
39:20 41:18 43:5
49:25 88:16 135:5
140:19 151:4 157:2
157:5,18,21 161:23
161:24 163:13
167:25 175:18,20
175:21,22,22
178:23 202:19
206:18 207:5
217:20 225:7
236:13 238:24
273:18 274:11
280:4
**dealing (3)**
20:5 37:2 134:7
**dealings (2)**
79:2,8
**dealt (1)**
188:23
**debate (1)**
136:22
**debated (1)**
77:24
**debt (4)**
47:7 80:16 116:22
167:14
**December (17)**
43:8,10 48:3 49:6,6
49:24 60:18 70:16
81:3 108:18 134:24
135:4 158:19
250:12,19 251:14
251:15
**decide (15)**
132:11 157:4 217:23
219:2 227:18 238:2
252:18 260:23
264:16,18 270:22
277:13,15 278:9
280:19
**decided (5)**
48:7 78:4 187:18
238:6 260:20
**decision (31)**
12:17 14:2 132:24
138:17 143:25
169:9 200:6 201:13
202:12 210:6
218:20 219:5,18
221:14 224:7
228:25 229:7
230:23 238:18
239:5,11,13 240:9
241:7 251:2 259:6
260:10 262:14
264:21 269:6
280:16
**decisions (11)**

132:2,3,6 138:5
143:16 171:7
192:10 215:22
217:20 252:23
260:6
**declaration (1)**
179:8
**deed (2)**
200:21 247:4
**deem (1)**
57:18
**defeat (1)**
246:7
**defend (1)**
209:24
**defended (1)**
241:12
**defending (1)**
236:2
**defense (6)**
209:19 228:8 232:10
239:18 249:10
265:9
**defenses (2)**
129:18 265:10
**define (1)**
119:3
**definitely (3)**
27:5 90:16 194:7
**definition (2)**
59:8 87:15
**definitions (1)**
60:6
**Delaware (1)**
235:11
**delay (1)**
142:18
**delegate (1)**
219:17
**deleted (1)**
61:2
**deleterious (1)**
249:20
**deletion (2)**
61:21 73:16
**delivered (8)**
23:22 64:4,5,13,18,21
104:3 236:4
**delivery (1)**
97:16
**demand (3)**
176:24 192:13 193:14
**demonstrate (1)**
17:6
**denying (1)**
278:24
**department (6)**
32:18 97:6 215:12,15

216:16,19
**depend (2)**
229:20,21
**dependent (1)**
101:22
**Depending (1)**
272:16
**depends (2)**
253:22 262:6
**deputy (1)**
31:22
**derives (1)**
169:13
**describe (5)**
31:8 87:25 88:13
95:23 268:10
**described (3)**
145:14,19 176:22
**describes (1)**
145:21
**describing (1)**
65:6
**description (2)**
74:19 76:24
**deserves (1)**
240:19
**designated (1)**
208:2
**despite (1)**
239:8
**details (2)**
99:21 130:12
**determination (4)**
17:16 259:10,15
263:24
**determine (16)**
202:3 203:15 218:16
242:3 253:18,25
256:2 257:15,19
258:11 259:9
260:16 262:8 263:8
263:11 267:3
**determined (3)**
261:2 262:18 265:12
**determining (1)**
257:22
**developed (2)**
264:19 268:12
**developing (3)**
45:9 205:3 217:17
**development (1)**
82:20
**Didkovskiy (15)**
2:21,21 5:8,9 54:22
54:24 64:8 110:22
111:3,19,20 112:7
112:13,19 121:18
**Didkovskiy's (2)**

114:24 118:9
**difference (7)**
8:21 9:2 18:20 19:21
148:15,18 187:21
**differences (6)**
19:4 21:7,9,20,25
22:8
**different (22)**
9:4 11:17 19:15,25
20:22 22:3 56:16
61:13 77:2 123:3
151:16 160:12,18
160:19,20 167:20
173:10 207:13
218:18 219:13
237:17 252:20
**differently (1)**
9:17
**difficult (4)**
42:10 71:16 272:20
273:25
**dilemma (1)**
150:22
**diligence (4)**
147:15 148:20 154:7
156:2
**diplomatic (1)**
205:9
**direct (12)**
3:3 18:7 25:4 29:11
41:21 47:9 48:21
69:9 71:4 101:2,21
241:11
**directed (1)**
185:19
**directing (6)**
35:5 42:19 53:16
64:12,16 183:12
**direction (1)**
30:6
**directly (6)**
32:21 70:10 187:9
214:20 254:16
270:12
**director (11)**
25:18 28:8 31:22
48:15 64:11,25
127:11 210:16
234:11 235:6
243:13
**directors (18)**
43:16,18 49:7 50:6,7
50:7,25 51:6 54:20
55:22 66:18 67:8
70:13,16,18 124:15
249:19,23
**disagree (1)**
254:8
**disavow (1)**

153:19
**disclosure (1)**
215:25
**discover (1)**
153:23
**discovered (3)**
153:24 154:4 211:9
**discretion (1)**
140:9
**discuss (3)**
40:19 82:19 198:2
**discussed (4)**
27:17 52:18 82:23
87:19
**discussing (2)**
199:17 206:8
**discussion (22)**
38:2 43:21 54:2 59:7
73:19 85:2 87:14,18
87:20 96:3 114:12
125:8 140:24
152:15 164:15
209:7 220:25 221:4
228:11 255:17
279:12 282:20
**discussions (3)**
40:10 260:9 279:24
**disliked (1)**
86:7
**dismiss (6)**
16:16 34:24 133:12
141:10 208:18
278:24
**dismissed (2)**
191:20,22
**disposal (4)**
99:10,16 100:2
145:15
**disposition (3)**
97:21 98:7,14
**dispositive (2)**
268:25 270:12
**dispute (20)**
22:3 73:22 77:15
188:11 200:22
201:4 202:24
203:12 208:6
215:20 216:8
221:18 223:5
224:22 237:24
245:9 249:15 250:8
252:25 278:8
**disputes (7)**
187:4 199:24 215:18
216:4 253:8,21
254:22
**disregard (1)**
261:15
**disregarded (1)**

261:23
**distinction (1)**
259:12
**distinguish (1)**
141:17
**distinguished (1)**
229:5
**distribute (1)**
53:6
**distributed (3)**
219:15 220:4 244:21
**District (6)**
138:8 208:9 226:13
226:25 258:23
262:4
**diverted (1)**
170:25
**divestiture (1)**
229:17
**doctrines (1)**
269:4
**document (52)**
12:6 19:16 21:20,21
23:9 35:6 36:24
44:17 47:13 48:10
48:18 49:3 53:21,23
54:16 58:14 59:10
59:11,12 63:8,12,18
63:25 64:4 67:17,21
90:17 91:5,21 92:4
92:6 94:6 99:21
100:20 109:5
119:20 122:7
145:17 146:14
160:11 165:18
184:22 192:15,19
202:23 210:13
216:14,16 233:2
235:16,22 278:12
**documentation (4)**
76:4 123:2,12 279:19
**documents (58)**
15:14,19,24 21:5,24
22:2 34:2,8 36:6
48:5,16,24 54:5
55:16 58:20 61:14
64:5,9 65:2,4 76:23
78:20 90:15,21 91:7
91:8,20,23 92:20
96:5 102:22 103:13
111:12 115:10
122:10,11 123:10
124:14 125:9,13,15
128:17 129:10,13
150:18 153:15
165:19 172:22
191:8,9 193:6,12
195:13 233:19
234:12 266:3,10,17

**dog (1)**
212:10
**doing (15)**
12:20 71:17 72:8
112:23 151:11
158:20 162:9
165:25 168:11
185:6 206:11 213:7
215:14 216:16
225:21
**dollars (1)**
212:12
**domestic (2)**
204:21 215:21
**door (1)**
270:21
**doubt (12)**
16:5 64:22,24 65:7
91:22 92:18 96:9
104:5 143:17,19
178:2 251:2
**doubting (1)**
16:2
**dozen (2)**
9:15 150:19
**draft (26)**
10:15 11:3,3 18:21
19:5 20:10 33:4
44:4 51:10 60:24
73:12 88:8,15,15,16
98:3 108:11 109:12
109:18 111:25
117:21 147:25
163:22 173:4,18
174:7
**drafted (2)**
121:12 222:10
**drafting (4)**
58:2 112:23,25
243:16
**Drake (25)**
12:10 23:25 24:4 25:7
28:11 141:7,8,12,17
151:12 152:22
153:6 176:18
177:25 218:20
219:12 238:8 246:5
251:25 257:20
260:15,18 263:13
268:14,14
**draw (5)**
20:9 98:20 99:7 103:2
142:13
**drawn (2)**
21:10 153:15
**drop (1)**
156:20
**due (8)**
106:16,23 124:21

147:15 148:19
154:6 156:2 261:8
**duly (3)**
29:6 211:2 245:20
**duration (1)**
107:12
**duties (4)**
31:9 32:7 33:10 38:11
**DX (1)**
2:10
**D.C (1)**
5:21

_____
**E**

**E (7)**
2:2,2 3:2 29:5,5 94:21
287:3
**earlier (30)**
18:2 38:9 46:9 61:18
65:3 66:8 67:7
81:21 96:25 102:11
102:11 107:20
113:21 115:8,15
121:5 122:8 127:8
133:18 145:9
147:21 148:18
163:22 175:7
188:15 262:15
263:22,24 273:5,14
**early (3)**
43:8 76:16 198:13
**earth (1)**
177:24
**easiest (1)**
34:2
**easily (3)**
12:11 229:4 258:3
**Easterbrook (5)**
252:11,19 254:9
255:19 256:13
**Easterbrook's (1)**
252:7
**easy (1)**
279:20
**EC2N (1)**
2:9
**EE (3)**
36:7 69:10,12
**effect (19)**
23:10 106:9 138:11
146:3 150:23 166:4
202:22 205:13
207:15 220:16
222:21 223:23,25
223:25 240:11
242:7 243:3 244:17
249:21
**effective (2)**
20:15 144:13

20:15 144:13
**effectively (1)**
264:7
**efficient (1)**
8:18
**effort (3)**
228:2 250:4,5
**Egil (1)**
32:17
**eight (2)**
194:13 196:2
**Eighth (1)**
252:21
**either (24)**
13:9 38:7 132:6
  136:13 138:9 153:8
155:24 157:20
175:13 180:15
184:21 194:18
196:17 206:16
229:16 231:11
249:9 271:11,21,23
273:14 278:23,25
281:6
**Ekhougen (44)**
3:4 4:18,18 6:22,23
  6:25 9:23 16:25
  18:7 19:10 20:7
  29:4,13,15,16 30:17
  33:11 34:22 36:16
  38:8 40:9 46:3 56:9
  57:23 62:16 68:19
  69:18 71:4,6 90:6
  94:17 96:7 118:20
  128:9 131:2 135:18
  145:8,18 146:12
  147:12 160:24
  161:22 167:10
  175:7
**Ekhougen's (7)**
7:9 9:8,25 10:23 21:8
  22:5 147:5
**Ekhougen/Cross (1)**
89:1
**Ekhougen/Cross-V...**
90:1 91:1 92:1 93:1
  94:1 95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1
  107:1 108:1 109:1
  110:1 111:1 112:1
  113:1 114:1 115:1
  116:1 117:1 118:1
  119:1 120:1 121:1
  122:1 123:1 124:1
  125:1 126:1 127:1
  128:1 129:1 130:1
  131:1 132:1 133:1

**Ekhougen/Direct-S...**
29:1 30:1 31:1 32:1
  33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1
  41:1 42:1 43:1 44:1
  45:1 46:1 47:1 48:1
  49:1 50:1 51:1 52:1
  53:1 54:1 55:1 56:1
  57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1
  65:1 66:1 67:1 68:1
  69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1
  77:1 78:1 79:1 80:1
  81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1
**elect (1)**
282:10
**elected (6)**
27:15,19 66:22 67:5,7
  207:25
**eleventh (1)**
108:21
**elucidate (1)**
9:12
**empanelled (1)**
132:10
**emphasis (1)**
25:13
**emphasize (4)**
10:3 277:11 278:3,7
**employed (2)**
30:20,21
**enabling (1)**
160:8
**encapsulate (1)**
279:8
**enclosed (2)**
44:13 59:17
**enclosing (1)**
85:13
**encumbrance (3)**
99:10,12,13
**ended (3)**
86:16,23 88:2
**ends (2)**
87:3 104:15
**enforce (17)**
162:13 169:23 170:5
  170:24 173:20
  204:8,11 205:4,8,10
  205:15,17 225:24
  230:11,12,23 231:8
**enforceable (13)**
109:6,18 110:3,9
  161:2 162:6,12,17
  173:21 178:3 222:2
  222:14 227:19
**enforced (2)**

37:4 228:14
**enforcement (5)**
200:6 204:22 215:21
  228:9,20
**enforcing (2)**
199:21 232:6
**English (8)**
23:11 29:17,20 52:25
  53:2 94:22 95:19
  171:17
**entail (1)**
202:14
**enter (7)**
37:9,10 122:17
  125:18 248:14,16
  264:8
**entered (6)**
98:13 173:16,18
  188:10 248:18
  251:16
**entering (1)**
125:11
**entertain (1)**
108:19
**enthusiasm (1)**
230:8
**entirely (3)**
27:22 213:8 280:5
**entities (1)**
15:23 76:12 77:2
**entitled (2)**
35:7 268:18
**entity (3)**
15:22 77:22 102:2
**entry (2)**
101:21 102:16
**equal (2)**
71:19,20
**equally (1)**
218:13
**Eric (2)**
2:15 5:14
**Ericsson (6)**
42:11 47:7 60:15
  61:20 73:15 80:16
**errata (1)**
190:25
**erroneous (1)**
175:4
**especially (6)**
37:12 84:2 100:21
  206:20 232:4 264:4
**ESQ (7)**
2:5,6,10,14,15,16,19
**ESQS (1)**
2:13
**essentially (2)**
28:3,22

**establish (4)**
20:6 84:8 95:12 113:9
**established (5)**
21:23 92:23 98:10
  124:6 146:5
**estimate (2)**
31:24 128:4
**estopped (6)**
150:24 154:19,22
  155:4 156:7 241:5
**estoppel (6)**
155:3,14 156:22
  192:9 232:25 236:3
**et (6)**
36:4 136:21 149:15
  149:16 153:2 185:6
**Euro (1)**
42:14
**Europe (2)**
205:24 230:12
**European (1)**
204:19
**event (5)**
55:8 162:4 192:23
  208:5 282:2
**events (2)**
157:3 282:25
**everybody (4)**
4:3,4,11 29:3
**evidence (63)**
3:6 8:23 10:9,19 12:4
  12:5,12,13 20:4
  22:4,15 23:4 25:22
  27:11 35:20,25
  79:11 130:6,11
  133:2 135:25 136:7
  136:19 137:17,22
  145:10 150:8,10
  151:19 154:9,11
  155:17 157:23
  158:17 163:19
  177:5,17 179:13
  180:23 181:19
  183:9,10,20,23
  193:17 213:20,25
  234:15 239:12,15
  239:22 245:25
  246:10 257:25
  260:19 263:15,16
  265:24 270:7 281:7
  282:3,5 283:3
**evidencing (1)**
128:18
**evident (1)**
20:19
**evidentiary (10)**
6:2,10 17:21 21:17
  34:23 36:6 141:9
  268:16 279:13

280:8
**exact (3)**
76:17 244:17 255:7
**exactly (18)**
87:3 91:4 122:7
  126:13 145:20
  154:16 160:23
  161:16 164:6
  174:17 193:8 199:2
  220:5 222:11
  223:10 242:24
  243:22 263:4
**examination (4)**
18:7 25:4 29:11 71:5
**examined (1)**
29:7
**example (9)**
16:2 102:6 126:9
  193:15 229:10
  230:24 233:15
  247:3 264:10
**exceed (1)**
276:19
**excellent (1)**
154:24
**exception (1)**
91:8
**exceptions (1)**
217:9
**exchanged (1)**
236:17
**exchanges (1)**
233:23
**exchanging (1)**
276:22
**excuse (6)**
88:17 145:23 182:11
  214:16 219:10
  284:5
**execute (10)**
22:25 23:2 47:3 66:3
  68:21 69:25 105:16
  108:9 210:24 249:8
**executed (15)**
33:13 46:8,22 49:20
  63:8 64:20 73:8
  76:9 114:18 210:12
  211:3 235:16
  245:14 249:5 270:3
**execution (6)**
10:12 39:12 62:17
  97:16 103:17 211:9
**executive (4)**
32:9,17 33:2 50:18
**exercise (4)**
161:9 257:6 260:3,10
**exercising (1)**
262:23
**exhibit (65)**

19:8 34:9,23 35:20
35:25 36:19,21
41:22 47:10 48:13
48:22 49:12,15
50:11,22 53:17,20
57:16,18,19,21
58:12 59:9,25 62:5
63:6,10 64:12,17
69:10,10,11 73:7
76:21 77:5 78:18
79:19,21 91:12,16
92:5,13 93:8 94:19
95:4 98:19 102:24
102:25 103:22
106:3,5 108:7
110:18 113:6
115:17 117:25
119:16 126:21
128:2 171:16
172:11 233:21
234:4,6 279:19
**exhibits (5)**
3:6 33:24 36:7 52:14
171:17
**exist (2)**
17:17 227:13
**existence (7)**
102:4 189:15 202:4
218:6 225:2 254:4
256:2
**existing (5)**
45:12,15 46:13 57:3
109:6
**exists (3)**
15:7 245:20 263:16
**expand (4)**
8:13 9:13 63:20 66:5
**expanded (1)**
30:13
**expect (4)**
18:19 76:16 159:18
174:25
**expected (1)**
37:22
**expensive (1)**
117:19
**expert (3)**
26:21 31:21 185:12
**expertise (2)**
143:18 225:2
**experts (1)**
169:24
**expert's (1)**
143:19
**expire (2)**
106:16,23 124:21,25
**expires (1)**
107:2
**explain (9)**

5:24 8:10 36:16 37:6
47:18 63:20 72:13
87:22 135:10
**explained (1)**
30:12
**explaining (1)**
198:22
**explanation (4)**
72:7,10 81:16 135:13
**explicit (1)**
252:10
**exposing (1)**
24:15
**express (10)**
22:11 25:18 142:15
175:14 203:13
224:8 234:23 245:3
255:7 278:12
**expression (1)**
37:21
**expressly (7)**
173:17 214:13 223:21
224:15 236:4
255:25 284:12
**extant (1)**
193:7
**extend (2)**
62:12 125:6
**extended (3)**
23:7 140:24 228:11
**extending (2)**
136:20 140:10
**extension (3)**
48:19 124:21 246:24
**extensive (4)**
22:24 168:7 237:10
282:20
**extensively (1)**
8:14
**extent (6)**
21:19 28:4 150:21
229:6 247:7 258:4
**extra (1)**
94:9
**extraordinarily (1)**
235:9
**extraordinary (1)**
281:20
**extreme (1)**
178:14
**extremely (1)**
237:4
**e-mail (31)**
16:3 41:23 42:20,21
44:23 45:4,5,7,16
52:20 55:24 62:6
79:20,22 80:10 82:2
82:17 103:2,3 108:8

110:21,21 111:2
113:3,6 114:5,24
118:9 119:17
233:22 234:6
**e-mailing (1)**
4:5
**e-mails (10)**
52:18 58:15 79:21
110:19 112:22
118:14,22 233:13
233:16 234:3

---

**F**

**F (1)**
287:3
**FAA (1)**
255:5
**face (1)**
158:7
**fact (56)**
10:9 11:11 12:22,25
13:17 23:3,6,24
45:3 51:9 69:20
70:6 91:6 111:16
145:11 151:3
162:23 169:14
178:9 183:3 185:16
194:7 206:20
207:10 209:11
210:4,15,22 211:4
211:15,18 212:2,9
219:2 220:2 223:20
225:19 232:23
235:2,23 240:21
244:14 245:11,22
251:3 253:7 254:21
265:15 269:9 270:5
270:6 276:15,24
279:18,23 280:9
**facts (7)**
15:2 20:7,8 21:10
118:19 137:11
228:22
**factual (4)**
20:9 179:4 195:2
282:3
**fact-finding (1)**
132:25
**failed (1)**
144:8
**failure (2)**
115:10 156:2
**fair (3)**
112:11 197:18 215:20
**fairly (4)**
206:3 237:10 252:10
284:22
**fairness (1)**
220:21

**faith (1)**
187:23
**fall (1)**
105:16
**false (3)**
28:4,19 143:6
**familiar (3)**
32:16 34:25 217:6
**familiarize (1)**
33:16
**far (39)**
20:3 35:18 37:11 38:5
55:5 65:17 74:21
75:3,16,25 76:3,7
84:14 95:16 98:10
100:25 102:18
114:14 120:18
126:12 127:14
130:22 131:9,11,16
132:7 179:20
183:13,17 190:11
193:20 194:22,24
224:4 249:13
251:23 255:3
268:13 282:16
**fast (2)**
160:15 250:12
**favor (3)**
68:12 205:11 262:23
**fax (4)**
23:8,10 63:7 235:20
**February (3)**
106:9 216:23 245:24
**Fed (1)**
201:15
**federal (9)**
208:2 214:15 218:24
220:13 225:23
251:5 262:5 263:2
277:22
**feel (5)**
9:16 152:13 158:2
163:3 174:9
**feeling (1)**
159:16
**feels (1)**
277:14
**Feinberg (144)**
1:22 4:2,14 5:11,22
6:7,15,24 7:16 8:19
9:9 16:22 17:2,4,9
17:18 24:7,20 25:2
28:24 29:9,24 31:4
34:5 35:23 40:6
52:15 53:9,13 71:6
71:11,23 72:3,15,23
79:16 89:5,8,16,23
101:6 104:8,18
107:13 112:16

133:10 135:16
136:5,12 137:6
139:16,18 140:2
149:23 150:16
151:15,20,25 152:9
156:4,6,24 157:7,13
158:8 159:2,22
160:17 161:3,14,17
162:21 170:11,15
175:16,25 176:5,9
177:8 180:17
182:11 198:14,18
203:19,24 204:2,6,9
206:23 208:22,25
212:17 214:6,9,17
223:3 225:8 226:3
226:17 227:2
232:12 239:25
250:9 254:10
256:18,23 257:4
258:7,14,20 259:19
261:17,24 262:21
267:7,23 270:18
271:2,19 272:3,6,10
272:11,12,16,21,25
273:10,17,22,24
274:4,20 275:10,14
276:11 280:3,22
281:12 283:6 284:5
284:21 285:10
286:2
**fellow (2)**
8:20 271:3
**fide (1)**
78:9
**Fifth (2)**
1:16 2:3
**fight (1)**
254:13
**figured (2)**
34:20 272:9
**figures (1)**
87:20
**file (8)**
115:10 124:4 131:4
165:23 179:11
266:20 271:17,19
**filed (13)**
68:24 69:16 78:21
131:9,12,20 132:25
210:10 250:24
265:20 269:25
270:6,15
**files (8)**
15:15 35:4 123:25
130:15 146:22
152:18,19 181:15
**filings (1)**
193:20

18:17 87:3 88:8,15
111:25
**finally (4)**
19:7 46:17 209:17
268:23
**finance (1)**
37:13
**financial (1)**
42:10
**financing (1)**
42:12
**find (22)**
15:3 16:12 17:14
19:18 20:25 72:16
78:6,15 96:22
103:22 112:21
157:4 178:16 179:3
179:21 181:15
195:16 203:21
227:24 239:10
259:25 262:2
**finding (4)**
151:13 276:15 279:18
279:20
**findings (4)**
13:17 276:23 279:23
280:9
**findings/conclusion...**
179:5
**finds (1)**
168:18
**fine (8)**
17:24 34:6 36:14 40:5
99:25 174:18 176:8
238:11
**fingers (1)**
222:22
**finish (1)**
139:13
**finished (1)**
99:5
**firm (6)**
80:11 183:5 194:2
196:22 197:21
274:9
**firm's (1)**
241:14
**first (59)**
31:17 32:19 36:19
37:8 42:20 46:9
53:20 66:8 68:19
69:23 78:23 111:2
116:3 119:18
120:11,17 136:24
140:13,20 143:12
146:14 155:12
158:22 159:6 162:3
178:24 179:6
180:15,25 181:21

181:25 184:22
186:20,23 191:10
193:18 196:22
199:18 204:17
207:5 209:12
212:22 221:14,15
237:25 238:4,18
239:7,9 240:5
242:14 244:15
253:11 254:24
255:2 266:2 271:7
274:4 280:23
**firstly (1)**
58:24
**fit (2)**
75:25 235:24
**five (6)**
67:3 128:3 251:7,15
274:24 276:18
**five-minute (2)**
198:17 256:22
**flag (1)**
199:15
**flat (1)**
30:19
**floor (1)**
89:24
**flurry (1)**
147:13
**flux (1)**
206:22
**focus (7)**
99:15,16 137:14
138:3 148:12 192:9
194:9
**focused (3)**
130:3 194:20 195:10
**focuses (1)**
21:19
**focusing (3)**
123:4 155:12 169:10
**follow (8)**
56:6 108:9 225:21
261:16,19 264:20
265:6 266:6
**followed (4)**
157:11,11,15 166:13
**following (8)**
7:3 10:6 35:6 51:7
80:24 172:2 213:6
280:17
**follows (4)**
28:10 29:8 93:16
252:11
**food (1)**
285:9
**fooled (1)**
155:16
**footnote (1)**

142:14
**force (1)**
212:3
**forecasting (1)**
233:6
**forecloses (1)**
241:3
**foreign (2)**
158:24 204:22
**forgery (1)**
14:22
**forget (2)**
164:24 259:24
**form (5)**
164:13 173:3,24
229:20 283:22
**forma (1)**
161:8
**formal (4)**
7:5 46:4 203:2 233:10
**formalities (4)**
157:10,14 166:12
177:20
**formally (1)**
43:5
**format (3)**
278:16,19 279:16
**formation (6)**
129:25 130:13 186:5
188:18 257:23
262:9
**forms (6)**
121:20 202:6,7
203:17 256:4,7
**forth (3)**
141:8 224:14 282:23
**fortiori (1)**
159:9
**fortunately (1)**
274:8
**forum (3)**
138:22 207:9 253:17
**forward (17)**
6:16 19:12 20:24
109:7 137:20
178:13 193:19
203:22 204:3
232:11 263:9 264:3
264:17 270:22
273:4 277:15
283:13
**found (6)**
12:13 70:8 151:21
156:10 165:17
166:14
**foundational (2)**
165:18,19
**founded (1)**

57:5
**four (7)**
67:2,4,4 142:14 231:9
252:12 276:17
**fours (1)**
170:2
**framing (1)**
278:15
**frank (1)**
214:8
**frankly (2)**
274:17 276:17
**fraud (1)**
216:2
**Frequently (1)**
215:18
**Friday (2)**
63:5,14
**Fried (3)**
2:16 5:12,12
**Friendly (1)**
163:16
**front (6)**
6:17 8:22 10:7 94:18
95:25 119:17
**frustrate (1)**
230:21
**fully (4)**
30:11 203:6 264:19
268:12
**functionally (2)**
12:19 145:25
**Fund (1)**
178:15
**fundamental (1)**
10:5
**funds (1)**
205:22
**further (14)**
4:10 55:15 80:12
82:19 109:17 130:9
130:11,25 133:10
136:6 145:10 280:7
282:10,13
**futile (2)**
159:14 228:2

_____
**G**
_____

**G (2)**
29:5,5
**game (1)**
7:14
**gather (2)**
18:20 220:11
**general (15)**
25:17 28:8 31:22
48:15 64:25 66:20
110:5 127:11

164:14 210:16
234:11 235:6
243:13 269:13
270:14
**generally (2)**
32:9 250:23
**gentleman (2)**
129:20 130:19
**gentlemen (4)**
18:6 36:3 51:8 281:7
**genuine (1)**
16:4
**gesture (1)**
206:9
**getting (10)**
41:11,16 112:12
160:13 207:19
230:10 231:19
267:5 278:8,18
**Gibralter (1)**
77:20
**give (18)**
14:14 39:10 91:6,7
99:24 106:13
123:21 136:16
140:7 210:25 219:3
227:22,25 252:15
271:21 274:23
276:7 278:14
**given (16)**
8:2,4,8 11:23 12:4,5
20:14 143:5 150:4
206:20 210:15
217:12 232:22
233:2 266:21 267:8
**gives (1)**
148:23
**giving (1)**
140:6
**glad (2)**
21:12 27:24
**gloss (1)**
140:5
**go (89)**
4:9,10 6:16 7:5,10
16:8 19:9,12 24:20
32:22 36:8 40:7
44:22 46:14 65:16
81:6 83:25 89:13
91:10 101:8 102:21
107:25 108:14
109:7,16 112:16
118:23 125:14
128:15 140:4,14
142:16 143:7 144:4
155:14 156:17
159:5,8,22,23 161:8
162:15,20,23
163:10 167:10

168:20 171:22
172:14 176:17,18
177:24 178:4,13,15
179:20 186:10
189:8 207:16 217:2
224:4,9 226:13
227:11,17,20,23,24
236:14,15,18 237:8
247:23 257:8
258:19 261:20
262:25 263:9,17
264:16 266:23
267:4 270:22 272:7
272:11 275:6
277:15 280:12
284:16
**goal (1)**
89:16
**goes (16)**
97:20 98:6 101:6
137:4 152:16 160:3
165:17,19 168:16
187:14 188:13
200:21 202:16
210:6 247:4 253:12
**going (87)**
4:7 8:25 11:15 15:19
16:18,22 17:6,21
18:8,9 19:8,9,20,22
21:2,2 79:19 91:7
91:20 93:22 95:18
98:12 99:15,15
100:15 114:2
118:23 130:2
136:24 138:12
139:11,13 142:11
143:8,13 144:21
156:21,22,23
157:17 158:5,18
159:11 160:15
162:13 164:12
165:7 168:6 169:8
169:16,20,22,23
174:22 185:17
187:20 192:6 199:3
229:15,18,20,21
231:18 232:10
237:25 238:6
249:13 252:9
257:17 262:3,4
264:2,20 267:2,14
270:22,23 272:15
272:17 273:6,7
274:16 275:5 276:2
277:13 282:12,24
**good (21)**
4:2 26:2 72:10 81:16
83:7 84:22 85:9
90:6,7 95:9 118:17

118:17 159:16
177:22 187:23
198:19 200:20
234:18 241:19
247:3,4
**gotten (5)**
14:24 72:13 107:15
196:17 251:19
**govern (5)**
36:25 199:12 201:2
219:12 245:16
**governance (5)**
84:8 100:23 215:24
244:3 249:22
**governing (3)**
26:6 74:8 199:10
**government (1)**
115:11
**governmental (1)**
31:14
**governs (3)**
27:15,20 202:17
**graceful (1)**
230:17
**granted (2)**
209:15 284:9
**granting (4)**
122:3 194:16 196:5
278:24
**great (11)**
4:21 8:16 53:8 152:15
178:10 245:7
257:12 265:4 274:9
274:9 280:4
**greatly (2)**
9:7 140:25
**green (1)**
199:15
**Greg (4)**
89:6 137:8 138:25
139:16
**Gregory (2)**
1:24 5:19
**grotesque (1)**
249:16
**ground (3)**
31:12 126:18 159:7
**grounds (9)**
100:16 158:16 176:22
177:18 191:20,23
192:7 205:7 264:24
**group (13)**
55:11 56:11,14,16
75:21,23 77:17,23
201:14 205:18
220:10 230:13
237:15
**growing (1)**
237:6

**guess (14)**
6:17 9:11 20:22 39:25
52:19 57:14 73:6,13
78:13 138:7 148:6
171:21 186:8
243:15
**guide (2)**
139:2 216:17
**guiding (1)**
241:21
**Gustad (3)**
50:16,18 51:17
**guy (3)**
40:23 153:8 235:20
**guys (3)**
138:24 155:16 232:14

**H**

**H (6)**
29:5 76:21 77:5,8
97:24 172:5
**half (8)**
9:15 89:14 113:23
139:7 150:19
154:19 260:13,14
**halfway (1)**
184:25
**Hallvard (1)**
32:15
**hand (6)**
37:17 142:11 199:10
241:21 284:9
287:13
**handed (4)**
57:12 148:24 237:15
266:19
**handled (1)**
112:8
**handling (3)**
55:9 112:3,6
**hands (3)**
155:15 260:25 265:5
**Hansen (5)**
32:17,21,25 33:6
92:12
**Hansen's (4)**
92:18 93:3 96:11
247:24
**happen (5)**
148:25 156:3 161:24
169:15 275:5
**happened (18)**
16:18,20 18:14,15
74:20 75:2 131:24
147:10 154:17
162:4 178:23 180:3
180:6 181:20
239:24 259:11
262:10 265:6

**happens (7)**
126:8 154:12,14
169:18 203:20
236:13 257:20
**happy (2)**
18:16 116:12
**hard (3)**
275:7,11,25
**hard-pressed (1)**
275:6
**harmonize (1)**
257:13
**harmonized (1)**
258:3
**hat (1)**
156:20
**head (1)**
30:25
**headers (1)**
54:8
**hear (21)**
8:19 9:17 11:15 27:25
30:5 109:10 142:20
176:6,6,9 185:15
189:5 214:21
227:25 249:7 252:9
256:24 262:10
268:20,22 271:14
**heard (16)**
13:5,24 147:12 173:5
177:22 183:23
195:3 204:13
208:23 214:3
223:16 258:20
266:2 268:22,25
270:9
**hearing (36)**
6:2 9:3 11:10 13:9
21:15,17 27:18 34:6
68:20 69:24 141:16
143:11 152:20
169:19 180:25
181:2 183:8 188:2
189:12,14 190:21
192:7 193:19
194:18,19 208:21
211:7,7 220:23
222:20 266:2
271:16 277:9 278:4
285:6 286:2
**heart (2)**
167:13 216:3
**heavy (1)**
11:19
**held (7)**
1:15 38:2 96:3 232:5
249:23 252:17
269:18
**help (5)**

75:6 91:6 104:11
150:17 273:19
**helpful (3)**
8:12 46:2 199:9
**helps (2)**
62:2 99:17
**hereunto (1)**
287:12
**HERRINGTON (2)**
2:3,8
**hide (1)**
231:22
**high (2)**
140:7 178:8
**higher (1)**
213:12
**highlight (1)**
7:21
**highlights (1)**
208:20
**highly (4)**
155:11 167:22 228:21
265:13
**hiring (1)**
241:17
**history (3)**
61:12 205:2 237:9
**hit (1)**
140:22
**Hogstad (3)**
2:19 5:6,6
**hold (2)**
175:5 248:13
**holding (5)**
56:19,21 163:15
166:7 280:24
**holiday (1)**
274:2
**home (1)**
65:16
**homologate (1)**
230:24
**honor (2)**
231:20 240:12
**honored (1)**
200:23
**hope (12)**
8:10,16 45:8 98:19
140:20 203:25
205:5,19 251:23
267:19 275:23
282:9
**hopefully (4)**
274:10 276:4 277:7
277:16
**hoping (2)**
20:6 89:15
**horns (1)**

150:21
**horse (1)**
268:7
**hosting (1)**
285:5
**hour (7)**
89:14 108:22 109:22
134:21 139:3,7
266:9
**hours (3)**
86:11 276:2,18
**HQ (1)**
2:9
**Hudyakov (11)**
54:15,18,19 55:6,23
62:7 65:6 67:6
79:22 110:22
119:17
**Hum (1)**
115:7
**hypothetical (1)**
284:12
**hypothetically (2)**
226:7 243:16

**I**

**ICC (1)**
218:14
**idea (7)**
84:6 89:13 121:14
185:8 187:6 198:19
259:17
**identical (1)**
229:13
**IDENTIFICATIO... (1)**
3:6
**identified (1)**
262:12
**identity (1)**
283:21
**ignore (7)**
174:22 231:3 239:3
240:20 261:6,13
267:22
**ignored (1)**
170:4
**Igor (1)**
62:24
**iis (1)**
99:9
**illustrates (1)**
241:20
**imaginable (1)**
176:23
**imagine (1)**
243:15
**immaterial (1)**
161:6

immaterially (1)
160:19
**immediate (1)**
251:4
**immediately (2)**
250:19 251:18
**impartial (1)**
215:20
**implement (1)**
236:15
**implementation (1)**
116:14
**implicit (3)**
209:10 226:18 236:10
**import (1)**
167:5
**importance (1)**
223:18
**important (23)**
15:8 40:13 51:21
63:19,21 84:12
116:18 117:3,11,16
118:18 120:2,9,19
133:20,25 134:8
135:11,15 157:12
167:24 258:8
285:19
**importuning (1)**
247:11
**imposes (2)**
146:18 147:3
**impossible (1)**
203:9
**impression (2)**
76:6 84:25
**inability (1)**
268:10
**inadequate (2)**
215:24,25
**inappropriate (1)**
230:18
**inch (1)**
192:14
**incitral (1)**
129:17
**include (2)**
94:11 279:12
**included (1)**
60:12
**including (7)**
166:25 203:15 221:5
224:25 233:15
238:21 277:9
**inconvenience (1)**
285:23
**incorporate (1)**
244:22
**incorporated (1)**

85:14
**incorporates (1)**
201:8
**incorporating (3)**
244:18 245:12 255:23
**incorporation (3)**
142:6,17 218:4
**increase (1)**
84:9
**independent (3)**
113:12 202:10 256:10
**indicating (1)**
14:20
**indication (2)**
185:2 280:25
**indicia (1)**
270:4
**indirectly (1)**
75:4
**individuals (1)**
283:11
**Indosuez (4)**
27:16 269:7,9 270:11
**indulgence (2)**
7:7 9:22
**infer (1)**
174:10
**infirmity (1)**
211:8
**inform (1)**
9:6
**informal (1)**
285:3
**information (6)**
12:6 14:22,25 28:20
41:16 271:10
**informed (7)**
41:11 43:24 46:11
189:14 192:18
260:17 263:12
**inherent (1)**
188:16
**initial (4)**
16:15 22:12 107:21
220:7
**initialed (1)**
244:25
**initially (1)**
204:11
**insisted (1)**
133:19
**insistence (1)**
280:23
**insistent (1)**
120:8
**insisting (1)**
120:8
**inspire (1)**

215:10
**instance (9)**
178:24 179:6 180:15
181:21 182:2
186:20 191:11
238:18 247:7
**instructions (1)**
275:3
**intelligent (1)**
254:8
**intend (3)**
21:16 206:9 230:20
**intent (1)**
281:10
**intentional (2)**
174:22 241:7
**Inter (1)**
204:19
**interest (7)**
37:18 38:22 39:2
74:20 77:3 78:11
241:9
**interested (8)**
78:9,13 137:15 179:3
220:23 237:18
238:14 278:25
**interesting (6)**
17:12 141:14 178:6
181:7 188:19
240:23
**interests (1)**
79:25
**interim (2)**
200:8 226:20
**interject (1)**
54:4
**intermediary (1)**
77:18
**internal (2)**
142:4 150:18
**international (5)**
201:15 215:22 217:4
217:5 218:11
**internet (2)**
70:9 212:6
**interpretation (2)**
216:6 268:13
**interpreter (1)**
65:15
**interrupt (9)**
17:19 76:21 182:15
182:24 183:7
219:23 272:4,7,10
**interrupting (1)**
15:11
**Interruption (1)**
94:15
**intervene (5)**

132:14,16 212:25
213:5 214:4
**intervening (1)**
240:13
**introduce (1)**
4:11
**introduced (3)**
84:11 89:2 127:15
**introducing (1)**
213:25
**introduction (1)**
17:22
**invalid (6)**
68:17 170:3 223:7
243:9 244:4 269:15
**invalidate (1)**
244:16
**invalidated (1)**
248:25
**invalidating (1)**
132:4
**invalidation (1)**
223:21
**invalidity (1)**
202:15
**inventing (1)**
237:2
**invest (1)**
248:12
**investigated (1)**
152:17
**investment (3)**
32:3,5 215:18
**investor (2)**
216:4 248:10
**invoke (1)**
244:8
**invoked (1)**
245:20
**involve (3)**
145:4 215:19 252:24
**involved (27)**
15:20 19:10 40:15
55:20 69:19 88:23
100:22 111:4,20,22
112:14,19 113:4,17
124:10,11,16
131:23 147:14,19
147:21 148:8,13
150:9,10 179:22
237:23
**involvement (1)**
111:7
**involves (1)**
147:7
**involving (4)**
32:2 212:12 233:23
266:3

**IPO (4)**
126:5,8,17 244:4
**ipso (1)**
202:14
**ironic (1)**
265:13
**irreconcilable (1)**
263:21
**irregularly (1)**
261:8
**irrelevant (3)**
28:18 269:22 270:11
**issue (34)**
12:9,22,25 16:10
40:20 49:7 57:8
84:18 85:4 130:2
134:10,14,19 135:9
136:21 140:23
141:13 155:13
170:10 178:9
181:13 186:5 188:2
188:6 220:17 226:8
232:13 234:25
237:22,24 238:2
257:23 262:8
279:14
**issued (3)**
106:8 170:4 184:10
**issues (12)**
26:17 61:3 120:19
130:3 157:23
185:24,25 193:25
215:9 229:3 232:2
257:12
**item (1)**
172:14

**J**

**J (1)**
2:16
**January (37)**
10:11 11:14,16 12:8
13:3 16:20 18:11
20:13 31:7,20 48:8
51:24 62:13,17,23
68:6 73:9 76:10
107:6 110:19,20
111:21 112:12
113:6 114:18,24
118:9 121:7 122:21
123:15 124:12,17
125:18 149:2,6
173:7 176:3
**JAY (1)**
2:22
**Jentes (179)**
1:23 4:16,16,20 10:20
10:24 13:13 15:10
15:13 18:17 19:17

20:18 26:3,15 27:8
30:9 36:3 40:21
55:8,13 56:5,23
57:10 60:2,9,21
61:4,7,15,25 62:3
69:5 73:3,18 74:5
74:16 75:10,19,24
76:7,20 77:8,10,25
78:8,17,24 79:7,10
79:15 91:13 92:8
94:7,13 95:7,11
104:11,20 128:25
129:3,15 130:16
134:15 139:6
147:16,20 148:3,7
148:15 149:3,9,21
149:25 152:23
153:11,21 154:4
155:19 156:16
158:12 164:7,18,22
165:2,6 166:15
167:17 168:9,16,20
168:23 169:6
170:25 171:6
178:21 179:10,17
179:25 180:5,12,22
181:10,17,24 182:5
182:9 183:11,16,19
183:25 184:5,9,14
184:20,25 185:18
186:7,15,22 187:11
187:20 188:8,19
189:7,11,20 190:2
190:11,18 191:6
192:12,23 193:5,13
193:18,24 194:12
194:22,25 195:15
195:25 196:9,14,19
208:14,24 213:16
216:13,20,24 217:2
218:17 219:22
220:9,20 237:11
239:10 242:20,24
250:10,18,22 251:9
251:13,22 252:5,8
254:18 256:17
263:4 264:15 273:3
273:13 278:11
279:10 284:15,19
285:13,17
**Jim (1)**
4:25
**Jmak (7)**
110:22,24 113:4,7,12
113:23 114:5
**job (1)**
241:19
**joined (1)**
136:21

**joint (1)**
277:7
**journalist (1)**
70:5
**judge (12)**
163:16 184:10 185:2
185:9 221:14 252:7
252:11,19 254:9
255:9,19 256:13
**judges (1)**
215:5
**judgment (12)**
12:21 158:23 231:2,4
231:9 240:5 246:7
261:5,6 264:24
267:20 268:4
**judicata (1)**
241:4
**judicial (3)**
215:11 263:24 265:2
**judiciary (2)**
252:17 254:3
**June (7)**
93:14 211:7 250:14
250:15,15,25
251:21
**jure (1)**
202:14
**juridical (1)**
240:21
**jurisdiction (50)**
138:21 185:14,22
193:25 203:15,21
214:14 218:15,16
221:8 223:23
224:25 226:8 227:7
227:8,11,16,17,24
229:2 240:22
242:18 245:19
253:18,19 257:15
257:16,19,22
258:12,17,22 259:3
259:9 260:3,10,16
260:17,24 261:10
261:12,22 262:2,8
262:23 263:5
264:16 267:3
268:20,21
**jurisdictional (7)**
192:7 194:20 211:20
230:9 253:20
257:11 277:12
**jurisprudence (1)**
221:9
**jury (1)**
219:5
**justice (9)**
207:24 208:12,12
211:12 214:25

217:7 240:25
241:20 268:8

**K**

**K (4)**
2:22 29:5 233:21
234:5
**keep (8)**
15:10 95:18 125:7
168:24 218:21
257:7 280:18
284:25
**keeping (2)**
4:6 33:24
**Ken (2)**
4:14 139:7
**KENNETH (1)**
1:22
**kept (2)**
43:4 181:5
**key (1)**
148:17
**Khomyak (3)**
93:25 98:19 179:8
**Khomyak's (2)**
184:2 191:9
**Khudyakov (10)**
40:20 41:25 42:22
43:14 44:25 79:23
80:6 122:23 124:13
125:24
**Khudyakov's (1)**
42:25
**kick (1)**
257:12
**kicks (1)**
257:20
**Kiev (11)**
23:5,13 30:19 31:2,3
31:12,13,15 51:17
197:22 270:16
**killed (1)**
167:25
**kind (18)**
18:25 53:25 84:24
91:20 123:10 125:9
125:13 134:22
172:24 173:24
237:17 238:8,8
239:20 240:15
247:21 278:23
279:2
**kinds (2)**
65:2 152:6
**Kirilenko (1)**
240:15
**Klymenko (18)**
79:12 177:4 179:12
181:8 182:2,4

185:16 188:24
190:23 191:3
192:15 195:10
196:2,6 197:22
210:11 235:24
265:9
**Klymenko's (1)**
189:8
**knew (17)**
64:24 129:24 137:24
144:14 149:14,21
150:14 151:7,7
153:2,8,14 157:8,19
157:24 174:11
192:20
**knocks (1)**
166:8
**know (172)**
4:12 9:16 15:17 16:17
23:3 24:17 26:15,19
32:19 33:6 37:20
49:14 52:21 55:6,7
56:8 57:8 60:10
65:18 69:18 72:2
74:22 75:2,11,25
76:3,15 78:5 81:9
94:13 96:14,19
98:22 99:4 101:13
103:20 104:8,14,15
104:16,18,20
105:13,13 107:13
107:14 111:16
113:17 114:14
118:21 121:10
122:7 123:8,23
124:5,8 125:13
128:9,13,13 129:23
130:13 131:9,11,14
131:16,23 138:25
146:23 148:10,11
149:4,7,8,10,11
150:14,17,20 151:8
151:20,24 155:4
156:9 157:6,9,10
159:20 161:17
163:11 164:11
167:9 169:8 170:13
172:21,21 174:25
175:2,4,23 177:8,14
177:16 179:20
180:10,12 181:12
181:13,14,25
183:13,15,17,18,20
183:24 184:17,19
188:21,21 189:18
190:7,12,12,16,18
190:22 192:3,16
193:21 194:6,10,23
194:24 196:6,8,9,11

196:13,14,16,25
197:5,6,13 200:14
201:12 210:19
218:18 225:11
229:6,9 231:4,10,24
231:25 232:3,16
236:21 237:25
241:22 245:22
252:3,4 255:3
266:18 270:5,8
273:16 275:14
276:9 284:23
**knowledge (19)**
32:25 56:18 74:11
104:23 123:20
131:2,8,19 134:2
144:22 146:11,19
147:2 165:20
180:14 185:8 194:5
197:24 283:9
**knowledgeable (1)**
282:25
**known (9)**
85:17 144:14 149:20
153:2,9 175:2,3
210:12 232:14
**knows (3)**
25:13 173:25 274:5
**Kodelko (1)**
105:6
**Kosogov (8)**
40:19 43:17 50:24
52:9 64:10,18 84:21
121:7
**Kulikov (1)**
41:11
**Kyivstar (56)**
31:21,25 32:4,6 35:9
37:19 38:23,25 41:2
42:9,14 43:7 50:6
50:20 51:2,4,6
54:20 55:25 56:20
56:21 62:23 64:11
66:18,23,24 67:8,15
67:23 70:14 71:20
90:10 97:22 98:8,14
99:10 100:3,10
113:10,11,16 114:6
114:17 126:5,10
127:3,21,23 128:6,8
129:7,21 130:21
145:4 147:19,20
**Kyivstar's (1)**
100:8

L

**L (9)**
2:5 91:12,14,17 92:5
92:13 93:8 94:19

96:2
**Labor (6)**
272:18 273:15,19
283:22,23 285:14
**laboring (1)**
274:6
**lack (5)**
28:17 215:19 237:2
253:24 269:15
**lacked (6)**
48:18 69:20,25
137:19 144:2 153:9
**lamenting (1)**
265:2
**language (12)**
24:6 29:18 81:20
131:20 160:8
199:19 203:13
218:23 252:14
254:16 255:7,13
**largely (1)**
22:9
**largest (1)**
237:5
**lasted (1)**
208:21
**last-minute (2)**
11:20 49:17
**late (2)**
108:17 266:8
**laughable (1)**
212:16
**law (84)**
13:5,18 19:25 26:6,9
26:13,16,17,20 27:9
27:10,15,16,19,20
27:21,22 28:3,9,10
28:21,22 74:8 89:18
101:5 140:25 141:4
141:25 142:5,7,8,16
143:2,7,14 144:13
144:17,17 151:22
155:2 162:2,12
165:16 173:19
177:21 182:24
183:5 185:12,25
186:4 187:17
196:21 197:21
203:10 204:21
206:6 207:9 215:19
220:23 225:25
229:9 234:16 235:4
241:14 242:12
248:4 254:15
256:14 258:15
259:24 260:2,4,12
261:2,16,23 262:16
262:17 269:2,3,12
269:19 279:7,24

**laws (3)**
216:4 217:16,18
**lawsuit (5)**
200:4 211:11 212:18
214:7,11
**lawyer (31)**
19:3 55:6 61:8 88:18
91:18,18 97:2 99:20
111:4 113:12,25
121:19 123:11,13
123:21 125:14
132:9 143:16
155:24,25 158:22
175:10,11 176:4
182:21 187:24
212:7 234:10,22
241:15 254:8
**lawyers (18)**
54:2,9 87:14 88:19
103:25 121:17
125:10 128:14,15
147:19 148:13
150:12,13 175:8,17
175:24 234:24
241:17
**lawyer's (1)**
63:14
**lay (2)**
101:3 164:14
**layer (1)**
216:7
**layman (4)**
209:20 210:2 239:18
241:18
**layperson (1)**
182:8
**lays (1)**
145:2
**lead (1)**
195:13
**learn (2)**
196:22 276:3
**learned (5)**
72:4,4 197:15 209:13
212:18
**leave (2)**
24:25 60:2
**leaves (1)**
37:5
**leaving (1)**
246:16
**led (2)**
49:3 157:3
**left (3)**
32:12 108:5 278:10
**legal (35)**
54:24 55:3 59:6 64:7
65:3 77:22 84:12
91:19 97:2,3,6,7

99:13,21,22 105:21
111:13,23,24 112:8
112:8 113:13,24
122:9 205:4 206:21
209:22 217:16,17
228:15 236:25
242:15 269:21
279:6,13
**legally (3)**
112:13 160:25 245:14
**legislation (3)**
66:15 68:11 69:3
**legitimacy (1)**
214:25
**legitimate (1)**
217:11
**Lehman (1)**
142:12
**length (3)**
8:16 245:7 264:5
**lesser (1)**
167:5
**letter (25)**
46:16 47:14 50:2,7,13
50:16,23 51:7 52:9
58:9 62:10 74:4
81:3 84:21 85:8,18
85:25 86:2,3 109:11
110:10 134:3
135:14 233:5
271:23
**letterhead (1)**
69:14
**letters (1)**
34:13
**let's (17)**
89:23 101:20 106:2,3
109:23 110:12
116:21 140:3,6
157:4 158:24 161:5
175:13 176:17
204:2 256:23 257:4
**level (3)**
2:8 46:18 119:7
**levels (1)**
72:19
**liability (1)**
235:7
**licensed (1)**
206:14
**lies (1)**
216:3
**lieu (1)**
61:17
**light (5)**
9:2 140:10 151:2
227:21 276:8
**limit (3)**
59:7 164:17 187:12

**limitation (11)**
28:15 107:17,19
144:11,15,23 147:4
147:9 165:20,21
265:22
**limitations (1)**
254:5
**limited (4)**
107:12 163:10 226:22
235:7
**limits (1)**
223:25
**line (10)**
18:5 19:3,23 61:13
79:12 108:10
115:18,23 116:3
119:18
**lines (1)**
115:23
**Lisa (2)**
2:16 5:12
**list (1)**
52:17
**listening (1)**
281:21
**listing (1)**
74:18
**lists (1)**
77:13
**literally (1)**
262:17
**litigation (3)**
180:4 215:8 268:11
**little (9)**
61:5 78:13 99:8
167:19 209:24
215:10 218:17
242:18 273:5
**live (8)**
6:5,8 17:10 30:17
135:23 195:4 232:8
259:5
**lived (3)**
22:18 121:2 247:19
**living (1)**
30:18
**LLC (1)**
1:7
**LLP (2)**
2:3,8
**loan (1)**
42:15
**local (1)**
216:10
**locked (1)**
248:9
**Logush (1)**
169:25

**London (2)**
2:9 5:5
**London/City (1)**
2:10
**long (8)**
9:17 31:5 89:12 221:3
249:13 250:11,23
283:2
**longer (1)**
33:7
**long-time (1)**
234:9
**look (34)**
24:5 59:25 60:3 62:4
62:20 67:9 73:6
74:6,16 76:21 83:9
87:2 90:21 97:12
112:21 116:21
117:25 119:16
142:24 143:2,3
151:18,18 167:6
171:16 175:10,11
183:25 184:6,14
186:16 199:9
209:16 265:4
**looked (6)**
97:7,10 117:20 145:8
163:20 181:15
**looking (17)**
52:16 57:21 59:9
63:11,16 75:11
91:14 92:3 94:19
143:13 151:11
154:8 165:8 177:7
200:24 278:3
283:12
**looks (5)**
148:19 150:11 173:24
184:21 189:3
**loose (1)**
33:23
**loosest (1)**
176:22
**lose (1)**
205:13
**losing (2)**
231:16 254:13
**lost (2)**
209:6 210:5
**lot (8)**
8:21 12:5 24:12
112:22 139:9
213:20 232:18
281:14
**lots (1)**
10:17
**loudly (1)**
29:25
**Lovells (5)**

2:13 5:13,15,17
197:15
**low (1)**
119:6
**lunch (6)**
89:17 136:3,9 137:10
139:3 140:3
**luncheon (2)**
139:20 236:20
**lunchtime (1)**
17:23
**Lykke's (2)**
233:17,21
**Lytovchenki (4)**
62:24 128:7,10 129:5
**Lytovchenki's (1)**
128:18

————————
**M**

**M (2)**
29:5 32:18
**Madison (1)**
2:13
**Magister (1)**
183:3
**mail (1)**
65:5
**main (4)**
84:6 159:25 176:17
267:17
**maintain (1)**
142:23
**maintained (1)**
138:15
**making (13)**
40:11 44:3 49:8 51:23
138:6 154:21,23
198:23,24 224:9
229:23 259:9
267:14
**man (2)**
172:18 175:3
**management (2)**
90:10 157:4
**manager (7)**
31:6,10,11,19,23 32:8
32:12
**manifest (1)**
261:15
**manifestly (1)**
261:23
**March (1)**
69:16
**Marchenko (13)**
182:8,10,12,16,20
183:14,17 186:19
187:7 190:19 192:2
212:5 241:13

**marked (5)**
34:8,22 59:19 60:13
199:15
**marking (1)**
33:23
**marshal (3)**
136:7,19 139:4
**marshalling (2)**
135:25 137:11
**Marta (1)**
93:25
**material (29)**
21:7 59:3,8 86:24
87:13,16,19 88:10
88:16,25 115:2
116:4 117:15 118:3
118:23 119:3,13
120:5 134:7 161:6
161:12,18 163:18
167:12,18,19,22
168:14,19
**materiality (3)**
161:15 166:16 223:18
**materially (3)**
11:17 160:12,18
**materials (4)**
195:2,5,19 279:21
**matter (32)**
1:2,13 4:24 5:18 6:19
9:10 19:24 25:17,18
54:13 77:15 100:18
104:15 132:23
144:3 151:21
161:25 169:17
187:15 200:12
222:16 239:23
242:19 243:17
247:14 248:4
250:16 260:6
261:11 267:6
269:18 287:9
**matters (4)**
32:2,2,6 261:3
**mature (1)**
217:16
**mean (49)**
8:5,24 13:13,15 20:19
35:13 39:21 43:3
46:9 66:6 71:18
72:17 76:20 81:25
84:5 85:8 86:9 91:4
99:12 103:7,21
108:15 120:17
127:14 132:7
134:15 148:8
149:12 174:19
182:14,23 183:6
205:15 207:15
213:5 222:23

223:15 225:8,12
242:8,9 262:16
263:5 267:13 272:4
272:7 274:11,25
275:25
**meaning (1)**
242:13
**meaningful (2)**
162:19 163:3
**meaningless (3)**
206:8 239:4 245:14
**means (6)**
12:10 24:4,5 119:24
119:25 274:21
**meant (3)**
39:24 191:3 193:13
**measures (1)**
200:9
**mechanisms (1)**
215:21
**meet (10)**
51:15 82:18 141:10
277:6,6 278:5
280:14 284:16,23
284:24
**meeting (65)**
10:10 12:8 13:2 14:9
14:10 18:10 43:7,9
43:12,22 44:7 49:6
49:23,24 56:2,4
62:14 66:20,22 67:5
67:12,13,14,16,22
68:16 70:16 72:11
72:12 79:4 100:4
125:17,21 127:11
127:18 130:4 135:3
145:5 146:7 151:2
151:19 154:2,10
162:25 172:12
177:2,6,11,15
179:23 181:14
188:5 192:6 194:15
195:11 196:4 209:2
210:20 235:5 236:8
249:4 260:4 272:25
280:5,20
**meetings (8)**
41:3 70:13,18,23
236:18 249:18,19
249:23
**meets (1)**
256:12
**member (3)**
64:10 67:8 183:3
**members (6)**
40:18 66:23,25 67:3,4
124:15
**memo (1)**
276:19

**mention (3)**
210:14 211:4,15
**mentioned (13)**
67:7,12 74:3 90:17
106:2 124:13 140:3
140:5 150:19 208:4
210:4,21 211:18
**merely (4)**
118:4,7 120:6 283:8
**merits (13)**
13:9 129:25 138:18
152:16,21 203:23
204:3 227:25
230:10 270:17
277:8,10 278:8
**message (2)**
41:18 105:5
**met (6)**
12:11 43:6 79:3,4,5
214:2
**mid (1)**
198:12
**mid-November (1)**
41:17
**mildly (1)**
206:25
**million (3)**
119:7,10,13
**mind (5)**
64:22 93:22 120:23
142:20 285:13
**mine (1)**
72:19
**minimum (5)**
12:25 175:9 241:3
257:8 266:14
**minor (1)**
141:19
**minority (1)**
248:10
**minute (12)**
7:8,19 8:7 9:22 11:8
15:11 105:10
147:13 162:10
168:3 272:21
284:17
**minutes (10)**
89:21 128:3 136:17
140:8,10,14 172:11
208:21 236:6,7
**mislead (1)**
208:10
**misrepresenting (1)**
265:14
**missing (1)**
281:18
**misspeak (1)**
69:6

**misstate (1)**
271:4
**mistake (1)**
174:23
**Mistakes (1)**
156:2
**misunderstand (1)**
198:5
**mobile (75)**
1:3 5:3 10:7 12:20
13:6,16 17:13 18:25
26:25 27:12 30:21
30:22 84:23 91:23
92:24 96:10,16 97:6
102:25 103:10,16
104:2 105:11,14
107:10,16 108:19
109:5,16 110:2
111:4 114:15 118:4
118:7 119:9,12
121:2,6,17,22,25
123:6,21,24 124:3,9
131:3 132:5,14,21
141:14 143:22
144:14,22,25
145:12 146:10,25
148:21 152:7,11
156:14,20 158:3
159:12,13,17
160:15,22 173:22
175:2 177:23 183:9
237:5 266:25
**Mobile's (7)**
15:2 16:15 91:9,17
146:21 160:4
178:12
**modes (1)**
207:13
**modification (2)**
173:10,12
**modifications (1)**
82:10
**modify (1)**
50:3
**moment (7)**
53:5 94:5 99:3 133:7
165:3 169:7,11
**Monday (4)**
1:17 63:5,15 65:16
**monetary (1)**
229:17
**money (1)**
119:4
**month (4)**
43:7 80:24 136:17
250:16
**months (8)**
10:17 14:2 20:16
160:10 174:6 233:7

251:7,15
**moot (1)**
274:5
**morning (5)**
4:2 90:6,7 91:15
173:6
**morphed (1)**
208:19
**mother (1)**
30:22
**motion (25)**
5:23,24,25 8:4 9:12
16:15 34:24 68:24
136:2,8,8,23 137:16
141:10 178:7
208:18,18 219:19
220:8 246:7 251:4
276:15,24 277:13
278:24
**motions (1)**
12:18
**motivation (2)**
71:13,24
**motive (1)**
100:19
**motives (1)**
207:22
**mouth (1)**
214:22
**movant (1)**
140:14
**move (13)**
101:20 128:24 136:2
141:19 142:22
203:22 204:3 250:7
250:13,18 273:4,20
274:22
**moved (1)**
251:14
**moving (3)**
44:18 137:19 275:17
**Musoff (3)**
2:22 4:25,25
**Myron (1)**
171:17
**mystified (2)**
158:21 159:3

——————————
**N**
——————————
**N (5)**
2:2 3:2 29:5,5 287:3
**name (12)**
4:12,21 29:14,15
32:15,17 62:11 75:6
110:23 111:11,20
172:18
**names (2)**
54:9 282:22

**national (3)**
216:10 230:22 231:22
**native (2)**
29:16,18
**nature (3)**
88:14 120:6 172:25
**necessarily (2)**
7:25 195:13
**necessary (6)**
21:16 66:15 103:5
105:15 122:22
123:2
**necessity (1)**
253:20
**need (9)**
91:6 97:2 123:6 137:2
145:16 163:4
227:20 265:19
274:17
**needed (5)**
11:21,22 42:2 74:12
247:16
**needing (1)**
241:21
**needs (1)**
127:11
**negotiate (13)**
49:22 50:10 51:9
54:21 59:3 82:25
83:6 108:2,25
109:21 110:8,13,15
**negotiated (8)**
22:21 122:6 156:25
212:11 235:16
246:11 247:5 270:2
**negotiating (10)**
25:10 32:19 33:3
51:22,23 58:22
84:18,24 85:5 87:9
**negotiation (14)**
10:17 11:20,20 87:6,8
87:25 108:23 112:6
118:13,22 124:11
134:16 168:7
282:21
**negotiations (14)**
19:11 36:23 51:19
55:10,20 80:13
86:19 102:20
109:17 111:5,8,15
111:21 112:4
**neither (3)**
23:18 130:17 264:14
**nervous (1)**
267:12
**never (22)**
32:20 50:13 70:9 72:9
72:10,12 76:18
81:16 94:3 102:9

109:20,21 122:13
141:11 146:13
155:10 173:22
177:22 211:18
257:14 264:22
266:2
**new (114)**
1:16,16 2:4,4,14,14
10:14 11:22,23
16:21 20:16,19,20
21:18 26:8,16 27:14
27:16,19,20 28:21
39:17 40:4 42:3
45:13,25 46:6,14,22
49:8 52:7 57:18
66:11,11,16,17 67:2
68:3 74:8 86:17
89:2 100:8 101:21
102:3,16 105:7,9,15
105:16 108:10,22
114:17 121:3
125:19 128:24
138:8 141:5 142:7
143:5 147:14,16,18
147:19 148:13
157:3 158:16
163:14 189:15
190:5,20 191:12
193:7 201:5 204:17
206:5,5,13 207:8,8
207:25 208:3
211:19 213:10,14
213:25 214:7,10,14
217:16 218:25
220:13 221:10,22
221:25 225:6,22,23
225:25 226:2,13
235:10 244:10
245:10 246:22
251:3 261:2,4 269:2
269:6,17,18,25
285:20 287:7
**news (1)**
271:13
**nexus (2)**
143:5 170:23
**night (1)**
285:20
**Nilov (69)**
11:23 12:7 14:7 20:15
22:25 23:4,10,12,24
25:16,24 27:2 47:16
48:9,14,15 62:15
63:7,12 64:25 65:11
65:13 67:13 69:19
69:25 70:6,24 79:2
90:25 94:22 96:14
100:11 101:14,16
122:3,10,17,24

125:18 144:2 160:8
162:18 172:19
174:4,11,16,24
175:4 194:16 196:5
196:10,12 202:22
203:11 210:24
232:24 233:6,14,19
235:17,19 243:20
244:5 249:8 264:7
271:12 281:5
282:17 283:4
**Nilov's (12)**
27:3 28:7 64:22 65:21
66:3 68:21 100:19
144:12,23 236:5
243:11,12
**nine (2)**
67:3 207:12
**Ninth (1)**
252:22
**NIS (1)**
178:15
**nodding (1)**
182:13
**Nolov's (1)**
63:3
**non-breaching (1)**
59:4
**non-circular (1)**
254:2
**non-compete (5)**
117:8 229:11,13,24
230:4
**non-lawyer (1)**
189:2
**non-recognition (1)**
264:23
**non-voting (1)**
56:3
**Norway (3)**
5:7 30:18 65:16
**Norwegian (3)**
29:18 162:11 205:11
**nose (1)**
238:23
**noses (2)**
230:14 240:18
**Notary (3)**
1:15 29:7 287:6
**note (2)**
23:15 93:19
**Noted (1)**
286:5
**notes (2)**
1:11 271:6
**notice (10)**
48:2 150:5 161:22
171:18 209:4 240:2
240:3 247:21 283:3

noticed (1)
  55:16
notices (1)
  167:9
notified (4)
  68:24 69:4 209:9,12
notify (2)
  275:23 276:4
notion (3)
  212:11 240:11 241:25
notwithstanding (3)
  27:24 220:12 262:24
November (7)
  41:17,24 80:10,18
    103:3 105:4 134:24
null (6)
  154:16 202:13 219:8
    220:16 232:16
    238:20
nullable (1)
  244:7
nullity (1)
  170:9
number (7)
  66:11 77:4,11 86:3
    172:14 234:8 236:7
numbered (2)
  77:13 96:5
numbers (1)
  49:14
numerous (1)
  220:2

O

O (2)
  29:5 287:3
oath (1)
  29:2
object (1)
  100:15
objection (10)
  6:19 22:12 24:25
    35:21 36:5 77:22
    112:15,18 214:3
    247:12
obligation (2)
  37:21 99:14
obligations (3)
  121:2 172:23 174:11
obliging (1)
  185:3
obtain (1)
  105:3
obtained (1)
  101:14
obtains (1)
  182:25

obviously (6)
  120:22 159:10 170:17
    186:13 192:21
    206:24
occur (1)
  172:10
occurred (2)
  164:2 172:12
occurring (1)
  248:6
occurs (1)
  284:11
October (13)
  14:11 92:14,24
    100:12 101:15
    104:2 105:12 106:8
    124:7 145:11
    162:25 164:2
    172:13
offer (5)
  35:19 36:8 137:17,23
    150:3
offered (1)
  42:11
offers (1)
  36:4
office (7)
  25:17 31:2,3 54:9
    63:15 65:15 90:15
officer (5)
  4:19 92:9 153:20
    163:17 234:11
offices (1)
  1:15
official (6)
  71:12 75:4 76:23
    215:13 216:15
    270:16
officially (2)
  56:3 78:21
officials (1)
  216:6
oh (6)
  94:13 158:5 166:23
    171:12 180:3
    193:13
okay (39)
  53:24 54:14 61:7,8,25
    69:23 78:24 80:4
    85:19 93:7 97:4
    98:10 105:19
    107:15,24 109:2
    110:14 111:3
    114:22 117:5 119:2
    120:10 124:8
    126:15,18 127:4,25
    131:15,17 133:4
    137:5 140:2 159:22
    184:5 195:25

198:14 216:24
  256:17 280:2
old (5)
  2:9 14:2 66:24 81:6
    205:3
Oleksiy (4)
  2:21 5:8 54:22 121:18
Olkesiy (1)
  64:7
Omega (31)
  37:3,5,11 38:19 39:5
    39:9,14,20 40:12,13
    40:15 41:6,12 43:5
    43:22,24 46:10
    47:21,22 66:25
    101:23 102:2,6,13
    102:15 135:5,5
    161:23 246:15,20
    248:18
Omega's (3)
  37:18,23 38:4
once (4)
  27:19 39:14 212:18
    248:4
ones (2)
  60:14 114:25
one-minute (1)
  17:21
ongoing (4)
  189:24 192:18,20
    211:19
online (1)
  241:15
oops (1)
  166:2
open (3)
  85:2 108:22 280:18
opening (1)
  7:19
openings (1)
  7:5
operate (1)
  15:6
operating (3)
  36:12 212:5 230:6
operation (3)
  37:13 56:22 100:23
operations (1)
  56:19
opinion (9)
  71:7 138:20 143:19
    169:25 176:11
    221:13,15 228:7
    234:23
opportunities (1)
  216:8
opportunity (5)
  281:17 282:4,8
    283:13,16

oppose (2)
  83:16 158:14
opposed (7)
  32:2 69:20 81:19
    82:13 138:24
    171:14 217:17
opposing (7)
  25:13 153:6 159:6
    219:3 257:24
    263:14 268:15
opposition (4)
  34:24 83:10 136:8
    220:7
Option (1)
  253:11
Options (7)
  221:14,15 237:25
    238:4 242:14
    254:24 255:2
oral (4)
  140:4 179:2 194:6
    271:5
orally (1)
  276:16
order (22)
  11:21 63:8 119:10
    127:19 144:9
    158:19 178:13
    184:9,15 185:3
    210:25 250:12,19
    251:15,15,21,21
    274:23 276:12
    278:23 279:14
    281:11
ordered (1)
  21:17
ordinary (3)
  43:15,15 224:11
organization (1)
  142:4
organizational (1)
  192:5
organized (1)
  77:19
original (2)
  58:11 88:21
Orrick (9)
  1:15 2:3,8,23 4:23 5:2
    5:5 274:8,23
Oslo (12)
  32:19 50:15,19,20
    51:8 83:6,13 85:2
    105:22,25 110:11
    124:14
ought (7)
  24:5 139:8,10,14
    144:3 278:14
    279:12
ousted (1)

27:21
outside (6)
  25:11,24 101:2
    205:18 208:6,6
overall (1)
  219:7
overcome (1)
  221:11
overran (1)
  128:4
overruled (1)
  112:18
overturned (1)
  17:15
owned (4)
  56:24,25 75:20 77:17
owners (5)
  57:2,3,6 74:19 76:2
ownership (9)
  56:10 74:19,21 76:11
    76:24,25 113:22,23
    113:23
o'clock (4)
  136:16 139:13,19
    274:24
O'Driscoll (3)
  2:10 5:4,4 150:10
    183:5 234:7

P

P (2)
  2:2,2
packed (1)
  253:17
page (39)
  25:7 35:6 42:21 44:24
    60:23 61:5,10 62:25
    63:4,14,15,17 64:8
    70:9 73:24 74:6,17
    77:10 93:8,10,11,11
    94:18 95:25 97:12
    97:13,23,23 98:25
    113:5 119:17
    127:25 128:2,5
    168:5 171:23 221:2
    234:5 252:12
pages (5)
  77:12 220:6 276:19
    278:13 279:12
Paint (3)
  202:16 223:12 224:7
panel (51)
  6:4 8:12 13:11,14
    31:9,24 36:17 37:6
    57:22 89:19 95:7
    133:11 136:20
    139:12 140:11
    150:22 152:6
    157:17 170:3

179:14 185:15
188:7 190:14 192:4
195:7,19 199:11
217:6 220:22 226:7
227:10,12 238:6
264:2 265:13
270:20,20 271:2,9
275:23 277:2,2,14
278:2,3,6,16 280:15
282:12 284:23
286:3
**panelists (3)**
8:20 9:3 256:18
**panel's (2)**
20:4 191:12
**paper (2)**
10:6 220:3
**papers (12)**
14:18 16:8 21:14 25:8
94:10,12 121:15
201:18 204:24
209:16 233:16
269:8
**paragraph (10)**
94:21 97:14,18,24
103:4 108:7 144:16
189:11 194:12
196:2
**paragraphs (1)**
99:2
**parameters (1)**
164:14
**Pardon (1)**
124:2
**parent (6)**
75:14 170:15 212:4
228:24 239:17
241:10
**parents (1)**
229:19
**part (42)**
9:12 27:5 31:22 36:19
36:21,22 53:22 57:7
57:19 58:25 73:21
84:4 85:22 86:16
87:20 92:15 96:17
97:9 104:9 109:13
111:15 112:9
113:24 114:12
127:14 132:9
135:25 138:3
146:18 202:6,8
203:17 214:18
221:8 223:22
232:20 236:11
255:14,15 256:4,7
267:17
**partial (3)**
278:15,20,22

**participant (2)**
56:4 78:23
**participants (37)**
10:10 12:9 13:3 14:9
14:11 18:11 77:14
94:24 100:4 125:17
125:22 127:12,18
130:5 145:6 146:8
151:19 154:3,10
162:16,24 163:5
164:3 172:12,18,23
174:12 177:6,11,15
179:24 181:14
188:6 194:15
195:11 196:4 286:4
**participate (2)**
102:14 197:4
**participated (5)**
55:25 67:15 72:11
174:14 228:20
**participating (3)**
41:2,4 62:15
**participation (1)**
198:11
**particular (10)**
73:18 100:20 112:25
134:6 167:3 199:16
201:7,24 237:22
275:7
**particularly (3)**
172:10 199:23 271:8
**parties (76)**
8:13 23:5 27:15,19,21
33:13 37:7 38:16
39:12 46:4 57:22
147:14,17 156:25
175:19,21 186:12
187:12,14 188:9
199:20,23 200:11
200:25 202:19
207:5,20,23 214:12
217:11,20,22 218:2
218:3 219:16,19
222:6,10,18,19
224:15 225:7 227:9
228:23 232:2
236:14,15 240:6,10
241:6,6,8 242:4,16
243:4 245:3,7
246:12,17 249:14
253:7,23 254:4,21
255:6,18 261:9
266:18 269:2 271:7
276:5 277:5,19
278:5 282:7 284:22
**partly (3)**
39:2,3,3
**partner (8)**
2:21,22 4:23 5:2,5,16

37:12,15
**Partners (2)**
2:21 183:3
**partnership (4)**
83:7 84:22 85:10
118:17
**party (25)**
23:2,18 25:13 63:17
73:20 114:6,9,17,19
147:18 148:4 155:4
170:4 186:14
204:17,18 209:5,8
219:3 228:19
230:18 241:9 268:5
268:15 269:10
**pass (2)**
260:19 281:2
**passed (1)**
174:6
**passes (1)**
263:16
**passing (1)**
165:2
**path (1)**
227:23
**pay (1)**
29:3
**pending (1)**
187:2
**people (10)**
110:4 115:9 119:18
140:6 231:18
274:10 275:8,11
281:15 282:22
**percent (13)**
46:18,19 56:14,17
71:21 75:9,22 77:3
77:16 236:24 248:3
248:5,12
**percentage (4)**
31:24 32:5 56:10,15
**perfect (1)**
206:15
**perfectly (7)**
26:2 157:2 217:24
241:16 254:14
256:15 270:2
**performance (1)**
97:16
**period (9)**
38:25 47:24,25 48:7
104:19,21 125:7
187:4 188:11
**permission (5)**
130:10 244:5,6
253:23 282:13
**permit (1)**
6:16
**person (8)**

16:4 30:2 172:17
182:22 253:15
257:23 263:14
280:16
**personal (2)**
261:10 272:13
**personally (2)**
81:15 139:9
**perspective (2)**
84:13,13
**Peter (3)**
2:10 5:4 284:11
**phone (1)**
237:5
**phrase (2)**
118:6 175:3
**pick (2)**
268:3 282:15
**picked (1)**
147:11
**picking (1)**
279:4
**Pieter (13)**
2:14 5:16 17:20 89:10
89:13,24 140:15
152:10 256:20
257:5,9 275:22
284:17
**Pieter's (2)**
284:10 285:5
**pile (1)**
220:3
**ping-ponging (1)**
285:2
**pint (1)**
80:6
**place (12)**
34:21 38:10 45:11,14
62:14 120:20 142:5
142:17,25 143:15
143:21 156:12
**places (1)**
213:13
**plaintiff (1)**
4:24
**plan (4)**
7:14 34:18 262:25
271:15
**planned (1)**
279:9
**planning (1)**
179:17
**plans (2)**
7:20 271:24
**platform (1)**
84:10
**play (1)**
262:13

**players (1)**
4:13
**pleadings (2)**
210:7,7
**please (12)**
4:20,21 16:9 29:3,13
36:17 47:19 79:20
98:22 99:3 108:6
115:17
**pleased (1)**
284:7
**plenty (2)**
140:6 205:20
**POA (1)**
103:8
**POAs (1)**
103:5
**point (51)**
18:6 22:22 24:21 28:2
28:23 58:5 65:9
79:23 97:8 101:4
107:9,24 109:15,22
110:14 112:7 113:4
113:18 141:19,21
143:12 146:17
148:9 152:5,14
153:13 157:16
165:20 174:20
177:22 187:19
188:13 190:25
192:8 203:9 215:4
223:9 231:18
238:11,13,14
257:11 266:7 269:6
270:12,13 274:21
280:23 283:15,18
284:22
**pointed (2)**
23:19 186:10
**points (7)**
28:5,20 159:25
167:22 171:4
176:17 267:25
**policy (1)**
261:13
**poll (2)**
162:24 163:2
**polling (5)**
14:10 171:19,24
172:16 236:10
**poor (2)**
215:23 265:9
**portion (4)**
35:6 42:20 57:21 77:5
**pose (1)**
138:24
**posed (1)**
232:13
**position (37)**

7:22 8:5 26:5,9,11
27:14 30:23 31:18
40:2 47:2 49:18
50:9 51:13 80:11,23
81:10,14 82:9,12
83:10,16,24 84:17
85:4,11 86:10
118:11 129:19
141:11 146:21
163:25 206:17
227:6 234:22
258:15 260:25
282:6
**positions (2)**
8:14 190:4
**possession (1)**
213:20
**possibility (3)**
29:21 159:4 226:15
**possible (9)**
33:17 39:6 200:15
206:6 217:14
233:10 245:9
278:19 280:5
**possibly (3)**
100:17 217:10 277:18
**postpone (1)**
48:7
**posture (2)**
8:9 191:17
**Post-It (2)**
95:5,6
**post-Soviet (1)**
205:2
**power (35)**
20:13,14 103:9,15,23
104:3,7,24 105:3,11
105:15 106:4,8,12
107:15 124:25
163:17 182:20,25
202:3 203:14
233:20 234:13
245:18 248:6,7
254:5,6 256:2
257:18 259:8
260:15 263:6,8,10
**powers (7)**
28:9 106:13 107:11
144:12,23 235:6,10
**practice (1)**
107:14
**precedent (1)**
228:16
**precedents (1)**
227:22
**precise (5)**
10:21 19:18 74:23
166:19 181:18
**precisely (4)**

156:8 174:14 197:13
269:5
**predecessor (1)**
210:23
**predecessors (1)**
253:14
**predicate (1)**
279:13
**predict (2)**
206:12,17
**prehearing (3)**
277:8,24 278:6
**preliminary (2)**
246:6 249:14
**preparation (1)**
57:7
**prepare (4)**
41:19 89:18 99:20
281:9
**prepared (12)**
23:2 42:6 62:8 105:6
121:13 122:24
125:25 231:12,15
232:8 242:11 259:5
**preparing (1)**
279:23
**prerogative (1)**
257:6
**presence (2)**
6:20 135:19
**present (17)**
2:18 24:18 43:12,13
43:14,17,19 55:4
65:15 130:11,12
136:17 179:18
193:6 195:4 213:17
282:10
**presentation (5)**
27:6 140:19 179:2
192:24 193:4
**presented (9)**
8:3 13:23 61:18
172:17 179:14
190:14 195:6
239:22 266:11
**presenting (1)**
17:10
**president (6)**
31:21 38:13 50:19
62:23 128:7 235:10
**press (4)**
69:13 70:6,8 209:14
**pressure (1)**
125:8
**presumably (1)**
233:7
**presumption (3)**
36:13 219:16 221:6

**pretty (2)**
159:16 163:20
**prevailed (1)**
119:12
**prevent (2)**
203:11 248:6
**previous (4)**
31:20 32:12 204:24
269:8
**previously (6)**
34:22 35:12,17 63:7
131:22 201:17
**Prima (1)**
202:16 223:12 224:7
**primary (2)**
158:9,10
**prime (1)**
118:11
**principal (1)**
21:13
**principle (6)**
25:11 28:11 38:18
202:17 253:2
269:22
**principles (1)**
224:12
**printed (1)**
54:8
**prior (7)**
17:16 111:12 112:3
115:4 141:15
150:14 191:23
**private (1)**
253:17
**privilege (2)**
54:6,13
**pro (1)**
161:8
**probably (6)**
8:17 88:18 158:15
171:4 189:3 196:17
**probe (1)**
130:10
**probed (1)**
130:9
**problem (12)**
152:24 153:3 155:5
215:23 232:7,10
233:25 234:2
235:12 238:16
242:21 268:17
**problematic (1)**
273:7
**problems (4)**
30:5 208:20 232:6
261:8
**procedural (7)**
158:15 191:17 207:13

213:24 261:3,7
279:2
**procedure (3)**
62:8 65:6 266:5
**procedures (1)**
212:24
**proceed (6)**
14:18 28:25 29:9
42:25 225:20
238:23
**proceeding (13)**
132:15,17 184:11
190:20 199:13
200:5 208:15,16
209:5 211:17,19,23
239:20
**proceedings (187)**
1:6,12 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
94:15 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
189:16 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1,3
201:1,2 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1,25
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1

239:1 240:1 241:1
242:1,4 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:9,11
**process (5)**
37:8 112:10,20
174:14 261:8
**processors (1)**
61:13
**productive (1)**
275:17
**profession (1)**
115:6
**Professional (1)**
287:6
**Professor (1)**
169:25
**proffer (1)**
282:2
**progress (7)**
40:11,14,16 41:24
42:2 43:4,22
**prohibit (1)**
266:25
**prolong (1)**
48:7
**prolongation (1)**
62:10
**promise (1)**
248:14
**promises (2)**
253:10 254:24
**prompt (1)**
278:4
**prompted (1)**
81:2
**promptness (1)**
278:7
**prong (1)**
149:19
**proof (2)**
280:8 282:14
**proper (2)**
46:12 156:12
**proposal (13)**
44:13 49:10,12 50:3

57:23 58:3 60:17,19
82:5 87:2 88:21
134:22 283:19
**propose (3)**
7:15 44:14 136:13
**proposed (22)**
19:4 42:13 46:15
49:23,24 52:17
58:22 60:18 66:19
73:13 83:11 85:13
85:20 86:15,20
93:13 109:12
114:23 133:17
276:23 279:17,23
**proposes (1)**
62:8
**proposing (4)**
86:22 117:14 118:2
273:11
**proposition (4)**
137:18,23 142:24
144:19
**prosecuted (1)**
241:12
**protect (1)**
267:14
**protection (1)**
215:24
**prove (1)**
8:16
**proven (1)**
8:15
**provide (8)**
123:14 185:4 247:21
276:14,21 277:7
283:3,3
**provided (5)**
168:10 179:7 243:22
243:23 279:21
**provides (7)**
202:8 214:14 220:4
222:11 223:21
225:25 256:8
**providing (5)**
113:25 204:22 216:6
221:23 281:7
**provision (18)**
74:9 111:25 113:2
115:25 116:18
117:3,11 126:7,20
126:22 127:15
165:13 175:15
199:16,24 203:10
218:8,15
**provisional (1)**
200:8
**provisions (20)**
73:23 74:7,14 115:22
117:16,20 118:14

118:24 120:6,25
160:14 166:21
167:7 229:11,13
244:2,15 247:2
249:17 258:3
**PRUSZYNSKI (3)**
1:14 287:5,16
**public (4)**
1:15 29:7 261:12
287:7
**publication (1)**
215:13
**pull (2)**
160:15 283:24
**purchase (10)**
37:18 38:4 41:12
101:23 102:2,15
126:5,10 127:2
146:3
**purchased (2)**
39:6,15
**purchaser (3)**
78:10 92:10 94:24
**purchases (1)**
154:22
**purchasing (1)**
40:12
**pure (1)**
242:12
**purely (2)**
161:8 284:12
**purportedly (1)**
248:25
**purporting (1)**
65:24
**purpose (1)**
146:2
**purposes (5)**
11:10 78:2 197:14
202:6 256:5
**pursuant (3)**
137:16 162:15 200:3
**pursue (2)**
21:16 55:14
**pushing (1)**
151:3
**put (18)**
22:14 147:22 169:10
209:20 210:3
214:22 219:18
238:15,25 239:17
243:20 245:22
246:4 249:5,11
266:4 282:4,13
**putative (1)**
129:16
**puts (2)**
12:14 176:24

**putting (3)**
169:7 206:25 238:21
**puzzled (1)**
149:4
**p.m (3)**
139:21 271:9,22
276:23 286:5

_____

**Q**

**qualify (1)**
195:9
**quality (5)**
150:6 217:7 249:10
268:8,9
**question (69)**
9:11 15:4 18:18 26:4
26:7 30:11 44:3,17
52:3 55:14 60:8
65:12,21 66:2 67:20
78:25 95:10 99:5
101:17 104:13
107:4 109:25 123:3
128:12 129:14
130:14 131:17
137:13 138:2 142:5
142:6,7 154:25
155:9 165:8 171:11
188:14,18,22 198:6
199:6 201:16
203:16 204:12
214:24 218:6
221:21,23 222:7
224:12,16,19
225:14 231:7
234:15,19 235:14
242:9,12 249:2
251:23 252:24
253:4 258:8 266:22
268:21,22,23
283:14
**questioning (3)**
93:2 139:12 209:21
**questions (33)**
29:22,23 38:24 40:16
44:22 72:24 73:4
79:18 99:25 119:2
131:25 133:11
139:2,9 140:11
165:10 171:10
176:7 178:10,18,22
183:12 196:20
200:18 205:19
208:13 209:11
211:20 230:16
231:25 236:20
249:14 256:19
**quick (1)**
256:22
**quickly (6)**

102:22 126:18 159:24
176:15 257:11
284:22
**Quire (1)**
150:9
**quite (13)**
15:12 37:12 42:10
48:3 79:13 88:4
97:10 214:2,20
217:10 232:13
239:2 282:19
**quorum (1)**
248:6
**quote (9)**
133:19 186:24 187:5
188:9,12 189:14
215:17 253:6,6
**quoting (1)**
80:11

_____

**R**

**R (6)**
1:22,23 2:2 49:15
108:7 287:3
**Rabij (6)**
27:7 28:5,19 144:10
171:17 235:2
**Rabij's (10)**
26:20 27:25 76:22
77:6 78:18 143:9,17
144:4 159:24
234:14
**Raggi's (1)**
255:9
**raiding (1)**
237:9
**raise (2)**
195:2 214:23
**raised (21)**
26:18 44:3 69:24
134:14 135:9
140:23 144:7 181:9
185:16 188:3,24
192:22 194:2 199:7
201:17 204:12
211:21 235:15
265:10 269:10
285:8
**raising (3)**
170:17 230:9 265:11
**ramification (1)**
155:2
**ratification (11)**
155:13 156:23 162:16
163:4,25 171:11,25
172:9 173:16
177:14 232:15
**ratify (2)**
162:25 174:12

**rational (1)**
217:19
**reach (1)**
224:11
**reached (2)**
218:2,3
**reaching (1)**
55:16
**reaction (2)**
16:15 107:21
**read (14)**
85:8 99:4 101:10,12
207:21 228:18,19
237:14,16 238:7
252:14 254:17
255:2 277:11
**reading (1)**
221:14
**reads (2)**
13:21
**ready (5)**
7:13 22:24 139:4
246:18 277:16
**real (3)**
212:3 241:9 274:7
**reality (1)**
139:15
**realize (2)**
146:23 275:4
**really (23)**
8:20 12:9 13:6 43:25
77:25 84:3 134:20
143:19 147:9,10
148:12 150:20
152:16 169:13
178:7 200:17
205:15 206:2
222:23 247:11
275:16,20 285:19
**reason (36)**
9:24 26:2 37:7 47:17
47:18,20 59:3 65:17
70:21 81:13 82:24
85:22 88:20 91:22
92:18 93:6 96:9,12
100:11 101:13
104:5 133:2 143:17
143:18 157:12
160:13 161:8 166:8
174:2 212:17
228:13 244:21
252:6 259:7 261:13
262:9
**reasons (6)**
54:6 109:3 138:18
175:6 207:4 212:22
**rebut (1)**
27:11
**rebuttal (9)**

136:20 137:3
256:20,25 257:5,7,7
267:25 283:25
**recall (8)**
42:21 44:10 47:12,15
68:20 69:24 127:8
152:10
**receive (1)**
122:2
**received (13)**
16:13 35:25 62:6
91:23 92:13,21,24
93:4,6 96:10 121:6
122:2 282:18
**receiving (3)**
42:21 47:12,15
**recess (9)**
32:24 89:22 139:20
198:17 199:4,7
236:20 257:3
270:25
**recognition (2)**
122:12 236:11
**recognize (4)**
63:24 139:11,14
257:14
**recollect (1)**
127:14
**recommendation (1)**
7:3
**reconcile (1)**
263:19
**reconvene (5)**
89:20,23 136:15
139:18 198:20
**record (33)**
22:24 23:4 29:14
32:23 34:7 37:24
38:2 67:17 96:3
101:12 144:20
213:3,10,15 226:4
226:10 239:6
240:14 258:9
259:22 262:22
264:19 265:14
267:10,15 268:11
272:17 280:9,17
281:25 283:24
284:16,19
**recorded (1)**
69:6
**records (5)**
22:16 78:22 154:8
209:18 210:19
**recourse (1)**
207:11
**recross (3)**
3:3 133:5,9
**red (1)**

158:7
**redacted (1)**
54:10
**redactions (1)**
54:5
**redirect (2)**
3:3 133:8
**reduce (1)**
230:25
**refer (4)**
9:7 45:8 91:10 279:20
**reference (10)**
52:6 75:13 116:4
141:6 143:9 201:7,9
255:23 269:3
279:18
**referenced (1)**
176:12
**references (2)**
74:24 167:22
**referred (11)**
26:8 34:2 35:12,17
54:15,23 73:14 83:7
120:3 167:18
204:23
**referring (12)**
44:23 45:18 59:17
67:25 82:2,3 84:22
106:5 189:13
199:14 208:24
255:11
**refers (3)**
98:2 119:19,22
**reflect (2)**
59:15 67:21
**reflected (4)**
42:12 66:13 118:13
211:6
**reflecting (1)**
80:15
**reflects (2)**
253:7 254:20
**refuse (1)**
231:8
**refused (1)**
102:7
**regard (2)**
226:20 259:5
**regarded (2)**
224:6 261:23
**regarding (12)**
37:17 39:12 44:15
48:25 65:21 74:7
86:23 91:2 96:15
102:20 118:15
171:18
**Regardless (1)**
161:14

**regime (2)**
217:16,17
**register (1)**
165:24
**Registered (1)**
287:6
**registration (1)**
268:24
**regular (3)**
183:4 212:8 241:12
**regularly (1)**
217:6
**regulate (1)**
84:6
**regulations (1)**
216:4
**rehearing (1)**
251:5
**rehearse (1)**
233:12
**rejected (5)**
85:22,24,25 86:8
189:5
**rejecting (1)**
50:3
**relate (3)**
49:7 55:23 91:19
**related (6)**
60:15 61:3 132:23
193:21,25 211:25
**relating (6)**
74:10 88:10 95:14
186:25 191:11
195:13
**relation (3)**
31:15 36:25 40:25
**relationship (3)**
36:18 46:21 118:17
**release (4)**
69:13 70:6,9 209:14
**relentless (2)**
215:7 236:25
**relevant (11)**
48:16 57:9 84:3,15
90:15 155:9,11,11
161:18,21 254:16
**reliance (1)**
248:13
**relief (8)**
158:4,6 209:16
229:11,15,16,17,21
**reluctant (2)**
206:24 207:4
**rely (4)**
27:3 132:8 194:17
260:8
**relying (1)**
154:20

**remains (2)**
6:25 216:9
**remarks (3)**
7:8 24:18 267:18
**remedy (2)**
168:10,13
**remember (11)**
38:19 43:17 62:11
86:2 121:8 126:12
127:20 128:22
133:21 191:16
192:17
**remind (1)**
17:25
**reminded (1)**
271:7
**reminder (1)**
271:13
**renaming (1)**
75:17
**render (2)**
138:17 280:16
**renegotiate (1)**
86:12
**renegotiating (1)**
164:17
**reopen (1)**
133:3
**repaid (1)**
42:15
**repeated (1)**
235:17
**repetitive (1)**
153:12
**rephrase (1)**
29:22
**replaced (1)**
79:11
**reply (1)**
176:23
**reported (1)**
287:8
**Reporter (2)**
1:14 287:6
**represent (3)**
4:23 5:2 209:22
**representation (1)**
14:15
**representative (7)**
31:2,3,12 51:5,16
103:16 134:17
**representatives (6)**
43:15 44:3 55:18
58:21 70:12,22
**represented (3)**
75:8 182:17 211:23
**representing (6)**
43:19 51:2 56:2,3

64:11 113:16
**represents (1)**
32:4
**reprint (1)**
252:12
**reputational (1)**
231:13,15
**request (10)**
22:11 23:7 42:25
49:18 51:10,19 89:3
137:13 247:10
284:10
**requested (6)**
22:19,23 44:11 59:16
59:23 62:16
**require (3)**
126:15 157:20 269:24
**required (13)**
67:19 68:4 70:23
96:20,23 125:22
126:4 194:16 196:5
225:18,19 236:16
269:11
**requirement (5)**
78:19 100:13 127:2
145:10 151:2
**requirements (2)**
157:19 260:4
**requires (4)**
100:4 127:5,18
249:22
**res (1)**
241:4
**reserve (1)**
137:2
**reserved (2)**
273:16,18
**resign (1)**
235:21
**resist (1)**
17:20
**resolution (11)**
11:22 14:19 73:22
96:19 145:16 174:5
175:13 177:2
199:24 215:20
267:5
**resolutions (25)**
11:6,11,12 16:10 91:2
95:13 96:6,15,23
97:11,13 100:12
101:14 122:3,14,16
122:21 123:4,7
145:12 146:6 160:5
171:19,23 172:15
**resolve (1)**
206:25
**resolved (4)**
178:12 221:21 226:9

253:21
**resolving (1)**
229:2
**resort (7)**
206:9 208:8 214:11
217:23 225:5,9,17
**resources (1)**
205:21
**respect (6)**
46:5 133:15 166:11
188:11 219:23
242:25
**respond (7)**
8:24 42:24 112:17
176:13 271:23
273:15 276:6
**Respondent (2)**
1:8 2:16
**response (6)**
101:11 136:24 179:7
196:18 225:14
271:25
**responsibilities (4)**
31:9 32:8 33:11 38:12
**responsibility (1)**
90:9
**responsible (5)**
32:10 33:2 50:19 87:9
175:5
**rest (1)**
276:12
**restated (2)**
30:13 93:13
**restricted (1)**
281:5
**result (4)**
68:8,9 86:18 89:3
**resulted (1)**
88:9
**retired (1)**
33:9
**return (2)**
57:20 98:17
**returned (1)**
23:12
**returning (2)**
218:21 257:10
**revealing (1)**
24:16
**reversal (1)**
250:12
**reverse (2)**
132:23 242:6
**reversed (1)**
250:14
**reverting (1)**
191:25
**review (6)**

33:18,19 125:10
226:22,24 227:3
**reviewed (1)**
90:12
**reviewing (1)**
130:14
**revision (1)**
226:21
**revisions (1)**
61:22
**revisit (2)**
13:16 14:3
**revisited (1)**
158:19
**re-ordered (1)**
140:19
**re-rebuttal (1)**
257:8
**right (85)**
10:24 15:12 24:9 27:7
30:4,13 37:21 38:19
56:5 61:8 81:7
84:18 88:11 91:16
92:25 95:15 98:8,14
100:4 101:23 102:4
102:7,10,17 105:17
106:5,10,14 107:22
108:12,16 111:5
112:14,24 113:4,11
114:3,7 115:6,11
116:9,22 117:17
118:24 119:4,7,10
119:14,20 124:4,22
125:2 126:6,11,16
127:5,12,17,22
131:7 132:14,16,18
145:6 146:8 159:7
167:12 181:5
207:18 209:22
221:20 224:20
235:20 241:20
242:24 251:12,17
258:6 264:2 267:7
272:7,23,24 277:3
285:14
**rights (7)**
39:9 71:20 78:11,12
214:5 215:25
267:14
**risk (1)**
261:15
**risks (2)**
231:13,16
**road (2)**
140:7 232:7
**roadmap (1)**
45:10
**Robert (4)**
2:5 4:22 17:24 280:12

**role (1)**
58:2
**room (3)**
6:25 216:5 281:15
**roughly (1)**
79:2
**round (1)**
63:23
**ruined (1)**
85:9
**rule (19)**
25:9 138:11 215:19
217:9 222:3 224:25
226:8 245:18
258:21 259:2,4
260:6 261:25 262:7
262:7,22,22 277:2,3
**rules (30)**
1:2 199:10,12 200:25
201:7,9,24 202:9
218:5,9,13,14
219:11,13 222:12
222:24 223:2 224:8
243:3 244:18,22
245:13,16 255:8,11
255:23,24 256:6,9
263:7
**ruling (6)**
130:7 191:24 220:16
221:7 277:20 279:3
**rulings (1)**
138:21
**run (9)**
162:10 178:14 211:13
212:19,21 229:18
231:18 258:23
261:14
**running (3)**
109:23 242:6 277:21
**rush (3)**
125:4,6 157:21
**Russia (1)**
104:10 150:13 275:8
275:11
**Russian (6)**
70:5,5 113:22 269:10
269:12,21
**R.V (2)**
182:16,19

_____
S
_____

**S (6)**
2:2,6 29:5 47:10
48:12,13
**safe (1)**
241:18
**Sanders (1)**
150:9
**Sandvik (1)**

253:13
**sat (1)**
155:6
**satisfied (3)**
152:8 176:21 281:25
**satisfy (5)**
30:3 153:18 172:22
185:13 262:11
**satisfying (1)**
171:5
**Saturday (1)**
272:22
**save (1)**
36:4
**saw (16)**
10:19 14:17 82:24
91:21 117:20
125:14 127:8
144:23 145:18
160:11 167:25
175:24 176:20
236:22 239:7,8
**saying (27)**
22:24 81:5 85:9 110:7
130:7 141:18
145:13 156:20
159:19 163:16
173:23 175:17
177:2 179:22 188:4
223:5 225:10,11,13
226:6 243:3 259:8
259:21,22 260:5
264:7 265:3
**says (52)**
12:7 24:4 26:16 39:17
80:5,9 93:12 94:22
99:23 100:5 126:9
127:21 145:6
146:13,22 148:21
150:23 152:22
153:6 155:3 166:2
173:17 176:24
177:10,10 182:19
186:11 187:21
189:12 196:2 200:2
202:2 203:5,5
205:14 218:23
219:15 220:12
224:24 225:22
233:18 243:6
252:11,16,23
255:19 257:21
258:22 263:13,15
265:15 267:2
**scattered (1)**
140:21
**schedule (7)**
41:5,14 273:25 277:8
277:17,24 278:6

**scheduled (1)**
62:14
**Scientific (1)**
163:15
**scope (8)**
25:12,25 28:13 101:2
208:6 210:6 226:22
235:5
**scrap (1)**
10:8
**scribbled (1)**
271:6
**seal (1)**
249:5
**sealed (2)**
63:17 64:4
**Sear (1)**
197:4
**second (39)**
32:23 36:20 37:25
44:24 57:21 63:11
93:7,10,11 95:4,5
100:25 146:18
149:19 150:11
158:2 177:18 181:2
188:8 201:4,13
218:19 220:19
221:4 229:6 234:5,6
238:3 240:13 243:8
244:8,16 245:13
247:16 250:4,21
255:9 259:24 261:9
**secondly (1)**
162:5
**secretary (1)**
67:13
**section (17)**
28:15 74:9 98:21,23
99:8 100:13 115:6
115:25 116:12
117:5,6 127:9,17
145:7 200:4,24
244:25
**sections (2)**
116:5 118:3
**secure (1)**
229:15
**see (62)**
8:20 15:18 19:8 21:6
21:12 35:18 48:9
55:23 61:4 69:13
84:14,20 85:14,19
86:11 93:4,5,8,12
94:20,20,25 95:16
95:18,24 97:14,18
97:24 99:7,9,14,18
99:19 100:2,8,17
103:4 106:7 114:4
116:3,7,9,24 126:24

137:3 144:6 148:22
150:16 160:22
178:6 184:18
193:16 207:17
228:25 234:21
235:24 247:16
251:5 265:21
274:17 279:5
282:20
**seek (6)**
162:16 204:7 205:16
226:24 227:2,5
**seeking (2)**
228:19 277:22
**seen (40)**
14:20 36:23 48:24
53:21 58:14,17
59:10 71:19 76:4,18
94:3 95:21 96:6
99:22 100:6 110:10
111:11 114:22
122:13,15,16
123:24 128:17
129:9,12 130:5
146:13,15,17
163:11 164:11,16
177:17 234:25
239:6 245:24
263:22 264:22,24
265:2
**select (1)**
227:10
**self (1)**
270:8
**self-generated (1)**
270:8
**self-inflicted (1)**
224:2
**self-serving (2)**
176:25 177:3
**sell (1)**
102:7
**send (6)**
16:9 51:12 86:2
122:25 239:18
241:18
**sending (2)**
123:11 277:4
**senior (1)**
92:9
**sense (6)**
28:18 110:5 191:5
200:20 224:10
233:11
**sent (26)**
45:4,6 47:14 49:11,16
50:2,7,13 51:7
58:20 63:2 85:17,18
86:3 90:22 91:2

96:14 110:11
121:18,22,24
144:25 145:12
155:20 171:21
210:2
**separable (1)**
243:8
**separate (12)**
100:16 103:15 202:23
203:8 221:22
232:13 243:5,8,14
244:11,24 264:12
**separately (3)**
253:8 254:21 255:18
**September (20)**
6:8 78:22 271:11,16
271:22,24 272:14
272:14,19,22
275:18,21 276:7
277:6 280:6,13,14
280:18,20 284:24
**sequence (1)**
46:7
**sequentially (1)**
77:13
**series (6)**
77:18 110:19 186:23
230:9 233:13,22
**serious (5)**
201:4 212:14 222:5
246:12 249:20
**set (13)**
52:13 66:14 103:23
191:8 201:10
224:14 227:5
244:23 251:14
255:11,13 256:12
287:13
**sets (4)**
24:2 141:8 261:7
268:14
**settlement (1)**
216:9
**seven (2)**
172:14 221:2
**Seventh (1)**
252:2
**severability (14)**
74:10 166:18 167:7
188:15 218:8
219:14 220:15
223:13,17,20
224:12 243:2
254:19 259:17
**severable (7)**
188:16 202:21 203:7
222:13 224:6,9,10
**share (2)**
46:17 101:23

**shareholder (18)**
37:3 39:17 49:2 59:4
67:12 79:4 83:22
84:9 100:9 102:13
120:16 126:10
150:25 166:2
215:25 223:7
249:18,22
**shareholders (164)**
10:12,13,14 11:4,13
14:8,12 16:21 18:21
19:14 33:4,19 35:7
35:14,16 36:20 37:4
37:10 38:10 39:8,14
39:17,22,23 40:4
41:20 42:4,13,16
44:4,7 45:12,16,17
45:19 46:6,14,15,22
47:4 49:8,20 51:11
52:8 57:24 58:6,23
59:13,18 62:18,22
64:21 66:7,11,12,20
67:5,19,22 68:5,9
68:16,22 69:15 70:2
70:23,25 71:8 72:11
72:14 73:8,11 75:9
76:9 80:20 81:6,21
82:5,22 84:5,7 85:5
85:15 86:17 87:4,24
88:6,8,23 90:18
98:2,12 101:22
102:3,10,17,21
103:21 105:7,9,17
106:17,24 108:3,10
108:20,25 109:13
110:16 114:3,7,20
115:5,19 116:18
117:17,22 120:20
121:3 122:5 125:19
126:3,3,4 127:2
128:11 131:3,6,10
131:11 132:4,11,12
133:16 135:10
145:19,22,24
147:22 163:8 164:4
166:10 171:15
172:6,9 173:12
174:3,13 193:10
195:12,24 214:13
223:13 229:12
243:17,24,25
246:16,22 248:14
248:16,22 255:16
266:13
**shareholding (1)**
66:12
**shares (37)**
37:18,23 38:4 39:5,14
47:22 56:19,21 66:9

71:22 75:7 78:5
97:22 98:8,14 99:11
99:16 100:3,8,10
102:2,7,15 126:5,10
126:16 127:3,6,10
127:19 145:5,15
146:3 147:7 236:17
246:15,20
**Shaw (3)**
201:14 220:10 237:15
**sheet (2)**
148:4 191:2
**Shevchenko (1)**
2:21
**shoes (1)**
263:14
**short (1)**
18:6
**shorthand (2)**
1:14 245:12
**show (22)**
12:15,22 16:18,23
18:13,19 20:21 21:6
21:8 26:23,25 59:12
77:6 91:5 93:23
150:18 153:7
157:17 178:9 243:7
243:10 283:21
**showed (2)**
210:2 228:24
**showing (8)**
10:9 19:3 27:13 57:6
115:18 128:18
246:6 268:16
**shown (4)**
33:15 74:3 148:4
259:14
**shows (2)**
22:5 171:22
**shred (2)**
25:22 245:25
**shuffle (1)**
209:6
**side (11)**
124:10 136:16 140:7
151:9 169:10
245:22 246:4
275:24 276:13,18
276:21
**sides (6)**
26:4 139:8,10,14
276:16 280:10
**side's (1)**
276:14
**Sigmund (1)**
3:4 4:18 29:4,15
**sign (50)**
14:8 19:15 42:7,25
49:24 51:14 60:18

62:8,17 64:23 70:25
80:14 82:5,22 103:6
103:10 105:6,7
108:23 109:12,23
110:12 120:21,22
122:4,24,25 123:7
125:25 128:10
129:6,21 130:20
135:7 148:5,23
155:14,22 163:10
165:11 231:20
232:24 233:19
234:12 235:20
243:14 246:22
269:13,14 270:14
**signal (1)**
277:5
**signatories (1)**
50:23
**signature (20)**
23:9 63:3,4,5,7,16,22
64:8 65:5 122:10
128:2,5 162:18,19
163:2,3 243:4,12,12
243:21
**signed (56)**
11:13,21 18:22 19:7
20:12 21:21 22:17
23:9,12,14,22 38:14
39:18 47:15 48:10
48:14,16,18 62:22
63:12,13,13,15 64:4
64:9 65:8 68:5
83:22 88:9 106:18
106:25 114:13
121:21 124:17,20
124:24 148:7 149:5
151:4 163:22 165:9
165:9 173:7 175:21
195:22,23 199:20
200:23 202:23
221:22 222:25
232:22 236:14
243:4,17 250:6
**significance (2)**
240:22 247:15
**significantly (1)**
80:20
**signing (10)**
14:12 23:6 45:13 48:8
49:22 62:9,12 65:2
231:13 232:21
**signs (1)**
235:22
**Sills (163)**
2:5 4:22,22 6:6,13 7:2
7:4,13,24 12:4
14:21 16:8 21:11
24:7,10,18,23 25:3

25:6 26:8,17 27:14
28:25 29:4,10,12
30:16 32:22 33:22
34:10,12,18 35:15
35:19,24 36:15
37:24 39:25 40:8
44:19 47:19 48:13
52:2,4,21 53:4,14
53:15,19 54:3,7,12
56:6 57:16 59:21
60:7 61:11 68:2
71:3 76:20 77:9,12
78:17 93:23 94:4,9
100:15 112:15
133:6 136:10 141:2
141:16 143:6
169:18 170:8
182:12,14,17,23
183:6 185:11 195:6
195:21 197:7
198:14,16,21 199:2
199:5 203:22,25
204:4,7,10 207:3
208:23 209:3
212:21 213:18,23
214:8,18 215:3
216:15,22,25 217:3
219:10,25 220:18
220:25 223:10
225:13 226:15,19
227:4 228:10,17
229:25 230:5
232:18 234:5
238:25 239:14
240:3 242:23
250:14,20,24
251:12,17 252:3,7
254:7,12,20 259:12
261:19 263:23
264:10 265:8,11,24
266:21 267:24
268:2 272:3,9,12,18
272:24 273:12
274:2,13 280:22
281:24 282:6
283:19 284:2,7,18
285:3,24

**Sill's (1)**
14:17
**similar (1)**
218:14
**simply (7)**
24:11 54:7 198:22
224:10 230:14
243:16 262:7
**simultaneously (1)**
276:22
**single (2)**
17:13 184:10

**sir (1)**
77:9
**sit (1)**
146:20
**site (3)**
215:16 216:19 241:14
**sitting (2)**
225:23 261:4
**situation (2)**
42:10 238:8
**six (5)**
9:15 25:7 125:7
189:11 233:7
**size (1)**
87:18
**slightest (2)**
121:14 178:2
**slowly (1)**
30:2
**small (2)**
42:5 80:15
**somebody (5)**
19:20 138:10 176:25
277:21 285:19
**someplace (1)**
79:12
**somewhat (6)**
8:8,10,13 9:13 22:3
206:24
**son (1)**
272:15
**soon (5)**
33:16 45:14 153:24
156:10 246:14
**sorry (34)**
15:10 18:25 19:17
35:15 61:7 67:20
69:5 96:4 98:16
106:23 107:5
109:10 117:5,6,6
118:5 128:4 130:24
146:11 153:11
156:18 173:7 180:2
181:17 183:6 186:9
195:8 216:25 236:8
239:16 251:13
255:15 258:19
262:19
**sort (25)**
9:14 17:22 31:15 39:9
41:14 46:10 52:17
59:6 75:17 76:19
83:23 84:6 87:13,15
99:20 122:12
138:23 140:8
151:25 201:20
232:25 240:22
241:19 268:16
285:3

**sought (3)**
207:11 229:10 251:18
**sound (2)**
217:24 253:14
**sounds (1)**
147:10
**Southern (4)**
138:8 208:9 226:13
226:24
**so-called (4)**
36:6 186:18 208:16
209:13
**speak (7)**
8:6 29:25 30:2,6 53:3
207:21 215:3
**speaker (1)**
29:17
**speaking (8)**
79:24 80:3,7 83:2,4
130:15 279:11,16
**speaks (1)**
65:13
**specific (1)**
229:16
**specifically (4)**
126:22 127:21 222:14
233:18
**speculate (2)**
81:17 207:22
**speculation (1)**
100:18
**speed (1)**
4:6
**spell (1)**
4:21
**spend (2)**
31:25 32:6
**Sphere (25)**
12:10 23:25 24:4 25:7
28:11 141:7,8,12,17
151:12 152:22
153:6 176:18
177:25 218:20
219:12 238:8 246:5
251:25 257:20
260:14,18 263:13
268:14,14
**spirit (2)**
22:20 33:25
**spoke (1)**
225:15
**spring (2)**
40:17 68:23
**Sputnik (4)**
38:19,20,22 39:2
**squarely (1)**
256:16
**stacks (1)**

10:6
**stage (5)**
82:16 87:11 108:17
113:13 240:13
**stake (1)**
212:15
**stamp (5)**
63:23,24 96:5 243:21
249:5
**stance (1)**
141:7
**stand (1)**
270:23
**standard (11)**
12:11,18 24:2 26:24
141:9 151:12
155:12 176:18
178:7 245:5 263:13
**standards (3)**
153:18 279:6,24
**standing (1)**
71:20
**stands (3)**
240:25 244:20 280:8
**start (12)**
4:9 40:15 82:25 84:24
86:12 102:24 141:6
143:15 198:15,21
199:3 260:14
**started (6)**
31:19 41:4 51:22
66:16 184:11
198:12
**starts (3)**
73:24 97:15 99:9
**state (11)**
29:13 74:8 103:5
208:3 214:15
215:12,15 216:15
216:19 255:4 287:7
**statement (10)**
19:19 175:14 180:9
180:20 187:7 188:9
194:23 226:18
233:16 254:15
**statements (1)**
186:23
**states (10)**
79:22 169:18 170:12
170:19,23 201:6
202:18 205:23,24
213:3
**stating (3)**
51:13 70:6 226:10
**status (1)**
28:7
**statutes (1)**
253:22
**statutory (1)**

205:6
**stay (1)**
277:22
**staying (2)**
97:11 141:25
**steelworkers (1)**
200:14
**stenographic (1)**
1:11
**step (1)**
46:10 66:9 261:18
**steps (2)**
46:4 203:2
**stick (2)**
58:10 270:20
**stock (1)**
154:21
**stop (1)**
267:4
**stopped (1)**
70:12
**Storm (235)**
1:7 5:17,24 6:4,9,16
6:18,24 8:3 9:19
12:3 14:6,16 15:15
15:20 21:12 22:14
22:23 23:16,23 25:8
26:5 35:9,22 36:5
37:2,14,16,22 38:4
38:5,18 39:4 40:10
40:17 43:13,14 44:2
46:19 47:23 48:15
48:16 49:7,16 50:4
50:6 51:2,3,9,16,19
51:22 54:20 55:12
55:13,22 56:2,10,14
56:18 57:3,4,24
58:21 59:2,16 60:19
61:18,18 62:19
63:24 64:9,10,11,25
65:2,23,24 66:19,25
67:4,18 68:12,20,24
70:10 71:17 72:5,7
72:19 73:21 74:4,12
74:20 75:5,14 76:11
76:17,25 77:3 80:3
80:4,7,19 82:8
83:10 86:19 90:22
92:6 94:12 97:7
101:25 107:22
108:2 109:16 110:8
113:8,14,16,22,24
114:15,23 117:14
118:2 119:6 120:15
120:24 121:15,22
121:24 122:8,20
123:5 125:10,14,16
125:21 126:9,16
127:9,17,24 129:19

130:17,18 132:25
133:17,19,24 134:4
134:8,14 135:23
136:23 137:2,16,18
137:22 138:24
140:14 144:25
145:12 146:9
148:24 149:4,17,23
149:25 150:23
153:4,15 155:24
156:10,16,25
160:13 162:7,15
163:3 165:25
167:24 170:14
174:3 175:14,16,23
176:4 183:4 191:18
194:14 196:3,7,12
196:23 198:3 203:3
204:13 205:13
206:3,3 207:10,22
209:13,22,22
211:21 212:4,4,8,9
221:19 222:20
229:19 232:13,23
233:4 234:10,13
239:16,16,17
241:13,16 242:2
247:8 248:2 268:10
271:8,14 273:4
280:3,6,19 282:2
**Storm's (31)**
5:23 7:18 8:4 18:24
21:19 23:7 24:3
34:24 50:3 51:10
58:22 65:10 70:12
79:24 93:13 94:2
96:20,23 122:17
123:14,16,17,18,22
124:3 146:8 197:21
261:18 276:15,24
280:23
**straight (3)**
7:6,10 102:23
**straightened (1)**
156:13
**straightforward (1)**
163:21
**Street (1)**
2:9
**stretched (1)**
273:8
**strict (1)**
242:25
**strike (2)**
166:24 170:6
**strikes (5)**
36:11 240:16 241:23
241:23 242:6
**stripping (1)**

216:2
**stronger (1)**
204:20
**struck (1)**
265:8
**stuck (2)**
213:3 240:14
**stuff (1)**
31:15
**sub (3)**
94:21 97:13,24
**subject (12)**
11:19 133:4 136:13
136:19 140:5
178:18 180:7
181:22 187:16
225:24 226:21
261:11
**subjected (1)**
215:9
**submission (5)**
6:10 8:11,22 282:18
284:3
**submissions (3)**
15:14 16:12 222:4
**submit (12)**
12:24 13:7,19 143:14
179:21 188:20,21
190:25 193:14
208:5 222:6 264:25
**submitted (7)**
21:14 22:5 180:18
186:18 191:10
195:20 280:10
**submitting (1)**
181:23
**subsection (2)**
145:7 201:25
**subsequent (2)**
157:3 285:6
**subsidiaries (1)**
170:16
**subsidiary (3)**
77:16 170:18 241:11
**substance (4)**
81:20 85:20 119:25
250:7
**substantial (2)**
19:21 22:8
**substantially (1)**
19:25
**substantive (12)**
22:22 112:13 119:19
119:22,24 120:15
244:15 248:20,21
249:16 253:10
254:23
**substantively (1)**
141:12

**substitute (2)**
113:15 138:20
**succeeded (2)**
42:14 246:15
**successor (1)**
78:10
**suddenly (3)**
82:25 83:25 228:24
**sue (3)**
156:21,22,23
**sued (2)**
212:9 228:23
**sufficient (3)**
65:4 122:9 160:6
**suggest (8)**
5:22 44:7 48:17 65:20
70:21 89:8 273:3
274:6
**suggested (11)**
44:11 52:7 58:5 63:6
66:2 73:21 107:21
138:10 175:7
205:18 246:25
**suggesting (2)**
136:14 174:17
**suggestion (4)**
68:15 74:12 119:21
222:5
**suggestions (1)**
29:25
**suggests (2)**
246:2 273:13
**sum (2)**
260:19 263:16
**summarize (1)**
46:3
**summary (4)**
12:21 140:4 246:7
256:14
**summation (12)**
7:20,21 8:23 9:6,8,10
17:22 24:13 26:12
26:23 136:2 178:20
**summations (1)**
7:12
**summer (2)**
41:9,13
**summing (1)**
24:8
**superiors (1)**
107:25
**supplied (7)**
10:8 34:3 63:7 93:18
143:10 209:17
210:25
**supplying (2)**
100:19,20
**support (3)**

144:18 174:8 278:20
**supporting (1)**
51:13
**supports (2)**
219:24 279:19
**suppose (6)**
105:21 200:17,20
217:22 221:17
247:3
**supposed (3)**
19:24 240:5 269:21
**supposedly (1)**
236:2
**supposition (1)**
187:10
**suppositions (1)**
152:2
**supreme (4)**
213:12 221:16 224:7
251:20
**sure (33)**
7:16 8:25 21:22 22:13
26:12 34:7,12 38:21
49:13 54:4 61:6
79:3,14 102:23
111:9,10 120:25
126:19 151:6
163:13,17 167:6
175:12 191:6 217:6
220:20 226:5
250:22 252:4
259:20 267:8,15
274:14
**Surely (1)**
274:21
**surprised (9)**
16:11 44:2 111:17
134:9,12,13,20
254:11 282:20
**surprising (1)**
23:18
**surprisingly (2)**
98:15 256:15
**survives (2)**
223:9 245:2
**suspect (2)**
231:5 252:8
**suspending (1)**
251:21
**SUTCLIFFE (2)**
2:3,8
**sworn (6)**
6:11,11 7:21 9:13
29:7 92:18
**sympathy (1)**
158:3
**system (6)**
40:24 215:2,11
217:24 265:3

267:12
**systems (1)**
216:11

_____

**T**

**T (8)**
50:12,22 57:15,16,19
57:21 287:3,3
**tab (10)**
62:20 93:19,19,24
95:4 184:6,15,18
186:8,16
**table (5)**
4:10 60:3 61:5 231:6
238:16
**tail (1)**
212:10
**take (54)**
6:9,21 9:22 23:8
45:11,13 46:4 50:9
53:4 62:14 72:24
88:3 89:9 90:8,21
92:17 94:18 98:16
99:3 131:3 135:22
136:5 140:6 146:12
153:21 160:8,9
169:22 191:7
192:14 195:18
198:19 206:23
207:16 212:18
214:17 220:16
231:12,15 245:8,9
250:11,23 251:9
256:21,23 258:25
259:25 262:17
274:16 283:6 284:6
284:13 285:4
**taken (11)**
1:13 32:24 67:22
76:22 89:22 139:21
141:11 190:5 199:4
203:3 257:3
**takes (1)**
29:2
**talk (4)**
7:13 45:15 159:24
176:4
**talked (5)**
125:12 177:5 196:6
196:10,15
**talking (14)**
31:13 34:16 48:11
56:24 76:4 103:21
118:16 126:19
142:15 173:3
233:14 259:13
279:16 282:16
**teaches (1)**
240:23

**technical (11)**
42:5,8 43:2 47:6
53:25 54:21 60:12
73:14 80:15 112:4
120:6
**Telecom (1)**
75:18
**Telenor (194)**
1:3 2:20 4:19 5:3,7,9
6:18,18 10:7 12:15
12:20 13:6,15 15:2
15:15 16:14 17:13
18:25 22:12,20
25:24 26:25 27:12
30:21,22,24,25
31:10,11,18 32:9,16
33:2,7 35:9 37:2,14
37:17,22 38:18 39:3
41:22 43:18,19 44:6
46:19 47:2,10 48:22
50:8,9,12,19 51:5,9
51:22 55:3 58:2,5
58:21 59:23 62:5
64:5 65:19 67:2,3
69:11 70:4,4 72:18
83:3,5,6 84:17,23
84:25 85:3,10,21
86:6,10,19 87:10
91:9,17,23 92:24
96:10,16 97:6
100:23 102:25
103:10,15 104:2
105:11,14 107:10
107:16 108:8,18
109:5,16 110:2,4
111:4,14,24 114:15
118:4,7 119:9,12
121:2,6,17,22,25
123:6,9,21,24 124:3
124:9,15,15 131:3
132:5,14,21 136:25
137:18,23 138:2
141:14 143:22
144:14,22,25
145:12 146:10,20
146:25 148:20
149:10,13 151:4
152:7,10 153:2
155:25 156:14,19
157:18 158:3
159:12,13,16 160:4
160:15,22 168:11
171:21 173:22
174:25 175:5 176:6
177:23 178:8,12
183:9 190:5 207:6
208:25 209:3,4,8,9
211:2 234:8 240:7
247:10 248:11

258:23 262:2
266:25 268:5,5,6
271:10,22 276:6
281:24,25
**Telenor's (9)**
7:25 19:9 26:21 35:20
55:2 83:16 247:12
247:25 282:18
**telephone (2)**
192:6 197:2
**telephonically (1)**
280:15
**tell (22)**
18:9 60:4,22 83:15
99:22 103:25
113:19 120:4,24
122:20 123:5,9,10
133:24 157:9
215:12 227:11,16
227:20 239:21,23
267:21
**telling (2)**
24:19 105:19
**tells (3)**
177:25 238:4 249:9
**ten-minute (3)**
180:25 198:19,22
**term (2)**
87:12 247:13
**terminate (7)**
39:7 45:24 46:13 59:4
71:8,13 72:14
**terminated (1)**
46:8
**terminating (1)**
88:20
**termination (15)**
44:15 45:12 50:10
51:23 73:25 89:2
115:2,5,13,14,22
115:24 117:19
247:2
**terms (15)**
59:15 86:7 108:2
119:3 154:21 172:6
202:11 245:3
248:20,22 256:11
256:16 266:17
278:7 282:5
**test (3)**
146:19 260:19 263:17
**testified (10)**
29:8 90:11 92:13
100:21 101:21
102:19 107:20
115:8 121:5 133:18
**testifies (1)**
9:23
**testify (4)**

24:22 29:20 100:18
233:25
**testimony (28)**
6:11 7:6,9,11,22 9:8
9:14,25 10:23 11:15
16:24 21:8 22:6
24:11 25:5 27:25
28:2 71:12 92:18
93:3 96:12 133:21
147:5 164:16 195:3
281:4,22 282:11
**tests (1)**
25:6
**text (5)**
21:24,25 23:11 43:4
80:14
**thank (24)**
4:3,4 21:11 29:10
34:10 35:24 36:15
53:15 71:3 79:15
90:2 101:9 107:3,5
115:16 135:17,18
135:21 140:16
199:5 250:9 267:23
270:18 286:3
**thanks (2)**
133:12 286:4
**theory (3)**
127:16 160:4 250:5
**thick (1)**
192:14
**thing (15)**
34:13 66:8 74:2
148:25 149:3
158:22 177:19
178:5 180:13
217:24 246:17
267:21 273:4 276:3
285:23
**things (14)**
42:18 47:7 73:4 83:7
91:2 93:9 100:3
104:3 115:9 152:7
164:10 167:14
175:17 262:12
**think (147)**
6:15 8:2,11,17 9:19
10:22 16:16 17:20
17:24 18:12 20:3
21:5,8 22:13 24:3
24:23 28:18 35:13
36:12 39:18 40:16
44:13 46:24 49:12
55:21 57:10 61:11
69:6 71:15 76:15
77:15,23 79:5 84:3
91:21 100:25
101:16 103:12
107:8 109:20

112:20 113:19
114:11 115:8,12,13
127:20 138:9
139:10 140:25
141:2 142:19 143:8
144:20 146:4
152:23 156:24
159:13 161:10,20
164:23 165:4
166:22 171:3,5
175:19,20 176:12
176:16 180:11
181:4 182:7 185:23
191:14,18,18 192:8
196:12 197:18
199:8 201:3,20
203:3 204:10,16
205:20 206:2,16
207:20 208:13
209:10 210:11
212:2,16 214:19
218:10 219:20,20
220:21,25 221:17
221:20 222:4
224:19 225:14
227:14 228:10,17
229:4 231:23 232:5
236:19 237:3
239:14 240:18,21
240:23,25 241:18
242:9,14,23 243:6
244:13 245:11
246:10 249:9
250:24 254:14,15
254:25 256:13
257:12 258:22
264:17 268:11,24
270:16,21 275:16
278:13,17 279:2,8
279:11 282:9 285:5
**thinking (1)**
88:19
**third (7)**
5:20 37:2 74:17 93:11
250:5 252:21
253:13
**thought (14)**
7:4 16:14 105:14
140:13 162:8
174:17,18 175:22
175:24 189:3
226:17 233:8
236:12 237:23
**thoughts (2)**
237:12 278:18
**three (19)**
4:15 23:10 38:20
39:19 50:8 75:8
77:4 82:21 97:23

99:2 184:6,18 231:9
244:10 246:20
252:20 261:7,12
262:12
**three-day (3)**
47:24,25 246:14
**threshold (2)**
119:13 248:5
**thumb (3)**
230:14 238:23 240:17
**thwart (1)**
204:14
**tie (2)**
73:4 78:2
**tied (2)**
260:25 265:5
**time (93)**
7:20 31:25 32:6 36:4
36:9 38:10 40:9,22
41:3,5,10,14 43:6
47:2 48:17 51:18
56:13,23 62:12
63:11 64:3,3,20
67:7 68:19 69:23
70:11,15 78:23,25
82:21 84:17 90:9
91:21 92:16 96:18
97:8 100:24 104:10
106:14 107:12,17
108:25 109:23
110:13,15 113:21
121:25 123:19
135:4,8 136:20
137:2 140:6 146:15
149:5 154:13,13
155:21 156:3
162:17 170:8,8,8
175:20 178:25
180:25 181:2 186:3
191:15 192:12
193:24 197:2
206:15 208:19
222:3,25 239:6,7,9
243:18 249:25
250:3,7,17 269:12
270:16 274:18
275:4,6,11 276:8
286:5
**timeline (1)**
41:13
**times (3)**
23:10 150:19 207:12
**title (1)**
184:24
**today (33)**
4:4 6:5,9,22 7:12 10:4
11:15 14:15,18 15:5
16:18,23 20:7 21:6
56:15 61:19 87:23

95:21 96:7 132:3
133:13 135:19,21
135:24 137:11
138:6 144:21
150:20 160:11
183:23 195:3
198:24 223:2
**today's (1)**
164:16
**Tol (269)**
2:14 5:16,16 7:23 8:6
9:5,21 10:22 11:2
13:15 14:14 15:12
15:16 16:24 17:3,8
17:11 18:3,24 20:6
21:5 24:14,24 26:11
26:19 27:10 34:11
34:20 35:13,21
36:10 46:24 54:3,11
54:14 57:17 61:23
62:2 77:21 78:6,15
89:14 90:1,2,5 91:1
91:16 92:1,5,11
93:1 94:1,6,8,10,16
95:1,9,12 96:1,2,4
97:1 98:1 99:1
100:1 101:1,9 102:1
103:1 104:1,22
105:1 106:1,21
107:1,8 108:1 109:1
110:1 111:1 112:1
113:1,9 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1,2,8,22
130:1,22 131:1
132:1 133:1,4,9
136:4 137:5 140:16
147:18,24 148:5,10
148:17 149:7,18
150:3 151:10,17,24
152:4,13 153:5,16
153:23 154:6,24
155:10,23 156:5,8
156:18 157:6,8,22
158:10,15 159:11
159:23 160:21
161:10,16,20
162:20 163:6 164:6
164:9,21,23 165:4
165:15 167:4,21
168:13,22 169:3,12
170:13,18 171:3,12
172:4,7 173:2,15
174:16 175:6,23
176:2,15 177:10,16
179:9,16,19 180:3,7

180:19 181:3,12,22
182:3,7,16,19 183:8
183:15,18,22 184:4
184:8,12,17,23
185:10,20 186:9,21
187:9,13,23 188:13
188:20 189:10,19
189:21 190:7,15,22
191:14 192:16
193:2,8,16,23 194:5
194:21,24 195:8,22
196:8,11,16,25
197:8,11,18,24
198:5,10 199:11
201:20 206:16
234:16 256:21
257:2,10 258:13,18
259:7 260:13 262:6
263:3,6 264:22
266:12,16 267:11
273:6,20,23 275:2
275:12 276:10
279:4 280:2 281:10
282:15 283:8 284:2
284:20,25 285:8,16
285:22
**told (33)**
25:21 33:14 40:17,23
55:22 56:13 65:3
75:3,12 105:19,21
107:25 122:23,23
123:8 125:16,21,24
132:13 134:19
135:5 190:3 192:2,3
194:14 196:3 214:4
233:5,9,10 235:19
244:5 247:18
**Tom (1)**
92:13
**Tootlers (1)**
142:12
**top (3)**
42:20 45:8 93:12
**tops (1)**
128:3
**tossed (1)**
259:17
**touch (1)**
9:24
**tough (1)**
162:11
**Tower (1)**
2:8
**track (1)**
283:10
**traditional (1)**
279:22
**trail (1)**
98:17

**transaction (29)**
15:21 40:13,15 41:6
43:23,25 46:11,12
46:18 47:25 90:23
91:25 95:15 122:18
125:11 135:6
137:20 143:4
145:13 148:19
150:6,7,11,15
156:11 170:22
173:25 179:22
233:3
**transactions (3)**
19:11 142:25 145:3
**transcribe (1)**
30:7
**transcript (6)**
1:5,11 181:4,5 194:11
211:6
**transcription (1)**
287:11
**transfer (2)**
47:22 76:10
**translated (1)**
70:7
**translation (4)**
94:2 95:19 98:18
171:18
**translations (1)**
94:23
**Transparency (1)**
217:5
**travelled (1)**
121:10
**treated (3)**
202:10,21 256:10
**treaty (1)**
205:6
**tremendous (1)**
237:6
**trial (15)**
165:22 166:7 181:20
181:25 186:19
187:8 192:25 219:4
219:5 238:18 246:8
246:9 258:2 265:4
268:19
**tribunal (41)**
7:15 12:24 13:8,10,16
17:15 20:8 22:7,14
34:4 93:24 141:13
141:22 158:11
185:23 188:4
200:22 201:19
202:3,13 203:14
206:19 207:8 208:7
208:10 214:23
218:12 222:8
224:22,24 225:20

227:6,8,23 230:15
242:17 245:17
247:9 255:25 260:7
283:2
**tribunal's (8)**
7:7 9:21 130:10
142:10,13 257:15
258:11 279:5
**tried (6)**
33:15 90:14 141:16
173:20 214:4
254:12
**trigger (1)**
246:14
**triggers (2)**
167:16 280:4
**trilogy (1)**
200:15
**Triplefin (1)**
201:14
**trouble (2)**
232:18 248:17
**troubled (3)**
157:15,16,16
**troublesome (1)**
37:12
**true (8)**
30:10 96:13 104:6
132:21 213:9
265:23 269:23
270:10
**truism (1)**
247:4
**truncate (1)**
140:25
**try (7)**
84:8 152:19 204:11
216:11 275:3
277:23 278:5
**trying (20)**
13:7,8,10,20 15:3,25
19:18 20:20,25
60:21 78:2 118:19
133:18 179:3
191:16 192:17
195:15 207:14
214:22 267:4
**Tumanov (12)**
40:18 43:16 50:24
51:2,4 52:9 64:9,14
66:18 67:14 84:21
121:7
**turn (25)**
18:16 50:11 58:12
91:11 93:7 95:3,4
97:23 106:2,3 108:6
110:18,20 115:17
115:21,24 126:21
127:25 152:11

186:8 199:6,23
201:23 230:19
285:5
**turned (3)**
47:20 206:14 223:17
**turning (1)**
231:14
**turns (3)**
142:3 242:13 285:4
**two (66)**
16:7 20:24 21:7,24,25
23:21 38:20 40:17
43:15,15 44:2,14
47:21 48:4 49:6,7
50:6,23,25,25 51:8
54:20 55:22 64:8
66:25 74:13 76:25
77:13 79:21 86:21
86:22 97:13 99:8
100:16 107:19
113:5 124:24
141:22 145:7,24
152:16 153:22
157:22 161:22
171:23 172:22
177:12 184:15
201:25 204:16
206:19 228:11
230:7 231:9 232:22
236:4 243:4 246:16
250:16 267:24
268:22 271:12,15
274:22 275:8 280:7
**two-page (1)**
243:19
**two-step (1)**
37:8
**type (2)**
145:13 219:17
**types (2)**
141:22 217:12
**typical (1)**
107:10
**typically (1)**
224:5
**typo (1)**
191:2

---

U

**U (10)**
29:5,5 48:22 52:15
53:20 54:5 57:14
110:18 117:25
119:16
**Ukraine (96)**
4:19 5:10,11 12:13,16
13:18,22 23:13
26:13 31:4,6,10,14
31:16,18,23 32:5

53:3 57:2,3 63:19
63:21 76:23 78:21
100:24 111:24
113:13 130:7 141:5
150:13 152:8
156:13 158:13
165:24 177:13
178:24 181:6
191:11 194:4 195:5
195:17,18 196:23
197:23 204:12,15
204:17 205:2,12,18
206:10 207:12,16
208:13,16 211:23
211:24 213:13,24
215:5,9,13,14
216:17 217:8,18
224:2,3 228:4,7,14
228:20 229:23
230:7,11,13 231:3,8
237:6 240:14
259:11,23 260:5,21
262:11,16,18 264:4
265:7,18,19 266:23
267:16 268:24
269:25 270:6
**Ukraine's (1)**
205:2
**Ukrainian (151)**
10:18 11:25 23:17,20
26:16,20 27:8,10,21
27:22 28:3,9,10,16
28:21 48:5 54:24
57:4 65:13 66:15
68:11,25 69:2,21
93:10,17 95:17
101:4 111:13,14
113:14,22,24
115:11 121:19
130:19,24 131:4,12
131:13,20,21
132:15,17 138:5,7
138:13,16,21 142:8
143:7,14,15,16,21
143:25 144:7,13,17
144:17 151:14,21
151:22 153:25
159:5,8 162:11
164:24 165:3,16,17
165:22,24 166:14
169:3,9,23 170:2,5
171:7 176:12 177:7
177:21 180:4,6
185:12,25 186:4,6
187:17,18,24,25
188:7,23 191:23
192:10 193:11
198:25 203:10
206:18,20 207:2,24

208:11 209:14,25
210:10,13 211:12
212:6,20,24 213:22
214:25 215:11
217:23 226:9,12
228:5 229:8,9
234:16,22,24 235:3
235:4,7,22 238:19
240:18,24 248:4,25
249:11 250:2 260:8
260:11 261:5,20
262:25 264:18
265:16,20 266:4,11
267:2,5,12 268:8,11
**ultimate (1)**
13:9
**ultimately (1)**
86:16
**ultravirus (5)**
153:17,20 174:5,21
174:21
**Um (1)**
127:7
**Um-hum (3)**
93:15 97:25 116:23
**unable (1)**
138:17
**unambiguous (1)**
147:3
**unanimous (3)**
94:23 236:9 249:3
**unanswered (1)**
208:15
**unauthorized (1)**
68:17
**unaware (5)**
14:17 174:7 179:23
180:20 283:21
**unbreakable (2)**
272:5,13
**Uncitral (19)**
1:2 199:12 200:25
201:24 218:5,9,13
222:12,24 223:2
224:8 243:3 244:18
245:13,15 255:8
256:5 263:7 266:24
**unclear (1)**
10:25
**undecided (1)**
277:3
**understand (42)**
7:17 30:10,11 38:6
39:3,7 55:19 71:16
73:7 75:15,17 80:2
83:25 102:5,18
115:16 120:13,19
127:16 130:17
138:14 149:12

152:24 153:13,16
157:13 159:3 161:3
185:20 206:21
212:23 213:14
223:4 226:5 230:8
233:24 235:8
259:20 261:25
281:5,19 284:7
**understanding (27)**
6:3,3 36:17,24 37:7
38:9 39:11 46:20
56:9 61:17,24 75:20
76:8,13 80:17
100:11 101:19
103:14 120:14
126:2 134:6 184:13
185:10 197:12,15
213:18 281:2
**understood (11)**
37:11 54:11 55:10
80:6 82:7 85:12
173:9 242:15
276:10 280:2
285:16
**undertakings (1)**
199:22
**underway (1)**
189:17
**undoubtedly (1)**
65:9
**unenforceable (6)**
161:13,25 169:17
228:3,4,6
**unfair (1)**
174:10
**unfortunately (2)**
198:12 238:12
**unit (2)**
92:16 96:18
**United (9)**
169:18 170:12,19,23
201:6 202:18
205:22,24 213:2
**unlimited (1)**
106:13
**unnecessary (2)**
10:2 18:8
**unpredictable (1)**
216:11
**unpunished (2)**
200:21 247:4
**unusual (3)**
8:9,10 228:22
**unwilling (3)**
108:15 110:8 138:16
**upset (3)**
138:12 157:5 212:13
**urge (1)**
83:6

**urged (2)**
84:23 85:8
**urgent (1)**
89:3
**urging (1)**
50:8
**use (2)**
13:10 115:22
**useful (1)**
18:12
**usual (2)**
221:9 270:3
**usually (1)**
8:8
**U.S (9)**
166:20,22 170:3
216:9,18 258:23
261:21 262:3
263:25

**V**

**V (5)**
2:21 52:15 53:17,18
58:12
**vacations (1)**
273:9
**vague (1)**
216:5
**Valeriy (1)**
63:3
**valid (10)**
68:25 109:6,18 110:9
165:5 186:4 203:18
227:19 245:20
270:2
**validity (8)**
202:4,24 218:6
221:24 222:7
224:13 225:3 256:3
**valuable (2)**
170:8 237:4
**value (2)**
84:9 237:7
**Van (225)**
2:14 5:16,16 7:23 8:6
9:5,21 10:22 11:2
13:15 14:14 15:12
15:16 16:24 17:3,8
17:11 18:3,24 20:6
21:5 24:14,24 26:11
26:19 27:10 34:11
34:20 35:13,21
36:10 46:24 54:3,11
54:14 57:17 61:23
62:2 77:21 78:6,15
89:14 90:2,5 91:16
92:5,11 94:6,8,10
94:16 95:9,12 96:2
96:4 101:9 104:22

106:21 107:8 113:9
129:2,8,22 130:22
133:4,9 136:4 137:5
140:16 147:18,24
148:5,10,17 149:7
149:18 150:3
151:10,17,24 152:4
152:13 153:5,16,23
154:6,24 155:10,23
156:5,8,18 157:6,8
157:22 158:10,15
159:11,23 160:21
161:10,16,20
162:20 163:6 164:6
164:9,21,23 165:4
165:15 167:4,21
168:13,22 169:3,12
170:13,18 171:3,12
172:4,7 173:2,15
174:16 175:6,23
176:2,15 177:10,16
179:9,16,19 180:3,7
180:19 181:3,12,22
182:3,7,16,19 183:8
183:15,18,22 184:4
184:8,12,17,23
185:10,20 186:9,21
187:9,13,23 188:13
188:20 189:10,19
189:21 190:7,15,22
191:14 192:16
193:2,8,16,23 194:5
194:21,24 195:8,22
196:8,11,16,25
197:8,11,18,24
198:5,10 199:11
201:20 206:16
234:16 256:21
257:2,10 258:13,18
259:7 260:13 262:6
263:3,6 264:22
266:12,16 267:11
273:6,20,23 275:2
275:12 276:10
279:4 280:2 281:10
282:15 283:8 284:2
284:20,25 285:8,16
285:22
**variety (2)**
74:24 207:13
**various (4)**
56:10 76:22 119:18
144:5
**vehicle (2)**
213:7,24
**vendor (1)**
42:11
**veracity (1)**
104:6

**verbatim (3)**
201:11 244:24 255:12
**verify (1)**
122:10
**version (10)**
15:2 19:23 23:11,14
115:4,18,19,23
187:17 221:2
**versions (2)**
122:4 147:21
**versus (4)**
73:12 142:12 150:6
201:14
**vice (3)**
31:21 38:13 50:18
**Victor (2)**
53:18 58:13
**victory (1)**
209:13
**view (10)**
9:4 18:21 65:9 112:7
147:6 162:5 166:18
247:14 274:8
276:20
**views (1)**
278:12
**vigorously (1)**
223:6
**violated (1)**
207:10
**violation (2)**
240:12 249:16
**virtue (1)**
276:20
**void (11)**
26:7 154:16 169:4
202:14 219:8
220:17 232:16
238:10,20 264:5,6
**voluntary (1)**
27:23
**vote (1)**
68:12
**voting (78)**
10:16 11:5,7,18 19:13
20:11 32:20 33:3,12
33:18 35:3,11 36:18
36:24 37:9 39:16
46:5,16,21 47:5
49:19 59:14 82:3
83:21 88:7 90:12,23
91:3,24 95:14 96:15
97:17,20,21 98:4,7
98:11 100:7 103:17
108:11 109:14,19
111:8 114:9,14,20
117:23 126:13
131:18,19,23
144:24 145:14,23

160:5 163:7,10,20
164:3,8,19 165:12
165:12 166:3,9
171:14 172:3 173:4
173:13 193:9
195:14,23 216:2
229:14 248:18,24
266:12 282:21
**vs (1)**
1:6

_____
**W**
_____

**W (5)**
19:8 59:9,20 60:4
115:17
**Wack (9)**
150:8 196:15 233:23
234:7,9 271:12
281:6 282:17 283:5
**Wack's (1)**
233:15
**waging (3)**
22:16 236:25 249:25
**wait (2)**
158:25 272:21
**waited (1)**
211:16
**waive (2)**
7:5 150:25
**waived (3)**
159:7 207:18 214:5
**waiver (4)**
10:4 47:23 48:6 192:8
**walking (1)**
231:17
**want (57)**
10:3 17:25 24:11,21
25:3 52:23 53:9,11
58:9 61:16 71:19,24
80:12,19 81:5 82:13
98:17 99:7 103:2
105:12 118:21
136:18,19 137:8
142:18 148:22
152:20 164:13
170:7 173:25
176:13 181:10,18
208:9 214:8 215:3
226:5,16 227:24
233:11,24 237:8,11
237:12 238:15
259:19 260:23
262:10,17 268:7
271:14 273:2
277:11,14,15
284:25 285:23
**wanted (7)**
72:13 81:18 82:9
119:6,9 120:15,25

**wants (5)**
9:20 17:24 109:7
142:20 278:2
**war (3)**
22:17 227:14 249:25
**Washington (1)**
5:21
**wasn't (23)**
11:24,25 100:22
125:5 129:23
149:14 151:6
155:11 160:17
162:17 164:18
168:4 182:12 188:3
191:24 209:9
228:21 234:2
241:11 246:19
249:8 251:4 268:5
**waste (2)**
170:7
**water (1)**
16:17
**way (46)**
8:2 12:15 46:12 48:9
50:20 58:7 61:12
68:17 74:17 95:23
104:23 123:13
136:14 145:20
147:22 153:17
157:4 166:8 169:4
171:4,20 178:12,19
190:16 195:3,9
219:20 221:12,17
221:20 222:9
235:23 242:14
245:12 247:23
254:25 257:13
263:18,19 276:25
277:4 278:9,25
279:22 281:8 283:9
**ways (1)**
204:20
**weak (1)**
216:9
**Web (3)**
215:15 216:19 241:14
**wedge (1)**
18:13
**Wednesday (6)**
16:13 129:24 239:8,9
282:19 284:4
**week (5)**
45:11,14 129:24
273:14,16
**weekend (4)**
272:19 274:3 283:23
285:15
**weeks (5)**
42:3 48:4 125:7

251:11 275:8
**weight (1)**
101:7
**well-accepted (1)**
142:23
**Well-recognized (1)**
217:3
**went (17)**
45:24 66:6 87:17
132:22 145:17
156:12 158:12
161:23 166:7
167:12 169:4 170:5
173:19 175:8
187:13 245:7 264:5
**weren't (14)**
17:14 117:21 147:20
148:8 166:13 188:4
209:12 212:14,15
213:17 240:6,9
241:5,6
**western (2)**
48:3 178:15
**we'll (2)**
53:5 130:10
**we're (2)**
157:17 283:12
**whatsoever (6)**
48:20 64:24 68:18
170:22 265:24
277:5
**WHEREOF (1)**
287:12
**wide-ranging (1)**
209:15
**WILLIAM (1)**
1:23
**Williams (1)**
5:20
**willing (20)**
39:10 49:21 50:10
51:15 59:2 62:11
81:17 82:18 84:23
87:12 108:8,19,22
108:24 109:21
110:5,13,15 120:21
120:21
**Wills (1)**
283:15
**win (2)**
169:14,15
**window (2)**
259:18 275:20
**winning (1)**
204:5
**wish (2)**
14:14 279:5
**wishes (1)**
278:7

**withdrawn (1)**
69:17
**within-entitled (1)**
287:9
**witness (113)**
3:3 6:20,21 17:2,5,10
18:16 21:2 24:9,10
24:17,17,22,25
26:22 28:24 29:2,6
30:8,10,14,15 38:5
39:24 40:22 41:8
45:2,5,19,23 52:10
52:22 53:2 55:3,7
55:12,21 57:2 60:8
60:9,11,16,25 61:6
69:8 71:10,15 72:2
72:9,17 73:17,25
74:15 75:3,16,22
76:2,14 79:3,9,13
80:2,8,22,25 81:4,8
81:11,15,23,25
82:11,15 83:4,14,18
83:20 84:20 85:7,16
85:24 86:9,21 87:5
87:11 88:4,12,17
89:17 94:11 95:16
100:17,21 101:3
104:12,16 105:25
129:12 133:11,12
133:22 134:2,9,13
134:18 135:2,12,19
247:13 274:3
283:20,25 287:12
**witnesses (12)**
6:5,8 135:23,24 136:6
150:5 271:12,15,23
271:25 280:7
282:23
**woman (1)**
30:4
**won (1)**
159:15
**wondering (2)**
61:16 129:18
**word (6)**
61:13 99:19 146:13
168:4 255:14,14
**wording (5)**
48:25 82:3 112:9
115:14 126:12
**wordings (1)**
54:2
**words (9)**
20:2 74:23 97:15 99:9
148:20 176:10
199:9 214:22
263:10
**work (3)**
167:4,8 278:6

**worked (1)**
121:23
**working (8)**
5:6 31:25 32:18,21
33:7 38:25 39:19
66:16
**works (2)**
7:15 153:17
**world (1)**
201:21
**worried (1)**
160:14
**worry (2)**
123:6 166:23
**worrying (1)**
280:13
**wouldn't (6)**
102:3 159:13 228:14
238:25 240:17
255:16
**wound (1)**
224:2
**write (1)**
50:4
**writing (3)**
44:12 210:3 276:18
**written (19)**
49:10 69:21 94:23
114:5 134:3 171:19
171:24 172:15
179:11 180:13
185:4 192:24 193:3
195:5 199:22 236:9
236:9 249:3 283:22
**wrong (17)**
14:21 18:10 69:8
109:5 138:14,22
155:23,24,25 156:7
156:9,11 159:20
225:5,9,12 246:3
**wrote (4)**
41:23 58:8 155:19
162:7

──────────
**X**
**X (4)**
3:2 59:25 62:5 63:6

──────────
**Y**
**Y (4)**
62:20 73:7 126:21
128:2
**yeah (19)**
33:14 60:25 67:11
80:25 98:5 116:8,25
116:25 119:21
120:3,3 122:15
124:8 126:17 127:4
127:20,20 156:16

157:7
**year (10)**
22:18 78:4 80:14
107:18 153:22
154:19 160:10
206:19 211:16
247:20
**years (6)**
20:24 107:19 153:22
205:3 206:11
231:10
**Yep (2)**
90:20 124:23
**York (60)**
1:16,16 2:4,4,14,14
21:18 26:8,17 27:15
27:16,19,20 28:21
74:8 138:8 141:5
142:7 143:5 163:14
189:15 190:5,20
191:12 193:7 201:5
204:17 206:5,6,13
207:8,9,25 208:3
211:20 214:14
217:16 218:25
220:13 221:10,22
221:25 225:6,22,23
225:25 226:2,14
235:10 244:10
245:10 261:2,4
269:2,6,17,19,25
285:20 287:7
**Yuri (4)**
40:18 64:9 66:18
67:14

──────────
**Z**
**Z (2)**
2:15 106:3
**ZIMMERMAN (1)**
2:6

──────────
**$**
**$50 (1)**
119:13

──────────
**1**
**1 (2)**
2:9 34:23
**1st (2)**
106:9 272:14
**10-minute (1)**
256:24
**100 (4)**
56:17 75:22 77:3,16
**10002 (1)**
2:14
**10103-0001 (1)**
2:4

**11 (11)**
60:6,23 93:19,24 94:7
94:8 98:19 166:22
167:3,19 168:10
**11th (2)**
43:10 49:6
**11's (1)**
73:16
**11.01 (1)**
61:22
**11.02 (3)**
61:22 115:25 116:2
**11:10 (1)**
89:21
**115 (1)**
201:16
**12 (6)**
80:10,18 86:11
199:24 243:23
255:15
**12th (2)**
109:22 134:21
**12.01 (2)**
73:23 214:16
**12.01A (2)**
200:4,24
**12.01B (1)**
199:25
**12.2 (1)**
214:16
**12.4 (7)**
98:21,23 100:3,13
127:9,17 145:7
**12.42 (1)**
99:8
**12:00 (1)**
139:21
**13.06 (1)**
74:9
**13.07 (1)**
74:10
**14 (2)**
1:17 287:10
**14th (1)**
197:7
**15 (3)**
89:21 168:5 208:21
**15-minute (2)**
89:9 180:24
**16th (1)**
108:18
**17 (1)**
184:16
**17th (2)**
48:3 81:3
**18-year-old (1)**
272:15
**1998 (6)**

38:9,16 39:7 45:21
46:5 246:21

──────────
**2**
**2 (2)**
126:23 139:13
**2nd (5)**
271:22 272:14,19,22
280:13
**2.03 (2)**
126:22,24
**2.03B (1)**
126:25
**2.05 (2)**
116:5,13
**20 (3)**
186:8,16 205:3
**20th (1)**
51:24
**200 (1)**
39:13
**2000 (1)**
194:19
**2002 (68)**
10:16 11:5,7,19 14:7
14:13,21 16:10,19
17:6 18:14,20 19:6
20:11,15 21:21
25:19 28:6 33:3
39:22 42:9,15 43:2
46:17,22 73:13
88:15,16 90:23
91:24 92:14,24
93:14 95:14 96:16
97:10 100:7,12
101:15 103:17,18
104:2 105:12
109:19 111:8 114:9
117:21,23 124:7
127:15 144:24
145:11,11 148:2
160:5 162:22 164:2
171:20 172:16
173:11 174:15
177:14 210:20
234:18 236:8,8
246:13 247:24
**2003 (15)**
31:7,20 33:11 40:17
41:7,9 42:9 43:8
45:17 80:10,18
103:3 105:4,16
108:18
**2004 (59)**
10:11 11:14,16 12:8
13:3 16:20 17:7
18:11,15,23 19:16
20:13 21:22 39:13
39:22,24 59:14

65:25 66:21 70:16
73:9 76:10,16 78:22
79:5 88:9 102:20
103:21 106:9
110:20,20 111:21
112:12 113:6 114:6
114:18,24 118:9
121:7 122:16,21
123:15 124:12,18
125:18 126:3
128:11 149:2,6
151:5 166:17 173:8
173:10 174:13
176:3 223:6 232:15
232:21 234:19
**2005 (9)**
68:23 69:7,8,16 70:17
70:20 76:16 211:10
216:23
**2006 (15)**
1:17 70:3 72:4 132:3
184:16 186:20
189:13 190:21
191:16 194:18
198:13 211:11,14
287:10,13
**21 (6)**
186:20 201:25 202:7
218:9 255:8 256:5
**21st (1)**
191:16
**21.2 (4)**
222:12 243:6 245:15
255:13
**212 (1)**
2:4
**22 (1)**
220:6
**22nd (6)**
110:19 113:6 114:24
118:9 158:19
287:13
**23 (1)**
220:6
**23rd (1)**
110:20
**25 (4)**
2:9 276:19 278:13
279:11
**25th (3)**
189:13 190:21 197:17
**26th (1)**
93:14
**27th (3)**
106:8 250:15 251:21
**28 (2)**
60:23 255:14
**29 (1)**
3:4

Page  33

**29th (6)**
63:8 211:7 274:22
275:24 276:5 281:3

**3**

**3 (1)**
78:22
**3d (1)**
201:15
**30 (8)**
73:24 136:17,23
140:7,10,13 206:11
236:7
**30th (7)**
62:22 73:9 95:13
107:6 124:18
171:20 172:16
**30-minute (1)**
136:24
**31 (1)**
144:16
**31st (12)**
62:12,17 271:9 273:8
274:17,24 275:22
276:6,13,23 280:11
280:24
**322 (1)**
201:15
**34 (1)**
74:7
**35 (2)**
2:8 3:7
**36 (1)**
127:25
**37 (1)**
66:24

**4**

**4th (5)**
41:24 103:3 273:19
274:19 276:7
**4:15 (1)**
286:5
**40 (2)**
248:3,5
**42 (1)**
2:8
**43 (2)**
71:21 74:17
**43.5 (2)**
46:19 248:12
**44 (1)**
35:6
**48 (1)**
276:2
**49.39 (1)**
75:9
**49.9 (1)**

56:25

**5**

**5 (4)**
119:7 271:9,22
276:23
**5th (19)**
6:8 271:11,16,24
273:2,16,17,18,20
275:18,21 277:6
280:6,14,18,20
282:11 284:24
285:6
**50 (2)**
119:10 236:24
**50.1 (2)**
56:14,24
**506-5110 (1)**
2:4
**557 (1)**
2:10
**56.5 (1)**
46:18
**590 (1)**
2:13

**6**

**6.01 (3)**
116:5,21,21
**6.02 (2)**
116:6 117:6
**666 (2)**
1:16 2:3

**8**

**8 (1)**
216:23
**8.01 (1)**
117:5
**8.08 (2)**
61:21 73:16
**8.308 (1)**
115:6
**808 (2)**
61:2 115:12

**9**

**9 (1)**
285:12
**9:35 (1)**
1:17
**90 (1)**
3:4
**92 (1)**
28:16
**95 (1)**
32:4
**98 (7)**

31:22 38:15 45:20,23
57:5 102:12 111:14
**99 (1)**
31:22