-

**IN THE MATTER OF AN ARBITRATION UNDER
THE UNCITRAL ARBITRATION RULES BETWEEN:**

**TELENOR MOBILE COMMUNICATIONS AS,**

Claimant,

Snarøyveien 30
N-1331 Fornebu
Norway

-and-

**STORM LLC,**

Respondent,

1 Narodnogo Opolchennya Street
Kyiv 03151
Ukraine

**CLAIMANT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

I.    Factual Summary Of The Dispute ............................................................... 1

    A.    The Parties ............................................................................................ 1

    B.    The Background of the Dispute .............................................................. 3

        1.    1998 Shareholders Agreement ...................................................... 3

        2.    2002 Agreements ........................................................................... 3

        3.    Execution of the New Shareholders Agreement........................... 6

        4.    Execution of the Shareholders Agreement in 2004 ..................... 8

        5.    Storm and Telenor Mobile Execute the Shareholders Agreement
            and Alfa and Storm Deliver Customary Closing Documents to
            Confirm the Authority of Storm to Enter Into the Shareholders
            Agreement .................................................................................... 9

        6.    Storm's Boycott of Board and Shareholders Meetings Begins ............... 11

        7.    Storm's Violation of the Non-Compete Provision of the
            Shareholders Agreement ............................................................. 12

            a.    Astelit .............................................................................. 13

            b.    Ukrainian High Technologies .................................................. 14

            c.    WiMAX Technology.......................................................... 14

        8.    The Arbitration Commences ........................................................ 15

        9.    The Alpren Decisions ................................................................... 15

        10.    The Southern District of New York Litigation........................... 17

II.    The Dispute Between the Parties is Governed by New York Law............................... 20

    A.    This Panel Has Already Found That the Arbitration Clause, including Its
        Incorporation of the UNCITRAL Rules, is a Severable and Valid
        Agreement Between the Parties ............................................................. 20

    B.    Under the UNCITRAL Rules and Section 12.01 of the Shareholders
        Agreement, New York Law is the Governing Law of This Dispute.................. 22

        1.    International Commercial Arbitration Rules Honor Party
            Autonomy on Choice of Law ...................................................... 23

    C.    New York Law Requires Respect For Party Autonomy With Regard to
        Choice of Law Provisions.................................................................... 24

         1.    New York is the Situs of the Arbitration, and Therefore New York
            Procedural Law Applies to the Parties' Choice of Law......................... 25

    D.    Under Ukrainian Law, if it Applied, the Parties' Choice of Law Would
        Also be Valid ...................................................................................... 26

III.    Neither the Alpren Decisions Nor Ukrainian Law Govern the Question of the
    Validity of the Shareholders Agreement and Should be Wholly Disregarded............... 27

A.    The Ukrainian Decisions Are Meritless, Collusive Litigations Entitled to No Weight ............................................................................................ 27

    1.    The Ukrainian Legal System Is Not Favored ......................................... 27

    2.    The Alpren Decisions Were Not the Products of Adversary Proceedings by the Parties .................................................................... 29

    3.    Telenor Mobile Was Never Given Notice of a Single Ukrainian Proceeding in a Timely Manner ............................................................ 30

    4.    Collusive Judgments Are Not Entitled to Any Weight and Cannot be Considered as Governing Law ....................................................... 30

IV.    The Shareholders Agreement Was Validly Executed And Governs The Parties' Obligations ........................................................................................................ 32

    1.    Mr. Nilov Had Actual Authority to Enter Into the Shareholders Agreement ........................................................................................... 32

    1.    A Company May Not Set Up the Ultra Vires Act of its Own Officer as a Defense to an Action in a Contract That It Signed ............. 38

    2.    Storm Has Ratified the Shareholders Agreement by its Conduct ........... 39

    3.    Storm is Estopped From Denying its Responsibilities Under the Shareholders Agreement .................................................................... 40

B.    Even If Ukrainian Law Applied, the Shareholders Agreement Is Valid ............. 41

V.    Storm Has Violated The Shareholders Agreement ....................................... 45

A.    Storm Has Failed to Comply With Its Obligations to Attend Board of Directors and Shareholders Meetings [§ 2.01] ................................................. 45

    1.    Storm Has Failed to Produce Any Evidence that it Relied in Good Faith on Any Legitimate Authority to Cease Attending Board and Shareholders Meetings .......................................................................... 47

        a.    The Record Shows that Storm's "Good Faith" Argument Is without Merit ................................................................................ 49

            (1)    Storm's Proposal to Amend the Provisions of the Charter Regarding the Board Clearly Demonstrates that Storm Is Not Acting in Good Faith ......................... 51

            (2)    Storm's Recent Actions Against Kyivstar's Outside Auditors Further Demonstrate That Storm Is Not Acting in Good Faith ................................................. 53

    2.    Storm's Argument That Attendance At Board and Shareholders Meetings Is its Right, Not its Obligation, Is Irrelevant............................ 55

    3.    Telenor Mobile Has Not Waived its Right to Arbitrate an Issue in this Proceeding by Defending Itself Against the December 22 Order ............................................................................................... 57

B.    Storm Has Violated the Non-Compete Clause of the Shareholders Agreement [§ 6.02] ........................................................................................ 59

    1.    The Non-Compete Provision is Valid .................................................. 60

     2.    The Parol Evidence Rule Applies to the Non-Compete Provision .......... 61

     3.    Altimo and Alfa Have Invested in Competing Telecommunications Businesses in Ukraine ........................................................................ 64

VI.    Telenor Mobile Has Been Damaged By Storm's Breaches Of The Shareholders Agreement ............................................................................................................ 65

     A.    Inability to Conduct Business ........................................................................ 65

VII.   Conclusion ............................................................................................................ 69

Claimant Telenor Mobile Communications AS ("Telenor Mobile"), respectfully submits its proposed findings of fact and conclusions of law.

## I.     FACTUAL SUMMARY OF THE DISPUTE

### A.     The Parties

1.     Telenor Mobile is a subsidiary of Telenor ASA ("Telenor"), the largest provider of telecommunications services in Norway.  Through its various subsidiaries and affiliates, Telenor has mobile telecommunications operations in 12 countries, with over 50 million subscribers.  Telenor is a company organized and existing under the laws of the Kingdom of Norway, with its principal place of business in Fornebu, Norway.  Slightly over half of Telenor's issued and outstanding shares are held by an agency of the Norwegian state; the remainder are publicly held.  Telenor's shares are listed in Norway on the Oslo Stock Exchange, and its American Depositary Shares are listed in the United States on the Nasdaq National Market.  See Exh. 2 at ¶ 4; Exh. 4 at ¶ 4; Exh. 7 at p. 2.[1]

2.     Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar" or the "Company") is the largest mobile telecommunications company in Ukraine, with over 18 million subscribers and annual revenues exceeding US$1 billion.  Telenor Mobile owns approximately 56.5% of the issued and outstanding shares of Kyivstar, while Storm LLC ("Storm") owns approximately 43.5% of the Company.[2]  See Exh. 2 at ¶ 9; Exh. 4 at ¶ 8; see also Exh. 189 at 49: 4-7.

3.     Storm is a limited liability company organized and existing under the laws of Ukraine.  Storm is an indirect wholly-owned subsidiary of Altimo Holdings & Investments

---

[1] As requested by this Panel, Telenor Mobile has assembled and renumbered its submissions and exhibits (as well as Storm's affidavits and pleadings) in a Master Index to assist in this Panel's review.   A copy of the Master Index has been included with Claimant's Proposed Findings of Fact and Conclusions of Law.

[2] Four wholly-owned subsidiaries of Telenor Mobile, Telenor Ukraina I AS, Telenor Ukraina II AS, Telenor Ukraina III AS and Telenor Ukraina IV AS, own one share each of Kyivstar.

Limited ("Altimo"),[3] a company organized under the laws of the British Virgin Islands. 50.1% of Altimo's interest in Storm is held through Hardlake Limited, a Cyprus corporation that is a wholly-owned subsidiary of Altimo ("Hardlake"), and the remaining 49.9% is held through Alpren Limited ("Alpren"),[4] a Cyprus corporation that is also a wholly-owned subsidiary of Altimo. See Exh. 38. Storm's sole function is to hold Altimo's shares in Kyivstar, and the sole function of Alpren and Hardlake is to hold Altimo's interest in Storm. Both Storm and Altimo are subsidiaries of a Russian business entity known as the Alfa Group Consortium (the "Alfa Group"). Exh. 4 at ¶ 7.

4.     The Alfa Group is one of Russia's largest privately owned financial-industrial conglomerates, with interests in oil and gas, commodities trading, commercial and investment banking, insurance, retail trade and telecommunications. The group was founded by Mikhail Fridman[5] and Peter Aven. See Exh. 7 at p. 3.

---

[3] Altimo was formerly known as Alfa Telecom Limited.

[4] Alpren's Articles of Association were amended by a special resolution of its sole shareholder on January 27, 2006. Regulation 139 of the amended articles states as follows:

> Notwithstanding anything contained in the Memorandum of Association of the Company the sole subject of activity of the Company shall be the holding of participants interests in Storm LLC a limited liability company registered in Ukraine as company number 23163325 ('Storm'), the exercise of any and all rights and obligations associated with or related to such shareholding and the entry into documents in connection with borrowing from Credit Suisse, London Branch and the lenders from time to time under the Loan Agreement. The Company shall not engage into or carry out any other business activity of any nature whatsoever.

Exh. 98 at N; see generally Exh. 157. (emphasis added).

[5] Fridman is generally referred to in the press as one of Russia's youngest "oligarchs" and is reputedly one of Russia's wealthiest men. Exh. 189 at 51: 16-22. Fridman holds a reputation of being extremely combative in his business relationships (see Arkady Ostrovsky, "Telecombative Oligarch Shares His Vision: Alfa's Mikhail Fridman Does Not Shrink From a Fight," Financial Times, July 7, 2005, at 26, Exh. 195; Exh. 189 at 106: 10-19 ("Mikhail Fridman said when there is a disagreement, we don't seek consultants, we seek conflict.").

B.    **The Background of the Dispute**

1.    **1998 Shareholders Agreement**

5.    On March 26, 1998, the then-existing shareholders of Kyivstar – Telenor Mobile, Storm, Sputnik IV L.P., and Sputnik V Holdings Ltd. (collectively "Sputnik"), Omega LLC ("Omega"), and Kyivstar itself – entered into a shareholders agreement concerning the corporate governance and management of Kyivstar (the "1998 Shareholders Agreement"). Exh. 138. The 1998 Shareholders Agreement soon proved to have significant shortcomings in facilitating the growth and development of Kyivstar. See Exh. 11 at ¶ 6.

6.    Section 8.3 of the 1998 Shareholders Agreement required Telenor Mobile to purchase all of Sputnik's shares in Kyivstar if certain conditions were met (the "Sputnik Put Option"). See Exh. 138. Sputnik exercised its rights under the Sputnik Put Option in May 2002, and Telenor Mobile purchased all of Sputnik's shares in Kyivstar on July 9, 2002. As Telenor Mobile's ownership interest in Kyivstar increased, Telenor Mobile sought a new shareholders agreement that would address Kyivstar's financial and governance needs. Exh. 11 at ¶ 8. In January 2002, Telenor Mobile approached Storm regarding a new shareholders agreement.

2.    **2002 Agreements**

7.    In 2002, Alfa expressed its intention to purchase Omega's interest in Kyivstar. Accordingly, Telenor Mobile, Storm and Alfa directly negotiated the terms of the new shareholders agreement, beginning in March 2002. Exhs. 42, 44, 140, 147-149.

8.    Alfa experienced difficulty in completing the purchase of Omega's shares, and was unable to immediately conclude the transaction. Accordingly, Telenor Mobile agreed to sell

enough Kyivstar shares to Storm to bring Storm's shareholding over the 40% level[6] on the

understanding that a portion of such shares would be repurchased by Telenor Mobile once the

Omega transaction was concluded.  The arrangements that would eventually make Telenor

Mobile and Storm the Company's sole shareholders were set out in a Letter Agreement dated

April 29, 2002 between Storm, Alfa Bank and Telenor Mobile (the "April 29 Letter

Agreement").  See Exh. 42.  The April 29 Letter Agreement further provided that "[a]ll

shareholders will be party to a single, new Shareholders Agreement . . . substantially on the

terms specified in the Term Sheet." Id. at 2.

9.    The term sheet attached to the April 29 Letter Agreement also set out in detail the

terms that would govern the new shareholders agreement, noting that:  "[t]he new Shareholders

Agreement shall also contain the following provisions." See id. at 10.  (emphasis added).  Those

terms included, in relevant part:

- A non-compete provision stating that "no shareholder shall be
  permitted to own directly or indirectly any interest in a competing
  GSM operator in Ukraine";

- A choice of governing law provision stating that "[t]he Shareholders
  Agreement . . . will remain in effect after an IPO . . . [t]o aid
  shareholders' understanding of the Company's corporate governance
  and thereby enhance the Company's ability to undertake an IPO in the
  United States, [and] . . . will be governed by the laws of the State of
  New York, United States of America."; and

- An arbitration provision stating that "the Shareholders
  Agreement . . . will contain arbitration clauses providing for
  UNCITRAL arbitration . . . The seat of arbitration for the Shareholders
  Agreement will be New York City . . ."[7]

---

[6] Under Ukrainian law, the holders of not less than 60% of the voting shares in a Ukrainian closed joint stock company are required to be present in order for there to be a quorum at a meeting of shareholders, thereby giving the holder of 40% or more of the voting shares of a Ukrainian closed joint stock company a blocking position.

[7] The April 29 Letter Agreement, by its terms, is governed by and construed in accordance with the laws of the State of New York, "without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction." Id. at 4.

10.     Until the Sputnik Put Option and Omega transactions were consummated and Omega ceased to be a shareholder in Kyivstar, the 1998 Shareholders Agreement, to which Omega was a party, remained in effect.  Accordingly, as a "bridge" to the new Shareholders Agreement – without which Telenor Mobile would not have allowed Storm to acquire its 40% plus blocking stake – the parties entered into the Voting Agreement.[8]  See Exh. 181; see also Exh. 189 at 187: 11 – 188: 3.

11.     The terms of the Voting Agreement, the new Shareholders Agreement and the Share Purchase Agreement were negotiated between July 26 and August 15, 2002.  See Exh. 11 at ¶ 33.  On August 15, 2002, Kirill Stein, a Director and the Deputy Head of Corporate Finance at Alfa Bank, sent an e-mail to various parties, stating:

> I can also confirm that neither Alfa nor the Ukrainian shareholders of Storm have any further comments to any of

---

[8] The Voting Agreement is unequivocal regarding its status as a bridge to the new Shareholders Agreement.  Section 2.05 of the Voting Agreement provides that:

> The Shareholders agree that within three (3) Business Days after the date on which Storm and/or any of its Affiliates purchases all of the Equity Interest in Omega or all of Omega's Securities, the Shareholders shall enter into and cause the Company to enter into, and Storm shall cause any such Affiliate which has purchased any of the Equity Interests in Omega or any of Omega's Securities to, or to cause Omega to, as applicable, enter into an agreement terminating the [1998] Shareholders Agreement, without the need for any further action by any of the Shareholders or the Company.  Within three (3) Business Days after the earlier of (a) the date of termination of the [1998] Shareholders Agreement and (b) Storm and/or any of its Affiliates purchasing all of the Equity Interests in Omega or all of Omega's Securities, the Shareholders agree to, and to cause the Company to, execute and deliver the New Shareholders Agreement . . . .

Id.  (emphasis added).

> the five documents to be signed at the closing
> (Shareholders Agreement; Share Purchase Agreement;
> Voting Agreement; Pledge Agreement; and the Option
> Agreement) …. Execution Copies should be prepared.

Id.; Exh 73.

12.    On August 30, 2002, final execution copies of the relevant agreements were exchanged between Alfa and Telenor Mobile.  On September 2, 2002, the parties exchanged the signature pages of the Share Purchase Agreement and the Voting Agreement.  See Exh. 179.  A copy of the new Shareholders Agreement that the parties agreed to execute three days after the Omega Transaction was concluded and was annexed as Exhibit B to the Voting Agreement.  See Exh. 181.

13.    The annexed version of the Shareholders Agreement set out in detail the various terms that would govern Kyivstar's two shareholders and any parties who might become shareholders in the future.  The terms were virtually identical to those included in the term sheet annexed to the April 29 Letter Agreement.

### 3.    Execution of the New Shareholders Agreement

14.    On October 29, 2002, the date of Telenor Mobile's sale of Kyivstar shares to Storm under the Share Purchase Agreement, the parties exchanged certificates confirming that they had the requisite authority to enter into all the relevant agreements, including the Shareholders Agreement.  Storm delivered a Certificate of Senior Officer of Purchaser, signed by both Mr. Valeriy Nilov, Storm's General Director, and Mr. Yuri Tumanov, who was the then Chairman of Storm (the "Storm Certificate").  See Exh. 164.

15.    Messrs. Nilov and Tumanov warranted in the Storm Certificate that:

> Such written consent constitutes valid approval under the
> laws of Ukraine of the Purchaser's execution, delivery and
> performance of the Share Purchase Agreement and the
> other Transaction Agreements and any other documents in

implementation of the Share Purchase Agreement and the other Transaction Agreements [which includes the Shareholders Agreement].  <u>Such written consent is in full force and effect on the date hereof in the form in which it was adopted and no other resolutions have been adopted by the General Meeting of Participants of the Purchaser or any committee thereof that rescind, modify, amend or contradict such written consent.</u>[9]

<u>Id</u>.  (emphasis added).

16.    Storm also attached to the Storm Certificate a copy of a "true, complete and correct English translation of a unanimous written consent of the participants of [Storm] approving the Share Purchase Agreement, the other Transaction Agreements, and the transactions contemplated thereby, dated August 30, 2002 . . ." (the "August 30 Notice").  <u>Id</u>.

17.    The resolutions adopted by the August 30 Notice annexed to the Storm Certificate expressly gave Mr. Nilov authority "to take or cause to be taken any and all other actions, as are required or desirable" to execute the Voting Agreement and the Shareholders Agreement.[10]  In particular, the August 30 Notice provided that Mr. Nilov's powers included the following:

1.    Authorization, approval, ratification and confirmation of: . . .

(h) the execution, delivery and performance by [Storm] of the Shareholders Agreement to be entered into between Telenor and [Storm];

2.    Authorization of [Storm's General Director], Nilov Valeriy Vladimirovich, <u>to execute and deliver the above-referenced agreements and to execute, certify, deliver, accept, file and record any and all notices, certificates, instruments and documents, and take or cause to be taken any and all actions, as are required <u>*or desirable*</u> in connection with this Resolution and the above referenced documents</u>.  (Emphasis added)

---

[9] The Storm Certificate makes no suggestion that this consent would be rescinded absent resolutions "adopted by the General Meeting of Participants . . . or any committee thereof. . .", of which there have been none.

[10] Under Part 4 of Article 60 of the Law of Ukraine "On Business Companies" and Section 11.11 of Storm's Charter, Storm's participants can decide on all matters within the competence of the meeting of participants by written polling without holding an actual meeting of participants.

Id. (emphasis added).  The August 30 Notice further provided that all of the "aforementioned resolutions have been approved by a unanimous vote of the participants of the Company."[11]

### 4.    Execution of the Shareholders Agreement in 2004

18.    By November 2003, Storm's purchase of the Omega shares finally began to progress.  Telenor Mobile asked Alfa whether Storm was prepared to sign the Shareholders Agreement in the form annexed to the Voting Agreement.  Alexey Khudyakov, an Alfa representative, stated that Alfa did not have any additional comments and was prepared to sign the Shareholders Agreement in that form, subject to some minor technical changes.  See Exh. 154.

19.    A month later, however, Mr. Khudyakov contacted Telenor Mobile and requested additional changes to the Shareholders Agreement, specifically changes to the termination provisions of the Agreement.  Exhs. 83, 85, 97, 99, 100-101.  Telenor Mobile eventually agreed to negotiate regarding Alfa's proposed changes.  See Exh. 189 at 176: 6-11, 193: 3-16; see also Exh. 187 at 55: 15-21 – 56: 22-25.

20.    On December 13, 2003, Storm completed its purchase of Omega, which it intended to liquidate so that it could hold Omega's shares in Kyivstar directly.  Because that liquidation could not be completed immediately, on December 17, 2003, Telenor Mobile and Storm entered into a letter agreement in which they jointly waived the requirement in Section 2.05 of the Voting Agreement that the parties terminate the 1998 Shareholders Agreement within three business days following Storm's completion of its purchase of Omega, and Storm agreed that it would enter into the Shareholders Agreement on or prior to January 31, 2004.  See Exh. 187 at 39: 16-20.

---

[11] The documents furnished by Storm in 2002 confirmed Mr. Nilov's authorization not only by written polling, but by an actual meeting of Storm's participants, held on October 7, 2002.  See Exh. 169.

21.     During the period between January 17 and January 28, 2004, Storm continued to request changes to the termination provisions of Shareholders Agreement, all of which favored Storm.  Telenor Mobile eventually agreed to a modification of the termination provisions, although not to the extent requested by Alfa.  See Exhs. 97, 99-100.

<strong>5.     <u>Storm and Telenor Mobile Execute the Shareholders Agreement and Alfa and Storm Deliver Customary Closing Documents to Confirm the Authority of Storm to Enter Into the Shareholders Agreement</u></strong>

22.     On January 28, 2004, Telenor Mobile's Ukrainian counsel circulated a final version of the Shareholders Agreement reflecting the additional changes requested by Storm and agreed to by Telenor Mobile.  <u>See</u> Exh. 100.  The next day, Mr. Khudyakov of Alfa agreed to the final text.  His January 29, 2004 email states as follows:

> Storm reviewed the language of the New Shareholders Agreement that you distributed yesterday and agreed to it. <u>We are ready to sign it tomorrow.</u>
>
> Please make the practical arrangements for the signing with Telenor (Ekhougen) and Kyivstar (Litovchenko). Unfortunately, Nilov will be out of Kyiv tomorrow and will not be able to sign any documents.  I hope it is possible to let him sign the agreement on Monday.  We could provide a fax copy of his signature tomorrow if needed.

Exh. 101. (Emphasis added)

23.     On January 30, 2004, Mr. Nilov, Mr. Sigmund Ekhougen, on behalf of Telenor Mobile, and Mr. Igor Lytovchenko, on behalf of Kyivstar, executed the Shareholders Agreement. <u>See</u> Exh. 105.  In addition, Storm and Telenor Mobile executed and exchanged at the closing customary certificates to demonstrate that each possessed full authority to enter into the Shareholders Agreement and had followed appropriate formalities in entering into the Shareholders Agreement.  Storm delivered two identical "Certificates of Incumbency and Authority of Storm."  <u>See</u> Exhs. 103, 104.  One of the certificates was signed by Andrei

9

Kosogov, who had previously signed the April 30 and May 7 letter agreements with Telenor

Mobile on behalf of Alfa, and was sent from Alfa Capital's office in Moscow.[12]   The other

certificate was signed by Yuri Tumanov, the then-Chairman of Storm.   The latter certificate

states as follows:

> I, Yuri G. Tumanov, being the chairman of Storm LLC, a limited liability
> company organized under the laws of Ukraine ("Storm"), do hereby certify that
> Valeriy Vladimirovich Nilov:
>
> (i)      is the duly elected, qualified and acting General Director of Storm;
>          and
>
> (ii)     is duly authorized to sign, on behalf of Storm, individually, (A) all
>          instruments necessary to terminate the Shareholders Agreement
>          dated March 26, 1998 between and among [Telenor Mobile,
>          Sputnik, Omega, and Kyivstar] . . . and (B) the Shareholders
>          Agreement dated January 30, 2004 between and among Telenor,
>          Storm and Kyivstar.

See Exh. 104. (emphasis added).

        24.     Subsequently, in March 2004, Telenor Mobile exercised its rights under the

Option Agreement to buy back 1.1632221% of the Kyivstar shares it had previously sold to

Storm, thereby ensuring that Telenor Mobile would have 56.5% of Kyivstar's shares and Storm

would have 43.5% of Kyivstar's shares.  See Exh. 165.  Shortly thereafter, on April 27, 2004, at

the annual meeting of Kyivstar shareholders, Storm voted in favor of the amended and restated

Charter of Kyivstar, as required by Section 6.03 of the Shareholders Agreement it had executed.

See Exh. 40 at p. 4.

---

[12] Mr. Kosogov, according to the Alfa Group website, is presently Chairman of the Board of Directors of Alfa Asset Management and Altimo.  See Exh. 175; see also Alfa Group Consortium, About the Group, available at http://www.alfagroup.org/142/18799/About.aspx (last visited Jan. 18, 2007).

6.     **Storm's Boycott of Board and Shareholders Meetings Begins**

25.     Although Storm initially complied with its obligations under the Voting

Agreement and the Shareholders Agreement, in March 2005, Storm began boycotting Kyivstar

Board meetings.

26.     Storm has failed to attend eight of Kyivstar's General Meetings of Shareholders

("GSM") since April 28, 2005, resulting in each of such meetings failing to have a quorum.

See Exh. 199.

27.     Storm has failed to attend nine Kyivstar Board meetings, resulting in each of such

meetings failing to have a quorum.  See Exh. 189 at 71: 20 – 72: 12; 96: 5 – 97: 17; see also

Exhs. 120-130; Exh. 21 at ¶ 9; Exh. 34 at ¶ 4; Exh. 76.

28.     In tabular form, the Board and shareholders meetings that Storm has failed to

attend are as follows:

*Shareholders Meetings*

| Meetings | Date | Location |
|----------|------|----------|
| GMS | April 28, 2005 | Kyiv |
| GMS | June 29, 2005 | Kyiv |
| Extraordinary GMS | September 20, 2005 (10:00 a.m.) | Kyiv |
| Extraordinary GMS | September 20, 2005 (12:00 p.m.) | Kyiv |
| Extraordinary GMS | February 28, 2006 | Kyiv |
| Extraordinary GMS | July 4, 2006 | Kyiv |
| Extraordinary GMS | December 12, 2006 (10:00 a.m.) | Kyiv |
| Extraordinary GMS | December 12, 2006 (2:00 p.m.) | Kyiv |

*Meetings of the Board*

| Meetings of the Board | Date | Location |
|---|---|---|
| Board Meeting No. 63 | March 18, 2005 | Vienna |
| Board Meeting No. 64 | April 8, 2005 | Vienna |
| Board Meeting No. 65 | May 12, 2005 | Kyiv |
| Board Meeting No. 66 | June 15, 2005 | Kyiv |
| Board Meeting No. 67[13] | June 15, 2005 | Kyiv |
| Board Meeting No. 68 | June 30, 2005 | Kyiv |
| Extraordinary Board Meeting No. 69 | July 1, 2005 | Kyiv |
| Extraordinary Board Meeting No. 70 | July 1, 2005 | Kyiv |
| Board Meeting No. 71 | October 27, 2005 | Moscow |

**7.      Storm's Violation of the Non-Compete Provision of the Shareholders Agreement**

29.     In addition to failing to attend board and shareholders meetings, Storm also has

violated the non-compete provisions of the Shareholders Agreement.  The non-compete clause of

the Shareholders Agreement states, in pertinent part:

> [N]o Shareholder or any of its Affiliates will, without the
> prior written consent of the Company and the other
> Shareholders, (i) engage in the Business in any region in
> Ukraine, (ii) own or control, directly or indirectly, more
> than five percent (5%) of the voting capital stock in any
> Person (other than [Kyivstar] or any of its Controlled
> Affiliates) engaged in the Business in any region in
> Ukraine or (iii) permit any of its Controlled Affiliates
> (other than [Kyivstar] or any of its Controlled Affiliates) to
> engage in the Business in any region in Ukraine <u>or own or
> control, directly or indirectly,</u> more than five percent (5%)
> of the voting capital stock in any Person (other than
> [Kyivstar] or any of its Controlled Affiliates) engaged in
> the Business in any region in Ukraine.[14]

<u>See</u> Exh. A, § 6.02(a).  (emphasis added).  The Agreement further defines an Affiliate as:

---

[13] In the English version of Protocol No. 67 dated June 15, 2005 that records the absence of a quorum, the meeting is referred to as a Board meeting.  The Russian version of Protocol No. 67, however, refers to this meeting as an extraordinary one.

[14] "Business" is defined as "the wireless mobile telecommunications business".

> [A]ny other person which directly or indirectly controls, or
> is under common control with, or is controlled by, such
> Person …. As used in this definition, "control" (including
> with its correlative meaning, "controlled by" and "under
> common control with") shall mean, with respect to any
> Person, <u>the possession, directly or indirectly, of power to
> direct or cause the direction of management or policies</u>
> (whether through ownership of securities or partnership or
> other ownership interests, by contract or otherwise of a
> Person.)[15]

<u>Id</u>. (emphasis added).

30.    Turkcell and Ukrainian High Technologies ("UHT"), two companies in which

Affiliates (as defined in the Shareholders Agreement) of Storm acquired substantial interests

following Storm's execution of the Shareholders Agreement, are engaged in the Business (as

defined in the Shareholders Agreement) in Ukraine without the consent of Telenor Mobile.

a.    <u>Astelit</u>

31.    It is a matter of public record that, on November 25, 2005, Alfa acquired a 49%

interest in Turkey's Cukurova Group, and thus acquired a 13.2% interest in Turkcell, Turkey's

leading Global System for Mobile Communications ("GSM") operator and the third biggest

GSM operator in Europe.[16]    According to Turkcell's most recent filing with the United States

Securities and Exchange Commission on Form 6-K, filed on January 12, 2007, Turkcell, in turn,

holds a 54.8% stake in Astelit LLC ("Astelit").  <u>See</u> Exh. 20 at 3.  Astelit is a mobile operator

that describes itself as "a pioneering digital communications technology and service provider" in

---

[15] "Person" is defined as any "corporation, general partnership, simple partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority, whether incorporated or unincorporated."  <u>See</u> Exh. A.

[16] Turkcell and its logo are featured on the Altimo website as one of "our investments."  <u>See</u> Exh. 176.  According to the most recent amendment to the Schedule 13D filed with the United States Securities and Exchange Commission on August 15, 2006 by Cukurova Telecom Holdings Limited ("Cukurova"), Alfa Telecom Turkey Limited, Alfa Finance Holdings S.A., OOO "Altimo" and Altimo itself, Alfa Telecom Turkey, a wholly-owned indirect subsidiary of Altimo, owns 49% of Cukurova, Cukurova owns 52.91% of a company called Turkcell Holding A.S. ("Turkcell Holding").  Turkcell Holding owns 51% of the issued and outstanding shares of Turkcell.

13

Ukraine. [17]   As of December 31, 2006, Astelit had a subscriber base of 5.55 million users, an increase of over 100% since December 31, 2005.

**b.      Ukrainian High Technologies**

32.      Through a March 2006 investment, Alfa Group now owns or controls, through its subsidiary, Russian Technologies, 40% of a broadband wireless ISP in Ukraine utilizing a technology popularly known as World Interoperability for Microwave Access ("WiMAX"). See Exh. 135.  UHT is involved in the development of one of the largest WiMAX networks in Eastern Europe, covering all of Ukraine's cities and towns and offering broadband to businesses and consumers. See id.  UHT is a telecommunications company whose self-described aim "is to become [a] national broadband wireless multiservice operator." See Exh. 36 at ¶ 7; Exh. R. UHT has extensive plans to expand its WiMAX network by the end of 2006.[18]  See Exhs.  R-T.

**c.      WiMAX Technology**

33.      WiMAX is a cost effective technology developed to enable broadband speeds over wireless networks and to enable mass market adoption.  Currently, there are two main applications of WiMAX:  fixed WiMAX applications which facilitate broadband access to homes and businesses, and mobile WiMAX applications which offer the full mobility of cellular networks at broadband speeds.  Public information distributed by Intel Corporation, WiMAX's originator,[19] states that it can be used to provide mobile telephony.  US mobile pioneer Craig McCaw has founded a company called Clearwire that is focused exclusively on the use of WiMAX technology.  According to information on Clearwire's website, "[a]t WiMAX World on

---

[17] See http://www.astelit.ru/eng/default.asp (last checked Jan. 19, 2006).

[18] See http://www.uht.com.ua/ru/plain445 (last checked Jan. 19, 2007)

[19]Intel Capital, an affiliate of Intel Corporation, is the other strategic investor in UHT.

October 11, 2006, Intel and Clearwire unveiled the first step in creating one of North America's first mobile WiMAX trials, with service to be provided by Clearwire."[20]

### 8.    The Arbitration Commences

34.    On February 7, 2006, Telenor Mobile commenced this arbitration against Storm pursuant to Section 12.01 of the Shareholders Agreement, to compel Storm to comply with its obligations under the Shareholders Agreement.

35.    On May 30, 2006, Storm filed its Statement of Defense to Telenor Mobile's claim, asserting, for the first time, that the Shareholders Agreement was invalid because it had allegedly been entered into without requisite authority and failed to comply with the registration and execution requirements of Ukrainian law.  See Exh. 5 at p. 3.  On June 7, 2006, Storm filed a Motion to Dismiss, arguing that this Panel had no jurisdiction to hear the arbitration and that the Shareholders Agreement was void.  Id.

36.    After three hearings on the jurisdictional issue, on October 22, 2006, this Panel unanimously issued its Partial Final Award Regarding Jurisdiction (the "October 22 Award"), which denied Storm's Motion to Dismiss.

### 9.    The Alpren Decisions

37.    On April 14, 2006 – the same day as the initial conference in this proceeding – Alpren, one of Storm's two corporate parents, filed a claim against Storm in the Ukrainian courts seeking a declaration that the Shareholders Agreement was invalid.  Telenor Mobile was not a party to that action, and had no notice that it had been commenced.

---

[20]See http://www.clearwire.com (last checked Jan. 19, 2007)

38.     On April 25, 2006, the Kyiv Commercial Court issued an order stating that the Shareholders Agreement was invalid (the "April 25 Order").  No notice of that decision was provided to Telenor Mobile.

39.     Storm purported to appeal from the April 25 Order, again without notice to Telenor Mobile.  On May 25, 2006, the April 25 Order was rapidly followed by a succession of rulings and decisions from various Ukrainian courts.  On May 25, 2006, a decision of the Kyiv Commercial Court (the "May 25 Decision") upheld the April 25 Order.  Exh. 145.  Storm was not represented by counsel in either proceeding.

40.     The April 25 Order and May 25 Decision formed the basis for Storm's motion to dismiss.  As noted above, that motion was denied by this Panel on October 22, 2006.  Storm then immediately returned to the Ukrainian courts and, again without notice to Telenor Mobile, obtained an order from the Kyiv Commercial Court dated November 8, 2006 "clarifying" the April 25 Order (the "Clarification Order").  The Clarification Order stated that the entire Shareholders Agreement was void, including the arbitration clause, and that the parties "had no grounds whatsoever to perform any acts on the basis of such agreement, including to resort to arbitration in connection therewith."  Exh. 162.  Storm notified Telenor Mobile and this Panel of the Clarification Order on November 15, 2006, and sought an indefinite postponement of this proceeding.  However, Storm's efforts to halt this arbitration based on the April 25 Order, the May 25 Decision, the Clarification Order and the December 1 Order (as defined below) (collectively referred to as the "Alpren Decisions") were unsuccessful.

41.     Storm then returned to the Ukrainian courts in its ongoing effort to disrupt this proceeding.  On December 1, 2006, the Golosiyiv District Court of the city of Kyiv, Goshko O.M., issued a ruling granting an injunction sought by Alpren, prohibiting Storm's General

Director, Mr. Vadim Klymenko, from participating in the arbitration and calling for its

"immediate execution" (the "December 1 Order").[21]  See Exh. 201.  In addition, the December 1

Order purported to enjoin Telenor Mobile and Storm, neither of which was a party to the case,

from proceeding in the arbitration.  On Monday, December 4, Storm again sought to halt these

proceedings, arguing that "a failure to abide by the ruling [was] punishable under Ukrainian

criminal law."  See Exh. 200.

### 10.     The Southern District of New York Litigation

42.     On November 13, 2006, Storm filed a petition in New York state court seeking

vacatur of the October 22 Award and an order permanently enjoining the parties from proceeding

with the arbitration, arguing that this Panel had manifestly disregarded applicable law, namely

the Alpren Decisions.  Storm also filed papers requesting a temporary restraining order and

preliminary injunction staying the arbitration until the petition for vacatur and permanent

injunction could be decided by the court.

43.     Telenor Mobile removed Storm's action to federal court on November 14, 2006,

asserting subject matter jurisdiction under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

44.     At a November 15, 2006 hearing before Judge Gerard E. Lynch of the Southern

District of New York, Judge Lynch stated, with regard to the Alpren litigation, that the Ukrainian

court was "presented with no adversarial issues" (Exh. 190 at 29: 25) and that Storm "basically

sue[d] [it]self." Exh. 190 at 29: 25; 33:17.  The Court denied Storm's application for a temporary

restraining order, and set a hearing on Storm's application for a preliminary injunction halting

the arbitration.

---

[21] As with the prior Alpren litigations, the proceeding in which the December 1 Order was entered was initiated by Alpren, and Telenor Mobile was given no notice of the proceeding until after its conclusion.

45.     A second hearing was held on November 22, 2006, at which Judge Lynch denied Storm's petition for a preliminary injunction (Exh. 191 at 38:14-15), finding that Storm was unable to demonstrate a likelihood of success on the merits (Exh. 191 at 38:11-12), and that the "balance of hardships tips decidedly in [Telenor's] favor." Id. 191 at 35:22-23; 36:17-18. Referring to the Alpren Decisions, Judge Lynch said "the effort to disrupt the arbitration proceeding on the basis of collusive litigation in the Ukraine is basically a shabby tactic on the part of the plaintiffs and should not be condoned." Id. at 37:25-38:3. Judge Lynch further noted that to call the Alpren Decisions collusive was to "dignify" them. Id. at 32:3-4. Finally, Judge Lynch stated that he believed Storm's strategy to be one of "delay and evasion of the arbitration proceedings" that he was not "persuaded [was] legitimate." Id. 191 at 36:17-18; 42:20-24.

46.     On December 4, 2006, shortly before the arbitration hearing on the merits scheduled for December 8, 2006, Storm's counsel stated that Storm had "just learned" of the December 1 Order enjoining Mr. Klymenko, Storm and Telenor Mobile from participating in the arbitration, and sought an indefinite stay of the arbitration on that basis. Exh. 200.

47.     In response to Storm and Alfa's repeated efforts to prevent the arbitration from going forward, on December 5, 2006, Telenor Mobile moved before Judge Lynch to compel arbitration and for an anti-suit injunction against Storm as a defendant, as well as Altimo and Alpren.

48.     On December 7, 2006, Judge Lynch granted Telenor Mobile's motion for a temporary restraining order. On December 11, 2006, Alpren and Altimo moved to dismiss the claims against them for lack of in personam jurisdiction, and Storm contested Telenor Mobile's motion on the merits. Exh. 193.

49.    After an evidentiary hearing on December 15, 2006, Judge Lynch concluded that Telenor Mobile was "extremely likely" to succeed in establishing that "virtually all" of the factors bearing on whether an injunction should issue weighed in Telenor Mobile's favor.[22]  Exh. 82 at 18-19.  Judge Lynch granted Telenor Mobile's motion to compel arbitration and for an anti-suit injunction against Storm, Altimo and Alpren.  Noting that Telenor Mobile would "likely succeed" in showing that Storm, Alpren and Altimo are alter egos of each other (id. at 11), Judge Lynch found that:

> [t]here is no real dispute that Altimo negotiated the entire transaction that gives rise to this dispute, agreed to the arbitration clause demanded by Telenor as part of that bargain, negotiated the Shareholders Agreement by which its vehicle Storm would operate . . . and provided Telenor with assurances that the general director of Storm – Altimo's own employee – was properly authorized to sign the Shareholders Agreement, including the Arbitration Agreement.  Altimo now seeks to frustrate the Arbitration Agreement by litigating the same issues in the very Ukrainian courts the parties agreed to bypass in favor of arbitration.  It cannot be permitted to do this.

Id. at 26-27.  Storm did not appeal Judge Lynch's ruling.

50.    On December, 15, 2006, Judge Lynch issued an opinion enjoining "Storm, Altimo and Alpren … from bringing or attempting to cause the enforcement of any legal action in the Ukraine that would disrupt, delay or hinder in any way the arbitration proceedings between Telenor and Storm in New York."  Exh. 82 at 27.  On December 18, 2006, Judge Lynch entered a formal order setting out the precise terms of the anti-suit injunction.  Exh. 80.

51.    Following Judge Lynch's ruling, Storm moved before this Panel for rehearing of the award upholding jurisdiction.  After that motion was denied, Storm declined to participate

---

[22] Judge Lynch commented that the Ukrainian litigations had been conducted "in the most vexatious way possible."  See Exh. 191 at 16-17.

further in the proceedings, and voluntarily absented itself during the hearing on the merits held

on December 18, 2006.  Exh. 189 at 33: 11-21.

## CONCLUSIONS OF LAW

**II.    THE DISPUTE BETWEEN THE PARTIES IS GOVERNED BY NEW YORK
LAW**

        **A.    This Panel Has Already Found That the Arbitration Clause, including Its
Incorporation of the UNCITRAL Rules, is a Severable and Valid Agreement
Between the Parties**

    52.    In its October 22 Award, this Panel held that under both the Shareholders

Agreement and the UNCITRAL Rules, "[it is clear that] the issue of the Tribunal's jurisdiction is

arbitrable and that the arbitration clause is severable from any question concerning the validity of

the Shareholders Agreement, itself."[23]  Exh. 202 at 12; see also Exh. 189 at 32: 13-21.[24]

    53.    The arbitration clause set out in Section 12.01(a) of the Shareholders Agreement

provides as follows:

> Any and all disputes and controversies arising under,
> relating to or in connection with this Agreement shall be
> settled by arbitration by a panel of three (3) arbitrators
> under the United Nations Commission on International

---

[23] The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention"), to which Ukraine is a signatory, and, by extension, the Federal Arbitration Act, 9 U.S.C. §§ 203, 205 (the "FAA"), govern the question of arbitrability of the Shareholders Agreement executed between Telenor Mobile and Storm.  See Williston on Contracts § 57:56 (4th ed. 2006), ("[g]eneral federal law, rather than the state law of the forum and its conflict of laws rules, governs the question, whether an agreement to arbitrate was made."); see also Republic of Ecuador v. ChevronTexaco Corp., 376 F.Supp.2d 334, 354-356 (S.D.N.Y. 2005) (following federal common law in interpreting arbitration clause).  However, even if federal common law principles regarding apparent authority were applied in lieu of New York law, the execution of the Shareholders Agreement by Mr. Nilov is fully enforceable and thus the contract, and all of its terms, remains valid.  36 Convent Ave. HDFC v. Fishman, 2004 WL 1048213, *3 (S.D.N.Y. May 7, 2004) ("Federal common law and New York State law are consistent with respect to the relevant determinations of agency relationships.")  See discussion at ¶¶ 76-84, infra.

[24] This conclusion would also be correct  under Ukrainian statutory law, which provides that: "the arbitral tribunal may rule on . . . any objections with respect to the existence or validity of the arbitration agreement.  For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract.  See Exh. 189 at 13: 9-15.

> Trade Law (UNCITRAL) Arbitration Rules then in force
> (the "UNCITRAL Rules") . . .

Accordingly, the parties explicitly chose the UNCITRAL Rules, including its choice of law provisions, to govern this proceeding. See Exh. 105 at § 12.01. By incorporating the UNCITRAL Rules into the Shareholders Agreement, the parties made them a part of the contract just as if they had been set out verbatim. See Exh. 202 at 12.

54.    Because this Panel found that "the arbitration clause is severable from any question concerning the validity of the Shareholders Agreement," the UNCITRAL Rules which are at the heart of that clause, form part of a valid and severable contract. Put another way, under the Shareholders Agreement, disputes are to be resolved through arbitration rather than litigation. It was uncontested by Storm that Mr. Nilov as General Director of Storm had actual authority not only to enter into that agreement, but also to determine the basis upon which the arbitration would proceed and the substantive laws to be applied. As the Ninth Circuit held in Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469 (9th Cir. 1991):

> According to the Supreme Court, when international companies commit themselves to arbitrate a dispute, they are in effect attempting to guarantee a forum for any dispute. Such agreements merit great deference, since they operate as both choice-of-forum and choice-of-law provisions, and offer stability and predictability regardless of the vagaries of local law.

Id. at 476 (citations omitted).

55.    Under the UNCITRAL Rules, "[t]he arbitral tribunal shall apply the law designated by the parties as applicable to the substance of the dispute." UNCITRAL, Article 33.

(emphasis added).[25]  Here, the parties designated New York law, and the Panel should enforce

that freely made agreement.

**B.      Under the UNCITRAL Rules and Section 12.01 of the Shareholders
Agreement, New York Law is the Governing Law of This Dispute**

56.      Under the UNCITRAL Rules, New York law, not Ukrainian law, governs the

question of the validity of the Shareholders Agreement.  As Storm itself argued:  "[t]he parties

agreed in the Shareholders Agreement that New York law will apply to the substantive issues in

this arbitration."  See Exh. 6 at  8-9.  Storm also noted that because the seat of the arbitration is

in New York, "regardless of whether . . . substantive or procedural issue[s]" are at play, "New

York law governs."  Id. at 8-9.  Indeed, the legal opinion from one of Storm's purported experts

in Ukrainian law, Roman Maydaynk, states that "New York law . . . is relevant to the <u>substance</u>

of the Shareholders Agreement . . ."  Exh. 132 at ¶ 12 (emphasis in original).  Similarly, David

Wack, counsel for the Alfa Group during the negotiations of the 2002 Shareholders Agreement,

noted that, with respect to the "two signature" requirement of Ukrainian law for a contract:

> since the contract is governed by [non-Ukrainian] law and conflicts
> rules have been excluded, <u>Ukrainian law is not relevant for this
> purpose</u>.

See Exh. 74 (emphasis added); see also Exh. 189 at 188: 25 – 190: 9.

---

[25] The European Convention on International Commercial Arbitration, to which Ukraine and Norway are signatories and which Storm itself noted serves as a governing provision in this dispute, provides in Article VII that "[t]he parties shall be free to determine, by agreement, the law to be applied by the arbitrators to the substance of the dispute."  See Exh. 18 at ¶ 63, n. 20.

1.      **International Commercial Arbitration Rules Honor Party Autonomy on Choice of Law**

57.      In addition to the UNCITRAL Rules, it is a basic principle of international commercial arbitration that the parties to a contract are free to determine the substantive law or rules applicable to the merits of the dispute to be resolved by arbitration.  As one leading treatise states:

> Party autonomy in international contracts has been well recognized and developed in national laws for many years. . . . In the context of international commercial arbitration, <u>the right of parties to determine the law applicable to the merits of their dispute is undisputed</u> . . . .
>
> Due to the universal acceptance of party autonomy in most developed legal systems and its origin in the express or determinable intention of the parties, it is now recognized that party autonomy operates as a right in itself.  <u>The rule has a special transnational or universal character and has binding effect because it has been agreed to and adopted by the parties.  Unquestionably, party autonomy is the most prominent and widely accepted international conflict of laws rule.</u>  These national conflict of laws systems recognize that contracting parties do express their view as to the law to govern their contractual relations, <u>and the national laws have no reason to ignore and very limited rights to interfere with the expressed will of the parties.</u>

Julian D. M. Lew, <u>et al.</u>, Comparative International Commercial Arbitration, at 413-14. (citations omitted) (emphasis added).  Indeed, "[t]here is no basis for a tribunal to ignore the express choice of the parties because it determines that there is a contrary mandatory rule in . . . national laws."  <u>See id</u>. at 421.[26]

58.      Storm never objected to the governing law provision.  <u>See</u> Exh. 189 at 177: 17 – 23 ("Q:  Was there ever any objection, from the time the term sheet was first proposed until the

---

[26] Mr. Maydanyk, one of Storm's expert witnesses on Ukrainian law, also cites Mr. Lew's treatise, albeit not accurately, and refers to Mr. Lew as a "prominent Professor and practitioner of International Arbitration."  Exh. 132 at ¶ 11.

Shareholders' agreement was executed in 2004, on the part of anyone from Storm or Alfa to the application of New York law?  A:  No."); See Exh. 189 at 207: 12-20 ("Q:  [Y]our testimony was that there simply was never any dispute between the Alfa and Storm people on the one side and the Telenor people on the other side that the Uncitral Rules would be used and that New York would be the situs of the arbitration?  A:  No").  At no time during the negotiation of any of these agreements did Storm make a single change to the governing law or arbitral seat provisions.  Id. at 177: 24-25 – 178: 4 ("Q:  Did anyone from Storm or Alfa ever suggest at any point in the negotiations that any law other than the law of New York should apply to the contract?  A:  No.  Not [to] my knowledge.."); see also 178: 5-20.

### C.   New York Law Requires Respect For Party Autonomy With Regard to Choice of Law Provisions

59.   Under New York law, as designated by the parties, the choice of New York law is itself enforceable.  By statute enacted in 1984, New York has also adopted a strong policy of party autonomy on contractual choice of law that parallels international arbitration principles.  Section 5-1401 of the New York General Obligations Law provides as follows:

> The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection one of section 1-105 of the uniform commercial code, may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract agreement or undertaking bears a reasonable relation to this state.

60.   Thus, the rule under international commercial arbitration principles and in New York state is that "parties may freely agree to stipulate that New York law shall govern any disputes arising out of [a] transaction."  Sun Forest Corp. v. Shvili, 152 F.Supp.2d 367, 388 n. 32 (S.D.N.Y. 2001); see also Smith Barney, Harris Upham & Co., Inc. v. Luckie, 85 N.Y.2d 193,

201, 647 N.E.2d 1308, 1313 (1995) ("[T]he parties are at liberty to include a choice of law

provision in their agreement, and the parties' choice will be honored unless the chosen law

creates a conflict with the terms of, or policies underlying, the FAA."); Finucane v. Interior

Const. Corp., 264 A.D.2d 618, 620 (1st Dep't 1999) ("Where, as here, the parties have agreed on

the law that will govern their contract, it is the policy of the courts of [New York] to enforce that

choice of law.").

       61.    Because this dispute is clearly transnational in nature, the parties' choice of New

York law controls all issues of contract formation and validity.  As the Second Circuit held in

Motorola Credit Corp. v. Uzan:

> [W]here the parties have chosen the governing body of law,
> honoring their choice is necessary to ensure uniform
> interpretation and enforcement of that agreement and to
> avoid forum shopping.  This is especially true of contracts
> between transnational parties, where applying the parties'
> choice of law is the only way to ensure uniform application
> of arbitration clauses within the numerous countries that
> have signed the New York Convention.[27]

388 F.3d 39, 50-51 (2d Cir. 2004); see also Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.,

263 F.3d 26, 31-34 (2d Cir. 2001) (applying New York choice of law clause to one party's claim

that it was not bound by an arbitration agreement that its agent had signed while purportedly

acting outside the scope of agency); Indosuez Int'l Finance B.V. v. Nat'l Reserve Bank, 98

N.Y.2d 238, 746, N.Y.S.2d 631 (2002) (applying New York choice of law clause to question of

authority of the vice chairman of a Russian bank to bind the bank in Russia, and rejecting claim

that Russian law governed).

       **1.**       **New York is the Situs of the Arbitration, and Therefore New York**
                **Procedural Law Applies to the Parties' Choice of Law**

---

[27] Ukraine is a signatory to the New York Convention.

62.     New York law is also applicable because the seat of arbitration is New York.  As

Storm noted in its Motion to Dismiss, arbitral procedure "is governed by the law of the place in

which [the arbitration] is held,"  See Exh. 6 at 9, quoting A. Redfern & M. Hunter, Law & Prac.

Of Int'l Comm'l Arb., at 81 (3d ed. 1999); see also Exh. 132 at 11 (noting that Professors

Redfern and Hunter "have over 30 years experience as arbitrators and counsel in complex

international commercial arbitration cases.")

63.     Because Telenor Mobile and Storm selected New York as the seat of arbitration

in the Shareholders Agreement, New York's choice of law methodology should be followed in

this Panel's resolution of Telenor Mobile's claim against Storm.  See Karaha Bodus Co. v.

Perushaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d 274, 291 (5th Cir. 2004)

("[T]he parties expressly agreed that Switzerland would be the site for the arbitration.  This

agreement presumptively selected Swiss procedural law to apply to the arbitration);  JSC

Surgutneftegaz v. President and Fellows of Harvard College, 2005 WL 1863676, at *7 (S.D.N.Y.

August 3, 2005) ("[T]he situs of the arbitration is of critical importance because the law of the

jurisdiction in which the arbitration is conducted ordinarily provides the procedural law of the

arbitration.").

### D.     Under Ukrainian Law, if it Applied, the Parties' Choice of Law Would Also be Valid

64.     Ukrainian law also follows the principle of party autonomy.  Under the

UNCITRAL Model Law, as adopted in Ukraine, "[t]he arbitral tribunal shall decide the dispute

in accordance with such rules of law as are chosen by the parties as applicable to the substance of

the dispute . . . .   In all cases, the arbitral tribunal shall decide in accordance with the terms of

the contract."  Law of Ukraine On International Commercial Arbitration of 24 February, 1994,

Article 28(1) (emphasis added); see also the Rules of the International Commercial Arbitration

Court at the Ukrainian Chamber of Commerce and Industry, § 8.1.[28]  Ukraine's treaty obligations

likewise adopt a policy of full party autonomy for international commercial arbitrations.  See

note 25, supra.

### III.    NEITHER THE ALPREN DECISIONS NOR UKRAINIAN LAW GOVERN THE QUESTION OF THE VALIDITY OF THE SHAREHOLDERS AGREEMENT AND SHOULD BE WHOLLY DISREGARDED

#### A.    The Ukrainian Decisions Are Meritless, Collusive Litigations Entitled to No Weight

65.    The Alpren Decisions are collusive litigations, in effect between Storm and itself

(in which Telenor Mobile was not a party), and should be entirely disregarded by this Panel. [29]

As Judge Lynch held:  "[t]he real parties in interest in the Ukrainian lawsuit are essentially the

same entities that are involved in the arbitration here."  Exh. 82 at p. 11.

#### 1.    The Ukrainian Legal System Is Not Favored

66.    The parties had a reasonable basis to choose New York law, given widespread

concerns about the stability and predictability of Ukrainian law and the Ukrainian legal system.

As the State Department has observed:

---

[28]As provided in the UNCITRAL Model Law, the Ukrainian international commercial statute is applicable only to arbitrations taking place within Ukraine.  However, that statute expresses Ukrainian policy regarding the substantive law governing the issues in an arbitration, and it is implausible that Ukrainian law would allow the parties to an arbitration pending in Kyiv to enter into an enforceable agreement to have their dispute decided under New York law, but would not allow such an agreement for an arbitration pending in New York.

[29] Storm repeatedly asserted that Telenor Mobile could have intervened in various Alpren litigations on appeal.  However, post-judgment intervention is disfavored.  United States v. Yonkers Bd. of Ed., 801 F.2d 593, 596 (2d Cir. 1986) ("[P]ost judgment intervention . . . is generally disfavored because it usually creates delay and prejudice to existing parties and undermines the orderly administration of justice.")  Moreover, even if Telenor Mobile were permitted to intervene post-judgment, it would by no means be required to do so.  In limited circumstances, parties may be permitted to intervene post-judgment after the consideration of a strict balancing test.  Buxbaum v. Deutsche Bank AG, 216 FRD 72 ( S.D.N.Y. 2003).  The unusual circumstances in the present case clearly mitigate against any such intervention.  As in its Statement of Defense, Storm likely would immediately assert that Telenor Mobile is estopped from proceeding with this arbitration.  The Panel has already adjudicated this issue, and Telenor Mobile does not believe it to be in its best interest to adjudicate this issue again in Ukraine.  As Judge Lynch stated in rejecting that assertion as a basis for giving any weight to the Alpren Decisions, "Storm's blithe suggestion that Telenor could intervene on appeal after judgment has already been reached against it is hardly an adequate opportunity to be heard."  Exh. 82 at 18.

> For many years, investment disputes frequently have
> involved key problems with the investment climate such as
> the lack of adequate rule of law, fair and impartial dispute
> resolution mechanisms, enforcement of domestic court and
> international arbitration decisions.  Another problem is
> poor corporate governance (inadequate protection for
> shareholder rights, inadequate disclosure, asset-stripping,
> and voting fraud).  Dispute settlement remains weak.  Most
> U.S. businesses consider the local and national court
> systems unpredictable and try to avoid them.  Commercial
> contracts may permit the parties to use international
> arbitration courts to settle disputes . . . Corruption continues
> to lie at the heart of many investor disputes.  Laws and
> regulations are vague, with considerable room for
> interpretation, providing officials at every bureaucratic
> layer ample opportunities for corruption.  Foreign investors
> are often seen as competitors to local firms and their
> government 'sponsors.'

See US & Foreign Commercial Service and U.S. Department of State, "Doing Business In

Ukraine:  A Country Commercial Guide for U.S. Companies,"

http://www.buyusainfo.net/docs/x_889096.pdf at 73-74, Aug. 15, 2006 (last checked Jan. 18,

2007).[30]

     67.    It is precisely because of the unpredictability mentioned above that the parties

negotiated for and agreed on New York law as the governing law of the Shareholders

Agreement.  As Mr. Lykke testified, "the purpose of [the 2004 Shareholders] agreement was to

have it under New York law . . . [and to] have it outside Ukrainian law . . ."  See Exh. 189 at

179: 10-14.  The choice of New York law, a sophisticated and predictable body of commercial

law, constitutes a reasonable basis for the parties' agreement.  See Marine Midland Bank, N.A.

v. United Missouri Bank, N.A., 223 A.D. 2d 119, 123, 643 N.Y.S.2d 528 (1st Dep't 1996)

(enforcing New York choice of law, and noting that "access to a convenient forum which

---

[30] Such reports have been held by the Second Circuit to be admissible into evidence and appropriately considered by the District Court in refusing recognition of a foreign judgment.  See Bridgeway Corp. v. Citibank, 201 F.3d 134 (2d Cir. 2000).

dispassionately administers a known, stable, and commercially sophisticated body of law may be considered as much an attraction to conducting business in New York as its unique financial and communications resources").

### 2. The Alpren Decisions Were Not the Products of Adversary Proceedings by the Parties

68.    The Alpren Decisions were not the products of adversary proceedings. Rather, without any notice to Telenor Mobile or Kyivstar, Alpren – a wholly-owned subsidiary of Alfa Group and, together with Hardlake, the immediate corporate parent of Storm, whose sole purpose is to hold Storm shares – brought an action against Storm, likewise a wholly-owned subsidiary of Alfa Group, seeking a declaration that the General Director of Storm lacked actual authority to execute the Shareholders Agreement. Storm, Alpren and Altimo are multiple personalities of the same entity, often employing the same employees to sue one another.[31] Indeed, Alfa negotiated for and pledged to "cause Storm to sign the Letter Agreement," even before Alfa acquired full control of Storm. See Exhs. 147-149.

69.    Storm's "defense" at the Alpren proceedings was essentially no defense at all. Indeed, Storm relied on a non-lawyer (and vice president of Altimo) to defend itself. See Exh. 35 at ¶ 1. No written defense was submitted by Mr. Klymenko, and Klymenko, on behalf of Storm, made no effort to defend the Shareholders Agreement.[32] See Exh. 187 at 215-217; see also Exh. 35 at ¶ 5.

---

[31] As Storm itself has noted, "key executives" at Altimo and the Alfa Group are Alexei Khudyakov and Andrei Kosogov, key players in this arbitration. See Exh. 47 at p. 2.

[32] Alpren was represented by Ilyashev & Partners, Storm's regular external counsel. Exh. 96; see also Exh. 34 at ¶ 1.

### 3.   Telenor Mobile Was Never Given Notice of a Single Ukrainian Proceeding in a Timely Manner

70.     Telenor Mobile first learned of Alpren's Ukrainian litigations through an Altimo

press release, issued after the Ukrainian appellate court issued its judgment on May 25, 2006.  As

the Panel noted in its October 22 Award, counsel for Storm represented that he was aware of the

Ukrainian proceedings as early as April 14, 2006.  See Exh. 187 at 191: 14-17.

### 4.   Collusive Judgments Are Not Entitled to Any Weight and Cannot be Considered as Governing Law

71.     Because the Alpren Decisions are not the product of contested litigations, they are

entitled to no weight at all.  This rule of law has been steadfastly articulated by United States

Courts for over 100 years.  In 1850, the United States Supreme Court declared:

> The objection in the case before us is, not that the
> proceedings were amicable, but that there is no real conflict
> of interest between them; that the plaintiff and defendant
> have the same interest, and that interest adverse and in
> conflict with the interest of third persons . . . A judgment
> entered under such circumstances, and for such purposes, is
> a mere form . . . A judgment in form, thus procured, in the
> eye of the law is no judgment of the court.  It is a
> nullity . . . .

Lord v. Veazie, 49 U.S. 251, 256 (1850); see also Judson v. Flushing Jockey Club, 14 Misc. 350,

351, 36 N.Y.S. 126 (Com. Pl. N.Y. 1895) ("Courts of judicature are organized only to decide real

controversies between actual litigants.  When . . . it appears . . . that a pretended action is not a

genuine litigation over a contested right between opposing parties, but is merely the proffer of a

simulated issue by a person dominating both sides of the record, the court, from a sense of its

own dignity as well as from regard to the public interests, will decline a determination of the

fabricated case . . ."); Charles A. Wright and Arthur R. Miller, 13 Federal Practice and Procedure

§ 3530 (3rd ed. 2004) (describing as "fundamental" the "rule against suits brought by

cooperating interests for the purpose of affecting the interests of nonparties"); Restatement

(First) of Judgments § 122 (1942) ("Collusion between an agent in charge of an action and the other party to the action has the same effect as the bribery of the court . . . .").

72.     More recent decisions are just as emphatic on this point.  In Uzan, the Second Circuit Court of Appeals declined to give any effect to a Turkish judgment because it was the result of collusive litigation in Turkey between parties in a "close relationship," a Turkish corporation – the defendant in the New York proceeding – and several of its Turkish distributors. The Second Circuit affirmed a lower court decision that declined to give any weight to the several injunctions obtained in the Turkish courts purporting to prohibit a transfer of assets, after finding that those orders were the product of collusion between ostensible adversaries.  There, the Court found that:

> The distributors [the Turkish Plaintiffs] enjoyed a very
> close relationship with the Uzans [the Turkish Defendants];
> that the timing of the filings in Turkey suggested that they
> were intended to thwart the District Court's proceedings
> just before the Court ruled on the preliminary injunction
> motion; that the suits in Turkey were nearly identical even
> though they were purportedly filed by different parties; and
> that the defendants' responses to the distributors' lawsuits
> were so pathetic that they actually indicated support for the
> suits.  'Most telling of all,' according to the District Court,
> was defendants' concealment of the Turkish injunctions
> from the District Court and the Court of Appeals.

Id. at 388 F.3d 39, 60.

73.     Here, the relationship between Alpren and Storm is not merely "close."  As Judge Lynch found, "[a]lthough Alpren is a participant in the Ukrainian litigation, Alpren is not merely a shareholder of Storm but is part of a family of affiliated corporations that collectively owns the entirety of Storm.  The real parties in interest in the Ukrainian lawsuit are essentially the same entities that are involved in the arbitration."  See Exh. 82 at pp. 11, 27; see also South Spring Hill Gold Mining Co. v. Armador Medean Gold Mining Co., 145 U.S. 300, 12 S. Ct. 921 (1892)

(dismissing lawsuit where parent and subsidiary corporation were under common ownership and control).

74.    As stated above, no statement of defense was filed at the April 2006 hearing, and the defendant in the action applied to the court for a "clarification" that, for all intents and purposes, strengthened the opinion against it.  Moreover, just as in Uzan, Storm proceeded before the Ukrainian court without notice to Telenor Mobile or this Panel.   There is no basis to give any weight to the Alpren Decisions.

## IV.    THE SHAREHOLDERS AGREEMENT WAS VALIDLY EXECUTED AND GOVERNS THE PARTIES' OBLIGATIONS

### 1.    Mr. Nilov Had Actual Authority to Enter Into the Shareholders Agreement

75.    "[A]ctual authority is the authority that a principal invests in its agent, which, upon its exercise, binds the principal."  See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., KG v. Republic of Romania, 123 F. Supp.2d 174, 186 (S.D.N.Y. 2000); see also Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 51 F.Supp.2d 457, 472 (S.D.N.Y. 1999).  Actual authority may be established by any indication to the agent from the principal that the principal wants the agent to perform a certain task or "from all circumstances including business customs, subject matter, formal agreements between the parties, any facts known to both parties, or omissions by the principal."  Seetransport Wiking Trader, 123 F. Supp.2d at 186.

76.    The only reason that the Shareholders Agreement was not actually executed in 2002 was that Alfa was unable to close its purchase of Omega's Kyivstar shares at that time. Accordingly, the parties fully negotiated the terms of the Shareholders Agreement; mirrored its substantive terms in the Voting Agreement; and provided, in the Voting Agreement, that the Shareholders Agreement, as negotiated, would be executed three business days after the purchase of the Omega shares was concluded.

77.     When the 2002 agreements were signed, Storm delivered a copy of the resolution

of its participants, granting Mr. Nilov:

>    1.     Authorization, approval, ratification and
>    confirmation of the following:
>
>    . . .
>
>    (h)     the execution, delivery and performance by the
>    Company of the *Shareholders Agreement* to be entered into
>    between Telenor and the Company regarding voting and
>    disposition of shares in Kyivstar, on the terms and
>    conditions set forth in the draft *Shareholders Agreement*
>    attached hereto as exhibit 5;
>
>    2.     Authorization of the General Director of Limited
>    Liability Company "Storm", Nilov Valeriy Vladimirovich,
>    to execute and deliver the above-referenced agreements and
>    to execute, certify, deliver, accept, file and record any and
>    all notices, certificates, instruments and documents, and
>    take or cause to be taken any and all other actions, as are
>    required or desirable in connection with this Resolution and
>    the above-referenced agreements.
>
>    (emphasis added)

78.     The logical and natural reading of that language is that Mr. Nilov was authorized

not only to execute the Shareholders Agreement, but to negotiate amendments to it.  As Mr.

Rabij explained, that interpretation is consistent with Ukrainian law.  See Exh. 13 at ¶ 20.  The

contrary position taken by Storm's experts on Ukrainian law, that any change in the Agreement,

however slight or even ministerial, required a new meeting of participants, is unreasonable,

inequitable, and would render the 2002 resolutions a nullity.  Accordingly, Mr. Nilov had actual

authority to execute the Shareholders Agreement under the 2002 resolutions.[33]

---

[33] Mr. Nilov never testified or supplied any evidence, despite the fact that he works as a senior executive for Alfa
Capital, and that Storm sought and obtained an opportunity to present his testimony.  The logical inference is that
Mr. Nilov, a controlled witness, was not called by Storm because he would have testified that he did have authority
to execute the Shareholders Agreement.  See Crowder v. Wells & Wells Equip., Inc., 11 A.D. Ed 360, 361 (1st
Dep't 2004) ("A missing witness charge to draw adverse inference is appropriate when it appears that the non-
appearing witness is knowledgeable about a material issue upon which evidence is already in the case, the witness

79.    That conclusion is heightened by the fact that the only substantive changes in the Shareholders Agreement were made at Storm's request and for its benefit.  It would be inequitable and unjust if Storm were able to utilize the changes it requested to defeat the agreement it signed.[34]

80.    In determining whether a party has authority to enter into an agreement, the rule in New York is that:

> Every manager is an agent of the limited liability company
> for the purpose of its business, and the act of every
> manager, including the execution in the name of the limited
> liability company of any instrument, for apparently
> carrying on in the usual way the business of the limited
> liability company binds the limited liability company,
> unless (a) the manager acting has in fact no authority to act
> for the limited liability company . . . and (b) the person
> with whom he or she is dealing has knowledge of the fact
> that the manager has no such authority.

N.Y. Limited Liability Company Law § 412 (McKinney 2006) (agency of members or managers).

81.    The rule is "If an agent that has been charged with negotiating a contract on behalf of the principal acts outside the scope of its agency, and the opposing party knows this, then the agent lacks both actual and apparent authority and the principal is not bound to the contract."  Sphere Drake, 263 F.3d at 32 (citing Scientific Holding Co., Ltd. v. Plessey Inc., 510 F.2d 15, 25 (2d Cir. 1974)).  (emphasis in original).  In Indosuez, the Second Circuit Court of Appeals rejected a claim that because confirmations binding a Russian bank were not executed

---

would naturally be expected to provide noncumulative testimony favorable to the party who had not called him, and the witness is available to such party."); see also Queenie Ltd. v. Nygard Int'l, 204 F.Supp.2d 601, 604 n.2 (S.D.N.Y. 2002).

[34] Storm has taken the position that any change to the agreed text of the Shareholders Agreement, however slight, required a new meeting of participants.  That would, in effect render the 2002 resolution a nullity, and cannot possibly be correct.  In any event, if there were any merit to Storm's position that execution of the Shareholders Agreement was unauthorized because of the changes it requested, the appropriate remedy would be to enforce the Shareholders Agreement strictly in accordance with the text agreed upon in 2002, and not to invalidate it.

by defendant's accountant general, the contracts were null and void, and held that Indosuez was entitled to rely upon the apparent authority of the deputy chairman of the Russian defendant who had repeatedly executed the relevant contracts. Indosuez Int'l Finance B.V., 98 N.Y.2d at 245-46, 746 N.Y.S.2d at 636.

82.    In January 2004, Storm executed and delivered to Telenor Mobile two "Certificates of Incumbency and Authority of Storm," signed by the Chairman of Storm and a member of Storm's Board of Directors as evidence that Mr. Nilov possessed full authority to enter into the Shareholders Agreement on Storm's behalf and had followed appropriate formalities in entering into the Shareholders Agreement. Exhs. 103 and 104; see also Exh. 189 at 199: 3-5; 199: 12 – 200: 9.[35]  Storm also warranted that "the [Shareholders] Agreement is binding upon, inures to the benefit of and is enforceable by the parties and their respective successors and assigns." See Exh. 105 at § 13.05.

83.    It is well settled that corporate chief executives possess broad authority which is "inherent" to their position. Such implied authority may be inferred "solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers." Marfia v. T.C. Ziraat Bankasi, 100 F.3d 243, 251 (2d Cir. 1996) (citations omitted). In such circumstances, the burden is on the principal to inform third parties of any unexpected limits on the agent's authority. See Seetransport Wiking Trader, 123 F. Supp.2d 174 at 186; Restatement (Second) of Contracts § 12 (1981) cmt. e.  ("the tendency of modern legislation is to restrict the assertion of the defense of ultra vires by business corporations, and in effect give them full capacity"). As

---

[35] The alleged failure of either party to comply with any formal requirements of Ukrainian law is irrelevant. As in Indosuez, the validity of the Shareholders Agreement, which contains a New York choice of law clause, should be tested under New York law. Indosuez, 98 N.Y.2d at 245.

the Appellate Division held in <u>Odell v. 704 Broadway Condominium</u>, 284 A.D. 2d 52, 728

N.Y.S.2d 464 (1st Dep't 2001):

> On the issue of whether plaintiff, by obtaining Leitersdorf's
> consent, as president, secured the approval of the board,
> several well-settled principles bear mentioning.  <u>There is a
> general presumption that the president of a corporation is
> clothed with the powers which, of necessity, inhere in the
> position of chief executive</u> . . . '<u>The president or other
> general officer of a corporation has power, prima facie, to
> do any act which the director could authorize or ratify</u> . . .
> The true test of this authority to bind the corporation is . . .
> whether, at the time, he is engaged in the discharge of the
> general duties of his office, and in the business of the
> corporation.' . . . In this regard, the condominium's bylaws
> expressly grant the president 'all of the general powers and
> duties which are incident to the office of president of a
> stock corporation organized under the Business
> Corporation Law of the State of New York,'
>
> Moreover, plaintiff could reasonably rely on the apparent
> authority of Leitersdorf, as board president, to approve the
> construction.  "The rule is well settled that <u>it will ordinarily
> be presumed that a president of a corporation has the power
> to make contracts pertaining to the business of the
> corporation and coming within the apparent scope of his
> authority</u>." . . .  A president's apparent authority exists
> regardless of whether the president has actual authority to
> carry out such acts . . .  Furthermore, <u>a president of a
> corporation has apparent authority to act within the general
> scope of his office and such acts are binding on the
> corporation against one who does not know of any
> limitation or the president's true authority</u> . . .  thus,
> Leitersdorf, as president of the board, had the power,
> whether actual, implied or apparent to approve of the
> proposed construction and to bind the entire board.

<u>Odell</u>, 284 A.D.2d 56-57, 728 N.Y.S2d at 468-69 (citations omitted) (emphasis added).

Accordingly, Telenor Mobile was entitled to rely on the apparent authority of Mr. Nilov to enter

into a binding agreement.  Exh. 189 at 190:3-22; 191: 2-10.[36]

---

[36] The same result would be obtained under Ukrainian law.  As Mr. Rabij explained, the scope of authority of the
General Director of a Ukrainian company is broader than that of the chief executive officer in the United States.

84.    When one "relies upon the possession by the agent of indicia of authority entrusted to him by the principal," notification must be given directly to the third person by the principal to terminate that apparent authority.  See Restatement (Second) of Agency § 136(1)&(2) (1958).  Such notification was simply never delivered to Telenor Mobile by Storm, or its corporate parent, in a timely fashion.  Storm does not dispute – rather, it acknowledges as in several of its own affidavits and press releases – that any supposed lack of authority was unknown to Storm and Altimo's own directors and negotiators until August 2006, over a year and a half after execution of the Shareholders Agreement.  Prior to Altimo's May 2006 press release, neither Storm nor Alfa ever even hinted, let alone provided notice, that Storm's general director lacked authority to bind Storm.[37]    Rather, in the letter agreements, communications, contractual warranties, and formal documents confirming Mr. Nilov's authority to execute the Shareholders Agreement, Alfa and Storm repeatedly represented to Telenor Mobile that Mr. Nilov had authority to enter into the Shareholders Agreement, and that the Shareholders Agreement was binding.  Exh. 189 at 190: 3-25; 191: 2-10.

85.    Alexey Khudyakov, a Vice President of Altimo and an individual directly involved in the negotiation of the 2004 Shareholders Agreement, claims that he only "recently [had] been informed" that Mr. Nilov needed "additional" authority in August 2006.  Exh. 30 at ¶ 12.  Andrei Kosogov, the Chairman of the Board of Directors of Alfa Asset Management and Altimo, authorized Mr. Nilov's authority as a "routine business matter" and learned that Mr. Nilov was not properly authorized to enter into the agreement only in August 2006.  Exh. 31 at ¶

---

Moreover, there is no relevant restriction in Storm's Charter on the General Director's authority to agree to a modification to the Shareholders Agreement and then execute it.  Exh. 117.  Moreover, as Mr. Wack stated, "Ukrainian law is not relevant for this purpose."  See Exh. 74.

[37] Mr. Nilov had repeatedly entered into several agreements with Telenor Mobile on Storm's behalf over the course of the two years between execution of the Voting Agreement and execution of the Shareholders Agreement, further confirming his apparent authority.

6.  Altimo only discovered what it referred to as a "gross violation" of authority after a "thorough legal and financial audit" of Kyivstar's activities in May 2006.  See Exh. 146.

        1.       **A Company May Not Set Up the Ultra Vires Act of its Own Officer as a Defense to an Action in a Contract That It Signed**

      86.     Storm cannot argue that its own alleged failure to follow its internal procedures renders the Shareholders Agreement invalid.  New York follows "[t]he rule that ultra vires contracts which have been fully executed on both sides will not be disturbed by the courts . . . ." Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp., 219 A.D.2d 186, 190, 641 N.Y.S.2d 680, 683 (2d Dep't 1996).  A contrary rule would leave parties to contracts in a perpetual "state of uncertainty as to the possibility of being undone on some remote point."  Id. Even if such a defense were available, that claim would almost certainly be barred under the doctrine of laches, waiver, or estoppel, particularly given that it was made over two years after the Shareholders Agreement was executed and after the parties had performed under the Agreement for more than a year.  See, e.g., Congregation Yetev Lev D'Satmar, 219 A.D.2d at 191-92, 641 N.Y.S.2d at 683-84.

      87.     As discussed above, Storm has failed to present any credible evidence during the entire course of this arbitration that Telenor Mobile was aware of the claimed ultra vires action and, in fact, presented evidence to the contrary.  Thus, even if an ultra vires defense were available, that claim would be barred under the doctrines of waiver or estoppel, given that it was made over two years after the Shareholders Agreement was executed and after the parties had performed under the Agreement for more than a year.  See e.g., Congregation Yetev Lev D'Satmar, 219 A.D.2d at 191-92, 641 N.Y.S.2d at 683-84.  As Sigmund Ekhougen testified, he was not aware until Spring 2006, well after Storm's nominees on the Kyivstar Board had stopped

attending Board meetings, that Storm was challenging Mr. Nilov's authority to sign the Share-

holders Agreement on its behalf.  See Exh. 187 at 69:23-70:10; 70:20-71:2; 153: 13 – 157: 7.

## 2.    Storm Has Ratified the Shareholders Agreement by its Conduct

88.    Ratification of the acts of an agent occurs "where the principal has full knowledge

of all material facts and takes some actions to affirm the agent's actions."  36 Convent Ave.

HDFC, 2004 WL 1048213 at *5.  Such ratification may also be inferred from "knowledge of the

principal coupled with a failure to timely repudiate, where the party seeking a finding of

ratification has in some way relied on the principal's silence."  Id. (quoting Monarch Ins. Co. of

Ohio v. Ins. Corp. of Ireland, Ltd., et al., 835 F.2d 32, 36 (2d Cir. 1987)); see Indosuez, 98

N.Y.2d at 245, 746 N.Y.S.2d at 635 (finding that the contracts at issue had been ratified where

the defendant was aware of the allegedly ultra vires transaction, but failed to raise the issue of

authority throughout the course of performance between the parties).

89.    As previously noted, Storm was a party to and participated in litigation in Ukraine

months before Telenor Mobile received notice of the supposed invalidity of the Shareholders

Agreement and a year after both parties had complied with the requirements of the Agreement.

Alfa, through Storm, ratified the Shareholders Agreement in multiple ways by:

- negotiating an amendment to the Option Agreement;

- voting in favor of the amended and restated Charter of Kyivstar;

- performing its obligations under the Option Agreement to allocate shares between Telenor Mobile and Storm consistent with the Shareholders Agreement; and

- attending Kyivstar Board and shareholder meetings without protest or complaint for over a year after the parties entered into the Shareholders Agreement.

Such behavior is as far removed from a timely repudiation as can be imagined; further, Storm

has only selectively abandoned the Shareholders Agreement.  It has never once argued that the

allocation of shares contemplated by the Shareholders Agreement is no longer valid or, for

instance, disavowed <u>every</u> action taken since January 31, 2004 by Storm, Kyivstar and Telenor

Mobile.[38]

### 3.    Storm is Estopped From Denying its Responsibilities Under the Shareholders Agreement

90.    A principal is estopped from denying its agent's authority if:  "(1) the principal's

intentional or negligent acts, including acts of omission, created an appearance of authority in the

agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance

resulted in a detrimental change in position on the part of the third party."  <u>Trs. of the Am. Fed'n</u>

<u>of Musicians and Employers' Pension Fund v. Steven Scott Enters., Inc.</u>, 40 F. Supp.2d 503, 508

(S.D.N.Y. 1990); <u>see</u> <u>also</u> <u>36 Convent Ave.</u>, 2004 WL 1048213 at *3-4 (respondent estopped

from denying apparent authority of director from binding company to arbitration even though

corporate bylaws did not clearly allocate authority to director).

91.    Far from alerting Telenor Mobile to any purported <u>ultra</u> <u>vires</u> action:  (a) Alfa

promised to cause Storm to undertake the obligations articulated in the April 29 Letter

Agreement, including Storm's commitment to obtain all necessary consents and hold necessary

meetings of participants; (b) Alfa and Storm represented that Mr. Nilov would be responsible for

signing the Shareholders Agreement and confirmed that he was "prepared to do so"; and (c) Alfa

---

[38] In a similar case in Ukraine, the Higher Commercial Court of Ukraine issued a decision validating a contract between parties where, <u>unlike here</u>, the contract did not meet the formal requirements of the Law of Ukraine regarding valid execution of a contract.  In that case, the contract had been signed on behalf of the parties by only one officer and, thus, was inconsistent with the requirements of Ukrainian law.  In the Court's words, that contract remained valid even after it was established that the contract had not been properly executed, because: "the parties fulfilled the assumed obligations [of the contract] and clauses . . . of the Defendant's Charter expressly provide for the authority of the Chairman of the Management Board (President) to independently sign on behalf of the Company any agreements, including foreign economic agreements . . . "  Therefore, in the Court's opinion, "the invalidation of the Contract and Attachments . . . is groundless."  <u>Armor-LTD v. Open Joint Stock Company Lubnipharm</u>, #04-0/1-7/28, Higher Commercial Court of Ukraine (Jan. 10, 2000).

faxed Storm's a certificate of incumbency confirming that Mr. Nilov had authority to sign the Shareholders Agreement to Telenor Mobile.

92.    In reliance on Alfa's promises and representations, Telenor Mobile allowed Storm to purchase enough Kyivstar shares to obtain a 40% plus blocking interest in Kyivstar. Telenor Mobile would not have allowed Storm to acquire that valuable blocking position absent the parties' execution of the Voting Agreement and Storm's promise to execute the new Shareholders Agreement. See Exh. 189 at 49: 19 – 50:2 ("Q: Would you [Mr. Moland] have sold Alfa enough shares to get their percentage over 40 percent, if they had not agreed to enter into a shareholder's agreement that stated they wouldn't use their blocking position to obstruct the operations? A: That's right. We would never have considered that.").[39]

93.    Further, this change in position has been abusively used by Storm to effectively shut down the higher level operations of Kyivstar through a sustained boycott of its shareholders and Board meetings. See discussion at Section V(A), infra.

**B.    Even If Ukrainian Law Applied, the Shareholders Agreement Is Valid**

94.    Although Ukrainian law is not relevant here, the Shareholders Agreement is valid under Ukrainian law, as well as New York law. As Myron Rabij, a partner in the Kyiv office of Salans, with over 10 years of corporate and international transactional experience in Ukraine explained, Mr. Nilov had actual authority under Ukrainian law to enter into the 2004 Shareholders Agreement.[40]

---

[39] As noted above, Storm failed to provide any meaningful answers to this Panel's questions regarding why Storm was not estopped from avoiding its agreement to arbitrate. See Exh. 187 at 149:3-157:21.

[40] As one District Court noted: "[i]n the years since it achieved independence, Ukraine has developed a complex and, from an outsider's perspective, exceptionally murky body of law governing the form and content of international commercial agreements." Amco Ukrservice & Prompriladamco v. American Meter Company, 312 F.Supp.2d 681, 689 (E.D. Pa 2004).

95.     First, as noted above at paragraphs 16 through 17, the August 30 Notice and the subsequent October 7 Meeting of Participants expressly authorized the execution of the Voting Agreement and the Shareholders Agreement, and were sufficient authority for Mr. Nilov to execute the 2004 Shareholders Agreement.  See Exh. 75.

96.     In Ukraine, general directors – who exercise all "functions of the executive body of the Company" – have broad authority to enter into and execute agreements on behalf of a limited liability company.  See Exhs. 54, 65, 68, 117.  Mr. Nilov's status as a General Director was, in itself, sufficient authority to execute the Voting Agreement and the Shareholders Agreement without any further action by a general meeting of Storm's participants.  Exh. 13 at ¶ 10(b), 20.  As a "one man" executive body, Mr. Nilov, armed with the authority granted him through the August 30 Notice, was, under Ukrainian law, empowered to execute the Shareholders Agreement.

97.     A General Director's responsibilities are limited only:  (a) where the General Director is forbidden by the "constituent documents"[41] of a company from acting without a power of attorney and representing a company in relations with other businesses (see Exh. 132 at ¶ 5); and (b) where the issues of the company's activities fall under the province of a meeting of participants.  See Exh. 65.

98.     Storm's Charter also assigns to the General Director the ability to decide all matters pertaining to Storm's activities except for those falling within the competence of Storm's meeting of participants.  Id.

99.     Of the two legal opinions submitted by Storm that discuss Mr. Nilov's authority, one, from Mr. Peter Magnus, argued that outside of the approval of a special shareholders

---

[41] The only constituent document relevant here is Storm's Charter, which grants broad powers to the General Director to execute binding agreements.  See Exh. 117 at § 12.1.

meeting, "Mr. Nilov could [not] have obtained the legal authority to bind Storm to the Shareholders Agreement [and] [c]onsequently, Mr. Nilov, in executing the Shareholders Agreement acted unlawfully and in excess of his powers." See Exh. 17 at ¶¶ 10-11. The other, from Mr. Maydaynk, insists that Mr. Rabij's assertions are incorrect because the Shareholders Agreement involves the disposal of Kyivstar shares and thus falls within Article 12.4(ii) of the Charter's limitations on the General Director's authority to enter into agreements.[42] Neither of those assertions is correct.[43]

100.    First, as stated above, and explained by Mr. Rabij, under Ukrainian law, Mr. Nilov's power extends to negotiating changes to the Shareholders Agreement and executing them. Storm's Charter does not require the approval of a special shareholders meeting. Rather those powers were inextricably linked with his office. Second, as is clearly stated in Storm's Charter, "disposal of or encumbrance upon the Kyivstar Shares . . . and other transactional documents" are clearly delineated as requiring the approval of the Meeting of Participants. As Mr. Rabij explained, nothing in the Shareholders Agreement amounts to a transactional document and nothing in the Agreement can logically be read as a disposition or encumbrance of shares. Storm has presented nothing to refute this logical reading of Storm's Charter and Ukrainian law. [44]

---

[42] Even this point, however, is convoluted. As evidence for his assertion that the Shareholders Agreement involves the disposal of Kyivstar shares, Mr. Maydaynk refers to the August 30 Notice and the Omega sale. Storm has never contested the legitimacy of the 2002 Shareholders Agreement; the August 30 Notice specifically addresses the 2002 Shareholders Agreement. Furthermore, the Omega sale was a prerequisite for entering into the 2004 Shareholders Agreement, not the reason for its existence.

[43] Mr. Magnus is a Canadian lawyer whose expertise appears to be in international trade law, involving matters such as anti-dumping and countervailing duties. He was never cross-examined because of Storm's refusal to participate in the hearing on the merits.

[44] As Mr. Rabij points out under, Article 4 of the Law of Ukraine "On Securing the Rights of Demand of Creditors and Registration of Encumbrances," the definition of encumbrance must be a security interest or contractual encumbrance arising out of the transfer or possession of property, along the lines of a lien. See Exh. 13 at ¶ 28.

101.    In addition, under Ukrainian law, just as under New York law, Telenor Mobile was entitled to rely on the certificates of incumbency presented by Storm and Alfa and the Storm Certificate, all of which explicitly gave "valid approval" to Mr. Nilov to enter into the 2004 Shareholders Agreement.  See Exhs. 104, 164; see generally Exh. 13.

102.    Under Ukrainian law, such conduct gives authority to Mr. Nilov, and would be invalid only if the representative of the legal entity could "prove that the third party knew or could not but [have] known" that such authority was limited by restrictions.  That is the exact opposite of what happened here.  Far from informing Telenor Mobile that Mr. Nilov lacked authority, Storm expressly represented that Mr. Nilov was "duly authorized" to execute the Shareholders Agreement.  See Exh. 13, n.3.

103.    Storm acknowledges that Ukrainian law was amended to expressly recognize the concept of apparent authority effective January 1, 2004, but asserts that the statute is not retroactive, so that it would not apply to Storm's actions in 2002.[45]  Assuming that to be the case, it is irrelevant here.  The Shareholders Agreement was executed in 2004, and the two certificates of incumbency and authority attesting to Mr. Nilov's authority were delivered then.  The question of apparent authority is measured as of that date, and the record, as discussed above, is clear that Mr. Nilov was clothed with all the indicia of authority as of that date, and that Telenor Mobile had no reason to question that authority.

---

[45] Storm initially took a different position.  At the August 14, 2006 hearing, Mr. Van Tol stated as follows:  "I think that Mr. Sills and I are agreed, at least on apparent authority, the law seems to be the same between Ukraine and New York."  Exh. 176 at 141: 2-5.

## V.     STORM HAS VIOLATED THE SHAREHOLDERS AGREEMENT

### A.     Storm Has Failed to Comply With Its Obligations to Attend Board of Directors and Shareholders Meetings [§ 2.01]

104.     Section 2.01 of the Shareholders Agreement sets forth the procedure for nominations to Kyivstar's Board of Directors. Telenor Mobile has the right to nominate, and has nominated, five members of Kyivstar's Board. Storm has the right to nominate, and did at one point nominate, the remaining four members of the Board. See Exh. 105 at § 2.01(b). Further, under Section 2.01(b) of the Shareholders Agreement, the Shareholders must "take all action necessary . . . to (1) ensure the election of such candidates and (2) maintain the membership of the Board."

105.     The Shareholders Agreement additionally specifies that, in order to establish a quorum and hold a meeting, six Board members must be present. In order to vote on certain specified governance issues, seven Board members must be present. A quorum must always include at least one Board member nominated by Storm. See Exh. 105 at § 2.01(c). Article 9.2 of the Charter sets forth the same requirement. See Exh. 197. If a quorum is not achieved in two consecutive attempts to convene a meeting of the Board, the items on the agenda for that meeting shall be determined by Kyivstar's general meeting of the shareholders. See Exh. 105 at § 2.01(c).

106.     Despite those clear provisions of the Shareholders Agreement, Storm admits that, since Spring 2005, it and its nominees on the Board have refused to participate in any consistent way, in either meetings of the Board or the shareholders.[46] Although Telenor Mobile on April

---

[46] Storm's argument that it stopped attending meetings based on its "good faith belief" that the Kyivstar Charter was invalid did not prevent Storm from executing a written board resolution in April 2005, authorizing execution of a loan agreement and attending two Extraordinary Board Meetings in fall 2005 to, among other things, approve and ratify: (a) the audited financial statements for 2004; (b) the distribution of 25% of the 2004 profits to the shareholders, including Storm; (c) the confirmation of management bonuses for 2004 and the bonus scheme for 2005; and (d) the approval of the 2006 budget. See Exhs. 128-129; see also Exh. 189 at 88: 18 – 90: 15. It is

12, 2005 informed Storm that its absences violated Storm's responsibilities under the

Shareholders Agreement, Storm has done nothing to fulfill its responsibilities under the

Agreement and has, in fact, refused to attend a single Board meeting to the present day.  See

Exhs 76, 89.

107.    In late November and early December 2005, Storm sued two of its own

representatives on the Kyivstar Board, Messrs.  Pavel Kulikov and Vladimir Jmak, to prevent

them from attending Board meetings in the future and to prevent the votes made in two meetings

Jmak attended  from being counted.  See Exh. 4 at ¶ 42; see also Ex. 189 at 111: 10-15.

108.    Mikhail Fridman, the head of Alfa Group, has stated that his desire with regard to

Kyivstar is to obtain 50% ownership and equal rights in its leadership.  See Exh. 189 at 61: 20 -

62: 20.  (Mr. Moland testifying that the Norwegian ambassador to Ukraine told him that Mikhail

Fridman was "angry with Telenor because Telenor wouldn't give him 50 percent and equal

rights."); see also 64: 9-17 (Mr. Moland testifying that "It was quite . . . clear in 2002 that

[Mikhail Fridman] wanted to be . . . a 50 percent shareholder.  And also that . . . Alfa's ultimate

goal here was to have a merger between Kyivstar and Russian VimpelCom making Kyivstar in

fact run by – from Moscow.  That was . . . also our clear understanding.").  Storm's boycott of

Board and shareholders meetings is simply a tactic in that campaign.

109.    Once Storm was allowed to purchase its blocking percentage in Kyivstar, it was

critical that it not be permitted to paralyze the company by boycotting Kyivstar shareholder and

Board meetings and thus causing a lack of quorum.  See Exh. 12 at ¶ 7; see also Exh. 11 at ¶ 29.

Accordingly, the Shareholders Agreement expressly obligates Storm to attend these meetings.

Section 2.05(b) of the Shareholders Agreement reads as follows:

---

apparent that Storm is prepared to participate in Kyivstar's affairs when it suits its purposes, and that its "good faith" belief that it cannot attend Board meetings is a sham.

Storm undertakes:

(i)     to comply with its obligations under this Agreement;

(ii)     to act in a good faith and constructive manner such as to give effect to the provisions of this Agreement, including, without limitation, through participating in and voting at the GMS [General Meeting of Shareholders] and the Board; and

(iii)     not to take, or permit any of its Affiliates to take, any action permitted by Ukrainian law which would allow Storm to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.03(b) as an action for which Storm is required to vote its Voting Securities and cause the Directors nominated by it to vote in favor of approving.

See Exh. 105 at § 2.05(b) (emphasis added).

110.     Storm began boycotting Board meetings beginning in March 2005.  See Exh. 5 at ¶ 10 ("Storm further admits that, beginning in March 2005, those Board members nominated by Storm have not appeared at or participated in Board meetings and that, as a result, the Board has been unable to achieve the quorum necessary to hold a meeting or to conduct business affecting the management of Kyivstar."); see also Exh. 30 at ¶ 5; Exh. 189 at 65:7-11; Exh. 34 at ¶ 4.

**1.     Storm Has Failed to Produce Any Evidence that it Relied in Good Faith on Any Legitimate Authority to Cease Attending Board and Shareholders Meetings**

111.     Storm argues that it did not need to attend Kyivstar's Board or shareholders meetings because of its "good-faith belief that the corporate governance provisions for Kyivstar violated Ukrainian law."  See Exh. 5 at ¶ 11; see Exh. 34 at ¶ 5; Exh. 30 at ¶ 5; Exh. 17 at ¶ 29. Storm rests this "good faith belief" upon the April 25 Order and the May 25 Decision, as well as the order of the Higher Commercial Court of Ukraine purporting to invalidate certain provisions of Kyivstar's Charter in response to a claim initially filed by Storm against Kyivstar and Telenor

Mobile in the Kyiv City Commercial Court (the "December 22 Order").  See Exh. 5 at ¶ 13, FN 2; Exh. 34 at ¶¶ 5-6, 8.

112.    In the first instance, Storm's argument that its boycott was performed in "good faith" is not supported by the record.  Despite Telenor Mobile's requests for documentation of the grounds upon which Storm relies to support its "good faith belief," Storm has refused to produce a single document on this topic.[47]  Defending its failure to produce the relevant documents, Storm argued that the responsive documents are "privileged."  However, a party asserting as a defense that it relied on the advice of counsel must disclose all otherwise privileged communications on that subject matter.  See In re Buspirone Antitrust Litigation, 211 F.R.D. 249, 253 (S.D.N.Y. 2002).

113.    Additionally, the attorney-client privilege is waived with respect to all conversations or documents regarding a particular subject matter once the privilege holder discloses privileged conversations or documents on that topic.  In re von Bulow, 828 F.2d 94, 101-02 (2d Cir. 1987).  Subject matter waiver is implicated when a client places an attorney's advice "at issue" by asserting a defense or advice of counsel.  See U.S. v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991); In re von Bulow, 828 F.2d at 101 (The fairness doctrine aims "to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information."); see also Am. S.S. Owner Mut. Prot. and Indem. Ass'n v. Alcoa S.S. Co., 232 F.R.D. 191, 200 (S.D.N.Y. 2005) ("It bears emphasis that these cases do not require the discovering party to demonstrate prejudice, such as, for example, proof that the privilege holder has disclosed only

---

[47] See Exhs. 152, 156.  Indeed, Storm's entire document production was comprised of 506 pages, consisting of:  (1) various minutes from the general meetings of shareholders in Ukrainian and English; (2) protocols from Kyivstar Board meetings from 1998 to 2005 in Ukrainian and English; (3) a "screen shot" of the Alfa Group's website; and (4) two documents printed from the SEC website on 11/15/06, the day of the document production deadline, one of which was a 227 page photocopy of Turkcell's most recent Form 20-F.

favorable materials…[i]t appears sufficient, for a waiver as to subjects discussed in the disclosed conversations, that the privilege holder has voluntarily revealed only some of the communications on the subject and has withheld others.").  Storm failed to produce any evidence regarding its claim of good faith.

a.    **The Record Shows that Storm's "Good Faith" Argument Is without Merit**

114.    The record shows that Storm did not act in good faith.  As Torstein Moland testified, Storm began planning to boycott meetings well over a year before the issuance of the December 22 Order.  See Exh. 189 at 65:12-22.  In Summer 2004, Igor Lytovchenko, president of Kyivstar, learned from an Alfa representative that Storm would soon begin boycotting board meetings "to prove that Telenor did not have control over the company."  Id. at 65:21-22.  Storm has put on no evidence to the contrary.

115.    The timing of Storm's boycotts of the Board and shareholders meetings conforms with the timing of the conversation between Mr. Lytovchenko and Alfa.  Storm began boycotting the Board meetings in March 2005, approximately nine months prior to the issuance of the December 22 Order.  It began boycotting shareholders meetings one month later in April 2005. See Exhs. 76, 199.  Apparently, Storm is arguing that merely initiating court proceedings was a sufficient basis to boycott the meetings.  See Exh. 5 at ¶ 12.

116.    However, in its April 7, 2005 letter to Telenor Mobile in which Storm asserted that it would not be attending the April 8, 2005 Kyivstar Board meeting, it made no mention of its "good faith" basis for boycotting the meeting generally, or of its initiation of court proceedings specifically.  See Exh. 199.  In short, the April 7, 2005 letter did not give Telenor Mobile any reason to believe that Storm believed the Shareholders Agreement was invalid.  Id.; see also Exh. 189 at 74:9-15.  Rather, the letter consists of a mere blanket assertion that "it is

49

impossible" for Storm representatives to attend the meeting.  <u>See</u> Exh. 199; <u>see</u> <u>also</u> Exh. 189 at 74:6-9.

117.    Even if the timing of the boycotts were not suspect, the December 22 Order did not call into question, or even address, the validity of the Shareholders Agreement.  Rather, the December 22 Order concerned the eligibility for membership of the Kyivstar Board by declaring that only shareholders could serve as directors.  <u>See</u> Exh. 86.

118.    To the contrary, the December 22 Order essentially required that shareholders meetings be held.  The Order stated that Storm and Kyivstar were "oblige[d] . . . to amend the text of the charter in conformity with the applicable legislation of Ukraine."  <u>See</u> <u>id</u>.  The only way in which the parties could cause such an amendment to be made would be to vote to amend the text of the charter at a shareholders meeting.  It is difficult to understand how Storm could be acting in "good faith" in boycotting shareholders meetings when the December 22 Order directs Storm to attend such meetings.

119.    Further, to the extent that Storm was relying on the December 22 Order as a "confirm[ation of] Storm's belief that the governing provisions of Kyivstar were invalid as a matter of Ukrainian law and that Storm was therefore under no obligation to attend either shareholder or Kyivstar Board hearings," that rationale was not applicable when the court orders overruling the December 22 Order were in effect.  <u>See</u> Exh. 8.  The December 22 Order was only reinstated on October 3, 2006.  Storm, however, did not attend Board meetings scheduled between June 27, 2006 (when the December 22 Order was overruled by a lower court) and October 3, 2006.

120.    Lastly, Mr. Kulikov's assertion that "Storm continues to refuse attendance at the Kyivstar Board meetings, and shall continue to do so until such time as Telenor Mobile agrees to

follow the December 22 Order" is ironic at best.  See Exh. 34 at ¶ 12.  Telenor Mobile's attempts

to do precisely that by conforming the Kyivstar Charter with the December 22 Order have been

consistently rebuffed by Storm.

**(1)    Storm's Proposal to Amend the Provisions of the
Charter Regarding the Board Clearly Demonstrates
that Storm Is Not Acting in Good Faith**

121.    Mr. Khudyakov stated in his affidavit that Storm would boycott Board meetings

until "such time as Telenor Mobile agrees to follow the December 22 Order, or until such time as

this dispute is fully resolved by a competent authority."  See Exh. 30 at ¶ 10.  Beginning on

March 16, 2006, Telenor Mobile repeatedly proposed to Storm to do just that when Telenor

Mobile initially offered to "enter into a technical amendment to the Charter that is consistent

with both the Shareholders Agreement and the December 22 Order, including that aspect of the

December 22 Order that purports to hold that only shareholders of Kyivstar may serve as

directors . . ."  See Exh. 136 at p. 4.

122.    Storm failed to respond to Telenor Mobile's repeated offers to make the Charter

"follow" the December 22 Order until November 7, 2006, when Storm proposed a

"compromise" that the December 22 Order would not allow.  See Exh. 161.  In that letter,

Klymenko proposed an amendment to the Kyivstar Charter that would allow three "Independent

Directors" to be nominated to the Board, in addition to Telenor Mobile's three and Storm's three.

123.    Storm clearly has no intent to end its boycott of Kyivstar Board and shareholders

meetings and has no intent to act in good faith.  Mikhail Fridman, the head of Alfa Group, has

publicly stated that his desire with regard to Kyivstar is to obtain 50% ownership and equal

rights in its leadership.  See Exh. 189 at 62: 6-20.

51

124.    Under the Shareholders Agreement, Storm is obligated to cooperate in amending the Kyivstar Charter to bring it into compliance with the Shareholders Agreement.  Section 6.03 provides as follows:

>   Amendment of Charter
>
>   (a)    In the event of any conflict or inconsistency between this Agreement and the Charter, this Agreement shall prevail.  Without limiting the generality of the foregoing, the Shareholders shall take such action as may be necessary to supplement or amend the Charter to reflect, and not conflict or be inconsistent with, the provisions of this Agreement.  The Shareholders also agree, to the extent permitted by applicable laws, to waive any rights or privileges granted to them (including, but not limited to, redemption rights, rights of first refusal and the like)  by applicable law or the Shareholders that conflict or are inconsistent with the terms and conditions of this Agreement.
>
>   (b)    To the extent that pursuant to applicable law the legality, validity or enforceability of any provision contained in this Agreement now or at any time hereafter requires that such provision, or a reference to such provision, be contained in the Charter, or requires any amendment to the Charter, then the Shareholders shall vote their Voting Securities to approve any such amendments and cause the Company to take such action as may be necessary to register such amendments to the Charter as so required with all appropriate Governmental or Regulatory Authorities, and each Shareholders hereby consents to such amendment to the fullest extent permitted by law.

125.    Accordingly, Storm should be compelled to attend a meeting of Kyivstar shareholders and vote to approve an amendment to Kyivstar's Charter that would permit Telenor Mobile and its four affiliates, and Storm and three of its affiliates, each to appoint a representative to Kyivstar's Board, thereby preserving the Board composition explicitly defined in Section 2.01(b)(ii) of the Shareholders Agreement.

126.    The amendment proposed by Telenor Mobile in March 2006, and described in Telenor Mobile's Amended Statement of Claim, is simple.  It provides for Telenor Mobile to form four new corporate affiliates, each of which would hold one share of Kyivstar stock, and for

Storm to form three such affiliates; those nine entities would then be elected as directors of Kyivstar.[48]  That amendment is fully in compliance with Ukrainian law and the December 22 Order, and will preserve the five to four governance scheme agreed to by Telenor Mobile and Storm in the Shareholders Agreement.

127.     The December 22 Order did not address any aspects of the Shareholders Agreement, nor did it require the nomination of any particular number of shareholders or directors of Kyivstar.  Rather that decision, and the recent "clarification" obtained by Storm, simply provided that every director must be a shareholder, and that each shareholder serving as a director will have one vote on the Board.  The amendment proposed by Telenor Mobile is fully consistent with that ruling.  It is striking that the "compromise" proposed by Storm – which would give three seats to Telenor Mobile, three to Storm, and three to "independents" who, by definition, are not shareholders – flies directly in the face of the rulings obtained by Storm from the Ukrainian courts.

> **(2)     Storm's Recent Actions Against Kyivstar's Outside Auditors Further Demonstrate That Storm Is Not Acting in Good Faith**

128.     In yet another example of Storm's failure to act in good faith with regard to its responsibilities under the Kyivstar Charter, Storm recently claimed that Kyivstar has appointed Ernst & Young as auditor without Board approval, and thus without proper authorization.  Storm proceeded to demand that an agreement to audit should be cancelled and threatened legal action, including removal of Igor Lytovchenko, one of the founders of Kyivstar, from his position as president of the company.  Storm has, through Alfa, attacked the right of Telenor to consolidate Kyivstar's results on its books.

---

[48] As the December 22 Order states, under Ukrainian law, a corporation or other entity may serve as a director.

129.     Storm filed a claim against Limited Liability Company "Ernst & Young Audit Services," and Limited Liability Company "Ernst & Young" (collectively, "E&Y") and "any of their authorized persons, officers and shareholders of [Kyivstar]" requesting a hearing, currently set for January 22, and seeking a ruling from the Kyiv City Commercial Court declaring invalid the agreements between Kyivstar and E&Y for audit services.

130.     In addition, Storm sought an order prohibiting:

> Kyivstar, EYAS, EY, and any persons authorized by them, officers, as well as Kyivstar shareholders from undertaking any actions on fulfillment of any agreements (contracts) aimed at provision (obtaining) of audit services, including prohibition from furnishing and obtaining any information on the financial and business activities of Kyivstar, including the source accounting documents, reports, data; signing and filing of any reports or letters; to prohibit (till the decision on the substance of the case) Kyivstar, EYAS, EY, and any persons authorized by them, officers, as well as Kyivstar shareholders from using [sic] financial statements, reports documents and data already received from each other; to prohibit (till the decision on the substance of the case) Kyivstar from conclusion of any agreements (contracts) for provision (obtaining) of audit services.

See Exhs. 87-88, 203.

131.     On December 29, 2006, in response to Storm's petition, the Kyiv City Commercial Court issued an injunction against Kyivstar, purporting to prohibit Kyivstar and E&Y from taking any action aimed at performance of any contracts or agreements the subject matter of which is the provision of audit services for Kyivstar, including signing and submitting any reports or letters.  See Exh. 87.

132.     This latest action by Storm was clearly intended to pressure Telenor Mobile to surrender its rights by harming Kyivstar and Telenor, because Telenor is required to consolidate Kyivstar's results with its own.  Without obtaining  audited financial statements, Kyivstar cannot

continue to access international capital markets, and it may experience substantial difficulty in meeting its obligations under United States securities laws, including the Sarbanes-Oxley Act. See Exh. 189 at 79: 23 – 80: 8.

      **2.**     **Storm's Argument That Attendance At Board and Shareholders Meetings Is its Right, Not its Obligation, Is Irrelevant**

133.     Storm's purported expert Peter Magnus asserted in his affidavit that "participation in the Kyivstar Board was Storm's right rather than its obligation" because, under Article 10(a) of the Law on Business Entities, "shareholders shall have the right to participate in the companies' managing bodies as provided for by the Charter." See Exh. 17 at ¶ 24; Exh. 16 at ¶¶ 71; 74. Mr. Magnus makes this same argument with respect to Storm's attendance at shareholders meetings. Id. at ¶35. That argument is nonsensical; while Ukrainian law may not create an affirmative obligation for directors and shareholders to attend board meetings, the express terms of the Shareholders Agreement clearly do exactly that.

134.     Under Section 2.01(b) of the Shareholders Agreement, the shareholders must "take all action necessary . . . to (1) ensure the election of such candidates and (2) maintain the membership of the Board." See Exh. 105 at § 2.01(b). Furthermore, under Section 2.05 of the Shareholders Agreement, Storm must act "in a <u>good faith and constructive manner such as to give effect to the provisions of this Agreement, including, without limitation, through participating in and voting at the GMS [General Meeting of Shareholders] and the Board</u>." See Exh. 105 at § 2.05 (emphasis added).

135.     Storm clearly acted in contravention of its obligations under Sections 2.01 and 2.05 of the Shareholders Agreement by failing to attend Kyivstar Board and shareholders meetings. The parties expressly made attendance at the meetings an affirmative obligation because, as discussed at VI(A), <u>infra</u>, failure to attend meetings would cause serious financial

hardship to Kyivstar.  In fact, Telenor Mobile was keenly aware that, under Ukrainian law, a

holder of more than 40% of the shares in a Ukrainian company could, in the absence of a

shareholders agreement or other contractual obligation, block decisions of the company's general

meetings of shareholders by failing to attend and thus preventing a quorum.[49]  See Exh. 12 at ¶

6; Exh. 11 at ¶¶ 25, 28.  Because of this Ukrainian law, and the "potential impact" this law could

have on the company, "it was imperative [for Telenor Mobile] that there first be an agreement

between Telenor Mobile and Storm that would prevent Storm from using its 40% plus stake in

Kyivstar to block general meetings of the shareholders of Kyivstar from occurring" prior to

allowing Storm to increase its shares in Kyivstar to above 40%.  See Exh. 12 at ¶ 7; see also Exh.

11 at ¶ 29, Exh. 189 at 49: 19 – 50: 2 ("Q:  Would you have sold Alfa enough shares to get their

percentage over 40 percent, if they had not agreed to enter into a shareholder's agreement that

stated they wouldn't use their blocking position to obstruct the operations?  A:  That's right.  We

would never have considered that"); id. at 208: 4 – 210: 21 (Mr. Lykke noting that "blocking

rights" are routinely tailored "in order to cater to both parties in an acceptable way.").

136.     Accordingly, when the parties entered into the Voting Agreement with Storm, the

Voting Agreement contained language – identical to the language of Section 2.05 of the

Shareholders Agreement – which obligated Storm to act in good faith and to participate in the

shareholders and Board meetings.  See Exh. 12 at ¶¶ 9-11; See also Exh. 11 at ¶ 30; compare

Exh. 11 at ¶¶ 30-31 (describing a conference call between representatives of Telenor Mobile and

Alfa in which Mr. Fridman "argued vehemently that Alfa should have the ability to prevent

---

[49] Mr. Magnus' argument that "blocking power" by a minority shareholder is a legal safeguard that allows minority
shareholders to "protect their rights" is unavailing.  First, Ukrainian law is inapplicable with regard to the
governance provisions of the meetings of the Shareholders Agreement.  Second, it was precisely the threat of such a
boycott that caused Telenor Mobile to request, and Storm to agree, to, Section 2.05(b) of the Shareholders
Agreement.  See Exh. 189 at 49: 14-18 (Mr. Moland: "[Telenor Mobile] should have a shareholder's agreement that
prevented Alfa from exploiting the rights according to Ukrainian law – and the 40 percent [blocking] threshold.").

Kyivstar shareholders and board meetings from having a quorum if there was something on the agenda of the relevant meeting that Alfa did not like."); <u>see also</u> Exh. 110.

**3.**      **<u>Telenor Mobile Has Not Waived its Right to Arbitrate an Issue in this Proceeding by Defending Itself Against the December 22 Order</u>**

137.      Storm's arguments that Telenor Mobile has waived its right to arbitrate because it defended itself in the case in which the December 22 Order was issued, and in other Ukrainian cases in which the Charter was in dispute, is misleading.[50] <u>See</u>, Exh. 6 at p. 8-9.  Storm argues that Telenor Mobile never sought an order compelling arbitration and did not raise Section 12.01 as a defense to the action.  Storm's waiver argument confuses the issues presented in Ukraine with the issues presented in this arbitration.

138.      New York courts favor arbitration and waivers of arbitration are not lightly inferred.  <u>See</u> <u>Weinrott v. Carp</u>, 32 N.Y.2d 190, 199, 298 N.E.2d 42, 47, 344 N.Y.S.2d 848, 856 (N.Y. 1973).  As the New York Court of Appeals has noted, "[n]ot every foray into the courthouse effects a waiver of the right to arbitrate."  <u>Sherrill v. Grayco Bldrs.</u>, 64 N.Y.2d 261, 273, 475 N.E.2d 772, 776, 486 N.Y.S.2d 159, 163 (N.Y. 1985) (finding waiver where party seeking arbitration, "affirmatively sought the benefits of litigation . . . .").

139.      Courts consider an arbitration right waived only where a party has "engaged in litigation to such an extent as to manifest a preference clearly inconsistent with that party's later claim that the parties were obliged to settle their differences by arbitration."  <u>Flynn v. Labor Ready, Inc.</u>, 6 A.D.3d 492, 493, 775 N.Y.S.2d 357, 359 (2d Dep't 2004).  For example, "actions undertaken by the party against whom the waiver would operate that are merely defensive will

---

[50] Storm's argument that Telenor Mobile waived its right to the violation claim with regard to Section 12.01 is applicable only to the December 22 Order and its progeny.  Storm's waiver claim cannot apply to the Alpren Decisions because Telenor Mobile was never a party to those actions.

57

be considered consistent with an assertion of a right to arbitrate." Id. (finding that defendant did not waiver arbitration by filing motions to dismiss complaint and to deny class certification).

140.    Additionally, even if there had been a waiver of arbitration on the particular issue of consent to jurisdiction or as a result of Telenor Mobile's limited defense of the case in which the December 22 Order was issued or Storm's other barrage of Ukrainian litigation, that would have no effect on Telenor's right to arbitrate the violations of the Shareholders Agreement at issue here.  The rule in New York is that a party does not waive its right to arbitrate a given issue by engaging in litigation upon a different issue.  See e.g. Denihan v. Denihan, 34 N.Y.2d 307, 310-311, 313 N.E.3d 759, 760-61 (N.Y. 1974) (holding that the party did not waive its right to arbitrate separate and distinct issues under agreement from those previously litigated, but did waive its right to arbitrate claims already covered by actions).  Litigation of separate and distinct claims, even if they involve overlapping factual issues and are contained in the same agreement, will not constitute a waiver of the right to arbitrate.  See, e.g., Liberman v. Wachsman, 1 Misc. 3d 910(A), 781 N.Y.S.2d 625, 625 (N.Y. Sup. Ct. 2004), citing Denihan, 34 N.Y.2d at 310-311; Radzievsky v. MacMillan, Inc., 170 A.D.2d 400, 400, 566 N.Y.S.2d 285, 286 (1st Dep't, 1991) (concluding that employee's waiver of right to arbitrate claim for breach of employment contract could not be implied from litigation alleging fraudulent conspiracy to induce employee into employment contract).  "Where claims are entirely separate, through arising from a common agreement, no waiver of arbitration may be implied from the fact that resort had been made to the courts on other claims."  Grayco Bldrs., 64 N.Y.2d at 273, 475 N.E.2d at 163.

141.    Telenor Mobile has never been involved in a litigation concerning the meaning of any provision of the Shareholders Agreement  – as opposed to the Charter – in a Ukrainian, or

any other, court.  Telenor Mobile's only resort to a court was before the Southern District in order to compel the arbitration to which Storm itself agreed.

**B.    Storm Has Violated the Non-Compete Clause of the Shareholders Agreement [§ 6.02]**

142.    As part of the Shareholders Agreement, Storm and Telenor Mobile mutually agreed to enter into a non-compete clause.  See Exh. 105 at § 6.02.  The purpose of the non-compete was, as Mr. Moland testified, "to make sure that the shareholders have the same interests in developing the company and that we do not risk that any business secret from Kyivstar should fall into the hands of one of the competitors."  See Exh. 189 at 84:13-18.  However, Storm, through two of its affiliates, violated and continues to violate the expressly agreed upon terms of Section 6.02 of the Shareholders Agreement, which states:

> [N]o Shareholder or any of its Affiliates will, without the prior written consent of the Company and the other Shareholders, (i) engage in the Business in any region in Ukraine, (ii) own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than [Kyivstar] or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine or (iii) permit any of its Controlled Affiliates (other than [Kyivstar] or any of its Controlled Affiliates) to engage in the Business in any region in Ukraine or own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than [Kyivstar] or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine.[51]

See Exh. 105 at § 6.02(a).  (emphasis added).

143.    The Agreement further defines an Affiliate as:

> [A]ny other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person . . . As used in this definition, "control"(including with its correlative meanings, "controlled by" and "under

---

[51]  "Business" is defined as the wireless mobile telecommunications business.  See Exh. 105

> common control with") shall mean, with respect to any
> Person, <u>the possession, directly or indirectly, of power to
> direct or cause the direction of management or policies
> (whether through ownership of securities or partnership or
> other ownership interests, by contract or otherwise) of a
> Person.</u>[52]

<u>Id</u>. (emphasis added).

### 1.    <u>The Non-Compete Provision is Valid</u>

144.    As Mr. Lykke testified at the December 18 hearing, the non-compete clause was a

negotiated provision of the Shareholders Agreement.  In particular, Storm requested that Alfa's

investment in Golden Telecom, which would otherwise violate the non-compete clause, be

excluded.  In turn, Telenor Mobile agreed to that exclusion, provided that none of Alfa's

nominees on the Golden Telecom board would simultaneously serve on the Kyivstar Board.

Storm agreed, and the Shareholders Agreement reflects that compromise.[53]  <u>See</u> Exh. 189 172: 9

- 173: 2. (Mr. Lykke: "[I]t came up during the discussions that Alfa have an ownership in a

company called Golden Telecom, which has a subsidiary in Ukraine.  So . . . Telenor agreed to

have a carveout for that holding which otherwise would be breach of the general non-compete

starting point. And then we did some additional tailoring of the clause making sure that . . .

directors which Alfa nominated cannot be heavily involved or involved in the Golden Telecom

company in any way. Q: And what was the reason for requiring that there be no cross

directorships? [Mr. Lykke:] Well, that was basically to make the non-compete clause a bit

---

[52] "Person" is defined as any ". . . corporation, general partnership, simple partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority, whether incorporated or unincorporated." <u>See</u> Exh. 105.

[53] Storm originally argued in its Statement of Defense that, even if the Shareholders Agreement were valid, the non-compete provision would be unenforceable under applicable New York law.  <u>See</u> Exh. 5 at 3, 7.  In a complete about face, Storm renounced its position that New York law governs, arguing that the non-compete provision should be governed by Ukrainian law and that, under Ukrainian law, the non-compete provision is non-arbitrable and, in fact, against Ukrainian law.  <u>See</u> Exh. 17 at ¶ 38; Exh. 18 at ¶ 75.  As previously discussed, New York law is the governing law of this dispute and thus Storm's position is unsustainable.

safer.") . There was never any suggestion from Alfa during the course of the negotiations that the non-compete clause was unfair or unreasonable, nor was there any suggestion that some limit should be placed on the provision.  See Exh. 189 at 174:17-175:15.

145.    An agreement not to compete is lawful under New York law so long as the restraint is "merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the full enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party."  U.S.  v. Addyston Pipe & Steel Co., 85 F. 271, 282 (6th Cir. 1898), aff'd, 175 U.S. 211 (1899).

146.    In Addyston Pipe & Steel, the court identified five common types of non-compete covenants that various courts had held should be enforced because they promoted trade, including a covenant by and between partners not to engage in the same business outside of the partnership because it is ancillary to a legitimate transaction.  See Addyston Pipe & Steel Co., 85 F. at 281.  That remains the law today.  See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 3541 (1990).  Indeed, once Storm acquired its stake in Kyivstar, it, and its affiliates, acquired access to Kyivstar's confidential business information and plans.  As Messrs. Lykke and Moland explained, a covenant against investing in a rival concern for so long as Storm holds its stake in Kyivstar is a reasonable way to prevent Storm and its affiliates from exploiting that information.[54]

## 2.    The Parol Evidence Rule Applies to the Non-Compete Provision

147.    Storm argues that the non-compete provision is overbroad and asserts that "at the time [of the signing of the Agreement], Altimo's position was that Article 6.02 could not possibly affect Altimo . . . or any of its subsidiaries other than Storm."  See Exh. 18 at ¶ 83; Exh.

---

[54] The dramatic, and well-funded increase of Astelit's subscriber base described below, at the same time that Storm, Astelit's sister company is hindering Kyivstar's business, convincingly demonstrates the need for such protection.

34 at ¶ 15; Exh. 30 at ¶ 13.  There were never any communications to Telenor Mobile of Storm's "position" at the time the Shareholders Agreement was negotiated.  See Exh. 189 at 173: 11-174: 16.  Furthermore, Storm has not produced any documents to that effect.  To the contrary, the only evidence on this point – the negotiated exclusion of Altimo's holding in Golden Telecom – directly contradicts Storm's current position.

148.    In any event, even if such evidence did exist, it would have no bearing on the contractual issue before this Panel because of New York's parol evidence rule.  Under New York law, contracts are to be interpreted according to their unambiguous terms.  Therefore, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."  W.W.W. Associates, Inc. v. Frank Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990); see also Namad v. Salomon, Inc., 74 N.Y.2d 751, 753 (1989) ("Parol evidence is inadmissible if a contract is clear on its face and sufficient alone to divine the intent of the parties.").  The rule against parol evidence in New York is "not merely a rule of evidence," but rather "'[a]n important principle of substantive law.'"  Unisys v. Hercules Inc., 224 A.D.2d 365, 368 (1st Dep't 1996) (finding that where a contract constitutes the entire agreement between the parties, the law considers the contract "not merely the best but the exclusive evidence of the parties' intent"), citing Fogelson v. Rackfay Const. Co., 300 N.Y. 334, 338, 340 (N.Y. 1950).

149.    The Shareholders Agreement is clear on its face, was the product of negotiations, and was warranted by Storm to be "binding upon . . .  and enforceable by the parties. . . ."  See Exh. 105 at § 13.05.  Storm's assertion that only its conduct, and that of no other Alfa entity, could violate the non-compete provision, contradicts the express language to which Storm

agreed.[55]  Moreover, it was Alfa, not Storm, that controlled the negotiations leading to the

formation of the Shareholders Agreement.  See Exh. 189 at 61:14-16.

150.    In its discovery requests, Telenor Mobile asked Storm to produce all documents

concerning Altimo's ownership interest in Astelit, Turkcell and UHT, as well as any business

plans concerning Astelit, Turkcell and UHT's plans to compete with any other mobile

telecommunications businesses in Ukraine.  See Exh. 152.  Although Storm had ample time to

review and procure documents responsive to Telenor Mobile's requests, Storm responded that it

could not produce such documents because it would require Storm to produce documents in the

"possession, custody or control of other persons or entities."  See Exh. 156.

151.    Those documents are in Storm's "possession, custody or control" because they

can be readily obtained from other companies controlled by Altimo or other members of Alfa

Group.  In fact, Storm had no difficulty obtaining an affidavit from UHT's chief executive.[56]

Presumably, the withheld documents, including UHT's business plans, would have enabled

Telenor Mobile to test that assertion.

152.    Storm's principal attack on the non-compete provision rests not on its substance,

but on an argument that, because it implicates Ukrainian competition law, it is not arbitrable.

Putting to one side the fact that Storm's argument on Ukrainian law is based on the opinion of

Mr. Magnus, a Canadian lawyer with no relevant expertise, and that New York law governs by

agreement of the parties, that argument is irrelevant, even if correct.  It is firmly established that

---

[55] Alfa, not Storm, controlled the negotiations that eventually led to the formation of the Shareholders Agreement; indeed, the Agreement went through several iterations integrating Alfa's comments and concerns.  See Exhs. 99-79, 101, 104-105.  Yet the Agreement does not reflect Alfa's alleged requested changes to the non-compete clause, or to the definition of affiliate.  Additionally, given that the individuals most involved in the negotiations of the Agreement on behalf of Storm were Alfa employees, including Aleksey Khudyakov, a Vice President of Altimo Holdings & Investments Limited – Storm's corporate parent – Storm's protestations that the non-compete clause was not intended to apply to Altimo are groundless.  See Exh. 30 at ¶ 1.

[56] Mr. Chuikov, as with all of the other witnesses who provided affidavits for Storm, was never made available for cross-examination, and his bland denial that UHT does not compete with Kyivstar is entitled to no weight at all.

antitrust claims are arbitrable under the New York Convention and the Federal Arbitration Act.

See Mitsubishi Motors Corp v. Solar Chrysler-Plymouth Inc., 473 U.S. 614 (1985).  See

Southland Corp. v. Keating, 465 U.S. 1 (1984) (holding that state statutory prohibition on

arbitration of franchise claims is preempted by Federal Arbitration Act).  This Panel would be

fully able to judge Storm's competition law defense to enforcement of the non-compete

provision, had one actually been advanced.

### 3.   Altimo and Alfa Have Invested in Competing Telecommunications Businesses in Ukraine

153.   Turkcell and UHT, two companies in which affiliates of Storm have acquired

interests following Storm's execution of the Shareholders Agreement, are engaged in the

wireless mobile telecommunications business in the Ukraine without the consent of Telenor

Mobile.  See http://www.turkcell.com.tr/index/0,1028,300028,00. html (last checked Jan. 12,

2006).  In both instances, Storm's affiliates have violated the non-compete clause of the

Shareholders Agreement by purchasing more than a 5% ownership interest in the voting capital

stock of companies engaged in the Business in the Ukraine.[57]  As of December 31, 2006,

Astelit's number of subscribers had increased to 5.55 million.  See www.telecom.paper.nl/news/

article.aspx?id=154668 ("Ukrainian mobile operator Astelit, operator of the life:) brand, had 5.55

million subscribers at end-2006, up 126 percent from 2.46 million at end-2005.")

154.   Storm's pre-hearing brief claimed that only its conduct, and that of no other Alfa

entity, could violate the non-compete.  That assertion flies in the face of the express language

---

[57]It is a matter of public record that WiMax technology is being used to enhance mobile phone use worldwide.  See http://www.wimax.com/education/faq/faq5c ("The short answer is WiMax on your phone is only a matter of time."); http://www.handcellphone.com/archives/lg-wimax-kc1-pda-cell-phone-releaed-in-itu-2006 ("To make her 'stand out of crowd', LG releases a shocking cellular phone which is called LG WiMAX (KC1) [a] PDA cell phone that integrated WiMAX technology."); http://www.cellphonedigest.net/news/2006/11/samsung_showcases_the_ sphp9000.php ("Samsung Electronics unveiled the latest in mobile convergence device, the SPH-P90000 . . . the true convergence device capable of voice and multimedia data communications through Mobile WiMAX technology.") (Last checked Jan. 12, 2007).

which Alfa negotiated and to which Storm agreed.  In effect, Storm took upon itself the risk that

one of its affiliates would violate the non-compete; indeed, it successfully negotiated to exclude

Altimo's subsidiary, Golden Telecom, from the coverage of the clause.  Given that Alfa and

Altimo control Storm and Storm's affiliates, that makes business, as well as legal, sense.

155.    It is true that the Panel cannot order an Alfa party other than Storm to divest all or

part of a business, but that goes to the remedy for violation of the Shareholders Agreement,

rather than liability for the violation itself.  Storm itself is subject to an award for the violation of

the clause.

156.    Here, the Panel should enter an award (a) declaring that the non-competition

clause has been violated, and that the violation will be cured if Altimo's interests in Turkcell and

UHT are divested within a reasonable time to be fixed by the Panel.  If those interests are not so

divested, then Storm, over which the Panel does have jurisdiction, should be compelled to sell its

interest in Kyivstar in accordance with the provisions of the Shareholders Agreement.  In that

way, the Panel will not have purported to compel any party other than Storm to take or refrain

from taking any action, while at the same time creating an effective remedy for the violation of

the non-competition provision.

## VI.    TELENOR MOBILE HAS BEEN DAMAGED BY STORM'S BREACHES OF THE SHAREHOLDERS AGREEMENT

157.    Alfa's constant attempts to undermine the business of Kyivstar have wreaked

havoc with the company's ability to conduct its day-to-day operations, as well as its long-term

prospects.

### A.    Inability to Conduct Business

158.    Storm's refusal to participate in both shareholders and Board meetings has

prevented Kyivstar from paying dividends, directly harming Telenor Mobile.  See Exh. 189 at

88: 5-14.  Kyivstar has been unable to approve a budget for 2007 or an external financing plan

for the company.  Id. at 133: 15-25.   In addition, because Storm's actions have prevented the

distribution of dividends, Kyivstar's capital structure has too much equity and inadequate debt,

see id at 135: 5-16, thereby harming its ability to expand.  Id. at 81: 23 – 82: 6.

159.    From a marketing perspective, Kyivstar has been unable to do simple things, like

creating an opening logo screen for Kyivstar users or open sales offices and expand operations.

Although Telenor Mobile has bolstered the marketing and operational aspects of Kyivstar with

international experts, Telenor Mobile has not been reimbursed for its efforts.  See id at 80: 9-14;

15-22.

160.    Operationally, Storm has attempted to prevent Kyivstar from implementing

Sarbanes-Oxley regulations by approving basic procedures, as well as attempting to enjoin

Kyivstar's outside auditors from conducting required fiscal reviews of Kyivstar's financials, a

fact that may make it impossible for Telenor to comply completely with required procedures.  Id.

at 135: 17 – 136: 23.  As Torstein Moland testified, "[i]f it turns out that . . . Kyivstar should not

be able to fulfill all the requirements from SEC, Telenor would have to say to . . . the SEC that

we are not able to do that . . . [which would have a direct impact] on the share price" of Telenor's

stock on the Nasdaq.  Id. at 128: 2-18.  Kyivstar has further been unable to approve labor

contracts for the non-Ukrainian management.  Id. at 134: 2-11.  Storm has simply blocked

Kyivstar's ability to grow the administrative capacities of a burgeoning company that has to now

serve over 20 million subscribers.  Id. at 80: 23 – 81: 12.  All of these are factors that detract

from the company's growth and productivity, and thus from the return to the shareholders of the

company.

161.    Throughout these proceedings, Storm has claimed that any award will be futile because of the need to enforce it in Ukraine.  However, as Judge Lynch noted in rejecting the same argument:

> [I]t cannot simply be assumed that this Court's judgments will be disregarded by foreign courts.  The "determin[ations]" of the Ukrainian courts to which Storm refers were reached in apparently non-adversarial proceedings between friendly parties with no incentive to raise serious issues about the correctness of their joint position.  Such determinations may not be adhered to in genuine judicial proceedings.  Moreover, the record in this case contains no information about what assets Storm may have outside Ukraine that could be reached by either a judgment on the merits or a contempt adjudication.  The view of the Ukrainian courts may not be shared by those of other countries.

Exh. 82 at 23.  <u>See</u> W. Craig, W. Park and J. Paulsson, International Chamber of Commerce Arbitration § 11.04 (3d ed 1998) ("arguments that arbitral jurisdiction should be refused on the grounds that the award might not be enforceable at the domicile of the respondent are given no weight in ICC arbitration, and properly so").

162.    The Shareholders Agreement was carefully negotiated and is fully enforceable. Storm's attack on its own agreement, pursuant to which it obtained the extremely valuable rights to invest in Kyivstar, should be rejected, and the contract between the parties should be enforced according to its terms.


**PROPOSED RELIEF**

163.    Telenor Mobile respectfully requests and seeks an award from this Panel:

A.    Declaring that Storm is in breach of the Shareholders Agreement for (a) initiating litigations in the Ukraine; (b) failing to attend annual and extraordinary shareholder meetings; (c) failing to appoint candidates for election to the Kyivstar Board, and to cause the Storm-nominated Board members to attend Board

meetings and participate in the management of Kyivstar, (d) owning, indirectly or directly, more than 5% of other companies engaged in the mobile telecommunications business in Ukraine, and (e) violating the good faith and dispute resolution procedures of the Shareholders Agreement;

B.      Enjoining the commencement or prosecution of any and all court actions by Storm, its affiliates, and anyone acting in concert with Storm or its affiliates, in any way arising out of, relating to or in connection with any obligations described in the Shareholders Agreement, including all of the existing litigations in Ukraine described herein;

C.      Enjoining Storm, its affiliates or anyone acting in concert with Storm or its affiliates from seeking to enforce the December 29, 2006 Injunction or its attendant Enforcement Order;

D.      Requiring that Storm attend all future annual and extraordinary shareholders meetings, and causing Storm to nominate candidates for election to the Kyivstar Board; and cause the Storm-nominated Board members to be elected and to attend all future Board meetings and participate, in good faith, in the management of Kyivstar;

E.      Requiring that Storm amend the Charter to conform to the Shareholders Agreement, pursuant to Sections 2.05(b)(ii) and 6.03 thereof, with respect to the December 22 Order and any other ruling of the court, in Ukraine or elsewhere, purporting to invalidate, limit or circumscribe any provision of the Charter, including, without limitation, amending the Charter, to the extent necessary, to reflect the transfer of shares to Telenor Ukraina I AS, Telenor Ukraina II AS, Telenor Ukraina III AS and Telenor Ukraina IV AS, and the status of each such entity as a shareholder of Kyivstar;

F.      Requiring Storm to take all actions necessary to cause the December 29, 2006 Injunction and Enforcement Order to be withdrawn;

G.      Requiring that Storm sell its interest in Kyivstar in accordance with the provisions of the Shareholders Agreement unless, within a reasonable time to be fixed by this Panel, Altimo divest its holdings in Turkcell and UHT;

H.      Awarding Telenor Mobile its costs and disbursements of this proceeding, including its reasonable attorneys' and experts' fees, in accordance with Article 38 of the UNCITRAL arbitration rules; and

I.      Granting such other relief as this Panel deems just and proper.

# VII.    **CONCLUSION**

For the foregoing reasons, Claimant Telenor Mobile's requests for relief should be

granted in its entirety.

Dated:  New York, New York
        January 19, 2007


By: _____

                    Robert L. Sills
                    Jay K. Musoff
                    ORRICK, HERRINGTON & SUTCLIFF LLP
                    666 Fifth Avenue
                    New York, New York 101013
                    Telephone:  212 506 5000
                    Facsimile:  212 506 5151

                    -and-

                    Peter O'Driscoll
                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    25 Old Broad Street
                    London EC2N 1HQ
                    DX:  557 London/City
                    United Kingdom
                    Telephone:  011-44 20 7562 5000
                    Facsimile:  011-44 20 7628 0078


                    Attorneys for Claimant