IN THE MATTER OF AN ARBITRATION UNDER
THE UNCITRAL ARBITRATION RULES BETWEEN:


**TELENOR MOBILE COMMUNICATIONS AS,**

Claimant,


Snarøyveien 30
N-1331 Fornebu
Norway


-and-


**STORM LLC,**

Respondent,


1 Narodnogo Opolchennya Street
Kyiv 03151
Ukraine


**MEMORANDUM IN RESPONSE TO THE PANEL'S INTERIM ORDER
DIRECTING FURTHER BRIEFING**

Claimant Telenor Mobile Communications AS ("Telenor Mobile") respectfully submits this memorandum in response to the Interim Order Directing Further Briefing dated February 12, 2007 (the "Interim Order"). Each of the questions in the Interim Order is set out below, followed by Telenor Mobile's response.

I.  **ASSUMING NEW YORK LAW APPLIES AS AN INITIAL MATTER TO THIS ARBITRATION PURSUANT TO THE PARTIES' CHOICE OF THAT LAW IN THE SHAREHOLDERS AGREEMENT, AND PURSUANT TO ARTICLE 33 OF THE UNCITRAL RULES, DO NEW YORK CHOICE OF LAW RULES NONETHELESS DIRECT THIS TRIBUNAL TO APPLY UKRAINIAN LAW TO DISPUTES AFFECTING THE GOVERNANCE OF A UKRAINIAN CORPORATION, LIKE STORM, INCLUDING DISPUTES OVER THE AUTHORITY OF CORPORATE OFFICIALS CONTRACTUALLY TO BIND THE CORPORATION?**

   A.  **Under the Shareholders Agreement, New York Law Applies Without Reference to its Choice of Law Rules**

The Shareholders Agreement and the UNCITRAL Arbitration Rules (the "UNCITRAL Rules") expressly require this Panel to apply New York law to Telenor Mobile and Storm's disputes, including the dispute over whether Storm's General Director, Valeriy Nilov, had authority to bind Storm to the Shareholders Agreement, without regard to New York's choice of law principles. Section 13.06 of the Shareholders Agreement dated January 30, 2004 (the "Shareholders Agreement") between and among Telenor Mobile, Storm and Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar"), states unequivocally that:

> This Agreement shall be governed by, and in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction.

Shareholders Agreement § 13.06 (emphasis added). The UNCITRAL Rules, which the parties chose to govern this proceeding, include a similar rule. Under UNCITRAL Rule 33(a), "the arbitral tribunal shall apply the law designated by the parties . . . to the substance of the dispute." UNCITRAL Rule 33(a) (emphasis added). Only "[f]ailing such designation by the parties" is the

arbitral tribunal to "apply the law determined by the conflict of laws rules which it considers applicable." Id. The unambiguous language chosen by the parties removes any doubt that New York substantive law governs disputes arising under the Shareholders Agreement. To import choice of law principles into such an agreement "defeat[s] the basic objectives, namely those of certainty and predictability, which the choice-of-law provision was designed to achieve." See Restatement (Second) of Conflicts of Law, § 187 comment h (1971).

In transnational disputes like this one, honoring the parties' choice of substantive law is necessary to ensure the "uniform interpretation and enforcement of that agreement and to avoid forum shopping." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 51 (2d Cir. 2004); see also Julian D. M. Lew, et al., Comparative International Commercial Arbitration, at 421 ("There is no basis for a tribunal to ignore the express choice of the parties because it determines that there is a contrary mandatory rule in . . . national laws."). As the Ninth Circuit has observed:

> [C]hoice-of-law and choice-of-forum provisions in international commercial contracts are 'an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction,' and should be enforced absent strong reasons to set them aside."

Northrop Corp. v. Triad Int'l Marketing S.A., 811 F.2d 1265, 1270 (9th Cir. 1987) (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 516-20 (1974)); see also Marine Midland Bank N.A. v. United Missouri Bank, N.A., 223 A.D.2d 119, 112-23, 643 N.Y.S.2d 528, 530 (1st Dep't 1996) ("As a general rule, choice of law provisions . . . are valid and enforceable in this State.")

Accordingly, New York courts have repeatedly applied the law selected by the parties without reference to that jurisdiction's choice of law rules in international arbitrations. See, e.g., Motorola Credit Corp., 388 F.3d at 50-52 (applying Swiss law, without reference to Swiss choice of law principles, to question of whether agent had authority to bind Turkish corporation); Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 32 n.3 (2d Cir. 2001) (applying

2

New York law, without reference to New York choice of law principles, to one party's claim that it was not bound by an arbitration agreement that its agent had signed while purportedly acting outside the scope of agency); Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 592-93 (2d Cir. 1996) (applying English law, without reference to English choice of law principles, to issue of contract formation). Even if, in the absence of a choice of law clause, New York's general choice of law principles might point to Norwegian or Ukrainian law, here, the Panel would be bound to apply New York law under Section 13.06 of the Shareholders Agreement and the UNCITRAL Rules.

### B.     New York Law Applies Under its Own Choice of Law Rules

Under New York's choice of law rules, New York law would still apply to the issue of whether a corporate officer of Storm had authority to bind Storm to a contract with Telenor Mobile. The general rule in New York is that "parties . . . may freely agree to stipulate that New York law shall govern any disputes arising out of [a] transaction." Sun Forest Corp. v. Shvili, 152 F. Supp. 2d 367, 388 (S.D.N.Y. 2001). See discussion of New York General Obligations Law § 5-1401, infra.

Storm argues that the determination of whether a corporate officer had actual authority to enter into a contract on behalf of a corporation is typically determined by that corporation's jurisdiction of incorporation.[1] Even if that is the rule, there is no question that, where the parties

---

[1] The rule suggested by Storm as to actual authority is not necessarily the case. For example, in Seetransport Wiking Trade Schiffahrt Gesellschaft MBH & Co. v. Rep. of Romania, 123 F. Supp. 2d 174, 185-90 (S.D.N.Y. 2000), the contract at issue was between a German corporation and the Romanian government, and provided that it was "governed by the law of the State of New York, without reference to a foreign law in any case." Id. at 183. The Romanian government claimed that the official who had executed the contract had lacked authority to do so. The Court expressly held that, under New York's choice of principles, the question of the agent's actual authority would be governed by New York, and not Romanian, law. See Maxtor Corp v. Read-Rite (Thailand) Co., 2003 U.S. Dist. LEXIS 27208 (N.D. Cal. Dec. 4, 2003) (holding that California law, rather than law of Thailand (under which defendant was organized and did business) would determine the actual authority of an agent to execute a contract, applying California choice of law rules)). In any event, whether New York or Ukrainian law applies, the question of actual authority should be determined by examining Storm's charter, its minutes, and the documents it actually executed. The basis on which Mr. Nilov had actual authority, under either New York or Ukrainian law, is set out in

have chosen New York law to govern a contract by including a New York choice of law clause in the contract, New York law will govern if the corporate officer is clothed with <u>apparent</u> authority to enter into the contract on behalf of the corporation, or if the contracting parties are bound to the contract under the doctrine of ratification, estoppel or latches. <u>See Sphere Drake</u>, 263 F.3d. at 32-34 (applying New York choice of law clause to one party's claim that it was not bound by an arbitration agreement that its agent had signed while purportedly acting outside the scope of agency); <u>Indosuez Int'l Finance B.V. v. Nat'l Reserve Bank</u>, 98 N.Y.2d 238, 244-46, 746 N.Y.S.2d 631, 635-36 (2002) (applying New York law under New York choice of law clause to question of apparent authority and contract ratification, and rejecting claim that Russian law governed).

    <u>Sphere Drake</u> holds that the parties' choice of New York law, and not the location where the contract was executed, controls the question of whether or not the defendant's agent acted within the scope of his <u>apparent</u> authority to bind a corporation.[2] <u>Sphere Drake</u>, 263 F.3d at 32 n. 3.[3] In <u>Motorola Credit Corp</u>, the Second Circuit expressly relied on <u>Sphere Drake</u> to find that the parties' choice of law in that case governed all questions of contract formation. <u>Motorola Credit Corp.</u>, 388 F.3d at 50. In so doing, the Second Circuit held that, pursuant to a Swiss choice of law clause Swiss law applied to the question of whether or not an arbitration clause

---

paragraphs 75-85 of Telenor Mobile's Proposed Findings of Fact and Conclusions of Law, and the legal basis for that conclusion under Ukrainian law is set out in the affidavit of Myron Rabij. Telenor Mobile notes that Storm has never produced so much as a witness statement from Mr. Nilov, who executed the Shareholders Agreement, although he is under Storm's control.

[2] <u>Sphere Drake</u> involved a challenge to an outside agent's authority to bind a company, and not the more difficult task of repudiating the actions of a chief executive officer. It is well settled that certain corporate chief executive actions possesses authority that is "apparent" or "inherent" to the ordinary scope of authority associated with their position. <u>Seetransport</u>, 123 F. Supp. 2d at 185-86. Such implied authority may be inferred "solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers." <u>Marfia v. T.C. Ziraat Bankasi</u>, 100 F.3d 243, 251 (2d Cir. 1996) (citations omitted); <u>Odell v. 704 Broadway Condo.</u>, 284 A.D.2d 52, 56 (1st Dep't. 2001) ("The president or other general officer of a corporation has power, prima facie, to do any act which the directors could authorize or ratify.")(internal quotation omitted).

was binding on a Turkish corporation. See id. at 51-53. In both of those cases, the Second Circuit underscored the general rule that a choice of law clause in a contract applies to all disputes involving the existence and validity of the contract. See id. at 50-51.

In Indosuez, the New York Court of Appeals rejected the defendant's claims that Russian law, rather than New York law, determined whether a Russian bank had validly entered into a series of forward contracts with the Geneva branch of a Netherlands corporation. 98 N.Y. 2d at 245, 746 N.Y.S.2d at 635. Although ten out of fourteen of the relevant contracts specified New York law as the governing law, and six specified a New York forum, the defendant, a Russian bank, claimed that Russian law governed the question of whether one of its executives, acting in Russia, had authority to bind the bank. Id. Just as Storm argues here, the defendant in Indosuez claimed that because its corporate officer had acted without actual authority to execute the confirmations in Russia, the contracts were allegedly null and void. The Court of Appeals rejected that argument, finding that regardless of whether the corporate officer who executed the confirmations lacked actual authority to execute the agreement under Russian law, New York substantive law controlled the question of whether or not the plaintiff was entitled to rely upon the apparent authority of that corporate officer. Id. [4]

In Indosuez, the documents on which the finding of reliance were based were faxed from

---

[3] The Sphere Drake court also held that New York law governed the question of whether Sphere Drake was prohibited from repudiating the contract under the doctrines of ratification and estoppel.

[4] In any event, the same result would obtain under Ukrainian law. Under Ukrainian law, just as under New York law, Telenor Mobile was entitled to rely on the certificates of incumbency presented by Storm and Alfa and the Storm Certificate, all of which explicitly gave "valid approval" to Mr. Nilov to enter into the 2004 Shareholders Agreement. Storm acknowledges that Ukrainian law was amended to expressly recognize the concept of apparent authority effective January 1, 2004, but asserts that the statute is not retroactive, so that it would not apply to Storm's actions in 2002. See Storm's Prehearing Brief at p. 19. Assuming that to be the case, it is irrelevant here. The Shareholders Agreement was executed by Mr. Nilov, the General Director of Storm, on January 30, 2004, and the two certificates of incumbency and authority attesting to Mr. Nilov's authority were delivered on that date. The question of apparent authority is measured as of that date, and the record, as discussed above, is clear that Mr. Nilov was clothed with all the indicia of authority as of that date, and that Telenor Mobile had no reason to question that authority. Indeed, Storm claims that it only recently discovered Mr. Nilov's supposed lack of authority.

a Russian bank in Russian to a Dutch bank in the Netherlands.  Nonetheless, the Court of

Appeals applied New York law to hold that the signatory for the Russian bank had actual and

apparent authority.  Nonetheless, despite the holdings in <u>Indosuez</u>, <u>Sphere Drake</u> and <u>Motorola</u>,

Storm argues that the New York law should not apply, because questions of apparent authority,

in Storm's view, are tested under the law of the place where Telenor Mobile relied.  Storm relies

on a footnote in the unreported decision in <u>Lehman Bros., Inc. v. Tutelar, CIA Financiera, S.A.</u>,

1997 WL 403463, at *3 n.4 (S.D.N.Y. July 17, 1997), for that proposition.  In <u>Tutelar</u>, which

pre-dates <u>Indosuez</u> by five years, no party challenged the application of New York law, there

was no contractual choice of law clause, and the opinion relied in turn on a case decided in 1959

under Connecticut's choice of law rules.  <u>Id</u>. at *4-5.  In any event, whether that case accurately

stated New York's general choice of law rule for determining apparent agency, it is irrelevant

here because of the parties' express adoption of New York law in the Shareholders Agreement,

as <u>Indosuez</u>, <u>Sphere Drake</u>, and <u>Motorola</u> make clear.  Put another way, <u>Tutelar</u> subjects

questions of apparent agency to a choice of law analysis; New York's choice of law

methodology, which includes New York's statutory adoption of full party autonomy to choose

New York law, requires that the question of apparent authority be tested under New York law, as

expressly adopted by the parties.

### C.     The "Internal Affairs Doctrine" Is Not an Obstacle to the Selection of New York Law Under the Shareholders Agreement

The Panel has also asked whether New York choice of law principles would direct the

Panel to apply Ukrainian law to disputes affecting the governance of a Ukrainian corporation.  In

some cases, not applicable here, the law of a corporation's state of incorporation may be held to

govern the liabilities of officers or directors of that corporation to the corporation itself and its

stockholders.  <u>See</u> <u>First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba</u>, 462 U.S.

611, 621 (1983).  This rule applies to matters peculiar to a corporation, based on the recognition

that "one State should have the authority to regulate a corporation's internal affairs . . . because

otherwise a corporation could be faced with conflicting demands."  See Edgar v. MITE Corp.,

457 U.S. 624, 645 (1982).  Accordingly, the internal affairs doctrine generally applies to such

issues as:

> steps taken in the course of the original incorporation, the election
> or appointment of directors and officers . . . the issuance of
> corporate shares . . . the holding of directors' and shareholders'
> meetings, methods of voting including any requirement for
> cumulative voting, the declaration and payment of dividends and
> other distributions, charter amendments, mergers, consolidations,
> and reorganizations, the reclassification of shares and the purchase
> and redemption by the corporation of outstanding shares of its own
> stock.

Restatement (Second) of Conflict of Laws § 302, comment e (1971).  However, different

"conflicts principles apply . . . where the rights of third parties external to the corporation are at

issue," including the making of contracts and the transfer of property.  First Nat'l City Bank, 462

U.S. at 621.  Issues involving acts "such as these when done by a corporation are determined by

the same choice-of-law principles as are applicable to non-corporate parties."  Restatement

(Second) of Conflict of Laws § 301 cmt. b (1971).

Storm's assertion that Ukrainian law governs the authority of its General Director to enter

into a contract with a third party finds no support in the "internal affairs doctrine."  The claims at

issue here are contract claims regarding the rights of Telenor Mobile, a "third part[y] external to"

Storm.  Roselink Investors L.L.C. v. Shenkman, 386 F. Supp.2d 209, 225-26 (S.D.N.Y. 2004).

Telenor Mobile is not one of Storm's shareholders, officers or directors, nor does the

Shareholders Agreement have anything to do with Storm's governance, so that the internal

affairs rule is inapplicable.  Similarly, the restatement provides as follows with respect to the

defense of ultra vires, which does have to do with the powers of a corporation under its Charter:

> If the third person knew, or should have known, that the corporation was acting in excess of its powers, the question will then arise as to the effect, if any, which the fact that the corporation was acting ultra vires has upon the rights and duties of the parties . . . If ultra vires is not a defense in the particular circumstances under the law selected by application of the choice of law rules . . . the contract will not be held unenforceable on the ground of ultra vires. This is so even though the contract would be unenforceable on the ground of ultra vires under the local law of the state of incorporation.

Restatement (Second) of the Conflict of Laws, § 301, cmt. c.

Storm has never argued (nor could it) that, because the Shareholders Agreement may have a collateral effect on Kyivstar, a Ukrainian corporation, the "internal affairs doctrine" requires the application of Ukrainian law. While parties cannot contract to force a corporation to violate the laws under which it is incorporated, nothing in the "internal affairs doctrine" prevents parties from creating additional obligations and conditions upon each other, and subjecting those conditions to adjudication in another jurisdiction in accordance with another body of law. As Judge Easterbrook observed:

> [T]he choice-of-law clause governs the validity and effect of the contract and does not affect corporate law on subjects outside that pact . . . The agreement between [Plaintiff] and [Defendant] settles many subjects concerning [Plaintiff's] employment (it contains a no-competition clause, for example) and their relative stakes as investors (it says among many other things that [Defendant's] holdings shall not be less than 51% and that [Plaintiff] shall have preemptive rights if the firm issues additional stock). It does not speak to corporate governance—questions such as how directors are elected, whether demand on directors is necessary before pursuing claims, and the like. Investors may strike agreements between themselves on many subjects, under many bodies of law, without altering the principle that the law of the state of incorporation regulates internal affairs.

Bagdon v. Bridgestone/Firestone, Inc, 916 F.2d 379, 383 (7th Cir. 1990) (emphasis added); see also Roselink Investors L.L.C., 386 F. Supp.2d at 224-26.

Here, the Shareholders Agreement expressly provides that Storm and Telenor Mobile's contractual obligations to one another are governed by New York law. As Storm has conceded

throughout this proceeding, "[t]he parties agreed in the Shareholders Agreement that New York law will apply to the substantive issues in this arbitration." See Respondent's June 5, 2006 Motion to Dismiss at p. 8. Indeed, the legal opinion from one of Storm's purported experts in Ukrainian law, Roman Maydaynk, states that "New York law . . . is relevant to the substance of the Shareholders Agreement . . ." See Legal Opinion of Roman Maydanyk at ¶ 12. (emphasis in original). As explained in the attached legal opinion of Oleksiy Didkovskiy ("Didkovskiy Opinion"), Ukrainian law expressly allow the parties to the Shareholders Agreement to make such a choice.

**II. MAKING THE SAME INITIAL ASSUMPTION, DO NEW YORK CHOICE OF LAW RULES NONETHELESS HOLD THAT THE PARTIES' CHOICE OF LAW IS NOT BINDING, WHERE, AMONG OTHER FACTORS, ANOTHER STATE HAS MORE SIGNIFICANT CONTACTS WITH THE TRANSACTION IN QUESTION? WOULD APPLICATION OF NEW YORK LAW TO THE ISSUE AT BAR BE CONTRARY TO A FUNDAMENTAL POLICY OF THAT OTHER STATE? DO THESE OR OTHER EXCEPTIONS APPLY SO THAT THE PARTIES' CHOICE OF NEW YORK LAW SHOULD BE REJECTED IN FAVOR OF UKRAINIAN LAW?**

**A. Section 5-1401 of New York's General Obligations Law Requires Courts to Honor the Parties' Choice of New York Law, Even if the Contract or Transaction Bears No Relationship to the State of New York**

New York General Obligations Law § 5-1401 expressly allows parties to a contract to select New York law even if the contract or transaction bears no relation to New York.[5] See Sun Forest, 152 F. Supp.2d at 388 n. 32. By that statute, enacted in 1984, New York adopted a policy of complete party autonomy with respect to contractual choice of New York law in large commercial transactions. Section 5-1401 of the New York General Obligation Law provides that:

> The parties to any contract, agreement, or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out

---

[5] As set out in ¶¶ 62-63 of Telenor Mobile's Proposed Findings of Fact and Conclusions of Law, the agreement to arbitrate in New York also creates a strong relationship and a separate basis for choosing its law.

of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection one of section 1-105 of the uniform commercial code, <u>may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state</u>. This section shall not apply to any contract, agreement, or undertaking (a) for labor or personal services, (b) relating to any transaction for personal, family or household services, or (c) to the extent provided to the contrary in subsection two of section 1-105 of the uniform commercial code.

N.Y. Gen. Oblig. Law. § 5-1401 (McKinney Supp. 1984-85) (emphasis added).

Section 5-1401 is a broad choice of law provision "clearly written to leave no doubt that New York substantive law applies" when it is provided for by contract. <u>Supply & Building Co. v. Estee Lauder Intern., Inc.</u>, 2000 WL 223838, at *3 (S.D.N.Y. Feb. 25, 2000). It expressly "eliminated the 'contacts' analysis of choice of law provisions" that once applied in New York. <u>Bank of America Nat'l Trust and Sav. Ass'n v. Envases Venezolanos</u>, 740 F. Supp. 260, 264 (S.D.N.Y. 1990).

Section 5-1401 was enacted to enhance the status of New York as a commercial and financial center. <u>See</u> M. Siegel, <u>Memorandum in Support of Bill 73-07-A</u>, reprinted in N.Y. State Legisl. Annual 1984 ("In order to encourage the parties to significant commercial, mercantile or financial contracts to choose New York law, it is important . . . that the parties be certain that their choice of law will not be rejected by a New York Court . . ."). The act's sponsors specifically sought to reverse decisions by "some New York Courts" that rejected the application of New York law despite a New York choice of law clause because "the particular contract had insufficient 'contact' or 'relationship' with New York." <u>Memorandum of Legislative Representative of City of New York,</u> McKinney's 1984 Session Laws of New York, p. 3288 (noting that the mere existence of this possibility has frequently deterred parties from choosing the law of New York for major contracts, to the detriment of the standing of New York

10

as a commercial and financial center."). Accordingly, once § 5-1401 applies, "the choice-of-law discussion must end [t]here." <u>Supply & Building Co.</u>, 2000 WL 223838 at *2.

There is no question that § 5-1401 applies here. The Shareholders Agreement concerns Telenor Mobile and Storm's respective investment in Kyivstar, which is valued at over US$3 billion. The agreement plainly provides that the laws of the State of New York govern the agreement (Shareholders Agreement § 13.06) and requires arbitration in New York under the UNCITRAL Rules (Shareholders Agreement § 12.01).

Presumably because § 5-1401 is fatal to Storm's choice of law argument, Storm's papers barely refer to it, although §5-1401 has been discussed in several of Telenor Mobile's briefs in this proceeding. Rather, relying on authority that either predates or explicitly falls outside of the scope of § 5-1401, Storm asserts that New York does not follow the rule of "party autonomy," and that a contractual designation of New York law is invalid unless New York has "sufficient contacts" with the parties or the transaction and only if the application of New York law "would not be contrary to any fundamental policy of a state which has a materially greater interest . . ." Respondent's Pre-Trial Brief at ¶¶ 38-40.

The following cases cited by Storm pre-date the enactment of § 5-1401 in 1984: <u>Bus. Incentives Co. v. Sony Corp. of Am.</u>, 397 F. Supp. 63 (S.D.N.Y. 1975) (decided in 1975); <u>Southern Int'l Sales Co. v. Potter & Brumfield</u>, 410 F. Supp. 1339 (S.D.N.Y. 1976) (decided in 1976); <u>North Am. Bank, Ltd. v. Schulman</u>, 123 Misc. 2d 516 (N.Y. Co. Ct. 1984) (decided in March 1984); <u>S. Leo Harmonay, Inc. v. Binks Mfg. Co.</u>, 597 F. Supp. 1014 (S.D.N.Y. 1984) (briefing before statute was enacted and no mention of the statute in the opinion).

Two other cases cited by Storm involve the enforceability of choice of law clauses for jurisdictions other than New York, as to which § 5-1401 does not apply: <u>Hartford Fire Ins. Co.</u>

v. Orient Overseas Containers Lines, 230 F.3d 549 (2d Cir. 2000) (federal choice of law clause);

and Cargill, Inc. v. Charles Kowsky Res., Inc., 949 F.2d 51 (2d Cir. 1991) (Massachusetts choice

of law clause).

Only two post-1984 decisions cited by Storm in any of its papers rejected the application

of New York law despite a New York choice of law clause. The first, Triad Fin. Establishment

v. Tumpane Co., 611 F. Supp. 157 (D.C.N.Y. 1985), does not even mention § 5-1401, and states

that the parties in that case had agreed that the choice of law issue presented was governed by the

methodology of § 187 of the Restatement (Second) of Conflicts of Laws. See Triad, 611 F.

Supp. at 162 n.3. The second, SG Cowan Sec. Corp. v. Messih, 2000 WL 633434 (S.D.N.Y.

May 17, 2000), as Judge Lynch points out, involved "employment issues, which are specifically

exempted from the statute's coverage." 152 F. Supp.2d at 388 n. 32. Storm's attempt to avoid

the New York choice of law clause to which it agreed is ill-founded and must be rejected.[6]

**B.    The Public Policy of a Foreign State Cannot Overcome the Parties' Choice of New York Law**

Although Storm also argues that the application of New York law would violate a

fundamental policy of Ukrainian law, there is no public policy exception for contracts governed

by § 5-1401. The rule is that "Section 5-1401 does not provide for any exceptions that would

permit a court to decline to enforce a choice-of-law clause if the clause would infringe a

---

[6] Agreeing to a New York choice of law clause and then arguing that it is inapplicable when a proceeding is brought to enforce the contract of which it is a part is apparently part of Alfa Group's regular legal repertoire. Alfa's subsidiary, Eco Telecom Limited, and Telenor's subsidiary Telenor East Invest AS are both major shareholders in Open Joint Stock Company "Vimpel-Communications", the second largest mobile operator in Russia. Telenor East and Eco Telecom executed a shareholders agreement, expressly governed by New York law, that provides, among other things, that Eco Telecom may nominate up to four members of VimpelCom's nine member board. After Eco Telecom nominated more than the prescribed number of candidates in 2004 and 2005, Telenor East initiated an arbitration under the UNCITRAL Rules to enforce that provision. In response, Eco Telecom argued that it had the right under Russian law to nominate all nine candidates, and that this right was non-waivable under Russian law, which supposedly applied despite the contractual designation of New York law. On January 25, 2007 the arbitration tribunal in that proceeding, consisting of Charles Adams, Gerald Aksen and Bénédict Fontanet, rejected Eco Telecom's choice of law argument and, applying New York law, limited Eco Telecom to the four candidates permitted by the shareholders agreement.

fundamental public policy of the conflicting jurisdiction." <u>Sun Forest</u>, 152 F.Supp. 2d at 388.

<u>See</u> <u>Supply & Building Co.</u>, 2000 WL 223838 at *3; <u>Lehman Bros. Comm. Corp. v. Minmetals</u>

<u>Int'l</u>, 179 F. Supp. 2d 118, 137 ("This Court agrees that § 5-1401 is not limited by Restatement

§ 187(2)(b)).  Section 5-1401 is clear on its face, and thus there is no need to look beyond its

own provisions to resolve any ambiguity in its meaning.").  Accordingly, even if the

Shareholders Agreement somehow violated some fundamental public policy of Ukrainian law,

New York law would govern.

      In any event, it is difficult to understand what "fundamental" public policy of Ukraine

could support the rejection of New York law.  The public policy exception followed in a general

choice of law analysis is reserved for those foreign laws "that are truly obnoxious." <u>Welsbach</u>

<u>Elec. Corp. v. MasTec North America, Inc.</u>, 7 N.Y.3d 624, 859 N.E.2d 498, 825 N.Y.S.2d 692

(2006) (noting that the exception applies where the "chosen law violates some fundamental

principle of justice, some prevalent conception of good morals, [or] some deep-rooted tradition

of the common weal.") (internal quotations omitted).  In contrast, the relief sought by Telenor

Mobile seeks to harmonize the requirements of the Shareholders Agreement and Ukrainian law.

      The December 22 Order, upon which Storm relies on this point, does not address any

aspects of the Shareholders Agreement, nor does it require the nomination of any particular

number of shareholders or directors of Kyivstar.  Rather, that decision, and the recent

"clarification" orders obtained by Storm, simply provide that every director must be a

shareholder, and that each shareholder serving as a director will have one vote on the Kyivstar

board of directors (the "Board").  The amendment proposed by Telenor Mobile is fully

consistent with that ruling.  It is simply not a violation of any public policy, "fundamental" or

otherwise, to direct that Kyivstar's Charter be amended so as to be consistent with Ukrainian law

and the Shareholders Agreement, or to order Storm and its nominees to participate in

shareholders or Board meetings, as Storm agreed to do when it executed the Shareholders

Agreement.[7]

III. **MAKING THE SAME INITIAL ASSUMPTION AS IN [PART]-[I] ABOVE, DO NEW YORK CHOICE OF LAW RULES REQUIRE THAT CONCLUSIVE EFFECT BE GIVEN BY THIS TRIBUNAL TO THE VARIOUS DECISIONS OF THE UKRAINIAN COURTS RELIED UPON BY RESPONDENT, UNLESS (A) THE UKRAINIAN COURTS LACK SUBJECT-MATTER OR PERSONAL JURISDICTION, (B) THE JUDGMENTS WERE FRAUDULENTLY OBTAINED, OR (C) ENFORCEMENT WOULD OFFEND NEW YORK PUBLIC POLICY?**

Throughout these proceedings, Storm has asserted that under the New York law of

"comity", this Panel is bound to follow the determination of the courts in Ukraine (collectively

the "Alpren decisions") which found that the entire Shareholders Agreement was "null and void,

including the arbitration clause," because Storm failed to hold a "meeting of participants" to

approve the underlying transactions.

This Panel has already faced and resolved this issue. In its Partial Final Award

Regarding Jurisdiction, dated October 22, 2006 (the "Jurisdictional Award"), the Panel declined

to follow the Ukrainian decisions invalidating the Shareholders Agreement that Storm claimed

were conclusive. The Panel adhered to that ruling on Storm's motion for rehearing, despite the

"clarification" obtained by Storm, in its ruling of December 18, 2006. There is, in any event, no

basis to follow those rulings. On Storm's application to set the Jurisdictional Award aside, Judge

Lynch similarly declined to follow that the decision in that Ukrainian litigation.[8] As set out

---

[7] Further, New York has a strong public policy interest in "upholding a choice of law provision that requires the substantive law to be New York." See Supply & Building Co., 2000 WL 223838 at *3, citing J. Zeevi & Sons v. Grindlays Bank (Uganda) Ltd., 37 N.Y.2d 220, 228, 371 N.Y.S.2d 892, 899 (1975); Smith Barney, Harris Upham & Co., Inc., v. Luckie, 85 N.Y.2d 193, 206, 623 N.Y.S.2d 800, 804 ("by honoring the parties' selection of New York law to govern their agreement and its enforcement, our holding advances the Federal Policy of 'ensur[ing] the enforceability according to their terms, of private agreements to arbitrate'.")

[8] Telenor Mobile refers to Judge Lynch's two opinions in this matter for the extensive discussion of the various infirmities in the Ukrainian litigations being pursued by Storm and its affiliates, including their collusive nature.

below, there is no basis to defer to the Ukrainian decisions that Storm has obtained against itself.

First, the Alpren decisions did not result in a judgment against Telenor Mobile. Telenor Mobile was not named a party to those lawsuits, nor was it notified of the initial action until after an appeal had been taken and rendered. The decision, accordingly, has no res judicata or collateral estoppel effect on Telenor Mobile under New York law. It is only entitled to the evidentiary weight any non-binding judgment is due in light of the circumstances giving rise to that judgment. See Jurisdictional Award p. 16. As Judge Casey noted in JSC Surgutneftegaz v. President and Fellows of Harvard College, 2005 WL 1863676, at *4 (S.D.N.Y. Aug. 3, 2005); aff'd, 2006 WL 354282 (2d Cir. Feb. 15, 2006):

> [I]t is undisputed that Respondent was not a party to the litigation before the Russian courts or in privity with those who were parties to the litigation such as to make the Russian courts' decisions binding on Respondent. There is therefore little chance that enforcing the arbitration agreement in the manner in which the Russian Federation agreed when it acceded to the New York Convention would circumvent or undermine the decisions of the Russian courts.

Any other result would violate fundamental principles of due process under both federal and New York law. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327 n.7 (1979); Gramatan Home Investors Corp. v. Lopez, 46 N.Y.2d 481, 486, 414 N.Y.S.2d 308, 327 (1979) . (Generally, . . . a person may not be precluded from litigating issues resolved in an action in which that person was not a party").[9] There is no question that Telenor Mobile was not afforded any opportunity to litigate its claims in Ukraine. As Judge Lynch underscored in his decision to enjoin Storm and its affiliates from proceeding in Ukraine:

---

[9] Telenor Mobile has never participated in any litigation in the Ukraine concerning the validity or enforceability of the Shareholders Agreement. Accordingly, any suggestion by Storm that Telenor Mobile somehow waived its right to arbitrate by defending any of the Ukrainian litigations brought by Storm, in addition to its legal infirmities, lacks any factual foundation.

> After every setback in the arbitration or in this Court, parties
> associated with Storm have proceeded to the Ukrainian courts,
> seeking and obtaining broad rulings without any meaningful
> opposition.  Telenor seeks to arbitrate the dispute in a neutral forum;
> Storm and its parents seek to coopt that process by resorting to a
> forum in which their home-court advantage is magnified by their
> willingness to play the game without letting the other team show up.

Storm LLC v. Telenor Mobile Communications AS,  2006 WL 3735657 at *10 (S.D.N.Y. Dec.

15, 2006).

Second, the Alpren decisions were not the product of an adversary proceeding.  See

Judson v. Flushing Jockey Club, 14 Misc. 350, 357 (S. Ct. N.Y. Co. 1895) ("Courts of judicature

are organized only to decide real controversies between actual litigants."); see also Lord v.

Veazie, 49 U.S. 251, 255 (1850).  Rather, the evidence presented to this Panel and to Judge

Lynch overwhelmingly demonstrated that the Alpren litigation is the product of collusion, and

accordingly, entitled to no effect.  See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60 (2d Cir.

2004).  As Judge Lynch found, "Storm's claim that it has opposed Alpren's lawsuit is simply

implausible."  Storm, 2006 WL 3735657 at *11.

It has long been established that actions between parties under common control have no

legal effect, particularly on non-parties.  See, e.g., South Spring Hill Gold Mining Co. v.

Armador Medean Gold Mining Co., 145 U.S. 300, 12 S. Ct. 921 (1892) (dismissing lawsuit

where parent and subsidiary corporation were under common ownership and control).

Moreover, just as in Uzan, Storm proceeded before the Ukrainian court without notice to Telenor

Mobile or to this Panel until after the decision was rendered on May 30, 2006, even though

counsel for Storm represented that it was aware of the Ukrainian proceedings as early as April

14, 2006.  Indeed, at the December 18 hearing, counsel for Storm stated that no notice of the

motion for "clarification" in Ukraine was provided to Telenor Mobile on advice of Storm's

Ukrainian Counsel.  See 8/14/2006 Hearing Tr. at 191: 14-17.  Also, as in Uzan, Storm's

purported defense was so weak as to indicate support for its wholly owned parent's position.[10]

After weighing the same evidence, Judge Lynch found: "[I]t is a fair inference, and one that on

this limited record the Court finds more likely true than not, that Storm colluded in the bringing

of this litigation against itself." Storm, 2006 WL 3735657 at *12.

Finally, a proceeding in a foreign court contrary to an agreement between the parties that

the dispute in question is to be settled in arbitration is entitled to no weight. See Restatement of

Law of Foreign Relations (3d), Reporters' Notes 5 (agreement to submit dispute to international

arbitration has the effect of "oust[ing] courts that would have had jurisdiction to adjudicate the

controversy but for the forum selection agreement"); American Constr. Mach. & Equip. Corp. v.

Mechanised Constr. of Pakistan, 659 F. Supp. 426, 429-30 (S.D.N.Y. 1987) (refusing recognition

to Pakistani judgment purporting to invalidate arbitration award where parties had agreed on

New York arbitration).

Here, even had Telenor Mobile been a named party to the Alpren litigation, the highly

irregular procedures described above would make it inappropriate to give any weight to its

conclusions. See Bridgeway Corp. v. Citibank, 201 F.3d 134 (2d Cir. 2000); see also Films by

Jove, Inc. v. Berov, 250 F. Supp. 2d. 156 (E.D.N.Y. 2003). However, there is no need to reach

those issues, because the Alpren litigation has no effect on Telenor Mobile, which was never a

party to and had no notice of those collusive proceedings.[11]

---

[10] Storm repeatedly asserted that Telenor Mobile could have intervened on appeal in the various litigations that led to the Alpren decisions. However, post-judgment intervention is disfavored. United States v. Yonkers Bd. of Ed., 801 F.2d 593, 596 (2d Cir. 1986) ("[P]ost judgment intervention . . . is generally disfavored because it usually creates delay and prejudice to existing parties and undermines the orderly administration of justice."). As Judge Lynch stated in rejecting that assertion as a basis for giving any weight to the Alpren decisions, "Storm's blithe suggestion that Telenor could intervene on appeal after judgment has already been reached against it is hardly an adequate opportunity to be heard." Storm, 2006 WL 37375657 at *9, fn 5 (S.D.N.Y. Dec. 15, 2006).

[11] Storm principally relies on Sea Dragon Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V., 574 F. Supp. 367 (S.D.N.Y. 1983) for the proposition that this Panel is bound by the Alpren decisions. The facts in Sea Dragon are dramatically and materially different from those present here. In that case, an in rem action to adjudicate rights in a specific fund which involved a prior sequestration order entered by a Dutch court, the District Court expressly held

**IV.    IF UKRAINIAN LAW MUST BE APPLIED BY THIS TRIBUNAL UNDER EITHER OF THE PROCEEDING TWO ASSUMPTIONS, DOES UKRAINIAN LAW PROVIDE THAT MATTERS OF CORPORATE GOVERNANCE IN A CORPORATION'S CONSTITUENT DOCUMENTS CANNOT BE MODIFIED BY PRIVATE CONTRACT?**

Relations between shareholders in a Ukrainian corporation can be – and frequently are – governed by private contract and made subject to foreign law. As set forth in the Didkovskiy Opinion "freedom of contract" is a fundamental principle of Ukrainian civil law. See Didkovsky Op. at ¶ 4. Parties may enter into contracts regardless of "whether the subject matter of such contract is specifically envisaged by Ukrainian law." Id. While contracts must be consistent with the other fundamental principles of Ukrainian civil law, a company's shareholders may agree on the issues of the company's corporate governance and may record such agreement in a private contract. See id.

Storm itself does not contest the fundamental right of shareholders to agree to terms and conditions above and beyond those provided for in the Ukrainian Civil Code. See Storm's Pre-Hearing Brief at ¶ 58 n.17. (noting that "Articles 116(1) and 117(1) of the Ukrainian Civil Code permits shareholders to stipulate to other rights and regulations). Rather, Storm argues that either (a) the Shareholders Agreement is a "constituent document" that must be registered with state authorities, or (b) additional rights and obligations in the Shareholders Agreement must be set forth in Kyivstar's constituent documents.

Storm's first contention is simply wrong. Shareholders agreements that concern matters of corporate governance are routinely executed by foreign shareholders in Ukrainian joint stock companies. Didkovskiy Op. at ¶ 14. As a result, in cross-border transactions like the instant

---

that the plaintiff had been given adequate notice and an appropriate opportunity to respond in the proceeding in the Netherlands. As the Court stated, "respondent's unopposed position is that the Dutch Order was obtained in compliance with both Dutch law and American due process standards." Sea Dragon, 574 F. Supp. at 372 n.2

one, foreign investors in a Ukrainian company typically attempt to protect their investments

through private contract, and often select a more mature foreign law to govern potential disputes.

See Didkovskiy Op. at ¶ 7.  In fact, the Ukrainian government itself expressly endorses the use

of shareholders agreements by foreign parties, and states that such agreements do not need to be

registered.  Didkovskiy Op at ¶ 12 and Exh. C.  As that publication states:

> The registration procedure in Ukraine, as long and tedious as it is,
> simply consists of registration of a company charter.  If the
> company consists of two or more founders, however, they must
> also draft a shareholders agreement. . . .
>
> The shareholders agreement. . . secures the rights and obligations
> of the shareholders and/or founders amongst each other. A detailed
> description of the company's structure is not necessary. What is
> important, however, is a detailed agreement that outlines issues
> vital to the shareholders; namely, divisions of profits, ownership
> rights, transferability of shares and assignability, confidentiality,
> division of assets upon liquidation and, of course, dispute
> resolution and arbitration procedures.

See Exh. C, Embassy of Ukraine in the Netherlands, Registration of a Representative Office of

Foreign Company, http://www.oekraine.com/core/reg_e.htm (last checked March 12, 2007)

(emphasis added).  For the same reason, Storm's second contention is that "additional rights" in a

shareholders agreement must be reflected in the Charter.  It is not the case that all additional

rights set forth in the Shareholders Agreement need be included in the Charter; that would defeat

the point of a having a shareholders agreement at all.[12]

---

(emphasis added).  As the extensive record before the Panel amply demonstrates, that is most emphatically not the case here.

[12] Storm's support for these two propositions are the opinion of Peter Magnus.  Mr. Magnus, who was never produced for cross-examination because Storm refused to participate in the hearing on the merits, is a Canadian lawyer who lived for a time in Kyiv, where his practice appears to have focused on anti-dumping and similar trade laws.  His opinion does not claim that he is a Ukrainian lawyer, that he practiced as a foreign lawyer in the field in which he offers an opinion, or even that he speak Ukrainian.

## V.    THE TRIBUNAL HAS AUTHORITY TO INCLUDE IN ITS ORDER THE AWARD SET OUT IN PARAGRAPH E OF THE PROPOSED RELIEF IN CLAIMANT'S PROPOSED FINDINGS AND CONCLUSIONS

New York law vests arbitrators with authority to fashion equitable remedies to do justice between the parties.  An arbitral tribunal in the application of New York law is specifically empowered to interpret and enforce contracts in a manner which reflects the spirit of the agreement between the parties.  In one of the leading cases referring to the power of an arbitrator, the New York Court of Appeals held that an arbitrator, "may do justice as he sees it, applying his own sense of law and equity to the facts as he finds them to be, and making an award reflecting the spirit rather then the letter of the agreement. . . ."  Silverman v. Benmor Coats, Inc., 61 N.Y. 2d 299, 308; 473 N.Y.S.2d 774, 779 (1984).

Arbitration is "analogous to a proceeding in equity, and the arbitrator, like the Chancellor, is . . . empowered to reach a just result regardless of the technicalities."  Board of Ed. of the Dover Union Free Sch. Dist. v. Dover-Wingdale Teachers Ass'n, 95 A.D.2d 497, 502 (2d Dep't 1983) (citations and internal punctuation omitted).  In that regard, numerous decisions underscore the wide latitude of arbitrators to craft a just award.  See, e.g., North Syracuse Cent. Sch. Dist. v. North Syracuse Ed. Ass'n, 45 N.Y. 2d 195, 200, 408 N.Y.S.2d 64, 67 (1978) (arbitrator empowered to "disregard technicalities to achieve a just result"); In re Application of Solow Building Co., 6 A.D. 3d 356, 356 (1st Dep't 2004) ("[A]rbitrators are not strictly tethered to substantive and procedural laws and may do justice as they see it").

This Panel, however, need not resort to such sweeping powers because this Panel is in a position to fashion an award which does no violence either to the letter or the spirit of the Shareholders Agreement or Ukrainian law.  As set forth in Telenor Mobile's Amended Statement of Claim, now that Storm has succeeded through its Ukrainian litigation in overturning the section of the Charter providing for the Board composition contemplated by the Shareholders

Agreement, the parties are obligated by the terms of the Shareholders Agreement to amend the

Charter to reflect, consistent with Ukrainian and New York law, the governance arrangement in

the Shareholders Agreement.

Section 6.03 specifies that the provisions of the Shareholders Agreement prevail over any

contrary provisions of the Charter. That clause provides that:

(a)    In the event of any conflict or inconsistency between this
Agreement and the Charter, this Agreement shall prevail.
Without limiting the generality of the foregoing, the
Shareholders shall take such action as may be necessary to
supplement or amend the Charter to reflect, and not conflict
or be inconsistent with, the provisions of this Agreement.
The Shareholders also agree, to the extent permitted by
applicable law, to waive any rights or privileges granted to
them (including, but not limited to, redemption rights,
rights of first refusal and the like) by applicable law or the
Shareholders that conflict or are inconsistent with the terms
and conditions of this Agreement.

(b)    To the extent that pursuant to applicable law the legality,
validity or enforceability of any provision contained in this
Agreement now or at any time hereafter requires that such
provision, or a reference to such provision, be contained in
the Charter, or requires any amendment to the Charter, then
the Shareholders shall vote their Voting Securities to
approve any such amendments and cause the Company to
take such action as may be necessary to register such
amendments to the Charter as to required with all
appropriate Governmental or Regulatory Authorities, and
each Shareholder hereby consents to such amendment to
the fullest extent permitted by law.

The December 22 Order does not address any aspects of the Shareholders Agreement, nor

does it require the nomination of any particular number of shareholders or directors of Kyivstar.

Rather, that decision, and the recent "clarification" orders obtained by Storm, simply provide that

every director must be a shareholder, and that each shareholder serving as a director will have

one vote on the Board.

To the extent any provision of the Shareholders Agreement needs to be incorporated into

the Charter, the Shareholders Agreement expressly provides that the parties jointly amend the Charter to do so. <u>See</u> Shareholders Agreement § 6.03. This is, in part, why Paragraph E of the Proposed Relief in Claimant's Proposed Findings of Fact and Conclusions of Law is so important. <u>See</u> Didkovsky Op. at ¶ 15. At present, because of the December 22 Order obtained by Storm, the Charter does not contain all the information required to be included in the charter of a joint stock company under Ukrainian law. In particular, the provisions governing the composition of the Board were struck from the Charter in the December 22 Order obtained by Storm but no substitute provisions were put in place. <u>See</u> Didkovsky Op. at ¶ 16.

Accordingly, Telenor Mobile seeks an award, in accordance with Sections 2.05(b)(ii) and 6.03 of the Shareholders Agreement, to vote to amend the Charter to conform to the Shareholders Agreement and the December 22 Order. The December 22 Order obtained by Storm only provides that every director must be a shareholder, and that each shareholder serving as a director will have one vote on the Board. <u>See id.</u> Because Ukrainian law, as interpreted in the December 22 order, provides that only shareholders can be directors, Telenor Mobile asks the Panel to direct the parties to vote to approve an amendment to the Charter that provides that Kyivstar's shareholders are (a) Storm, together with its three newly formed corporate affiliates, each of which will hold at least one Kyivstar share, and (b) Telenor Mobile, and its existing four corporate affiliates, each of which holds one Kyivstar share. <u>See</u> Didkovsky Op. at ¶ 17. Together, those nine entities would then be elected as directors. These amendments are fully consistent with Ukrainian law and with the governance scheme of the Shareholders Agreement.[13] <u>See</u> Didkovsky Op. at ¶ 20. While there may well be alternative remedies, none would be as

---

[13] It is important to recognize that the governance scheme of the Shareholders Agreement protects Storm, as the minority investor. Ukrainian corporations do not have cumulative voting, but elect directors seat by seat. Telenor Mobile, which holds an absolute majority of Kyivstar shares, could therefore elect the entire board, but for the protection given to Storm by the provisions of the Shareholders Agreement it has attacked.

simple and effective in meeting both the requirements of Ukrainian law, as announced in the December 22 Order, and the Shareholders Agreement.[14]  Certainly none has been proposed by Storm.

---

[14] As provided by the Shareholders Agreement, the decision on this issue, as on all others, should be made by this Panel even if the necessary amendment does address an aspect of Kyivstar's internal affirs.  As the courts held in JSC Surgutneftguz:

> Petitioner's second ground for refusing to enforce the agreement – the internal-affairs doctrine – is equally meritless.  Not surprisingly, Petitioner has failed to cite a single case in which a court has refused enforcement of an arbitration agreement under the New York Convention because the subject matter of the dispute went to a foreign corporations internal affairs.  The FAA does not carve out disputes relating to the internal affairs of corporation as an exception to the general enforceability of arbitration agreements.  The Supreme Court has rejected the claim that particular areas of law are not arbitrable under the FAA without express congressional direction.

2005 WL 1863676 at *4.

Since this proceeding began over a year ago, Telenor Mobile has attempted to engage Storm on this point, without success.  Rather, Storm has continued to boycott shareholder meetings, at which an amendment to the charter to reconstitute the board of directors could be adopted, in the evident hope that Storm could thereby acquire equal rights in Kyivstar without paying for them.  The only response made by Storm was a proposal for a nine member board, with three members nominated by Storm, three by Telenor Mobile, and three "independents, who by definition would not be shareholders.  In addition to depriving Telenor Mobile of its bargained – for rights, the "solution" offered by Storm would violate the December 22 Order, and could not possibly have been made in good faith.

Dated: New York, New York
       March  14, 2007

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

By ~Robert L. Sills~

       Robert L. Sills
       Jay K. Musoff
       Adam Zimmerman
       666 Fifth Avenue
       New York, New York 101013
       Telephone:  212 506 5000
       Facsimile:  212 506 5151

       -and-

       Peter O'Driscoll
       ORRICK, HERRINGTON & SUTCLIFFE LLP
       25 Old Broad Street
       London EC2N 1HQ
       United Kingdom
       Telephone:  011-44 20 7562 5000
       Facsimile:  011-44 20 7628 0078

       Attorneys for Claimant