

ORRICK

Robert L. Sills
(212) 506-5110
rsills@orrick.com

April 25, 2007

Kenneth R. Feinberg, Esq.
The Feinberg Group LLP
The Willard Office Building
1455 Pennsylvania Avenue, N.W.
Suite 390
Washington, DC 20004

Gregory B. Craig, Esq.
Williams & Connolly LLP
725 Twelfth St., N.W.
Washington, DC 20005

William R. Jentes, Esq.
1500 North Lake Shore Drive
Suite 4C
Chicago, IL 60610

<u>Telenor Mobile Communications AS v. Storm LLC</u>

Dear Messrs. Feinberg, Craig and Jentes:

I write in response to Storm's letter dated April 24, 2007 (the "April 24 Letter") regarding the contempt hearing in the District Court and Telenor Mobile's application to the Panel for an anti-suit injunction. I also write to update the Panel with respect to recent developments in the Ukrainian litigations being pursued by Storm and its corporate affiliates, that are the subject of Telenor Mobile's application.

Storm's description of the hearing held before Judge Lynch on April 20 is not accurate. Attached at Tab A is the transcript of that hearing. First, Judge Lynch denied the motion by Alpren and Altimo to dismiss the case for lack of subject matter jurisdiction. Second, Judge Lynch held that the three Ukrainian litigations preventing the audit of Kyivstar's financial statements were not within the scope of the injunction the Court entered on December 18. Third, with respect to the enforcement actions taken against Telenor Mobile in Ukraine, Judge Lynch held that Telenor Mobile had not established that the defendants had taken steps to cause enforcement proceedings after the restraining order was entered, but stated that he had intended to halt all enforcement proceedings in Ukraine, and that he would entertain an application to clarify and expand the injunction if the defendants did not voluntarily take steps to halt further Ukrainian proceedings. In that regard, Ronald S. Rolfe, Esq., counsel for Alpren and Altimo,



ORRICK

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 2

assured me that his clients' intent in the proposed withdrawal of its enforcement petitions was to prevent any further enforcement proceedings in Ukraine.[1]

As set forth below, Storm's campaign of Ukrainian litigation to prevent Kyivstar from engaging its regular external auditors, Ernst & Young ("E & Y"), or even from disclosing its financial results to Telenor Mobile or to the public (the "E & Y Litigation"), represents the most recent chapter in Storm's efforts to profit from its own bad faith failure to abide by the Shareholders Agreement. The E & Y Litigation purports to rescind Kyivstar's contracts with its auditors, using Storm's own two-year boycott of Kyivstar Board and shareholders meetings – and Kyivstar's consequent alleged inability to meet the formal requirements of Ukrainian law to approve the E & Y contract – as the basis for its claims. Absent the requested an anti-suit injunction, the E & Y Litigation threatens to frustrate the very rights in Kyivstar that Telenor Mobile seeks to vindicate in arbitration. Accordingly, in keeping with the request for relief set out in Section V(4) of Telenor Mobile's Amended Statement of Claim, and in its letters of January 16, 2007 and March 13, 2007, Telenor Mobile again respectfully requests that this Panel enjoin Storm, and any party acting in concert with Storm, from commencing or prosecuting any further litigation seeking to prevent an audit of Kyivstar, in violation of the Shareholders Agreement, and requiring the withdrawal of any such pending actions.

## A.    The E & Y Litigation

There are three Ukrainian cases involving E & Y. In the first action, filed in December 2006, Judge L. G. Smirnova of the Kyiv City Commercial Court[2] issued an injunction in a case filed by Storm against Kyivstar requesting that the agreements between Kyivstar and E & Y, Kyivstar's outside auditors, be declared "null and void".[3] That injunction was soon followed by a series of enforcement proceedings against Kyivstar and E & Y. Although the injunction in the

---

[1] Rather remarkably, Storm also claims that the "Ukrainian proceedings have not interfered with the arbitration". While the arbitration has proceeded, that has only been over Storm's strident objections, and in the face of a fine and the threat of further penalties in Ukraine against Telenor Mobile as a result of Storm's collusive litigation campaign. The injunction entered by Judge Lynch has, of course, been a critical factor in allowing the arbitration to go forward.

[2] Judge Smirnova is the same judge who purported to invalidate the Shareholders Agreement in the first case brought by Alpren against Storm.

[3] The injunction issued by the Kyiv City Commercial Court purported to prohibit "any of [Kyivstar and E & Y's] authorized persons, officers and shareholders of [Kyivstar]" from taking any actions that would result in the provision of audit services to Kyivstar.



ORRICK

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 3

case before Judge Smirnova (the "First E & Y Case") was vacated <u>sua sponte</u> on January 19, 2007, the case remains active.

Shortly after the injunction in the First E & Y Case was vacated, Alpren filed another claim in the Krasnolutsky District Court of Lugansk Region[4] on grounds similar to the claims in the First E & Y Case against E & Y, Kyivstar, Storm's General Director, Vadym Klymenko, and Trond Moe, the current head of Telenor Mobile's country office in Ukraine, seeking to have the court declare the relevant E & Y contracts null and void. On January 31, 2007, the Krasknolutsky District Court of Lugansk Region immediately issued an injunction similar in scope to the one issued by the Kyiv City Commercial Court in the First E & Y Case. That injunction was also vacated by the Judge who issued it on April 2, 2007, but the underlying case (the "Second E & Y Case") remains active.

On February 16, 2007, Alpren filed yet another claim with the Kyiv City Commercial Court essentially identical to the claim it filed in the Second E & Y Case and obtained another injunction (the "Third E & Y Case"). However, the scope of that injunction is significantly broader, purporting to enjoin (a) Kyivstar and E & Y and "any other individuals or legal entities" "from taking any actions aimed at performance of any contracts . . ., the subject matter of which is to provide (obtain) audit services to/by [Kyivstar], including [to] enjoin from providing and receiving any information, reports or data on financial and business activity" of Kyivstar, (b) Kyivstar "from entering into any transactions (contracts, agreements), the subject matter of which is to provide (obtain) audit services" and (c) Kyivstar and E & Y and "any other individuals or legal entities, which have received information on [Kyivstar], specifically, financial and other reports of [Kyivstar] not approved by authorized bodies of [Kyivstar], from making such information available to any persons in any way whatsoever, including by making it public using any media, specifically, printed and/or electronic mass media, from placing such information in the Internet, from disseminating (distributing), using in any manner whatsoever and for any purpose any information on [Kyivstar], including financial or other reports of [Kyivstar] not approved by authorized bodies of [Kyivstar], as well as enjoin from using the said information in their consolidated financial statements." That injunction remains in effect.

---

[4] Lugansk is located near the border of Ukraine and Russia, approximately 540 miles southeast of Kyiv. The ostensible basis for venue in that case is that Mr. Klymenko supposedly lives there, although he actually lives and works in Kyiv.



ORRICK

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 4

**B.    The Harm to Telenor Mobile and the Need for Injunctive Relief**

As a direct result of the E & Y Litigation, Kyivstar's financial statements for 2006 have not been audited, and Kyivstar cannot publish its financial results.  Indeed, Telenor Mobile cannot even examine the books of Kyivstar, a subsidiary in which it holds a 56.5% interest. Accordingly, on March 21, 2007, Telenor Mobile's parent corporation, Telenor ASA, announced that it would deconsolidate Kyivstar's financial results from Telenor ASA's financial results, and that the auditors' report for Telenor ASA and its consolidated subsidiaries would be qualified with respect to Kyivstar's financial information.  (See Tab B).  This announcement resulted in an immediate drop in Telenor ASA's share price.  (See Tab C).

Additionally, the E & Y Litigation now threatens to place Kyivstar in default of its bond obligation, which totals over $400 million.  Under the terms and conditions of the relevant agreements, Kyivstar is required to deliver to the Lender an auditor's compliance certificate and audited year-end financial statements by April 30, 2007.  On March 19, 2007, Kyivstar notified Dresdner Bank of the injunction issued by the Kyiv City Commercial Court in the third E & Y litigation and stated that, as a result of the injunction "Kyivstar currently believes that it may not be able to comply with the covenants relating to the outstanding Notes under which it is obligated to deliver certain annual and quarterly information."  (See Tab D).  On March 26, 2007, Standard & Poor's ("S&P") issued a notice stating that it may suspend its BB- credit rating for Kyivstar if Kyivstar does not provide financial statements to its creditors and shareholders. (See Tab E).  On March 29, 2007, Moody's Investors Service issued a notice stating that it had put Kyivstar on review for a possible downgrade from its Ba3 credit rating due to Kyivstar's inability to provide financial and other information to third parties as a result of the injunction in the third E & Y case.  (See Tab F).

The cumulative result of the actions of Storm and its affiliates has been immediate and significant financial harm to Kyivstar and Telenor Mobile. At the December 18 hearing, Telenor Mobile described how Storm's boycott would prevent Kyivstar from complying with Sarbanes-Oxley requirements, and would force Telenor Mobile to deconsolidate Kyivstar's financial results, a long-term goal of Storm and its affiliates.  (See Tab G).  As Mr. Moland explained in his testimony, there is no possible legitimate business reason for that effort; rather it is simply another tactic being used to pressure Telenor to surrender its rights in Kyivstar.  Id (Tr. at 141). Absent the requested anti-suit injunction, that campaign will be successful.



**ORRICK**

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 5

    **C.**    **Telenor Mobile's Request for an Injunction to Halt the E & Y Litigations Is Within the Scope of the Arbitration Clause in the Shareholders Agreement**

    Storm erroneously asserts that Telenor Mobile's application to enjoin the E & Y Litigation is not arbitrable because it involves "collateral disputes" and does not involve "a violation of any obligations imposed by the Shareholders Agreement."[5]  That is simply not the case.  Storm's most recent Ukrainian litigation campaign does not merely "touch upon" issues raised in the instant arbitration, although that would be sufficient for this Panel to assert jurisdiction, but arises directly out of the claims at the heart of Telenor Mobile's case.

    Because the arbitration clause in the Shareholders Agreement is broadly written, it is "presumptively applicable to disputes involving matters going beyond the 'interpret[ation] or enforce[ment] of particular provisions' of the contract which contains the arbitration clause." See JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 172 (2d Cir. 2004) (collecting examples of "broad" arbitration language).  JLM Industries discussed and distinguished Collins & Aikman Products Co. v. Building Systems, Inc., 58 F.3d 16 (2d Cir. 1995), the sole case on which Storm relies in the March 23 Letter for its claim that the arbitration clause does not cover the E & Y Litigation.  In JLM Industries, the Second Circuit specifically rejected the contention that Storm now makes here, namely that "claims that present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it, are beyond the scope of the arbitration agreement." JLM Indus., 387 F.3d at 167 n.6.   The Court observed there that so long as the "allegations underlying the claims 'touch matters' covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." Id.   The categories of "collateral matters" that fall under a broad agreement to arbitrate are extensive, see JLM Indus., 387 F.3d at 172, and certainly cover the E & Y claims at issue here.

---

[5] Storm argues in the April 24 Letter, as it did in its letter dated March 23, 2007 (the "March 23 Letter"), that the claims against Kyivstar being prosecuted by Storm and Alpren are not subject to any arbitration agreement.  See April 24, 2007 letter at p. 2; March 23, 2007 Letter at pp. 2-5; 8.  Because Storm's arguments are addressed to the wrong question, the arbitrability of its dispute between Storm and Kyivstar is irrelevant.  Telenor Mobile does not seek to compel the arbitration of the dispute between Storm and E & Y.  Rather, Telenor Mobile seeks an anti-suit injunction preventing Storm and those acting in concert with it from prosecuting the Ukrainian E & Y lawsuits at all because the prosecution of those cases violates the Shareholders Agreement, as set forth below.



**ORRICK**

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 6

    Telenor Mobile's request for injunctive relief arises from Storm's continuing violation of obligations specifically described in the Shareholders Agreement, including:

- Storm's failure to maintain the membership of the Board   Under Section 2.01(b) of the Shareholders Agreement, Storm agreed to "take all action necessary . . . to (1) ensure the election of candidates and (2) maintain the membership of the Board" as specified in the Shareholders Agreement.   Storm has not only failed to maintain the membership of the Board, but has engaged in ongoing litigation to destroy the structure of the Board as contemplated by the Shareholders Agreement and obstructed attempts to reconstitute the Board since the December 22, 2005 Order.   The inability of Kyivstar's Board to meet and approve the E & Y contract flow directly from those violations, as well as the following two items.

- Storm and its nominees' failure to attend shareholders and Board meetings   The Shareholders Agreement expressly provides that both parties will "give effect to the provisions" of the Shareholders Agreement in good faith by participating and voting at shareholders and Board meetings.   Shareholders Agreement § 2.05(b)(ii).   That representation includes the obligation to maintain a quorum for Board or shareholders meetings for, among other things, the "appointment of the Company's external auditors."   Shareholders Agreement § 2.01(d)(x).[6]

- Storm and its nominees' failure to amend the Charter   Storm's litigation in Ukraine does not, as Storm argues, arise out of the December 22, 2005 Order, but, instead, out of Storm's longstanding refusal to participate in any way in the necessary amendments to the Charter that will allow the Board to function again.   It is precisely because of the December 22, 2005 Order that the parties now need to amend the Charter so that it is consistent both with applicable law and the Shareholders Agreement.   Storm's failure to do so and the remedy for that failure are, of course, principal subjects of this proceeding.[7]

---

[6] Section 2.01(c) provides that if a quorum is not achieved in any two consecutive attempts to convene a meeting of the Board, the items on the agenda for that meeting "shall be determined by Kyivstar's general meeting of the Shareholders."   Accordingly, even if Storm's failure to attend Board meetings were somehow excusable, its failure to attend shareholders meetings under Section 2.05(b)(ii), has directly compromised Kyivstar's ability to enter into its contracts with its auditors, at least on the theory of Ukrainian law that Storm is pursuing.

[7] See Am. Statement of Cl. at 18-19. The Shareholders Agreement expressly provides that in the event any provision of the Charter is invalidated, Storm is required to vote its shares to amend the Charter consistent with the Shareholders Agreement and to consent to such amendments to "the fullest extent of the law".   See Shareholders



ORRICK

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 7

- **Storm and its nominees' interference with Kyivstar's access to international financial markets**. The ability to access the international capital markets was a central reason behind the parties' decision to enter into the Shareholders Agreement. <u>See</u> Affidavit of Egil Hansen, dated August 8, 2006. Accordingly, Section 8.07 of the Shareholders Agreement is intentionally broadly worded, and is aimed at preventing any kind of conduct by a Shareholder or its Affiliates that might cut off Kyivstar's access to the capital markets. Because of the E & Y Litigation, Kyivstar will not be allowed to certify its financial statements by April 30, 2007, resulting in an "event of default" under the relevant bond agreements, in violation of Storm's express obligations under the Shareholders Agreement.[8]

- <u>Storm's interference with Telenor Mobile's Right to Audit</u>. The Shareholders Agreement also expressly provides each party with the right to audit Kyivstar's books and records. <u>See</u> Shareholders Agreement § 9.02. As a result of the injunction issued in the Third E & Y case, Kyivstar cannot even provide financial information to its majority owner, Telenor Mobile, or publish its financial results. The result of that third action is, therefore, a separate violation of the Shareholders Agreement.

Accordingly, Telenor Mobile's request for injunctive relief does not involve a matter that is merely collateral to its dispute with Storm, but arises directly out of issues already submitted to the Panel and fully within the broad scope of the Panel's jurisdiction. Particularly in light of the covenant of "good faith" that is expressly incorporated into the Shareholders Agreement, a party cannot "take advantage of his own wrong, and [] escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised." <u>A.H.A. Gen. Constr., Inc. v. N.Y. City Housing Auth.</u>, 92 N.Y.2d 20, 677 N.Y.S.2d 9, 699 N.E.2d 368, 374 (1998) (Kaye, C.J.). <u>See Spanos v. Skouras Theatres Corp.</u>, 364 F.2d 161, 169 (2d Cir. 1966) (Friendly, J.) (" 'One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised.'"

---

Agreement § 6.03(b). To this date, Storm has not sought to bring the Charter into conformity with the Shareholders Agreement, despite its obligations under Section 2.05(b)(ii).

[8] In that regard, Storm, as part of its good faith obligations under the Shareholders Agreement, expressly promised that it would not "<u>take, or permit any of its Affiliates to take</u>, any action permitted by Ukrainian law which would allow Storm to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.03(b). . ." <u>Shareholders Agreement</u> § 2.05(b)(ii) (emphasis added). Section 2.03(b)(ii) expressly includes the Eurobond obligations described in Section B, <u>supra</u>.



ORRICK

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 8

(quoting 3A Corbin on Contracts § 767, at 540 (1960))).[9]  Absent the requested injunction, Storm's longstanding failure to abide by the express provisions of the Shareholders Agreement will further damage the rights that Telenor Mobile seeks to vindicate in arbitration.

### E.     The Requested Injunction Should be Issued as Part of the Award

The Shareholders Agreement expressly provides this Panel with broad authority to grant injunctive relief, including "interim, provisional or conservatory" measures pending the final outcome of the arbitration.  See Shareholders Agreement § 12.01(a)(v).  Moreover, as set forth in Telenor Mobile's supplemental brief dated March 14, 2007, New York law provides arbitrators with broad remedial discretion.[10]  Accordingly, Telenor Mobile respectfully requests that this

---

[9]Storm narrowly reads language in the Shareholders Agreement to limit its duty to act in good faith towards Telenor Mobile to express obligations specifically described in the Shareholders Agreement.  See March 23, 2007 Letter at 6.  The plain language of Section 2.05 is broadly worded and does not in any way limit Storm's general duty to act in good faith to Telenor Mobile or Kyivstar.  See Richbell Information Services, Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 302 765 N.Y.S.2d 575, 587 (1st Dep't 2003) (finding "bad-faith targeted malevolence in the guise of business dealings" violated duty of good faith and fair dealing even if conduct was expressly permitted by parties contract). In any event, even were Storm's view correct, the E & Y Litigation arises directly out of Storm's breach of the provisions of the Shareholders Agreement discussed above.

[10] In another letter dated March 23 (the "Supplemental Letter"), Storm refers to the unreported District Court opinion in Seybold v. Groenick, 2007 WL 737502 (S.D.N.Y. Mar. 12, 2007) in support of its claim that Ukrainian law governs here, despite the choice of law provision in the Shareholders Agreement.  That case stands for the uncontroversial proposition that the law of the state of incorporation ordinarily applies to standing to bring a shareholder derivative action, and lends no support to Storm's argument for the application of Ukrainian law in this case.  Under the "internal affairs doctrine", the law of a corporation's state of incorporation may be held to govern the liabilities of officers or directors to the corporation itself and its stockholders.  See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983).  However, it is well settled that different "conflicts principles apply . . . where the rights of third parties external to the corporation are at issue."  First Nat. City Bank, 462 U.S. at 621. This includes the making of contracts, the commission of torts and the transfer of property. Id. Issues involving acts "such as these when done by a corporation are determined by the same choice-of-law principles as are applicable to non-corporate parties."  See Restatement (Second) of the Conflict of Laws § 301. Storm selectively cites language from Seybold in an effort to make it stand for the proposition that "conduct falling under the internal affairs doctrine, includes "acts that are beyond the purposes of the corporation, acts which are prohibited either by the state of incorporation or by the state where the acts are to be performed and acts which are alleged to be beyond the authority of the officers or directors."  Supplemental Letter at 2 (emphasis in original). However, the sentence immediately preceding that language in Seybold, which Storm omits, makes clear that the District Court there is referring only to the derivative right of "a shareholder to object to conduct occurring in the operation of the corporate enterprise." Id. That case involved neither the contractual rights of a third party, nor a contractual choice of law clause, much less the questions presented here of whether an agent possessed apparent authority to bind the corporation or whether the corporation is estopped to repudiate its contract.



ORRICK

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 9

Panel enjoin Storm, or any party acting in concert with Storm, from commencing or prosecuting any further litigation in connection with the inspection and audit of Kyivstar's financial records and statements, and to withdraw any such pending cases.

Given the continuing paralysis of Kyivstar, and the increasing damage to Telenor Mobile from Storm's repeated and abusive resort to the Ukrainian courts in violation of the Shareholders Agreement, Telenor Mobile looks forward to the Panel's issuance of its award in the near future. In light of the extensive development of the record, Telenor Mobile does not believe that there is any need for an additional formal briefing or hearing as to the issues concerning the E & Y Litigation, although we will, of course, proceed as the Panel wishes in this regard.[11]

The April 24 Letter requests an "opportunity to submit further evidence and/or argument" if the Panel holds that Telenor Mobile's request for an anti-suit injunction is within the scope of the Shareholders Agreement, but asserts that Storm would "need to seek leave of the Ukrainian court" to do so.  As set forth above, Telenor Mobile believes that the record regarding the E & Y Litigation is sufficient for the Panel to rule.  However, if the Panel does determine that there

---

In any event, Storm's reading of <u>Seybold</u> is irrelevant in light of its concession in its March 14, 2007 letter that there is no conflict between New York and Ukrainian law with respect to the issue of apparent authority.  Absent a conflict New York law applies.  <u>See Simon v. Phillip Morris Inc.</u>, 124 F. Supp. 2d 42, 71 (E.D.N.Y. 2000) (Weinstein, J.) ("A court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict").  As extensively briefed and argued, there can be no serious argument that Mr. Nilov possessed at least apparent authority under New York law to execute the Shareholders Agreement.

[11]Storm's March 23 Letter asks that the portion of Telenor Mobile's submission of March 13, 2006 concerning Altimo's covert public relations campaign in Ukraine be stricken because (a) it is not relevant to Telenor Mobile's claim that Storm has acted in bad faith under the Shareholders Agreement, and in light of (b) Storm's baseless assertion that the documents are not genuine.  First, Telenor Mobile only sought to introduce that evidence before the Panel as further proof of Storm's bad faith, and seeks no other relief based upon that evidence.  That evidence is clearly relevant to Telenor Mobile's claim that Storm's actions are part of a purposeful scheme designed to deprive Telenor Mobile of the benefits of its investment in Kyivstar.  Second, Storm does not point to any evidence that calls into question the authenticity of the documents submitted by Telenor Mobile, aside from Storm's own press release, which makes the same unsubstantiated assertion.  <u>See</u> March 23 Letter, Ex. W.  Telenor Mobile did not obtain those documents from IPOC, and Storm's attack on IPOC is entirely beside the point.  I note that journalists analyzing Altimo's "black PR" campaign in the financial press expressed little, if any, doubt about the veracity of the documents, despite Altimo's claims that the documents were forged.  <u>See, e.g.</u>, Andrew E. Kramer, <u>Russian Company Accused of Buying Press Coverage</u>, N.Y. Times (Mar. 14, 2007); Geoffrey T. Smith, <u>Telenor Claims Alfa Used Smear Campaign In Kyivstar Dispute</u>, Dow Jones Newswires (Mar. 13, 2007) (observing that "Alfa, which cut its teeth in the chaotic early days of Russian capitalism, has developed a reputation for highly effective exploitation of the many loopholes in local law").



ORRICK

Kenneth R. Feinberg, Esq.
Gregory B. Craig, Esq.
William R. Jentes, Esq.
April 25, 2007
Page 10

should be further formal proceedings regarding the E & Y Litigation, Telenor Mobile
respectfully suggests that those proceedings should be severed from the matters heard on
December 18, 2006, so that the Panel can proceed to issue its award on the pending questions of
contract validity and enforcement.  With respect to Storm's claim that it would need to obtain
relief from the injunction it secured against itself before proceeding in this matter, Telenor
Mobile notes that the Panel has previously dealt with that argument, and allowed the arbitration
to proceed in a timely manner.

Respectfully,

Robert L. Sills

Copy (by e-mail) (w/att.) to
    Pieter Van Tol, Esq.


Attachments

# Tab A

74KDSTOA.txt

```
                                                              1
     74kdstoa

1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2    STORM LLC,
3
3                  Plaintiff,          New York, N.Y.
4
4           v.                         06 Civ. 13157(GEL)(DF)
5
5    TELENOR MOBILE COMMUNICATIONS
6    AS,
6
7                  Defendant.
7    ------------------------------x
8    TELENOR MOBILE COMMUNICATIONS
8    AS,
9
9                  Counterclaimant,
10
10          v.
11
11   STORM LLC,
12
12                 Counter-Defendant.
13
13       - and -
14
14   ALTIMO HOLDINGS & INVESTMENTS
15   LIMITED and ALPREN LIMITED,
15
16                 Relief Defendants.
16   ------------------------------x
17
18
18                               April 20, 2007
19                               4:00 p.m.
19
20   Before:
20
21               HON. GERARD E. LYNCH,
21
22                               District Judge
23
24
25

               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              2
     74kdstoa

1                    APPEARANCES
2
3
3    LOVELLS
4        Attorneys for Plaintiff
4        STORM LLC
5    BY:  PETER VAN TOL
5
6
6    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    Page 1
```

```
                            74KDSTOA.txt
      7         Attorneys for Defendant/Respondent
      7         Telenor Mobil Communications AS
      8    BY:  ROBERT L. SILLS
      8         PETER O'DRISCOLL
      9         JAY MUSOFF
      9         KAREN D. THOMPSON
     10         ADAM ZIMMERMAN
     10
     11
     11    CRAVATH, SWAINE & MOORE LLP
     12         Attorneys for Relief Defendants
     12         Altimo Holdings & Investments Ltd.
     13         Alpren Ltd.
     13    BY:  RONALD S. ROLFE
     14         ANDREW E. GOLDSMITH
     14         Richard Tucker
     15
     16
     17
     18
     19
     20
     21
     22
     23
     24
     25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
♀                                                                    3

```
          74kdstoa

      1            THE CLERK:  In the matter of Storm LLC against Alpren
      2    Limited, Altimo Holdings & Investments Limited and Telenor
      3    Mobile Communications.
      4            Counsel, please identify yourselves for the record,
      5    beginning with the plaintiff.
      6            MR. VAN TOL:  Good afternoon, your Honor.  Peter Van
      7    Tol for Storm.
      8            THE COURT:  OK.  Good afternoon, Mr. Van Tol.
      9            MR. VAN TOL:  Good afternoon.
     10            MR. ROLFE:  Ron Rolfe, your Honor, for Altimo and
     11    Alpren, and with me, your Honor, are Andy Goldsmith and Rich
     12    Tucker from my office.
     13            THE COURT:  OK, gentlemen, good afternoon.
     14            MR. SILLS:  Your Honor, Robert Sills on behalf of
     15    Telenor Mobile.  With me are my colleagues, Peter O'Driscoll,
     16    Jay Musoff, Karen Thompson and Adam Zimmerman.
     17            THE COURT:  Good afternoon, Mr. Sills, and all.
     18            The first item on my agenda is that there is a
     19    challenge made to the Court's jurisdiction.  I don't think it's
     20    necessary for me to deal with that in any very elaborate way,
     21    because, as I understand it, the same issue has already been
     22    briefed to the Court of Appeals and they have enough law clerks
     23    without me adding to the memoranda coming to them, but it is
     24    necessary for me to satisfy myself that the Court has
     25    jurisdiction for proceeding, and so I have reviewed the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
♀                                                                    4

```
          74kdstoa

      1    arguments that have been advanced by both sides and I am
                                Page 2
```

74KDSTOA.txt

2    prepared to rule on that.
3             The argument for lack of jurisdiction is advanced by
4    Altimo and Alpren, who argue that the Court should deny the
5    pending motion for contempt because the Court lacked
6    jurisdiction to enter the preliminary injunction on which the
7    motion depends and, therefore, it does not have jurisdiction
8    over the matter at all and certainly not to hold anyone in
9    contempt. Citing, among other cases, Prayze FM v. The FCC, 214
10   F.3d 245 at 253 (2d Cir. 2000). I'll just refer to "Altimo"
11   for the sake of convenience. Altimo argues that the Court
12   lacked jurisdiction either under original jurisdiction or
13   removal jurisdiction to hear the underlying suit by Storm to
14   vacate the arbitral award of October 22, 2006, the matter
15   brought by Storm in state court and removed here by Telenor. I
16   find that the Court did have subject matter jurisdiction.
17            Subject matter jurisdiction over foreign arbitration
18   agreements is, or arbitral awards, is granted to the district
19   courts pursuant to Section 203 of Chapter 2 of the Federal
20   Arbitration Act, which states, among other things, that "[t]he
21   district courts of the United States...shall have original
22   jurisdiction over...an action or proceeding" that arises under
23   the New York Convention, 9 U.S.C. Section 2003. The New York
24   Convention, in turn, applies to "the recognition and
25   enforcement of [foreign] arbitral awards." 21 U.S.T. 2517, 330

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

74kdstoa

1    U.N.T.S. at 3. Altimo interprets the term "recognition and
2    enforcement" narrowly to encompass only actions that seek to
3    enforce arbitration awards and not to the "adjudication of
4    petitions to vacate or suspend arbitral awards." Altimo brief
5    at 14.
6             However, although the language of the New York
7    Convention is capable of a narrow interpretation, courts have
8    generally interpreted the Convention and Chapter 2 of the
9    Federal Arbitration Act broadly, to account for "[t]he goal of
10   the Convention," which is not simply the enforcement and
11   recognition of arbitration and of arbitral awards, but the
12   "encouragement...of commercial arbitration agreements in
13   international contracts." Scherk v. Alberto-Culver Company,
14   417 U.S. 506, at page 530 Note 15. Thus, in order to fully
15   recognize, enforce, and encourage foreign arbitration
16   agreements as well as awards, both the Second Circuit and other
17   courts have consistently interpreted 9 U.S.C. Section 203
18   broadly, with an eye towards "entertaining requests for
19   provisional remedies in aid of arbitration even where the
20   request for remedies does not accompany a motion to compel
21   arbitration or to confirm an award." Venconsul N.V. v. Tim
22   Int'l N.V., 2003 WL 21804833 at page *3 (S.D.N.Y. August 6,
23   2003). As the Court said in that case, "Seeking equitable
24   remedies in connection with arbitration is consistent with the
25   Convention's 'provisions and...spirit,'... because 'the desire

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

74kdstoa

1    for speedy decisions in arbitration is entirely consistent with
2    a desire to make as effective as possible recovery upon awards,
3    after they have been made, which is what provisional remedies
4    do,'" citing Borden v. Meiji Milk Products Company, Ltd., 919

Page 3

74KDSTOA.txt

```
 5    F.2d 822 at 826 (2d Cir. 1990). Such expansive equitable
 6    remedies include requests for injunctive relief, as in Borden
 7    at pages 825-26, and, as Storm moved for here, the vacatur of
 8    an award. See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, 126
 9    F.3d 15 at 19 (2d Cir. 1997). See also Productos Mercantiles E
10    Industriales S.A. v. Faberge USA, Inc., 23 F.3d 41, at 44-45
11    (2d Cir. 1994) (finding that the court had jurisdiction over
12    modification of an arbitral award under the Inter-American
13    Convention, which was "intended to reach the same results" as
14    the New York Convention.)
15              Accordingly, the relevant inquiry is not whether
16    Storm's original claim was an action to "recognize or enforce"
17    an arbitral award but whether resolution of the claim by this
18    Court would aid the arbitration in such a way as to further the
19    goals of Chapter 2 of the FAA and encourage international
20    arbitration. It is clear that a claim for vacatur of an
21    arbitral award goes to the very heart of an arbitration
22    proceed. Indeed, district courts are specifically permitted to
23    vacate certain domestic arbitration awards. See 9 U.S.C.
24    Section 10, and see, e.g., Michaels v. Marifourm Shipping,
25    S.A., 624 F.2d 411 at 414 (2d. Cir. 1980). Section 10, along
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

74kdstoa

```
 1    with the remaining provisions of Chapter 1 of Title 9, applies
 2    equally to international arbitration awards, unless such
 3    application would engender a conflict with the Convention. See
 4    9 U.S.C. Section 208. There is no conflict here; an action for
 5    vacatur is as much an "aid" to arbitration in the international
 6    context as in the domestic context, and there is no reason to
 7    distinguish between domestic and international arbitration
 8    proceedings in this situation.
 9              Indeed, Storm implicitly recognized that the Court's
10    resolution of its claim would aid the arbitration in its case
11    when it failed to object to the Court's subject matter
12    jurisdiction in the underlying action. Although it is
13    axiomatic that subject matter jurisdiction may not be waived by
14    a party, the fact that Storm did not dispute this court's
15    jurisdiction in the underlying action reflects its recognition
16    that a claim for vacatur of an arbitral award is one that
17    directly affects the arbitration and aids in the process of
18    judicial encouragement of arbitration.
19              Altimo makes two arguments to support its position.
20    First, Altimo argues that Chapter 2 of the FAA, the
21    Convention's implementing legislation, only permits two
22    specific causes of action -- actions to compel arbitration
23    under Section 206 and to confirm arbitral awards, Section 207.
24    Section 206 provides district courts with the authority to
25    "direct that arbitration be held in accordance with" the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

74kdstoa

```
 1    arbitration agreement and the authority to appoint arbitrators,
 2    while Section 207 allows arbitrating parties to apply to
 3    district courts to confirm the award. Altimo reads these
 4    sections as implicit limitations on subject matter
 5    jurisdiction -- since there are no corresponding sections with
 6    respect to other causes of action related to arbitration
 7    proceedings, Altimo argues that no subject matter jurisdiction
```

Page 4

74KDSTOA.txt

8    exists over such causes of action.  However, Sections 206 and
9    207 do not state that they are limitations on subject matter
10   jurisdiction; they are merely explicit grants of authority to
11   district courts with respect to certain causes of action under
12   the Act.  Sections 206 and 207 do not undercut or eviscerate
13   Section 203 of the Act, which has been interpreted broadly by
14   courts; they represent the floor, not the ceiling, for subject
15   matter jurisdiction under Chapter 2 of the FAA.  Indeed, it
16   would be most peculiar to permit actions to confirm arbitral
17   awards but not to permit corresponding actions by aggrieved
18   parties to vacate arbitral awards.
19            Notwithstanding the statutory language, Altimo next
20   argues that the Second Circuit and other courts have previously
21   held that Chapter 2 of the FAA does not apply to vacatur of
22   arbitral awards but only suits to compel arbitration or confirm
23   an award.  However, the only Second Circuit case cited by
24   Altimo for this proposition, the Toys "R" Us case cited
25   earlier, is inapposite.  In Toys "R" Us, in fact, the Second
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              9

     74kdstoa

1    Circuit specifically held that the Convention provides subject
2    matter jurisdiction to district courts over vacatur claims.
3    126 F.3d at 19.  Although the Toys "R" Us court held that
4    certain defenses to vacatur claims created by the Convention
5    are not available when a party seeks vacatur in a foreign
6    court, 126 F.3d at 22-23, this holding was limited to the
7    availability of certain defenses under the Convention and did
8    not concern the issue of subject matter jurisdiction.  Any
9    indications otherwise in the opinion were dicta, intended to
10   show that the Convention did not strip "the rendering state of
11   its supervisory authority over an arbitral award, including its
12   authority to set aside that award under domestic law," at page
13   22, and were not intended to deprive the nonrendering court of
14   such authority.
15            The other cases cited by Altimo either were decided by
16   courts outside of this circuit, for example, Lander v. MMP, 107
17   F.3d 476 (7th Cir. 1997), and Tesoro Petroleum Corp., 798
18   F.Supp. 400, from the Western District of Texas 1992, or do not
19   support their argument, for example, International Shipping
20   Company v. Hydra Offshore, 875 F.2d 388, 391 at Note 5 (2d Cir.
21   1989), which affirmed a lower court's denial of subject matter
22   jurisdiction over a contract dispute in which there was no
23   agreement to arbitrate, and Gerling Global Reinsurance
24   Corporation, 348 F.Supp.2d 102 at 105 (S.D.N.Y. 2004) (denying
25   subject matter jurisdiction under the Convention over an action
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                             10

     74kdstoa

1    seeking a declaratory judgment), or both outside this
2    jurisdiction and don't support their argument, for example,
3    Czarina v. W.F. Poe Syndicate, 358 F.3d 1286 (11th Cir. 2004),
4    which found that the court's subject matter jurisdiction under
5    the Convention is dependent on satisfaction of Article IV's
6    agreement-in-writing prerequisite.  The remainder of Altimo's
7    support rests in various commentator statements or decisions by
8    foreign courts, which are not binding on this Court and have
9    limited persuasive value.
10            To the contrary, courts in this circuit and elsewhere
                            Page 5

74KDSTOA.txt

11  have frequently adjudicated claims for vacatur of international
12  arbitral awards pursuant to the FAA.  See Sole Resort v. Allure
13  Resorts Management, 450 F.3d 100 at 102, (2d Cir. 2006);
14  Industrial Risk Insurers, 141 F.3d 1434 at 1439 (11th Cir.
15  1998); and Celulosa Del Pacifico, 1996 WL 103826, at page *1
16  (S.D.N.Y. Mar. 11, 1996).  Although Altimo concedes the
17  existence of these cases, it points out that none of the
18  parties in those cases objected to, and none of the courts in
19  those cases discussed the issue of subject matter jurisdiction.
20          Although it's correct that "the existence of
21  unaddressed jurisdictional defects has no precedential effect,"
22  Lewis v. Casey, 518 U.S. 343 at 352 Note 2 (1996), this history
23  of unchallenged exercise of jurisdiction is consistent with
24  both the language and the spirit of the FAA.  It is likely that
25  the courts and parties in those cases failed to address the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

74kdstoa

 1  issue precisely because subject matter jurisdiction was assumed
 2  as self-evident.
 3          In this matter, crediting Altimo's argument would be
 4  "inconsistent with the Convention's provisions and its spirit"
 5  of supporting international arbitration, see Borden, 919 F.2d
 6  at 826, as it would limit the court's authority to a narrow set
 7  of circumstances not intended by either the Convention or the
 8  FAA.  The FAA authorizes district courts to hear suits that not
 9  only seek to directly compel arbitration or recognize an
10  arbitral award, but also suits that seek remedies that would
11  result in "speedy [arbitration decisions] [and]
12  effective...recovery," citing the same case.  There is little
13  point in allowing courts to entertain suits to compel
14  arbitration and recognize awards, but not allowing them to
15  determine the award's effectiveness; such a narrow
16  interpretation would limit the federal court's authority to
17  adjudicate the enforceability of foreign arbitral awards, which
18  is clearly not the intended consequence of the FAA or the
19  Convention, which "established a strong and clear preference
20  for a federal forum" in adjudicating disputes over
21  international arbitration.  Quoting from Suter v. Munich
22  Reinsurance, 223 F.3d 150, at 158 (3d Cir. 2000).
23          Accordingly, the Court had subject matter jurisdiction
24  over Storm's original claim for vacatur of the arbitral award,
25  had and has subject matter jurisdiction over Telenor's motions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

74kdstoa

 1  for relief and, therefore, over the current motion.
 2          All right.  That out of the way, we now turn to the
 3  contempt motion proper.
 4          There are, generally speaking, two things that Telenor
 5  seems to regard as contempt of this Court's order.  One is a
 6  series of actions brought against Ernst & Young in the Ukraine.
 7  The other are alleged requests for enforcement of the Ukrainian
 8  injunctions that were originally sought by Storm and Altimo in
 9  the litigation in the Ukraine that were the subject of prior
10  proceedings.
11          Mr. Sills, the first thing I am interested in is with
12  respect to the Ernst & Young actions, how are these actions
13  interferences with the ongoing arbitration that the Court was

Page 6

74KDSTOA.txt
```
14    trying to protect?  These are actions not brought against you,
15    as a party to the arbitration, not brought against the
16    arbitrators; they are brought against other parties relying on,
17    as I understand it, the results of earlier litigation in the
18    Ukraine that was not the litigation that was the subject of the
19    proceedings here.  Do I misunderstand that.
20         MR. SILLS:  I was entirely with the Court until the
21    very last point, your Honor.  You are exactly right, that we
22    don't seek to compel arbitration of those now three lawsuits
23    because we are not a party to them, although the same cast of
24    characters appears, Alpren, the parent of Storm, purporting to
25    assert rights against its subsidiary.
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    13
♀

74kdstoa

```
 1         Your Honor, the claim that is involved in the
 2    arbitration is the request to the arbitrators for an anti-suit
 3    injunction against Storm and its affiliates, that is, Storm and
 4    anyone acting in concert with Storm, to interfere with rights
 5    that my client, Telenor Mobile, has under the Shareholders
 6    Agreement, and there were three separate sources of that right
 7    under the Shareholders Agreement.
 8         The first is the obligation to attend board meetings
 9    and to act in such a way as to amend the Charter and
10    reconstitute the board to allow the board to go forward if for
11    any reason there is a problem under Ukrainian law with the
12    construction of the board, and here there is but that is an
13    entirely self-inflicted wound.
14         The case to which they refer, your Honor, was the
15    first in this series of --
16         THE COURT:  Excuse me one second.
17         (Pause)
18         I don't know what is happening but I'm hearing a buzz
19         MR. SILLS:  Is that better, your Honor?
20         THE COURT:  Maybe.  Go ahead and we'll do the best we
21    can.
22         MR. SILLS:  So, your Honor, the first in this long
23    series of Ukrainian cases that ultimately bring us here was
24    Storm's attack on the Shareholders Agreement itself, which, I'm
25    sure your Honor recalls, provides that on a nine-member board
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    14
♀

74kdstoa

```
 1    there will be five members nominated by Telenor, which controls
 2    approximately 56 percent of the shares, and the remaining four
 3    members of the board would be nominated by the minority
 4    shareholder, Storm.
 5         Storm began a litigation attacking that provision,
 6    asserting, ultimately successfully, that as a matter of
 7    Ukrainian law, only shareholders could serve as directors.
 8    Their construction, ultimately the Ukrainian Supreme Court
 9    endorsed that, but it's not --
10         THE COURT:  Right.  But you were a participant in
11    that.
12         MR. SILLS:  We were, your Honor, and we don't seek to
13    set that aside.  But under the Shareholders Agreement -- and
14    the words are as plain as could be -- if there is for any
15    reason an inability under Ukrainian law, as it was understood
16    at the time the agreement was drafted, to construct the board
```
                            Page 7

74KDSTOA.txt

17  in that way, that is, five to four, and to keep the Charter
18  that way, they are absolutely obligated, and it is I believe
19  Section 2.07 of the Shareholders Agreement, they are obligated,
20  without question, to cooperate and participate with Telenor
21  Mobile in amending the Charter so as to reconstitute the board
22  with that five-to-four majority, and for coming up on two years
23  now they have simply refused to engage.  And so that is one of
24  the claims at the heart of the arbitration.
25           Because of their refusal to participate in putting the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                15

74kdstoa

1  board back together after they broke it, they then go and in
2  these Ernst & Young claims assert that because the board, which
3  can't act precisely because of their actions, hasn't endorsed
4  the contract with Ernst & Young, Ernst & Young cannot therefore
5  have a contractual relationship, it can't audit the books of
6  Kyivstar.
7           So, your Honor -- and we have put that claim directly
8  before the arbitrators.  It is in our Statement of Claim, where
9  there is a request for a anti-suit injunction.  It was made
10  specifically with reference to the Ernst & Young claims on
11  January 16, contrary to the representation that has been made.
12  It was expressly made shortly after the first of these three
13  attacks on the Ernst & Young relationship.  It was responded to
14  by Storm.  We responded again.  That matter is pending before
15  the arbitrators, and it's part of the arbitration.  It has been
16  part of the arbitration since the first pleading filed in that
17  case.
18           And so it's the attempt to create facts in Ukraine
19  that would frustrate the ability of the arbitrators to grant
20  that relief by continuing their assault on Ernst & Young.  And
21  what happened here was that the injunction in case number one
22  was vacated sua sponte by the Ukrainian judge.  Very shortly
23  thereafter, as you know from the papers, Alpren resorted to a
24  town called Lugansk, which I believe is in the far southeast
25  corner of Ukraine, where Mr. Klymenko supposedly has some kind
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                16

74kdstoa

1  of legal residence.  He got a sweeping injunction that
2  prevented Ernst & Young from auditing the books.  Of course,
3  without an audit, all kinds of business problems were being
4  created for Telenor, not the least of which is that there has
5  been a long campaign by Storm and its affiliates to prevent a
6  consolidation of Kyivstar's financial results with Telenor.  It
7  is an important part of the Telenor's overall business.  There
8  was testimony at the hearing on the merits in the arbitration
9  about this precise issue, again, applying it directly to the
10  arbitration.
11           There are two other -- I should say, so that the
12  record is complete, not satisfied with that, Alpren brought yet
13  a third case in the Ukraine this time preventing Kyivstar from
14  releasing any financial information to anyone, including its
15  corporate parent, Telenor, and preventing anyone, not just
16  Ernst & Young, from auditing the books of Kyivstar.
17           Now, there is an express provision in the contract,
18  which I believe is Paragraph 807 of the Shareholders Agreement,
19  under which Storm agreed to do nothing to interfere with the
                            Page 8

74KDSTOA.txt
```
20  right of either party to inspect and audit the books of
21  Kyivstar.  In addition, your Honor, there are elaborate
22  provisions, and they are cited in our papers, having to do with
23  access to the international capital markets.  That, again, has
24  been placed before the arbitrators.  Without an audit, there
25  can be no access to the capital markets.
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                17

74kdstoa

```
 1          THE COURT:  Yes.  But what I thought I ordered was
 2  Storm and its affiliated entities from taking actions that
 3  would interfere with the arbitration proceeding, because what
 4  brought us here in the first place, as I understood it, were
 5  Ukrainian court actions that purported to enjoin first Storm,
 6  then possibly Telenor, from engaging in the arbitration, and I
 7  thought that's what I told them to stop doing.
 8          It's not clear to me -- maybe it is relief that you
 9  want and maybe I misunderstand it was relief that was at issue
10  the last time, but I didn't think that I ordered a
11  comprehensive "don't bring any suit that falls within the aegis
12  of what ought to be arbitrated in New York."  I thought what I
13  ordered them to do was to stop attempting to obstruct the
14  arbitration.
15          MR. SILLS:  And I think, your Honor, that's exactly
16  what they have done.  At the time we came before you and you
17  issued that injunction, first in your Honor's Opinion on
18  December 15 and then by signing our order, rather than the
19  proposed counter order, on December 18, all that was before you
20  were those cases.  Then on January 16, they opened this new
21  front in the war.  But those are claims that are within the
22  arbitration.
23          THE COURT:  Well, but, again, what I'm trying to focus
24  on is not are these proceedings that perhaps ought to be
25  enjoined, but are these proceedings that violated the Court's
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                18

74kdstoa

```
 1  order that's already been granted?  And as I understood the
 2  order, it was stop interfering with the arbitration, which is
 3  not the same thing as don't bring any lawsuit that is seeking
 4  to ask anybody else to adjudicate the things that are before
 5  the arbitral panel.
 6          In fact, I thought that as the proceedings before me
 7  went on, that Telenor had withdrawn a claim that was sort of
 8  that nature, that was asking me to make them pull their
 9  lawsuits and so on.  I didn't think that I was being asked to
10  enter a comprehensive anti-suit injunction.  I thought I was
11  being asked for narrower relief, which was to enjoin the Storm
12  parties from taking action aimed at the arbitration proceeding,
13  which is exactly what they had done.  They had taken direct aim
14  at the arbitration by getting these Ukrainian courts to enjoin
15  Storm, in the first place, and then you, and then even the
16  arbitrators, as I understood it.  And those actions were
17  directly aimed at the arbitration, and it was in that context
18  that I thought I said stop doing that.
19          Is that the same thing in your view, or is there some
20  language in my Order that you read as telling them don't bring
21  any suits anywhere else in the world related to the subject
22  matter of this contract outside of the arbitral forum?
```
                         Page 9

74KDSTOA.txt

23          MR. SILLS:  It is not, your Honor, but I don't read it
24   that broadly.  I don't think it would have to be read that
25   broadly because --
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                19
     74kdstoa

1           THE COURT:  OK.  So if the language that we're relying
2    on is the language that they should stop bringing or enforcing
3    legal actions that would disrupt, delay, or hinder the
4    arbitration proceedings, how do these actions against a third
5    party who is not in the arbitration disrupt, delay, or hinder
6    the arbitrators from doing their thing?  We can have two
7    actions pending in two different places concerning the same
8    subject matter, and if the arbitrators act and enter an award
9    in your favor and you come and try to enforce that here, we'll
10   move on to that zone, but I've not understood that I was
11   entering myself an anti-suit injunction that confined us to the
12   arbitral forum.
13          How does this violate my order?
14          MR. SILLS:  Your Honor, in our view, by bringing this
15   series of cases in Ukraine and, in effect, attempting or very
16   close to succeeding in foreclosing the arbitrators from
17   granting the relief which is sought in the arbitration, we see
18   it, albeit indirectly, as an attack on the arbitration.
19          THE COURT:  Why would it preclude the arbitrators from
20   granting relief?  The arbitrators are being asked to
21   reconstitute the board -- they can do that regardless of
22   whether Ernst & Young is told to do it in the Ukraine -- and
23   they could even then say, all right, now we've got the board, I
24   don't know, maybe the arbitrators can say approve the Ernst &
25   Young contract.  You know, whatever it is you're asking the
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                20
     74kdstoa

1    arbitrators to do, why can't they do it?
2           MR. SILLS:  Well, they certainly can, your Honor.  And
3    what we're attempting to do here -- and perhaps it should have
4    been framed as a request for a second injunction or to modify
5    the injunction -- is to prevent what your Honor called in one
6    of the previous opinions your stealth attack, by allowing these
7    proceedings to go forward in Ukraine and come the 30th, as we
8    say in our papers, it's going to be too late, by their, in
9    effect, preventing the arbitrators from granting that, the
10   anti-suit injunction that we've asked of them, and it's the
11   anti-suit injunction that we've asked of the arbitrators.  We
12   can't and wouldn't ask the arbitrators to compel arbitration of
13   a dispute between two parties not involving Telenor.
14          THE COURT:  Isn't that self-defeating?  I mean, if you
15   can't get relief related to this, these actions, because you're
16   not involved in the -- and Ernst & Young isn't party to the
17   arbitration contract, then how are any actions involving Ernst
18   & Young hindering the arbitration?  What's hindering the
19   arbitration is the Ernst & Young business isn't in their
20   jurisdiction.
21          MR. SILLS:  But, your Honor, the request that we've
22   made to the arbitrators for an anti-suit injunction against
23   Storm and its affiliates to hold them from litigating on this
24   Ernst & Young issue in Ukraine is very much before the
25   arbitrators.
                          Page 10

74KDSTOA.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

74kdstoa

1      THE COURT: Yes, and they'll do that. Why can't they
2  do that? They'll say stop your actions against Ernst & Young.
3      MR. SILLS: They can and we hope they will. But in
4  the interim, your Honor, by -- I'm repeating myself.
5      THE COURT: Well, I understand the point, but it seems
6  to me this is the subject of the anti-suit injunction. In
7  other words, what often happens is one party's pursuing a
8  litigation in one place, another party is pursuing a parallel
9  litigation somewhere else, and one side or the other or both
10 are asking for anti-suit injunctions. Well, the arbitrators
11 can award an anti-suit injunction if they think that's the
12 right outcome -- now, I guess you have to get it enforced here;
13 I don't know how that all works, but that will come in due
14 course -- and action is taken.
15     Now, what I was concerned about, as I understood it,
16 was not simply that these other parties were bringing actions
17 over there that were parallel to the arbitration -- I mean, you
18 aren't asking me for an anti-suit injunction, you're asking the
19 arbitrators for an anti-suit injunction, and until it's
20 granted, until and unless it's granted, a thousand litigations
21 bloom, right? And people can litigate all they want until
22 somebody tells them to stop.
23     But I don't think I did tell them to stop. All I told
24 them to stop doing was stop taking actions that would hinder
25 the arbitrators from reaching a decision, like trying to
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

74kdstoa

1  prevent parties from being in the arbitration or trying to
2  somehow influence the arbitrators. At least I thought that's
3  what was going on before, and it's actions of that nature that
4  I would think would be contumacious, not other actions that
5  might be enjoined someday by the arbitrators.
6      MR. SILLS: Perhaps, your Honor, then I should turn to
7  those events.
8      THE COURT: Now, here I have a different problem, but
9  I think that problem is more manageable and I may need to hear
10 from Mr. Van Tol on this.
11     My problem with your contempt application on the
12 enforcement of the Ukrainian injunctions is a different type of
13 problem. Again, you'll tell me if I don't have the sequence
14 right or the facts right or if there is a factual dispute about
15 this. As I understood your papers, you were saying one thing
16 that I clearly did order was stop any actions, any efforts to
17 enjoin the arbitration. That's got to be at the core of what I
18 did. And you say they violated that order right at its core
19 because, look, we just got and the arbitrators just got these
20 orders from the Ukrainian court. And you're expert says these
21 would not have come about without action being taken by some
22 private party to the case, either Storm or Altimo or Alpren,
23 and, therefore, we infer that they must have violated that
24 order.
25     Now, one issue is a factual issue of can I infer that
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

Page 11

74KDSTOA.txt
74kdstoa

1   or not based on simply the expert's opinion that that's how
2   things work there.  But that's not the primary response that
3   these folks make, as I understood it.  Their response was, as a
4   factual matter, not only are we saying we didn't do that after
5   the Court's Order, but, in fact, the record discloses that we
6   had sought enforcement, only we did it before the Court entered
7   its order.  And so it sort of moots the issue of can I infer
8   that this wasn't sua sponte by the Ukrainian authorities.
9   There is a kind of concession that one of the people on the
10  other side of the table did ask that this be enforced.  It's
11  just that it is a slow-acting fuse, and the folks who take the
12  steps didn't take them until much later.
13            Now, if that's so, then a couple of other things may
14  follow.  One is you have an argument that the injunction also
15  says thou shalt not fail to take steps to prevent others from
16  doing things.  And there is a question in my mind as to whether
17  that is sufficiently specific or whether -- maybe it is my
18  carelessness, but whether I had really focused on exactly what
19  that meant, because I understood that I was not ordering these
20  people to withdraw any requests they had previously made or any
21  actions that they had previously filed; and, therefore, I'm
22  concerned that the order is insufficiently specific,
23  particularly in the context in which it was entered, to put the
24  enjoined parties on notice that they were somehow required to
25  go back and withdraw requests for enforcement that were made
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    24
74kdstoa

1   prior to the entry of the injunction.
2             MR. SILLS:  Your Honor, let me respond in reverse
3   order, if I may?
4             THE COURT:  Yes.
5             MR. SILLS:  First, I think the injunction on its face
6   is very clear and the words are paragraph B of the Decretal.
7   And it says that they are enjoined pending final disposition
8   from allowing or failing to take steps to prevent any other
9   person, official or entity from enforcing or attempting to
10  enforce any such order.
11            Now, I think, with all respect, your Honor, I think
12  you're being too harsh on the language there.  I think it's
13  quite clear, and the best proof of that is the brief that was
14  filed in the Second Circuit by Altimo and Alpren, Storm not
15  having appealed from your Honor's injunction, and it's quoted
16  in our papers.  And there they say that in support of their
17  argument that the order is overbroad, they expressly say that
18  they have been required to police the injunction and to take
19  affirmative steps in Ukraine to prevent others from enforcing
20  it.
21            So I think it's not only Telenor that understands the
22  injunction in this sense, your Honor, but it certainly -- and
23  it can't be both.  If they mean what they say in the Second
24  Circuit, and I take them at their word, as to their
25  understanding of the injunction, then it was certainly clear to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    25
74kdstoa

1   them.  And we're not -- you are exactly right, your Honor, that
                              Page 12

74KDSTOA.txt

2   the ultimate relief we seek is the withdrawal of these cases.
3   But there is a lot short of withdrawing these cases that comes
4   well within that language. It is in Mr. Didkovskiy's expert
5   affidavit, and almost a simple letter to the enforcement
6   authorities would have halted this. There are express
7   provisions for a petition to halt enforcement.
8       THE COURT: You are very optimistic about that. But
9   do you think it is simpler, given the restraint appropriate to
10  a court asked to hold parties in contempt, which is a drastic
11  remedy, isn't it more restrained and more appropriate for the
12  court now to clarify or supplement its prior order to require
13  exactly that; that is, to directly enjoin all these guys, to
14  take the necessary steps to withdraw the actions and to
15  withdraw their requests for enforcement, and to do so within a
16  week, and to present proof that they have done so to the Court
17  in ten days? Then we'll have an absolutely clear order and
18  there will be no question as to what they are being asked to
19  do.
20      And as I spin this out, I'm asking you whether that
21  wouldn't be more appropriate. Your answer is going to be no,
22  but I'm probably already past that point. And what I really
23  need to hear may be from Mr. Van Tol, if he is going to speak,
24  or Mr. Rolfe, if he is taking this up. Because it seems to me,
25  without trying to focus on the contradiction that you allege
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                26

74kdstoa

1   between their position here and their position in the Second
2   Circuit, what I have before me, it seems, is a situation where
3   the -- let me find a way to call these people -- the
4   counterclaim defendants, a contradiction between in effect what
5   I was told -- I'm sure in good faith, I'm not criticizing what
6   they said, but my understanding at the time was that the reason
7   that you were not asking for anything to be withdrawn, and the
8   reason why I did not have to face the question of whether they
9   needed to withdraw these actions, is that it was represented to
10  me that the Ukrainian authorities would only act to further
11  enforce the order if they were requested, and that may be
12  right.
13      But, you know, if it was somewhere in the record --
14  I'm not saying anybody tried to hide anything -- that they
15  already had filed this request, then the relief that I ordered
16  at the time was not sufficient to accomplish what we were
17  trying to accomplish, to protect the arbitrators. I thought at
18  the time I issued this order that the state of play was that
19  unless they took some affirmative step to push the Ukrainian
20  authorities to take enforcement action, that we wouldn't see
21  the arbitrators getting letters in the mail saying don't come
22  to Ukraine any more, we'll put you in jail.
23      I thought that the order that I entered was
24  sufficiently protective of the arbitrators, and of Telenor,
25  because I thought it would take some affirmative action on the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                27

74kdstoa

1   counterclaim defendants' part to further interfere with the
2   injunction, and at least my understanding -- and maybe it was
3   careless on my part -- of the "fail to prevent" language was
4   they couldn't wink and a nod and get some third party to come
                           Page 13

74KDSTOA.txt

5  in and file that kind of request.  But I didn't think I was
6  requiring them to, you know, sue the government or deal with
7  Ukrainian prosecutors.
8      But what I am saying now is I was wrong.  I was
9  deceived, not affirmatively deceived by anybody making these
10 statements.  I was mistaken -- perhaps you were, too -- in the
11 belief that you and the arbitrators would be adequately
12 protected by stopping the counterclaim defendants from filing a
13 request for enforcement.  The request for enforcement already
14 having been filed, that horse already out of the barn, you and
15 the arbitrators were in precisely the danger that we were
16 trying to prevent, and, therefore, to effectuate the relief it
17 would be in fact necessary to do something that I didn't think
18 was necessary at the time
19         MR. SILLS:  Three points, your Honor.
20         I'm always reluctant to disappoint a court's
21 expectations, but I think the solution you propose, to issue an
22 absolutely clear order that will put this to rest, is a
23 practical and an effective solution.  But I've gone back over
24 the transcripts of the five proceedings we have had, and I did
25 represent to the Court -- and it is confirmed by
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

28

74kdstoa

1  Mr. Didkovskiy's rather detailed and thorough affidavit -- that
2  affirmative action is required in Ukraine.  It is a marshal
3  service, in effect, and it is a juridical act for that marshal
4  service to make service of any particular court document.
5      And it is true, your Honor, just as the Court
6  believed, I had said, based on what we had seen from the other
7  side at that point -- and we had still never seen a petition to
8  enforce against our client -- that the train hadn't left the
9  station and simply telling them not to pull out would be
10 sufficient in the context of a preliminary injunction.  We were
11 trying not to ask for more relief than we needed.  If, in fact,
12 your Honor, the train was already barreling down the tracks and
13 no one said that, I think that would explain that.
14     I was the drafter of this proposed order.  The reason
15 I put in this language -- and I apologize, because in looking
16 at it now, I see that it is somewhat awkwardly worded -- was
17 precisely in case, given our history in the Ukrainian courts
18 with these parties, something had already been undertaken.
19     I should say, briefly, your Honor, that there doesn't
20 seem to be any dispute that a request is necessary.  We have
21 seen petitions to enforce against the two other parties,
22 Klymenko, the general director of Storm, and Storm itself.
23 There is nothing in the file in Ukraine asking this state
24 enforcement agency to commence proceedings against Telenor.
25 And none has been produced.  And one would think if it existed,
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

29

74kdstoa

1  it would be shown to you, shown to your Honor.
2         THE COURT:  What do I infer from that?  How can I
3  infer from the fact there is no enforcement petition in the
4  file, that the petition that must have been made must have been
5  made after the Court's order?
6         MR. SILLS:  Your Honor, I think there are two
7  circumstances.  When I looked at this enforcement order that
                              Page 14

74KDSTOA.txt

8   was sent to my client -- received by my client on
9   February 19th, long after this December 4 Order was supposedly
10  made, it specifically says on its face that the enforcement
11  officer had examined application for the enforcement of Decree
12  No. 2-5613, which is the December 1 injunction.  So there is an
13  application.
14          Mr. Didkovskiy has had someone from his office go at
15  least two times to the State Enforcement Service, which, like
16  any marshal service I suppose anywhere on earth, maintains its
17  files, there is no such application in that file.
18          THE COURT:  Yes.  But if you go to our Clerk's office,
19  half the time you don't find the papers that are supposed to be
20  there, and we like to believe, with all due respect to the
21  Ukrainian court system, that we're better at this than most
22  people in the world, right?  But things get lost.
23          But whether it got lost or whether they burned it,
24  whatever happened to it, the state of play is you don't have
25  anything showing that they asked for enforcement after the

1   Court's order.  They represent that they did make such an
2   application previous to the Court's order.  As far as I'm
3   concerned, that is a significant difference if the question is
4   did somebody take action in contempt of this Court's order, but
5   it's not particularly significant with respect to protecting
6   the arbitrators.
7           You know, what you have shown, not in the Ernst &
8   Young matter but with respect to this matter, is a direct
9   attack on the arbitral tribunal, as I read it.  That is
10  precisely what the Court's order was trying to prevent.
11  Perhaps the Court's order was not properly geared to prevent it
12  because the train had left the station.
13          Now, when I said you were being overly optimistic, I
14  don't know whether the train can be called back as easily as
15  that.  I can direct the counterclaim defendants to wave at the
16  engineer and say come back.  Whether the engineer will do so I
17  guess we'll have to see.
18          But what I'm concerned about in terms of contempt is
19  that there is not evidence that is sufficiently clear-cut to
20  persuade me that these folks made a request for enforcement
21  after the injunction, and it is not entirely clear that the
22  Order requires the counterclaim defendants to withdraw actions
23  previously taken.
24          I don't know even, when would they have to do that?
25  Were they actually being told by me, by using this "failed to

1   prevent" language, that they should do exactly what you said
2   they weren't being ordered to do the day after?  Or is it only
3   after they know that the Ukrainian authorities are taking these
4   actions, that then they have to withdraw the request for --
5           MR. SILLS:  The relief that we put off until a final
6   hearing was the actual withdrawal of these cases.  It is, in
7   effect, a dismissal.  I don't think we ever -- and, again, this
8   was put in I suppose out of an excess of caution, which in
9   retrospect was fully justified, that there might be a need for
10  some sort of interim step to halt these proceedings.  Again,

Page 15

74KDSTOA.txt
```
11   your Honor, I think there is a strong circumstantial case, how
12   could we ever get the piece of paper except from them.  And so
13   I think it would be appropriate, if we go forward on the
14   contempt, for there to be an evidentiary hearing because it's
15   only through cross-examination, I think, that their assertion
16   they didn't act afterwards could be tested.
17          THE COURT:  You know, I think I'm going to do you
18   better than that, because if I have this hearing, I've got a
19   trial next week and then I start a three-week criminal trial,
20   if we have to have a contempt trial, you are not going to get
21   anything for months.  What I want to do is to amend the
22   injunction to require them now to withdraw at least the request
23   for enforcement.  Because it sounds to me as if you're saying
24   that's what you now think is the key thing, and you're still a
25   little reluctant perhaps to ask them to withdraw the underlying
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    32

        74kdstoa

```
 1   lawsuits, but one or the other or both of those things to be
 2   withdrawn, and to be done promptly.
 3          And then that's either going to be done or it's not
 4   going to be done.  It is either going to work or it is not
 5   going to work to halt whatever enforcement these authorities
 6   take.  I mean, if they are like the Marshal Service, that ought
 7   to do.  If they are like the United States Attorney's office,
 8   maybe it is a different story.
 9          Let me ask Mr. Van Tol at this point, who has been
10   patient:  I think I'm asking you to do something difficult.  I
11   know that you believe that I shouldn't have entered this order
12   at all.  But what I'm going to ask you to do is, you know,
13   that's already been done.  That's already been decided.  I've
14   already made findings and conclusions in that regard.
15          Assuming that I know that you and Mr. Rolfe -- if he
16   wants to speak to this instead or in addition -- assuming that
17   I know that you don't believe that the injunction was properly
18   entered, is there any reason why I should not add to it at this
19   point a requirement that you withdraw these requests for
20   enforcement which apparently had been entered previous to the
21   Court's order?
22          MR. ROLFE:  Yes, absolutely.  A number of reasons.
23          First of all, words like "deceptive" or "deceitful,"
24   whether they are addressed to people or not, do not comport
25   with the facts.  The December 1st injunction was accompanied by
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    33

        74kdstoa

```
 1   a request that the State Enforcement Service enforce --
 2          THE COURT:  Right.
 3          MR. ROLFE:  -- the December 1st ruling.  It was
 4   self-executing.
 5          Mr. Van Tol told the Court that on December 7th.
 6   December 7th.  I wasn't around then.  I hadn't been --
 7          THE COURT:  Mr. Rolfe, if I was -- you know, when I
 8   use the word "misled," I was specifically careful to say not by
 9   any of you -- maybe by Mr. Sills.
10          MR. ROLFE:  I understand, but Mr. Sills is not fessing
11   up to what he knew at the time.  It is very important, your
12   Honor.  Because Mr. Sills knew and told the Court on
13   December 11th that the injunction was issuing against Telenor,
```
                            Page 16

74KDSTOA.txt

14    because that's what the papers said.
15          THE COURT:  Yes.
16          MR. ROLFE:  It was a self-executing Order.  The Order
17    of the Court, December 1st, said it was to be forwarded to the
18    parties and to Telenor and to the respective bodies of the
19    State Enforcement Agency.  It said that the ruling was subject
20    to immediate execution.  That's what Mr. Van Tol told you.  No
21    application was necessary by Alpren to enforce that Order.
22          THE COURT:  OK.
23          MR. ROLFE:  None.  Mr. Ilyashev said that.
24    Mr. Vlasenko said that.  I need to continue, your Honor,
25    because it is very important what we knew before this
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    34
      74kdstoa

1    injunction was entered.  And I don't want anybody to believe
2    that we were misled and that the train was going down the track
3    and nobody knew it.  Everybody knew that the Order was being
4    enforced.
5          On December 4th, Alpren filed enforcement petitions
6    against Storm and against Klymenko, not against Telenor,
7    because Telenor wasn't a party.  There is no petition to
8    enforce against Telenor.
9          As they were entitled --
10         THE COURT:  Excuse me, Mr. Rolfe.  Whether they are --
11   then how do you explain the fact that they got this 100 ruble
12   fine?
13         MR. ROLFE:  Because the State Enforcement Agency has
14   the power and the duty completely to enforce the Order.  They
15   did it on their own.  Alpren had nothing to do with that.
16         And the timing of that and the delivery of that is
17   entirely unknown to us.  It was done through the State
18   Enforcement Agency.
19         Now, if your Honor looks at the enforcement statute
20   that we gave to your Honor, you will see -- and I can read it
21   to you -- that it says what they shall do.  It says, The state
22   enforcement agent shall -- mandatory language -- take required
23   measures to ensure timely and complete enforcement of the
24   decision identified in the document for decision enforcement.
25         The document for decision enforcement is not the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    35
      74kdstoa

1    application.  The document for decision enforcement is the
2    order itself, because if you look at Article III of the
3    statute, the statute provides that court orders are one of the
4    things upon which enforcement may be based.  And the
5    enforcement agency has full power to implement that.  It has
6    full power to impose fines without anybody asking them to, and
7    that's what they did here.  And that's entirely consistent with
8    the affidavits.
9          THE COURT:  Well, let me --
10         MR. ROLFE:  I just want to say one more thing.
11         Mr. Sills told your Honor on December 11th, they're
12   seeking to enforce this order against Telenor.  And, yes,
13   that's exactly what the documents that Mr. Van Tol gave him on
14   December 4th said.  So there was no question --
15         THE COURT:  Wait.  Who is "they" in that last
16   sentence?

                            Page 17

74KDSTOA.txt

```
17          MR. ROLFE: They, the enforcement agency. That's what
18  Mr. Sills said in haec verba. They're seeking to enforce it
19  against us, and there are criminal penalties, your Honor.
20  That's what he told you. He knew that enforcement proceedings
21  were underway. He said he was not requiring us to do anything
22  affirmative. We didn't do anything affirmative. We didn't
23  seek to stop it.
24          Now I'm going to answer your last question, which is:
25  What now? OK?
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    36
        74kdstoa

```
1           I want an evidentiary hearing on a permanent
2   injunction. I have never had an opportunity to argue against
3   any anti-suit injunction. As your Honor knows, I requested an
4   evidentiary hearing. Your Honor told me we would get one. We
5   didn't. There wasn't much I could do at the end except appeal,
6   which, as your Honor knows, we have done.
7           This time we want an evidentiary hearing if you're
8   going to enter a permanent injunction doing anything. We want
9   to take testimony. We want discovery from Telenor. Because we
10  want to litigate the whole question of alter ego at the time
11  the Shareholder Agreement was entered into, because
12  Mr. O'Driscoll was there --
13          THE COURT: Sure, we'll do that, but meanwhile I'm
14  modifying the prior Order, which is a temporary order. And the
15  question is, are you saying that Alpren -- the only request for
16  enforcement that is on the table is something that Storm filed
17  on December the 1st, or December whatever?
18          MR. ROLFE: No. What I'm saying is the only request
19  for enforcement that is on the table are two things that Alpren
20  filed on December 4th.
21          THE COURT: Right.
22          MR. ROLFE: One with respect to Storm, one with
23  respect to Klymenko They never filed anything with respect to
24  Telenor.
25          The State Enforcement Service or State Enforcement
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    37
        74kdstoa

```
1   Agency did that on its own, to afford complete relief, just the
2   way your Honor entered an injunction against us as relief
3   defendants even though we weren't parties.
4           THE COURT: And who is sending stuff to the
5   arbitrators.
6           MR. ROLFE: The State Enforcement Service. And the
7   State Enforcement Service is not doing anything. The State
8   Enforcement Service is notifying the arbitrators that there is
9   an enforcement proceeding. If your Honor looks at the
10  document, it doesn't enjoin them from saying anything. In
11  fact, Mr. Sills --
12          THE COURT: Tell me where it is. Tell me what I'm
13  looking at and then I'll look at it.
14          MR. ROLFE: Where is the letter?
15          MR. VAN TOL: The notice.
16          MR. ROLFE: There is so much paper, your Honor, that
17  it is very difficult to get a handle on it.
18          MR. VAN TOL: Your Honor, I think it is Exhibit F to
19  the Oleksiy Didkovskiy affidavit, the thinner one, not the
```
                            Page 18

74KDSTOA.txt
```
20   thicker one, so it is Exhibit F, the Didkovskiy affidavit.
21           MR. ROLFE:  I have it.
22           THE COURT:  That is not the reply affidavit?
23           MR. VAN TOL:  No, your Honor.  There were two filed
24   originally.  It is the smaller of the two.  It is Exhibit F,
25   the December 20th letter, dated December 20.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    38
       74kdstoa

```
 1           MR. ROLFE:  Your Honor, it is dated December 20.  I
 2   could hand it up.
 3           THE COURT:  I've got it.
 4           (Pause)
 5           Right.  So is this something other than a complaint,
 6   in effect, a summons and complaint?
 7           MR. ROLFE:  It is not a summons and complaint at all.
 8           THE COURT:  So what is it?
 9           MR. ROLFE:  It is a notice to the arbitrators that the
10   Enforcement Service has taken enforcement action with respect
11   to Storm and with respect to Telenor and with respect to
12   Klymenko.  That's all it is.
13           And Mr. Sills told the arbitrators, when this came in
14   over the transom, you don't need to worry about this, it
15   doesn't enjoin you from doing anything, it doesn't affect you
16   at all.  He's right.
17           MR. VAN TOL:  If I can elaborate, your Honor?
18           I was on the conference call with Mr. Sills because
19   the arbitrators received this and they were confused by it, and
20   they asked the parties what it was.  And Mr. Rolfe has
21   accurately described the conversation.  Mr. Sills says it
22   doesn't enjoin you from doing anything.  I concurred, and that
23   was the end of the matter.
24           We haven't heard anything from the arbitration
25   tribunal about it since then.  If anything, it's been sloughed
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    39
       74kdstoa

```
 1   off and they've gone on their business, your Honor, unimpeded.
 2           THE COURT:  So this is a notice to the arbitrators
 3   that enforcement actions are being taken against Klymenko --
 4           MR. ROLFE:  Storm and Telenor.
 5           THE COURT:  -- storm and Telenor.
 6           MR. ROLFE:  That's correct, your Honor.
 7           THE COURT:  And this is an action taken by the State
 8   Enforcement Service, who you are saying are not these
 9   marshal-like people who serve things at the behest of the
10   parties, but are prosecutors.
11           MR. ROLFE:  That is correct.
12           THE COURT:  Independent state officials.
13           MR. ROLFE:  They are independent state officials and
14   they can refer things on their own for criminal prosecution.
15   They can refuse to enforce things on their own, when they look
16   at the papers, and they can do any of this and all of this
17   without any application from the parties.  Because one of the
18   enforcement documents permitted under the statute is a court
19   order.  And if your Honor looks at the Court Order of
20   December 1st, you can see that the Court orders it sent to
21   these people.  Alpren didn't have to anything.
22           THE COURT:  That's what I would have anticipated, in a
```
                                Page 19

74KDSTOA.txt
```
23  sense, is the way most court systems and state agencies would
24  operate.
25                   So explain to me what in your view is the request for
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                        40

    74kdstoa

```
 1  enforcement, or whatever this request is that was filed on
 2  December the 4th.
 3                   MR. ROLFE:  Belt and suspenders.  Alpren filed two
 4  requests against the parties to enforce, leaving it up to the
 5  judgment of the enforcement agency as to how to enforce.
 6                   It determined to put a $100 fine on Telenor.
 7  Obviously, that didn't impede Telenor from going ahead with its
 8  participation in the arbitration, and it sent a letter to
 9  Telenor saying we want you to comply.
10                   THE COURT:  And the reason why I should not require
11  you to withdraw that request is because you say Mr. Sills
12  should have asked for that back in December because he knew
13  that you had done that as of that time?
14                   MR. ROLFE:  That is one reason.
15                   The other reason is I think we are entitled to an
16  evidentiary hearing on that.  I don't think your Honor can just
17  change a prohibitory injunction to a mandatory injunction
18  without having a hearing.  I think we're entitled to put in
19  evidence on the elements of an anti-suit injunction that is
20  mandatory.
21                   MR. VAN TOL:  Your Honor, just one practical point so
22  we don't lose sight of what is going on in the arbitration.
23  We're almost finished and I say "almost" because all we're
24  waiting for is an order from the tribunal.  Both parties have
25  put in papers.  There has been no requests for a couple of
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                        41

    74kdstoa

```
 1  weeks or months for any further papers.  We believe, and I
 2  don't think Mr. Sills could disagree, that an award -- a final
 3  award from the arbitration tribunal is imminent.
 4                   MR. ROLFE:  It may be that if I talk to the client,
 5  which is probable Monday morning or tomorrow, they will say,
 6  yeah, we'll withdraw the request for enforcement, but I'm not
 7  authorized to do that at the moment, your Honor.
 8                   THE COURT:  I hear that, but I'm still trying to get
 9  what the evidentiary hearing is about because the uncontested
10  fact is that you did make this request for an enforcement.
11                   MR. ROLFE:  On December 4th, before the TRO was
12  entered.
13                   THE COURT:  I understand.
14                   MR. ROLFE:  So there is no contempt.
15                   THE COURT:  I'm not saying there is any contempt.
16                   MR. ROLFE:  So we're talking about an anti-suit
17  injunction.  If your Honor will remember, your Honor ruled on
18  personal jurisdiction with respect to my client.  I asked for
19  and your Honor said that I could have an evidentiary hearing on
20  the anti-suit injunction.
21                   THE COURT:  That's all going forward.  We're talking
22  about what I should have ordered at the time, because I was
23  operating under the misapprehension, fostered, no doubt, by
24  Mr. Sills' incompetence, if you'll have it so.  That's not my
25  problem.
```
                                Page 20

74KDSTOA.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

74kdstoa

```
 1          I believe that the reason that we were not going any
 2  further and dealing with anything else was that an action had
 3  to be taken by Alpren or Storm in order to engage in any
 4  further interference with the arbitration.  I was mistaken.  He
 5  was apparently mistaken.  It turns out that the train had
 6  already left the station, and, therefore, the very relief that
 7  I was trying to accomplish was not done by the words of that
 8  injunction.  Or maybe Mr. Sills says it was because he has the
 9  failed to prevent language.
10          In what may be an excess of caution, I'm thinking,
11  well, I don't know that that put you on any kind of notice.
12  But had I properly understood that arbitrators were going to
13  get letters from Ukrainian courts and that Telenor was going to
14  be fined, all stemming from a request that had been filed by
15  the counterclaim defendants, or some of them, previously, I
16  would certainly have given Mr. Sills, not as a permanent
17  anti-suit injunction but as the very temporary relief that he
18  was asking for and that I decided to give him, a term that
19  included "withdraw the enforcement request."  That's what I'm
20  saying now.
21          Again, no one came to me -- you know, you said he said
22  we're going to get all this stuff, all these proceedings, in
23  the future.  Nobody came to me at any time between January and
24  when Mr. Sills brought this contempt application and said,
25  well, let's get on the schtick now and schedule these other
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

74kdstoa

```
 1  things.  You're saying that now.  Fine, we'll schedule them.
 2          But what I'm concerned about is modifying the Order
 3  that I entered back then because it didn't accomplish what I
 4  thought it would accomplish, and if that's because I overlooked
 5  something or that's because Mr. Sills overlooked something that
 6  was in the record, I'm sorry.  But I think that that's exactly
 7  what I was trying to prevent was these kinds of fines and these
 8  kinds of letters going to the arbitrators.
 9          Now, I appreciate the fact -- I said to Mr. Sills
10  right from the start, he may be very optimistic to think that
11  you folks saying, please, we withdraw our enforcement request,
12  is going to stop a state agency from deciding to do whatever it
13  wants to do, and I'm not undertaking to tell them what to do or
14  anything else.  I'm just saying I thought at the time this
15  temporary injunction issued that it would be necessary for some
16  affirmative action to take place in order for the state to act.
17  I thought that by enjoining you folks not to pull that trigger,
18  nothing would therefor occur.
19          I was wrong.  It may have required an order to you to
20  withdraw the enforcement request.  And even that might not
21  work, because, after all, now that the state authorities are
22  aware of this Court Order, if they believe it's being violated
23  and they have an independent authority to pursue relief,
24  they'll do so, I guess.
25          MR. VAN TOL:  Your Honor.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

44

Page 21

74KDSTOA.txt
74kdstoa

```
 1              THE COURT:  Mr. Van Tol.
 2              MR. VAN TOL:  I brought up the arbitration to point
 3  out that your arbitration has worked.  If your goal was to make
 4  sure that the arbitration wasn't impeded, delayed, hindered in
 5  any way, it worked.  We're almost done with the arbitration.
 6  So my point is I don't see that an injunction is even
 7  necessary.
 8              So far we have had an enforcement notice that the
 9  tribunal disregarded and a $100 fine to Sills' client.  There
10  is nothing else going on in the Ukraine that we are aware of,
11  and nothing else could be done at our instance.  So I think
12  we're actually covered, and I don't see the need for an
13  injunction when we're almost done with the arbitration.
14              THE COURT:  That is an interesting point and I will
15  ask Mr. Sills about that.
16              But again, Mr. Van Tol, let me just make sure I
17  understand.  When you say "almost done with the arbitration," I
18  think what you then clarified is you are done with the taking
19  of evidence and the submission of briefs, the things that the
20  parties are to do are done, and we're just waiting for what
21  could be a week or could be a year for the arbitrators to
22  render their award.
23              MR. VAN TOL:  That is right, your Honor.  Absent any
24  other requests from the tribunal, I believe we're just waiting
25  for an order.
```

74kdstoa

```
 1              THE COURT:  Is that your view, too, Mr. Sills?
 2              MR. SILLS:  It is true, your Honor, that there has
 3  been a hearing on the merits which Mr. Van Tol and his clients
 4  refused to participate in because of this supposed injunction
 5  in Ukraine.  There are --
 6              THE COURT:  But they have the right to do that whether
 7  they are enjoined or not.
 8              MR. SILLS:  No party has to show up and defend.
 9              But there are a number of open issues, your Honor,
10  including there has been a series of letter briefs, I suppose I
11  should call them for want of a better term, on the question of
12  the anti-suit injunction concerning Ernst & Young.  I simply
13  can't say when the arbitrators will rule.
14              THE COURT:  Of course.
15              MR. SILLS:  As with any decision maker.
16              But, your Honor, I don't see any point in responding
17  to these personal attacks about who said what to whom before
18  your Honor.  The record is clear, as early as December 7th --
19  it is at page 23 of the transcript -- I specifically said that
20  there had to be affirmative action.  It hadn't been taken, I
21  said.  This is an appropriate moment to stop that from being an
22  issue.  And everyone sat silent.  If we were wrong, although I
23  think Mr. Didkovskiy's two affidavits are very convincing on
24  the requirements of Ukrainian law -- he was the only Ukrainian
25  lawyer who has spoken to this; neither Mr. Rolfe nor I are in a
```

74kdstoa

```
 1  position to express a firm conclusion on Ukrainian procedures,
```

                              Page 22

74KDSTOA.txt

```
2     but it seems to me I would rather focus on the proposal your
3     Honor has put before us --
4              THE COURT:  Let me just ask really the only question
5     that I have for you arising out of the arguments that have been
6     made.
7              The rationale for any further clarification of the
8     Order is that it is necessary to accomplish the goals that we
9     started with.  The goals that we started with, as I have always
10    understood it, is to protect the jurisdiction of the arbitral
11    tribunal.
12             Now, Mr. Van Tol says, and we did.  That is, they are
13    sitting, apparently unintimidated, ready to render a decision.
14    You conducted the arbitration, apparently unintimidated by
15    whatever enforcement proceedings are going on.  If the factual
16    conclusion is no one on the Alpren side of the table has done
17    anything or at least it has not been proven to my satisfaction
18    that anyone on the Alpren side of the table took any action
19    after the Court's order to stimulate these actions of the State
20    Enforcement Service, can it be said that it's necessary to
21    accomplish the relief that I want to accomplish to make them
22    withdraw this request given (a) that the arbitration has been
23    successfully accomplished and (b) that even if they do withdraw
24    their request at this stage for any further enforcement steps,
25    a state agency is seized of the issue and presumably can do
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47

74kdstoa

```
1     whatever it wants if it thinks it wants to do anything further
2     in response to the prior request, or on its own?
3              MR. SILLS:  Well, your Honor, I think, with respect to
4     the second, ordering them to make a good faith effort to halt
5     these proceedings, it is entirely appropriate to take whatever
6     steps are appropriate if the State Enforcement Service -- not
7     because of a wink and a nod but because it somehow has an
8     overwhelming interest here -- were to proceed, then I suppose
9     we could deal with that but --
10             THE COURT:  Excuse me.  Or a not so overwhelming
11    interest.  My thought about why this is not likely to have a
12    big effect, they don't have to have a wink and a nod.  Putting
13    aside any conspiracy theories, they go in and say, all right,
14    we've been ordered by the Court to withdraw this.  We withdraw
15    it.
16             Now, I suppose if I were a prosecutor and somebody who
17    was purportedly a victim came in and said, well, we've been
18    constrained by a foreign court to come in and withdraw our
19    request that you look into this matter, I will say, thank you
20    very much, I'll take that under advisement.  And, you know, it
21    wouldn't require a lot of overwhelming interest for me to think
22    in those circumstances that, you know, I'll do what I'm going
23    to do.  They made their complaint earlier.  They are
24    withdrawing their complaint under duress.  You know --
25             MR. SILLS:  But they are not prosecutors, your Honor.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

74kdstoa

```
1     They are --
2              THE COURT:  I don't know what they are.
3              MR. SILLS:  What Mr. Didkovskiy's reply affidavit has
4     is an actual decided case not involving these parties in which
```

Page 23

74KDSTOA.txt
5   the State Enforcement Service declined to go forward because
6   there wasn't a request.  He explains at length the procedures
7   for petitioning to have the enforcement stopped.
8           Your Honor, if, although I have to say I find it
9   somewhat unlikely, the State Enforcement Service in Kyiv or
10  Lugansk, or wherever they are proceeding these days, were to
11  decide sua sponte to proceed and honestly proceed sua sponte
12  and proceed, I suppose that is just life.  But I don't think
13  that means that the effort shouldn't be made.
14          With respect to the timing issue, your Honor, I don't
15  know when the case is going to be over.  What I do know is that
16  in Ukraine, as Mr. Didkovskiy explains, that fine, however
17  small it seems to us, is a predicate for further criminal
18  action, including the arrest of the personnel of the parties
19  seen to be in contempt.
20          THE COURT:  The fine is not the predicate, the
21  underlying order is the predicate and that's been in place.
22          MR. SILLS:  As I understand Ukrainian procedures, your
23  Honor, they are both predicates; that is, there is no arrest
24  until there is the fine.  And so it is a series of --
25          THE COURT:  Escalating penalties.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                        49
     74kdstoa

1           MR. SILLS:  Precisely, your Honor.
2           THE COURT:  All right.
3           MR. SILLS:  So the history of the arbitration so far
4   is that the hearing was held once your Honor entered the
5   injunction on December 18th.  Proposed findings and conclusions
6   were submitted in January.  There was a long -- we expected an
7   award.  About 60 days later there was a request for further
8   briefing on a number of issues.  Those briefs had been
9   submitted.  There have been letters exchanged on other issues.
10          My experience in arbitrations, your Honor, is that
11  sometimes it's as quick as its reputation and sometimes it is
12  not.  And this one shows -- but, your Honor, if there were an
13  award tomorrow and we went to enforce it here, my understanding
14  is that that would be in violation of the Ukrainian order.  So
15  that even if an award were to be issued shortly, and I would
16  hope Mr. Van Tol is right but I don't have any reason to
17  believe there will be an award tomorrow as opposed to a month
18  from now or two months from now, or however long, then there
19  are a lot of steps along the way in the arbitral process.
20          The arbitrators might, for example, decide that they
21  would set up a separate, in effect, sever the request for the
22  anti-suit injunction on E & Y matters.  I don't control the
23  arbitration, but it seemed to me, your Honor, the need for the
24  injunction is even greater now, and the fact that they haven't
25  yet succeeded with this process in Ukraine in interfering with
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                        50
     74kdstoa

1   the arbitration -- you know, why was this letter sent to the
2   arbitrator, how did they know what was going on, how did they
3   learn that the arbitrators had gone forward so that there could
4   be a fine, which presumably came from one or more --
5           THE COURT:  I don't know, there are different
6   inferences that could be drawn from that, including that the
7   wheels of the Ukrainian justice, like those here, grind slowly
                            Page 24