Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Petitioner

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **TELENOR MOBILE COMMUNICATIONS AS,** | **07 Civ. 6929** (GEL)(DF) |
| Petitioner, | |
| -against- | ECF Case |
| **STORM LLC,** | |
| Respondent. | |

**MEMORANDUM IN OPPOSITION TO RESPONDENT'S MOTION TO VACATE AND**
**IN SUPPORT OF PETITIONER'S MOTION TO CONFIRM**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 3

ARGUMENT ....................................................................................... 3

I.    THE TRIBUNAL DID NOT MANIFESTLY DISREGARD THE LAW BY
      REFUSING TO FOLLOW THE UKRAINIAN JUDGMENTS ..................... 4

II.   THE AWARD IS ENTIRELY CONSISTENT WITH NEW YORK'S PUBLIC
      POLICY .................................................................................... 9

III.  STORM APPEARED IN THE ARBITRATION AND ENJOYED AMPLE
      OPPORTUNITIES TO PRESENT ITS CASE.................................... 12

IV.   THE TRIBUNAL CORRECTLY DETERMINED THAT IT HAD
      JURISDICTION TO HEAR CONTRACT FORMATION ISSUES ............ 14

      A.    Storm Waived its Right to Jury Trial by Entering into the Arbitration
            Agreement................................................................... 15

V.    THE TRIBUNAL ACTED WELL WITHIN THE SCOPE OF THE
      SHAREHOLDERS AGREEMENT AND APPLICABLE LAW IN ORDERING
      CONDITIONAL DIVESTITURE ..................................................... 18

VI.   THERE IS NO BASIS TO DISTURB THE ANTI-SUIT INJUNCTION
      ENTERED BY THE ARBITRATORS ............................................... 22

CONCLUSION.................................................................................. 25

Petitioner Telenor Mobile Telecommunications AS ("Telenor Mobile") respectfully submits this memorandum in support of its motion to confirm, and in opposition to the cross-motion of Respondent Storm LLC ("Storm") to vacate, the final award rendered in the arbitration between Telenor Mobile and Storm (the "Final Award").

## PRELIMINARY STATEMENT

Telenor Mobile commenced the underlying arbitration against Storm in February 2006 in order to enforce the terms of a carefully negotiated, comprehensive Shareholders Agreement, dated January 30, 2004 (the "Shareholders Agreement") to which Telenor Mobile, Storm and Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar") are parties. The three-member arbitration tribunal (the "Tribunal") was constituted on March 31, 2006, and no challenge is raised by Storm to the Tribunal's selection or composition.[1] During the course of the arbitration proceeding (the "Arbitration"), the Tribunal took the written or oral testimony of 18 witnesses and reviewed a documentary record of thousands of pages. Following extensive briefing and argument, the Tribunal rendered the Final Award on August 1, 2007.[2]

The Final Award, like the interim award previously before this Court, speaks for itself as to the care and attention paid by the Tribunal to the factual and legal issues presented by the parties.[3] Nonetheless, Storm attacks the Final Award as supposedly in "manifest disregard"

---

[1] Mr. William Jentes was nominated by Telenor Mobile, and Mr. Gregory Craig was nominated by Storm. Messrs. Craig and Jentes then selected Mr. Kenneth Feinberg to serve as Chairman of the Tribunal.

[2] The Final Award is dated July 2, 2007, but its release was delayed by Storm's failure to pay fees owing both to the chairman of the Tribunal and to the arbitrator Storm had nominated. See Declaration of Robert L. Sills (I), dated August 30, 2007 ("Sills Decl. I"), Exhs. W-FF. After Telenor Mobile offered to pay those fees, Storm finally did so, and the Final Award was released. Id., Exhs. FF-HH.

[3] In rejecting Storm's attack on the Tribunal's interim award upholding its own jurisdiction (the "Interim Award"), this Court stated as follows:

> [w]hile this Court has had a relatively short period of time to address these issues, the arbitration tribunal... conducted an exemplary inquiry into these issues. The arbitration tribunal did not act hastily or precipitately. It did anything but manifestly disregard the arguments presented to it with respect to Ukrainian law. Rather, it conducted an extensive factual inquiry into the nature of the

of the law, based on a series of Ukrainian lawsuits prosecuted against Storm by one of its own corporate parents, a Cyprus shell corporation known as Alpren Limited ("Alpren"). The Tribunal's rejection of that argument, far from being in manifest disregard of the law, was clearly correct, and Storm's efforts to avoid the Final Award on the basis of the campaign of foreign litigation it has pursued against itself should be rejected. On November 22, 2006, this Court rejected essentially the same arguments made by Storm in the related case of Storm LLC v. Telenor Mobile Communications AS, 06-CV-13157 (GEL)(DF).[4]

Storm also argues that it was somehow deprived of a jury trial on the question of whether the parties had entered into an arbitration agreement. As set forth below, Storm waived any right it may have had to such a trial by agreeing in the Shareholders Agreement that the Tribunal, rather than a court, would resolve any questions of its own jurisdiction, including issues of contract formation. In any event, Storm has not shown, either before the Tribunal or here, any factual dispute concerning the arbitration agreement that could be resolved by a jury.

Finally, Storm argues that the Tribunal supposedly exceeded its powers by ordering relief against non-parties. The Tribunal did no such thing. Rather, the relief granted by the Tribunal, and the relief awarded to Telenor Mobile, and against Storm, was entirely appropriate, and fully within the broad scope of the arbitration particularly in light of Storm's egregious violations of the Shareholders Agreement.

---

Ukrainian litigation, and provided a thoughtful and reasoned judgment with respect to its reasons for believing that the arbitration tribunal did have jurisdiction over this controversy, and should proceed to address its merits.
Declaration of Robert L. Sills (II), dated August 30, 2007 ("Sills Decl. II"), Exh. 191 at 33.
[4] Telenor Mobile respectfully asks that this Court take judicial notice of the record and of its rulings in that case.

## STATEMENT OF FACTS

The history of the dealings between the parties, the arbitration proceeding itself, and the campaign of Ukrainian litigation waged by Storm and its affiliates are accurately set out, in detail, in the Final Award. Rather than restate the description in the Final Award, Telenor Mobile simply refers to that narrative and incorporates it by reference. Telenor Mobile notes that Storm does not challenge or question any of the factual findings made in the Final Award.

## ARGUMENT

Arbitration awards are subject to "very limited review" in order to ensure that "the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation" are met. Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993). Accordingly, "[t]he showing required to avoid summary confirmation of an arbitration award is high, and a party moving to vacate the award has the burden of proof." Willemijn Houdstermaaschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir. 1997) (citations omitted). Here, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), reprinted following 9 U.S.C.A. § 201, enacted into law by Chapter 2 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 201, et seq., governs.

Section 207 of the FAA provides as follows:

> Within three years after an arbitral award falling under the [New York] Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

The New York Convention, in turn, sets out strictly limited bases upon which a Court may decline to enforce an award in Article V. The one invoked by Storm is Article V(c), which

provides that enforcement of an award "may be refused" if the party opposing enforcement establishes that:

> The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . . .

In addition, Storm argues that the Final Award should be vacated because it is supposedly in "manifest disregard" of the law, a non-statutory ground applicable to awards subject to the New York Convention under <u>Yusuf Ahmed Alghanim & Sons v. Toys 'R' Us, Inc.</u>, 126 F.3d 15, 23-25 (2d Cir. 1997), <u>cert.</u> <u>denied</u>, 522 U.S. 1111 (1998). Both arguments are frivolous, and should be summarily rejected.

## I.   THE TRIBUNAL DID NOT MANIFESTLY DISREGARD THE LAW BY REFUSING TO FOLLOW THE UKRAINIAN JUDGMENTS

Storm's motion to vacate the Final Award is premised, in large part, on its contention that the Tribunal manifestly disregarded the law by declining to follow a series of judgments collusively procured against Storm in the Ukrainian courts by its own corporate parent, Alpren.[5] These decisions, all entered without notice to Telenor Mobile, purported to invalidate the Shareholders Agreement, including its arbitration clause, and also purported to enjoin Storm and Telenor Mobile from participating in the arbitration itself. As the Final Award provides, and as this Court previously held, those Ukrainian decisions do not bind the arbitrators. When tested under the "manifest disregard" – or, for that matter, any other – standard, the Ukrainian decisions that Storm procured against itself provide no basis for vacating the Final Award.

---

[5] The Ukrainian decisions on which Storm relies (Sills Decl. II, Exhs. 38, 86, 162 and 168) are referred to collectively as the "Ukrainian Judgments".

A party seeking to vacate an arbitration award on the basis of manifest disregard of the law must establish that (1) the arbitrators knew of a governing legal principle, yet refused to apply it or ignored it altogether; and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case. See, e.g., D. H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110-111 (2d Cir. 2006); Westerbeke Corp. v. Daihatsu Motor Corp., 304 F.3d 200, 209 (2d Cir. 2002); Alghanim, 126 F.3d at 23-24 (noting that the "error must have been obvious and capable of being readily and instantly perceived . . . Moreover, the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.") (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir. 1986)); Wizard v. Clipper Cruise Lines, 06 Civ. 2074, 2007 WL 29232, *5 (S.D.N.Y. Jan. 3, 2007) (Lynch, J.) ("Courts may not vacate an arbitration award merely because of an arguable difference regarding the meaning or applicability of laws . . .") (internal quotations and citations omitted).

Accordingly, manifest disregard for the law requires more than just an error or misunderstanding respecting the law. As the Second Circuit stated in Wallace, a "federal court cannot vacate an arbitral award merely because it is convinced that the arbitral panel made the wrong call on the law. On the contrary, the award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached." Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004) (emphasis added); see also Wizard, 2007 WL 29232 at *5.

The Final Award contains much more than the "barely colorable justification" for the Tribunal's conclusions that would be sufficient under Second Circuit precedent. Rather, the Award enforces, in accordance with its express terms, a written shareholders agreement

produced after a four year course of bargaining and negotiation between sophisticated commercial parties.  See Sills Decl. I, Exh. HH, pp. 1-10.  As the Tribunal held, and as Storm concedes, Telenor Mobile was not a party to any of the Ukrainian Judgments on which Storm relies, and was not even given prior notice of them.  Accordingly, Telenor Mobile cannot be bound by the Ukrainian Judgments, and the Tribunal was under no obligation to enforce the Ukrainian Judgments against Telenor Mobile.  Indeed, as both this Court and the Tribunal recognized, to do so would violate fundamental principles of due process.  Sills Decl. I, Exh. HH at 42; Sills Decl. II, Exh. 191, 30:12-21; see also Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 n. 7 (1979) ("[I]t is a violation of due process for a judgment to be binding on a litigant who was not a party or privy and therefore has never had an opportunity to be heard.").  Accordingly, even if the Tribunal could be said to have disregarded the Ukrainian Judgments in some respect, that would not constitute the disregard of a "governing legal principle," so as to satisfy the first prong of the "manifest disregard" standard.  See D.H.Blair & Co., 462 F.3d at 110-111.

The Tribunal also based its refusal to follow the Ukrainian Judgments on its finding that those judgments did not arise from adversary proceedings.  Sills Decl. I, Exh. HH, pp. 42-43.  The record shows that the Ukrainian actions were brought by Storm's corporate parent, Alpren, which, like Storm, is wholly owned by Altimo Holdings & Investments Limited ("Altimo").  Id. at pp. 2-3, 20-21.  In effect, therefore, the Ukrainian actions were brought by Storm against itself.  Id.  In those cases, Storm was not represented by counsel, and mounted essentially no defense.  Id. at p. 21.  The Tribunal correctly determined that:  (a) the Ukrainian actions were friendly contests between Storm and its parent, (b) the resulting decisions were not

products of adversarial proceedings, and (c) the Ukrainian Judgments were accordingly not entitled to any weight.[6] See Id. at pp. 42-43.

Far from evidencing manifest disregard of the law, those conclusions are entirely consistent with applicable New York law and elementary notions of due process. There is no *per se* rule requiring recognition of the orders of foreign courts. See, e.g., Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60-61 (2d Cir. 2004) (affirming the District Court's refusal to recognize collusively procured foreign judgments resulting from actions that were concealed from the plaintiffs and the courts); Bridgeway Corp. v. Citibank, 201 F.3d 134 (2d Cir. 2000). To the contrary, where a judgment is the product of collusive litigation between friendly parties, it should be afforded no weight, particularly in the absence of notice to the affected parties. See Motorola, 388 F.3d at 60. Indeed, the rule against the enforcement of collusive judgments has a long and unbroken pedigree. See, e.g., Lord v. Veazie, 49 U.S. 251, 255 (1850) (holding that where the "plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons . . . A judgment entered under such circumstances . . . is no judgment of the court. It is a nullity . . . "); see generally Charles A. Wright and Arthur R. Miller, 13 Federal Practice and Procedure § 3530 (3rd ed. 2004) (describing as "fundamental" the "rule against suits brought by cooperating interests for the purpose of affecting the interests of nonparties").[7]

---

[6] This Court previously held that the non-adversarial nature of the Ukrainian proceedings and the failure to give notice to Telenor entitled the Ukrainian proceedings to no weight. Storm LLC v. Telenor Mobile, No. 06 Civ. 13157, 2006 WL 3735657, 2006 U.S. Dist LEXIS 90978 at *12 (S.D.N.Y Dec. 15, 2006); see also Sills Decl. II, Exh. 191 at 32:1-25, 33:1-12).

[7] Storm relies principally upon the District Court's decision in Sea Dragon v. Gebr. Van Weelde Scheepvaartkantoor B.V., 574 F.Supp. 367 (S.D.N.Y. 1983), as support for its argument that the Tribunal's failure to recognize a foreign judgment gained through collusive litigation constitutes manifest disregard of the law. There is, of course, no such rule. Moreover, the decision in Sea Dragon was rendered over 20 year ago, does not bind this Court, and was decided on facts that are dramatically and materially different from those present here. In Sea Dragon, which involved a prior sequestration order entered by a Dutch court – an in rem proceeding, in which a Court has

The Tribunal further found that, in declaring the Shareholders Agreement invalid, the Ukrainian Judgments had failed to consider the question of the severability of the arbitration clause. Sills Decl. I, Exh. HH, pp. 24-25. The Ukrainian courts purported to invalidate "the Shareholders Agreement and the arbitration clause contained therein as its integral part . . ." and never addressed the invalidity of the severable arbitration clause. See Memorandum of Law in Opposition to Petition to Confirm and in Support of Motion to Vacate Arbitration Award ("Storm Opp."), pp. 7-8 (emphasis added).[8] The Tribunal accordingly concluded that there was nothing in the Ukrainian Judgments impeding the Tribunal's conclusion that the arbitration clause was a severable and valid agreement requiring the Parties to resolve their disputes through arbitration. Sills Decl. I, Exh. HH, pp. 24-25. In that regard, the Tribunal reaffirmed the Interim Award in the Final Award, noting that the "intervening judicial developments and the record developed in connection with [subsequent hearings] have actually reinforced the Tribunal's prior conclusions. . . ." Id. at p. 33. The Tribunal's interpretation of the Ukrainian Judgments is fully supported by the record, and in any event could not possibly constitute manifest disregard of the law.

Finally, Storm asserts in a footnote that the Final Award should be vacated pursuant to Article V(1)(a) of the New York Convention, which provides that an arbitral award may not be enforced "if there is an incapacity that renders the arbitration agreement void."

_____

significantly greater power to bind parties not before it than in an in personam proceeding – the District Court expressly held that the plaintiff had been given adequate notice and an appropriate opportunity to respond in the proceeding in the Netherlands, in which a specific fund had been ordered to be sequestered. As the Court stated, "respondent's unopposed position is that the Dutch Order was obtained in compliance with both Dutch law and American due process standards." Sea Dragon, 574 F.Supp. at 372, n.2 (emphasis added). Moreover, the respondent in Sea Dragon had been ordered by the arbitrators to take action in violation of the Dutch sequestration order. Here, in contrast the Tribunal in the Award did not order Storm to violate any Ukrainian statute or court order.

[8] The Tribunal's interpretation of the Ukrainian Judgments is buttressed by this Court's own endorsement of the conclusions set forth in the Interim Award. Sills Decl. II, Exh. 191 at 31:18-25 ("The Ukrainian courts were not actually asked to rule on the severability as such of the arbitration agreement, but the question was put to them whether the shareholders agreement was null and void, including the arbitration clause.").

Storm Opp. at n. 8. However, Storm ignores the relevant language of the treaty. Article V(1)(a)

of the New York Convention provides as follows:

> 1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>
>> (a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made . . . .

It is clear, however, that Storm's argument is not one of lack of capacity by Storm to contract, so

Storm has cited an irrelevant section of the treaty it invokes. Rather, Storm attempts to argue

that because the Ukrainian Judgments purport to invalidate the Shareholders Agreement, the

Shareholders Agreement falls within the reference in Article V(1)(a) to an agreement that "is not

valid." However, the New York Convention explicitly provides that invalidity of an agreement

is to be tested under "the law to which the parties have subjected [the agreement]," or, absent an

effective designation of governing law, the law "of the country where the award was made."

The Shareholders Agreement is expressed governed by New York law (Sills Decl.

II, Exh. 105 at § 13.06), and the Final Award was made in the United States. There can be no

serious argument that the Shareholders Agreement or its arbitration clause is invalid under either

New York law or federal law, and Storm does not even attempt to do so.

## II.    THE AWARD IS ENTIRELY CONSISTENT WITH NEW YORK'S PUBLIC POLICY

Storm also asserts that the Final Award should be vacated pursuant to Article

V(2)(b) of the Convention because enforcement of the Final Award would supposedly violate

New York or United States public policy by compelling Storm to violate decrees of a foreign

court, specifically the Ukrainian Judgments, and expose Storm to conflicting orders.[9]  As with its

contentions regarding manifest disregard of the law by the Tribunal, this argument is unavailing.

The public policy exception in Article V(2)(b) of the Convention is very narrow,

and applies only where enforcement of the award would violate "the most basic notions of

morality and justice" of the forum where enforcement is sought.  See, e.g., Europcar Italia,

S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 315 (2d Cir. 1998) (internal citations omitted).  As

the party opposing enforcement of the Final Award, Storm has the burden of proving that

enforcement would violate New York's public policy.  Id. at 313.  Far from any such violation,

enforcement will serve New York's strong policies of enforcing contracts and encouraging

arbitration.  See Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 49, 666 N.Y.S.2d 990,

995-96 (1997) (recognizing New York's "long and strong public policy favoring arbitration");

Miller v. Continental Ins. Co., 40 N.Y.2d 675, 679, 389 N.Y.S.2d 565, 568 (1974) (noting that

"the usual and most important function of courts of justice is . . . to maintain and enforce

contracts [rather] than to enable parties thereto to escape from their obligation on the pretext of

public policy . . .").

The public policy defense under the New York Convention is limited to the public

policy of the enforcing forum.  Europcar, 156 F.3d at 315 ("Article V(2)(B) of the Convention

allows a court to refuse enforcement where to do so would violate the public policy of the

enforcing state.") (emphasis added).  However, even if Ukrainian public policy were relevant

here, it is difficult to understand what "fundamental" public policy of Ukraine would be violated

by confirmation of an award enforcing a privately negotiated shareholders agreement, or by the

parties' compliance with the Final Award.  First, the relief granted by the Tribunal in the Final

---

[9] Article V(2)(b) of the Convention, provides that "[r]ecognition and enforcement of an arbitral award may also be refused if the competent authority in the country where enforcement is sought finds that . . . (b) The recognition or enforcement of the award would be contrary to the public policy of that county."

Award does not compel Storm to violate any Ukrainian statute or court order, whether valid or not. Rather, the Final Award was expressly intended to, and does, harmonize the requirements of the Shareholders Agreement and Ukrainian law. See Sills Decl I, Exh. HH at 58 and 66-67. It is implausible that it would be an affront to Ukrainian public policy that, in compliance with the Final Award, and to preserve the corporate governance scheme to which the parties agreed, affiliates of the two parties should be referenced in Kyivstar's charter as shareholders, or that Storm and its nominees should be required to participate in shareholders and board meetings, as they agreed to do. Second, Ukraine is a signatory not only to the New York Convention, but also to the European Convention on International Commercial Arbitration, and Ukraine has adopted, in its statute "On International Arbitration," virtually verbatim, the UNCITRAL Model Law on Arbitration. All of those treaties and that statute provide, in similar terms, for the recognition and enforcement of arbitral awards. Accordingly, Ukraine's stated public policy on the desirability of arbitration and the enforcement of arbitration awards would be served, and not violated, by an order of confirmation.

In American Const. Machinery & Equipment Corp. Ltd. v. Mechanised Const. of Pakistan Ltd., 659 F.Supp. 426, 429 (S.D.N.Y. 1987), the defendant, a Pakistani concern known as MCP, initially appeared in an arbitration, but then sought and obtained a Pakistani judgment invalidating both the arbitration and the arbitration clause of the relevant agreement. The arbitration nonetheless proceeded, and an award was rendered against MCP. The Court rejected MCP's argument that confirmation would violate public policy because of the Pakistani orders it had obtained, as follows:

> Respondent's contention based upon Article V(2)(b), that
> recognition of the award would be contrary to United States public
> policy is not persuasive. This defense is very narrow and is only
> applicable when enforcement "would violate the forum state's

11

> most basic notions of morality and justice." . . . .This is hardly such
> a case. Respondent urges that this Court conclude United States
> public policy would be offended by confirming an arbitral award in
> the face of a Pakistani judgment that the arbitration clause and
> proceeding were void. In fact, public policy would be violated if
> the Court declined to confirm the award. The Pakistani proceeding
> was, according to the Arbitrator, marked by MCP's 'omissions and
> positive misstatements.' Respondent had agreed to arbitrate,
> appeared in the proceeding, and then sought to circumvent the
> process. In light of this strategy, enforcing the award in no way
> violates this forum's notions of justice.

659 F. Supp. at 429 (citation omitted). Here, too, public policy will be served by enforcing the

Final Award.

## III.     STORM APPEARED IN THE ARBITRATION AND ENJOYED AMPLE OPPORTUNITIES TO PRESENT ITS CASE

Despite the voluminous record, including the reception into evidence of

statements of eleven witnesses presented by Storm during the course of the Arbitration, Storm

contends that that Award should be vacated because the Ukrainian order obtained by Storm

against itself purporting to enjoin its participation in the Arbitration rendered Storm unable to

present its case, requiring vacatur under Article V(1)(b) of the Convention.[10] Like all of Storm's

other contentions, this argument is meritless.

The governing standard under Article V(1)(b) of the New York Convention is the

forum state's standards of due process. See Parsons & Whittemore Overseas Co. Inc. v. Societe

Generale De L'Industrie Du Papier, 508 F.2d 969, 975 (2d Cir. 1974). "The fundamental

requirement of due process is the opportunity to be heard 'at a meaningful time and a meaningful

manner.'" Ukrneshprom State Foreign Economic Enterprise v. Tradeway, Inc., No. 95 Civ.

10278, 1996 WL 107285 at *5 (S.D.N.Y. Mar. 12, 1996) (internal citations and quotations

---

[10] Article V(1)(b) provides, in relevant part, that: "Recognition and enforcement of the award may be refused . . . [upon] proof that . . . (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case . . ." (emphasis added).

omitted). Accordingly, to obtain relief under Article V(1)(b), Storm must establish that it was denied the opportunity to be heard at a meaningful time or in a meaningful manner. As with the other bases to deny enforcement of the Final Award, Storm bears the burden of proving that it was denied an opportunity to present its case. Europcar, 156 F.3d at 313. Storm cannot meet that burden.

It is clear from the Final Award, as well as the Interim Award previously before this Court, that Storm was afforded an ample opportunity to be heard regarding all of the issues in the Arbitration, and that it took full advantage of that opportunity. Sills Decl. I, Exh. HH, pp. 19-20. It is true that Storm physically withdrew from one hearing, held on December 18, 2006, after its motion for an indefinite stay was denied by the Tribunal. Storm's purported basis for that withdrawal was its claim that to have remained in the hearing would have violated the Ukrainian injunction. First, because Storm had, in effect, obtained that injunction against itself, it provided no basis for not proceeding with the Arbitration. See Sills Decl. II, Exh. 191 at 34:16-23. Moreover, even then, the Tribunal proceeded with scrupulous care for Storm's rights. It stated on the record that no default would be entered, and that Telenor Mobile remained obligated to carry its burden of proof. See Sills Decl. II, Exh. 189 at 33: 3-10. In fact, in connection with the December 18 hearing, the Tribunal admitted into the record, and considered, four additional witness statements and numerous documents offered by Storm, although neither they nor any other of Storm's eleven witnesses were ever produced for cross-examination. The Tribunal likewise considered Storm's pre-hearing brief on the merits, and directed the parties to submit further briefs on certain of the issues raised by Storm.[11] Indeed, Storm's papers do not

---

[11] At the December 18 hearing, the following exchange between the Tribunal and Storm's counsel took place:

> THE CHAIRMAN: Let me ask a question of Pieter, because I just want to make
> sure it's clear in my mind. Are you participating on the merits, Pieter, with your

refer to any "evidence" or arguments it was supposedly barred from presenting to the Tribunal. Moreover, despite the ostensible need to comply with the Ukrainian injunction, Storm, when it suited its purposes, submitted additional briefing after the hearing from which it absented itself. See Sills Decl. I, Exhs. K, Q, S and HH at pp. 32-33. Storm had a full and fair opportunity to present its case, and its invocation of Article V(1)(b) is unavailing. See Phoenix Aktiengesellschaft v. Ecoplas, Inc., 391 F.3d 433, 438 (2d Cir. 2004).

## IV.    THE TRIBUNAL CORRECTLY DETERMINED THAT IT HAD JURISDICTION TO HEAR CONTRACT FORMATION ISSUES

Storm asserts that the Tribunal acted in manifest disregard of the law by supposedly (1) depriving Storm of a jury trial; and (2) failing to defer to the Court's jurisdiction under the "some evidence" standard applied in Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26 (2d Cir. 2001). Storm's contentions are meritless. Storm clearly waived its right to a jury trial by agreeing to be bound by an arbitration agreement under which the arbitrators determine their own jurisdiction. Moreover, the "some evidence" standard of Sphere

---

written submissions on the merits, or do you take the position that both orally and in writing you offer no evidence whatsoever on the merits of the underlying dispute?

MR. VAN TOL:  Our position has to be that we've already submitted papers and those can't be undone. They're before the tribunal. What we're barred from doing by the December 1 ruling is continuing with any arguments, hearing, et cetera, on the merits, so we're not presenting any new evidence because we're barred from doing so.

THE CHAIRMAN:  But you would ask us to consider your written submissions prior to the Ukrainian order on the merits of the dispute?

MR. VAN TOL:  I would think under fundamental due process and the FAA you would have to.

ARBITRATOR JENTES:  And this includes the prehearing submissions and the prehearing brief that we got on November 29th?

MR. VAN TOL:  Correct.

Sills Decl. II, Exh. 189 at 34:18-35:23.

<u>Drake</u> is not met on the facts of this case. Accordingly, the Tribunal did not act with "manifest disregard for the law"; rather, it acted in strict conformity with it.

**A.    <u>Storm Waived its Right to Jury Trial by Entering into the Arbitration Agreement</u>**

Storm waived its right to a jury trial when it agreed to resolve "[a]ny and all disputes and controversies arising under, relating to or in connection with [the Shareholders Agreement] . . . by arbitration by a panel of three (3) arbitrators under [UNCITRAL] Arbitration rules . . . ." Sills Decl. II, Exh. 105 at § 12.01.[12]  As the Supreme Court held in <u>First Options of Chicago v. Kaplan</u>, 514 U.S. 938, 943 (1995), the parties may contractually agree to allow the arbitrator to rule on his or her own jurisdiction under the arbitration agreement, and the Court must defer to that agreement. In contrast, if "the parties did <u>not</u> agree to submit the arbitrability question to arbitration, then the court should decide that question . . . independently." <u>Id</u>. (emphasis in original).

Accordingly, when, as here, parties incorporate arbitration rules that allow for the arbitrator to decide upon issues of jurisdiction and arbitrability, courts have consistently found that this serves as "clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." <u>Contec Corp. v. Remote Solution Co. Ltd.</u>, 398 F.3d 205, 208 (2d Cir. 2005) (finding that incorporation of the American Arbitration Association rules in the contract delegated the issue of arbitrability to the arbitrator); <u>see</u> <u>Shaw Group, Inc. v. Triplefine Intern. Corp.</u>, 322 F.3d 115, 123 (2d Cir. 2003) (finding that the incorporation of the International Chamber of Commerce rules delegated the issue of arbitrability to the arbitrator); <u>Termnix Int'l Co. v. Palmer Ranch LP</u>, 432 F.3d 1327, 1332-33 (11th Cir. 2005); <u>Way Services, Inc. v. Adecco</u>

---

[12] Storm is presumably not arguing that it was entitled to a jury trial before the arbitrators, but that a trial should have been held before this Court.

North America, LLC, 06 Civ. 2109, 2007 U.S. Dist LEXIS 44206 at *8-9, 2007 WL 1775393, at

3-5 (E.D.Pa, Jun. 18, 2007) (collecting cases).

The Shareholders Agreement incorporates, and is governed by, the UNCITRAL

Arbitration Rules, which provide that "[t]he Arbitral tribunal shall have the power to rule on

objections that it has no jurisdiction,[13] including any objections with respect to the existence or

validity of the arbitration clause or the separate arbitration agreement." UNCITRAL Arb. Rules,

Art. 21(1); see also Sills Decl. I, Exh. HH at 13 ("Sphere Drake did not involve an arbitration

clause incorporating rules similar to the UNCITRAL Rules, which expressly confer power on the

Tribunal to decide questions concerning its own jurisdiction. Accordingly, the present matter is

not one where the issue of jurisdiction must be referred to a court for resolution....").[14]

Therefore, the Shareholders Agreement and the UNCITRAL Arbitration Rules it incorporates

give the Tribunal, rather than a court (sitting with or without a jury), the authority to determine

whether an arbitration agreement was reached, and whether the arbitration is the correct forum to

hear any particular dispute, subject to review, like any other question within the arbitrators'

jurisdiction, for manifest disregard of the law.

In any event, there is no factual dispute that would call for a jury trial here. As

Judge Feinberg explained in affirming the denial of a demand for a jury trial in Doctor's Assocs.,

Inc. v. Distajo, 107 F.3d 126 (2d Cir. 1997):

Although a party may demand a jury trial when issues respecting
arbitrability are 'in issue,' 9 U.S.C. § 4, we have cautioned that '[a]

---

[13] Storm conceded at several points on the record that the Tribunal had jurisdiction to determine whether it had jurisdiction. See, e.g., Storm's Opp. at p. 16; Sills Decl. II, Exh. 202 at p. 12, Exh. 188 at 21:6-22:21.

[14] Storm's contention that the Tribunal "disregarded" Sphere Drake in the Award is simply wrong. Storm Opp. p. 15. The Tribunal stated in the Final Award that it determined it had jurisdiction over the ability to determine its jurisdiction, and to hear the issues "[f]or the reasons spelled out more fully in its Partial Final Award Regarding Jurisdiction." Sills Decl. I, Exh. HH, p. 23. As the Final Award shows, the Tribunal carefully analyzed and distinguished Sphere Drake.

> party resisting arbitration . . . 'bears the burden of showing that he
> is entitled to a jury trial.' . . . As when opposing a motion for
> summary judgment under Fed.R.Civ.P. 56, the party requesting a
> jury trial must 'submit evidentiary facts showing that there is a
> dispute of fact to be tried.'

Id. at 129-30 (citations omitted). See Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 961

F.2d 1148, 1154 (5th Cir. 1992) (party opposing arbitration "cannot obtain a jury trial merely by

demanding one"), cert. denied, 506 U.S. 1079 (1993).

Here, Storm has not, and cannot, demonstrate that there is any factual dispute

regarding "the making of the agreement for arbitration." It is uncontested that Valeriy Nilov,

Storm's general director, signed the Shareholders Agreement, and that, simply by virtue of his

status as General Director of Storm, he had authority to bind the company to arbitrate a

contractual dispute.[15] See Sills Decl. I, Exh. HH at pp. 44-53. Moreover, the facts determined

by the Tribunal regarding the negotiation and execution of the Shareholders Agreement as a

whole, set out in detail at pages 4 through 14 and 43-44 of the Final Award, are likewise

uncontested. While Storm disagrees with the legal conclusions to be drawn from those facts, that

is not the province of a jury, even assuming that Storm had not agreed that all issues of contract

validity would be decided by the arbitrators.

Finally, under either federal law or New York law, any argument that the

Shareholders Agreement was not validly executed is frivolous. As the Tribunal found, and as the

record amply shows, the Shareholders Agreement was carefully negotiated by sophisticated

parties; there was a formal meeting of Storm's participants to approve execution of the

Shareholders Agreement; modifications were thereafter made at Storm's request and for its

---

[15] Whether the question of arbitrability here is governed by federal or New York law, the arbitration agreements are severable from the contracts of which they form a part. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 360 F.2d 315, 317 (2d Cir. 1966); Weinrott v. Carp, 32 N.Y.2d 190, 198, 344 N.Y.S.2d 42, 47 (1973). Storm has never contended that Mr. Nilov lacked authority to enter into a separate arbitration agreement.

benefit; Mr. Nilov, Storm's chief executive officer, executed the contract;[16] Storm provided

formal written assurances that Mr. Nilov had authority to do so; Storm performed its obligations

under the contract for approximately two years after executing it; and Storm received extremely

valuable rights in exchange for executing the Shareholders Agreement. See Sills Decl. I, Exh.

HH at pp. 4-14, 44-53. There can be no serious argument that the Shareholders Agreement,

including its arbitration clause, is anything other than a valid and enforceable agreement.

V.    **THE TRIBUNAL ACTED WELL WITHIN THE SCOPE OF THE SHAREHOLDERS AGREEMENT AND APPLICABLE LAW IN ORDERING CONDITIONAL DIVESTITURE**

Storm asserts that the Tribunal acted improperly by ordering Storm to divest its

shares in Kyivstar within 120 days, unless Storm's affiliates divest their shares in Turkcell

İletişim Hizmetleri A.Ş. ("Turkcell") and Ukrainian High Technologies ("UHT"). Storm argues

not only that the Tribunal exceeded its powers in entering that order, but also asserts that Telenor

Mobile is not entitled to such a decision because "the order goes far beyond the . . . relief that

Telenor Mobile sought in the arbitration." Storm Opp. at p. 18. The record shows that, in

ordering conditional divestiture and granting the relief specifically requested by Telenor Mobile,

the Tribunal acted well within the powers conferred upon it by the Shareholders Agreement and

governing law.

Storm's claim that only its conduct, and not that of its affiliates, could violate the

non-compete clause of the Shareholders Agreement flies in the face of the express language to

which Storm agreed in the Shareholders Agreement. The Shareholders Agreement provides as

follows:

---

[16] As the Tribunal noted, Storm sought, and obtained, an adjournment in order to call Mr. Nilov as a witness and then failed to produce him, or even to provide his affidavit.

> [N]o Shareholder or any of its Affiliates will, without the prior
> written consent of the Company and the other Shareholders, (i)
> engage in the Business in any region in Ukraine, (ii) own or
> control, directly or indirectly, more than five percent (5%) of the
> voting capital stock in any Person (other than [Kyivstar] or any of
> its Controlled Affiliates) engaged in the Business in any region in
> Ukraine or (iii) permit any of its Controlled Affiliates (other than
> [Kyivstar] or any of its Controlled Affiliates) to engage in the
> Business in any region in Ukraine or own or control, directly or
> indirectly, more than five percent (5%) of the voting capital stock
> in any Person (other than [Kyivstar] or any of its Controlled
> Affiliates) engaged in the Business in any region in Ukraine.

Sills Decl. II, Exh. 105 at § 6.02.  (emphasis added).

Storm has not disputed, either before the Tribunal or here, that Altimo, the

indirect corporate parent of Storm, holds more than a 5% interest in Astelit, a Turkcell subsidiary

that is a provider of wireless mobile telecommunications in Ukraine and a competitor of

Kyivstar, or that Altimo is an "Affiliate" of Storm, as such term is defined in the Shareholders

Agreement.[17]  Similarly, Storm does not dispute that Ukrainian High Technologies, a provider of

"WiMax" wireless telecommunications services that compete with Kyivstar in Ukraine, is

likewise owned by Russian Technologies, a subsidiary of the Alfa Group Consortium (the "Alfa

Group") and is an "Affiliate" of Storm, as that term is defined in the Shareholders Agreement.[18]

In support of its argument that the order of the Tribunal in the Final Award is

"over-reaching," Storm provides an elaborate discussion of the requirements for binding non-

signatories to an arbitration agreement, as set out in Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64

F.3d 773, 776 (2d Cir. 1995); but those theories are not relevant here.  Unlike Thomson, where

the claimant sought to arbitrate against Thomson even though Thomson was not a party to the

---

[17] Altimo holds its 100% interest in Storm through two Cyprus shell corporations, Alpren and Hardlake.  Sills Decl.
I, Exh. HH at p. 2.

[18] Before the Tribunal, Storm did dispute that WiMax services came within the scope of the non-compete in the
Shareholders Agreement, but that question was resolved against Storm by the Tribunal.  Id. at pp. 58-61.

arbitration agreement at issue, the Tribunal here granted relief only against Storm.  While it is true that Storm's obligation to divest its Kyivstar shares is contingent on the conduct of its affiliates, Altimo and Russian Technologies, the relationship between Storm's obligations and the conduct of its affiliated entities flows directly from the structure of the Shareholders Agreement, as negotiated by the Alfa Group and Storm.  Under the terms of Section 6.02 of the Shareholders Agreement, Storm, in effect, took upon itself the risk that its affiliates would breach the non-compete clause, as the express language of the contract provides.  Indeed, a non-compete clause that applied only to Storm, a shell corporation with only one asset, its shares in Kyivstar, and not to other entities under common control, would be meaningless.  It was therefore eminently reasonable for the non-compete clause in the Shareholders Agreement to be triggered by investments in competitive businesses made by other members of the Alfa Group.[19]

The rule is that "[a]rbitrators . . . enjoy broad discretion to create remedies unless the parties' agreement specifically limits this power."  See Orlogin, Inc. v. U.S. Watch Co., No. 90 Civ. 1106, 1990 WL 364470 at *1, 3-4 (S.D.N.Y. Jun. 25, 1990) (under broad arbitration clause allowing arbitrators to resolve "any dispute or controversy arising between or among the parties," arbitrators had power to dissolve partnership even though prerequisites for dissolution provided in the partnership agreement had not been fulfilled).  "While an arbitrator's award must 'draw its essence' from the parties' agreement . . . the effectiveness of arbitration in resolving complicated commercial disputes would be severely undermined if arbitrators were limited to the mechanical application of contested contractual provisions."  Millicom Int'l V N.V. v. Motorola,

---

[19]The record shows that the non-compete was actively negotiated.  In particular, as the Tribunal noted, Storm negotiated for, and received, an exemption from the non-compete clause for what was then Alfa Telecom's (and is now Altimo's) investment in Golden Telecom, Inc. ("Golden"), subject to a prohibition on a board interlock.  Sills Decl. I, Exh. HH at 60; Sills Decl. II, Exh. 105, Schedule 4.  In view of the fact that Storm does not have, and never has had, an interest in Golden, that is powerful evidence that the non-compete clause means exactly what it says, and was always so understood by Storm.

Inc., No. 01 Civ. 2668, 2002 WL 472042, *7 (S.D.N.Y. Mar. 28, 2002). Accordingly, if the

parties' arbitration clause does not include any limit on the arbitrators' powers to craft a remedy,

a respondent must "overcome a powerful presumption that the arbitral body acted within its

powers." Millicom, 2002 WL 472042 at *6, quoting Parsons, 508 F.2d at 976 (emphasis added).

     Accordingly, while an arbitrator may not award relief expressly forbidden by the

agreement of the parties, an arbitrator may award relief not sought by either party, so long as he

or she acts within the very broad discretion conferred by the Federal Arbitration Act. See Carte

Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd., 888 F.2d 260, 266 (2d Cir. 1989);

Sanluis Developments, L.L.C. v. CCP Sanluis, L.L.P., 06 Civ. 11531, 2007 U.S. DIST. LEXIS

56572, at *17-18, 2007 WL 2219115, *6 (S.D.N.Y. Aug. 2, 2007). Here, far from limiting the

remedial powers of the Tribunal, the Shareholders Agreement states as follows:

> The arbitrators shall have the power to grant any remedy or relief
> that they deem just and equitable and that is [in] accordance with
> the terms of this Agreement, including specific performance, and
> including, but not limited to injunctive relief, whether interim or
> final, and any such relief and any interim, provisional or
> conservatory measure ordered by the arbitrators may be
> specifically enforced by any court of competent jurisdiction . . ..

Sills Decl. II, Exh. 105 at § 12.01(a)(v). That power is granted with regard to "[a]ny and all

disputes and controversies arising under, relating to or in connection with" the Shareholders

Agreement. Id. at § 12.01(a). The conditional divestiture order is well within that broad

contractual grant.

     Storm's assertion that Telenor Mobile only "sought money damages in the

arbitration for the breach of the non-competition provision and included in its submission only a

boilerplate, cursory request referring to equitable relief" is simply false. Storm Opp. pp. 18-19

(citation omitted). In its Proposed Findings of Fact and Conclusions of Law, Telenor Mobile

stated as follows:

> It is true that the Panel cannot order an Alfa party other than Storm to divest all or part of a business, but that goes to the remedy for violation of the Shareholders Agreement, rather than liability for the violation itself . . . Here, the Panel should enter an award (a) declaring that the non-competition clause has been violated, and that the violation will be cured if Altimo's interests in Turkcell and UHT are divested within a reasonable time to be fixed by the Panel. If those interests are not so divested, then Storm, over which the Panel does have jurisdiction, should be compelled to sell its interest in Kyivstar in accordance with the provisions of the Shareholders Agreement.

Sills Decl. I, Exh. B at p. 68.[20]

Section 6.02 of the Shareholders Agreement specifically prohibits Storm "or any of its Affiliates" from engaging in the telecommunications business in Ukraine or "owning or controlling, directly or indirectly, more than five percent of the stock in any telecommunications business in Ukraine . . . ." The double breach of the non-compete clause found by the Tribunal, triggered the provisions of Section 12.01, leaving the Tribunal to craft an appropriate remedy. There is no basis to disturb the Tribunal's exercise of its discretion.

## VI.  THERE IS NO BASIS TO DISTURB THE ANTI-SUIT INJUNCTION ENTERED BY THE ARBITRATORS

As the Tribunal found, and as this Court is well aware, Storm has waged an unrelenting campaign of litigation in the Ukrainian courts to undermine the Shareholders Agreement. As part of the Final Award, the Tribunal granted the anti-suit injunction sought by Telenor Mobile. Storm now attacks that award as beyond the scope of the Tribunal's powers.

As set out above, the Shareholders Agreement gives the arbitrators broad equitable powers. Because Storm has repeatedly violated its contractual undertaking to arbitrate all disputes, an injunction to enforce that undertaking is entirely appropriate. Moreover, as the

---

[20] In its original and amended statements of claim, Telenor Mobile requested that the Tribunal "[g]rant . . . Telenor Mobile appropriate relief in respect of violations of Section 6.02 of the Shareholders Agreement." See Sills Decl. II, Exh. 2 at p. 18; see also Sills Decl. II, Exh. 4 at 21. It is hardly manifest error for arbitrators to grant relief sought generally in a statement of claim and more specifically later in the proceedings.

Tribunal found, Storm's campaign of litigation is in direct violation of its express obligation of good faith performance of the Shareholders Agreement, set out in Section 2.05(b)(ii), as well as the express terms of Section 2.03(b), of the Shareholders Agreement.

Storm's litigation in Ukraine includes actions against Kyivstar and its auditor, Ernst & Young, which have halted Kyivstar's efforts to have its 2006 financial statements audited and have prevented Kyivstar from providing financial information to its majority owner, Telenor Mobile. Storm claims that those lawsuits are "collateral" matters outside the scope of the arbitration agreement. The Tribunal, however, found that the Ernst & Young actions were "intimately related to issues already submitted to the Tribunal and fully within the broad scope of the Tribunal's jurisdiction." Sills Decl. I, Exh. HH at 63. Given the very broad arbitration clause here, the applicable test for arbitral jurisdiction is whether the claims at issue merely "touch matters" within the contract. See Ace Capital Re Overseas Ltd v. Central United Life Ins. Co., 307 F.3d 24, 26-28 (2d Cir. 2002). Under that standard, there is, no possible basis to set aside the Tribunal's finding, and Storm's suggestion that it is manifest error is absurd.

The fact that the litigation enjoined by the Tribunal is against third parties does not remove it from the scope of the Tribunal's jurisdiction. In Rintin Corp. v. Domar, Ltd., 476 F.3d 1254 (11th Cir. 2007), the arbitrators granted an anti-suit injunction halting litigation against third parties. In rejecting the motion to vacate the award, the Court of Appeals stated as follows:

> [T]he Arbitrators found it necessary, in order to enforce the Agreement, to compel termination of the suits against the affiliates and their officers. The district court also found that termination of the foreign suits was indispensable to granting relief to Domar because Rintin's suits threatened the 'foundational documents of [Dominicana]' that defined Rintin's and Domar's rights with each other and with Dominicana. Neither the Shareholder's Agreement nor the American Arbitration Association's International

> Arbitration Rules (which the Shareholder's Agreement specifies as
> the rules by which the arbitration shall proceed) limit the
> Arbitrators' power to award equitable relief. The Arbitrators did
> not clearly err in concluding that the order to cease litigating
> against the affiliates and their officers was an essential part of the
> remedy in the arbitrable dispute.

Rintin, 476 F.3d at 1260-61 (footnote and citations omitted).

Finally, Storm claims that the Tribunal exceeded its powers by enjoining litigation by Altimo and Alpren, but that is not the case.[21] The Tribunal enjoined Storm "and anyone acting in concert with it," from (a) commencing or prosecuting litigation "under, relating to, or in connection with" the obligations under the Shareholders Agreement, (b) enforcing the December 29 Injunction, which prevented Ernst & Young from conducting the Kyivstar audit or (c) taking actions "to hinder or preclude" Telenor Mobile or Ernst & Young from carrying out "their rights and obligations under the Shareholders Agreement or other pertinent agreements with Kyivstar." Sills Decl. I, Exh. HH at pp. 67-68. An injunction against litigation being pursued in derogation of an arbitration agreement is not unusual; indeed, this Court has already granted one in the course of this dispute. See Storm, 2006 WL 3735657 at *14; Indosuez Int'l Finance, B.V. v. Nat'l Reserve Bank, 304 A.D.2d 429, 430-31, 758 N.Y.S.2d 308, 310-311 (2d Dep't 2003) (affirming grant of permanent injunction against foreign litigation in light of "defendant's repeated and relentless resort to foreign forums" despite arbitration clause).

An injunction issued by a federal or state court ordinarily runs against those acting in concert with the enjoined party, as Rule 65(d) provides, and it can hardly be manifest disregard of the law for the Tribunal to have put such language in the Final Award. If the Ukrainian litigation ostensibly being pursued by Altimo and Alpren continues, then it will

---

[21] It is not at all clear why Storm would have standing to raise claims on behalf of Altimo and Alpren, especially given Storm's claims that they are independent actors.

become necessary to determine in a future contempt proceeding whether they are acting in concert with Storm, but that is a question for another day.[22]  The injunction entered by the Tribunal was well within its jurisdiction, and there is no basis to disturb it.

## CONCLUSION

Telenor Mobile respectfully requests that this Court grant, in its entirety, Telenor Mobile's motion to confirm the Final Award and deny Respondent Storm's motion to vacate.

Dated: New York, New York
      August 30, 2007

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: Robert L. Sills

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
666 Fifth Avenue
New York, New York  10103
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151

---

[22] A contempt proceeding is not the only means by which the Tribunal's injunction can be enforced against Altimo and Alpren.  In Storm, this Court held that "[t]he same alter-ego theory that provides for jurisdiction over Altimo and Alpren also leads the Court to conclude that Telenor is likely to succeed in establishing that Altimo and Alpren are bound by the Arbitration Agreement."  Storm, 2006 WL 3735657 at *14 (S.D.N.Y. Dec. 15, 2006).  However, under the Second Circuit's decision in Orion Shipping v. Eastern States Petroleum Corp. of Panama, 312 F.2d 299, 301 (2d Cir. 1963) a proceeding for confirmation of an arbitral award is not the occasion to sort out the details of "the corporate relationship between a party bound by an arbitration award and its purported 'alter ego.'"  Rather, the court should "simply . . . determine whether the arbitrator's award falls within the four corners of the dispute as submitted to him."  Accordingly, any claims that Alpren or Altimo are alter egos of Storm could not be joined in this proceeding at this time.