UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                                        :

TELENOR MOBILE COMMUNICATIONS AS,     :
                                                      :
                          Petitioner,      :
                                                      :
               - against -                :          **07 Civ. 6929 (GEL)**
                                                        :
STORM LLC,                                    :          ECF Case
                                                        :
                             Respondent.    :
                                                           :
-------------------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF STORM LLC'S MOTION FOR STAY PENDING APPEAL OR TEMPORARY STAY

LOVELLS LLP

Pieter Van Tol (PVT-2445)
Gonzalo S. Zeballos (GZ-5994)
Johanne Houbouyan

590 Madison Avenue
New York, New York 10022
Tel: (212) 909-0600
Fax: (212) 909-0660

*Attorneys for Respondent Storm LLC*

**Table of Contents**

**Page**

Preliminary Statement.................................................................................................. 1

Argument ....................................................................................................................... 2

I.     THE SECOND CIRCUIT HAS ESTABLISHED A "SLIDING SCALE" TEST FOR STAY MOTIONS................................................................................................... 2

II.    THE FOUR FACTORS WEIGH HEAVILY IN FAVOR OF A STAY ........................... 3

     A.    Storm Will Be Irreparably Harmed if the Stay Is Not Granted ...................... 4

     B.    Telenor Mobile Would Not Suffer "Substantial Injury" if a Stay Were Issued................................................................................................ 5

     C.    Public Policy Considerations Weigh in Favor of Staying Judgment ............... 7

     D.    There Is Far More than a "Substantial Possibility" Here that Storm Will Succeed on Appeal ........................................................................... 8

          1.    There Are Several Issues on Appeal Relating to Contract Formation that Easily Satisfy the "Substantial Possibility" of Success Standard......................................................................... 8

               a)  Manifest Disregard .................................................................. 8

                  (1) Right to a Jury Trial .......................................................... 8

                  (2) Recognition of Ukrainian Decisions ................................. 17

               b)  Independent Determination........................................................ 21

          2.    The Court's Ruling on the Public Policy Basis for Vacatur Provides Further Support for Storm's Appeal ...................................... 22

III.   EVEN IF THE COURT DENIES A STAY PENDING APPEAL, A TEMPORARY STAY IS WARRANTED ............................................................................... 24

Conclusion .................................................................................................................. 25

## Table of Authorities

Page

**Cases**

*Ackermann v. Levine*,
   788 F.2d. 830 (2d Cir. 1986) ...........................................................................19

*Am. Const. Mach. & Equip. Corp. Ltd. v. Mechanised Const. of Pakistan Ltd.*,
   659 F. Supp. 426 (S.D.N.Y. 1987) ...................................................................23

*Bank of America v. Diamond State Ins. Co.*,
   2002 WL 1378683 (2d Cir. June 26, 2002) ......................................................11

*Becker v. DPC Acquisition Corp.*,
   No. 00 Civ. 1035 (WK), 2002 WL 1144066 (S.D.N.Y. May 30, 2002) .............11

*Benckiser Consumer Prods., Inc. v. Kasday*,
   No. 97 Civ. 5389, 1998 WL 677631 (S.D.N.Y. Sept. 30, 1998).......................12

*Bensadoun v. Jobe-Riat*,
   316 F.3d 171 (2d Cir. 2003) ............................................................................12

*Bristol Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
   973 F.2d 1033 (2d Cir. 1992) ..........................................................................18

*Cargill, Inc. v. Sears Petroleum & Transp. Corp.*,
   No. 5:03 CV 0530 (DEP), 2004 WL 3507329 (N.D.N.Y. Aug. 27, 2004) ...........5

*Centauri Shipping Ltd. v. Western Bulk Carriers KS*,
   No. 07-CV-4761 (RJS) (HBP), 2007 WL 3025706 (S.D.N.Y. Oct. 12, 2007) ...............3, 24

*China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp.*,
   334 F.3d 274 (3d Cir. 2003) ......................................................................13, 21

*Diapulse Corp. of Am. v. Carba, Ltd.*,
   626 F.2d 1108 (2d Cir. 1980) ..........................................................................23

*Herlofson Mgmt. v. Ministry of Supply*,
   No. 88 CIV. 7542 (RLC), 1989 WL 111083 (S.D.N.Y. Sept. 19, 1989) .....................10, 12

*Hirschfeld v. Board of Elections*,
   984 F.2d 35 (2d Cir. 1993) ................................................................................2

*In re Advanced Mining Sys., Inc.*,
   173 B.R. 467 (S.D.N.Y. 1994).............................................................................4

*In re Albicocco*,
   No. 06-CV-3409 (JFB), 2006 WL 2620464 (E.D.N.Y. Sept. 13, 2006) .............24

*In re Azores Int'l Shipping, Inc.*,
   No. 99 Civ. 850 (JSM), 1999 WL 493380 (S.D.N.Y. July 9, 1999) ...................11

*In re Brunswick Baptist Church*,
   Nos. 1:05-CV-1085, 1:05-CV-1203, 2007 WL 294087 (N.D.N.Y. Jan. 25, 2007)...........24

*In re Country Squire Assocs. of Carle Place, L.P.*,
   203 B.R. 182 (2d Cir. BAP 1996)....................................................................4, 7

*In re Sphere Holding Corp.*,
  162 B.R. 639 (E.D.N.Y. 1994) ........................................................................... 7

*In re St. Johnsbury Trucking Co.*,
  185 B.R. 687 (S.D.N.Y. 1995) ........................................................................... 4

*Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*,
  462 F.2d 673 (2d Cir. 1972) ......................................................................... 9, 11

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  500 F.3d 111 (2d Cir. 2007) ............................................................................ 19

*Miller v. LeSea Broadcasting, Inc.*,
  927 F. Supp. 1148 (E.D. Wis. 1996) ........................................................... 2, 4, 7

*Mohammed v. Reno*,
  309 F.3d 95 (2d Cir. 2002) ................................................................................ 3

*Par-Knit Mills, Inc. v. Stockbridge Fabrics Company*,
  636 F.2d 51 (3d Cir. 1980) .............................................................................. 12

*RxUSA Wholesale, Inc. v. Dep't of Health and Human Serv.*,
  467 F. Supp. 2d 285 (E.D.N.Y. 2006) .............................................................. 18

*Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.*,
  547 F. Supp. 367 (S.D.N.Y. 1983) ................................................... 19, 20, 21, 23

*Sphere Drake v. Clarendon Nat'l Ins. Co.*,
  263 F.3d 26 (2d Cir. 2001) .......................................................................passim

*Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Café*,
  566 F.2d 861 (2d Cir. 1977) ............................................................................ 15

*Stolt-Nielsen Transp. Group v. Edible Oil Trad. Corp.*,
  No. 06 Civ. 0703 (NRB), 2007 WL 194182 (S.D.N.Y. Jan. 24, 2007) ................. 21

*Thapa v. Gonzales*,
  460 F.3d 323 (2d Cir. 2006) .............................................................................. 3

*U.S. v. Fox*,
  M-18-304 (ADS), 1983 WL 1586 (S.D.N.Y. Feb. 14, 1983) ................................ 4

*University of Texas v. Camenisch*,
  451 U.S. 390 (1981) ....................................................................................... 18

**Statutes**

Fed. R. Civ. P. 62(c) .................................................................................. 1, 2, 24

Fed. R. Civ. P. 62(d) ........................................................................................... 2

Fed. R. Civ. P. 8(a) ............................................................................................. 1

**Other Authorities**

11 C. Wright & A. Miller, *et al.*, FED. PRAC. & PROC. § 2905 (1995) ...................... 2

Respondent Storm LLC ("Storm") respectfully submits this memorandum of law, together with the Declaration of Pieter Van Tol, dated November 15, 2007 (the "Van Tol Decl."), in support of its motion, pursuant to Rule 62(c) of the Federal Rules of Civil Procedure (the "Federal Rules"), for an order staying the enforcement of the Court's November 2, 2007 Opinion and Order (the "Order") and judgment entered the same day (the "Judgment") pending the conclusion of Storm's appeal or, in the alternative, temporarily staying the enforcement of the Order and Judgment to enable Storm to apply to the United States Court of Appeals for the Second Circuit for a stay pursuant to Rule 8(a) of the Federal Rules of Appellate Procedure.

## Preliminary Statement

The four factors for the issuance of a stay weigh heavily in favor of a stay pending Storm's appeal from the Order and Judgment, which was filed on November 6, 2007.

One of the key factors in the Rule 62(c) analysis (as with any stay) is irreparable harm. In the absence of a stay, Storm would suffer irreparable harm. The enforcement of the Order and Judgment would jeopardize Storm's ability to pursue its appeal and obtain meaningful relief from the Court of Appeals. In similar circumstances, courts in this Circuit have held that the potential for the mooting of an appeal constitutes irreparable harm. Also, the award (the "Final Award") issued by the tribunal (the "Tribunal") in the underlying arbitration contains several forms of relief — including the forced sale of interests in certain companies — that would be very difficult to reverse, if not impossible, in the event Storm prevails on its appeal. The courts have held that concerns that such forced transactions cannot (or might not) be undone will justify a finding of irreparable harm on a stay application.

The remaining factors further support the issuance of a stay. As explained below, Storm has a number of strong arguments on appeal. Thus, Storm has made the required showing of a

"substantial possibility" of success, which is the standard for the "success" prong on stay applications. Moreover, Storm comes out well ahead of Telenor Mobile Communications AS ("Telenor Mobile") on the balancing of harms, since any damage to Telenor Mobile (which it could not prove in the arbitration) is far outweighed by the potential irreparable injury to Storm. Lastly, no public interest would be adversely affected by the issuance of a stay.

The circumstances here warrant a stay pending appeal.

**Argument**

## I.   THE SECOND CIRCUIT HAS ESTABLISHED A "SLIDING SCALE" TEST FOR STAY MOTIONS

Pursuant to Rule 62(c) of the Federal Rules, district courts may stay a judgment granting injunctive relief for the purpose of preserving the *status quo* while such judgment is appealed. Fed. R. Civ. P. 62(c). The nature of the relief granted in the Final Award is "an order to do rather than an order to pay," which makes it analogous to mandatory injunctive relief and brings this motion within the scope of Rule 62(c) rather than Rule 62(d). *See, e.g., Miller v. LeSea Broadcasting, Inc.*, 927 F. Supp. 1148, 1151 (E.D. Wis. 1996) (holding that application for stay pending appeal of judgment ordering sale of company was analogous to injunctive relief and therefore properly analyzed under Fed. R. Civ. P. 62(c)). *See generally* 11 C. Wright & A. Miller, *et al.*, FED. PRAC. & PROC. § 2905 (1995).

The Second Circuit has established a four-factor test for determining whether a district court should grant a discretionary stay pursuant to Rule 62(c): "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued; (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal; and (4) the public interests that may be affected." *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir. 1993) (internal quotations omitted) (emphasis added). To prevail on a motion to stay, a party need not show that all four factors have been met.

2

*See Centauri Shipping Ltd. v. Western Bulk Carriers KS*, No. 07-CV-4761 (RJS) (HBP), 2007 WL 3025706 at *3 n.4 (S.D.N.Y. Oct. 12, 2007) (rejecting "failure as to one, failure as to all" standard proposed by party opposing stay). Rather, the four factors will be balanced as a whole. *See, e.g., Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (weighing all four factors in assessing stay motion).

It is well established that the four factors are weighed on a "sliding scale" basis, which means that "the necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (citations and internal quotations omitted). As a result, the Second Circuit has held that the standard for the "substantial possibility" of success factor is inversely proportional to the amount of irreparable harm suffered by the movant. *Mohammed*, 309 F.3d at 101. "Simply stated, more of one excuses less of the other." *Id.* (citation and internal quotation omitted).

## II.   THE FOUR FACTORS WEIGH HEAVILY IN FAVOR OF A STAY

The potential harm to Storm is irreparable because several facets of the relief set forth in the Final Award either cannot be reversed or would be very difficult to reverse if Storm were to prevail on appeal. Moreover, the enforcement of the Order and Judgment could render Storm's appeal moot. Although the irreparable harm present in this case lowers the showing that Storm must make with regard to the "success" element of the four-factor test, Storm's well-founded appellate arguments on the complex issues decided in the Order — which involve (among other things) the rejection of several foreign court judgments, the denial of a jury trial, and an independent determination regarding contract validity — demonstrate that Storm has more than a "substantial possibility" of success. By contrast, Telenor Mobile cannot show that it will suffer "substantial injury" if a stay were granted (especially when compared to Storm's potential harm), nor can it identify a public interest that would be adversely affected by a stay.

3

**A.    Storm Will Be Irreparably Harmed if the Stay Is Not Granted**

Courts in this Circuit have held that the risk that an appeal may become moot in the absence of a stay satisfies the irreparable injury requirement. *See, e.g., In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 183 (2d Cir. BAP 1996) (holding that, without a stay, a foreclosure sale ordered by the lower court would render the appeal moot and thereby result in the "quintessential form of prejudice" to the movant); *In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 690 (S.D.N.Y. 1995) (holding that the "risk that [the moving party's appeal] will be mooted absent a stay" constitutes irreparable injury); *In re Advanced Mining Sys., Inc.*, 173 B.R. 467, 468-469 (S.D.N.Y. 1994) (finding that, in the absence of a stay, the distribution of assets to creditors would moot any appeal and would be "a quintessential form of prejudice"); *U.S. v. Fox*, M-18-304 (ADS), 1983 WL 1586 at *1 (S.D.N.Y. Feb. 14, 1983) (stating that movant would be "faced with irreparable harm" without a stay because he would lose his ability to appeal).

Here, the divestiture order in the Final Award requires Storm to sell its shares in Kyivstar G.S.M. JSC ("Kyivstar") unless Storm's affiliates (which Storm does not control) divest themselves of their interests in Astelit LLC ("Astelit") and Ukrainian High Technologies ("UHT"). Once Storm divests its shares in Kyivstar, or its affiliates divest themselves of the interests in the two allegedly competing companies, the purchaser (or purchasers) could in turn sell the assets to others. Thus, Storm or its affiliates cannot guarantee that the original transaction could be reversed or that the property could be returned in the event Storm is successful on appeal.

The defendant faced the same situation in *Miller v. LeSea Broadcasting, Inc.*, 927 F. Supp. 1148 (E.D. Wis. 1996). The *Miller* court had granted summary judgment to Miller and ordered LeSea to perform its contract with Miller by selling him a television station, Channel 55. *Id.* at 1149. LeSea appealed and moved for a stay. The court granted a stay, stating that:

4

> LeSea could suffer significant injury absent a stay of the specific performance
> portion of the judgment.  Without a stay, the defendant will be forced to proceed
> with a sale of Channel 55 to Mr. Miller, who in turn may sell the station to some
> third party.  It could be difficult, if not impossible, to undo the sale if LeSea is
> forced to complete the sale of Channel 55 to Mr. Miller at this time and if the
> appeal is subsequently resolved in favor of LeSea.

*Id.* at 1152.  Thus, the divestiture order in the Final Award, by itself, justifies the conclusion that

Storm would suffer irreparable harm in the absence of a stay.

Other portions of the relief in the Final Award provide further support for a finding of

irreparable injury.  The Tribunal ordered Storm to take a number of steps concerning the

corporate governance of Kyivstar.  (*See* Final Award, Ex. A to Van Tol Decl., at 66-67.)  As with

divestiture, several of the actions that Storm would have to take pursuant to the Final Award are

irreversible or the ability to reverse them is in doubt.  For example, the Tribunal has ordered

Storm to "participate in good faith in the direction and management of Kyivstar's business."  (*Id.*

at 67.)  This, in turn, is likely to involve third parties who do business with Kyivstar; neither

Storm nor the Court would have the ability to force such parties to return to the *status quo ante* if

Storm were to obtain a reversal of the Order.

Furthermore, as Storm has noted in previous filings, it could suffer irreparable harm from

compliance with the Final Award in the form of fines and criminal prosecution.  Several of the

steps that Storm would have to take, particularly the corporate governance actions, are directly

contrary to the Ukrainian Decisions and other Ukrainian court orders.  The Ukrainian authorities

already indicated a willingness to impose such penalties in connection with the December 2006

injunction that barred Storm from participating in the underlying arbitration.  (*See* December 1,

2006 Order and related documents, Ex. B to Van Tol Decl.)

**B.    Telenor Mobile Would Not Suffer "Substantial Injury" if a Stay Were Issued**

This factor requires a balancing of the relative harm to the parties.  *See, e.g., Cargill, Inc.*

*v. Sears Petroleum & Transp. Corp.*, No. 5:03 CV 0530 (DEP), 2004 WL 3507329 at *12

(N.D.N.Y. Aug. 27, 2004) ("I am required to evaluate the relative harm to the parties of either allowing the injunction to be implemented or, instead, granting a stay."). Given Storm's strong showing of irreparable harm, Telenor Mobile must demonstrate a high level of injury.

Telenor Mobile will likely claim that a stay would cause monetary loss, but it is telling that Telenor Mobile was not able to prove such damages in the underlying arbitration and the Tribunal specifically denied that relief. (*See* Ex. A to Van Tol Decl., at 66.) Jay Moland of Telenor Mobile testified in a general way at the arbitration hearing that the alleged "boycott" by Storm had caused damage, but he did not put forth any figure or specific amount. (*See* Tr. for Dec. 18, 2006 Hearing, Ex. C to Van Tol Decl., at 84-87.) It is not surprising that the Tribunal found that Mr. Moland's testimony was insufficient to show damages.

Telenor Mobile also claimed in the arbitration that, as a result of Ukrainian actions involving Ernst & Young (the "E & Y Actions"), it could not consolidate Kyivstar's financial results with its own, which allegedly caused a drop in Telenor Mobile's share price. Telenor Mobile further asserted that the E & Y Actions threatened to cause Kyivstar to default on certain bond obligations, although Storm is not aware of any acceleration of Kyivstar bonds. Again, the Tribunal did not credit this "evidence" enough to award money damages to Telenor Mobile.

Telenor Mobile's argument that it has suffered financially also should be viewed in the context of the results for Kyivstar. The financial statements for Kyivstar through the third quarter of 2006 show that the net revenues and net income dramatically increased since 2005, growing steadily over the course of 2006. (*See* Ex. D to Van Tol Decl.) In addition, in its recent third quarter 2007 report, Telenor Mobile admitted that "Kyivstar … is estimated to have delivered a strong financial performance." (Ex. E to Van Tol Decl.) Telenor Mobile has contended in the past that Kyivstar could have done even better in the absence of the "boycott," but such speculation cannot constitute "substantial injury" for purposes of the stay analysis.

Finally, the cost to Storm and its affiliates associated with divestiture is very high and dwarfs the speculative injury to Telenor Mobile. As noted above, the harm is irreparable because Storm (or its affiliates) may not be able to recover the transferred interests should Storm prevail on its appeal. Storm estimates that its shares in Kyivstar are worth several billion dollars; thus, a forced sale could deprive Storm of an asset with very significant value. The same is true for Storm's affiliates that hold the interests in Astelit and UHT, although Storm understands that the value of those holdings is lower and likely to be in the several tens of millions or hundreds of millions of dollars (depending on the valuation method used). Therefore, it is clear that Storm would suffer far more harm if a stay were denied than Telenor Mobile would suffer if a stay were granted.

### C.    Public Policy Considerations Weigh in Favor of Staying Judgment

This factor favors a stay if the movant can show a relative absence of harm to the public as a result of a stay, or if "the granting of relief sought is not contrary to public policy." *In re Sphere Holding Corp.*, 162 B.R. 639, 642 (E.D.N.Y. 1994). A stay in this case is clearly not contrary to public policy. *See In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 184 (2nd Cir. BAP 2006) ("no adverse public interest will be implicated" by the granting of a stay where a party has legitimate grounds for appeal). Nor can it be said that a granting of a stay pending appeal would run counter to the federal policy favoring arbitration. The arbitration has already taken place and a stay will not affect it. On the other hand, a denial of the stay application would jeopardize Storm's right to appeal or to return matters to the *status quo ante* in the event the Second Circuit reverses the Order. It would also adversely affect the public policy interest that Ukraine has in making sure that foreign countries enforce and give respect to Ukrainian court judgments and laws.

**D.    There Is Far More than a "Substantial Possibility" Here that Storm Will Succeed on Appeal**

As noted above, where the movant demonstrates irreparable harm in the absence of a stay, the required showing for success on appeal is considerably lower.  In *Miller*, for example, the court granted a stay even though the movant had failed to show <u>any</u> likelihood of success on appeal.  927 F. Supp. at 1152.  Here, the potential harm is just as severe as in *Miller*, so the required showing for this factor is reduced accordingly.  Unlike the movant in *Miller*, however, Storm well exceeds the "substantial possibility" of success threshold on the appellate issues discussed below.[1]

**1.    There Are Several Issues on Appeal Relating to Contract Formation that Easily Satisfy the "Substantial Possibility" of Success Standard**

**a)    Manifest Disregard**

The Court made two findings in rejecting Storm's argument that the Tribunal acted in manifest disregard of law: one relating to the right to a jury trial and the other relating to the recognition of the April 25, 2006 Order (the "April 25 Order") and May 25, 2006 Order of the Ukrainian courts (collectively, the "Ukrainian Decisions").

**(1)    Right to a Jury Trial**

The Court concluded that the Tribunal did not manifestly disregard the law when it failed to dismiss the arbitration in favor of a jury trial regarding contract formation issues.  (*See* Order at 27-39.)  In contrast to the Tribunal, which ignored the test set forth in *Sphere Drake v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001), the Court agreed with Storm that *Sphere Drake* controls here.  (Order at 32.)  But the Court ruled that Storm had not satisfied the *Sphere*

---

[1]    Storm's appeal will cover a range of issues, including the divestiture order and injunctive relief in the Final Award.  Because a discussion of all the appellate issues would be beyond the scope of this brief (and the purpose of the "substantial possibility" of success prong), the section below focuses on (1) the Court's findings on contract formation issues (which in turn affect the relief the Court ordered); and (2) the Court's ruling that the Final Award does not violate public policy (which could also be dispositive on appeal).

*Drake* standard, which holds that a party opposing arbitration is entitled to a trial on contract formation issues if (1) it unequivocally denies that an agreement was formed; and (2) it comes forward with "some evidence" to support the challenge to the contract's validity.  263 F.3d at 30.

With regard to the first *Sphere Drake* prong, the Court held that Storm had not presented any evidence that it consistently argued that the signatory, Mr. Nilov, lacked authority to enter into the Shareholders Agreement or a severable arbitration clause.  (Order at 32.)  Indeed, the Court stated that Storm had conceded that there was no such evidence.  (*Id.* at 32-33.)  Storm will demonstrate on appeal that there is ample evidence in the record from the underlying arbitration showing that Storm (a) unequivocally denied that Mr. Nilov had the requisite authority (including the authority to enter into a severable arbitration agreement); and (b) there was never any concession to the contrary.[2]

In its Statement of Defense filed on May 30, 2006 (which was Storm's initial submission and was in response to Telenor Mobile's Amended Statement of Claim), Storm expressly stated that it would be moving for dismissal of the arbitration on the basis that a Ukrainian court had found, in the April 25 Order, that Shareholders Agreement <u>and</u> its arbitration clause were void because the signatory lacked the required authority.  (*See* Stmt. of Defense, Ex. F to Van Tol Decl., at 3-4 and Ex. A thereto at 3 (holding that the Agreement was "null and void in full, <u>including the arbitration clause</u>"); emphasis added.)  Storm soon thereafter filed its motion to dismiss on jurisdictional grounds and pointed out that, in the Ukrainian Decisions, the Ukrainian courts had invalidated both the Shareholders Agreement and the arbitration clause contained

---

[2]     Telenor Mobile submitted substantial parts of the record from the arbitration to the Court when it filed the second Declaration of Robert L. Sills on August 30, 2007.  However, the CD provided by Telenor Mobile is not complete and Storm has supplemented it, as necessary, in this filing.  We have also provided hard copies of the documents cited herein for the Court's convenience.

therein. (*See* Mot. to Dismiss, Ex. G to Van Tol Decl., at 5-6.)[3] The foregoing documents, by themselves, are sufficient evidence that the "unequivocal denial" prong has been met. *See, e.g., Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972) (noting that National and Hellenic's "answer to Interocean's petition categorically denied entering into a charter party with Interocean"); *Herlofson Mgmt. v. Ministry of Supply*, No. 88 CIV. 7542 (RLC), 1989 WL 111083 at *3 (S.D.N.Y. Sept. 19, 1989) (stating that, in reply to petition, "the Jordan Ministry unequivocally denies having entered into a charter").

Here, however, there was even more evidence showing that Storm unequivocally denied that a valid Shareholders Agreement or severable agreement to arbitrate had been made. Storm provided affidavits from several witnesses who testified that they were unaware of any Meeting of Participants around the time of the Shareholder Agreement's execution granting Mr. Nilov the authority to enter the Agreement. (*See* Aff. of Vadim Klymenko, dated August 9, 2006 (revised version), Ex. H to Van Tol Decl., at ¶ 8; Aff. of Andrei Kosogov, dated August 31, 2006, Ex. I to Van Tol Decl., at ¶ 4.) Storm also provided expert evidence — never rebutted by Telenor Mobile — demonstrating that Ukrainian law applies and will not recognize the severability of arbitration clauses, which is why the Ukrainian courts repeatedly stated that both the Shareholders Agreement and the arbitration clause therein are null and void. (*See* Logush Op., dated July 28, 2006, Ex. J to Van Tol Decl., at ¶ 28; Proposed Findings and Conclusions, dated Sept. 12, 2006, Ex. K to Van Tol Decl., at ¶¶ N-P.) Storm further submitted a Ukrainian court order dated November 8, 2006 (the "Clarification Order") establishing that the Ukrainian Decisions went beyond the validity of the Shareholders Agreement and invalidated any agreement to arbitrate. (*See* Ex. L to Van Tol Decl.)

---

[3]      The Ukrainian Decisions cited Article 216 of the Ukrainian Civil Code, which, as explained below, is inconsistent with the severability doctrine. In other words, under Ukrainian law, the invalidity of the Shareholders Agreement *a fortiori* results in the invalidity of any agreement to arbitrate therein.

Storm never conceded, as the Court stated, that "there was no evidence that Mr. Nilov lacked authority to enter into the arbitration agreement insofar as that clause was severable from the Agreement as a whole." (Order at 32-33.) The sole basis for the Court's finding is a single statement by counsel for Storm at an arbitration hearing regarding Mr. Nilov's ability to enter into an agreement to arbitrate <u>as a general matter</u> and without reference to the issues here. Immediately after the statement, counsel for Storm noted that, in the specific situation before the Tribunal, Storm was clearly arguing that the invalidity of the Shareholders Agreement results in the invalidity of the arbitration clause because Ukrainian law will not recognize the severability of agreements to arbitrate. (*See* Tr. for Sept. 5, 2006 Hearing, Ex. M to Van Tol Decl., at 98-99.) Moreover, the statement on which the Court relied refers back to the following statement at the same hearing: "I haven't seen anything in [the] charter that would bar [Mr. Nilov from entering into an agreement to arbitrate without authority from a Meeting of Participants] <u>so long as</u> the agreement doesn't have to do with the transfer of Kyivstar shares." (*Id.* at 74:11-14; emphasis added.) The two statements, therefore, are perfectly consistent with Storm's unequivocal position in the arbitration, which is that Mr. Nilov needed specific authority to enter into the Shareholders Agreement — including any agreement to arbitrate contained in the Agreement — because it involves the disposition of Kyivstar shares.

With regard to the second *Sphere Drake* prong, the Court found that "Storm has not presented sufficient evidence to warrant a jury trial on that issue." (Order at 33.) As an initial matter, the cases from the Second Circuit and lower courts in this district demonstrate that the "some evidence" standard is an exceedingly low threshold. For example, in *Bank of America v. Diamond State Ins. Co.*, 2002 WL 1378683 (2d Cir. June 26, 2002), the Second Circuit held that statements in a party's briefs and other unsworn documents satisfied the "some evidence" standard. *Id.* at *1. *See also Sphere Drake*, 263 F.3d at 33 (single affidavit on apparent authority issue sufficed with regard to one contract); *Becker v. DPC Acquisition Corp.*, No. 00 Civ. 1035

11

(WK), 2002 WL 1144066 at *7-8 (S.D.N.Y. May 30, 2002) (holding that the defendant met the "some evidence" standard on an agency issue by submitting deposition testimony from one individual that conflicted with the plaintiff's evidence); *In re Azores Int'l Shipping, Inc.*, No. 99 Civ. 850 (JSM), 1999 WL 493380 at *2 (S.D.N.Y. July 9, 1999) (single affidavit from party sufficient to meet "some evidence" standard). *Cf. Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972) (holding that party opposing arbitration, which submitted minimal evidence and presented an uncertain record, had satisfied the standard); *Herlofson Mgmt. v. Ministry of Supply*, No. 88 Civ. 7542 (RLC), 1989 WL 111083 at *3 (S.D.N.Y. Sept. 19, 1989) (holding that party opposing arbitration, which submitted a single affidavit, had come forward with "some evidence" because it was "not clear" whether its agent had binding authority).

Telenor Mobile, on the other hand, was required to meet the summary judgment standard by showing that there is <u>no</u> genuine issue of fact regarding Mr. Nilov's authority. *See, e.g., Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (noting that "the court applies a standard [on motions to compel] similar to that applicable for a motion for summary judgment" and that "[i]f there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary"); *Benckiser Consumer Prods., Inc. v. Kasday*, No. 97 Civ. 5389, 1998 WL 677631 at *2 (S.D.N.Y. Sept. 30, 1998) (standard for evaluating a motion to compel arbitration is the same as that for summary judgment) (citing *Par-Knit Mills, Inc. v. Stockbridge Fabrics Company*, 636 F.2d 51, 54 n.9 (3d Cir. 1980)). Moreover, as with a motion for summary judgment, the Tribunal should have viewed the evidence on Mr. Nilov's authority in the light most favorable to Storm and drawn all inferences in Storm's favor. *See Par-Knit Mills*, 636 F.2d at 54; *Benckiser*, 1998 WL 677631 at *2. The Tribunal did neither.

The Court restricted its review of the Tribunal's application of the *Sphere Drake* standard to a single statement in Storm's brief in which Storm noted that it had come forward with

sufficient evidence in the arbitration on the authority issue. The Court found that Storm's "bare allegations" in its brief were not adequate. (Order at 33.) The Court's holding ignores the fact that much of the record from the arbitration was before the Court on Telenor Mobile's petition to confirm and that, in prior proceedings, Storm had provided evidence to the Court regarding Mr. Nilov's authority. As set forth above, Storm presented fact and expert affidavits to the Tribunal on this issue, as well as the Ukrainian Decisions (and Clarification Order) expressly holding that Mr. Nilov lacked authority. Storm also provided the court record from the Ukrainian proceedings that resulted in the Ukrainian Decisions. (*See* Aff. of Marta Khomyak, dated Aug. 8, 2006, Ex. N to Van Tol Decl., and exhibits thereto.) The issue, under *Sphere Drake*, is not whether the Court was persuaded by this evidence. The issue is whether the Tribunal should have found that Storm's submissions met the minimal "some evidence" threshold or raised an issue of material fact regarding Mr. Nilov's authority. By disregarding the *Sphere Drake* standard, the Tribunal did not engage in either inquiry, thereby depriving Storm of its well-established right to a jury trial on contract formation issues.

Rather than considering the foregoing evidence for the limited purpose of determining whether the Tribunal should have allowed a jury to decide the contract formation issues, the Court engaged in an independent assessment of the actual and apparent authority questions. (*See* Order at 33-39.) In so doing, the Court conflated the *Sphere Drake* standard, which applies at the outset of an arbitration when contract formation issues are raised, with the requirements set forth in *China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274 (3d Cir. 2003), which apply after the arbitration has concluded and the court is considering confirmation of the award. *See id.* at 289 (noting that the independent determination of arbitrability takes place at the confirmation stage). The Court's independent determination under *China Minmetals* is discussed below. (*See infra* at II.D.1.b.) This section focuses on whether

13

Storm raised "some evidence" with respect to the actual and apparent authority issues that should have led the Tribunal to defer the arbitration while a jury decided contract formation questions.

With regard to actual authority, neither the Order nor the Final Award reached that precise issue because both the Court and the Tribunal determined the ultimate question, not whether Storm had presented "some evidence" to warrant a jury trial. The record, however, demonstrates that Storm easily satisfied the *Sphere Drake* standard in the arbitration. *First*, in addition to the Ukrainian Decisions, Storm submitted fact and expert evidence showing that — contrary to Telenor Mobile's argument in the arbitration — a Meeting of Participants was required because the Shareholders Agreement involved the disposition of Kyivstar shares. (*See* Ex. K to Van Tol Decl., at ¶¶ T-U; Storm's Pre-Hearing Br., Ex. O to Van Tol Decl., at ¶ 35.) *Second*, Storm submitted affidavits from witnesses to the effect that no such Meeting of Participants took place around the time of the execution of the Shareholders Agreement. (*See* Ex. K to Van Tol Decl., at ¶ V; Ex. H to Van Tol Decl., at ¶ 8; Ex. I to Van Tol Decl., at ¶ 4.) Telenor Mobile did not rebut this testimony with any evidence of a contemporaneous Meeting of Participants. *Third*, Storm established — through cross-examination of Telenor Mobile's witness, Sigmund Ekhougen, as well as through the fact and expert testimony of its own witnesses, Alexy Khoudyakov, David Wack and Roman Maydanyk — that the Meeting of Participants for the 2002 Voting Agreement was not a substitute for the requisite Meeting of Participants for the 2004 Shareholders Agreement. (*See* Ex. K to Van Tol Decl., at ¶¶ W-X.) Those witnesses testified that the authorization for the 2002 Voting Agreement was limited in scope, that a new authorization was necessary in 2004 for the new shareholders agreement, and that the Shareholders Agreement executed in January 2004 was materially different from the form agreement appended to the 2002 Voting Agreement. (*See id.*) Under the *Sphere Drake* standard and related cases, the Tribunal was required to credit such testimony and draw the inferences from the testimony in Storm's favor.

14

With regard to apparent authority, the Court and the Tribunal once again did not consider the issue of whether Storm was entitled to a jury trial under *Sphere Drake* because they were focused on the determining the ultimate question. As with the actual authority issue, Storm presented sufficient evidence to the Tribunal on apparent authority to warrant a jury trial. The parties agreed in the arbitration that the doctrine of apparent authority could not be invoked if Telenor Mobile knew or should have known that there were limitations on Mr. Nilov's authority. Telenor Mobile conceded it had received a copy of Storm's Charter well in advance of the execution of the Shareholders Agreement and that it was aware that Mr. Nilov had limitations on his authority (namely, the need for a Meeting of Participants). (*See* Ex. K to Van Tol Decl., at ¶¶ CC; Ex. O to Van Tol Decl., at ¶ 42.) This evidence, along with expert testimony presented by Storm on apparent authority (*see* Ex. O to Van Tol Decl., at ¶ 42), more than suffices under *Sphere Drake*.[4]

Finally, the Court found that (a) the Ukrainian Decisions, by themselves, did not constitute adequate proof under *Sphere Drake* because they "are not <u>evidence</u> of anything" and raise questions of law for the court, not questions of fact for the jury (Order at 37); and (b) the Ukrainian Decisions do not satisfy the *Sphere Drake* standard because the Ukrainian courts failed to consider the issue of severability. (*See id.* at 37-38.) The Court's first finding misconstrues the purpose of the "some evidence" standard. The court (or Tribunal, in this case), and not the jury, must determine whether the *Sphere Drake* standard has been met. Certainly, the Tribunal could have taken judicial notice of the Ukrainian Decisions, *see, e.g., Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Café*, 566 F.2d 861, 862-63 (2d Cir. 1977),

---

[4]    In the arbitration, Telenor Mobile attempted to argue that Storm was estopped from challenging the Shareholders Agreement or had ratified the Shareholders Agreement through its conduct. Storm presented sufficient evidence showing that these theories did not act as a bar, or, at a minimum, that a jury needed to consider them. (*See* Ex. K to Van Tol Decl., at ¶¶ DD-EE; Ex. O to Van Tol Decl., at ¶¶ 46-47.) The estoppel theory, in particular, raised issues of fact because it turns on the reasonable reliance of the opposing party, which is a classic jury determination.

and the decisions are relevant in that they support Storm's interpretation of Ukrainian law. Indeed, the Court previously recognized that the Ukrainian Decisions are evidence of what Ukrainian law is. (*See* Tr. for Nov. 15, 2006 Hearing, Ex. P to Van Tol Decl., at 28:17-29:2.)

The Court's finding on severability also misses the mark. The Ukrainian Decisions refer to Article 216 of the Ukrainian Civil Code, under which the invalidation of the Shareholders Agreement meant, as a matter of law, that any arbitration agreement therein is also invalid. (*See* Ex. K to Van Tol Decl., at ¶¶ N-P; Ex. J to Van Tol Decl., at ¶ 28.) Article 216(4) provides that parties may not alter the consequences of a finding of nullity under Article 216. (*See id.*) As a result, the invalidation of the Shareholders Agreement, by operation of Ukrainian law, means that any agreement to arbitrate within the Shareholders Agreement is also invalid. Therefore, Storm presented evidence showing that severability is not cognizable under Ukrainian law.

The Clarification Order makes it as clear as possible that the Ukrainian courts had addressed the severability issue in the Ukrainian Decisions. The order was in response to an application that Storm made following the Partial Final Award dated October 22, 2006 and the Tribunal's findings regarding severability. In the application, Storm asked the Ukrainian court the following questions:

> 1.      The Court had ruled that the Shareholder Agreement, as an authority that violated public order, is a void authority in its entirety, including the arbitration clause, from the moment of its execution. <u>Does this mean that said authority and the arbitration clause as its integral part do not and did not have any legal force, notwithstanding the so called independence of the arbitration clause, established by the UNCITRAL rules or any other statutes</u>?

> 3.      Does the declaration of the Shareholder Agreement as a void authority <u>preclude the application of the arbitration clause</u> contained in its text?

> 6.      Can parties or any other persons voluntarily waive the application to them of the consequences of the invalidity of the void authority — the Shareholder Agreement, and/or its integral part — the arbitration clause?

(Application for Clarification Order, dated October 26, 2006, Ex. Q to Van Tol Decl.; emphasis added.) In response, the Clarification Order held that, as a result of the invalidity of the

Shareholders Agreement, "the arbitration agreement contained in the Shareholders Agreement in the form of an arbitration clause is also void/invalid." (Ex. L to Van Tol Decl., at 1.) Thus, the Ukrainian court stated, the "parties had no grounds whatsoever to perform any acts on the basis of such agreement, including to resort to arbitration in connection therewith." (*Id.*, at 2.) The Ukrainian court further noted that the referral of the dispute to arbitration under the severability provisions in the UNCITRAL Rules constituted a violation of Article 216(4) of the Ukrainian Civil Code, which, as discussed above, does not allow parties to escape the legal consequences of a finding that an agreement is invalid. (*Id.*)

The Clarification Order thus demonstrates, indisputably, that the Ukrainian courts considered the issue of a separate agreement to arbitrate and flatly rejected severability.[5]

### (2)    Recognition of Ukrainian Decisions

Storm has several grounds for its appeal from the Court's determination that the Tribunal acted properly when it refused to recognize the Ukrainian Decisions invalidating the Shareholders Agreement. As discussed below, those grounds provide an additional basis for a ruling that Storm satisfies the "substantial possibility" of success factor.

In finding that the Tribunal did not act in manifest disregard of the law, the Court relied on its earlier rulings that Storm and Alpren Limited ("Alpren") are "essentially the same entities," 2006 WL 3735657 at *6, and that Storm did not really oppose the Ukrainian actions. (*See* Order at 21.) According to the Court, this resulted in a finding that Storm and Alpren colluded in the Ukrainian proceedings. The Court also relied on cases holding that international

---

[5]    The Court stated that the testimony from Mr. Klymenko undermines Storm's position because his affidavit allegedly says that Storm argued, in the Ukrainian proceedings, that there was a valid agreement to arbitrate. (Order at 38.) In fact, Mr. Klymenko merely raised a jurisdictional defense, arguing that the Tribunal had the "jurisdiction to hear Alpren's claim." (Ex. H to Van Tol Decl., at ¶ 6.) That is not at all inconsistent with what Storm contended in the arbitration, which is that the Tribunal had jurisdiction, in the first instance, to consider whether it or a jury should determine contract formation issues.

comity considerations do not apply where there is collusion or an intent to impede the enforcement of federal orders. (*See* Order at 19-27.)[6]

Turning first to the Court's finding that Storm and Alpren are "essentially the same parties," that ruling was made only in the context of a Rule 65 preliminary injunction and is not binding in subsequent proceedings. Findings of fact made by a court granting a preliminary injunction are not binding in later proceedings because "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *RxUSA Wholesale, Inc. v. Dep't of Health and Human Serv.*, 467 F. Supp. 2d 285, 291 (E.D.N.Y. 2006), *citing University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). *See also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1049 (2d Cir. 1992) (findings of fact at the preliminary injunction stage are not binding at trial on the merits). Indeed, the Court's finding was made without any evidentiary hearing in which Alpren or Altimo Holdings and Investments Limited ("Altimo") participated. Alpren and Altimo have appealed from the Court's December 2006 injunction (the "December 2006 Order"), and the appeal is still pending. Accordingly, the Court's earlier rulings should not form the basis for a conclusion that Alpren and Storm acted collusively.

In addition, the Court's December 2006 Order, the Final Award and the Order do not address the unrebutted expert evidence submitted by Storm showing that the action by Alpren was entirely proper under Ukrainian law and procedure. Professor Lyubov Logush, for example, noted in two expert opinions that Alpren and Storm are separate entities under Ukrainian law (even though Alpren is Storm's parent) and that there are numerous examples under Ukrainian practice in which companies are sued by their own shareholders. (*See* Ex. J to Van Tol Decl., at ¶¶ 12-15; Logush Supp. Op., dated August 9, 2006, Ex. R to Van Tol Decl., at ¶ 6.) There is no

---

[6]     The Tribunal did not find (or rely on a finding of) collusion, but rather asserted that the record before the Ukrainian courts was inadequate and that the Ukrainian courts had not considered severability. (*See* Ex. A to Van Tol Decl., at 33-36.)

evidence that the Ukrainian courts were unaware of the corporate relationship between Storm and Alpren. To the contrary, the parties submitted documents to the Ukrainian courts — including Storm's Charter — showing that Alpren is one of Storm's shareholders. (*See, e.g.*, Ex. N to Van Tol Decl. and Ex. 8 thereto.)[7]

The Court's holdings regarding the relevant case law provide a further basis for Storm's appeal. The Court (a) cited cases for the proposition that decisions in "friendly" litigation are non-binding on the Tribunal (*see* Order at 20); (b) held that Storm could not invoke comity considerations because it had deliberately sought to interfere with federal judgments (*see id.* at 19-20, 21-23); and (c) distinguished *Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.*, 547 F. Supp. 367 (S.D.N.Y. 1983), from this case. (*See* Order at 24-26.)

*First*, the cases holding that actions between allegedly "friendly" litigants are "non-binding" do not apply here because they involve attempts by one party to invoke the doctrine of collateral estoppel or to bind a party to an outside judgment as if that party had participated in the other action. In this case, by contrast, Storm has never argued that the Ukrainian Decisions are binding on Telenor Mobile under the doctrine of collateral estoppel or similar theories. (*See* Tr. for Nov. 22, 2006 Hearing, Ex. S to Van Tol Decl., at 41:3-6.) Instead, Storm has relied on the standard for recognition of foreign judgments, which is set forth in *Ackermann v. Levine*, 788 F.2d 830, 837-38 (2d Cir. 1986).[8]

*Second*, the "legal impediment" cases cited by the Court are inapposite. The Court states, for example, that "where foreign proceedings are instituted in order to undermine federal judgments, comity considerations have no bearing on a court's consideration of whether to

---

[7]    Mr. Klymenko also testified unequivocally that he, as Storm representative, never cooperated or colluded with Alpren or any third party in the Ukrainian proceedings. (Ex. H to Van Tol Decl., at ¶ 9 (as revised).) Telenor Mobile did not present any evidence to the contrary.

[8]    The Court also held that *Ackermann* does not apply here because the Ukrainian Decisions were not obtained through "sound procedures." (Order at 23.) This refers to the allegedly collusive nature of the Ukrainian proceedings, which is discussed above. Because the procedures in the Ukrainian proceedings were sound and there was no abuse of the Ukrainian system, *Ackermann* controls here.

enforce an arbitral award under the New York Convention." (Order at 20; *citing Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111 (2d Cir. 2007).) Even though Storm pointed out that the Ukrainian Decisions preceded any federal judgment in this case (in contrast to the situation in the cases involving "legal impediments"), the Court held that the timing is immaterial because the Ukrainian Decisions constitute a "pre-emptive strike on the arbitration proceedings." (Order at 22.) Storm, however, did not attempt to use the Ukrainian Decisions to interfere with any federal court order. Instead, the record shows that Storm consistently used the Ukrainian Decisions in an effort to get into federal court for the express purpose of obtaining a jury trial on contract formation issues. (*See, e.g.*, Ex. M to Van Tol Decl., at 50:24-51:25; Tr. for Aug. 14, 2006 Hearing, Ex. T to Van Tol Decl., at 257:17- 258:3; 263:10-17.) Moreover, Storm did not argue, in relying upon the Ukrainian Decisions before the Tribunal, that it would not go forward with the arbitration if a jury determined it was bound to do so. Indeed, Storm requested a jury trial and determination of contract issues upfront in order to avoid any adjudication regarding jurisdiction at the end of the arbitration, which could result in a waste of the parties' resources. (*See, e.g.*, Ex. P to Van Tol Decl., at 13:9-12.)[9]

*Third*, notwithstanding the Court's holding that *Sea Dragon* is distinguishable, Storm has several valid arguments on appeal regarding the applicability of the case. The Court held that the petitioner in *Sea Dragon* had been given notice and an opportunity to be heard in the Dutch proceedings, while "Telenor had neither notice nor an opportunity to respond in the Ukrainian proceedings." (Order at 25.) However, the parties in both cases had the same notice and opportunity to be heard. The *Sea Dragon* court noted that the petitioner received notice of the foreign order after it was obtained. "Under Dutch law, Sea Dragon would then have had an opportunity to challenge the sequestration order, but it did not do so." 574 F. Supp. at 372.

---

[9]     Storm did argue that the Tribunal should follow the Ukrainian Decisions on the ultimate issues, but only in the event that it denied Storm the right to a jury trial under *Sphere Drake*. (*See* Ex. M to Van Tol Decl., at 72:17-73:8.)

Here, Telenor Mobile similarly received notice after the Ukrainian Decisions were rendered, but, as in *Sea Dragon*, it had the opportunity to challenge the Ukrainian Decisions. (*See* Ex. J to Van Tol Decl., at ¶¶ 16-19.) Indeed, the record is clear that Telenor Mobile has challenged other rulings in the Ukrainian courts after the fact. (*See* Tr. for June 29, 2006 Hearing, Ex. U to Van Tol Decl., at 34:5-16 (noting that Telenor Mobile had collaterally attacked Ukrainian decision at Ukrainian appellate level).) Like the petitioner in *Sea Dragon*, Telenor Mobile cannot complain to a U.S. court when it has decided to forego rights in a foreign court.

The Court also found that the Dutch proceedings in *Sea Dragon* were different from the Ukrainian proceedings because the former complied with "American due process standards" (Order at 25), whereas the latter were "undertaken in a collusive and vexatious manner." (*Id.*) That distinction does not hold up. When the *Sea Dragon* court referred to "due process standards," it was in the context of the notice and opportunity to be heard in the foreign proceeding (which, as noted above, was the same as in this case). *See* 574 F. Supp. at 372 n.2. Also, the Dutch proceedings in *Sea Dragon* were not simply the product of a third party acting in its own interest, as the Court stated. (Order at 25.) The *Sea Dragon* court pointed out that the respondent, whose assets were attached by the Dutch sequestration order, had assisted and cooperated with the third party in obtaining the order. 574 F. Supp. at 370. Thus, there was evidence of cooperation in *Sea Dragon*, but it was not enough to overcome international comity considerations in the absence of fraud. *See id.* at 372.

Under the circumstances, there is at least a "substantial possibility" that Storm will succeed on its argument that *Sea Dragon* provides the rule of law in this case.

### b)     Independent Determination

The Court agreed with Storm that *China Minmetals* applies here, and that it required the Court to determine — without any deference to the Tribunal's findings — whether the Shareholders Agreement is valid. (*See* Order at 30-32.) Nevertheless, the Court's application of

21

the *China Minmetals* standard in the Order raises several additional appellate issues on which

Storm has a "substantial possibility" of success.

Rather than granting the evidentiary hearing that Storm requested (*see* Storm's Reply Br.,

dated Sept. 12, 2007, at 6-7), the Court made an independent determination based on the record

before it. Courts have granted evidentiary hearings in connection with the independent

determination of contract formation issues, *see Stolt-Nielsen Transp. Group v. Edible Oil Trad.*

*Corp.,* No. 06 Civ. 0703 (NRB), 2007 WL 194182 at *5 (S.D.N.Y. Jan. 24, 2007), and Storm

noted here that the arbitration record was not sufficient for such a determination. (Storm's Reply

Br. at 7 n.2.) Among other things, Storm was not able to put on its evidence, including expert

testimony, at the merits hearing before the Tribunal in December 2006, and it could not cross-

examine Telenor Mobile's witnesses. At the proposed evidentiary hearing before the Court on

the petition to confirm and motion to vacate, Storm planned to present such evidence and

supplement the record. It also intended to present briefing and expert evidence to the Court on

choice-of-law issues, which is another area for independent determination.[10]

On appeal, Storm will argue that the Court should have applied Ukrainian law and that

(for the reasons set forth above, *see supra*) the Court should have followed the well-established

law on the recognition of foreign judgments. The Court's determination involved complex and

sometimes novel questions of law, which means, in conjunction with the other issues discussed

above, that Storm has a "substantial possibility" of success on appeal.

### 2. The Court's Ruling on the Public Policy Basis for Vacatur Provides Further Support for Storm's Appeal

The Court rejected Storm's public policy argument on the grounds that (a) it is unclear

whether the Final Award would compel Storm to violate Ukrainian law (*see* Order at 41-42); (b)

---

[10]    The Court applied New York law to the contract formation questions, but that was a hotly
contested issue before the Tribunal and Storm made several arguments in favor of the application of
Ukrainian law instead. (*See* Ex. K to Van Tol Decl., at ¶¶ S, Y-AA; Ex. O to Van Tol Decl., at ¶¶ 33, 38-
41; Letter to Tribunal, dated March 14, 2007, Ex. V to Van Tol Decl.)

there is no "authoritative New York precedent" in support of Storm's contentions (*see id.* at 42); and (c) any public policy concerns are outweighed by countervailing New York policy favoring arbitrations. (*See id.* at 42-43.) Storm has several arguments on these findings that have a more than reasonable prospect of succeeding on appeal.

*First*, the Final Award squarely conflicts with the Ukrainian Decisions, the Clarification Order and the more recent ruling from the Ukrainian court refusing to recognize the Final Award, all of which are based on the premise that the Shareholders Agreement is null and void as a matter of Ukrainian law. If Storm were to take the steps ordered by the Tribunal, which derive from an illegal agreement, it would expose itself to sanctions in Ukraine. As discussed above, Storm previously faced such sanctions in connection with the injunction issued by the Ukrainian courts prohibiting it from participating in the arbitration. In addition to the potential violations of Ukrainian anti-monopoly laws that Storm pointed out earlier, Storm could also violate the law on corporate governance in Ukraine if it were to comply with the procedures set forth in the Final Award. Thus, the Final Award would require Storm to take action that is directly contrary to Ukrainian law. That is exactly the dilemma the party faced in the *Sea Dragon* case, which held that the existence of such a conflict between an award and foreign law is a basis for vacating an award on public policy grounds.

*Second*, there was no reason for the Court to describe *Sea Dragon* as not "authoritative." *Sea Dragon* has not been overruled, has been cited by other district courts in this Circuit and itself cited unquestioned Second Circuit authority, including *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108 (2d Cir. 1980). The *Diapulse* court stated, in keeping with a long line of other cases, that an award may be set aside "if it compels a violation of law or is contrary to well accepted and deep-rooted public policy." *Id.* at 1110. The *Sea Dragon* court quite reasonably held that *Diapulse* and other courts were equating the two concepts, and that compelling a party to violate a foreign decree is contrary to public policy.

23

*Third*, the Court held that any violation of public policy would be outweighed by the policy in New York favoring arbitrations. The Order does not cite any case law supporting such a balancing test for vacatur based on public policy violations. Moreover, vacatur on that basis does not undermine the policy in favor of arbitrations or the arbitral process itself — which has already run its course here — any more than the other grounds for vacatur do. The public policy exception looks at whether the resulting <u>award</u> was proper, not whether the parties should arbitrate. The main case cited by the Court on this issue, *Am. Const. Mach. & Equip. Corp. Ltd. v. Mechanised Const. of Pakistan Ltd.*, 659 F. Supp. 426 (S.D.N.Y. 1987), is inapposite because it did not deal with a party invoking public policy grounds to vacate an award. The foreign proceeding in that case involved evidence of fraud and an attempt to circumvent the arbitral process. *Id.* at 429. Here, as noted above, there was no evidence of fraud and Storm participated in the arbitration in order to obtain a ruling on jurisdictional issues.

## III. EVEN IF THE COURT DENIES A STAY PENDING APPEAL, A TEMPORARY STAY IS WARRANTED

In cases where courts have denied stays pending appeal, they frequently granted a temporary stay to enable the moving party to seek a stay from the Court of Appeals. *See, e.g., Centauri Shipping Ltd. v. Western Bulk Carriers KS*, No. 07-CV-4761 (RJS) (HBP), 2007 WL 3025706 at *9 (S.D.N.Y. Oct. 12, 2007) (granting 5-day stay to allow filing of stay application with appellate court); *In re Brunswick Baptist Church*, Nos. 1:05-CV-1085, 1:05-CV-1203, 2007 WL 294087 at *3 (N.D.N.Y. Jan. 25, 2007) (10-day stay); *In re Albicocco*, No. 06-CV-3409 (JFB), 2006 WL 2620464 at *5 (E.D.N.Y. Sept. 13, 2006) (2-day stay). Temporary stays are especially common where, as in this case, the movant has shown irreparable harm. *See Brunswick*, 2007 WL 294087 at *3; *In re Albicocco*, 2006 WL 2620464 at *5. Although Storm has fully satisfied the four-part test for a stay pursuant to Rule 62(c), it respectfully requests that

the Court enter a temporary stay in the event it does not grant a stay pending the completion of the appeal.[11]

## **Conclusion**

For the foregoing reasons, Storm respectfully requests that the Court grant its motion for an order staying the Order and Judgment pending appeal or, in the alternative, that the Court enter a temporary stay while Storm seeks a stay from the Second Circuit.

Dated: November 15, 2007

LOVELLS LLP

By: _Pieter Van Tol_____

        Pieter Van Tol (PVT-2455)
        Gonzalo S. Zeballos (GZ-5994)
        Johanne Houbouyan

590 Madison Avenue
New York, New York 10022
Telephone: (212) 909-0600
Facsimile: (212) 909-0660

*Attorneys for Respondent Storm LLC*

---

[11]     Both the *Brunswick* and *Albicocco* courts held that the temporary stay would remain in effect until the Court of Appeals decided the application for a stay pending appeal. *See id.* Storm respectfully requests that the Court similarly extend any such temporary stay.

25