# EXHIBIT A
# PART 1

IN THE MATTER OF AN ARBITRATION UNDER
THE UNCITRAL ARBITRATION RULES BETWEEN:

**TELENOR MOBILE COMMUNICATIONS AS,**
Claimant,

-and-

**STORM LLC,**
Respondent

## FINAL AWARD

We, the undersigned Arbitrators, having been designated in accordance with the January 30, 2004 arbitration agreement between the above-named Parties, having been duly sworn, and having heard the allegations, arguments and proofs of the Parties regarding (1) Respondent's Motion to Dismiss on the ground that the Tribunal assertedly does not have jurisdiction to hear this Arbitration and (2) the merits of the claims and defenses of the Parties, do hereby reaffirm their earlier Partial Final Award that they do have jurisdiction to hear this Arbitration and make the following Final Award:[1]

## A.    THE PARTIES AND THEIR CONFLICTING CLAIMS.

This Arbitration involves significant and highly contentious disputes between the majority and minority shareholders of CJSC "Kyivstar G.S.M." ("Kyivstar"), a Ukrainian closed joint stock company that is the largest mobile telecommunications company in Ukraine, with over 18 million subscribers and

---

[1] Although some portions of this Final Award repeat earlier findings and conclusions of the Partial Final Award, they are restated here to avoid excessive cross-referencing.

annual revenues exceeding one billion United States dollars.  At the heart of the

Parties' disputes are differences over the validity and implementation of a

Shareholders Agreement between the Parties, dated January 30, 2004 (the

"2004 Shareholders Agreement"), which sets forth their rights and obligations

regarding the governance and operation of Kyivstar.  The Parties' differences

have led not only to this Arbitration, but also to related litigation in the courts of

Ukraine and the United States.

### 1.    The Parties and Their Affiliates.

Claimant Telenor Mobile Communications AS ("Telenor") is a Norwegian

corporation headquartered in Fornebu, Norway.  It is a subsidiary of Telenor

ASA, also a Norwegian company, which is the largest provider of

telecommunications services in Norway and the provider of such services to over

50 million subscribers in a total of 12 countries.  Claimant owns approximately

56.5 % of the issued and outstanding shares of Kyivstar, with single shares

owned by each of four of its wholly-owned subsidiaries.

Respondent Storm LLC ("Storm") is a Ukrainian limited liability company

headquartered in Kyiv, Ukraine. Storm owns the remaining approximately 43.5 %

of Kyivstar shares.  At the times relevant to this Arbitration, Storm was, in turn,

owned 50.1% by Hardlake Limited ("Hardlake"), a Cyprus corporation, and 49.9%

by Alpren Limited ("Alpren"), another Cyprus corporation.   Hardlake and Alpren

were, themselves, wholly-owned by Altimo Holdings & Investments Limited

("Altimo"), a British Virgin Islands company.  At the top of this ownership pyramid

was – and remains -- a large Russian financial-industrial conglomerate known as the Alfa Group Consortium ("Alfa").

### 2.    The Factual Background of the Parties' Disputes.

The course of events that ultimately led to the Parties' disputes in this Arbitration and the related court litigation dates back to 1998, when the ownership of Kyivstar was divided among a somewhat different group of shareholders than today.  At that time, the shareholders were Kyivstar itself, Telenor, Storm (before the Alfa entities were in control), Omega LLC, Sputnik IV L.P. and Sputnik V Holdings Ltd. (the last two together, "Sputnik's Holdings"). The present disputes arose from a series of often complicated negotiations and agreements relating to the transfer of control of Kyivstar from its former owners to its present owners -- Telenor and its subsidiaries, and Storm – and to the execution and implementation of the 2004 Shareholders Agreement governing the relationships among Telenor, Storm and Kyivstar.

The Tribunal includes the following detailed description of this course of dealings -- which is based on the extensive evidentiary record in this Arbitration -- because it supports the Tribunal's conclusion that the Parties engaged  in a lengthy course of bargaining and negotiation that lasted almost six years in order to agree upon their mutual rights and obligations regarding Kyivstar; that they conducted those negotiations in good faith; that the Parties ultimately agreed upon and executed the 2004 Shareholders Agreement; that they also entered into other arrangements along the way that involved a meeting of the minds and resolved various situations that arose; and that the Parties, during this course of

conduct, never challenged the validity of their various agreements and arrangements but, to the contrary, were diligent in complying with all the terms and conditions of their obligations, including the 2004 Shareholders Agreement, until shortly before the initiation of this Arbitration.

a.    **The 1998 Shareholders Agreement and the initial transfer of minority interests.** On March 26, 1998, the then owners of Kyivstar entered into a Shareholders Agreement concerning the corporate governance and management of the company (the "1998 Shareholders Agreement"). Among other things, that Agreement gave Sputnik's Holdings an option to put its shares to Telenor. Shortly after receiving notice of the exercise of this option, Telenor approached Storm and expressed a desire to negotiate a new shareholders agreement that would reflect Telenor's acquisition of the Sputnik holdings and the change in the ownership interest that would result. On January 17, 2003, the Parties met, and Storm told Telenor that it was willing to terminate the 1998 Shareholders Agreement and enter into a new shareholders agreement on the assumption that Storm would succeed in its effort to purchase Omega's minority shares

In February 2002, Alfa entered the picture. Its representatives met with Telenor and expressed an interest in becoming a shareholder in Kyivstar through Storm. Alfa told Telenor that it accepted that Telenor would be the dominant shareholder in Kyivstar. In March 2002, Alfa reached an agreement with Storm's Ukrainian shareholders in which Alfa was allowed to purchase a majority stake in Storm.

Thereafter, in March 2002, Storm initiated steps to acquire Omega's shares in Kyivstar, a transaction which, when completed, would render Storm the holder of 40% or more of the shares in Kyivstar. Under Ukrainian law, holders of not less than 60% of the voting shares are required to be present for there to be a quorum at a general meeting of shareholders. Thus, the holder of 40% or more of an ownership interest is able to block certain decisions.

**b.    The 2002 Letter Agreement.** On March 20, 2002, representatives of Telenor traveled to Moscow and met with Alfa to begin discussions about a new agreement to replace the 1998 Shareholders Agreement and to define the parties' interests in Kyivstar going forward. The negotiations continued during the spring of 2002 with the Chairman of the Supervisory Board of Alfa heading the Alfa team.

On April 29, 2002, the Alfa and Telenor representatives entered into a Letter Agreement that set out the expected arrangement between Telenor and Storm once they became the sole shareholders of Kyivstar. In Annex B to the Letter Agreement, the parties agreed that Storm would own 43.48 percent of Kyivstar and Telenor would own 56.5 percent. In the Letter Agreement, the parties also agreed to enter into a new Shareholders Agreement which would include specific provisions set forth in a term sheet attached as Annex A.

According to the term sheet, the new Shareholders Agreement would provide for a nine-member board of directors with Telenor having the right to appoint five of the directors and Alfa and Storm having the right jointly to appoint four directors. The term sheet also provided that the new Shareholders

Agreement would include the following provisions: a non-competition provision prohibiting any shareholder from owning any interest in a competing telecommunications operator in Ukraine; a choice of law provision that the Shareholders Agreement would be governed by the laws of the State of New York; and an arbitration provision that the Shareholders Agreement would contain a clause providing for UNCITRAL arbitration.

The First Deputy Chairman of the Executive Board of Storm, Andrei Kosogov, signed the Letter Agreement for Storm.[2]  The evidence established that Telenor relied on the representations of Alfa and Storm that Kosogov was authorized to sign the Letter Agreement on their behalf.  Storm has never asserted that Telenor's reliance was misplaced, nor has Storm ever argued that Kosogov did not have the authority to bind Alfa and Storm to the terms of the Letter Agreement.

c.    **The 2002 Share Purchase, Voting and Shareholders Agreements.**  Following the execution of the April 29, 2002 Letter Agreement, it developed that Telenor's acquisition of the Sputnik holdings was proceeding as planned, but that Storm's effort to purchase the Omega shares would take longer.  On June 28, 2002, Storm wrote a letter to Telenor expressing concern that, if it failed to purchase Omega's shares in Kyivstar, Storm would have less than a 40% interest in Kyivstar.  Notwithstanding Storm's concern, Telenor proceeded on July 9, 2002 to purchase all of Sputnik's shares, which amounted to 16.5% of the outstanding shares of Kyivstar.

---

[2]  Kosogov is currently Chairman of the Board of Directors of Alfa Asset Management and of Altimo

6

On July 16, 2002, Kosogov wrote Telenor asserting that Telenor's acquisition of the Sputnik holdings prior to Storm's acquisition of the Omega shares dropped Storm's ownership interest below 40% and violated the Letter Agreement. Storm demanded that Telenor sell Alfa or an Alfa affiliate a portion of the Kyivstar shares purchased from Sputnik. To allay Storm's concern about having less than a 40% interest in Kyivstar, Telenor agreed to enter into a Share Purchase Agreement with Storm under which Telenor would sell Storm 7.7% of the shares of Kyivstar, which would keep Storm's ownership interest over 40%. The Share Purchase Agreement went on to provide that Storm, after completing its acquisition of Omega's shares, would sell back to Telenor whatever shares were necessary to achieve the shareholder structure to which the parties had originally agreed: i.e., Telenor at 56.5% and Storm at 43.5%.

While the Share Purchase Agreement would take care of Storm's concerns pending its acquisition of the Omega shares, it left Omega as a Kyivstar holder and prevented the Parties from entering into the new Shareholders Agreement contemplated by the April 29, 2002 Letter Agreement. Accordingly, as an interim "bridge", the Parties negotiated a Voting Agreement which dealt with the governance of Kyivstar in the meantime and which provided for the execution of a new Shareholders Agreement immediately upon Storm's acquisition of Omega's shares. A form of the new Shareholders Agreement was negotiated between July 26 and August 15, 2002 -- along with the Share Purchase Agreement and the Voting Agreement -- and attached to the latter. On August 30, 2002, the parties exchanged final copies of the agreements, including

the form of Shareholders Agreement. On September 2, 2002, the parties exchanged signature pages for the Share Purchase Agreement and the Voting Agreement.

**d.    The 2002 authorization for the signature of the Shareholders Agreement.** In accordance with the Share Purchase Agreement, Telenor sold a 7.7% interest in Kyivstar to Storm on October 29, 2002. That same day, Storm presented certificates to Telenor (the "October 29, 2002 Certificates") stating that Valeriy Nilov, Storm's General Director, was authorized to sign all the above-described documents on behalf of Storm. These included a "Certificate of Senior Officer of Purchaser", accompanied by copies of resolutions of Storm's Participants authorizing Storm to enter into the Share Purchase Agreement, the Voting Agreement and the form of new Shareholders Agreement. The document was signed by Storm's General Director, Valeriy Nilov, and by Storm's Chairman, Yuri Tumanov.

As reflected by the Nilov and Tumanov Certificate, Storm's Participants authorized Nilov's execution of the Voting Agreement and the Share Purchase and Shareholders Agreements on two occasions: First, in a written polling of Participants that occurred on August 30, 2002, and second, in a unanimous live vote that took place at a meeting of Participants held on October 7, 2002. The precise wording of those authorizations deserves attention, because Storm provided that wording to Telenor in a "Notice Regarding Resolutions Adopted by Written Polling." Storm attached that Notice to the October 29, 2002 Certificates as a "true, complete and correct English translation of a unanimous written

consent of the participants of [Storm] approving the Share Purchase Agreement, the other Transaction Agreements, and the transactions contemplated thereby, dated August 30, 2002."

The resolutions adopted by the written polling on August 30, 2002 state that Storm's Participants unanimously approved several resolutions relating to the Shareholders Agreement and gave Nilov broad authority to act on Storm's behalf. The Notice specifically informed Telenor that Nilov had the authority to execute, on Storm's behalf, the Voting Agreement. See Section 1 (c).

Importantly, the Notice further informed Telenor that Nilov had the authority to execute, on behalf of the Company, "the Shareholders Agreement to be entered into between Telenor and the Company regarding voting and disposition of shares in Kyivstar, on the terms and conditions set forth in the draft Shareholders Agreement." See Section 1(h). Finally, the Notice informed Telenor that Nilov was authorized "to take or cause to be taken any and all other actions as are required or desirable in connection with this Resolution and the above-referenced agreements." See Section _ (?) _.

In addition to the August 30, 2002 polling of Participants, Storm held an actual meeting of Participants on October 7, 2002, at which the resolutions adopted on August 30, 2002 were specifically approved by live vote. Further, at the same time that Storm provided Telenor with the October 29, 2002 Certificates, Storm also attached to it a document entitled "Minutes No. 19 of the Extraordinary General Meeting of Participants" dated October 7, 2002, which

reported that all of the "aforementioned resolutions have been approved by a unanimous vote of the participants of the Company."

      **e.**     **The 2004 Shareholders Agreement.** As it turned out, it took over a year from the foregoing events for Storm finally to acquire the Omega shares. Storm's purchase of the Omega shares occurred on December 13, 2003. That event triggered Section 2.05 of the 2002 Voting Agreement requiring the parties to terminate the 1998 Shareholders Agreement within three business days and to enter into the new Shareholders Agreement attached to the Voting Agreement. Because more time was needed to liquidate Omega, the parties entered into a letter of agreement on December 17, 2003, which extended the deadline to January 31, 2004.

      On December 11, 2003, Storm asked Telenor to accept three changes in the form of Shareholders Agreement, each of which favored Storm. Initially – on December 16, 2003 – Telenor rejected all of Storm's proposed amendments. On December 18, 2003, Messrs Tumanov and Kosogov intervened on Storm's behalf and persuaded Telenor to change its position. On January 20, 2004, Telenor agreed to negotiate new language dealing with material breach. See Section 11.02 "Termination for Material Breach," of the 2004 Shareholders Agreement. As part of that new language, Storm proposed – on January 26, 2004 -- that the material breach figure be lowered from $50 million to $5 million. Telenor refused. On January 28, 2004, Alexey Khoudyakov, an official within the Alfa Group negotiating for Storm, came back again, this time suggesting that the material breach figure be reduced to US $30 million. Telenor held firm.

According to Khoudyakov: "In the end, Telenor Mobile won on this point, and the final Shareholders Agreement kept the US $50 million amount."

Although Telenor prevailed and kept the material breach figure at US $50 million, Storm did succeed in amending the 2002 Draft Shareholders Agreement with the compromise language that now appears as Section 11.02 -- "Termination for Material Breach" – of the 2004 Shareholders Agreement. There is no such provision in the 2002 Draft Shareholders Agreement. This amendment – made at Storm's request and in Storm's favor – constitutes the only substantive change in the text of the 2002 draft as compared to the final 2004 Shareholders Agreement.

On January 28, 2004, Telenor circulated a final draft of the Shareholders Agreement to Telenor. The following day, January 29, 2004, Alexey Khudyakov sent an email to Telenor stating: "Storm reviewed the language of the New Shareholders Agreement that you distributed yesterday and agreed to it. We are ready to sign it tomorrow." Khudyakov is currently Vice President of Altimo, which is the Alfa subsidiary holding control of Storm through Hardlake and Alpren.

On January 30, 2004, the Parties executed the new Shareholders Agreement. Nilov signed for Storm; Sigmund Ekhougen signed for Telenor; and Igor Lytovchenko signed for Kyivstar. In connection with the execution, Storm and Telenor exchanged customary certificates that each signatory possessed full authority to sign on its behalf. In Storm's case, it delivered to Telenor two identical documents entitled "Certificates of Incumbency and Authority", dated

January 30, 2004. One was signed by Andrei Kosogov; the other by Yuri

Tumanov. Tumanov's Certificate recited that he was the Chairman of Storm LLC

and certified that Nilov:

> (i) is the duly elected, qualified and acting General Director of Storm; and

> (ii) is duly authorized to sign, on behalf of Storm, individually, (A) all instruments as necessary to terminate the Shareholders Agreement dated March 26, 1998 ... and, (B) the Shareholders Agreement dated January 30, 2004 between and among Telenor, Storm and Kyivstar.

In the course of the arbitration, Andrei Kosogov submitted an affidavit in

which he confirmed that he had signed a January 30, 2004 Certificate of

Incumbency and Authority. He did so, he said, "because this was a fairly routine

business practice in transactional matters," and because he "was not aware that

a special resolution of Storm's participants was necessary to authorize Mr. Nilov

to enter into the Shareholders Agreement." Mr. Kosogov stated further: "I signed

the Certificate by relying on my knowledge of provisions of Ukrainian law giving

the General Director of a Ukrainian company general authority to act on behalf of

the company, including entering into agreements on behalf of the company."

Kosogov Affidavit, Paragraphs 5-6.

    **f.**    **The Arbitration and Choice of Law Provisions of the**

**2004 Shareholders Agreement.** As signed, the text of the January 30, 2004

Shareholders Agreement differed in only one respect from the form of

Shareholders Agreement that had been attached as Exhibit B – "Draft of New

Shareholders Agreement" -- to the Voting Agreement and approved in 2002;

namely, the inclusion of Section 11.02, a provision requested by Storm,

negotiated, compromised and ultimately entitled "Termination for Material

Breach." Otherwise, the 2004 Agreement remained identical in all respects to the 2002 form Agreement.

One of the key provisions that remained unchanged was Section 12.01 of the January 30, 2004 Shareholders Agreement, entitled Arbitration: Consent to Jurisdiction, which provides in pertinent part:

(a)     Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a Panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules then in force (the "UNCITRAL Rules") in accordance with the following terms and conditions:

(i)     In the event of any conflict between the UNCITRAL Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail.

(ii)     The place of the arbitration shall be New York, New York, United States of America.

*     *     *

(v)     The arbitrators shall have the power to grant any remedy or relief that they deem just and equitable and that is in accordance with the terms of the Agreement, including specific performance, and including but not limited to injunctive relief, whether interim or final, and any such relief ... ordered by the arbitrators may be specifically enforced by any court of competent jurisdiction.[3]

Another important provision that remained unchanged is Section 13.06, entitled Governing Law, which states in its entirety:

---

[3] Interestingly, of the changes to the Term and Termination provisions in Article XI of the Shareholders Agreement -- which was the only altered Article -- one was to include the following arbitration clause in Section 11.02(c), which provides in pertinent part: "If a Shareholder disputes whether a Material Breach has occurred or whether it has been cured, such Shareholder may commence an arbitration proceeding in accordance with Section 12.01." Thus, the modified Article XI in 2004 reaffirmed, at Storm's instigation, the Parties' on-going commitment to arbitration pursuant to Section 12.01.

"This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction.

**g.     The Parties' further actions leading up to this Arbitration.** In March 2004, Telenor exercised its rights under the Share Purchase Agreement to buy back the Kyivstar shares it had previously sold to Storm, thereby ensuring that Telenor would have 56.5 % of Kyivstar's shares and Storm would have 43.5%.

Telenor and Storm performed their respective obligations under the 2004 Shareholders Agreement for over a year. At the annual meeting of Kyivstar shareholders on April 27, 2004, for example, the two Parties voted in favor of an amended Kyivstar Charter that brought it into compliance with the Shareholders Agreement. This Charter was duly registered with the appropriate Ukrainian authorities.

During 2005, however, increasing friction developed between the Parties. In March 2005, Storm and its designated representatives stopped attending Kyivstar shareholder and general board meetings. Thereafter, Storm affiliates in the Alfa consortium commenced several lawsuits in the Ukrainian courts challenging various aspects of its relationship with Telenor. Storm's affiliates also purchased interests in excess of 5% in two telecommunications operators in Ukraine.

**3.     Summary of Telenor Claims and Requested Relief**

On February 7, 2006, Telenor commenced this Arbitration pursuant to Section 12.01 of the Shareholders Agreement, and the UNCITRAL Arbitration

14

Rules, by filing a Notice of Arbitration and Statement of Claim against Storm. On April 25, Telenor filed an Amended Notice of Arbitration and Statement of Claim. As amended, Telenor's Notice and Statement of Claim seek a declaration that Storm is in breach of the Shareholders Agreement in three principal respects:

(a) by Storm's failure to attend annual and extraordinary shareholder meetings of Kyivstar, its failure to appoint candidates for election to the Kyivstar board of directors, and the failure of the Storm directors to attend board meetings, in breach of Section 2.05 and other provisions of the Shareholders Agreement;

(b) by the ownership by Storm affiliates of an interest in excess of 5% in two telecommunications operators in Ukraine, in violation of the non-competition provision in Section 6.02 of the Agreement; and

(c) by the initiation of litigation in Ukraine aimed at invalidating the rights and obligations of the Parties under the Shareholders Agreement, in breach of the arbitration provisions of Section 12.01.

In addition to a declaration that Storm is in breach of the Shareholders Agreement in the foregoing respects, Telenor seeks an award requiring Storm to comply in the future with the Agreement's requirements relating to shareholder and board meetings, granting Telenor appropriate relief against the breaches of the non-competition provision of the Agreement, enjoining court actions in violation of the Agreement's arbitration provisions, and requiring Storm to take steps to amend the Charter to conform to the Shareholders Agreement and a December 22, 2005 Order of the High Commercial Court of Ukraine (the "December 22 Order"). Finally, Telenor's Amended Statement of Claim seeks an award of damages for Storm's breaches of the Agreement, plus attorney's fees and costs.

4.    **Summary of Storm Defense and Requested Relief.**

On May 30, 2006, Storm filed its Statement of Defense to Telenor's

Amended Notice and Statement of Claim.  In summary, Storm takes issue with

each of Telenor's claims, alleging that:

> (a) Storm was justified in bringing actions in the Ukrainian courts because the Kyivstar Charter was violative of Ukrainian law, as confirmed by the December 22, 2005 Order of the High Commercial Court of Ukraine;

> (b) Storm and its nominated directors were, accordingly, justified in not attending Kyivstar shareholder and board meetings;

> (c) Storm is not required to accept amendments to the Kyivstar Charter proposed by Telenor because they are governed by Ukrainian law and must be heard by the Ukrainian courts;

> (d) Storm did not breach the arbitration provisions of the Shareholders Agreement because Telenor waived those provisions by failing to raise them in the Ukrainian court proceedings; and

> (e) Storm and its affiliates did not violate the non-competition provision of the Shareholders Agreement because the provision is overbroad and unenforceable.

Storm's Defense prays for a declaration that Storm's nominees to the

Kyivstar board were justified in not attending meetings; that Storm was justified in

not attending shareholder meetings; that Storm has not violated the non-

competition provision of the Shareholders Agreement; and that Telenor has

waived and is estopped from seeking relief under the arbitration provision. Storm

also prays for its fees and costs in connection with this Arbitration, plus interest.

Storm's Defense alleges "as an alternative ground' that the Tribunal

should "dismiss Telenor Mobile's claim and even the arbitration in its entirety"

because the Kyiv Commercial Court had declared on April 25, 2006, that "the

entire Shareholders Agreement is invalid because it was entered into without the requisite authority and fails to comply with the registration and execution requirements of Ukrainian law." (p. 3.)    Storm further alleges that, "An appellate court recently upheld the April 25 Order."  (p. 6.)

Storm's May 30, 2006 Statement of Defense was the first notice given to the Tribunal that Storm and one of its affiliates had been in litigation in Ukraine where the affiliate challenged the validity of the Shareholders Agreement and its arbitration provisions.  The Tribunal learned shortly thereafter that Telenor also had no notice of the Ukrainian proceedings until after the order of the Ukrainian appellate court, because Telenor had not been made a party to the proceedings that resulted in the April 25, 2006 Order, or its affirmance.

**B.**  **THE COURSE OF THE ARBITRATION AND THE RELATED COURT PROCEEDINGS THROUGH THE PARTIAL FINAL AWARD.**

**1.**  **The Arbitration and Court Proceedings Leading Up to Storm's Motion to Dismiss.**

Because the April-May 2006 Ukrainian court proceedings came as a surprise both to the Tribunal and to Telenor, and because Storm relied upon these proceedings to challenge this Tribunal's jurisdiction, it is appropriate to review what had occurred in this Arbitration prior to the filing of Storm's Statement of Defense and its subsequent Motion to Dismiss the Arbitration.

As previously noted, Telenor initiated this Arbitration with the filing of its original Notice of Arbitration and Statement of Claim on February 7, 2006. Promptly thereafter, Telenor selected William R. Jentes as its arbitrator to serve on the Tribunal, and Storm selected Gregory B. Craig.  On March 31, 2006, the

two party-appointed arbitrators selected Kenneth R. Feinberg to serve as Chair. All of the arbitrators agreed that they would serve as neutral members of the Tribunal and so notified the Parties.

The Tribunal's first order of business was to ask the Parties to supply names of all affiliates, parents and subsidiaries related to the parties, along with the names of all officers and executives who were likely to be mentioned in the proceeding, to be certain there would be no disabling relationships with the Tribunal members. Both Parties complied with that request, the Tribunal disclosed no conflicts, and its members were accepted.

On April 14, 2006, the Tribunal held its first pre-hearing conference with the Parties to consider their views on a schedule for the Arbitration. During the conference, Storm notified the Tribunal that it intended to file a motion to dismiss asserting that the 2004 Shareholders Agreement was invalid, and that the Tribunal accordingly lacked jurisdiction to decide Telenor's claim. No mention was made by Storm that one of its affiliates either had initiated, or was about to initiate, court proceedings in Ukraine. Instead, the Parties agreed to a schedule for briefing and hearing Storm's proposed motion, which was approved by the Tribunal..

Storm filed its Motion to Dismiss on June 7, 2006, a week after filing its Statement of Defense on May 30, 2006. Storm's Motion was predicated on the "alternative ground" in its Statement of Defense, contending that the Tribunal had "no authority to decide the merits of Telenor's claim because the Ukrainian courts had ruled, among other things, that the January 30, 2004 Shareholders

Agreement was 'null and void in full, including the arbitration clause,'" (quoting Decision of Kyiv Commercial Court, April 25, 2006 (translation, p. 3); *aff'd* Kyiv Appellate Commercial Court, May 25, 2006 (translation, p. 3)). Storm prayed that the Arbitration be dismissed in its entirety for lack of jurisdiction.

Telenor filed its Opposition to Storm's Motion on June 23, 2006, contending that the Ukrainian litigation was "collusive", having been brought against Storm by one of its own affiliates, Alpren; that Telenor was not notified of, or made a party to, the Ukrainian litigation; and, therefore, that Telenor was not bound by the Ukrainian decisions. Telenor further contended that, pursuant to the choice of law provision in the Shareholders Agreement, New York law, not Ukrainian law, governed the issue of whether the Shareholders Agreement was valid.

**2.    The Proceedings on Storm's Motion to Dismiss.**

On June 29, 2006, the Tribunal held the first of three hearings on Storm's Motion to Dismiss. The first hearing consisted largely of oral argument by the Parties' counsel concerning the two Ukrainian decisions of April 25 and May 25, 2006 (the "Alpren litigation"), and the background of the Voting Agreement of September 2, 2002, the attached form of Shareholders Agreement and the 2004 Shareholders Agreement. At the end of the argument, the Tribunal concluded the Parties needed to make further evidentiary submissions regarding both the background of the 2004 Shareholders Agreement and what evidence and arguments had been presented to the Ukrainian courts concerning its validity, including the arbitration provision. Accordingly, the Tribunal ordered such

submissions and scheduled a second hearing for August 14, 2006. Following the August 14 hearing, the Tribunal held a third hearing on September 5, 2006, in response to Storm's concerns about the unavailability of certain of its witnesses for the August 14 hearing.

In the course of the three hearings, the Tribunal received extensive evidence regarding the background, negotiation, approval and execution of the 2004 Shareholders Agreement and its predecessors -- from which the recitation in Section A.2 is derived -- and about what of this evidence, if any, was submitted to the Ukrainian courts. The evidence presented to the Tribunal consisted of live testimony and declarations from Telenor and Storm officials and counsel, documents relating to the negotiation, approval and signing of the relevant corporate documents, including emails and letters exchanged between the parties and their representatives, and the official court records from the Ukrainian courts and English translations of those records. The evidence before this Tribunal also included affidavits and supporting documents submitted by Ukrainian legal experts.[4]

With regard to the proceedings in the Ukrainian courts, the evidence submitted to this Tribunal established that on April 14, 2006, Alpren brought suit against Storm in the Kyiv Commercial Court, claiming among other things that Storm's 2004 Shareholders Agreement with Telenor had not been executed by

---

[4] Because the evidence presented during the three hearings also bears on the merits of the claims in this Arbitration, it is further discussed in the later Sections of this Final Award dealing with those claims.

an authorized representative and was accordingly invalid.[5]  As previously noted, Alpren and Storm were under the direct or indirect control of Altimo, and the ultimate control of Alfa.  It was undisputed that Telenor received no notice of this proceeding or of the subsequent appeal until after the Commercial Appellate Court later rendered its decision.

On April 21, 2006, the Kyiv Commercial Court held a 20-minute hearing at which Storm submitted no statement of defense.  Its representative did advise the Court of the arbitration clause and of the existence of this Arbitration, but made no argument that the arbitration clause commits "any and all disputes" to the arbitral tribunal for resolution and that the governing UNCITRAL Rules provide for the severability of the arbitration clause from the Shareholders Agreement.  Storm's representative also made no attempt to present to the Ukrainian court the extensive evidence received by this Tribunal regarding the background, approval and affirmation of the 2004 Shareholders Agreement, including its arbitration and choice of law provisions.

On April 25, 2006, the Kyiv Commercial Court rendered its decision in which it determined that Storm's participating shareholders had not properly approved the 2004 Shareholders Agreement; that Storm's General Director Nilov had "acted unlawfully and in excess of [his] powers"; and that the Shareholders Agreement was "null and void in full, including the arbitration clause, from the time of their execution." ( p. 3.)

The record before this Tribunal disclosed that Storm filed an appeal from the April 25 Order, in which it repeated that the dispute was currently in

arbitration in New York and argued that it was not "examinable" by the Kyiv Commercial Court. However, Storm once more presented none of the extensive evidence submitted to this Tribunal concerning the approval of the 2004 Shareholder Agreement, nor regarding the certification by Storm officials on repeated occasions of the authority of Storm's General Director and others to sign the Agreement on its behalf. Storm also made no argument regarding the severability of the arbitration clause, nor did it supply the evidence heard by this Tribunal of Storm's clear intent to submit any and all disputes with Telenor to arbitration.

On May 25, 2006, the Appellate Commercial Court held a 15-minute hearing, at which Alpren was represented by two lawyers from a Ukrainian law firm, while Storm was represented by an inside official who was not a lawyer and who proferred no factual submissions. Telenor was not present or notified of the hearing. Immediately following the hearing, the court issued a decision affirming the lower court's ruling that Storm's General Director had "acted unlawfully" and "in excess of his authority" in signing the January 30, 2004 Shareholders Agreement, and that the Agreement, including its arbitration provision, was "null and void" from the outset. (pp. 2-3.) The Court further ruled that the lower court had jurisdiction to proceed because any arbitration agreement was not between Alpren and Storm.

### 3.    The Tribunal's Partial Final Award Regarding Jurisdiction.

Based on the record before it, this Tribunal concluded that Storm's Motion to Dismiss presented two issues: First, did the Tribunal have jurisdiction to

decide the question of whether it has jurisdiction to hear this Arbitration, or is that a decision for a court?  Second, assuming the Tribunal has jurisdiction to decide this first issue, did it, in fact, have authority to proceed to hear the issues raised by Claimant's Amended Notice of Arbitration and Statement of Claim?  For the reasons spelled out more fully in its Partial Final Award Regarding Jurisdiction, issued on October 22, 2006 and re-issued in corrected form on December 22, 2006 ("Partial Award"), the Tribunal unanimously answered both questions in the affirmative.

    As to the first question, the Tribunal's Partial Award pointed out that Storm, itself, had repeatedly conceded that the Tribunal had authority to decide the issue of its own jurisdiction.  For example, Storm counsel stated at the June 29, 2006 Hearing:

> Now, [Claimant] spend[s] a lot of time saying that this panel has the jurisdiction to determine whether it has jurisdiction, or has the power to determine whether it has jurisdiction.  Storm does not disagree with that proposition . . . . We believe that you do have the power to decide whether you have jurisdiction.  That's why we made the motion to you and are here today.
> Hearing on June 29, 2006; Tr. at p. 23, 13-23.

    The Partial Award underscored that Storm's concession is consistent with the applicable case law, citing Shaw Group, Inc. v. Triplefine Intern. Corp., 322 F.3d 115, 123 (2d Cir. 2003).   That case stands for the proposition that where, as here, the question of jurisdiction to arbitrate is delegated in clear and unmistakable language to the Tribunal, it is the Tribunal – not a court – that has the authority to decide its jurisdiction to proceed.  In this matter, Section 12.01 of the Shareholders Agreement plainly states that "any and all disputes and

23

controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration." Moreover, Article 21 of the UNCITRAL Rules, which Section 12.01 expressly adopts, is equally clear that:

1. The arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement.

2. The arbitral tribunal shall have the power to determine the existence or the validity of the contract of which an arbitration clause forms a part. For the purposes of Article 21, an arbitration clause which forms part of a contract and which provides for arbitration under these Rules shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause

The Tribunal, having concluded that it had jurisdiction to decide its own jurisdiction, next unanimously concluded that it did, in fact, have jurisdiction to hear the merits of this Arbitration. It reached this conclusion notwithstanding the decisions of the Ukrainian courts declaring the 2004 Shareholders Agreement, including the arbitration clause, to be "null and void". The Partial Award explained that the record showed that the Ukrainian courts had never adequately addressed the severability of the arbitration clause from the rest of the Shareholders Agreement, or the separate validity of the arbitration clause. Indeed, those courts never referenced Article 21 of the UNCITRAL Rules, which expressly provides for the severability of the arbitration clause and further provides that a decision that the underlying Shareholders Agreement is invalid

"shall not entail ipso jure the invalidity of the arbitration clause". The Partial Award stressed that the Tribunal had developed a full record on these issues. Based on the extensive evidence before it, the Partial Award found that Storm and Telenor had a clear intent to have their disputes resolved through arbitration; that Nilov confirmed that intention by executing agreements that contained a broad arbitration clause and that incorporated the UNCITRAL Rules; and that none of the reasons assigned by the Ukrainian courts for invalidating the Shareholders Agreement applied to the arbitration clause. In fact, there is nothing in those decisions suggesting that the General Director of a Ukrainian company could not enter into a binding agreement to arbitrate.

The Tribunal made clear in its Partial Award that it was not ignoring the decisions of the Ukrainian courts. Nor was it impugning the integrity of those courts or their decisions. To the contrary, the Tribunal found no evidence of any impropriety or violations of any Ukrainian procedures. Instead, the Tribunal rested the conclusions in its Partial Award on the fact that the Ukraine courts had lacked the full record presented to the Tribunal on the issues of arbitrability and the validity of the arbitration clause. Unlike the Ukrainian court proceedings, both the Claimant and Respondent had been afforded a full and complete opportunity to present their evidence and arguments on those issues. Furthermore, Claimant and Respondent had expressly stated that there was no further evidence or legal argument they wished to present.

The Partial Award observed that it was understandable that the Ukrainian courts never gave meaningful consideration to whether the validity of the

arbitration clause might be severable from the Shareholders Agreement, since neither Alpren nor Storm raised those issues with the courts, and Telenor had no ability to do so because it was never notified of, or made a party to, the Ukrainian proceedings.  In some respects, the Tribunal felt this failure reinforced the Parties' intention that those issues were for this Arbitration.

In the latter regard, the Tribunal found it significant that this Arbitration was initiated in February 2006, two months before Alpren commenced its Ukrainian litigation.  The Tribunal was fully constituted by the end of March with Storm's concurrence, and held its first pre-hearing conference where Storm gave no indication that its affiliate intended to proceed before the Ukrainian courts. Instead, Storm agreed to a schedule for filing its Motion to Dismiss and made no attempt to seek a court stay of the Arbitration.  Instead, Storm was steadfast in its effort to secure a  ruling on its Motion from this Tribunal.

Finally, the Tribunal pointed out that its Partial Award  was not deciding whether the Shareholders Agreement, as opposed to the arbitration clause, is valid or not.  That decision, the Tribunal stressed, must await the further arbitration hearing then scheduled in New York City for December 7 and 8, 2006, when Storm would have an opportunity to present whatever additional evidence it wished on the issue.

In sum, based on the record before it, the Tribunal's Partial Award: (a) denied Storm's Motion to Dismiss, (b) concluded the Tribunal should proceed to final hearing on the claims raised by Claimant's Amended Notice of Arbitration and Statement of Claim, and (c) denied Storm's then pending request for a

continuance of the hearing and ruled that it should go forward as scheduled on December 7 and 8, 2006 in New York City.

C.     **THE COURSE OF THE ARBITRATION AND THE RELATED COURT PROCEEDINGS AFTER THE PARTIAL FINAL AWARD.**

1.     **The Subsequent Ukrainian Court Decisions.**

On October 26, 2006, four days after the Partial Award was first issued on October 22,  Alpern returned to the Kyiv Appellate Commercial Court with an application to "clarify" that Court's May 25, 2006 Order.  The application was an effort to have the Court  deal, after the fact, with several of the critical deficiencies in the May 25 ruling on the arbitration clause that were identified in the Partial Award.  Once again, Alpern gave no notice of its application to Telenor and made no effort to supply the Court with the record before this Tribunal.  Nor did Alpern or Storm present any of the evidence before this Tribunal that had led to its Partial Final Award.

On November 8, 2006, the appellate court issued a Ruling that reiterated its earlier position that the Shareholders Agreement was void *ab initio*, and that this included the arbitration clause.   However, the Ruling made no attempt to respond to the findings in the Partial Award that led the Tribunal to conclude that the arbitration clause was severable from the Shareholders Agreement and reflected an enforceable agreement between the Parties.  In fact, the Ruling nowhere discussed the severability issue.  Nor did it provide any authority for the proposition that the General Director of a Ukrainian company could not enter into a binding arbitration agreement on the company's behalf.  As for the UNCITRAL

Rules, the Court's only mention was its statement that "the referral of a dispute for arbitration by three arbitrators in accordance with the applicable UNCITRAL Rules under such agreement shall be treated as a violation of Clause 4 of Article 216 of the Civil Code of Ukraine."

The November 8 Ruling did seek to cure Alpren's failure to join Telenor as a party by announcing that the May 25, 2006 Order "shall apply and be binding also upon those entities that were not among the parties to the court proceedings". (p.2.) The Court also ruled that, "Should the parties and the arbitrators, appointed in accordance with the Shareholders Agreement, ignore the above circumstances and render an award on the dispute, such acts shall constitute a violation of the court decision,..." *Id.*

Storm notified Telenor and the Tribunal of the November 8, 2006 Ruling on November 15, and sought an indefinite postponement of this Arbitration. The Tribunal denied the postponement and reaffirmed the December 7 and 8 hearing dates. Alpern returned once more to the Ukrainian courts without notice to Telenor, and secured an injunction from the Golosiyiv District Court of the City of Kyiv, dated December 1, 2006, barring Telenor, Storm and Storm's current General Director, Vadim Klymenko, from participating in any way in this Arbitration. Three days later, on December 4, 2006, Storm again sought to halt these proceedings on the basis of the December 1 injunction. The Tribunal denied this latest request and ordered the hearing to proceed as scheduled.

### 2.    Proceedings in New York State Court and United States District Court (SDNY)

In yet another collateral attack on the Tribunal's Partial Award, Storm commenced an action on November 13, 2006 in New York Supreme Court, New York County, seeking to vacate the Tribunal's Award and enjoining the parties from proceeding with the arbitration.  The following day, Telenor removed the action to the United States District Court (SDNY) where the case was assigned to Judge Gerard E. Lynch.

At an emergency hearing convened the following day (November 15, 2006), Judge Lynch inquired of the parties whether either party challenged the federal court's jurisdiction.  Telenor stated that jurisdiction was proper under the New York Convention.  Storm raised no question as to the jurisdiction of the federal court.

Thereafter, the District Court denied Storm's Motion for a Preliminary Injunction on the ground that the Tribunal's October 22, 2006 order was an interlocutory order and not a final award.  On November 22, 2006, Judge Lynch issued an opinion and order denying Storm's motion to vacate the Panel's award and rejecting Storm's request for a preliminary injunction that would halt the arbitration proceeding.

On December 5, 2006, Telenor asked Judge Lynch to issue an anti-suit injunction against Storm, Altimo and Alpren because of efforts by those parties – in Ukraine – to enjoin officials from Kyivstar, Storm and Telenor from participating in the New York arbitration proceedings. Judge Lynch held a hearing on December 7, 2006 to consider Telenor's motion, and on December 11 and 15,

29

2006, Judge Lynch held additional hearings, in part on the question of his own jurisdiction and in part on the merits of Telenor's request for relief.

In a December 15, 2006 Opinion and Order, Judge Lynch concluded that Telenor "will likely succeed in establishing that Storm, Alpren and Altimo are alter egos of one another" and "for purposes of the present dispute, the same entity" and therefore bound by Storm's agreement to submit to the Court's jurisdiction. Judge Lynch further found that Telenor would likely prevail in establishing that Storm's General Director (Nilov), "had at least apparent authority to sign the Shareholders Agreement and to thereby bind Storm to the Agreement's arbitration clause."  The Court went on to observe that, "The foreign litigation here has been conducted in the most vexatious way possible."  Judge Lynch concluded that continued litigation in Ukraine "raises the distinct specter of delay, inconvenience, expense, inconsistency and an unseemly race to judgment" and an "acute" risk of "inconsistent adjudications."  Since, in the Court's view, "It is a fair inference . . . that Storm colluded in the bringing of this [Ukrainian] litigation against itself, it can therefor be enjoined from continuing with such actions."

In sum, the Court granted Telenor's motion for an anti-suit injunction against Storm, Altimo and Alpren and issued an order prohibiting them from "attempting to cause the enforcement of any legal action in Ukraine that would disrupt, delay or hinder in any way the arbitration proceedings between Telenor and Storm in New York."

3.     **Further Pre-Hearing and Hearing Proceedings.**

The arbitration hearing originally scheduled to occur in New York City on December 7-8, 2006 took place ten days later on December 18-19, 2006.  Prior to the hearing, Storm took the position that, because of the Ukrainian court's order of December 1, 2006 enjoining the parties from continuing the arbitration proceeding in New York City, Storm was prohibited from participating in the hearing in any way. At the hearing on December 18, Storm asked the Tribunal to reconsider its Partial Award and "to adjourn this hearing until such time as the Ukrainian Court action has run its course."

The Tribunal denied Storm's application and stated it would proceed on June 18 to take further evidence on the merits of Telenor's underlying claim against Storm.  In response, counsel for Storm said, "Because of the December 1 ruling [in Ukraine], Storm feels that its hands are tied and that it cannot go forward on the merits."  Storm physically withdrew from the hearing room and did not participate in the hearing.  At the hearing, Telenor presented two witnesses and submitted one new affidavit into evidence.

The first witness was Jay Moland, a Norwegian citizen, who is Chief Financial Officer at Telenor, Deputy Chairman of the Board of Kyivstar and a member of that board since 1998.  Among other things, Moland testified about the failure of Storm's members of the Kyivstar Board of Directors to attend board meetings beginning on March 18, 2005 and continuing to the present.  He described the damage caused to Kyivstar that resulted from Storm's boycott, and testified that Storm -- up until the commencement of the arbitration -- had never

explained their Board members' absence by claiming that the 2004 Shareholder's Agreement was invalid.

The second witness was Fredrik Lykke, in house counsel for Telenor from 1999 to 2006. Lykke described the drafting and negotiation of the 2002 form of Shareholders Agreement, the fact that there was no objection to identifying the law of the State of New York in the choice of law provision, and the importance to Telenor of having a non-competition provision included in the Agreement.

In sum, during the hearings on Storm's Motion to Dismiss and during the December 2006 hearing, the Tribunal heard or received testimony from eighteen different witnesses by live appearance and by affidavit. It received hundreds of exhibits and thousands of pages of other documentary submissions. The Parties also submitted lengthy pleadings, briefs, letters and submissions of legal authorities in which they analyzed the facts, discussed the relevant law and argued their positions without interruption or limitation. Thus, the evidentiary record and legal authority available to this Tribunal has been voluminous and comprehensive, dwarfing the limited record made available to the Ukrainian courts. .

### 4.    Post-evidentiary hearing submissions.

The Tribunal requested post-evidentiary hearing briefs, and Telenor filed its brief in timely fashion. Storm declined to submit any post-evidentiary brief and did not file any additional argumentation either on the law or on the merits. On February 12, 2007, the Tribunal issued an Interim Order Directing Further Briefing by February 28, 2007 concerning four issues relating to the governing

law to be applied.  The Parties requested additional time and the deadline was extended to March 14, 2007.  During that time, Storm received permission to participate – with certain limiting conditions – in the final briefing of the case and did so.

5..    **The Hearing is Closed.**

On May 8, 2007, the Tribunal issued an Order Closing the Hearing pursuant to Article 29 of the UNCITRAL Arbitration Rules.  In that Order, the Tribunal informed the parties:  "Absent special permission from the Tribunal, no further submissions of any type will be delivered to the Tribunal."

**D.    THE TRIBUNAL REAFFIRMS ITS JURISDICTION TO HEAR AND RESOLVE THIS ARBITRATION.**

As previously explained, the Tribunal made a two-fold decision in its Partial Award on the basis of the record then before it: the Tribunal first ruled that it had jurisdiction to decide its own jurisdiction to hear this Arbitration, and then it concluded that it did, in fact, have that authority.  Nothing that has since transpired, either in this Arbitration or in the collateral judicial proceedings in Ukraine or the United States, has caused the Tribunal to change its earlier decisions.  Quite the opposite.   The intervening judicial developments and the record developed in connection with the December hearing in this Arbitration have actually reinforced the Tribunal's prior conclusions and now lead it to reaffirm its Partial Award and to proceed to the resolution of the merits of the Parties' claims, defenses and prayers for relief in this Arbitration.

The November 8, 2006 Ruling of the Kyiv Appellate Commercial Court actually convinces the Tribunal that the Court in Kyiv failed to take into account several crucial factors bearing on a determination of the validity of the arbitration clause in Section 12.01 of the Shareholders Agreement.   For example, except for passing mention of the UNCITRAL Rules (without even acknowledging their adoption by Ukraine), the Court provided no response to the key provisions of Article 21, which expressly recognize the severability of the arbitration clause from the Shareholders Agreement and that any decision that the latter Agreement is null and void shall not *ipso jure* entail the invalidity of the arbitration clause.  Likewise, despite the explicit mention of the point in the Partial Award, the Court cited no law supporting the unusual proposition that the General Director of a Ukrainian company purportedly has no authority to enter into an arbitration agreement.

The force of the November 8, 2006 Ruling is further reduced by the fact that Telenor (again) did not receive notice of the proceeding before the Ruling was rendered, and by the fact that Alpren did not provide the Court with the extensive evidentiary record bearing on the validity of the 2004 Shareholders Agreement that had been compiled and submitted to this Tribunal.  One example is the evidence relating to Storm's "changes" to the 2004 Shareholders Agreement, which included the incorporation into Section 11.02 of the arbitration procedures from Section 12.01, a change that reconfirmed Storm's clear intent to have its disputes with Telenor resolved through arbitration.  Indeed, as set out fully in Section F *infra*, the totality of the record before and after the Partial Award

supports the Tribunal's conclusion that the 2004 Shareholders Agreement, as well as its arbitration clause, are valid and binding on both Parties, thus removing a key underpinning for the <u>Alpren</u> decisions.

In reaching its decision to proceed with this Arbitration, the Tribunal carefully considered the injunction issued by the Golosiyic District Court of Kyiv on December 1, 2006, which purported to bar Storm and Storm's current General Director from participating in this Arbitration. The Tribunal notes that the injunction does not apply to the Tribunal, and notes further that the Ukrainian injunction was shortly followed by a countervailing order issued by the federal court in New York enjoining the Parties and their affiliates from making any effort to impede this Arbitration. Taking the two orders together, the Tribunal concludes that there is no direct bar to its proceeding, and that continuing with the Arbitration was and is fully consistent with the directives of the UNCITRAL Rules, the Parties' intent as reflected in the Shareholders Agreement, and well-settled international commercial arbitration practice.

In the latter regard, the Tribunal points out that international commercial arbitration is a centerpiece of dispute resolution in today's global economy, where Ukraine and Norway are active participants. For commercial arbitration to succeed in this international environment, an arbitral tribunal must be free to proceed in accordance with the arbitration rules selected by the Parties. Accordingly, this Tribunal firmly believes that the Parties to this proceeding, their affiliates and the countries where they operate are all best served by allowing this Arbitration to complete its course and reach a conclusion in accordance with the