# EXHIBIT A
# PART 2

Arbitration Rules prepared by the United Nations Commission on International Trade, Rules which were expressly selected by the Parties and have been widely adopted by the international community, including Norway and Ukraine.

## E.  NEW YORK LAW GOVERNS THIS ARBITRATION.

### 1.  Controlling International and New York Law Mandates the Application of the Parties' Choice of Law.

The Tribunal has already underlined that the arbitration clause in Section 12.01 of the Shareholders Agreement specifically adopts the UNCITRAL Rules, and that by doing so the Parties made those Rules an integral part of their agreement.  Particularly significant to the issue of what law the Tribunal should apply to this proceeding is Article 33 of the Rules, which expressly mandates that, "The arbitral tribunal shall apply the law designated by the parties as applicable to the substance of the dispute." (emphasis added.)  Here, the Parties were explicit in Section 13.06 of the Shareholders Agreement that:

> This Agreement shall be governed by, and in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction.  (emphasis added.)[6]

The principle embodied in UNCITRAL Article 33 that the arbitral tribunal must apply the law chosen by the parties is a basic tenet of international commercial arbitration.  As one leading treatise states:

> Party autonomy in international contracts has been well recognized and developed in national laws for many years.... In

---

[6] Significantly, the choice of New York provision is one of those that remained unchanged from its first appearance in the 2002 form of Shareholders Agreement through the Agreement's execution in 2004.  In fact, the evidence disclosed that Storm never voiced any objection to the application of New York law.

the context of international commercial arbitration, <u>the right of parties to determine the law applicable to the merits of their dispute is undisputed.</u>

Julian D. M. Lew, et al.. *Comparative International Commercial Arbitration*, at 413-14. (citations omitted; emphasis added).

Consistent with accepted international practice, the European Convention on International Commercial Arbitration, to which Ukraine and Norway are signatories and which Storm itself noted serves as a governing provision in this dispute, provides in Article VII that "[t]he parties shall be free to determine, by agreement, the law to be applied by the arbitrators to the substance of the dispute."

The decisions of state and federal courts applying New York law are fully in accord with this established international law and practice. In fact, New York has reinforced the binding effect of the parties' contractual choice of law by the special statutory provisions of New York General Obligations Law § 5-1401. That statute expressly authorizes parties to a contract involving a transaction in excess of $250,000 to select New York law, even if the contract bears no relation to New York. The statute states in pertinent part:

The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection one of section 1-105 of the uniform commercial code, may <u>agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract agreement or undertaking bears a reasonable relation to this state.</u>

N.Y. Gen. Oblig. Law. § 5-1401 (McKinney Supp. 1984-85) (emphasis added).

As emphasized in *Bank of America Nat'l Trust and Sav. Ass'n v. Envases Venezolanos*. 740 F. Supp. 260, 264 (S.D.N.Y. 1990), the Section's passage "explicitly eliminated the 'contacts' analysis of choice of law provisions" that once applied in New York. In short, Section 5-1401 was drafted "to leave no doubt that New York substantive law applies to contracts that specify it in their choice of law clauses." *Supply & Building Co. v. Estee Lauder Intern. Inc..* 2000 WL 223838, at *3 n. 6 (S.D.N.Y. Feb. 25,2000), Accordingly, "[i]f the requirements of section 5-1401 are met, a contract's choice of law provision is given binding effect." *Id.* at *2. Here, there is no question that § 5-1401 applies because the Shareholders Agreement arises out of the Parties' investment in Kyivstar, which is valued at over US$3 billion.

In addition to settled caselaw and statutory mandate, sound policy supports giving binding effect to the parties' choice of law. As articulated in the leading case of *Motorola Credit Corp. v. Uzan*. 388 F.3d 39, 51 (2d Cir. 2004):

> [W]here the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping. This is especially true of contracts between transnational parties, where applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses within the numerous countries that have signed the New York Convention.

**2.    Storm's Arguments Against the Parties' Choice of New York Law Find no Support in Established Legal Authority.**

In an effort to counter the overwhelming weight of authority directing application of the Parties' choice of New York law, Storm has advanced four arguments, all designed to substitute Ukrainian law. The Tribunal has carefully weighed Storm's arguments and found them contrary to well-settled precedent.

Storm's first argument is that, where the issue is an agent's authority contractually to bind a corporate principal, New York courts supposedly apply a conflicts of law principle that looks to the law of the place of incorporation.  This argument is confounded by the express language of Section 13.08 of the Shareholders Agreement that New York law is to govern "without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction."  Furthermore, where the agent is clothed with <u>apparent</u> authority, as the Tribunal finds was true of  Storm's General Director who signed the Shareholders Agreement (*see* Section F *infra*), the New York courts have repeatedly applied the parties' choice of law.

In *Sphere Drake Ins. Ltd, v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001), for example, the Second Circuit held the parties' choice of New York and New Jersey law in two sets of contracts with a British company governed the latter's claim that it was not bound by an arbitration agreement that its agent had signed while allegedly acting beyond its agency.  The Court held that "we consider New York and New Jersey law, as appropriate, for questions relating to contract formation," including the issue of agent authority. *Id.* at 32 n. 3.

In *Motorola Credit Corp, supra,* the Second Circuit confirmed that in *Sphere Drake* it had applied the parties' "choice-of-law clauses to one party's claim that it was not bound by an arbitration agreement that its agent had signed while purportedly acting outside the scope of agency." 388 F. 3d at 50.  The Court  went on to state:" More generally, a choice-of-law clause in a contract will apply to

disputes about the existence or validity of that contract." *Id.*[7]  *See also, Int'l Minerals & Res.. S.A. v. Pappas,* 96 F.3d 586, 592 (2d Cir. 1996) (applying an English choice-of-law clause to an issue of contract formation); *Seetransport Wiking Trade Schiffarht Gcsellschuft MBH & Co. v. Rep, of Romania.* 123 F. Supp. 2d 174, 184-5 (S.D.N.Y. 2000) (applying parties' choice of New York law to contract between German corporation and the Romanian government, where Romanian government claimed that the official who had executed the contract lacked authority to do so).[8]

Storm's second argument against application of the Parties' choice of New York law is a variant on its first.  Storm contends that whether Storm's General Director could bind it to the Shareholders Agreement is governed by Ukrainian law under another of New York's conflicts of law rules relating to the "internal affairs doctrine."  Here, too, Storm's argument is undercut by the explicit language of Section 13.08 excluding application of such conflicts rules.  Of equal importance, it has long been recognized that, "Different conflicts principles apply ... where the rights of third parties external to the corporation are at issue."  *First Nat'l City Bank v. Banco para el Comercio Exterior de Cuba,* 462 U.S. 611,621 (1983) (emphasis in original).   Telenor is not a shareholder, officer or employee of Storm, and the issue of whether Storm's General Director has authority to enter into a contract with such a third party "external to the corporation" is not one where the "internal affairs

---

[7] *Motorola Credit Corp.* was also an instance, like the present, where the choice-of-law clause included a provision that it was to be applied without regard to the conflicts laws of the chosen jurisdiction. *Id.* at 43.

[8] Against this wealth of authority supporting application of the Parties' choice of New York law, Storm placed its principal reliance on cases pre-dating Section 5-1401 and on a footnote in the unreported decision *in Lehman Bros. Inc. v. Tutelar. CIA Financiera. S.A.,* 1997 WL 403463, at *3 n.4 (S.D.N.Y. May 17, 1997).  However, that case predates the key Second Circuit decisions discussed in the text and relied on a 1959 decision under Connecticut's choice of law rules. *Id.* at*4-5.

doctrine" is implicated.  *See Roselink Investors L.L.C. v. Shenkman.* *386* F. Supp.2d 209, 225 (S.D.N.Y. 2004).

Storm's third argument against the Parties' choice of New York law is that such a step would allegedly violate a "fundamental policy" of Ukrainian law.  Once again, Storm's argument is met with the undoubted fact that there is no "public policy" exception where the contract is governed by § 5-1401. As stated in *Sun Forest, supra*, 152 F.Supp. 2d at 388, "Section 5-1401 does not provide for any exceptions that would permit a court to decline to enforce a choice-of-law clause if the clause would infringe a fundamental public policy of the conflicting jurisdiction." *See also, Supply & Building Co. supra.* 2000 WL 223838 at *2-3; *Lehman Bros. Comm. Corp. v. Minmetals Int'l.* 179 F. Supp. 2d 118, 137-38 (S.D.N.Y. 2000).

Furthermore, the Tribunal finds no "fundamental" public policy of Ukraine that could support the rejection of New York law.  The "public policy exception" is reserved for those foreign laws "that are truly obnoxious." *Welsbach Elec. Corp. v. MasTec North America. Inc..* 7 N.Y.3d 624, 630; 859 N.E.2d 498 (2006) (noting that the exception applies where the "chosen law violates some fundamental principle of justice, some prevalent conception of good morals, [or] some deep-rooted tradition of the common weal.") (internal quotations omitted).  Storm relied on a presumed conflict between the Shareholders Agreement and the December 22 Order of the High Commercial Court regarding Storm directors.  That Order made no mention of the Shareholders Agreement, however, and Section F *infra* shows the two are reconcilable.

Storm's final argument against application of New York law contends that the Tribunal is obligated to give conclusive effect to the decisions of the Ukrainian courts,

regardless of what contrary results might be reached under New York law. The Tribunal has already explained the reasons why it has declined to accept those Ukrainian decisions in connection with the issue of its jurisdiction to hear this Arbitration. Essentially the same reasons lead the Tribunal to reject those decisions in favor of the application of New York law to the merits of this controversy.

Because Telenor was not named as a party to those lawsuits, nor notified of them until after an appeal had already been rendered, the decisions have no *res judicata* or collateral estoppel effect on Telenor. Indeed, granting them binding force would violate fundamental principles of due process under both federal and New York law. *See Parklane Hosiery Co.. Inc. v. Shore*, 439 U.S. 322, 327 n.7 1979); *Gramatan Home Investors Corp. v. Lopez*, 46 N.Y.2d 481, 486; 414 N.Y.S.2d 308, 327 (1979).

Additionally, Telenor's absence means that the Alpren decisions were not the product of an adversary proceeding, which further undermines their conclusive, or even persuasive, force. *See Judson v. Flushing Jockey Club*, 14 Misc. 350, 357 (S. Ct. N.Y. Co. 1895) ("Courts of judicature are organized only to decide real controversies between actual litigants."). As stated long ago in *Lord v. Veazie*, 49 U.S. 251, 255 (1850):

> The objection in the case before us is … that there is no real conflict of interest between them [the parties]; that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be.

*See also, Rough Spring Hill Gold Mining Co. v. Armador Medean Gold Mining Co.,* 145 U.S. 300 (1892) (dismissing lawsuit where the parties were parent and subsidiary corporations under common ownership and control).

The Tribunal finds unpersuasive Storm's contention that Telenor could have countered the non-adversarial nature of the Ukrainian proceedings by intervening on appeal <u>after</u> the initial decisions had already been rendered. "[P]ost- judgment intervention. . . is generally disfavored because it usually creates delay and prejudice to existing parties ... and undermines the orderly administration of justice." *United States v. Yonkers Bd. of Ed.,* 801 F.2d 593, 596 (2d Cir. 1986) 9internal citations omitted). More fundamentally, any experienced litigant knows that first appearing after the case has already been decided is hardly consistent with the fair administration of justice.[9]

In summary, the Tribunal finds that none of Storm's arguments against application of New York law withstands analysis, whereas the explicit language of the UNCITRAL Rules, the Parties' clearly expressed intent, and well-accepted international commercial arbitration law and practice, all support the Tribunal's conclusion that New York law governs this Arbitration.

## F.    THE 2004 SHAREHOLDERS AGREEMENT WAS VALIDLY EXECUTED AND BINDS THE PARTIES UNDER NEW YORK LAW.

The Parties' dispute over the validity of the 2004 Shareholders Agreement is at the center of this Arbitration. Storm claims that the Agreement is not valid,

---

[9] For reasons discussed more fully in Section G *infra*, the Tribunal also rejects Storm's argument that Telenor waived its right to arbitration because it litigated other issues in the Ukrainian courts. None of those other litigations involved the validity or enforceability of the 2004 Shareholders Agreement where invocation of arbitration under Section 12.01 would have been required.

and that it need not comply with its terms, because the Ukrainian courts – in their various decisions – have ruled that the Agreement is null and void under Ukrainian law  and  this Tribunal should give effect to those rulings.  Telenor counters that the officials at Storm and its parent entities who negotiated and executed the 2004 Shareholders Agreement had actual as well as apparent authority to bind Storm.  Telenor further maintains that the confirmatory actions of Storm and its controlling entities, both before and after the execution of the Agreement, estop Storm from challenging the Agreement and constitute a ratification of its terms.

The Tribunal is unanimous in reaching the conclusion that the 2004 Shareholders Agreement is valid and binding on the Parties.  For the reasons detailed in Section E *supra*, the Tribunal concludes that New York, not Ukrainian, law governs the issue of the validity of the 2004 Shareholders Agreement and that the decisions of the Ukrainian courts are not binding on that question. Turning to New York law, the Tribunal concludes that the 2004 Shareholders Agreement was validly executed and is binding on the Parties for four separate and  reinforcing reasons: (1) the person who executed the Agreement on Storm's behalf – its General Director, Valeriy Nilov -- had actual authority to do so; (2) he also had apparent authority; (3) the actions of Storm and its controlling entities estop it from challenging the Agreement's validity; and (4) Storm ratified the Agreement by its subsequent actions.

1.   **Nilov Had Actual Authority to Execute the 2004 Shareholders Agreement.**

Under New York law, actual authority is "the authority that a principal invests in its agent, which, upon its exercise, binds the principal." *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 51 F. Supp.2d 457, 472 (S.D.N.Y. 1990). Such authority "is created by direct manifestations from the principal to the agent," *Peltz v. SHB Commodities, Inc.,* 115 F.2d 1082, 1088 (2d Cir. 1997). Such authority may "be established by any action that reasonably indicates to the agent that the principal wants the agent to perform a certain task," *Seetransport Wiking Trader, v. Republic of Romania,* 123 F. Supp.2d 174, 185 (S.D.N.Y. 2000), but it can also be "inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." *In re Artha Management, Inc.,* 191 F.3d 326, 329 (2d Cir. 1996). "The extent of the agent's actual authority is interpreted in light of all the circumstances . . . including the customs of business, the subject matter, any formal agreement between the parties and the facts of which both parties are aware." *Peltz v. SHB Commodities, Inc., supra.*

In making a determination as to whether Valeriy Nilov possessed actual authority to execute the 2004 Shareholders Agreement and to bind Storm, the touchstone is whether there is evidence that Storm – by "direct manifestations" or by "words or conduct" – invested Nilov with the authority to execute that Agreement. The Tribunal has no difficulty in concluding that Nilov did have such authority. The Tribunal finds that Nilov's authority was specific, it was explicit, it was in writing, and it came directly from Storm's Participants.

Moreover, under New York law, "certain agents possess authority which is inherent or incidental to the ordinary scope of authority associated with their position. Such implied authority may be inferred solely from the designation of the principal as the kind of agent who ordinarily possesses certain powers." *Seetransport Wiking Trader v. the Rep. of Rom., supra.* The Tribunal finds that, under New York law, Mr. Nilov, by virtue of his position as General Director of Storm, also had the inherent authority to sign the 2004 Shareholders Agreement and, in doing so, to bind Storm.

Although Storm places its principal reliance on Ukrainian law as announced by the Ukrainian courts, it also argues that General Director Nilov had no actual authority even under New York law to sign the 2004 Shareholders Agreement. Storm does not dispute that Nilov may have been duly authorized to sign the 2002 Voting Agreement and the attached form of Shareholders Agreement, but contends that he had no comparable authority to sign the actual 2004 Shareholders Agreement without its being formally approved at a Meeting of Storm's Participants. Since no such Meeting occurred, Storm argues, and since the Participants never formally approved the 2004 Shareholders Agreement – either by written poll or by live vote – Nilov lacked actual authority to bind Storm. Storm argues further that, while it is true that an agreed-upon form of Shareholders Agreement was attached as an exhibit to the 20002 Voting Agreement, the form Agreement was materially changed during the negotiations preceding the execution of the 2004 Agreement. Because of that change, Storm claims, a new Meeting of the Participants and a new blessing of the new

46

Shareholders Agreement was required before Nilov could validly execute the 2004 Shareholders Agreement on Storm's behalf..

Storm claims further that Telenor knew or should have known that Nilov lacked the requisite authority, pointing out that Article 12 of Storm's Charter inescapably requires approval of a Meeting of Participants whenever, among other things, the General Director is planning to enter into an agreement that involves the disposition of, or encumbrance upon, Storm's shares "or any other assets of the Company."[10]  Storm argues that, inasmuch as the 2004 Shareholders Agreement involves voting and governance and the disposition of Kyhivstar shares, it is just such an agreement.  Accordingly, a meeting of Storm's Participants was absolutely required to approve the new Agreement before anyone could validly bind the company.

The Tribunal concludes that there are critical legal and factual flaws in Storm's challenges to Nilov's actual authority.   The Tribunal finds that the broad language of the resolutions dated August 30, 2002 – first  adopted by a written polling and thereafter ratified by unanimous live vote in an October 7, 2002 meeting of the Participants – clearly authorized Nilov to execute, on Storm's behalf, the January 2004 Shareholders Agreement.   In one of the resolutions authorizing  Nilov to sign the 2002 Voting Agreement, the Participants specifically authorized  Nilov – by name – "to execute and deliver the above-referenced agreements" and also "to take or cause to be taken any and all other actions as are required or desirable in connection with this Resolution and the above-

---

[10] Storm also points out that Section 145 of the Ukrainian Civil Code provides that the corporate charter shall determine all issues pertaining to corporate governance.

referenced agreements." There can be no doubt that "the above-referenced agreements" included – and were intended to include – the form of Shareholders Agreement that had been negotiated and approved by the Parties. Equally, there can be no doubt that the language authorizing Nilov "to take or cause to be taken any and all other actions as are required or desirable in connection with this Resolution and in the above-referenced agreements" authorized Nilov to negotiate changes in the terms of the form Shareholders Agreement, and ultimately to sign the amended agreement.

Consequently, even if Telenor was on notice in 2004 – as Storm claims – that a Meeting of the Participants was required to approve any agreement that involved the disposal of Storm assets, that approval had already been obtained in 2002. It is not just a question of what Telenor was told, what Telenor knew, or what Telenor could reasonably assume. The fact is that the Storm Participants in no uncertain terms specifically authorized Nilov to do whatever was "required or desirable" to put in effect a new shareholders agreement, and this plainly included execution of the 2004 Agreement. In short, the Tribunal concludes that the resolutions adopted by the Meeting of Storm's Participants in 2002 bestowed, as a matter of New York law, actual authority on Nilov to enter into the 2004 Shareholders Agreement on behalf of Storm.

2. **Nilov Also Had Apparent Authority to Execute the 2004 Shareholders Agreement.**

When it comes to apparent authority, New York law is no less clear:

"Apparent authority is based on the principle of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds

48

the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized."

*Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 665 (2d Cir. 1964). See also

*Marfia v. T.c. Ziraat Bakasi, New York Branch,* 100F.3d 243, 251 (S.D.N.Y. 1996)

And when it comes to determining whether an agent did or did not act with

apparent authority, thereby binding his principal, the New York Court of Appeals

held:

> "Essential to the creation of apparent authority are words or conduct of the principal communicated to a third party, that give rise to the appearance and belief that the agent possess authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority."

*Hallock v. State,* 64 N.Y.2d 224, 231; 485 N.Y.S.2d 510, 513; 474 N.aE.2d 1178

(1984). See generally, *Old Republic Insurance Company v, Hansa World Cargo*

*Service, supra* at 474-475..

Unlike the situation that pertains to actual authority where the evidentiary

inquiry is focused on communications between principal and agent, the inquiry

with respect to apparent authority is focused on communications between the

principal and third parties, *i.e.,* in this case, communications between Storm and

Telenor.[11] Did Storm, by its words or its acts, tell Telenor that Valeriy Nilov was

authorized to sign the 2004 Shareholders Agreement thereby vesting him with

apparent authority to do so? Did Telenor rely upon that information? Was it

reasonable for Telenor to rely upon that information? If all the answers to those

---

[11]  As the court wrote in *Seetransport Wiking Rader v. Rep. of Rom., supra,* "An agent has apparent authority when his principal represents through words or acts to a third party that the agent has the principal's consent to perform a certain action. (Citation omitted.)" 123 F.Supp.2d at 190.

questions are in the affirmative, Nilov was vested with apparent authority, and whether or not he was invested with actual authority, he could still bind Storm.

Again, the Tribunal has no difficulty concluding that Storm, by its words and its deeds, invested Valeriy Nilov with apparent authority to sign the 2004 Shareholders Agreement on behalf of Storm. The evidence is clear: Storm's communications to Telenor as to Nilov's authority were unambiguous. Storm told Telenor that Nilov was duly authorized to sign the document. Telenor relied upon that representation and would not have signed the Agreement without it. Finally, Telenor's reliance was reasonable under the circumstances. The Tribunal concludes that, when he signed the 2004 Shareholders Agreement, Valeriy Nilov was acting with apparent authority, and when he signed that document, he bound Storm to the terms and conditions of that Agreement.

As with its challenge to Nilov's actual authority, Storm rests its attack on his apparent authority principally on Ukrainian law and the rulings of the Ukrainian courts. Neverthelss, Storm also challenges Nilov's apparent authority under New York law. Storm argues that Telenor knew that there needed to be a Meeting of Storm's Participants to approve the proposed 2004 Shareholders Agreement, and that Nilov did not have that approval. Storm claims that Telenor knew this fundamental truth because (1) Telenor had received a copy of Storm's Charter well in advance of the Parties' execution of the 2004 Agreement and was presumed to had read Article 12 of that document, and (2) Telenor knew from the 2002 transactions that approval conferred by a special meeting of Storm's shareholders was required for any transaction involving the disposition of Storm's

assets, including Kyivstar stock. Accordingly, Storm argues, Telenor could not reasonably rely on Nilov's apparent authority to sign the 2004 Shareholders Agreement on Storm's behalf.

Once again, the Tribunal concludes that there are serious flaws in Storm's position, both from a factual and legal standpoint under New York law. Storm's arguments simply ignore the critical role that Nilov, as Storm's General Director, played in virtually all the proceedings leading up to and ending with the signing of the 2004 Shareholders Agreement. The Tribunal finds that Telenor was fully justified in relying (a) on Nilov's own representations as to his authority; (b) the representations of other Storm officials as to Nilov's authority; and (c) the actual terms of the resolution adopted by the Meeting of Participants in 2002 which explicitly authorized Nilov, by name, to "take or cause any and all other actions as are required or desirable in connection with this Resolution and the above-referenced agreements."

The Tribunal is particularly impressed by the affidavit of Storm's own Chairman, Andrei Kosogov. See the discussion *supra*, at pp. 11-12. His affidavit confirms that, while he was unaware that any Meeting of Participants of Storm's shareholders had taken place to approve the new Shareholders Agreement, he nonetheless signed a Certificate of Incumbency and Authority on January 30, 2004, explicitly authorizing Nilov to sign the new Shareholders Agreement. In that affidavit, Kosogov states that "I signed the Certificate at Telenor Mobile's request and agreed to do so because this was a fairly routine business practice in transactional matters." Kosogov went on to state: "Until recently I was not

aware that a special resolution of Storm's participants was necessary to authorize Mr. Nilov to enter into the Shareholders Agreement."

If Kosogov believed that Nilov was authorized to enter into the 2004 Shareholders Agreement on behalf of Storm, the Tribunal concludes that Telenor can hardly be faulted for reaching the same conclusion. The Tribunal's conclusion is further buttressed by the fact that Nilov, himself, also signed a Certificate on January 30, 2004 that he had the requisite authority to sign the 2004 Agreement and bind Storm.[12] In the face of this evidence, Storm's argument that Telenor knew, or should have known, that Nilov did not have the requisite authority is unconvincing.

The Tribunal also finds it significant that Storm never presented any evidence from Nilov to rebut his authority to sign the 2004 Shareholders Agreement. From the earliest days of this arbitration, the Tribunal identified Nilov as a person whose testimony would be important to the ultimate disposition of this particular issue. The Tribunal went out of its way to give Storm the opportunity to obtain Nilov's testimony by scheduling hearings to accommodate what it was told was his schedule. Then, when Nilov assertedly could not attend on those dates, the Tribunal re-scheduled the hearing dates in an effort to accommodate him. Still he did not appear. Nor did Storm secure his affidavit.

---

[12] The Tribunal can only assume that Nilov knew about the provisions contained in Storm's Charter requiring certain types of agreements to be presented to and approved by Storm's Participants. The Tribunal also assumes that Nilov knew that a written polling and live vote of Storm's participants had been taken in 2002 approving the 2002 Shareholders Agreement, and that the Participants had not re-convened to approve the 2004 Shareholders Agreement. The Tribunal finds it instructive that knowing all this, Nilov nonetheless felt himself authorized to sign the 2004 Shareholders Agreement.

Nilov's failure to appear was a serious blow to Storm's case. His failure to offer any testimony whatsoever – even by affidavit – compounded that blow. Nilov's absence left many of Telenor's most critical assertions unrefuted. His absence compels the Tribunal to draw the adverse conclusion that, had he testified, he would have damaged Storm's case.

In sum, the Tribunal concludes that Telenor was entitled to rely, and did rely, on the two Certificates of Incumbency and Authority signed by the Chairman of Storm and by a member of Storm's Board of Directors as providing Nilov with the authority to enter into the 2004 Shareholders Agreement on behalf of Storm. The straightforward language of those certificates and the oral representations that accompanied them plainly entitled Telenor to believe that Nilov had both actual and apparent authority to sign the agreement as a binding obligation of Storm.

### 3.    Storm Is Estopped From Challenging the Validity of the 2004 Shareholders Agreement.

To determine whether Storm is estopped from challenging the validity of the 2004 Shareholders Agreement on the ground that Nilov did not have the requisite authority, the Tribunal is required to answer three questions: [13]

First, did Storm by intentional acts of commission or omission create an appearance that Nilov had the authority to enter into the 2004 Shareholders Agreement on behalf of Storm? The Tribunal has no problem concluding that Storm did create such an appearance. As far back as the April 29, 2002 Letter

---

[13] See *Am. Fed'n of Musicians and Employers' Pension fund v. Steven Scott Enters., Inc.*, 40 F. Supp.2d 503, 508 (S.D.N.Y. 1990)

Agreement, Storm explicitly represented that Nilov was authorized to sign a new Shareholders Agreement and confirmed that he was "prepared to do so." In conjunction with Storm's execution of the 2002 Voting Agreement, Storm provided Telenor with the October Certificates that clearly confirmed that Nilov was authorized not only to enter into the 2002 Voting Agreement but also to take whatever steps were necessary to conclude the new Shareholders Agreement, which was attached to the Voting Agreement as an exhibit. Finally, in the Certificates of Incumbency that Storm provided to Telenor in January 2004, Storm expressly confirmed that Nilov was authorized to enter into the 2004 Shareholders Agreement.

Second, did Telenor reasonably and in good faith rely upon Storm's representations that Nilov was authorized to sign the Shareholders Agreement? For the reasons already spelled out above, the Tribunal has no difficulty concluding that Telenor did rely upon Storm's representations, and that Telenor's reliance was in fact reasonable.

Finally, did Telenor rely on Nilov's authority to its detriment? Again, the Tribunal has no difficulty answering in the affirmative. The evidence is clear that, in reliance on Storm's representations and promises, Telenor sold sufficient Kyivstar shares to Storm to allow Storm to obtain an interest in Kyivstar that exceeded 40%, which allowed Storm to block Telenor from taking important corporate action.

### 4.    Storm Ratified the 2004 Shareholders Agreement.

Finally, the record establishes that Storm ratified the 2004 Shareholders Agreement by its actions following the Agreement's execution. Storm lived with the 2004 Shareholders Agreement and complied with its terms for over a year after the parties entered into that Agreement. Storm never raised any concerns or questions about the validity of the Agreement during this period. To cite two examples, Storm officials attended meetings of the Kyivstar board and participated in Kyivstar shareholder meetings for at least one year after the Agreement was executed in January 2004.

Indeed, with its record of compliance, Storm ratified each and every agreement that it entered into on the way to the 2004 Shareholders Agreement. More specifically, there is no dispute that Storm complied with the terms of the April 29, 2002 Letter Agreement, the 2002 Share Purchase Agreement and the 2002 Voting Agreement. At no time did Storm ever raise any concerns or questions as to the validity of these agreements until after the commencement of this Arbitration.

## G.    STORM HAS BREACHED, AND IS CONTINUING TO BREACH, THE 2004 SHAREHOLDERS AGREEMENT.

The record in this Arbitration demonstrates conclusively that Storm has breached the 2004 Shareholders Agreement in the following three respects: (1) Storm has breached the contractual provisions relating to Board of Directors and Shareholder governance of Kyivstar; (2) Storm, through its affiliates, has breached the non-competition provisions of the 2004 Agreement; and (3) Storm has breached the Agreement's arbitration requirements. The record further

establishes that each of these breaches is material and that Storm has evidenced a clear intent to continue its breaches. In fact, Storm does not seriously deny its on-going breaches, but seeks to excuse its actions. The Tribunal unanimously rejects Storm's excuses as unsupported by the evidence and contrary to a plain reading of the 2004 Shareholders Agreement.

1.    **Storm's Breach of the Governance Provisions of the 2004 Shareholders Agreement.**

The 2004 Shareholders Agreement imposes explicit obligations on Storm to participate in good faith in the governance and operation of Kyivstar. Section 2.01(b) of the Shareholders Agreement states unambiguously that Storm must "take all action necessary ... to (1) ensure the election of candidates and (2) maintain the membership of the Board." Section 2.05 (b) goes on to impose a requirement on Storm:

(i)    to comply with its obligations under this Agreement;

(ii)    to act in a good faith and constructive manner such as to give effect to the provisions of this Agreement, including, without limitation, through participating in and voting at the GMS [General Meeting of Shareholders] and the Board; and

(iii)    not to take, or permit any of its Affiliates to take, any action permitted by Ukrainian law which would allow Storm to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.03(b) as an action for which Storm is required to vote its Voting Securities and cause the Directors nominated by it to vote in favor of approving.

Despite these unambiguous obligations, it is undisputed that Storm has failed to maintain its membership on the Board. In addition, it has obstructed Telenor's attempts to reconstitute the Board in conformity with the December 22, 2005 Order of the High Commercial Court of Ukraine, as discussed hereafter.

Equally undisputed is the evidence that Storm and its nominees failed to attend Board of Directors meetings, as well as Shareholder meetings, despite the fact that the Shareholders Agreement provides that the Parties will give effect to the provisions of the Agreement in good faith by participating and voting at Shareholder and Board meetings. (See Section 2.05(b)(ii)).

Storm has not denied that it and its nominees have absented themselves from Kyivstar Board and Shareholder meetings since the spring of 2005. Moreover, it has made it clear by its statements and its actions that it has no intention of attending future meetings. Storm's affiliate, Alpern, has even gone so far as to sue two of Storm's representatives on the Kyivstar Board to prevent them from attending Board meetings. As a result, the Board has been paralyzed. It has been unable to achieve a quorum necessary to hold a meeting or to conduct critical corporate business.

Storm seeks to excuse its failure to attend Board and Shareholder meetings by claiming that it relied in good faith on the December 22, 2005 Order of the High Commercial Court of Ukraine. Storm's claim is undermined by two uncontroverted facts. Storm began its boycott of Board meetings in March 2005, nine months _before_ the December 22, 2005 Order. It likewise began its boycott of Shareholder meetings in April 2005, eight months before the December 22 Order. Plainly, its actions could not have been in good faith reliance on a court ruling that did not exist.

Not only is Storm's "good faith" plea undercut by the course of events, but an examination of the December 22, 2005 Order discloses that the court did not

even address the validity of the 2004 Shareholders Agreement. Rather, the court's sole focus was on Kyivstar's Charter and, in particular, on its provisions regarding the eligibility for membership on the Kyivstar Board. On that issue, the court ruled that only Kyivstar shareholders could serve as Directors, a point that is not covered by the Shareholders Agreement.

Moreover, contrary to Storm's claim that the December 22, 2005 Order provided an excuse from attending Board and Shareholder meetings, the ruling did just the opposite. The court in Ukraine ruled that Telenor and Storm were obligated "to amend the text of the charter in conformity with the applicable legislation of Ukraine" as interpreted by the court, and the only way the Parties could carry out such an amendment was through a vote at a Shareholders meeting. (See Section 6.03 of the Shareholders Agreement). Yet, by boycotting such meetings, Storm prevented this from occurring, contrary to the manifest requirement of the December 22, 2005 Order. In short, Telenor has consistently sought to conform the Kyivstar Charter with the December 22 Ruling, but it has been Storm that has made this impossible by its breach of its obligation to participate in good faith in Kyivstar Shareholders meetings.

**2.      Storm's Breach of the Non-Competition Provisions of the Shareholders Agreement.**

Section 6.02 of the 2004 Shareholders Agreement contains a broadly worded provision barring the Parties and their affiliates from engaging, directly or indirectly, in competing telecommunications business in Ukraine:

> [N]o Shareholder *or any of its Affiliates* will, without the prior written consent of the Company and the other Shareholders, (i) engage in the Business in any

region in Ukraine, (ii) own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than [Kyivstar] or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine or (iii) permit any of its Controlled Affiliates (other than [Kyivstar] or any of its Controlled Affiliates) to engage in the Business in any region in Ukraine or own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than [Kyivstar] or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine.
(Emphasis added)

Section 1.01 defines an "Affiliate" as "any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person ...." It defines "Business" as "the wireless mobile telecommunications business."

The Tribunal finds that a plain reading of the definition of "Affiliate" includes the various entities that directly or indirectly have a controlling interest in Storm, and that this includes Alfa. Accordingly, Storm became in breach of the non-competition provision of the 2004 Shareholders Agreement on November 25, 2005, when Alfa acquired a 13.2 percent interest in Turkcell, a wireless mobile telecommunications company which maintains a majority stake in Astelit, LLC., a wireless mobile telecommunications operator that describes itself as "a pioneering digital communications technology and service provider" in Ukraine. Storm continues in breach of the non-competition provision because Alfa's ownership continues.

Storm became in further breach of the non-competition provision in March 2006, when Alfa, acting through its subsidiary Russian Technologies, secured a 40 percent ownership interest in Ukrainian High Technologies, which offers

broadband wireless mobile telecommunications to businesses and consumers in Ukraine and which has a mandate "to become a national broadband wireless multiservice operator."

In both of these instances, Storm "Affiliates" acquired substantial interests exceeding five percent in companies engaged in the wireless mobile telecommunications business without first securing the consent of Telenor. They continue to compete with Telenor in the lucrative Ukrainian wireless market. While Storm contends that only its own conduct, and not that of any other affiliated entity, can violate Section 6.02, this argument is contrary to the plain language of the 2004 Shareholders Agreement, which, as already indicated, speaks in terms of "affiliates."

Storm maintains that Telenor's interpretation of the non-compete language in the Shareholders Agreement is too sweeping. The Tribunal disagrees. If Storm desired to limit the scope of the non-compete language, it could have negotiated a more limited application; indeed, it did so when it negotiated with Telenor to permit Alfa's investment in Golden Telecom notwithstanding the non-compete language. In that instance, Telenor agreed to exclude Alfa's investment provided that none of Alfa's nominees on the Golden Telecom board would simultaneously serve on the Kyivstar board. The Shareholders Agreement reflects this compromise by carving out Alfa's investment in Golden Telecom.

Nor did Storm ever communicate to Telenor the argument that the non-compete language of the 2004 Shareholders Agreement was limited only to Storm and not its "affiliates." The Shareholders Agreement is clear on its face,

60

was the product of careful negotiation, and was binding on the parties once lawfully executed. Representatives of Alfa, not Storm, were primarily responsible for the negotiations leading up to the 2004 Shareholders Agreement; if Alfa's representatives at the negotiation table had sought a more restrictive non-compete clause, limited only to Storm, they could have made such a demand. Nothing in the record of this proceeding has been offered in support of Storm's claim concerning the limited application of the non-compete language. In sum, the non-compete language should be interpreted according to its unambiguous terms. The Shareholders Agreement is clear on its face, was the product of arms length negotiation and was warranted by Storm to be "binding upon ... and enforceable by the parties ... ." (Section 13.05).

### 3.    Storm's Breach of the Arbitration Provision of the Shareholders Agreement.

The Tribunal has previously underscored the sweeping arbitration clause in the 2004 Shareholders Agreement, which requires that, "Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration . . ." (See Section 12.01.) For the reasons explained earlier, that language plainly obligated Storm to arbitrate the issue of the validity of the 2004 Agreement before this Tribunal, rather than in the Ukrainian courts. Yet, the Tribunal finds that Storm breached that obligation by its steadfast efforts before this Tribunal to block the resolution on the merits of Telenor's claims, particularly when allied with Storm's half-hearted opposition to the Ukrainian litigation brought by its affiliate, Alpern.

61

Storm has similarly breached Section 12.01 in connection with more recent and on-going litigation in the Ukrainian courts which is preventing Kyivstar from having its financial statements audited and certified by Ernst & Young, or from publishing its financial statements. In the first case, filed by Storm itself in December of 2006, Storm sought an injunction against Kyivstar demanding that agreements between Kyivstar and Ernst & Young be declared "null and void." A second similar suit was filed by Alpern, again seeking to prevent Ernst & Young from performing its auditing and accounting services on behalf of Kyivstar. Finally, on February 16, 2007, Alpern filed yet another suit in the Kiev City Commercial Court and secured an injunction to prevent Kyivstar, Ernst & Young and "any other individuals or legal entities" from: "taking any actions aimed at performance of any contracts ..."

As a result of these three separate litigations involving Kyivstar and its auditor, Ernst & Young, Kyivstar's financial statements for 2006 have not been audited and it cannot publish its final financial results. Nor has Telenor been able to examine the Kyivstar books. As a result, on March 21, 2007, Telenor announced that it would deconsolidate Kyivstar's financial results from Telenor ASA's parent corporation's financial results and that it would "qualify" all pertinent Kyivstar financial information. This announcement had an immediate adverse impact in Telenor ASA share price.

In addition, the pending Ukrainian Ernst & Young litigation threatens to compel Kyivstar to default on certain bond obligations totaling over $400 million; as to these bonds, Kyivstar is required to deliver to the lender both an auditor's

compliance certificate and audited year-end financial statements through April 30, 2007. It has been unable to do so. On March 26, 2007, Standard & Poor's issued a notice stating that it may suspend Kyivstar's credit rating if the Company does not provide financial statements to its creditors and shareholders. Similarly, on March 29, 2007, Moody's Investors Service issued a notice stating that it was placing Kyivstar on review for a possible downgrade in its credit rating because of Kyivstar's inability to provide financial information to third parties as a result of the Ukrainian Court injunction.

Storm argues that Telenor's application to enjoin the Ernst & Young litigation now pending in the Ukraine is not arbitrable because it involves "collateral disputes" and does not involve "a violation of any obligations imposed by the Shareholders Agreement." This is incorrect. First, the Ernst & Young litigation in Ukraine is not "collateral" to this arbitration; it is directly related to other of the claims asserted by Telenor before this Tribunal. For example:

- The inability of Kyivstar's Board to meet and approve the Ernst & Young contract flows directly from Storm's failure to maintain its membership on the Board.

- Because of the Ernst & Young litigation, Kyivstar was not allowed to certify its financial statements by April 30, 2007, resulting in an "event of default" under the relevant bond agreements, in violation of Storm's express obligations under the Shareholders Agreement (See Section 2.03(b); 2.05(b)(ii).

- Kyivstar cannot even provide financial information to its majority owner, Telenor, or publish its financial results because of the Ukrainian injunction issued in the Ernst & Young litigation. This constitutes a separate violation of the Shareholders Agreement.

In short, Telenor's request to this Tribunal to enjoin the Ukrainian Ernst & Young litigation is intimately related to issues already submitted to the Tribunal and fully within the broad scope of the Tribunal's jurisdiction.

Second, even though Storm maintains that the Ernst & Young litigation does not involve the violation of any obligation imposed by the Shareholders Agreement, the Tribunal cannot ignore the "good faith" language that is expressly incorporated into Section 2.05 of that Agreement. The language of Section 2.05 is broadly worded and does not in any way limit Storm's general duty to act in good faith when it comes to Telenor or Kyivstar. As already indicated, the Ernst & Young litigation arises directly out of Storm's breach of the provisions of the Shareholders Agreement; this fact, coupled with the good faith language of Section 2.05, disposes of Storm's argument.

Finally, Storm maintains that Telenor has waived its right to rely on the arbitration provisions of the 2004 Shareholders Agreement because it defended itself in the Ukrainian proceeding that led to the December 22, 2005 Order. Storm argues that Telenor never sought an order compelling arbitration in that proceeding, nor raised Section 12.01 as a defense. As a result, Storm contends that, because Telenor participated in the proceeding that gave rise to the December 22, 2005 Order, Telenor has lost its right to invoke the arbitration clause and to compel arbitration in this proceeding.

The Tribunal disagrees. In the first place, the dispute leading to the December 22, 2005 Order was not one that arose "under, related to or in connection with" the 2004 Shareholders Agreement. The dispute involved the

applicability of Ukraine law to Kyivstar's Charter and whether a non-shareholder could be a board member.

Second, even if the arbitration clause could be interpreted as covering that particular disagreement, it is well settled that a party's failure to compel arbitration with respect to one matter does not result in a wholesale waiver of that party's contractual rights to compel arbitration in another matter. This is especially true where the validity of the 2004 Shareholders Agreement was not at issue in that proceeding. In fact, prior to this arbitration, Telenor has not been a party to any litigation where either the interpretation of a provision in the Agreement or the validity of the 2004 Shareholders Agreement itself has been at issue. Under those circumstances, Telenor's failure to invoke Section 12.01 can hardly be viewed as a waiver.

## H.    CONCLUSION AND AWARD.

Based on the foregoing findings of fact and conclusions of law, the Tribunal **DECLARES, ORDERS AND FINALLY AWARDS** as follows:

1.    The Tribunal adopts and reaffirms its Partial Final Award Regarding Jurisdiction, dated October 22, 2006, and re-issued as corrected on December 22, 2006, that the Tribunal has jurisdiction to hear and resolve the claims raised by Claimant's Amended Notice of Arbitration and Statement of Claim.

2.    The Tribunal declares that the Shareholders Agreement, dated January 30, 2004, between Claimant Telenor Mobile Communications AS ("Telenor"), Respondent Storm LLC ("Storm") and Closed Joint Stock Company "Kyivstar "G.S.M." ("Kyivstar") was validly executed and is binding on these

parties, and that Respondent Storm has breached such Shareholders Agreement, and continues to breach such Shareholders Agreement, in the following particulars:

   a.    by failing to appoint candidates for election to the Kyivstar Board of Directors and by failing to cause Storm-nominated members of the Kyivstar Board of Directors to attend its meetings and to participate in the direction of Kyivstar's business;

   b.    by failing to attend annual and extraordinary meetings of the Kyivstar shareholders;

   c.    by owning or controlling, directly or indirectly through its affiliates, more than five percent of the voting capital stock of entities engaged in the wireless mobile telecommunications business in Ukraine, without the prior written consent of Claimant , and

   d.    by failing to settle any and all disputes and controversies arising under, relating to or in connection with the Shareholders Agreement, dated January 30, 2004, by arbitration under the UNCITRAL Arbitration Rules.

3.    In its original claim, Telenor prayed for an award of damages. In the course of this proceeding, it has established that, as a result of Storm's breaches of the 2004 Shareholders Agreement, it has suffered and continues to suffer significant injury. Although Claimant Telenor has failed to prove an amount of damages with sufficient specificity to support an award of damages, the Tribunal orders Respondent Storm to take the following actions in order to preclude further serious injury to Claimant Telenor from Respondent Storm's continuing breaches of the 2004 Shareholders Agreement:

   a.    Respondent Strom shall transfer at least one of its Kyivstar shares to three newly-formed affiliated companies so that it is in a position to designate and nominate a total of four candidates for election to the Kyivstar Board of Directors, and it shall designate and nominate those candidates for election to the Kyivstar Board of Directors.;

66

b.    Respondent Storm shall take such steps as are necessary to assure that its nominated candidates are elected to the Kyivstar Board of Directors, attend all future Board meetings and participate in good faith in the direction and management of Kyivstar's business;

c.    Respondent Storm shall cause its duly authorized representatives to attend all future annual and extraordinary meetings of the Kyivstar shareholders while it remains a Kyivstar shareholder;

d.    Respondent Storm shall take such steps as are necessary to amend the Charter to conform it both to the December 22, 2005 Order of the High Commercial Court of Ukraine, the Shareholders Agreement, dated January 30, 2004, and the ownership of Kyivstar shares by Claimant Telenor and by its affiliates, Telenor Ukraina I AS, Telenor Ukraina II AS, Telenor Ukraina III AS and Telenor Ukraina IV AS. Claimant Telenor and Respondent Storm, and all persons to whom they transfer Kyivstar shares shall vote to approve an amendment to the Kyivstar Charter that provides that Kyivstar's shareholders are (a) Storm, together with its three newly-formed corporate affiliates, each of which will hold at least one Kyivstar share; and (b) Telenor , and its existing four corporate affiliates, each of which holds one Kyivstar share.  Together, the persons designated and nominated as members of the Kyivstar Board of Directors by these nine entities will be elected as Directors.

4.    The Tribunal further orders Respondent Storm to sell its shares in Kyivstar to a person other than a Storm affiliate within one hundred and twenty (120) days of this Final Award, unless prior to that time Storm and any affiliated entities divest their holdings in Turkcell and Ukrainian High Technologies that exceed five percent.

5.    Finally, the Tribunal orders that:

a.    Respondent Storm, and anyone acting in concert with it, is enjoined from the commencement or prosecution of any and all court actions concerning any disputes or controversies under, relating to, or in connection with, any obligations described in the Shareholders Agreement, including all of the existing litigations currently pending in the Ukraine and described herein.

b.    Respondent Storm, and anyone acting in concert with it, are enjoined from enforcing the December 29, 2006 Injunction or its attendant Enforcement Order.

c.    Respondent Storm, and anyone acting in concert with it, are enjoined from taking any actions to hinder or preclude Claimant Telenor, Ernst & Young and their related entities from carrying out their rights and obligations under the Shareholders Agreement or other pertinent agreements with Kyivstar.

6.    Each party shall bear its own fees and costs, including attorneys' fees relating to this Arbitration.

7.    This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All relief requested but not granted is expressly denied.

8.    This Award may be signed by the members of the Tribunal in counterparts.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

_____
Kenneth R. Feinberg
Chair
July 2, 2007


_____
Gregory B. Craig
July 2, 2007


_____
William R. Jentes
July 2, 2007

68

c.    Respondent Storm, and anyone acting in concert with it, are enjoined from taking any actions to hinder or preclude Claimant Telenor, Ernst & Young and their related entities from carrying out their rights and obligations under the Shareholders Agreement or other pertinent agreements with Kyivstar.

6.    Each party shall bear its own fees and costs, including attorneys' fees relating to this Arbitration.

7.    This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All relief requested but not granted is expressly denied.

8.    This Award may be signed by the members of the Tribunal in counterparts.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

Kenneth R. Feinberg
Chair
July 2, 2007

Gregory B. Craig
July 2, 2007

William R. Jentes
July 2, 2007

68