# EXHIBIT C

```
 1
 2  IN THE MATTER OF AN ARBITRATION UNDER
    THE UNCITRAL ARBITRATION RULES BETWEEN
 3  ------------------------------x
    TELENOR MOBILE COMMUNICATIONS, AS,
 4
                        Claimant,
 5
    vs.                              Volume IV
 6
    STORM, LLC,
 7
                        Respondent.
 8  ------------------------------x
 9
10                      666 Fifth Avenue
                        New York, New York
11
12                      December 18, 2006
                        9:15 a.m.
13
14
15
16
17  B E F O R E:
18      KENNETH R. FEINBERG, Chairman
19      WILLIAM R. JENTES, Arbitrator
20      GREGORY B. CRAIG, Arbitrator
21
22
23
24  Reported by:
25  Amy E. Sikora, CRR, CSR, RPR, CLR
```

Page 2

```
 2  A P P E A R A N C E S:
 3  For the Claimant:
 4  ORRICK, HERRINGTON & SUTCLIFFE, LLP
        666 Fifth Avenue
 5     New York, New York 10103-0001
 6  BY: ROBERT L. SILLS, ESQ.
        JAY K. MUSOFF, ESQ.
 7
 8        -and-
 9  ORRICK, HERRINGTON & SUTCLIFFE, LLP
        Tower 42, Level 35
10     25 Old Broad Street
        London, EC2N 1 HQ
11     DX: 557 London/City
12  BY: PETER O'DRISCOLL, ESQ.
13
14
15  For the Respondent:
16
17  LOVELLS, ESQS.
        590 Madison Avenue
18     New York, New York 10022
19
    BY: PIETER VAN TOL, ESQ.
20     GONZALO S. ZEBALLOS, ESQ.
        ERIC Z. CHANG, ESQ.
21
22
23  ALSO PRESENT:
24     KAREN D. THOMPSON, ESQ., Orrick
25     MAYSIE ANDERSON, ESQ., Orrick
```

Page 3

```
 1           Proceedings
 2       THE CHAIRMAN: Good morning,
 3  everybody. This is a continuation of
 4  the matter of an arbitration under the
 5  Uncitral arbitration rules between
 6  Telenor Mobile Communications as
 7  claimant and Storm, LLC as respondent.
 8       I think the best place to start
 9  this morning, on behalf of my fellow
10  panel members, is to request of Storm,
11  Pieter, that you summarize your late
12  Saturday night e-mail to the panel
13  explaining Storm's latest position
14  concerning this arbitration, what you
15  propose to do this morning, and what you
16  feel you cannot do this morning, so that
17  we have a brief summarization of exactly
18  where Storm stands as of 9:30 a.m. this
19  morning, December 18th.
20       Pieter.
21       MR. VAN TOL: Thank you,
22  Mr. Chairman. I'll be brief.
23       ARBITRATOR JENTES: If I could
24  also ask, since we have so many orders
25  from different courts, I think it would
```

Page 4

```
 1           Proceedings
 2  be useful if you would indicate what you
 3  think are the orders that apply to this
 4  panel as opposed to the parties.
 5       MR. VAN TOL: Absolutely.
 6       ARBITRATOR JENTES: Okay.
 7       MR. VAN TOL: That leads me to my
 8  first point, gentlemen, which is the
 9  controlling order here is the
10  December 1, 2006 ruling from the
11  Ukrainian court. There's been no
12  subsequent ruling by any Ukrainian court
13  saying that that order is ineffective or
14  improper in any way. So it still
15  stands, as it did when it was issued.
16  It binds Storm automatically and it
17  prohibits Storm from going forward
18  today.
19       Now, we have buttressed that
20  opinion with the Logush expert evidence
21  showing that the December 1 ruling is
22  proper, both substantively and
23  procedurally.
24       Telenor Mobile, on the other
25  hand, has provided you with absolutely
```

Page 5

```
 1           Proceedings
 2  nothing from any Ukrainian law expert
 3  regarding the December 1 ruling.
 4  Instead, and this is in keeping with its
 5  usual approach, it's asking you to
 6  effectively overturn, ignore, the
 7  December 1 ruling.
 8       Gentlemen, we submit that that is
 9  improper. If Telenor Mobile wants to do
10  something about the December 1 ruling,
11  it should go to Ukraine. The ruling
12  from the court said you have X number of
13  days to appeal. That's a very expedited
14  schedule. Telenor Mobile didn't take
15  the court up on that offer.
16       We know from their submissions,
17  they have competent Ukrainian counsel.
18  They participated in other matters in
19  Ukraine. They know their way around the
20  court system, but they chose not to do
21  anything about the December 1 ruling.
22       And, indeed, I note on several
23  occasions over the course of the past
24  few months the tribunal has asked
25  Mr. Sills, why is it that you haven't
```

```
1              Proceedings
2  gone to the Ukrainian courts.  I would
3  submit that you haven't gotten a
4  sufficient answer, but the answer you
5  did get before was, more or less, why
6  should we go there.  The appellate
7  record's been developed already and
8  there's no reason -- there's no way for
9  us to change it.
10      Well, that's not the case with
11 respect to the December 1st ruling.
12 It's out there.  It could have been
13 appealed by Telenor Mobile and they
14 decided not to.
15      So the standard today is whether
16 or not Storm has good cause for what
17 it's doing.  Mr. Sills cited the
18 Uncitral default provisions in
19 Article 28 of the rules.  But they apply
20 when a party fails to appear, quote,
21 without showing sufficient cause for
22 such failure.
23      Well, we're here and we're
24 telling you why there's sufficient
25 cause, and it's hard to conceive of a
```

```
1              Proceedings
2  more sufficient cause than an injunction
3  barring us from going forward.  An
4  injunction from a court in Storm's home
5  country.  An injunction that also
6  operates against Telenor Mobile.  No one
7  debates that Telenor Mobile appears or
8  is in Ukraine and that the court would
9  have jurisdiction over Telenor Mobile.
10      ARBITRATOR CRAIG:  Why do you
11 think Telenor Mobile is bound by that
12 order, when Telenor Mobile is not a
13 party?
14      MR. VAN TOL:  Telenor Mobile is
15 not a party to the action, but Telenor
16 Mobile is a party to the injunction, and
17 that's what Professor Logush was
18 explaining in her opinion.
19      ARBITRATOR CRAIG:  That's a new
20 concept for American lawyers to sort of
21 get their heads around.
22      MR. VAN TOL:  And it is for me,
23 too, Mr. Craig, because that's what
24 Judge Lynch did in the recent
25 proceedings when he found that Altimo
```

```
1              Proceedings
2  and Alpren were part of the same
3  injunction, even though we submit
4  they're not parties.  We, their counsel,
5  submits they're not parties to the
6  Southern District action.
7       But what Professor Logush was
8  saying in her opinion is the injunction
9  really only has full effect if you
10 enjoin Telenor Mobile, over which there
11 is jurisdiction in the Ukraine.  But,
12 really, you know, if it binds Storm,
13 that's enough for us not to go forward.
14 If there were a ruling from the
15 Ukrainian court saying it doesn't apply
16 to Telenor Mobile, our position wouldn't
17 change.  We would still say today we
18 can't go forward.
19      Now, you've led me to my next
20 point which is, as we expected,
21 Mr. Sills is relying on Judge Lynch's
22 December 15th order.  And that was
23 really one of the purposes of my e-mail
24 was to lay out what effect, if any, that
25 that ruling has on the December 1
```

```
1              Proceedings
2  ruling.  And as you can see, it has no
3  effect.
4       Judge Lynch did not say the
5  Ukrainian court was wrong to issue the
6  December 1st ruling.  Judge Lynch did
7  not overturn the December 1 ruling.  He
8  did not do anything that would disturb
9  that ruling.
10      ARBITRATOR JENTES:  Let me ask --
11 I've read his conclusion several times,
12 and he says that Storm, Altimo, and
13 Alpren, but let's focus on Storm, are
14 enjoined from bringing, so you're not
15 bringing, but you're attempting to cause
16 the enforcement of any legal action in
17 the Ukraine that would disrupt, delay,
18 or hinder in any way the arbitration
19 proceeding.
20      It does seem to me that his
21 injunction stops you from attempting to
22 delay and hinder this arbitration
23 proceeding.  That's why I asked you.
24 I'm just trying to understand what your
25 position is vis-a-vis Judge Lynch and
```

1          Proceedings
2  what we're supposed to do.
3          MR. VAN TOL:  And I parsed that
4  language carefully myself.  What he said
5  is, don't bring an action in Ukraine.
6  We haven't done that, we're the
7  defendant.
8          ARBITRATOR JENTES:  No, I
9  understand that.
10         MR. VAN TOL:  Don't enforce the
11  action in the Ukraine.  We haven't done
12  that either.  We're the defendant.  We
13  haven't done anything to enforce.
14  That's why we got Professor Logush's
15  opinion which shows you it's a
16  self-executing ruling.  It says right in
17  there it shall take effect immediately,
18  it's automatically binding, and it goes
19  to the state enforcement service for
20  enforcement.  Storm has not done
21  anything to enforce that order.
22         THE CHAIRMAN:  Yet.
23         MR. VAN TOL:  Well, you say yet.
24  We're the defendant, so I don't know
25  what it is a defendant would do to --

1          Proceedings
2          THE CHAIRMAN:  Well, picking up
3  on Bill's point, as I read Judge Lynch's
4  last conclusion, he says that Storm is
5  enjoined from attempting to cause the
6  enforcement.  Attempting to cause the
7  enforcement, of any legal action in the
8  Ukraine that would disrupt, delay, or
9  hinder the arbitration.
10         MR. VAN TOL:  Right.  We have no
11  plans to do so.
12         ARBITRATOR JENTES:  Your point
13  is, all you're doing is, you're saying
14  there's a self-enforcing order over
15  here.  We're calling it to your
16  attention.  And it stops you from
17  proceeding and whatever flows from that
18  is not your doing.
19         MR. VAN TOL:  That's exactly
20  right.
21         ARBITRATOR JENTES:  Okay.
22         THE CHAIRMAN:  So what do you
23  propose, again, to summarize your
24  e-mail, Pieter, what do you propose to
25  do today?

1          Proceedings
2          MR. VAN TOL:  What I propose to
3  do today is make the application I just
4  made, which is to adjourn this hearing
5  until such time as the Ukrainian court
6  action has run its course.  And that we
7  reconvene at a later point.
8          What I cannot do today is, I
9  cannot go forward with argument or
10  proceeding on the merits of the action
11  or the arbitration because that would
12  violate the December 1 injunction from
13  the Ukrainian court.
14         THE CHAIRMAN:  You also had an
15  alternative.
16         MR. VAN TOL:  Our alternative
17  grounds doesn't go to the merits, it
18  goes to the jurisdiction, is really a
19  reminder, because I think we really
20  fully laid this out for the tribunal.  A
21  reminder that there was a clarification
22  from the Ukrainian court.
23         In your October 22nd order, as I
24  read it, and I think I read it right,
25  the basis of jurisdiction is that there

1          Proceedings
2  is a severable agreement to arbitrate.
3  And in that October 22nd award you said
4  that it was apparent to you from the
5  record before you that the Ukrainian
6  courts did not consider severability nor
7  even the existence of the arbitration
8  here in New York.
9          And what the purpose of the
10  clarification order was to show you
11  that, yes, Ukrainian courts are aware
12  there's an arbitration here.  And also
13  that severability is not a concept that
14  the Ukrainian courts are going to
15  recognize.
16         Under Ukrainian law, as we said
17  in our expert evidence, and it's
18  buttressed by the opinion, when the
19  agreement is found to be null and void,
20  all legal consequences that entail from
21  it flow, and one of them is the
22  arbitration clause is null and void.
23         THE CHAIRMAN:  Let me ask one
24  question, Pieter.  Doesn't Judge Lynch,
25  in effect, rule -- find the opposite on

1          Proceedings
2   both of your points?
3          MR. VAN TOL:  I don't think he
4   did, Mr. Chairman.  I think he was
5   deferring to the tribunal.  What he was
6   doing was, we were making a motion, with
7   respect, that you had manifestly
8   disregarded the law.  And the judge made
9   it as clear as he could that he was not
10  substituting his finding for yours, but
11  merely that you had a basis for your
12  ruling.  We disagree and think that
13  there is more to be heard on that, but
14  Judge Lynch did not say anything other
15  than that you did not manifestly
16  disregard the law.
17         ARBITRATOR JENTES:  You said that
18  you thought that we should adjourn until
19  the Ukrainian proceedings runs its
20  course.  In light of the five-day
21  limitation, what's -- what's out there
22  to be done in the Ukraine?
23         MR. VAN TOL:  That's a very good
24  question, and I always hesitate to opine
25  on what Ukrainian law is, but I would

1          Proceedings
2   imagine that Telenor Mobile could try to
3   go to the Ukrainian court and say, I
4   missed the deadline, but I did so with
5   good cause.  May I intervene and appeal
6   now.  I'm just saying that's what I
7   would do if I were in their shoes.
8          But it's not as if -- well, and
9   two things I should say, actually.  As I
10  understand that order, it was akin to a
11  preliminary injunction to keep things in
12  place while there is an action going on
13  there.
14         So even if Telenor Mobile doesn't
15  attack the preliminary injunction, it
16  may go in and litigate the merits of the
17  ultimate injunction there.  There's an
18  anticipated permanent injunction, much
19  as there has been before Judge Lynch.
20  So the action will continue beyond the
21  preliminary injunction stage.
22         THE CHAIRMAN:  Mr. Sills.
23         MR. SILLS:  Thank you,
24  Mr. Chairman.  Let me begin by
25  addressing the question that Mr. Jentes

1          Proceedings
2   raised at the very outset.  And the
3   answer is that these orders, supposed
4   orders in the Ukraine, on their face do
5   not apply to this panel at all.  And
6   there was a representation made on the
7   record in court by Altimo and Altimo's
8   lawyer, who's not here today, Mr. Ron
9   Rolfe of the Cravath firm, it appears at
10  pages 39 and 40 of the transcript which
11  Mr. Van Tol has forwarded to you, where
12  he specifically represents that there's
13  no effort to enjoin the arbitrators, and
14  that the arbitrators are not subject to
15  these supposed Ukrainian orders.  So I
16  think that's one issue that's off the
17  table.
18         I think it's helpful to put this
19  in context.  We brought this case in
20  February.  And it gets plagued by an
21  endless series of delays and there's
22  delays of all kinds at the influence by
23  Storm.  Every time a hearing is
24  scheduled, we get a last-minute
25  application to delay it.  Typically,

1          Proceedings
2   because of one of these self-generated
3   Ukrainian litigations.
4          Now, we weren't the ones who
5   invoked the jurisdiction of the Southern
6   District here.  After this panel denied
7   Storm's motion to dismiss, an
8   application was made in court to set it
9   aside on grounds that it was a manifest
10  disregard of the law.  That generated
11  Judge Lynch's first opinion.  I don't
12  want to take up the panel's time because
13  that opinion speaks for itself.
14         Dissatisfied with that,
15  apparently, they went back and sued
16  themselves again, and it's absolutely
17  clear that that's what's going on.  The
18  claims that these are not collusive
19  litigations and cannot stand, and they
20  particularly cannot stand after two
21  orders of an exceptionally well-regarded
22  district judge in the Southern District.
23  He had five hearings, as he said, in
24  this case.  And what he heard on the
25  record with a witness present, after

```
 1            Proceedings
 2   giving Storm the fullest possible
 3   opportunity to make its case, is that
 4   Storm was being sued by members of its
 5   own corporate family as part of a design
 6   to frustrate, hinder, and delay this
 7   arbitration.
 8            I think I should say that I do
 9   believe that making this application
10   itself is arguably a contempt of that
11   order.  And there are further
12   proceedings to be had before Judge
13   Lynch.
14            Unlike Ukrainian proceedings, we
15   did give notice.  We did serve Alpren
16   and Altimo.  They hired an eminent firm,
17   a senior member of that firm to make
18   their argument that they were not
19   subject to this court's jurisdiction.
20   He made that pitch and he lost.
21            He has appellate rights in the
22   Second Circuit.  They're not subject to
23   five-day limitations.  We didn't get an
24   order that binds him and tells him to
25   come in later.  There's been the fullest
```

```
 1            Proceedings
 2   opportunity for due process.
 3            This arbitration, by agreement,
 4   is to be held in New York.  The Southern
 5   District has accorded the seat of the
 6   arbitration.  It's subject to New York
 7   law, and by agreement of the parties
 8   review or confirmation can be sought in
 9   the Southern District.
10            So we are proceeding in
11   accordance with the agreement between
12   the parties.  What we've been trying to
13   do, ever since February, is get a
14   hearing on the merits.
15            THE CHAIRMAN:  You say that, but
16   is Pieter right when he says, Bob, that
17   to this day you haven't appealed, you
18   haven't appealed the Ukrainian orders?
19            MR. SILLS:  We don't because we
20   don't believe they're proper.  We
21   believe they're a collusive and
22   collateral attack on this tribunal's
23   jurisdiction and on the agreed
24   jurisdiction of the Southern District.
25            And the fact that we've agreed on
```

```
 1            Proceedings
 2   a forum, arbitration, a venue for that
 3   arbitration, New York, and a governing
 4   law for that arbitration, New York law,
 5   is enough.  And the fact they choose to
 6   sue us in Ukraine or anyplace else
 7   doesn't mean that at their option they
 8   can avoid the deal the parties make.
 9            THE CHAIRMAN:  So let me ask you
10   a question.  Let's say we go forward,
11   and let's assume you prevail in Storm's
12   absence here.  Then what do you do?
13            MR. SILLS:  We're going to
14   enforce that order.
15            THE CHAIRMAN:  In the United
16   States?
17            MR. SILLS:  Well, I think, as
18   Judge Lynch pointed out, there has never
19   been a contested hearing in Ukraine on
20   any of these issues.  And once we get an
21   order, and I think the fact that -- I
22   don't want to get ahead of myself, but I
23   believe we have an exceptionally strong
24   case on the merits.  If the panel does
25   rule in our favor, and that is reduced
```

```
 1            Proceedings
 2   to a judgment in the Southern District
 3   in accordance with the agreement of the
 4   parties, and we seek enforcement in the
 5   Ukraine, that's the appropriate time to
 6   invoke the jurisdiction of Ukrainian
 7   courts, not with these efforts to hinder
 8   and delay this arbitration.
 9            And whether or not on a real
10   hearing with a real presentation of
11   evidence and, most important, real
12   adversaries, not parties who are all on
13   the same side of the caption pretending
14   to be plaintiffs and defendants, we may
15   well get a different result.
16            But it's also important, I think,
17   to see that as Judge Lynch found, Storm
18   is part of a larger corporate family.
19   He expressly held that we had a
20   significant likelihood sufficient for
21   preliminary injunction to show that
22   Altimo and Alpren are bound to this
23   agreement as well.
24            Altimo has significant assets
25   outside of Russia and Ukraine.  They're
```

```
1              Proceedings
2    co-headquarters are in London.  They
3    maintain significant cash and noncash
4    assets in New York.  We're confident
5    we'll be able to enforce that order.
6          But I think, to take a step back,
7    there's two points.  We wouldn't be
8    pursuing this and taking up the
9    tribunal's time and our time, if we
10   didn't think we could get an effective
11   order in the end.
12         Sometimes there are people who
13   hide from the process server.  But in
14   the end we think we'll be able to
15   enforce this panel's order.  But, it
16   seems to me, more than unseemly for a
17   party that made a deal and agreed to
18   arbitration to raise as a defense the
19   claim that if they lose they will simply
20   thumb their noses at that tribunal and
21   at any award entered upon -- I'm sorry,
22   any judgment entered upon award in the
23   United States.  That in effect is our
24   problem.  Just as it's our problem, and
25   I don't think any concern of Storm's,
```

```
1              Proceedings
2    that we regard these Ukrainian orders as
3    a nullity.  We don't plan, we don't have
4    any current plans to appear before the
5    Ukrainian court in these collusive
6    cases.
7          There is an injunction that
8    specifically prohibits Storm and its
9    corporate parents from doing anything in
10   Ukraine to try and enforce those orders.
11   And if they try and enforce those
12   orders, we will have them held in
13   contempt in New York and we will proceed
14   against the non-Ukranian assets.
15         I think what Judge Lynch has
16   done, and I think it's absolutely clear
17   from the content and tone of both his
18   opinions, that he believes this
19   arbitration ought to go forward; that
20   there is no legal reason it shouldn't go
21   forward.  He's cleared the path for us,
22   and he's given us an order that prevents
23   the Ukrainian courts and prevents Storm
24   and its fellow corporate family members
25   from using and abusing the Ukrainian
```

```
1              Proceedings
2    courts to interfere with this
3    arbitration.
4          The panel heard this application
5    in effect on December 4 when this was
6    raised.  There was an exchange of
7    correspondence.  There was, as I'm sure
8    you recall, a lively debate in a
9    telephone conference on this point.  The
10   panel made its ruling that we could go
11   forth today, at long last, and hear the
12   case on the merits.
13         This is nothing more than a
14   last-minute, literally a last-minute,
15   application argument.  It's no more
16   meritorious now than it was on the 4th.
17   We're here.  We're ready to go forward.
18   It's up to Storm whether it wants to
19   proceed or not.  We welcome their
20   participation, but it is not up to me
21   and it's not up to the panel.  If they
22   want to go forward, as I think they
23   should, then we ought to take a brief
24   recess and proceed to the evidence.  If
25   they want to absent themselves for
```

```
1              Proceedings
2    reasons of their own, then we're
3    prepared to go forward in any event.
4          ARBITRATOR JENTES:  I'd like to
5    get back, I'm sorry, on a simplistic
6    approach towards this thing.  What I
7    heard was that there is no outstanding
8    order from any court that says that we
9    should not proceed.  I take it that
10   Storm agrees with that?  That is, the
11   panel should not proceed?
12         MR. VAN TOL:  From my reading of
13   the December 1 ruling, I don't see any
14   reference to any order against the
15   tribunal members.
16         ARBITRATOR JENTES:  And then on
17   November 15 when you wrote us the letter
18   requesting the alternative relief, is
19   that still the relief that you're asking
20   for us -- from us today?
21         MR. VAN TOL:  I'm sorry, I am
22   losing my dates.  The November 15th was
23   after the clarification order.
24         ARBITRATOR JENTES:  What you said
25   then was --
```

1           Proceedings
2      THE CHAIRMAN: December.
3      ARBITRATOR JENTES: No. This is
4 November 15. That's why I want to make
5 sure I understand what their motion is.
6      ARBITRATOR CRAIG: This is the
7 reconsideration motion?
8      ARBITRATOR JENTES: It says,
9 "Storm, therefore, respectfully requests
10 that the tribunal reconsider the
11 October 22 award and find that under
12 New York law it must grant recognition
13 of the Ukrainian court's order by
14 dismissing the arbitration."
15    I only want to understand, what
16 is the exact motion and the action that
17 you want us to do today?
18      MR. VAN TOL: If I could just lay
19 it out again, to make it as clear as I
20 can. The reconsideration is of the
21 October 22nd award in which you found
22 jurisdiction on the narrow ground that
23 there was a severable agreement to
24 arbitrate.
25      ARBITRATOR JENTES: Just so

1           Proceedings
2 you're clear, I didn't view it as being
3 that narrow ground. We did find that we
4 had jurisdiction. And we articulated
5 the reasons, among others. But in any
6 event, that order by -- partial award by
7 the tribunal is out there.
8      MR. VAN TOL: Right.
9      ARBITRATOR JENTES: What do you
10 want us to do?
11      MR. VAN TOL: I want you to
12 reconsider that, in light of the
13 clarification order from the Ukrainian
14 court which made it clear that, one, the
15 Ukrainian courts were aware of both the
16 arbitration clause and the existence of
17 an arbitration in New York.
18    And two, that the Ukrainian court
19 meant to void both the shareholder's
20 agreement itself and the
21 shareholder's -- the agreement to
22 arbitrate contained therein.
23      ARBITRATOR JENTES: Okay. And on
24 those grounds you want us to reconsider
25 the October 22 award, and then after we

1           Proceedings
2 reconsider what are we to do, under your
3 motion to us today?
4      MR. VAN TOL: I think you have no
5 jurisdiction, then.
6      ARBITRATOR JENTES: So we
7 should --
8      MR. VAN TOL: Dismiss.
9      ARBITRATOR JENTES: We should
10 dismiss the proceeding?
11      MR. VAN TOL: Yes.
12      THE CHAIRMAN: Or in the
13 alternative, I take it, adjourn until
14 the Ukrainian courts enter a final --
15      MR. VAN TOL: That's correct.
16 And I think I heard from Mr. Sills that
17 he's happy to go to Ukrainian courts but
18 just not now. And I would submit there
19 is a stark difference there when Storm,
20 Altimo, Alpren are under the
21 jurisdiction of a court, they appear,
22 and fight it.
23    When Telenor Mobile is under the
24 jurisdiction of a court and says, maybe
25 I'll go in some other date, but first

1           Proceedings
2 let me collaterally attack it before
3 this tribunal.
4      ARBITRATOR CRAIG: Let me ask you
5 a question on that, Pieter. After we
6 had issued our opinion finding
7 jurisdiction and Storm decided it should
8 go back to the Ukrainian court to seek
9 clarification and maybe reasons for
10 their opinion that would clarify for us
11 what they were judging on, did you
12 consider giving notice to Telenor that
13 you were going back to seek that
14 clarification?
15      MR. VAN TOL: We did not --
16      ARBITRATOR CRAIG: So that they
17 could participate in the proceeding
18 before the Ukrainian judge as to the
19 clarification issues? And it had to do
20 with the meaning of the Uncitral rules,
21 in specific.
22      MR. VAN TOL: You've hit on the
23 main point. If we had given notice to
24 Telenor, and we did not, it would have
25 been ineffective. That procedure under

```
1            Proceedings
2   Ukrainian law is always ex parte,
3   always.  And that's why we happily
4   provided a copy of the questions to
5   Mr. Sills.  If Mr. Sills thought those
6   questions were misleading in some way,
7   Telenor could have gone in to the court
8   and said, hang on a minute, you got it
9   wrong.  And they've done that to other
10  appellate courts.
11          But in answer to your question,
12  we didn't give notice for two reasons:
13  One, it's not required.  But, more
14  importantly, it wouldn't have done
15  Telenor any good.
16          ARBITRATOR JENTES:  Just to be
17  fair, on the November 15 letter you
18  said, continuing in the next sentence,
19  "In the alternative, Storm respectfully
20  requests that the tribunal dismiss the
21  arbitration on the grounds that Storm
22  has satisfied the Sphere Drake standard
23  by coming forward with," quote, some
24  evidence, end of quote, "to support its
25  position that the arbitration clause is
```

```
1            Proceedings
2   invalid as a matter of law which means
3   that a court must decide the contract
4   formation issues."  That's the end of
5   the alternative.
6           Are you still promoting that
7   position to us today?
8           MR. VAN TOL:  That's a good
9   question.  I may have to rest on the
10  record there because I'm worried that
11  I'm getting too close to arguing the
12  merits.  But what we argued to Judge
13  Lynch, that's already in the record, is
14  that the sum evidence standard had been
15  met, and that we're entitled to a jury
16  trial before Judge Lynch.  And we filed
17  a jury demand just last week.
18          So I hope that can answer your
19  question that it's still a live issue,
20  but I'm concerned about getting close to
21  the merits of our application, although
22  I understand that to be a jurisdictional
23  question.
24          So I think the line I need to
25  draw is that, to the extent we're asking
```

```
1            Proceedings
2   you to find you have no jurisdiction,
3   that doesn't touch on the merits and we
4   think we can, because that's in
5   accordance with the December 1 ruling.
6           ARBITRATOR JENTES:  Okay.
7           THE CHAIRMAN:  Anybody else?
8   Anything to add?  Let's take a brief
9   adjournment so that the panel can
10  consult.
11          MR. VAN TOL:  Thank you.
12          (Recess taken.)
13          THE CHAIRMAN:  All right.  The
14  tribunal has conferred.  Storm's motion
15  to reconsider our October 22, 2006 order
16  is denied.  Alternatively, Storm's
17  motion to dismiss on the ground that
18  Storm has satisfied the Sphere Drake
19  standard is similarly denied.  The
20  tribunal is now ready to proceed on the
21  merits.
22          We invite Storm to participate
23  fully on the merits, if it so desires.
24  We note that there will not be -- the
25  tribunal will not entertain a default
```

```
1            Proceedings
2   under Article 28 of the Uncitral rules.
3           Telenor Mobile will be required
4   to go forward and present its case in
5   full on the merits.  It has the burden
6   of proof in advancing its arguments.
7   Accordingly, the tribunal will go
8   forward with or without Storm's active
9   participation.  And we welcome any
10  comment from the parties.
11          MR. VAN TOL:  I thank the
12  tribunal for its consideration of our
13  motions, and I'm going to have to stand
14  by our earlier statement that, because
15  of the December 1 ruling, Storm feels
16  that its hands are tied and that it
17  cannot go forward on the merits.
18          With respect to the panel, we'd
19  like to leave the proceedings and leave
20  it at that.  Rest on the papers that we
21  have submitted.
22          THE CHAIRMAN:  Thank you.
23  Mr. Sills, any comment to that?
24          MR. SILLS:  Just so it's clear
25  how we intend to proceed.  And we had
```

1          Proceedings
2    intended to proceed exactly as you laid
3    out, Mr. Chairman.  We have two
4    witnesses to present today.  One who's
5    physically present here in New York, one
6    by video link to Norway.  And at that
7    point we're going to move to close the
8    record.  And I assume that without
9    opposition that motion will be granted.
10         But I just want to make it clear
11   that we view this as the last
12   evidentiary hearing, after which the
13   record will be closed, and the panel
14   will take whatever submissions or
15   perhaps submission it decides is
16   appropriate and then proceed to decide
17   the case.
18         THE CHAIRMAN:  Let me ask a
19   question of Pieter, because I just want
20   to make sure it's clear in my mind.  Are
21   you participating on the merits, Pieter,
22   with your written submissions on the
23   merits, or do you take the position that
24   both orally and in writing you offer no
25   evidence whatsoever on the merits of the

1          Proceedings
2    underlying dispute?
3          MR. VAN TOL:  Our position has to
4    be that we've already submitted papers
5    and those can't be undone.  They're
6    before the tribunal.  What we're barred
7    from doing by the December 1 ruling is
8    continuing with any arguments, hearing,
9    et cetera, on the merits, so we're not
10   presenting any new evidence because
11   we're barred from doing so.
12         THE CHAIRMAN:  But you would ask
13   us to consider your written submissions
14   prior to the Ukrainian order on the
15   merits of the dispute?
16         MR. VAN TOL:  I would think under
17   fundamental due process and the FAA you
18   would have to.
19         ARBITRATOR JENTES:  And this
20   includes the prehearing submissions and
21   the prehearing brief that we got on
22   November 29th?
23         MR. VAN TOL:  Correct,
24   Mr. Jentes.  Yes.
25         ARBITRATOR CRAIG:  Let me just

1          Proceedings
2    say one thing about the state of the
3    record.  I think the tribunal is not
4    going to be bound by Telenor's view as
5    to whether or not the record should be
6    closed or kept open.
7          The tribunal is, I think, capable
8    of asking for other information, keeping
9    the record open and asking for
10   information, if the tribunal believes it
11   to be so.  Just because Telenor wants to
12   close the record doesn't necessarily
13   mean that we have to close the record.
14         MR. SILLS:  Mr. Craig, I wasn't
15   suggesting that.  But it does seem to me
16   that --
17         ARBITRATOR CRAIG:  It seemed to
18   be implied in your statement.
19         MR. SILLS:  If I did, I apologize
20   to you and to the tribunal.  But,
21   Mr. Craig, it's our view that this case,
22   and I don't want to rehearse the history
23   of delay that we've been plagued with,
24   that this case was called for a hearing
25   on the merits today.  We're prepared to

1          Proceedings
2    proceed.
3          ARBITRATOR CRAIG:  That's fine.
4          MR. SILLS:  And, as the chairman
5    says, Storm is invited to proceed,
6    welcome to proceed, and decided for its
7    own reasons, apparently, not to do so.
8    We're prepared to rest.  And once we
9    rest, and no evidence is presented by
10   Storm, which appears to be their intent,
11   other than what they've already
12   presented, then we will ask that the
13   record will closed.
14         I must say, with all respect, it
15   seems to me there's no -- at that point
16   there would be no reason to hold the
17   record open, but it's our motion and the
18   tribunal's decision, obviously.
19         ARBITRATOR JENTES:  I think the
20   only thing that Mr. Craig's pointing to
21   is Article 29 of the Uncitral rules is
22   pretty clear under what circumstances
23   you close the hearing, whether it can be
24   reopened, what kind of evidence can be
25   received, what the panel can request.

1          Proceedings
2    So I think that the panel merely wants to
3    emphasize that within the rules we may
4    keep this thing open.  There may be an
5    application by Storm to reopen.  They
6    have to meet the extraordinary
7    circumstances test, but in any event
8    we'll go each step at a time.
9          MR. SILLS:  And, of course, we
10   wouldn't dispute that.  But I just -- so
11   our position is clear, we would strongly
12   resist any effort at gamesmanship by
13   Storm to walk out, have us present our
14   case, and then in effect claim that they
15   had the right to come back and months
16   later put on a defense case,
17   cross-examine, in effect give themselves
18   a rebuttal position.  That's for the
19   tribunal to decide, not for us.
20         But I think just so Storm is
21   making a fully informed decision before
22   it walks out, I want to make our
23   position clear on the record so that
24   they don't claim that our position is
25   somehow taken them by surprise or that

1          Proceedings
2    we sandbagged them.
3          MR. VAN TOL:  And just for
4    clarity, too, one thing that Mr. Sills
5    said was he assumed we had no objection
6    to going forward.  I want to make it
7    clear that we do, in fact, still take
8    exception to that, and we respect the
9    tribunal's ruling, but there is no
10   waiver here of our rights.
11         ARBITRATOR JENTES:  Okay.
12         THE CHAIRMAN:  The tribunal will
13   take a 10-minute recess at which time
14   we'll proceed on the merits.
15         MR. SILLS:  Thank you,
16   Mr. Chairman.
17         ARBITRATOR JENTES:  What is your
18   plan at that point?  Do we hear the live
19   witness?  How do we deal with the
20   logistics of the person by phone?
21         MR. SILLS:  I think the easiest
22   way to deal with that, subject to the
23   tribunal's pleasure, would be to call
24   Mr. Moland, who's here and present,
25   ready to testify.  And in the meantime

1          Proceedings
2    we'll arrange with Mr. Lykke to make
3    himself available by video.
4          His wife is in the last stages of
5    a difficult pregnancy, and we didn't
6    want to take him away from her any
7    longer than necessary, but we'll have
8    him standing by.  We'll proceed to
9    examine him by video.
10         THE CHAIRMAN:  Will the video be,
11   I take it, in another room?
12         MR. SILLS:  I believe that's
13   right.
14         MS. THOMPSON:  23H.
15         MR. SILLS:  But it appears we
16   will have sufficient places at the table
17   now.  And then present whatever argument
18   the tribunal asks for, and then we'll
19   make our motion to close the record.
20         THE CHAIRMAN:  The tribunal will
21   adjourn for 10 minutes.
22         MR. SILLS:  Thank you,
23   Mr. Chairman.
24         (Recess taken.)
25         THE CHAIRMAN:  Mr. Sills, on the

1          Proceedings
2    record.  You may proceed.
3          MR. SILLS:  Mr. Chairman, with
4    the tribunal's permission, I would ask
5    my colleague, Jay Musoff, to examine our
6    first witness.
7          MR. MUSOFF:  Members of the
8    panel, we've collected the exhibits
9    we're going to be referring to for this
10   witness just in one binder here.  We've
11   made copies available to you.
12         ARBITRATOR CRAIG:  Thank you.
13   **T O R S T E I N   M O L A N D,**
14   called as a witness, having been first
15   duly sworn by the Notary Public (Amy E.
16   Sikora), was examined and testified as
17   follows:
18   DIRECT EXAMINATION
19   BY MR. MUSOFF:
20   **Q.    Mr. Moland, where do you live?**
21   A.    I live in Norway.
22   **Q.    And what's your native language?**
23   A.    Norwegian.
24   **Q.    Are you comfortable testifying**
25   **here today in English?**

Moland - Direct

1
2    A.    Yes, I am.
3        Q.    **Can you tell us a little bit**
4    **about your educational background, please?**
5        A.    I'm an economist from the
6    University of Oslo. I also spent one year at
7    department of economics in MIT studying
8    microeconomics.
9        Q.    **Are you currently employed?**
10       A.    Yes.
11       Q.    **And who are you currently**
12   **employed by?**
13       A.    I'm currently employed by Telenor
14   in a part-time position.
15       Q.    **And before we go into your**
16   **positions at Telenor, can you give us brief**
17   **highlights of your work experience prior to**
18   **joining Telenor?**
19       A.    Yeah. My first 20 years after
20   graduation was with the government. I was
21   first about 10 years in the Ministry of
22   Finance in Norway. Then I worked as an
23   adviser on economic policy for Prime Minister
24   Brundtland, first when she was in opposition,
25   and then for almost four years in government.

Moland - Direct

1
2        Q.    **And did you --**
3        A.    And then after that I was -- I
4    was CFO at Norway's major paper producer. I
5    was Central Bank governor for two years and
6    since '96 I have been with Telenor. From '97
7    as CFO. And senior executive vice president.
8    I stepped down from that position exactly one
9    year from now. And I'm now a part-time
10   adviser to the president of Telenor with a
11   special emphasis on Kyivstar and Ukraine.
12       Q.    **And what were your**
13   **responsibilities as CFO at Telenor?**
14       A.    Well, I believe that was the
15   traditional CFO responsibilities as you can
16   see them from any big American company. We
17   are listed in -- at NASDAQ. And we, for that
18   reason, has to follow all the regulations by
19   SEC and Sarbanes-Oxley.
20           My more specific responsibilities
21   was, of course, all the report, financial
22   reporting, financial controlling, accounting,
23   financing of Telenor, communication with our
24   shareholders and with our creditors.
25       Q.    **Now, in addition to your**

Moland - Direct

1
2    **responsibilities as CFO, you mentioned you**
3    **have special responsibilities for Kyivstar.**
4    **Can you explain what you mean by that?**
5        A.    Yes. Well, when I entered
6    Telenor and became CFO, they wanted me not
7    only to be a CFO and look at the business
8    from distance, they wanted me to be more
9    directly involved in one of the most
10   difficult operations. So I was asked to be a
11   board member of Kyivstar since the starter in
12   1998.
13       Q.    **Now, prior to testifying here**
14   **today, have you had an opportunity to review**
15   **the affidavit of Egil Hansen that was**
16   **submitted in this arbitration?**
17       A.    Yes. I have.
18       Q.    **And based on your personal**
19   **knowledge, do you agree with his recollection**
20   **of the events that he set forth in his**
21   **affidavit?**
22       A.    Yes. I agree with that, but I
23   would -- you know, he is referring to a
24   meeting in Moscow, an important meeting. And
25   I remember also additional points from that

Moland - Direct

1
2    meeting which is important.
3        Q.    **So let me direct your attention**
4    **to that meeting in Moscow. When was that**
5    **meeting that you're referring to?**
6        A.    That meeting was late winter or
7    early spring 2002.
8        Q.    **And who was at that meeting from**
9    **Telenor that you remember?**
10       A.    It was a meeting between --
11           ARBITRATOR CRAIG: 2002?
12           THE WITNESS: 2002, yes.
13       A.    It was a meeting between the
14   principals from Telenor side. Chief
15   executive, Tormel Hermaster (ph) was there.
16   I was there as CFO and board member of
17   Kyivstar. The number two from Telenor Mobile
18   was there, in addition to Egil Hansen from
19   M & A.
20       Q.    **Now, you mentioned this was a**
21   **meeting of principals. Who was the principal**
22   **on the other side that you were meeting with?**
23       A.    That was Mikhail Fridman. He was
24   there.
25       Q.    **Who is Mikhail Fridman?**

**Moland - Direct**

1     
2      A.    He is most senior partner of
3 Alfa, and he was there together with Peter
4 Aven, which was, I suppose also is, head of
5 Alfa Bank.
6      ARBITRATOR CRAIG:  How do you
7 spell his last name?
8      THE WITNESS:  A-V-O-N.  I think
9 that's right.
10      ARBITRATOR CRAIG:  Avon.
11      MR. SILLS:  It's actually
12 A-V-E-N.
13      THE WITNESS:  E-N.  Okay.  Sorry.
14      **Q.    Now, what was the purpose of that**
15 **meeting in Moscow in the spring of 2002?**
16      A.    Prior to that meeting, few months
17 earlier, we got a message from Mikhail
18 Fridman and Alfa that they wanted to become a
19 shareholder in Kyivstar.  We were then
20 partners in VimpelCom, in Russia, a mobile
21 company in Russia, and we were positive to
22 also to bringing Alfa as a shareholder in
23 Kyivstar.
24      Then shortly after -- then
25 shortly before we had this meeting in Moscow,

Moland - Direct

1
2 we heard that Alfa had bought about
3 50 percent of Storm.  So that they were --
4 they would become a big shareholder in
5 Kyivstar, also without Telenor's help.
6      And there were then discussions
7 on the M & A expert level on Alfa buying
8 shares from Telenor.  And it turned out,
9 then, that there were disagreements on two or
10 three important items.  So it was a need for
11 a meeting at the top level to the companies
12 to clarify this.
13      **Q.    And what were the topics that**
14 **were discussed at that meeting?**
15      A.    In Egil Hansen's affidavit it's
16 about -- it's about the possibility of an IPO
17 of Kyivstar.  That was one important point.
18 The two other important points were what
19 should, in the end, be the relative
20 shareholder -- share holdings for Telenor and
21 Alfa.  And the third one, what should be the
22 roles in the company for the two parties.
23      **Q.    Can you tell us, what was Alfa's**
24 **position on what it wanted to be in terms of**
25 **its share holdings in Kyivstar?**

**Moland - Direct**

1
2      A.    Alfa's position was that it
3 wanted as close to 50 percent as possible to
4 make this more or less a 50/50 company where
5 they -- they regarded themselves as a
6 financial investor and regarded Telenor as
7 the industrial partner who should be
8 responsible for actually running the company.
9 And assisting the company in all its
10 operations.
11      Telenor's position was that,
12 well, before -- before we sold anything to
13 Kyivstar, we had the possibility of having
14 close to 65 percent of the shares.  But we
15 were willing to sell some -- some shares to
16 them to please a good partner.
17      **Q.    And what percentage was it that**
18 **Alfa wanted to obtain in terms of their share**
19 **holding in Kyivstar?**
20      A.    Yeah.  They wanted to obtain
21 50 percent.
22      **Q.    And if they couldn't get**
23 **50 percent was there another threshold level**
24 **that that they wanted to be above?**
25      A.    They wanted to be above

Moland - Direct

1
2 40 percent because that gave them strong
3 rights, according to Ukrainian legislation.
4 And we concluded in that meeting with 56 1/2
5 percent to Telenor, 43 1/2 to Alfa, and a
6 shareholder's agreement with two important
7 contents.
8      One content was that the
9 shareholder's agreement should reflect that
10 Telenor was the operating partner of
11 Kyivstar, so that we could support Kyivstar
12 with all expertise and guide them on
13 developing the operation.
14      The second was that we should
15 have a shareholder's agreement that prevented
16 Alfa from exploiting the rights according to
17 Ukrainian law or -- and the 40 percent
18 threshold.
19      **Q.    Would you have sold Alfa enough**
20 **shares to get their percentage over**
21 **40 percent, if they had not agreed to enter**
22 **into a shareholder's agreement that stated**
23 **they wouldn't use their blocking position to**
24 **obstruct the operations?**
25      A.    That's right.  We would never

1       Moland - Direct
2   have considered that.
3       ARBITRATOR JENTES:  Might I
4   interrupt in this regard:  You have been
5   talking entirely about Alfa.
6       THE WITNESS:  Yes.
7       ARBITRATOR JENTES:  Whereas, the
8   agreements that the panel has seen talk
9   about Storm.  And we have a general idea
10  of what Alfa's role here is, but in your
11  words, would you explain to us what you
12  saw Alfa's role as, who are all these
13  other people that show up as corporate
14  entities?
15      THE WITNESS:  Yeah.  At the time
16  of the meeting in Moscow, we are talking
17  about?
18      ARBITRATOR JUNTES:   yes.
19      THE WITNESS:  Alfa had made an
20  agreement with the Storm shareholders,
21  the Storm's Ukrainian shareholders, of
22  Alfa buying about 50 percent of the
23  shares in Storm.  And Alfa then behaved
24  as they controlled Storm.  And it turned
25  out later that they also acquired the

1       Moland - Direct
2   rest of the shares in Storm.  So Alfa
3   was, in effect, controlling Storm.  And
4   through different legal entities.
5   First, I think it was through Alfa Bank.
6   It was through Alfa Telecom.  And now
7   it's this two new -- relatively new
8   companies, Altimo and Alpren.
9       ARBITRATOR JENTES:  What was your
10  understanding of who Alfa was?  In other
11  words, these people that you were
12  dealing with and that you had had a
13  relationship with involving, I gather, a
14  Russian telecom company?  Who was this
15  Alfa, as you understood it?
16      THE WITNESS:  Well, as we
17  understood it, Alfa was a company
18  controlled by a number of partners where
19  this Peter Aven was one, but where the
20  most important was Mikhail Fridman.  And
21  he was one of the famous oligarchs, to
22  put it that way.  Very close
23  relationships to the top -- to the
24  Kremlin.
25      ARBITRATOR JENTES:  And is he or

1       Moland - Direct
2   was he a Russian?
3       THE WITNESS:  He was born, as far
4   as I know, in Ukraine.
5       ARBITRATOR JENTES:  Oh, in the
6   Ukraine?
7       THE WITNESS:  Yes.
8       ARBITRATOR JENTES:  But Alfa was,
9   as you understood it, a Russian
10  financial company?
11      THE WITNESS:  Yes.  A Russian
12  financial company involved in a lot of
13  different businesses, among other, oil.
14  They have big positions in the oil
15  business.
16      ARBITRATOR JENTES:  Okay.
17      ARBITRATOR CRAIG:  Where is the
18  headquarters of Alfa Bank?
19      THE WITNESS:  It's in Moscow.
20      ARBITRATOR CRAIG:  And the
21  headquarters of Mikhail Fridman?  Is
22  that where he has his headquarters?
23      THE WITNESS:  He's also in
24  Moscow.
25      ARBITRATOR CRAIG:  He was born in

1       Moland - Direct
2   Ukraine.
3       THE WITNESS:  Born in Ukraine.
4   But studied in Moscow, as far as I
5   understand.  Started his career in
6   Moscow.
7   **Q.   Now, at this meeting in Moscow**
8   **you're referring to, do you recall any**
9   **one-on-one meeting between Mr. Fridman and**
10  **the CEO of Telenor?**
11  A.    Yes.  There was a one-on-one
12  meeting and the four eyes between Thor
13  Haverson and Mikhail Fridman, where, as far
14  as I can remember, they came out and
15  concluded on the three main topics:  The IPO,
16  the share holdings of the two parties, and
17  the roles of Alfa as a financial investor and
18  Telenor as an industrial investor with
19  operations and responsibility of Kyivstar.
20  **Q.    And was there an agreement to**
21  **enter into a new shareholder's agreement**
22  **reflecting these terms?**
23  A.    Yes.  After this meeting, the
24  agreement was written down in a letter giving
25  sort of a term sheet on the future.  I think

Moland - Direct

1  it was dated in April.
2
3      Q.    And is that the April term sheet
4  referred to in Mr. Hansen's affidavit?
5      A.    That's right, yes.  And there you
6  will find, I think, all the -- all the
7  substantial items, points also from related
8  shareholders meeting.
9          ARBITRATOR CRAIG:  This is
10  Exhibit D?  It's actually attached to
11  Egil Hansen's --
12          MR. MUSOFF:  We're incorporating
13  by reference.  It's the one attached to
14  Mr. Hansen's affidavit.
15          THE WITNESS:  That's right.  It
16  is.  I remember that.
17          ARBITRATOR JENTES:  I'm sorry,
18  you're looking at what, Craig?
19          ARBITRATOR CRAIG:  I'm looking at
20  Egil Hansen's affidavit.  And I'm going
21  to Exhibit D, which has got an April 29
22  letter agreement.
23          MR. MUSOFF:  Yes, I believe
24  that's the one.
25          ARBITRATOR CRAIG:  Signed by --

Moland - Direct

1
2          THE WITNESS:  Yes.  Exhibit D,
3  the letter dated April 29.  And it's
4  also on the last page, accepted and
5  agreed to by Alfa Bank.
6          ARBITRATOR CRAIG:  And the term
7  sheet is attached?
8          THE WITNESS:  Yeah.  And reading
9  that, you will see that the later
10  shareholder's agreement reflects that
11  term sheet.
12          ARBITRATOR CRAIG:  The term
13  sheet.
14          THE WITNESS:  So the point here
15  is that -- that, you know, the basic
16  term sheet was agreed by the two
17  principals in a meeting and all later
18  reflected in this.
19          ARBITRATOR CRAIG:  Let me ask you
20  about Storm.  Storm is on this letter
21  agreement.  But at that time in
22  April 2002, was Storm controlled by Alfa
23  Bank?
24          THE WITNESS:  Well, I cannot give
25  you an exact answer to that, because

Moland - Direct

1
2  there was at that time a process between
3  Storm's shareholders and Alfa whereby
4  Alfa was entering into the company and
5  was later controlling them.
6          ARBITRATOR CRAIG:  But you don't
7  know as of April 29, 2002 whether Storm
8  was in fact controlled by Alfa?
9          THE WITNESS:  Well, there was --
10  as far as I know, there was made an
11  agreement of -- where Alfa should take
12  over the 50.1 percent of the shares in
13  Storm.  But whether that was actually --
14  transaction had taken place at that
15  time, I don't know.
16          MR. MUSOFF:  Mr. Craig, while
17  this witness may not recall the date, I
18  believe there is record evidence that we
19  can provide you after his testimony that
20  shows that at that date Storm was
21  controlled by Alfa.
22          MR. SILLS:  In particular,
23  Mr. Craig, it's referred to as a
24  participant's agreement, a copy of which
25  was provided to us, which does show on

Moland - Direct

1
2  its face that at the time of the deal
3  50.1 percent of the interest in Storm
4  was already held by Alfa, and that Alfa
5  had special governance rights under that
6  participant's agreement, including the
7  right to appoint the general director,
8  who's the sole officer and who's this
9  fellow Nilov.  It's is now Konenko.
10          But there is record evidence I
11  believe that's annexed to Mr. Hansen's
12  affidavit, if not to our evidentiary
13  brief.  It's referred to as
14  participant's agreement.  Maybe at a
15  break we can supply that.
16          ARBITRATOR CRAIG:  That's fine.
17  I didn't mean to interrupt.  But that
18  was an issue that had come up.
19          THE WITNESS:  And it was
20  completely clear in all of our
21  communications with Alfa that they
22  regarded themselves as controlling
23  Storm.
24      Q.    Since we have referred to
25  Mr. Hansen's affidavit, if you could open it,

**Moland - Direct**
1
2 **just to bring out a couple of points. If you**
3 **could turn to, I believe, page 8 of the term**
4 **sheet, which is annex A.**
5     A.    Page?
6     **Q.    It should say 8 at the bottom.**
7     A.    8 at the bottom.
8         ARBITRATOR JENTES:  And you're in
9 which exhibit?
10         MR. MUSOFF:  Exhibit D to
11 Mr. Hansen's affidavit.  The one you
12 were referring to, Mr. Craig.
13         ARBITRATOR CRAIG:  Yes.
14     **Q.    And generally, Mr. Moland, does**
15 **the term sheet state anything with respect to**
16 **the agreement to enter into a new**
17 **shareholder's agreement in that term sheet?**
18     A.    Yes.  In the paragraph named
19 "shareholder's agreement."  You can read the
20 points there.  All the major reality points
21 on the -- on the -- in the shareholder's
22 agreement with -- with Telenor appointing
23 five directors to the board, Alfa and Storm
24 four, adjusted pro rata to the share
25 holdings.  And it also describes the

1     Moland - Direct
2 requirement for quorum and the procedure, if
3 a meeting does not have quorum.
4     **Q.    And if you would, turn to the**
5 **second-to-last page of that exhibit that's**
6 **labeled 13 at the bottom.  And what does the**
7 **term sheet state about what the governing law**
8 **of the shareholder's agreement is to be?**
9     A.    Yeah.  It's by the laws of the
10 State of New York, the United States.
11     **Q.    And the next paragraph, what, if**
12 **anything, does it say about arbitration in**
13 **the term sheet?**
14     A.    Both parties -- all -- both share
15 purchase agreement and the shareholder's
16 agreement will have arbitration clause
17 providing for Uncitral arbitration, and the
18 seat of the arbitration will be in New York
19 City.
20     **Q.    Now, turning --**
21         ARBITRATOR JENTES:  One other
22 question.  At the time that this meeting
23 in Moscow occurred, were there lawyers
24 present for both sides?
25         THE WITNESS:  Not at that

1     Moland - Direct
2 meeting.
3         ARBITRATOR JENTES:  Not at that
4 meeting?
5         THE WITNESS:  No, no.  That was a
6 commercial meeting, not to say agreement
7 draft meeting.
8         ARBITRATOR JENTES:  Okay.  Do you
9 know when this document that's Exhibit D
10 was drafted?
11         THE WITNESS:  No.  That was
12 drafted shortly afterwards.  And I can
13 remember from Egil Hansen, who was the
14 M & A person on this, that there was a
15 discussion on governing law and on
16 arbitration, because in the -- with the
17 former shareholders, shareholder
18 agreement, that was governed by Swedish
19 law, and it was now regarded that that
20 U.S. law was more independent by all the
21 parties than Swedish law.
22         ARBITRATOR JENTES:  Okay.  But it
23 was your understanding that the document
24 that's Exhibit D, the sort of expanded
25 term sheet, was that prepared with the

1     Moland - Direct
2 assistance of counsel for both the Alfa
3 side and Telenor side?
4         THE WITNESS:  I know that we from
5 the Telenor side had counsel.  And I
6 believe also that the other side had
7 that.
8         ARBITRATOR JENTES:  Do you know
9 whether the counsel for the Alfa side
10 was the gentleman that's Mr. Wack from
11 the Moscow -- I forgot the firm now.
12         THE WITNESS:  I cannot remember
13 that.
14         ARBITRATOR CRAIG:  But you do
15 recall that Alfa had counsel there?
16         THE WITNESS:  Yes.
17         ARBITRATOR CRAIG:  In this
18 negotiation.
19         MR. MUSOFF:  Squire Sanders.
20     **Q.    I believe you said that at the**
21 **spring 2002 meeting Mr. Fridman said he would**
22 **like to get 50 percent of Kyivstar?**
23     A.    Yes.
24     **Q.    What is your current**
25 **understanding of what Mr. Fridman would like**

Moland - Direct

1
2 to do with respect to Kyivstar?
3    A.    I believe that that still is
4 his -- his ambition.
5    Q.    And what is that based on?
6    A.    Well, I can -- there was -- there
7 was, I think last week, as a result of the
8 injunction in Ukraine we have been talking
9 about, there was a phone call between the
10 prime minister of Norway and the prime
11 minister of Ukraine.  And in that meeting the
12 prime minister of Ukraine said that he had
13 been talking to Mikhail Fridman, who told him
14 that he was angry with Telenor because
15 Telenor wouldn't give him 50 percent and
16 equal rights.
17    Q.    Even though they owned less than
18 50 percent?
19    A.    Right.  We heard this from the
20 Norwegian ambassador.
21    Q.    Now, you stated that one of your
22 roles is to be a board member of Kyivstar; is
23 that correct?
24    A.    That's right, yes.
25    Q.    For how long have you been a

Moland - Direct

1
2 board member of Kyivstar?
3    A.    I have been board member since
4 Telenor entered into that company in the
5 spring of '98.
6    Q.    And are you familiar with how
7 board meeting for Kyivstar are called?
8    A.    Oh, yes.
9    Q.    And can you just generally
10 describe your understanding?
11    A.    Well, generally, once a year we
12 decide a schedule for board meetings for the
13 next year.  And then both administration and
14 the shareholders, they make proposals of
15 items on the agenda which then they -- the
16 secretary of the board sends out a week or
17 so -- yeah, before the meetings.  In due time
18 before the meetings, according to the
19 statutes, I believe.
20    Q.    And it's your understanding that
21 all the board members are made aware of the
22 meeting dates and their locations?
23    A.    Oh, yes.  Oh, yes.  No doubt.
24       ARBITRATOR CRAIG:  Have you
25 yourself had conversations with Mikhail

Moland - Direct

1
2 Fridman?
3       THE WITNESS:  Not personally.
4 I've only met him a few times in
5 meetings.
6       ARBITRATOR CRAIG:  But have you
7 ever discussed with him his ambitions
8 for Alfa Group inside of Kyivstar?
9       THE WITNESS:  It was quite --
10 quite clear in '92 that he wanted to
11 be -- to be a 50 percent shareholder.
12 And also that -- that Alfa's ultimate
13 goal here was to have a merger between
14 Kyivstar and Russian VimpelCom making
15 Kyivstar in fact run by -- from Moscow.
16 That was -- that was also our clear
17 understanding.
18       ARBITRATOR CRAIG:  In 1992?
19       MR. MUSOFF:  I believe you said
20 '92.
21    Q.    Did you mean 2002?
22    A.    I'm sorry.
23       ARBITRATOR CRAIG:  2002.
24       THE WITNESS:  I'm sorry, 2002.
25 I'm sorry.

Moland - Direct

1
2       ARBITRATOR CRAIG:  When was the
3 last time you had a conversation with
4 Mr. Fridman?
5       THE WITNESS:  I think it was in
6 that meeting.
7    Q.    Mr. Moland, turning to your role
8 as a member of the board for Kyivstar, did
9 there come a time when the members nominated
10 by Storm stopped attending board meetings?
11    A.    Yes.  That was in March 2005.
12    Q.    And let me turn your attention to
13 the summer of 2004, before that time.  At
14 that time, what, if anything, did you hear
15 about whether or not Storm would be sending
16 its representatives to the board meeting?
17    A.    Yeah.  I heard sometime during
18 the summer from Igor Lytovchenko, the
19 president of Kyivstar, that Alfa had told
20 them that they would soon start boycotting
21 the board meetings to prove that Telenor did
22 not have control over the company.
23    Q.    And what, if anything, did you do
24 when you heard that?
25    A.    You know, I said to Igor

Moland - Direct

1 Lytovchenko that I doubt they will do that,
2 because that would be a violation of the
3 shareholder's agreement.  We would take them
4 to arbitration in New York.  They would lose,
5 and they would prove to all the world that
6 they were not reliable shareholders.  And I
7 didn't believe that Alfa would take such a
8 risk.  So I thought it was more a reflection
9 of the deterioration in the relation between
10 the two parties that had taken place in
11 Russia.
12     **Q.    Did you speak to anyone yourself**
13 **at Storm about what you had heard?**
14     A.    No, I didn't do that.
15     **Q.    What about at Alfa?**
16     A.    No.
17         ARBITRATOR CRAIG:  What was the
18     name of the person who was the president
19     of Kyivstar again?
20         THE WITNESS:  Igor Lytovchenko.
21     I have we have the -- I can't spell the
22     name.  I'm sorry, but I think it's in
23     some of the papers here.
24         MR. MUSOFF:  I think it's spelled

*(Note: lines 1-25 above correspond to Page 66; line numbers as printed)*

Moland - Direct

1 L-Y-T-O-C-H-E-N-K-O.
2     **Q.    Did Mr. Lytovchenko tell you on**
3 **what basis he had heard that Storm and Alfa**
4 **was to boycott the board meetings?**
5     A.    No.  It was -- as I can recall
6 it, it was to demonstrate that Telenor did
7 not have -- have control over the company.
8     **Q.    Did he ever mention that they**
9 **were taking the position that the**
10 **shareholder's agreement was invalid at that**
11 **time?**
12     A.    No, no.
13     **Q.    Or that the charter violated**
14 **Ukrainian law?**
15     A.    No, no.
16     **Q.    Now --**
17         ARBITRATOR JENTES:  Who exactly
18     is Mr. Lytovchenko?
19         THE WITNESS:  He is one of the
20     founding fathers of Kyivstar.  And he
21     was the first president and has been
22     president of the company since the
23     start.
24         ARBITRATOR JENTES:  And is today?

Moland - Direct

1         THE WITNESS:  Is today.
2         ARBITRATOR JENTES:  And is he
3     Ukrainian?
4         THE WITNESS:  Is native
5     Ukrainian.
6         ARBITRATOR JENTES:  Who nominated
7     him to be the president?
8         THE WITNESS:  I think he and a
9     couple of friends started the company,
10     must have been in '96, I believe, when
11     they obtained licenses for doing mobile
12     communication.
13         ARBITRATOR JENTES:  And has
14     Telenor continued to support him as the
15     president?
16         THE WITNESS:  Yes, we have.
17         ARBITRATOR JENTES:  And does he
18     do an adequate job, as far as you're
19     concerned, in operating the company?
20         THE WITNESS:  Well, we have
21     supported him with a lot of senior
22     persons from Telenor.  So he's the chief
23     executive, but chief, we have during
24     this period, the chief technical officer

Moland - Direct

1 has been a Telenor person.  The chief
2 marketing person, with a few exceptions,
3 has been a Telenor person.  The chief
4 financial officer has been.  So that we
5 have built around him the sufficient
6 expertise to run the company.  But he
7 has been important because of his
8 connections in Ukraine.
9         ARBITRATOR JENTES:  Are the
10     people that you've just mentioned that
11     provide the technical and management
12     support, are they Norwegians or are they
13     Ukrainians?
14         THE WITNESS:  None of them are
15     Ukrainians.  They are either Norwegians
16     or they are coming from other Norwegian
17     mobile operations in different partner
18     or we have hired them on an
19     international job market.
20         ARBITRATOR JENTES:  Okay.  Thank
21     you.
22     **Q.    Now, I'd like you to turn to the**
23 **first exhibit in the binder.  Yes.  Could you**
24 **tell us what is there as the first exhibit?**

**Moland - Direct**

1
2    A.    Yeah.  This is the protocol for
3    the first meeting, board meeting, where the
4    Alfa or Storm representatives did not attend.
5        Q.    And what's the date of that?
6        A.    That's the March 18, 2005.
7        Q.    And can you summarize what was
8    the business of that meeting?
9        A.    Yeah.  That you can see from
10   page 2, there were the ordinary status
11   reports on financial, technical marketing and
12   so on.  And then on the second section,
13   item 5, is a lot of very important decision
14   items.  It goes for approval of strategy and
15   business plan.
16       ARBITRATOR CRAIG:  I'm sorry, I
17   didn't understand.  Where are you
18   looking?
19       THE WITNESS:  At Exhibit 1.
20       MR. MUSOFF:  The second page.
21       ARBITRATOR CRAIG:  I'm sorry, I'm
22   there.  I didn't understand what you
23   were saying.
24       Q.    If you could just repeat what the
25   important decisions were.

**Moland - Direct**

1
2        A.    The important businesses in that
3    meeting is seen from point 5 at page 2 here.
4        ARBITRATOR CRAIG:  Right.  I'm
5    there.
6        THE WITNESS:  And there is
7    approval of strategy and business plan,
8    2005 to 2007.  Approval of audited
9    financial statement for 2004.  Approval
10   of dividends, payouts.  Approval of
11   external financing scheme for 2005.  We
12   had -- the company then had to borrow
13   money.
14       And then there were approval of
15   organization development, procurement
16   policy.  Approval of acquiring one of
17   the smaller mobile operators.  So it
18   was -- it was very important decision
19   items on that meeting.
20       Q.    And the court -- and because
21   Storm failed to attend this board meeting,
22   were you able to achieve a quorum?
23       A.    No.
24       Q.    And were you able to take any
25   decisions with respect to these important

**Moland - Direct**

1
2    items?
3        A.    No.
4        Q.    What, if anything, did you do
5    when you learned that Storm was not going to
6    attend the March 2005 board meeting?
7        A.    Well, according to the statutes,
8    we follow that procedure and call for a new
9    board meeting with the same agenda.
10       Q.    And was that new board meeting
11   scheduled for April?
12       A.    Yes.
13       Q.    I'd like to now turn to the
14   second --
15       ARBITRATOR CRAIG:  Can I ask you
16   when you got notice that Storm was not
17   going to attend this meeting?
18       THE WITNESS:  I don't think we
19   got notice until we were in the meeting.
20   I cannot remember that we got it in
21   advance.  Which we -- we come to the
22   next meeting.  We got it the day before
23   or so.
24       Q.    And can you tell us --
25       ARBITRATOR JENTES:  Why was the

Moland - Direct

1
2    meeting held in Vienna?
3        THE WITNESS:  Because Vienna
4    was -- we could attend as a one-day
5    meeting for both Telenor people going --
6    flying in from Oslo, from the Alfa
7    people flying in from directly from
8    Moscow to Vienna.  And from the Kyivstar
9    people from Kiev to Vienna.  So it was
10   for the logistic reasons a very
11   convenient to have it there.
12       ARBITRATOR JENTES:  All right.
13       THE WITNESS:  So we often had
14   board meetings in Vienna.
15       ARBITRATOR JENTES:  Okay.
16       Q.    Turning to this second exhibit,
17   what's reflected there?
18       A.    There is a letter from -- no.
19   From -- Mr. Kulikov, the director general of
20   Storm --
21       Q.    And --
22       A.    -- to us and to the chairman of
23   the board telling that -- no.  I'm sorry.
24   Telling that Storm had a general meeting and
25   decided that they could not attend the board

Moland - Direct

1   meeting.
2       Q.    And what was the reason given in
3   the letter, referring to the second
4   paragraph?
5       A.    Well, the reason is that was
6   impossible for them to go there.  They were
7   not given any other reason other than that.
8       Q.    And to your understanding, did
9   anyone from Storm inform you or to your
10  knowledge, anyone at Telenor that the reason
11  they were not attending at this point was
12  before the shareholder's agreement was
13  invalid?
14      A.    No.
15      Q.    Turning now to Exhibit 3.  Do you
16  see what's --
17          ARBITRATOR CRAIG:  Can I ask a
18  question.  This may be a legal question.
19  Did you think it was a violation of the
20  shareholder's agreement not to attend?
21          THE WITNESS:  Not to attend the
22  March 18th meeting.  But if -- and the
23  statutes then said that, then there
24  should be called for another meeting.

Moland - Direct

1   And if they didn't attend that, we could
2   call for a shareholders meeting or a
3   general meeting of the company to make
4   those decisions.  And, you know, I think
5   our counsels here could answer the legal
6   part.  But I understand that it would be
7   a violation of the shareholder's
8   agreement if they didn't show up at the
9   final stage.
10          They could repair -- if it was a
11  violation of not attending the first
12  meeting, they could repair that by
13  attending the second meeting or a
14  shareholders meeting.
15      Q.    Let's now turn to the third
16  exhibit.  And is that a response to the
17  letter at Exhibit 2?
18      A.    Yes.
19      Q.    And this appears to be a draft.
20  Do you know if a final letter was ever sent?
21      A.    I don't know.  I don't remember
22  if it was sent.  It was to tell the chairman
23  about the importance of some of the items
24  here.

Moland - Direct

1       Q.    And to your understanding, was
2   the chairman informed about the importance of
3   the items to be discussed in attending the
4   board meetings?
5       A.    Oh, yes.  He was.
6          ARBITRATOR CRAIG:  Just a second.
7   This April 7th letter, we don't know
8   whether it was sent or not?
9          THE WITNESS:  That's right, yes.
10  I cannot remember.  And we haven't been
11  able to -- to find the original letter.
12      Q.    To your knowledge, was the
13  important points made in this letter
14  communicated to Mr. Tumanov?
15      A.    I think so.  But I have no very
16  clear recollection of that.
17          ARBITRATOR JENTES:  Just so I
18  understand, the meeting -- the document
19  that's numbered 2 is sent by
20  Mr. Kulikov, who didn't attend the
21  meeting on March 18, 2005, to
22  Mr. Tumanov, who also didn't attend the
23  meeting; right?
24          THE WITNESS:  That's right.

Moland - Direct

1          ARBITRATOR JENTES:  And then they
2   sent a copy of that -- well, I guess
3   they sent it also to Mr. Ekhougen.
4          THE WITNESS:  Right.
5          ARBITRATOR JENTES:  Who was your
6   representative, in effect.
7          ARBITRATOR CRAIG:  And Ekhougen
8   did attend the March 18th meeting?
9          THE WITNESS:  Oh, yes.  Yes, he
10  did.  They sent it to him because he was
11  the country manager for Ukraine.
12          ARBITRATOR JENTES:  Okay.
13          ARBITRATOR CRAIG:  The April 7th
14  letter, the copy that I have makes no
15  reference to any violation of the
16  shareholder's agreement or even of the
17  charter.  It doesn't make any allegation
18  that there's a violation of the charter.
19          THE WITNESS:  That's right, yes.
20      Q.    In that regard -- let's turn to
21  Exhibit No. 5.
22          ARBITRATOR CRAIG:  There's no
23  Exhibit 4; right?
24          MR. MUSOFF:  That's correct.

1          Moland - Direct
2        ARBITRATOR CRAIG:  Okay.
3        MR. SILLS:  That exhibit
4    intentionally is not there.
5        ARBITRATOR CRAIG:  That's it.
6        **Q.    With respect to referencing the**
7    **shareholder's agreement, can you tell us**
8    **what's Exhibit No. 5?**
9        A.    This is a letter, a form letter,
10    from Telenor Mobile to Storm, where we notify
11    them that they didn't attend the meetings in
12    March and April, and refer to the content of
13    the shareholder's agreement.  And that this
14    was a breach of Storm's obligation under the
15    shareholder's agreement.
16        So this was the first -- first
17    really formal notice of our view on this.
18        ARBITRATOR CRAIG:  Right.
19        **Q.    Now, turning to Exhibit No. 6.**
20    **Are those the minutes from the April 8th**
21    **meeting?**
22        ARBITRATOR CRAIG:  Would you just
23    hold on a second.
24        MR. MUSOFF:  Sure.  Of course.
25        ARBITRATOR CRAIG:  Okay.

1          Moland - Direct
2        **Q.    And just turning briefly to**
3    **Exhibit No. 6.  Does that reflect the failure**
4    **of Storm's representative to attend the**
5    **April 8th board meeting?**
6        A.    Yes.
7        **Q.    And, again, can you summarize**
8    **what was the agenda for that meeting?**
9        A.    Now, the agenda for that meeting
10    was identical to the agenda of the March 18th
11    meeting which we have been through.
12        **Q.    How did Storm's failure to attend**
13    **the March 18 and April 8 board meeting affect**
14    **Kyivstar?**
15        A.    Well, you know, not to attend
16    those two meetings would not have been that
17    important, if they then had come back to the
18    board later.  But if you are -- are you
19    asking me, you know, about the whole period
20    where they did not attend board meetings?
21        **Q.    Answer it in that respect and**
22    **I'll focus you again.**
23        A.    It had been quite a lot of harm
24    to both Kyivstar and the shareholders in
25    different company.  First, as you can see he,

1          Moland - Direct
2    we have not been able to take out dividend.
3    And operational -- operationally, they have
4    also tried to prevent Kyivstar from
5    implementing the Sarbanes-Oxley regulations.
6    And also, when it comes to the direct
7    operations, we have not been able to
8    implement marketing efforts.
9        For instance, if you look at the
10    mobile phone, and you will see the name of
11    the operators on the screen as the first
12    thing you do.  That's not the case in
13    Kyivstar.  And we have not been able to make
14    them do that.
15        We have asked them to open more
16    sales offices, which they have not done.  We
17    have supported Kyivstar with experts, but
18    have not been able to -- to be paid for that
19    because this is a kind of transaction that
20    needs board decision.  So that we are not
21    being paid for assistance we give to
22    Kyivstar.
23        We have tried to -- and not been
24    able to strengthen the financial control to
25    the degree we should have wanted because

1          Moland - Direct
2    there is a need for more financial
3    controllers in several of the departments.
4    And their organization doesn't take action
5    fast enough on this.
6        There is a general -- this
7    company has grown from being extremely small
8    to now having about 20 million customers.
9    And there is a lack of -- there is not
10    sufficient expertise in different areas.  And
11    the current administration, they haven't
12    taken action on this sufficiently fast.
13        So the Kyivstar operation is
14    being suffering by this.  And for the
15    shareholders, of course, that means that the
16    company could have made more money, been more
17    value to us.  And, in addition to this,
18    Kyivstar has -- has now gone to have a
19    capital structure, which is far from optimal
20    from any point of view.
21        ARBITRATOR JENTES:  I'm sorry, a
22    what?
23        THE WITNESS:  Capital structure.
24    Because we are not able to take out
25    dividend.  And with the present

Page 82

1      Moland - Direct
2  shareholder situation, the company is --
3  would not be able to borrow money, if we
4  should try to do that.  And we would not
5  be able to IPO the company, if that
6  should be the case.
7      ARBITRATOR CRAIG:  The 20 million
8  subscribers, is that the current size of
9  Kyivstar?
10     THE WITNESS:  Well, I don't have
11 the exact number, but it's above
12 18 million subscribers.  I think we will
13 reach 20 million subscribers early next
14 year.
15     ARBITRATOR CRAIG:  And are they
16 all in Ukraine?
17     THE WITNESS:  They're all in
18 Ukraine.  It's been a tremendous growth
19 in penetration, and Kyivstar has gone
20 from being a number five operator when
21 we started --
22     ARBITRATOR CRAIG:  In Ukraine?
23     THE WITNESS:  In Ukraine.  To be
24 the number one now.
25     ARBITRATOR CRAIG:  And who is

Page 83

1      Moland - Direct
2  Kyivstar's major competition inside
3  Ukraine?
4      THE WITNESS:  There are one major
5  competitor.  That was the mobile branch
6  of the -- of the incumbent, the
7  Ukrainian government-owned mobile
8  operator, which was first partly owned
9  by some western European companies.  Now
10 it's 100 percent owned by -- by a
11 Russian mobile operator, MTS.
12     ARBITRATOR CRAIG:  And how many
13 subscribers does that company have?
14     THE WITNESS:  They hare slightly
15 fewer than Kyivstar.  And the third one
16 is subsidiary of Turkcell.
17     ARBITRATOR CRAIG:  A Turkish
18 company?
19     THE WITNESS:  Yeah.  It's a
20 Ukrainian company but partly owned by
21 Turks and also Russian -- Ukrainian
22 oligarch.
23  Q.    And do you know who is a partial
24 owner of Turkcell?
25  A.    And there we have our friends.

Page 84

1      Moland - Direct
2      ARBITRATOR CRAIG:  The Alfa
3  Group?
4      THE WITNESS:  The Alfa Group.
5  Q.    In response to Mr. Craig's
6  questions, since we were talking briefly
7  about competitors of Kyivstar, is it your
8  understanding that there's a noncompete
9  clause in the shareholder's agreement?
10 A.    Yes.
11 Q.    And what's your understanding of
12 the purpose of that clause?
13 A.    The purpose of that is simple.
14 It's to make sure that the shareholders have
15 the same interests in developing the company
16 and that we do not risk that any business
17 secret from Kyivstar should fall into the
18 hands of one of the competitors.
19 Q.    And what sort of damage would
20 occur, if the business secrets of Kyivstar
21 would fall into any competitors hands?
22 A.    You know, it would be -- for
23 instance, planned market activities falls
24 into the hands of a competitor, they could
25 easily destroy or, you know, make actions

Page 85

1      Moland - Direct
2  that could really undo a lot of what we would
3  else have obtained.
4  Q.    And Telenor, as the majority
5  shareholder of Kyivstar, would also be
6  damaged by such actions?
7  A.    Oh, yes.  Oh, yes.
8  Q.    And you've mentioned to Mr. Craig
9  and the panel that Kyivstar does have a lot
10 of subscribers.  You mentioned somewhere
11 close to 20 million.  What is your
12 understanding if Kyivstar could have done
13 better, if it was able to have a functioning
14 board?
15 A.    I'm sure that Kyivstar would have
16 done better, if we had a functioning board
17 and that not only the board, but also that
18 Telenor would have been able to give -- give
19 Kyivstar more support.
20     THE CHAIRMAN:  Do you have an
21 opinion as to why Storm refused to
22 attend and decided to boycott these
23 meetings?
24     THE WITNESS:  You know, I haven't
25 made my thoughts to put it that way.

Moland - Direct

1  But I don't know for sure.
2
3         THE CHAIRMAN:  You don't know
4  why?
5         THE WITNESS:  I think it's
6  because they want to soften us and to
7  make us softer and go to the negotiation
8  table and give them 50 percent of the
9  shares.
10        THE CHAIRMAN:  You don't think it
11 has anything to do with the competition
12 from the wholly owned Ukrainian
13 competitor?
14        THE WITNESS:  No.  Well, no.  I
15 don't think that's -- I think the
16 important motivation here is to increase
17 the stake in Kyivstar at favorable
18 terms.  Or maybe to make us sell
19 Kyivstar to -- to the Russian mobile
20 operator, VimpelCom, which, of course,
21 would be seen from Moscow would give
22 meaning both to a Russian oligarch and
23 to the Kremlin.
24    Q.    With respect to competition with
25 Turkcell, is the damage caused by Storm's

Moland - Direct

1
2  boycott of the board hurting Kyivstar, which
3  would then benefit its competitors, including
4  Turkcell?
5     A.    You know, to the extent that
6  information goes from Kyivstar to the Turkish
7  owned company, then it would cause damage to
8  Kyivstar.
9     Q.    Let's go to Exhibit 8, if there
10 are no further questions.
11        ARBITRATOR CRAIG:  I've got a
12 couple.  The failure of the Storm board
13 members to attend, did that prevent the
14 board from voting dividends?
15        THE WITNESS:  Yes.
16        ARBITRATOR CRAIG:  And that is
17 because it's required to have six
18 members of the board to approve
19 dividends?
20        THE WITNESS:  Yeah.  We need to
21 have a board meeting and we also --
22        ARBITRATOR CRAIG:  You need to
23 have a board meeting?
24        THE WITNESS:  Yes.  We need to
25 have a board meeting and we need --

Moland - Direct

1
2         ARBITRATOR JENTES:  The real
3  problem is you can't get a quorum, I
4  take it.
5         THE WITNESS:  Right.  We don't
6  get a quorum and they also boycotted all
7  shareholder meetings.  So the dividend
8  should be finally decided by -- by
9  the --
10        ARBITRATOR CRAIG:  The
11 shareholders.
12        THE WITNESS:  The shareholders
13 meeting and we have not been able to
14 have that.
15        ARBITRATOR CRAIG:  Does the
16 failure to have a board meeting preclude
17 Kyivstar from borrowing money?
18        THE WITNESS:  We borrowed some
19 money in the spring of '05.  We had --
20 we had a Eurobond tap issue then.  And
21 on that specific case, as far as I can
22 remember, we had a written board
23 resolution.
24        ARBITRATOR CRAIG:  And did the
25 members from Storm participate in that

Moland - Direct

1
2  written board resolution?
3         THE WITNESS:  Yes, as far as I
4  can remember, they did.
5         ARBITRATOR CRAIG:  And what was
6  the date of that?
7         THE WITNESS:  I think it was on
8  April 8, 2005.  I cannot remember the
9  exact date.
10        THE CHAIRMAN:  Wait a minute.  I
11 want to make sure I understand this.
12 Are you saying that on that one occasion
13 Storm did not boycott but did
14 participate?
15        THE WITNESS:  That's right, yes.
16        THE CHAIRMAN:  Do we have that in
17 the record anywhere?
18        MR. MUSOFF:  We do.
19        THE CHAIRMAN:  Up until today?
20 Have we heard that before?  I was
21 laboring under the misapprehension that
22 post initial boycott they stayed away.
23 Am I now hearing that on at least one
24 occasion, concerning the borrowing of
25 the floating of a loan they actually

Moland - Direct

1  participated?
2
3      MR. O'DRISCOLL:  Mr. Chairman,
4  this was right around the time the
5  initial boycott got started.
6      THE CHAIRMAN:  Is it before or
7  after?  Right around.
8      MR. SILLS:  It was shortly
9  thereafter.  And I believe it's in the
10 record.  It was not a meeting.  There
11 was a signature on a unanimous written
12 consent that allowed one round of
13 borrowing in '05.  I suppose we should
14 clarify the record.  I think the record
15 contains it, Mr. Chairman.
16     THE CHAIRMAN:  I haven't heard
17 until just now that there was an
18 occasion post initial boycott when
19 Storm, to one extent or another, did
20 participate.
21     MR. O'DRISCOLL:  Mr. Chairman,
22 just for the sake of clarity, there was
23 one other occasion where a
24 representative of Storm turned up at a
25 meeting, one of the Ukrainian

Moland - Direct

1
2  representatives of Storm turned up at a
3  physical meeting.  And you may recall,
4  it is in the record, that individual was
5  subsequently sued by Alfa for having
6  turned up at that meeting.
7      MR. MUSOFF:  And it's in proposed
8  or expected testimony with respect to
9  those later meetings, which I believe
10 took place in November of 2005, which
11 we're going to get to chronologically.
12 But we could turn to that.
13     ARBITRATOR JENTES:  No, no.
14     ARBITRATOR CRAIG:  The
15 chronological approach I think is good,
16 but every now and then we can pause.
17     MR. MUSOFF:  Of course.
18     ARBITRATOR CRAIG:  Let me ask a
19 question about whether there were any
20 other written ballots taken of board
21 members on corporate business?
22     THE WITNESS:  The answer is no.
23     ARBITRATOR CRAIG:  This is the
24 only one that you can recall?
25     THE WITNESS:  This is the only

Moland - Direct

1
2  one.
3      ARBITRATOR CRAIG:  Okay.
4      THE WITNESS:  And I believe the
5  president of Kyivstar, Igor Lytovchenko,
6  persuaded Alfa to take -- to participate
7  in that.
8      ARBITRATOR CRAIG:  Well, do you
9  know if there was any other attempt made
10 by the president to secure a written
11 ballot?
12     THE WITNESS:  I think there was.
13 I have no concrete evidence, but we were
14 talking about him doing that a couple of
15 times.  But he failed to -- to have them
16 agree to do that.
17 Q.    Let's turn back to May of 2005.
18 And if you can look at Exhibit 8.  And we'll
19 come back to Exhibit 7.  Just take it
20 chronologically.
21 A.    This is a letter from Telenor's
22 in-house lawyer to the chairman of Kyivstar,
23 who then represented Storm, to tell him, you
24 know, how serious it was that he didn't do
25 his job.  It was trying to pressure him to --

Moland - Direct

1
2  to participate in the board meetings.  We
3  knew that he was -- well, he was one of the
4  founding fathers of the company and had his
5  loyalty to Kyivstar.  So we hoped that, you
6  know, putting pressure on him maybe would
7  make him attend the board meeting so that we
8  could have a quorum.
9  Q.    Was Telenor successful in getting
10 Mr. Tumanov to attend the next board meeting?
11 A.    No.  But during the conversations
12 we had with him, he said that he would attend
13 a board meeting where I would be elected as
14 vice chairman, and that he also thought of
15 stepping down as chairman.  But he didn't
16 then show up at that meeting.
17 Q.    Let me then just turn you -- I
18 can perhaps summarize, sir -- we'll do these
19 one at a time.  It might be easier for the
20 record.  Exhibit 7, does that reflect the
21 attendance at the May 12, 2005 board meeting?
22 A.    May 12th.  Yes.
23 Q.    And was Mr. Tumanov or any of the
24 other representatives of Storm present?
25 A.    No.  All the Storm

Moland - Direct

1    representatives were not present.
2    ARBITRATOR CRAIG: Referring to
3    Exhibit 8, there are, in the first
4    paragraph and in the third paragraph, a
5    reference to a letter that Mr. Tumanov
6    wrote on April 11th. And I assume that
7    letter was in response to the letter
8    that had been sent to him on April 12th.
9    Maybe not, no. It couldn't have been
10   responding to -- is that letter included
11   here somewhere, the Tumanov letter?
12   MR. MUSOFF: I believe we haven't
13   been available to locate that letter.
14   MR. SILLS: We've searched for
15   that letter, Mr. Craig. We've been
16   unable to find it. I believe we also
17   asked for a copy from Storm in our
18   document requests, and putting to one
19   side rather the scanty response we got
20   in general, we didn't get a copy.
21   I mean, it seems clear from the
22   context that the letter was sent, but we
23   have been unable to locate a copy.
24   ARBITRATOR CRAIG: What appears

Moland - Direct

1    is that there was a letter from
2    Mr. Ekhougen to Tumanov on April 7th to
3    which he responded on April 11th, and
4    then there was an April 12th letter to
5    Storm saying that you violated the
6    agreement. And then a response to his
7    letter of April 11th dated May 9th. But
8    it's hard to figure out what Tumanov is
9    saying about the situation, if we don't
10   have his letter.
11   MR. SILLS: Mr. Craig, you're
12   exactly right. We've looked for that
13   letter. We've searched the files.
14   We've been unable to locate one. We did
15   demand a copy from Storm and, well, we
16   got very few documents from Storm. And
17   I frankly don't know.
18   It would appear that it's some
19   sort of clerical or ministerial error
20   that it wasn't filed properly. It seems
21   clear from the context that it was
22   drafted and sent, and I think we can
23   more or less reconstruct it from the
24   sequence of correspondence you're

Moland - Direct

1    describing, but we just have been unable
2    to locate a copy.
3    ARBITRATOR CRAIG: Okay.
4    Q. Mr. Moland, let's turn to June of
5    2005. I'd like to direct your attention to
6    Exhibits 9, 10, and we could include 11 as
7    well. If you'd briefly walk us through those
8    scheduled meetings.
9    A. The protocol No. 6 of the
10   Ukraine -- the 15th of June meeting, there is
11   a new agenda. This was not a repeat of the
12   two nonattendance meetings, it was a new
13   agenda.
14   Q. Can you summarize what the new
15   agenda was?
16   A. Yeah. It was of the reporting
17   and it was dividends. And, again, company
18   policies which also were in the March and
19   April meetings. And approval of position of
20   the company we were talking about.
21   Q. And then, if you can also discuss
22   Exhibit No. 10, which is protocol 67, which
23   appears to be on the same date?
24   A. Yeah. This protocol No. 66, I

Moland - Direct

1    think this is -- I'm sorry, I think this is a
2    repeat again of the May 12th meeting. You'll
3    see the identical agendas in those two
4    meetings. And on Exhibit 10 we also have
5    another board meeting, an additional board
6    meeting on the 15th of June with agenda items
7    that were not repeated from the May meeting.
8    None of these meetings were attended by -- by
9    Storm and we couldn't make any decisions. We
10   had -- because we hadn't a quorum.
11   Q. Now, you mentioned Mr. Tumanov
12   had stated that he might attend one meeting
13   in June to elect a new deputy chairman. And
14   I believe you said Mr. Tumanov did not show
15   up; is that correct?
16   A. That's correct.
17   Q. If you'd turn to Exhibit 11.
18   A. Yes. That's the Exhibit 11 where
19   there were two items on the agenda. It was
20   election of a deputy chairman, and the item
21   was a little more -- well, it was, say, about
22   the chairman of the board where we expected
23   Mr. Tumanov then to announce that he would
24   step down as the chairman.

Moland - Direct

1
2    **Q.    And what was the purpose of**
3    **trying to elect a new deputy chairman of the**
4    **board at the June 30, 2005 board meeting?**
5        A.    It was that -- to make sure
6    that -- that Kyivstar had a chairman, even if
7    the then -- that Kyivstar had an acting
8    chairman, if the chairman should not attend
9    the meetings.
10        ARBITRATOR CRAIG:  Where was
11    Tumanov's offices?  Where was he
12    located?
13        THE WITNESS:  He had an office in
14    the company in Kiev.
15        ARBITRATOR CRAIG:  And these
16    meetings in June were in the company
17    headquarters; correct?
18        THE WITNESS:  Yes.
19        ARBITRATOR CRAIG:  They're not in
20    Vienna, they're in Kiev?
21        THE WITNESS:  Yeah.  The place of
22    the meeting, Kyivstar headquarters.  I'm
23    looking at -- yeah, the 30th of
24    June meeting was in the headquarters.
25        ARBITRATOR JENTES:  Why didn't

Moland - Direct

1
2    the two people from Telenor attend the
3    meeting?
4        THE WITNESS:  You are now talking
5    about --
6        ARBITRATOR JENTES:  The meeting
7    on June the 30th.
8        MR. MUSOFF:  Referring to
9    Mr. Espin and Mr. Thygesen?
10        ARBITRATOR JENTES:  Yes.
11        Q.    Do you know why they didn't
12    **attend?**
13        A.    No.  I think that was for
14    practical purposes, we had substitutes.
15        ARBITRATOR JENTES:  Well, I
16    notice they didn't attend the next
17    meeting either.  And I was just
18    wondering why they weren't around, if
19    you know?
20        THE WITNESS:  We had -- we had
21    substitutes so that if for some reason
22    one or two of us could not attend the
23    meeting, Telenor would have all the
24    five --
25        MR. SILLS:  If you look on the

Moland - Direct

1
2    protocol, Mr. Jentes, you'll see there
3    were five attendees at that meeting for
4    Telenor.  As I understand Ukrainian law,
5    you can appoint sort of a vice director
6    or a substitute who, without board
7    action, can show up, if the sort of
8    principal representative of a company is
9    not present.  So there was a full slate
10    of or full component of Telenor
11    representatives there shown in the
12    protocol.
13        **Q.    Mr. Moland, is that reflected in**
14    **the protocol, where it says Mr. Sigmund**
15    **Ekhougen, representing Telenor Mobile**
16    **Communications, substituting Mr. Paul Lien**
17    **Espin and the same with the substitution for**
18    **Mr. Thygesen.  Is that what you're referring**
19    **to?**
20        A.    Yes.  That's right.  Both the two
21    attending were substitutes to the board.
22        **Q.    Do you have an understanding why**
23    **Mr. Tumanov failed to show up so that the**
24    **board could elect an acting chairman?**
25        ARBITRATOR CRAIG:  That's the

Moland - Direct

1
2    June 30th.
3        **Q.    At the June 30th, 2005?**
4        A.    No.  He had instructions from
5    Alfa not to be there.  And I remember that we
6    talked to him, and he said that -- that he
7    was -- we talked to him and he said that he
8    was Alfa's representative in Ukraine and
9    therefore he had to follow their
10    instructions.
11        **Q.    And Alfa had instructed him not**
12    **attend that board meeting?**
13        A.    That's right.  That's right.
14        ARBITRATOR CRAIG:  Did he tell
15    you why?
16        THE WITNESS:  No.
17        ARBITRATOR CRAIG:  Did you ask
18    him why?
19        THE WITNESS:  It was obvious
20    that, you know, as a part of the whole
21    boycott situation Alfa had instructed
22    all the Storm board members not to
23    attend any meeting.  Because this
24    meeting would further increase, you
25    know, Telenor's visuality in the company

Moland - Direct

1  by electing me as a vice chairman.
2  
3       ARBITRATOR CRAIG:  I'm just
4  curious to know if there was any
5  specific articulated reason given for
6  the boycott that we can find in writing
7  or coming from some official at Storm or
8  from Alfa Group that we can use to try
9  to understand why they were doing this?
10      THE WITNESS:  No.  I don't think
11 there is any written reason for their
12 not attending.  So it's more like we
13 have --
14      ARBITRATOR CRAIG:  This is your
15 supposition?
16      THE WITNESS:  Our analysis, yeah.
17 And during -- during the -- well,
18 since -- since the agreements in 2002
19 and up to late in 2004, there was a very
20 good relationship in Kyivstar, and they
21 attended all the meetings.
22      I don't -- well, I'm positive
23 we -- we didn't vote.  All decisions
24 were unanimous.  They didn't oppose to
25 anything.  They voted in favor of

Moland - Direct

1  agreements between Telenor and Kyivstar
2  whereby we introduced the Telenor youth
3  brand in Ukraine.  And on all matters
4  that related to Telenor's operational
5  influence in Kyivstar.  They voted in
6  favor of that.
7       And on the broader level during
8  those two years, there were discussions
9  between Telenor and Alfa about doing
10 more together in the mobile business.
11 And as long as those discussions went
12 on, the relationship was very good.  But
13 it was after those discussions were
14 terminated that there started to be
15 trouble both in VimpelCom in Moscow and
16 then in Kyivstar.
17      And we, of course, we didn't at
18 any point in time, so to say, get a
19 proposal from them of, you know, what
20 they wanted from us to go back to the
21 board.  They didn't say anything about
22 that.
23      ARBITRATOR CRAIG:  But let me get
24 back to that point you're making.  Can

Moland - Direct

1  you put a date on when the boycott
2  began?  It looks from these exhibits
3  like it began in March of 2005.
4       THE WITNESS:  Yes, yes.
5       ARBITRATOR CRAIG:  That's right?
6       THE WITNESS:  Yeah.  That's
7  right.  They participated in the -- you
8  know, we got that warning during the
9  summer of 2002.
10 **Q.    All right.  2004, you mean?**
11 A.    2004, sorry.
12      THE WITNESS:  And then they
13 participated in the board meetings
14 during the fall of 2004.  Including the
15 December meeting where we finally
16 decided to budget for 2005.
17      ARBITRATOR CRAIG:  And are you
18 able to explain in your analysis what
19 the event is that triggered the boycott
20 that began in March of 2005?
21      THE WITNESS:  You know, there is
22 nothing in the Kyiv -- there is no
23 Kyivstar thing that triggered that
24 boycott.  You know, we had full

Moland - Direct

1  agreement on all issues in the Kyivstar
2  board.  So, you know, it was -- it was
3  as a result of some -- some broader or
4  outside --
5       ARBITRATOR JENTES:  Outside.
6       THE WITNESS:  Outside Kyivstar
7  related issues that caused them to do
8  this, from my analysis.
9  **Q.    What issues are you referring to**
10 **that are outside Kyivstar?**
11 A.    Well, it was outside the Kyivstar
12 operation.  It wasn't a part of Kyivstar
13 because in our -- according to our analysis,
14 what they really wanted was to have more
15 shares in Kyivstar and more influence.  But,
16 you know, the trigger of this had to do with
17 the broader relationship.
18 **Q.    And what was your understanding**
19 **of what was going on in that broader**
20 **relationship at the time?**
21 A.    Now that turn out that we did not
22 succeed in establishing further cooperation
23 in the mobile area.  And after that it
24 started in VimpelCom, where they started to

Moland - Direct

1 Moland - Direct
2 squeeze our rights, and then came here. And
3 in our analysis, this was attempts to make
4 Telenor soft and willing to go to the
5 negotiating table and make a deal that was
6 favorable to Alfa. That was our analysis.
7 And that was the, so to say, the business
8 practice these people used to do to break
9 them.
10     I can refer to a discussion, I
11 think it was in June, August -- or August,
12 between Mikhail Fridman and now the president
13 of Telenor, Freddie Baksaas, where Mikhail
14 Fridman said when there is a disagreement, we
15 don't seek consultants, we seek conflict. We
16 believe that that's the way it will turn out
17 to be -- we can get the best results. So
18 it's, so to say, part of their business
19 behavior.
20     **Q.    Let's continue proceeding**
21 **chronologically. If I could direct your**
22 **attention to the next two exhibits, 12 and**
23 **13, relating to July 2005. Tell us, what are**
24 **those exhibits? And these are protocols**
25 **No. 69 and 70.**

1 **Moland - Direct**
2     A.    Yeah. It was another attempt to
3 have a board meeting.
4     **Q.    And what were the topics on the**
5 **agenda for those board meetings?**
6     A.    On the 1st of July meeting, it
7 was the IT strategy. It was a review of the
8 network operation, and it was a meeting on
9 the strategy of the company. And the other
10 meeting was about forecasts. It was more on
11 strategy, investment budget. Vendor
12 strategy.
13     **Q.    Okay. And I take it there was no**
14 **quorum and the board was unable to act on any**
15 **of those agenda items; correct?**
16     A.    That's right.
17     **Q.    Let's go to Exhibit 14.**
18     A.    Yeah.
19     **Q.    And what's reflected there,**
20 **protocol No. 71?**
21     A.    This was -- this was the board
22 meeting with -- with approved agenda.
23     **Q.    Now, were there new items on this**
24 **agenda?**
25     A.    Oh, yes. That were -- were --

1 Moland - Direct
2 were both old and new items.
3     **Q.    Could you just highlight some of**
4 **the significant items on the October 22, 2005**
5 **board meeting agenda?**
6     A.    In this board meeting we summed
7 up the most important items we had not been
8 able to make decisions on in the earlier
9 meetings. Namely, approval of financial
10 statements for '04, and dividends for '04,
11 and strategy and business plan. In addition
12 to that, this was also the first meeting
13 where we wanted a decision on the budget for
14 2005.
15     **Q.    And were you able to make any of**
16 **those decisions at that board meeting?**
17     A.    No. We were not. And you see
18 that.
19     ARBITRATOR CRAIG: What about
20 your management bonuses for 2004, did
21 you get that done?
22     THE WITNESS: No. We were not
23 able to make decisions on that either.
24 But we -- they were basically executed.
25     ARBITRATOR CRAIG: You just did

1 Moland - Direct
2 it?
3     THE WITNESS: Just did it. I
4 think that was one of the items where
5 Igor Lytovchenko, the president, tried
6 to persuade Alfa to make a written
7 resolution, but they wouldn't, but it
8 was simply executed.
9     **Q.    Now, before turning to the next**
10 **set of exhibits, are you familiar with**
11 **someone named Vladimir Jmak?**
12     ARBITRATOR CRAIG: And
13 pronounced.
14     THE WITNESS: Jmak.
15     A.    He was also one of the founding
16 fathers of the company. And he was legal
17 adviser to the president of the company and
18 to the chairman.
19     **Q.    Were you aware of any efforts**
20 **made to convince Mr. Jmak, as one of the**
21 **founding fathers, to attend board meetings?**
22     A.    Yes. He was -- he was at that
23 time elected board member and as a
24 representative of Alfa. But his loyalty was
25 to the company. And he had then been looking

Page 110

Moland - Direct

1        Moland - Direct
2   at what had been going on for about half a
3   year, and he told us that he felt no loyalty
4   to Alfa anymore because of what they had
5   done. And that he would, in spite that he
6   feared that Alfa would harm him later on, he
7   would appear at the board meeting to make it
8   possible to have a quorum and make important
9   board decisions.
10       Q.    And let's now turn to Exhibits 15
11  **and 16. Those are protocols No. 72 and 73**
12  **from November 18, 2005.**
13       ARBITRATOR CRAIG:  His name does
14  appear on 14 as well, as a person that's
15  absent.
16       THE WITNESS:  Yes.
17       MR. MUSOFF:  Yes.
18       ARBITRATOR CRAIG:  On the
19  October 27 protocol?
20       THE WITNESS:  Yes.  He didn't --
21       MR. MUSOFF:  Right.  He appears
22  on many of the protocols as someone
23  absent up until now we're showing as
24  Exhibit 15.
25       ARBITRATOR CRAIG:  Right.

Page 111

1        Moland - Direct
2       A.    And the agenda there and the
3   protocol reflects that we were able to make
4   board decisions, have a quorum and make board
5   decisions on all those important items.
6       ARBITRATOR CRAIG:  On
7   November 18?
8       THE WITNESS:  On November 18,
9   yes.
10       Q.    And what is your understanding as
11  **to whether Alfa took action again Mr. Jmak to**
12  **prevent him from attending board meetings**
13  **after that?**
14       A.    I had the understanding that Alfa
15  took actions and in fact sued him.
16       ARBITRATOR CRAIG:  Did you become
17  deputy chairman on that occasion?
18       THE WITNESS:  In that meeting,
19  yes, I became deputy chairman.
20       MR. SILLS:  Mr. Craig, I believe
21  the lawsuit against Mr. Jmak that Alfa
22  brought was actually Mr. Kulikov, who is
23  an Alfa functionary, who is a nominal
24  plaintiff, who at the time was the
25  general director of Storm, is referenced

Page 112

1        Moland - Direct
2   in our statement of claim and in the
3   various litigation documents we've
4   supplied.
5       They sought an injunction to
6   prevent him from going to meetings in
7   the future and a declaration of
8   invalidity of his attendance at the
9   board meetings.  It was another of these
10  lawsuits in which we didn't participate.
11       ARBITRATOR CRAIG:  And what
12  happened in that lawsuit?
13       MR. O'DRISCOLL:  Ultimately, that
14  lawsuit was dismissed because they
15  failed to follow the procedural rules in
16  Ukraine in bringing it.
17       ARBITRATOR CRAIG:  And Telenor
18  itself did not appear in that lawsuit?
19       MR. O'DRISCOLL:  We were not
20  named as a party.
21       MR. SILLS:  Which is typical of
22  these Ukrainian lawsuits.
23       MR. O'DRISCOLL:  My recollection
24  is Jmak defended it himself.
25       MR. SILLS:  But we didn't receive

Page 113

1        Moland - Direct
2   notice.  We weren't served with process
3   and we weren't named as a party.
4       A.    On Exhibit 16, protocol No. 73,
5   simply reflects that we also, the same day,
6   approved the protocols of -- of a meeting we
7   had earlier in the day and made all these
8   decisions.  So we had an approved protocol on
9   the same day.
10       Q.    Now, was there a meeting
11  **scheduled after the November 18, 2005 board**
12  **meeting?  Was there any meeting scheduled**
13  **after that?**
14       A.    Well, we made a timetable or
15  schedule for meetings through 2006, but as
16  far as I can remember, there was a court
17  decision preventing us from having board
18  meetings.
19       Q.    And were any other meetings held?
20       A.    No.  We tried to have -- have a
21  shareholder meetings, but we were not able to
22  have a quorum in those.
23       Q.    And with respect to the
24  **shareholders meeting, directing your**
25  **attention to just the past few weeks, was a**

Page 114

```
1        Moland - Direct
2  shareholders meeting scheduled for Kyivstar?
3      A.    Yes.  There was a shareholder
4  meeting scheduled shortly, a couple of weeks
5  ago, with, as far as I remember, two items.
6  One was to make amendments of the charter so
7  that it would comply with the supreme court
8  decision in the Ukraine.  And the second was
9  to elect new board members.
10     Q.    And were you able to act on those
11 proposed agenda items?
12     A.    No.  We didn't have a quorum.
13     Q.    Why?
14     A.    Alfa didn't participate, that's
15 why.
16         ARBITRATOR CRAIG:  Whatever
17 happened to Mr. Jmak?
18         THE WITNESS:  No.  He is still
19 there.
20         ARBITRATOR CRAIG:  But he stopped
21 coming?
22         THE WITNESS:  Nobody's coming
23 because we cannot call for a board
24 meeting for the time being.
25         ARBITRATOR CRAIG:  I see.
```

Page 115

```
1        Moland - Direct
2  Because there's a court order against
3  it?
4         THE WITNESS:  Court order in
5  Kyivstar preventing us from having board
6  meetings.
7         ARBITRATOR CRAIG:  And the date
8  of that court order is 2005 sometime?
9         MR. SILLS:  It's actually got a
10 slightly complicated procedural history,
11 because there have been times during the
12 relevant period when there was and times
13 when there weren't these court orders in
14 effect, because it's been back and forth
15 as it's worked its way up the Ukrainian
16 appellate ladder.
17         But I think, Mr. Craig, just for
18 clarity, the court order to which the
19 witness is referring is the one that was
20 ultimately confirmed by the Supreme
21 Court of Ukraine earlier this year which
22 held that only shareholders could serve
23 as directors of Kyivstar.  And Alfa has
24 taken the position that because of that
25 there cannot be any board meetings.
```

Page 116

```
1        Moland - Direct
2         But, for example, there was a
3  period of time when an appellate court
4  had overturned that.  An immediate
5  appellate court had ruled that there was
6  no such requirement, and the boycott
7  continued during that period as well.
8         But since the supreme court
9  ruling on this, there haven't been any
10 meetings.  We can describe it after the
11 witness' testimony, but there's been --
12 there's been a further decision by an
13 intermediate appellate court clarifying
14 that there can be board meetings with
15 five Telenor representatives and four
16 Alfa representatives, but Alfa still
17 won't show up.  And their refusal to
18 show up has persisted, despite the state
19 of appellate decision-making in Ukraine
20 throughout this event.
21         ARBITRATOR CRAIG:  I don't want
22 to waste your time.  I'm curious.  Just
23 briefly, was this litigation initiated
24 by Storm or Alfa Group to prevent --
25         MR. SILLS:  Yes, it was.  What
```

Page 117

```
1        Moland - Direct
2  happened was that a lawsuit was brought
3  in 2005, I believe, initially in a
4  Ukrainian court of first instance in
5  Kiev, seeking a declaration that as a
6  matter of Ukrainian corporate law only
7  shareholders could be directors.
8         ARBITRATOR CRAIG:  And did
9  Kyivstar resist that?
10         MR. SILLS:  I suppose it depends
11 what you mean by "resist."  But, yes,
12 they were represented.  They did make an
13 appearance.  And they did succeed, I
14 believe on the first appeal.  There was
15 trial court decision so holding.  And
16 that was overturned at the first
17 appellate level.  I believe it's called
18 the Kyiv City Court of Appeals, which
19 held that there was nothing wrong with
20 the corporate governance structure of
21 the company.
22         There was then a further appeal
23 to what I believe is called the higher
24 commercial court by the Alfa interests
25 which reinstated the trial court ruling
```

Moland - Direct

1  as to eligibility to serve on the board.
2  Then that was, in turn, reversed on a
3  hearing by the higher commercial court.
4  And we were participating in that case.
5  That was -- that was reversed.
6      Then a further appeal was taken
7  by the Alfa interests in Ukrainian
8  Supreme Court which held, as I
9  understand it, not on the merits, but
10  that it had not been appropriate as a
11  matter of Ukrainian appellate procedure
12  for the higher commercial court to have
13  reconsidered its own order and so left
14  the first of the two higher commercial
15  court orders in place.  And that's now a
16  final decision that only shareholders
17  may serve as directors.
18      And as you know, we've proposed,
19  as far back as the very early stages of
20  this dispute, a technical fix to that.
21  We've never gotten a substantive
22  response.  We finally got one, I
23  believe, on the 7th of this month in
24  which -- yeah, on the 7th of November of

Moland - Direct

1  this year, we got something in writing
2  which I intend to hand up and make part
3  of the record, and I suppose we ought to
4  now, in which Storm suggested a new
5  board structure under which they would
6  have equal rights without increasing
7  their share holding or paying anything
8  for those rights.
9      And what's particularly striking
10  about this, aside from the fact that
11  finally we got written confirmation that
12  their goal was to achieve equal rights,
13  is that they propose that there be three
14  independent members of the board, which
15  is striking for two reasons.  One, in a
16  company where there is only economic
17  interest, and no public shareholders so
18  one might ask why should there be any
19  independent board members.  What was
20  also interesting, independent board
21  members, by definition, would not be
22  shareholders.
23      So having slogged their way
24  through the Ukrainian trial and

Moland - Direct

1  appellate courts and secured this
2  ruling, they've now made a proposal to
3  us under which there would be
4  nonshareholder members of the board.
5  And I think it tells us a lot about both
6  their goal and the good faith with which
7  they've been pursuing strategy.
8      THE CHAIRMAN:  Well, they say in
9  the spirit of compromise.
10     MR. SILLS:  Well, they do say
11  that, Mr. Chairman.  But --
12     THE CHAIRMAN:  All right.  That's
13  argument.  I'm just --
14     MR. SILLS:  I understand that.
15  But if in fact there is such a Ukrainian
16  legal requirement, then it's very
17  difficult to see how this would be a
18  compromise in any meaningful sense of
19  the word.  I mean, I think what it shows
20  is that they're prepared to turn their
21  backs on that ruling they obtained as
22  soon as it suits their convenience.
23     ARBITRATOR CRAIG:  Just two quick
24  questions.  It may require a brief

Moland - Direct

1  answer.
2      Do you remember the date that the
3  Ukrainian court of first instance found
4  that Ukrainian law required
5  shareholders -- I mean, required members
6  of the board to be shareholders?
7      MR. SILLS:  Yes.  It's in the
8  chart which appears in our statement of
9  claim.  Bear with me just a moment.
10     THE CHAIRMAN:  You can get it
11  during the break.
12     ARBITRATOR CRAIG:  It's just a
13  matter of historical interest to me as
14  to when that first happened.
15     And the second question is, did
16  Telenor take the position that this
17  dispute was governed by the arbitration
18  provisions?
19     MR. SILLS:  No.  Because that was
20  purely a dispute over the charter and
21  over these formal requirements of
22  Ukrainian law to serve on the board.
23  There was no mention of the
24  shareholder's agreement there or attack

Page 122

Moland - Direct

1  on the shareholder's agreement or on the
2  provisions of the shareholder's
3  agreement that would require amendments
4  to the charter to conform to the
5  shareholder's agreement.  It was purely
6  on this formal issue of Ukrainian law.
7      So the answer is no, because we
8  didn't view it as implicating rights
9  under the -- under the shareholder's
10  agreement.
11      ARBITRATOR CRAIG:  And you didn't
12  view Storm as being governed by any
13  obligations under the arbitration
14  provision in the shareholder's agreement
15  reaching this kind of an issue?  Of
16  Ukrainian law?
17      MR. SILLS:  Well, I think that
18  argument, in fairness, could have been
19  made at that point.  But I suppose this
20  goes to the waiver argument that Storm's
21  hinted at throughout this case.
22      Any decision to participate in
23  arbitration goes only so far as that
24  particular -- I'm sorry, litigation goes
25

Page 123

Moland - Direct

1  only so far as that issue.  And -- but I
2  think in taking a step back and looking
3  at it, because this had to do entirely
4  with the formal requirements of
5  Ukrainian law to serve on the board of a
6  Ukrainian company and had nothing to do
7  with the shareholder's agreement
8  because, after all, the shareholder's
9  agreement has a provision that its
10  provisions trump any contrary provisions
11  of the charter or Ukrainian law and
12  obligates the shareholders to conform
13  the charter to the governance provisions
14  of the shareholder's agreement.
15      To the extent there were such
16  formal requirements, the shareholder's
17  agreement would require a fix.  And
18  that, of course, is one of the
19  particular heads of relief we're seeking
20  here, that is, to require Storm to
21  consent to the amendments that are
22  necessary to restore the governance
23  provisions that they agreed to in the
24  shareholder's agreement and its New York
25

Page 124

Moland - Direct

1  law provisions.
2      So that, I mean, if there was a
3  requirement that everyone had to be a
4  Ukrainian citizen or had to wear, you
5  know, a silly hat to the meetings or
6  whatever it is, that Ukrainian law would
7  impose as a formal matter, as an
8  eligibility to serve on the board, we
9  didn't regard that as implicating rights
10  under the shareholder's agreement, at
11  least to the extent -- we didn't regard
12  that as implicating rights under the
13  shareholder's agreement.
14      And so -- and we also regarded
15  the shareholder's agreement as having
16  provisions that would prevent that from
17  affecting the ultimate governing
18  structure of the company.  So no
19  application was made in the Ukrainian
20  courts.  We didn't choose to bring the
21  shareholders issues before the Ukrainian
22  courts.  And I don't think -- based on
23  advice we got from Ukrainian counsel,
24  the Ukrainian courts wouldn't have taken
25

Page 125

Moland - Direct

1  cognizance of that.  They would have
2  viewed it, I think, the same way we did,
3  as a purely formal arising under
4  Ukrainian corporate law.
5      THE CHAIRMAN:  Without objection,
6  Exhibit 1 will be this letter to Sigmund
7  Ekhougen, undated, and signed by Vadim
8  Klymenko with a cc to Robert Sills and
9  Alexei Reznikovich.
10      (Claimant Exhibit No. 1, letter
11  to Sigmund Ekhougen, undated, signed by
12  Vadim Klymenko, with cc to Robert Sills
13  and Alexei Reznikovich, marked for
14  identification as of this date.)
15      MR. SILLS:  I should note,
16  Mr. Chairman, that I had received an
17  e-mail from our absent colleague
18  objecting to this, claiming that it was
19  a settlement document.
20      THE CHAIRMAN:  So noted.
21      MR. SILLS:  But I do want to make
22  it clear on the record that he did have
23  that objection.
24      ARBITRATOR JENTES:  I gather what
25

Page 126

Moland - Direct

1  we really ought to do is get back to the
2  chronology.
3
4          ARBITRATOR CRAIG:  I'm sorry,
5  that's my fault.
6          ARBITRATOR JENTES:  No, no --
7          ARBITRATOR CRAIG:  I'm all for
8  chronology.
9          MR. SILLS:  I think I have to
10  take more of the blame on that than the
11  arbitrator.  Mr. Jentes, I think we're
12  done, unless the panel has any further
13  questions for the witness.  But there is
14  a summary chronology, both of the
15  shareholder and the board meetings, in
16  the affiliated of Mr. Halverson that was
17  just filed with the tribunal.  It
18  appears as Exhibit F.  And it just
19  summarizes in tabular form the date of
20  each of the shareholder and board
21  meetings, the location of the meeting or
22  the proposed meeting.
23          And it describes -- I suppose I
24  should also at this time, Mr. Chairman,
25  move Mr. Halverson's affidavit into the

Page 127

Moland - Direct

1  record.
2
3          THE CHAIRMAN:  No objection.
4          (Claimant Exhibit No. F,
5  Halverson's affidavit, received in
6  evidence as of this date.)
7          ARBITRATOR JENTES:  I think you
8  may be right, but I was sort of back at
9  16.  In any event, I just wanted to get
10  to the end of the meetings that are
11  covered in the notebook, and then we've
12  got this sort of supplemental affidavit
13  regarding the December 12 meeting.  And
14  I just would like to get through that,
15  only because then I have a question for
16  the witness.
17          ARBITRATOR CRAIG:  We received
18  the Halverson affidavit in the mail from
19  you?
20          MR. O'DRISCOLL:  By e-mail on
21  Friday evening.
22          ARBITRATOR CRAIG:  This is part
23  of the recent.
24          MR. SILLS:  Right.
25  Q.    Just to finish the chronology,

Page 128

**Moland - Direct**

1          **Moland - Direct**
2  **Mr. Moland, if you would turn to what's the**
3  **last exhibit in the binder, which I believe**
4  **is labeled Exhibit 18.**
5          ARBITRATOR CRAIG:  There is no
6  17?
7          MR. MUSOFF:  There is no 17,
8  omitted intentionally.
9  **Q.    And could you tell us what's**
10  **reflected there, briefly?**
11      A.    It's reflected that we tried to
12  have a board meeting this summer in July.
13  There was a window then where we wanted -- we
14  had a court decision in our favor, and we
15  thought that we should have a board meeting
16  in July.  But then before we were able to
17  have that meeting there was a new court
18  ruling saying that we -- implying that we
19  couldn't have it.
20  **Q.    And was that meeting ever held?**
21      A.    No.
22          THE CHAIRMAN:  Any further
23  questions?  Tribunal?
24          ARBITRATOR JENTES:  Yes.  So then
25  after the summer failure of the board,

Page 129

Moland - Direct

1          Moland - Direct
2  there was this effort to have an
3  extraordinary shareholders meeting, is
4  that correct, that's reflected in
5  Halverson's affidavit?
6          THE WITNESS:  Yes.
7          ARBITRATOR JENTES:  And that,
8  too, was blocked so that you could not
9  proceed with that either?
10          THE WITNESS:  That's right.  Yes.
11          ARBITRATOR JENTES:  All right.
12  Do I understand that what exactly is
13  your role as -- on the board today?
14          THE WITNESS:  No.  I am still
15  elected board member and elected vice
16  chairman of the board.
17          ARBITRATOR JENTES:  Okay.  Could
18  you just state generally what you see as
19  the problem in running Kyivstar as a
20  result of the actions that have been
21  taken by Alfa and Storm by not
22  participating in the board meetings and
23  not permitting a shareholders meeting?
24          THE WITNESS:  I think I touched
25  upon it.

Moland - Direct

1
2     ARBITRATOR JENTES:  A little bit.
3 I'd like to have you just summarize it.
4     THE WITNESS:  I can try to
5 summarize it.  We are not able to have
6 decisions on dividend.  And there is
7 also a lot of other more specific things
8 of the operation of the company.
9     Telenor cannot be paid for the
10 support we give the company in terms of
11 technical expertise, marketing expertise
12 and so on.  There is a lack of speed in
13 the company when it comes to hiring
14 high-quality people.  In particular,
15 when it comes to financial controlling.
16     On the marketing side, they are
17 not -- we are not able to have them --
18 make them do what we believe they should
19 do to speed up the customer uptake
20 further in terms of having more shops,
21 branding the mobile phone, and so on.
22     And there is a more general
23 point.  Namely, that the employees of
24 the company, they are, as a result of
25 this, questioning to whom should we have

Moland - Direct

1
2 our loyalty.  So there is a lack of --
3 of, so to say, there is a big
4 uncertainty as to who is the future
5 owner of the company.  And that makes it
6 difficult to have the right authority to
7 make them do the right things to -- to
8 expand the business.
9     ARBITRATOR JENTES:  I notice that
10 some of the meetings that couldn't be
11 held of the board you had to approve the
12 audited financial statements.  Does this
13 mean that there is no board approval of
14 audited financial statements?
15     THE WITNESS:  There is -- there
16 is -- we did that in the meeting in
17 November '05 where Jmak participated.
18     ARBITRATOR JENTES:  November
19 window?
20 **Q.    November '05, you're referring**
21 **to?**
22     THE WITNESS:  November of '05
23 where Mr. Jmak was attending.
24     ARBITRATOR JENTES:  But since
25 that time you've been unable to get

Moland - Direct

1
2 board approval of financial statements?
3     THE WITNESS:  That's right, yes.
4     ARBITRATOR JENTES:  What do you
5 do?  Do you issue financial statements
6 or what happens?
7     THE WITNESS:  No, we issue
8 financial statements as a part of
9 Telenor financial statements.  Kyivstar
10 is consolidated into Telenor's financial
11 statements.
12     ARBITRATOR JENTES:  But Kyivstar
13 itself cannot issue financial
14 statements?
15     THE WITNESS:  They cannot issue
16 financial statements approved by a
17 general meeting.
18     ARBITRATOR JENTES:  There was
19 also an indication that there was to be
20 an approval of a strategy and a business
21 plan for 2006 through 2008.  So I take
22 it there's no strategic plan that's
23 approved by the board?
24     THE WITNESS:  Well, it was --
25 again, it was approved in that --

Moland - Direct

1
2     ARBITRATOR JENTES:  I see, in
3 that window.
4     THE WITNESS:  -- that window.
5     ARBITRATOR JENTES:  But that's a
6 year old?
7     THE WITNESS:  That's more than a
8 year old.
9     ARBITRATOR JENTES:  There was
10 also an indication there was going to be
11 an approval of the budget for 2006.
12     ARBITRATOR CRAIG:  Which one are
13 you looking at, Bill?
14     ARBITRATOR JENTES:  I'm looking
15 at No. 14, the second page.  The
16 approval of the budget for 2006 and the
17 external financing for 2005 and 2006.  I
18 take it that was approved at this window
19 meeting, but do you have approval of the
20 a budget for 2007?
21     THE WITNESS:  No.
22     ARBITRATOR JENTES:  And no
23 external financing plan approved for
24 2007?
25     THE WITNESS:  No, no.

Page 134

Moland - Direct

1          Moland - Direct
2          ARBITRATOR JENTES:  What about
3     the labor contract, is that also not
4     approved or it has been approved?
5          THE WITNESS:  That has created a
6     lot of problems.  Because the expat
7     contracts, the non-Ukrainan part of
8     management, their appointment and
9     contract should be also approved by the
10    board.  And impact also the shareholders
11    meeting.
12  BY MR. MUSOFF:
13    **Q.    I think following up or**
14  **Mr. Jentes' question, what is your**
15  **understanding of whether Telenor is able to**
16  **consolidate the finance with Kyivstar?**
17    A.    We're able to consolidate.
18    **Q.    What is your understanding as to**
19  **whether there's been a challenge to that by**
20  **Storm?**
21    A.    Yes.  There has been an attempt
22    where they have argued that we have not -- we
23    are not able to consolidate things.
24    **Q.    And you also mentioned earlier, I**
25  **believe, about the capital structure of**

Page 135

1          Moland - Direct
2     **Kyivstar.  Can you explain a little bit more**
3     **about the issues you see with the capital**
4     **structure of Kyivstar going forward?**
5       A.    Yes.  While the problem back in
6     2002 was that the company needed money to
7     expand the business.  Now, going forward, the
8     company has been a money machine.  They are
9     making a lot of money.  And they have to have
10    the money in Ukrainian banks.  So we believe
11    that there is a huge financial risk attached
12    to this.  And the natural thing -- thing
13    would have been that the owners should have
14    taken the money and given them back to the
15    shareholders.  So we have -- we have a
16    capital structure that is not good.
17         ARBITRATOR JENTES:  If I may, let
18    me continue, just because I want pursue
19    this a little bit further.
20         In terms of complying with United
21    States laws, particularly those relating
22    to the Securities and Exchange
23    Commission, are there impediments to
24    doing that, as a result of this current
25    blockage by the Storm and the Alfa

Page 136

1          Moland - Direct
2     people?
3          THE WITNESS:  Yes.
4          ARBITRATOR JENTES:  Would you
5     explain what that is?
6          THE WITNESS:  I can explain that.
7     I will mention two things.  One is that
8     Alfa has made an attempt to stop
9     Kyivstar from implementing these
10    procedures set by the American
11    authorities.
12         The second is that when this has
13    been done, to make Kyivstar do all the
14    hard work that it is to implement this
15    new routines has proved to be very
16    difficult.  Telenor has to a great
17    extent had to pay consultants for doing
18    this.  And I'm not sure that Telenor is
19    going to comply fully with -- with
20    requirements set by American
21    authorities, as a result of this -- this
22    problems in Kyivstar.  Of course, that
23    could also harm Telenor's shareholders.
24         ARBITRATOR JENTES:  Right.  And
25    you're listed in the United States?

Page 137

1          Moland - Direct
2          THE WITNESS:  Yes.
3          ARBITRATOR JENTES:  And what's
4     the listing?
5          THE WITNESS:  It's on NASDAQ.
6          ARBITRATOR JENTES:  This is who's
7     listing?
8          THE WITNESS:  Telenor ASA.  ASA.
9          ARBITRATOR CRAIG:  This is
10    Telenor that's being listed, not
11    Kyivstar.
12         ARBITRATOR JENTES:  I know that.
13    I just want to have him state on the
14    record what it is.  So it's Telenor ASA.
15         And what problems do you see that
16    the whole situation with Kyivstar and
17    Storm, et cetera, has for Telenor with
18    NASDAQ?
19         THE WITNESS:  Well, it's not
20    problems with NASDAQ.  It's within the
21    SEC.
22         ARBITRATOR JENTES:  Okay.
23         THE WITNESS:  If it turns out
24    that -- that Kyivstar should not be able
25    to fulfill all the requirements from

Page 138

Moland - Direct

1  SEC, Telenor would have to say to -- to
2  say to the -- to the SEC that we are not
3  able to do that.
4      ARBITRATOR JENTES:  Okay.  And
5  that, in turn, would have impacts on
6  your NASDAQ listing?
7      THE WITNESS:  Yeah.  On the share
8  price, yeah.
9      ARBITRATOR CRAIG:  But when we
10  talk about SEC requirements, are we
11  talking about Sarbanes-Oxley
12  specifically?
13      THE WITNESS:  Yes, it is
14  Sarbanes-Oxley.  That's the part of it
15  that's difficult when it comes to --
16  to -- to have financial control over it
17  and internal control over everything.
18      ARBITRATOR CRAIG:  Right.
19      THE WITNESS:  To do -- to do all
20  the work that this requires is very
21  difficult in Kyivstar because of the
22  present situation.  And for Telenor it's
23  a goal to be -- to be among, so to say,
24  the top ranking list of companies.  And

Page 139

Moland - Direct

1  fulfill all requirements.  If Kyivstar
2  should be the thing that -- that makes
3  Telenor not able to fulfill it, it would
4  be important.
5      ARBITRATOR CRAIG:  Does Telenor
6  have operations in other countries?
7      THE WITNESS:  Oh, yes.  Many
8  countries.
9      ARBITRATOR CRAIG:  Are there any
10  other countries that you're having
11  difficulty implementing Sarbanes-Oxley?
12      THE WITNESS:  I think it's fair
13  to say that Kyivstar is the country
14  where it is most difficult to do it.
15      ARBITRATOR CRAIG:  Well, my
16  question is, are there other countries,
17  though, where you've had difficulty?
18      THE WITNESS:  Well, we have
19  difficult, yes, but they are much easier
20  to -- to solve.
21      ARBITRATOR JENTES:  To deal with?
22      THE WITNESS:  To deal with than
23  in Kyivstar.  I think it's difficult
24  also in Norway.

Page 140

Moland - Direct

1      THE CHAIRMAN:  You mean the
2  United States instead of Kyivstar?  You
3  mean the United States?  It's difficult
4  to deal with the regulatory --
5      THE WITNESS:  No, no.  It's
6  difficult to have Kyivstar implementing
7  the American rules.
8      ARBITRATOR CRAIG:  Some would say
9  it's difficult here, too.
10      THE CHAIRMAN:  Any other
11  questions?
12      MR. SILLS:  Yes.  I just want to
13  follow up on that line of questioning,
14  on the consolidation issue.
15  DIRECT EXAMINATION
16  BY MR. SILLS:
17      Q.   Do you know whether or not Alfa
18  has attacked the right of Telenor to
19  consolidate Kyivstar's results on its books?
20      A.   Yes.  I know they have tried to
21  do that.
22      Q.   And do you know whether or not
23  they've communicated directly with Telenor's
24  outside auditors raising this question?

Page 141

Moland - Direct

1      A.   I think they have, yes.
2      Q.   And have they also written to the
3  Telenor board of directors?
4      A.   Yes.  That's right.
5      Q.   And have they issued press
6  releases challenging Telenor's right to
7  consolidate?
8      A.   That's right.
9      Q.   Can you think of any legitimate
10  business reason Alfa would have to be
11  interested in Telenor's accounting practices?
12      A.   No.  It's part of the same game
13  they are seeking.
14      THE CHAIRMAN:  Okay.  One final
15  question.  Did you say, I believe an
16  hour ago or more, that this dispute has
17  risen to the level of the prime
18  ministers of Norway and the Ukraine
19  discussing this dispute among
20  themselves?
21      THE WITNESS:  No.  Not this
22  dispute.  But the court order in Ukraine
23  saying that Telenor is forbidden from --
24  from coming here and using this panel.

36

Page 142

Moland - Direct

1      That's a thing that is a potential
2      threat both to Norwegian citizens,
3      Telenor employees in the Ukraine, and
4      also to Telenor's values.
5          THE CHAIRMAN:  And the prime
6      ministers have discussed this?
7          THE WITNESS:  Yes.  The Norwegian
8      prime minister has brought -- brought
9      Ukraine prime minister's attention to
10     this.
11         THE CHAIRMAN:  Thank you very
12     much.  Thank you for coming here today.
13         THE WITNESS:  Thank you.
14         THE CHAIRMAN:  Thank you.
15         Mr. Sills, we're going to
16     obviously take a break.  What is your
17     pleasure now in -- plus our reporter
18     also would appreciate a break.  But what
19     is your pleasure now?  Is your witness
20     available?
21         MR. O'DRISCOLL:  Chairman
22     Feinberg, we've lost our window with our
23     witness, and he is now not available
24     until two o'clock our time, I'm afraid.

Page 143

Moland - Direct

1          ARBITRATOR JENTES:  Chicago?  I
2      mean, New York time.
3          MR. O'DRISCOLL:  Because his wife
4      is --
5          ARBITRATOR JENTES:  No, no.
6          MR. O'DRISCOLL:  It will be
7      eight o'clock Oslo time.  He had to go
8      home and take care of his small
9      children.  And once his children are in
10     bed --
11         ARBITRATOR CRAIG:  The absolute
12     proper priority.
13         THE CHAIRMAN:  So he'll be ready
14     at two.  Do you have an estimate,
15     Mr. Sills, as how long this testimony
16     would take?
17         MR. SILLS:  I think it will be
18     much briefer.  I would think in the
19     range of half an hour, subject to
20     whatever questions.
21         He's available for as long as the
22     panel has questions for him.  But I
23     would think his direct testimony would
24     take a half an hour or less.

Page 144

Moland - Direct

1          ARBITRATOR JENTES:  I was only
2      going to ask, are there any other things
3      that we could in effect advance, like
4      our logistical aspects of winding up
5      this thing.  So in other words, we could
6      do something from one to two or
7      something, I don't know.
8          MR. SILLS:  That's a very good
9      suggestion.  I suppose, in terms of
10     identifying and moving in exhibits.  But
11     I'm not sure we really need to go to
12     that formal extent.
13         ARBITRATOR JENTES:  Well, if I
14     could on that, and perhaps we could go
15     off the record.  Off the record.
16         (Discussion off the record.)
17         (Luncheon recess:  12:31 p.m.)

Page 145

Moland - Direct

1      A F T E R N O O N   S E S S I O N
2          (1:27 p.m.)
3          THE CHAIRMAN:  On the record.
4          Mr. Sills, the tribunal has
5      consulted during the lunch break and
6      we're of the view that the tribunal
7      would benefit from a post-hearing brief,
8      particularly conclusions of fact and
9      law.
10         We know that the Storm written
11     submissions over the past few months
12     provide substantial information on both
13     Storm's approach to findings of fact and
14     conclusions of law.  And that source,
15     coupled with your own submissions,
16     should hopefully ease somewhat the
17     difficulty in your getting us such
18     findings of fact, conclusions of law,
19     and written argument.
20         We also would welcome similar
21     submissions from Storm by an order that
22     we will issue.  We welcome any thoughts
23     you have on that.  Those -- those
24     submissions might also include as an

```
 1          Proceedings
 2   appendix a listing of the various
 3   submissions in writing and orders of
 4   various courts, both Ukrainian and the
 5   United States, that would help us in our
 6   deliberations.
 7          We're open, understanding full
 8   well the nature of the season and the
 9   timing of all this, we're open to
10   suggestions from claimant on when you
11   could provide us this omnibus document.
12          And then we ask the claimant,
13   pursuant to the Uncitral rules, once the
14   date for your submission is reached, for
15   your submitting these post-hearing
16   information, am I correct, how long do
17   we have under the Uncitral rules?  It's
18   a question, you don't have to answer
19   now.  We'll also inquire as to how long
20   we have for the circulation of our
21   opinion.  Under -- Mr. Jentes suggested,
22   that under the AAA rules it would be 30
23   days but we're not sure under the
24   Uncitral.
25          MR. SILLS:  I believe it's the
```

```
 1          Proceedings
 2   same.  We do have a copy of the rules
 3   with us.
 4          THE CHAIRMAN:  But that's sort of
 5   our opening approach to this, following
 6   our adjournment today.  And we invite a
 7   response from you.
 8          MR. SILLS:  Well, I think that --
 9   I think that makes a lot of sense, and
10   it will provide for an orderly pulling
11   together of this rather extensive
12   record.
13          It will give Storm an opportunity
14   to reconsider its position not to
15   participate.  We would strongly oppose
16   any effort to reopen the evidentiary
17   hearings.  But we would certainly not
18   oppose, I don't think we could oppose,
19   any decision by Storm to return to the
20   table and put in its papers.
21          The one question is if Storm does
22   return to the proceeding, it might be
23   appropriate to leave an opportunity open
24   for responding papers, but I really
25   leave that to the tribunal.  Obviously,
```

```
 1          Proceedings
 2   if we continue to be the only party
 3   actually participating, there obviously
 4   would be no occasion for a second round
 5   briefing, and perhaps it makes sense to
 6   see what, if anything, Storm submits and
 7   address that question at that time.
 8          THE CHAIRMAN:  Maybe.  I'm
 9   inclined, speaking for myself, that the
10   panel would fix a date for the
11   simultaneous submission of post-trial --
12   post-hearing briefs and findings of fact
13   and conclusions of law.  I wouldn't
14   personally see a need for responses.
15          MR. SILLS:  Then I won't press
16   that any further.  As far as timing
17   goes, you're exactly right.  With the
18   time of year, and I have to say the same
19   team that's been working with me here
20   has been working on the VimpelCom
21   dispute, which also involves a
22   shareholder's agreement, and as well as
23   on the proceeding before Judge Lynch,
24   and I think -- I'd at least like not to
25   work them weekends.
```

```
 1          Proceedings
 2          I would think, Mr. Chairman,
 3   subject to the tribunal's pleasure,
 4   sometime in the middle of January would
 5   make a sensible time for that
 6   submission.
 7          THE CHAIRMAN:  What is the Friday
 8   in the middle of January, if somebody
 9   has a calendar?
10          MR. SILLS:  Could we make it
11   Friday, the 19th?
12          THE CHAIRMAN:  Friday, the 19th
13   of January, by that date, that's the
14   deadline, and we'll issue -- the
15   tribunal will issue an order to that
16   effect to both you and Storm.  But
17   Friday the 19th would be the deadline.
18          MR. SILLS:  Okay.  And would you
19   like us -- we had discussed before the
20   break providing a formal summary of the
21   matters in evidence, both documentary
22   and testimonial, so that it's clear what
23   the evidentiary record is.  Would you
24   like that submitted at the same time or
25   in advance?
```

Page 150

1          Proceedings
2          THE CHAIRMAN:  Could be the same
3   time.
4          MR. SILLS:  Okay.  We'll make
5   sure to include that as well.  And would
6   you like it in the form of proposed
7   findings and conclusions with numbered
8   paragraphs and then any supporting
9   argument in those proposed findings and
10  conclusions?
11         THE CHAIRMAN:  That's fine.
12         MR. SILLS:  Without a separate
13  brief?
14         THE CHAIRMAN:  Yes.
15         MR. SILLS:  Okay.  We'll follow
16  the form we did on the jurisdictional
17  issue.
18         THE CHAIRMAN:  Fine.
19         MR. SILLS:  We'll certainly do
20  that.  And I think we'll be easily able
21  to meet that schedule.
22         THE CHAIRMAN:  And then,
23  depending on our interpretation of the
24  Uncitral rules, we would then issue our
25  order within the time frame allotted.

Page 151

1          Proceedings
2          MR. SILLS:  Article 36 -- I'm
3   sorry, no.  No.
4          ARBITRATOR CRAIG:  I don't think
5   there's any obligation that we have to
6   issue an award within a specific period
7   of time.
8          After we issue an award, there
9   are deadlines that might be complied
10  with for correction or for additions,
11  corrections, interpretations.  But I
12  don't see any comparable deadline of the
13  AAA on this.
14         ARBITRATOR JENTES:  Well, I think
15  what it says in Article 32-7, "The
16  tribunal shall comply with this
17  requirement for the period of time
18  required by the law."  So I think we're
19  going to have to be guided, I suspect,
20  by New York law as to when the time for
21  the award is out.
22         MR. SILLS:  I believe that's
23  right, but, I mean --
24         ARBITRATOR CRAIG:  I think
25  that's -- Bill, that's after we've

Page 152

1          Proceedings
2   issued the award for it to be filed and
3   registered.  After we issue the award,
4   it must be filed and registered within
5   the terms of the --
6          ARBITRATOR JENTES:  You may be
7   right.
8          ARBITRATOR CRAIG:  I don't think
9   we're held to issue an award with any --
10  within any period of time.
11         MR. SILLS:  I think that's right.
12  And our interest is in getting a sound
13  and correct award, not getting an award
14  within some particular fixed period.
15  That being said, for obvious reasons, we
16  have an interest in a prompt award so
17  that we can right the ship.  But --
18         ARBITRATOR CRAIG:  Is that write
19  the check?
20         MR. SILLS:  No.  To right the
21  ship.
22         THE CHAIRMAN:  Right the ship.
23         ARBITRATOR CRAIG:  I'm sorry, I
24  misheard.
25         MR. SILLS:  Subject to, and I've

Page 153

1          Proceedings
2   asked one of my colleagues to go and get
3   us a copy of the CPLR, so we can see if
4   there is anything particular.  Nothing
5   comes to mind in terms of a specific,
6   you know, so-many-days deadline for an
7   award.  And I have every confidence that
8   the panel will deal with it as promptly
9   as it can.
10         But, as I say, I mean, our
11  interest is in getting a sound award
12  that will withstand any judicial
13  scrutiny as opposed to getting one on
14  day one as opposed to day two.
15         THE CHAIRMAN:  All right.
16  Anything else from the tribunal?  If
17  not, do we have anything else before our
18  conversation with our next witness?
19         MR. O'DRISCOLL:  They should be
20  there momentarily.  Let me just call.
21         ARBITRATOR CRAIG:  Mr. Sills, on
22  the issue of the Storm contribution to
23  this, in their prehearing brief which
24  they filed, I guess, some weeks ago,
25  they have a collection of proposed

39

Page 154

1       Proceedings
2 findings of fact that are also -- have
3 paragraphs that are numbered. So in
4 designing your own proposed findings of
5 fact, you want to take into account,
6 because I think the tribunal is going to
7 be using the Storm prehearing brief for
8 Storm's version of this.
9       MR. SILLS: I would assume so. I
10 mean, since I don't think they've
11 characterized the issues correctly,
12 we're not planning to respond to it as
13 if it were a pleading point by point.
14       But as I'm sure you recall, on
15 the previous -- on the proceedings
16 leading up to the partial final award,
17 the panel asked for the submission of
18 proposed findings and conclusions, and
19 we did that, and that's in numbered
20 paragraphs. We treated it as if they
21 were proposed findings and conclusions
22 in federal court.
23       I mean, I have said, I think,
24 their brief is more just a brief with
25 each paragraph having a number. But

Page 155

1       Proceedings
2 what we would do, subject to the
3 tribunal's approval, is submit proposed
4 findings and conclusions, just as we
5 would after the close of the evidence in
6 a bench trial in federal court. And
7 we'll, of course, address their
8 contentions.
9       ARBITRATOR CRAIG: That's fine.
10 I just think you ought to know what
11 we're going to be looking at at the same
12 time we're looking at yours.
13       MR. SILLS: I appreciate that. I
14 suppose that's helpful. I suppose if
15 they do continue their nonparticipation
16 that's all you'd have to look at in
17 terms of what their position is.
18       I guess we should just note for
19 the record that of the three witnesses
20 that had been designated by Storm, they
21 had told us -- three of the witnesses
22 designated by Storm would be subject to
23 cross-examination, that's Mr. Magnus,
24 Mr. Khudyokov, and possibly Mr. Kulikov.
25 And I just want to note for the record

Page 156

1       Proceedings
2 that we would have exercised our right
3 to cross-examine them. And that their
4 testimony, such as it is, is now simply
5 in the form of affidavits drafted by
6 their attorneys.
7       ARBITRATOR JENTES: Let me add
8 only one thing to what Mr. Craig says.
9 And that is, that speaking for myself, I
10 continue to be very much, not so much
11 troubled, but at least interested in the
12 core issue here which, in my opinion, is
13 what exactly is the controlling law
14 that's governing our decision on the
15 merits.
16       And on the one hand the Telenor
17 position starts out, well, of course,
18 New York law applies and from that point
19 on it's almost a foregone conclusion
20 what the result is.
21       Conversely, when you read the
22 materials that are submitted by Storm,
23 they start out with, well, of course,
24 what the applicable law is is the law of
25 Ukraine. And once you get over that it

Page 157

1       Proceedings
2 sort of follows, of course, that they
3 come out right. So I think that both
4 sides need to make certain in their
5 post-evidentiary hearing submission that
6 you really lay out why the panel needs
7 to come out with your view as to the
8 applicable law on the merits of this
9 controversy.
10       MR. SILLS: And we're planning
11 to. But I should -- could you get that.
12 You know, I should note for the record
13 that, and I understand that Storm made
14 this point, I will note, and we'll brief
15 this, that the cases that they cite and
16 rely on were all -- all involve New York
17 law prior to a critical statutory
18 amendment to which they do not refer.
19       In 1984 New York adopted Section
20 514-01 of its general obligations law
21 which expressly endorses the principle
22 of full court party autonomy to
23 designate governing law. So that the
24 choice of law argument they made might
25 have had some appeal in 1983 but it's

Page 158

```
 1              Proceedings
 2   been changed by the legislature in
 3   New York.  And I think also, and this is
 4   a point that's been briefed to some
 5   extent here, it's been briefed
 6   extensively before Judge Lynch, and
 7   we'll, of course, brief it here.
 8         The other point is that as a
 9   matter of sort of the customary law of
10   international arbitration, I guess the
11   best source is Julian Lew's treatise
12   which is consulted as an authority by
13   everyone.  And I'll note that he is the
14   senior partner in the arbitration group
15   of the firm that had long experience in
16   representing Alfa Group, the Herbert
17   Smith firm.
18         He makes an express point, and
19   we'll supply the quotation, that party
20   autonomy is a key, if not the key
21   principle in international arbitration.
22   And that it is universally followed by
23   international arbitration tribunals, and
24   that the parties have full autonomy to
25   designate the governing law.  As well as
```

Page 159

```
 1              Proceedings
 2   the express sanction in the Uncitral
 3   rules themselves.  So we will address
 4   that.
 5         ARBITRATOR JENTES:  Again, now is
 6   not the point to engage in this
 7   arbitration discussion about the
 8   applicable law.  I think what, if I may
 9   suggest, you need to address is, what if
10   we were to conclude that in fact no
11   agreement was ever reached because the
12   applicable people at Storm and Kyivstar
13   didn't have the authority to reach that
14   agreement.  Where does that leave us in
15   the choice of law issue.  That's what I
16   think is the important issue that we at
17   least need to get over.
18         You look puzzled, and I
19   understand why you're puzzled, because
20   both sides have come at this from a
21   totally different world view of what's
22   the issue here.  All I'm trying to say
23   is, speaking only for myself, I continue
24   to be at least interested in trying to
25   find out how we, as a panel, assuming
```

Page 160

```
 1              Proceedings
 2   we're going to come down on Telenor's
 3   side, and we may very well come down on
 4   Storm's side, how do we get over this
 5   question that maybe there was never a
 6   valid agreement in the first place.
 7         And don't we have to, in order to
 8   even reach that issue, say to ourselves,
 9   that issue is decided by New York law or
10   by Ukrainian law.  And I think it begs
11   the question a little bit if you simply
12   say, well, the parties have the right to
13   choose New York law.  But what if they
14   never chose it?  That's the issue that I
15   think, for me, we need to get over.
16         MR. SILLS:  I understand your
17   question.  Although I think the approach
18   we both -- you've obviously got to start
19   unraveling the knot somewhere.  You
20   know, both the law of the seat and the
21   law chosen by the parties point in the
22   same direction.  And as you know, in
23   international arbitration the law of the
24   seat is a critical factor as well, that
25   is, the procedural law, the sort of
```

Page 161

```
 1              Proceedings
 2   choice of law, methodology of the place
 3   where the arbitration is being
 4   conducted.
 5         So that, I mean, I think it's an
 6   obviously important issue.  But I think
 7   the answer, and we'll brief this, of
 8   course, is very clear under both the law
 9   of New York, which would obviously
10   govern, you know, any review of a
11   decision, and, you know, it will be
12   Judge Lynch who will decide that.  He's
13   already expressed at least a preliminary
14   view on that.  As well as sort of
15   customary, to the extent there's sort of
16   a customary international law of
17   international arbitration, and that's
18   why I refer to Mr. Lew's treatise, would
19   point in exactly the same direction.
20         So that the validity of the
21   agreement designating New York law being
22   heard in New York would itself be tested
23   under New York law and not under
24   Ukrainian law.  And we'll address --
25   that I take it is the point you're
```

Page 162

```
1          Proceedings
2  asking us to address?
3          ARBITRATOR JENTES:  I'll only add
4  one other thing so that you understand.
5  You assume that it's the law of the
6  place where the arbitration is sitting.
7  But what if there is no agreement that
8  New York is the place for the
9  arbitration to sit because, at least if
10 I take the view of the Ukrainian courts,
11 there never was an agreement on
12 arbitration taking place in New York?
13         MR. SILLS:  Well, but that raises
14 two questions, I think, Mr. Jentes.  The
15 first is that, as a matter of New York
16 law, the Uncitral rules and U.S. federal
17 law, the law passed on by Judge Lynch,
18 and the customary law of international
19 arbitration, the arbitration clause is
20 itself separable.  And we've already
21 crossed that bridge, twice now after
22 this morning's ruling.
23         So that we're over the hump of
24 whether or not there's an agreement to
25 arbitrate.  That's been argued twice and
```

Page 163

```
1          Proceedings
2  lost twice by Storm.  And that, it seems
3  to me, is the key to unraveling the
4  knot.
5          Once there's been a decision that
6  there's a valid agreement to arbitrate,
7  and there's been that decision, then
8  everything else follows from that.  The
9  valid agreement to arbitrate is in
10 New York.  The arbitration agreement
11 expressly provides for arbitration in
12 New York.  And so once we've crossed
13 that bridge, there is a valid agreement
14 to arbitrate in New York.
15         I have to say, I mean, I don't
16 want to rehearse all the evidence, that
17 these Ukrainian orders are meaningless
18 and collusive, and there have now been
19 two litigated findings in a real court
20 in New York to precisely that effect.
21 And there is no meaningful evidence that
22 the Cypress Shell Company that he's
23 suing his own subsidiary has any
24 interest in the case.  And, in fact,
25 there was evidence at the last hearing
```

Page 164

```
1          Proceedings
2  before Judge Lynch that the Cypress
3  Company isn't even notionally
4  participating, that months ago it gave a
5  general power of attorney to someone.
6          We will brief all that.  We
7  understand it's an important issue.
8  Although, I really have to say I think
9  there's a very clear answer in the
10 governing law, and that there's no
11 occasion for applying Ukrainian law,
12 whatever it may be.  And that there is,
13 in any event, very little evidence on
14 the record, other than these collusive
15 decisions as to what Ukrainian law is.
16         THE CHAIRMAN:  All right.
17 Mr. Sills, thank you.  We're ready for
18 your next witness.
19         MR. SILLS:  Thank you.
20         Mr. Chairman, we call Frederick
21 Lykke.
22         THE CHAIRMAN:  Mr. Lykke, would
23 you raise your right hand, please.
24
25
```

Page 165

```
1          Proceedings
2  F R E D R I K   L Y K K E,
3    called as a witness, having been first
4    duly sworn by the Notary Public (Amy E.
5    Sikora), was examined and testified as
6    follows:
7  DIRECT EXAMINATION
8  BY MR. SILLS:
9       Q.    Mr. Lykke, could you state your
10 name for the record?
11      A.    Fredrik Lykke.
12      Q.    How are you employed?
13      A.    As of Monday this week or last
14 week, I started private practice in DLA
15 Piper.  Prior to that, ending on Friday, 8th
16 of December, I was employed as in-house
17 counsel with Telenor ASA.
18      Q.    When did you begin your
19 employment with Telenor?
20      A.    1st February 1999.
21      Q.    And could you briefly describe
22 for us your duties and responsibilities as
23 in-house counsel for Telenor?
24      A.    Yes.  I work mainly on M & A
25 contracts, joint ventures for various
```

Page 166

1          Lykke - Direct
2  entities within the Telenor group.  In
3  particular, for the mobile division.
4      **Q.    Do you recall previously**
5  **submitting an affidavit in this proceeding?**
6      A.    Yes, I do.
7      **Q.    If you were to testify today on**
8  **the subject matter of that affidavit, would**
9  **you testify to the same effect?**
10      A.    Yes, I would.
11      **Q.    And have you read and reviewed**
12  **the affidavit of Mr. Egil Hansen in this**
13  **matter?**
14      A.    Yes, I have.
15      **Q.    Is there anything in that**
16  **affidavit with which you disagree?**
17      A.    No.  However, I'm, of course, not
18  aware of all the facts in that affidavit, but
19  to my knowledge there's nothing I disagree
20  with.
21      **Q.    Were you the attorney, the**
22  **in-house attorney at Telenor, responsible for**
23  **the negotiation and execution of the 2002**
24  **voting rights agreement?**
25      A.    Yes.

Page 167

1          Lykke - Direct
2      **Q.    Were you the in-house attorney at**
3  **Telenor responsible for the drafting and**
4  **execution of the 2002 shareholder's**
5  **agreement?**
6      A.    Yes.
7      **Q.    And were you involved in the**
8  **drafting and negotiation of the changes to**
9  **the 2002 shareholder's agreement that**
10  **resulted in the 2004 shareholder's agreement?**
11      A.    Yes, I was.
12      **Q.    Could you briefly describe for us**
13  **what your role was vis-a-vis the business**
14  **personnel at Telenor and outside counsel for**
15  **Telenor in those negotiations?**
16      A.    Yes.  Most of the negotiations
17  were commercial negotiations, so there was
18  commercial negotiations with primarily when
19  Egil Hansen left.  And he asked me to assist
20  on the legal side as in-house counsel.  We
21  also then retained Coudert Brothers.  These
22  were outside New York counsel or U.S.
23  counsel.
24          And my role was to -- to advise
25  internally Egil Hansen on various matters and

Page 168

1          Lykke - Direct
2  liaise between the business persons, Alfa
3  counsel, for the actual drafting of the
4  agreements.
5          MR. SILLS:  Bear with me one
6      second, Mr. Chairman.
7          Mr. Chairman, we've handed a
8      premarked set of exhibits to Mr. Lykke
9      and also for the panel as well.  And I
10      would ask that we use these exhibit
11      numbers.
12      **Q.    Could you turn to Exhibit 5 in**
13  **the premarked set of documents, Mr. Lykke.**
14      A.    Yes.
15      **Q.    Have you seen this document**
16  **before?**
17      A.    This is an e-mail from Peter
18  O'Driscoll dated 28th of April.
19      **Q.    And can you describe the document**
20  **annexed to it?**
21      A.    That is the draft letter
22  agreement to the term sheets which was
23  finally dated on the 29th of April.
24      **Q.    And what was your understanding**
25  **of the business purpose of this term sheet?**

Page 169

1          **Lykke - Direct**
2      A.    Well, it was to set the process
3  going forward which would lead to Telenor
4  becoming the majority of Kyivstar with Storm
5  as a minority shareholder with 43.5 percent
6  of Telenor, and the steps leading up to that.
7          We should have included
8  anticipated future happenings.  And that
9  included a new shareholder's agreement
10  between the two parties, when other
11  shareholders have disposed of their shares.
12  That was basically it.
13      **Q.    With whom were you negotiating --**
14  **let me rephrase that.**
15          **Who was Telenor's counterparty in**
16  **these negotiations?  Was it Storm or was it**
17  **Alfa?**
18      A.    Well, mostly was representatives
19  of Alfa, the Alfa Group, who were negotiating
20  in a way on behalf of Storm, as Alfa was in
21  the process of acquiring Storm or at least
22  parts of it.
23      **Q.    Could you turn to page 8 of this**
24  **exhibit, please.  And, in particular, to the**
25  **section headed "shareholder's agreement."**

Lykke - Direct
1
2   A.   Yeah.
3   Q.   Can you describe for the panel
4  your understanding of the business purpose of
5  these terms?
6   A.   The business purpose was that
7  Telenor should have a controlling share
8  holding, having the majority of the board.
9  However, giving Storm some protection in the
10  form of veto rights in the corporate
11  governance.
12   Q.   And was that expressed in the
13  form of requiring a super majority of the
14  board for particular corporate decisions?
15   A.   Yes.
16   Q.   To your understanding, does the
17  exhibit we're looking at reflect the business
18  understanding between the parties as to the
19  composition of the board?
20   A.   Yes.
21   Q.   Okay.  Look at page 10, if you
22  would.
23   A.   Yes.
24   Q.   You see the section headed
25  "Noncompete"?

Lykke - Direct
1
2   A.   Yes.
3   Q.   Okay.  Were there discussions of
4  which you're aware between Alfa, representing
5  Storm on the one hand, and Telenor on the
6  other, concerning a noncompete provision
7  being put into the shareholder's agreement?
8   A.   Yes.  Normally, Telenor, as the
9  industrial player in communication ventures,
10  require a noncompete from its own partners
11  because of market secrets, technology, know
12  how, et cetera.
13       In order to in a way protect that
14  information and the knowledge and know how,
15  we ordinarily enter into a noncompete
16  provision with the local partner in order for
17  them not to exploit that information in other
18  ventures competing with other partners in a
19  particular jurisdiction.
20       In this matter there was a
21  noncompete clause in the old shareholder's
22  agreement which I mentioned earlier.
23  However, when Alfa came in and was the
24  driving force on behalf of Storm, we decided,
25  together with them, that we should use as a

Lykke - Direct
1
2  template or a starting point a similar -- a
3  similar noncompete provision which Telenor
4  and Alfa had negotiated this in Russia for
5  the company VimpelCom.
6       As we started out with that
7  wording, and then we have certain tailoring
8  of the clause to make it work in Ukraine with
9  respect to factual circumstances, and it came
10  up during the discussions that Alfa have an
11  ownership in a company called Golden Telecom,
12  which has a subsidiary in Ukraine.
13       So we have -- Telenor agreed to
14  have a carveout for that holding which
15  otherwise would be breach of the general
16  noncompete starting point.  And then we did
17  some additional tailoring of the clause
18  making sure that -- that directors which Alfa
19  nominated cannot be heavily involved or
20  involved in the Golden Telecom company in any
21  way.
22   Q.   And what was the reason for
23  requiring that there be no cross
24  directorships?
25   A.   Well, that was basically to make

Lykke - Direct
1
2  the noncompete a bit safer.  As directors in
3  Kyivstar always, they would receive a lot of
4  confidential information about, well, call it
5  Telenor specific plans of technology, which
6  means of value for that company and that
7  shouldn't easily be transferred to knowledge
8  of people working for the competitor in
9  Ukraine, namely, the subsidiary of Golden
10  Telecom.
11   Q.   In the course of your
12  negotiations and discussions concerning the
13  noncompete, did anyone from Alfa ever suggest
14  in words or substance that it would apply
15  only to Storm and that Alfa would be free to
16  compete through other corporations in
17  Ukraine?
18   A.   No, no.  That was never
19  suggested.  It was only related to Storm.
20   Q.   Well, you say it wasn't suggested
21  that it would only relate to Storm.  What was
22  your understanding in these negotiations as
23  to who was bound by the noncompete on the
24  Alfa side?
25   A.   Well, basically the technique in

Page 174

Lykke - Direct

1  Lykke - Direct
2  the agreements, it covers all affiliates of
3  each of the parties. And that's kind of a
4  dynamic definition. So we would also cover
5  future affiliates, also the signing of the
6  agreements. And it would, on the other hand,
7  not be -- we wouldn't stop covering
8  affiliates at the time of signing the
9  agreement, if those affiliates were sold to
10  that related party.
11      And the purpose of that was, of
12  course, to ensure that a group of companies
13  couldn't circumvent the clause by having
14  activities in sister companies or other
15  companies within the same group, where
16  information usually flowed rather freely.
17  **Q.    In the course of your**
18  **negotiations, did anyone from the Alfa side**
19  **ever suggest that for the noncompete to cover**
20  **the entire territory of Ukraine was unfair or**
21  **unreasonable?**
22      A.    No, I never heard that.
23  **Q.    Did any person representing Alfa,**
24  **in the course of these discussions and**
25  **negotiations, ever suggest there should be**

Page 175

1  **Lykke - Direct**
2  **some kind of time limit on the noncompete,**
3  **other than the ones set forth in the term**
4  **sheet?**
5      A.    Not that I recall, no.
6  **Q.    And did this provision that we're**
7  **looking at in Exhibit 5 carry forward into**
8  **the shareholder's agreement?**
9      A.    Yes.
10  **Q.    And from the time of the term**
11  **sheet until the time the shareholder's**
12  **agreement was signed in 2004, did anyone from**
13  **Alfa ever object to any of the terms or**
14  **provisions of the noncompete?**
15      A.    Not to my knowledge, no.
16  **Q.    Look, if you would, at page 13 of**
17  **the term sheet.**
18      A.    Yes.
19  **Q.    Do you have that before you?**
20      A.    Yes.
21  **Q.    Look at the section headed**
22  **"Governing Law," if you would.**
23      A.    Yes.
24  **Q.    Does this reflect an agreement**
25  **that the shareholder's agreement will be**

Page 176

1  Lykke - Direct
2  **governed by the laws of the State of New**
3  **York?**
4      A.    Yes.
5  **Q.    Were there discussions and**
6  **negotiations between Alfa on the one hand,**
7  **and Telenor the other as to what law would**
8  **govern the agreements?**
9      A.    No. I don't think there were any
10  particular discussions about that. I think
11  we quite frequently landed on U.S. law or
12  New York law.
13  **Q.    When you say we landed, do you**
14  **mean that Alfa and Telenor, Storm and**
15  **Telenor, agreed readily on the application of**
16  **U.S law?**
17      A.    I mean, in these kinds of joint
18  ventures, it's usually either English or
19  New York law which is relevant. I don't
20  recall whether we discussed whether it should
21  be English law. I don't think we did. I
22  think it was New York law from the start.
23  And that we had both of us had U.S. lawyers
24  and that was kind of the natural choice when
25  we decided not to continue with Swedish law.

Page 177

1  Lykke - Direct
2  **Q.    I'm sorry, please continue.**
3      A.    Originally, in the earlier
4  agreement with Ukraine after Kyivstar, it was
5  Swedish law.
6  **Q.    And --**
7      A.    But --
8  **Q.    Do you mean in the 1998**
9  **shareholder's agreement there was Swedish**
10  **law?**
11      A.    Yeah. I think it was Swedish
12  law.
13  **Q.    And in negotiating the new**
14  **contract, the term sheet reflects New York**
15  **law as the governing law?**
16      A.    Yes.
17  **Q.    Was there ever any objection,**
18  **from the time the term sheet was first**
19  **proposed until the shareholder's agreement**
20  **was executed in 2004, on the part of anyone**
21  **from Storm or Alfa to the application of**
22  **New York law?**
23      A.    No.
24  **Q.    Did anyone from Storm or Alfa**
25  **ever suggest at any point in the negotiations**

Lykke - Direct

1  that any law other than the law of New York
2  should apply to the contract?
3       A.   No.  Not my knowledge.
4       Q.   Did anyone from Storm or Alfa
5  ever suggest, in the course of those
6  negotiations, that the law of any
7  jurisdiction other than New York would apply
8  or would have to apply to any aspect of the
9  relationship between the parties?
10      A.   No.
11      Q.   Did anyone from Alfa or Telenor
12 ever state that Ukrainian law would govern
13 one or more aspects of the relationship
14 between the parties?
15      A.   No.  Not more than the part you
16 would have to comply with some Ukrainian
17 applications within Kyivstar.  But not
18 governing the shareholder relationship.  That
19 was the point about it.
20      ARBITRATOR CRAIG:  Could I ask a
21 question about that?
22      MR. SILLS:  Of course.
23      ARBITRATOR CRAIG:  You just said
24 that it was understood that the

(Lines renumbered as shown: line 1 is the heading line.)

Lykke - Direct

1  shareholder relationship would be
2  governed by New York law.  Is that what
3  you just said?
4       THE WITNESS:  No.  I said that --
5  the question was whether Ukrainian law
6  would have any sort of impact in court
7  for the joint venture, basically.  That
8  was how I understood it.
9       And what I said was that -- was
10 that the purpose of this agreement was
11 to have it under New York law, have it
12 outside Ukrainian law, and Kyivstar was
13 also a party.  However, I don't think
14 Alfa in any way made any particular
15 point out of it.  But when doing
16 business in Ukraine, you have to follow
17 Ukrainian rules, and some of those could
18 have an impact also on the company
19 sometimes.
20      Q.   Mr. Lykke, when you speak about
21 that, do you mean sort of the technical
22 corporate rules of Ukrainian law having to do
23 with the actual structure of Kyivstar?
24      A.   Yeah.

Lykke - Direct

1       Q.   Was there ever any suggestion
2  that the parties in -- the parties, that is,
3  the Storm and Alfa parties on the one hand,
4  and Telenor on the other, that their
5  relationship between themselves would be
6  governed by any law other than New York?
7       A.   No.  That was completely
8  New York.  And that we went through -- that
9  we were very detailed on in the shareholder's
10 agreement, that the parties were obliged to
11 make the agreement under New York law work
12 also in Ukraine.
13      Q.   Was there an understanding
14 between the parties as to what would happen
15 if, because of a change or requirement in
16 Ukrainian law, the charter -- let me rephrase
17 that question.
18      Was there any agreement between
19 the parties as to which would have primacy,
20 the governance arrangements in the
21 shareholder's agreement or the requirements
22 of Ukrainian law, with regard to the
23 governance of Kyivstar?
24      A.   The shareholder's agreement was

Lykke - Direct

1  the priority.  That was spelled out very
2  explicitly in the agreement.  There were
3  anticipated that would have to be done some
4  changes to the articles.  And it was
5  explicitly stated in the shareholder's
6  agreement that the parties would -- would
7  make all relevant changes pursuant then
8  through the shareholder's agreement of the
9  articles.
10      ARBITRATOR CRAIG:  Was there any
11 discussion of what would be covered by
12 Ukrainian law, if anything?
13      THE WITNESS:  I don't think there
14 were any particular discussions about
15 it.  It was more about the -- the
16 corporate backup, for instance, that the
17 general meeting would have to formally
18 decide, for instance, on an IPO, for
19 instance.  And whether issue of shares.
20 Those kind of things.
21      Whereas, the difference between
22 how you do things typically in the U.S.
23 company or Ukrainian company or
24 Norwegian company, you have to just

Page 182

1          Lykke - Direct
2    adjust for that in your overriding
3    shareholder's agreement.
4          MR. SILLS:  Could we turn to one
5    other exhibit on that point for a
6    moment.  Could you look at tab 16, which
7    is a copy of the shareholder's agreement
8    itself.
9    A.    Yes.
10         ARBITRATOR CRAIG:  Are you
11   looking at 2002 or 2004?
12         MR. SILLS:  I'm looking at the
13   executed document, the 2004 agreement.
14         ARBITRATOR CRAIG:  That would be
15   G attached to his affidavit?
16         MR. SILLS:  I believe that's
17   right.
18         MR. O'DRISCOLL:  Not G, no.
19         ARBITRATOR CRAIG:  It's I.
20         MR. O'DRISCOLL:  It would be I.
21         THE WITNESS:  I.
22   Q.    Look, if you would, at section
23   6.03A on page 23 of the agreement.
24   A.    6 point?
25         MR. O'DRISCOLL:  03.

Page 183

1          Lykke - Direct
2          ARBITRATOR CRAIG:  We don't have
3    page 23.  And we don't have the first
4    page --
5          THE CHAIRMAN:  Okay, we've got
6    it.
7          MR. SILLS:  Okay.
8    Q.    Now that we're all looking at the
9    same document.
10         MR. SILLS:  My apologies for the
11   copying error, Mr. Chairman.
12   Q.    You have page 23 before you,
13   Mr. Lykke?
14   A.    Yes.
15   Q.    Can you describe for us the
16   business purpose of the language we're
17   looking at in section 6.03A?
18   A.    Yes.  This is an example of what
19   the parties are explicitly agreeing that the
20   shareholder's agreement and the will of the
21   shareholder's agreement and what was agreed
22   between the parties under the New York law
23   shall take party over kind of local issues in
24   the charter, for instance, and the parties
25   undertake to amend the charter in order to

Page 184

1          Lykke - Direct
2    give the text of the shareholder's agreement.
3    Q.    And was that always part of the
4    understanding between the parties?
5    A.    Yes.  Absolutely.
6    Q.    Was this identical provision that
7    we're looking at in the 2002 version of the
8    agreement that was annexed to the voting
9    rights agreement?
10   A.    I think they were basically
11   identical.  In the voting agreement?
12   Q.    No.  In the 2000 -- in the
13   shareholder's agreement which is annexed to
14   the 2000 -- to the 2002 voting agreement.
15   A.    Yes.  Yeah, that's identical.
16   However, it was 604.  But this seems to be
17   the same clause.  Basically, those agreements
18   were more or less the same.
19   Q.    Okay.  And if you would turn,
20   please, to Exhibit 10, which is the voting
21   agreement.
22         ARBITRATOR CRAIG:  Wait a minute.
23   Is the 2002 shareholder's agreement --
24   where is that in the attachment here?
25         MR. SILLS:  In the exhibits?

Page 185

1          Lykke - Direct
2          ARBITRATOR CRAIG:  In the
3    exhibits.
4          MS. THOMPSON:  It would be
5    Exhibit D.
6          THE CHAIRMAN:  D?
7          MS. THOMPSON:  D, in the Lykke.
8          ARBITRATOR CRAIG:  D, as in
9    David.
10         MR. SILLS:  No.  Mr. Craig, it
11   was the 2002 shareholder's agreement
12   which appears as part of the voting
13   agreement because it had that three-day
14   trigger.
15         ARBITRATOR CRAIG:  I got it,
16   okay.
17         MR. SILLS:  So it's the second
18   half of Exhibit C to Mr. Lykke's
19   previous affidavit.
20   Q.    And so looking at the voting
21   agreement, Mr. Lykke, which was executed in
22   2002.
23   A.    Same concept and the identical
24   wording.  But this time in 503 of the voting
25   agreements.

47

```
 1           Lykke - Direct
 2     Q.   Okay.  And the voting -- does the
 3  voting agreement have a governing law clause?
 4     A.   Yes.
 5     Q.   And what law is selected by the
 6  parties?
 7     A.   That's the same, New York law.
 8     Q.   In fact, substantively, the
 9  substantive business terms of the voting
10  agreement are the same as the substantive
11  business terms of the shareholder's
12  agreement, aren't they?
13     A.   That's right.  And that was the
14  purpose as well.
15     Q.   And was there a noncompete
16  provision in the voting agreement?
17     A.   Yes.  Yes, there was.
18     Q.   Does it differ in any way from
19  the noncompete provision in either the 2002
20  shareholder's agreement or the 2004
21  shareholder's agreement?
22     A.   No.  It's identical.
23          ARBITRATOR CRAIG:  That's 5.02?
24          MR. O'DRISCOLL:  That's correct.
25          MR. SILLS:  Yes.
```

```
 1           Lykke - Direct
 2     Q.   And with respect to dispute
 3  resolution, is there any difference in the
 4  arbitration provisions among the voting
 5  agreement, the 2002 shareholder's agreement,
 6  and the 2004 shareholder's agreement?
 7     A.   No.  I haven't double-checked
 8  whether they exactly the same, but they
 9  should be exactly the same, and I think they
10  are.  They seem to be the same.  Yes.
11          Basically, the whole agreement
12  package was agreed to in 2002.  And the new
13  shareholder's agreement from 2004 was really
14  a technical thing, due to some changes on
15  number of shareholders and the fact that we
16  were then able to terminate old shareholder's
17  agreement.
18          We had a voting agreement in
19  order to have that alongside the existing
20  shareholder's agreement, which couldn't be
21  terminated without all parties consenting to
22  it.  But the whole agreement all along was
23  that we should act under the new regime, so
24  to speak, from 2002.
25          Then on the voting agreement with
```

```
 1           Lykke - Direct
 2  an attachment -- with the new shareholder's
 3  agreement, which was basically the same as
 4  the voting agreement, with an annex in which
 5  we agreed to enter into the new shareholder
 6  agreement when certain events have taken
 7  place, which then did take place in
 8  January '04.
 9     Q.   Mr. Lykke, in the course of your
10  discussions and negotiations in 2002 leading
11  up to the execution of the voting agreement,
12  did you deal with an individual named David
13  Wack, W-A-C-K?
14     A.   Yes, partly.  Most of it went
15  through external counsel, but I was also
16  involved with him.
17     Q.   Who is Mr. Wack?
18     A.   He was the U.S. counsel for the
19  Alfa Group based in Moscow.
20     Q.   In Oslo or in Kiev?
21     A.   Moscow.
22     Q.   Moscow.
23          THE CHAIRMAN:  Moscow.
24     Q.   Turn, if you would, to Exhibit 8
25  in the premarked set of documents.  Do you
```

```
 1           Lykke - Direct
 2  recall receiving this document?
 3     A.   Yes.
 4     Q.   Okay.  Could you just read for us
 5  the second sentence that Mr. Wack -- well,
 6  let me lay a foundation for this.
 7          For what purpose was this e-mail
 8  sent to you?
 9     A.   Basically, there was just in
10  order to have the signing formalities in
11  place.  For Storm there a question as to --
12  as to whether two persons needed to sign on
13  behalf of Storm or not.  Basically, David
14  Wack came back to us and confirmed to us some
15  factual matters with the consequence that one
16  only needed one signatory for Storm.
17     Q.   And is that -- and would you read
18  for us, please, the second sentence of the
19  first paragraph of Mr. Wack's e-mail?
20     A.   Yes.  "I will confirm that there
21  is no acting chief accountant for Storm and
22  that no second signature is required under
23  Ukrainian law, although presumably since the
24  contract is governed by Swedish law and
25  conflicts rules have been excluded, Ukrainian
```

1        Lykke - Direct
2  law is not relevant for this purpose."
3      Q.    In all of your dealings with
4  Mr. Wack or anyone else representing Alfa or
5  Storm, did anyone ever suggest that Ukrainian
6  law had any relevance at all to the question
7  of authority to execute the various
8  agreements?
9      A.    No.
10     Q.    In all of those discussions, did
11 all of the representatives of Alfa and Storm
12 take the same position that Mr. Wack did in
13 this e-mail we're looking at, that Ukrainian
14 law was irrelevant to that question?
15     A.    That was never raised as an
16 issue.
17     Q.    Did anyone ever claim that there
18 was some requirement, formal requirement of
19 Ukrainian law that needed to be complied with
20 in order for these agreements to be valid and
21 binding?
22     A.    No, not really.
23     Q.    Did anyone ever suggest that the
24 agreements had to be written in Ukrainian?
25     A.    No.

1        Lykke - Direct
2      Q.    Did anyone ever suggest that
3  these agreements had to be registered with
4  some state office in Ukraine?
5      A.    No.
6      Q.    Did anyone ever suggest that
7  there was any other formality under Ukrainian
8  law that had to be complied with in order for
9  these agreements to be valid?
10     A.    No.
11     Q.    Look at tab 11 in the premarked
12 documents, please.
13         ARBITRATOR CRAIG:  We don't have
14     the same book.
15         MR. SILLS:  I'm sorry, I thought
16     that was already distributed.  I
17     apologize.
18         ARBITRATOR CRAIG:  What was the
19     number of the Wack e-mail?
20         MR. SILLS:  That was, I believe,
21     Exhibit 8, Mr. Craig.
22         ARBITRATOR CRAIG:  And this one's
23     11?
24         MR. SILLS:  That's correct.
25     Q.    And look, if you would, at the

1        Lykke - Direct
2  second e-mail in the chain.  The one -- from
3  Mr. Khyudyakov to -- it's actually to
4  Mr. Ekhougen with a copy to you.  Do you
5  recall receiving that?
6      A.    Yes.
7      Q.    Look at the second paragraph.
8         ARBITRATOR CRAIG:  Page 2 of 3?
9         MR. SILLS:  That's correct.
10     Q.    First, who is Mr. Khudyakov?
11     A.    He was the negotiator for Storm
12 who -- Storm/Alfa who was handling the
13 practicalities on the -- on the amendments
14 that were done to the shareholders.  The new
15 shareholder's agreement, so to speak, which
16 was done on the 30th of January '04.
17     Q.    Could you just read for us the
18 first sentence -- the first two sentences of
19 the second paragraph?
20     A.    Okay.  "We reviewed the New
21 Shareholders Agreement, and there is no
22 comment beyond what we've already discussed.
23 Our firm position is that we do not want any
24 further negotiations over the Agreement and
25 should sign the text that was agreed last

1        Lykke - Direct
2  year with small technical changes reflecting
3  the Ericcson debt repayment and the third
4  party to the Agreement."
5      Q.    And is the agreement referred to
6  there the 2002 version of the agreement
7  annexed to the voting agreement?
8      A.    Yes.
9      Q.    Did there come a time when Alfa
10 requested, despite Mr. Khudyakov's statement,
11 changes to the shareholder's agreement?
12     A.    They suggested a change to the
13 termination provision, which Telenor found
14 was -- was too much -- too much of an
15 amendment.  So we -- we wrote back to them
16 and said that we did not want those changes
17 but that we should be -- we should be looking
18 at some kind of amendment on the termination.
19     Q.    Did Telenor ever suggest any
20 changes to the agreement, the 2002 agreement?
21     A.    Not anything more than the actual
22 technical issues, to my knowledge.  Other
23 than cleaning up factual matters, which have
24 been outdated due to factual happenings in
25 the meantime.  For instance, what's mentioned

1           Lykke - Direct
2    here, the Ericsson matter.
3        Q.    Did there come a time when an
4    agreement was reached on the change to the
5    termination provisions requested by Storm?
6        A.    Yes.
7        Q.    From the time Mr. Khudyakov said
8    that Storm did not want any changes to the
9    agreement, until the time an agreement was
10   struck on the change to the termination
11   provisions, did anyone from Storm or Alfa
12   suggest that there needed to be a new board
13   meeting or a new meeting of participants or
14   any other formality in order to execute the
15   new agreement?
16       A.    No.
17       Q.    Look, if you would, at tab 15 in
18   your witness book.
19           ARBITRATOR CRAIG:  Could you read
20       back the previous question and answer,
21       for me.
22           (Record read.)
23       Q.    And just to go back for a moment
24   to that question, Mr. Lykke.  The only
25   changes to the agreement, that is, from the

1           Lykke - Direct
2    2002 agreement to the 2004 agreement, other
3    than technical changes, were at the request
4    of Storm; is that correct?
5        A.    Yes.  I should be clear about
6    that.  The actual change -- the end result of
7    the change was based upon a compromise
8    suggestion from Telenor.  That was -- that
9    was a smaller change than that one that was
10   suggested by Alfa in the first place or
11   Storm.
12       Q.    So would it be fair to say that
13   Storm requested a change, Telenor agreed to
14   part of that change, and then it was executed
15   in that form?
16       A.    Yes.
17       Q.    Can you tell us why Telenor was
18   willing to consider the change to the 2002
19   agreement proposed by Storm?
20       A.    Well, I think that we were
21   interested in having the agreement signed up,
22   putting the opening feuds behind us.  From a
23   business viewpoint, the change that was
24   agreed to between the two of us was, in our
25   view, not of any real importance.  And we

1           Lykke - Direct
2    felt that we have all the control we needed
3    anyway about having Storm trying to terminate
4    the agreement because we have put in now a
5    reasonable materiality threshold, and we
6    didn't consider it any risk for us, the
7    change.
8            ARBITRATOR CRAIG:  When you say
9        "we," who are you talking about?
10           THE WITNESS:  Sorry, Telenor.
11           ARBITRATOR CRAIG:  What
12       individuals inside Telenor did you
13       consult on this question?
14           THE WITNESS:  Basically it was --
15           MR. SILLS:  Could you just speak
16       up a little, Mr. Lykke.
17           THE WITNESS:  Yes, sorry.
18       Sigmund Ekhougen and Kare Gustav were
19       mainly holding this matter from the
20       Telenor side.
21           ARBITRATOR CRAIG:  Ekhougen?
22           THE WITNESS:  Ekhougen, yes.
23           MR. SILLS:  That's the same
24       Mr. Ekhougen who has already testified.
25       Q.    Now, Telenor had originally

1           Lykke - Direct
2    resisted making any changes to the agreement,
3    hadn't it?
4        A.    Yes.  The starting point was
5    probably that.
6        Q.    Do you know whether or not any
7    pressure was put on senior executives at
8    Telenor by senior executives at Alfa to
9    engage in negotiations over the change
10   requested by Alfa?
11       A.    No, I don't.
12       Q.    Look, if you would, at tab 15.
13           MR. SILLS:  Which we have
14       distributed to the panel, Mr. Chairman.
15       Q.    This is an e-mail from
16   Mr. Khudyakov to Mr. Divkovskiy with a copy
17   to Mr. Ekhougen.  Have you seen this document
18   before?
19       A.    Yes.
20       Q.    And would you read for us the
21   first two sentences.
22       A.    "Oleksiy, Storm reviewed the
23   language of the New shareholder's agreement
24   that was introduced yesterday and agreed to
25   it.  We are ready to sign tomorrow."

Lykke - Direct

1
2    Q.    The Oleksiy is Oleksiy
3 Divkovskiy, outside counsel for Telenor?
4    A.    That's correct.
5    Q.    And the Alexey, spelled
6 differently, who signed this agreement,
7 that's Mr. Khudyakov?
8    A.    Who signed the e-mail?
9    Q.    Yes.
10   A.    Yes.  That's correct.
11   Q.    And when he said, "We are ready
12 to sign it tomorrow," did he say that there
13 was any need for any further formalities?
14   A.    No.
15   Q.    And was, in fact, the document
16 executed by Storm, as Mr. Khudyakov said it
17 would be?
18   A.    Yes.  That's right.
19   Q.    Who executed that document?
20   A.    Mr. Nilov.
21   Q.    Had Mr. Nilov signed other
22 documents on behalf of Storm in the course of
23 your dealings?
24   A.    Yes.  He signed most of them.
25   Q.    Did he sign the voting agreement?

1        Lykke - Direct
2    A.    Yes.
3    Q.    Did anyone ever question his
4 authority to sign any of those documents?
5    A.    No.
6    Q.    Do you know what his title was at
7 Storm?
8    A.    He was general -- general --
9    Q.    Was it general director?
10   A.    General director or general
11 manager.
12   Q.    In addition to the document
13 itself, the shareholder's agreement in 2004,
14 were any documents attesting to Mr. Nilov's
15 authority supplied to Telenor?
16   A.    Yes.  We received two
17 certificates of incumbency dated the date on
18 the agreement.
19   Q.    Look, if you would, at tabs 18
20 and 19.  I'm sorry, 17 and 18.
21   A.    Yeah.
22   Q.    Are these the certificates that
23 you just referred to?
24   A.    That's correct.
25   Q.    Do these reflect that Mr. Nilov,

1        Lykke - Direct
2 quote, is duly authorized to sign the
3 shareholder's agreement?
4    A.    Yes.
5    Q.    Did anyone from the Alfa side
6 ever suggest to you that there was any
7 limitation or qualification on the
8 representation made in these two documents?
9    A.    No.
10   Q.    Look at the fax line at the top
11 of Exhibit 17, please.
12   A.    Yes.
13   Q.    What does that reflect?
14   A.    That it stems from Alfa Capital
15 in Moscow.
16   Q.    And does Mr. Kosogov work for
17 Alfa Capital?
18   A.    I believe so.  At least one of
19 the Alfa Group companies.  And also I can
20 mention that both Mr. Kosogov and Mr. Tumanov
21 were well known to Telenor through our
22 partnership with them for a couple of years,
23 also Kosogov with respect to other holdings.
24   Q.    At any time in the year 2004, did
25 anyone from Alfa or Storm ever suggest there

1        Lykke - Direct
2 had been any problem or deficiency in the
3 execution of the shareholder's agreement?
4    A.    No.
5    Q.    Were changes to the Kyivstar
6 charter required by the shareholder's
7 agreement made with Alfa's consent in 2004?
8    A.    Yes.
9    Q.    And in the year 2005, did anyone
10 from Alfa or Storm ever claim or contend that
11 there was any problem in the execution of the
12 shareholder's agreement?
13   A.    Not to my knowledge, no.
14   Q.    Did anyone ever suggest, in the
15 year 2005, that Mr. Nilov had not been fully
16 and duly authorized to execute the
17 shareholder's agreement?
18   A.    No.  Not to my knowledge.
19   Q.    Until Alfa put out a press
20 release in 2006 claiming that Mr. Nilov had
21 not been duly authorized to execute the
22 shareholder's agreement, did anyone from Alfa
23 or Storm or acting on their behalf ever
24 suggest, publicly or privately, that there
25 was any problem with Mr. Nilov's execution of

Page 202

Lykke - Direct

1      Lykke - Direct
2  the shareholder's agreement?
3      A.    No.  Not to my knowledge.
4      Q.    If Alfa and Storm had not been
5  willing to execute the shareholder's
6  agreement, would Telenor have allowed Alfa to
7  buy into Kyivstar?
8      A.    No.  I'm rather certain about
9  that.  That was not kind of my decision, but
10  it was very clear to me that these -- that
11  the shareholder agreement was a very critical
12  condition for letting Storm or Alfa increase
13  their ownership in Kyivstar.
14      MR. SILLS:  Thank you,
15  Mr. Chairman.  Thank you, Mr. Lykke.
16  That's all I have.
17      THE CHAIRMAN:  Mr. Lykke, there
18  may be some questions from the panel.
19      Mr. Jentes.
20      THE WITNESS:  Okay.
21      ARBITRATOR JENTES:  I'd like to
22  go back to the first set of documents
23  that you were shown that began with
24  Mr. O'Driscoll's e-mail, and then
25  there's the attachments of the letter

Page 203

1      Lykke - Direct
2  and the sort of term sheet.
3      Do you have those?
4      THE WITNESS:  Yes.
5      ARBITRATOR JENTES:  The letter,
6  or the two forms of the letter that are
7  attached, indicate that this is an
8  agreement among Alfa Bank and Storm and
9  Telenor.  And I take it that you were
10  the principal negotiator involved in
11  this set of documents; is that correct?
12      THE WITNESS:  No.  It was Egil
13  Hansen, who left the negotiations.
14      ARBITRATOR JENTES:  That was on
15  behalf of Telenor?
16      THE WITNESS:  That's correct.
17  Yes.
18      ARBITRATOR JENTES:  And what was
19  your role in the negotiations?
20      THE WITNESS:  Well, I
21  participated in some meetings with Alfa
22  personnel.  I liaised a bit between
23  Peter O'Driscoll and Egil Hansen.  Was
24  part of a sparring partner with Egil
25  Hansen on some of these meetings.

Page 204

1      Lykke - Direct
2  However, there was a number of meetings
3  that I was not involved in during the
4  negotiations.
5      ARBITRATOR JENTES:  Who did you
6  deal with from the Alfa Group?
7      THE WITNESS:  Mainly, Kirill
8  Stayn.  I also met Mr. Tolchinsky once
9  and Alex Shtyrba.
10      ARBITRATOR JENTES:  What were
11  their positions in the overall Alfa
12  Group?
13      THE WITNESS:  Well, I think that
14  Tolchinsky was in a way head of their
15  M & A activities.  Kirill Stayn was a
16  kind of an in-house counsel.  And Alex
17  Shtyrba was -- was kind of a business
18  negotiator on their team, I believe.
19      ARBITRATOR JENTES:  All right.
20  When it got around to drafting the
21  letter that ultimately became the
22  April 29, 2002 document, were you
23  actively involved in the drafting and
24  finalization of that document?
25      THE WITNESS:  Yeah.  I was

Page 205

1      Lykke - Direct
2  involved in that.  Kind of in between,
3  in a way.  Alfa counsel and Egil Hansen.
4      ARBITRATOR JENTES:  All right.
5  If you turn over to page 13, under the
6  section on governing law, there's a
7  sentence that I'd appreciate your
8  explaining a little bit.  It says, "To
9  aid shareholders' understanding of the
10  company's corporate governance and
11  thereby enhance the company's ability to
12  undertake an IPO in the United States,
13  the shareholder's agreement and the
14  registration rights agreement will be
15  governed by the laws of the State of New
16  York, United States of America."
17      This sounds as though it was
18  important to select the law of the State
19  of New York for reasons of both sides to
20  be able to market the ultimate company
21  in a potential IPO.  Was that -- am I
22  correct about that?
23      THE WITNESS:  Yeah.  An important
24  aspect for Telenor was the possibility
25  of being able to do an IPO in the United

52

Page 206

Lykke - Direct

1
2  States.  So that is correct.  Everything
3  that could help an IPO in the U.S. was
4  important for Telenor.
5      ARBITRATOR JENTES:  And I take
6  it, if there would be an IPO, it would
7  also be important to the Alfa Group and
8  to Storm to have this same capability in
9  the United States?
10     THE WITNESS:  Yeah.
11     ARBITRATOR JENTES:  With regard
12  to the arbitration clause in this
13  letter, you've already explained that
14  the shareholder's agreement would be
15  pursuant to Uncitral arbitration and
16  would take place in New York City as the
17  site of it.
18     I was not clear from your
19  testimony, was this a subject of
20  discussion or negotiation between the
21  Telenor side and the Storm side and the
22  Alfa side to arrive at the use of
23  Uncitral and the use of New York as
24  being the place of the arbitration?
25     THE WITNESS:  No.  I don't think

Page 207

Lykke - Direct

1
2  that was an issue.  I cannot recall
3  being involved in discussions whether it
4  should be ICT, whether it should be
5  London, New York, English law or U.S.
6  law.  And since I don't recall any
7  discussions about this, I draw the
8  conclusion that the parties were happy
9  with -- with this mechanism from the
10  Alfa.  It was also a typical selection
11  in such a joint venture.
12     ARBITRATOR JENTES:  So if I
13  understand, your testimony was that
14  there simply was never any dispute
15  between the Alfa and Storm people on the
16  one side and the Telenor people on the
17  other side that the Uncitral rules would
18  be used and that New York would be the
19  situs of the arbitration?
20     THE WITNESS:  No.
21     ARBITRATOR JENTES:  Okay.  That's
22  all the questions I have.
23     THE CHAIRMAN:  Any, Craig?
24     ARBITRATOR CRAIG:  Yes, I do.
25     Looking at that same document,

Page 208

Lykke - Direct

1
2  Mr. Lykke, where there's a cover e-mail
3  that's dated April 27th, struck out
4  April 29th, 2002.  The first paragraph
5  talks about Alfa Bank or one of its
6  affiliates collectively and Storm being
7  able to acquire up to 43.5 percent of
8  the issued and outstanding shares of
9  Kyivstar.  Do you see that right at the
10  first paragraph?
11     THE WITNESS:  Yes.
12     ARBITRATOR CRAIG:  And that was a
13  negotiated number, was it not?
14     THE WITNESS:  That's right.
15     ARBITRATOR CRAIG:  And that was a
16  number that Alfa Bank and Storm desired;
17  isn't that correct?
18     THE WITNESS:  Yes.
19     ARBITRATOR CRAIG:  And they
20  wanted over 40 percent.  Do you know why
21  they wanted over 40 percent of the
22  issued and outstanding shares of
23  Kyivstar?
24     THE WITNESS:  Well, I think
25  basically they wanted as much as

Page 209

Lykke - Direct

1
2  possible in a way.  However, it was
3  important for them to get above
4  40 percent.  I don't really recollect
5  why it ended on 43.5.
6     ARBITRATOR CRAIG:  Well, you
7  mentioned earlier, I think, when you
8  were being questioned by Mr. Sills, of a
9  veto right.  Do you remember that
10  testimony?
11     THE WITNESS:  Yes.
12     ARBITRATOR CRAIG:  Was it your
13  impression that it was important to Alfa
14  and Storm, as a precondition of its
15  being involved in this venture with
16  Telenor, that it have a veto right?
17     THE WITNESS:  Well, I think in
18  general, as a large minority
19  shareholder, you want some protection
20  against decisions by the majority owner.
21     So what we routinely see is that
22  corporate governance structures are
23  tailored in order to cater to both
24  parties in an acceptable way.  So we
25  made our kind of private veto right

Lykke - Direct

1    contractually whereby a certain number
2    of directors were needed in order for
3    the company to validly resolve certain
4    issues, which was then negotiated
5    heavily.
6        For instance --
7        ARBITRATOR CRAIG: Excuse me, go
8    ahead.
9        THE WITNESS: For instance,
10   certain big investments, debt uptakes,
11   et cetera, et cetera, with thresholds.
12   So that was kind of a veto right I was
13   talking about. The right to --
14       ARBITRATOR CRAIG: Go ahead.
15       THE WITNESS: That was -- when I
16   say "veto right," I mean the ability
17   to -- for the board members not to be
18   overruled in certain well-defined areas
19   which otherwise would be decided by a
20   simple majority, for instance.
21       ARBITRATOR CRAIG: And there
22   were -- there was agreement between the
23   parties that in this arrangement that a
24   super majority would be required for

1        Lykke - Direct
2    contractually whereby a certain number
3    of directors were needed in order for
4    the company to validly resolve certain
5    issues, which was then negotiated
6    heavily.
7        For instance --
8        ARBITRATOR CRAIG: Excuse me, go
9    ahead.
10       THE WITNESS: For instance,
11   certain big investments, debt uptakes,
12   et cetera, et cetera, with thresholds.
13   So that was kind of a veto right I was
14   talking about. The right to --
15       ARBITRATOR CRAIG: Go ahead.
16       THE WITNESS: That was -- when I
17   say "veto right," I mean the ability
18   to -- for the board members not to be
19   overruled in certain well-defined areas
20   which otherwise would be decided by a
21   simple majority, for instance.
22       ARBITRATOR CRAIG: And there
23   were -- there was agreement between the
24   parties that in this arrangement that a
25   super majority would be required for

1        Lykke - Direct
2    certain issues; correct?
3        THE WITNESS: That's correct.
4        ARBITRATOR CRAIG: Is there an
5    identification of what issue would
6    require a super majority?
7        THE WITNESS: Yes.
8        ARBITRATOR CRAIG: And where is
9    that to be found? If you want to look
10   at the --
11       THE WITNESS: Yes.
12       ARBITRATOR CRAIG: -- 2004
13   agreement.
14       THE WITNESS: The 2004 agreement,
15   okay.
16       MR. SILLS: That's tab 16 to the
17   document you have before you.
18       THE WITNESS: Yes.
19       MR. SILLS: Mr. Craig, I don't
20   want to testify for the witness, but we
21   could point to the provision.
22       ARBITRATOR CRAIG: Fine. Help us
23   out.
24       MR. SILLS: Could I direct your
25   attention to page 10 of the document,

1        Lykke - Direct
2    Mr. Lykke.
3        ARBITRATOR CRAIG: It's actually
4    his document.
5        MR. SILLS: I understand. It was
6    just he was paging through it.
7        THE WITNESS: Yeah. Yes, I have
8    it here.
9        ARBITRATOR CRAIG: Now, tell me,
10   my question is, is this the list of
11   issues for which a super majority is
12   required?
13       THE WITNESS: Yes.
14       ARBITRATOR CRAIG: And the super
15   majority that is required here is seven
16   of the nine?
17       THE WITNESS: That's correct.
18       ARBITRATOR CRAIG: Including at
19   least one director from Storm?
20       THE WITNESS: Yes.
21       ARBITRATOR CRAIG: Was there any
22   effort to include other issues on this
23   list that was rejected by Telenor?
24       THE WITNESS: Well, there were
25   quite a bit of negotiation about --

1        Lykke - Direct
2    about the matters, about the thresholds,
3    et cetera. And, in general, I don't in
4    detail remember if there were any
5    particular issues which they tried to
6    negotiate into the detail catalog or
7    which we should not succeed in or
8    whether we found compromises on most of
9    them.
10       ARBITRATOR JENTES: In any event,
11   this what a debated negotiated list, and
12   this is the list that was the result of
13   that negotiation?
14       THE WITNESS: Definitely. This
15   is always, in such joint ventures, is
16   always want to spend the kind of, I
17   don't know which percentage, but you
18   spend an awful lot of time on this
19   particular clause.
20       ARBITRATOR CRAIG: Let me ask you
21   another question about this
22   shareholder's agreement. In the event
23   the shareholder's agreement is silent on
24   a particular subject, but there is a
25   provision of Ukrainian law that imposes

Page 214

Lykke - Direct

1     some requirement on the corporation, if
2     you are the lawyer advising the
3     corporation, would the corporation be
4     required to comply with Ukrainian law?
5          THE WITNESS:  Say that again.
6          ARBITRATOR CRAIG:  It's a
7     hypothetical.  In the event the
8     shareholder's agreement is silent, there
9     is nothing in the shareholder's
10    agreement that you can look to to
11    consult as to what the corporation
12    should do, but there's a law in Ukraine
13    that requires the corporation to do
14    something, whether it's to register,
15    whether it's to have no smoking in your
16    hallways, if it requires minimum wage,
17    if it requires child labor laws, in your
18    judgment as a lawyer, what would be the
19    obligation of Kyivstar?
20         THE WITNESS:  Well, if there are
21    no factors which can lead you to
22    interpret within the contract, something
23    contradictory to that, Kyivstar, being a
24    Ukrainian company, would have to follow

Page 215

Lykke - Direct

1     the law.
2          ARBITRATOR CRAIG:  And Kyivstar
3     is headquartered in Ukraine; right?
4          THE WITNESS:  Yes.
5          ARBITRATOR CRAIG:  And what
6     percentage of its operations are
7     conducted in Ukraine?
8          THE WITNESS:  Almost all.  I'm
9     not quite sure about percentage.  It's
10    clearly Ukrainian.
11         ARBITRATOR CRAIG:  It's a
12    registered Ukrainian company?
13         THE WITNESS:  Yes.  And I think
14    most of its business, if not all of it,
15    is in Ukraine.
16         ARBITRATOR CRAIG:  Now, in the
17    event there is a provision in the
18    shareholder's agreement that conflicts
19    with Ukrainian law, as the lawyer to
20    Kyivstar, how would you resolve the
21    question of what law or what provision
22    governs Kyivstar?
23         THE WITNESS:  Well, not being a
24    Ukrainian lawyer, but in general terms,

Page 216

Lykke - Direct

1     since Kyivstar, they're a party to the
2     agreement, to the shareholder's
3     agreement, it would have to comply with
4     the agreement, and then it would have to
5     consider the Ukrainian relevant law as
6     to whether that could be -- could be,
7     what you call it, could be deviated from
8     or whether it was kind of something you
9     mandatorily have to follow.
10         To clear this up, if it was
11    either criminal or something, but then
12    going through the chain, I guess, from
13    civil law and more procedures and
14    general law which could be agreed
15    around, you could deviate from it, of
16    the shareholder's agreement.
17         ARBITRATOR CRAIG:  But what
18    you're telling me is that it's not a
19    blanket principle that whenever there is
20    a conflict between a provision in the
21    shareholder's agreement and a provision
22    in Ukrainian law, the provision in the
23    shareholder's agreement trumps the
24    provision in Ukrainian law.  You're not

Page 217

Lykke - Direct

1     telling me that, are you?
2          THE WITNESS:  No.
3          ARBITRATOR CRAIG:  Now, I have
4     another question which has to do with
5     your knowledge as to the way in which
6     Storm or Alfa Group ratified the
7     agreement, if any ratification was done.
8     That was negotiated in 2002.  And I'm
9     talking about the voting rights
10    agreement with the attached proposed
11    shareholder's agreement.
12         Are you aware of any actions that
13    Storm or Alfa Group -- actually, I'm
14    asking about Storm here, that Storm took
15    to ratify the approval of that
16    agreement?
17         THE WITNESS:  No.  Not other than
18    in practice of --
19         ARBITRATOR CRAIG:  I'm sorry, I
20    didn't understand you.  At the time in
21    2002, you had officials from Storm
22    signing the agreement, did you not?
23         THE WITNESS:  Yes.
24         MR. SILLS:  You're talking about

55

Page 218

Lykke - Direct

1  the voting agreement?
2      ARBITRATOR CRAIG:  I'm talking
3  about the voting agreement.
4      MR. SILLS:  And the resolutions
5  supporting that, is that what you're
6  asking?
7      ARBITRATOR CRAIG:  I'm asking if
8  there were any other actions taken by
9  Storm officials that you're aware of
10  associated with just signing the
11  document, over and above that, that
12  Storm took to ratify that agreement?
13      THE WITNESS:  I'm not quite sure
14  I understand the question as to what
15  other actions they took except for
16  complying with it.
17      ARBITRATOR CRAIG:  Well, you
18  understand that a representative of
19  Storm signed the agreement; correct?
20      THE WITNESS:  Yes.
21      ARBITRATOR CRAIG:  And on that
22  basis you believe Storm is obligated to
23  comply with the terms of the agreement;
24  correct?

Page 219

Lykke - Direct

1      THE WITNESS:  Yes.
2      ARBITRATOR CRAIG:  Is there
3  anything else, other than the signature
4  on the document, on the agreement
5  itself, that you would point to that
6  says that Storm is obligated to comply
7  with the terms of the agreement?
8      THE WITNESS:  Well, it's a seal
9  on it.  We received important
10  documentation around it.  Is that the
11  kind of thing you're asking about?
12      ARBITRATOR CRAIG:  Yes.  I'm
13  trying to find out what it is you
14  understand was required in 2002 for
15  Storm to certify, if anything, other
16  than just a signature.
17      THE WITNESS:  Well, they have the
18  chairman approving it.  They have an
19  internal process, which was referred to
20  in the certificates of incumbency.
21      ARBITRATOR CRAIG:  Were you aware
22  also that the participants ratified --
23  at a shareholders meeting ratified the
24  agreement?

Page 220

Lykke - Direct

1      THE WITNESS:  Yes.
2      ARBITRATOR CRAIG:  You were aware
3  of that?
4      THE WITNESS:  Yes.
5      MR. O'DRISCOLL:  Mr. Craig, sorry
6  to interrupt.  I just want to clarify
7  one thing.  It may be a language issue.
8  Ratification suggests post-signing
9  approval.  I think you mean presigning
10  approval, is that not correct?
11      ARBITRATOR CRAIG:  Well, I don't
12  know.  It could be either one to me.
13      THE CHAIRMAN:  Go ahead.
14      ARBITRATOR CRAIG:  I will ask you
15  about both.  Were you aware of any
16  actions taken by the shareholders of
17  Storm or the directors of Storm prior to
18  the signature on the document
19  authorizing the signature to be made?
20      THE WITNESS:  Yes.  They have an
21  internal process and attach certain
22  corporate documents showing -- showing
23  approval of the agreements which was
24  attached to the certificates of

Page 221

Lykke - Direct

1  incumbency when it was signed.
2      ARBITRATOR CRAIG:  And after the
3  signature was affixed to the document,
4  are you aware of any other actions taken
5  by Storm shareholders, Storm directors,
6  or officials of Storm, participants of
7  Storm, to ratify the approval or to
8  approve of that agreement?
9      THE WITNESS:  No.  I think that
10  was done in advance.
11      ARBITRATOR CRAIG:  I beg your
12  pardon.
13      THE WITNESS:  I think that was
14  done in advance.
15      ARBITRATOR CRAIG:  In advance?
16      THE WITNESS:  Yes.
17      ARBITRATOR CRAIG:  Okay.  I think
18  I'm done, for the time being.
19      THE CHAIRMAN:  Anything else,
20  Mr. Sills?
21      MR. SILLS:  Can I just have one
22  moment.  If I could just follow up on a
23  few of these questions.

56

Page 222

1            Lykke - Direct
2    BY MR. SILLS:
3        Q.    I'd like to follow up first on
4    Mr. Craig's questions concerning the
5    relationship between Ukrainian law and its
6    requirements and the shareholder agreement
7    and its requirements.  Could you turn to
8    page 13.  I'm sorry.  Could you turn to
9    section 6.03 of the shareholder's agreement.
10           THE WITNESS:  602?
11       Q.    603.
12       A.    Yes.  Okay.
13           ARBITRATOR CRAIG:  Entitled
14   "Amendment of Charter."
15           MR. SILLS:  Right.
16       A.    Yes.
17       Q.    First, with reference to the
18   first sentence of section 6.03A -- I'm sorry,
19   with the first and second sentences.
20           What was the business deal
21   between the parties as to conforming any of
22   the corporate documents to the shareholder's
23   agreement, in the event that there was a
24   problem under Ukrainian law?
25       A.    Well, it was to -- it was to

Page 223

1            Lykke - Direct
2    amend the charter to be consistent with the
3    shareholder agreement.
4        Q.    And let me give a concrete
5    example.  At the time the shareholder's
6    agreement was negotiated and executed, were
7    you aware of any requirement of Ukrainian law
8    that directors of a closed joint stock
9    company be shareholders?
10       A.    No.
11       Q.    I'd like you to assume for the
12   moment that sometime after the agreement was
13   executed in 2004 that such a requirement came
14   into being under Ukrainian law, so that in
15   order to sit on the board of directors of
16   Kyivstar, it was necessary to be a
17   shareholder.
18       A.    Okay.
19       Q.    And I'd also like you to assume
20   that it would be possible for each of the
21   economic owners in the company to create one
22   or more subsidiaries holding one share each.
23   So that each of those subsidiaries would be a
24   shareholder.  Do you understand the
25   hypothetical so far?

Page 224

1            Lykke - Direct
2        A.    Yup.
3        Q.    Under this provision that we're
4    looking at, 6.03, is it your opinion that the
5    parties would be obligated to enter into an
6    amendment to the charter making those new
7    subsidiaries shareholders eligible to be
8    directors, in order to preserve the
9    governance scheme that the parties agreed to
10   in the shareholder's agreement?
11       A.    Before just going through the
12   details there, that would be kind of the
13   obvious interpretation of the generality of
14   the shareholder's agreements that the parties
15   should do, use their best efforts to be able
16   to conform with what have been agreed.
17           And if there came such changes in
18   law in Ukraine, then the parties were
19   obligated to make efforts to solve the
20   problems so that the spirit of the agreement,
21   and the agreement itself, for instance, this
22   five, four number of directors, could be
23   still worked, so to speak, in Ukraine between
24   the parties.
25       Q.    As a general matter, would it be

Page 225

1            Lykke - Direct
2    fair to say that the parties agreed to work
3    within Ukrainian law to preserve and
4    effectuate the governance structure agreed to
5    in the shareholder's agreement?
6        A.    Absolutely.  That was, for
7    instance, the reason for all the wording in
8    the shareholder's agreement about Alfa and
9    Storm being obligated to show up at the
10   general meetings and board meetings when the
11   board --
12       Q.    Could you just repeat the last
13   part of your answer.
14       A.    They were obligated -- in the
15   shareholder's agreement they undertook to
16   show up at board meetings and general
17   meetings.
18       Q.    And that brings me to my next
19   question.  Mr. Craig was asking you about
20   veto rights.  Other than the negotiated veto
21   rights that you and he were discussing
22   calling for a super majority, did Storm ever
23   suggest that it would have the right to veto
24   corporate action by boycotting board or
25   shareholders meetings?

Page 226

Lykke - Direct

1
2    A.    Well, what I heard from
3  Mr. Hansen was that, and this was -- that was
4  something they indicated earlier in
5  negotiations.  We then said that on that
6  basis we are just stopping all negotiations,
7  and then they kind of thought about it and
8  came back and agreed to not use those kinds
9  of tactics.
10    Q.    Continue, please.
11    A.    Yeah.  Then they came back and
12  said they have reconsidered and were willing
13  to waive those kind of legal rights under
14  Ukrainian law.  And we then carefully drafted
15  their obligation to not use that legal right
16  under Ukrainian law in the shareholder
17  agreements, and on that basis we proceeded
18  with the transaction.
19    Q.    **And is that reflected in the**
20  **final section of section 6.03A which reads,**
21  **"The shareholders also agree, to the extent**
22  **permitted by applicable law, to waive any**
23  **rights or privileges granted to them,**
24  **including but not limited to redemption**
25  **rights, rights of first refusal and the like**

Page 227

Lykke - Direct

1
2  **by applicable law or the shareholders that**
3  **conflict or are inconsistent with the terms**
4  **and conditions of this agreement"?**
5    A.    Yes.
6    Q.    **And look, if you would, at**
7  **page 13, clause 2.05B-2.**
8    A.    Yeah.  That was -- that was, by
9  the way, an even clearer undertaking by Storm
10  than the more general one just referred to.
11  And that was just because of this problem.
12    Q.    **You were also questioned by the**
13  **panel, Mr. Lykke, concerning the resolutions**
14  **passed in 2002.  Do you remember that?**
15    A.    Yes.
16    Q.    **And do you have a copy of those**
17  **resolutions with you?**
18    A.    If they're in the kit, I do.
19    Q.    **It was separately e-mailed to you**
20  **last night.  Did you bring that with you?**
21    A.    Yeah, yeah.  Okay.  Yeah, yeah.
22        MR. SILLS:  Mr. Chairman, this is
23    Exhibit L to the evidentiary brief.
24    Q.    **Look, if you would, you see that**
25  **there's a lot of Ukrainian language and then**

Page 228

Lykke - Direct

1
2  **there's, toward the end, there's something**
3  **that says, "Notice regarding resolutions**
4  **adopted by written polling."**
5    A.    Uh-huh.
6    Q.    **Do you have that before you?**
7    A.    No.  Sorry.  I don't have that in
8  front of me, actually.
9    Q.    **Could you turn to it.**
10        ARBITRATOR CRAIG:  No.  He
11    said --
12    A.    I don't have it.
13        ARBITRATOR CRAIG:  What number
14    are we?
15        MR. SILLS:  L.
16        THE CHAIRMAN:  He doesn't have
17    it, Mr. Sills.
18        ARBITRATOR JENTES:  We're talking
19    about the same resolutions that we've
20    been through on the record.
21        MR. SILLS:  Right.
22    Q.    **And it was your understanding**
23  **that in 2002 Mr. Nilov was expressly**
24  **authorized to execute the shareholder's**
25  **agreement; is that correct?**

Page 229

Lykke - Direct

1
2    A.    Yes.
3    Q.    **And other than the two**
4  **certificates of incumbency that you and I**
5  **were discussing a little while ago, did you**
6  **believe that, in light of that express**
7  **authorization in 2002, it was necessary or**
8  **appropriate to obtain any further**
9  **documentation of Mr. Nilov's authority to**
10  **execute the 2004 agreement?**
11    A.    No.  Not really.
12        ARBITRATOR CRAIG:  Does your
13    answer change, Mr. Lykke, if you thought
14    that was a material change in the 2002
15    agreement that was negotiated?
16        THE WITNESS:  Well, if -- if the
17    change would have been very, very
18    material, it could have been out of the
19    question whether one needed further --
20    further resolutions.
21        ARBITRATOR CRAIG:  But I'm giving
22    you the question that it was a material
23    change.  I was asking you to assume that
24    it was a material change between 2002
25    and 2004.  If there was a material

Page 230

```
 1           Lykke - Direct
 2   change between the shareholder's
 3   agreement as drafted in 2002 and as
 4   drafted in 2004, you would agree that
 5   further authorization or additional or
 6   new authorization would be required,
 7   wouldn't you?
 8           THE WITNESS:  Not necessarily,
 9   no.  It would depend on what you mean by
10   "material change."
11           I mean, Mr. Nilov --
12           ARBITRATOR CRAIG:  I'll accept
13   your definition.  Whatever definition
14   you want to make, I'll accept your
15   definition.  And if there's a material
16   change in the text of the agreement
17   between 2002 and 2004, would you, as the
18   lawyer for one of the parties, want to
19   seek new authorization or new authority
20   to enter into that new agreement?
21           THE WITNESS:  For Mr. Nilov as
22   general manager, and based upon the old
23   2002 approvals, it would depend on what
24   is material.  And I would give the
25   general manager a rather big leeway in
```

Page 231

```
 1           Lykke - Direct
 2   those kinds of decisions.  But,
 3   obviously, you come to a point where you
 4   would need a kind of a new -- a new
 5   interim resolution.  And in a way what
 6   happened in 2004 was that Telenor
 7   obtained new certificates of incumbency
 8   from the chairman of Storm confirming
 9   that he did have the authorization.
10           ARBITRATOR JENTES:  Would it also
11   be relevant, in your viewpoint, if the
12   change that was material was adverse to
13   Telenor and favorable to Storm, which I
14   think is the case here?
15           So that do you believe that if
16   Telenor is confronted with a situation
17   where the change is only going to be
18   adverse to it, that it needs to go back
19   and obtain approval from the Storm side
20   of the equation?
21           THE WITNESS:  If the change was
22   detrimental to Storm?
23           ARBITRATOR JENTES:  No.  It's
24   detrimental to Telenor, not to Storm.
25           THE WITNESS:  Well, I would
```

Page 232

```
 1           Lykke - Direct
 2   believe that the threshold for when you
 3   have to go back and seek new approvals
 4   would be influenced by whether it was an
 5   advantage -- a positive amendment or
 6   negative one, so to speak.  I think that
 7   would go into the legal equation.
 8           ARBITRATOR CRAIG:  Could I ask
 9   again, Mr. Lykka, whether you would
10   consult Ukrainian law or New York law as
11   to the definition of what is material?
12           THE WITNESS:  I would go to
13   New York law.
14           ARBITRATOR CRAIG:  And why's
15   that?
16           THE WITNESS:  Because New York
17   law governs the agreements and that's
18   how we have to measure whether it's
19   material or not.
20           THE CHAIRMAN:  Anything else?
21   Thank you very, very much.  We are the
22   beneficiaries of great technology.
23   Thank you, and off the record.
24           (Discussion off the record.)
25           THE CHAIRMAN:  Well, anything
```

Page 233

```
 1           Lykke - Direct
 2   else, Mr. Sills?
 3           MR. SILLS:  I think, other than
 4   the schedule for going forward that the
 5   panel has set out, which is fully
 6   acceptable to us -- there is one very
 7   small matter which is we had asked for a
 8   correction of a small wording error in
 9   the permanent final award.
10           ARBITRATOR CRAIG:  All those
11   corrections were adopted unanimously.
12           THE CHAIRMAN:  There are two
13   errors which will be -- which are
14   corrected but which will be formally
15   corrected in a redistributed order.
16           MR. SILLS:  Thank you.  Other
17   than -- it's always the corporate
18   lawyers who call your attention to those
19   details.
20           THE CHAIRMAN:  No, no.  That's
21   important.
22           MR. SILLS:  Other than that, I
23   think we're done for the day.  I would
24   only thank the panel for being present
25   today.  And we're prepared to move
```

Page 234

```
 1            Lykke - Direct
 2   forward, and we look forward to getting
 3   our papers in to you on the 19th.
 4         THE CHAIRMAN:  Subject to
 5   consulting with my fellow panel members,
 6   the tribunal will promptly issue a
 7   scheduling order, tomorrow morning, to
 8   both you and to Storm highlighting the
 9   January 19th date for submissions.
10         Anything else?  We also thank our
11   witness for coming a great distance.
12   Thank you.  And this arbitration hearing
13   is adjourned.
14         (Time noted:  3:22 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 235

```
 1
 2
 3            C E R T I F I C A T E
 4   STATE OF NEW YORK  )
                         : ss.
 5   COUNTY OF NEW YORK )
 6
 7         I, AMY E. SIKORA, CRR, CSR, RPR,
 8   a Certified Realtime Reporter, Certified
 9   Shorthand Reporter, Registered Professional
10   Reporter, and a Notary Public within and for
11   the State of New York, do hereby certify that
12   the foregoing proceedings were taken before me
13   on December 18, 2006;
14         That the within transcript is a
15   true record of said proceedings;
16         That I am not connected by blood or
17   marriage with any of the parties herein nor
18   interested directly or indirectly in the matter
19    in controversy, nor am I in the employ of any
20   of the counsel.
21         IN WITNESS WHEREOF, I have hereunto
22   set my hand this 20th day of December, 2006.
23
24         _____
              AMY E. SIKORA, CRR, CSR, RPR
25
```

Page 236

```
 1
 2   December 18, 2006
 3            I N D E X
 4   WITNESS    EXAMINATION BY       PAGE
 5   TORSTEIN MOLAND
 6         MR. MUSOFF - Direct     41
 7         MR. SILLS - Direct     140
 8
 9   FREDRIK LYKKE
10         MR. SILLS - Direct     165
11
12          E X H I B I T S
13   CLAIMANT             I.D.   EVID.
14   1    letter to Sigmund Ekhougen,   125
15        undated, signed by Vadim
16        Klymenko, with cc to Robert
17        Sills and Alexei Reznikovich
18   F    Halverson's affidavit       127
19
20
21
22
23
24
25
```

**A**

**AAA (2)**
146:22 151:13
**ability (2)**
205:11 210:17
**able (38)**
22:5,14 71:22,24
76:12 80:2,7,13,18
80:24 81:24 82:3,5
85:13,18 88:13
104:19 108:8,15,23
111:3 113:21
114:10 128:16
130:5,17 134:15,17
134:23 137:24
138:4 139:4 150:20
187:16 205:20,25
208:7 224:15
**absence (1)**
20:12
**absent (4)**
24:25 110:15,23
125:18
**absolute (1)**
143:12
**absolutely (6)**
4:5,25 17:16 23:16
184:5 225:6
**abusing (1)**
23:25
**accept (2)**
230:12,14
**acceptable (2)**
209:24 233:6
**accepted (1)**
55:4
**accorded (1)**
19:5
**account (1)**
154:5
**accountant (1)**
189:21
**accounting (2)**
43:22 141:12
**achieve (2)**
71:22 119:13
**acquire (1)**
208:7
**acquired (1)**
50:25
**acquiring (2)**
71:16 169:21
**act (3)**
107:14 114:10 187:23
**acting (4)**
98:7 100:24 189:21
201:23
**action (16)**

7:15 8:6 9:16 10:5,11
11:7 12:6,10 15:12
15:20 26:16 81:4,12
100:7 111:11
225:24
**actions (9)**
84:25 85:6 111:15
129:20 217:13
218:9,16 220:17
221:5
**active (1)**
33:8
**actively (1)**
204:23
**activities (3)**
84:23 174:14 204:15
**actual (4)**
168:3 179:24 193:21
195:6
**add (3)**
32:8 156:7 162:3
**addition (5)**
43:25 45:18 81:17
108:11 199:12
**additional (4)**
44:25 97:6 172:17
230:5
**additions (1)**
151:10
**address (6)**
148:7 155:7 159:3,9
161:24 162:2
**addressing (1)**
15:25
**adequate (1)**
68:19
**adjourn (4)**
12:4 14:18 28:13
40:21
**adjourned (1)**
234:13
**adjournment (2)**
32:9 147:6
**adjust (1)**
182:2
**adjusted (1)**
58:24
**administration (2)**
63:13 81:11
**adopted (3)**
157:19 228:4 233:11
**advance (6)**
72:21 144:4 149:25
221:11,15,16
**advancing (1)**
33:6
**advantage (1)**
232:5

**adversaries (1)**
21:12
**adverse (2)**
231:12,18
**advice (1)**
124:24
**advise (1)**
167:24
**adviser (3)**
42:23 43:10 109:17
**advising (1)**
214:3
**affect (1)**
79:13
**affidavit (22)**
44:15,21 47:15 54:4
54:14,20 57:12,25
58:11 126:25 127:5
127:12,18 129:5
166:5,8,12,16,18
182:15 185:19
236:18
**affidavits (1)**
156:5
**affiliated (1)**
126:16
**affiliates (5)**
174:2,5,8,9 208:6
**affixed (1)**
221:4
**afraid (1)**
142:25
**agenda (17)**
63:15 72:9 79:8,9,10
96:12,14,16 97:7,20
107:5,15,22,24
108:5 111:2 114:11
**agendas (1)**
97:4
**ago (5)**
114:5 141:17 153:24
164:4 229:5
**agree (5)**
44:19,22 92:16
226:21 230:4
**agreed (22)**
19:23,25 22:17 49:21
55:5,16 123:24
172:13 176:15
183:21 187:12
188:5 192:25
195:13,24 197:24
216:15 224:9,16
225:2,4 226:8
**agreeing (1)**
183:19
**agreement (221)**
13:2,19 19:3,7,11
21:3,23 26:23 27:20

27:21 49:6,9,15,22
50:20 53:20,21,24
54:22 55:10,21
56:11,24 57:6,14
58:16,17,19,22 59:8
59:15,16 60:6,18
66:4 67:11 74:13,21
75:9 77:17 78:7,13
78:15 84:9 95:7
105:2 121:25 122:2
122:4,6,11,15 123:8
123:10,15,18,25
124:11,14,16
148:22 159:11,14
160:6 161:21 162:7
162:11,24 163:6,9
163:10,13 166:24
167:5,9,10 168:22
169:9,25 171:7,22
174:9 175:8,12,24
175:25 177:4,9,19
179:11 180:11,12
180:19,22,25 181:3
181:7,9 182:3,7,13
182:23 183:20,21
184:2,8,9,11,13,14
184:21,23 185:11
185:13,21 186:3,10
186:12,16,20,21
187:5,5,6,11,13,17
187:18,20,22,25
188:3,4,6,11 192:15
192:21,24 193:4,5,6
193:7,11,20,20
194:4,9,9,15,25
195:2,2,19,21 196:4
197:2,23 198:6,25
199:13,18 200:3
201:3,7,12,17,22
202:2,6,11 203:8
205:13,14 206:14
210:23 211:13,14
213:22,23 214:9,11
215:19 216:3,4,5,17
216:22,24 217:8,11
217:12,17,23 218:2
218:4,13,20,24
219:5,8,25 221:9
222:6,9,23 223:3,6
223:12 224:10,20
224:21 225:5,8,15
227:4 228:25
229:10,15 230:3,16
230:20
**agreements (18)**
50:8 102:18 103:2
168:4 174:2,6 176:8
184:17 185:25
190:8,20,24 191:3,9

220:24 224:14
226:17 232:17
**agrees (1)**
25:10
**ahead (4)**
20:22 210:9,15
220:14
**aid (1)**
205:9
**akin (1)**
15:10
**Alex (2)**
204:9,16
**Alexei (3)**
125:10,14 236:17
**Alexey (1)**
198:5
**Alfa (134)**
46:3,5,18,22 47:2,7
47:21 48:18 49:5,16
49:19 50:5,19,22,23
51:2,5,6,10,15,17
52:8,18 53:17 55:5
55:22 56:3,4,8,11
56:21 57:4,4,21
58:23 61:2,9,15
64:8 65:19 66:8,16
67:4 70:4 73:6 84:2
84:4 91:5 92:6
101:5,11,21 102:8
103:10 106:6 109:6
109:24 110:4,6
111:11,14,21,23
114:14 115:23
116:16,16,24
117:24 118:8
129:21 135:25
136:8 140:18
141:11 158:16
168:2 169:17,19,19
169:20 171:4,23
172:4,10,18 173:13
173:15,24 174:18
174:23 175:13
176:6,14 177:21,24
178:5,12 179:15
180:4 188:19 190:4
190:11 193:9
194:11 195:10
197:8,10 200:5,14
200:17,19,25
201:10,19,22 202:4
202:6,12 203:8,21
204:6,11 205:3
206:7,22 207:10,15
208:5,16 209:13
217:7,14 225:8
**Alfa's (7)**
47:23 48:2 50:10,12

64:12 101:8 201:7
**allegation (1)**
77:18
**allotted (1)**
150:25
**allowed (2)**
90:12 202:6
**alongside (1)**
187:19
**Alpren (6)**
8:2 9:13 18:15 21:22
28:20 51:8
**alternative (6)**
12:15,16 25:18 28:13
30:19 31:5
**Alternatively (1)**
32:16
**Altimo (8)**
7:25 9:12 16:7 18:16
21:22,24 28:20 51:8
**Altimo's (1)**
16:7
**ambassador (1)**
62:20
**ambition (1)**
62:4
**ambitions (1)**
64:7
**amend (2)**
183:25 223:2
**amendment (6)**
157:18 193:15,18
222:14 224:6 232:5
**amendments (4)**
114:6 122:4 123:22
192:13
**America (1)**
205:16
**American (5)**
7:20 43:16 136:10,20
140:8
**Amy (5)**
1:25 41:15 165:4
235:7,24
**analysis (6)**
102:16 104:19 105:9
105:14 106:3,6
**ANDERSON (1)**
2:25
**angry (1)**
62:14
**annex (2)**
58:4 188:4
**annexed (5)**
57:11 168:20 184:8
184:13 193:7
**announce (1)**
97:24

**answer (17)**
6:4,4 16:3 30:11
31:18 55:25 75:6
79:21 91:22 121:2
122:8 146:18 161:7
164:9 194:20
225:13 229:13
**anticipated (3)**
15:18 169:8 181:4
**Anybody (1)**
32:7
**anymore (1)**
110:4
**anyplace (1)**
20:6
**anyway (1)**
196:3
**apologies (1)**
183:10
**apologize (2)**
36:19 191:17
**apparent (1)**
13:4
**apparently (2)**
17:15 37:7
**appeal (6)**
5:13 15:5 117:14,22
118:7 157:25
**appealed (3)**
6:13 19:17,18
**Appeals (1)**
117:18
**appear (7)**
6:20 23:4 28:21 95:19
110:7,14 112:18
**appearance (1)**
117:13
**appears (11)**
7:7 16:9 37:10 40:15
75:20 94:25 96:24
110:21 121:9
126:18 185:12
**appellate (11)**
6:6 18:21 30:10
115:16 116:3,5,13
116:19 117:17
118:12 120:2
**appendix (1)**
146:2
**applicable (6)**
156:24 157:8 159:8
159:12 226:22
227:2
**application (11)**
12:3 16:25 17:8 18:9
24:4,15 31:21 38:5
124:20 176:15
177:21
**applications (1)**

178:18
**applies (1)**
156:18
**apply (8)**
4:3 6:19 8:15 16:5
173:14 178:3,8,9
**applying (1)**
164:11
**appoint (2)**
57:7 100:5
**appointing (1)**
58:22
**appointment (1)**
134:8
**appreciate (3)**
142:19 155:13 205:7
**approach (6)**
5:5 25:6 91:15 145:14
147:5 160:17
**appropriate (5)**
21:5 34:16 118:11
147:23 229:8
**approval (22)**
70:14 71:7,8,9,10,14
71:16 96:20 108:9
131:13 132:2,20
133:11,16,19 155:3
217:16 220:10,11
220:24 221:8
231:19
**approvals (2)**
230:23 232:3
**approve (3)**
87:18 131:11 221:9
**approved (11)**
107:22 113:6,8
132:16,23,25
133:18,23 134:4,4,9
**approving (1)**
219:19
**April (26)**
54:2,3,21 55:3,22
56:7 72:11 76:8
77:14 78:12,20 79:5
79:13 89:8 94:7,9
95:3,4,5,8 96:20
168:18,23 204:22
208:3,4
**arbitrate (7)**
13:2 26:24 27:22
162:25 163:6,9,14
**arbitration (58)**
1:2,2 3:4,5,14 9:18,22
11:9 12:11 13:7,12
13:22 18:7 19:3,6
20:2,3,4 21:8 22:18
23:19 24:3 26:14
27:16,17 30:21,25
44:16 59:12,16,17

59:18 60:16 66:5
121:18 122:14,24
158:10,14,21,23
159:7 160:23 161:3
161:17 162:6,9,12
162:19,19 163:10
163:11 187:4
206:12,15,24
207:19 234:12
**arbitrator (307)**
1:19,20 3:23 4:6 7:10
7:19 9:10 10:8
11:12,21 14:17 25:4
25:16,24 26:3,6,8
26:25 27:9,23 28:6
28:9 29:4,16 30:16
32:6 35:19,25 36:17
37:3,19 39:11,17
41:12 45:11 46:6,10
50:3,7,18 51:9,25
52:5,8,16,17,20,25
54:9,17,19,25 55:6
55:12,19 56:6 57:16
58:8,13 59:21 60:3
60:8,22 61:8,14,17
63:24 64:6,18,23
65:2 66:18 67:18,25
68:3,7,14,18 69:10
69:21 70:16,21 71:4
72:15,25 73:12,15
74:18 76:7,18 77:2
77:6,8,13,14,23
78:2,5,18,22,25
81:21 82:7,15,22,25
83:12,17 84:2 87:11
87:16,22 88:2,10,15
88:24 89:5 91:13,14
91:18,23 92:3,8
94:3,25 96:4 98:10
98:15,19,25 99:6,10
99:15 100:25
101:14,17 102:3,14
103:24 104:6,18
105:6 108:19,25
109:12 110:13,18
110:25 111:6,16
112:11,17 114:16
114:20,25 115:7
116:21 117:8
120:24 121:13
122:12 125:25
126:4,6,7,11 127:7
127:17,22 128:5,24
129:7,11,17 130:2
131:9,18,24 132:4
132:12,18 133:2,5,9
133:12,14,22 134:2
135:17 136:4,24
137:3,6,9,12,22

138:5,10,19 139:6
139:10,16,22 140:9
143:2,6,12 144:2,14
151:4,14,24 152:6,8
152:18,23 153:21
155:9 156:7 159:5
162:3 178:21,24
181:11 182:10,14
182:19 183:2
184:22 185:2,8,15
186:23 191:13,18
191:22 192:8
194:19 196:8,11,21
202:21 203:5,14,18
204:5,10,19 205:4
206:5,11 207:12,21
207:24 208:12,15
208:19 209:6,12
210:8,15,22 211:4,8
211:12,22 212:3,9
212:14,18,21
213:10,20 214:7
215:3,6,12,17
216:18 217:4,20
218:3,8,18,22 219:3
219:13,22 220:3,12
220:15 221:3,12,16
221:18 222:13
228:10,13,18
229:12,21 230:12
231:10,23 232:8,14
233:10
**arbitrators (2)**
16:13,14
**area (1)**
105:24
**areas (2)**
81:10 210:19
**arguably (1)**
18:10
**argued (3)**
31:12 134:22 162:25
**arguing (1)**
31:11
**argument (10)**
12:9 18:18 24:15
40:17 120:14
122:19,21 145:20
150:9 157:24
**arguments (2)**
33:6 35:8
**arising (1)**
125:4
**arrange (1)**
40:2
**arrangement (1)**
210:24
**arrangements (1)**
180:21

**arrive (1)**
206:22
**Article (5)**
6:19 33:2 37:21 151:2
151:15
**articles (2)**
181:5,10
**articulated (2)**
27:4 102:5
**ASA (4)**
137:8,8,14 165:17
**aside (2)**
17:9 119:11
**asked (9)**
5:24 9:23 44:10 80:15
94:18 153:2 154:17
167:19 233:7
**asking (13)**
5:5 25:19 31:25 36:8
36:9 79:19 162:2
217:15 218:7,8
219:12 225:19
229:23
**asks (1)**
40:18
**aspect (2)**
178:9 205:24
**aspects (2)**
144:5 178:14
**assets (3)**
21:24 22:4 23:14
**assist (1)**
167:19
**assistance (2)**
61:2 80:21
**assisting (1)**
48:9
**associated (1)**
218:11
**assume (8)**
20:11 34:8 94:7 154:9
162:5 223:11,19
229:23
**assumed (1)**
39:5
**assuming (1)**
159:25
**attach (1)**
220:22
**attached (8)**
54:10,13 55:7 135:11
182:15 203:7
217:11 220:25
**attachment (2)**
184:24 188:2
**attachments (1)**
202:25
**attack (4)**

15:15 19:22 29:2
121:25
**attacked (1)**
140:19
**attempt (4)**
92:9 107:2 134:21
136:8
**attempting (4)**
9:15,21 11:5,6
**attempts (1)**
106:3
**attend (31)**
70:4 71:21 72:6,17
73:4,25 74:21,22
75:2 76:21,23 77:9
78:11 79:4,12,15,20
85:22 87:13 93:7,10
93:12 97:13 98:8
99:2,12,16,22
101:12,23 109:21
**attendance (2)**
93:21 112:8
**attended (2)**
97:9 102:21
**attendees (1)**
100:3
**attending (9)**
65:10 74:12 75:12,14
76:4 100:21 102:12
111:12 131:23
**attention (9)**
11:16 45:3 65:12 96:6
106:22 113:25
142:10 211:25
233:18
**attesting (1)**
199:14
**attorney (4)**
164:5 166:21,22
167:2
**attorneys (1)**
156:6
**audited (3)**
71:8 131:12,14
**auditors (1)**
140:25
**August (2)**
106:11,11
**authorities (2)**
136:11,21
**authority (8)**
131:6 158:12 159:13
190:7 199:4,15
229:9 230:19
**authorization (5)**
229:7 230:5,6,19
231:9
**authorized (4)**
200:2 201:16,21

228:24
**authorizing (1)**
220:20
**automatically (2)**
4:16 10:18
**autonomy (3)**
157:22 158:20,24
**available (6)**
40:3 41:11 94:14
142:21,24 143:22
**Aven (2)**
46:4 51:19
**Avenue (3)**
1:10 2:4,17
**avoid (1)**
20:8
**Avon (1)**
46:10
**award (20)**
13:3 22:21,22 26:11
26:21 27:6,25 151:6
151:8,21 152:2,3,9
152:13,13,16 153:7
153:11 154:16
233:9
**aware (8)**
13:11 27:15 63:21
109:19 166:18
171:4 217:13
218:10 219:22
220:3,16 221:5
223:7
**awful (1)**
213:18
**A-V-E-N (1)**
46:12
**A-V-O-N (1)**
46:8
**a.m (2)**
1:12 3:18

_____
B
_____
**B (3)**
1:17,20 236:12
**back (27)**
17:15 22:6 25:5 29:8
29:13 38:15 79:17
92:17,19 103:21,25
115:14 118:20
123:3 126:2 127:8
135:5,14 189:14
193:15 194:20,23
202:22 226:8,11
231:18 232:3
**background (1)**
42:4
**backs (1)**
120:22
**backup (1)**

181:17
**Baksaas (1)**
106:13
**ballot (1)**
92:11
**ballots (1)**
91:20
**Bank (9)**
43:5 46:5 51:5 52:18
55:5,23 203:8 208:5
208:16
**banks (1)**
135:10
**barred (2)**
35:6,11
**barring (1)**
7:3
**based (6)**
44:18 62:5 124:23
188:19 195:7
230:22
**basic (1)**
55:15
**basically (13)**
108:24 169:12 172:25
173:25 179:8
184:10,17 187:11
188:3 189:9,13
196:14 208:25
**basis (6)**
12:25 14:11 67:4
218:23 226:6,17
**Bear (2)**
121:10 168:5
**becoming (1)**
169:4
**bed (1)**
143:11
**beg (1)**
221:12
**began (4)**
104:3,4,21 202:23
**begs (1)**
160:10
**behalf (7)**
3:9 169:20 171:24
189:13 198:22
201:23 203:15
**behaved (1)**
50:23
**behavior (1)**
106:19
**believe (45)**
18:9 19:20,21 20:23
40:12 43:14 54:23
56:18 57:11 58:3
61:6,20 62:3 63:19
64:19 66:8 68:11
90:9 91:9 92:4

94:13,17 97:15
106:16 111:20
117:3,14,17,23
118:24 128:3
130:18 134:25
135:10 141:16
146:25 151:22
182:16 191:20
200:18 204:18
218:23 229:6
231:15 232:2
**believes (2)**
23:18 36:10
**bench (1)**
155:6
**beneficiaries (1)**
232:22
**benefit (2)**
87:3 145:8
**best (4)**
3:8 106:17 158:11
224:15
**better (2)**
85:13,16
**beyond (2)**
15:20 192:22
**big (6)**
43:16 47:4 52:14
131:3 210:11
230:25
**Bill (2)**
133:13 151:25
**Bill's (1)**
11:3
**binder (3)**
41:10 69:24 128:3
**binding (2)**
10:18 190:21
**binds (3)**
4:16 8:12 18:24
**bit (9)**
42:3 130:2 135:2,19
160:11 173:2
203:22 205:8
212:25
**blame (1)**
126:10
**blanket (1)**
216:20
**blockage (1)**
135:25
**blocked (1)**
129:8
**blocking (1)**
49:23
**blood (1)**
235:16
**board (118)**
44:11 45:16 58:23

62:22 63:2,3,7,12
63:16,21 65:8,10,16
65:21 67:5 70:3
71:21 72:6,9,10
73:14,23,25 76:5
79:5,13,18,20 80:20
85:14,16,17 87:2,12
87:14,18,21,23,25
88:16,22 89:2 91:20
93:2,7,10,13,21
97:6,6,23 98:4,4
100:6,21,24 101:12
101:22 103:22
104:14 105:3 107:3
107:5,14,21 108:5,6
108:16 109:21,23
110:7,9 111:4,4,12
112:9 113:11,17
114:9,23 115:5,25
116:14 118:2 119:6
119:15,20,21 120:5
121:7,23 123:6
124:9 126:15,20
128:12,15,25
129:13,15,16,22
131:11,13 132:2,23
134:10 141:4 170:8
170:14,19 194:12
210:18 223:15
225:10,11,16,24
**Bob (1)**
19:16
**bonuses (1)**
108:20
**book (2)**
191:14 194:18
**books (1)**
140:20
**born (3)**
52:3,25 53:3
**borrow (2)**
71:12 82:3
**borrowed (1)**
88:18
**borrowing (3)**
88:17 89:24 90:13
**bottom (3)**
58:6,7 59:6
**bought (1)**
47:2
**bound (4)**
7:11 21:22 36:4
173:23
**boycott (13)**
67:5 85:22 87:2 89:13
89:22 90:5,18
101:21 102:6 104:2
104:20,25 116:6
**boycotted (1)**

88:6
**boycotting (2)**
65:20 225:24
**branch (1)**
83:5
**brand (1)**
103:4
**branding (1)**
130:21
**breach (2)**
78:14 172:15
**break (7)**
57:15 106:8 121:12
142:17,19 145:6
149:20
**bridge (2)**
162:21 163:13
**brief (19)**
3:17,22 24:23 32:8
35:21 42:16 57:13
120:25 145:8
150:13 153:23
154:7,24,24 157:14
158:7 161:7 164:6
227:23
**briefed (2)**
158:4,5
**briefer (1)**
143:19
**briefing (1)**
148:5
**briefly (7)**
79:2 84:6 96:8 116:23
128:10 165:21
167:12
**briefs (1)**
148:12
**bring (4)**
10:5 58:2 124:21
227:20
**bringing (4)**
9:14,15 46:22 112:16
**brings (1)**
225:18
**Broad (1)**
2:10
**broader (4)**
103:8 105:4,18,20
**Brothers (1)**
167:21
**brought (5)**
16:19 111:22 117:2
142:9,9
**Brundtland (1)**
42:24
**budget (6)**
104:17 107:11 108:13
133:11,16,20

**built (1)**
69:6
**burden (1)**
33:5
**business (30)**
44:7 52:15 70:8,15
71:7 84:16,20 91:21
103:11 106:7,18
108:11 131:8
132:20 135:7
141:11 167:13
168:2,25 170:4,6,17
179:17 183:16
186:9,11 195:23
204:17 215:15
222:20
**businesses (2)**
52:13 71:2
**buttressed (2)**
4:19 13:18
**buy (1)**
202:7
**buying (2)**
47:7 50:22

**C**
**C (4)**
2:2 185:18 235:3,3
**calendar (1)**
149:9
**call (10)**
39:23 62:9 72:8 75:3
114:23 153:20
164:20 173:4 216:8
233:18
**called (8)**
36:24 41:14 63:7
74:25 117:17,23
165:3 172:11
**calling (2)**
11:15 225:22
**capability (1)**
206:8
**capable (1)**
36:7
**capital (7)**
81:19,23 134:25
135:3,16 200:14,17
**caption (1)**
21:13
**care (1)**
143:9
**career (1)**
53:5
**carefully (2)**
10:4 226:14
**carry (1)**
175:7

**carveout (1)**
172:14
**case (19)**
6:10 16:19 17:24 18:3
20:24 24:12 33:4
34:17 36:21,24
38:14,16 80:12 82:6
88:21 118:5 122:22
163:24 231:14
**cases (2)**
23:6 157:15
**cash (1)**
22:3
**catalog (1)**
213:6
**cater (1)**
209:23
**cause (3)**
6:16,21,25 7:2 9:15
11:5,6 15:5 87:7
**caused (2)**
86:25 105:8
**cc (3)**
125:9,13 236:16
**Central (1)**
43:5
**CEO (1)**
53:10
**certain (10)**
157:4 172:7 188:6
202:8 210:2,4,11,19
211:2 220:22
**certainly (2)**
147:17 150:19
**certificates (6)**
199:17,22 219:21
220:25 229:4 231:7
**Certified (2)**
235:8,8
**certify (2)**
219:16 235:11
**cetera (6)**
35:9 137:17 171:12
210:12,12 213:3
**CFO (8)**
43:4,7,13,15 44:2,6,7
45:16
**chain (3)**
192:2 216:13
**chairman (116)**
1:18 3:2,22 10:22
11:2,22 12:14 13:23
14:4 15:22,24 19:15
20:9,15 26:2 28:12
32:7,13 33:22 34:3
34:18 35:12 37:4
39:12,16 40:10,20
40:23,25 41:3 73:22
75:23 76:3 85:20

86:3,10 89:10,16,19
90:3,6,15,16,21
92:22 93:14,15
97:14,21,23,25 98:3
98:6,8,8 100:24
102:2 109:18
111:17,19 120:9,12
120:13 121:11
125:6,17,21 126:24
127:3 128:22
129:16 140:2,11
141:15 142:6,12,15
142:22 143:14
145:4 147:4 148:8
149:2,7,12 150:2,11
150:14,18,22
152:22 153:15
164:16,20,22 168:6
168:7 183:5,11
185:6 188:23
197:14 202:15,17
207:23 219:19
220:14 221:20
222:22 228:16
231:8 232:20,25
233:12,20 234:4
**challenge (1)**
134:19
**challenging (1)**
141:7
**CHANG (1)**
2:20
**change (26)**
6:9 8:17 180:16
193:12 194:4,10
195:6,7,9,13,14,18
195:23 196:7 197:9
229:13,14,17,23,24
230:2,10,16 231:12
231:17,21
**changed (1)**
158:2
**changes (14)**
167:8 181:5,8 187:14
193:2,11,16,20
194:8,25 195:3
197:2 201:5 224:17
**characterized (1)**
154:11
**chart (1)**
121:9
**charter (15)**
67:14 77:18,19 114:6
121:21 122:5
123:12,14 180:17
183:24,25 201:6
222:14 223:2 224:6
**check (1)**
152:19

**Chicago (1)**
143:2
**chief (7)**
45:14 68:23,24,25
69:2,4 189:21
**child (1)**
214:18
**children (2)**
143:10,10
**choice (4)**
157:24 159:15 161:2
176:24
**choose (3)**
20:5 124:21 160:13
**chose (2)**
5:20 160:14
**chosen (1)**
160:21
**chronological (1)**
91:15
**chronologically (3)**
91:11 92:20 106:21
**chronology (4)**
126:3,8,14 127:25
**Circuit (1)**
18:22
**circulation (1)**
146:20
**circumstances (3)**
37:22 38:7 172:9
**circumvent (1)**
174:13
**cite (1)**
157:15
**cited (1)**
6:17
**citizen (1)**
124:5
**citizens (1)**
142:3
**City (3)**
59:19 117:18 206:16
**civil (1)**
216:14
**claim (7)**
22:19 38:14,24 112:2
121:10 190:17
201:10
**claimant (8)**
1:4 2:3 3:7 125:11
127:4 146:10,12
236:13
**claiming (2)**
125:19 201:20
**claims (1)**
17:18
**clarification (7)**
12:21 13:10 25:23

27:13 29:9,14,19
**clarify (4)**
29:10 47:12 90:14
220:7
**clarifying (1)**
116:13
**clarity (3)**
39:4 90:22 115:18
**clause (16)**
13:22 27:16 30:25
59:16 84:9,12
162:19 171:21
172:8,17 174:13
184:17 186:3
206:12 213:19
227:7
**cleaning (1)**
193:23
**clear (27)**
14:9 17:17 23:16
26:19 27:2,14 33:24
34:10,20 37:22
38:11,23 39:7 57:20
64:10,16 76:17
94:22 95:22 125:23
149:22 161:8 164:9
195:5 202:10
206:18 216:11
**cleared (1)**
23:21
**clearer (1)**
227:9
**clearly (1)**
215:11
**clerical (1)**
95:20
**close (12)**
31:11,20 34:7 36:12
36:13 37:23 40:19
48:3,14 51:22 85:11
155:5
**closed (4)**
34:13 36:6 37:13
223:8
**CLR (1)**
1:25
**cognizance (1)**
125:2
**collateral (1)**
19:22
**collaterally (1)**
29:2
**colleague (2)**
41:5 125:18
**colleagues (1)**
153:2
**collected (1)**
41:8
**collection (1)**

153:25
**collectively (1)**
208:6
**collusive (5)**
17:18 19:21 23:5
163:18 164:14
**come (15)**
18:25 38:15 57:18
65:9 72:21 79:17
92:19 157:3,7
159:20 160:2,3
193:9 194:3 231:3
**comes (5)**
80:6 130:13,15
138:16 153:5
**comfortable (1)**
41:24
**coming (8)**
30:23 69:17 102:7
114:21,22 141:25
142:13 234:11
**comment (3)**
33:10,23 192:22
**commercial (7)**
60:6 117:24 118:4,13
118:15 167:17,18
**Commission (1)**
135:23
**communicated (2)**
76:15 140:24
**communication (3)**
43:23 68:13 171:9
**communications (4)**
1:3 3:6 57:21 100:16
**companies (8)**
47:11 51:8 83:9
138:25 174:12,14
174:15 200:19
**company (68)**
43:16 46:21 47:22
48:4,8,9 51:14,17
52:10,12 56:4 63:4
65:22 67:8,23 68:10
68:20 69:7 71:12
75:4 79:25 81:7,16
82:2,5 83:13,18,20
84:15 87:7 93:4
96:18,21 98:14,16
100:8 101:25 107:9
109:16,17,25
117:21 119:17
123:7 124:19 130:8
130:10,13,24 131:5
135:6,8 163:22
164:3 172:5,11,20
173:6 179:19
181:24,24,25
205:20 210:4
214:25 215:13

223:9,21
**company's (2)**
205:10,11
**comparable (1)**
151:12
**compete (1)**
173:16
**competent (1)**
5:17
**competing (1)**
171:18
**competition (3)**
83:2 86:11,24
**competitor (4)**
83:5 84:24 86:13
173:8
**competitors (4)**
84:7,18,21 87:3
**completely (2)**
57:20 180:8
**complicated (1)**
115:10
**complied (3)**
151:9 190:19 191:8
**comply (8)**
114:7 136:19 151:16
178:17 214:5 216:4
218:24 219:7
**complying (2)**
135:20 218:17
**component (1)**
100:10
**composition (1)**
170:19
**compromise (3)**
120:10,19 195:7
**compromises (1)**
213:8
**conceive (1)**
6:25
**concept (3)**
7:20 13:13 185:23
**concern (1)**
22:25
**concerned (2)**
31:20 68:20
**concerning (6)**
3:14 89:24 171:6
173:12 222:4
227:13
**conclude (1)**
159:10
**concluded (2)**
49:4 53:15
**conclusion (4)**
9:11 11:4 156:19
207:8
**conclusions (9)**

145:9,15,19 148:13
150:7,10 154:18,21
155:4
**concrete (2)**
92:13 223:4
**condition (1)**
202:12
**conditions (1)**
227:4
**conducted (2)**
161:4 215:8
**conference (1)**
24:9
**conferred (1)**
32:14
**confidence (1)**
153:7
**confident (1)**
22:4
**confidential (1)**
173:4
**confirm (1)**
189:20
**confirmation (2)**
19:8 119:12
**confirmed (2)**
115:20 189:14
**confirming (1)**
231:8
**conflict (3)**
106:15 216:21 227:3
**conflicts (2)**
189:25 215:19
**conform (3)**
122:5 123:13 224:16
**conforming (1)**
222:21
**confronted (1)**
231:16
**connected (1)**
235:16
**connections (1)**
69:9
**consent (3)**
90:12 123:22 201:7
**consenting (1)**
187:21
**consequence (1)**
189:15
**consequences (1)**
13:20
**consider (6)**
13:6 29:12 35:13
195:18 196:6 216:6
**consideration (1)**
33:12
**considered (1)**
50:2

consistent (1)
223:2
consolidate (5)
134:16,17,23 140:20
141:8
consolidated (1)
132:10
consolidation (1)
140:15
consult (4)
32:10 196:13 214:12
232:10
consultants (2)
106:15 136:17
consulted (2)
145:6 158:12
consulting (1)
234:5
contained (1)
27:22
contains (1)
90:15
contempt (2)
18:10 23:13
contend (1)
201:10
content (3)
23:17 49:8 78:12
contentions (1)
155:8
contents (1)
49:7
contested (1)
20:19
context (3)
16:19 94:23 95:22
continuation (1)
3:3
continue (10)
15:20 106:20 135:18
148:2 155:15
156:10 159:23
176:25 177:2
226:10
continued (2)
68:15 116:7
continuing (2)
30:18 35:8
contract (7)
31:3 134:3,9 177:14
178:3 189:24
214:23
contracts (2)
134:7 165:25
contractually (1)
210:2
contradictory (1)
214:24

contrary (1)
123:11
contribution (1)
153:22
control (6)
65:22 67:8 80:24
138:17,18 196:2
controlled (5)
50:24 51:18 55:22
56:8,21
controllers (1)
81:3
controlling (8)
4:9 43:22 51:3 56:5
57:22 130:15
156:13 170:7
controversy (2)
157:9 235:19
convenience (1)
120:23
convenient (1)
73:11
conversation (2)
65:3 153:18
conversations (2)
63:25 93:11
Conversely (1)
156:21
convince (1)
109:20
cooperation (1)
105:23
copies (1)
41:11
copy (15)
30:4 56:24 77:3,15
94:18,21,24 95:16
96:3 147:2 153:3
182:7 192:4 197:16
227:16
copying (1)
183:11
core (1)
156:12
corporate (19)
18:5 21:18 23:9,24
50:13 91:21 117:6
117:20 125:5
170:10,14 179:23
181:17 205:10
209:22 220:23
222:22 225:24
233:17
corporation (5)
214:2,4,4,12,14
corporations (1)
173:16
correct (30)

28:15 35:23 62:23
77:25 97:16,17
98:17 107:15 129:4
146:16 152:13
186:24 191:24
192:9 195:4 198:4
198:10 199:24
203:11,16 205:22
206:2 208:17 211:2
211:3 212:17
218:20,25 220:11
228:25
corrected (2)
233:14,15
correction (2)
151:10 233:8
corrections (2)
151:11 233:11
correctly (1)
154:11
correspondence (2)
24:7 95:25
Coudert (1)
167:21
counsel (20)
5:17 8:4 61:2,5,9,15
124:24 165:17,23
167:14,20,22,23
168:3 188:15,18
198:3 204:16 205:3
235:20
counsels (1)
75:6
counterparty (1)
169:15
countries (4)
139:7,9,11,17
country (3)
7:5 77:12 139:14
COUNTY (1)
235:5
couple (6)
58:2 68:10 87:12
92:14 114:4 200:22
coupled (1)
145:16
course (27)
5:23 12:6 14:20 38:9
43:21 78:24 81:15
86:20 91:17 103:18
123:19 136:22
155:7 156:17,23
157:2 158:7 161:8
166:17 173:11
174:12,17,24 178:6
178:23 188:9
198:22
court (55)
4:11,12 5:12,15,20

7:4,8 8:15 9:5 12:5
12:13,22 15:3 16:7
17:8 23:5 25:8
27:14,18 28:21,24
29:8 30:7 31:3
71:20 113:16 114:7
115:2,4,8,13,18,21
116:3,5,8,13 117:4
117:15,18,24,25
118:4,9,13,16 121:4
128:14,17 141:23
154:22 155:6
157:22 163:19
179:7
courts (18)
3:25 6:2 13:6,11,14
21:7 23:23 24:2
27:15 28:14,17
30:10 120:2 124:21
124:23,25 146:4
162:10
court's (2)
18:19 26:13
cover (5)
174:4,19 208:2
covered (2)
127:11 181:12
covering (1)
174:7
covers (1)
174:2
co-headquarters (1)
22:2
CPLR (1)
153:3
Craig (209)
1:20 7:10,19,23 26:6
29:4,16 35:25 36:14
36:17,21 37:3 41:12
45:11 46:6,10 52:17
52:20,25 54:9,18,19
54:25 55:6,12,19
56:6,16,23 57:16
58:12,13 61:14,17
63:24 64:6,18,23
65:2 66:18 70:16,21
71:4 72:15 74:18
76:7 77:8,14,23
78:2,5,18,22,25
82:7,15,22,25 83:12
83:17 84:2 85:8
87:11,16,22 88:10
88:15,24 89:5 91:14
91:18,23 92:3,8
94:3,16,25 95:12
96:4 98:10,15,19
100:25 101:14,17
102:3,14 103:24
104:6,18 108:19,25

109:12 110:13,18
110:25 111:6,16,20
112:11,17 114:16
114:20,25 115:7,17
116:21 117:8
120:24 121:13
122:12 126:4,7
127:17,22 128:5
133:12 137:9
138:10,19 139:6,10
139:16 140:9
143:12 151:4,24
152:8,18,23 153:21
155:9 156:8 178:21
178:24 181:11
182:10,14,19 183:2
184:22 185:2,8,10
185:15 186:23
191:13,18,21,22
192:8 194:19 196:8
196:11,21 207:23
207:24 208:12,15
208:19 209:6,12
210:8,15,22 211:4,8
211:12,19,22 212:3
212:9,14,18,21
213:20 214:7 215:3
215:6,12,17 216:18
217:4,20 218:3,8,18
218:22 219:3,13,22
220:3,6,12,15 221:3
221:12,16,18
222:13 225:19
228:10,13 229:12
229:21 230:12
232:8,14 233:10
Craig's (3)
37:20 84:5 222:4
Cravath (1)
16:9
create (1)
223:21
created (1)
134:5
creditors (1)
43:24
criminal (1)
216:12
critical (3)
157:17 160:24 202:11
cross (1)
172:23
crossed (2)
162:21 163:12
cross-examination (...
155:23
cross-examine (2)
38:17 156:3
CRR (3)

1:25 235:7,24
**CSR (3)**
1:25 235:7,24
**curious (2)**
102:4 116:22
**current (5)**
23:4 61:24 81:11 82:8
135:24
**currently (3)**
42:9,11,13
**customary (4)**
158:9 161:15,16
162:18
**customer (1)**
130:19
**customers (1)**
81:8
**Cypress (2)**
163:22 164:2

---

**D**

**D (14)**
2:24 41:13 54:10,21
55:2 58:10 60:9,24
165:2 185:5,6,7,8
236:3
**damage (3)**
84:19 86:25 87:7
**damaged (1)**
85:6
**date (18)**
28:25 56:17,20 70:5
89:6,9 96:24 104:2
115:7 121:3 125:15
126:19 127:6
146:14 148:10
149:13 199:17
234:9
**dated (7)**
54:2 55:3 95:8 168:18
168:23 199:17
208:3
**dates (2)**
25:22 63:22
**David (3)**
185:9 188:12 189:13
**day (9)**
19:17 72:22 113:5,7,9
153:14,14 233:23
235:22
**days (2)**
5:13 146:23
**deadline (5)**
15:4 149:14,17
151:12 153:6
**deadlines (1)**
151:9
**deal (13)**

20:8 22:17 39:19,22
57:2 106:5 139:22
139:23 140:5 153:8
188:12 204:6
222:20
**dealing (1)**
51:12
**dealings (2)**
190:3 198:23
**debate (1)**
24:8
**debated (1)**
213:11
**debates (1)**
7:7
**debt (2)**
193:3 210:11
**December (26)**
1:12 3:19 4:10,21 5:3
5:7,10,21 6:11 8:22
8:25 9:6,7 12:12
24:5 25:13 26:2
32:5 33:15 35:7
104:16 127:13
165:16 235:13,22
236:2
**decide (6)**
31:3 34:16 38:19
63:12 161:12
181:19
**decided (11)**
6:14 29:7 37:6 73:25
85:22 88:8 104:17
160:9 171:24
176:25 210:20
**decides (1)**
34:15
**decision (19)**
37:18 38:21 70:13
71:18 80:20 108:13
113:17 114:8
116:12 117:15
118:17 122:23
128:14 147:19
156:14 161:11
163:5,7 202:9
**decisions (17)**
70:25 71:25 75:5
97:10 102:23 108:8
108:16,23 110:9
111:4,5 113:8 130:6
164:15 170:14
209:20 231:2
**decision-making (1)**
116:19
**declaration (2)**
112:7 117:5
**default (2)**
6:18 32:25

**defendant (4)**
10:7,12,24,25
**defendants (1)**
21:14
**defended (1)**
112:24
**defense (2)**
22:18 38:16
**deferring (1)**
14:5
**deficiency (1)**
201:2
**Definitely (1)**
213:14
**definition (6)**
119:22 174:4 230:13
230:13,15 232:11
**degree (1)**
80:25
**delay (7)**
9:17,22 11:8 16:25
18:6 21:8 36:23
**delays (2)**
16:21,22
**deliberations (1)**
146:6
**demand (2)**
31:17 95:16
**demonstrate (1)**
67:7
**denied (3)**
17:6 32:16,19
**department (1)**
42:7
**departments (1)**
81:3
**depend (2)**
230:9,23
**depending (1)**
150:23
**depends (1)**
117:10
**deputy (5)**
97:14,21 98:3 111:17
111:19
**describe (7)**
63:10 116:10 165:21
167:12 168:19
170:3 183:15
**describes (2)**
58:25 126:23
**describing (1)**
96:2
**design (1)**
18:5
**designate (2)**
157:23 158:25
**designated (2)**

155:20,22
**designating (1)**
161:21
**designing (1)**
154:4
**desired (1)**
208:16
**desires (1)**
32:23
**despite (2)**
116:18 193:10
**destroy (1)**
84:25
**detail (2)**
213:4,6
**detailed (1)**
180:10
**details (2)**
224:12 233:19
**deterioration (1)**
66:10
**detrimental (2)**
231:22,24
**developed (1)**
6:7
**developing (2)**
49:13 84:15
**development (1)**
71:15
**deviate (1)**
216:16
**deviated (1)**
216:8
**differ (1)**
186:18
**difference (3)**
28:19 181:22 187:3
**different (8)**
3:25 21:15 51:4 52:13
69:18 79:25 81:10
159:21
**differently (1)**
198:6
**difficult (13)**
40:5 44:10 120:18
131:6 136:16
138:16,22 139:15
139:20,24 140:4,7
140:10
**difficulty (3)**
139:12,18 145:18
**direct (185)**
41:18 42:1 43:1 44:1
45:1,3 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1

64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1,6 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1,6 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
106:21 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1,16
141:1 142:1 143:1
143:24 144:1 145:1
165:7 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1,24
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 236:6,7
236:10
**directing (1)**
113:24
**direction (2)**
160:22 161:19
**directly (4)**
44:9 73:7 140:24
235:18
**director (7)**

57:7 73:19 100:5
111:25 199:9,10
212:19
**directors (14)**
58:23 115:23 117:7
118:18 141:4
172:18 173:2 210:3
220:18 221:6 223:8
223:15 224:8,22
**directorships (1)**
172:24
**disagree (3)**
14:12 166:16,19
**disagreement (1)**
106:14
**disagreements (1)**
47:9
**discuss (1)**
96:22
**discussed (7)**
47:14 64:7 76:4 142:7
149:19 176:20
192:22
**discussing (3)**
141:20 225:21 229:5
**discussion (7)**
60:15 106:10 144:17
159:7 181:12
206:20 232:24
**discussions (15)**
47:6 103:9,12,14
171:3 172:10
173:12 174:24
176:5,10 181:15
188:10 190:10
207:3,7
**dismiss (5)**
17:7 28:8,10 30:20
32:17
**dismissed (1)**
112:14
**dismissing (1)**
26:14
**disposed (1)**
169:11
**dispute (12)**
35:2,15 38:10 118:21
121:18,21 141:17
141:20,23 148:21
187:2 207:14
**disregard (2)**
14:16 17:10
**disregarded (1)**
14:8
**disrupt (2)**
9:17 11:8
**Dissatisfied (1)**
17:14
**distance (2)**

44:8 234:11
**distributed (2)**
191:16 197:14
**district (8)**
8:6 17:6,22,22 19:5,9
19:24 21:2
**disturb (1)**
9:8
**dividend (4)**
80:2 81:25 88:7 130:6
**dividends (5)**
71:10 87:14,19 96:18
108:10
**division (1)**
166:3
**Divkovskiy (2)**
197:16 198:3
**DLA (1)**
165:14
**document (25)**
60:9,23 76:19 94:19
125:20 146:11
168:15,19 182:13
183:9 189:2 197:17
198:15,19 199:12
204:22,24 207:25
211:17,25 212:4
218:12 219:5
220:19 221:4
**documentary (1)**
149:21
**documentation (2)**
219:11 229:9
**documents (13)**
95:17 112:3 168:13
188:25 191:12
198:22 199:4,14
200:8 202:22
203:11 220:23
222:22
**doing (14)**
6:17 11:13,18 14:6
23:9 35:7,11 68:12
92:14 102:9 103:10
135:24 136:17
179:16
**double-checked (1)**
187:7
**doubt (2)**
63:23 66:2
**draft (3)**
60:7 75:20 168:21
**drafted (7)**
60:10,12 95:23 156:5
226:14 230:3,4
**drafting (5)**
167:3,8 168:3 204:20
204:23
**Drake (2)**

30:22 32:18
**draw (2)**
31:25 207:7
**driving (1)**
171:24
**due (5)**
19:2 35:17 63:17
187:14 193:24
**duly (5)**
41:15 165:4 200:2
201:16,21
**duties (1)**
165:22
**DX (1)**
2:11
**dynamic (1)**
174:4

———————————
E
———————————

**E (18)**
1:17,17,25 2:2,2
41:13,15 145:2,2
165:2,2,4 235:3,3,7
235:24 236:3,12
**earlier (10)**
33:14 46:17 108:8
113:7 115:21
134:24 171:22
177:3 209:7 226:4
**early (3)**
45:7 82:13 118:20
**ease (1)**
145:17
**easier (2)**
93:19 139:20
**easiest (1)**
39:21
**easily (3)**
84:25 150:20 173:7
**economic (3)**
42:23 119:17 223:21
**economics (1)**
42:7
**economist (1)**
42:5
**EC2N (1)**
2:10
**educational (1)**
42:4
**effect (16)**
8:9,24 9:3 10:17
13:25 22:23 24:5
38:14,17 51:3 77:7
115:14 144:4
149:16 163:20
166:9
**effective (1)**
22:10

**effectively (1)**
5:6
**effectuate (1)**
225:4
**effort (5)**
16:13 38:12 129:2
147:16 212:22
**efforts (5)**
21:7 80:8 109:19
224:15,19
**Egil (13)**
44:15 45:18 47:15
54:11,20 60:13
166:12 167:19,25
203:12,23,24 205:3
**eight (1)**
143:8
**either (9)**
10:12 69:16 99:17
108:23 129:9
176:18 186:19
216:12 220:13
**Ekhougen (13)**
77:4,8 95:3 100:15
125:8,12 192:4
196:18,21,22,24
197:17 236:14
**elect (4)**
97:14 98:3 100:24
114:9
**elected (4)**
93:13 109:23 129:15
129:15
**electing (1)**
102:2
**election (1)**
97:21
**eligibility (2)**
118:2 124:9
**eligible (1)**
224:7
**eminent (1)**
18:16
**emphasis (1)**
43:11
**emphasize (1)**
38:3
**employ (1)**
235:19
**employed (5)**
42:9,12,13 165:12,16
**employees (2)**
130:23 142:4
**employment (1)**
165:19
**ended (1)**
209:5
**endless (1)**

16:21
**endorses (1)**
157:21
**enforce (8)**
10:10,13,21 20:14
22:5,15 23:10,11
**enforcement (6)**
9:16 10:19,20 11:6,7
21:4
**engage (2)**
159:6 197:9
**English (4)**
41:25 176:18,21
207:5
**enhance (1)**
205:11
**enjoin (2)**
8:10 16:13
**enjoined (2)**
9:14 11:5
**ensure (1)**
174:12
**entail (1)**
13:20
**enter (8)**
28:14 49:21 53:21
58:16 171:15 188:5
224:5 230:20
**entered (4)**
22:21,22 44:5 63:4
**entering (1)**
56:4
**entertain (1)**
32:25
**entire (1)**
174:20
**entirely (2)**
50:5 123:4
**entities (3)**
50:14 51:4 166:2
**entitled (2)**
31:15 222:13
**equal (3)**
62:16 119:7,13
**equation (2)**
231:20 232:7
**ERIC (1)**
2:20
**Ericcson (1)**
193:3
**Ericsson (1)**
194:2
**error (3)**
95:20 183:11 233:8
**errors (1)**
233:13
**Espin (2)**
99:9 100:17

ESQ (8)
2:6,6,12,19,20,20,24
2:25
ESQS (1)
2:17
establishing (1)
105:23
estimate (1)
143:15
et (6)
35:9 137:17 171:12
210:12,12 213:3
Eurobond (1)
88:20
European (1)
83:9
evening (1)
127:21
event (12)
25:3 27:6 38:7 104:20
116:20 127:9
164:13 213:10,22
214:8 215:18
222:23
events (2)
44:20 188:6
everybody (1)
3:3
EVID (1)
236:13
evidence (20)
4:20 13:17 21:11
24:24 30:24 31:14
34:25 35:10 37:9,24
56:18 57:10 92:13
127:6 149:21 155:5
163:16,21,25
164:13
evidentiary (5)
34:12 57:12 147:16
149:23 227:23
ex (1)
30:2
exact (4)
26:16 55:25 82:11
89:9
exactly (12)
3:17 11:19 34:2 43:8
67:18 95:13 129:12
148:17 156:13
161:19 187:8,9
EXAMINATION (4)
41:18 140:16 165:7
236:4
examine (2)
40:9 41:5
examined (2)
41:16 165:5
example (3)

116:2 183:18 223:5
exception (1)
39:8
exceptionally (2)
17:21 20:23
exceptions (1)
69:3
exchange (2)
24:6 135:22
excluded (1)
189:25
Excuse (1)
210:8
execute (7)
190:7 194:14 201:16
201:21 202:5
228:24 229:10
executed (10)
108:24 109:8 177:20
182:13 185:21
195:14 198:16,19
223:6,13
execution (6)
166:23 167:4 188:11
201:3,11,25
executive (3)
43:7 45:15 68:24
executives (2)
197:7,8
exercised (1)
156:2
exhibit (52)
54:10,21 55:2 58:9,10
59:5 60:9,24 69:24
69:25 70:19 73:16
74:16 75:17,18
77:22,24 78:3,8,19
79:3 87:9 92:18,19
93:20 94:4 96:23
97:5,18,19 107:17
110:24 113:4 125:7
125:11 126:18
127:4 128:3,4
168:10,12 169:24
170:17 175:7 182:5
184:20 185:5,18
188:24 191:21
200:11 227:23
exhibits (11)
41:8 96:7 104:3
106:22,24 109:10
110:10 144:11
168:8 184:25 185:3
existence (2)
13:7 27:16
existing (1)
187:19
expand (2)
131:8 135:7

expanded (1)
60:24
expat (1)
134:6
expected (3)
8:20 91:8 97:23
expedited (1)
5:13
experience (2)
42:17 158:15
expert (4)
4:20 5:2 13:17 47:7
expertise (5)
49:12 69:7 81:10
130:11,11
experts (1)
80:17
explain (6)
44:4 50:11 104:19
135:2 136:5,6
explained (1)
206:13
explaining (3)
3:13 7:18 205:8
explicitly (3)
181:3,6 183:19
exploit (1)
171:17
exploiting (1)
49:16
express (3)
158:18 159:2 229:6
expressed (2)
161:13 170:12
expressly (4)
21:19 157:21 163:11
228:23
extensive (1)
147:11
extensively (1)
158:6
extent (10)
31:25 87:5 90:19
123:16 124:12
136:17 144:13
158:5 161:15
226:21
external (4)
71:11 133:17,23
188:15
extraordinary (2)
38:6 129:3
extremely (1)
81:7
eyes (1)
53:12
e-mail (15)
3:12 8:23 11:24

125:18 127:20
168:17 189:7,19
190:13 191:19
192:2 197:15 198:8
202:24 208:2
e-mailed (1)
227:19
E-N (1)
46:13

——————————
F
——————————
F (7)
1:17 126:18 127:4
145:2 165:2 235:3
236:18
FAA (1)
35:17
face (2)
16:4 57:2
fact (20)
19:25 20:5,21 39:7
56:8 64:15 111:15
119:11 120:16
145:9,14,19 148:12
154:2,5 159:10
163:24 186:8
187:15 198:15
factor (1)
160:24
factors (1)
214:22
facts (1)
166:18
factual (4)
172:9 189:15 193:23
193:24
failed (4)
71:21 92:15 100:23
112:15
fails (1)
6:20
failure (6)
6:22 79:3,12 87:12
88:16 128:25
fair (4)
30:17 139:13 195:12
225:2
fairness (1)
122:19
faith (1)
120:7
fall (3)
84:17,21 104:15
falls (1)
84:23
familiar (2)
63:6 109:10
family (3)

18:5 21:18 23:24
famous (1)
51:21
far (15)
52:3 53:4,13 56:10
68:19 81:19 88:21
89:3 113:16 114:5
118:20 122:24
123:2 148:16
223:25
fast (2)
81:5,12
fathers (4)
67:21 93:4 109:16,21
fault (1)
126:5
favor (4)
20:25 102:25 103:7
128:14
favorable (3)
86:17 106:6 231:13
fax (1)
200:10
feared (1)
110:6
February (3)
16:20 19:13 165:20
federal (3)
154:22 155:6 162:16
feel (1)
3:16
feels (1)
33:15
Feinberg (2)
1:18 142:23
fellow (4)
3:9 23:24 57:9 234:5
felt (2)
110:3 196:2
feuds (1)
195:22
fewer (1)
83:15
Fifth (2)
1:10 2:4
fight (1)
28:22
figure (1)
95:9
filed (6)
31:16 95:21 126:17
152:2,4 153:24
files (1)
95:14
final (8)
28:14 75:10,21
118:17 141:15
154:16 226:20

233:9
**finalization (1)**
204:24
**finally (5)**
88:8 104:16 118:23
119:12 168:23
**finance (2)**
42:22 134:16
**financial (24)**
43:21,22 48:6 52:10
52:12 53:17 69:5
70:11 71:9 80:24
81:2 108:9 130:15
131:12,14 132:2,5,8
132:9,10,13,16
135:11 138:17
**financing (4)**
43:23 71:11 133:17
133:23
**find (10)**
13:25 26:11 27:3 32:2
54:6 76:12 94:17
102:6 159:25
219:14
**finding (2)**
14:10 29:6
**findings (11)**
145:14,19 148:12
150:7,9 154:2,4,18
154:21 155:4
163:19
**fine (6)**
37:3 57:16 150:11,18
155:9 211:22
**finish (1)**
127:25
**firm (7)**
16:9 18:16,17 61:11
158:15,17 192:23
**first (46)**
4:8 17:11 28:25 41:6
41:14 42:19,21,24
51:5 67:22 69:24,25
70:3 75:12 78:16,16
79:25 80:11 83:8
94:4 108:12 117:4
117:14,16 118:15
121:4,15 160:6
162:15 165:3
177:18 183:3
189:19 192:10,18
192:18 195:10
197:21 202:22
208:4,10 222:3,17
222:18,19 226:25
**five (7)**
17:23 58:23 82:20
99:24 100:3 116:15
224:22

**five-day (2)**
14:20 18:23
**fix (3)**
118:21 123:18 148:10
**fixed (1)**
152:14
**floating (1)**
89:25
**flow (1)**
13:21
**flowed (1)**
174:16
**flows (1)**
11:17
**flying (2)**
73:6,7
**focus (2)**
9:13 79:22
**follow (11)**
43:18 72:8 101:9
112:15 140:14
150:15 179:17
214:25 216:10
221:23 222:3
**followed (1)**
158:22
**following (2)**
134:13 147:5
**follows (4)**
41:17 157:2 163:8
165:6
**forbidden (1)**
141:24
**force (1)**
171:24
**forecasts (1)**
107:10
**foregoing (1)**
235:12
**foregone (1)**
156:19
**forgot (1)**
61:11
**form (8)**
78:9 126:19 150:6,16
156:5 170:10,13
195:15
**formal (10)**
78:17 121:22 122:7
123:5,17 124:8
125:4 144:13
149:20 190:18
**formalities (2)**
189:10 198:13
**formality (2)**
191:7 194:14
**formally (2)**
181:18 233:14

**formation (1)**
31:4
**former (1)**
60:17
**forms (1)**
203:6
**forth (4)**
24:11 44:20 115:14
175:3
**forum (1)**
20:2
**forward (23)**
4:17 7:3 8:13,18 12:9
20:10 23:19,21
24:17,22 25:3 30:23
33:4,8,17 39:6
135:4,7 169:3 175:7
233:4 234:2,2
**forwarded (1)**
16:11
**found (8)**
7:25 13:19 21:17
26:21 121:4 193:13
211:9 213:8
**foundation (1)**
189:6
**founding (4)**
67:21 93:4 109:15,21
**four (5)**
42:25 53:12 58:24
116:15 224:22
**frame (1)**
150:25
**frankly (1)**
95:18
**Freddie (1)**
106:13
**Frederick (1)**
164:20
**Fredrik (2)**
165:11 236:9
**free (1)**
173:15
**freely (1)**
174:16
**frequently (1)**
176:11
**Friday (6)**
127:21 149:7,11,12
149:17 165:15
**Fridman (14)**
45:23,25 46:18 51:20
52:21 53:9,13 61:21
61:25 62:13 64:2
65:4 106:12,14
**friends (2)**
68:10 83:25
**front (1)**

228:8
**frustrate (1)**
18:6
**fulfill (3)**
137:25 139:2,4
**full (8)**
8:9 33:5 100:9,10
104:25 146:7
157:22 158:24
**fullest (2)**
18:2,25
**fully (6)**
12:20 32:23 38:21
136:19 201:15
233:5
**functionary (1)**
111:23
**functioning (2)**
85:13,16
**fundamental (1)**
35:17
**further (18)**
18:11 87:10 101:24
105:23 116:12
117:22 118:7
126:12 128:22
130:20 135:19
148:16 192:24
198:13 229:8,19,20
230:5
**future (5)**
53:25 112:7 131:4
169:8 174:5

———————

**G**

**G (2)**
182:15,18
**game (1)**
141:13
**gamesmanship (1)**
38:12
**gather (2)**
51:13 125:25
**general (29)**
50:9 57:7 73:19,24
75:4 81:6 94:21
111:25 130:22
132:17 157:20
164:5 172:15
181:18 199:8,8,9,10
199:10 209:18
213:3 215:25
216:15 224:25
225:10,16 227:10
230:22,25
**generality (1)**
224:13
**generally (4)**
58:14 63:9,11 129:18

**generated (1)**
17:10
**gentleman (1)**
61:10
**gentlemen (2)**
4:8 5:8
**getting (9)**
31:11,20 93:9 145:18
152:12,13 153:11
153:13 234:2
**give (16)**
18:15 30:12 38:17
42:16 55:24 62:15
80:21 85:18,18 86:8
86:21 130:10
147:13 184:2 223:4
230:24
**given (6)**
23:22 29:23 74:3,8
102:5 135:14
**giving (5)**
18:2 29:12 53:24
170:9 229:21
**go (42)**
5:11 6:6 8:13,18 12:9
12:17 15:3,16 20:10
23:19,20 24:10,17
24:22 25:3 28:17,25
29:8 33:4,7,17 38:8
42:15 74:7 86:7
87:9 103:21 106:4
107:17 143:8
144:12,15 153:2
194:23 202:22
210:8,15 220:14
231:18 232:3,7,12
**goal (4)**
64:13 119:13 120:7
138:24
**goes (8)**
10:18 12:18 70:14
87:6 122:21,24,25
148:17
**going (35)**
4:17 7:3 13:14 15:12
17:17 20:13 29:13
33:13 34:7 36:4
39:6 41:9 54:20
72:5,17 73:5 91:11
105:20 110:2 112:6
133:10 135:4,7
136:19 142:16
144:3 151:19 154:6
155:11 160:2 169:3
216:13 224:11
231:17 233:4
**Golden (3)**
172:11,20 173:9
**GONZALO (1)**

2:20
**good (13)**
  3:2 6:16 14:23 15:5
  30:15 31:8 48:16
  91:15 102:20
  103:13 120:7
  135:16 144:9
**gotten (2)**
  6:3 118:22
**govern (3)**
  161:10 176:8 178:13
**governance (11)**
  57:5 117:20 123:14
  123:23 170:11
  180:21,24 205:10
  209:22 224:9 225:4
**governed (8)**
  60:18 121:18 122:13
  176:2 179:3 180:7
  189:24 205:15
**governing (13)**
  20:3 59:7 60:15
  124:18 156:14
  157:23 158:25
  164:10 175:22
  177:15 178:19
  186:3 205:6
**government (2)**
  42:20,25
**government-owned...**
  83:7
**governor (2)**
  43:5
**governs (2)**
  215:23 232:17
**graduation (1)**
  42:20
**grant (1)**
  26:12
**granted (2)**
  34:9 226:23
**great (3)**
  136:16 232:22 234:11
**GREGORY (1)**
  1:20
**ground (3)**
  26:22 27:3 32:17
**grounds (4)**
  12:17 17:9 27:24
  30:21
**group (18)**
  64:8 84:3,4 102:8
  116:24 158:14,16
  166:2 169:19
  174:12,15 188:19
  200:19 204:6,12
  206:7 217:7,14
**grown (1)**
  81:7

**growth (1)**
  82:18
**guess (5)**
  77:3 153:24 155:18
  158:10 216:13
**guide (1)**
  49:12
**guided (1)**
  151:19
**Gustav (1)**
  196:18

**H**

**H (1)**
  236:12
**half (4)**
  110:2 143:20,25
  185:18
**hallways (1)**
  214:17
**Halverson (2)**
  126:16 127:18
**Halverson's (4)**
  126:25 127:5 129:5
  236:18
**hand (9)**
  4:25 119:3 156:16
  164:23 171:5 174:6
  176:6 180:4 235:22
**handed (1)**
  168:7
**handling (1)**
  192:12
**hands (4)**
  33:16 84:18,21,24
**hang (1)**
  30:8
**Hansen (11)**
  44:15 45:18 60:13
  166:12 167:19,25
  203:13,23,25 205:3
  226:3
**Hansen's (8)**
  47:15 54:4,11,14,20
  57:11,25 58:11
**happen (1)**
  180:15
**happened (5)**
  112:12 114:17 117:2
  121:15 231:6
**happenings (2)**
  169:8 193:24
**happens (1)**
  132:6
**happily (1)**
  30:3
**happy (2)**
  28:17 207:8

**hard (3)**
  6:25 95:9 136:14
**hare (1)**
  83:14
**harm (3)**
  79:23 110:6 136:23
**hat (1)**
  124:6
**Haverson (1)**
  53:13
**head (2)**
  46:4 204:14
**headed (3)**
  169:25 170:24 175:21
**headquartered (1)**
  215:4
**headquarters (6)**
  52:18,21,22 98:17,22
  98:24
**heads (2)**
  7:21 123:20
**hear (3)**
  24:11 39:18 65:14
**heard (16)**
  14:13 17:24 24:4 25:7
  28:16 47:2 62:19
  65:17,24 66:14 67:4
  89:20 90:16 161:22
  174:22 226:2
**hearing (14)**
  12:4 16:23 19:14
  20:19 21:10 34:12
  35:8 36:24 37:23
  89:23 118:4 157:5
  163:25 234:12
**hearings (2)**
  17:23 147:17
**heavily (2)**
  172:19 210:6
**held (12)**
  19:4 21:19 23:12 57:4
  73:2 113:19 115:22
  117:19 118:9
  128:20 131:11
  152:9
**help (4)**
  47:5 146:5 206:3
  211:22
**helpful (2)**
  16:18 155:14
**Herbert (1)**
  158:16
**hereunto (1)**
  235:21
**Hermaster (1)**
  45:15
**HERRINGTON (2)**
  2:4,9

**hesitate (1)**
  14:24
**he'll (1)**
  143:14
**hide (1)**
  22:13
**higher (4)**
  117:23 118:4,13,15
**highlight (1)**
  108:3
**highlighting (1)**
  234:8
**highlights (1)**
  42:17
**high-quality (1)**
  130:14
**hinder (5)**
  9:18,22 11:9 18:6
  21:7
**hinted (1)**
  122:22
**hired (2)**
  18:16 69:19
**hiring (1)**
  130:13
**historical (1)**
  121:14
**history (2)**
  36:22 115:10
**hit (1)**
  29:22
**hold (2)**
  37:16 78:23
**holding (7)**
  48:19 117:15 119:8
  170:8 172:14
  196:19 223:22
**holdings (5)**
  47:20,25 53:16 58:25
  200:23
**home (2)**
  7:4 143:9
**hope (1)**
  31:18
**hoped (1)**
  93:5
**hopefully (1)**
  145:17
**hour (3)**
  141:17 143:20,25
**HQ (1)**
  2:10
**huge (1)**
  135:11
**hump (1)**
  162:23
**hurting (1)**
  87:2

**hypothetical (2)**
  214:8 223:25

**I**

**ICT (1)**
  207:4
**idea (1)**
  50:9
**identical (7)**
  79:10 97:4 184:6,11
  184:15 185:23
  186:22
**identification (2)**
  125:15 211:5
**identifying (1)**
  144:11
**ignore (1)**
  5:6
**Igor (5)**
  65:18,25 66:21 92:5
  109:5
**imagine (1)**
  15:2
**immediate (1)**
  116:4
**immediately (1)**
  10:17
**impact (3)**
  134:10 179:7,19
**impacts (1)**
  138:6
**impediments (1)**
  135:23
**implement (2)**
  80:8 136:14
**implementing (4)**
  80:5 136:9 139:12
  140:7
**implicating (3)**
  122:9 124:10,13
**implied (1)**
  36:18
**implying (1)**
  128:18
**importance (3)**
  75:24 76:3 195:25
**important (33)**
  21:11,16 44:24 45:2
  47:10,17,18 49:6
  51:20 69:8 70:13,25
  71:2,18,25 76:14
  79:17 86:16 108:7
  110:8 111:5 139:5
  159:16 161:6 164:7
  205:18,23 206:4,7
  209:3,13 219:10
  233:21
**importantly (1)**

30:14
**impose (1)**
124:8
**imposes (1)**
213:25
**impossible (1)**
74:7
**impression (1)**
209:13
**improper (2)**
4:14 5:9
**inclined (1)**
148:9
**include (4)**
96:7 145:25 150:5
212:22
**included (3)**
94:11 169:7,9
**includes (1)**
35:20
**including (5)**
57:6 87:3 104:15
212:18 226:24
**inconsistent (1)**
227:3
**incorporating (1)**
54:12
**increase (3)**
86:16 101:24 202:12
**increasing (1)**
119:7
**incumbency (5)**
199:17 219:21 221:2
229:4 231:7
**incumbent (1)**
83:6
**independent (4)**
60:20 119:15,20,21
**indicate (2)**
4:2 203:7
**indicated (1)**
226:4
**indication (2)**
132:19 133:10
**indirectly (1)**
235:18
**individual (2)**
91:4 188:12
**individuals (1)**
196:12
**industrial (3)**
48:7 53:18 171:9
**ineffective (2)**
4:13 29:25
**influence (3)**
16:22 103:6 105:16
**influenced (1)**
232:4

**inform (1)**
74:10
**information (9)**
36:8,10 87:6 145:13
146:16 171:14,17
173:4 174:16
**informed (2)**
38:21 76:3
**initial (3)**
89:22 90:5,18
**initially (1)**
117:3
**initiated (1)**
116:23
**injunction (17)**
7:2,4,5,16 8:3,8 9:21
12:12 15:11,15,17
15:18,21 21:21 23:7
62:8 112:5
**inquire (1)**
146:19
**inside (3)**
64:8 83:2 196:12
**instance (14)**
80:9 84:23 117:4
121:4 181:17,19,20
183:24 193:25
210:7,10,21 224:21
225:7
**instructed (2)**
101:11,21
**instructions (2)**
101:4,10
**intend (2)**
33:25 119:3
**intended (1)**
34:2
**intent (1)**
37:10
**intentionally (2)**
78:4 128:8
**interest (7)**
57:3 119:18 121:14
152:12,16 153:11
163:24
**interested (5)**
141:12 156:11 159:24
195:21 235:18
**interesting (1)**
119:21
**interests (3)**
84:15 117:24 118:8
**interfere (1)**
24:2
**interim (1)**
231:5
**intermediate (1)**
116:13

**internal (3)**
138:18 219:20 220:22
**internally (1)**
167:25
**international (8)**
69:20 158:10,21,23
160:23 161:16,17
162:18
**interpret (1)**
214:23
**interpretation (2)**
150:23 224:13
**interpretations (1)**
151:11
**interrupt (3)**
50:4 57:17 220:7
**intervene (1)**
15:5
**introduced (2)**
103:3 197:24
**invalid (2)**
31:2 67:11 74:14
**invalidity (1)**
112:8
**investment (1)**
107:11
**investments (1)**
210:11
**investor (3)**
48:6 53:17,18
**invite (2)**
32:22 147:6
**invited (1)**
37:5
**invoke (1)**
21:6
**invoked (1)**
17:5
**involve (1)**
157:16
**involved (12)**
44:9 52:12 167:7
172:19,20 188:16
203:10 204:3,23
205:2 207:3 209:15
**involves (1)**
148:21
**involving (1)**
51:13
**in-house (7)**
92:22 165:16,23
166:22 167:2,20
204:16
**IPO (9)**
47:16 53:15 82:5
181:19 205:12,21
205:25 206:3,6
**irrelevant (1)**

190:14
**issue (39)**
9:5 16:16 31:19 57:18
88:20 122:7,16
123:2 125:4 132:5,7
132:13,15 140:15
145:23 149:14,15
150:17,24 151:6,8
152:3,9 153:22
156:12 159:15,16
159:22 160:8,9,14
161:6 164:7 181:20
190:16 207:2 211:5
220:8 234:6
**issued (6)**
4:15 29:6 141:6 152:2
208:8,22
**issues (16)**
20:20 29:19 31:4
105:2,8,10 124:22
135:3 154:11
183:23 193:22
210:5 211:2 212:11
212:22 213:5
**item (2)**
70:13 97:21
**items (19)**
47:10 54:7 63:15
70:14 71:19 72:2
75:24 76:4 97:7,20
107:15,23 108:2,4,7
109:4 111:5 114:5
114:11
**IV (1)**
1:5
**I.D (1)**
236:13

_____
**J**
_____
**January (6)**
149:4,8,13 188:8
192:16 234:9
**Jay (2)**
2:6 41:5
**Jentes (123)**
1:19 3:23 4:6 9:10
10:8 11:12,21 14:17
15:25 25:4,16,24
26:3,8,25 27:9,23
28:6,9 30:16 32:6
35:19,24 37:19
39:11,17 50:3,7
51:9,25 52:5,8,16
54:17 58:8 59:21
60:3,8,22 61:8
67:18,25 68:3,7,14
68:18 69:10,21
72:25 73:12,15
76:18 77:2,6,13

81:21 88:2 91:13
98:25 99:6,10,15
100:2 105:6 125:25
126:6,11 127:7
128:24 129:7,11,17
130:2 131:9,18,24
132:4,12,18 133:2,5
133:9,14,22 134:2
134:14 135:17
136:4,24 137:3,6,12
137:22 138:5
139:22 143:2,6
144:2,14 146:21
151:14 152:6 156:7
159:5 162:3,14
202:19,21 203:5,14
203:18 204:5,10,19
205:4 206:5,11
207:12,21 213:10
228:18 231:10,23
**Jmak (9)**
109:11,14,20 111:11
111:21 112:24
114:17 131:17,23
**job (3)**
68:19 69:20 92:25
**joining (1)**
42:18
**joint (6)**
165:25 176:17 179:8
207:11 213:15
223:8
**judge (24)**
7:24 8:21 9:4,6,25
11:3 13:24 14:8,14
15:19 17:11,22
18:12 20:18 21:17
23:15 29:18 31:12
31:16 148:23 158:6
161:12 162:17
164:2
**judging (1)**
29:11
**judgment (3)**
21:2 22:22 214:19
**judicial (1)**
153:12
**Julian (1)**
158:11
**July (4)**
106:23 107:6 128:12
128:16
**June (11)**
96:5,11 97:7,14 98:4
98:16,24 99:7 101:2
101:3 106:11
**JUNTES (1)**
50:18
**jurisdiction (18)**

7:9 8:11 12:18,25
17:5 18:19 19:23,24
21:6 26:22 27:4
28:5,21,24 29:7
32:2 171:19 178:8
**jurisdictional (2)**
31:22 150:16
**jury (2)**
31:15,17

---

**K**

**K (4)**
2:6 165:2,2,2
**Kare (1)**
196:18
**KAREN (1)**
2:24
**keep (2)**
15:11 38:4
**keeping (2)**
5:4 36:8
**KENNETH (1)**
1:18
**kept (1)**
36:6
**key (1)**
158:20,20 163:3
**Khudyakov (5)**
192:10 194:7 197:16
198:7,16
**Khudyakov's (1)**
193:10
**Khudykov (1)**
155:24
**Khyudyakov (1)**
192:3
**Kiev (5)**
73:9 98:14,20 117:5
188:20
**kind (22)**
37:24 80:19 122:16
174:3 175:2 176:24
181:21 183:23
193:18 202:9
204:16,17 205:2
209:25 210:13
213:16 216:9
219:12 224:12
226:7,13 231:4
**kinds (4)**
16:22 176:17 226:8
231:2
**Kirill (2)**
204:7,15
**kit (1)**
227:18
**Klymenko (3)**
125:9,13 236:16

**knew (1)**
93:3
**knot (2)**
160:19 163:4
**know (64)**
5:16,19 8:12 10:24
44:23 52:4 55:15
56:7,10,15 60:9
61:4,8 65:25 75:5
75:21,22 76:8 79:15
79:19 83:23 84:22
84:25 85:24 86:2,3
87:5 92:9,24 93:6
95:18 99:11,19
101:20,25 102:4
103:20 104:9,22,25
105:3,17 118:19
124:6 137:12
140:18,21,23 144:8
145:11 153:6
155:10 157:12
160:20,22 161:10
161:11 171:11,14
197:6 199:6 208:20
213:17 220:13
**knowledge (13)**
44:19 74:11 76:13
166:19 171:14
173:7 175:15 178:4
193:22 201:13,18
202:3 217:6
**known (1)**
200:21
**Konenko (1)**
57:9
**Kosogov (3)**
200:16,20,23
**Kremlin (2)**
51:24 86:23
**Kulikov (4)**
73:19 76:21 111:22
155:24
**Kyiv (2)**
104:23 117:18
**Kyivstar (111)**
43:11 44:3,11 45:17
46:19,23 47:5,17,25
48:13,19 49:11,11
53:19 61:22 62:2,22
63:2,7 64:8,14,15
65:8,19 66:20 67:21
73:8 79:14,24 80:4
80:13,17,22 81:13
81:18 82:9,19 83:15
84:7,17,20 85:5,9
85:12,15,19 86:17
86:19 87:2,6,8
88:17 92:5,22 93:5
98:6,7,22 102:20

103:2,6,17 104:24
105:2,7,11,12,13,16
114:2 115:5,23
117:9 129:19 132:9
132:12 134:16
135:2,4 136:9,13,22
137:11,16,24
138:22 139:2,14,24
140:3,7 159:12
169:4 173:3 177:4
178:18 179:13,24
180:24 201:5 202:7
202:13 208:9,23
214:20,24 215:3,21
215:23 216:2
**Kyivstar's (2)**
83:2 140:20

---

**L**

**L (5)**
2:6 41:13 165:2
227:23 228:15
**labeled (2)**
59:6 128:4
**labor (2)**
134:3 214:18
**laboring (1)**
89:21
**lack (3)**
81:9 130:12 131:2
**ladder (1)**
115:16
**laid (2)**
12:20 34:2
**landed (2)**
176:11,13
**language (6)**
10:4 41:22 183:16
197:23 220:8
227:25
**large (1)**
209:18
**larger (1)**
21:18
**last-minute (3)**
16:24 24:14,14
**late (3)**
3:11 45:6 102:19
**latest (1)**
3:13
**law (139)**
5:2 13:16 14:8,16,25
17:10 19:7 20:4,4
26:12 30:2 31:2
49:17 59:7 60:15,19
60:20,21 67:15
100:4 117:6 121:5
121:23 122:7,17

123:6,12 124:2,7
125:5 145:10,15,19
148:13 151:18,20
156:13,18,24,24
157:8,17,20,23,24
158:9,25 159:8,15
160:9,10,13,20,21
160:23,25 161:2,8
161:16,21,23,24
162:5,16,17,17,18
164:10,11,15
175:22 176:7,11,12
176:16,19,21,22,25
177:5,10,12,15,15
177:22 178:2,2,7,13
179:3,6,12,13,23
180:7,12,17,23
181:13 183:22
186:3,5,7 189:23,24
190:2,6,14,19 191:8
205:6,18 207:5,6
213:25 214:5,13
215:2,20,22 216:6
216:14,15,23,25
222:5,24 223:7,14
224:18 225:3
226:14,16,22 227:2
232:10,10,13,17
**laws (5)**
59:9 135:21 176:2
205:15 214:18
**lawsuit (5)**
111:21 112:12,14,18
117:2
**lawsuits (2)**
112:10,22
**lawyer (7)**
16:8 92:22 214:3,19
215:20,25 230:18
**lawyers (4)**
7:20 59:23 176:23
233:18
**lay (4)**
8:24 26:18 157:6
189:6
**lead (2)**
169:3 214:22
**leading (3)**
154:16 169:6 188:10
**leads (1)**
4:7
**learned (1)**
72:5
**leave (5)**
33:19,19 147:23,25
159:14
**led (1)**
8:19
**leeway (1)**

230:25
**left (3)**
118:14 167:19 203:13
**legal (13)**
9:16 11:7 13:20 23:20
51:4 74:19 75:6
109:16 120:17
167:20 226:13,15
232:7
**legislation (1)**
49:3
**legislature (1)**
158:2
**legitimate (1)**
141:10
**letter (39)**
25:17 30:17 53:24
54:22 55:3,20 73:18
74:4 75:18,21 76:8
76:12,14 77:15 78:9
78:9 92:21 94:6,8,8
94:11,12,14,16,23
95:2,5,8,11,14
125:7,11 168:21
202:25 203:5,6
204:21 206:13
236:14
**letting (1)**
202:12
**let's (12)**
9:13 20:10,11 32:8
75:16 77:21 87:9
92:17 96:5 106:20
107:17 110:10
**level (7)**
2:9 47:7,11 48:23
103:8 117:17
141:18
**Lew's (2)**
158:11 161:18
**liaise (1)**
168:2
**liaised (1)**
203:22
**licenses (1)**
68:12
**Lien (1)**
100:16
**light (3)**
14:20 27:12 229:6
**likelihood (1)**
21:20
**limit (1)**
175:2
**limitation (2)**
14:21 200:7
**limitations (1)**
18:23
**limited (1)**

226:24
line (3)
31:24 140:14 200:10
link (1)
34:6
list (5)
138:25 212:10,23
213:11,12
listed (3)
43:17 136:25 137:10
listing (4)
137:4,7 138:7 146:2
literally (1)
24:14
litigate (1)
15:16
litigated (1)
163:19
litigation (3)
112:3 116:23 122:25
litigations (2)
17:3,19
little (10)
42:3 97:22 130:2
135:2,19 160:11
164:13 196:16
205:8 229:5
live (4)
31:19 39:18 41:20,21
lively (1)
24:8
LLC (2)
1:6 3:7
LLP (2)
2:4,9
loan (1)
89:25
local (2)
171:16 183:23
locate (4)
94:14,24 95:15 96:3
located (1)
98:12
location (1)
126:21
locations (1)
63:22
logistic (1)
73:10
logistical (1)
144:5
logistics (1)
39:20
Logush (3)
4:20 7:17 8:7
Logush's (1)
10:14
London (3)

2:10 22:2 207:5
London/City (1)
2:11
long (8)
24:11 62:25 103:12
143:16,22 146:16
146:19 158:15
longer (1)
40:7
look (23)
44:7 80:9 92:18 99:25
155:16 159:18
170:21 175:16,21
182:6,22 191:11,25
192:7 194:17
197:12 199:19
200:10 211:9
214:11 227:6,24
234:2
looked (1)
95:13
looking (22)
54:18,19 70:18 98:23
109:25 123:3
133:13,14 155:11
155:12 170:17
175:7 182:11,12
183:8,17 184:7
185:20 190:13
193:17 207:25
224:4
looks (1)
104:3
lose (2)
22:19 66:5
losing (1)
25:22
lost (3)
18:20 142:23 163:2
lot (14)
52:12 68:22 70:13
79:23 85:2,9 120:6
130:7 134:6 135:9
147:9 173:3 213:18
227:25
LOVELLS (1)
2:17
loyalty (4)
93:5 109:24 110:3
131:2
lunch (1)
145:6
Luncheon (1)
144:18
Lykka (1)
232:9
Lykke (90)
40:2 164:21,22 165:9
165:11 166:1 167:1

168:1,8,13 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1,21 180:1
181:1 182:1 183:1
183:13 184:1 185:1
185:7,21 186:1
187:1 188:1,9 189:1
190:1 191:1 192:1
193:1 194:1,24
195:1 196:1,16
197:1 198:1 199:1
200:1 201:1 202:1
202:15,17 203:1
204:1 205:1 206:1
207:1 208:1,2 209:1
210:1 211:1 212:1,2
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
227:13 228:1 229:1
229:13 230:1 231:1
232:1 233:1 234:1
236:9
Lykke's (1)
185:18
Lynch (18)
7:24 9:4,6,25 13:24
14:14 15:19 18:13
20:18 21:17 23:15
31:13,16 148:23
158:6 161:12
162:17 164:2
Lynch's (7)
8:21 11:3 17:11
Lytovchenko (7)
65:18 66:2,21 67:3,19
92:5 109:5
L-Y-T-O-C-H-E-N-...
67:2

M

M (6)
41:13 45:19 47:7
60:14 165:24
204:15
machine (1)
135:8
Madison (1)
2:17
Magnus (1)
155:23
mail (1)
127:18
main (2)
29:23 53:15

maintain (1)
22:3
major (4)
43:4 58:20 83:2,4
majority (11)
85:4 169:4 170:8,13
209:20 210:21,25
211:6 212:11,15
225:22
making (9)
14:6 18:9 38:21 64:14
103:25 135:9
172:18 197:2 224:6
management (3)
69:12 108:20 134:8
manager (4)
77:12 199:11 230:22
230:25
mandatorily (1)
216:10
manifest (1)
17:9
manifestly (2)
14:7,15
March (12)
65:11 70:6 72:6 74:23
76:22 77:9 78:12
79:10,13 96:19
104:4,21
marked (1)
125:14
market (4)
69:20 84:23 171:11
205:20
marketing (5)
69:3 70:11 80:8
130:11,16
marriage (1)
235:17
material (11)
229:14,18,22,24,25
230:10,15,24
231:12 232:11,19
materiality (1)
196:5
materials (1)
156:22
matter (17)
1:2 3:4 31:2 117:6
118:12 121:14
124:8 158:9 162:15
166:8,13 171:20
194:2 196:19
224:25 233:7
235:18
matters (7)
5:18 103:4 149:21
167:25 189:15
193:23 213:2

MAYSIE (1)
2:25
mean (29)
20:7 36:13 44:4 57:17
64:21 94:22 104:11
117:11 120:20
121:6 124:3 131:13
140:2,4 143:3
151:23 153:10
154:10,23 161:5
163:15 176:14,17
177:8 179:22
210:17 220:10
230:9,11
meaning (2)
29:20 86:22
meaningful (2)
120:19 163:21
meaningless (1)
163:17
means (3)
31:2 81:15 173:6
meant (1)
27:19
measure (1)
232:18
mechanism (1)
207:9
meet (2)
38:6 150:21
meeting (137)
44:24,24 45:2,4,5,6,8
45:10,13,21,22
46:15,16,25 47:11
47:14 49:4 50:16
53:7,9,12,23 54:8
55:17 59:3,22 60:2
60:4,6,7 61:21
62:11 63:7,22 65:6
65:16 70:3,3,8 71:3
71:19,21 72:6,9,10
72:17,19,22 73:2,5
73:24 74:2,23,25
75:3,4,13,14,15
76:19,22,24 77:9
78:21 79:5,8,9,11
79:13 87:21,23,25
88:13,16 90:10,25
91:3,6 93:7,10,13
93:16,21 96:11 97:3
97:6,7,8,13 98:4,22
98:24 99:3,6,17,23
100:3 101:12,23,24
104:16 107:3,6,8,10
107:22 108:5,6,12
108:16 110:7
111:18 113:6,10,12
113:12,24 114:2,4
114:24 126:21,22

114:24 126:21,22
127:13 128:12,15
128:17,20 129:3,23
131:16 132:17
133:19 134:11
181:18 194:13,13
219:24
**meetings (53)**
63:12,17,18 64:5
65:10,21 67:5 73:14
76:5 78:11 79:16,20
85:23 88:7 91:9
93:2 96:9,13,20
97:5,9 98:9,16
102:21 104:14
107:5 108:9 109:21
111:12 112:6,9
113:15,18,19,21
115:6,25 116:10,14
124:6 126:15,21
127:10 129:22
131:10 203:21,25
204:2 225:10,10,16
225:17,25
**member (9)**
18:17 44:11 45:16
62:22 63:2,3 65:8
109:23 129:15
**members (20)**
3:10 18:4 23:24 25:15
41:7 63:21 65:9
87:13,18 88:25
91:21 101:22 114:9
119:15,20,22 120:5
121:6 210:18 234:5
**mention (4)**
67:9 121:24 136:7
200:20
**mentioned (10)**
44:2 45:20 69:11 85:8
85:10 97:12 134:24
171:22 193:25
209:7
**merely (2)**
14:11 38:2
**merger (1)**
64:13
**meritorious (1)**
24:16
**merits (23)**
12:10,17 15:16 19:14
20:24 24:12 31:12
31:21 32:3,21,23
33:5,17 34:21,23,25
35:9,15 36:25 39:14
118:10 156:15
157:8
**message (1)**
46:17

**met (3)**
31:15 64:4 204:8
**methodology (1)**
161:2
**microeconomics (1)**
42:8
**middle (2)**
149:4,8
**Mikhail (10)**
45:23,25 46:17 51:20
52:21 53:13 62:13
63:25 106:12,13
**million (5)**
81:8 82:7,12,13 85:11
**mind (2)**
34:20 153:5
**minimum (1)**
214:17
**minister (5)**
42:23 62:10,11,12
142:9
**ministerial (1)**
95:20
**ministers (2)**
141:19 142:7
**minister's (1)**
142:10
**Ministry (1)**
42:21
**minority (2)**
169:5 209:18
**minute (3)**
30:8 89:10 184:22
**minutes (2)**
40:21 78:20
**misapprehension (1)**
89:21
**misheard (1)**
152:24
**misleading (1)**
30:6
**missed (1)**
15:4
**MIT (1)**
42:7
**mobile (35)**
1:3 3:6 4:24 5:9,14
6:13 7:6,7,9,11,12
7:14,16 8:10,16
15:2,14 28:23 33:3
45:17 46:20 68:12
69:18 71:17 78:10
80:10 83:5,7,11
86:19 100:15
103:11 105:24
130:21 166:3
**Moland (112)**
39:24 41:20 42:1 43:1

44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1,14
59:1 60:1 61:1 62:1
63:1 64:1 65:1,7
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1,5
97:1 98:1 99:1
100:1,13 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1,2
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 236:5
**moment (5)**
121:10 182:6 194:23
221:23 223:12
**momentarily (1)**
153:20
**Monday (1)**
165:13
**money (10)**
71:13 81:16 82:3
88:17,19 135:6,8,9
135:10,14
**month (1)**
118:24
**months (5)**
5:24 38:15 46:16
145:12 164:4
**morning (6)**
3:2,9,15,16,19 234:7
**morning's (1)**
162:22
**Moscow (21)**
44:24 45:4 46:15,25
50:16 52:19,24 53:4
53:6,7 59:23 61:11
64:15 73:8 86:21
103:16 188:19,21
188:22,23 200:15
**motion (11)**

14:6 17:7 26:5,7,16
28:3 32:14,17 34:9
37:17 40:19
**motions (1)**
33:13
**motivation (1)**
86:16
**move (3)**
34:7 126:25 233:25
**moving (1)**
144:11
**MTS (1)**
83:11
**Musoff (24)**
2:6 41:5,7,19 54:12
54:23 56:16 58:10
61:19 64:19 66:25
70:20 77:25 78:24
89:18 91:7,17 94:13
99:8 110:17,21
128:7 134:12 236:6

---

**N**

**N (7)**
2:2 41:13,13 145:2,2
145:2 236:3
**name (6)**
46:7 66:19,23 80:10
110:13 165:10
**named (5)**
58:18 109:11 112:20
113:3 188:12
**narrow (2)**
26:22 27:3
**NASDAQ (5)**
43:17 137:5,18,20
138:7
**native (2)**
41:22 68:5
**natural (2)**
135:12 176:24
**nature (1)**
146:8
**necessarily (2)**
36:12 230:8
**necessary (4)**
40:7 123:23 223:16
229:7
**need (15)**
31:24 47:10 81:2
87:20,22,24,25
144:12 148:14
157:4 159:9,17
160:15 198:13
231:4
**needed (8)**
135:6 189:12,16
190:19 194:12
196:2 210:3 229:19

**needs (3)**
80:20 157:6 231:18
**negative (1)**
232:6
**negotiate (1)**
213:6
**negotiated (8)**
172:4 208:13 210:5
213:11 217:9 223:6
225:20 229:15
**negotiating (4)**
106:5 169:13,19
177:13
**negotiation (7)**
61:18 86:7 166:23
167:8 206:20
212:25 213:13
**negotiations (20)**
167:15,16,17,18
169:16 173:12,22
174:18,25 176:6
177:25 178:7
188:10 192:24
197:9 203:13,19
204:4 226:5,6
**negotiator (3)**
192:11 203:10 204:18
**network (1)**
107:8
**never (10)**
20:18 49:25 118:22
160:5,14 162:11
173:18 174:22
190:15 207:14
**new (107)**
1:10,10 2:5,5,18,18
7:19 13:8 19:4,6
20:3,4 22:4 23:13
26:12 27:17 34:5
35:10 51:7,7 53:21
58:16 59:10,18 66:5
72:8,10 96:12,13,15
97:14 98:3 107:23
108:2 114:9 119:5
123:25 128:17
136:15 143:3
151:20 156:18
157:16,19 158:3
160:9,13 161:9,21
161:22,23 162:8,12
162:15 163:10,12
163:14,20 167:22
169:9 176:2,12,19
176:22 177:13,14
177:22 178:2,8
179:3,12 180:7,9,12
183:22 186:7
187:12,23 188:2,5
192:14,20 194:12

194:13,15 197:23
205:15,19 206:16
206:23 207:5,18
224:6 230:6,19,19
230:20 231:4,4,7
232:3,10,13,16
235:4,5,11
**night (1)**
3:12 227:20
**Nilov (9)**
57:9 198:20,21
199:25 201:15,20
228:23 230:11,21
**Nilov's (3)**
199:14 201:25 229:9
**nine (1)**
212:16
**Nobody's (1)**
114:22
**nominal (1)**
111:23
**nominated (3)**
65:9 68:7 172:19
**nonattendance (1)**
96:13
**noncash (1)**
22:3
**noncompete (16)**
84:8 170:25 171:6,10
171:15,21 172:3,16
173:2,13,23 174:19
175:2,14 186:15,19
**nonparticipation (1)**
155:15
**nonshareholder (1)**
120:5
**non-Ukrainan (2)**
23:14 134:7
**Normally (1)**
171:8
**Norway (6)**
34:6 41:21 42:22
62:10 139:25
141:19
**Norway's (1)**
43:4
**Norwegian (6)**
41:23 62:20 69:17
142:3,8 181:25
**Norwegians (2)**
69:13,16
**noses (1)**
22:20
**Notary (3)**
41:15 165:4 235:10
**note (8)**
5:22 32:24 125:16
155:18,25 157:12
157:14 158:13

**notebook (1)**
127:11
**noted (2)**
125:21 234:14
**notice (11)**
18:15 29:12,23 30:12
72:16,19 78:17
99:16 113:2 131:9
228:3
**notify (1)**
78:10
**notionally (1)**
164:3
**November (15)**
25:17,22 26:4 30:17
35:22 91:10 110:12
111:7,8 113:11
118:25 131:17,18
131:20,22
**null (2)**
13:19,22
**nullity (1)**
23:3
**number (15)**
5:12 45:17 51:18
82:11,20,24 154:25
187:15 191:19
204:2 208:13,16
210:2 224:22
228:13
**numbered (4)**
76:20 150:7 154:3,19
**numbers (1)**
168:11

---

**O**

**O (6)**
1:17 41:13,13 145:2,2
145:2
**object (1)**
175:13
**objecting (1)**
125:19
**objection (5)**
39:5 125:6,24 127:3
177:17
**obligated (6)**
218:23 219:7 224:5
224:19 225:9,14
**obligates (1)**
123:13
**obligation (4)**
78:14 151:5 214:20
226:15
**obligations (2)**
122:14 157:20
**obliged (1)**
180:11

**obstruct (1)**
49:24
**obtain (4)**
48:18,20 229:8
231:19
**obtained (4)**
68:12 85:3 120:22
231:7
**obvious (3)**
101:19 152:15 224:13
**obviously (8)**
37:18 142:17 147:25
148:3 160:18 161:6
161:9 231:3
**occasion (7)**
89:12,24 90:18,23
111:17 148:4
164:11
**occasions (1)**
5:23
**occur (1)**
84:20
**occurred (1)**
59:23
**October (8)**
12:23 13:3 26:11,21
27:25 32:15 108:4
110:19
**offer (2)**
5:15 34:24
**office (2)**
98:13 191:4
**officer (3)**
57:8 68:25 69:5
**offices (2)**
80:16 98:11
**official (1)**
102:7
**officials (3)**
217:22 218:10 221:7
**Oh (10)**
52:5 63:8,23,23 76:6
77:10 85:7,7 107:25
139:8
**oil (2)**
52:13,14
**okay (40)**
4:6 11:21 27:23 32:6
39:11 46:13 52:16
60:8,22 69:21 73:15
77:13 78:2,25 92:3
96:4 107:13 129:17
137:22 138:5
141:15 149:18
150:4,15 170:21
171:3 183:5,7
184:19 185:16
186:2 189:4 192:20
202:20 207:21

211:15 221:18
222:12 223:18
227:21
**old (7)**
2:10 108:2 133:6,8
171:21 187:16
230:22
**Oleksiy (3)**
197:22 198:2,2
**oligarch (2)**
83:22 86:22
**oligarchs (1)**
51:21
**omitted (1)**
128:8
**omnibus (1)**
146:11
**once (9)**
20:20 37:8 63:11
143:10 146:13
156:25 163:5,12
204:8
**ones (2)**
17:4 175:3
**one's (1)**
191:22
**one-day (1)**
73:4
**one-on-one (2)**
53:9,11
**open (9)**
36:6,9 37:17 38:4
57:25 80:15 146:7,9
147:23
**opening (2)**
147:5 195:22
**operates (1)**
7:6
**operating (2)**
49:10 68:20
**operation (5)**
49:13 81:13 105:13
107:8 130:8
**operational (2)**
80:3 103:5
**operationally (1)**
80:3
**operations (8)**
44:10 48:10 49:24
53:19 69:18 80:7
139:7 215:7
**operator (4)**
82:20 83:8,11 86:20
**operators (2)**
71:17 80:11
**opine (1)**
14:24
**opinion (13)**

4:20 7:18 8:8 10:15
13:18 17:11,13 29:6
29:10 85:21 146:21
156:12 224:4
**opinions (1)**
23:18
**opportunity (5)**
18:3 19:2 44:14
147:13,23
**oppose (2)**
102:24 147:15,18,18
**opposed (3)**
4:4 153:13,14
**opposite (1)**
13:25
**opposition (2)**
34:9 42:24
**optimal (1)**
81:19
**option (1)**
20:7
**orally (1)**
34:24
**order (49)**
4:9,13 7:12 8:22
10:21 11:14 12:23
13:10 15:10 18:11
18:24 20:14,21 22:5
22:11,15 23:22 25:8
25:14,23 26:13 27:6
27:13 32:15 35:14
115:2,4,8,18 118:14
141:23 145:22
149:15 150:25
160:7 171:13,16
183:25 187:19
189:10 190:20
191:8 194:14
209:23 210:3
223:15 224:8
233:15 234:7
**orderly (1)**
147:10
**orders (14)**
3:24 4:3 16:3,4,15
17:21 19:18 23:2,10
23:12 115:13
118:16 146:3
163:17
**ordinarily (1)**
171:15
**ordinary (1)**
70:10
**organization (2)**
71:15 81:4
**original (1)**
76:12
**originally (2)**
177:3 196:25

**Orrick (4)**
2:4,9,24,25
**Oslo (4)**
42:6 73:6 143:8
188:20
**ought (5)**
23:19 24:23 119:4
126:2 155:10
**outdated (1)**
193:24
**outset (1)**
16:2
**outside (11)**
21:25 105:5,6,7,11,12
140:25 167:14,22
179:13 198:3
**outstanding (3)**
25:7 208:8,22
**overall (1)**
204:11
**overriding (1)**
182:2
**overruled (1)**
210:19
**overturn (2)**
5:6 9:7
**overturned (2)**
116:4 117:16
**owned (6)**
62:17 83:8,10,20
86:12 87:7
**owner (3)**
83:24 131:5 209:20
**owners (2)**
135:13 223:21
**ownership (2)**
172:11 202:13
**o'clock (2)**
142:25 143:8
**O'Driscoll (18)**
2:12 90:3,21 112:13
112:19,23 127:20
142:22 143:4,7
153:19 168:18
182:18,20,25
186:24 203:23
220:6
**O'Driscoll's (1)**
202:24

_____

**P**

**P (2)**
2:2,2
**package (1)**
187:12
**page (21)**
55:4 58:3,5 59:5
70:10,20 71:3

133:15 169:23
170:21 175:16
182:23 183:3,4,12
192:8 205:5 211:25
222:8 227:7 236:4
**pages (1)**
16:10
**paging (1)**
212:6
**paid (3)**
80:18,21 130:9
**panel (34)**
3:10,12 4:4 16:5 17:6
20:24 24:4,10,21
25:11 32:9 33:18
34:13 37:25 38:2
41:8 50:8 85:9
126:12 141:25
143:23 148:10
153:8 154:17 157:6
159:25 168:9 170:3
197:14 202:18
227:13 233:5,24
234:5
**panel's (2)**
17:12 22:15
**paper (1)**
43:4
**papers (6)**
33:20 35:4 66:24
147:20,24 234:3
**paragraph (11)**
58:18 59:11 74:5 94:5
94:5 154:25 189:19
192:7,19 208:4,10
**paragraphs (3)**
150:8 154:3,20
**pardon (1)**
221:13
**parents (1)**
23:9
**parsed (1)**
10:3
**part (20)**
8:2 18:5 21:18 75:7
101:20 105:13
106:18 119:3
127:22 132:8 134:7
138:15 141:13
177:20 178:16
184:3 185:12
195:14 203:24
225:13
**parte (1)**
30:2
**partial (3)**
27:6 83:23 154:16
**participants (3)**
194:13 219:23 221:7

**participant's (3)**
56:24 57:6,14
**participate (11)**
29:17 32:22 88:25
89:14 90:20 92:6
93:2 112:10 114:14
122:23 147:15
**participated (6)**
5:18 90:2 104:8,14
131:17 203:21
**participating (5)**
34:21 118:5 129:22
148:3 164:4
**participation (2)**
24:20 33:9
**particular (16)**
56:22 122:25 123:20
130:14 152:14
153:4 166:3 169:24
170:14 171:19
176:10 179:11
181:15 213:5,19,24
**particularly (4)**
17:20 119:10 135:21
145:9
**parties (47)**
4:4 8:4,5 19:7,12 20:8
21:4,12 33:10 47:22
53:16 59:14 60:21
66:11 158:24
160:12,21 169:10
170:18 174:3
178:10,15 180:3,3,4
180:11,15,20 181:7
183:19,22,24 184:4
186:6 187:21 207:8
209:24 210:24
222:21 224:5,9,14
224:18,24 225:2
230:18 235:17
**partly (3)**
83:8,20 188:14
**partner (8)**
46:2 48:7,16 49:10
69:18 158:14
171:16 203:24
**partners (4)**
46:20 51:18 171:10
171:18
**partnership (1)**
200:22
**parts (1)**
169:22
**party (15)**
6:20 7:13,15,16 22:17
112:20 113:3 148:2
157:22 158:19
174:10 179:14
183:23 193:4 216:2

**part-time (2)**
42:14 43:9
**passed (2)**
162:17 227:14
**path (1)**
23:21
**Paul (1)**
100:16
**pause (1)**
91:16
**pay (1)**
136:17
**paying (1)**
119:8
**payouts (1)**
71:10
**penetration (1)**
82:19
**people (15)**
22:12 50:13 51:11
69:11 73:5,7,9 99:2
106:8 130:14 136:2
159:12 173:8
207:15,16
**percent (23)**
47:3 48:3,14,21,23
49:2,5,17,21 50:22
56:12 57:3 61:22
62:15,18 64:11
83:10 86:8 169:5
208:7,20,21 209:4
**percentage (5)**
48:17 49:20 213:17
215:7,10
**period (9)**
68:25 79:19 115:12
116:3,7 151:6,17
152:10,14
**permanent (2)**
15:18 233:9
**permission (1)**
41:4
**permitted (1)**
226:22
**permitting (1)**
129:23
**persisted (1)**
116:18
**person (8)**
39:20 60:14 66:19
69:2,3,4 110:14
174:23
**personal (1)**
44:18
**personally (2)**
64:3 148:14
**personnel (2)**
167:14 203:22

**persons (3)**
68:23 168:2 189:12
**persuade (1)**
109:6
**persuaded (1)**
92:6
**Peter (5)**
2:12 46:3 51:19
168:17 203:23
**ph (1)**
45:15
**phone (4)**
39:20 62:9 80:10
130:21
**physical (1)**
91:3
**physically (1)**
34:5
**picking (1)**
11:2
**Pieter (9)**
2:19 3:11,20 11:24
13:24 19:16 29:5
34:19,21
**Piper (1)**
165:15
**pitch (1)**
18:20
**place (18)**
3:8 15:12 56:14 66:11
91:10 98:21 118:16
160:6 161:2 162:6,8
162:12 188:7,7
189:11 195:10
206:16,24
**places (1)**
40:16
**plagued (2)**
16:20 36:23
**plaintiff (1)**
111:24
**plaintiffs (1)**
21:14
**plan (8)**
23:3 39:18 70:15 71:7
108:11 132:21,22
133:23
**planned (1)**
84:23
**planning (2)**
154:12 157:10
**plans (3)**
11:11 23:4 173:5
**player (1)**
171:9
**pleading (1)**
154:13
**please (10)**

42:4 48:16 164:23
169:24 177:2
184:20 189:18
191:12 200:11
226:10
**pleasure (4)**
39:23 142:18,20
149:3
**plus (1)**
142:18
**point (41)**
4:8 8:20 11:3,12 12:7
24:9 29:23 34:7
37:15 39:18 47:17
55:14 71:3 74:12
81:20 103:19,25
122:20 130:23
154:13,13 156:18
157:14 158:4,8,18
159:6 160:21
161:19,25 172:2,16
177:25 178:20
179:16 182:5,24
197:4 211:21 219:6
231:3
**pointed (1)**
20:18
**pointing (1)**
37:20
**points (9)**
14:2 22:7 44:25 47:18
54:7 58:2,20,20
76:14
**policies (1)**
96:19
**policy (2)**
42:23 71:16
**polling (1)**
228:4
**position (26)**
3:13 8:16 9:25 30:25
31:7 34:23 35:3
38:11,18,23,24
42:14 43:8 47:24
48:2,11 49:23 67:10
96:20 115:24
121:17 147:14
155:17 156:17
190:12 192:23
**positions (3)**
42:16 52:14 204:11
**positive (3)**
46:21 102:22 232:5
**possibility (3)**
47:16 48:13 205:24
**possible (5)**
18:2 48:3 110:8 209:2
223:20
**possibly (1)**

155:24
**post (2)**
89:22 90:18
**post-evidentiary (1)**
157:5
**post-hearing (3)**
145:8 146:15 148:12
**post-signing (1)**
220:9
**post-trial (1)**
148:11
**potential (2)**
142:2 205:21
**power (1)**
164:5
**practical (1)**
99:14
**practicalities (1)**
192:13
**practice (3)**
106:8 165:14 217:19
**practices (1)**
141:12
**precisely (1)**
163:20
**preclude (1)**
88:16
**precondition (1)**
209:14
**pregnancy (1)**
40:5
**prehearing (4)**
35:20,21 153:23
154:7
**preliminary (5)**
15:11,15,21 21:21
161:13
**premarked (4)**
168:8,13 188:25
191:11
**prepared (6)**
25:3 36:25 37:8 60:25
120:21 233:25
**present (15)**
2:23 17:25 33:4 34:4
34:5 38:13 39:24
40:17 59:24 81:25
93:24 94:2 100:9
138:23 233:24
**presentation (1)**
21:10
**presented (2)**
37:9,12
**presenting (1)**
35:10
**preserve (2)**
224:8 225:3
**president (13)**

43:7,10 65:19 66:19
67:22,23 68:8,16
92:5,10 106:12
109:5,17
**presigning (1)**
220:10
**press (3)**
141:6 148:15 201:19
**pressure (3)**
92:25 93:6 197:7
**presumably (1)**
189:23
**pretending (1)**
21:13
**pretty (1)**
37:22
**prevail (1)**
20:11
**prevent (6)**
80:4 87:13 111:12
112:6 116:24
124:17
**prevented (1)**
49:15
**preventing (2)**
113:17 115:5
**prevents (2)**
23:22,23
**previous (3)**
154:15 185:19 194:20
**previously (1)**
166:4
**price (1)**
138:9
**primacy (1)**
180:20
**primarily (1)**
167:18
**prime (8)**
42:23 62:10,10,12
141:18 142:6,9,10
**principal (3)**
45:21 100:8 203:10
**principals (3)**
45:14,15 55:17
**principle (3)**
157:21 158:21 216:20
**prior (7)**
35:14 42:17 44:13
46:16 157:17
165:15 220:18
**priority (2)**
143:13 181:2
**private (2)**
165:14 209:25
**privately (1)**
201:24
**privileges (1)**

226:23
**pro (1)**
58:24
**probably (1)**
197:5
**problem (10)**
22:24,24 88:3 129:19
135:5 201:2,11,25
222:24 227:11
**problems (5)**
134:6 136:22 137:15
137:20 224:20
**procedural (2)**
112:15 115:10 160:25
**procedurally (1)**
4:23
**procedure (4)**
29:25 59:2 72:8
118:12
**procedures (2)**
136:10 216:14
**proceed (16)**
23:13 24:19,24 25:9
25:11 32:20 33:25
34:2,16 37:2,5,6
39:14 40:8 41:2
129:9
**proceeded (1)**
226:17
**proceeding (11)**
9:19,23 11:17 12:10
19:10 28:10 29:17
106:20 147:22
148:23 166:5
**proceedings (67)**
3:1 4:1 5:1 6:1 7:1,25
8:1 9:1 10:1 11:1
12:1 13:1 14:1,19
15:1 16:1 17:1 18:1
18:12,14 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1,19 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1,15
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 235:12
235:15
**process (9)**
19:2 22:13 35:17 56:2
113:2 169:2,21
219:20 220:22
**procurement (1)**

71:15
**producer (1)**
43:4
**Professional (1)**
235:9
**Professor (3)**
7:17 8:7 10:14
**prohibits (2)**
4:17 23:8
**promoting (1)**
31:6
**prompt (1)**
152:16
**promptly (2)**
153:8 234:6
**pronounced (1)**
109:13
**proof (1)**
33:6
**proper (3)**
4:22 19:20 143:13
**properly (1)**
95:21
**proposal (2)**
103:20 120:3
**proposals (1)**
63:14
**propose (5)**
3:15 11:23,24 12:2
119:14
**proposed (14)**
91:7 114:11 118:19
126:22 150:6,9
153:25 154:4,18,21
155:3 177:19
195:19 217:11
**protect (1)**
171:13
**protection (2)**
170:9 209:19
**protocol (12)**
70:2 96:10,23,25
100:2,12,14 107:20
110:19 111:3 113:4
113:8
**protocols (4)**
106:24 110:11,22
113:6
**prove (2)**
65:21 66:6
**proved (1)**
136:15
**provide (5)**
56:19 69:12 145:13
146:11 147:10
**provided (3)**
4:25 30:4 56:25
**provides (1)**

**providing (2)**
59:17 149:20
**provision (19)**
122:15 123:10 171:6
171:16 172:3 175:6
184:6 186:16,19
193:13 211:21
213:25 215:18,22
216:21,22,23,25
224:3
**provisions (13)**
6:18 121:19 122:3
123:11,11,14,24
124:2,17 175:14
187:4 194:5,11
**public (4)**
41:15 119:18 165:4
235:10
**publicly (1)**
201:24
**pulling (1)**
147:10
**purchase (1)**
59:15
**purely (3)**
121:21 122:6 125:4
**purpose (14)**
13:9 46:14 84:12,13
98:2 168:25 170:4,6
174:11 179:11
183:16 186:14
189:7 190:2
**purposes (2)**
8:23 99:14
**pursuant (3)**
146:13 181:8 206:15
**pursue (1)**
135:18
**pursuing (2)**
22:8 120:8
**put (10)**
16:18 38:16 51:22
85:25 104:2 147:20
171:7 196:4 197:7
201:19
**putting (3)**
93:6 94:19 195:22
**puzzled (2)**
159:18,19
**p.m (3)**
144:18 145:3 234:14

_____
**Q**
**qualification (1)**
200:7
**question (44)**
13:24 14:24 15:25
20:10 29:5 30:11
163:11

31:9,19,23 34:19
59:22 74:19,19
91:19 121:16
127:15 134:14
139:17 140:25
141:16 146:18
147:21 148:7 160:5
160:11,17 178:22
179:6 180:18
189:11 190:6,14
194:20,24 196:13
199:3 212:10
213:21 215:22
217:5 218:15
225:19 229:19,22
**questioned (2)**
209:8 227:12
**questioning (2)**
130:25 140:14
**questions (15)**
30:4,6 84:6 87:10
120:25 126:13
128:23 140:12
143:21,23 162:14
202:18 207:22
221:24 222:4
**quick (1)**
120:24
**quite (7)**
64:9,10 79:23 176:11
212:25 215:10
218:14
**quorum (12)**
59:2,3 71:22 88:3,6
93:8 97:11 107:14
110:8 111:4 113:22
114:12
**quotation (1)**
158:19
**quote (4)**
6:20 30:23,24 200:2

_____
**R**
**R (9)**
1:17,18,19 2:2 41:13
145:2 165:2,2 235:3
**raise (2)**
22:18 164:23
**raised (3)**
16:2 24:6 190:15
**raises (1)**
162:13
**raising (1)**
140:25
**range (1)**
143:20
**ranking (1)**
138:25
**rata (1)**

58:24
**ratification (2)**
217:8 220:9
**ratified (3)**
217:7 219:23,24
**ratify (3)**
217:16 218:13 221:8
**reach (3)**
82:13 159:13 160:8
**reached (3)**
146:14 159:11 194:4
**reaching (1)**
122:16
**read (13)**
9:11 11:3 12:24,24
58:19 156:21
166:11 189:4,17
192:17 194:19,22
197:20
**readily (1)**
176:15
**reading (2)**
25:12 55:8
**reads (1)**
226:20
**ready (7)**
24:17 32:20 39:25
143:14 164:17
197:25 198:11
**real (6)**
21:9,10,11 88:2
163:19 195:25
**reality (1)**
58:20
**really (17)**
8:9,12,23 12:18,19
78:17 85:2 105:15
126:2 144:12
147:24 157:6 164:8
187:13 190:22
209:4 229:11
**Realtime (1)**
235:8
**reason (14)**
6:8 23:20 37:16 43:18
74:3,6,8,11 99:21
102:5,11 141:11
172:22 225:7
**reasonable (1)**
196:5
**reasons (9)**
25:2 27:5 29:9 30:12
37:7 73:10 119:16
152:15 205:19
**rebuttal (1)**
38:18
**recall (15)**
24:8 53:8 56:17 61:15
67:6 91:3,24 154:14

166:4 175:5 176:20
189:2 192:5 207:2,6
**receive (2)**
112:25 173:3
**received (6)**
37:25 125:17 127:5
127:17 199:16
219:10
**receiving (2)**
189:2 192:5
**recess (5)**
24:24 32:12 39:13
40:24 144:18
**recognition (1)**
26:12
**recognize (1)**
13:15
**recollect (1)**
209:4
**recollection (3)**
44:19 76:17 112:23
**reconsider (6)**
26:10 27:12,24 28:2
32:15 147:14
**reconsideration (2)**
26:7,20
**reconsidered (2)**
118:14 226:12
**reconstruct (1)**
95:24
**reconvene (1)**
12:7
**record (45)**
13:5 16:7 17:25 31:10
31:13 34:8,13 36:3
36:5,9,12,13 37:13
37:17 38:23 40:19
41:2 56:18 57:10
89:17 90:10,14,14
91:4 93:20 119:4
125:23 127:2
137:14 144:16,16
144:17 145:4
147:12 149:23
155:19,25 157:12
164:14 165:10
194:22 228:20
232:23,24 235:15
**record's (1)**
6:7
**redemption (1)**
226:24
**redistributed (1)**
233:15
**reduced (1)**
20:25
**refer (4)**
78:12 106:10 157:18
161:18

**reference (5)**
25:14 54:13 77:16
94:6 222:17
**referenced (1)**
111:25
**referencing (1)**
78:6
**referred (8)**
54:4 56:23 57:13,24
193:5 199:23
219:20 227:10
**referring (12)**
41:9 44:23 45:5 53:8
58:12 74:4 94:3
99:8 100:18 105:10
115:19 131:20
**reflect (7)**
49:9 79:3 93:20
170:17 175:24
199:25 200:13
**reflected (8)**
55:18 73:17 100:13
107:19 128:10,11
129:4 226:19
**reflecting (2)**
53:22 193:2
**reflection (1)**
66:9
**reflects (4)**
55:10 111:3 113:5
177:14
**refusal (2)**
116:17 226:25
**refused (1)**
85:21
**regard (7)**
23:2 50:4 77:21
124:10,12 180:23
206:11
**regarded (5)**
48:5,6 57:22 60:19
124:15
**regarding (3)**
5:3 127:13 228:3
**regime (1)**
187:23
**register (1)**
214:15
**registered (5)**
152:3,4 191:3 215:13
235:9
**registration (1)**
205:14
**regulations (2)**
43:18 80:5
**regulatory (1)**
140:5
**rehearse (2)**

36:22 163:16
**reinstated (1)**
117:25
**rejected (1)**
212:23
**relate (1)**
173:21
**related (5)**
54:7 103:5 105:8
173:19 174:10
**relating (2)**
106:23 135:21
**relation (1)**
66:10
**relationship (11)**
51:13 102:20 103:13
105:18,21 178:10
178:14,19 179:2
180:6 222:5
**relationships (1)**
51:23
**relative (1)**
47:19
**relatively (1)**
51:7
**release (1)**
201:20
**releases (1)**
141:7
**relevance (1)**
190:6
**relevant (6)**
115:12 176:19 181:8
190:2 216:6 231:11
**reliable (1)**
66:7
**relief (3)**
25:18,19 123:20
**rely (1)**
157:16
**relying (1)**
8:21
**remember (19)**
44:25 45:9 53:14
54:16 60:13 61:12
72:20 75:22 76:11
88:22 89:4,8 101:5
113:16 114:5 121:3
209:9 213:4 227:14
**reminder (2)**
12:19,21
**reopen (2)**
38:5 147:16
**reopened (1)**
37:24
**repair (2)**
75:11,13
**repayment (1)**

193:3
**repeat (4)**
70:24 96:12 97:3
225:12
**repeated (1)**
97:8
**rephrase (2)**
169:14 180:17
**report (1)**
43:21
**Reported (1)**
1:24
**reporter (4)**
142:18 235:8,9,10
**reporting (1)**
43:22 96:17
**reports (1)**
70:11
**representation (2)**
16:6 200:8
**representative (7)**
77:7 79:4 90:24 100:8
101:8 109:24
218:19
**representatives (10)**
65:16 70:4 91:2 93:24
94:2 100:11 116:15
116:16 169:18
190:11
**represented (2)**
92:23 117:12
**representing (5)**
100:15 158:16 171:4
174:23 190:4
**represents (1)**
16:12
**request (3)**
3:10 37:25 195:3
**requested (4)**
193:10 194:5 195:13
197:10
**requesting (1)**
25:18
**requests (3)**
26:9 30:20 94:19
**require (6)**
120:25 122:4 123:18
123:21 171:10
211:6
**required (14)**
30:13 33:3 87:17
121:5,6 151:18
189:22 201:6
210:25 212:12,15
214:5 219:15 230:6
**requirement (11)**
59:2 116:6 120:17
124:4 151:17
180:16 190:18,18

214:2 223:7,13
**requirements (10)**
121:22 123:5,17
136:20 137:25
138:11 139:2
180:22 222:6,7
**requires (4)**
138:21 214:14,17,18
**requiring (2)**
170:13 172:23
**resist (3)**
38:12 117:9,11
**resisted (1)**
197:2
**resolution (5)**
88:23 89:2 109:7
187:3 231:5
**resolutions (6)**
218:5 227:13,17
228:3,19 229:20
**resolve (2)**
210:4 215:21
**respect (16)**
6:11 14:7 33:18 37:14
39:8 58:15 62:2
71:25 78:6 79:21
86:24 91:8 113:23
172:9 187:2 200:23
**respectfully (2)**
26:9 30:19
**respond (1)**
154:12
**responded (1)**
95:4
**respondent (3)**
1:7 2:15 3:7
**responding (2)**
94:11 147:24
**response (7)**
75:17 84:5 94:8,20
95:7 118:23 147:7
**responses (1)**
148:14
**responsibilities (6)**
43:13,15,20 44:2,3
165:22
**responsibility (1)**
53:19
**responsible (3)**
48:8 166:22 167:3
**rest (5)**
31:9 33:20 37:8,9
51:2
**restore (1)**
123:23
**result (10)**
21:15 62:7 105:4
129:20 130:24

135:24 136:21
156:20 195:6
213:12
**resulted (1)**
167:10
**results (2)**
106:17 140:20
**retained (1)**
167:21
**return (2)**
147:19,22
**reversed (2)**
118:3,6
**review (4)**
19:8 44:14 107:7
161:10
**reviewed (3)**
166:11 192:20 197:22
**Reznikovich (3)**
125:10,14 236:17
**right (84)**
10:16 11:10,20 12:24
19:16 27:8 32:13
38:15 40:13 46:9
49:25 54:5,15 57:7
62:19,24 71:4 73:12
76:10,24,25 77:5,20
77:24 78:18 88:5
89:15 90:4,7 95:13
100:20 101:13,13
104:6,8,11 107:16
110:21,25 120:13
127:8,24 129:10,11
131:6,7 132:3
136:24 138:19
140:19 141:5,7,9
148:17 151:23
152:7,11,17,20,22
153:15 156:2 157:3
160:12 164:16,23
182:17 186:13
198:18 204:19
205:4 208:9,14
209:9,16,25 210:13
210:14,17 215:4
222:15 225:23
226:15 228:21
**rights (24)**
18:21 39:10 49:3,16
57:5 62:16 106:2
119:7,9,13 122:9
124:10,13 166:24
170:10 184:9
205:14 217:10
225:20,21 226:13
226:23,25,25
**risen (1)**
141:18
**risk (4)**

66:9 84:16 135:11
196:6
**Robert (4)**
2:6 125:9,13 236:16
**role (7)**
50:10,12 65:7 129:13
167:13,24 203:19
**roles (3)**
47:22 53:17 62:22
**Rolfe (1)**
16:9
**Ron (1)**
16:8
**room (1)**
40:11
**round (2)**
90:12 148:4
**routinely (1)**
209:21
**routines (1)**
136:15
**RPR (3)**
1:25 235:7,24
**rule (2)**
13:25 20:25
**ruled (1)**
116:5
**rules (20)**
1:2 3:5 6:19 29:20
33:2 37:21 38:3
112:15 140:8
146:13,17,22 147:2
150:24 159:3
162:16 179:18,23
189:25 207:17
**ruling (29)**
4:10,12,21 5:3,7,10
5:11,21 6:11 8:14
8:25 9:2,6,7,9 10:16
14:12 24:10 25:13
32:5 33:15 35:7
39:9 116:9 117:25
120:3,22 128:18
162:22
**run (3)**
12:6 64:15 69:7
**running (2)**
48:8 129:19
**runs (1)**
14:19
**Russia (5)**
21:25 46:20,21 66:12
172:4
**Russian (9)**
51:14 52:2,9,11 64:14
83:11,21 86:19,22

S

**S (7)**
2:2,20 41:13 145:2,2
145:2 236:12
**safer (1)**
173:2
**sake (1)**
90:22
**sales (1)**
80:16
**sanction (1)**
159:2
**sandbagged (1)**
39:2
**Sanders (1)**
61:19
**Sarbanes-Oxley (5)**
43:19 80:5 138:12,15
139:12
**satisfied (2)**
30:22 32:18
**Saturday (1)**
3:12
**saw (1)**
50:12
**saying (11)**
4:13 8:8,15 11:13
15:6 70:23 89:12
95:6,10 128:18
141:24
**says (14)**
9:12 10:16 11:4 19:16
25:8 26:8 28:24
37:5 100:14 151:15
156:8 205:8 219:7
228:3
**scanty (1)**
94:20
**schedule (5)**
5:14 63:12 113:15
150:21 233:4
**scheduled (7)**
16:24 72:11 96:9
113:11,12 114:2,4
**scheduling (1)**
234:7
**scheme (2)**
71:11 224:9
**screen (1)**
80:11
**scrutiny (1)**
153:13
**seal (1)**
219:9
**searched (2)**
94:15 95:14
**season (1)**
146:8
**seat (4)**

19:5 59:18 160:20,24
**SEC (5)**
43:19 137:21 138:2,3
138:11
**second (24)**
18:22 49:14 70:12,20
72:14 73:16 74:4
75:14 76:7 78:23
114:8 121:16
133:15 136:12
148:4 168:6 185:17
189:5,18,22 192:2,7
192:19 222:19
**second-to-last (1)**
59:5
**secret (1)**
84:17
**secretary (1)**
63:16
**secrets (2)**
84:20 171:11
**section (12)**
70:12 157:19 169:25
170:24 175:21
182:22 183:17
205:6 222:9,18
226:20,20
**secure (1)**
92:10
**secured (1)**
120:2
**Securities (1)**
135:22
**see (26)**
9:2 21:17 25:13 43:16
55:9 70:9 74:17
79:25 80:10 97:4
100:2 108:17
114:25 120:18
129:18 133:2 135:3
137:15 148:6,14
151:12 153:3
170:24 208:9
209:21 227:24
**seek (7)**
21:4 29:8,13 106:15
106:15 230:19
232:3
**seeking (3)**
117:5 123:20 141:14
**seen (5)**
50:8 71:3 86:21
168:15 197:17
**select (1)**
205:18
**selected (1)**
186:5
**selection (1)**
207:10

**self-enforcing (1)**
11:14
**self-executing (1)**
10:16
**self-generated (1)**
17:2
**sell (2)**
48:15 86:18
**sending (1)**
65:15
**sends (1)**
63:16
**senior (7)**
18:17 43:7 46:2 68:22
158:14 197:7,8
**sense (3)**
120:19 147:9 148:5
**sensible (1)**
149:5
**sent (11)**
75:21,23 76:9,20 77:3
77:4,11 94:9,23
95:23 189:8
**sentence (6)**
30:18 189:5,18
192:18 205:7
222:18
**sentences (3)**
192:18 197:21 222:19
**separable (1)**
162:20
**separate (1)**
150:12
**separately (1)**
227:19
**sequence (1)**
95:25
**series (1)**
16:21
**serious (1)**
92:24
**serve (7)**
18:15 115:22 118:2
118:18 121:23
123:6 124:9
**served (1)**
113:2
**server (1)**
22:13
**service (1)**
10:19
**set (14)**
17:8 44:20 109:10
136:10,20 168:8,13
169:2 175:3 188:25
202:22 203:11
233:5 235:22
**settlement (1)**

125:20
**seven (1)**
212:15
**severability (2)**
13:6,13
**severable (2)**
13:2 26:23
**share (10)**
47:20,25 48:18 53:16
58:24 59:14 119:8
138:8 170:7 223:22
**shareholder (24)**
46:19,22 47:4,20
60:17 64:11 82:2
85:5 88:7 113:21
114:3 126:15,20
169:5 178:19 179:2
188:5 202:11
209:19 222:6 223:3
223:17,24 226:16
**shareholders (44)**
43:24 50:20,21 54:8
56:3 60:17 63:14
66:7 75:3,15 79:24
81:15 84:14 88:11
88:12 113:24 114:2
115:22 117:7
118:17 119:18,23
121:6,7 123:13
124:22 129:3,23
134:10 135:15
136:23 169:11
187:15 192:14,21
205:9 219:24
220:17 221:6 223:9
224:7 225:25
226:21 227:2
**shareholder's (106)**
27:19,21 49:6,9,15,22
53:21 55:10 58:17
58:19,21 59:8,15
66:4 67:11 74:13,21
75:8 77:17 78:7,13
78:15 84:9 121:25
122:2,3,6,10,15
123:8,9,15,17,25
124:11,14,16
148:22 167:4,9,10
169:9,25 171:7,21
175:8,11,25 177:9
177:19 180:10,22
180:25 181:6,9
182:3,7 183:20,21
184:2,13,23 185:11
186:11,20,21 187:5
187:6,13,16,20
188:2 192:15
193:11 197:23
199:13 200:3 201:3

201:6,12,17,22
202:2,5 205:13
206:14 213:22,23
214:9,10 215:19
216:3,17,22,24
217:12 222:9,22
223:5 224:10,14
225:5,8,15 228:24
230:2
**shares (13)**
47:8 48:14,15 49:20
50:23 51:2 56:12
86:9 105:16 169:11
181:20 208:8,22
**sheet (19)**
53:25 54:3 55:7,11,13
55:16 58:4,15,17
59:7,13 60:25
168:25 175:4,11,17
177:14,18 203:2
**sheets (1)**
168:22
**Shell (1)**
163:22
**ship (3)**
152:17,21,22
**shoes (1)**
15:7
**shops (1)**
130:20
**Shorthand (1)**
235:9
**shortly (5)**
46:24,25 60:12 90:8
114:4
**show (13)**
13:10 21:21 50:13
56:25 75:9 93:16
97:15 100:7,23
116:17,18 225:9,16
**showing (5)**
4:21 6:21 110:23
220:23,23
**shown (2)**
100:11 202:23
**shows (3)**
10:15 56:20 120:20
**Shtyrba (2)**
204:9,17
**side (23)**
21:13 45:14,22 61:3,3
61:5,6,9 94:20
130:16 160:3,4
167:20 173:24
174:18 196:20
200:5 206:21,21,22
207:16,17 231:19
**sides (4)**
59:24 157:4 159:20

205:19
**Sigmund (5)**
100:14 125:7,12
196:18 236:14
**sign (7)**
189:12 192:25 197:25
198:12,25 199:4
200:2
**signatory (1)**
189:16
**signature (7)**
90:11 189:22 219:4
219:17 220:19,20
221:4
**signed (12)**
54:25 125:8,12
175:12 195:21
198:6,8,21,24
218:20 221:2
236:15
**significant (4)**
21:20,24 22:3 108:4
**signing (5)**
174:5,8 189:10
217:23 218:11
**Sikora (5)**
1:25 41:16 165:5
235:7,24
**silent (2)**
213:23 214:9
**Sills (121)**
2:6 5:25 6:17 8:21
15:22,23 19:19
20:13,17 28:16 30:5
30:5 33:23,24 36:14
36:19 37:4 38:9
39:4,15,21 40:12,15
40:22,25 41:3 46:11
56:22 78:3 90:8
94:15 95:12 99:25
111:20 112:21,25
115:9 116:25
117:10 120:11,15
121:8,20 122:18
125:9,13,16,22
126:9 127:24
140:13,17 142:16
143:16,18 144:9
145:5 146:25 147:8
148:15 149:10,18
150:4,12,15,19
151:2,22 152:11,20
152:25 153:21
154:9 155:13
157:10 160:16
162:13 164:17,19
165:8 168:5 178:23
182:4,12,16 183:7
183:10 184:25

185:10,17 186:25
191:15,20,24 192:9
196:15,23 197:13
202:14 209:8
211:16,19,24 212:5
217:25 218:5
221:21,22 222:2,15
227:22 228:15,17
228:21 233:2,3,16
233:22 236:7,10,17
**silly (1)**
124:6
**similar (3)**
145:21 172:2,3
**similarly (1)**
32:19
**simple (2)**
84:13 210:21
**simplistic (1)**
25:5
**simply (6)**
22:19 109:8 113:5
156:4 160:11
207:14
**simultaneous (1)**
148:11
**sir (1)**
93:18
**sister (1)**
174:14
**sit (2)**
162:9 223:15
**site (1)**
206:17
**sitting (1)**
162:6
**situation (6)**
82:2 95:10 101:21
137:16 138:23
231:16
**situs (1)**
207:19
**six (1)**
87:17
**size (1)**
82:8
**slate (1)**
100:9
**slightly (2)**
83:14 115:10
**slogged (1)**
119:24
**small (5)**
81:7 143:9 193:2
233:7,8
**smaller (2)**
71:17 195:9
**Smith (1)**

158:17
**smoking (1)**
214:16
**soft (1)**
106:4
**soften (1)**
86:6
**softer (1)**
86:7
**sold (3)**
48:12 49:19 174:9
**sole (1)**
57:8
**solve (2)**
139:21 224:19
**somebody (1)**
149:8
**somewhat (1)**
145:17
**soon (2)**
65:20 120:23
**sorry (29)**
22:21 25:5,21 46:13
54:17 64:22,24,25
66:23 70:16,21
73:23 81:21 97:2
104:12 122:25
126:4 151:3 152:23
177:2 191:15
196:10,17 199:20
217:20 220:6 222:8
222:18 228:7
**sort (18)**
7:20 53:25 60:24
84:19 95:20 100:5,7
127:8,12 147:4
157:2 158:9 160:25
161:14,15 179:7,22
203:2
**sought (2)**
19:8 112:5
**sound (2)**
152:12 153:11
**sounds (1)**
205:17
**source (2)**
145:15 158:11
**Southern (7)**
8:6 17:5,22 19:4,9,24
21:2
**so-many-days (1)**
153:6
**sparring (1)**
203:24
**speak (7)**
66:13 179:21 187:24
192:15 196:15
224:23 232:6
**speaking (3)**

148:9 156:9 159:23
**speaks (1)**
17:13
**special (3)**
43:11 44:3 57:5
**specific (8)**
29:21 43:20 88:21
102:5 130:7 151:6
153:5 173:5
**specifically (3)**
16:12 23:8 138:13
**speed (2)**
130:12,19
**spell (2)**
46:7 66:22
**spelled (3)**
66:25 181:2 198:5
**spend (2)**
213:16,18
**spent (1)**
42:6
**Sphere (2)**
30:22 32:18
**spirit (2)**
120:10 224:20
**spite (1)**
110:5
**spring (5)**
45:7 46:15 61:21 63:5
88:19
**squeeze (1)**
106:2
**Squire (1)**
61:19
**ss (1)**
235:4
**stage (2)**
15:21 75:10
**stages (2)**
40:4 118:20
**stake (1)**
86:17
**stand (3)**
17:19,20 33:13
**standard (4)**
6:15 30:22 31:14
32:19
**standing (1)**
40:8
**stands (2)**
3:18 4:15
**stark (1)**
28:19
**start (6)**
3:8 65:20 67:24
156:23 160:18
176:22
**started (9)**

53:5 68:10 82:21 90:5
103:15 105:25,25
165:14 172:6
**starter (1)**
44:11
**starting (3)**
172:2,16 197:4
**starts (1)**
156:17
**state (16)**
10:19 36:2 58:15 59:7
59:10 116:18
129:18 137:13
165:9 176:2 178:13
191:4 205:15,18
235:4,11
**stated (4)**
49:22 62:21 97:13
181:6
**statement (6)**
33:14 36:18 71:9
112:2 121:9 193:10
**statements (10)**
108:10 131:12,14
132:2,5,8,9,11,14
132:16
**States (12)**
20:16 22:23 59:10
135:21 136:25
140:3,4 146:5
205:12,16 206:2,9
**status (1)**
70:10
**statutes (3)**
63:19 72:7 74:24
**statutory (1)**
157:17
**stayed (1)**
89:22
**Stayn (2)**
204:8,15
**stems (1)**
200:14
**step (4)**
22:6 38:8 97:25 123:3
**stepped (1)**
43:8
**stepping (1)**
93:15
**steps (1)**
169:6
**stock (1)**
223:8
**stop (2)**
136:8 174:7
**stopped (2)**
65:10 114:20
**stopping (1)**

226:6
**stops (2)**
9:21 11:16
**Storm (175)**
1:6 3:7,10,18 4:16,17
6:16 8:12 9:12,13
10:20 11:4 16:23
18:2,4 21:17 23:8
23:23 24:18 25:10
26:9 28:19 29:7
30:19,21 32:18,22
33:15 37:5,10 38:5
38:13,20 47:3 50:9
50:20,23,24 51:2,3
55:20,20,22 56:7,13
56:20 57:3,23 58:23
65:10,15 66:14 67:4
70:4 71:21 72:5,16
73:20,24 74:10
78:10 85:21 87:12
88:25 89:13 90:19
90:24 91:2 92:23
93:24,25 94:18 95:6
95:16,17 97:10
101:22 102:7
111:25 116:24
119:5 122:13
123:21 129:21
134:20 135:25
137:17 145:11,22
147:13,19,21 148:6
149:16 153:22
154:7 155:20,22
156:22 157:13
159:12 163:2 169:4
169:16,20,21 170:9
171:5,24 173:15,19
173:21 176:14
177:21,24 178:5
180:4 189:11,13,16
189:21 190:5,11
192:11 194:5,8,11
195:4,11,13,19
196:3 197:22
198:16,22 199:7
200:25 201:10,23
202:4,12 203:8
206:8,21 207:15
208:6,16 209:14
212:19 217:7,14,15
217:15,22 218:10
218:13,20,23 219:7
219:16 220:18,18
221:6,6,7,8 225:9
225:22 227:9 231:8
231:13,19,22,24
234:8
**Storm's (18)**
3:13 7:4 17:7 20:11

22:25 32:14,16 33:8
50:21 56:3 78:14
79:4,12 86:25
122:21 145:14
154:8 160:4
**Storm/Alfa (1)**
192:12
**strategic (1)**
132:22
**strategy (9)**
70:14 71:7 107:7,9,11
107:12 108:11
120:8 132:20
**Street (1)**
2:10
**strengthen (1)**
80:24
**striking (2)**
119:10,16
**strong (2)**
20:23 49:2
**strongly (2)**
38:11 147:15
**struck (2)**
194:10 208:3
**structure (10)**
81:19,23 117:20
119:6 124:19
134:25 135:4,16
179:24 225:4
**structures (1)**
209:22
**studied (1)**
53:4
**studying (1)**
42:7
**subject (14)**
16:14 18:19,22 19:6
39:22 143:20 149:3
152:25 155:2,22
166:8 206:19
213:24 234:4
**submission (6)**
34:15 146:14 148:11
149:6 154:17 157:5
**submissions (11)**
5:16 34:14,22 35:13
35:20 145:12,16,22
145:25 146:3 234:9
**submit (5)**
5:8 6:3 8:3 28:18
155:3
**submits (2)**
8:5 148:6
**submitted (5)**
33:21 35:4 44:16
149:24 156:22
**submitting (2)**
146:15 166:5

**subscribers (5)**
82:8,12,13 83:13
85:10
**subsequent (1)**
4:12
**subsequently (1)**
91:5
**subsidiaries (3)**
223:22,23 224:7
**subsidiary (4)**
83:16 163:23 172:12
173:9
**substance (1)**
173:14
**substantial (2)**
54:7 145:13
**substantive (3)**
118:22 186:9,10
**substantively (2)**
4:22 186:8
**substitute (1)**
100:6
**substitutes (3)**
99:14,21 100:21
**substituting (2)**
14:10 100:16
**substitution (1)**
100:17
**succeed (3)**
105:23 117:13 213:7
**successful (1)**
93:9
**sue (1)**
20:6
**sued (4)**
17:15 18:4 91:5
111:15
**suffering (1)**
81:14
**sufficient (8)**
6:4,21,24 7:2 21:20
40:16 69:6 81:10
**sufficiently (1)**
81:12
**suggest (17)**
159:9 173:13 174:19
174:25 177:25
178:6 190:5,23
191:2,6 193:19
194:12 200:6,25
201:14,24 225:23
**suggested (6)**
119:5 146:21 173:19
173:20 193:12
195:10
**suggesting (1)**
36:15
**suggestion (3)**

144:10 180:2 195:8
**suggestions (1)**
146:10
**suggests (1)**
220:9
**suing (1)**
163:23
**suits (1)**
120:23
**sum (1)**
31:14
**summarization (1)**
3:17
**summarize (8)**
3:11 11:23 70:7 79:7
93:18 96:15 130:3,5
**summarizes (1)**
126:19
**summary (2)**
126:14 149:20
**summed (1)**
108:6
**summer (5)**
65:13,18 104:10
128:12,25
**super (6)**
170:13 210:25 211:6
212:11,14 225:22
**supplemental (1)**
127:12
**supplied (2)**
112:4 199:15
**supply (2)**
57:15 158:19
**support (6)**
30:24 49:11 68:15
69:13 85:19 130:10
**supported (2)**
68:22 80:17
**supporting (2)**
150:8 218:6
**suppose (9)**
46:4 90:13 117:10
119:4 122:20
126:23 144:10
155:14,14
**supposed (3)**
10:2 16:3,15
**supposition (1)**
102:15
**supreme (4)**
114:7 115:20 116:8
118:9
**sure (17)**
24:7 26:5 34:20 78:24
84:14 85:15 86:2
89:11 98:5 136:18
144:12 146:23

150:5 154:14
172:18 215:10
218:14
**surprise (1)**
38:25
**suspect (1)**
151:19
**SUTCLIFFE (2)**
2:4,9
**Swedish (7)**
60:18,21 176:25
177:5,9,11 189:24
**sworn (2)**
41:15 165:4
**system (1)**
5:20

_____

**T**

**T (6)**
41:13,13 145:2 235:3
235:3 236:12
**tab (5)**
182:6 191:11 194:17
197:12 211:16
**table (5)**
16:17 40:16 86:8
106:5 147:20
**tabs (1)**
199:19
**tabular (1)**
126:19
**tactics (1)**
226:9
**tailored (1)**
209:23
**tailoring (2)**
172:7,17
**take (42)**
5:14 10:17 17:12 22:6
24:23 25:9 28:13
32:8 34:14,23 39:7
39:13 40:6,11 56:11
66:4,8 71:24 80:2
81:4,24 88:4 92:6
92:19 107:13
121:17 126:10
132:21 133:18
142:17 143:9,17,25
154:5 161:25
162:10 183:23
188:7 190:12 203:9
206:5,16
**taken (17)**
32:12 38:25 40:24
56:14 66:11 81:12
91:20 115:24 118:7
124:25 129:21
135:14 188:6 218:9
220:17 221:5

235:12
**talk (2)**
50:8 138:11
**talked (2)**
101:6,7
**talking (15)**
50:5,16 62:8,13 84:6
92:14 96:21 99:4
138:12 196:9
210:14 217:10,25
218:3 228:18
**talks (1)**
208:5
**tap (1)**
88:20
**team (2)**
148:19 204:18
**technical (10)**
68:25 69:12 70:11
118:21 130:11
179:22 187:14
193:2,22 195:3
**technique (1)**
173:25
**technology (3)**
171:11 173:5 232:22
**telecom (5)**
51:6,14 172:11,20
173:10
**Telenor (138)**
1:3 3:6 4:24 5:9,14
6:13 7:6,7,9,11,12
7:14,15 8:10,16
15:2,14 28:23 29:12
29:24 30:7,15 33:3
36:11 42:13,16,18
43:6,10,13,23 44:6
45:9,14,17 47:8,20
48:6 49:5,10 53:10
53:18 58:22 61:3,5
62:14,15 63:4 65:21
67:7 68:15,23 69:2
69:4 73:5 74:11
78:10 85:4,18 93:9
99:2,23 100:4,10,15
103:2,3,10 106:4,13
112:17 116:15
121:17 130:9 132:9
134:15 136:16,18
137:8,10,14,17
138:2,23 139:4,6
140:19 141:4,24
142:4 156:16
165:17,19,23 166:2
166:22 167:3,14,15
169:3,6 170:7 171:5
171:8 172:3,13
173:5 176:7,14,15
178:12 180:5

193:13,19 195:8,13
195:17 196:10,12
196:20,25 197:8
198:3 199:15
200:21 202:6 203:9
203:15 205:24
206:4,21 207:16
209:16 212:23
231:6,13,16,24
**Telenor's (14)**
36:4 47:5 48:11 92:21
101:25 103:5
132:10 136:23
140:24 141:7,12
142:5 160:2 169:15
**telephone (1)**
24:9
**tell (13)**
42:3 47:23 67:3 69:25
72:24 75:23 78:7
92:23 101:14
106:23 128:9
195:17 212:9
**telling (5)**
6:24 73:23,24 216:19
217:2
**tells (2)**
18:24 120:6
**template (1)**
172:2
**term (20)**
53:25 54:3 55:6,11,12
55:16 58:3,15,17
59:7,13 60:25
168:22,25 175:3,10
175:17 177:14,18
203:2
**terminate (2)**
187:16 196:3
**terminated (2)**
103:15 187:21
**termination (4)**
193:13,18 194:5,10
**terms (19)**
47:24 48:18 53:22
86:18 130:10,20
135:20 144:10
152:5 153:5 155:17
170:5 175:13 186:9
186:11 215:25
218:24 219:8 227:3
**territory (1)**
174:20
**test (1)**
38:7
**tested (1)**
161:22
**testified (3)**
41:16 165:5 196:24

**testify (4)**
39:25 166:7,9 211:20
**testifying (2)**
41:24 44:13
**testimonial (1)**
149:22
**testimony (9)**
56:19 91:8 116:11
143:16,24 156:4
206:19 207:13
209:10
**text (3)**
184:2 192:25 230:16
**thank (23)**
3:21 15:23 32:11
33:11,22 39:15
40:22 41:12 69:21
142:12,13,14,15
164:17,19 202:14
202:15 232:21,23
233:16,24 234:10
234:12
**thing (17)**
25:6 36:2 37:20 38:4
39:4 80:12 104:24
135:12,12 139:3
142:2 144:6 156:8
162:4 187:14
219:12 220:8
**things (9)**
15:9,11 130:7 131:7
134:23 136:7 144:3
181:21,23
**think (132)**
3:8,25 4:3 7:11 12:19
12:24 14:3,4,12
16:16,18 18:8 20:17
20:21 21:16 22:6,10
22:14,25 23:15,16
24:22 28:4,16 31:24
32:4 35:16 36:3,7
37:19 38:2,20 39:21
46:8 51:5 53:25
54:6 62:7 65:5
66:23,25 68:9 72:18
74:20 75:5 76:16
82:12 86:5,10,15,15
89:7 90:14 91:15
92:12 95:23 97:2,2
99:13 102:10
106:11 109:4
115:17 120:6,20
122:18 123:3
124:23 125:3 126:9
126:11 127:7
129:24 134:13
139:13,24 141:2,10
143:18,19,24 147:8
147:9,18 148:24

149:2 150:20 151:4
151:14,18,24 152:8
152:11 154:6,10,23
155:10 157:3 158:3
159:8,16 160:10,15
160:17 161:5,6
162:14 164:8 176:9
176:10,21,22
177:11 179:14
181:14 184:10
187:9 195:20
204:13 206:25
208:24 209:7,17
215:14 220:10
221:10,14,18
231:14 232:6 233:3
233:23
**third (5)**
47:21 75:16 83:15
94:5 193:3
**THOMPSON (4)**
2:24 40:14 185:4,7
**Thor (1)**
53:12
**thought (8)**
14:18 30:5 66:9 93:14
128:15 191:15
226:7 229:13
**thoughts (2)**
85:25 145:23
**threat (1)**
142:3
**three (5)**
47:10 53:15 119:14
155:19,21
**three-day (1)**
185:13
**threshold (4)**
48:23 49:18 196:5
232:2
**thresholds (2)**
210:12 213:2
**thumb (1)**
22:20
**Thygesen (2)**
99:9 100:18
**tied (1)**
33:16
**time (61)**
12:5 16:23 17:12 21:5
22:9,9 38:8 39:13
50:15 55:21 56:2,15
57:2 59:22 63:17
65:3,9,13,14 67:12
90:4 93:19 103:19
105:21 109:23
111:24 114:24
116:3,22 126:24
131:25 142:25

143:3,8 148:7,18
149:5,24 150:3,25
151:7,17,20 152:10
155:12 174:8 175:2
175:10,11 177:18
185:24 193:9 194:3
194:7,9 200:24
213:18 217:21
221:19 223:5
234:14
**times (5)**
9:11 64:4 92:15
115:11,12
**timetable (1)**
113:14
**timing (2)**
146:9 148:16
**title (1)**
199:6
**today (24)**
4:18 6:15 8:17 11:25
12:3,8 16:8 24:11
25:20 26:17 28:3
31:7 34:4 36:25
41:25 44:14 67:25
68:2 89:19 129:13
142:13 147:6 166:7
233:25
**Tol (34)**
2:19 3:21 4:5,7 7:14
7:22 10:3,10,23
11:10,19 12:2,16
14:3,23 16:11 25:12
25:21 26:18 27:8,11
28:4,8,11,15 29:15
29:22 31:8 32:11
33:11 35:3,16,23
39:3
**Tolchinsky (2)**
204:8,14
**told (4)**
62:13 65:19 110:3
155:21
**tomorrow (3)**
197:25 198:12 234:7
**tone (1)**
23:17
**top (4)**
47:11 51:23 138:25
200:10
**topics (3)**
47:13 53:15 107:4
**Tormel (1)**
45:15
**TORSTEIN (1)**
236:5
**totally (1)**
159:21
**touch (1)**

32:3
**touched (1)**
129:24
**Tower (1)**
2:9
**traditional (1)**
43:15
**transaction (3)**
56:14 80:19 226:18
**transcript (2)**
16:10 235:14
**transferred (1)**
173:7
**treated (1)**
154:20
**treatise (2)**
158:11 161:18
**tremendous (1)**
82:18
**trial (5)**
31:16 117:15,25
119:25 155:6
**tribunal (33)**
5:24 12:20 14:5 22:20
25:15 26:10 27:7
29:3 30:20 32:14,20
32:25 33:7,12 35:6
36:3,7,10,20 38:19
39:12 40:18,20
126:17 128:23
145:5,7 147:25
149:15 151:16
153:16 154:6 234:6
**tribunals (1)**
158:23
**tribunal's (8)**
19:22 22:9 37:18 39:9
39:23 41:4 149:3
155:3
**tried (7)**
80:4,23 109:5 113:20
128:11 140:21
213:5
**trigger (2)**
105:17 185:14
**triggered (2)**
104:20,24
**trouble (1)**
103:16
**troubled (1)**
156:11
**true (1)**
235:15
**trump (1)**
123:11
**trumps (1)**
216:24
**try (6)**

15:2 23:10,11 82:4
102:8 130:4
**trying (8)**
9:24 19:12 92:25 98:3
159:22,24 196:3
219:14
**Tumanov (13)**
76:15,23 93:10,23
94:6,12 95:3,9
97:12,15,24 100:23
200:20
**Tumanov's (1)**
98:11
**Turkcell (4)**
83:16,24 86:25 87:4
**Turkish (2)**
83:17 87:6
**Turks (1)**
83:21
**turn (28)**
58:3 59:4 65:12 69:23
72:13 75:16 77:21
91:12 92:17 93:17
96:5 97:18 105:22
106:16 110:10
118:3 120:21 128:2
138:6 168:12
169:23 182:4
184:19 188:24
205:5 222:7,8 228:9
**turned (5)**
47:8 50:24 90:24 91:2
91:6
**turning (7)**
59:20 65:7 73:16
74:16 78:19 79:2
109:9
**turns (1)**
137:23
**twice (3)**
162:21,25 163:2
**two (46)**
15:9 17:20 22:7 27:18
30:12 34:3 43:5
45:17 47:9,18,22
49:6 51:7 53:16
55:16 66:11 79:16
96:13 97:4,20 99:2
99:22 100:20 103:9
106:22 114:5
118:15 119:16
120:24 136:7
142:25 143:15
144:7 153:14
162:14 163:19
169:10 189:12
192:18 195:24
197:21 199:16
200:8 203:6 229:3

233:12
**typical (2)**
112:21 207:10
**typically (2)**
16:25 181:23

_____
**U**
_____

**Uh-huh (1)**
228:5
**Ukraine (57)**
5:11,19 7:8 8:11 9:17
10:5,11 11:8 14:22
16:4 20:6,19 21:5
21:25 23:10 43:11
52:4,6 53:2,3 62:8
62:11,12 69:9 77:12
82:16,18,22,23 83:3
96:11 101:8 103:4
112:16 114:8
115:21 116:19
141:19,23 142:4,10
156:25 172:8,12
173:9,17 174:20
177:4 179:17
180:13 191:4
214:13 215:4,8,16
224:18,23
**Ukrainian (115)**
4:11,12 5:2,17 6:2
8:15 9:5 12:5,13,22
13:5,11,14,16 14:19
14:25 15:3 16:15
17:3 18:14 19:18
21:6 23:2,5,23,25
26:13 27:13,15,18
28:14,17 29:8,18
30:2 35:14 49:3,17
50:21 67:15 68:4,6
83:7,20,21 86:12
90:25 100:4 112:22
115:15 117:4,6
118:8,12 119:25
120:16 121:4,5,23
122:7,17 123:6,7,12
124:5,7,20,22,24,25
125:5 135:10 146:4
160:10 161:24
162:10 163:17
164:11,15 178:13
178:17 179:6,13,18
179:23 180:17,23
181:13,24 189:23
189:25 190:5,13,19
190:24 191:7
213:25 214:5,25
215:11,13,20,25
216:6,23,25 222:5
222:24 223:7,14
225:3 226:14,16

227:25 232:10
**Ukrainians (2)**
69:14,16
**ultimate (4)**
15:17 64:12 124:18
205:20
**ultimately (3)**
112:13 115:20 204:21
**unable (6)**
94:17,24 95:15 96:2
107:14 131:25
**unanimous (2)**
90:11 102:24
**unanimously (1)**
233:11
**uncertainty (1)**
131:4
**Uncitral (16)**
1:2 3:5 6:18 29:20
33:2 37:21 59:17
146:13,17,24
150:24 159:2
162:16 206:15,23
207:17
**undated (3)**
125:8,12 236:15
**underlying (1)**
35:2
**understand (29)**
9:24 10:9 15:10 26:5
26:15 31:22 53:5
70:17,22 75:7 76:19
89:11 100:4 102:9
118:10 120:15
129:12 157:13
159:19 160:16
162:4 164:7 207:13
212:5 217:21
218:15,19 219:15
223:24
**understanding (27)**
51:10 60:23 61:25
63:10,20 64:17 74:9
76:2 84:8,11 85:12
100:22 105:19
111:10,14 134:15
134:18 146:7
168:24 170:4,16,18
173:22 180:14
184:4 205:9 228:22
**understood (5)**
51:15,17 52:9 178:25
179:9
**undertake (2)**
183:25 205:12
**undertaking (1)**
227:9
**undertook (1)**
225:15

**undo (1)**
85:2
**undone (1)**
35:5
**unfair (1)**
174:20
**United (12)**
20:15 22:23 59:10
135:20 136:25
140:3,4 146:5
205:12,16,25 206:9
**universally (1)**
158:22
**University (1)**
42:6
**unraveling (2)**
160:19 163:3
**unreasonable (1)**
174:21
**unseemly (1)**
22:16
**uptake (1)**
130:19
**uptakes (1)**
210:11
**use (9)**
49:23 102:8 168:10
171:25 206:22,23
224:15 226:8,15
**useful (1)**
4:2
**usual (1)**
5:5
**usually (2)**
174:16 176:18
**U.S (10)**
60:20 162:16 167:22
176:11,16,23
181:23 188:18
206:3 207:5

_____

**V**

**Vadim (3)**
125:8,13 236:15
**valid (4)**
160:6 163:6,9,13
190:20 191:9
**validity (1)**
161:20
**validly (1)**
210:4
**value (2)**
81:17 173:6
**values (1)**
142:5
**Van (34)**
2:19 3:21 4:5,7 7:14
7:22 10:3,10,23

11:10,19 12:2,16
14:3,23 16:11 25:12
25:21 26:18 27:8,11
28:4,8,11,15 29:15
29:22 31:8 32:11
33:11 35:3,16,23
39:3
**various (6)**
112:3 146:2,4 165:25
167:25 190:7
**Vendor (1)**
107:11
**venture (3)**
179:8 207:11 209:15
**ventures (5)**
165:25 171:9,18
176:18 213:15
**venue (1)**
20:2
**version (3)**
154:8 184:7 193:6
**veto (9)**
170:10 209:9,16,25
210:13,17 225:20
225:20,23
**vice (5)**
43:7 93:14 100:5
102:2 129:15
**video (4)**
34:6 40:3,9,10
**Vienna (6)**
73:2,3,8,9,14 98:20
**view (14)**
27:2 34:11 36:4,21
78:17 81:20 122:9
122:13 145:7 157:7
159:21 161:14
162:10 195:25
**viewed (1)**
125:3
**viewpoint (2)**
195:23 231:11
**VimpelCom (7)**
46:20 64:14 86:20
103:16 105:25
148:20 172:5
**violate (1)**
12:12
**violated (2)**
67:14 95:6
**violation (6)**
66:3 74:20 75:8,12
77:16,19
**visuality (1)**
101:25
**vis-a-vis (2)**
9:25 167:13
**Vladimir (1)**
109:11

**void (3)**
13:19,22 27:19
**Volume (1)**
1:5
**vote (1)**
102:23
**voted (2)**
102:25 103:6
**voting (23)**
87:14 166:24 184:8
184:11,14,20
185:12,20,24 186:2
186:3,9,16 187:4,18
187:25 188:4,11
193:7 198:25
217:10 218:2,4
**vs (1)**
1:5

---

**W**

**Wack (8)**
61:10 188:13,17
189:5,14 190:4,12
191:19
**Wack's (1)**
189:19
**wage (1)**
214:17
**Wait (2)**
89:10 184:22
**waive (2)**
226:13,22
**waiver (2)**
39:10 122:21
**walk (2)**
38:13 96:8
**walks (1)**
38:22
**want (36)**
17:12 20:22 24:22,25
26:4,15,17 27:10,11
27:24 34:10,19
36:22 38:22 39:6
40:6 86:6 89:11
116:21 125:22
135:18 137:13
140:13 154:5
155:25 163:16
192:23 193:16
194:8 209:19 211:9
211:20 213:16
220:7 230:14,18
**wanted (19)**
44:6,8 46:18 47:24
48:3,18,20,24,25
64:10 80:25 103:21
105:15 108:13
127:9 128:13
208:20,21,25

**wants (4)**
5:9 24:18 36:11 38:2
**warning (1)**
104:9
**wasn't (4)**
36:14 95:21 105:13
173:20
**waste (1)**
116:22
**way (24)**
4:14 5:19 6:8 9:18
30:6 39:22 51:22
85:25 106:16
115:15 119:24
125:3 169:20
171:13 172:21
179:15 186:18
204:14 205:3 209:2
209:24 217:6 227:9
231:5
**wear (1)**
124:5
**week (5)**
31:17 62:7 63:16
165:13,14
**weekends (1)**
148:25
**weeks (3)**
113:25 114:4 153:24
**welcome (5)**
24:19 33:9 37:6
145:21,23
**well-defined (1)**
210:19
**well-regarded (1)**
17:21
**went (4)**
17:15 103:12 180:9
188:14
**weren't (5)**
17:4 99:18 113:2,3
113:11
**western (1)**
83:9
**we'll (22)**
22:5,14 38:8 39:14
40:2,7,8,18 92:18
93:18 146:19
149:14 150:4,15,19
150:20 155:7
157:14 158:7,19
161:7,24
**we're (51)**
6:23,23 10:2,6,12,24
11:15 20:13 22:4
24:17,17 25:2 31:15
31:25 34:7 35:6,9
35:11 36:25 37:8
41:9 54:12 91:11

110:23 123:20
126:11 134:17
142:16 145:7 146:7
146:9,23 151:18
152:9 154:12
155:11,12 157:10
160:2 162:23
164:17 170:17
175:6 183:8,16
184:7 190:13 224:3
228:18 233:23,25
**we've (23)**
19:12,25 35:4 36:23
41:8,10 94:15,16
95:13,14,15 112:3
118:19,22 127:11
142:23 151:25
162:20 163:12
168:7 183:5 192:22
228:19
**whatsoever (1)**
34:25
**WHEREOF (1)**
235:21
**wholly (1)**
86:12
**why's (1)**
232:14
**wife (2)**
40:4 143:4
**WILLIAM (1)**
1:19
**willing (5)**
48:15 106:4 195:18
202:5 226:12
**winding (1)**
144:5
**window (6)**
128:13 131:19 133:3
133:4,18 142:23
**winter (1)**
45:6
**withstand (1)**
153:12
**witness (217)**
17:25 39:19 41:6,10
41:14 45:12 46:8,13
50:6,15,19 51:16
52:3,7,11,19,23
53:3 54:15 55:2,8
55:14,24 56:9,17
57:19 59:25 60:5,11
61:4,12,16 64:3,9
64:24 65:5 66:21
67:20 68:2,5,9,17
68:21 69:15 70:19
71:6 72:18 73:3,13
74:22 76:10,25 77:5
77:10,20 81:23

82:10,17,23 83:4,14
83:19 84:4 85:24
86:5,14 87:15,20,24
88:5,12,18 89:3,7
89:15 91:22,25 92:4
92:12 98:13,18,21
99:4,20 101:16,19
102:10,16 104:5,7
104:13,22 105:7
108:22 109:3,14
110:16,20 111:8,18
114:18,22 115:4,19
116:11 126:13
127:16 129:6,10,14
129:24 130:4
131:15,22 132:3,7
132:15,24 133:4,7
133:21,25 134:5
136:3,6 137:2,5,8
137:19,23 138:8,14
138:20 139:8,13,19
139:23 140:6
141:22 142:8,14,20
142:24 153:18
164:18 165:3 179:5
181:14 182:21
194:18 196:10,14
196:17,22 202:20
203:4,12,16,20
204:7,13,25 205:23
206:10,25 207:20
208:11,14,18,24
209:11,17 210:10
210:16 211:3,7,11
211:14,18,20 212:7
212:13,17,20,24
213:14 214:6,21
215:5,9,14,24 217:3
217:18,24 218:14
218:21 219:2,9,18
220:2,5,21 221:10
221:14,17 222:10
229:16 230:8,21
231:21,25 232:12
232:16 234:11
235:21 236:4
**witnesses (3)**
34:4 155:19,21
**wondering (1)**
99:18
**word (1)**
120:20
**wording (4)**
172:7 185:24 225:7
233:8
**words (4)**
50:11 51:11 144:6
173:14
**work (9)**

42:17 136:14
138:21 148:25
165:24 172:8
180:12 200:16
225:2
**worked (3)**
42:22 115:15 224:23
**working (3)**
148:19,20 173:8
**world (2)**
66:6 159:21
**worried (1)**
31:10
**wouldn't (11)**
8:16 22:7 30:14 38:10
49:23 62:15 109:7
124:25 148:13
174:7 230:7
**write (1)**
152:18
**writing (4)**
34:24 102:6 119:2
146:3
**written (16)**
34:22 35:13 53:24
88:22 89:2 90:11
91:20 92:10 102:11
109:6 119:12 141:3
145:11,20 190:24
228:4
**wrong (3)**
9:5 30:9 117:19
**wrote (3)**
25:17 94:7 193:15
**W-A-C-K (1)**
188:13

_____

### X

**x (5)**
1:3,8 5:12 236:3,12

_____

### Y

**Y (1)**
165:2
**yeah (37)**
42:19 48:20 50:15
55:8 59:9 63:17
65:17 70:2,9 83:19
87:20 96:17,25
98:21,23 102:16
104:7 107:2,18
118:25 138:8,9
170:2 177:11
179:25 184:15
199:21 204:25
205:23 206:10
212:7 226:11 227:8
227:21,21,21,21
**year (15)**

42:6 43:9 63:11,13
82:14 110:3 115:21
119:2 133:6,8
148:18 193:2
200:24 201:9,15
**years (6)**
42:19,21,25 43:5
103:9 200:22
**yesterday (1)**
197:24
**York (67)**
1:10,10 2:5,5,18,18
13:8 19:4,6 20:3,4
22:4 23:13 26:12
27:17 34:5 59:10,18
66:5 123:25 143:3
151:20 156:18
157:16,19 158:3
160:9,13 161:9,21
161:22,23 162:8,12
162:15 163:10,12
163:14,20 167:22
176:3,12,19,22
177:14,22 178:2,8
179:3,12 180:7,9,12
183:22 186:7
205:16,19 206:16
206:23 207:5,18
232:10,13,16 235:4
235:5,11
**youth (1)**
103:3
**Yup (1)**
224:2

_____

### Z

**Z (1)**
2:20
**ZEBALLOS (1)**
2:20

_____

### 0

**03 (1)**
182:25
**04 (4)**
108:10,10 188:8
192:16
**05 (5)**
88:19 90:13 131:17
131:20,22

_____

### 1

**1 (18)**
2:10 4:10,21 5:3,7,10
5:21 8:25 9:7 12:12
25:13 32:5 33:15
35:7 70:19 125:7,11
236:14
**1st (4)**

6:11 9:6 107:6 165:20
**1/2 (2)**
49:4,5
**1:27 (1)**
145:3
**10 (8)**
40:21 42:21 96:7,23
97:5 170:21 184:20
211:25
**10-minute (1)**
39:13
**100 (1)**
83:10
**10022 (1)**
2:18
**10103-0001 (1)**
2:5
**11 (5)**
96:7 97:18,19 191:11
191:23
**11th (3)**
94:7 95:4,8
**12 (3)**
93:21 106:22 127:13
**12th (4)**
93:22 94:9 95:5 97:3
**12:31 (1)**
144:18
**125 (1)**
236:14
**127 (1)**
236:18
**13 (6)**
59:6 106:23 175:16
205:5 222:8 227:7
**14 (3)**
107:17 110:14 133:15
**140 (1)**
236:7
**15 (7)**
25:17 26:4 30:17
110:10,24 194:17
197:12
**15th (4)**
8:22 25:22 96:11 97:7
**16 (5)**
110:11 113:4 127:9
182:6 211:16
**165 (1)**
236:10
**17 (4)**
128:6,7 199:20
200:11
**18 (14)**
1:12 70:6 76:22 79:13
82:12 110:12 111:7
111:8 113:11 128:4
199:19,20 235:13

236:2
**18th (4)**
3:19 74:23 77:9 79:10
**19 (1)**
199:20
**19th (5)**
149:11,12,17 234:3,9
**1983 (1)**
157:25
**1984 (1)**
157:19
**1992 (1)**
64:18
**1998 (2)**
44:12 177:8
**1999 (1)**
165:20

_____

### 2

**2 (5)**
70:10 71:3 75:18
76:20 192:8
**2.05B-2 (1)**
227:7
**20 (5)**
42:19 81:8 82:7,13
85:11
**20th (1)**
235:22
**2000 (2)**
184:12,14
**2002 (44)**
45:7,11,12 46:15
55:22 56:7 61:21
64:21,23,24 102:18
104:10 135:6
166:23 167:4,9
182:11 184:7,14,23
185:11,22 186:19
187:5,12,24 188:10
193:6,20 195:2,18
204:22 208:4 217:9
217:22 219:15
227:14 228:23
229:7,14,24 230:3
230:17,23
**2004 (27)**
65:13 71:9 102:19
104:11,12,15
108:20 167:10
175:12 177:20
182:11,13 186:20
187:6,13 199:12
199:13 200:24
201:7 211:12,14
223:13 229:10,25
230:4,17 231:6
**2005 (26)**
65:11 70:6 71:8,11

72:6 76:22 89:8
91:10 92:17 93:21
96:6 98:4 101:3
104:4,17,21 106:23
108:4,14 110:12
113:11 115:8 117:3
133:17 201:9,15
**2006 (12)**
1:12 4:10 32:15
113:15 132:21
133:11,16,17
201:20 235:13,22
236:2
**2007 (3)**
71:8 133:20,24
**2008 (1)**
132:21
**22 (4)**
26:11 27:25 32:15
108:4
**22nd (3)**
12:23 13:3 26:21
**23 (3)**
182:23 183:3,12
**23H (1)**
40:14
**25 (1)**
2:10
**27 (1)**
110:19
**27th (1)**
208:3
**28 (2)**
6:19 33:2
**28th (1)**
168:18
**29 (5)**
37:21 54:21 55:3 56:7
204:22
**29th (3)**
35:22 168:23 208:4

_____

### 3

**3 (2)**
74:16 192:8
**3:22 (1)**
234:14
**30 (2)**
98:4 146:22
**30th (5)**
98:23 99:7 101:2,3
192:16
**32-7 (1)**
151:15
**35 (1)**
2:9
**36 (1)**
151:2

**39 (1)**
16:10
_____4_____
**4 (2)**
24:5 77:24
**4th (1)**
24:16
**40 (7)**
16:10 49:2,17,21
208:20,21 209:4
**41 (1)**
236:6
**42 (1)**
2:9
**43 (1)**
49:5
**43.5 (3)**
169:5 208:7 209:5
_____5_____
**5 (6)**
70:13 71:3 77:22 78:8
168:12 175:7
**5.02 (1)**
186:23
**50 (10)**
47:3 48:3,21,23 50:22
61:22 62:15,18
64:11 86:8
**50.1 (2)**
56:12 57:3
**50/50 (1)**
48:4
**503 (1)**
185:24
**514-01 (1)**
157:20
**557 (1)**
2:11
**56 (1)**
49:4
**590 (1)**
2:17
_____6_____
**6 (4)**
78:19 79:3 96:10
182:24
**6.03 (2)**
222:9 224:4
**6.03A (4)**
182:23 183:17 222:18
226:20
**602 (1)**
222:10
**603 (1)**
222:11

**604 (1)**
184:16
**65 (1)**
48:14
**66 (1)**
96:25
**666 (2)**
1:10 2:4
**67 (1)**
96:23
**69 (1)**
106:25
_____7_____
**7 (2)**
92:19 93:20
**7th (5)**
76:8 77:14 95:3
118:24,25
**70 (1)**
106:25
**71 (1)**
107:20
**72 (1)**
110:11
**73 (2)**
110:11 113:4
_____8_____
**8 (11)**
58:3,6,7 79:13 87:9
89:8 92:18 94:4
169:23 188:24
191:21
**8th (3)**
78:20 79:5 165:15
_____9_____
**9 (1)**
96:7
**9th (1)**
95:8
**9:15 (1)**
1:12
**9:30 (1)**
3:18
**92 (2)**
64:10,20
**96 (2)**
43:6 68:11
**97 (1)**
43:6
**98 (1)**
63:5