# EXHIBIT J

**IN THE MATTER OF AN ARBITRATION
UNDER THE UNCITRAL ARBITRATION RULES BETWEEN**

_____

**TELENOR MOBILE COMMUNICATIONS AS,**

Claimant,

Snarøyveien 30
N-1331 Fornebu
Norway

-and-

**STORM LLC,**

Respondent,

1 Narodnogo Opolchennya Street,
Kyiv 03151
Ukraine

_____

**LEGAL OPINION BY LYUBOV LOGUSH**

_____

## I.     Introduction.

I, Lyubov Logush, maintaining my professional address at 24, Shovkovychna St., Suite 15, Kyiv 01024, Ukraine, will say as follows:

1. I am an Associate Professor of Law at the National University of Kyiv-Mohyla Academy, Kyiv, Ukraine. I submit this affidavit in support of Respondent's position to dismiss arbitral proceedings and will opine on issues of Ukrainian law and procedure relevant in the current context.

2. I have reviewed the following documents: Telenor Mobile's Amended Notice of Arbitration dated April 25, 2006, Telenor Mobile's Amended Statement of Claim dated April 25, 2006, Storm's Statement of Defense dated May 30, 2006, Storm's Motion to Dismiss dated June 7, 2006, Storm's Supplemental Brief dated June 22, 2006, Telenor Mobile's Memorandum in Opposition to the Motion to Dismiss dated June 23, 2006, Telenor Mobile's Supplemental Brief dated June 27, 2006, and the transcripts of the Hearing held on June 29, 2006 in New York, New York.

3. I have been requested to issue an opinion regarding Ukrainian proceedings and Judgments which relate to claims made in this arbitration.

## II.     Qualifications to express an expert opinion regarding Ukrainian legal system.

4. I graduated from Lviv State I. Franko University in 1974 and hold a PhD in Law in 1997. In 1993, I also attended LL.M. program at Fordham University, School of Law, NY. I have been practicing law in Ukraine since 1975 (admitted in Ukraine), and am a member in good standing of the Kyiv and Lviv Bars. Currently, I am a Senior Partner with Logush, Borsuk, Bronfman, and Kalyshevych, a private Law Firm based in Kyiv, Ukraine. I have extensive experience in epresenting companies and individuals in civil, commercial and administrative litigation, as well as in international commercial arbitrations.

5. I am an Associate Professor at the Faculty of Law at the National University of Kyiv-Mohyla Academy, Kyiv, Ukraine. At the Academy, I am teaching the following courses: Civil and Commercial Procedure and International Commercial Arbitration, International Contracts.

6. I have published numerous articles in legal publications approved by the National Academy of Sciences of Ukraine, as well as in other periodicals. A more detailed account of my professional background is attached as Exhibit A to this affidavit.

**III.    Issues for which the Respondent has requested my expert legal opinion.**

7.  I have been requested to review and analyze the Decision of the Kyiv Commercial Court
    dated April 25, 2006, ("April Decision") and the Ruling of the Kyiv Appellate Commercial
    Court dated May 25, 2006, ("May Ruling"), and to issue an opinion regarding their
    conformity with procedural and material requirements of Ukrainian law. I will comment on
    some specific rights and obligations of the parties in the commercial court proceedings.
    Finally, I will consider whether the enforcement of an arbitral award would be possible
    under Ukrainian law, should the tribunal assert jurisdiction over the current dispute.

**IV.    The April Decision and the May Ruling were consistent with Ukrainian procedure.**

8.  Having analyzed the April Decision and the May Ruling, I find no violations of Ukrainian
    law. The content of these decisions is regulated by the Code of Commercial Procedure of
    Ukraine (the "CCPU")[1]. Both the April Decision and the May Ruling are consistent with its
    requirements.

9.  The Kyiv Commercial Court was competent to try Alpren's claim at first instance, while the
    Kyiv Appellate Commercial Court had jurisdiction over Storm's appeal.

10. This is so because commercial disputes between legal entities are – under the general rule –
    decided by commercial courts[2]. Also, the Kyiv Commercial Court was competent to
    consider Alpren's claim as the court of first instance [3] of the domicile of the respondent[4], *i.e.*
    Storm. Finally, the Kyiv Appellate Commercial Court was competent to consider Storm's
    appeal, as the appellate instance court over the Kyiv Commercial Court[5]. Therefore, there
    have been no violations of the rules of jurisdiction under Ukrainian law.

11. It was also correct for Alpren to file its claim before the Ukrainian courts. Alpren is a
    company governed by the laws of Cyprus; Storm is a Ukrainian law entity. According to
    Ukrainian rules of private international law, the claim in the present dispute must be brought
    in the court where respondent resides[6]. Storm is a legal entity under Ukrainian Law, and
    under Ukrainian rules its place of residence is to be understood as the state where it is
    registered or otherwise incorporated under the laws of that state[7]. Since Storm is registered
    in Ukraine, it was correct for Alpren to bring the claim against in the Ukrainian courts.

---

[1] Article 84 of the CCPU as regards the April Decision (Exhibit B); Article 105 of the CCPU as regards the May Ruling
(Exhibit C).
[2] Articles 1 and 2 of the CCPU (Exhibit D); Article 12 of the CCPU (Exhibit E).
[3] Article 13 of the CCPU (Exhibit F); Articles 21(2) and 22(3) of the Law "On the Judiciary of Ukraine" (Exhibit G).
[4] Article 15(2) of the CCPU (Exhibit H); Article 21(2) of the Law "On the Judiciary of Ukraine" (Exhibit G).
[5] Article 92 of the CCPU (Exhibit I); Article 25(3) of the Law "On the Judiciary of Ukraine" (Exhibit J).
[6] Article 76(2) of the Law "On Private International Law" (Exhibit K).
[7] Article 25(2) of the Law "On Private International Law" (Exhibit L).

3

**V.    Under Ukrainian law, Alpren was entitled to sue Storm in order to protect its rights.**

12. Procedurally, Alpren correctly brought a claim against Storm before the Kyiv Commercial Court. Notwithstanding that both entities are said to have the same ultimate corporate parent company, they nevertheless remain separate entities under Ukrainian law. My opinion is not affected by the fact that Alpren is a parent company of Storm. Ukrainian legal practice provides numerous examples when companies-shareholders sue companies, of which they are shareholders[8].

13. As *de jure* and *de facto* separate legal entities, Alpren and Storm may indeed violate each other's rights.

14. According to the Civil Code of Ukraine (the "CCU"), every person is entitled to protection if deems its civil right violated, non-recognized or disputed[9]. The CCU also establishes that any person may seize the courts to protect its rights and interests[10]. A similar provision is laid down in the CCPU, providing that any legal entity may refer to a commercial court to protect its violated or disputed rights[11].

15. Thus, to the extent that Alpren considered certain of its rights to have been violated by Storm, it correctly brought the respective claim to the Kyiv Commercial Court.

**VI.    Telenor could have intervened in the Alpren v. Storm proceedings.**

16. Ukrainian commercial procedure stipulates a number of possibilities for third persons. Under these procedures, when third parties consider that their rights are affected by commercial proceedings, these parties may intervene into such proceedings.

17. Telenor Mobile could have applied to be included as a third person. The CCPU sets forth two types of third persons as parties to commercial proceedings: those with independent claims on the merits of the case[12] and those without such claims[13].

18. If Telenor Mobile had a claim on the merits of the case against Alpren, Storm or both of them, it could have filed a respective statement of claim[14] drafted in a general manner[15].

---

[8] *E.g.* Ruling of the Highest Commercial Court of Ukraine dated August 15, 2001, in Case # 19/449 (Exhibit M); Judgment of the Constitutional Court of Ukraine # 18-рп/2004 dated December 1, 2004, in Case # 1-10/2004 on the matter on the constitutional submission of 50 members of parliament of Ukraine regarding official interpretation of certain provisions of Article 4, part 1, of the Code of Civil Procedure of Ukraine (case on legitimate interest) (Excerpt is attached hereto as Exhibit N).

[9] Article 15(1) of the CCU (Exhibit O).

[10] Article 16(1) of the CCU (Exhibit P).

[11] Article 1 of the CCPU (Exhibit D).

[12] Article 26 of the CCPU (Exhibit Q).

[13] Article 27 of the CCPU (Exhibit R).

[14] Article 26(1) of the CCPU (Exhibit Q); Articles 55-57 of the CCPU (Exhibit S).

[15] Article 54 of the CCPU (Exhibit T).

Even if Telenor Mobile had no such claims but expected the proceedings to affect its rights, it could still intervene as a third person without independent claims on the merits of the case. In order to be included into the proceedings in such capacity, a mere application from Telenor Mobile would have sufficed[16]. Consequently, Telenor Mobile had the opportunity to employ any of the above-mentioned possibilities. I have not been presented with evidence that Telenor has attempted to do this.

19. Moreover, the CCPU allows persons who were not included into the proceedings to submit a cassation appeal if the court's decision influences their rights or obligations[17]. This means that in a general manner[18], Telenor Mobile could have appealed the April Decision, the May Ruling or both of them to the Highest Commercial Court of Ukraine. To my knowledge, Telenor Mobile has decided not to use this opportunity.

## VII.   It is customary for Directors General to represent their companies in the court proceedings in Ukraine

20. Unlike many other jurisdictions, Ukrainian law does not restrict representation in courts to admitted lawyers only. A party or any person, duly authorized by the party, is entitled to appear before the commercial courts of Ukraine[19]. As regards legal entities, the CCPU entitles management to represent the company [20] without any power of attorney.

21. Representation of legal entities by Directors General is possible not only in Ukrainian commercial procedures, but in other instances as well. Indeed, the substantive law of Ukraine[21] generally allows Directors General to act on behalf of limited liability companies (Storm is an LLC) without a power of attorney. This right is often exercised in court proceedings. Sometimes, other officers are entitled to do this[22].

22. I am not aware of the exact reason for Storm's Director General to have represented the company in the analyzed proceedings. But I will attest that in my experience I have often represented clients, and had directors or other officers (rather than lawyers) presenting arguments in the court hearings for the opposing party. I therefore see no problem in the fact that Mr. Klymenko represented Storm in the Alpren v. Storm proceedings. Certainly, in my opinion, the absence of representation by a lawyer in the proceedings in no way implies in itself that Storm was intentionally putting up a weak or illusory defense.

---

[16] Article 27(1, 2) of the CCPU (Exhibit R).
[17] Article 107 of the CCPU (Exhibit U).
[18] Articles 108-111¹ of the CCPU (Exhibit V).
[19] Article 28 of the CCPU (Exhibit W).
[20] Article 28(2) of the CCPU (Exhibit W).
[21] Article 62(5) of Law "On Commercial Entities" (Exhibit X).
[22] Id.

**VIII. It is customary in Ukrainian court proceedings not to submit written statements and to argue orally instead**

23. Ukrainian commercial procedure lays down no obligation under which a party to commercial proceedings must submit written statements in support of its position. Moreover, there is no obligation to support one's position at all, either in writing or orally at the hearing. In fact, the Code of Commercial Procedure provides that a Respondent may agree with Claimant's claims, in which case the Court would rule accordingly[23].

24. The parties have the right to support their position in commercial proceedings, including in the form of written statements[24]. Moreover, the CCPU sets forth that a commercial dispute may be resolved even if the respondent has not sent its written reply to the statement of claim[25].

25. Although it is not a systematic practice, many parties refrain from submitting written statements. The reasons can be varied, including strategic planning. Sometimes parties do not want to present their evidence and arguments in advance of the hearing so that the opposing party will not have the benefit of being familiar with the arguments before the hearing. Some parties draft last-minute statements to present them orally during the hearing. This approach is common and sensible, bearing in mind that during hearings, courts almost always ask parties to repeat orally what they have presented in the written statements.

26. Sometimes a party may send its written statement to the court but, for various reasons, the court does not receive it on time. In such a case the party may simply present its statement orally, while the written brief is received by the court after the hearing, or even after the decision has already been delivered.

27. Therefore, it is my opinion that it is fairly common in Ukrainian court proceedings for parties to not submit written statements, and to argue orally instead. The absence of a written statement of defense in no way implies that Storm was putting a weak or illusory defense.

---

[23] Article 78 of the CCPU (Exhibit Y).
[24] Article 22(2) of the CCPU (Exhibit Z).
[25] Article 75 of the CCPU (Exhibit A1).

**IX.    The April Decision held the entire Shareholders Agreement to be null and void in full, including the arbitration clause.**

28. The Ukrainian commercial courts in the April Decision and the May Ruling considered the Shareholders Agreement to be not merely an invalid contract, but a contract which is null and void in full. This type of invalidity (absolute nullity) means that the agreement never existed at all and cannot be executed. The April Decision specifically extended this absolute nullity to the arbitration clause. It is therefore reasonable to conclude that no disputes could arise from such a non-existent agreement. Further, as the nullity is absolute, the parties cannot modify its legal consequences by agreement.

29. Hence, if the parties wanted to resolve a dispute in arbitration, a new arbitration agreement must be signed between them.

**X.    An award in the present dispute ("Award") may run into enforcement problems in Ukraine**

30. If, notwithstanding my opinions above, the Tribunal decides not to follow the April Decision and considers the dispute, the resulting Award will likely not be enforceable in Ukraine.

31. As far as both the United States and Ukraine are parties to New York Convention, the Ukrainian court, in the matter on recognition and enforcement of the Arbitral Award in Ukraine, will be guided by its provisions.

32. Among various grounds to refuse recognition and enforcement, New York Convention stipulates the following:

> 2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:
>
>     i.   [...]
>
>     ii.  (b) The recognition or enforcement of the award would be contrary to the public policy of that country.[26]

---

[26] Article V(2.b) of the New York Convention (Exhibit A2).

33. Public policy is one of the most undefined, yet widely used concepts in the Ukrainian law. In order to present a more or less clear picture of how it should be understood it is worth paying attention to case law[27] and doctrine.

34. By the Resolution[28], the Supreme Court of Ukraine defined the public policy concept as legal order of the state, basic principles, and foundations forming the cornerstone of its regime (they concern independence, integrity, self-determination and inviolability, fundamental constitutional rights, freedoms and guarantees, etc.). The approach of the Supreme Court of Ukraine is given considerable weight in one of the most frequently cited Ukrainian articles on public policy[29]. The author summarizes the portion of the Resolution dealing with public policy by stating that public policy is reflected in the mandatory rules of Ukrainian law, *i.e.* those, which are to be observed in order for the legal system of Ukraine to remain stable.

35. It is not disputed that the one of the most prominent example of mandatory rules in Ukrainian law is that which sets forth the obligatory nature of the Ukrainian courts' decisions throughout the territory of Ukraine. These rules are laid down in the Constitution of Ukraine:

Court decisions are delivered in the name of Ukraine and are mandatory throughout Ukraine's territory. [30]

and the Law "On the Judiciary of Ukraine":

Court decisions in force are obvious for execution by all state organs, local authorities, their officials, associations of citizens and other organizations, citizens and legal entities throughout Ukraine's territory. [31]

36. Consequently, insofar as the April Decision declares the Shareholders Agreement invalid in its entirety, a Ukrainian court, faced with an application for the recognition and enforcement of an Award, will be obliged to apply Ukrainian public policy and pay deference to the obligatory nature of the April Decision and will refuse recognition and enforcement.

---

[27] *E.g.* Resolution of the Plenum of the Supreme Court of Ukraine # 12 "On the Practice of the Courts' Consideration of the Applications for Recognition and Enforcement of the Foreign Court and Arbitral Awards and on Setting Aside of Awards Delivered in the International Commercial Arbitration in the Territory of Ukraine" dated December 24, 1999 ("Resolution") (Excerpt is attached hereto as Exhibit A3).

[28] Resolutions are summaries of the law issued by the Supreme Court which pertain to specific issues. These are considered highly persuasive under Ukrainian law.

[29] 'Public Policy Concept in Private International Law', Oleg Alyoshin, Yuridicheskaya Practika # 41 (303) dated October 14, 2003 (Excerpt is attached hereto as Exhibit A4).

[30] Article 124(5) of the Constitution of Ukraine (Exhibit A5).

[31] Article 11(2) of the Law "On the Judiciary of Ukraine" (Exhibit A6).

37. Ukrainian courts have dealt with this issue in the past. One of the most celebrated examples is the so-called Western NIS Enterprise Fund case, in which the Ukrainian courts refused to recognize and enforce a foreign arbitral award by reason of the invalidity of the underlying agreement. The Fund succeeded in a U.S. arbitration against a Ukrainian company, Sonola. However, recognition and enforcement of the US award was refused in Ukraine because the agreement between the Fund and Sonola had been previously declared invalid by Ukrainian courts. The Fund lodged a series of unsuccessful appeals and finally failed in the Supreme Court of Ukraine.

38. Thus, it is my considered opinion that if the Tribunal decides not to follow April Decision and considers the present dispute, Telenor may face serious enforcement problems in Ukraine.

**I declare that the foregoing is true and correct.**

**Executed on July 28, 2006.**

Lyubov Logush

**Table of Exhibits:**

**Exhibit A.**    Curriculum Vitae of Lyubov Logush;

**Exhibit B.**    Article 84 of the CCPU;

**Exhibit C.**    Article 105 of the CCPU;

**Exhibit D.**    Articles 1 and 2 of the CCPU;

**Exhibit E.**    Article 12 of the CCPU;

**Exhibit F.**    Article 13 of the CCPU;

**Exhibit G.**    Articles 21(2) and 22(3) of the Law "On the Judiciary of Ukraine";

**Exhibit H.**    Article 15(2) of the CCPU;

**Exhibit I.**    Article 92 of the CCPU;

**Exhibit J.**    Article 25(3) of the Law "On the Judiciary of Ukraine";

**Exhibit K.**    Article 76(2) of the Law "On Private International Law";

**Exhibit L.**    Article 25(2) of the Law "On Private International Law";

**Exhibit M.**    Ruling of the Highest Commercial Court of Ukraine dated August 15, 2001, in Case # 19/449;

**Exhibit N.**    Excerpt of Judgment of the Constitutional Court of Ukraine # 18-рп/2004 dated December 1, 2004, in Case # 1-10/2004 on the matter on the constitutional submission of 50 members of parliament of Ukraine regarding official interpretation of certain provisions of Article 4, part 1, of the Code of Civil Procedure of Ukraine (case on legitimate interest);

**Exhibit O.**    Article 15(1) of the CCU;

**Exhibit P.**    Article 16(1) of the CCU;

**Exhibit Q.**    Article 26 of the CCPU;

**Exhibit R.**    Article 27 of the CCPU;

**Exhibit S.**    Articles 55-57 of the CCPU;

**Exhibit T.**    Article 54 of the CCPU;

**Exhibit U.**    Article 107 of the CCPU;

**Exhibit V.**    Articles 108-111[1] of the CCPU;

**Exhibit W.**    Article 28 of the CCPU;

**Exhibit X.**    Article 62(5) of Law "On Commercial Entities";

**Exhibit Y.**    Article 78 of the CCPU;

**Exhibit Z.**    Article 22(2) of the CCPU;

**Exhibit A1.**    Article 75 of the CCPU;

**Exhibit A2.**    Article V(2.b) of the New York Convention;

**Exhibit A3.**    Excerpt of Resolution of the Plenum of the Supreme Court of Ukraine # 12 "On the Practice of the Courts' Consideration of the Applications for Recognition and Enforcement of the Foreign Court and Arbitral Awards and on Setting Aside of Awards Delivered in the International Commercial Arbitration in the Territory of Ukraine" dated December 24, 1999;

**Exhibit A4.**    Excerpt of 'Public Policy Concept in Private International Law', Oleg Alyoshin, Yuridicheskaya Practika # 41 (303) dated October 14, 2003;

**Exhibit A5.**    Article 124(5) of the Constitution of Ukraine;


**Exhibit A6.**    Article 11(2) of the Law "On the Judiciary of Ukraine".