# EXHIBIT K

**IN THE MATTER OF AN ARBITRATION
UNDER THE UNCITRAL ARBITRATION RULES BETWEEN**
_____


**TELENOR MOBILE COMMUNICATIONS AS,**

Claimant,

Snarøyveien 30
N-1331 Fornebu
Norway

-and-

**STORM LLC,**

Respondent,

1 Narodnogo Opolchennya Street,
Kyiv 03151
Ukraine


_____

**STORM LLC'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**
_____

Respondent Storm LLC ("Storm"), by its attorneys, Lovells, respectfully submits the following proposed findings of fact and conclusions of law:

## Summary

1.      The parties are before the Tribunal on Storm's motion to dismiss the Amended Statement of Claim by claimant Telenor Mobile Communications AS ("Telenor Mobile") in the above-captioned arbitration on the grounds that the Tribunal lacks jurisdiction over Telenor Mobile's claims, which were brought pursuant to Section 12.01 of the Shareholders Agreement, dated January 30, 2004, between and among Storm, Telenor Mobile and Closed Joint Stock Company "Kyivstar G.S.M." (the "2004 Shareholders Agreement" or "Agreement").

2.      The Tribunal has the power to hear Storm's jurisdictional objection under the well-recognized international arbitration doctrine of "*compétence-compétence*."  Although the UNCITRAL Rules (which are referred to in Section 12.01 of the 2004 Shareholders Agreement) similarly state in Article 21(1) that the Tribunal has the power to decide such jurisdictional objections, the Tribunal relies on the general principle of "*compétence-compétence*" rather than the UNCITRAL provisions.  The Tribunal is not relying on the UNCITRAL Rules because, for the reasons set forth below, the Tribunal finds that Storm has made a sufficient showing under the applicable standard that the arbitration clause in the 2004 Shareholders Agreement (and, *a fortiori*, the parties' purported agreement to adopt the UNCITRAL Rules) is null and void.

3.      In making these Findings of Fact and Conclusions of Law, the Tribunal has considered the following:  Telenor Mobile's Amended Statement of Claim, dated April 25, 2006 (with exhibits); Storm's Statement of Defense, dated May 30, 2006 (with exhibits); Storm's Motion to Dismiss, dated June 7, 2006 (with exhibits); Storm's Supplemental Brief, dated June 22, 2006; Telenor Mobile's Memorandum in Opposition to the Motion to Dismiss, dated June 23, 2006 (with exhibits); Telenor Mobile's Supplemental Brief, dated June 27, 2006; the transcript of the hearing held on June 29, 2006 in New York, New York ("6/29 Tr."); Storm's Evidentiary Brief (with exhibits, supporting affidavits and legal opinions), dated August 9, 2006 ("Storm Evidentiary Br."); Telenor Mobile's Evidentiary Brief (with exhibits and supporting affidavits), dated August 9, 2006

("Telenor Mobile Evidentiary Br."); the transcript of the hearing held on August 14, 2006, in New York, New York ("8/14 Tr."); the affidavits and legal opinion submitted by Storm on August 31, 2006; and the transcript of the hearing held on September 5, 2006 in New York, New York ("9/5 Tr.," *See* Ex. A.)

4.     Storm's motion to dismiss primarily relies on two decisions in which the Ukrainian trial and appellate courts have ruled, in orders dated April 25, 2006 (the "April 2006 Order") and May 25, 2006 (the "May 2006 Order," and, collectively with the April 2006 Order, the "Orders"), that the 2004 Shareholders Agreement is invalid as a matter of Ukrainian law.  The Ukrainian courts based that finding on their conclusion that Storm's former General Director, Valeriy Nilov, lacked authority under Storm's Charter and Ukrainian law to enter into the 2004 Shareholders Agreement.  As a result, the courts held, both the 2004 Shareholders Agreement *and the arbitration provisions therein* are null and void as a matter of Ukrainian law.  The Ukrainian trial court ruled that the 2004 Shareholders Agreement is invalid as a matter of Ukrainian law on the additional grounds that it was not registered with the state authorities in the Ukrainian language, which is a requirement for documents that affect a party's charter provisions.

5.     As an alternative basis for its motion to dismiss, Storm argues that Telenor Mobile waived its right to enforce the arbitration clause in the 2004 Shareholders Agreement by fully participating in several Ukrainian court actions directly related to the Agreement without once raising arbitrability as a defense.[1]

6.     The Tribunal finds that it must dismiss Telenor Mobile's claims for lack of jurisdiction, for the following reasons (among others):

7.     *First*, under the relevant evidentiary standard set forth in *Sphere Drake v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001) (hereinafter "*Sphere Drake*"), (a) the Orders more than

---

[1]     In addition, Storm has asserted that one of Telenor Mobile's claims, namely that Storm violated Section 2.05 of the 2004 Shareholders Agreement by not attending shareholders and board meetings, is barred by the doctrine of collateral estoppel because the Ukrainian courts previously held that certain governing provisions of the Kyivstar Charter — including the provisions under which the shareholders and

satisfy the requirement that a party seeking to have an arbitration dismissed because the underlying contract is void "must present 'some evidence' in support of its claim"; and (b) Storm, throughout these arbitration proceedings, has "unequivocal[ly] deni[ed]" that the 2004 Shareholders Agreement had been entered into.[2]  As discussed below, the Ukrainian courts found that the required Meeting of Participants for the 2004 Shareholders Agreement did not take place.  There has been no evidence submitted in this arbitration that such a meeting in fact occurred.  Moreover, Telenor Mobile has not rebutted the finding of the Ukrainian trial court that the 2004 Shareholders Agreement was not registered with the proper authorities in the Ukrainian language.  Under the circumstances, Storm has met the "some evidence" standard set forth in *Sphere Drake*.

8.      *Second*, Telenor Mobile, as the party effectively making a motion to compel arbitration, has failed to meet the requisite standard for such motions, which is the same as the standard for summary judgment motions.[3]  Under the relevant authority discussed below, Telenor Mobile has the burden of showing that there are no genuine issues of material fact regarding contract formation and the evidence would allow for a finding, as a matter of law, that the 2004 Shareholders Agreement is a validly formed contract.  The Tribunal concludes that there clearly exist genuine issues of material fact regarding Mr. Nilov's authority to enter into the 2004 Shareholders Agreement and it cannot find, as a matter of law, that the 2004 Shareholders Agreement is valid.

9.      *Third*, the Tribunal rejects Telenor Mobile's contention that there was a separate agreement between the parties to arbitrate because the arbitration clause in the 2004 Shareholders Agreement refers to the UNCITRAL Rules.  Telenor Mobile has not cited to any case or other authority for this proposition.  Moreover, Telenor Mobile's severability argument cannot stand in

---

board meetings were conducted — are invalid under Ukrainian law.  That aspect of Storm's motion to dismiss has been deferred for later determination because of recent developments in the Ukrainian courts.

[2]      The parties have agreed that the applicable standard here was articulated in *Sphere Drake*.  (*See, e.g.,* 6/29 Tr. at 26:16-22; 61:20-62:8; Telenor Mobile's Supp. Br., dated June 27, 2006, at 3.)

[3]      Telenor Mobile has conceded that the summary judgment standard applies.  (*See* 9/5 Tr. at 19:24-20:17.)

light of the Orders from the Ukrainian courts, which held that *both* the 2004 Shareholders Agreement *and* the arbitration clause are "null and void."

10.     *Fourth*, the Tribunal has no choice but to follow the judgments of the Ukrainian courts in the Orders in the absence of evidence establishing procedural irregularities, a fundamental lack of due process, a lack of jurisdiction, or an affront to public policy.  No such evidence has been submitted in the course of these proceedings.  The Tribunal is unaware of any case law or other authority, and Telenor Mobile has not cited any, holding that an arbitral panel may overturn or disregard a court's prior finding with respect to contract formation under the circumstances presented in this case.

11.     *Fifth*, if the Tribunal were to ignore the Orders and issue an award on the merits, it is very likely that the award would not be enforceable in Ukraine.  In a case presented by Storm's expert (which was not contradicted by any authority or expert evidence from Telenor Mobile), the Ukrainian Supreme Court refused to recognize an arbitral award where the arbitration panel had disregarded a Ukrainian court's finding that an agreement was invalid.

12.     *Sixth*, as an additional grounds for dismissal, the Tribunal concludes that Telenor Mobile has waived its right to arbitration as a result of its active participation in various related Ukrainian litigations.

13.     *Seventh*, although the Tribunal is not required to consider the other arguments on contract formation that were raised by Telenor Mobile for the first time in this arbitration (but never put before the Ukrainian courts, despite an opportunity to do so), the Tribunal has nevertheless examined those arguments under the relevant standards.  The Tribunal finds that they do not allow the Tribunal to assert jurisdiction over Telenor Mobile's claims.

**Findings of Fact**

## I.    The Parties

14.    Telenor Mobile is a corporation duly organized and existing under the laws of the Kingdom of Norway, with its principal place of business in Fornebu, Norway.  Telenor Mobile is a subsidiary of Telenor ASA.  (Statement of Defense at ¶ 1.)

15.    Storm is a limited liability company organized and existing under the laws of Ukraine, with its principal address at 1, Narodnogo Opolchennya Street, Kyiv 03151, Ukraine.  (*Id.* at ¶ 2.)

16.    Storm is wholly owned by Alfa Telecom, a company organized under the laws of the British Virgin Islands that currently uses the trade name "Altimo."  Storm and Alfa Telecom are associated with the Alfa Group, one of Russia's largest privately owned financial-industrial conglomerates.  (*Id.* at ¶ 3.)

17.    Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar") is the largest mobile telecommunications company in Ukraine.  Telenor Mobile and Storm are the only two shareholders of Kyivstar.  Telenor Mobile owns approximately 56.5% of the issued and outstanding shares of Kyivstar, and Storm owns approximately 43.5% of the shares of the company.  (*Id.* at ¶ 4.)

## II.    The 2004 Shareholders Agreement And Its Predecessors

18.    Telenor Mobile, Kyivstar and Storm are signatories to the 2004 Shareholders Agreement.  (Amended Statement of Claim at ¶ 1.)  The 2004 Shareholders Agreement was one of several documents related to the corporate governance and management of Kyivstar executed by the parties and other entities beginning in 1998.  (*See generally* Telenor Mobile Evidentiary Br.)

19.    On March 26, 1998, the then-existing shareholders of Kyivstar — Telenor Mobile, Storm, Sputnik IV L.P. and Sputnik V. Holdings Ltd. (collectively, "Sputnik"), Omega LLC ("Omega") and Kyivstar itself — entered into a shareholders agreement concerning the corporate governance and management of Kyivstar (the "1998 Shareholders Agreement").  (*Id.* at 5.)

20.    Pursuant to a put option in the 1998 Shareholders Agreement, Telenor Mobile in early 2002 agreed that it would purchase all of Sputnik's shares in Kyivstar.  (*Id.*)  In anticipation

of that purchase, Telenor Mobile sought to have a new shareholders agreement executed and approached Storm in January 2002 to begin the process for negotiating such an agreement.  (*Id.*)

**III.    Negotiations Relating To The 2002 Transactions**

21.    Beginning in March 2002, Telenor Mobile, Storm and Storm parent Alfa Telecom or related entities (collectively, "Alfa") began negotiating the documents relating to the contemplated transactions.  (*Id.*)  At approximately the same time, it became clear that Alfa, by itself or through Storm, sought to purchase Omega's shares in Kyivstar.  (*Id.* at 6.)

22.    Storm's contemplated purchase of Omega's shares would render it a holder of 40% or more of the shares of Kyivstar.  In the absence of a shareholders agreement, the holder of 40% or more of the shares in a Ukrainian company can block decisions on various matters.  Accordingly, a term sheet negotiated by the parties required that they enter into a new shareholders agreement in connection with the purchase of the Omega shares.  (*See id.* at 6-7 and Ex. B thereto.)

23.    By May 2002, Telenor Mobile's acquisition of Sputnik's interest in Kyivstar was proceeding as planned, but it became clear that Storm's purchase of the Omega shares would likely not take place before the closing of the transaction between Alfa, Storm and Telenor Mobile.  (*Id.* at 7.)  During this time, Storm expressed concern that the failure to complete the purchase of Omega's shares would leave Storm with less than a 40% interest in Kyivstar.  (*Id.*)  Storm expressed an interest in acquiring a 7.8% interest in Kyivstar from Sputnik, which would permit Storm to reach 40% ownership.  Storm proposed that when and if the Omega transaction took place, Storm would sell back to Telenor Mobile the number of Kyivstar shares necessary to achieve the shareholder structure to which the parties originally had agreed:  Telenor Mobile, 56.5%; Storm, 43.5%.  (*See id.* at 7-8.)

24.    The parties continued to negotiate, and in July 2002 Telenor Mobile agreed to waive the requirement that Alfa complete its acquisition of the Omega shares prior to Telenor Mobile's purchase of Sputnik's shares.  (*Id.* at 8.)

25.    On July 9, 2002, Telenor Mobile purchased 16.5% of Kyivstar's shares from Sputnik. (*Id.*)  Having received notice of the purchase, Alfa notified Telenor Mobile that Alfa viewed the

6

consummation of the transaction to be a violation of the parties' previous agreement and demanded that Telenor Mobile sell Alfa or one of its affiliates a portion of the Kyivstar shares purchased from Sputnik.  (*Id.*)

26.     Following additional negotiations, Telenor Mobile agreed to enter into a share purchase agreement (the "Share Purchase Agreement") with Storm, under which Telenor Mobile would agree to sell Storm 7.7% of the issued and outstanding shares of Kyivstar, which would bring Storm over the 40% ownership threshold.  (*Id.* at 9.)

27.     Alfa's acquisition of Omega's Kyivstar shares had yet to occur, and, until Omega ceased to be a shareholder in Kyivstar, the 1998 Shareholders Agreement, to which Omega was a party, would remain in effect.  (*Id.* at 9.)

28.     During July and August 2002, Telenor Mobile, Alfa and Storm negotiated a voting agreement (the "2002 Voting Agreement"), which was intended to act as a "bridge" between the 1998 Shareholders Agreement and a new agreement to be entered into *after* Storm completed its acquisition of Omega's Kyivstar shares.  (*Id.* at 9.)  The new agreement, which was ultimately the 2004 Shareholders Agreement, was entirely dependent on the acquisition of the Omega shares by Storm.  (*See* Ekhougen Test., 8/14 Tr., at 101:20-102:18; Wack Aff. at ¶ 6.)

29.     On August 30, 2002, final execution copies of the Share Purchase Agreement and 2002 Voting Agreement were exchanged between Alfa and Telenor Mobile.  On September 2, 2002, the parties exchanged signature pages of the Share Purchase Agreement and the 2002 Voting Agreement.  (Telenor Mobile Evidentiary Br. at 10.)

30.     A form (in draft) of the new shareholders agreement the parties contemplated entering into once the Omega transaction was concluded was annexed as Exhibit B to the 2002 Voting Agreement.  (*Id.*)  Telenor Mobile's representative, Mr. Ekhougen, has testified that Telenor Mobile never argued that the draft shareholders agreement attached to the 2002 Voting Agreement was an enforceable contract in and of itself.  (*See* Ekhougen Test., 8/14 Tr., at 109:4-110:17.)

31.     On October 29, 2002, the date of Telenor Mobile's sale of a 7.7% interest in Kyivstar to Storm under the Share Purchase Agreement, the parties exchanged certificates

confirming that they possessed the requisite authority to enter into the relevant agreements. (Telenor Mobile Evidentiary Br. at 10.) Of particular relevance to the instant proceeding, Storm attached to its certificate (the "Storm Certificate") a copy of its charter, founding documents, and registration certificate. (*See id.* at 11, Ex. L; Hansen Aff. at ¶ 37.)

32.    Storm also attached to the Storm Certificate a copy of a "true, complete and correct English translation of a unanimous written consent of the participants of [Storm] approving the Share Purchase Agreement, the other Transaction Agreements and the transactions contemplated thereby, dated August 30, 2002" and a document entitled "Minutes No. 19 of the Extraordinary General Meeting of Participants" of Storm dated October 7, 2002, which confirmed approval of the resolutions adopted by written polling on August 30, 2002. (*See* Exs. L and N to Telenor Mobile Evidentiary Br.) Although the foregoing documents refer to the draft form of a new shareholders agreement to be entered into between the parties after the Omega transaction had been completed, they do not grant Mr. Nilov the authority to sign the shareholders agreement "as is" nor do they purport to authorize Mr. Nilov to execute versions of the new shareholders agreement that are materially different from the draft form.

33.    The attorney who advised Storm in connection with the above-described 2002 transactions, David Wack, has testified that it was generally understood by the parties at the time that the Shareholders Agreement was still in draft form and that several conditions had to be satisfied before the Agreement could be signed; most notably, Storm needed to purchase Omega's shares in Kyivstar. (Wack Aff. at ¶ 6.) Because there was no guarantee that the Omega transaction would occur, the form of shareholders agreement attached to the 2002 Voting Agreement was not in and of itself an enforceable contract.

## IV.    Alfa And Storm Close The Omega Transaction And Request Significant And Material Changes To The Shareholders Agreement

34.    Shortly before the closing of the Omega share purchase transaction, Alexey Khoudyakov, Vice President of Altimo, requested certain changes to the draft shareholders agreement (including amendments to the material breach section and to other sections involving the appointment and powers of Kyivstar officials). Mr. Khoudyakov requested those changes at the

8

insistence of Storm's Ukrainian partners, on whose behalf he acted, and he testified that the Ukrainian partners sought the amendments to the draft agreement because they did not fully trust Telenor Mobile.  (*See* Khoudyakov Aff. at ¶¶ 6-7.)

35.     Although Telenor Mobile's representative, Mr. Ekhougen, initially refused to make any changes, he noted that his refusal to incorporate Mr. Khoudyakov's amendments "does not mean that Telenor is unwilling to consider any possible amendments that Kyivstar's shareholders may bring forward at a later stage."  (Ex. R to Telenor Mobile's Evidentiary Br.; *see also* Ekhougen Test., 8/14 Tr., at 110:7-17.)  It is significant that Telenor Mobile, in response to the requested changes, did not insist on signing the draft shareholders agreement "as is" and did not argue that the form language attached to the 2002 Voting Agreement constituted an enforceable contract.

36.     On December 15, 2003, Storm finalized the terms of its purchase of the Omega shares.  Because the officers and directors of Omega would remain in their respective positions for several weeks until Omega was liquidated, Telenor Mobile and Storm entered into a letter agreement, dated December 17, 2003, jointly waiving the requirement in Section 2.05 of the 2002 Voting Agreement that the parties terminate the 1998 Shareholders Agreement and enter into the new shareholders agreement within three business days of completion of the Omega transaction. Instead, under the letter agreement, Storm agreed to enter into the new shareholders agreement on or before January 31, 2004.  (*See* Telenor Mobile Evidentiary Br. at 15, Ex. S.)

37.     On December 18, 2003, Storm again wrote to representatives of Telenor Mobile to urge Telenor Mobile to consider Storm's proposed changes to the draft shareholders agreement. (*See* Telenor Mobile Evidentiary Br. at 15, Ex. T.)  As originally contemplated, these changes included the renegotiation of Telenor Mobile's right to appoint the President, a renegotiation of the material limits on the company's CEO to make decisions, and the material breach section.  Notably, the material breach section was deemed particularly crucial for the Ukrainian shareholders of Storm, due to their increasingly difficult relations with Telenor Mobile.  (*See* Khoudyakov Aff. at ¶¶ 6-7.) Telenor Mobile rejected two of the proposed amendments, but agreed to negotiate the material breach provisions.  (*See id.* at ¶¶ 8-9.)

38.    Between January 22, 2004 and January 28, 2004, several drafts of the new termination provision for material breaches of the agreement were exchanged among Alfa, Storm and Telenor Mobile.  (*See* Telenor Mobile Evidentiary Br. at 15, Exs. U, V and W; Khoudyakov Aff. at ¶ 9.)  Mr. Ekhougen conceded at the August 14, 2006 hearing that the changes proposed by Storm would have implications for various "important" provisions of the shareholders agreement. (Ekhougen Test., 8/14 Tr., at 115:16-117:18.)  At the time, Mr. Khoudyakov referred to the comments Alfa had to the draft agreement as "substantive."  (Telenor Mobile Evidentiary Br., Ex. U.)  In his affidavit submitted in these proceedings, Mr. Khoudyakov similarly characterized the amendments in the final executed agreement as substantial, material and important to Storm.  (*See* Khoudyakov Aff. at ¶ 7.)  Mr. Khoudyakov recalled in particular that the parties negotiated the amount of direct breach specified in the agreement; though Storm proposed lowering the figure from $50 million to $5 million, Telenor Mobile refused and ultimately prevailed.  (*Id.* at ¶ 11.)  Mr. Khoudyakov noted that Telenor Mobile would not have taken such a firm stance on the issue had it believed the issue to be merely "technical."  (*See id.*)

39.    In contrast to the 2002 transactions, which involved lawyers for both Telenor Mobile and Storm, Storm's negotiations culminating in the 2004 Shareholders Agreement were primarily led by a non-lawyer, Mr. Khoudyakov.  Telenor Mobile was represented in these negotiations by its Ukrainian counsel, Oleksiy Didkovskiy.  (*See* Khoudyakov Aff. at ¶ 9; Ekhougen Test., 8/14 Tr., at 111:3-6.)  Although Mr. Wack (who was involved extensively in the 2002 transactions) did not participate actively in the negotiations surrounding the 2004 Shareholders Agreement, he did briefly review the material breach amendments after having been contacted by Mr. Khoudyakov on January 22, 2004.  (*See* Khoudyakov Aff. at ¶ 10; Wack Aff. at ¶ 8 and Ex. A thereto.)  Mr. Wack did not provide any other advice to Storm with regard to the 2004 Shareholders Agreement, and Mr. Khoudyakov did not rely on Mr. Wack (who is not a Ukrainian lawyer) for any advice on Ukrainian law in that transaction.  (Khoudyakov Aff. at ¶ 10.)

40.    On January 30, 2004, Mr. Nilov, on behalf of Storm; Mr. Ekhougen, on behalf of Telenor Mobile; and Mr. Igor V. Lytovchenko, on behalf of Kyivstar; executed the 2004 Shareholders Agreement.  (*See* Telenor Mobile Evidentiary Br. at 16, Ex. Y.)

41.    In connection with the execution of the 2004 Shareholders Agreement, Storm delivered "Certificates of Incumbency and Authority of Storm" dated January 30, 2004.  (*See* Exs. AA and BB to Telenor Mobile Evidentiary Br.)  The documents purported to certify that Mr. Nilov was authorized to sign the 2004 Shareholders Agreement.  (*Id.*)  One of the certificates was signed by Andrey Kosogov, a member of the Alfa Group Supervising Board of Directors and chairman of Altimo.  Unlike the documents provided for the 2002 transactions, the 2004 certificates do not anywhere indicate (or provide any evidence) that a Meeting of Participants had been held or that Mr. Nilov had been given authority to execute the 2004 Shareholders Agreement.  (*Compare* Exs. AA and BB *with* Ex. L to Telenor Mobile Evidentiary Br.)  Storm's expert, Mr. Maydanyk, has testified that the 2004 certificates have no effect under Ukrainian law absent such a Meeting of Participants.  (*See* Maydanyk Op. at ¶¶ 26-29.)

42.    Mr. Kosogov also testified that he signed one of the certificates at Telenor Mobile's request and he mistakenly believed that Mr. Nilov had general authority under Ukrainian law to execute the 2004 Shareholders Agreement.  (*See* Kosogov Aff. at ¶¶ 5-6.)  Mr. Kosogov did not consult the provisions of Storm's Charter, and he did not seek legal advice before signing the certificate.  (*Id.* at ¶ 6.)  Mr. Kosogov further testified that he did not intend to represent that there had been a Meeting of Participants authorizing the execution of the 2004 Shareholders Agreement and he does not recall any such meeting.  (*See id.* at ¶¶ 4, 6.)

**V.    Alpren Proceedings Against Storm In Ukraine**

43.    In 2005, after completing the purchase of the Ukrainian partners' shares in Storm, Alfa discovered that Mr. Nilov lacked authority to enter into the 2004 Shareholders Agreement.  (*See* Ex. C to Telenor Mobile's Mem. in Opp'n to Mot. to Dismiss; 9/5 Tr. at 9:17-10:17.)  At the time, Storm had already begun to raise issues relating to Kyivstar's corporate governance through litigation in Ukraine.  (*See* Statement of Defense at ¶¶ 10-13.)  The claims several of those actions

were directly related to the corporate governance provisions in the 2004 Shareholders Agreement. Storm has taken the position that its representatives are not required to follow those provisions because it has alleged in the Ukrainian actions that they are invalid. (*See id.*)

44.    The litigation commenced by Alpren Limited ("Alpren"), an Alfa subsidiary, in April 2006 is consistent with the actions brought by Storm in Ukraine because it too challenged the 2004 Shareholders Agreement.

45.    The Alpren litigation culminated in the Orders, in which the Ukrainian courts found that Mr. Nilov lacked authority under Storm's Charter and Ukrainian law to enter into the 2004 Shareholders Agreement. The courts noted that Section 2.03(b)(1) of the 2004 Shareholders Agreement bound Storm to purchase shares of Kyivstar. As a result, the courts held, Section 12.4(ii) of Storm's Charter required approval for the Agreement from a Meeting of Participants. The courts found that there was no evidence of such a Meeting of Participants. (*See* Khomyak Aff., Exs. 23 and 29.)

46.    The trial court also held that the 2004 Shareholders Agreement was not registered with the proper authorities in the Ukrainian language, which is a requirement for documents that affect a company's foundational documents. Because the 2004 Shareholders Agreement and the 2002 Voting Agreement call for changes in Storm's Charter under certain circumstances, the trial court ruled that both agreements are invalid for failure to comply with the Ukrainian registration requirements. (*See* Khomyak Aff., Ex. 23 at 3.)

47.    Storm was represented in those proceedings by its current General Director (and Mr. Nilov's successor), Vadim Klymenko. (Klymenko Aff. at ¶ 4.) In opposing Alpren both in the court of first instance and on appeal, Mr. Klymenko was unable to argue that there was in fact a Meeting of Participants granting Mr. Nilov the authority to enter into the 2004 Shareholders Agreement because Mr. Klymenko had not seen any evidence of such a meeting. (Klymenko Aff. at ¶ 8.) Mr. Klymenko informed the Ukrainian courts of these ongoing arbitration proceedings. (*See id.* at ¶¶ 6-7.) The courts, however, ruled that they had jurisdiction over the dispute. (*See* Khomyak Aff, Exs. 23 and 29.)

48.    Telenor Mobile did not at any time attempt to intervene in the Ukrainian proceedings, even though it had the right to do so.  (*See* Storm Evidentiary Br. at 3; Logush Op. at ¶¶ 16-19.)

49.    Telenor Mobile has, however, invoked the Ukrainian legal system in a related litigation.  Telenor Mobile recently obtained a reversal from the appellate court of an earlier decision dated December 22, 2005.  (Storm Evidentiary Br. at 3.)

## Conclusions of Law

### I.    Legal Standard

A.    The parties have agreed, and the Tribunal finds, that the evidentiary standard upon which to evaluate Storm's motion is set forth in *Sphere Drake*.  Where, as in this case, a party alleges that an arbitration should be dismissed because the underlying contract is void, the party "must present 'some evidence' in support of its claim."  *Sphere Drake*, 263 F.3d at 30.  There must also be an "'unequivocal denial [by the party opposing arbitration] that the agreement had been made.'"  *Id.* (quoting *Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)).  Accordingly, to prevail on the motion to dismiss, Storm only needs to present "some evidence" that Mr. Nilov lacked authority to enter into the 2004 Shareholders Agreement and it must have "unequivocal[ly] denied" that the 2004 Shareholders Agreement was formed.

B.    *Sphere Drake*'s "some evidence" standard is a very low one.  For example, the standard has been met where (i) the party opposing arbitration stated in its brief and other submissions that its agent lacked authority to sign the relevant agreement; (ii) the party opposing arbitration submitted a single affidavit stating that a corporate official or agent was not authorized to enter into the subject agreement; (iii) the evidence tended to support the opposing party's position or, at a minimum, created uncertainty about the validity of the agreement; or (iv) the opposing party submitted evidence from the individuals involved in the transaction that showed they simply assumed the person executing the subject document had authority to do so.  *See, e.g., Bank of America v. Diamond State Ins. Co.*, No. 01 CIV. 0645 (LMM), 2001 WL 1029410, at *2 (S.D.N.Y. Sep. 7, 2001) (hereinafter "*Diamond State I*"), *aff'd*, 38 Fed. Appx. 687, 2002 WL 1378683 (2d Cir. June 26, 2002); *In re Azores Int'l Shipping, Inc.*, No. 99 Civ. 850 (JSM), 1999

WL 493380, at *2 (S.D.N.Y. July 9, 1999); *In re Herlofsen Mgmt.*, No. 88 CIV. 7542 (RLC), 1989 WL 111083, at *3 (S.D.N.Y. Sept. 19, 1989); *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972); *Becker v. DPC Acquisition Corp.*, No. 00 Civ. 1035 (WK), 2002 WL 1144066, at *6-8 (S.D.N.Y. May 20, 2002); *Sphere Drake*, 263 F.3d at 33.  Telenor Mobile has not attempted to distinguish the foregoing cases and the Tribunal finds that they apply here.

C.    The *Sphere Drake* standard is not contradicted by *Sphere Drake Ins. Ltd. v. All American Ins. Co.*, 256 F.3d 587 (7th Cir. 2001) (hereinafter, "*All American*").  *All American* stands for the proposition that courts, and not arbitrators, have the authority to hear disputes about an agent's authority to bind a principal to a contract, *unless* the parties had separately agreed to arbitrate disputes about whether they have agreed to the contract's substantive provisions.  *Id.* at 591.  As discussed below, Telenor Mobile has not met the applicable standard on the issue of whether there was a separate agreement to arbitrate.[4]

D.    Finally, as the party seeking to compel arbitration, Telenor Mobile must meet the well-established summary judgment standard.  (*See* 9/5 Tr. at 19:24-20:17 (in which counsel for Telenor Mobile conceded that the summary judgment standard applies).)  Telenor Mobile must show that there are no genuine issues of material fact regarding the formation of the 2004 Shareholders Agreement and that Telenor Mobile is entitled to a finding, as a matter of law, that the agreement is a valid and enforceable contract.  *See, e.g., Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *Benckiser Consumer Prods., Inc. v. Kasday*, No. 97 Civ. 5389, 1998 WL 677631, at *2 (S.D.N.Y. Sept. 30, 1998).

**II.    Application Of *Sphere Drake* Standard To Relevant Facts**

E.    Storm easily satisfies the "unequivocal denial" prong of the *Sphere Drake* standard, inasmuch as it has consistently taken the position in this arbitration that Telenor Mobile's claims

---

[4]    Because Telenor Mobile's argument relates to contract formation, it too must be evaluated under the *Sphere Drake* standard.  Storm, therefore, is only required to show that it has "some evidence" to support its contention that there is no separate agreement to arbitrate.

should be dismissed because the 2004 Shareholders Agreement is void. (*See, e.g.*, Statement of Defense at 3-4.)

F.    With respect to the second *Sphere Drake* prong, Storm's statements in its submissions and affidavits that the 2004 Shareholders Agreement is void and that there was no Meeting of Participants authorizing the 2004 Shareholders Agreement, by themselves, constitute "some evidence" and they require the dismissal of Telenor Mobile's claims. *See Diamond State I*, 2001 WL 1029410, at *2; *In re Azores Int'l Shipping*, 1999 WL 493380, at *2.

G.    In addition to those statements, however, Storm also submitted the Orders, which invalidated the 2004 Shareholders Agreement on the grounds that (a) there is no evidence of a Meeting of Participants in connection with the 2004 Shareholders Agreement; and (b) the Agreement was not properly registered in the Ukrainian language. These findings, by courts of competent jurisdiction that followed Ukrainian laws and rules of procedure, exceed the evidence that had been accepted by numerous courts as satisfying the "some evidence" standard set forth in *Sphere Drake*. The findings of the Ukrainian courts are also supported by the evidence adduced in this arbitration. Telenor Mobile has not shown that the necessary Meeting of Participants did, in fact, occur or that the 2004 Shareholders Agreement was filed in accordance with Ukrainian law.[5] Storm's witnesses similarly testified that they do not have any evidence of a Meeting of Participants in connection with the Agreement.

H.    The Ukrainian litigation was neither collusive nor otherwise improper. The record produced by Storm, as supported by the Klymenko Affidavit, the Ilyashev Affidavit and the expert opinion of Professor Logush, all show that the proceedings were conducted properly and that Storm defended against Alpren's application, even taking an appeal from the trial court's judgment. It is well settled that courts applying New York law "generally will accord recognition to the judgments rendered in a foreign country under the doctrine of comity absent a showing of fraud in the procurement of the foreign judgment or unless recognition of the foreign judgment would offend a

---

[5]    Telenor Mobile has insisted that there was a Ukrainian version of the 2004 Shareholders Agreement, but it provided no evidence that such a version was filed, as required by Ukrainian law.

strong policy of New York." *S.C. Chimexim v. Velco Enters. Ltd.*, 36 F. Supp. 2d 206, 211 (S.D.N.Y. 1999). Telenor Mobile has not even attempted to argue that there was any fraud in the Ukrainian litigation or that any New York public policy is implicated here.

I. In enforcing foreign judgments, the courts will also examine whether there were any procedural irregularities in the original jurisdiction. *Id.*, 36 F. Supp. 2d at 211-12. While Telenor Mobile has lodged vague complaints about the Ukrainian court system in general, it has not pointed to any relevant procedural irregularities here. The expert opinion of Prof. Logush — which has not been rebutted by Telenor Mobile — demonstrates that it is not unusual or improper for parties to appear through a corporate representative rather than a lawyer and to present arguments orally in lieu of a written statement. (*See* Logush Op. at ¶¶ 20-27.) In addition, Telenor Mobile has not cited any case where a court refused to enforce a Ukrainian judgment based on irregularities in, or other problems with, the Ukrainian judicial system.

J. We are also mindful that the Tribunal, if it were to disregard the Orders, would run the substantial risk of issuing an award that would not be enforceable in Ukraine.[6] Storm has referred the Tribunal to the *Western NIS Enterprise Fund* case, attached to the opinion of Professor Logush, in which the Ukrainian Supreme Court refused to enforce the award of a U.S. arbitration panel that disregarded an earlier judgment of the Ukrainian court. (*See* Logush Op. at ¶ 37; Logush Supp. Op. at ¶ 8, Exs. A7, A8.) Telenor Mobile has not distinguished *Western NIS Enterprise Fund*, nor has it cited any authority to the contrary.

K. Thus, Telenor Mobile has failed to demonstrate that there are no genuine issues of material fact regarding the formation of the 2004 Shareholders Agreement and that a court could find, as a matter of law, that a valid and enforceable contract had been formed.

L. Telenor Mobile also argues that by including a reference to the UNCITRAL Rules in the Agreement's arbitration clause, the parties entered into an agreement to arbitrate that is

---

[6]     Telenor Mobile has acknowledged that it would have to enforce an award from the Tribunal in Ukraine. (*See* 6/29 Tr. at 59:25-60:1.)

independent and severable from the 2004 Shareholders Agreement. (*See, e.g.*, 8/14 Tr. at 254:20-256:16.) The Tribunal declines to adopt Telenor Mobile's argument, for two reasons.

M.     *First*, Telenor Mobile has not cited any case (or any other authority) holding that the reference to the UNCITRAL Rules in a contract's arbitration clause constitutes a separate and independent agreement to arbitrate where, as in this case, the party opposing arbitration has shown that there is "some evidence" in support of its argument that the contract was never formed.[7]

N.     *Second,* Telenor Mobile cannot rely on the UNCITRAL Rules referred to in the arbitration clause because the Ukrainian courts specifically held in the Orders that the arbitration clause, not just the 2004 Shareholders Agreement, was "null and void." (*See* Khomyak Aff., Exs. 23 and 29; Logush Op. at ¶ 28.) The Orders demonstrate that the Ukrainian courts had a basis, under Ukrainian law, for voiding the arbitration clause as well. The courts held that the 2004 Shareholders Agreement violated the public policy of Ukraine under Article 228 of the Ukrainian Civil Code. (*See* Khomyak Aff., Exs. 23 and 29; Ex. B, Ukrainian Civ. Code, Art. 228.) The Ukrainian courts then cited Article 216 of the Ukrainian Civil Code, which states that null and void contracts do not create any legal consequences other than those relating to its nullity. (*See id.*; Ex. C, Ukrainian Civ. Code Art. 216(1).)[8] In other words, the result of a finding of nullity is that the parties must be restored to their pre-contract state.

O.     The survival of an agreement to arbitrate the validity of the 2004 Shareholders Agreement would be directly contrary to these provisions of the Ukrainian law. It would allow an arbitration panel to revisit the issue of contract formation (which the Ukrainian courts already had determined), and it would give effect to part of the Agreement, in violation of Article 216 of the Ukrainian Civil Code. The Tribunal must assume that in voiding the arbitration clause the

---

[7]    Telenor Mobile attempts to rely on *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003), but *Shaw* is distinguishable because it did not involve the issue of whether a contract had been formed. Instead, *Shaw* related to whether a contract for attorneys' fees and costs was arbitrable. *Id.* at 118.

[8]    Article 216 also provides that the parties may not agree to alter the consequences of such a finding of nullity. Ukrainian Civ. Code Art. 216(4). Thus, the severability provisions in the 2004 Shareholders

Ukrainian courts were attempting to avoid the very situation presented here, where Telenor Mobile

is arguing that the Tribunal may re-determine the issue of contract formation that had been decided

by the Ukrainian courts earlier.[9]

      P.     This conclusion is in accord with the law of the Second Circuit.  In *Pollux Marine*

*Agencies, Inc. v. Louis Dreyfus Corp.*, 455 F. Supp. 211 (S.D.N.Y. 1978), the court rejected the

argument that an arbitration clause was severable or that there was an independent agreement to

arbitrate.  *Id.* at 218-219.  The court surveyed Second Circuit precedent and stated that "the

controlling principle of law is that an arbitration clause is not severable when the existence of the

contract from which it is to be severed is in dispute."  *Id.* at 219.

**III.     Telenor Mobile Waived The Right To Arbitrate**

      Q.     As an additional basis on which to dismiss, this Tribunal concludes that Telenor

Mobile waived its right to arbitrate by actively participating in several of the actions in Ukraine

listed in its Amended Statement of Claim without once raising the arbitration clause as a defense.

For example, Telenor Mobile has fully participated in an action commenced by Storm in the Kyiv

City Commercial Court which resulted in the December 22, 2005 Order invalidating Sections 9.1

and 10.3 of the Kyivstar Charter.  Even though the provisions in the Kyivstar Charter are similar to

the provisions in the 2004 Shareholders Agreement (and thus an order invalidating the former

affects the latter), Telenor Mobile has never argued that the case should be dismissed or stayed

because of the arbitration clause in the 2004 Shareholders Agreement.  There is a waiver of

arbitration if a party "by [its] litigation activity manifested a preference 'clearly inconsistent with [a]

later claim that the parties were obligated to settle their differences by arbitration.'"  *Sherrill v.*

---

Agreement — which were before the Ukrainian courts — cannot be used to override the conclusion that the
Agreement and the arbitration clause are null and void.  (Logush Op. at ¶ 28.)

[9]      Indeed, in the *Western NIS Enterprise Fund* case attached to the Supplemental Opinion of Professor
Logush, the Ukrainian Supreme Court was confronted with a similar set of circumstances in which a party
argued that the arbitration panel should disregard a Ukrainian court's holding that the agreement involved in
the arbitration was invalid.  As discussed above, the Ukrainian Supreme Court refused to enforce the award
issued by the panel that ignored the Ukrainian court's holding.  The Ukrainian courts in this case were
certainly aware of the arbitration in New York (and the potential for a repeat of the *Western NIS Enterprise
Fund* scenario) because the parties submitted arguments relating to the pending arbitration.

*Grayco Builders, Inc.*, 475 N.E.2d 772, 775-76 (N.Y. 1985) (*quoting Matter of Zimmerman v.*

*Cohen*, 139 N.E. 764, 765 (N.Y. 1923)).  *See also Figueroa v. Flatbush Women's Servs.*, 664

N.Y.S. 2d 118, 118 (N.Y. App. Div. 1997) (holding that party "waived his right to arbitrate by

actively participating in this litigation prior to making his belated demand for arbitration").

## IV.     Application Of *Sphere Drake* To Arguments Advanced By Telenor Mobile

R.     In response to Storm's motion to dismiss, Telenor Mobile has advanced a number of

arguments in support of its claim that, despite the Orders, the 2004 Shareholders Agreement is

valid and enforceable.  Because there are no grounds under the applicable law for the Tribunal to

disregard the Orders, a consideration of those arguments is not necessary.  Furthermore, the

Tribunal finds that Telenor Mobile had ample opportunity to submit evidence and make similar

arguments before the Ukrainian courts.  In the event, however, that the Tribunal's deference to the

Orders is held to be in error (and purely as an alternative grounds for dismissal), the Tribunal will

apply the "some evidence" standard from *Sphere Drake* to Telenor Mobile's arguments.

### 1.     Mr. Nilov Lacked Actual Authority To Enter Into The 2004 Shareholders Agreement

#### a.     Ukrainian Law Governs The Issue Of Actual Authority

S.     Although Telenor Mobile contends that New York law applies to issues of actual

authority, the New York courts instead have looked to the law of the place of incorporation in

determining whether an agent had such authority.  *See, e.g., Lehman Bros., Inc. v. Tutelar*, No. 85

CIV. 3772 (DLC), 1997 WL 403463, at *3 n.4 (S.D.N.Y. July 17. 1997) (applying law of place of

incorporation, Argentina, to issue of actual authority).  Ukrainian law is to the same effect.  (*See*

Maydanyk Op. at ¶¶ 8-13.)

#### b.     Mr. Nilov Could Not Have Properly Executed The 2004 Shareholders Agreement Without A Meeting Of Participants

T.     The Ukrainian courts concluded that Mr. Nilov could not have executed the 2004

Shareholders Agreement without authorization from a Meeting of Participants.  This conclusion is

amply supported by the relevant documents and one of Storm's experts in Ukrainian law.  Storm's

Charter states that the approval of a Meeting of Participants is required where, among other things,

the General Director will be entering into an agreement providing for "the disposal of or encumbrance upon the Kyivstar Shares or any other assets of the Company." (Ex. 11 to Khomyak Aff. at Section 12.3(ii).) The August 30, 2002 Notice of Written Polling notes that the new shareholders agreement would involve the "voting and disposal of shares in Kyivstar" (*see* Telenor Mobile Evidentiary Br., Ex. L) and the 2004 Shareholders Agreement clearly contemplates such a disposition. (*See* Telenor Mobile Evidentiary Br., Ex. Y, at Section 2.03(b).)

U.      Storm's expert, Mr. Maydanyk, reviewed this evidence and concluded that "it is my opinion that [Storm's Charter] expressly limits the power of the General Director to enter into the Shareholders Agreement precisely because it entails the disposal of Kyivstar shares." (Maydanyk Op. at ¶ 14.) We accept Mr. Maydanyk's opinion on this issue over the opinion of Telenor Mobile's expert, Mr. Rabij, because the latter has no basis for his statement that "the Shareholders Agreement does not involve any … disposition of shares." (Rabij Aff. at ¶ 27.) Mr. Rabij's statement is undercut by the documentary evidence and the admission of Telenor Mobile's representative, Mr. Ekhougen, that the 2004 Shareholders Agreement does indeed involve the disposition of Kyivstar shares. (*See* 8/14 Tr. at 98:10-15.)

### c.      There Is No Evidence That A Meeting Of Participants Authorizing The 2004 Shareholders Agreement Occurred

V.      In the Orders, the Ukrainian courts found that the required Meeting of Participants for the 2004 Shareholders Agreement did not occur. Telenor Mobile has not submitted any evidence to the Tribunal that a Meeting of Participants specifically authorizing Mr. Nilov's execution of the 2004 Shareholders Agreement took place. Storm has informed the Tribunal that it is unaware of any such evidence and that its files do not refer to a Meeting of Participants around the time of the 2004 Shareholders Agreement. Storm's witnesses have testified that they have not seen any evidence of, and do not recall, a Meeting of Participants in connection with the 2004 Shareholders Agreement.

>    **d.    The Authorization For The 2002 Voting Agreement Is Not Sufficient Authority For Mr. Nilov's Execution Of The 2004 Shareholders Agreement**

W.    Telenor Mobile has argued that the authorizations in connection with the 2002 Voting Agreement may be considered proper authority for the execution of the 2004 Shareholders Agreement. Those authorizations, however, were limited to the 2002 Voting Agreement. Although they refer to the draft form for the new shareholders agreement and allow Mr. Nilov to take steps to enter into a new shareholders agreement, the authorizations cannot be stretched to apply to a materially different agreement entered into more than a year later. Telenor Mobile has not presented the Tribunal with any case or other authority in which a board resolution or power of attorney was construed so broadly.

X.    Telenor Mobile's own witness, Mr. Ekhougen, admitted that the 2004 Shareholders Agreement contained new material breach provisions that affected important clauses in the Agreement and that those changes were the subject of negotiations. (*See* Ekhougen Test., 8/14 Tr., at 115:21-119:15.) At the time of the negotiations, Storm's representative, Mr. Khoudyakov, referred to the new provisions as "substantive." (Ex. U to Telenor Mobile Evidentiary Br.) Mr. Khoudyakov and Mr. Wack submitted affidavits in this proceeding in which they similarly describe the amendments as material and important to Storm. (*See* Khoudyakov Aff. at ¶¶ 7-11; Wack Aff. at ¶¶ 7-9.) Mr. Maydanyk also testified that the differences between the draft shareholders agreement attached to the 2002 Voting Agreement and the 2004 Shareholders Agreement meant that a new and separate authorization was required before Mr. Nilov could execute the latter. (*See* Maydanyk Op. at ¶¶ 23-25.)

>    **2.    Telenor Mobile Cannot Rely On Mr. Nilov's Apparent Authority To Enter Into The 2004 Shareholders Agreement**

>    **a.    The Applicable Law On Apparent Authority**

Y.    Telenor Mobile has argued that New York and Ukrainian law (Article 92(3) of the Ukrainian Civil Code) are the same on the issue of apparent authority, and that Telenor Mobile was permitted to rely on Mr. Nilov's authority unless it knew or should have known there were limitations on such authority. (*See* 8/14 Tr. at 28:3-5; Rabij Aff. at ¶ 31.) If there is no conflict

between New York and Ukrainian law, then the Tribunal would not be required to determine the applicable law. The Tribunal finds, however, that Ukrainian and New York law are not the same.

Z.      Storm's expert, Mr. Maydanyk, has shown (in testimony which Telenor Mobile fails to rebut) that Article 92(3) applies only when a person has exceeded his authority, not when there is an allegation that the person lacked authority. (*See* Maydanyk Op. at ¶¶ 30-32.) Mr. Maydanyk also points outs that, to the extent Telenor Mobile is relying on actions pre-dating January 1, 2004, Article 92(3) is inapplicable because it came into effect on January 1, 2004. (*See id.* at ¶¶ 35-38.) Under the circumstances, the Tribunal cannot conclude that the New York and Ukrainian law is the same, and it must determine the applicable law.

AA.     The issue of apparent authority is governed by the law where Telenor Mobile "relied upon" such authority. *See, e.g., Lehman Bros., Inc. v. Tutelar*, No. 85 CIV. 3772 (DLC), 1997 WL 403463, at *3 n.4 (S.D.N.Y. July 17. 1997). That analysis compels the application of Ukrainian law because there is no evidence that any of the negotiations surrounding the 2004 transaction took place in New York. The documents and testimony instead show that there was a clear nexus with Ukraine, which is the only other jurisdiction cited by the parties. For example, Telenor Mobile's chief negotiator and counsel were located in Ukraine at the time of the transaction. (Ekhougen Test., 8/14 Tr., at 30:23-31:7, 111:3-112:2.) Mr. Rabij also states in his affidavit that Telenor Mobile was "entitled to rely on Mr. Nilov's authority under Article 92(3) of the Ukrainian Civil Code. (Rabij Aff. at ¶ 30.) The Tribunal, therefore, will apply Ukrainian law to the issue of apparent authority.

BB.     Because, as noted above, Article 92(3) does not apply to the facts of this case and the Ukrainian Civil Code otherwise contains no provisions relating to apparent authority (*see* Maydanyk Op. at ¶ 37), the Tribunal concludes that Telenor Mobile may not rely on Mr. Nilov's apparent authority to enter into the 2004 Shareholders Agreement.

CC.     Moreover, even if the concept of apparent authority were relevant (or if New York law applied here), Telenor Mobile knew or should have known that there were limitations on Mr. Nilov's authority. Telenor Mobile has acknowledged, both in its submissions and in the testimony

of its witnesses, that it received a copy of Storm's Charter well in advance of the parties executing the 2004 Shareholders Agreement. (*See, e.g.*, Telenor Mobile Evidentiary Br. at 11; Ekhougen Test., 8/14 Tr., at 91:11-96:13; 97:5-10.) Telenor Mobile also knew, from the 2002 transactions, that approval by Storm's Participants was required for transactions involving the disposition of Kyivstar shares. As a result, Telenor Mobile cannot show, as a matter of either New York or Ukrainian law, that Mr. Nilov had apparent authority.

> **4.    Storm Is Not Estopped From Raising An *Ultra Vires* Defense And Has Not, Through Its Actions, Ratified The 2004 Shareholders Agreement**

DD.    Telenor Mobile has maintained that Storm is estopped from avoiding the 2004 Shareholders Agreement. A principal is estopped from denying an agent's authority if, among other things, the principal's acts or omissions "created an appearance of authority in the agent" or the third party "reasonably and in good faith relied" on such authority. *See, e.g., Trs. of the Am. Fed'n. of Musicians and Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503, 508 (S.D.N.Y. 1999) (cited by Telenor Mobile). Because Telenor Mobile undeniably was aware that Mr. Nilov had limitations on his authority to enter into the 2004 Shareholders Agreement, there was no "appearance of authority" and any reliance that Telenor Mobile claims to have placed on Mr. Nilov's authority could not have been reasonable. Accordingly, the Tribunal finds that Telenor Mobile cannot rely on the doctrine of estoppel.

EE.    Telenor Mobile's ratification theory fails as well. Alfa did not learn of Mr. Nilov's lack of authority until 2005 and by that time it had begun to raise issues relating to Kyivstar's corporate governance. These challenges continued thereafter and included the April 2006 lawsuit brought by Alfa's subsidiary, Alpren, regarding Mr. Nilov's lack of authority. The main case cited by Telenor Mobile, *36 Convent Ave. HDFC v. Fishman*, No. 03 Civ. 3998 (JGK), 2004 WL 1048213 (S.D.N.Y. May 7, 2001), states that ratification "only occurs when the principal has full knowledge of all material facts and takes some action to affirm the agent's actions." *Id.* at *5. Here, there was no action to affirm Mr. Nilov's execution of the 2004 Shareholders Agreement after Alfa learned the facts. *36 Convent Avenue* also noted that the court may find there is ratification if the principal fails to timely repudiate after learning the material facts and the

23

opposing party relies on the principal's silence. *See id.* That is not the case here because, as noted above, Alfa has been challenging the Kyivstar corporate governance provisions since 2005.

## **Relief Granted**

For the foregoing reasons, the Tribunal orders that (a) this arbitration be dismissed in its entirety; and (b) Storm be awarded its costs and disbursements incurred in this proceeding, including its reasonable attorneys' and any experts' fees.

Dated:        September 12, 2006
New York, New York

Respectfully submitted,

LOVELLS

By: *Pieter Van Tol*

Joe Cyr
Pieter Van Tol
Lisa J. Fried
Eric Z. Chang

590 Madison Avenue
New York, NY 10022
Tel. (212) 909-0600
Fax (212) 909-0660

Attorneys for Storm LLC