# EXHIBIT M

Page 1

1

2 IN THE MATTER OF AN ARBITRATION UNDER

THE UNCITRAL ARBITRATION RULES BETWEEN

3 --------------------------------------

4 TELENOR MOBILE

COMMUNICATIONS, AS,

5

6         Claimant,       VOLUME III

7    vs.                  TRANSCRIPT OF

8                         PROCEEDINGS

9 STORM, LLC,

10         Respondent.

11 --------------------------------------

12

13         Transcript of the stenographic notes of the

14 proceedings in the above-entitled matter, as taken by

15 and before BONNIE ATELLA PRUSZYNSKI, a Certified

16 Shorthand Reporter and Notary Public, held at the

17 offices of Lovells, Esqs., 590 Madison Avenue, New

18 York, New York, on Tuesday, September 5, 2006,

19 commencing at 9:30 a.m.

20

21 BEFORE:

22         KENNETH R. FEINBERG, CHAIRMAN

23         WILLIAM R. JENTES, ARBITRATOR

24         GREGORY B. CRAIG, ARBITRATOR

25

Page 2

```
 1
 2
 3  A P P E A R A N C E S:
 4  ORRICK, HERRINGTON & SUTCLIFFE, LLP
       666 Fifth Avenue
 5  New York, New York 10103-0001
       (212) 506-5110
 6  BY:  ROBERT L. SILLS, ESQ.
           -and-
 7      ADAM S. ZIMMERMAN, ESQ.
           -and-
 8
 9  ORRICK, HERRINGTON & SUTCLIFFE, LLP
       Tower 42, Level 35
10  25 Old Broad Street
       London, EC2N 1 HQ
11  DX:  557 London/City
       BY:  PETER O'DRISCOLL, ESQ.
12      Attorneys for Claimant
13
14  LOVELLS, ESQS.
       590 Madison Avenue
15  New York, New York 10002
       BY:  PIETER VAN TOL, ESQ.
16           -and-
       ERIC Z. CHANG, ESQ.
17           -and-
       LISA J. FRIED, ESQ.
18      Attorneys for Respondent
19
20  ALSO PRESENT:
21
22      BJORN HOGSTAD, ESQ., Telenor
23
24      OLEKSIY V. DIDKOVSKIY, Partner
       Shevchenko Didkovskiy & Partners
25
```

Page 3

```
 1
 2    JAY K. MUSOFF, Partner, Orrick
 3
 4    CHAIRMAN FEINBERG:  Good morning,
 5  everybody.
 6    We are here from far flung locations
 7  to reconvene on this arbitration on the
 8  Motion to Dismiss.  And in light of the
 9  arbitration panel's ruling concerning
10  schedule, we are here today to hear from
11  Storm, initially on whatever it wants to add
12  to the record on the subject of the
13  affidavit of David Wack and, as long as we
14  have reconvened, on any other matters or
15  loose ends or other issues that Storm and
16  its counsel wish to raise.
17    After you conclude, we will ask
18  Telenor, A, if they have any response today
19  to the affidavit of David Wack or any other
20  related matters.  By the panel's recent
21  order, we have given Telenor until the close
22  of business on September 8, if it wishes to
23  supplement the record in any manner on this
24  pending motion, before we close the record
25  on this motion and proceed to decide the
```

Page 4

```
 1           Proceedings
 2  motion as a panel.
 3    The second item we wish to cover
 4  today, once we conclude argument on the
 5  evidence offered by Storm, is to discuss on
 6  the record the question of a hearing date
 7  and any prehearing discovery.
 8    And with that summary of the state of
 9  play, I call on Storm and its distinguished
10  counsel to add anything that it wishes to
11  add concerning the affidavit of Wack or
12  other matters.
13    Pieter?
14    MR. VAN TOL:  Thank you, Mr. Chairman.
15  With the tribunal's indulgence, what I
16  would like to do is pick up on what I think
17  you referred to as some loose ends from the
18  last hearing and then go to the affidavits.
19  But, of course, I am happy to deal with any
20  questions that coming along as they come up.
21    At the last hearing, we focused very
22  much on the issue of apparent authority, and
23  the question of whether Telenor Mobile knew
24  or should have known that there were
25  limitations on Mr. Nilov's authority.
```

Page 5

```
 1           Proceedings
 2    I won't rehearse, again, our
 3  arguments.  You know what they are.  It's
 4  that Telenor Mobile was in possession of
 5  Storm's charter.  It knew from the 2002
 6  transactions that an authorization was
 7  needed for any transaction involving the
 8  disposition of Kyivstar shares.  Since the
 9  2004 shareholders' agreement was the same in
10  that respect, it's our position that Telenor
11  Mobile knew or should have known that
12  another authorization was needed.
13    Now, in response to that, Storm has
14  claimed -- sorry, Telenor Mobile has claimed
15  that Storm is essentially estopped from
16  arguing that Mr. Nilov lacked authority or
17  that Storm, through its actions, somehow
18  ratified the 2004 shareholders' agreement.
19    I will deal with each of those in
20  turn.
21    First, with regard to what we will
22  loosely call estoppel.  I noted from the
23  tribunal's questions last time that you are
24  somewhat troubled by the notion that Storm
25  could argue that Telenor Mobile knew or
```

1          Proceedings
2    should have known of the limitations, while
3    at the same time you queried whether Storm
4    had the same information in its possession
5    and shouldn't it have known or been aware
6    that Mr. Nilov needed authority.
7          What I would like to do is reorient us
8    on the law.  The key prong of estoppel
9    that's involved here is reasonable reliance,
10   and that question only looks at the
11   knowledge of the party raising the estoppel
12   argument, which is Telenor Mobile.
13         It's essentially the same question
14   that is raised by apparent authority.  What
15   did Telenor Mobile know?
16         Now, estoppel theory adds another
17   layer, which is:  Was it reasonable for
18   Telenor Mobile to rely on Mr. Nilov's
19   apparent authority in light of what it knew?
20   And we submit that the answer is a no, for
21   the reasons I have just articulated.
22         So, really, Storm's knowledge for
23   purposes of the legal analysis, is not
24   relevant here.
25         Now, I think it's clear from what we

1          Proceedings
2    have seen so far, particularly the new
3    affidavits, that the main participants for
4    Storm in 2004 were simply unaware that there
5    was a need for another authorization from
6    the meeting of participants.  No one has
7    suggested that they knew and somehow didn't
8    want to get one.
9          It looks like, from what we know, that
10   Mr. Khudyakov, and other people involved,
11   simply didn't know until later that there
12   needed to be a meeting of participants.
13   That doesn't change the fact that such an
14   authorization was needed, as the courts have
15   found and as our expert, Mr. Maydanyk, has
16   shown in his legal opinion.
17         I want to pause here and emphasize
18   here why, though, Storm is even talking
19   about this evidence.  Because our view has
20   been and still is that Sphere Drake does not
21   require a searching analysis of the merits
22   of each party's argument on estoppel or
23   ratification, et cetera.  All it requires by
24   Storm is that Storm show there is some
25   evidence that no contact was formed.

1          Proceedings
2    So, I don't have to, today, show you
3    that Telenor Mobile's theory of estoppel is
4    wrong.  I also don't have to show you today
5    or later that their ratification theory is
6    wrong.
7          What Sphere Drake requires me to do is
8    show that I have some evidence for saying
9    Telenor Mobile's counterarguments are
10   deficient.  So long as I can do that, the
11   issues of estoppel, ratification and
12   anything else we can think of, need to be
13   decided by a court.
14         And I note that if Telenor Mobile is
15   arguing, again, how terribly unfair it all
16   is, well, they had the opportunity to go the
17   Ukraine courts.  We have been over this, and
18   I haven't heard yet an articulation from
19   Telenor Mobile other than we are not sure
20   Ukrainian courts are the best place to be.
21   And then at the last hearing Mr. Sills
22   mentioned that Telenor Mobile could be bound
23   by the appellate record as it is in the
24   Ukraine.
25         Well, we have seen, from the goings on

1          Proceedings
2    relating to the December 22 order, that
3    that's not the case.  Telenor Mobile has
4    gone back and introduced new evidence in
5    connection with that proceeding.  As far as
6    I'm aware, they can do the same with respect
7    to our case.  They have submitted no expert
8    opinion saying that they are bound by the
9    record, and that's a pretty thin reed to
10   rely upon if you are going to say I'm going
11   to ignore, basically, or ask the tribunal to
12   disregard what's happened in Ukraine.
13         Now, I will turn briefly to
14   ratification, because it's in many ways
15   related to estoppel and can be dealt with
16   fairly quickly.
17         Telenor Mobile, as a party arguing for
18   ratification, has to show that Storm, first
19   of all, knew that Mr. Nilov lacked
20   authority; and, two, that it failed to
21   repudiate the agreement in a timely manner.
22         Now, I take it from the last hearing
23   that what Telenor Mobile is saying is that
24   the events of 2004, the amendment to the
25   charter and other events, show that there

1          Proceedings
2   was ratification of the 2004 shareholders'
3   agreement.  But at the time of those events
4   in 2004, Storm was not aware that Mr. Nilov
5   had acted outside his authority.  It was
6   only after Alpha's purchase of the remaining
7   shares in Storm through Alperin in the fall
8   of 2004, that Alpha obtained all the records
9   for Storm and realized something was amiss.
10  As I understand it, the transaction went
11  through sometime in the fall of 2004, and it
12  wasn't during the due diligence period, but
13  it was after all the records had been
14  assembled that, sometime in 2005, likely
15  early 2005, Alpha/Storm realized that
16  Mr. Nilov had signed the 2004 agreement
17  without authority.
18         And remember, it's not as if it's been
19  from early 2005 until April 2006, when Storm
20  first raises the issue of corporate
21  governance.  We have been arguing since
22  March of 2005, as Mr. Sills has wanted to
23  point out, that there are many issues about
24  corporate governance relating to Kyivstar.
25  Our representatives stopped attending

1          Proceedings
2   corporate meetings.  It's not as if Storm
3   has pretended, since January 2004, that the
4   shareholders' agreement is a good and extant
5   agreement.
6          To the contrary, as soon as Alpha
7   realized something was amiss, it started
8   attacking the corporate governance issues
9   any way it could.  And this ultra virus
10  argument is just the last, I hope, in a
11  series of attacks on the same issues.
12         That's all I want to say on apparent
13  authority.  And I am about to move on to the
14  standard, the Sphere Drake cases, that
15  Mr. Jentes raised last time.
16         If the tribunal has any questions now
17  on apparent authority, I am happy to take
18  them; if not, I will move on to the legal
19  standard.
20         CHAIRMAN FEINBERG:  Go ahead.
21         MR. VAN TOL:  Okay.  At the last
22  hearing, Mr. Sills brought up the case
23  called Shaw in the Second Circuit.  And I
24  believe this has been distinguished already,
25  but I just want to make sure we nail this.

1          Proceedings
2          Shaw does not go to the same issue
3   that is before the tribunal or is involved
4   in this case.  It did not go to the question
5   of whether a contract was formed.  It went
6   to the issue of whether, I believe it was
7   attorneys' fees, or whether a party was
8   entitled to attorneys' fees, was an
9   arbitrable issues.
10         Telenor Mobile has not cited any case
11  and I am unaware of any case, where the
12  courts have said if you have an arbitration
13  agreement, and you cite the Uncitral rules,
14  and you have a severability provision, and a
15  party like Storm argues that there is no
16  contract, that an arbitration tribunal may
17  find that there is a separate agreement to
18  arbitrate, and it may go ahead and decide
19  the issue of contract formation.  There is
20  no authority that has been given to you for
21  that proposition.  Shaw doesn't stand for it
22  and Sphere Drake in the Seventh Circuit
23  actually supports the Sphere Drake in the
24  Second Circuit case, which I thought we had
25  all agreed was the standard.  And that

1          Proceedings
2   standard is:  Where a party says no contact
3   was formed, and it comes up with some
4   evidence to back that up, the issue of
5   contract formation is decided by someone
6   other a tribunal.
7          Now, moving on to some of the things
8   that were raised in the affidavits.  One
9   point quickly, and I want to make sure this
10  came through in the David Wack affidavit, at
11  the last hearing, I believe it was Exhibit K
12  to the -- and I apologize for mispronouncing
13  his name -- to the Lykke affidavit, there
14  was a series of e-mails from Mr. Wack that
15  talked about whether or not Mr. Nilov could
16  sign the agreement himself or whether there
17  needed to be a signature for a chief
18  accountant at Storm.
19         Telenor Mobile has tried to make a lot
20  of those e-mails, even suggesting that
21  Mr. Wack was saying there that Mr. Nilov had
22  authority for all time to bind Storm to any
23  agreement, the 2002 voting agreement and the
24  2004 shareholders' agreement.  Mr. Wack has
25  told in his affidavit that he had a much

Proceedings

1
2  more limited purpose in his e-mails, which
3  was simply to tell Telenor Mobile that it
4  was his understanding that Mr. Nilov could
5  sign as the general director.
6      Now, what that obviously assumes is
7  that Mr. Nilov has authority to act and
8  that, in turn, derives from the meeting of
9  participants.
10      If you look at the e-mail chain in
11  Exhibit K, this is from August of 2002.
12  Clearly, between August 2002 and
13  October 2002, someone advised the parties
14  that there needed to be meeting of
15  participants because there was one to give
16  Mr. Nilov authority.
17      And it's our understanding that, for
18  the 2002 transaction, Storm had separate
19  Ukrainian counsel that did not participate
20  in the 2004 transaction.  Mr. Wack and
21  Mr. Hudyakov go to great pains to tell the
22  tribunal that Mr. Wack is not a Ukrainian
23  law expert, he's a transactional lawyer.
24  Any advice he's giving is merely passing on
25  his understanding from Ukrainian counsel

Proceedings

1
2  and, in 2004, he was not imparting Ukrainian
3  law advice to Mr. Hudyakov.  It appears that
4  Storm either did not have separate Ukrainian
5  counsel in 2004, or is relying on
6  Mr. Jamack, as the representative of the
7  Kyivstar, to protect its interests on
8  Ukrainian law.  As I said earlier, this
9  looks like a mistake; that's what ultra
10  virus cases are about.
11      Now, just quickly, I would like to
12  point out a few more things from the Wack
13  affidavit and then move on briefly to the
14  other affidavits with the understanding that
15  the tribunal will rule on whether or not
16  it's going to accept those affidavits, given
17  that the original ruling was for us to
18  submit something from Mr. Wack.
19      In the Wack affidavit, Mr. Wack
20  recounts for the tribunal that the
21  understanding of the parties in 2002 was
22  that there -- there were conditions
23  precedent to moving forward with the
24  shareholders agreement, namely that the
25  Omega transaction go through.  I think that

Proceedings

1
2  is common ground now based on the Ekhougen
3  testimony.  He also testified that, looking
4  at the changes to the termination
5  provisions, that those were material and
6  substantial changes.
7      And as I said a moment ago, when he
8  was contacted by Mr. Khudyakov in January of
9  2004, what he was giving advice on was the
10  provisions of the material breach amendment.
11  He was not opining on Ukrainian law.  And it
12  appears that the need for another
13  authorization for the meeting of
14  participants somehow slipped through the
15  cracks.
16      Now, moving on to what Mr. Hudyakov
17  says, I think he fills in nicely a question
18  that was outstanding from the last hearing,
19  which is:  Why is it that Storm wanted these
20  changes to the breach, the material breach
21  provisions?
22      And he tells you in plain terms that
23  the Ukrainian partners of Storm at that time
24  did not have a good relationship with
25  Telenor Mobile.  They didn't trust Telenor

Proceedings

1
2  Mobile.  In fact, they used Mr. Hudyakov as
3  their intermediary to talk to Telenor
4  Mobile.  And what they wanted those
5  provisions for was for security to make sure
6  that Telenor Mobile abided by its
7  obligations.
8      Now, moving on, we also submitted the
9  affidavit from Mr. Kosogov, who I think
10  makes it plain that when he submitted the
11  Certificate of Incumbency in January of
12  2004, at the request of Telenor Mobile, the
13  one thing he was not saying is that there
14  was a meeting of participants in either
15  December 2003 or January 2004.
16      He has no information that there was
17  such a meeting, which is consistent with
18  what Mr. Wack says, with what Mr. Klymenko
19  has said, with what every witness we ever
20  has talked to has said.
21      What Mr. Kosogov was doing with the
22  Certificate of Incumbency was relying on his
23  knowledge of a general director's overall
24  ability to act.
25      Moving on, we have the affidavit from

Page 18

```
 1          Proceedings
 2   Mr. Ilyashev from Alperin, really saying
 3   that if you want see what arguments Alperin
 4   made, look at the statement that was
 5   submitted to the Ukrainian courts.  But
 6   there is a very interesting point that was
 7   raised about arbitration, and whether the
 8   Ukrainian court was aware of the proceedings
 9   going on in New York.  I think it's clear
10   now, based on the Klymenko affidavit and
11   Ilyashev affidavit, that the Ukrainian court
12   was advised of the New York proceedings and
13   that Alperin argued that Alperin was not a
14   party to these proceedings.  It had his own
15   free-standing claim and they ought to be
16   able to move forward in the Ukraine and
17   that's exactly what the Court found.
18          Finally, we have the Maydanyk
19   affidavit, and I will not go through that in
20   detail, because it's voluminous, and I am
21   sure the tribunal will have an opportunity
22   to consider it.  But the main point of that
23   affidavit, and the reason we submitted it,
24   is to show you that the decisions of the
25   Ukrainian courts are not some outlier
```

Page 19

```
 1          Proceedings
 2   decision that you can disregard for whatever
 3   reason.  The Ukrainian courts had a good
 4   reason in coming to their conclusion, it is
 5   supported by Ukrainian law, and at a
 6   minimum, what the Maydanyk affidavit shows
 7   is that Ukrainian law is not straightforward
 8   on this point, it's complex, but there is
 9   evidence to support Storm's arguments.
10          And if it were really the case that
11   Telenor Mobile had these great arguments
12   about apparent authority, when it incepted
13   and when that concept came into Ukrainian
14   law, I would submit that they should have
15   gone to the Ukrainian courts, as I have said
16   many times, and gotten those issues hashed
17   out there.
18          That's all I wanted to bring out for
19   the tribunal's benefit this morning, of
20   course, subject to anything that Mr. Sills
21   raises or any questions that you may have.
22          CHAIRMAN FEINBERG:  Mr. Sills.
23          MR. SILLS:  Thank you, Mr. Chairman.
24          Let me turn, first, to tell the claim
25   about Sphere Drake and the lack of the
```

Page 20

```
 1          Proceedings
 2   authority.
 3          The Second Circuit's decision in
 4   Sphere Drake does not say and cannot be made
 5   to say that a party opposing arbitration has
 6   to come up with a scintilla of evidence in
 7   order to defeat the arbitration agreement it
 8   made.
 9          What Sphere Drake says is that, on a
10   motion to compel arbitration, it will be
11   treated as motion for summary judgment, and
12   if the party opposing arbitration can
13   produce enough evidence to overcome a prima
14   facie showing, then there will be a hearing,
15   an evidentiary hearing, on the question of
16   whether or not there is or is not going to
17   be an arbitration.
18          And I don't want to take up everyone's
19   time, but Sphere Drake repeatedly says
20   that that is the showing that has to be
21   made, not to defeat arbitration, but in
22   order obtain a full blown evidentiary
23   hearing on the question of whether or not
24   there will be an arbitration.
25          We have had that hearing, and now we
```

Page 21

```
 1          Proceedings
 2   are having it for a second time, and there
 3   isn't any evidence sufficient to defeat the
 4   showing that Storm should be held to the
 5   agreement it made.
 6          Now, as to the claim what was just
 7   quoted, that this panel lacks jurisdiction,
 8   and this ought to be heard in court, I count
 9   five places in the last transcript where
10   this panel's jurisdiction was conceded.  The
11   first is at page 258, lines nine through 13.
12          You said, Mr. Feinberg, quote, you
13   have just said on the record that you are
14   not here challenging this tribunal's ability
15   to determine jurisdiction?
16          And Mr. Van Tol responded:  Correct.
17          The second is the following page, at
18   page 259, lines eight and nine, where
19   Mr. Van toll said, quote, I am saying you
20   have the power -- there appears to be
21   slightly garbled.  I am saying you have to
22   the power to determine your jurisdiction.
23          At page 260, again Mr. Van Tol said,
24   quote, we say you have the power to
25   determine your jurisdiction, that is
```

1           Proceedings
2   informed by Sphere Drake.  That appears at
3   lines 15 through 18.
4        A little while later in the hearing
5   Mr. Jentes said, what, exactly, do you mean,
6   we have jurisdiction?
7        And Mr. Van Tol responded as follows:
8   it's within your power under the Uncitral
9   rules.  You do have the power to determine
10  whether or not this case should go forward;
11  in other words, you have the power to
12  determine whether or not there was a
13  contract.
14       Again, at pages 266 and 267, Mr. Van
15  Tol said:  This clause, the Uncitral clause,
16  does not prohibit Telenor Mobile from
17  proceeding, going to the Ukrainian court.
18  It says you may determine your jurisdiction.
19       That's what Sphere Drake says.  That
20  was Storm's position at the last hearing.
21  They were right then; they are wrong now.
22       The Uncitral clause is clear.  The
23  contract is clear.  I had extended colloquy
24  with Mr. Jentes at the last hearing
25  concerning Judge Easterbrook's Seventh

1           Proceedings
2   Circuit decision in Sphere Drake, which
3   makes it clear that parties can opt out of
4   the usual rule that these matters are to be
5   determined in court and expressly provide
6   for determination before an arbitration
7   tribunal and that is expressly what they did
8   here.  It's what they did by adopting the
9   Uncitral rules in their entirety.  They are
10  incorporated by reference into this contract
11  as surely as if they had been set out word
12  for word.
13       I think this was gone into at great
14  length last time.  I don't think there can
15  be any serious argument that this tribunal
16  has the jurisdiction to determine its own
17  jurisdiction.
18       As to the question of apparent
19  authority that has been raised, the
20  presentation that was made, in effect,
21  stands the doctrine of apparent authority on
22  its head.  The whole reason for the doctrine
23  of apparent authority under New York law,
24  which, after all, governs here, is that one
25  party doesn't act at its peril in dealing

1           Proceedings
2   with a corporation.  If a corporation
3   creates all the indicia of authority,
4   whether or not it's followed its internal
5   procedures becomes irrelevant.
6        Now, the affidavits -- and there is no
7   particular burden on a party that has been
8   assured, both formally and informally, that
9   there is due authorization and there is
10  authority, to sort of drill down and
11  challenge that.  The test is actual
12  authority.
13       So, looking at these affidavits that
14  have been submitted, we could have submitted
15  these affidavits, because they actually lend
16  substantial support to Telenor's case.
17       Mr. Wack doesn't really address the
18  question of actual or apparent authority; in
19  effect, he's running away from his own
20  transaction saying he had very limited
21  involvement.
22       I will note that the claim now that he
23  didn't mean to say that Mr. Nilov could act
24  without a power of attorney, that it was in
25  some other context, just doesn't ring true.

1           Proceedings
2   When you look at the words of the e-mail he
3   sent, it's true he was addressing the
4   question of do we need two signatures or one
5   signature, because it's common, as I
6   understand it, in east European legal
7   systems for certain contracts to require two
8   signatures.  But he didn't say one signature
9   is enough.  He said the only officer is
10  Nilov.  Nilov can act without a power of
11  attorney.
12       Now, I don't understand how you could
13  twist words, can act without a power of
14  attorney, into saying only one signature is
15  required.  I know what the words say.  I
16  understand now why he's trying to run away
17  from them, but I think the document speaks
18  for itself.
19       The only other point he makes is to
20  weakly endorse this claim that was floated
21  at the last hearing that the 2004
22  shareholders' agreement was in some sense an
23  agreement to agree.  It's not.  It was
24  negotiated, it was annexed to the voting
25  agreement, and the voting agreement has an

```
 1              Proceedings
 2   automatic three-day trigger.
 3        Once Storm, that is Alpha, succeeds in
 4   buying the Omega shares, one it succeeds in
 5   getting the blocking position that Telenor
 6   agreed it could have by getting over the
 7   40 percent limit, there would be an
 8   automatic obligation to negotiate -- not
 9   limit, excuse me, to sign the new
10   shareholders' agreement.
11        It is true that there were provisions
12   inserted at the request of Storm on
13   termination.  But there they are estopped
14   and they can't profit from their own wrong.
15   Having requested, over Telenor's objection,
16   that the termination provisions be modified,
17   and Telenor having agreed to that, and then
18   having gone forward and signed the
19   agreement, they can hardly be said now, as a
20   matter of equity and good conscience, to set
21   up their own request as a basis for walking
22   away from their own agreement.
23        And there is certain irony here, since
24   they now claim they weren't aware of the
25   2002 meeting that expressly authorized the
```

```
 1              Proceedings
 2   contract to be signed.  It's a little
 3   unclear how they could have had this
 4   materiality argument that they have invented
 5   in mind, when they claim now not to be aware
 6   in 2002 that they had agreed to sign the
 7   shareholders' agreement.
 8        And on that point, with respect to
 9   this Maydanyk legal opinion, I think it's
10   described as, which I think is really
11   nothing more than an unauthorized reply
12   brief.  He argues that any change, however
13   slight or however formal, in his view
14   required a new meeting.  Well, that proves
15   far too much.
16        Plus, I don't think it could seriously
17   be argued that if the parties had simply
18   executed the 2002 draft in 2004, in keeping
19   with the express authorization, both by
20   written polling and by a meeting in 2002,
21   that there was lack of actual authority.
22   But that seems to the current position that
23   is being asserted, though it was not the
24   position that was asserted at the last
25   hearing.
```

```
 1              Proceedings
 2        The other thing that jumps off the
 3   page with Mr. Wack's affidavit, he says in
 4   paragraph ten, I do not recall a meeting of
 5   participants of Storm shareholders taking
 6   place in late December 2003 and early
 7   January 2004.  And that's the same kind of
 8   careful wording we see in all of these
 9   affidavits.  No one has said there was no
10   meeting.
11        We don't have control over Storm's
12   records.  Each one of these affidavits says
13   something like I'm unaware, I don't know.
14   And here I think it's significant, not only
15   what's been submitted, but what hasn't been
16   submitted.  It's another case of the dog
17   that didn't bark.
18        We are here because we were told that
19   Mr. Nilov was a critical witness, and his
20   testimony needed to be obtained, and that it
21   was more likely that his testimony could be
22   obtained than Mr. Wack's.
23        Well, Mr. Nilov was there.  He's the
24   one that signed this document.  He is an
25   employee of the Alpha Group.  He is a senior
```

```
 1              Proceedings
 2   officer of Alpha in charge of an entity
 3   called Alpha Capital, which is headquartered
 4   in Kiev.  It's a matter of public record.
 5   It's available on the internet.  He is a
 6   controlled witness.
 7        And despite the proceedings having
 8   been held over so Mr. Nilov's testimony
 9   could be obtained, despite the fact that one
10   would think that as a senior executive of
11   the group that is making this claim, he
12   would be willing to testify if he had
13   favorable testimony to offer, at the end of
14   the day, we have nothing from Mr. Nilov.
15        And that raises, as a matter of New
16   York law and as matter of common sense, the
17   presumption that were he to testify, his
18   testimony would be unfavorable.  Presumably
19   unfavorable because Mr. Nilov knew he had
20   authority to sign the agreement he signed.
21        When I turn to Mr. Khudyakov's
22   affidavit, Mr. Khudyakov does say -- and I
23   apologize because it's a little hard to read
24   the fax that we received.  He says he has
25   recently been informed that these material
```

```
 1            Proceedings
 2    changes required a new authorization by
 3    Storm's meeting of participants.  I wish to
 4    mention that at the time I did not ask for
 5    Mr. Wack's advice on this point.
 6         Well, what Mr. Khudyakov said, his
 7    last word in the transaction -- can I have a
 8    copy his last e-mail, please?
 9         And this is already in the record as
10    Exhibit X to our evidentiary brief.  And it
11    says this:  He's writing to Alexi
12    Didkovskiy, the Ukrainian attorney for
13    Telenor.  "Storm reviewed the language of
14    the new shareholders' agreement that you
15    distributed yesterday and agreed to it.  We
16    are ready to sign it tomorrow.  Please make
17    the practical arrangements for the signing
18    at Telenor (Ekhougen) and Kyivstar
19    (Litovchenko).  Also, I would appreciate it
20    if you could coordinate it with Avdeev as
21    well.  Unfortunately, Nilov will be out of
22    Kiev tomorrow and will not be able to sign
23    any documents.  I hope it is possible to let
24    him sign the agreement on Monday.  We could
25    provide a fax copy of his signature tomorrow
```

```
 1            Proceedings
 2    if needed."
 3         So, I suppose what Mr. Khudyakov is
 4    now saying is that when he said we are ready
 5    to sign it tomorrow, what he was really
 6    saying is we are ready to sign it tomorrow,
 7    but that is an empty and meaningless
 8    gesture.
 9         When someone says, "we are ready to
10    sign it tomorrow," that carries with it the
11    sense that we are ready to sign it tomorrow
12    with authority.  And, again, when we look at
13    the certificates that were delivered by Mr.
14    Kosogov and by Mr. Tumanov, Tumanov having
15    been the chairman at time of Storm, it
16    doesn't say we had a meeting, it doesn't say
17    you are invited to come conduct due
18    diligence to satisfy yourselves that there
19    is due authority.  What it says is this:
20    "I, Andre Kosogov, do hereby certify that
21    Valerie Vladimirich Nilov, it says two, is
22    duly authorized to sign behalf of Storm, b,
23    the shareholders' agreement dated
24    January 30, 2004, between and among Telenor,
25    Storm and Kyivstar."
```

```
 1            Proceedings
 2         "Duly authorized" means all
 3    formalities have been taken care of,
 4    everything is in order.  As Mr. Khudyakov
 5    said, we are ready to sign it tomorrow
 6    Ready to sign it doesn't mean we are ready
 7    to put a manual signature on it, but be on
 8    your guard.  It doesn't mean we have got our
 9    fingers crossed behind our backs.  It means
10    after these discussions, after these
11    negotiations that Storm initiated, we are
12    ready to sign it.  They delivered two
13    certificates, not one but two; one from the
14    Alpha side, one from Storm, itself, from its
15    chairman, saying that Nilov was, in their
16    words, "duly authorized."
17         And it's not our obligation to say
18    what steps you followed to assure us
19    that your man is duly authorized?  Did he
20    have to sign something in green ink?  Did he
21    have to wear a funny hat to a meeting?  Did
22    there have to be a meeting of participants?
23         We are entitled, based on these
24    documents, as well as on the representation
25    in the shareholders' agreement, itself, that
```

```
 1            Proceedings
 2    this is the binding agreement of the
 3    parties, to assume that they it had followed
 4    their own routine and that's precisely what
 5    we did.
 6         Now, Mr. Khudyakov also says that he
 7    gave -- I'm sorry.  Mr. Kosogov says that he
 8    gave a certificate, based on his
 9    understanding of Ukrainian law and the
10    general powers of the general director; in
11    effect, the president of the company.  He
12    says, "I signed the certificate by relying
13    on my knowledge of provisions of Ukrainian
14    law, giving the general director of a
15    Ukrainian company general authority to act
16    on behalf of the company, including entering
17    into agreements on behalf of the company."
18         Well, if he thought that, and I'm sure
19    he did, we were entitled to think that as
20    well.  It is inconceivable that we were
21    under a greater burden to test Mr. Nilov's
22    authority than the people who were actually
23    running Storm and providing us with the
24    assurances that has these contracts were
25    duly authorized.
```

Page 34

```
 1          Proceedings
 2       And here, I think a key case is a
 3  recent Appellate Division decision in New
 4  York.  It's a case called Odell versus 704
 5  Broadway Condominium.  It appears at 284
 6  Appellate Division 2nd 52, and it's 728 New
 7  York Supp. 2nd 464.
 8       I can distribute copies if you would
 9  like, Mr. Chairman.  I have one for each
10  member of the panel.  And we can provide one
11  to you as well, Pieter.
12       MR. VAN TOL:  Thank you.
13       MR. SILLS:  And this appears at tab 14
14  of the binder I have just distributed.
15       And this is a case where the president
16  of a New York corporation had gone and
17  executed a document, supposedly without
18  authorization from the board of directors of
19  the corporation.
20       Now, if you look at what appears as
21  page four of the annex here.  This is what
22  the Appellate Division, the appellate court
23  sitting here in Manhattan, had to say.
24       Several well settled principles bear
25  mentioning --
```

Page 35

```
 1          Proceedings
 2       MR. JENTES:  Where are you?
 3       MR. SILLS:  On page four, towards the
 4  bottom of the first column.
 5       The paragraph beginning "on the
 6  issue."
 7       It says, "Several well settled
 8  principles bear mentioning.  There is a
 9  general presumption that the president of a
10  corporation is clothed with the powers
11  which, of necessity, inhere in the position
12  of chief executive."  Quoting, the president
13  or other general officer of a corporation
14  has power, prima facie, to do any act which
15  the directors could authorize or ratify.
16  The true test of his authority to bind the
17  corporation is whether at the time he is
18  engaged in the discharge of the general
19  duties of his office and in the business of
20  the corporation.
21       Looking down to the next paragraph,
22  and I think this is the key on the question
23  of apparent authority.  "Moreover, plaintiff
24  could reasonably rely on the apparent
25  authority of Leidersdorf, as board
```

Page 36

```
 1          Proceedings
 2  president, to approve the construction.  The
 3  rule is well settled that it will ordinarily
 4  be presumed that a president of a
 5  corporation has the power to make contracts
 6  pertaining to the business of the
 7  corporation and coming within the apparent
 8  scope of his authority.  The president's
 9  apparent authority exists regardless of
10  whether the president has actual authority
11  to carry out such acts.  Furthermore, a
12  president of a corporation has apparent
13  authority to act within the general scope of
14  his office, and such acts are binding on the
15  corporation against one who does not know of
16  any limitation, and there must be a typo, it
17  says or but should read on, the president's
18  true authority.  Mr. Leidersdorf, as
19  president of the board, had the power,
20  whether actual, implied or apparent, to
21  approve of the proposed construction and to
22  bind the entire board.
23       That is the rule in this state.  That
24  is the rule under New York law.  New York
25  law what is the parties expressly agreed
```

Page 37

```
 1          Proceedings
 2  would govern here.  Although I do note that,
 3  contrary to the position now being taken by
 4  Mr. Maydanyk, at the last hearing there was
 5  an express statement by Mr. Van Tol on the
 6  record that he and I agreed that Ukrainian
 7  and New York law on the question of apparent
 8  authority was the same.  We still think it's
 9  the same.
10       Now, here the claim that is now -- and
11  claim has been something of a moving target,
12  but as I understand it, the claim is
13  essentially that we had a copy of the
14  charter, that there is a construction of the
15  charter that suggests that there wasn't
16  actual authority, and that despite the reams
17  of paper that have been supplied to us to
18  confirm that there had, in fact, been a
19  grant of authority to Nilov, and that he was
20  acting within the scope of his authority,
21  that we, in effect, acted at our peril.
22       Well, here I think it's useful to take
23  the two, Mr. Rabij's affidavit, which is in
24  the record, and then this opinion that's
25  been delivered of Mr. Maydanyk.
```

```
 1          Proceedings
 2          Well, if two Ukrainian lawyers are
 3   having this disagreement about whether or
 4   not this does or doesn't come within the
 5   scope of the charter, and whether or not the
 6   2002 authorization rolls forward to 2004,
 7   then I don't see how anyone can say that in
 8   the face of the assurances that we were
 9   given, there wasn't apparent authority that
10   somehow lept off the page on this charter.
11   It certainly didn't leap off the page to
12   Storm, which presumably has control of its
13   own records and presumably was in the best
14   position to say we should have had a
15   meeting.  For that matter, had they been
16   dealing in good faith, if they, in fact, had
17   believed that, they simply would have
18   convened another meeting, because what they
19   are now claiming is that they engaged in an
20   elaborate charade.  And that charade went
21   for years.
22          Now, what we just heard was in that
23   early 2005, they discovered this supposed
24   infirmity in Mr. Nilov's authority.  It is
25   not true that there was an attack on the
```

```
 1          Proceedings
 2   shareholders' agreement because of
 3   Mr. Nilov's lack of authority in 2005.  It
 4   is true there has been a relentless,
 5   unremitting attack in the Ukrainian courts
 6   on a whole series of agreements that Storm
 7   has made, because they don't seem to regard
 8   their agreements as worth the paper they are
 9   printed on.  But the fact of the matter is
10   that the first time a claim of Nilov's lack
11   of authority was made was not in 2005.  It
12   was made secretly in 2006, in the Alperin
13   case.  We did not learn of this claim until
14   we read in a press release in May of 2006
15   that Storm was pressing this claim against
16   itself.
17          And I should mention a small point on
18   that.  There was some discussion last time
19   about Mr. Marchenko, and when I look at
20   Mr. Ilyashev's affidavit, he makes it clear
21   that Mr. Marchenko is his partner.
22   Mr. Marchenko represented Alperin at the
23   trial, to the extent there was a trial.
24   Mr. Ilyashev took over on appeal.
25   Mr. Marchenko is, in fact, a lawyer, has
```

```
 1          Proceedings
 2   appeared for Storm.  I understand that he
 3   appeared only this morning in a court in
 4   Karkov, which is a provincial city in
 5   Ukraine, where yet another one of these
 6   assaults in the Ukrainian courts is being
 7   mounted, and he appeared on behalf of Storm.
 8          And I think that tells us something
 9   very important about the collusive nature of
10   the Alperin case, that Mr. Ilyashev and his
11   partners can appear on both sides of the
12   supposed controversy.
13          In that regard, I would like to -- I
14   would like to hand to the panel and, of
15   course, to Mr. Van Tol, copies of powers of
16   attorney that have been granted to the
17   Ilyashev firm, copies of a print of the
18   Ilyashev and Partners Web site, and a power
19   of attorney granted by Storm to the Ilyashev
20   firm, to a partner of the Ilyashev firm, a
21   Mr. Zinchenko, who also appears on the Web
22   site.
23          So, that it certainly appears that
24   Storm's lawyers and Alperin's lawyers are
25   one in the same.
```

```
 1          Proceedings
 2          Now, when I look at Mr. Ilyashev's
 3   affidavit, I'm struck by what wasn't argued
 4   in this Alperin case.  There is an elaborate
 5   argument about how the contract should have
 6   been in Ukrainian and should have been
 7   filed, which I think is a matter of
 8   irrelevance, because New York law governs.
 9   And I think at the last hearing there was an
10   extensive discussion about the Indosuez
11   case.  Indosuez, which is a New York Court
12   of Appeals case, is conclusive that New York
13   law and not foreign law governs on the
14   question of apparent authority when the
15   parties have elected New York law.
16          Now, Mr. Ilyashev says he argued that
17   the shareholders' agreement was a sham deed.
18   That seems to be a very envious argument
19   that it's, as a matter of Ukrainian law, an
20   amendment to the charter and, again, has to
21   be in Ukrainian and has to be filed.  Then
22   he says, Mr. Nilov required an express
23   authorization.  But what's interesting is
24   that no one, either from Alperin or Storm,
25   mentioned the fact that there had been a
```

11

Page 42

```
1              Proceedings
2   2002 meeting.  No one mentioned these
3   certificates.
4        I noted with interested that our new
5   expert, Mr. Maydanyk, is of the opinion that
6   the certificates, although they are formal
7   and were given in order to induce reliance
8   in a corporate transaction in which Storm
9   acquired extremely valuable rights, are in
10  his view a nullity, because they weren't --
11  there is no evidence that the certificates
12  of incumbency were duly authorized.
13       So, they are -- I suppose there would
14  be an infinite regression of asking who
15  authorized the authorization of the
16  authorization, which would destroy the
17  doctrine of apparent authority.  Apparent
18  authority exists when authority is apparent.
19  Here it was.
20       The rest of Mr. Ilyashev's affidavit
21  seems to be an elaborate argument that
22  Ukrainian law, not New York law, should
23  govern.  No one seems to have made any of
24  these arguments.
25       And Mr. Klymenko, who also, as the
```

Page 43

```
1              Proceedings
2   current director, you would think would have
3   supplied an affidavit at least in this
4   proceeding, saying there was no meeting.  I
5   have reviewed the corporate records and
6   there is nothing there.  From him, we also
7   have -- he has supplied an affidavit, but
8   although he presumably has control of the
9   books and records of Storm, also has never
10  said there is a lack of authority.  Yet
11  another controlled witness, who you would
12  think would have offered testimony if he had
13  favorable testimony to offer for Storm.
14       Finally, Mr. Kosogov, again,
15  confirming that there was apparent
16  authority, says "I did not check the
17  provisions of Storm's charter," the task
18  that they now claim should have been carried
19  out by Telenor.  And, again, as I think
20  Mr. Rabij's affidavit makes clear, even had
21  we done that, it would have seemed clear
22  that the 2002 authorization was adequate.
23  For that matter, we had no knowledge at time
24  that there hadn't been a 2004 meeting or a
25  unanimous written consent, which I think is
```

Page 44

```
1              Proceedings
2   referred to as written polling in Ukrainian
3   law, because we were told it was, again, in
4   the words of both certificates, "duly
5   authorized," that means all formal steps
6   necessary to execute this document have been
7   taken.
8        Contrary to what we were just told
9   about the discovery of this problem in 2005,
10  Mr. Kosogov says, "until recently I was not
11  aware that a special resolution of Storm's
12  participants was necessary to authorize
13  Mr. Nilov to enter into the shareholders'
14  agreement."
15       Well, the fact is there was a meeting.
16  Mr. Nilov, as the general director of this
17  company, had extremely broad powers.  I
18  think it's quite clear from Mr. Kosogov's
19  affidavit, as well as what we heard last
20  time, and what we saw in Mr. Rabij's
21  affidavit, that the general director of a
22  Ukrainian, LLC has extraordinarily broad
23  powers, broader than the president or chief
24  executive officer of a New York corporation.
25  Telenor acted in an entirely correct and
```

Page 45

```
1              Proceedings
2   responsible way.
3        As far as estoppel goes, it was in
4   reliance on the promise to execute these
5   agreements that Storm -- I'm sorry, that
6   Telenor allowed Alpha and its controlled
7   entity, Storm, to acquire a blocking
8   position in what is a remarkably valuable
9   company, worth many billions of dollars.
10  They then performed under that contract.
11       And, again, the rule in New York is
12  that once a contract has been fully executed
13  in the sense that it's been performed, a
14  company may not set up its own lack of
15  authority to defeat a contract under which
16  it's received benefits.  They took those
17  benefits, they operated under the contract
18  and even after they claim that they
19  discovered this technical infirmity in their
20  agreement in 2005, they waited a year or a
21  year-and-a-half before adding this to the
22  attacks they were making on their own
23  contract.
24       And, again, in the binder -- will you
25  bear with me one second, Mr. Chairman?
```

Page 46

1        Proceedings
2        If you look at tab one in the binder
3    of cases we have distributed, it's a case
4    called Congregation Yetev Lev Visotmar
5    versus 26 Adar MV Corp.
6        And here, if -- directing the panel's
7    attention to the second column on page
8    three, it says the -- it's the paragraph
9    beginning at the bottom of the column.  "The
10   defense of ultra virus cannot be wielded by
11   a sword by a plaintiff to invalidate a
12   contract that has already been fully
13   performed by both parties," and goes on
14   citing a number of cases.
15       So here what happened?  There is a
16   negotiated deal.  Because Storm and Alpha
17   were unable to purchase the Omega shares
18   they had agreed to purchase, Telenor
19   accommodated Storm.  How did we accommodate
20   them?  We accommodated them by signing a
21   voting agreement that has essentially the
22   same substantive provisions as a bridge to
23   the shareholders' agreement with a three-day
24   trigger.  As soon as they succeeded in
25   wrinkling out the Omega problem, they would

Page 47

1        Proceedings
2    sign the shareholders' agreement.
3        They bought the Omega shares
4    eventually.  We said, "We are ready to
5    sign."
6        They kept telling us they weren't
7    ready to sign and raised a new issue.  We
8    accommodated them.  We negotiated over that
9    issue.
10       Then a senior Alpha official,
11   Mr. Khudyakov, said, "We are ready to sign,"
12   and that presumably means we are ready to
13   sign with authority.  And they did sign.
14   Not once, not twice, but three times.  We
15   got a fax signature of Mr. Nilov, then he
16   came physically to Mr. Didkovskiy's office
17   and signed the document manually and put the
18   stamp on it, which is an act of juridical
19   significance in Ukraine to put the company
20   seal on a document, and then he signed it a
21   third time in Ukrainian.
22       Then the parties operated under that
23   agreement.  Shares were exchanged.  They
24   came to board meetings.  They amended the
25   charter of the company to conform to the

Page 48

1        Proceedings
2    shareholders' agreement.
3        In 2005, it is true they began their
4    assault on various agreements they had made,
5    but they didn't mount this assault until a
6    year-and-a-half later.
7        I think the record is absolutely clear
8    that this is a valid, binding and
9    enforceable agreement.  They should be held
10   to what they did, they should be held to
11   what they said and we should get on with the
12   merits of this case, which has been pending
13   far too long, tied up on a preliminary
14   question that never should have been
15   brought.
16       CHAIRMAN FEINBERG:  Let the record
17   reflect what I think is obvious, that in
18   addition to the Wack affidavit, the panel
19   admits into evidence into the record on this
20   motion the various other affidavits that
21   have been proffered by Storm in the last few
22   days.
23       MR. CRAIG:  I have a question for you,
24   Pieter.
25       I, too, was struck by the arguments

Page 49

1        Proceedings
2    that you were making at the end of the
3    session in our last meeting, which seemed to
4    be inconsistent with the original brief that
5    Storm submitted in support of its motion to
6    dismiss.
7        If you look at that brief, the opening
8    argument, which is repeated many, many
9    times, is that the panel lacks jurisdiction
10   to determine its own jurisdiction.
11       In fact, on page five, you say, "if
12   the agreement containing the arbitration
13   clause, or if the clause, itself, is found
14   to be invalid, the panel ceases to have any
15   power to issues rulings on the merits in
16   the" -- and that whole argument is that the
17   panel lacks jurisdiction to hear Telenor
18   Mobile's claims in this arbitration.
19       You say in two or three places that
20   were cited to just now, that we do have the
21   power to determine whether or not this case
22   should go forward.  That is a quote from
23   page 263.  The panel does have the power to
24   determine whether or not this case should go
25   forward.  We do have the power to determine

13

1          Proceedings
2   whether or not there was a contract.
3          Is that a change in Storm's position?
4          MR. VAN TOL:  No, it's not.  And I
5   think it's sort of the tyranny of language.
6   And I think it's actually put better in the
7   Uncitral rules, where it says the
8   arbitration tribunal shall have -- this is
9   Article 21.  I'm sorry.
10         The arbitration tribunal shall have
11  the power to rule on objections that it has
12  no jurisdiction.  And then it goes on to
13  say, including any objections with respect
14  to the existence or validity of the
15  arbitration clause or of the separate
16  arbitration agreement.
17         The better way to say it is you have
18  power to determine your jurisdiction or
19  whether you have jurisdiction.
20         MR. JENTES:  Including the validity of
21  the arbitration clause; right?
22         MR. VAN TOL:  Correct.  And that's
23  right.
24         What that turns on, though, is an
25  analysis of the arguments under Sphere

1          Proceedings
2   Drake; in other words, if we thought that
3   you didn't have the jurisdiction to even
4   determine your jurisdiction, we wouldn't
5   have brought the motion to dismiss before
6   you.  We would have gone to whatever court
7   has competent jurisdiction.
8          And I apologize if it's unclear.  I
9   am -- I was trying to make it clear at the
10  last hearing, and it is loose language and I
11  apologize.
12         What I am saying is, as Uncitral says,
13  you may look and see if you have
14  jurisdiction.  That depends on whether or
15  not a contract was formed.  But Sphere Drake
16  tells us you are not doing a full-blown
17  hearing on the merits, let's determine for
18  all end of time whether or not there was a
19  contract.  You are analyzing it under the
20  Sphere Drake standard.  You are asking
21  yourself has Storm shown me some evidence
22  that there was not a contract?  If that is
23  the case, then the issue of contract
24  validity and formation gets kicked to a
25  court of competent jurisdiction.

1          Proceedings
2          CHAIRMAN FEINBERG:  So, you are
3   saying -- and I am just repeating what I
4   think you just said.  For us to decide the
5   jurisdictional issue, requires us to decide
6   under Sphere Drake the contractual issue.
7          MR. VAN TOL:  Correct.
8          MR. CRAIG:  What do you say about
9   Mr. Sills' interpretation of Sphere
10  Drake that kicks it into an evidentiary
11  hearing, rather than to a court.  If we find
12  that there is some basis to believe that
13  there was an invalid contract, that the
14  thing to go forward is an evidentiary
15  hearing here.
16         MR. VAN TOL:  In a court.  Sphere
17  Drake is saying you have a right to a court
18  hearing and a determination of whether there
19  is contract, not a hearing before an
20  arbitral tribunal.
21         MR. JENTES:  It seems to me so
22  circular.  If we have jurisdiction under
23  Article 21 to decide the validity of the
24  arbitration clause, don't we go forward and
25  decide that?  Why should we be referring it

1          Proceedings
2   to somebody else?  That's just so contrary
3   to everything I have ever dealt with in
4   international commercial arbitration,
5   whether it's ICC, ICDR or Uncitral rules.
6          MR. VAN TOL:  It comes down to, it
7   comes down to the void versus voidable
8   issue.
9          If we are arguing that we cannot be
10  compelled to arbitrate, but we also agree
11  under -- to be guided by the Uncitral rules,
12  our only choice, and this what is we made
13  the determination of early on, is to come to
14  you, as the tribunal, and say we understand
15  that Telenor Mobile wants to arbitrate, but
16  we never agreed to either the agreement or
17  the arbitrable clause within the agreement,
18  and that's what the Ukrainian courts have
19  found.
20         So, we go to you, and when the issue
21  goes to you, you sit as a court would on a
22  motion to compel arbitration.  And what the
23  Court says is, okay, let's use a summary
24  judgment standard.  And I just heard
25  Mr. Sills agree with it.

1        Proceedings
2        He has a high burden.  What he has to
3    show is that there are no issues of fact
4    here.  I think at a minimum what we have
5    established over these three hearings is
6    that there is certainly an issue of fact on
7    every one of the issues that have been
8    raised.
9        On actual authority, we have findings
10    of fact from the Ukrainian courts that were
11    was no meeting of participants.  Mr. Sills
12    says we don't have the evidence that no such
13    meeting took place.  Well, he hasn't shown
14    that it did take place.
15        We have Mr. Ekhougen from Telenor
16    Mobile.  He got a new power of attorney for
17    the 2004 agreement.  If you were to ask
18    yourself, why didn't he sit there and say,
19    well, I wonder why, I wonder why Storm isn't
20    getting new certificate of authority?
21        But point is that we are -- the
22    summary judgment a standard applies, and we
23    both agree it does.  At a minimum, you have
24    to find that there is an issue of fact for a
25    court to determine.

1        Proceedings
2        MR. JENTES:  I have got to tell you
3    that I just don't read First Options that
4    way.  I don't read the Shaw case that way.
5    I am prepared to get convinced otherwise.
6        It seems to me that will the whole
7    Shaw approach, the whole First Options
8    approach is there are certain issues for the
9    arbitration panel to decide.  And here we
10    have, I think, the authority to decide
11    whether or not there is a valid arbitration
12    agreement.  It's not for the courts; that's
13    for us.
14        And Sphere Drake, in the CCA second,
15    doesn't have anything to do with that.  In
16    other words, that standard seems to me to be
17    only applicable if they didn't have an
18    Uncitral type of rule, and Sphere Drake is
19    an instance where there was no Uncitral type
20    rules.
21        MR. VAN TOL:  But we have agreed, and
22    the contract combines Uncitral and New York
23    law --
24        MR. JENTES:  Let's put New York law
25    aside for the moment, because speaking only

1        Proceedings
2    for myself, I think your affidavits have
3    raised a question as to which law applies.
4        MR. VAN TOL:  Okay.  Setting that
5    aside and going under the Uncitral rules, if
6    I go back to Article 21, it says you have
7    the power to rule on our objection.
8        Our objection is that you have no
9    jurisdiction.  It's the same as if you go to
10    a federal court, and someone sues you and
11    you appear, you make a limited appearance,
12    and you say, "I'm appearing to fight your
13    jurisdiction.  You can determine this, but
14    when I am doing this I am not submitting to
15    your jurisdiction.  I want you to find that
16    you have no power over me."  We are in the
17    same boat.
18        MR. JENTES:  See, that's where I
19    disagree.
20        Let's assume we were sitting in the
21    Southern District of New York, and we were
22    with exactly the same proposition, and you
23    told the Southern District of New York that
24    it had to decide the kind of issues you have
25    said we have to decide.

1        Proceedings
2        I think the Southern District of New
3    York would say no, you are in the wrong,
4    wrong location.  Go to the arbitrable
5    tribunal.  They are the ones that have to
6    decide this jurisdictional issue, including
7    the validity of the arbitration clause.
8        And let me add the other Phillip to
9    it.  If you look at paragraph two of the
10    Article 21, that is the one that provides
11    for arbitrable, separation.  Then it seems
12    to me what it concludes is, even if we were
13    to decide that the underlying contract were
14    null and void, it would not entail ipso jure
15    the invalidity of the arbitration clause.
16    That seems to me to reinforce the fact that
17    we are supposed to carve out the
18    jurisdiction to rule on and decide whether
19    or not there is a valid arbitration clause.
20    We treat that as an independent issue from
21    all of this stuff with regard to the
22    validity of the underlying contract.
23        MR. VAN TOL:  Even if you did that,
24    assuming that's the case, you do so under
25    the Sphere Drake standard; in other words,

1        Proceedings
2  let me back up because you made two points.
3  I think it's -- we can all agree that your
4  ability to hear disputes between the parties
5  is limited by the contract, and it's limited
6  by the parties agreement --
7      MR. JENTES:  Correct.
8      MR. VAN TOL:  -- so I would have to
9  respectfully disagree with you that if I
10  went to a Court on the same facts, the Court
11  would say, well, I'm uncomfortable, because
12  I need -- I think it's clear evidence it
13  says -- clear and unmistakable evidence that
14  both parties have agreed to arbitrate all
15  these issues that you now say are before me.
16  That's what they did in Sphere Drake, and
17  the Court said, as long as you can come up
18  with some evidence that you didn't agree to
19  arbitrate, whether we are talking about
20  arbitrate under the whole agreement or an
21  independent, severable arbitration clause,
22  if you come up with some evidence to that
23  effect, you, in this case Storm, are
24  entitled to have a court determine that,
25  either at a hearing or at a trial on the

1        Proceedings
2  merits.
3      MR. JENTES:  But then doesn't that run
4  into a clear conflict from Uncitral?  Then
5  we are before the Southern District of New
6  York.  It's going to have a hearing and it's
7  going to decide one way or the other.
8  What's for the arbitration tribunal to
9  decide?
10     Under your argument, that will have
11  already been tried, to a jury yet, in
12  New York.  What are we going to decide on
13  our jurisdiction?
14      MR. VAN TOL:  You could decide that
15  it's collateral estoppel and you will follow
16  what the court decided.
17      MR. JENTES:  As a practical matter,
18  that moots the whole point of the Uncitral
19  rules.  The whole point of the Uncitral
20  rules is get it out of the courts; that
21  seems to me to be clearly what's intended.
22      MR. VAN TOL:  This feels like
23  Socrates.
24      MR. JENTES:  No, no.  I agree.  It's
25  tough issues, really tough issues.

1        Proceedings
2      MR. VAN TOL:  We are not that far
3  apart, because what I am saying under
4  Uncitral, when they use the word "power"
5  they are saying to Storm, go to the tribunal
6  first and have the tribunal decide whether
7  are you right in objecting to the validity
8  of the contract.
9     Now, in doing so, you are guided by or
10  controlled, I think the parties have agreed,
11  by Sphere Drake.  You are not sitting here
12  with a clean slate.  We have all agreed that
13  the standard to be applied is:  Is there
14  some evidence that there is no contract?
15     Because the courts are very leary,
16  Uncitral or not, of forcing a party that
17  didn't agree to arbitrate to go to
18  arbitration, because it's the idea that
19  everyone has --
20      MR. JENTES:  Unless they separately
21  agreed, that's Easterbrook's statement,
22  unless they separately agreed to arbitrate.
23      MR. VAN TOL:  And there is no evidence
24  here that there is such a separate agreement
25  to arbitrate, and there is no case that

1        Proceedings
2  Mr. Sills came up with that is on all fours,
3  where there is Uncitral rules or there is a
4  severability provision, and the court has
5  said that's enough.
6      MR. CRAIG:  Mr. Van Tal, that's why I
7  took such comfort from your words the last
8  time we were meeting on August 14th.
9     The chairman asked you the question:
10  "If we rule for Telenor and find
11  jurisdiction to arbitrate, you are going to
12  the U.S. District Court or are you going to
13  a Federal Court?"
14     And you say, "it depends on what you
15  rule.  If you rule simply that you have
16  jurisdiction to determine the issue of
17  contract formation, and for some reason you
18  want to hear more about what happened in the
19  Ukraine to satisfy yourself, then we will
20  await your decision.  We said earlier, when
21  we say you are allowed to apply Ukraine law,
22  we mean it literally.  We want you to take
23  the law that has been determined by the
24  Ukraine and apply it here and say, sorry, no
25  contract."

Proceedings

1    Proceedings
2        Now, I took that to mean that you said
3    we had the authority to apply the facts as
4    we find them, to look at the Ukraine law,
5    the New York law, whatever we find is
6    applicable; that we at least had the
7    authority to determine our own jurisdiction.
8        MR. VAN TOL:  You do.  You do in light
9    of and under the Sphere Drake standard.
10       CHAIRMAN FEINBERG:  But you are also
11   saying, I take it, that having exercised
12   that jurisdiction, if we decide, having
13   exercised that, to bootstrap that and say
14   that the underlying contract is valid, you
15   are going to run to the U.S. District Court
16   to upset our ruling; in other words, you are
17   going to say in the U.S. District Court,
18   they had jurisdiction to decide the validity
19   of the contract, but they decided it
20   incorrectly.
21       MR. VAN TOL:  That's right.
22   Because -- and that's because we are in the
23   unusual situation where we have a foreign
24   court has already decided this issue.  I
25   mean, I think we can all agree that this

Proceedings

1    Proceedings
2    case is sui generis.  But I mean, that is
3    what separates it.  There is a Ukrainian
4    court saying no contract.
5        So it is not proper for you to sit and
6    go back over the findings of fact of the
7    Ukrainian court.  All I have to do is say,
8    is show that the Ukrainian court was not
9    coming out of left field, there were no
10   procedural irregularities, and under New
11   York law and the New York convention, you
12   have to follow what the Ukrainian court
13   said.
14       CHAIRMAN FEINBERG:  Aren't you going
15   to be hard pressed to convince a federal
16   court that the contract and the Uncitral
17   rules permitted the panel to decide the
18   validity of that contract, but they made a
19   mistake in finding it valid and now we want
20   to you upset it?
21       MR. VAN TOL:  I'm not saying that you
22   are deciding whether or not there is enough
23   evidence of contract formation.  That is a
24   fine point.  And I thank the arbitrators for
25   that.  I'm sorry if I have been unclear.

Proceedings

1    Proceedings
2        You are determining, as a threshold
3    matter, has Storm shown me enough that there
4    is no contract; or, conversely, it really
5    should be stated affirmatively.  It's
6    Telenor Mobile's burden to show that there
7    are no issues of fact, that if you were
8    sitting as a court you would have to find as
9    a matter of law that a contract exists.
10       MR. JENTES:  Let me ask Mr. Sills a
11   question that is closely related to that.
12       Let's assume that we basically
13   followed the Uncitral rules.  We address
14   paragraph one of Article 21, and on
15   paragraph two we sort of say, well, we are
16   not going to get to that; that is, we don't
17   get to the question as to whether or not
18   there was valid shareholders' agreement or a
19   valid voting agreement.  We only focus on
20   whether or not there was an arbitration
21   agreement.
22       If we do that, what's the authority
23   for the proposition that there was a valid
24   arbitration agreement?
25       Can that be?  You look puzzled.

Proceedings

1    Proceedings
2        MR. SILLS:  I'm not grasping the
3    question for some reason.
4        MR. JENTES:  What I am trying to do is
5    to sever the issue of whether or not there
6    is a valid arbitration agreement from
7    whether or not there is a valid underlying
8    shareholders' agreement.
9        And let's assume for the moment, since
10   that's the issue that Pieter has raised for
11   us, we say, okay, we are only going to look
12   at the question of whether or not there is a
13   valid arbitration agreement.  What, in a
14   nutshell, do you maintain is the basis for a
15   finding by us that there is a valid
16   arbitration agreement?
17       MR. SILLS:  It's Article 21 of the
18   Uncitral rules.  Those are a part.  I think
19   --
20       MR. JENTES:  No, no.  Let me be more
21   precise.
22       Was there an agreement reached in
23   2002, written or oral, that there is an
24   agreement to arbitrate?  If not, was there
25   an agreement reached in 2004 to arbitrate?

17

1             Proceedings
2    Was it oral, was it written, was it by a
3    course of conduct?
4         I am not trying to be a law professor.
5    I'm just trying to indicate if we go down
6    the Uncitral route, and only focus on
7    paragraph one, what do we rely on for the
8    proposition there was an arbitration
9    agreement?
10        MR. SILLS:  On the 2004 shareholders'
11   agreement that was signed by Mr. Nilov.  And
12   I know we went over this at the last
13   hearing, but I think it bears repeating,
14   Mr. Jentes.
15        The Uncitral rules have a strong
16   severability provision in them.  And by
17   entering into an agreement -- maybe there is
18   some common ground on this between Storm and
19   Telenor.
20        If you refer to particular arbitration
21   rules, they become part of the contract.  I
22   think that is undisputed.  The Uncitral
23   rules expressly provide that the arbitration
24   clause is fully severable from the contract
25   of which it forms a part, so that this

1             Proceedings
2    contract, the 2004 executed, in their words,
3    duly authorized contract, it's as if it were
4    two separate agreements.
5         And if, instead of signing the 2004
6    shareholders' agreement in the physical form
7    in which we have it, Mr. Nilov had signed
8    the 2004 shareholders' agreement in a
9    separate piece of paper called arbitration
10   agreement, it would be legally
11   indistinguishable from what we have now.
12   And there can't be any serious argument that
13   Mr. Nilov, as the general director of a
14   Ukrainian limited liability company, lacked
15   authority to enter into an arbitration a
16   agreement.
17        MR. JENTES:  That is the key point.
18   Is that -- what is the support for that
19   proposition?  In other words, let's assume
20   for the moment that ultimately we decide he
21   didn't have any authority to enter into the
22   shareholders' agreement, but he did have
23   authority to enter into the arbitration
24   agreement.
25        MR. SILLS:  Well, there is two.  There

1             Proceedings
2    is the legal authority begins at least with
3    Prima Paint and rolls forward, but even on
4    the terms that have now been presented for
5    the claim of lack of authority, there is
6    absolutely nothing in the charter that
7    suggests that Mr. Nilov lacked authority to
8    agree to arbitrate rather than litigate a
9    dispute.
10        CHAIRMAN FEINBERG:  Let me make it
11   easier.
12        Am I correct, Storm, you don't
13   challenge the proposition that, under
14   agreements entered into in the Ukraine and
15   the Uncitral rules, we have jurisdiction to
16   decide the validity of the underlying
17   contract?
18        MR. VAN TOL:  So long as you do so
19   under Sphere Drake, I don't disagree with
20   that.
21        CHAIRMAN FEINBERG:  Right.  You don't
22   have to get into all that other arguments
23   you are making.  There is room here.
24        But what you say is, Storm, the only
25   decision we can make that's legal, is,

1             Proceedings
2    having exercised that jurisdiction, to find
3    that the underlying contract is invalid,
4    and -- under Sphere Drake; and, therefore,
5    we agree with Telenor.  You have
6    jurisdiction to decide that the underlying
7    contract is invalid; that's your position in
8    a nutshell.
9         MR. VAN TOL:  That's close.  If I
10   could restate it though to pick up on the
11   last point.
12        Let's assume, for purposes of
13   argument, that there are two agreements;
14   that there is a separate agreement to
15   arbitrate, that Mr. Nilov had authority to
16   sign an agreement to arbitrate under
17   Uncitral.
18        Fine.  Let's assume that for purposes
19   of the argument.
20        If he had that, what then are you
21   going to decide?  You are going to decide
22   whether or not a contract was validly
23   formed.
24        MR. JENTES:  Which contract now?
25        MR. CRAIG:  The shareholder agreement.

18

1          Proceedings
2          MR. VAN TOL:  I'm assuming for
3    purposes of this argument that there is, and
4    I'm not conceding that, but I'm assuming for
5    these purposes.  What are you going to
6    decide?  You are going to decide whether or
7    not there was a 2004 shareholders'
8    agreement.  We will stop there.
9          There is a court finding from the
10   Ukraine that there is no agreement, so you
11   are bound by that either way.
12         CHAIRMAN FEINBERG:  I understand that.
13   But why are you hedging on assuming for a
14   minute authority on arbitration?  You have
15   admitted we have jurisdiction to decide the
16   validity of the contract.  Why do you hedge
17   on where that jurisdictional authority comes
18   from?
19         You have even said that again today
20   that we have jurisdiction.  Now, what you
21   are really saying is there is only one way
22   under the law to exercise that jurisdiction;
23   that is to strike down the shareholders'
24   agreement.
25         But I want to make sure I understand

1          Proceedings
2    here that, once again I think for the tenth
3    time, you agree that we have, under the
4    Uncitral rules --
5          MR. VAN TOL:  The power.
6          CHAIRMAN FEINBERG:  -- the power to
7    decide the validity of the underlying
8    contract, shareholder agreement.
9          Where does that come from?  Why do you
10   say, well, let's put it aside for a minute.
11   Let's make an assumption.
12         Where is that authority to decide?
13         MR. VAN TOL:  You have the authority
14   under the Uncitral rules to decide your
15   jurisdiction.
16         CHAIRMAN FEINBERG:  Right.
17         MR. VAN TOL:  That comes from the
18   contracts.  We are assuming that Mr. Nilov
19   had authority to at least sign that.
20         CHAIRMAN FEINBERG:  When you say
21   "assuming," do you agree that we have that
22   jurisdiction?  Not assuming that Mr. Nilov,
23   you have admitted -- I don't mean to cross
24   examine, but it's critical.
25         You have admitted last time and again

1          Proceedings
2    today we have the power to decide.  What is
3    the basis for that power in Storm's
4    position?
5          MR. VAN TOL:  It's got to be the
6    arbitration clause.
7          CHAIRMAN FEINBERG:  Of the shareholder
8    agreement?
9          MR. VAN TOL:  Correct.
10         CHAIRMAN FEINBERG:  Okay.  And we have
11   that, that arbitration clause, we have
12   actual power to decide.
13         And your gripe is, in your motion, go
14   right ahead and decide, but there is only
15   one way you can decide under the law of the
16   Second Circuit; that's your position.
17         MR. VAN TOL:  Right.  And for -- just
18   so I am clear, for two reasons though.  One
19   is a jurisdictional reason.  You apply
20   Sphere Drake.  Mr. Sills agreed with that.
21   It was his idea.  I don't know if he's
22   backing away it from, but he agreed Sphere
23   Drake applies.
24         So, what you do, first, is you say do
25   I have jurisdiction under Sphere Drake?  If

1          Proceedings
2    the answer is no, dismiss.
3          Second, if you find you do have, that
4    the Sphere Drake standard has been satisfied
5    by Telenor Mobile, then we go on to the
6    question of contract validity.  And then,
7    again, what I am saying is you are bound by
8    finding of the Ukrainian court.
9          CHAIRMAN FEINBERG:  That couldn't be
10   clearer.  To me that is very clear.
11         Mr. Sills, your position is very clear
12   to me, and unless somebody has anything else
13   to argue about this, is there anything else
14   anybody wants to say about this?  I mean, it
15   couldn't be clearer, it seems to me.  To me.
16   I am not sure my fellow panelists agree.
17         Your clarification in the last five
18   minutes is very important to me and I
19   understand it, and I just want to make sure
20   I understand it.
21         Is there anything else to be added
22   now?
23         MR. JENTES:  I do want to ask a
24   question.
25         CHAIRMAN FEINBERG:  Go ahead.

1      Proceedings
2      MR. JENTES:  We got up to it, but I
3  didn't quite hear the answer.
4      Is there any dispute that Mr. Nilov
5  could have entered into the arbitration
6  agreement, even though there was no meeting
7  of participants, no -- all the rest of the
8  rigmarole.
9      MR. VAN TOL:  I haven't seen anything
10  in charter and that's the only corporate
11  document I have.  I haven't seen anything in
12  charter that would bar him from doing so, so
13  long as the agreement doesn't have to do
14  with the transfer of Kyivstar shares.
15      My hesitation is:  Is this truly
16  severable?  Is it so intimately --
17      MR. JENTES:  I understand that.
18      MR. VAN TOL:  -- interrelated?  I want
19  to preserve that argument.
20      Assuming there is -- you can cleave
21  off a separate arbitration agreement, I
22  don't think it falls within any of the
23  limitations under Article 12.4.
24      MR. JENTES:  Does it have to be in
25  Ukrainian and registered?

1      Proceedings
2      MR. VAN TOL:  That I don't know.
3  Again, here, I am guessing as a Ukrainian
4  lawyer, but my understanding of that finding
5  on the filing was because it had -- the
6  shareholders' agreement affected the
7  charter, the foundational document.
8      I don't see how, sitting here, how an
9  agreement to arbitrate could affect a
10  foundational document.
11      MR. CRAIG:  I have one more question.
12      CHAIRMAN FEINBERG:  Go ahead.
13      MR. CRAIG:  This will be quick.
14      CHAIRMAN FEINBERG:  No, no.  I say go
15  ahead out of frustration, not out of the
16  number of questions, just the complexity of
17  the issue.
18      MR. CRAIG:  It has to do with whether
19  or not there was a meeting of participants
20  to consider the 2004.
21      Let's assume for the moment that we
22  accept the notion that it was a new
23  agreement, a new shareholders' agreement,
24  referred to as NSA in some of these
25  affidavits.  What is the state of the record

1      Proceedings
2  right now about whether or not there was a
3  meeting of participants?
4      MR. VAN TOL:  The state of the record
5  is no one from my client has any information
6  that were was a meeting of participants.
7  There is nothing in the files.
8      MR. CRAIG:  Is there no one in the
9  Storm hierarchy that can testify that there
10  was no such meeting?
11      MR. VAN TOL:  The problem is tracking
12  down any of the participants that would have
13  been there.  I don't think there is anyone.
14  We don't control Mr. Nilov, so the best we
15  can say is that anyone who would have been
16  aware of it is unaware of it.  Anyone who
17  has looked at the files doesn't know of one,
18  Mr. Wack doesn't know of one.  Mr. Kosogov,
19  who was closely involved in these matters,
20  has no recollection of there being a meeting
21  of participants.
22      Telenor Mobile hasn't come up with a
23  scrap of evidence there was meeting of
24  participants.
25      MR. CRAIG:  I think I heard Mr. Sills

1      Proceedings
2  make the affirmative contention that there
3  was such a meeting.
4      MR. SILLS:  No.
5      CHAIRMAN FEINBERG:  Mr. Sills says its
6  irrelevant based on apparent authority.
7      MR. SILLS:  The actual authority for
8  that matter.
9      MR. VAN TOL:  Mr. Sills, to be clear,
10  did say at the very first meeting that
11  Mr. Wack would testify there was a meeting
12  of participants.
13      MR. SILLS:  In 2002, and there was.
14      MR. VAN TOL:  He didn't say that then;
15  we found out now.  No one -- you know, look,
16  there was a meeting of participants in 2002.
17      MR. JENTES:  Where is Mr. Nilov?
18      MR. VAN TOL:  He is not controlled by
19  Alpha.  If we had him under our control, we
20  would have an affidavit from him today.
21      MR. JENTES:  Where is he?
22      MR. VAN TOL:  I don't know.
23      MR. SILLS:  Mr. Jentes, we do know
24  where he is.
25      Let me distribute, if I could, to the

1        Proceedings
2   panel --
3        MR. VAN TOL:  Is this the same thing
4   we saw last time from the internet?
5        MR. SILLS:  I don't believe so.
6        CHAIRMAN FEINBERG:  Yes.
7        MR. SILLS:  Mr. Nilov works for Alpha
8   Capital.  Alpha Capital is a wholly owned by
9   Alpha Group Consortium just as is Altimo.
10  Altimo owns 100 percent of Storm.
11       The notion that he is not a controlled
12  witness is fanciful.  If this proceeding
13  were in federal court in New York, and there
14  were a jury, we would be entitled, as a
15  matter of law, to a missing witness charge
16  if Mr. Nilov weren't called to the stand on
17  this issued.  I don't think there can be any
18  serious dispute about that.
19       MR. VAN TOL:  If we were in court, we
20  would have some authentication of this.  I
21  did the same internet search that Mr. Sills
22  did and all I could find was 2002, 2003
23  documents.
24       I have no the evidence Mr. Nilov is
25  currently in our control.  If he were, I

1        Proceedings
2   would have him here.
3        CHAIRMAN FEINBERG:  Anybody have
4   anything else to add on the motion or is the
5   record -- let me ask one logistical question
6   of Mr. Sills.
7        Mr. Sills, on the basis of what's
8   transpired today, are you prepared yet, and
9   you are not obligated to, to let the panel
10  and Storm know whether you are going to take
11  advantage of the September 8 deadline to
12  submit anything further on the motion?
13       MR. SILLS:  If you could bear with me
14  one second, Mr. Chairman.
15       CHAIRMAN FEINBERG:  You are not
16  obligated, Mr. Sills, to answer my question
17  now, unless it's readily apparent.  I'm not
18  looking to -- you can leave the question
19  open.
20       MR. SILLS:  Mr. Chairman, our interest
21  is in moving this case along.  I think an
22  extremely simple issue has been complicated
23  in a variety of ways that the claim keeps
24  morphing.
25       I'm glad to hear that we are back to

1        Proceedings
2   agreeing that this case can be decided.  I
3   think the record is largely closed.
4        The suggestion that was just made,
5   that the document we just distributed is in
6   some sense inauthentic, is a forgery, I
7   think is offensive and unfounded.  And I
8   would like to, I would like, to the extent
9   that there is any credence given to that, I
10  would like to supplement the record on that
11  point.
12       Other than that, we have no
13  evidentiary submission we wish to make on
14  the 8th, because I think the record is more
15  than ample for the panel to make this
16  decision.
17       CHAIRMAN FEINBERG:  I suggest the
18  following:  Let's take a break for about 15
19  minutes while the panel convenes and I find
20  out where my brethren are coming from.  And
21  then we should reconvene on the quite --
22  assuming that we take this all under
23  advisement, on the second issue of discovery
24  and scheduling.
25       So why don't we take a 15 minute break

1        Proceedings
2   and then we will reconvene here?
3        (Recess taken.)
4        CHAIRMAN FEINBERG:  The panel has
5   consulted and in terms of calendar, what
6   about the following, in light of what the
7   parties have told us today.
8        Can we accelerate proposed findings of
9   fact and conclusions of law on the sole
10  issue of the panel's jurisdiction to
11  arbitrate?  Can we accelerate those proposed
12  findings no later than one week from today
13  at 5 o'clock?
14       I'm not sure, on the basis of what I
15  have heard today, that it requires even that
16  long, but -- but on the single question or
17  issue of authority to arbitrate, can we have
18  any findings of fact or law -- in law to the
19  panel no later than one week from today at
20  5 o'clock?
21       MR. SILLS:  That is certainly
22  acceptable to Telenor, Mr. Chairman.
23       MR. VAN TOL:  It is to Storm, too.
24       CHAIRMAN FEINBERG:  That will
25  anticipate a partial decision by the panel

```
1              Proceedings
2   on the singular issue of jurisdiction to
3   arbitrate this dispute.  With the notion, I
4   think I speak for my fellow panelists who
5   will undoubtedly want to clarify this, but
6   on the notion that the panel will shortly
7   thereafter the 8th render a decision on this
8   issue of jurisdiction to arbitrate the
9   dispute; in other words, we will decide the
10  motion proffered by Storm.  And that's all
11  we contemplate deciding.
12      Is that understandable?
13  Comprehensible?
14      Then what we turn our attention to,
15  assuming, assuming for a moment a big
16  assumption that the Motion to Dismiss is
17  denied, do we have an agreement among the
18  parties on arbitration hearing dates and any
19  pre-arbitration hearing discovery leading up
20  to those dates?  And where are we on that
21  subject?
22      MR. SILLS:  Mr. Van Tol and I did
23  speak, as you had requested, and looking at
24  our respective calendars, it struck us that
25  the full hearing on the merits, although I
```

```
1              Proceedings
2   think we are in agreement that the issues
3   are not entirely legal issues, largely legal
4   issues calling for little, if any,
5   testimony, could be accommodated during the
6   second full week in November; that would be
7   the week of the 13th, in the Wednesday,
8   Thursday and Friday of that week work best
9   for us personally.
10      CHAIRMAN FEINBERG:  Is that is
11  November 15, 16 and 17?
12      MR. SILLS:  That is exactly right,
13  Mr. Chairman.
14      MR. VAN TOL:  With the only caveat
15  from Storm, and Mr. Sills and I discussed
16  that, if the non-compete issues appears to
17  be more fact intensive than we anticipated,
18  perhaps something to be discussed is the
19  possible bifurcation of corporate governance
20  from non-complete.  But as I sit here today,
21  I'm not sure the non-compete is going to
22  require that much and I would like to try to
23  adhere to the schedule that Mr. Sills
24  articulated.
25      CHAIRMAN FEINBERG:  It also implicit
```

```
1              Proceedings
2   in what both of you say, to the extent that
3   are evidentiary, as opposed to legal issues,
4   Mr. Sills, that you guys think that you can
5   work out consensually any prehearing
6   discovery related to those issues or should
7   we turn our attention to that?
8       MR. SILLS:  We haven't discussed it.
9   I'm encouraged by the fact that we agreed on
10  the schedule.  Perhaps, if we could go off
11  the record and discuss it informally, I
12  would hope we could agree and just put the
13  agreement on the record.  Otherwise we could
14  do it more formally.
15      MR. VAN TOL:  I'm confident we will be
16  able to work out a discovery schedule, if we
17  don't want tie up the tribunal's time.  I
18  have never had difficulty with Mr. Sills in
19  scheduling before and I don't see one now.
20      MR. SILLS:  For example, we haven't
21  discussed whether there would be
22  depositions.  I know that is an issue that
23  different Uncitral panels have ruled on
24  differently, at least in my experience.  And
25  there is, as I am sure the panel knows, in
```

```
1              Proceedings
2   Uncitral proceedings in particular and
3   international arbitration, there is a lot of
4   movement as to the content of discovery.
5   I'm confident we will be able to work out
6   timing.
7       CHAIRMAN FEINBERG:  Well, when you say
8   both sides seemed conspicuously confident
9   about being able to work out discovery;
10  therefore, what we might do, since you both
11  seem rather confident as to the hearing date
12  and any discovery that might be needed
13  leading up to that hearing date, why don't
14  you take it upon yourselves to work out --
15  I'm just suggesting my view -- working out
16  whatever discovery schedule you can consent
17  to, coming back to the chair only if there
18  is a problem on any prehearing discovery.
19      MR. SILLS:  I think that makes sense,
20  and I'm confident we won't have to burden
21  you with that.  I think we will be able to
22  work it out.
23      CHAIRMAN FEINBERG:  Let me ask my
24  fellow panelists whether the 15, 16 and 17th
25  of November here in New York City is
```

Page 86

1    Proceedings
2  workable?
3      MR. CRAIG:  Fine with me.
4      MR. JENTES:  Real problems, I'm sorry.
5  I have a longstanding, very contentious
6  arbitration scheduled to start on the 9th
7  and it's supposed to run through the 17th.
8  I don't know whether it will go forward all
9  of that second week or not, but it so far
10 has been very difficult.
11     This is not a happy thing.  I am free
12 the 20, the 21st and the 22nd, reminding you
13 the 23rd of November is Thanksgiving.  I
14 then have an arbitration in Bermuda during
15 the week of November 27th.  I am then free
16 the weeks of December 4th and the week of
17 December 11th.
18     MR. SILLS:  On the governance issues,
19 that is the question of whether or not Storm
20 should be obligated to conform to the
21 promise in the shareholders' agreement that
22 they attend shareholders and that their
23 nominees attended Board of Directors
24 meetings it seems to me there is, it's hard
25 for me to say see what testimony there would

Page 87

1    Proceedings
2  be on that.  It's important to the company,
3  to Telenor, to get this decided because of
4  the potential paralysis of a very valuable
5  operating company.
6      Is there any possibility that we could
7  advance the hearing rather than delay it
8  into October?  It seems to me this is
9  essentially going to be decided largely on
10 papers and with a one-day argument, so if we
11 could free up a day, say at the end of
12 October, we could do it.  Otherwise, we, I
13 would think the first two days of
14 Thanksgiving week, rather than that
15 Wednesday, which would be tough on
16 everybody, would work for me, though my
17 preference would be to advance it rather
18 than delay it.
19     MR. VAN TOL:  My preference, subject
20 to the tribunal's availability, would be to
21 take those first two days, Monday and
22 Tuesday --
23     CHAIRMAN FEINBERG:  Full.
24     MR. VAN TOL:  -- Thanksgiving week,
25 cognizant that that may speed up things.

Page 88

1    Proceedings
2      CHAIRMAN FEINBERG:  It's the following
3  week.  Yes, it may very well speed up
4  things.  We might do it in Plymouth,
5  Massachusetts.
6      MR. VAN TOL:  Or we could go to
7  Bermuda.
8      CHAIRMAN FEINBERG:  Are you available?
9      MR. CRAIG:  What.
10     CHAIRMAN FEINBERG:  Monday and
11 Tuesday.
12     MR. JENTES:  No, I said 20, 21st and
13 22nd.  Again, the alternative is November 6,
14 7 and 8.
15     MR. SILLS:  November 6th, Mr. Jentes,
16 is the hearing date set in a parallel
17 arbitration between Force, another
18 shareholders' agreement; that is in Geneva.
19     CHAIRMAN FEINBERG:  Let's reserve
20 Monday and Tuesday, I think it's November 20
21 and 21, for two days of hearing with the
22 idea that we will conclude Tuesday, even if
23 we have to go later, because Wednesday out
24 of the question.  And let's plan on that.
25     Let's plan on any discovery related to

Page 89

1    Proceedings
2  that two-day hearing to be worked out
3  consensually by the parties to come back to
4  the chair to resolve any discovery disputes
5  which the chair can then raise with his
6  fellow panelists.
7      And does everybody understand the
8  accelerated findings of fact, conclusions of
9  law schedule by the close of business next
10 Tuesday, one week from today, solely on the
11 issue of jurisdiction to arbitrate?
12     MR. VAN TOL:  Yes.
13     MR. SILLS:  And just two clarifying
14 questions.
15     Mr. Feinberg, I take it that there is
16 no schedule now in place for proposed
17 findings and conclusions on the question of
18 contract validity as opposed to
19 arbitrability?
20     CHAIRMAN FEINBERG:  My answer to that
21 is since we have worked out a hearing in
22 November.  Hopefully you guys can get
23 together with each other and decide in
24 conjunction with that hearing when you might
25 get us something.  I think probably --

```
1              Proceedings
2        MR. JENTES:  Let me try to help a
3   little bit.
4        What I envision the panel would enter,
5   after you submit whatever you want to submit
6   a week from now, would be either a final
7   award, which will essentially grant the
8   Motion to Dismiss, or it will be a partial
9   final award, which will essentially deny the
10  Motion to Dismiss and set the matter forward
11  for a hearing on the merits and the ultimate
12  decision on a final award.
13       MR. SILLS:  I guess my question is, in
14  thinking back to the argument that was being
15  made by Storm, does the panel want to hear
16  on the merits, for example, this claim that
17  the Alperin order somehow governs here on
18  the substantive question of contract
19  validity?  Or are we to address simply the
20  question of whether or not panel has
21  jurisdiction to resolve questions, including
22  the applicability of this Ukrainian order?
23       MR. CRAIG:  The latter.
24       CHAIRMAN FEINBERG:  The latter.
25       MR. SILLS:  So it's purely a
```

```
1              Proceedings
2   jurisdictional submission.
3        The other question is purely
4   logistical.  Given that we have now fixed
5   this November 20 hearing, is it appropriate
6   now to fix at least a preliminary schedule
7   for the submission of trial briefs and
8   witness statements?
9        MR. CRAIG:  I was going to ask that
10  same question.
11       CHAIRMAN FEINBERG:  Although I had
12  simply assumed that is precisely what you
13  guys will work out, and unless we, unless we
14  need that resolved -- I mean, based on the
15  cooperative tone of your conversations,
16  that's precisely what we are hoping you will
17  work out, all of the pretrial dates leading
18  up to the 20th.
19       MR. CRAIG:  I would only suggest that
20  you don't wait until November 19th to
21  provide whatever your work product is on
22  this.
23       CHAIRMAN FEINBERG:  And I guess, in
24  response to Bob's question, I guess proposed
25  findings as to issues unrelated to a week
```

```
1              Proceedings
2   from today on jurisdiction, I guess are moot
3   now, aren't they?
4        I mean assume, big assumption that we
5   decide that we have jurisdiction, are those
6   proposed findings, aren't those then going
7   to be submitted after the hearing rather
8   than before?
9        MR. SILLS:  So, that the November 20
10  hearing will consider this claim that the
11  contract isn't, doesn't exist?
12       CHAIRMAN FEINBERG:  I guess.  And
13  that's an interesting question that we defer
14  to you guys on what remains to be said that
15  hasn't been said ad nauseum, frankly.  But
16  there may be additional evidence,
17  depositions, documentation, whatever that
18  you may want to raise.
19       MR. SILLS:  I guess on that one, I
20  thought the parties had agreed that, at
21  least on that issue, the record was closed
22  and we were now going to get to put a
23  schedule in place on the merits.  I think
24  given the November 20 day, I mean we are
25  certainly prepared to agree that on the
```

```
1              Proceedings
2   question of contractual validity and
3   existence, that the record is closed and
4   that this hearing is on other issues, but
5   that there will be a single award.  In
6   effect, an omnibus ruling in effect at the
7   end of that.  I would hope that Storm would
8   agree with that as well.
9        MR. VAN TOL:  That's my understanding
10  of what we are doing.  We are going to
11  jurisdictional issues first and then to the
12  extent there are issues of contract validity
13  that we want to make, that will be part of
14  the final award by the panel.
15       MR. SILLS:  But my question is
16  different, Mr. Chairman.
17       There are other issues that, again,
18  assuming that we prevail on the
19  jurisdictional issue, for example, should
20  Storm come to shareholders' meeting, should
21  they, what is the appropriate remedy if they
22  are competing in violation of the
23  non-compete clause?  Those haven't been
24  addressed at all yet.  But our view is that
25  there has been enough ink spilled on the
```

Page 94

```
 1         Proceedings
 2  question of whether or not the shareholders'
 3  agreement is a valid, subsisting,
 4  enforceable contract.  That doesn't resolve
 5  the question of how it gets enforced, but it
 6  seems to me, in the interest of moving this
 7  along and not doing this for a fourth time,
 8  we should agree now that on those questions
 9  the record is closed and that evidentiary
10  submission, if any, and the argument, which
11  I think will take place on the 20th, is
12  addressed to these other issues and that we
13  don't have to do this one more time.
14         MR. VAN TOL:  Well now I'm confused.
15  Because I thought what we were going to do,
16  what the tribunal was suggesting was that
17  these findings of fact will go to the
18  primary argument we have made, which that is
19  there is no jurisdiction.  The tribunal has
20  no jurisdiction, that it should be decided
21  by a court.
22         Our subsidiary argument is, even if
23  you find you do have jurisdiction, you
24  should follow the findings of the Ukrainian
25  courts and find that no contracts exists.  I
```

Page 95

```
 1         Proceedings
 2  would like to raise that at the hearing,
 3  finally.  To the extent that there is any
 4  funeral evidence limited to those points,
 5  that ought to come in.
 6         CHAIRMAN FEINBERG:  So what you are
 7  saying is you reserve the right, on
 8  November 20, assuming we rule motion denied,
 9  you want the reserve the right on the 20th
10  to offer evidence, not only on other issues
11  that Bob has just suggested -- remedy, for
12  example -- but you want to keep the record
13  open so that you can offer additional
14  evidence on the question of the validity
15  of -- or invalidity of the underlying
16  shareholder agreement.
17         MR. VAN TOL:  That's correct.
18         MR. SILLS:  In that case, I am going
19  to make an oral motion.  I think there are
20  two solutions.  It's their motion, it's
21  their burden, I don't -- let me start again.
22         I think the record should be closed on
23  this point.  If they, as one of the letters
24  we saw said, work on Mr. Nilov and he now
25  has a change of heart, and he would now like
```

Page 96

```
 1         Proceedings
 2  to come to New York and testify, it seems me
 3  it's too late.  We have been doing this for
 4  three months and it's their motion.  They
 5  have had three shots at this.  I think the
 6  proposed findings and conclusions that we
 7  will be submitting with respect to this
 8  November 20 hearing should include the
 9  question of contract validity.
10         I assume that the award that will be
11  rendered after the November 20 hearing will
12  address the question of whether there is a
13  contract, which seems to me to be a
14  necessary predicate to whether or not they
15  are breaching the contract.  And they are
16  fully entitled to say whatever they want in
17  their proposed findings or conclusions or
18  any other briefing that the panel orders.
19  But we do move that, on the question of
20  contract validity and existence, that the
21  panel declare, as it has the power to do
22  under the Uncitral rules, that on that issue
23  the evidentiary record is closed and that we
24  are not going to be surprised by a new
25  affidavit from Mr. Khudyakov or Mr. Nilov
```

Page 97

```
 1         Proceedings
 2  showing up or yet another Ukrainian expert.
 3         The claim is morphed enough.  I think
 4  it's time to close the record on that issue
 5  and we would respectfully ask the panel to
 6  do so.
 7         MR. VAN TOL:  Well, I would oppose.  I
 8  don't see any prejudice to Telenor Mobile.
 9  I'm not suggesting bringing in a witness on
10  the 20th that they have had no notice of.  I
11  am not suggesting trial by surprise.  I will
12  make evidence available, just as Telenor
13  Mobile has made evidence available in these
14  hearings.  I'm not suggesting another
15  interim hearing.  I'm simply saying that if
16  more evidence comes to light, it should be
17  before the tribunal on the 20th and 21st.
18         And I think under the FAA at least,
19  the tribunal has an obligation to entertain
20  evidence going to the ultimate issues.
21         CHAIRMAN FEINBERG:  All right.  What
22  else?
23         MR. VAN TOL:  I do -- I'm sorry to do
24  this, but I have one clarification on what I
25  said earlier, and it's really to make sure
```

25

Proceedings

1    that I parse this carefully, because I
2    noticed the tribunal quite accurately pays
3    attention to what we say and how we say it.
4        Earlier I said and I stand by it that
5    I have no indication that Mr. Nilov lacked
6    authority under the charter to enter into a
7    separate arbitration agreement. What I
8    would remind the tribunal, and this is
9    already in the record so it's not new
10   evidence, is that in both the April 25th
11   decision and in the May 25th decision, the
12   trial court in the first instance, and the
13   appellate court, found that the
14   shareholders' agreement, quote, should be
15   rendered null and void in full, including
16   the arbitration clause, end quote.
17       So, and then in the next paragraph it
18   cites Article 216 of the Civil Code of the
19   Ukraine, which essentially says if a
20   transaction is invalid and it wipes out the
21   whole agreement, the parties can't agree to
22   resuscitate it.
23       So, we will be making the argument
24   that under Ukrainian law what Mr. Nilov did

Proceedings

1    and what the courts found, the fact that he
2    didn't have authority to enter into the
3    agreement, notwithstanding the severability
4    clause, wipes out the whole agreement. Not
5    under the charter, but Ukrainian law,
6    because it's in the two court findings. I
7    have to make my record on that. That is
8    part of the Court's finding. It went out of
9    its way to include the arbitration clause.
10       CHAIRMAN FEINBERG: Anything else? I
11   think before we, before everybody departs
12   just to be safe, I think the panel would
13   like another 15 minutes.
14       There is lunch anyway, I think, being
15   served. I think that the panel would like
16   to convene one more time.
17       MR. JENTES: Could I ask one question?
18   And that is: Is Ukraine a -- I don't know
19   whether they are a signatory the New York
20   convention. Did they participate in
21   Uncitral; in other words, are the Uncitral
22   rules valid and enforceable in Ukraine?
23       MR. VAN TOL: I don't know. Let me
24   confer with my colleagues.

Proceedings

1    I don't know. We would have to find
2    out the answer for you.
3        CHAIRMAN FEINBERG: Do you know?
4        MR. SILLS: I do, Mr. Chairman.
5    Ukraine has adopted the model law. I mean,
6    they wouldn't adopt the rules, themselves.
7        MR. JENTES: No.
8        MR. SILLS: There is no jurisdiction
9    that has done that. But Ukraine is a party
10   to the New York convention. It's a party to
11   the inter-European convention. And I am
12   informed by European counsel that they have
13   adopted, with slight variations that I don't
14   think are relevant, the Uncitral model rule.
15       So that as a result, although it's, of
16   course, the contract specifies New York law
17   not Ukrainian law, but to the extent
18   Ukrainian law were applicable on its face,
19   Ukraine follows the conventional
20   international arbitration regime.
21       CHAIRMAN FEINBERG: Before we have
22   lunch, let me just confer for a second with
23   my fellow arbitrators.
24       (Pause.)

Proceedings

1        CHAIRMAN FEINBERG: I just said a few
2    minutes ago we would like to confer, we just
3    did, and Bob's oral motion is denied.
4        If the parties wish to supplement that
5    which has already been admitted into
6    evidence, they have that option.
7        We are not seeking to rehash all of
8    this, but if there is additional evidence
9    beyond that which has already been admitted,
10   we leave open that avenue if either party
11   wishes to proceed.
12       Go ahead.
13       MR. CRAIG: Additional means not
14   duplicative and not repetitive. Additional
15   new evidence.
16       CHAIRMAN FEINBERG: Correct.
17       MR. JENTES: I would only emphasize
18   evidence, not just argument or legal
19   authority or anything like that.
20       MR. SILLS: And I take it, as the
21   panel ruled at the first argument, the first
22   hearing on this, that, Mr. Chairman, the
23   panel will entertain a motion to subpoena
24   any witness who provides an affidavit and

Page 102

1          Proceedings
2    cause to him be brought here to be
3    cross-examined, as I believe Article 75 of
4    the CPLR requires?
5          CHAIRMAN FEINBERG:  We will entertain
6    it.
7          This proceeding, this hearing today is
8    closed, is adjourned.  There is no reason
9    for anybody to stick round, I don't think,
10   to await any further word from the panel
11   today.
12         We will move forward towards
13   November 20.  And one week from today, we
14   will receive whatever is submitted by both
15   sides, and then we will render a decision
16   shortly thereafter.
17         Adjourned.
18         (Time noted:  1:07 p.m.)
19
20
21
22
23
24
25

Page 103

1
2          C E R T I F I C A T I O N
3
4      I, BONNIE ATELLA PRUSZYNSKI, a Registered
5    Professional Reporter and Notary Public, within and
6    for the State of New York, do hereby certify that I
7    reported the proceedings in the within-entitled
8    matter, on September 5, 2006, and that this is an
9    accurate transcription of these proceedings.
10        IN WITNESS WHEREOF, I have hereunto set my
11   hand this 8th day of September, 2006.
12
13
14        _____
15            BONNIE ATELLA PRUSZYNSKI
16
17
18
19
20
21
22
23
24
25

**A**

**abided (1)**
17:6
**ability (3)**
17:24 21:14 58:4
**able (6)**
18:16 30:22 84:16
85:5,9,21
**above-entitled (1)**
1:14
**absolutely (2)**
48:7 68:6
**accelerate (2)**
81:8,11
**accelerated (1)**
89:8
**accept (2)**
15:16 75:22
**acceptable (1)**
81:22
**accommodate (1)**
46:19
**accommodated (4)**
46:19,20 47:8 83:5
**accountant (1)**
13:18
**accurate (1)**
103:9
**accurately (1)**
98:3
**acquire (1)**
45:7
**acquired (1)**
42:9
**act (10)**
14:7 17:24 23:25
24:23 25:10,13
33:15 35:14 36:13
47:18
**acted (3)**
10:5 37:21 44:25
**acting (1)**
37:20
**actions (1)**
5:17
**acts (2)**
36:11,14
**actual (9)**
24:11,18 27:21 36:10
36:20 37:16 54:9
72:12 77:7
**ad (1)**
92:15
**ADAM (1)**
2:7
**Adar (1)**
46:5
**add (5)**

3:11 4:10,11 57:8
79:4
**added (1)**
73:21
**adding (1)**
45:21
**addition (1)**
48:18
**additional (5)**
92:16 95:13 101:9,14
101:15
**address (4)**
24:17 64:13 90:19
96:12
**addressed (2)**
93:24 94:12
**addressing (1)**
25:3
**adds (1)**
6:16
**adequate (1)**
43:22
**adhere (1)**
83:23
**adjourned (2)**
102:8,17
**admits (1)**
48:19
**admitted (5)**
70:15 71:23,25 101:6
101:10
**adopt (1)**
100:7
**adopted (2)**
100:6,14
**adopting (1)**
23:8
**advance (2)**
87:7,17
**advantage (1)**
79:11
**advice (4)**
14:24 15:3 16:9 30:5
**advised (2)**
14:13 18:12
**advisement (1)**
80:23
**affect (1)**
75:9
**affidavit (30)**
3:13,19 4:11 13:10,13
13:25 15:13,19 17:9
17:25 18:10,11,19
18:23 19:6 28:3
29:22 37:23 39:20
41:3 42:20 43:3,7
43:20 44:19,21
48:18 77:20 96:25

101:25
**affidavits (13)**
4:18 7:3 13:8 15:14
15:16 24:6,13,15
28:9,12 48:20 56:2
75:25
**affirmative (1)**
77:2
**affirmatively (1)**
64:5
**ago (2)**
16:7 101:3
**agree (19)**
25:23 53:10,25 54:23
58:3,18 59:24 60:17
62:25 68:8 69:5
71:3,21 73:16 84:12
92:25 93:8 94:8
98:22
**agreed (19)**
12:25 26:6,17 27:6
30:15 36:25 37:6
46:18 53:16 55:21
58:14 60:10,12,21
60:22 72:20,22 84:9
92:20
**agreeing (1)**
80:2
**agreement (96)**
5:9,18 9:21 10:3,16
11:4,5 12:13,17
13:16,23,23,24
15:24 20:7 21:5
25:22,23,25,25
26:10,19,22 27:7
29:20 30:14,24
31:23 32:25 33:2
39:2 41:17 44:14
45:20 46:21,23 47:2
47:23 48:2,9 49:12
50:16 53:16,17
54:17 55:12 58:6,20
60:24 64:18,19,21
64:24 65:6,8,13,16
65:22,24,25 66:9,11
66:17 67:6,8,10,16
67:22,24 69:14,16
69:25 70:8,10,24
71:8 72:8 74:6,13
74:21 75:6,9,23,23
82:17 83:2 84:13
86:21 88:18 94:3
95:16 98:8,15,22
99:4,5
**agreements (8)**
33:17 39:6,8 45:5
48:4 67:4 68:14
69:13
**ahead (7)**

11:20 12:18 72:14
73:25 75:12,15
101:13
**Alexi (1)**
30:11
**allowed (2)**
45:6 61:21
**Alperin (11)**
10:7 18:2,3,13,13
39:12,22 40:10 41:4
41:24 90:17
**Alperin's (1)**
40:24
**Alpha (14)**
10:8 11:6 26:3 28:25
29:2,3 32:14 45:6
46:16 47:10 77:19
78:7,8,9
**Alpha's (1)**
10:6
**Alpha/Storm (1)**
10:15
**alternative (1)**
88:13
**Altimo (2)**
78:9,10
**amended (1)**
47:24
**amendment (3)**
9:24 16:10 41:20
**amiss (2)**
10:9 11:7
**ample (1)**
80:15
**analysis (3)**
6:23 7:21 50:25
**analyzing (1)**
51:19
**Andre (1)**
31:20
**annex (1)**
34:21
**annexed (1)**
25:24
**answer (6)**
6:20 73:2 74:3 79:16
89:20 100:3
**anticipate (1)**
81:25
**anticipated (1)**
83:17
**anybody (3)**
73:14 79:3 102:9
**anyway (1)**
99:15
**apart (1)**
60:3
**apologize (4)**

13:12 29:23 51:8,11
**apparent (25)**
4:22 6:14,19 11:12,17
19:12 23:18,21,23
24:18 35:23,24 36:7
36:9,12,20 37:7
38:9 41:14 42:17,17
42:18 43:15 77:6
79:17
**appeal (1)**
39:24
**Appeals (1)**
41:12
**appear (2)**
40:11 56:11
**appearance (1)**
56:11
**appeared (3)**
40:2,3,7
**appearing (1)**
56:12
**appears (10)**
15:3 16:12 21:20 22:2
34:5,13,20 40:21,23
83:16
**appellate (6)**
8:23 34:3,6,22,22
98:14
**applicability (1)**
90:22
**applicable (3)**
55:17 62:6 100:19
**applied (1)**
60:13
**applies (3)**
54:22 56:3 72:23
**apply (4)**
61:21,24 62:3 72:19
**appreciate (1)**
30:19
**approach (2)**
55:7,8
**appropriate (2)**
91:5 93:21
**approve (2)**
36:2,21
**April (2)**
10:19 98:11
**arbitrability (1)**
89:19
**arbitrable (4)**
12:9 53:17 57:4,11
**arbitral (1)**
52:20
**arbitrate (21)**
12:18 53:10,15 58:14
58:19,20 60:17,22
60:25 61:11 65:24

65:25 68:8 69:15,16
75:9 81:11,17 82:3
82:8 89:11
**arbitration (58)**
1:2,2 3:7,9 12:12,16
18:7 20:5,7,10,12
20:17,21,24 23:6
49:12,18 50:8,10,15
50:16,21 52:24 53:4
53:22 55:9,11 57:7
57:15,19 58:21 59:8
60:18 64:20,24 65:6
65:13,16 66:8,20,23
67:9,15,23 70:14
72:6,11 74:5,21
82:18 85:3 86:6,14
88:17 98:8,17 99:10
100:21
**ARBITRATOR (2)**
1:23,24
**arbitrators (2)**
63:24 100:24
**argue (2)**
5:25 73:13
**argued (4)**
18:13 27:17 41:3,16
**argues (2)**
12:15 27:12
**arguing (5)**
5:16 8:15 9:17 10:21
53:9
**argument (25)**
4:4 6:12 7:22 11:10
23:15 27:4 41:5,18
42:21 49:8,16 59:10
67:12 69:13,19 70:3
74:19 87:10 90:14
94:10,18,22 98:24
101:19,22
**arguments (8)**
5:3 18:3 19:9,11
42:24 48:25 50:25
68:22
**arrangements (1)**
30:17
**Article (9)**
50:9 52:23 56:6 57:10
64:14 65:17 74:23
98:19 102:3
**articulated (2)**
6:21 83:24
**articulation (1)**
8:18
**aside (3)**
55:25 56:5 71:10
**asked (1)**
61:9
**asking (2)**
42:14 51:20

**assault (2)**
48:4,5
**assaults (1)**
40:6
**assembled (1)**
10:14
**asserted (2)**
27:23,24
**assume (10)**
33:3 56:20 64:12 65:9
67:19 69:12,18
75:21 92:4 96:10
**assumed (1)**
91:12
**assumes (1)**
14:6
**assuming (13)**
57:24 70:2,4,13 71:18
71:21,22 74:20
80:22 82:15,15
93:18 95:8
**assumption (3)**
71:11 82:16 92:4
**assurances (2)**
33:24 38:8
**assure (1)**
32:18
**assured (1)**
24:8
**ATELLA (3)**
1:15 103:4,15
**attack (2)**
38:25 39:5
**attacking (1)**
11:8
**attacks (2)**
11:11 45:22
**attend (1)**
86:22
**attended (1)**
86:23
**attending (1)**
10:25
**attention (4)**
46:7 82:14 84:7 98:4
**attorney (7)**
24:24 25:11,14 30:12
40:16,19 54:16
**attorneys (4)**
2:12,18 12:7,8
**August (3)**
14:11,12 61:8
**authentication (1)**
78:20
**authority (78)**
4:22,25 5:16 6:6,14
6:19 9:20 10:5,17
11:13,17 12:20

13:22 14:7,16 19:12
20:2 23:19,21,23
24:3,10,12,18 27:21
29:20 31:12,19
33:15,22 35:16,23
35:25 36:8,9,10,13
36:18 37:8,16,19,20
38:9,24 39:3,11
41:14 42:17,18,18
43:10,16 45:15
47:13 54:9,20 55:10
62:3,7 64:22 67:15
67:21,23 68:2,5,7
69:15 70:14,17
71:12,13,19 77:6,7
81:17 98:7 99:3
101:20
**authorization (14)**
5:6,12 7:5,14 16:13
24:9 27:19 30:2
34:18 38:6 41:23
42:15,16 43:22
**authorize (2)**
35:15 44:12
**authorized (10)**
26:25 31:22 32:2,16
32:19 33:25 42:12
42:15 44:5 67:3
**automatic (2)**
26:2,8
**availability (1)**
87:20
**available (4)**
29:5 88:8 97:12,13
**Avdeev (1)**
30:20
**avenue (4)**
1:17 2:4,14 101:11
**await (2)**
61:20 102:10
**award (6)**
90:7,9,12 93:5,14
96:10
**aware (8)**
6:5 9:6 10:4 18:8
26:24 27:5 44:11
76:16
**a.m (1)**
1:19

_____
**B**
_____
**b (2)**
1:24 31:22
**back (9)**
9:4 13:4 56:6 58:2
63:6 79:25 85:17
89:3 90:14
**backing (1)**
72:22

**backs (1)**
32:9
**bar (1)**
74:12
**bark (1)**
28:17
**based (6)**
16:2 18:10 32:23 33:8
77:6 91:14
**basically (2)**
9:11 64:12
**basis (6)**
26:21 52:12 65:14
72:3 79:7 81:14
**bear (4)**
34:24 35:8 45:25
79:13
**bears (1)**
66:13
**began (1)**
48:3
**beginning (2)**
35:5 46:9
**begins (1)**
68:2
**behalf (4)**
31:22 33:16,17 40:7
**believe (6)**
11:24 12:6 13:11
52:12 78:5 102:3
**believed (1)**
38:17
**benefit (1)**
19:19
**benefits (2)**
45:16,17
**Bermuda (2)**
86:14 88:7
**best (4)**
8:20 38:13 76:14 83:8
**better (2)**
50:6,17
**beyond (1)**
101:10
**bifurcation (1)**
83:19
**big (2)**
82:15 92:4
**billions (1)**
45:9
**bind (3)**
13:22 35:16 36:22
**binder (3)**
34:14 45:24 46:2
**binding (3)**
33:2 36:14 48:8
**bit (1)**
90:3

**BJORN (1)**
2:22
**blocking (2)**
26:5 45:7
**blown (1)**
20:22
**board (6)**
34:18 35:25 36:19,22
47:24 86:23
**boat (1)**
56:17
**Bob (1)**
95:11
**Bob's (2)**
91:24 101:4
**BONNIE (3)**
1:15 103:4,15
**books (1)**
43:9
**bootstrap (1)**
62:13
**bottom (2)**
35:4 46:9
**bought (1)**
47:3
**bound (4)**
8:22 9:8 70:11 73:7
**breach (3)**
16:10,20,20
**breaching (1)**
96:15
**break (2)**
80:18,25
**brethren (1)**
80:20
**bridge (1)**
46:22
**brief (4)**
27:12 30:10 49:4,7
**briefing (1)**
96:11
**briefly (2)**
9:13 15:13
**briefs (1)**
91:7
**bring (1)**
19:18
**bringing (1)**
97:9
**broad (3)**
2:10 44:17,22
**broader (1)**
44:23
**Broadway (1)**
34:5
**brought (4)**
11:22 48:15 51:5
102:2

**burden (6)**
24:7 33:21 54:2 64:6
85:20 95:21
**business (4)**
3:22 35:19 36:6 89:9
**buying (1)**
26:4

_____

**C**
_____

**C (3)**
2:3 103:2,2
**calendar (1)**
81:5
**calendars (1)**
82:24
**call (2)**
4:9 5:22
**called (6)**
11:23 29:3 34:4 46:4
67:9 78:16
**calling (1)**
83:4
**Capital (3)**
29:3 78:8,8
**care (1)**
32:3
**careful (1)**
28:8
**carefully (1)**
98:2
**carried (1)**
43:18
**carries (1)**
31:10
**carry (1)**
36:11
**carve (1)**
57:17
**case (32)**
9:3,7 11:22 12:4,10
12:11,24 19:10
22:10 24:16 28:16
34:2,4,15 39:13
40:10 41:4,11,12
46:3 48:12 49:21,24
51:23 55:4 57:24
58:23 60:25 63:2
79:21 80:2 95:18
**cases (4)**
11:14 15:10 46:3,14
**cause (1)**
102:2
**caveat (1)**
83:14
**CCA (1)**
55:14
**ceases (1)**
49:14

**certain (3)**
25:7 26:23 55:8
**certainly (5)**
38:11 40:23 54:6
81:21 92:25
**certificate (5)**
17:11,22 33:8,12
54:20
**certificates (6)**
31:13 32:13 42:3,6,11
44:4
**Certified (1)**
1:15
**certify (2)**
31:20 103:6
**cetera (1)**
7:23
**chain (1)**
14:10
**chair (3)**
85:17 89:4,5
**chairman (63)**
1:22 3:4 4:14 11:20
19:22,23 31:15
32:15 34:9 45:25
48:16 52:2 61:9
62:10 63:14 68:10
68:21 70:12 71:6,16
71:20 72:7,10 73:9
73:25 75:12,14 77:5
78:6 79:3,14,15,20
80:17 81:4,22,24
83:10,13,25 85:7,23
87:23 88:2,8,10,19
89:20 90:24 91:11
91:23 92:12 93:16
95:6 97:21 99:11
100:4,5,22 101:2,17
101:23 102:5
**challenge (2)**
24:11 68:13
**challenging (1)**
21:14
**CHANG (1)**
2:16
**change (4)**
7:13 27:12 50:3 95:25
**changes (4)**
16:4,6,20 30:2
**charade (2)**
38:20,20
**charge (2)**
29:2 78:15
**charter (15)**
5:5 9:25 37:14,15
38:5,10 41:20 43:17
47:25 68:6 74:10,12
75:7 98:7 99:6
**check (1)**

43:16
**chief (3)**
13:17 35:12 44:23
**choice (1)**
53:12
**Circuit (5)**
11:23 12:22,24 23:2
72:16
**Circuit's (1)**
20:3
**circular (1)**
52:22
**cite (1)**
12:13
**cited (2)**
12:10 49:20
**cites (1)**
98:19
**citing (1)**
46:14
**city (2)**
40:4 85:25
**Civil (1)**
98:19
**claim (21)**
18:15 19:24 21:6
24:22 25:20 26:24
27:5 29:11 37:10,11
37:12 39:10,13,15
43:18 45:18 68:5
79:23 90:16 92:10
97:3
**Claimant (2)**
1:6 2:12
**claimed (2)**
5:14,14
**claiming (1)**
38:19
**claims (1)**
49:18
**clarification (2)**
73:17 97:24
**clarify (1)**
82:5
**clarifying (1)**
89:13
**clause (20)**
22:15,15,22 49:13,13
50:15,21 52:24
53:17 57:7,15,19
58:21 66:24 72:6,11
93:23 98:17 99:5,10
**clean (1)**
60:12
**clear (18)**
6:25 18:9 22:22,23
23:3 39:20 43:20,21
44:18 48:7 51:9

58:12,13 59:4 72:18
73:10,11 77:9
**clearer (2)**
73:10,15
**clearly (2)**
14:12 59:21
**cleave (1)**
74:20
**client (1)**
76:5
**close (5)**
3:21,24 69:9 89:9
97:4
**closed (7)**
80:3 92:21 93:3 94:9
95:22 96:23 102:8
**closely (2)**
64:11 76:19
**clothed (1)**
35:10
**Code (1)**
98:19
**cognizant (1)**
87:25
**collateral (1)**
59:15
**colleagues (1)**
99:25
**colloquy (1)**
22:23
**collusive (1)**
40:9
**column (3)**
35:4 46:7,9
**combines (1)**
55:22
**come (13)**
4:20 20:6 31:17 38:4
53:13 58:17,22 71:9
76:22 89:3 93:20
95:5 96:2
**comes (6)**
13:3 53:6,7 70:17
71:17 97:16
**comfort (1)**
61:7
**coming (6)**
4:20 19:4 36:7 63:9
80:20 85:17
**commencing (1)**
1:19
**commercial (1)**
53:4
**common (4)**
16:2 25:5 29:16 66:18
**COMMUNICATI...**
1:4
**company (12)**

33:11,15,16,17 44:17
45:9,14 47:19,25
67:14 87:2,5
**compel (2)**
20:10 53:22
**compelled (1)**
53:10
**competent (2)**
51:7,25
**competing (1)**
93:22
**complex (1)**
19:8
**complexity (1)**
75:16
**complicated (1)**
79:22
**Comprehensible (1)**
82:13
**conceded (1)**
21:10
**conceding (1)**
70:4
**concept (1)**
19:13
**concerning (1)**
3:9 4:11 22:25
**conclude (3)**
3:17 4:4 88:22
**concludes (1)**
57:12
**conclusion (1)**
19:4
**conclusions (5)**
81:9 89:8,17 96:6,17
**conclusive (1)**
41:12
**conditions (1)**
15:22
**Condominium (1)**
34:5
**conduct (2)**
31:17 66:3
**confer (3)**
99:25 100:23 101:3
**confident (5)**
84:15 85:5,8,11,20
**confirm (1)**
37:18
**confirming (1)**
43:15
**conflict (1)**
59:4
**conform (2)**
47:25 86:20
**confused (1)**
94:14
**Congregation (1)**

46:4
**conjunction (1)**
89:24
**connection (1)**
9:5
**conscience (1)**
26:20
**consensually (2)**
84:5 89:3
**consent (2)**
43:25 85:16
**consider (3)**
18:22 75:20 92:10
**consistent (1)**
17:17
**Consortium (1)**
78:9
**conspicuously (1)**
85:8
**construction (3)**
36:2,21 37:14
**consulted (1)**
81:5
**contact (2)**
7:25 13:2
**contacted (1)**
16:8
**containing (1)**
49:12
**contemplate (1)**
82:11
**content (1)**
85:4
**contention (1)**
77:2
**contentious (1)**
86:5
**context (1)**
24:25
**contract (60)**
12:5,16,19 13:5 22:13
22:23 23:10 27:2
41:5 45:10,12,15,17
45:23 46:12 50:2
51:15,19,22,23
52:13,19 55:22
57:13,22 58:5 60:8
60:14 61:17,25
62:14,19 63:4,16,18
63:23 64:4,9 66:21
66:24 67:2,3 68:17
69:3,7,22,24 70:16
71:8 73:6 89:18
90:18 92:11 93:12
94:4 96:9,13,15,20
100:17
**contracts (5)**
25:7 33:24 36:5 71:18
94:25

**contractual (2)**
52:6 93:2
**contrary (4)**
11:6 37:3 44:8 53:2
**control (6)**
28:11 38:12 43:8
76:14 77:19 78:25
**controlled (6)**
29:6 43:11 45:6 60:10
77:18 78:11
**controversy (1)**
40:12
**convene (1)**
99:17
**convened (1)**
38:18
**convenes (1)**
80:19
**convention (4)**
63:11 99:21 100:11
100:12
**conventional (1)**
100:20
**conversations (1)**
91:15
**conversely (1)**
64:4
**convince (1)**
63:15
**convinced (1)**
55:5
**cooperative (1)**
91:15
**coordinate (1)**
30:20
**copies (3)**
34:8 40:15,17
**copy (3)**
30:8,25 37:13
**Corp (1)**
46:5
**corporate (8)**
10:20,24 11:2,8 42:8
43:5 74:10 83:19
**corporation (13)**
24:2,2 34:16,19 35:10
35:13,17,20 36:5,7
36:12,15 44:24
**correct (9)**
21:16 44:25 50:22
52:7 58:7 68:12
72:9 95:17 101:17
**counsel (6)**
3:16 4:10 14:19,25
15:5 100:13
**count (1)**
21:8
**counterarguments (...**

8:9
**course (5)**
4:19 19:20 40:15 66:3
100:17
**court (44)**
8:13 18:8,11,17 21:8
22:17 23:5 34:22
40:3 41:11 51:6,25
52:11,16,17 53:21
53:23 54:25 56:10
58:10,10,17,24
59:16 61:4,12,13
62:15,17,24 63:4,7
63:8,12,16 64:8
70:9 73:8 78:13,19
94:21 98:13,14 99:7
**courts (17)**
7:14 8:17,20 12:12
18:5,25 19:3,15
39:5 40:6 53:18
54:10 55:17 59:20
60:15 94:25 99:2
**Court's (1)**
99:9
**cover (1)**
4:3
**CPLR (1)**
102:4
**cracks (1)**
16:15
**CRAIG (16)**
1:24 48:23 52:8 61:6
69:25 75:11,13,18
76:8,25 86:3 88:9
90:23 91:9,19
101:14
**creates (1)**
24:3
**credence (1)**
80:9
**critical (2)**
28:19 71:24
**cross (1)**
71:23
**crossed (1)**
32:9
**cross-examined (1)**
102:3
**current (2)**
27:22 43:2
**currently (1)**
78:25
_____
**D**
**date (4)**
4:6 85:11,13 88:16
**dated (1)**
31:23
**dates (3)**

82:18,20 91:17
**David (3)**
3:13,19 13:10
**day (4)**
29:14 87:11 92:24
103:11
**days (4)**
48:22 87:13,21 88:21
**deadline (1)**
79:11
**deal (3)**
4:19 5:19 46:16
**dealing (2)**
23:25 38:16
**dealt (2)**
9:15 53:3
**December (5)**
9:2 17:15 28:6 86:16
86:17
**decide (39)**
3:25 12:18 52:4,5,23
52:25 55:9,10 56:24
56:25 57:6,13,18
59:7,9,12,14 60:6
62:12,18 63:17
67:20 68:16 69:6,21
69:21 70:6,6,15
71:7,12,14 72:2,12
72:14,15 82:9 89:23
92:5
**decided (9)**
8:13 13:5 59:16 62:19
62:24 80:2 87:3,9
94:20
**deciding (2)**
63:22 82:11
**decision (13)**
19:2 20:3 23:2 34:3
61:20 68:25 80:16
81:25 82:7 90:12
98:12,12 102:15
**decisions (1)**
18:24
**declare (1)**
96:21
**deed (1)**
41:17
**defeat (4)**
20:7,21 21:3 45:15
**defense (1)**
46:10
**defer (1)**
92:13
**deficient (1)**
8:10
**delay (2)**
87:7,18
**delivered (3)**
31:13 32:12 37:25

**denied (3)**
82:17 95:8 101:4
**deny (1)**
90:9
**departs (1)**
99:12
**depends (2)**
51:14 61:14
**depositions (2)**
84:22 92:17
**derives (1)**
14:8
**described (1)**
27:10
**despite (3)**
29:7,9 37:16
**destroy (1)**
42:16
**detail (1)**
18:20
**determination (3)**
23:6 52:18 53:13
**determine (19)**
21:15,22,25 22:9,12
22:18 23:16 49:10
49:21,24,25 50:18
51:4,17 54:25 56:13
58:24 61:16 62:7
**determined (2)**
23:5 61:23
**determining (1)**
64:2
**Didkovskiy (3)**
2:24,24 30:12
**Didkovskiy's (1)**
47:16
**different (2)**
84:23 93:16
**differently (1)**
84:24
**difficult (1)**
86:10
**difficulty (1)**
84:18
**diligence (2)**
10:12 31:18
**directing (1)**
46:6
**director (7)**
14:5 33:10,14 43:2
44:16,21 67:13
**directors (3)**
34:18 35:15 86:23
**director's (1)**
17:23
**disagree (3)**
56:19 58:9 68:19
**disagreement (1)**

**38**:3
**discharge (1)**
35:18
**discovered (2)**
38:23 45:19
**discovery (13)**
4:7 44:9 80:23 82:19
84:6,16 85:4,9,12
85:16,18 88:25 89:4
**discuss (2)**
4:5 84:11
**discussed (4)**
83:15,18 84:8,21
**discussion (2)**
39:18 41:10
**discussions (1)**
32:10
**dismiss (7)**
3:8 49:6 51:5 73:2
82:16 90:8,10
**disposition (1)**
5:8
**dispute (5)**
68:9 74:4 78:18 82:3
82:9
**disputes (2)**
58:4 89:4
**disregard (2)**
9:12 19:2
**distinguished (2)**
4:9 11:24
**distribute (2)**
34:8 77:25
**distributed (4)**
30:15 34:14 46:3 80:5
**District (7)**
56:21,23 57:2 59:5
61:12 62:15,17
**Division (3)**
34:3,6,22
**doctrine (3)**
23:21,22 42:17
**document (10)**
25:17 28:24 34:17
44:6 47:17,20 74:11
75:7,10 80:5
**documentation (1)**
92:17
**documents (3)**
30:23 32:24 78:23
**dog (1)**
28:16
**doing (8)**
17:21 51:16 56:14
60:9 74:12 93:10
94:7 96:3
**dollars (1)**
45:9

**draft (1)**
27:18
**Drake (30)**
7:20 8:7 11:14 12:22
12:23 19:25 20:4,9
20:19 22:2,19 23:2
51:2,15,20 52:6,10
52:17 55:14,18
57:25 58:16 60:11
62:9 68:19 69:4
72:20,23,25 73:4
**drill (1)**
24:10
**due (4)**
10:12 24:9 31:17,19
**duly (8)**
31:22 32:2,16,19
33:25 42:12 44:4
67:3
**duplicative (1)**
101:15
**duties (1)**
35:19
**DX (1)**
2:11

_____
E

**E (3)**
2:3,3 103:2
**earlier (4)**
15:8 61:20 97:25 98:5
**early (5)**
10:15,19 28:6 38:23
53:13
**easier (1)**
68:11
**east (1)**
25:6
**Easterbrook's (2)**
22:25 60:21
**EC2N (1)**
2:10
**effect (7)**
23:20 24:19 33:11
37:21 58:23 93:6,6
**eight (1)**
21:18
**either (8)**
15:4 17:14 41:24
53:16 58:25 70:11
90:6 101:11
**Ekhougen (3)**
16:2 30:18 54:15
**elaborate (3)**
38:20 41:4 42:21
**elected (1)**
41:15
**emphasize (2)**

**7**:17 101:18
**employee (1)**
28:25
**empty (1)**
31:7
**encouraged (1)**
84:9
**endorse (1)**
25:20
**ends (2)**
3:15 4:17
**enforceable (3)**
48:9 94:4 99:23
**enforced (1)**
94:5
**engaged (2)**
35:18 38:19
**entail (1)**
57:14
**enter (7)**
44:13 67:15,21,23
90:4 98:7 99:3
**entered (2)**
68:14 74:5
**entering (2)**
33:16 66:17
**entertain (3)**
97:19 101:24 102:5
**entire (1)**
36:22
**entirely (2)**
44:25 83:3
**entirety (1)**
23:9
**entitled (6)**
12:8 32:23 33:19
58:24 78:14 96:16
**entity (2)**
29:2 45:7
**envious (1)**
41:18
**envision (1)**
90:4
**equity (1)**
26:20
**ERIC (1)**
2:16
**ESQ (7)**
2:6,7,11,15,16,17,22
**Esqs (2)**
1:17 2:14
**essentially (8)**
5:15 6:13 37:13 46:21
87:9 90:7,9 98:20
**established (1)**
54:5
**estopped (2)**
5:15 26:13

**estoppel (10)**
5:22 6:8,11,16 7:22
8:3,11 9:15 45:3
59:15
**et (1)**
7:23
**European (2)**
25:6 100:13
**events (3)**
9:24,25 10:3
**eventually (1)**
47:4
**everybody (4)**
3:5 87:16 89:7 99:12
**everyone's (1)**
20:18
**evidence (36)**
4:5 7:19,25 8:8 9:4
13:4 19:9 20:6,13
21:3 42:11 48:19
51:21 54:12 58:12
58:13,18,22 60:14
60:23 63:23 76:23
78:24 92:16 95:4,10
95:14 97:12,13,16
97:20 98:11 101:7,9
101:16,19
**evidentiary (9)**
20:15,22 30:10 52:10
52:14 80:13 84:3
94:9 96:23
**exactly (4)**
18:17 22:5 56:22
83:12
**examine (1)**
71:24
**example (4)**
84:20 90:16 93:19
95:12
**exchanged (1)**
47:23
**excuse (1)**
26:9
**execute (2)**
44:6 45:4
**executed (4)**
27:18 34:17 45:12
67:2
**executive (3)**
29:10 35:12 44:24
**exercise (1)**
70:22
**exercised (3)**
62:11,13 69:2
**Exhibit (3)**
13:11 14:11 30:10
**exist (1)**
92:11

**existence (3)**
50:14 93:3 96:20
**exists (4)**
36:9 42:18 64:9 94:25
**experience (1)**
84:24
**expert (5)**
7:15 9:7 14:23 42:5
97:2
**express (3)**
27:19 37:5 41:22
**expressly (5)**
23:5,7 26:25 36:25
66:23
**extant (1)**
11:4
**extended (1)**
22:23
**extensive (1)**
41:10
**extent (6)**
39:23 80:8 84:2 93:12
95:3 100:18
**extraordinarily (1)**
44:22
**extremely (3)**
42:9 44:17 79:22
**e-mail (3)**
14:10 25:2 30:8
**e-mails (3)**
13:14,20 14:2

_____
F

**F (1)**
103:2
**FAA (1)**
97:18
**face (2)**
38:8 100:19
**facie (2)**
20:14 35:14
**fact (24)**
7:13 17:2 29:9 37:18
38:16 39:9,25 41:25
44:15 49:11 54:3,6
54:10,24 57:16 63:6
64:7 81:9,18 83:17
84:9 89:8 94:17
99:2
**facts (2)**
58:10 62:3
**failed (1)**
9:20
**fairly (1)**
9:16
**faith (1)**
38:16
**fall (2)**

10:7,11
**falls (1)**
74:22
**fanciful (1)**
78:12
**far (8)**
3:6 7:2 9:5 27:15 45:3
48:13 60:2 86:9
**favorable (2)**
29:13 43:13
**fax (1)**
29:24 30:25 47:15
**federal (4)**
56:10 61:13 63:15
78:13
**feels (1)**
59:22
**fees (2)**
12:7,8
**Feinberg (51)**
1:22 3:4 11:20 19:22
21:12 48:16 52:2
62:10 63:14 68:10
68:21 70:12 71:6,16
71:20 72:7,10 73:9
73:25 75:12,14 77:5
78:6 79:3,15 80:17
81:4,24 83:10,25
85:7,23 87:23 88:2
88:8,10,19 89:15,20
90:24 91:11,23
92:12 95:6 97:21
99:11 100:4,22
101:2,17 102:5
**fellow (5)**
73:16 82:4 85:24 89:6
100:24
**field (1)**
63:9
**Fifth (1)**
2:4
**fight (1)**
56:12
**filed (2)**
41:7,21
**files (2)**
76:7,17
**filing (1)**
75:5
**fills (1)**
16:17
**final (4)**
90:6,9,12 93:14
**finally (3)**
18:18 43:14 95:3
**find (15)**
12:17 52:11 54:24
56:15 61:10 62:4,5
64:8 69:2 73:3

78:22 80:19 94:23
94:25 100:2
**finding (6)**
63:19 65:15 70:9 73:8
75:4 99:9
**findings (14)**
54:9 63:6 81:8,12,18
89:8,17 91:25 92:6
94:17,24 96:6,17
99:7
**fine (3)**
63:24 69:18 86:3
**fingers (1)**
32:9
**firm (3)**
40:17,20,20
**first (18)**
5:21 9:18 10:20 19:24
21:11 35:4 39:10
55:3,7 60:6 72:24
77:10 87:13,21
93:11 98:13 101:22
101:22
**five (3)**
21:9 49:11 73:17
**fix (1)**
91:6
**fixed (1)**
91:4
**floated (1)**
25:20
**flung (1)**
3:6
**focus (2)**
64:19 66:6
**focused (1)**
4:21
**follow (3)**
59:15 63:12 94:24
**followed (4)**
24:4 32:18 33:3 64:13
**following (4)**
21:17 80:18 81:6 88:2
**follows (2)**
22:7 100:20
**Force (1)**
88:17
**forcing (1)**
60:16
**foreign (2)**
41:13 62:23
**forgery (1)**
80:6
**form (1)**
67:6
**formal (3)**
27:13 42:6 44:5
**formalities (1)**

32:3
**formally (2)**
24:8 84:14
**formation (5)**
12:19 13:5 51:24
61:17 63:23
**formed (5)**
7:25 12:5 13:3 51:15
69:23
**forms (1)**
66:25
**forward (13)**
15:23 18:16 22:10
26:18 38:6 49:22,25
52:14,24 68:3 86:8
90:10 102:12
**found (7)**
7:15 18:17 49:13
53:19 77:15 98:14
99:2
**foundational (2)**
75:7,10
**four (2)**
34:21 35:3
**fours (1)**
61:2
**fourth (1)**
94:7
**frankly (1)**
92:15
**free (3)**
86:11,15 87:11
**free-standing (1)**
18:15
**Friday (1)**
83:8
**FRIED (1)**
2:17
**frustration (1)**
75:15
**full (5)**
20:22 82:25 83:6
87:23 98:16
**fully (4)**
45:12 46:12 66:24
96:16
**full-blown (1)**
51:16
**funeral (1)**
95:4
**funny (1)**
32:21
**further (2)**
79:12 102:10
**Furthermore (1)**
36:11

———————— G ————————

**garbled (1)**
21:21
**general (13)**
14:5 17:23 33:10,10
33:14,15 35:9,13,18
36:13 44:16,21
67:13
**generis (1)**
63:2
**Geneva (1)**
88:18
**gesture (1)**
31:8
**getting (3)**
26:5,6 54:20
**give (1)**
14:15
**given (8)**
3:21 12:20 15:16 38:9
42:7 80:9 91:4
92:24
**giving (3)**
14:24 16:9 33:14
**glad (1)**
79:25
**go (33)**
4:18 8:16 11:20 12:2
12:4,18 14:21 15:25
18:19 22:10 49:22
49:24 52:14,24
53:20 56:6,9 57:4
60:5,17 63:6 66:5
72:13 73:5,25 75:12
75:14 84:10 86:8
88:6,23 94:17
101:13
**goes (4)**
45:3 46:13 50:12
53:21
**going (32)**
9:10,10 15:16 18:9
20:16 22:17 56:5
59:6,7,12 61:11,12
62:15,17 63:14
64:16 65:11 69:21
69:21 70:5,6 79:10
83:21 87:9 91:9
92:6,22 93:10 94:15
95:18 96:24 97:20
**goings (1)**
8:25
**good (6)**
3:4 11:4 16:24 19:3
26:20 38:16
**gotten (1)**
19:16
**govern (2)**
37:2 42:23
**governance (5)**

10:21,24 11:8 83:19
86:18
**governs (4)**
23:24 41:8,13 90:17
**grant (2)**
37:19 90:7
**granted (2)**
40:16,19
**grasping (1)**
65:2
**great (3)**
14:21 19:11 23:13
**greater (1)**
33:21
**green (1)**
32:20
**GREGORY (1)**
1:24
**gripe (1)**
72:13
**ground (2)**
16:2 66:18
**group (3)**
28:25 29:11 78:9
**guard (1)**
32:8
**guess (6)**
90:13 91:23,24 92:2
92:12,19
**guessing (1)**
75:3
**guided (2)**
53:11 60:9
**guys (4)**
84:4 89:22 91:13
92:14

———————— H ————————

**hand (2)**
40:14 103:11
**happened (3)**
9:12 46:15 61:18
**happy (3)**
4:19 11:17 86:11
**hard (3)**
29:23 63:15 86:24
**hashed (1)**
19:16
**hat (1)**
32:21
**head (1)**
23:22
**headquartered (1)**
29:3
**hear (7)**
3:10 49:17 58:4 61:18
74:3 79:25 90:15
**heard (7)**

8:18 21:8 38:22
44:19 53:24 76:25
81:15
**hearing (50)**
4:6,18,21 8:21 9:22
11:22 13:11 16:18
20:14,15,23,25 22:4
22:20,24 25:21
27:25 37:4 41:9
51:10,17 52:11,15
52:18,19 58:25 59:6
66:13 82:18,19,25
85:11,13 87:7 88:16
88:21 89:2,21,24
90:11 91:5 92:7,10
93:4 95:2 96:8,11
97:15 101:23 102:7
**hearings (2)**
54:5 97:14
**heart (1)**
95:25
**hedge (1)**
70:16
**hedging (1)**
70:13
**held (5)**
1:16 21:4 29:8 48:9
48:10
**help (1)**
90:2
**hereunto (1)**
103:10
**HERRINGTON (2)**
2:4,9
**hesitation (1)**
74:15
**hierarchy (1)**
76:9
**high (1)**
54:2
**HOGSTAD (1)**
2:22
**hope (4)**
11:10 30:23 84:12
93:7
**Hopefully (1)**
89:22
**hoping (1)**
91:16
**HQ (1)**
2:10
**Hudyakov (4)**
14:21 15:3 16:16 17:2

_____
**I**
_____
**ICC (1)**
53:5
**ICDR (1)**

**idea (3)**
60:18 72:21 88:22
**ignore (1)**
9:11
**III (1)**
1:6
**Ilyashev (9)**
18:2,11 39:24 40:10
40:17,18,19,20
41:16
**Ilyashev's (3)**
39:20 41:2 42:20
**imparting (1)**
15:2
**implicit (1)**
83:25
**implied (1)**
36:20
**important (3)**
40:9 73:18 87:2
**inauthentic (1)**
80:6
**incepted (1)**
19:12
**include (2)**
96:8 99:10
**including (6)**
33:16 50:13,20 57:6
90:21 98:16
**inconceivable (1)**
33:20
**inconsistent (1)**
49:4
**incorporated (1)**
23:10
**incorrectly (1)**
62:20
**incumbency (3)**
17:11,22 42:12
**independent (2)**
57:20 58:21
**indicate (1)**
66:5
**indication (1)**
98:6
**indicia (1)**
24:3
**indistinguishable (1)**
67:11
**Indosuez (2)**
41:10,11
**induce (1)**
42:7
**indulgence (1)**
4:15
**infinite (1)**
42:14

**infirmity (2)**
38:24 45:19
**informally (2)**
24:8 84:11
**information (3)**
6:4 17:16 76:5
**informed (3)**
22:2 29:25 100:13
**inhere (1)**
35:11
**initially (1)**
3:11
**initiated (1)**
32:11
**ink (2)**
32:20 93:25
**inserted (1)**
26:12
**instance (2)**
55:19 98:13
**intended (1)**
59:21
**intensive (1)**
83:17
**interest (2)**
79:20 94:6
**interested (1)**
42:4
**interesting (3)**
18:6 41:23 92:13
**interests (1)**
15:7
**interim (1)**
97:15
**intermediary (1)**
17:3
**internal (1)**
24:4
**international (3)**
53:4 85:3 100:21
**internet (3)**
29:5 78:4,21
**interpretation (1)**
52:9
**interrelated (1)**
74:18
**inter-European (1)**
100:12
**intimately (1)**
74:16
**introduced (1)**
9:4
**invalid (5)**
49:14 52:13 69:3,7
98:21
**invalidate (1)**
46:11
**invalidity (2)**

57:15 95:15
**invented (1)**
27:4
**invited (1)**
31:17
**involved (4)**
6:9 7:10 12:3 76:19
**involvement (1)**
24:21
**involving (1)**
5:7
**ipso (1)**
57:14
**irony (1)**
26:23
**irregularities (1)**
63:10
**irrelevance (1)**
41:8
**irrelevant (2)**
24:5 77:6
**issue (35)**
4:22 10:20 12:2,6,19
13:4 35:6 47:7,9
51:23 52:5,6 53:8
53:20 54:6,24 57:6
57:20 61:16 62:24
65:5,10 75:17 79:22
80:23 81:10,17 82:2
82:8 84:22 89:11
92:21 93:19 96:22
97:4
**issued (1)**
78:17
**issues (31)**
3:15 8:11 10:23 11:8
11:11 12:9 19:16
49:15 54:3,7 55:8
56:24 58:15 59:25
59:25 64:7 83:2,3,4
83:16 84:3,6 86:18
91:25 93:4,11,12,17
94:12 95:10 97:20
**item (1)**
4:3

_____
**J**
_____
**J (1)**
2:17
**Jamack (1)**
15:6
**January (6)**
11:3 16:8 17:11,15
28:7 31:24
**JAY (1)**
3:2
**Jentes (35)**
1:23 11:15 22:5,24
35:2 50:20 52:21

55:2,24 56:18 58:7
59:3,17,24 60:20
64:10 65:4,20 66:14
67:17 69:24 73:23
74:2,17,24 77:17,21
77:23 86:4 88:12,15
90:2 99:18 100:8
101:18
**Judge (1)**
22:25
**judgment (3)**
20:11 53:24 54:22
**jumps (1)**
28:2
**jure (1)**
57:14
**juridical (1)**
47:18
**jurisdiction (51)**
21:7,10,15,22,25 22:6
22:18 23:16,17 49:9
49:10,17 50:12,18
50:19 51:3,4,7,14
51:25 52:22 56:9,13
56:15 57:18 59:13
61:11,16 62:7,12,18
68:15 69:2,6 70:15
70:20,22 71:15,22
72:25 81:10 82:2,8
89:11 90:21 92:2,5
94:19,20,23 100:9
**jurisdictional (7)**
52:5 57:6 70:17 72:19
91:2 93:11,19
**jury (2)**
59:11 78:14

_____
**K**
_____
**K (3)**
3:2 13:11 14:11
**Karkov (1)**
40:4
**keep (1)**
95:12
**keeping (1)**
27:18
**keeps (1)**
79:23
**KENNETH (1)**
1:22
**kept (1)**
47:6
**key (4)**
6:8 34:2 35:22 67:17
**Khudyakov (5)**
7:10 16:8 29:22 30:6
31:33 32:4 33:6
47:11 96:25
**Khudyakov's (1)**

**kicked (1)**
51:24
**kicks (1)**
52:10
**Kiev (2)**
29:4 30:22
**kind (2)**
28:7 56:24
**Klymenko (3)**
17:18 18:10 42:25
**knew (6)**
4:23 5:5,11,25 6:19
7:7 9:19 29:19
**know (22)**
5:3 6:15 7:9,11 25:15
28:13 36:15 66:12
72:21 75:2 76:17,18
77:15,22,23 79:10
84:22 86:8 99:19,24
100:2,4
**knowledge (5)**
6:11,22 17:23 33:13
43:23
**known (4)**
4:24 5:11 6:2,5
**knows (1)**
84:25
**Kosogov (8)**
17:9,21 31:14,20 33:7
43:14 44:10 76:18
**Kosogov's (1)**
44:18
**Kyivstar (6)**
5:8 10:24 15:7 30:18
31:25 74:14

_____
L

**L (1)**
2:6
**lack (7)**
19:25 27:21 39:3,10
43:10 45:14 68:5
**lacked (5)**
5:16 9:19 67:14 68:7
98:6
**lacks (3)**
21:7 49:9,17
**language (3)**
30:13 50:5 51:10
**largely (3)**
80:3 83:3 87:9
**late (2)**
28:6 96:3
**law (46)**
6:8 14:23 15:3,8
16:11 19:5,7,14
23:23 29:16 33:9,14
36:24,25 37:7 41:8

41:13,13,15,19
42:22,22 44:3 55:23
55:24 56:3 61:21,23
62:4,5 63:11 64:9
66:4 70:22 72:15
78:15 81:9,18,18
89:9 98:25 99:6
100:6,17,18,19
**lawyer (3)**
14:23 39:25 75:4
**lawyers (3)**
38:2 40:24,24
**layer (1)**
6:17
**leading (3)**
82:19 85:13 91:17
**leap (1)**
38:11
**learn (1)**
39:13
**leary (1)**
60:15
**leave (2)**
79:18 101:11
**left (1)**
63:9
**legal (11)**
6:23 7:16 11:18 25:6
27:9 68:2,25 83:3,3
84:3 101:19
**legally (1)**
67:10
**Leidersdorf (2)**
35:25 36:18
**lend (1)**
24:15
**length (1)**
23:14
**lept (1)**
38:10
**letters (1)**
95:23
**let's (16)**
51:17 53:23 55:24
56:20 64:12 65:9
67:19 69:12,18
71:10,11 75:21
80:18 88:19,24,25
**Lev (1)**
46:4
**Level (1)**
2:9
**liability (1)**
67:14
**light (5)**
3:8 6:19 62:8 81:6
97:16
**limit (2)**

26:7,9
**limitation (1)**
36:16
**limitations (3)**
4:25 6:2 74:23
**limited (7)**
14:2 24:20 56:11 58:5
58:5 67:14 95:4
**lines (3)**
21:11,18 22:3
**LISA (1)**
2:17
**literally (1)**
61:22
**litigate (1)**
68:8
**Litovchenko (1)**
30:19
**little (5)**
22:4 27:2 29:23 83:4
90:3
**LLC (2)**
1:9 44:22
**LLP (2)**
2:4,9
**location (1)**
57:4
**locations (1)**
3:6
**logistical (2)**
79:5 91:4
**London (1)**
2:10
**London/City (1)**
2:11
**long (7)**
3:13 8:10 48:13 58:17
68:18 74:13 81:16
**longstanding (1)**
86:5
**look (15)**
14:10 18:4 25:2 31:12
34:20 39:19 41:2
46:2 49:7 51:13
57:9 62:4 64:25
65:11 77:15
**looked (1)**
76:17
**looking (5)**
16:3 24:13 35:21
79:18 82:23
**looks (3)**
6:10 7:9 15:9
**loose (3)**
3:15 4:17 51:10
**loosely (1)**
5:22
**lot (2)**

13:19 85:3
**Lovells (2)**
1:17 2:14
**lunch (2)**
99:15 100:23
**Lykke (1)**
13:13

_____
M

**Madison (2)**
1:17 2:14
**main (2)**
7:3 18:22
**maintain (1)**
65:14
**making (5)**
29:11 45:22 49:2
68:23 98:24
**man (1)**
32:19
**Manhattan (1)**
34:23
**manner (2)**
3:23 9:21
**manual (1)**
32:7
**manually (1)**
47:17
**March (1)**
10:22
**Marchenko (4)**
39:19,21,22,25
**Massachusetts (1)**
88:5
**material (4)**
16:5,10,20 29:25
**materiality (1)**
27:4
**matter (18)**
1:2,14 26:20 29:4,15
29:16 38:15 39:9
41:7,19 43:23 59:17
64:3,9 77:8 78:15
90:10 103:8
**matters (5)**
3:14,20 4:12 23:4
76:19
**Maydanyk (7)**
7:15 18:18 19:6 27:9
37:4,25 42:5
**mean (14)**
22:5 24:23 32:6,8
61:22 62:2,25 63:2
71:23 73:14 91:14
92:4,24 100:6
**meaningless (1)**
31:7
**means (5)**

32:2,9 44:5 47:12
101:14
**meeting (38)**
7:6,12 14:8,14 16:13
17:14,17 26:25
27:14,20 28:4,10
30:3 31:16 32:21,22
38:15,18 42:3 43:4
43:24 44:15 49:3
54:11,13 61:8 74:6
75:19 76:3,6,10,20
76:23 77:3,10,11,16
93:20
**meetings (3)**
11:2 47:24 86:24
**member (1)**
34:10
**mention (2)**
30:4 39:17
**mentioned (3)**
8:22 41:25 42:2
**mentioning (2)**
34:25 35:8
**merely (1)**
14:24
**merits (9)**
7:21 48:12 49:15
51:17 59:2 82:25
90:11,16 92:23
**mind (1)**
27:5
**minimum (3)**
19:6 54:4,23
**minute (3)**
70:14 71:10 80:25
**minutes (4)**
73:18 80:19 99:14
101:3
**mispronouncing (1)**
13:12
**missing (1)**
78:15
**mistake (2)**
15:9 63:19
**Mobile (31)**
1:4 4:23 5:4,11,14,25
6:12,15,18 8:14,19
8:22 9:3,17,23
12:10 13:19 14:3
16:25 17:2,4,6,12
19:11 22:16 53:15
54:16 73:5 76:22
97:8,13
**Mobile's (4)**
8:3,9 49:18 64:6
**model (2)**
100:6,15
**modified (1)**
26:16

**moment (6)**
16:7 55:25 65:9 67:20
75:21 82:15
**Monday (4)**
30:24 87:21 88:10,20
**months (1)**
96:4
**moot (1)**
92:2
**moots (1)**
59:18
**morning (3)**
3:4 19:19 40:3
**morphed (1)**
97:3
**morphing (1)**
79:24
**motion (23)**
3:8,24,25 4:2 20:10
20:11 48:20 49:5
51:5 53:22 72:13
79:4,12 82:10,16
90:8,10 95:8,19,20
96:4 101:4,24
**mount (1)**
48:5
**mounted (1)**
40:7
**move (6)**
11:13,18 15:13 18:16
96:19 102:12
**movement (1)**
85:4
**moving (8)**
13:7 15:23 16:16 17:8
17:25 37:11 79:21
94:6
**MUSOFF (1)**
3:2
**MV (1)**
46:5

**N**

**N (2)**
2:3 103:2
**nail (1)**
11:25
**name (1)**
13:13
**nature (1)**
40:9
**nauseum (1)**
92:15
**necessary (3)**
44:6,12 96:14
**necessity (1)**
35:11
**need (6)**

7:5 8:12 16:12 25:4
58:12 91:14
**needed (10)**
5:7,12 6:6 7:12,14
13:17 14:14 28:20
31:2 85:12
**negotiate (1)**
26:8
**negotiated (3)**
25:24 46:16 47:8
**negotiations (1)**
32:11
**never (4)**
43:9 48:14 53:16
84:18
**new (55)**
1:17,18 2:5,5,15,15
7:2 9:4 18:9,12
23:23 26:9 27:14
29:15 30:2,14 34:3
34:6,16 36:24,24
37:7 41:8,11,12,15
42:4,22 44:24 45:11
47:7 54:16,20 55:22
55:24 56:21,23 57:2
59:5,12 62:5 63:10
63:11 75:22,23
78:13 85:25 96:2,24
98:10 99:20 100:11
100:17 101:16
103:6
**nicely (1)**
16:17
**Nilov (42)**
5:16 6:6 9:19 10:4,16
13:15,21 14:4,7,16
24:23 25:10,10
28:19,23 29:14,19
30:21 31:21 32:15
37:19 41:22 44:13
44:16 47:15 66:11
67:7,13 68:7 69:15
71:18,22 74:4 76:14
95:24 96:25 98:6,25
**Nilov's (7)**
4:25 6:18 29:8 33:21
38:24 39:3,10
**nine (2)**
21:11,18
**nominees (1)**
86:23
**non-compete (3)**
83:16,21 93:23
**non-complete (1)**
83:20
**Notary (2)**
1:16 103:5
**note (3)**

8:14 24:22 37:2
**noted (3)**
5:22 42:4 102:18
**notes (1)**
1:13
**notice (1)**
97:10
**noticed (1)**
98:3
**notion (5)**
5:24 75:22 78:11 82:3
82:6
**notwithstanding (1)**
99:4
**November (17)**
83:6,11 85:25 86:13
86:15 88:13,15,20
89:22 91:5,20 92:9
92:24 95:8 96:8,11
102:13
**NSA (1)**
75:24
**null (2)**
57:14 98:16
**nullity (1)**
42:10
**number (2)**
46:14 75:16
**nutshell (2)**
65:14 69:8

**O**

**O (1)**
103:2
**objecting (1)**
60:7
**objection (3)**
26:15 56:7,8
**objections (2)**
50:11,13
**obligated (3)**
79:9,16 86:20
**obligation (3)**
26:8 32:17 97:19
**obligations (1)**
17:7
**obtain (1)**
20:22
**obtained (4)**
10:8 28:20,22 29:9
**obvious (1)**
48:17
**obviously (1)**
14:6
**October (3)**
14:13 87:8,12
**Odell (1)**
34:4

**offensive (1)**
80:7
**offer (4)**
29:13 43:13 95:10,13
**offered (2)**
4:5 43:12
**office (3)**
35:19 36:14 47:16
**officer (4)**
25:9 29:2 35:13 44:24
**offices (1)**
1:17
**official (1)**
47:10
**okay (5)**
11:21 53:23 56:4
65:11 72:10
**Old (1)**
2:10
**OLEKSIY (1)**
2:24
**Omega (5)**
15:25 26:4 46:17,25
47:3
**omnibus (1)**
93:6
**once (5)**
4:4 26:3 45:12 47:14
71:2
**ones (1)**
57:5
**one-day (1)**
87:10
**open (3)**
79:19 95:13 101:11
**opening (1)**
49:7
**operated (2)**
45:17 47:22
**operating (1)**
87:5
**opining (1)**
16:11
**opinion (5)**
7:16 9:8 27:9 37:24
42:5
**opportunity (2)**
8:16 18:21
**oppose (1)**
97:7
**opposed (2)**
84:3 89:18
**opposing (2)**
20:5,12
**opt (1)**
23:3
**option (1)**
101:7

**offensive (1)** ... (continued right column)

**Options (2)**
55:3,7
**oral (4)**
65:23 66:2 95:19
101:4
**order (8)**
3:21 9:2 20:7,22 32:4
42:7 90:17,22
**orders (1)**
96:18
**ordinarily (1)**
36:3
**original (2)**
15:17 49:4
**Orrick (3)**
2:4,9 3:2
**ought (3)**
18:15 21:8 95:5
**outlier (1)**
18:25
**outside (1)**
10:5
**outstanding (1)**
16:18
**overall (1)**
17:23
**overcome (1)**
20:13
**owned (1)**
78:8
**owns (1)**
78:10
**o'clock (2)**
81:13,20
**O'DRISCOLL (1)**
2:11

**P**

**P (2)**
2:3,3
**page (12)**
21:11,17,18,23 28:3
34:21 35:3 38:10,11
46:7 49:11,23
**pages (1)**
22:14
**pains (1)**
14:21
**Paint (1)**
68:3
**panel (32)**
4:2 21:7 34:10 40:14
48:18 49:9,14,17,23
55:9 63:17 78:2
79:9 80:15,19 81:4
81:19,25 82:6 84:25
90:4,15,20 93:14
96:18,21 97:5 99:13

99:16 101:22,24
102:10
**panelists (4)**
73:16 82:4 85:24 89:6
**panels (1)**
84:23
**panel's (5)**
3:9,20 21:10 46:6
81:10
**paper (3)**
37:17 39:8 67:9
**papers (1)**
87:10
**paragraph (9)**
28:4 35:5,21 46:8
57:9 64:14,15 66:7
98:18
**parallel (1)**
88:16
**paralysis (1)**
87:4
**parse (1)**
98:2
**part (5)**
65:18 66:21,25 93:13
99:9
**partial (2)**
81:25 90:8
**participants (21)**
7:3,6,12 14:9,15
16:14 17:14 28:5
30:3 32:22 44:12
54:11 74:7 75:19
76:3,6,12,21,24
77:12,16
**participate (2)**
14:19 99:21
**particular (3)**
24:7 66:20 85:2
**particularly (1)**
7:2
**parties (19)**
14:13 15:21 23:3
27:17 33:3 36:25
41:15 46:13 47:22
58:4,6,14 60:10
81:7 82:18 89:3
92:20 98:22 101:5
**partner (4)**
2:24 3:2 39:21 40:20
**partners (4)**
2:24 16:23 40:11,18
**party (14)**
6:11 9:17 12:7,15
13:2 18:14 20:5,12
23:25 24:7 60:16
100:10,11 101:11
**party's (1)**
7:22

**passing (1)**
14:24
**pause (2)**
7:17 100:25
**pays (1)**
98:3
**pending (2)**
3:24 48:12
**people (2)**
7:10 33:22
**percent (2)**
26:7 78:10
**performed (2)**
45:10,13 46:13
**peril (2)**
23:25 37:21
**period (1)**
10:12
**permitted (1)**
63:17
**personally (1)**
83:9
**pertaining (1)**
36:6
**PETER (1)**
2:11
**Phillip (1)**
57:8
**physical (1)**
67:6
**physically (1)**
47:16
**pick (2)**
4:16 69:10
**piece (1)**
67:9
**Pieter (5)**
2:15 4:13 34:11 48:24
65:10
**place (7)**
8:20 28:6 54:13,14
89:16 92:23 94:11
**places (2)**
21:9 49:19
**plain (2)**
16:22 17:10
**plaintiff (2)**
35:23 46:11
**plan (2)**
88:24,25
**play (1)**
4:9
**please (2)**
30:8,16
**Plus (1)**
27:16
**Plymouth (1)**
88:4

**point (18)**
10:23 13:9 15:12 18:6
18:22 19:8 25:19
27:8 30:5 39:17
54:21 59:18,19
63:24 67:17 69:11
80:11 95:23
**points (2)**
58:2 95:4
**polling (2)**
27:20 44:2
**position (14)**
5:10 22:20 26:5 27:22
27:24 35:11 37:3
38:14 45:8 50:3
69:7 72:4,16 73:11
**possession (2)**
5:4 6:4
**possibility (1)**
87:6
**possible (2)**
30:23 83:19
**potential (1)**
87:4
**power (29)**
21:20,22,24 22:8,9,11
24:24 25:10,13
35:14 36:5,19 40:18
49:15,21,23,25
50:11,18 54:16 56:7
56:16 60:4 71:5,6
72:2,3,12 96:21
**powers (5)**
33:10 35:10 40:15
44:17,23
**practical (2)**
30:17 59:17
**precedent (1)**
15:23
**precise (1)**
65:21
**precisely (3)**
33:4 91:12,16
**predicate (1)**
96:14
**preference (2)**
87:17,19
**prehearing (3)**
4:7 84:5 85:18
**prejudice (1)**
97:8
**preliminary (2)**
48:13 91:6
**prepared (3)**
55:5 79:8 92:25
**PRESENT (1)**
2:20
**presentation (1)**

23:20
**presented (1)**
68:4
**preserve (1)**
74:19
**president (10)**
33:11 34:15 35:9,12
36:2,4,10,12,19
44:23
**president's (2)**
36:8,17
**press (1)**
39:14
**pressed (1)**
63:15
**pressing (1)**
39:15
**presumably (5)**
29:18 38:12,13 43:8
47:12
**presumed (1)**
36:4
**presumption (2)**
29:17 35:9
**pretended (1)**
11:3
**pretrial (1)**
91:17
**pretty (1)**
9:9
**prevail (1)**
93:18
**pre-arbitration (1)**
82:19
**prima (3)**
20:13 35:14 68:3
**primary (1)**
94:18
**principles (2)**
34:24 35:8
**print (1)**
40:17
**printed (1)**
39:9
**probably (1)**
89:25
**problem (4)**
44:9 46:25 76:11
85:18
**problems (1)**
86:4
**procedural (1)**
63:10
**procedures (1)**
24:5
**proceed (2)**
3:25 101:12
**proceeding (5)**

9:5 22:17 43:4 78:12
102:7
**proceedings (108)**
1:8,14 4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1,8,12
18:14 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1,7 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1,2 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:7,9
**produce (1)**
20:13
**product (1)**
91:21
**Professional (1)**
103:5
**professor (1)**
66:4
**proffered (2)**
48:21 82:10
**profit (1)**
26:14
**prohibit (1)**
22:16
**promise (2)**
45:4 86:21
**prong (1)**
6:8
**proper (1)**
63:5
**proposed (8)**
36:21 81:8,11 89:16
91:24 92:6 96:6,17
**proposition (6)**
12:21 56:22 64:23
66:8 67:19 68:13
**protect (1)**
15:7
**proves (1)**

27:14
**provide (5)**
23:5 30:25 34:10
66:23 91:21
**provides (2)**
57:10 101:25
**providing (1)**
33:23
**provincial (1)**
40:4
**provision (3)**
12:14 61:4 66:10
**provisions (9)**
16:5,10,21 17:5 26:11
26:16 33:13 43:17
46:22
**PRUSZYNSKI (3)**
1:15 103:4,15
**public (3)**
1:16 29:4 103:5
**purchase (3)**
10:6 46:17,18
**purely (2)**
90:25 91:3
**purpose (1)**
14:2
**purposes (5)**
6:23 69:12,18 70:3,5
**put (8)**
32:7 47:17,19 50:6
55:24 71:10 84:12
92:22
**puzzled (1)**
64:25
**p.m (1)**
102:18

_____
**Q**
**queried (1)**
6:3
**question (48)**
4:6,23 6:10,13 12:4
16:17 20:15,23
23:18 24:18 25:4
35:22 37:7 41:14
48:14,23 56:3 61:9
64:11,17 65:3,12
73:6,24 75:11 79:5
79:16,18 81:16
86:19 88:24 89:17
90:13,18,20 91:3,10
91:24 92:13 93:2,15
94:2,5 95:14 96:9
96:12,19 99:18
**questions (8)**
4:20 5:23 11:16 19:21
75:16 89:14 90:21
94:8
**quick (1)**

75:13
**quickly (3)**
9:16 13:9 15:11
**quite (4)**
44:18 74:3 80:21 98:3
**quote (6)**
21:12,19,24 49:22
98:15,17
**quoted (1)**
21:7
**Quoting (1)**
35:12

_____
**R**
**R (4)**
1:22,23 2:3 103:2
**Rabij's (3)**
37:23 43:20 44:20
**raise (4)**
3:16 89:5 92:18 95:2
**raised (9)**
6:14 11:15 13:8 18:7
23:19 47:7 54:8
56:3 65:10
**raises (3)**
10:20 19:21 29:15
**raising (1)**
6:11
**ratification (6)**
7:23 8:5,11 9:14,18
10:2
**ratified (1)**
5:18
**ratify (1)**
35:15
**reached (2)**
65:22,25
**read (5)**
29:23 36:17 39:14
55:3,4
**readily (1)**
79:17
**ready (13)**
30:16 31:4,6,9,11
32:5,6,6,12 47:4,7
47:11,12
**Real (1)**
86:4
**realized (3)**
10:9,15 11:7
**really (10)**
6:22 18:2 19:10 24:17
27:10 31:5 59:25
64:4 70:21 97:25
**reams (1)**
37:16
**reason (8)**
18:23 19:3,4 23:22

61:17 65:3 72:19
102:8
**reasonable (2)**
6:9,17
**reasonably (1)**
35:24
**reasons (2)**
6:21 72:18
**recall (1)**
28:4
**receive (1)**
102:14
**received (2)**
29:24 45:16
**Recess (1)**
81:3
**recollection (1)**
76:20
**reconvene (3)**
3:7 80:21 81:2
**reconvened (1)**
3:14
**record (31)**
3:12,23,24 4:6 8:23
9:9 21:13 29:4 30:9
37:6,24 48:7,16,19
75:25 76:4 79:5
80:3,10,14 84:11,13
92:21 93:3 94:9
95:12,22 96:23 97:4
98:10 99:8
**records (6)**
10:8,13 28:12 38:13
43:5,9
**recounts (1)**
15:20
**reed (1)**
9:9
**refer (1)**
66:20
**reference (1)**
23:10
**referred (3)**
4:17 44:2 75:24
**referring (1)**
52:25
**reflect (1)**
48:17
**regard (4)**
5:21 39:7 40:13 57:21
**regardless (1)**
36:9
**regime (1)**
100:21
**registered (2)**
74:25 103:4
**regression (1)**
42:14

**rehash (1)**
101:8
**rehearse (1)**
5:2
**reinforce (1)**
57:16
**related (5)**
3:20 9:15 64:11 84:6
88:25
**relating (2)**
9:2 10:24
**relationship (1)**
16:24
**release (1)**
39:14
**relentless (1)**
39:4
**relevant (2)**
6:24 100:15
**reliance (3)**
6:9 42:7 45:4
**rely (4)**
6:18 9:10 35:24 66:7
**relying (3)**
15:5 17:22 33:12
**remaining (1)**
10:6
**remains (1)**
92:14
**remarkably (1)**
45:8
**remedy (2)**
93:21 95:11
**remember (1)**
10:18
**remind (1)**
98:9
**reminding (1)**
86:12
**render (2)**
82:7 102:15
**rendered (2)**
96:11 98:16
**reorient (1)**
6:7
**repeated (1)**
49:8
**repeatedly (1)**
20:19
**repeating (2)**
52:3 66:13
**repetitive (1)**
101:15
**reply (1)**
27:11
**reported (1)**
103:7
**Reporter (2)**

1:16 103:5
**representation (1)**
32:24
**representative (1)**
15:6
**representatives (1)**
10:25
**represented (1)**
39:22
**repudiate (1)**
9:21
**request (3)**
17:12 26:12,21
**requested (2)**
26:15 82:23
**require (3)**
7:21 25:7 83:22
**required (4)**
25:15 27:14 30:2
41:22
**requires (5)**
7:23 8:7 52:5 81:15
102:4
**reserve (2)**
88:19 95:7,9
**resolution (1)**
44:11
**resolve (3)**
89:4 90:21 94:4
**resolved (1)**
91:14
**respect (5)**
5:10 9:6 27:8 50:13
96:7
**respectfully (2)**
58:9 97:5
**respective (1)**
82:24
**responded (2)**
21:16 22:7
**Respondent (2)**
1:10 2:18
**response (3)**
3:18 5:13 91:24
**responsible (1)**
45:2
**rest (2)**
42:20 74:7
**restate (1)**
69:10
**result (1)**
100:16
**resuscitate (1)**
98:23
**reviewed (2)**
30:13 43:5
**right (15)**
22:21 50:21,23 52:17

60:7 62:21 68:21
71:16 72:14,17 76:2
83:12 95:7,9 97:21
**rights (1)**
42:9
**rigmarole (1)**
74:8
**ring (1)**
24:25
**ROBERT (1)**
2:6
**rolls (2)**
38:6 68:3
**room (1)**
68:23
**round (1)**
102:9
**route (1)**
66:6
**routine (1)**
33:4
**rule (15)**
15:15 23:4 36:3,23,24
45:11 50:11 55:18
56:7 57:18 61:10,15
61:15 95:8 100:15
**ruled (2)**
84:23 101:22
**rules (24)**
1:2 12:13 22:9 23:9
50:7 53:5,11 55:20
56:5 59:19,20 61:3
63:17 64:13 65:18
66:15,21,23 68:15
71:4,14 96:22 99:23
100:7
**ruling (4)**
3:9 15:17 62:16 93:6
**rulings (1)**
49:15
**run (4)**
25:16 59:3 62:15 86:7
**running (2)**
24:19 33:23

_____ S _____

**S (2)**
2:3,7
**safe (1)**
99:13
**satisfied (1)**
73:4
**satisfy (2)**
31:18 61:19
**saw (3)**
44:20 78:4 95:24
**saying (26)**
8:8 9:8,23 13:21

17:13 18:2 21:19,21
24:20 25:14 31:4,6
32:15 43:4 51:12
52:3,17 60:3,5
62:11 63:4,21 70:21
73:7 95:7 97:15
**says (32)**
13:2 16:17 17:18 20:9
20:19 22:18,19 28:3
28:12 29:24 30:11
31:9,19,21 33:6,7
33:12 35:7 36:17
41:16,22 43:16
44:10 46:8 50:7
51:12 53:23 54:12
56:6 58:13 77:5
98:20
**schedule (9)**
3:10 83:23 84:10,16
85:16 89:9,16 91:6
92:23
**scheduled (1)**
86:6
**scheduling (2)**
80:24 84:19
**scintilla (1)**
20:6
**scope (4)**
36:8,13 37:20 38:5
**scrap (1)**
76:23
**seal (1)**
47:20
**search (1)**
78:21
**searching (1)**
7:21
**second (16)**
4:3 11:23 12:24 20:3
21:2,17 45:25 46:7
55:14 72:16 73:3
79:14 80:23 83:6
86:9 100:23
**secretly (1)**
39:12
**security (1)**
17:5
**see (9)**
18:3 28:8 38:7 51:13
56:18 75:8 84:19
86:25 97:8
**seeking (1)**
101:8
**seen (4)**
7:2 8:25 74:9,11
**senior (3)**
28:25 29:10 47:10
**sense (6)**
25:22 29:16 31:11

45:13 80:6 85:19
**sent (1)**
25:3
**separate (10)**
12:17 14:18 15:4
50:15 60:24 67:4,9
69:14 74:21 98:8
**separately (2)**
60:20,22
**separates (1)**
63:3
**separation (1)**
57:11
**September (5)**
1:18 3:22 79:11 103:8
103:11
**series (3)**
11:11 13:14 39:6
**serious (4)**
23:15 67:12 78:18
**seriously (1)**
27:16
**served (1)**
99:16
**session (1)**
49:3
**set (6)**
23:11 26:20 45:14
88:16 90:10 103:10
**Setting (1)**
56:4
**settled (3)**
34:24 35:7 36:3
**Seventh (2)**
12:22 22:25
**sever (1)**
65:5
**severability (4)**
12:14 61:4 66:16 99:4
**severable (3)**
58:21 66:24 74:16
**sham (1)**
41:17
**shareholder (4)**
69:25 71:8 72:7 95:16
**shareholders (35)**
5:9,18 10:2 11:4
13:24 15:24 25:22
26:10 27:7 28:5
30:14 31:23 32:25
39:2 41:17 44:13
46:23 47:2 48:2
64:18 65:8 66:10
67:6,8,22 70:7,23
75:6,23 86:21,22
88:18 93:20 94:2
98:15
**shares (7)**

5:8 10:7 26:4 46:17
47:3,23 74:14
**Shaw (5)**
11:23 12:2,21 55:4,7
**Shevchenko (1)**
2:24
**Shorthand (1)**
1:16
**shortly (2)**
82:6 102:16
**shots (1)**
96:5
**show (10)**
7:24 8:2,4,8 9:18,25
18:24 54:3 63:8
64:6
**showing (4)**
20:14,20 21:4 97:2
**shown (4)**
7:16 51:21 54:13 64:3
**shows (1)**
19:6
**side (1)**
32:14
**sides (3)**
40:11 85:8 102:15
**sign (25)**
13:16 14:5 26:9 27:6
29:20 30:16,22,24
31:5,6,10,11,22
32:5,6,12,20 47:2,5
47:7,11,13,13 69:16
71:19
**signatory (1)**
99:20
**signature (7)**
13:17 25:5,8,14 30:25
32:7 47:15
**signatures (2)**
25:4,8
**signed (10)**
10:16 26:18 27:2
28:24 29:20 33:12
47:17,20 66:11 67:7
**significance (1)**
47:19
**significant (1)**
28:14
**signing (3)**
30:17 46:20 67:5
**Sills (57)**
2:6 8:21 10:22 11:22
19:20,22,23 34:13
35:3 52:9 53:25
54:11 61:2 64:10
65:2,17 66:10 67:25
72:20 73:11 76:25
77:4,5,7,9,13,23
78:5,7,21 79:6,7,13

79:16,20 81:21
82:22 83:12,15,23
84:4,8,18,20 85:19
86:18 88:15 89:13
90:13,25 92:9,19
93:15 95:18 100:5,9
101:21
**simple (1)**
79:22
**simply (9)**
7:4,11 14:3 27:17
38:17 61:15 90:19
91:12 97:15
**single (2)**
81:16 93:5
**singular (1)**
82:2
**sit (4)**
53:21 54:18 63:5
83:20
**site (2)**
40:18,22
**sitting (5)**
34:23 56:20 60:11
64:8 75:8
**situation (1)**
62:23
**slate (1)**
60:12
**slight (2)**
27:13 100:14
**slightly (1)**
21:21
**slipped (1)**
16:14
**small (1)**
39:17
**Socrates (1)**
59:23
**sole (1)**
81:9
**solely (1)**
89:10
**solutions (1)**
95:20
**somebody (2)**
53:2 73:12
**somewhat (1)**
5:24
**soon (2)**
11:6 46:24
**sorry (8)**
5:14 33:7 45:5 50:9
61:24 63:25 86:4
97:23
**sort (3)**
24:10 50:5 64:15
**Southern (4)**

56:21,23 57:2 59:5
**speak (2)**
82:4,23
**speaking (1)**
55:25
**speaks (1)**
25:17
**special (1)**
44:11
**specifies (1)**
100:17
**speed (2)**
87:25 88:3
**Sphere (30)**
7:20 8:7 11:14 12:22
23:12 19:25 20:4,9
20:19 22:2,19 23:2
50:25 51:15,20 52:6
52:9,16 55:14,18
57:25 58:16 60:11
62:9 68:19 69:4
72:20,22,25 73:4
**spilled (1)**
93:25
**stamp (1)**
47:18
**stand (3)**
12:21 78:16 98:5
**standard (12)**
11:14,19 12:25 13:2
51:20 53:24 54:22
55:16 57:25 60:13
62:9 73:4
**stands (1)**
23:21
**start (2)**
86:6 95:21
**started (1)**
11:7
**state (5)**
4:8 36:23 75:25 76:4
103:6
**stated (1)**
64:5
**statement (3)**
18:4 37:5 60:21
**statements (1)**
91:8
**stenographic (1)**
1:13
**steps (2)**
32:18 44:5
**stick (1)**
102:9
**stop (1)**
70:8
**stopped (1)**
10:25

**Storm (72)**
1:9 3:11,15 4:5,9 5:13
5:15,17,24 6:3 7:4
7:18,24,24 9:18
10:4,7,9,19 11:2
12:15 13:18,22
14:18 15:4 16:19,23
21:4 26:3,12 28:5
30:13 31:15,22,25
32:11,14 33:23
38:12 39:6,15 40:2
40:7,19 41:24 42:8
43:9,13 45:5,7
46:16,19 48:21 49:5
51:21 54:19 58:23
60:5 64:3 66:18
68:12,24 76:9 78:10
79:10 81:23 82:10
83:15 86:19 90:15
93:7,20
**Storm's (11)**
5:5 6:22 19:9 22:20
28:11 30:3 40:24
43:17 44:11 50:3
72:3
**straightforward (1)**
19:7
**Street (1)**
2:10
**strike (1)**
70:23
**strong (1)**
66:15
**struck (3)**
41:3 48:25 82:24
**stuff (1)**
57:21
**subject (4)**
3:12 19:20 82:21
87:19
**submission (4)**
80:13 91:2,7 94:10
**submit (6)**
6:20 15:18 19:14
79:12 90:5,5
**submitted (12)**
9:7 17:8,10 18:5,23
24:14,14 28:15,16
49:5 92:7 102:14
**submitting (2)**
56:14 96:7
**subpoena (1)**
101:24
**subsidiary (1)**
94:22
**subsisting (1)**
94:3
**substantial (2)**
16:6 24:16

**substantive (2)**
46:22 90:18
**succeeded (1)**
46:24
**succeeds (2)**
26:3,4
**sues (1)**
56:10
**sufficient (1)**
21:3
**suggest (2)**
80:17 91:19
**suggested (2)**
7:7 95:11
**suggesting (6)**
13:20 85:15 94:16
97:9,11,14
**suggestion (1)**
80:4
**suggests (2)**
37:15 68:7
**sui (1)**
63:2
**summary (4)**
4:8 20:11 53:23 54:22
**Supp (1)**
34:7
**supplement (3)**
3:23 80:10 101:5
**supplied (3)**
37:17 43:3,7
**support (4)**
19:9 24:16 49:5 67:18
**supported (1)**
19:5
**supports (1)**
12:23
**suppose (2)**
31:3 42:13
**supposed (4)**
38:23 40:12 57:17
86:7
**supposedly (1)**
34:17
**sure (13)**
8:19 11:25 13:9 17:5
18:21 33:18 70:25
73:16,19 81:14
83:21 84:25 97:25
**surely (1)**
23:11
**surprise (1)**
97:11
**surprised (1)**
96:24
**SUTCLIFFE (2)**
2:4,9
**sword (1)**

46:11
**systems (1)**
25:7

—————————

**T**

**T (2)**
103:2,2
**tab (2)**
34:13 46:2
**take (16)**
9:22 11:17 20:18
37:22 54:14 61:22
62:11 79:10 80:18
80:22,25 85:14
87:21 89:15 94:11
101:21
**taken (5)**
1:14 32:3 37:3 44:7
81:3
**Tal (1)**
61:6
**talk (1)**
17:3
**talked (2)**
13:15 17:20
**talking (2)**
7:18 58:19
**target (1)**
37:11
**task (1)**
43:17
**technical (1)**
45:19
**Telenor (52)**
1:4 2:22 3:18,21 4:23
5:4,10,14,25 6:12
6:15,18 8:3,9,14,19
8:22 9:3,17,23
12:10 13:19 14:3
16:25,25 17:3,6,12
19:11 22:16 26:5,17
30:13,18 31:24
43:19 44:25 45:6
46:18 49:17 53:15
54:15 61:10 64:6
66:19 69:5 73:5
76:22 81:22 87:3
97:8,12
**Telenor's (2)**
24:16 26:15
**tell (4)**
14:3,21 19:24 55:2
**telling (1)**
47:6
**tells (3)**
16:22 40:8 51:16
**ten (1)**
28:4
**tenth (1)**

71:2
**termination (3)**
16:4 26:13,16
**terms (3)**
16:22 68:4 81:5
**terribly (1)**
8:15
**test (3)**
24:11 33:21 35:16
**testified (1)**
16:3
**testify (5)**
29:12,17 76:9 77:11
96:2
**testimony (10)**
16:3 28:20,21 29:8,13
29:18 43:12,13 83:5
86:25
**thank (4)**
4:14 19:23 34:12
63:24
**Thanksgiving (3)**
86:13 87:14,24
**theory (3)**
6:16 8:3,5
**thin (1)**
9:9
**thing (5)**
17:13 28:2 52:14 78:3
86:11
**things (4)**
13:7 15:12 87:25 88:4
**think (74)**
4:16 6:25 8:12 15:25
16:17 17:9 18:9
23:13,14 25:17 27:9
27:10,16 28:14
29:10 33:19 34:2
35:22 37:8,22 40:8
41:7,9 43:2,12,19
43:25 44:18 48:7,17
50:5,6 52:4 54:4
55:10 56:2 57:2
58:3,12 60:10 62:25
65:18 66:13,22 71:2
74:22 76:13,25
78:17 79:21 80:3,7
80:14 82:4 83:2
84:4 85:19,21 87:13
88:20 89:25 92:23
94:11 95:19,22 96:5
97:3,18 99:12,13,15
99:16 100:15 102:9
**thinking (1)**
90:14
**third (1)**
47:21
**thought (5)**
12:24 33:18 51:2

92:20 94:15
**three (6)**
46:8 47:14 49:19 54:5
96:4,5
**three-day (2)**
26:2 46:23
**threshold (1)**
64:2
**Thursday (1)**
83:8
**tie (1)**
84:17
**tied (1)**
48:13
**time (28)**
5:23 6:3 10:3 11:15
13:22 16:23 20:19
21:2 23:14 30:4
31:15 35:17 39:10
39:18 43:23 44:20
47:21 51:18 61:8
71:3,25 78:4 84:17
94:7,13 97:4 99:17
102:18
**timely (1)**
9:21
**times (3)**
19:16 47:14 49:9
**timing (1)**
85:6
**today (19)**
3:10,18 4:4 8:2,4
70:19 72:2 77:20
79:8 81:7,12,15,19
83:20 89:10 92:2
102:7,11,13
**Tol (60)**
2:15 4:14 11:21 21:16
21:23 22:7,15 34:12
37:5 40:15 50:4,22
52:7,16 53:6 55:21
56:4 57:23 58:8
59:14,22 60:2,23
62:8,21 63:21 68:18
69:9 70:2 71:5,13
71:17 72:5,9,17
74:9,18 75:2 76:4
76:11 77:9,14,18,22
78:3,19 81:23 82:22
83:14 84:15 87:19
87:24 88:6 89:12
93:9 94:14 95:17
97:7,23 99:24
**told (6)**
13:25 28:18 44:3,8
56:23 81:7
**toll (1)**
21:19
**tomorrow (8)**

30:16,22,25 31:5,6,10
31:11 32:5
**tone (1)**
91:15
**tough (1)**
59:25,25 87:15
**Tower (1)**
2:9
**tracking (1)**
76:11
**transaction (9)**
5:7 10:10 14:18,20
15:25 24:20 30:7
42:8 98:21
**transactional (1)**
14:23
**transactions (1)**
5:6
**transcript (3)**
1:7,13 21:9
**transcription (1)**
103:9
**transfer (1)**
74:14
**transpired (1)**
79:8
**treat (1)**
57:20
**treated (1)**
20:11
**trial (6)**
39:23,23 58:25 91:7
97:11 98:13
**tribunal (25)**
9:11 11:16 12:3,16
13:6 14:22 15:15,20
18:21 23:7,15 50:8
50:10 52:20 53:14
57:5 59:8 60:5,6
94:16,19 97:17,19
98:3,9
**tribunal's (6)**
4:15 5:23 19:19 21:14
84:17 87:20
**tried (2)**
13:19 59:11
**trigger (2)**
26:2 46:24
**troubled (1)**
5:24
**true (8)**
24:25 25:3 26:11
35:16 36:18 38:25
39:4 48:3
**truly (1)**
74:15
**trust (1)**
16:25

**try (2)**
83:22 90:2
**trying (5)**
25:16 51:9 65:4 66:4
66:5
**Tuesday (6)**
1:18 87:22 88:11,20
88:22 89:10
**Tumanov (2)**
31:14,14
**turn (7)**
5:20 9:13 14:8 19:24
29:21 82:14 84:7
**turns (1)**
50:24
**twice (1)**
47:14
**twist (1)**
25:13
**two (22)**
9:20 25:4,7 31:21
32:12,13 37:23 38:2
49:19 57:9 58:2
64:15 67:4,25 69:13
72:18 87:13,21
88:21 89:13 95:20
99:7
**two-day (1)**
89:2
**type (2)**
55:18,19
**typo (1)**
36:16
**tyranny (1)**
50:5

_____
**U**
**Ukraine (18)**
8:17,24 9:12 18:16
40:5 47:19 61:19,21
61:24 62:4 68:14
70:10 98:20 99:19
99:23 100:6,10,20
**Ukrainian (51)**
8:20 14:19,22,25 15:2
15:4,8 16:11,23
18:5,8,11,25 19:3,5
19:7,13,15 22:17
30:12 33:9,13,15
37:6 38:2 39:5 40:6
41:6,19,21 42:22
44:2,22 47:21 53:18
54:10 63:3,7,8,12
67:14 73:8 74:25
75:3 90:22 94:24
97:2 98:25 99:6
100:18,19
**ultimate (2)**
90:11 97:20

**ultimately (1)**
67:20
**ultra (3)**
11:9 15:9 46:10
**unable (1)**
46:17
**unanimous (1)**
43:25
**unauthorized (1)**
27:11
**unaware (4)**
7:4 12:11 28:13 76:16
**Uncitral (36)**
1:2 12:13 22:8,15,22
23:9 50:7 51:12
53:5,11 55:18,19,22
56:5 59:4,18,19
60:4,16 61:3 63:16
64:13 65:18 66:6,15
66:22 68:15 69:17
71:4,14 84:23 85:2
96:22 99:22,22
100:15
**unclear (3)**
27:3 51:8 63:25
**uncomfortable (1)**
58:11
**underlying (9)**
57:13,22 62:14 65:7
68:16 69:3,6 71:7
95:15
**understand (13)**
10:10 25:6,12,16
37:12 40:2 53:14
70:12,25 73:19,20
74:17 89:7
**understandable (1)**
82:12
**understanding (8)**
14:4,17,25 15:14,21
33:9 75:4 93:9
**undisputed (1)**
66:22
**undoubtedly (1)**
82:5
**unfair (1)**
8:15
**unfavorable (2)**
29:18,19
**Unfortunately (1)**
30:21
**unfounded (1)**
80:7
**unmistakable (1)**
58:13
**unrelated (1)**
91:25
**unremitting (1)**

39:5
**unusual (1)**
62:23
**upset (2)**
62:16 63:20
**use (2)**
53:23 60:4
**useful (1)**
37:22
**usual (1)**
23:4
**U.S (3)**
61:12 62:15,17

_____
**V**
**V (1)**
2:24
**Valerie (1)**
31:21
**valid (14)**
48:8 55:11 57:19
62:14 63:19 64:18
64:19,23 65:6,7,13
65:15 94:3 99:23
**validity (20)**
50:14,20 51:24 52:23
57:7,22 60:7 62:18
63:18 68:16 70:16
71:7 73:6 89:18
90:19 93:2,12 95:14
96:9,20
**validly (1)**
69:22
**valuable (3)**
42:9 45:8 87:4
**Van (62)**
2:15 4:14 11:21 21:16
21:19,23 22:7,14
34:12 37:5 40:15
50:4,22 52:7,16
53:6 55:21 56:4
57:23 58:8 59:14,22
60:2,23 61:6 62:8
62:21 63:21 68:18
69:9 70:2 71:5,13
71:17 72:5,9,17
74:9,18 75:2 76:4
76:11 77:9,14,18,22
78:3,19 81:23 82:22
83:14 84:15 87:19
87:24 88:6 89:12
93:9 94:14 95:17
97:7,23 99:24
**variations (1)**
100:14
**variety (1)**
79:23
**various (2)**
48:4,20

**versus (3)**
34:4 46:5 53:7
**view (5)**
7:19 27:13 42:10
85:15 93:24
**violation (1)**
93:22
**virus (3)**
11:9 15:10 46:10
**Visotmar (1)**
46:4
**Vladimirich (1)**
31:21
**void (3)**
53:7 57:14 98:16
**voidable (1)**
53:7
**VOLUME (1)**
1:6
**voluminous (1)**
18:20
**voting (5)**
13:23 25:24,25 46:21
64:19
**vs (1)**
1:7

**W**

**Wack (18)**
3:13,19 4:11 13:10,14
13:21,24 14:20,22
15:12,18,19,19
17:18 24:17 48:18
76:18 77:11
**Wack's (3)**
28:3,22 30:5
**wait (1)**
91:20
**waited (1)**
45:20
**walking (1)**
26:21
**want (24)**
7:8,17 11:12,25 13:9
18:3 20:18 56:15
61:18,22 63:19
70:25 73:19,23
74:18 82:5 84:17
90:5,15 92:18 93:13
95:9,12 96:16
**wanted (4)**
10:22 16:19 17:4
19:18
**wants (3)**
3:11 53:15 73:14
**wasn't (4)**
10:12 37:15 38:9 41:3
**way (10)**

11:9 45:2 50:17 55:4
55:4 59:7 70:11,21
72:15 99:10
**ways (2)**
9:14 79:23
**weakly (1)**
25:20
**wear (1)**
32:21
**Web (2)**
40:18,21
**Wednesday (3)**
83:7 87:15 88:23
**week (15)**
81:12,19 83:6,7,8
86:9,15,16 87:14,24
88:3 89:10 90:6
91:25 102:13
**weeks (1)**
86:16
**went (6)**
10:10 12:5 38:20
58:10 66:12 99:9
**weren't (4)**
26:24 42:10 47:6
78:16
**WHEREOF (1)**
103:10
**wholly (1)**
78:8
**wielded (1)**
46:10
**WILLIAM (1)**
1:23
**willing (1)**
29:12
**wipes (2)**
98:21 99:5
**wish (5)**
3:16 4:3 30:3 80:13
101:5
**wishes (3)**
3:22 4:10 101:12
**within-entitled (1)**
103:7
**witness (10)**
17:19 28:19 29:6
43:11 78:12,15 91:8
97:9 101:25 103:10
**wonder (2)**
54:19,19
**word (5)**
23:11,12 30:7 60:4
102:10
**wording (1)**
28:8
**words (15)**
22:11 25:2,13,15

32:16 44:4 51:2
55:16 57:25 61:7
62:16 67:2,19 82:9
99:22
**work (12)**
83:8 84:5,16 85:5,9
85:14,22 87:16
91:13,17,21 95:24
**workable (1)**
86:2
**worked (2)**
89:2,21
**working (1)**
85:15
**works (1)**
78:7
**worth (2)**
39:8 45:9
**wouldn't (2)**
51:4 100:7
**wrinkling (1)**
46:25
**writing (1)**
30:11
**written (5)**
27:20 43:25 44:2
65:23 66:2
**wrong (6)**
8:4,6 22:21 26:14
57:3,4

**X**

**X (1)**
30:10

**Y**

**year (1)**
45:20
**years (1)**
38:21
**year-and-a-half (2)**
45:21 48:6
**yesterday (1)**
30:15
**Yetev (1)**
46:4
**York (40)**
1:18,18 2:5,5,15,15
18:9,12 23:23 29:16
34:4,7,16 36:24,24
37:7 41:8,11,12,15
42:22 44:24 45:11
55:22,24 56:21,23
57:3 59:6,12 62:5
63:11,11 78:13
85:25 96:2 99:20
100:11,17 103:6

**Z**

**Z (1)**
2:16
**ZIMMERMAN (1)**
2:7
**Zinchenko (1)**
40:21

**1**

**1 (1)**
2:10
**1:07 (1)**
102:18
**100 (1)**
78:10
**10002 (1)**
2:15
**10103-0001 (1)**
2:5
**11th (1)**
86:17
**12.4 (1)**
74:23
**13 (1)**
21:11
**13th (1)**
83:7
**14 (1)**
34:13
**14th (1)**
61:8
**15 (6)**
22:3 80:18,25 83:11
85:24 99:14
**16 (2)**
83:11 85:24
**17 (1)**
83:11
**17th (2)**
85:24 86:7
**18 (1)**
22:3
**19th (1)**
91:20

**2**

**2nd (2)**
34:6,7
**20 (10)**
86:12 88:12,20 91:5
92:9,24 95:8 96:8
96:11 102:13
**20th (5)**
91:18 94:11 95:9
97:10,17
**2002 (18)**
5:5 13:23 14:11,12,13
14:18 15:21 26:25

27:6,18,20 38:6
42:2 43:22 65:23
77:13,16 78:22
**2003 (3)**
17:15 28:6 78:22
**2004 (31)**
5:9,18 7:4 9:24 10:2,4
10:8,11,16 11:3
13:24 14:20 15:2,5
16:9 17:12,15 25:21
27:18 28:7 31:24
38:6 43:24 54:17
65:25 66:10 67:2,5
67:8 70:7 75:20
**2005 (10)**
10:14,15,19,22 38:23
39:3,11 44:9 45:20
48:3
**2006 (6)**
1:18 10:19 39:12,14
103:8,11
**21 (7)**
50:9 52:23 56:6 57:10
64:14 65:17 88:21
**21st (3)**
86:12 88:12 97:17
**212 (1)**
2:5
**216 (1)**
98:19
**22 (1)**
9:2
**22nd (2)**
86:12 88:13
**23rd (1)**
86:13
**25 (1)**
2:10
**25th (2)**
98:11,12
**258 (1)**
21:11
**259 (1)**
21:18
**26 (1)**
46:5
**260 (1)**
21:23
**263 (1)**
49:23
**266 (1)**
22:14
**267 (1)**
22:14
**27th (1)**
86:15
**284 (1)**
34:5

| | | | | |
|---|---|---|---|---|
| **3** | | | | |
| **30 (1)** | | | | |
| 31:24 | | | | |
| **35 (1)** | | | | |
| 2:9 | | | | |
| **4** | | | | |
| **4th (1)** | | | | |
| 86:16 | | | | |
| **40 (1)** | | | | |
| 26:7 | | | | |
| **42 (1)** | | | | |
| 2:9 | | | | |
| **464 (1)** | | | | |
| 34:7 | | | | |
| **5** | | | | |
| **5 (4)** | | | | |
| 1:18 81:13,20 103:8 | | | | |
| **506-5110 (1)** | | | | |
| 2:5 | | | | |
| **52 (1)** | | | | |
| 34:6 | | | | |
| **557 (1)** | | | | |
| 2:11 | | | | |
| **590 (2)** | | | | |
| 1:17 2:14 | | | | |
| **6** | | | | |
| **6 (1)** | | | | |
| 88:13 | | | | |
| **6th (1)** | | | | |
| 88:15 | | | | |
| **666 (1)** | | | | |
| 2:4 | | | | |
| **7** | | | | |
| **7 (1)** | | | | |
| 88:14 | | | | |
| **704 (1)** | | | | |
| 34:4 | | | | |
| **728 (1)** | | | | |
| 34:6 | | | | |
| **75 (1)** | | | | |
| 102:3 | | | | |
| **8** | | | | |
| **8 (3)** | | | | |
| 3:22 79:11 88:14 | | | | |
| **8th (3)** | | | | |
| 80:14 82:7 103:11 | | | | |
| **9** | | | | |
| **9th (1)** | | | | |
| 86:6 | | | | |
| **9:30 (1)** | | | | |
| 1:19 | | | | |