# EXHIBIT N
# PART 5

and/or the Board, the waiving of notice and attendance at meetings of the GMS and/or the Board, in each case, to the extent permitted by Ukrainian law) to (1) ensure the election of such candidates and (2) maintain the membership of the Board as specified in this Section 2.01(a)(i).

(ii)  If after the Effective Date through Transfer of any Voting Securities to any Person other than a Permitted Transferee or dilution of its Equity Interest in the Company Telenor Mobile ceases to own, together with any of its Permitted Transferees, at least fifty percent (50%) plus one (1) share of the Voting Securities of the Company, then Telenor Mobile shall use its best efforts to cause such number of Directors nominated by Telenor Mobile to resign or be removed by action of the GMS, such that the aggregate number of remaining Directors nominated by Telenor Mobile is equal to the number of Directors, if any, which Telenor Mobile would be able to elect through the voting of its remaining Voting Securities, if any, in accordance with the terms of the Charter.

(iii)  If after the Effective Date through Transfer of any Voting Securities to any Person other than a Permitted Transferee or dilution of its Equity Interest in the Company Storm ceases to own at least thirty-seven and seven tenths percent (37.7%) of the Voting Securities of the Company, then Storm shall use its best efforts to cause such number of Directors nominated by Storm to resign or be removed by action of the GMS, such that the aggregate number of remaining Directors nominated by Storm is equal to the number of Directors, if any, which Storm would be able to elect through the voting of its remaining Voting Securities, if any, in accordance with the terms of the Charter.

(iv)  If any Shareholder (an "Affected Shareholder") gives notice at any time to the Company and the other Shareholders that any Person nominated by such Affected Shareholder and then serving as a Director is no longer such Affected Shareholder's designee, then such Affected Shareholder and the other Shareholders shall take all such actions as are necessary to remove the Director so designated.

(v)  If a Director nominated by a Shareholder dies, resigns or is removed as a Director pursuant to Section 2.01(a)(iv), the other Shareholders shall take such actions as are necessary to elect as a Director any Person who is subsequently designated and nominated by the Shareholder whose nominee has died, resigned or been removed.

(b)  Chairman. Notwithstanding Section 2.2 of the Shareholders Agreement, upon the resignation or termination of the current Chairman of the Board, the Shareholders shall cause the Directors nominated by them to vote in favor of a nominee for the position of the Chairman of the Board chosen from the Directors nominated by (or pursuant to the instructions of) Telenor Mobile and who be nominated by any one or more of the Directors; provided, however, that Telenor Mobile must obtain the prior approval of Storm to Telenor Mobile's candidate for Chairman of the Board, which approval shall not be unreasonably withheld. If two (2) of Telenor Mobile's candidates for Chairman of the Board fail to obtain the approval of Storm, Telenor Mobile

9

shall have the right to nominate a third candidate for Chairman of the Board without obtaining the prior approval of Storm. The Chairman of the Board shall not have any specific powers, other than the authority to arrange the work of the Board and as may be otherwise provided by applicable law and the Charter. The Chairman of the Board shall not have any casting vote.

(c)  Quorum. Notwithstanding Section 2.3 and the first sentence of Section 2.4 of the Shareholders Agreement, the quorum for a meeting of the Board shall be any five (5) of the seven (7) Directors; provided that a quorum shall always include at least one (1) Director appointed by Storm; and provided, further, that if a quorum is not achieved in any two (2) consecutive attempts to convene a meeting of the Board, then the matters on the agenda for such Board meeting shall be determined by the GMS, and, subject to compliance with Ukrainian law and the provisions of the Charter, any Shareholder holding more than ten percent (10%) of the Voting Securities may call for a GMS to determine such matters.

(d)  Voting. Notwithstanding Section 2.4 of the Shareholders Agreement, subject to compliance with Ukrainian law and except as otherwise specified in the Charter, all decisions of the Board (or, if applicable, recommendations from the Board to the GMS) (including, without limitation, any decision or recommendation of the Board in relation to any matter described in Section 2.4(iii), (vii), (x), (xi), (xii), (xiii), (xiv) and, except as it relates to telecommunications Licenses, (xv) of the Shareholders Agreement) shall be determined by a vote of a simple majority of the Directors other than the following decisions, which shall require an affirmative vote of five (5) of the seven (7) Directors, including at least one (1) Director appointed by Storm:

(i)  any recommendation to the GMS of any amendment to the Charter (other than the amendment and restatement of the Charter referred to in Section 2.03, any amendment of the Charter required in connection with any increase in the authorized charter capital of the Company contemplated by Section 2.04 and any amendment to the Charter of the type referred to in Section 5.03 which is required by applicable law);

(ii)  except as contemplated by Section 2.04(b) and (c), any recommendation to the GMS to increase the authorized charter capital of the Company and/or to issue any Securities;

(iii)  except as contemplated by Section 2.04(c)(ii)(A), any individual incurrence by the Company or any of its Consolidated Subsidiaries of any Debt Obligation in an aggregate principal amount in excess of US$50 million;

(iv)  except as contemplated by Section 2.04(c)(ii)(A), any individual granting or other incurrence of any Lien on any Assets and Properties of the Company and/or any of its Consolidated Subsidiaries having an aggregate value in excess of US$50 million;

(v)  any acquisition by the Company or any of its Consolidated Subsidiaries or entry by the Company or any of its Consolidated Subsidiaries into a joint venture with, any Person the aggregate fair market or pro forma value of which, including any Debt Obligations incurred in connection

10

therewith, exceeds US$50 million;

(vi) any recommendation to the GMS of any merger or consolidation of the Company or any of its Consolidated Subsidiaries with any Person, the aggregate value of which exceeds US$50 million;

(vii) the commencement by the Company or any of its Consolidated Subsidiaries of any line of business other than the Business;

(viii) any transaction between the Company or any of its Consolidated Subsidiaries and any Shareholder or any Affiliate of any Shareholder, including any Debt Transaction (other than any transaction contemplated by Section 2.04 and any Shareholder Loan, except where such Shareholder Loan is subject to Board approval in accordance with item (iii) of this Section 2.01(d));

(ix) any amendment of any License material to the conduct by the Company or any of its Consolidated Subsidiaries of the Business;

(x) the appointment of the Company's external auditors; and

(xi) any recommendation to the GMS in respect of a change from uncertificated, non-documentary Securities to certificated, documentary Securities,

and, without prejudice to the generality of Section 10.02 and to the extent the provisions of Section 2.4(i) through (xvii) (inclusive) of the Shareholders Agreement are inconsistent with the provisions of this Section 2.01(d), the provisions of this Section 2.01(d) (including, without limitation, the qualifications and limitations set forth herein) shall prevail. For the avoidance of doubt, any decision or recommendation of the Board in relation to a matter described in Section 2.4(i) through (xvii) (inclusive) of the Shareholders Agreement, but not expressly described in clauses (i) through (xi) (inclusive) of this Section 2.01(d) shall be determined by a vote of a simple majority of the Directors.

President

...withstanding Section 2.2 of the Shareholders Agreement, upon the resignation or ...ination of the current President, the Shareholders shall cause the Directors nominated by ... to vote in favor of a nominee for the position of President nominated by Telenor ...ile. The President shall have the rights and responsibilities granted to chairmen of the ...agement under the laws of Ukraine and Article 10 of the Charter, provided that such ... and responsibilities may be expanded or restricted by a decision of the Board in ...ordance with the Charter.

Amendments to the Charter

...ect to compliance with the requirements of Ukrainian law and provided that not less than ...(4) Directors so recommend, at a GMS duly called and held within ten (10) Business ... after the Effective Date, each Shareholder shall vote its Voting Securities, and shall ...the Directors nominated by it to vote, and take any other action, in favor of approving

11

amendment and restatement of the Charter in a form which, subject to compliance with applicable law, reflects the terms and conditions of this Agreement and the Shareholders Agreement.

Capital Increases; Financing; IPO

(a) It is the intention of the Shareholders that the Company undertake an IPO in the United States within two (2) years after the Effective Date, subject to the existence of appropriate market conditions, the approval of the Board and the Company engaging one or more underwriters; provided that, except as otherwise specified in this Section 2.04, neither the Company nor any Shareholder shall have any obligation to undertake or take any action to effectuate such IPO.

(b) At a meeting of the Board and a GMS duly called and held promptly following the Effective Date, each Shareholder shall vote its Voting Securities and cause the Directors nominated by it to vote, and take any other action, in favor of approving an increase in the authorized charter capital of the Company in the amount of US$40 million, and, in connection with such increase in the authorized charter capital of the Company and an issuance of Common Stock in such amount, each Shareholder shall purchase such number of shares of Common Stock as is equal to (i) the total number of shares of Common Stock being issued minus any shares of Common Stock being purchased by Omega in connection with such increase in the authorized charter capital of the Company and issuance of Common Stock, multiplied by (ii) a fraction, the numerator of which is the number of Voting Securities owned by such Shareholder immediately prior to such issuance and the denominator of which is the total number of Outstanding Voting Securities (before giving effect to such issuance) minus the number of Voting Securities owned by Omega immediately prior to such issuance; provided that Storm shall be entitled to allocate to Alfa or any of its Controlled Affiliates any portion of the shares of Common Stock that Storm is entitled to purchase under this Section 2.04(b), as Storm and Alfa or Alfa's relevant Controlled Affiliate may agree between themselves, subject to providing the Company and the other Shareholders with notice of such allocation prior to completion of the subscription for such shares of Common Stock.

(c) Provided that not less than four (4) Directors so recommend, each Shareholder shall vote its Voting Securities and cause the Directors nominated by it to vote, and take any other action, in favor of approving:

(i) any increase in the authorized charter capital of the Company which is unrelated to the IPO; provided that (A) the New Securities issued in connection with such increase in the authorized charter capital of the Company ("New Securities") are sold at not less than their par value, and (B) each Shareholder is entitled to purchase such number of such New Securities as is equal to (1) the total number of New Securities then being issued minus any New Securities then being purchased by Omega multiplied by (2) a fraction, the numerator of which is the number of Voting Securities owned by such Shareholder immediately prior to such issuance and the denominator of which is the total number of Outstanding Voting Securities (before giving effect to such issuance) minus the number of Voting Securities owned by Omega immediately prior to such issuance; provided that Storm shall be entitled to allocate to Alfa or any of its Controlled Affiliates any portion of the

12

New Securities that Storm is entitled to purchase under this Section 2.04(c)(i), as Storm and Alfa or Alfa's relevant Controlled Affiliate may agree between themselves, subject to providing the Company and the other Shareholders with notice of such allocation prior to completion of the subscription for such New Securities; and provided, further, that no Shareholder shall be obligated to vote its Voting Securities in favor of any such issuance of New Securities if, after giving effect to such issuance and the purchase by all such Shareholders of such New Securities in an amount sufficient to maintain their respective percentage ownership of Voting Securities, all such Shareholders would be required to purchase and pay for, on a cumulative basis, New Securities in an aggregate amount in excess of US$120 million (including, without limitation, the US$40 million of New Securities contemplated by Section 2.04(b));

(ii)   (A) any financing transaction, whether in the form of an incurrence of a Debt Obligation, an issuance of Securities (including, without limitation, a Eurobond issue) or any combination of any thereof, more than fifty percent (50%) of the proceeds of which will be used to refinance in whole or in part the Ericsson Debt, and any incurrence of Liens on the Company's or any of its Consolidated Subsidiaries' Assets and Properties in connection with any such financing transaction; and (B) subject to the limitations specified in Section 2.01(d)(xii) and (iv) any other vendor financing, or re-financing of or amendment to any existing vendor financing, any financing provided by the European Bank for Reconstruction and Development or any other Person, or any Eurobond issue undertaken by the Company in accordance with the Company's annual budget and/or financing plan; and

(iii)   subject to the delivery to the Shareholders by an independent investment bank selected by Telenor Mobile from the list of Approved Bankers attached hereto as Schedule 3 of a letter confirming that, in the opinion of such investment bank (A) an IPO on the terms proposed by Telenor Mobile would be achievable, (B) an IPO on the terms proposed by Telenor Mobile would be well received by the market and (C) an IPO on the terms proposed by Telenor Mobile would constitute the most attractive IPO option for the Company in terms of liquidity, value realization and secondary market performance, each Shareholder shall vote its Voting Securities, and shall cause its respective Directors to vote, and take any other action, in favor of approving the IPO (and any increase in the authorized charter capital of the Company, any amendment of the Charter and any change from a closed joint stock company into an open joint stock company in connection therewith) or such other arrangement intended to achieve liquidity in respect of the Securities as shall be proposed by Telenor Mobile.

## Termination of Shareholders Agreement; New Shareholders Agreement

The Shareholders agree that within three (3) Business Days after the date on which Storm or any of its Affiliates purchases all of the Equity Interests in Omega or all of Omega's Securities, the Shareholders shall enter into and cause the Company to enter into, and Storm shall cause any such Affiliate which has purchased any of the Equity Interests in Omega or any of Omega's Securities to, or to cause Omega to, as applicable, enter into an agreement amending the Shareholders Agreement, without the need for any further action by any of

shareholders of the Company. Within three (3) Business Days after the earlier of (a) the consummation of the Shareholders Agreement and (b) Storm and/or any of its Affiliates owning all of the Equity Interests in Omega or all of Omega's Securities, the Shareholders ... and to cause the Company to execute and deliver the New Shareholders Agreement ... of such objective, Storm shall use commercially reasonable best efforts to ... as soon as possible after the Effective Date (i) the transfer by Omega of all of its ... or (ii) the transfer of all of the Equity Interests in Omega, in each case, to a Person ... acceptable to all of the Shareholders (the "Omega Transaction"). Storm shall ... notify the other Shareholders of any such transfer and provide to the ... written evidence of completion of the Omega Transaction in the form of ... copies of amendments to Omega's charter and founders agreement, duly registered ... relevant Governmental or Regulatory Authorities, or an extract from Storm's or any Affiliate's securities account.

### Registration Rights Agreement

... after the Effective Date, each Shareholder shall execute and deliver, and shall vote ... Securities and cause the Directors nominated by it to vote, and take any other ... in favor of approving the execution and delivery by the Company of, a Registration ... Agreement in form and substance satisfactory to the parties thereto.

### Dividend Policy

Shareholders agree that the dividend policy of the Company shall be determined by the ... and proposed to the GMS, taking into account, among other things, (a) the financial ... of the Company, including its capital expenditure requirements, (b) the shareholders' ... in receiving an appropriate level of dividends consistent with the Company's financial ... and the fulfilment of its development objectives, and (c) the objective of the ... holders to conduct an IPO in accordance with the terms of this Agreement.

8. **Implementation of and Compliance with Agreement**

   (a) Telenor Mobile undertakes:

   (i) to comply with its obligations under this Agreement;

   (ii) to act in a good faith and constructive manner so as to give effect to the provisions of this Agreement, including, without limitation, through participation in and voting at the GMS and the Board; and

   (iii) not to take, or permit any of its Affiliates to take, any action permitted by Ukrainian law which would allow Telenor Mobile to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.04(b) or (c) as an action for which Telenor Mobile is required to vote its Voting Securities and cause the Directors nominated by it to vote in favor of approving.

   (b) Storm undertakes:

   (i) to comply with its obligations under this Agreement;

14

(ii) to act in a good faith and constructive manner such as to give effect to the provisions of this Agreement, including, without limitation, through participation in and voting at the GMS and the Board; and

(iii) not to take, or permit any of its Affiliates to take, any action permitted by Ukrainian law which would allow Storm to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.04(b) or (c) as an action for which Storm is required to vote its Voting Securities and cause the Directors nominated by it to vote in favor of approving.

Acquisition of Additional Shares

Telenor Mobile hereby agrees, for a period of one year beginning on the date hereof, not to purchase, directly or indirectly, or otherwise take any action which would prevent Storm and/or any of its Affiliates from effecting the Omega Transaction. In connection with the foregoing, during such one year period, Telenor Mobile shall, in its sole discretion, either waive or abstain from exercising its rights arising under Article 5 of the Shareholders Agreement, Section A-1 of Annex A to the Charter and applicable law, as applicable, and as necessary, to permit the Omega Transaction to be completed.

## ARTICLE III REPRESENTATIONS AND WARRANTIES

1. Representations and Warranties of the Shareholders

h Shareholder hereby represents and warrants, in each case, severally and not jointly, as he Effective Date, that:

(a) Such Shareholder is the record holder and beneficial owner of the Securities specified opposite its name in Schedule I;

(b) The Securities specified opposite its name in Schedule I are the only shares of capital stock of the Company owned of record or beneficially by such Shareholder;

(c) Such Shareholder has sole power of disposition and sole voting power with respect to all of such Securities, with no restrictions on such rights, other than such restrictions on Transfer as arise under applicable United States federal securities laws, Ukraine securities laws, the terms and conditions of this Agreement, the Charter, the Option Agreement, the Pledge Agreement, the Shareholders Agreement, the Registration Rights Agreement, the Storm Participants Agreement, the Existing Agreements and the Share Retention and Subordination Deed;

(d) Such Securities are and will be held free and clear of all Liens, proxies, voting trusts or agreements, understandings or arrangements whatsoever, except for those arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement, the Shareholders Agreement, the Registration Rights Agreement, the Storm Participants Agreement, the Existing Agreements and the Share Retention and Subordination Deed;

(e) In connection with the Company or its Business, such Shareholder has not, and none of its Consolidated Subsidiaries or Affiliates, or any director, officer, agent,

employee or other Person acting on behalf of such Shareholder or any of its Consolidated Subsidiaries or Affiliates, has, in the course of its actions for, or on behalf of such Shareholder (i) provided, or arranged for the provision of, any unlawful contribution, gift, entertainment or other benefit relating to a political party or official thereof or a candidate for public office, (ii) made any payment, directly or indirectly, to any Government Official, (iii) otherwise violated any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), or any anti-corruption laws or regulations of Ukraine or of the jurisdiction of incorporation or principal activities of such Shareholder, or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any customer or other third party;

(f) The beneficial owners of such Shareholder are set forth in Schedule 5; and

(g) No asset which such Shareholder has contributed, or otherwise made available, to the Company, and no funds paid or otherwise transferred to any other Shareholder, any other Shareholder's Affiliate or the Company have been acquired by such Shareholder (i) pursuant to a transaction that has involved directly or indirectly an illegal payment to a Government Official or (ii) where such asset represents the proceeds of any illegal activity.

Representations and Warranties of Subsequent Shareholders

A Person (other than the Shareholders party hereto as of the Effective Date) who subsequently becomes a party hereto after the Effective Date shall, upon execution of the agreement by such Person, make the representations and warranties set forth in Annex 1 to Endorsement, which representations and warranties shall be incorporated by reference in, as though made in this Agreement.

## ARTICLE IV  TRANSFER RESTRICTIONS

General

The provisions of Section 5 of the Shareholders Agreement shall be applicable to all Securities owned, directly or indirectly, by a Shareholder or hereafter Transferred to a Shareholder in any manner whatsoever. No Shareholder may Transfer any or all of its Securities to or in favor of any Person other than in accordance with Section 5 of the Shareholders Agreement and this Article IV.

If Telenor Mobile determines to Transfer all or any portion of its Securities to a Proposed Transferee, and the other Shareholders (other than Storm) and Omega do not deliver an Exercise Notice to Telenor Mobile within the Exercise Period or provide a written waiver of their first refusal rights under Section 5 of the Shareholders Agreement, Storm shall be entitled to assign all or a portion of its right to purchase the Offered Shares to Alfa or any of its Controlled Affiliates, subject to provision of a new Proposed Transfer Notice by Telenor to Omega and the other Shareholders and, upon receipt of waivers or expiration of the Exercise Period in respect thereof, Telenor Mobile shall be obligated to sell the assigned portion of the Offered Shares to Alfa or its designated Controlled Affiliate. For purposes of such Transfer to Alfa or its Controlled Affiliate, and only for such Transfers, Storm hereby waives its right of first refusal arising under Section 5 of the Shareholders Agreement

16

Transfers to Permitted Transferees

[...] Shareholder Transfers any or all of its Securities to any Permitted Transferee, such [Permit]ted Transferee shall, at the time of such Transfer, execute an Endorsement and a Deed [of Ad]herence in accordance with Section 5.7 of the Shareholders Agreement and accede to [Ex]isting Agreements or the Share Retention and Subordination Deed, as then in effect.

Required Sale Right

[Af]ter the second (2nd) anniversary of the Effective Date, Telenor Mobile receives an offer [for al]l of its Securities from a Proposed Transferee (whether or not such offer was solicited [by Tel]enor Mobile) and the other Shareholders and Omega do not elect to purchase in the [aggr]egate all of the Offered Shares pursuant to Section 5.1 of the Shareholders Agreement, [then,] subject to Omega's rights of first refusal under Section 5.1 of the Shareholders [Agree]ment, Telenor Mobile shall have the right (the "**Required Sale Right**") to require all, [but] not less than all, the other Shareholders to sell to such Proposed Transferee all of the [Secur]ities owned by such other Shareholders. Telenor Mobile shall exercise its Required Sale [Righ]t by making reference thereto in its Proposed Transfer Notice, which shall state the [num]ber of Securities that Telenor Mobile is requiring each of the other Shareholders to sell. [Fail]ure by Telenor Mobile to set forth its Required Sale Right in its Proposed Transfer Notice [shal]l be deemed a waiver by Telenor Mobile of its Required Sale Right with respect to such [offe]r (but not any subsequent offer). The sale of Securities by the other Shareholders [pur]suant to this Section 4.03 shall be on the same terms and conditions as are set forth in the [Pro]posed Transfer Notice.

4. Co-Sale Right

[If (]a) an offer described in Section 5.1 of the Shareholders Agreement is for a number of [Off]ered Shares such that, as a result of such Transfer, the Proposed Transferee, together with [any] of its Affiliates, would beneficially hold a Controlling Interest in the Company, (b) the [oth]er Shareholders and Omega do not elect to purchase in the aggregate all of the Offered [Shar]es pursuant to Section 5.1 of the Shareholders Agreement, and (c) Telenor Mobile does [not] exercise its Required Sale Right in respect of such offer, then the Transferring [Sh]areholder shall require, as a condition of its acceptance of such offer, that the Proposed [Tra]nsferee, within sixty (60) days of delivery of the Proposed Transfer Notice, offer to [pur]chase, subject to Omega's right of first refusal under Section 5.1 of the Shareholders [Ag]reement, all of the Securities owned by such other Shareholders (in respect of which such [ot]her Shareholders have not exercised their tag-along rights under Section 5.3 of the [Sh]areholders Agreement), free and clear of any Liens other than Liens arising under this [Ag]reement, the Charter, the Option Agreement, the Pledge Agreement, the Registration [Rig]hts Agreement, the Existing Agreements and the Share Retention and Subordination [De]ed, and at the same purchase price and on the same terms and conditions as are set forth in [su]ch Proposed Transferee's Proposed Transfer Notice. Such other Shareholders must elect [w]hether to accept such offer within forty-five (45) days of the date of such offer by executing [an]d delivering a written notice to the Transferring Shareholder and the Proposed Transferee. [Fa]ilure of any Shareholder to provide such written notice within such forty-five (45) day [pe]riod shall be deemed an election by such Shareholder not to accept such offer.

17

## ARTICLE V CERTAIN CORPORATE MATTERS

<u>Debt Acquisition</u>

(a) A Shareholder or any other Standstill Party may enter into any Debt Transactions if and only if such Shareholder and its Standstill Parties comply with the provisions of this Section 5.01.

(b) Unless otherwise approved by the Board in accordance with Section 2.01(d)(viii), in the event a Shareholder or any of its other Standstill Parties enters into a Debt Transaction, such Shareholder shall, and shall procure that its other Standstill Parties shall:

    (i) Provide written notice thereof to the Protected Party (with a copy to the Company) within ten (10) days of entering into a Debt Transaction, which notice shall constitute an offer to such Protected Party (a "**Debt Transaction Offer Notice**") (which offer shall be legally binding on the Standstill Party upon acceptance by such Protected Party or the Company or the Company's designee on behalf of such Protected Party) to sell to such Protected Party, the Company or the Company's designee, such Debt Obligation (and, if applicable, the underlying obligation to which such Debt Obligation relates, such underlying obligation or Debt Obligation, as applicable, being the "**Relevant Obligation**") at a purchase price equal to the lesser of the Fair Market Value thereof, or one hundred percent (100%) of the aggregate unpaid principal amount of the Relevant Obligation plus any accrued interest and other amounts, if any, owing under the Relevant Obligation up to (but excluding) the purchase date thereof.

    (ii) Within ten (10) Business Days from the date of notice of an intention to accept such offer by the Protected Party, the Company or the Company's designee, the Standstill Party shall provide a copy of the document(s) evidencing the outstanding amount of the Relevant Obligation and a calculation of the purchase price thereof showing the amount of unpaid principal, any accrued interest thereon and any other amounts owing thereunder, as well as the basis for determining the Fair Market Value thereof ("**Price Notice**"). Within five (5) Business Days from the date of receipt of the Price Notice, the Protected Party, the Company or the Company's designee shall notify the Standstill Party whether it accepts the offer at such time and, if so, shall purchase such Relevant Obligation at such time. If the Protected Party, the Company or the Company's designee, as applicable, do not accept such offer at such time, the provisions of this Section 5.01(b) shall remain in effect with respect to such Relevant Obligation.

    (iii) The Standstill Party shall not be restricted from selling or otherwise disposing of the Relevant Obligation at any time prior to the acceptance of the Debt Transaction Offer Notice in accordance with the terms hereof; provided, however, that the Standstill Party shall provide written notice to the Protected Party (with a copy to the Company) within ten (10) days of such sale or disposition.

(c) In the event a Shareholder or any of its other Standstill Parties enters into a Debt Transaction, such Shareholder shall, and shall procure that its other Standstill

18