# EXHIBIT N
# PART 11

# EXHIBIT 6



EXECUTION COPY

ФОТОКОПІЯ

SHAREHOLDERS AGREEMENT

dated January 30, 2004

between and among

[T]ENOR MOBILE COMMUNICATIONS AS,

and

STORM LLC,

as Shareholders

and

CLOSED JOINT STOCK COMPANY "KYIVSTAR G.S.M.",

as the Company



TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND INTERPRETATION

ARTICLE II MANAGEMENT OF THE COMPANY

ARTICLE III REPRESENTATIONS AND WARRANTIES

ARTICLE IV TRANSFER RESTRICTIONS APPLICABLE PRIOR TO THE IPO

ARTICLE V TRANSFER RESTRICTIONS APPLICABLE AFTER THE IPO

ARTICLE VI CERTAIN CORPORATE MATTERS

ARTICLE VII CONFIDENTIALITY

ARTICLE VIII ETHICAL BUSINESS CONSIDERATIONS



Access to Capital Markets; IPO ........ 27

[ARTI]CLE IX COMPANY'S BOOKS AND RECORDS ........ 27

Maintenance of Company's Books and Records ........ 27
Right to Examine Books and Records ........ 27

[ARTI]CLE X INDEMNIFICATION ........ 27

[ARTI]CLE XI TERM AND TERMINATION ........ 28

Term and Termination ........ 28
Termination for Material Breach ........ 28

[ARTI]CLE XII DISPUTE RESOLUTION ........ 30

Arbitration; Consent to Jurisdiction ........ 30
Service of Process ........ 31
Waiver of Sovereign Immunity ........ 32

[ARTI]CLE XIII MISCELLANEOUS ........ 32

Notices ........ 32
Entire Agreement ........ 33
Waiver ........ 34
Amendment ........ 34
No Assignment; Binding Effect; No Third Party Beneficiary ........ 34
Governing Law ........ 34
Severability ........ 34
Further Assurances ........ 34
Headings ........ 35
Counterparts ........ 35

[Sched]ules

[Sched]ule 1 Shareholdings
[Sched]ule 2 Procedures for Determination of Fair Market Value
[Sched]ule 3 Approved Bankers
[Sched]ule 4 Investments
[Sched]ule 5 Beneficial Ownership

[Exhi]bits

[Exhi]bit A Form of Endorsement



88

SHAREHOLDERS AGREEMENT dated January 30, 2004 between and among [illegible] MOBILE COMMUNICATIONS AS, a company organized under the laws of [illegible] ("**Telenor Mobile**"), STORM LLC, a limited liability company organized under the [illegible] Ukraine ("**Storm**" and, together with Telenor Mobile and each other holder of shares of [illegible] Securities (as hereinafter defined) as shall be party hereto from time to time, collectively, [illegible]hareholders" and each, individually, a "**Shareholder**"), and CLOSED JOINT STOCK [illegible]ANY "KYIVSTAR G.S.M.", a closed joint stock company organized under the laws of [illegible] (the "**Company**").

WITNESSETH

WHEREAS, the Shareholders are the owners, beneficially and of record, of the issued [illegible]standing shares of Common Stock (as hereinafter defined) described in Schedule I hereto [illegible] their respective names; and

WHEREAS, the Shareholders believe it is in the best interests of the Company that [illegible] be made for the continuity and stability of the business and management of the [illegible];

NOW, THEREFORE, to implement the foregoing and in consideration of the mutual [illegible], conditions and covenants contained herein and for other good and valuable consideration, [illegible] receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as [illegible]:

## ARTICLE I. DEFINITIONS AND INTERPRETATION

Definitions

[illegible] used herein, the following terms shall have the following meanings:

"[illegible]ions or Proceedings" shall mean any action, suit, proceeding or arbitration commenced, [illegible], conducted or heard by or before any Governmental or Regulatory Authority.

"[illegible]ected Shareholder" shall have the meaning specified in Section 2.01(b)(v).

"[illegible]filiate" shall mean, with respect to any Person, any other Person which directly or indirectly [illegible], or is under common control with, or is controlled by, such Person, including, if such [illegible] is an individual, any relative or spouse of such Person, or any relative of such spouse of [illegible] Person, any one of whom has the same home as such Person, and also including any trust or [illegible] for which any such Person or Persons specified herein, directly or indirectly, serves as a [illegible], executor or in a similar capacity (including, without limitation, any protector or settlor of [illegible]) or in which any such Person or Persons specified herein, directly or indirectly, has a [illegible] beneficial interest, and any Person who is controlled by any such trust or estate. As [illegible] in this definition, "**control**" (including, with its correlative meanings, "**controlled by**" and "[illegible] common control with") shall mean, with respect to any Person, the possession, directly [illegible], of power to direct or cause the direction of management or policies (whether [illegible] ownership of securities or partnership or other ownership interests, by contract or [illegible]) of a Person.

13

[illegible]

ng body of a Person or more than fifty percent (50%) of the partnership or other ip interest therein (other than as a limited partner of such Person).

**lling Person"** shall mean, with respect to any Person, any other Person which owns or , directly or indirectly, more than fifty percent (50%) of the securities having ordinary power for the election of directors or other governing body of such first Person or more y percent (50%) of the partnership or other ownership interests therein (other than as a partner of such first Person).

**le Notice"** shall have the meaning specified in Section 4.07(b).

**Period"** shall have the meaning specified in Section 11.02(a)(1).

ges" shall have the meaning specified in Article X.

**Obligations"** shall mean, with respect to any Person, any obligations of such Person (a) rowed money; (b) evidenced by notes, bonds, debentures or similar instruments; (c) for erred purchase price of goods or services (other than trade payables or accruals incurred in rdinary course of business); (d) arising out of any credit facility or financial modation; (e) in respect of any liabilities and obligations of third parties (referred to in this ion or otherwise) to the extent that they are guaranteed by such Person or such Person has ise assumed or become liable for the payment of such liabilities or obligations or to the that they are secured by any Lien upon property owned by such Person, whether or not Person has assumed or become liable for the payment of such liabilities or obligations; (f) g under any lease that would be capitalized on the balance sheet of such Person in dance with GAAP that is otherwise in substance a financing lease; (g) arising in respect of ount), any acceptance or documentary credit or any receivables sold or discounted other n a non-recourse basis; (h) for trade payables incurred in the ordinary course of business; ting in connection with damages, fines, penalties, compensatory damages and other ct of similar kind or nature that may be assessed, charged or appraised against such Person any loan agreement, sale-purchase agreement, delivery of goods (works, services) ment, lease agreement or any other agreement of commercial nature; (j) arising in ction with any other transaction that, in accordance with GAAP, results in such obligation treated as "indebtedness"; (k) any other monetary obligation of a Person to pay an amount oney in excess of US$1,000,000 to a counter-party either under an agreement or on another , including without limitation on the basis of a normative act of a state body (including ut limitation payments to state bodies such as taxes, fees or fines) or a judicial decree or n and (l) any other obligations or liabilities of a Person (whether absolute, accrued, ngent, fixed or otherwise, and whether due or to become due).

**" Transaction"** means any transaction by which a Standstill Party directly or indirectly es any loan or extends any credit to any Protected Party (other than a Shareholder Loan) or rwise becomes an obligee or holds or is a beneficiary of any Debt Obligation of any ll Party (other than a Shareholder Loan).

**bt Transaction Offer Notice"** shall have the meaning specified in Section 6.01(b)(i).

**tor"** shall mean a member of the Board.

94

...orsement" shall mean an endorsement to this Agreement, in the form of Exhibit A.

...ity Interest" in a Person shall mean any share of capital stock of such Person.

...hange Act" shall mean the United States Securities Exchange Act of 1934, as amended, and ...les and regulations of the SEC promulgated thereunder.

... Market Value" shall mean the fair market value of the item to which such term is applied, ...termined in accordance with the methodology set forth in Schedule 2.

..."A" shall have the meaning specified in Section 3.01(e).

...eclosure Action" shall mean any action by a pledgee to enforce its rights in or to any ...ities pledged to such pledgee (including, but not limited to, any enforcement of a pledge of, ...losure upon, sale of, or acceptance of title to, such Securities).

...AP" shall mean generally accepted accounting principles in the United States, as in effect ...time to time.

...M" shall mean any general meeting of the shareholders of the Company, as defined in ...le 8.1 of the Charter.

...vernmental or Regulatory Authority" shall mean any court, tribunal, arbitrator, legislature, ...rnment, ministry, committee, inspectorate, authority, agency, commission, prosecutor, ...ict attorney, official or other competent authority of Ukraine, or any other country or any ..., as well as any county, city or other political subdivision of any of the foregoing.

...vernment Official" shall mean any Person holding office with any Governmental or ...ulatory Authority (or any member of such Person's immediate family) or any Person ...loyed by, or performing services for, any entity under the administrative control of, or ...ed by, any Governmental or Regulatory Authority even if such entity conducts commercial ...vities.

...yvnias" shall mean the legal currency of Ukraine.

...demnified Person" shall have the meaning specified in Article X.

...formation Letter" shall have the meaning specified in Section 4.11.

...tellectual Property" shall mean patents and patent rights, licenses, inventions, copyrights ... copyright rights, know-how (including trade secrets and other unpatented and/or ...atentable proprietary or confidential information, systems or procedures), trademarks and ...demark rights, service marks and service mark rights, trade names and trade name rights, ...vice names and service name rights, brand names, processes, formulae, trade dress, business ...product names, logos, slogans, industrial models, processes, designs, methodologies, ...puter programs (including all source codes) and related documentation, technical information, ...nufacturing, engineering and technical drawings, and all pending applications for and ...strations of patents, trademarks, service marks and copyrights.

92

" shall mean the initial underwritten public offering of the Common Stock which results in ... of the Common Stock (or Securities evidencing beneficial ownership interests in the ... Stock) on a national or international stock exchange or securities trading facility.

...s" shall mean all licenses, permits, certificates of authority, authorizations, approvals, ..., franchises and similar consents granted or issued by any Governmental or ... Authority.

..." shall mean any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, ... charge or other encumbrance of any kind, or any conditional sale Contract, title retention ... or other Contract to grant any of the foregoing.

...agement" shall mean the executive body of the Company, having such authority as is set ... in the Charter.

...erial Breach" shall have the meaning specified in Section 11.02(a).

...Securities" shall have the meaning specified in Section 2.03(b)(i).

...-Breaching Shareholder" shall mean, at any time of determination thereof, a Shareholder ... not in Material Breach of this Agreement.

...ice of Breach" shall have the meaning specified in Section 11.02(a)(i).

...ice of Termination" shall have the meaning specified in Section 11.02(a)(iv).

...fer" shall have the meaning specified in Section 4.04.

...fer Notice" shall have the meaning specified in Section 4.05(a).

...fered Securities" shall have the meaning specified in Section 4.04.

...tion Agreement" shall mean the Option Agreement dated October 29, 2002 between ... Mobile and Storm.

...rder" shall mean any writ, judgment, decree, injunction, indictment, complaint or similar ... of any Governmental or Regulatory Authority (in each case, whether preliminary or final).

...tstanding Voting Securities" shall mean, collectively, (a) shares of Common Stock that ...rrently, and in the absence of contingencies, entitle their holder to vote at any GMS, and that ... at the time specified in the context in which such term is used, issued and outstanding, and ... Securities that are, at the time specified in the context in which such term is used, issued and ...standing and convertible into, or exercisable or exchangeable for, any shares of Common ...ck described in clause (a).

...arty" shall mean (a) each of the Shareholders party hereto on the date hereof, (b) the Company ... (c) each Person that acquires Securities in accordance with this Agreement and executes an ...agreement.

...rmitted Transferee" shall mean, with respect to any Shareholder, any Controlling Person of ... Shareholder, or any Controlled Affiliate of any such Controlling Person or Shareholder.

20016

93

...on" shall mean any natural person, corporation, general partnership, simple partnership, ...d partnership, limited liability partnership, limited liability company, proprietorship, other ...ess organization, trust, union, association or Governmental or Regulatory Authority, ...her incorporated or unincorporated.

"...ge Agreement" shall mean the Pledge Agreement dated October 29, 2002 between Telenor ...ile and Storm.

"...sident" shall mean the chairman of the Management, whether the title of such officer is ...ident", "General Director" or otherwise, having the authority described in the Charter and ...d by applicable Ukrainian law.

"...y Notice" shall have the meaning specified in Section 6.01(b)(ii).

"...ected Party" shall mean the Company or any of its Controlled Affiliates.

"...chasing Shareholder" shall have the meaning specified in Section 4.05(b).

"...gistration Rights Agreement" shall mean the Registration Rights Agreement dated ...ober 29, 2002, between and among the Shareholders and the Company.

"...uired Sale Right" shall have the meaning specified in Section 4.06.

"...levant Obligation" shall have the meaning specified in Section 6.01(b)(i).

"...C" shall mean the Securities and Exchange Commission of the United States of America, or ...successor thereto.

"...urities" shall mean shares of Common Stock or other capital stock of the Company, whether ...not authorized, or any option, right, subscription, warrant, phantom stock right or other ...tract right to receive shares of Common Stock or such other capital stock, or any bonds, ...es, debentures or other securities of any kind whatsoever, that are, or may become, ...vertible into or exchangeable or exercisable for, shares of Common Stock.

"...urities Act" shall mean the United States Securities Act of 1933, as amended, and the rules ...d regulations of the SEC promulgated thereunder.

"...lling Shareholder" shall have the meaning specified in Section 4.04.

"...areholder Response Notice" shall have the meaning specified in Section 4.05(b).

"...hareholder Loan" shall mean a loan made to the Company or any of its Consolidated ...bsidiaries by Telenor Mobile or any of its Affiliates, or the acquisition of any Debt Obligation ...the Company or any of Consolidated Subsidiaries by Telenor Mobile or any of its Affiliates.

"...hareholder" and "Shareholders" shall have the meaning specified in the preamble hereto.

"...ecified Percentage" shall mean twenty-five percent (25%) plus one (1) share of the Voting ...curities.

...ated Parties" shall mean, with respect to a Shareholder, such Shareholder, its Controlling ..., its Controlled Affiliates, any Controlled Affiliate of any Controlling Person of such ...holder and any Person acting on behalf of any of the foregoing, in each case, pursuant to a ...act.

...m" shall have the meaning specified in the preamble hereto.

...m Participants Agreement" shall mean the agreement dated June 26, 2002 between and ...g Alfa and the other participants in Storm.

...sor Mobile" shall have the meaning specified in the preamble hereto.

...d Party Offeror" shall have the meaning specified in Section 4.05(a).

...nsfer" shall mean any direct or indirect sale, exchange, transfer (including, without ...ation, any transfer by gift or operation of law, or any transfer of an economic interest in any ...ative security of any Security), assignment, distribution or other disposition, or issuance or ...ion of any option or any voting proxy, voting trust or other voting agreement in respect of ... Person or instrument (including, without limitation, any of the Securities), whether in a ...e transaction or a series of related transactions, including, without limitation, the direct or ...ect enforcement or foreclosure of any Lien; provided, that nationalization, expropriation, ...fication, bankruptcy (other than any bankruptcy initiated by the petition of any Shareholder, ...y Affiliate of such Shareholder), arrest or any similar Action or Proceeding initiated by any ...ernmental or Regulatory Authority in respect of any Person or instrument shall not constitute ...ansfer.

...CITRAL Rules" shall have the meaning specified in Section 12.01(a).

...ting Agreement" shall mean the Voting Agreement dated September 2, 2002 between and ...ng the Shareholders.

...ting Securities" shall mean, collectively, shares of Common Stock, shares of preferred stock ... any other Securities that ordinarily, and in the absence of contingencies, entitle their holder ...ote in any GMS and that are, at the time specified in the context in which such term is used, ...ed and outstanding.

...2 Interpretation

...less the context of this Agreement otherwise requires, the following rules of interpretation ...ll apply to this Agreement:

(a) the singular shall include the plural, and the plural shall include the singular;

(b) words of any gender shall include the other gender;

(c) the words "hereof", "herein", "hereby", "hereto" and similar words refer to this entire Agreement and not to any particular Section or any other subdivision of this Agreement;

(d) a reference to any "Article", "Section", "Schedule" or "Exhibit" is a reference to a

96

specific Article or Section of, or Schedule or Exhibit to, this Agreement;

(e) a reference to any law, statute, regulation, notification or statutory provision shall include any amendment, modification or re-enactment thereof, any regulations promulgated thereunder from time to time, and any interpretations thereof from time to time by any regulatory or administrative authority;

(f) a reference to any agreement, instrument, contract or other document shall include any amendment, amendment and restatement, supplement or other modification thereto;

(g) a reference to any Person shall include such Person's successors and permitted assigns under any agreement, instrument, contract or other document;

(h) a reference to any dollar amount shall include its equivalent in another currency; and

(i) as used herein, "beneficial owner" (and the plural thereof) shall have the same meaning as in Rule 13d-3 under the Exchange Act (17 C.F.R. § 240.13d-3).

## ARTICLE II MANAGEMENT OF THE COMPANY

1 Board of Directors

(a) General. Except as limited by, or otherwise provided in, this Agreement or the Charter, the conduct of the overall business, management and affairs of the Company shall be the responsibility of the Board and the President.

(b) Composition; Election.

(i) From and after the date hereof, the Board shall consist of nine (9) Directors.

(ii) Subject to Section 2.01(b)(iii), (iv) and (v):

(A) Telenor Mobile shall be entitled to designate and nominate five (5) candidates for election to the Board; and

(B) Storm shall be entitled to designate and nominate four (4) candidates for election to the Board (of which two (2) shall be designated by Alfa pursuant to the terms of the Storm Participants Agreement),

and the Shareholders agree to take all action necessary from time to time (including, without limitation, the voting of their respective Voting Securities, the execution of written consents, the calling of special meetings of the GMS and/or the Board, the waiving of notice and attendance at meetings of the GMS and/or the Board, in each case, to the extent permitted by Ukrainian law) to (1) ensure the election of such candidates and (2) maintain the membership of the Board as specified in this Section 2.01(b)(ii).



96

(iii) If after the date hereof through Transfer of any Voting Securities to any Person other than a Permitted Transferee or dilution of its Equity Interest in the Company Telenor Mobile ceases to own, together with any of its Permitted Transferees, at least fifty percent (50%) plus one (1) share of the Voting Securities of the Company, then Telenor Mobile shall use its best efforts to cause such number of Directors nominated by Telenor Mobile to resign or be removed by action of the GMS, such that the aggregate number of remaining Directors nominated by Telenor Mobile is equal to the number of Directors, if any, which Telenor Mobile would be able to elect through the voting of its remaining Voting Securities, if any, in accordance with the terms of the Charter.

(iv) If after the date hereof through Transfer of any Voting Securities to any Person other than a Permitted Transferee or dilution of its Equity Interest in the Company Storm ceases to own at least forty percent (40%) of the Voting Securities of the Company, then Storm shall use its best efforts to cause such number of Directors nominated by Storm to resign or be removed by action of the GMS, such that the aggregate number of remaining Directors nominated by Storm is equal to the number of Directors, if any, which Storm would be able to elect through the voting of its remaining Voting Securities, if any, in accordance with the terms of the Charter.

(v) If any Shareholder (an "**Affected Shareholder**") gives notice at any time to the Company and the other Shareholders that any Person nominated by such Affected Shareholder and then serving as a Director is no longer such Affected Shareholder's designee, then such Affected Shareholder, the other Shareholders and the Company shall take all such actions as are necessary to remove the Director so designated.

(vi) If a Director nominated by a Shareholder dies, resigns or is removed as a Director pursuant to Section 2.01(b)(v), the Company and the other Shareholders shall take such actions as are necessary to elect as a Director any Person who is subsequently designated and nominated by the Shareholder whose nominee has died, resigned or been removed.

(c) Quorum. The quorum for a meeting of the Board shall be any six (6) Directors; provided that (i) if one or more of the matters on the agenda for such meeting is a decision specified in Section 2.01(d)(i)-(xi) (inclusive), any seven (7) Directors shall be required to be in attendance in order for such matter(s) to be voted on by the Board; (ii) a quorum shall always include at least one (1) Director appointed by Storm; and (iii) if a quorum is not achieved in any two (2) consecutive attempts to convene a meeting of the Board, then the matters on the agenda for such Board meeting shall be determined by the GMS, and, subject to compliance with Ukrainian law and the provisions of the Charter, any Shareholder holding more than ten percent (10%) of the Voting Securities may call for a GMS to determine such matters.



(d) Voting. Subject to compliance with Ukrainian law and except as otherwise specified in the Charter, all decisions of the Board (or, if applicable, recommendations from the Board to the GMS) shall be determined by a vote of a simple majority of the Directors other than the following decisions, which shall require an affirmative vote of seven (7) of the nine (9) Directors, including at least one (1) Director appointed by Storm:

(i) any recommendation to the GMS of any amendment to the Charter (other than any amendment of the Charter required in connection with any increase in the authorized charter capital of the Company contemplated by Section 2.01 and any amendment to the Charter of the type referred to in Section 6.03 which is required by applicable law);

(ii) except as contemplated by Section 2.03(b), any recommendation to increase the authorized charter capital of the Company and/or to issue any Securities;

(iii) any individual incurrence by the Company or any of its Consolidated Subsidiaries of any Debt Obligation in an aggregate principal amount in excess of US$50 million;

(iv) any individual granting or other incurrence of any Lien on any Assets and Properties of the Company and/or any of its Consolidated Subsidiaries having an aggregate value in excess of US$50 million;

(v) any acquisition by the Company or any of its Consolidated Subsidiaries or entry by the Company or any of its Consolidated Subsidiaries into a joint venture with, any Person the aggregate fair market or pro forma value of which, including any Debt Obligations incurred in connection therewith, exceeds US$50 million;

(vi) any recommendation to the GMS of any merger or consolidation of the Company or any of its Consolidated Subsidiaries with any Person, the aggregate value of which exceeds US$50 million;

(vii) the commencement by the Company or any of its Consolidated Subsidiaries of any line of business other than the Business;

(viii) any transaction between the Company or any of its Consolidated Subsidiaries and any Shareholder or any Affiliate of any Shareholder, including any [illegible] Transaction (other than any transaction contemplated by Section 7.03 and any Shareholder Loan, except where such Shareholder Loan is subject to Board approval in accordance with item (iii) of this Section 2.01(d));

(ix) any amendment of any License material to the conduct by the Company or any of its Consolidated Subsidiaries of the Business;

(x) the appointment of the Company's external auditors; and

(xi) any recommendation to the GMS in respect of a change from uncertificated, non-documentary Securities to certificated, documentary