# EXHIBIT N
# PART 12

Securities

(d)     Chairman.   Upon the resignation or termination of the current Chairman of the Board, the Board shall elect the Chairman of the Board by a simple majority vote.   The nominee for the position of Chairman of the Board shall be chosen from the Directors nominated by (or pursuant to the instructions of) Telenor Mobile and may be nominated by any one or more of the Directors; provided, however, that Telenor Mobile must obtain the prior approval of Storm to Telenor Mobile's candidate for Chairman of the Board, which approval shall not be unreasonably withheld.   If two (2) of Telenor Mobile's candidates for Chairman of the Board fail to obtain the approval of Storm, Telenor Mobile shall have the right to nominate a third candidate for Chairman of the Board without obtaining the prior approval of Storm.  The Chairman of the Board shall not have any specific powers, other than the authority to arrange the work of the Board and as may be otherwise provided by applicable law and the Charter.  The Chairman of the Board shall not have any casting vote.

2     President

on the resignation or termination of the current President, the new President shall be named by simple majority vote of the Board.   The President shall have the rights and possibilities granted to chairmen of the management under the laws of Ukraine and Article 10 the Charter; provided that such rights and responsibilities may be expanded or restricted by a vote of the Board in accordance with the Charter.

(i)     Capital Increases; Financing; IPO

(a)     It is the intention of the Shareholders that the Company undertake an IPO in the United States within two (2) years after the date hereof, subject to the existence of appropriate market conditions, the approval of the Board, and the Company engaging one or more underwriters; provided that, except as otherwise specified in this Section 2.03, neither the Company nor any Shareholder shall have any obligation to undertake or take any action to effectuate such IPO.

(b)     Provided that not less than five (5) Directors so recommend, each Shareholder shall vote its Voting Securities and cause the Directors nominated by it to vote, and take any other action, in favor of approving:

(i)     any increase in the authorized charter capital of the Company which is unrelated to the IPO, provided that (A) the New Securities issued in connection with such increase in the authorized charter capital of the Company ("New Securities") are sold at not less than their par value; and (B) each Shareholder is entitled to purchase such number of such New Securities as is equal to the total number of New Securities then being issued multiplied by a fraction, the numerator of which is the number of Voting Securities owned by such Shareholder immediately prior to such issuance and the denominator of which is the total number of Outstanding Voting Securities (before giving effect to such issuance); provided that Storm shall be entitled to allocate to Alfa or any of its Controlled Affiliates any portion of the New Securities that Storm is entitled to purchase under this Section 2.03(b)(i), as Storm and Alfa or Alfa's relevant

11

Controlled Affiliate may agree between themselves, subject to providing the Company and the other Shareholders with notice of such allocation prior to completion of the subscription for such New Securities and provided, further that no Shareholder shall be obligated to vote its Voting Securities in favor of any such issuance of New Securities if, after giving effect to such issuance and the purchase by all Shareholders of such New Securities in an amount sufficient to maintain their respective percentage ownership of Voting Securities, all Shareholders would be required to purchase and pay for, on a cumulative basis, New Securities in an aggregate amount in excess of (US\$120 million (including without limitation, the US\$40 million of New Securities contemplated by Section 2.04(b) of the Voting Agreement);

(ii)     subject to the limitations specified in Section 2.01(b)(ii) and (iv), any vendor financing or re-financing of or amendment to any existing vendor financing, any financing provided by the European Bank for Reconstruction and Development or any other Person, or any Eurobond issue undertaken by the Company in accordance with the Company's annual budget and/or financing plan; and

(iii)    subject to the delivery to the Shareholders by an independent investment bank selected by Telenor Mobile from the list of Approved Bankers attached hereto as Schedule 3 of a letter confirming that, in the opinion of such investment bank (A) an IPO on the terms proposed by Telenor Mobile would be achievable, (B) an IPO on the terms proposed by Telenor Mobile would be well received by the market and (C) an IPO on the terms proposed by Telenor Mobile would constitute the most attractive IPO option for the Company in terms of liquidity, value realization and secondary market performance, each Shareholder shall vote its Voting Securities, and shall cause its respective Directors to vote, and take any other action, in favor of approving the IPO (and any increase in the authorized charter capital of the Company, any amendment of the Charter and any change from a closed joint stock company into an open joint stock company in connection therewith) or such other arrangement intended to achieve liquidity in respect of the Securities as shall be proposed by Telenor Mobile.

### 6.4    Dividend Policy

The Shareholders agree that the dividend policy of the Company shall be determined by the Board and proposed to the GMS, taking into account, among other things, (a) the financial results of the Company, including its capital expenditure requirements; (b) the shareholders' interest in arriving at appropriate level of dividends consistent with the Company's financial structure and the fulfillment of its development objectives; and (c) the objective of the Shareholders to conduct a IPO in accordance with the terms of this Agreement.

### 6.5    Implementation of and Compliance with Agreement

(a)    Telenor Mobile undertakes:

(i)     to comply with its obligations under this Agreement;

13



(c)    Such Securities are and will be held free and clear of all Liens, proxies, voting trusts or agreements, understandings or arrangements whatsoever, except for those arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement, the Registration Rights Agreement and the Inter Participant Agreement.

(d)    In connection with the Company or its Business, such Shareholder has not, and none of its Consolidated Subsidiaries or Affiliates or any director, officer, agent, employee or other Person acting on behalf of such Shareholder or any of its Consolidated Subsidiaries or Affiliates has, in the course of its actions for, or on behalf of such Shareholder (i) [illegible] or arranged for the governmental, any unlawful contribution, gift, entertainment or other benefit relating to a political party or official directly or a candidate for public office, (ii) made any payment, directly or indirectly, to any Government Official, (iii) otherwise violated any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, (the "FCPA"), or any anti-corruption laws or regulations of Ukraine or of the jurisdiction of incorporation or principal activities of such Shareholder, or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any customer or other third party.

(e)    The beneficial owners of such Shareholder are set forth in Schedule 1; and

(f)    No asset which such Shareholder has contributed to otherwise made available to the Company, and no funds paid or otherwise transferred to any other Shareholder, any other Shareholder, Affiliate or the Company have been acquired by such Shareholder (i) pursuant to a transaction that has involved directly or indirectly an illegal payment to a Government Official or (ii) where such asset represents the proceeds of any illegal activity.

3.02    Representations and Warranties of Subsequent Shareholders

Each Person (other than the Shareholders party hereto as of the date hereof) who subsequently becomes a party hereto after the date hereof shall, upon execution of the Endorsement by such Person, make the representations and warranties set forth in Annex 1 to the Endorsement, which representations and warranties shall be incorporated by reference herein, as though made in this Agreement.

## ARTICLE IV    TRANSFER RESTRICTIONS APPLICABLE PRIOR TO THE IPO

4.01    General

(a)    The provisions of this Article IV shall be applicable to all Securities owned, directly or indirectly, by a Shareholder or hereafter Transferred to a Shareholder in any manner whatsoever, from the date hereof until the date of the IPO. The provisions of this Article IV shall not apply to any Transfer of Securities by a Shareholder in the IPO or after the IPO.

(b)    For the purposes of this Article IV, any fees and expenses incurred in determining the Fair Market Value of any Securities shall be divided pro rata among the Shareholders who are party to the relevant transaction, in proportion to the amount of Securities purchased or sold by such Shareholder, as the case may be.

14

Transfers and Liens

(a)    Except as provided in this Article IV, no Shareholder may Transfer any or all of its Securities to, or create or permit any Lien in any Securities in favor of, any Person.

(b)    A Shareholder may Transfer any or all of its Securities to any of its Permitted Transferees at any time without compliance with Sections 4.04, 4.05, 4.06 or 4.07, provided that at the time of such Transfer such Permitted Transferee executes an Endorsement in accordance with Section 6.04.

(c)    Sprint may Transfer Securities to Telenor Mobile under the Option Agreement, and Securities may be Transferred to Telenor Mobile under the Pledge Agreement, in each case, without compliance with Sections 4.04, 4.05, 4.06 or 4.07.

4.03    Pledge

No Shareholder shall create a security interest in, pledge, assign, mortgage, hypothecate or otherwise permit a Lien on any of its Securities to or for the benefit of any Person other than:

(a)    Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement, the Sprint Participants Agreement or the Registration Rights Agreement;

(b)    with the prior written consent of the other Shareholders, a Lien for the benefit of a Person who, prior to entering into a pledge or other arrangement, executes an Endorsement in accordance with Section 4.09 (such Endorsement to become effective automatically upon the occurrence of any Foreclosure Action, without the need for any further action by the Parties) and undertakes, on terms satisfactory to the other Shareholders, to comply with the provisions of Sections 4.04, 4.05, 4.06, 4.07 and 4.08 in connection with such Foreclosure Action.

4.04    Transfers to Persons Other than Permitted Transferees

Subject to Section 4.02 and Section 4.03, any Shareholder (a "Selling Shareholder") may sell, transfer title, assign all rights and interest in or otherwise affect the physical disposition of (but in no event may otherwise Transfer) any or all of such Selling Shareholder's Securities (the "Offered Securities") to any Person from whom the Selling Shareholder receives a bona fide offer (whether or not such offer is solicited by the Selling Shareholder) that such Selling Shareholder desires to accept (an "Offer"), provided that:

(a)    such Selling Shareholder complies with Sections 4.05, 4.06 and 4.07 prior to effecting any such sale or disposition; and

(b)    the Person from whom the Selling Shareholder received the Offer is a reputable Person (i) whose financial statements are audited by an internationally recognized accounting firm, or (ii) whose shares or other securities are listed on an internationally recognized stock exchange, or (iii) who has long-term indebtedness rated at least investment grade or higher by Moody's Investors Service, Inc. (i.e., Baa or higher) or Standard & Poor's Corporation (i.e., BBB or higher), as determined at the time of the

proposed Transfer.

### Right of First Refusal

(a)    A Selling Shareholder, before accepting any Offer, shall first give sixty (60) days' prior written notice of such Offer (the "Offer Notice") to the other Shareholders. The Offer Notice shall set forth (i) the identity of the Person (including its Controlling Person) from whom the Selling Shareholders received such Offer (the "Third Party Offeror"), (ii) the number and type of Offered Securities subject to the Offer, (iii) the purchase price per share in cash of the Offer (or, if the Offer consists in whole or in part of non-cash consideration, a description of such non-cash consideration, the Selling Shareholder's proposed good faith determination of the fair market value per share thereof and any valuation by the Third Party Offeror of such non-cash consideration) and (iv) if applicable, notice of the exercise of such Selling Shareholder's Required Sale Right pursuant to Section 4.06.

(b)    Upon receipt of the Offer Notice, the other Shareholders shall each have the first right and option to elect to purchase, for cash, in the aggregate, all (but not less than all) of the Offered Securities (pro rata according to the respective percentage of Voting Securities owned by each of the other Shareholders prior to the giving of the Offer Notice relative to the total number of Outstanding Voting Securities prior to the giving of the Offer Notice, or in such other proportion as such other Shareholders electing to purchase such Offered Securities may agree among themselves) at the purchase price and on the terms and conditions set forth in the Offer Notice, such election to be made by the other Shareholders by written notice delivered to the Selling Shareholder (a "Shareholder Response Notice") within sixty (60) days from the date of the Offer Notice. Failure of any Shareholder to provide a Shareholder Response Notice within such sixty (60) day period shall be deemed an election by such Shareholder not to purchase any of the Offered Securities. If the purchase price set forth in the Offer Notice consists in whole or in part of non-cash consideration, the Shareholder(s) electing to purchase the Offered Securities (the "Purchasing Shareholder(s)") shall pay such portion of the consideration in cash equal to the Fair Market Value thereof.

(c)    In the event of an election by the other Shareholders to purchase in the aggregate all of the Offered Securities, a single closing for the purchase of all of the Offered Securities shall be held at the time and place designated by the Purchasing Shareholder(s), but in any event no later than one hundred eighty (180) days following receipt of the Offer by the Selling Shareholder. At such closing, the Selling Shareholder shall deliver to the Purchasing Shareholder(s), against payment of the purchase price, (i) the Offered Securities, free and clear of all Liens, other than any Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement or the Registration Rights Agreement, and (ii) such documents as are required to transfer title to the Offered Securities.

(d)    In the event that the other Shareholders do not elect to purchase in the aggregate all of the Offered Securities in accordance with Section 4.05(b), the Selling Shareholder (i) shall not be required to sell any of the Offered Securities to any of the other Shareholders and (ii) subject to Section 4.07, may, within one hundred eighty (180) days

16

following receipt of the Offer, Transfer to the Third Party Offeror identified in the Offer Notice all (but not less than all) of the Offered Securities for a purchase price payable in cash for, if the Offer Notice states that the purchase price consists in whole or in part of non-cash consideration, such non-cash consideration stated therein) equal to or greater than the purchase price specified in the Offer Notice and otherwise on the same terms and conditions specified in the Offer Notice. Such Transfer shall be made in accordance with and subject to Section 4.04. If the Selling Shareholder fails to effect the Transfer of the Offered Securities on such terms and within such time period, then such proposed Transfer or any other proposed Transfer shall again become subject to the provisions of this Section 4.05.

(e)    Other than as provided in this Article IV, without the prior written consent of the Selling Shareholder, the other Shareholders shall not negotiate with, or sell any of their Securities to, the Third Party Offeror identified in the Offer Notice until the earlier of (i) one hundred eighty (180) days following receipt of the Offer by the Selling Shareholder, (ii) the Transfer of the Offered Securities by the Selling Shareholder and (iii) the termination of the Offer by the Selling Shareholder.

(f)    If Telenor Mobile determines to Transfer all or any portion of its Securities to a Third Party Offeror, Storm shall be entitled to assign all or a portion of its right to purchase such Offered Securities to Alfa or any of its Controlled Affiliates, and, upon notice of such assignment, Telenor Mobile shall be obligated to sell the assigned portion of the Offered Securities to Alfa or its designated Controlled Affiliate. For purposes of any such Transfer to Alfa or any of its Controlled Affiliates, Storm hereby waives its right of first refusal under this Article IV.

### 4.06    Required Sale Rights

If, after the second (2nd) anniversary of the date hereof, Telenor Mobile receives an Offer for all of its Securities from a Third Party Offeror (whether or not such Offer was solicited by Telenor Mobile) and the other Shareholders do not elect to purchase in the aggregate all of the Offered Securities pursuant to Section 4.05, then Telenor Mobile shall have the right (the "Required Sale Right") to require all, but not less than all, the other Shareholders to sell to such Third Party Offeror all of the Securities owned by such other Shareholders. Telenor Mobile shall exercise its Required Sale Right by making reference thereto in its Offer Notice, which shall state the number of Securities that Telenor Mobile is requiring each of the other Shareholders to sell. Failure by Telenor Mobile to set forth its Required Sale Right in the Offer Notice shall be deemed a waiver by Telenor Mobile of its Required Sale Right with respect to such Offer (but not any subsequent Offer). The sale of Securities by the other Shareholders pursuant to this Section 4.06 shall be on the same terms and conditions as are set forth in the Offer Notice.

### 4.07    Co-Sale Rights

(a)    If (i) the Offer described in Section 4.04 is for a number of Offered Securities such that, as a result of such Transfer, the Third Party Offeror, together with any of its Affiliates, would beneficially hold a Controlling Interest in the Company, (ii) the other Shareholders do not elect to purchase in the aggregate all of the Offered Securities pursuant to Section 4.05 and (iii) Telenor Mobile does not exercise its Required Sale



Right in respect of each Offer, then the Selling Shareholder shall receive, as a condition of its acceptance of such Offer, that the Third Party Offeror, within sixty (60) days of delivery by the Selling Shareholder of the Offer Notice, offer to purchase all of such other Shareholders' Securities, free and clear of any Liens other than Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement or the Registration Rights Agreement, and at the same purchase price and on the same terms and conditions as are set forth in the Offer Notice. Such other Shareholders must elect whether to accept such offer by the Third Party Offeror within thirty (30) days of the date of such offer by executing and delivering a written notice to the Selling Shareholder and the Third Party Offeror. Failure of any Shareholder to provide such written notice within such thirty (30) day period shall be deemed an election by such Shareholder not to accept such offer.

(b)     If the Offer described in Section 4.04 is for a number of Offered Securities such that, as a result of such Transfer or a series of related Transfers, the Third Party Offeror, together with any of its Affiliates, will have purchased not less than fifteen percent (15%) of the issued share capital of the Company (and not more than a Controlling Interest in the Company) from the Selling Shareholder, and the other Shareholders do not elect to purchase in the aggregate all of the Offered Securities pursuant to Section 4.05, then each other Shareholder shall have the right, exercisable by executing and delivering a written notice to the Selling Shareholder (a "Co-Sale Notice") within sixty (60) days from delivery by the Selling Shareholder of the Offer Notice, to elect to sell in the proposed Transfer of Offered Securities to such Third Party Offeror, such number of Securities owned by such other Shareholder as is equal to (i) the number of Securities owned by such other Shareholder multiplied by (ii) a fraction, the numerator of which is the number of Securities being Transferred by such Selling Shareholder and the denominator of which is the total number of Securities owned by the Selling Shareholder immediately prior to such proposed Transfer, free and clear of any Liens, other than any Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement or the Registration Rights Agreement.

(c)     The Transfer of Securities by the other Shareholders pursuant to a Co-Sale Notice shall be at the purchase price and on the same terms and conditions as are set forth in the Offer Notice.

(d)     In the event any of the other Shareholders gives a Co-Sale Notice, the Selling Shareholder shall have the option to (i) require, as a condition of acceptance by the Selling Shareholder of the Offer, the Third Party Offeror to purchase both the Offered Securities and the additional Securities to be Transferred by such other Shareholders pursuant to the Co-Sale Notice or (ii) cancel such Transfer to the Third Party Offeror and reject the Offer.

4.08    Closing

The closing of any Transfer of Securities pursuant to Sections 4.05, 4.06 or 4.07 shall be held at the time and place designated by the purchaser(s) and, in any event, unless otherwise agreed by the Parties, within one hundred eighty (180) days after receipt of an Offer by the Selling Shareholder. At the closing of such Transfer, (a) each Shareholder participating in the Transfer

18

[...text heavily faded...] to the purchaser(s) the Securities to be Transferred to the purchaser(s), free and [...] of any Lien, other than any Lien arising under this Agreement, the Charter, the Option [...], the Pledge Agreement or the Registration Rights Agreement, together with such [...] as may be required to transfer title to such Securities, and (b) such purchaser(s) shall pay [...] purchase price for such Securities and deliver an Endorsement to the Company and the [...].

#### [...] Effectiveness of Transfer

[...] a Transfer in accordance with the terms and conditions of this Article IV shall remain [...] in the provisions of this Agreement, and, during the period prior to the IPO, no proposed [...] of Securities shall be effective, unless and until the proposed transferee, including [...] Securities, any Permitted Transferee, agrees in writing to assume and be bound by the [...] of this Agreement by executing and delivering to the Company and each other [...] an Endorsement. Following the execution and delivery of such Endorsement and [...] effectiveness of such Endorsement, the transferee shall be a "Shareholder" for all purposes of [...] Agreement, and shall be entitled to all rights and subject to all obligations of Shareholders under this Agreement.

#### 4.[..] Improper Transfers; Forfeitures

At any time prior to the IPO, any purported Transfer of, creation of any Lien upon, or permitting [...] any Lien to subsist on, any Securities that is in violation of the provisions of this Agreement [...] be void and of no force or effect whatsoever, and the Company shall not treat any purported [...] transferee of such Securities as the owner or pledgee of such Securities for any purpose. Without [...] prejudice to any other rights or remedies of any Shareholder or the Company, if any Shareholder [...] effects a Transfer of any Securities to any Person in violation of this Article IV, then any [...] transferee of such Securities shall receive and hold any and all such Securities so Transferred [...] without any of the rights, but subject to all of the obligations, set forth in this Agreement.

#### 4.11  Information Letter

At any and all times prior to the IPO, the Company shall deliver to each Permitted Transferee or [...] other Person who becomes a Shareholder an original information letter on the Company's [...] letterhead and executed on behalf of the Company which shall contain (in addition to the [...] addresses) details a Russian translation of the following text: "THE SHARES OF THE COMPANY ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER (AND PLEDGE) AS SET FORTH IN THE SHAREHOLDERS AGREEMENT DATED JANUARY 30, 2004, COPIES OF WHICH MAY BE FURNISHED BY THE COMPANY UPON WRITTEN REQUEST AND WITHOUT CHARGE" (an "Information Letter"). The Company shall maintain a list of any written requests to provide copies of this Agreement. Each Shareholder shall be entitled to receive from the Company copies of any such written requests or Information Letters.

#### 4.12  Pre-emptive Rights

(a)    Subject to Section 2.03 and Section 6.04, each Shareholder shall have the pre-emptive right to purchase its pro rata portion of any issuance of any New Securities, as is provided on the date hereof by Section 3 of Article 38 of the Law "On Business Associations" of Ukraine and

_____ 10 of the Regulations of the Ukrainian Securities Commission "On Procedure for _____ (Decrease) in the Authorized Capital of a Joint Stock Company", exercisable in _____ with Chapter III of such Regulation, or as may be otherwise provided by the laws of _____.

_____ if at any time Section 3 of Article IX of the Law "On Business Associations" of Ukraine and Section 10 of the Regulations of the Ukrainian Securities Commission "On Procedure for _____ (Decrease) in the Authorized Capital of a Joint Stock Company" are no longer in effect _____ have not been replaced by other laws and/or regulations of Ukraine providing the _____holders with a pre-emptive right to their respective pro rata portions of any issuance of Securities, then, subject to Section 2.01 and Section 6.04, during the period prior to the IPO, each Shareholder shall have a pre-emptive right to purchase its pro rata portion of any issuance of New Securities, on the same terms and conditions as such New Securities are offered to other purchasers thereof.  The Company shall provide the Shareholders with sixty (60) days' prior written notice of any proposed issuance of New Securities which would be subject to the pre-emptive rights provided for in this Section 4.12(b).  The Shareholders desiring to exercise their pre-emptive rights in connection with any such issuance of New Securities must notify the Company in writing on or prior to 5:30 pm on the last day of such sixty (60) day period.  Each Shareholder shall be entitled to purchase its pro rata portion of New Securities based on the number of Voting Securities held by it immediately prior to the issuance of such New Securities.  If any Shareholder fails to exercise its pre-emptive right hereunder to purchase any New Securities, the other Shareholders shall, if they have indicated their intention to purchase the maximum possible number of New Securities in their notification to the Company, be entitled to purchase their respective pro rata portion thereof.

## ARTICLE V   TRANSFER RESTRICTIONS APPLICABLE AFTER THE IPO

### 5.01   General

The provisions of this Article V shall be applicable to all Securities owned, directly or indirectly, by a Shareholder after the date of the IPO.

### 5.02   Transfer of Specified Percentage after the IPO

If after the IPO any Shareholder proposes to Transfer to any Person, in a single transaction, a number of Voting Securities equal to or greater than the Specified Percentage, such Shareholder shall not Transfer such Voting Securities to such Person, unless such Shareholder has given the other Shareholders thirty (30) days' prior written notice of such proposed Transfer in accordance with Section 13.01.

### 5.03   Effect of Transfers after the IPO

(a)    At any time after the IPO, in the event of any Transfer of Securities (in one or a series of related transactions, by operation of law or otherwise) from a Shareholder to another Shareholder or a Permitted Transferee, the transferee shall receive and hold any and all Securities so Transferred subject to the terms and conditions of this Agreement and the rights and obligations, if any, of the transferor hereunder, and shall forthwith

20



execute and deliver to the other Shareholders an Endorsement. Each of the Shareholders hereby undertakes to cause each of their respective Permitted Transferees to which Voting Securities are so Transferred to execute and deliver an Endorsement to each of the other Shareholders.

(b)    In the event of any Transfer following the IPO of Voting Securities in an amount less than the Specified Percentage by a Shareholder or any of its Permitted Transferees to any Person who is not a Shareholder or a Permitted Transferee, such Person shall not be entitled to any rights, nor subject to any obligations, under this Agreement.

(c)    If the Shareholders, or any of them, Transfer, in the aggregate, such number of Voting Securities as is equal to or greater than the Specified Percentage (in one or a series of related transactions) to any Person, other than another Shareholder or a Permitted Transferee, provided such Transfer is made in accordance with this Article V, the transferee shall receive and hold any and all Securities so Transferred subject to the terms and conditions of this Agreement and the rights and obligations, if any, of the transferor hereunder, and shall forthwith execute and deliver to the other Shareholders an Endorsement.

(d)    Following the execution and delivery of an Endorsement and the effectiveness of such Endorsement, a transferee pursuant to Section 5.03(a) or (c) shall be a "Shareholder" for all purposes of this Agreement, and shall be entitled to all of the rights and subject to all of the obligations of a Shareholder under this Agreement.

## ARTICLE VI  CERTAIN CORPORATE MATTERS

6.01    Debt Acquisition

(a)    A Shareholder or any other Standstill Party may enter into any Debt Transactions if and only if such Shareholder and its Standstill Parties comply with the provisions of this Section 6.01.

(b)    Unless otherwise approved by the Board in accordance with Section 2.01(b)(vii), in the event a Shareholder or any of its other Standstill Parties enters into a Debt Transaction, such Shareholder shall, and shall procure that its other Standstill Parties shall:

(i)    Provide written notice thereof to the Protected Party (with a copy to the Company) within ten (10) days of entering into a Debt Transaction, which notice shall constitute an offer to such Protected Party (a "Debt Transaction Offer Notice") (which offer shall be legally binding on the Standstill Party upon acceptance by such Protected Party or the Company or the Company's designee on behalf of such Protected Party) to sell to such Protected Party, the Company or the Company's designee, such Debt Obligation (and, if applicable, the underlying obligation to which such Debt Obligation relates, such underlying obligation or Debt Obligation, as applicable, being the "Relevant Obligation") at a purchase price equal to the lesser of the Fair Market Value thereof, or one hundred percent (100%) of the aggregate unpaid principal amount of the Relevant Obligation plus any accrued interest and other amounts, if any, owing under the Relevant Obligation up to (but excluding) the purchase date thereof;

