# EXHIBIT N
# PART 13

its Standstill Parties have entered into the Debt Transaction.

(f) Any breach of Section 6.01(e) shall be deemed cured and no violation of Section 6.01(e) shall be deemed to have occurred or to exist if the Standstill Party complies with Section 6.01(d) and such enforcement action or bankruptcy proceeding is thereafter terminated.

(g) The Company will, or will cause each Protected Party to, promptly inform each Shareholder if it becomes aware of any violation of the terms of this Section 6.01.

6.02 Non-Compete

(a) Subject to Section 6.02(b), no Shareholder or any of its Affiliates will, without the prior written consent of the Company and the other Shareholders, (i) engage in the Business in any region in Ukraine, (ii) own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than the Company or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine or (iii) permit any of its Controlled Affiliates (other than the Company or any of its Controlled Affiliates) to engage in the Business in any region in Ukraine or own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than the Company or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine.

(b) The Shareholders acknowledge that this Section 6.02 shall not in any way limit any Shareholder's or any of its Affiliates' right to:

(i) maintain, increase the amount of, or otherwise develop, its investments in the Company or any of the Company's Controlled Affiliates; or

(ii) acquire, maintain, increase the amount of, or otherwise develop, any investment in a Person specified in Schedule 4 or an Affiliate thereof, so long as no officer, director or employee of such Shareholder or any of its Affiliates serves as a member of the board of directors of such Person's Ukrainian Affiliate or otherwise participates in the management of such Person's Ukrainian Affiliate; provided that, for purposes of this Section 6.02(b)(ii), no Person identified in Schedule 4 shall be considered an Affiliate of any Shareholder.

6.03 Amendment of Charter

(a) In the event of any conflict or inconsistency between this Agreement and the Charter, this Agreement shall prevail. Without limiting the generality of the foregoing, the Shareholders shall take such action as may be necessary to supplement or amend the Charter to reflect, and not conflict or be inconsistent with, the provisions of this Agreement. The Shareholders also agree, to the extent permitted by applicable law, to waive any rights or privileges granted to them (including, but not limited to, redemption rights, rights of first refusal and the like) by applicable law or the Shareholders that conflict or are inconsistent with the terms and conditions of this Agreement.

(b) To the extent that pursuant to applicable law the legality, validity or enforceability of any provision contained in this Agreement now or at any time hereafter requires that such provision, or a reference to such provision, be contained in the Charter, or requires

any amendment to the Charter, then the Shareholders shall vote their Voting Securities to approve any such amendments and cause the Company to take such action as may be necessary to register such amendments to the Charter as so required with all appropriate Governmental or Regulatory Authorities, and each Shareholder hereby consents to such amendment to the fullest extent permitted by law.

6.07 Purchase Rights of Telenor Mobile

For so long as it individually (or, together with its Affiliates, collectively) owns at least 50% plus one share of the Company's Voting Securities, Telenor Mobile shall have the right, but not the obligation, to elect to purchase from the Company at the price offered to investors in the IPO such number of New Securities issued in connection with any increase in the Company's authorized charter capital relating to the IPO as may be required by Telenor Mobile to maintain its individual (or, together with its Affiliates, collective) ownership of 50% plus one share of the Company's Voting Securities. The Company shall provide Telenor Mobile with at least sixty (60) days' prior written notice of the issuance by the Company of any Voting Securities in connection with the IPO. Such notice shall set forth (a) the approximate number and type of New Securities proposed to be issued and sold by the Company and the material terms thereof and (b) the proposed price or range of prices at which such New Securities are proposed to be sold and the terms of payment. Telenor Mobile shall have thirty (30) days' following its receipt of such notice to notify the Company of its election to purchase such New Securities. Failure by Telenor Mobile to notify the Company of such election within such thirty (30) day period shall be deemed an election by Telenor Mobile not to exercise such right.

6.08 Disclosure of Beneficial Ownership in connection with Securities Offering

Each Shareholder undertakes and agrees that, within ten (10) days following a written request from the Company or its external legal counsel stating that the Company is preparing to undertake the IPO or any other offering of Securities, such Shareholder shall deliver to the Company and its external legal counsel a true and correct written description of the ultimate (and any intermediate) beneficial owners of such Shareholder and shall use its best efforts to cooperate with the Company and its external legal counsel in responding to questions and providing additional information regarding such beneficial owners.

6.09 Other Arrangements

(a) Except for this Agreement, the Option Agreement, the Pledge Agreement, the Registration Rights Agreement and the Storm Participants Agreement, no Shareholder shall grant any proxy or enter into or agree to be bound by any understanding or any voting trust, voting proxy or other voting agreement with respect to any Securities, nor shall any Shareholder enter into any shareholders agreement or arrangement of any kind (whether written or oral) with any Person with respect to any Securities, including, without limitation, any agreement, understanding or arrangement with respect to the acquisition, ownership, Transfer or other disposition or voting of Securities, nor shall any Shareholder act, for any reason, as a member of a group or in concert with any other Person in connection with the acquisition, transfer or other disposition or voting of Securities in any manner which is inconsistent with any obligation of such Shareholder under this Agreement, provided that each Shareholder shall be permitted to Transfer its

Securities in accordance with the terms of this Agreement.

(d) Without prejudice to any other rights or remedies of any Shareholder in this Agreement, if any representation and warranty made by any Shareholder in Article III is shown to have been false or misleading when made or confirmed, or if any Shareholder violates the provisions of Article IV, Article V or this Article VI, the rights of such Shareholder under this Agreement and the Registration Rights Agreement shall terminate forthwith, but such Shareholder shall continue to be bound by all of its obligations hereunder and thereunder.

6.07 Shareholder Capacity

No Person executing this Agreement who is, or who becomes during the term hereof, a Director makes any agreement or understanding herein in his or her capacity as such Director, and the agreements set forth herein shall in no way restrict any Director in the exercise of his or her fiduciary duties as a Director. Each Shareholder executes and delivers this Agreement solely in its capacity as the record and beneficial owner of such Shareholder's Voting Securities.

## ARTICLE VII CONFIDENTIALITY

Each Party will hold, and will use its best efforts to cause its Affiliates, and their respective representatives to hold, in strict confidence from any Person (other than any such Affiliate or representative or a bona fide pledgee in connection with any action contemplated by Article IV), unless (a) compelled to disclose by judicial or administrative process (including, without limitation, as may be required to be disclosed under the Securities Act, the Exchange Act or applicable stock exchange rules) or by other requirements of law or (b) disclosed in an action or proceeding brought by a Party in pursuit of its rights or in the exercise of its remedies hereunder, all documents and information concerning the Company or any other Party or any of its or their Affiliates furnished by the Company or such other Party or their respective representatives to each Party in such capacity, except to the extent that such documents or information can be shown to have been (i) previously known by the Party receiving such documents or information, (ii) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such receiving Party or (iii) later acquired by the receiving Party from another source if the receiving Party is not aware that such source is under an obligation to another Party hereto to keep such documents and information confidential. In the event that this Agreement is terminated, upon the request of another Party, each Party hereto will, and will cause its Affiliates and their respective representatives to, unless otherwise required by law, promptly redeliver or cause to be redelivered all copies of documents and information furnished by the other Parties in connection with this Agreement or the transactions contemplated hereby and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon prepared by the Party which furnished such documents and information or its representatives.

## ARTICLE VIII ETHICAL BUSINESS CONSIDERATIONS

8.01 Offers to Government Officials

No Party shall (a) pay, promise to pay, or offer any fee, commission, material remuneration or other thing of value to or for the benefit of any Government Official, political party or official

[illegible] or candidate for political office in order to corruptly influence an act or decision of such [illegible] in his or her official capacity, cause such Person to act or fail to act in violation of his or [illegible] lawful duty or cause such Person to influence an act or decision of the government, for the [illegible] of assisting such Party or any of its Affiliates to obtain or retain business or gain any [illegible] advantage, or (b) shall otherwise violate the FCPA or any Ukrainian or other [illegible] laws applicable to any Party, its Affiliates or their respective directors, officers, [illegible], consultants or agents. Nothing in this Agreement, however, shall be construed to [illegible] the Company or any Shareholder from offering or making any facilitating or expediting [illegible] the purpose of which is to expedite or to secure the performance of a routine [illegible] action by a Government Official within the meaning of the FCPA, or any other [illegible] to a Government Official that is permitted under Ukrainian or other laws applicable to [illegible] Shareholder.

[illegible] Books and Records

[illegible] connection with this Agreement, all transactions, including, but not limited to, the disposition of assets, the incurrence of liabilities, the recordation of expenses and the documentation of [illegible] arrangements undertaken by any Party in connection with this Agreement shall be [illegible] in compliance with applicable law and shall in reasonable detail accurately and fairly [illegible] the transactions (including the purpose of each transaction and the party with whom it was [illegible]) in such Party's books and records.

8.03 Agents, Subcontractors and Consultants

In connection with this Agreement, no Party shall retain or pay any agent, sub-contractor or consultant if such Party knows that, or has reason to believe that circumstances exist which make it likely that, such agent, subcontractor or consultant will engage in conduct that would violate any provision of Section 8.01 or Section 8.02 if such agent, subcontractor or consultant were a party to this Agreement. Each Party shall take reasonable precautions to require its agents, sub-[illegible] and consultants to comply with the obligations in Sections 8.01 and 8.02.

8.04 Transfers to the Company

No asset which any Shareholder shall contribute, or otherwise make available, to the Company, and no funds to be paid or otherwise transferred to any other Shareholder, any other Shareholder's Affiliate or the Company shall have been acquired by such Shareholder (a) pursuant to a transaction that has involved directly or indirectly an illegal payment to a Government Official or (b) where such asset represents the proceeds of any illegal activity.

8.05 Affiliates, Directors, Officers and Employees

In connection with this Agreement, each Party shall require its Affiliates and its and their respective directors, officers and employees to comply with the obligations assumed by such Party in this Article VIII. This effort shall include, but not be limited to, establishing reasonable precautions to prevent such Affiliates, directors, officers and employees from receiving entertainment or gifts, payments, loans, or other things of value from the Company's or any other Shareholder's directors, officers, employees or agents, or Government Officials, or making, promising or offering entertainment or gifts, payments, loans, or other things of value to the Company's or any other Shareholder's directors, officers, employees or agents, or Government



[illegible] in violation of applicable law, including, without limitation, anti-corruption laws.

[illegible] Compliance Policies

The Shareholders agree to cause the Company to enact and maintain appropriate compliance [illegible] to implement the provisions of this Article VIII, including arranging for appropriate [illegible] of officers, directors and employees regarding their obligations or others in the [illegible] of conduct set forth in such policies.

[illegible] Access to Capital Markets; IPO

Without prejudice to any other provision of this Article VIII, no Shareholder shall take any [illegible] or engage in any conduct, or permit any of its Affiliates or any of its or their respective directors, officers, employees, agents, subcontractors or consultants to take any action or engage in any conduct, the direct or indirect consequence of which would be to prevent the Company from having access to the United States or other international capital markets, or from completing an IPO.

## ARTICLE IX COMPANY'S BOOKS AND RECORDS

[illegible] Maintenance of Company's Books and Records

The Company shall maintain such corporate books and records as are necessary and appropriate for the conduct of its business. Such books and records, and the minutes of actions and/or meetings of the shareholders and directors of the Company, shall be kept at the principal office of the Company or at such other reasonable place as the Board may determine.

9.02 Right to Examine Books and Records

[illegible] Any Shareholder shall have the right, at such Shareholder's expense, to examine, audit and make copies of the books and records of the Company, in person or by duly authorized agent or attorney, upon reasonable prior notice to the Company and during normal business hours.

## ARTICLE X INDEMNIFICATION

The Company shall indemnify, defend and hold harmless the Shareholders' respective directors, officers and employees who are serving as a Director or officer of the Company or any of its Controlled Affiliates, and any other directors or officers of the Company or any of its Controlled Affiliates, in such Person's capacity as a Director or officer of the Company or any of its Controlled Affiliates (each and severally, an "**Indemnified Person**" and, collectively, the "**Indemnified Persons**"), from and against any and all liabilities, losses, damages, claims, fines, penalties, costs and expenses, including reasonable fees and expenses of counsel selected by the Indemnified Person (collectively, "**Damages**") to which the Indemnified Person may become subject by reason of, or in connection with, any action taken or omitted to be taken by such Person arising out of such Person's status as a director or officer of the Company or any of its Controlled Affiliates, to the fullest extent permitted by law, except that the Company shall not indemnify any Indemnified Person for any Damages (a) arising from such Indemnified Person's bad faith or willful misconduct, or (b) as to which indemnification is barred under applicable law. Attorneys' fees and expenses shall be paid by the Company as they are incurred, upon

[illegible] in each case, of an undertaking by or on behalf of the Indemnified Person to repay such amounts if it is ultimately determined that such Indemnified Person is not entitled to indemnification with respect thereto.

The Company shall procure director and officer liability insurance or similar insurance policy at its expense, insuring each Indemnified Persons against any of the Damages for which the Company is obligated to indemnify any Indemnified Person pursuant to this Article X. Notwithstanding any other provision of this Article X, the Company shall be obligated to indemnify any Indemnified Person eligible for indemnification hereunder only to the extent amounts under such insurance policy are insufficient to hold harmless such Indemnified Person in respect of any such Damages (or actions in respect thereof).

## ARTICLE XI TERM AND TERMINATION

11.01 Term and Termination

This Agreement shall become effective on the date hereof and remain in effect until the earliest of:

(a) the date on which all of the Shareholders and the Company agree in writing to the termination of this Agreement;

(b) the date on which this Agreement is terminated in accordance with Section 11.02;

(c) the date on which the Shareholders and their Affiliates cease to own at least fifty percent (50%) plus one (1) share of the issued and outstanding capital stock of the Company; and

(d) the date on which there is only one (1) Party hereto;

provided that (i) any Shareholder who on the date hereof owns at least ten percent (10%) or more of the Outstanding Voting Securities and thereafter ceases to own at least ten percent (10%) of the Outstanding Voting Securities shall cease to be a party to, or be bound by the terms of, this Agreement from and after the date of the relevant Transfer (or dilution); and (ii) no Transfer or termination shall be deemed to relieve any Party of any obligations of such Party pursuant to this Agreement accruing, or resulting from actions or omissions of such Party occurring, prior to the date of such Transfer or termination.

11.02 Termination for Material Breach

(a) Subject to Section 11.02(b) and (c), if any Shareholder (or in the case of a breach or violation of Section 8.01, 8.02, 8.04 or 8.07, any of its Affiliates or any of its or their respective directors, officers, employees, agents, subcontractors or consultants) (in each such case, a "**Breaching Shareholder**") breaches or otherwise violates any of its obligations under Article III, IV or VII or Section 2.05, 6.01, 6.02, 8.01, 8.02, 8.04 or 8.07 and (x) with respect to any breach or violation (or series of breaches or violations) of Article III, IV or VII or Section 2.05, 6.01 or 6.02, in the reasonable opinion of a Non-Breaching Shareholder, such breach or violation (or series of breaches or violations) has resulted or will result in direct loss or damage to the Non-Breaching Shareholder or the

Company in an amount in excess of US$50,000,000 in the aggregate or (y) in the case of any breach or violation of Section 8.01, 8.02, 8.04 or 8.07, such breach or violation has resulted in the issuance of an Order by any Governmental or Regulatory Authority alleging that the Breaching Shareholder, any of its Affiliates, the Company or any of its or their respective directors, officers, employees, agents, subcontractors or consultants has violated applicable law (any such breach(es) or violation(s) meeting the criteria specified in clause (x) or (y) above, a "**Material Breach**"):

(i) the Non-Breaching Shareholder may provide written notice (a "**Notice of Breach**") to the Breaching Shareholder and the Company of the facts constituting such Material Breach and the Non-Breaching Shareholder's intent to terminate this Agreement if such Material Breach is not cured within thirty (30) days from the date of receipt of the Notice of Breach by the Breaching Shareholder and the Company (the "**Cure Period**");

(ii) upon receipt of such Notice of Breach, the Breaching Shareholder shall have the right to cure (or cause to be cured) the Material Breach within the Cure Period;

(iii) a Material Breach shall be deemed cured if (1) in the case of any Material Breach arising from a breach or violation of Article III, IV or VII or Section 2.05, 6.01 or 6.02, prior to the end of the Cure Period the Breaching Shareholder pays to the Company or the Non-Breaching Shareholder, as applicable, an amount equal to the direct loss or damage alleged by the Non-Breaching Shareholder to have arisen from such Material Breach or otherwise remedies such direct loss or damage or (2) in the case of any Material Breach arising from a breach or violation of Section 8.01, 8.02, 8.04 or 8.07 and the issuance of an Order by a Governmental or Regulatory Authority in connection therewith, such Order is revoked or otherwise ceases to be effective (and no new Order is imposed in connection with such breach or violation) prior to the end of the Cure Period;

(iv) if the Material Breach is not cured within the Cure Period, the Non-Breaching Shareholder shall have the right to terminate this Agreement by delivering to the Breaching Shareholder and the Company not later than fifteen (15) days following the end of the Cure Period written notice of termination (a "**Notice of Termination**");

(v) the failure of the Non-Breaching Shareholder to provide a Notice of Termination to the Breaching Shareholder and the Company not later than fifteen (15) days following the end of the Cure Period shall constitute a waiver of such Non-Breaching Shareholder's right to terminate this Agreement due to such Material Breach; and

(vi) if the Non-Breaching Shareholder provides a Notice of Termination to the Breaching Shareholder and the Company not later than fifteen (15) days following the end of the Cure Period, this Agreement shall terminate effective as of the date thirty (30) days after the end of the Cure Period.

(f) During the period following the Non-Breaching Shareholder having provided a Notice of Breach to the Breaching Shareholder and the Company in accordance with Section 11.02(a)(i) and prior to the date of termination of this Agreement in accordance with this Section 11.02 (including, without limitation, during the period of any arbitration proceeding of the type referred to in Section 11.02(c)), the Parties shall continue to perform their respective obligations under this Agreement in accordance with the terms hereof.

(g) If a Shareholder disputes whether a Material Breach has occurred or whether it has been cured, such Shareholder may commence an arbitration proceeding in accordance with Section 12.01. If prior to the date of termination of this Agreement in accordance with Section 11.02(a)(vi) a Shareholder commences an arbitration proceeding disputing whether a Material Breach has occurred or has been cured, then, notwithstanding Section 11.02(a), this Agreement shall not be terminated pursuant to Section 11.02 on the basis of such disputed Material Breach or cure until the date on which the panel of arbitrators selected in connection with such proceeding has issued a final, non-appealable award confirming that such disputed Material Breach has occurred and/or has not been cured, as applicable.

## ARTICLE XII DISPUTE RESOLUTION

12.01 Arbitration; Consent to Jurisdiction.

(a) Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules then in force (the "**UNCITRAL Rules**") in accordance with the following terms and conditions:

(i) In the event of any conflict between the UNCITRAL Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail.

(ii) The place of the arbitration shall be New York, New York, United States of America.

(iii) Where there is only one claimant party and one respondent party, each shall appoint one arbitrator in accordance with the UNCITRAL Rules, and the two arbitrators so appointed shall appoint the third (and presiding) arbitrator in accordance with the UNCITRAL Rules within thirty (30) days from the appointment of the second arbitrator. In the event of an inability to agree on a third arbitrator, the appointing authority shall be the International Court of Arbitration of the International Chamber of Commerce, acting in accordance with such rules as it may adopt for such purpose. Where there is more than one claimant party, or more than one respondent party, all claimants and/or all respondents shall attempt to agree on their respective appointment(s). In the event that all claimants and all respondents cannot agree upon their respective appointments(s) within thirty (30) Business Days of the date of the notice of arbitration, all appointments shall be made by the International Court of

Arbitration of the International Chamber of Commerce.

(iv) The English language shall be used as the written and spoken language for the arbitration and all matters connected to the arbitration.

(v) The arbitrators shall have the power to grant any remedy or relief that they deem just and equitable and that is in accordance with the terms of this Agreement, including specific performance, and including, but not limited to injunctive relief, whether interim or final, and any such relief and any interim, provisional or conservatory measure ordered by the arbitrators may be specifically enforced by any court of competent jurisdiction. Each Party retains the right to seek interim, provisional or conservatory measures from judicial authorities and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(vi) The award of the arbitrators shall be final and binding on the Parties.

(vii) The award of the arbitrators may be enforced by any court of competent jurisdiction and may be executed against the person and assets of the losing party in any competent jurisdiction.

(b) Except for arbitration proceedings pursuant to Section 12.01(a), no action, lawsuit or other proceeding (other than the enforcement of an arbitration decision, an action to compel arbitration or an application for interim, provisional or conservatory measures in connection with the arbitration) shall be brought by or between the Parties in connection with any matter arising out of or in connection with this Agreement.

12.02 Service of Process

Each Party irrevocably appoints CT Corporation System, located on the date hereof at 111 Eighth Avenue, 13th Floor, New York, New York 10011, USA, as its true and lawful agent and attorney to accept and acknowledge service of any and all process against it in any judicial action, suit or proceeding permitted by Section 12.01, with the same effect as if such Party were a resident of the State of New York and had been lawfully served with such process in such jurisdiction, and waives all claims of error by reason of such service, provided that the Party effecting such service shall also deliver a copy thereof on the date of such service to the other Parties by facsimile as specified in Section 13.01. Each Party will enter into such agreements with such agent as may be necessary to constitute and continue the appointment of such agent hereunder. In the event that any such agent and attorney resigns or otherwise becomes incapable of acting, the affected Party will appoint a successor agent and attorney in New York reasonably satisfactory to each other Party, with like powers. Each Party hereby irrevocably submits to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York state court sitting in New York City, Borough of Manhattan, in connection with any such action, suit or proceeding, and agrees that any such action, suit or proceeding may be brought in such court, provided, however, that such consent to jurisdiction is solely for the purpose referred to in this Section 12.02 and shall not be deemed to be a general submission to the jurisdiction of said courts of or in the State of New York other than for such purpose. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable law,

4/19

objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum. Nothing herein shall affect the right of any Party to serve process in any other manner permitted by applicable law or to commence legal proceedings or otherwise proceed against any other Party in any other jurisdiction in a manner not inconsistent with this Section 12.02.

12.03 Waiver of Sovereign Immunity

Each Party hereby represents and acknowledges that it is acting solely in its commercial capacity in executing and delivering this Agreement and in performing its obligations hereunder, and each Party hereby irrevocably waives with respect to all disputes, claims, controversies and all other matters of any nature whatsoever that may arise under or in connection with this Agreement and any other document or instrument contemplated hereby, all immunity it may otherwise have as a sovereign, quasi-sovereign or state-owned entity (or similar entity) from any and all proceedings (whether legal, equitable, arbitral, administrative or otherwise), attachment of assets, and enforceability of judicial or arbitral awards.

## ARTICLE XIII MISCELLANEOUS

13.01 Notices

All notices and other communications provided for herein (including, without limitation, any modifications of, or waivers or consents under, this Agreement) shall be given or made by facsimile or by hand in writing and transmitted by facsimile or courier and delivered to the address specified below or at such other address as shall be designated by such Party in a notice to each other Party:

The Shareholders:

(i) If to Telenor Mobile, to:

Telenor Mobile Communications AS
Snarøyveien 30
N-1331 Fornebu
Norway

Facsimile No.: + 47-67-89-48-18
Attn: Mr. Ragnar Korsæth

with a copy to:

Advokatene i Telenor
Snarøyveien 30, 1A
N-1331 Fornebu

Facsimile No.: +47-96-212-216
Attn: Fredrik Lykke, Esq.