# EXHIBIT O

IN THE MATTER OF AN ARBITRATION UNDER
THE UNCITRAL ARBITRATION RULES BETWEEN:

**TELENOR MOBILE COMMUNICATIONS AS,**

Claimant,
Snaroyveien 30
N-1331 Fornebu
Norway

**-and-**

**STORM LLC,**

Respondent,
1 Narodnogo Opolchennya Street
Kyiv 03151
Ukraine

---

**RESPONDENT'S PRE-HEARING BRIEF**

---

## Table of Contents

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ........................................................................... 3

ARGUMENT ............................................................................................. 13

I. The Entire Shareholders Agreement Is Invalid and Unenforceable as a Matter of Ukrainian Law, Which is the Law Applicable to This Dispute ................................................. 13

    A. Storm's Signatory to the Shareholders Agreement Lacked Actual Authority to Bind Storm to that Agreement ................................................................. 13

        1. The Authorization Granted to Mr. Nilov to Sign the 2002 Voting Agreement Is Insufficient as a Matter of Law to Grant Mr. Nilov Authority to Sign the Shareholders Agreement .......................................... 15

    B. Mr. Nilov Lacked Apparent Authority to Bind Storm to the Shareholders Agreement .......................................... 16

        2. Storm Is Not Estopped From Raising an *Ultra Vires* Defense and Has Not, Through Its Actions, Ratified the Shareholders Agreement ...................................... 20

    C. The Absence of Mr. Nilov's Actual or Apparent Authority to Bind Storm Has Been Confirmed Several Times by the Ukrainian Courts, and This Tribunal Is Obligated Under New York Law to Recognize Those Decisions ................................................................. 22

II. Even if the Shareholders Agreement Were Enforceable, the Provisions Relating to the Nomination of Directors to the Kyivstar Board Are Illegal, Invalid, and Unenforceable as a Matter of Ukrainian Law .............................................. 26

    A. The Ukrainian Law Applicable to Matters Relating to the Corporate Governance of Ukrainian Companies Cannot Be Modified by Private Contract ................................. 26

B. The Shareholders Agreement Cannot, as a Matter of Ukrainian Law, Define the Composition and Competence of Kyivstar's Corporate Bodies ..............................................27

1. Under Ukrainian Law the Parameters of a Company's Corporate Governance Principles Are Determined by Recourse to the Company's Constituent Documents ..........................................27

2. The Kyivstar Board Was Deemed by the Highest Commercial Court of Ukraine to Be Improperly and Illegally Constituted ..............................................28

C. The December 22 Order Estops Telenor Mobile From Arbitrating Its Claim Concerning Storm's Non-Attendance at Kyivstar Board Meetings. .......................29

III. Even if the Shareholders Agreement Is Enforceable, the Storm Directors Have No Obligation to Attend Shareholders Meetings or Nominate Kyivstar Officers ..........................32

A. The Provisions of the Shareholders Agreement Pertaining to the Nomination of Kyivstar Directors and the Kyivstar President Are Invalid as a Matter of Ukrainian Law ..............................................32

B. As a Matter of Ukrainian Law, a Shareholder's Right to Participate in a Company's Managing Bodies Is Considered a Fundamental Right, But It Is Not Considered an Obligatory Duty ..............................33

IV. Even if the Shareholders Agreement Were Enforceable, the Non-Compete Provisions Thereof Are Invalid and Unenforceable as a Matter of Ukrainian Law ..............................34

A. Storm Cannot, as a Matter of Both New York and Ukrainian Law, Bind Its Parent or the Alfa Subsidiaries ..............................................35

1. Ukrainian Law Does Not Recognize the Ability of a Subsidiary to Bind a Parent or Unrelated Subsidiaries Absent the Grant of Specific Authority From That Parent or Unrelated Subsidiary ..............................35

2. New York Law Rejects the Ability of Subsidiary to Bind a Parent Absent Special Circumstances Not Present Here ..............................................36

B.   Ukrainian Antimonopoly Law Applies to the
Adjudication of the Validity of the Non-Compete Clause............................37

    1.   New York Choice of Law Rules Mandate the
Selection of Ukrainian Law for the Determination of
the Validity of the Non-Compete Clause.................................................38

    2.   Even If New York Law Applies, the Shareholders
Agreement Is Invalid and Unenforceable ...............................................39

V.   Storm Did Not Violate the Arbitration Clause of the
Shareholders Agreement by Litigating in the Ukrainian
Courts..........................................................................................................40

CONCLUSION............................................................................................................ 43

**Table of Authorities**

**Page**

**Cases**

*36 Convent Ave. HDFC v. Fishman,*
   No. 03 Civ. 3998 (JGK), 2004 WL 1048213 (S.D.N.Y. May 7, 2001)......................... 22

*Ackermann v. Levine*; 788 F.2d 830, 837-38 (2d Cir. 1986) (emphasis in original); *See also S.C. Chimexim v. Velco Enters. Ltd.*, 36 F. Supp. 2d 206, 211 (S.D.N.Y. 1999) . 23

Affidavit of Myron B. Rabij dated August 9, 2006 ("Rabij Aff.") at ¶¶ 11-18 ............... 15

*Airline Delivery Svcs. Corp. v. Lee,* 443 N.Y.S.2d 5, 6 (N.Y. App. Div. 1979) .............. 39

*American Institute of Chemical Engineers v. Reber-Friel Co.,* 682 F.2d 382, 390 (2d Cir. 1982) ................................................................................................................................ 39

*Benjamin v. Coughlin,*
   905 F.2d 571 (2d Cir. 1990) ...................................................................................... 30

*Business Incentives Co. v. Sony Corp. of Am.,*
   397 F. Supp 63 (S.D.N.Y. 1975) ............................................................................... 17

*Cargill, Inc. v. Charles Kowsky Res., Inc.,*
   949 F.2d 51 (2d Cir. 1991) ........................................................................................ 17

*CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.,* 792 N.E.2d 155, 159 (N.Y. 2003) ... 23

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.,* 42 N.Y.2d 496, 499 (N.Y. 1977) ................................................................................................................................ 39

*Fletcher v. Atex, Inc.,*
   68 F.3d 1451 (2d Cir. 1995) ...................................................................................... 37

*Gilberg v. Barbieri,*
   423 N.E.2d 807 (N.Y. 1981)...................................................................................... 30

*Harcourt Brace Jovanovich, Inc. v. Goldwater,*
  532 F.Supp. 619 (D.C.N.Y. 1982) ............................................................... 35

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines,*
  230 F.3d 549 (2d Cir. 2000) ...................................................................... 17

*Int'l Sales Co. v. Potter & Brumfield,*
  410 F. Supp. 1339 (S.D.N.Y. 1976) ........................................................... 18

*Johnston v. Compagnie Generale Transatlantique,* 152 N.E. 121, 122 (N.Y. 1926)....... 23

*Kalb Voorhis & Co. v. Am. Fin. Corp.,*
  8 F.3d 130 (2d Cir. 1993) ......................................................................... 37

*Kohler v. Bank of Bermuda Ltd.,* No. M18-302 (CSH),  2004 WL 444101, at *9
  (S.D.N.Y. Mar. 10, 2004) .......................................................................... 23

*Lasry v. Lasry,* 180 A.D.2d 488, 489, (N.Y. App. Div. 1992) ......................................... 23

*Lehman Bros., Inc. v. Tutelar,*
  No. 85 CIV, 3772 (DLC), 1997 WL 403463 (S.D.N.Y. July 17, 1997)..... 13, 14, 19, 20

*Lehman Bros., Inc. v. Tutelar, CIA Financiera, S.A.* No. 95 CIV, 3772 (DLC), 1997 WL
  403463, at *3 n.4 (S.D.N.Y. July 17, 1997) ................................................. 13

*Liberman v. Lieberman,* 149 Misc. 2d 983, 989, 566 N.Y.S. 2d 490, 395 (N.Y Sup. Ct.
  1991) ...................................................................................................... 42

*Matter of Express Indus. & Term. Corp. v. New York State Dep't of Transp.,*
  93 N.Y.2d 584 (N.Y. 1999) ........................................................................ 35

*North American Bank, Ltd. v. Schulman,*
  123 Misc. 2d 516, 474 N.Y.S.2d 383 (N.Y. Co. Ct. 1984)........................... 18

*Perkins v. DeWitt,* 279 A.D. 903, (N.Y. App. Div. 1952) .............................................. 23

*Presbyterian Church of Sudan v. Talisman Energy Inc.,*
  No. Civ. A. 01-9882, 2006 WL 2602145 (S.D.N.Y. Sept. 12, 2006)........................ 37

*Robison v. Sweeney,*
  301 A.D.2d 815 (N.Y. App. Div. 2003) ........................................................ 35

*S. Leo Harmonay Inc. v. Binks Mfg. Co.,*
    597 F. Supp. 1014 (S.D.N.Y. 1984) ........................................................... 16

*Sea Dragon Inc. v. Van Weedle Scheepvaartkantoor B.V.,* 574 F. Supp. 367, 372
    (S.D.N.Y. 1983) ........................................................................................ 23

*SG Cowen Sec. Corp. v. Messih,*
    No. 00 Civ. 3228, 2000 WL 633434 (S.D.N.Y. May 17, 2000) ................... 18

Storm, Telenor Mobile, Omega LLC ("Omega") and Sputnik IV L.P. and Sputnik V.
    Holdings Ltd. (collectively, "Sputnik"). ..................................................... 4

*Thomson-CSF, S.A. v. American Arbitration Ass'n,*
    64 F.3d 773 (2d Cir. 1995) ........................................................................ 36

*Triad Fin. Establishment v. Trumpane Co.,*
    611 F. Supp. 157 (N.D.N.Y. 1985) ...................................................... 17, 18

*Trs. of the Am. Fed'n. of Musicians and Employers' Pension Fund v. Steven Scott
    Enters., Inc.,*
    40 F. Supp. 2d 508 (S.D.N.Y. 1999) .......................................................... 21

**Statutes**

N.Y. Bus. Corp. Law at §304 (McKinney 2006) ................................................. 26

**Treatises**

Restatement (Second) of Judgments §27 cmt. c (1982) ...................................... 30

Samuel Williston and Richard A. Land, A Treatise on the Law of Contracts at §13:4 (4th
    ed. 1993) ..................................................................................................... 39

Respondent Storm LLC ("Storm") respectfully submits this pre-hearing brief setting forth its defense to the claims asserted by Telenor Mobile Communications AS ("Telenor Mobile") in its Amended Statement of Claim dated April 25, 2006 (the "Amended Statement of Claim").

## PRELIMINARY STATEMENT

1.    These proceedings arise out of a shareholders agreement allegedly agreed to among each of Storm, Telenor Mobile and Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar"), dated as of January 30, 2004 (the "Shareholders Agreement" or "Agreement").  Telenor Mobile alleges that Storm has, as one of two of Kyivstar's shareholders (Telenor Mobile being the other), violated that Shareholders Agreement by failing to attend annual and extraordinary shareholders meetings; failing to appoint candidates for election to the Kyivstar board of directors (the "Board"); and to cause Storm-nominated board members (the "Storm Directors") to attend Board meetings and participate in the management of Kyivstar.  In addition, Telenor Mobile alleges that Storm has also, indirectly through its parent company and its parent company's subsidiaries (other than Storm), violated the terms of the non-compete clause contained in the Shareholders Agreement by owning, indirectly or directly, more than 5% of another company engaged in the mobile telecommunications business in Ukraine.  Finally, Telenor Mobile alleges that Storm violated the good faith and dispute resolution procedures of the Shareholders Agreement.

2.    As an initial matter, the Tribunal does not need to address the merits of any of Telenor Mobile's claims because the Shareholders Agreement does not bind any of the parties.  The Shareholders Agreement does not, and cannot, bind Storm because its signatory did not have the proper authority, as a matter of Ukrainian law, to enter into the

Agreement. The Ukrainian courts have expressly held in two orders dated April 25 and May 25, 2006 (the "April Order" and "May Order"; collectively, the "Ukrainian Orders") that the Shareholders Agreement is null and void, and the Tribunal is required, under New York law on the recognition of foreign judgments to follow those Ukrainian orders. To the extent that Telenor Mobile is alleging a breach arising from the actions of Storm's parent company and its parent company's subsidiaries, it is a matter of basic contracts law that these entities, over which Storm exercises no authority or control, cannot be bound to the terms of an agreement that they have not signed. Nor can Storm be held accountable for the actions of companies over which it exercises no authority or control.

3.    Even if the Tribunal were to address the merits of Telenor Mobile's allegations, the applicable law is of no avail to Telenor Mobile. The provisions of the Shareholders Agreement that Telenor Mobile contends obligate Storm to participate in the corporate governance of Kyivstar are illegal and unenforceable by implication, as the parallel provisions contained in Kyivstar's corporate charter were invalidated in a decision by the Highest Commercial Court of Ukraine, which decision was recently confirmed by the Ukrainian Supreme Court (the "December 22 Order"). As such Storm was under no obligation to nominate directors to Kyivstar Board. Nor did the Storm Directors elected to the Board have any obligation to attend Board meetings or otherwise participate in Kyivstar's corporate governance. Moreover, the so-called "obligation" to participate in, *inter alia*, shareholders meetings, is not so much an obligation under Ukrainian law as a right, which the vested party may choose to exercise as he or she sees fit.

4.    Finally, to the extent that the Tribunal believes that it is necessary to look to the merits of Telenor Mobile's claims that the non-compete provisions of the Shareholders Agreement have been violated by Storm's parent company and/or its parent's subsidiaries, it should refrain from so doing for two key reasons. *First*, as non-signatories to the Shareholders Agreement, neither Storm's parent nor its parent's subsidiaries have agreed to submit to this arbitration, and therefore any dispute regarding their alleged breach of the Shareholders Agreement should be brought in a Ukrainian Court. *Second*, because the validity of the non-compete clause, which Storm disputes, falls under the penumbra of the Ukrainian anti-monopoly laws and the jurisdiction of the Ukrainian Anti-monopoly Committee (the "AMC"), the subject matter is non-arbitrable, and the Tribunal should defer adjudication of this matter to the Ukrainian authorities.

5.    For these reasons, Storm respectfully requests that this Tribunal reject Telenor Mobile's claims in their entirety.

## FACTUAL BACKGROUND[1]

**The Parties**

6.    Telenor Mobile is a corporation duly organized and existing under the laws of the Kingdom of Norway, with its principal place of business in Fornebu, Norway. Telenor Mobile is a subsidiary of Telenor ASA. *See* Proposed Findings of Fact and Conclusions of Law dated September 12, 2006 ("Storm Findings and Conclusions") at 14.

---

[1]    The following statement of facts hereby incorporates by reference the statement of facts contained in Storm's Proposed Findings of Fact and Law September 12, 2006, which are restated here in an abbreviated form.

7.    Storm is a limited liability company organized and existing under the laws of Ukraine, with its principal address at 1, Narodnogo Opolchennya Street, Kyiv 03151, Ukraine.  *Id*. at  15.   Storm is wholly owned by Alfa Telecom JSC ("Alfa Telecom"), a company organized under the laws of the British Virgin Islands that currently uses the trade name "Altimo."  Storm and Alfa Telecom are associated with the Alfa Group, one of Russia's largest privately owned financial-industrial conglomerates. *Id*. at 16.

8.    Kyivstar is the largest mobile telecommunications company in Ukraine. Telenor Mobile and Storm are the only two shareholders of Kyivstar.  Telenor Mobile owns approximately 56.5% of the issued and outstanding shares of Kyivstar, and Storm owns approximately 43.5% of the shares of the company.  *Id*. at 17.

**Negotiations Relating To The 2002 Transactions**

9.    Telenor Mobile, Kyivstar and Storm are signatories to the Shareholders Agreement.   The Shareholders Agreement is one of several documents related to the corporate governance and management of Kyivstar executed by the parties and other entities beginning in 1998. *Id*. at 18.

10.    Prior to 2002, Kyivstar had several existing shareholders: Storm, Telenor Mobile, Omega LLC ("Omega") and Sputnik IV L.P. and Sputnik V. Holdings Ltd. (collectively, "Sputnik").  The parties had entered into a shareholders agreement in 1998. In early 2002, Telenor Mobile sought to acquire all of Sputnik's shares in Kyvistar, while Storm sought to acquire Omega's shares.  *See id*. at 18-21.  In light of these changes to Kyivstar's ownership, Telenor Mobile approached Storm in early 2002 to enter into a new shareholders agreement (what would effectively become the 2004 version of the Shareholders Agreement).  By May 2002, Telenor Mobile's purchase

proceeded as planned, while Storm's purchase of the Omega shares was delayed. Until Omega ceased to be a shareholder, the 1998 shareholders agreement would remain in effect. *Id.* at 22-25.

11. While the Omega transaction was still being negotiated, Storm and Telenor Mobile agreed to enter into a Voting Agreement dated August 30, 2002 (the "Voting Agreement"), which would essentially serve as a "bridge" between the original 1998 shareholders agreement and the new shareholders agreement, until such time as Storm purchased the Omega shares. The new shareholders agreement was entirely dependent on the acquisition of Omega shares by Storm. *Id.* at 26-29.

12. A draft form of the new shareholders agreement was annexed as Exhibit B to the Voting Agreement. *Id.* at 30. Mr. Ekhougen, head of Telenor's Representative Office in Ukraine, and who was responsible for Telenor's negotiations with Storm at the time, has testified that Telenor Mobile never argued that this draft shareholders agreement was an enforceable contract in and of itself. *See* Ekhougen Test., August 14, 2006 Hearing Transcript ("8/14 Tr.") at 109:4 – 110:17.

13. The parties exchanged certificates confirming that each possessed the requisite authority to enter into the Voting Agreement. Of particular importance to the instant proceeding, Storm included with the certificates a copy of its charter, founding documents, and registration certificates. *See* Storm Findings and Conclusions at 31.

14. Just as importantly, Storm also attached to its certificate a copy of a "written consent of the participants of [Storm]" approving the Voting Agreement, dated August 30, 2002 (the "Written Consent"), as well as a document entitled "Minutes No. 19 of the Extraordinary General Meeting of Participants" of Storm dated October 7, 2002,

which confirmed approval of the Written Consent. *Id.* at 32; *see also* Exs. L and N to Telenor Mobile's Evidentiary Brief dated August 9, 2006 ("Telenor Mobile Evidentiary Br."). Although the foregoing documents refer to the draft shareholders agreement annexed to the Voting Agreement, they did not authorize Storm's Director General, Valeriy Nilov, to sign that draft "as is," nor did they purport to authorize Mr. Nilov to execute versions of the new shareholders agreement that were materially different from the draft form. *See* Storm Findings and Conclusions at 32.

### Alfa and Storm Close the Omega Transaction and Request Significant and Material Changes to the Shareholders Agreement

15.    Shortly before the closing of the Omega share purchase transaction, Alexey Khudyakov,[2] Vice President of Altimo, requested certain changes to the draft shareholders agreement. Mr. Khudyakov requested those changes at the insistence of Storm's Ukrainian partners, on whose behalf he acted. *See* Affidavit of Alexey Khudyakov dated August 31, 2006 ("First Khudyakov Aff.") at ¶¶ 6-7. Telenor Mobile's representative, Mr. Ekhougen, initially refused to make any changes, but noted that his refusal to incorporate Mr. Khudyakov's amendments "does not mean that Telenor is unwilling to consider any possible amendments that Kyivstar's shareholders may bring forward at a later stage." *See* Ex. R to Telenor Mobile Evidentiary Br.; *see also* Ekhougen Test., 8/14 Tr., at 110:7-17. It is significant that Telenor Mobile, in response to the requested changes, did not insist on signing the draft shareholders agreement "as is" and did not argue that the form language attached to the 2002 Voting Agreement constituted an enforceable contract.

---

[2]     Mr. Alexey Khudyakov's name was incorrectly spelled as "Khoudyakov" in his first Affidavit.

16.     Meanwhile, Storm and Telenor Mobile had agreed to enter into the new shareholders agreement on or before January 31, 2004.  *See* Storm Findings and Conclusions, 36; *see also* Telenor Mobile Evidentiary Br. at 15, Ex. S.

17.     On December 18, 2003, Storm again wrote to representatives of Telenor Mobile to urge Telenor Mobile to consider Storm's proposed changes to the draft shareholders agreement, which included, among other points, a renegotiation of the material breach section (which was deemed particularly important to Storm's Ukrainian partners, due to their increasingly difficult relations with Telenor Mobile).  *See* Telenor Mobile Evidentiary Br. at 15, Ex. T; *See* First Khudyakov Aff. at ¶¶ 6-7.  Telenor Mobile rejected two of the proposed amendments, but agreed to negotiate the material breach provisions.  *See id.* at ¶¶ 8-9.

18.     Between January 22-28, 2004, several drafts of the new termination provision for material breaches of the agreement were exchanged between Storm and Telenor Mobile.  *See* Telenor Mobile Evidentiary Br. at 15, Exs. U, V and W; First Khudyakov Aff. at ¶ 9.  Mr. Ekhougen conceded at the August 14, 2006 hearing that the changes proposed by Storm would have implications for various "important" provisions of the Shareholders Agreement.  Ekhougen Test., 8/14 Tr., at 115:16-117:18.  At the time, Mr. Khudyakov referred to the comments Alfa had to the draft agreement as "substantive."  Telenor Mobile Evidentiary Br., Ex. U.  In his affidavit, Mr. Khudyakov similarly characterized the amendments in the final executed agreement as substantial, material and important to Storm.  *See* First Khudyakov Aff. at ¶ 7.[3]

---

[3]     Mr. Khudyakov recalled in particular that the parties negotiated the amount of direct breach specified in the agreement; although Storm proposed lowering the figure from $50 million to $5 million, Telenor Mobile refused and ultimately prevailed.  *See* First Khudyakov Aff. at ¶ 11.  Mr. Khudyakov gave

19.    In contrast to the 2002 transactions, which involved lawyers for both Telenor Mobile and Storm, Storm's negotiations culminating in the Shareholders Agreement were primarily led by a non-lawyer, Mr. Khudyakov.  Telenor Mobile was represented in these negotiations by its Ukrainian counsel, Oleksiy Didkovskiy.  *See* First Khudyakov Aff. at ¶ 9; Ekhougen Test., 8/14 Tr., at 111:3-6.[4]

20.    On January 30, 2004, Mr. Nilov, on behalf of Storm; Mr. Ekhougen, on behalf of Telenor Mobile; and Mr. Igor V. Lytovchenko, on behalf of Kyivstar; executed the Shareholders Agreement.  *See* Telenor Mobile Evidentiary Br. at 16, Ex. Y.

21.    In connection with the execution of the Shareholders Agreement, Storm delivered "Certificates of Incumbency and Authority of Storm" dated January 30, 2004.  *See* Exs. AA and BB to Telenor Mobile Evidentiary Br.  The documents purported to certify that Mr. Nilov was authorized to sign the Shareholders Agreement.  *Id*.  One of the certificates was signed by Andrei Kosogov, a member of the Alfa Group Supervising Board of Directors and chairman of Altimo.  Unlike the documents provided for the 2002 transactions, the 2004 certificates do not anywhere indicate (or provide any evidence) that a Meeting of Participants had been held or that Mr. Nilov had been given authority to execute the Shareholders Agreement.  *Compare* Exs. AA and BB with Ex. L to Telenor Mobile Evidentiary Br.  Storm's expert, Professor Roman Maydanyk, has presented unrebutted testimony that the 2004 certificates have no effect under Ukrainian law absent

---

unrebutted testimony that Telenor Mobile would not have taken such a firm stance on the issue had it believed the issue to be merely "technical." *Id.*

[4]    Although Mr. Wack (a lawyer for Storm who was involved extensively in the 2002 transactions) did not participate actively in the negotiations surrounding the Shareholders Agreement, he did briefly review the material breach amendments after having been contacted by Mr. Khudyakov on January 22, 2004.  *See* First Khudyakov Aff. At ¶ 10; Affidavit of David Wack dated August 31, 2006 ("Wack Aff.") at ¶ 8 and Ex. A thereto.  Mr. Wack did not provide any other advice to Storm with regard to the Shareholders

such a Meeting of Participants. *See* Legal Opinion of Roman Maydanyk dated August 31, 2005 ("Maydanyk Op.") at ¶¶ 26-29.

22.    Mr. Kosogov also testified that he signed one of the certificates at Telenor Mobile's request and he mistakenly believed that Mr. Nilov had general authority under Ukrainian law to execute the Shareholders Agreement. *See* Affidavit of Andrei Kosogov dated August 31, 2006 ("Kosogov Aff.") at ¶¶ 5-6. Mr. Kosogov did not consult the provisions of Storm's Charter, and he did not seek legal advice before signing the certificate. *Id*. at ¶ 6. Mr. Kosogov further testified that he did not intend to represent that there had been a Meeting of Participants authorizing the execution of the Shareholders Agreement and he does not recall any such meeting. *See id*. at ¶¶ 4, 6.

**The Ukrainian Litigations**

23.    In 2005, after completing the purchase of the Ukrainian partners' shares in Storm, Alfa discovered that Mr. Nilov lacked authority to enter into the Shareholders Agreement. *See* Ex. C to Telenor Mobile's (Memorandum of Law in Opposition to Respondent Storm's Motion to Dismiss, dated June 23, 2006 "Mem. in Opp'n to Mot. to Dismiss"); *see also* September 5, 2006 Hearing Transcript ("9/5 Tr.") at 9:17-10:17. At the time, Storm had already begun to raise issues relating to Kyivstar's corporate governance through litigation in Ukraine. *See* Storm's Statement of Defense at ¶¶ 10-13. Specifically, Storm commenced an action in the Ukrainian courts which was directly related to the corporate governance provisions in Kyivstar's Charter and the Shareholders Agreement. In that litigation (the "December 22, 2005 litigation"), Storm took the position that its representatives were not required to follow the provisions relating to

---

Agreement, and Mr. Khudyakov did not rely on Mr. Wack (who is not a Ukrainian lawyer) for any advice on Ukrainian law in that transaction. Khudyakov Aff. At ¶ 10.

Kyivstar's board member nominations because they are invalid under Ukrainian law. *See id.*; *see also* Second Affidavit of Alexey Khudyakov dated November 22, 2006 ("Second Khudyakov Aff.") at ¶ 5; Affidavit of Pavel Kulivov dated November 22, 2006 ("Kulikov Aff.") at 4-5.[5]

24.    The litigation commenced by Alpren Limited ("Alpren"), an Alfa subsidiary, in April 2006 is consistent with the actions brought by Storm in Ukraine because it too challenged the Shareholders Agreement. The Alpren litigation culminated in the April Order, which was confirmed on appeal by the May Order. The Ukrainian courts found that Mr. Nilov lacked authority under Storm's Charter and Ukrainian law to enter into the Shareholders Agreement. The courts noted that Section 2.03(b)(1) of the Shareholders Agreement bound Storm to purchase shares of Kyivstar. As a result, the courts held, Section 12.4(ii) of Storm's Charter required approval for the Agreement from a Meeting of Participants. The courts found that there was no evidence that such a Meeting ever took place. *See* Decl. of Anna-Marta Khomyak dated August 8, 2006 ("Khomyak Decl."), Exs. 23 and 29.[6]

25.    Storm was represented in those proceedings by its current General Director (and Mr. Nilov's successor), Vadim Klymenko. *See* Affidavit of Vadim Klymenko dated August 9, 2006 ("Klymenko Aff.") at ¶ 4. Mr. Klymenko was unable to

---

[5]    Mr. Kulikov has alto testified in his Affidavit that Altimo's position at the time was that the Article 6.02, the non-exempt clause which is cited by Telenor Mobile in its claim against Storm, could not possibly affect Altimo nor any of its subsidiaries other than Storm. *See* Kulikov Aff. at ¶ 15. This will be discussed in greater detail below.

[6]    The trial court also held that the Shareholders Agreement was not registered with the proper authorities in the Ukrainian language, which is a requirement for documents that affect a company's foundational documents. Because the Shareholders Agreement and the 2002 Voting Agreement call for changes in Storm's Charter under certain circumstances, the trial court ruled that both agreements were invalid for failure to comply with the Ukrainian registration requirements. *See* Khomyak Decl., Ex. 23 at 3.

argue, both at trial and on appeal, that there was in fact a Meeting of Participants granting Mr. Nilov the authority to enter into the Shareholders Agreement, because Mr. Klymenko had not seen any evidence of such a meeting. Klymenko Aff. at ¶ 8. Mr. Klymenko informed the Ukrainian courts of these ongoing arbitration proceedings. *See id.* at ¶¶ 6-7. The courts, however, ruled that they had jurisdiction over the dispute. *See* Khomyak Decl., Exs. 23 and 29.

26.    Telenor Mobile did not attempt to intervene in the Ukrainian proceedings, even though it had the right to do so. *See* Storm's Evidentiary Brief dated August 9, 2006 ("Storm Evidentiary Br.") at 3; Legal Opinion of Lyubov Logush dated July 28, 2006 ("Logush Op.") at ¶¶ 16-19.

27.    Telenor Mobile, however, did invoke the Ukrainian legal system in the December 22, 2005 litigation, fully participated in that proceeding, and in fact obtained a reversal of the December 22 Order on July 5, 2006, based on a procedure in which it introduced newly admitted evidence.[7]  Storm Evidentiary Br. at 3.  The reversal of the December 22 Order was itself reversed by the Ukrainian Supreme Court on October 3, 2006 (the "October 3 Ruling"), thus permanently reinstating the original December 22 Order, which remains binding law to this day. *See* October 3 Ruling, attached hereto as Exhibit 1.

**The Clarification Order of the Kyiv Appellate Commercial Court**

28.    The Tribunal rendered its Partial Final Award on Jurisdiction on October 22, 2006 (the "October 22 Award" or the "Award").  In light of the reasoning contained in the Award, Storm filed an application to the Kyiv Appellate Commercial

---

[7]    It is significant that Telenor Mobile initiated this proceeding *ex parte*, in direct violation of Ukrainian civil procedure rules which required notice. *See* 6/29 Tr. At 33:7-13.

Court on October 30, 2006 requesting that it clarify certain aspects of the Ukrainian Orders.

29.    On November 8, 2006, the Kyiv Appellate Commercial Court issued a Clarification Order. The Clarification Order states in no uncertain terms that, "the Shareholders Agreement violated the public order of Ukraine and … the representative of one of the parties to the agreement – Storm LLC – was not authorized to execute the said Shareholders Agreement and the arbitration clause contained therein as its integral part." *See* Clarification Order at 1, attached hereto as Exhibit 2.

30.    The appellate court further noted that the invalidation of the Shareholders Agreement arose under Article 216, which provides that "an invalid deed does not entail any legal consequences except for those related to its invalidity." Accordingly, the court stated that the entire agreement was void *ab initio*, and that "the parties had no grounds whatsoever to perform any acts on the basis of such agreement, including to resort to arbitration in connection therewith." *Id.* at 2.

31.    Finally, the court stated that the Ukrainian Orders "that have entered into effect shall be binding on legal entities, individuals, citizens, state authorities, local government authorities, their officials, citizen unions, and other organizations. Therefore the court decision shall also be binding upon those entities that were not among the parties to the court proceedings." *Id.*

**ARGUMENT**

I.    **The Entire Shareholders Agreement Is Invalid and Unenforceable as a Matter of Ukrainian Law, Which is the Law Applicable to This Dispute**

32.    Telenor Mobile assumes that New York law should apply to this dispute because the Shareholders Agreement contains a New York choice of law clause. That is not the case. The New York case law and the New York conflicts of laws rules clearly mandate the application of Ukrainian law to this dispute. Under that analysis, there is no question that the Shareholders Agreement, in its entirety, is unenforceable as to Storm because: (a) Storm's signatory to the Shareholders Agreement lacked actual authority to bind Storm to the Agreement; and (b) Storm's signatory to the Shareholders Agreement lacked apparent authority to bind Storm to the Agreement; and (c) the Ukrainian courts have confirmed Mr. Nilov's lack of actual and/or apparent authority, and the Tribunal is bound by those decisions.

A.    **Storm's Signatory to the Shareholders Agreement Lacked Actual Authority to Bind Storm to that Agreement**

33.    With regard to the question of whether Storm's signatory to the Shareholder's Agreement, Mr. Valeriy Nilov, had actual authority to bind Storm to the Shareholders Agreement, the applicable case law clearly directs New York courts to the law of the place of incorporation. *See, e.g., Lehman Bros., Inc. v. Tutelar, CIA Financiera, S.A.*, No. 95 CIV, 3772 (DLC), 1997 WL 403463, at *3 n.4 (S.D.N.Y. July 17, 1997) (applying law of place of incorporation (Argentina) to issue of actual authority). Applying Ukrainian law, there is no question that Mr. Nilov, lacked the proper legal authority to bind Storm to the terms of that agreement.[8]

---

[8]    *See* Maydanyk Op. at ¶¶ 8-13 (stating that Ukrainian law is applicable to the question of Mr. Nilov's authority to enter into the Shareholders Agreement.)

34.     *Tutelar* is in accord with Ukrainian statutory law that mandates the application of Ukrainian law to issues relating to the status and operation of a Ukrainian company. *See* Legal opinion of Peter Magnus dated November 22, 2006 ("Magnus" Op.) at ¶ 18. As such, the application of New York law to matters of corporate governance would constitute a violation of Ukrainian positive law. The mandatory nature of the Ukrainian laws applicable to domestic corporate governance evinces a strong public policy favoring the application of Ukrainian law to disputes arising under such circumstances. This is particularly so in light of the fact that the entities here affected by the application of Ukrainian corporate law, namely, Kyivstar and Storm, are each Ukrainian companies doing business exclusively within Ukrainian territory and in a highly regulated national market.

35.     Storm's corporate charter (the "Storm Charter") expressly limits the power of its General Director to enter into agreements such as the Shareholders Agreement.[9] *See* Maydanyk Op. at ¶¶ 14-18. Under Article 12 of Storm Charter, before Storm's general director can bind the company, he requires specific authorization to do so, which authorization may be conferred only by the affirmative vote of a special shareholders meeting. *See* Magnus Op. at ¶ 10; Kulikov Aff. at ¶ 6; Second Khudyakov Aff. at ¶ 6. No such meeting ever took place prior to Mr. Nilov's execution of the

---

[9]     Storm's Charter states that the approval of a Meeting of Participants is required where, among other things, the General Director will be entering into an agreement providing for "the disposal of or encumbrance upon the Kyivstar Shares or any other assets of the Company." (Ex. 11 to Khomyak Aff. at Section 12.3(ii).) The August 30, 2002 Notice of Written Polling notes that the new shareholders agreement would involve the "voting and disposal of shares in Kyivstar" (*see* Telenor Mobile Evidentiary Br., Ex. L) and the Shareholders Agreement clearly contemplates such a disposition. *See* Telenor Mobile Evidentiary Br., Ex. Y, at Section 2.03(b). One of Storm's legal experts, Mr. Maydanyk, reviewed this evidence and concluded that "that [Storm's Charter] expressly limits the power of the General Director to enter into the Shareholders Agreement precisely because it entails the disposal of Kyivstar shares." Maydanyk Op. at ¶ 14. Telenor Mobile, through its representative, Mr. Ekhougen, admits that the

Shareholders Agreement.  Accordingly, when Mr. Nilov signed that agreement, he acted unlawfully and without authority.  *See* Magnus Op. at ¶¶ 9-12.

36.    Because authority to bind the corporation can derive only via the mechanisms set forth in the Storm Charter, both under the terms of the Storm Charter and § 145 of the Ukrainian Civil Code, which provides that the corporate charter shall determine all issues pertaining to corporate governance and that the charter shall be amended only by a vote at the general shareholders meeting, there is no other legal way under which Mr. Nilov could have obtained authority to bind Storm.  As such, absent the granting of special authority at a special shareholders meeting, Mr. Nilov could not, as a matter of law, have bound Storm to the Shareholders Agreement.

1.      **The Authorization Granted to Mr. Nilov to Sign the 2002 Voting Agreement Is Insufficient as a Matter of Law to Grant Mr. Nilov Authority to Sign the Shareholders Agreement**

37.    Telenor Mobile has argued that the authorizations prepared in connection with the 2002 Voting Agreement may be considered proper authority for the execution of the Shareholders Agreement.  *See* Affidavit of Myron B. Rabij dated August 9, 2006 ("Rabij Aff.") at ¶¶ 11-18  Those authorizations, however, were limited to the 2002 Voting Agreement.  Although they refer to the draft form for the new shareholders agreement and allow Mr. Nilov to take steps to enter into that new shareholders agreement, the authorizations cannot be stretched to apply to a materially different agreement entered into more than a year later.  Telenor Mobile has not presented the

---

Shareholders Agreement involves the disposition of Kyivstar shares.  *See* Ekhougen Test., 8/14 Tr. at 98:10-15.

Tribunal with any case law or other authority in which a board resolution or power of attorney was construed so broadly.[10]

### B.    Mr. Nilov Lacked Apparent Authority to Bind Storm to the Shareholders Agreement

38.    The determination of the applicable law to the issue of apparent authority is somewhat more complicated, but it still leads to the conclusion that Ukrainian law applies.  Such an analysis may not even be required because, as noted in *Tutelar,* the issue of apparent authority is governed by the law of the place of where Telenor Mobile "relied upon such authority."  *Tutelar*, 1997 Wl 403463, at *3 n.4 (citations and internal quotations omitted).  Assuming a choice-of-law analysis is required, New York choice of law principles mandate the application of Ukrainian law to this issue, notwithstanding the existence of a New York choice-of-law clause in the Shareholders Agreement.  Although some U.S. "jurisdictions give determinative effect to a choice-of-law clause and thereby follow the so-called 'autonomy rule,' . . . New York is not one of them."  *S. Leo Harmonay Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014, 1024 (S.D.N.Y. 1984) (internal citations omitted) *aff'd mem.* 762 F.2d 990 (2d Cir. 1985).  It is well-settled law in the State of New York that the existence of a contractual choice of law clause is not binding on the New York courts.  Rather, New York courts will only enforce a contractual choice of law provision where:

> [the state whose law is] selected has sufficient contacts with the transaction in question and the application of that state's law would not be contrary to any fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular

---

[10]    Telenor Mobile itself admitted that the Shareholders Agreement contained new material breach provisions that affected important clauses in the Agreement and that those changes were the subject of negotiations.  *See* ¶ 18, *supra*.  This was confirmed by Mr. Khudyakov.  *Id.  See also* Wack Aff. At ¶ 9.

issue at bar, and which would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Business Incentives Co. v. Sony Corp. of Am.*, 397 F. Supp. 63, 67 (S.D.N.Y. 1975), *citing* Restatement (Second) Conflict of Laws, § 187 (1971).  *See also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines*, 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear [that] in cases involving a contract with an express choice-of-law provision . . . a court is to apply the law selected in the contract *as long as* the state selected has sufficient contacts with the transaction.") (emphasis added); *Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991)  (holding that New York courts may disregard an express choice-of-law provision where the most significant contacts with the subject matter of the dispute are in another state); *Triad Fin. Establishment v. Trumpane Co.*, 611 F. Supp. 157, 162-63 (N.D.N.Y. 1985) (holding that "New York courts do not consider themselves bound by a forum selection clause if its application would override the policies of a state with a materially greater interest in the controversy").  Thus, applying New York conflict of laws principles to this case, the choice-of-law clause contained in the Shareholders Agreement should be enforced if and only if: (1) New York has sufficient contacts with the transaction in question to justify its application to the Shareholders Agreement; (2) the application of New York law is not contrary to any fundamental policy of the state (Ukraine) which has a materially greater interest than New York; *and* (3) the state with the materially greater interest would have been the state of the applicable law in the absence of an effective choice by the parties. Here, as is set forth in greater detail below, there is no question that all of these elements mandate the application of Ukrainian law.

39.    New York courts have not hesitated to invalidate a choice-of-law provision where the chosen law does not bear a substantial relationship to the parties or the underlying transaction and/or the state whose law is chosen has little or no interest in the outcome of the dispute.  *See, e.g. SG Cowen Sec. Corp. v. Messih*, No. 00 Civ. 3228 (HB), 2000 WL 633434, at *4 (S.D.N.Y. May 17, 2000) (denying effect of New York law selection where California had greater interest in the transaction) *aff'd* 224 F.3d 79 (2d Cir. 2000); *Int'l Sales Co. v. Potter & Brumfield*, 410 F. Supp. 1339, 1341 (S.D.N.Y. 1976) (applying the law of Puerto Rico even though the contract had an Indiana choice of law provision where Puerto Rico had a more significant relationship to the controversy); *Triad Fin. Establishment*, 611 F. Supp. at 162 (N.D.N.Y. 1985) (denying enforcement of choice of law provision due to insufficient connection with chosen state and because application would override policies of forum with materially greater interest in the controversy); *North American Bank, Ltd. v. Schulman*, 123 Misc. 2d 516, 521, (N.Y. Co. Ct. 1984) (denying choice of Israeli law due to insufficient connection to Israel and conflict with New York's law against usury).[11]

40.    Neither the Shareholders Agreement, nor the transactions contemplated therein, nor the parties to that agreement, have any connection whatsoever to New York. The parties to the Shareholders Agreement are Ukrainian and Norwegian.    The obligations set forth in the Shareholders Agreement are to be performed exclusively in Ukraine.  Every aspect of the Shareholders Agreement relates to the operations of

---

[11]    In prior documents provided to the Tribunal, Storm has applied New York law on collateral estoppel and waiver.  It did so, notwithstanding the choice of law arguments put forward here, because the Tribunal sits in the same position as a New York court with respect to deciding what effect to give to foreign orders.  A New York court would apply New York law to that analysis.  *See* Storm Motion to Dismiss dated June 5, 2006 ("Storm Mot. to Dismiss").

Kyivstar, a Ukrainian company, whose business engagements consist of activity in a highly regulated national market in Ukraine. The Shareholders Agreement itself was negotiated and executed in Ukraine, with the involvement of Telenor Mobile's Ukrainian legal counsel and Storm's advisors. It is therefore indisputable that the state with the most substantial relationship to the parties and the transaction is Ukraine, and that therefore, Ukrainian law must apply to the question of Mr. Nilov's apparent authority.[12]

41.     Telenor Mobile itself acknowledges that Ukrainian law applies,[13] citing (incorrectly) to article 92(3) of the Ukrainian Civil Code. *See* Rabij Aff. at ¶¶ 30-37. Ukrainian law does not recognize the concept of apparent authority except for Article 92(3), which applies the concept of apparent authority only when a person has exceeded his or her legal authority, not when there is an allegation that the person lacked any authority whatsoever. *See* Maydanyk Op. at ¶¶ 31-32. Even if, *arguendo*, Article 92(3) were apposite under these facts, it is inapplicable here because the Ukrainian New Civil Code (containing the new Article 2(3) came into effect only as of January 1, 2004.[14] Therefore, because Article 92(3), cannot apply to the facts of this case and the Ukrainian Civil Code contains no other provisions relating to the doctrine of apparent authority (*see* Maydanyk Op. at 37), Telenor Mobile may not therefore assert that Mr. Nilov had apparent authority to enter into the Shareholders Agreement.

---

[12]     This choice-of-law analysis is, in fact, applicable to *all* aspects of this dispute.

[13]     Even if, *arguendo*, New York law were to apply to this analysis, under New York law, the issue of apparent authority is governed by the law of the place where Telenor Mobile "relied upon such authority indicating that Ukrainian law would apply." *Lehman Bros., Inc. v. Tutelar CIA Financiera, S.A.*, No. 95 Civ. 3772 (DLC), 1997 WL 403463, at *3 n.4 (S.D.N.Y. July 17, 1997) (citations and internal quotations omitted).

[14]     The Legal Opinion of Prof. Maydanyk presents unrebutted testimony that because the New Civil Code came into force in January 2004, *i.e.*, after the 2002 Written Polling, Telenor Mobile may not rely on its provisons. *See* Maydanyk Op. at ¶¶ 35-38.

42.     Moreover, even if the Ukrainian concept of apparent authority were relevant -- and indeed, even if New York law on apparent authority were applicable -- Telenor Mobile knew or should have known that there were limitations on Mr. Nilov's authority.   Telenor Mobile has acknowledged, both in its submissions and in the testimony of its witnesses, that it received a copy of Storm's Charter well in advance of the parties' execution of the Shareholders Agreement.   *See, e.g.*, Telenor Mobile Evidentiary Br. at 11; Ekhougen Test., 8/14 Tr., at 91:11-96:13; 97:5-10.   Telenor Mobile also knew, from the 2002 transactions, that approval conferred by a special meeting of Storm's shareholders was required for transactions involving the disposition of Kyivstar shares.   Prof. Maydanyk has presented testimony (once again, unrebutted by Telenor Mobile) that even if Article 92(3) of the Ukrainian Civil Code 2004 were applicable, Telenor Mobile would not be able to rely on the principle of apparent authority, because it knew or should have known of the limitations on Mr. Nilov's authority.   *See* Maydanyk Op. at ¶¶ 33-34.   Under New York law on apparent authority the result would be the same:  a third party asserting the existence of apparent authority, has a duty of inquiry where, *inter alia*, the facts and circumstances are such as to put the third party on inquiry.  *See Tutelar*, 1997 WL 403463, at *4. Under the present circumstances, Telenor Mobile clearly had a duty to inquire since it had knowledge of the requirement of a Meeting of Participants.  As a result, Telenor Mobile cannot show, as a matter of either New York or Ukrainian law, that Mr. Nilov had apparent authority.

**2.      Storm Is Not Estopped From Raising an *Ultra Vires* Defense and Has Not, Through Its Actions, Ratified the Shareholders Agreement**

46.    Telenor Mobile has also maintained that Storm is estopped from denying Mr. Nilov's authority to bind Storm to the Shareholders Agreement through actions that allegedly ratified the Shareholders Agreement.  A principal is estopped under New York law from denying an agent's authority if, among other things, the principal's intentional or negligent acts or omissions "created an appearance of authority in the agent" on which the third party "*reasonably* and *in good faith relied*" on such authority to its detriment.  *See, e.g.*, *Trs. of the Am. Fed'n. of Musicians and Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503, 508 (S.D.N.Y. 1999) (cited by Telenor Mobile) (emphasis added).  Notwithstanding that, as noted above, New York law cannot be applied to the merits of this dispute, Telenor Mobile cannot be said to have reasonably relied on any alleged act or omission on Storm's part, because it was undeniably aware that Mr. Nilov had limitations on his authority to enter into the Shareholders Agreement.[15]  There was no "appearance of authority" and any reliance that Telenor Mobile claims to have placed on Mr. Nilov's authority could not have been reasonable.  Accordingly, Telenor Mobile cannot rely on the doctrine of estoppel.

47.    Telenor Mobile's ratification theory fails as well.  Alfa did not learn of Mr. Nilov's lack of authority until 2005 and by that time it had begun to raise issues relating to Kyivstar's corporate governance.  These challenges continued thereafter and included the April 2006 lawsuit brought by Alfa's subsidiary, Alpren, regarding Mr. Nilov's lack of authority.  Without prejudice to that fact the New York law does not

---

[15]    Indeed, Telenor Mobile's reliance on *Steven Scott* is misplaced, because that case is highly distinguishable from the present facts.  In that case, the court held that the relying party reasonably relied on the agent's apparent authority in part because it had not been mailed a copy of a trust agreement which described the agent's inability to enter into the relevant settlement agreement.  Here, however, Telenor Mobile knew since 2002 that a Meeting of Participants was necessary for Mr. Nilov to sign the

apply, the main case cited by Telenor Mobile, *36 Convent Ave. HDFC v. Fishman*, No. 03 Civ. 3998 (JGK), 2004 WL 1048213 (S.D.N.Y. May 7, 2004), states that ratification "only occurs where the principal has full knowledge of all material facts and takes some action to affirm the agent's actions." *Id*. at *5 (quoting *Trs. of the Am. Fed'n,* 40 F. Supp. 2d at 511). Here, after Alfa learned the facts, there was no action to affirm Mr. Nilov's execution of the Shareholders Agreement. *36 Convent Avenue* also notes that the court may find there is ratification if the principal fails to timely repudiate after learning the material facts and the opposing party relies on the principal's silence. *See id*. That is not the case here because, as noted above, Alfa has been challenging the Kyivstar corporate governance provisions since 2005. *See* ¶ 23, supra; *See also* Storm Statement of Defense at ¶¶ 10-13.

### C.    The Absence of Mr. Nilov's Actual or Apparent Authority to Bind Storm Has Been Confirmed Several Times by the Ukrainian Courts, and This Tribunal Is Obligated Under New York Law to Recognize Those Decisions

48.    The April and May 2005 Orders made a clear, unequivocal finding that Mr. Nilov lacked actual or apparent authority to bind Storm due to the lack of a Meeting of Participants. Under New York law and Ukrainian law, the Tribunal is obligated to recognize those decisions.

49.    The New York courts have long held that "a final judgment obtained through sound procedures in a foreign country is generally conclusive as to its merits unless: (1) the foreign court lacked jurisdiction over the subject matter or the person of the defendant; (2) the judgment was fraudulently obtained; or (3) enforcement of the judgment would offend the public policy of the state in which enforcement is sought.

---

Shareholders Agreement, because it did in fact receive a copy of Storm's Charter, and had previously

*Ackermann v. Levine*, 788 F.2d 830, 837-38 (2d Cir. 1986) (emphasis in original); *See also S.C. Chimexim v. Velco Enters. Ltd.*, 36 F. Supp. 2d 206, 211 (S.D.N.Y. 1999) (noting that the courts "generally will accord recognition to the judgments rendered in a foreign country under the doctrine of comity absent a showing of fraud in the procurement of the foreign judgment or unless recognition of the foreign judgment would offend a strong policy of New York"); *Johnston v. Compagnie Generale Transatlantique*, 152 N.E. 121, 122 (N.Y. 1926) (foreign judgment is conclusive upon the merits and can be impeached only by proof that the court in which it was rendered did not have jurisdiction of the subject matter of the action or of the person of the defendant, or that it was procured by means of fraud).

50.    New York has been characterized as a generous forum in which to enforce judgments made in foreign courts, *CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 792 N.E.2d 155, 159 (N.Y. 2003), and New York's statutory provisions regarding foreign money judgments have been "liberally construed by New York courts in favor of recognition and enforcement." *Kohler v. Bank of Bermuda Ltd.*, No. M18-302 (CSH), 2004 WL 444101, at *9 (S.D.N.Y. Mar. 10, 2004). The courts have accorded equally broad recognition to judgments not involving money damages. *See id.* at *10. *See also Lasry v. Lasry*, 180 A.D.2d 488, 489, (N.Y. App. Div. 1992); *Perkins v. DeWitt*, 279 A.D. 903, (N.Y. App. Div. 1952), *Sea Dragon Inc. v. Van Weedle Scheepvaartkantoor B.V.*, 574 F. Supp. 367, 372 (S.D.N.Y. 1983) ("Absent any evidence to the contrary, it is the firm and established policy of the American courts to respect a valid foreign decree.").

---

signed the Voting Agreement and knew of the requirement for a Meeting of Participants for that agreement.

51.     In light of the highly favorable New York policy towards enforcement of foreign judgments, the Tribunal must follow the decisions of the Ukrainian courts as regards Mr. Nilov's lack of authority and the consequent invalidity of the Shareholders Agreement.  Telenor Mobile has never made an express claim that the Ukrainian Orders specifically were corrupt, and has equally failed to present any evidence that the judgments were obtained fraudulently.  *See* 6/29 Tr. at 44:15 – 45:10; 8/14 Tr. at 214:23 – 215:11.  Storm, on the other hand, has presented unrebutted expert testimony that the procedures were entirely fair and consistent with Ukrainian procedure and free of any irregularities.  *See* Logush Op.; Logush Supp. Op.  The Tribunal itself explicitly stated that it was not "impugn[ing] in any way the integrity of those courts or their decisions" and there was "no evidence of any impropriety or violations of any Ukrainian procedures."  *See* October 22 Award, at 15.

52.     The *Sea Dragon* case is especially instructive, as it involves facts that are on all accounts identical to the present dispute.  In that case, the federal district court vacated an arbitral award based on the principle of respect for a valid foreign judgment, absent any showing of fraud:

> [T]he doctrine of comity, founded on diplomatic respect for valid foreign judgments[,] militates against disregard of the Dutch order.  Comity is to be accorded a decision of a foreign court so long as that court is a court of competent jurisdiction and as long as the laws and public policy of the forum state and the rights of its residents are not violated.  [*Sea Dragon*] claimed that the Dutch decree was obtained fraudulently, yet provided little evidence of such conduct before the arbitrators.  Fraud, therefore, was not a basis for the majority's decision.  Moreover, such claims appropriately should have been raised in the [Dutch] court.  *Sea Dragon* has not and did not challenge the Dutch court's jurisdiction nor demonstrated that the Dutch decree violates American law or policy.  Absent any evidence to the contrary, it is the firm and established policy of American courts to respect a valid decree.

574 F. Supp. 367 at 372 (internal quotation and citation omitted).

53.    Under New York law, then, the Tribunal may disregard the valid Ukrainian court judgments only if there is a specific finding of fraud or if enforcement that would offend New York public policy. Neither is present here. It is essential to note that second-guessing the competence of the Ukrainian courts, and asserting that they lacked a complete record (which Storm refutes, in any case) is not a sufficient reason to disregard the Ukrainian decisions under New York law.

54.    Under Ukrainian law, the Tribunal must also recognize the Ukrainian Orders. Once again, Storm has presented unrebutted expert testimony that enforcement in Ukraine of an award based on an arbitration clause which has been declared null and void would violate Ukrainian public policy (and further, that under the New York Convention, violation of such public policy would be a reason to set aside the award). *See* Logush Op. at 30-38. Storm has also cited the *Western NIS Enterprise Fund* case, a Ukrainian case in which the Ukrainian courts refused to recognize and enforce a foreign arbitral award (rendered in New York) by reason of the invalidity of the underlying agreement as previously declared by a competent Ukrainian court. *Id.* at 37; *see also* Exs. A7 and A8 of Logush Supp. Op.

55.    Finally, the recent Clarification Order states in clear terms that the Ukrainian courts consider that any further pursuit of the arbitration, in light of its findings that the Shareholders Agreement is null and void due to Mr. Nilov's lack of authority, would be a violation of Ukrainian law and of the Ukrainian Orders itself. The court goes on to state that the decision is binding on entities which are not part of the court proceedings. *See* Clarification Order at 2.

25

**II.    Even if the Shareholders Agreement Were Enforceable, the Provisions Relating to the Nomination of Directors to the Kyivstar Board Are Illegal, Invalid, and Unenforceable as a Matter of Ukrainian Law**

56.    For the same reasons set forth above at Section I.B, Ukrainian law applies to any analysis of the validity of the Shareholders Agreement.  Ukrainian law prohibits the modification by private contract of the corporate governance rules set forth in a company's constituent documents, in this case, the Kyivstar Charter.  Moreover, under Ukrainian law, the constituent documents of a corporation define the corporate governance principles of a corporation.

**A.    The Ukrainian Law Applicable to Matters Relating to the Corporate Governance of Ukrainian Companies Cannot Be Modified by Private Contract**

57.    Under Ukrainian law, the rights of shareholders of a Ukrainian company are understood to be a matter of corporate governance, and as such are determined exclusively by recourse to Ukrainian law.  *See* Magnus Op. at ¶ 18.  Article 1(4) of the Law on Business Entities (the "Business Law") and Article 81(3) of the New Civil Code mandate the application of Ukrainian law to the corporate governance of Ukrainian companies.  *See id.*  Ukrainian corporate law pertaining to corporate governance is a mandatory, non-derogable norm;[16] in other words, a Ukrainian company cannot opt out of Ukrainian corporations law by recourse to a private contract.  *See* Magnus Op. at ¶¶ 17-18.

---

[16]    This concept would be analogous to a New York corporation trying to circumvent the corporate governance requirements of New York law (*e.g.*, the requirement that every New York corporation must designate the secretary of state as an agent for service of Process) by entering into a shareholders agreement governed by another jurisdiction whose law does not require the registration of such an agent.  Even if the choice of law were binding on the parties, it would in no way absolve the New York corporation of its requirement to comply with New York corporate law applicable to New York corporations – just as a Ukrainian corporation, regardless of any choice-of-law clause must nevertheless comply with Ukrainian corporate law.  *See e.g.*, N.Y. Bus. Corp. Law at §304 (McKinney 2006).

**B.**     **The Shareholders Agreement Cannot, as a Matter of Ukrainian Law, Define the Composition and Competence of Kyivstar's Corporate Bodies**

    **1.**     **Under Ukrainian Law the Parameters of a Company's Corporate Governance Principles Are Determined by Recourse to the Company's Constituent Documents**

58.     Article 4(2) of the Business Law establishes that a Ukrainian company's "constituent documents" shall exclusively determine the composition and competence of corporate bodies as well as the procedures underlying their decision-making authority. *See* Magnus Op. at ¶ 21.[17]  The corporation's constituent documents are required by law to be submitted to a state authority when the company is registered as a Ukrainian company.  *See id.* at ¶ 22.  Thereafter, only those documents registered as "constituent documents" may be used to define the composition and competence of the company's decision-making bodies.  *See id.*  The constituent documents of a Ukrainian corporation cannot be altered or supplemented after the registration of the corporation, even if that supplemental document is unanimously ratified by the company's shareholders.  *See id.*

59.     In this case, the Shareholders Agreement was not, and can never be, registered as one of Kyivstar's constituent documents.  *See id.* at 22.  As such, the provisions of the Shareholders Agreement relating to the rights and obligations of Kyivstar's shareholders are presumptively invalid, as those rights and obligations can only be set forth in Kyivstar's constituent documents, namely, the Kyivstar charter.  *See id.* at 21.  As discussed in greater detail below, the provisions of the Kyivstar charter

---

[17]     As set forth more fully in the Magnus Op. at ¶ 21, Article 117(1) and 116(1) of the Ukrainian Civil Code provide for the rights and obligations, respectively, for a Ukrainian shareholder.  While these sections do allow shareholders to have other rights and obligations than are stipulated in the above-mentioned articles of the Ukrainian Civil Code, such additional rights and obligations must be set forth in the corporation's constituent documents.

relating to the nomination and election of the Kyivstar Board were invalidated by the Ukrainian courts in the December 22 Order.

### 2.    The Kyivstar Board Was Deemed by the Highest Commercial Court of Ukraine to Be Improperly and Illegally Constituted

60.    In issuing the December 22 Order, the Highest Commercial Court of Ukraine (the "Highest Court") expressly found that the provisions of Article 9.1 of the Kyivstar charter contravene Ukrainian corporations law and are therefore invalid and unenforceable.[18]   In so finding, the Highest Court noted that under Ukrainian law, the Kyivstar board was required to be comprised solely by Kyivstar shareholders, *i.e.*, Storm and Telenor.   The election of individuals who are not shareholders, but who are representatives of shareholders, was expressly rejected by the Highest Court as contrary to Ukrainian law.   *See* Ex. C to Storm Mot. to Dismiss at 2-3.   The Highest Court then went on to find the Kyivstar Board, which included representatives of the shareholders but who were not shareholders themselves, to be illegally constituted, and invalidated the decisions of Kyivstar shareholders meetings appointing five of the company's nine directors, including all of the directors nominated by Storm Directors.   *Id.*

61.    The substance of the December 22 Order leads to several inescapable conclusions.   *First*, as a matter of law, Storm was under no obligation to nominate Storm Directors.   *Second*, at no time did those Storm Directors who were nominated and elected

---

[18]    Significantly, Telenor Mobile was a party to the proceedings that gave rise to the December 22 Order.  As a participant in those proceedings, Telenor Mobile had a full and fair opportunity to be heard, and lost the decision on the merits.  At no point during the course of those proceedings did Telenor Mobile seek to stay those proceedings in favor of arbitration.  Indeed, Telenor Mobile later sought, and obtained, a reversal of the December 22 Order through a procedure based on newly admitted evidence (which Telenor Mobile made *ex parte*, in violation of Ukrainian procedural rules).  Storm was able to seek a permanent reinstatement of the December 22 Order before the Ukrainian Supreme Court.  Telenor Mobile, in fully participating in this litigation, is estopped from relitigating the same issues before the Arbitral Tribunal. *See* ¶¶ 63 *et seq.*, infra.

ever become proper members of the Kyivstar Board, because their election was illegitimate. As such, the Storm Directors were under no obligation to attend of any of the Kyivstar Board meetings at any time, because they at no time exercised legal authority to act as Kyivstar directors. *Third*, were the Storm Directors to have continued to engage in business as usual, they would have been acting in violation of Ukrainian law and exposing themselves to liability under that law. *See* Magnus Op. at ¶ 28. *Fourth*, even if, *arguendo*, the Storm Directors could have continued to act as members of the Kyivstar Board, such activity would have been futile, as any decision rendered by an illegal board would have been subject to invalidation by the Ukrainian courts and would have exposed Kyivstar to potential liability.[19] *See* Magnus Op. at ¶ 29.

### C.    The December 22 Order Estops Telenor Mobile From Arbitrating Its Claim Concerning Storm's Non-Attendance at Kyvistar Board Meetings.

62.    As is evident from the above, Telenor Mobile's claims regarding the corporate governance issues directly and substantially overlap with the issues that were decided in the December 22 Order. As such, Telenor Mobile is estopped from bringing its claims before the Arbitral Tribunal, under both Ukrainian law and New York law. *See generally* Storm Mot. to Dismiss, at 10-13.

63.    Ukrainian law recognizes the principle of estoppel. Article 62 of the Ukrainian Code of Commercial Procedure prohibits a commercial court from litigating issues that have already been decided. Likewise, Article 122 of the Ukrainian Code of Civil Procedure prohibits a general court from litigating those issues that have been

---

[19]    It is a matter of common sense that Board decisions to enter into legal agreements with third party contractors and others, would, in the event of their invalidation by a Ukrainian court, have exposed Kyivstar to lawsuits by such third parties.

already decided, and requires that a defendant raise the existence of an arbitration agreement at the same time as his defense on the merits. [20]

64.     Under New York law, Telenor Mobile is also estopped from bringing its claim.  New York case law uses a two-pronged test to apply the collateral estoppel doctrine.  "[First,] [t]here must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.  *Gilberg v. Barbieri*, 423 N.E.2d 807, 809 (N.Y. 1981).[21]

65.     Clearly, there is an identity of issues, as there is a very close relationship between the December 22 Order and Telenor's claim in this arbitration.  The claims in both cases involve the resolution of the issue raised by Telenor Mobile in this arbitration, *i.e.*, whether the corporate governance provisions of Kyivstar are legal, and as a result, whether Storm properly instructed its representatives to not attend the various meetings.  The same legal principles of Ukrainian law apply to both disputes, evidence and arguments in both cases substantially overlap, and the preparation for the Ukrainian litigation clearly embraces the matter in the present arbitration.  The December 22 Order

---

[20]     Ukraine is also a signatory to the European Convention on International Commercial Arbitration, which states at Article VI(1) that the respondent to a court action must raise the arbitration clause at the same time as its substantive defense "under penalty of estoppel."  *See generally*, Storm Mot. to Dismiss, at 10.

[21]     As regards identity and decisiveness of issues, the Restatement (Second) of Judgments states the rule, which asks (1) whether there is a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first; (2) whether the new evidence or argument involves the application of the same rule of law as that involved in the prior proceeding; (3) whether pretrial preparation and discovery relating to the matter presented in the first action can be reasonably expected to have embraced the matter sought to be presented in the second; and (4) whether the claims in the two proceedings are closely related.  Restatement (Second) of Judgments §27 cmt. c (1982); *see also Benjamin v. Coughlin*, 905 F.2d 571, 576 (2d Cir. 1990) (applying New York law and finding "there is a 'substantial overlap' of evidence and arguments").  *See* Storm Mot. to Dismiss, at 11-12.

was decisively decided (appeal is no longer possible), and the corporate governance provisions of Kyivstar are invalidated under Ukrainian law.

66.    As mentioned above, it does not matter that Telenor Mobile bases its claim on the Shareholders Agreement rather than the Kyivstar Charter, because the two are nearly identical in their nomination provisions.  Since Article 9.1 of the Kyivstar Charter and Section 2.01 are virtually identical, the logical conclusion is that the latter must be similarly invalid, in light of the former's invalidation in the December 22 Order. *See* Magnus Op. at ¶ 31.  In other words, in light of Article 9.1's invalidation by the December 22 Order, it would be illogical to substitute in an identical provision from the Shareholders Agreement.

67.    Telenor Mobile attempts to reject the defense of estoppel by arguing that if the December 22 Order is valid, Storm has waived its right to avoid board meetings because it signed on to the Shareholders Agreement provisions.   *See* Telenor Mobile Mem. in Opp'n to Mot. to Dismiss, at 33.  As explained above, this is incorrect: the Shareholders Agreement is not a constituent document, and it cannot supplement or violate the Charter.  Magnus Op. at ¶ 31.

68.    Telenor Mobile likewise cannot claim that Storm had an obligation to attend board meetings prior to the December 22 Order.  *See* Telenor Mem. in Opp'n to Mot. to Dismiss, at 32-33.  Because the Ukrainian courts vindicated Storm's position that the Board nomination provisions—and by consequence, the Board's then-current composition—were illegal under Ukrainian law, Storm never had an obligation to attend board meetings, even prior to the judgment of the Highest Commercial Court in December 2005.

69.    Finally, as regards the full and fair opportunity to be heard, this prong is easily met because Telenor Mobile fully participated in the December 22 litigation, appealed the litigation without success, then obtained an *ex parte* reversal based on the "newly admitted evidence" procedure on July 5.

70.    In conclusion, Telenor is fully estopped from arbitrating its claim regarding Storm's non-attendance of Kyivstar Board meetings.

## III.    Even if the Shareholders Agreement Is Enforceable, the Storm Directors Have No Obligation to Attend Shareholders Meetings or Nominate Kyivstar Officers

71.    For the same reasons set forth above at Section I.B, Ukrainian law applies to any analysis of the obligations set forth in the Shareholders Agreement. Under Ukrainian law, the provisions of the Shareholders Agreement pertaining to the nomination of Kyivstar directors and its president are invalid and unenforceable. As such, Storm was under no obligation to nominate directors to, or the president of, the Kyivstar Board. In addition, Ukrainian law recognizes attendance at shareholders meetings as a right pertaining to all shareholders, but not as an obligation. As such, Storm was under no obligation to attend shareholders meetings.

### A.    The Provisions of the Shareholders Agreement Pertaining to the Nomination of Kyivstar Directors and the Kyivstar President Are Invalid as a Matter of Ukrainian Law

72.    Article 203(1) of the Ukrainian Civil Code provides that neither the charter nor the shareholders agreement of a joint-stock company may violate Ukrainian law. *See* Storm Statement of Defense at ¶ 8. Article 215 provides that any agreement that so violates Ukrainian law may be invalidated by the courts or, alternatively, would be considered to be invalid *ab initio*. *Id*. Because the Shareholders Agreement contains

32

provisions that are virtually identical to the Articles of the Kyivstar Charter invalidated by the December 22 Order, those Sections of the Shareholders Agreement are also effectively invalidated by the December 22 Order. *See* Magnus Op. at ¶ 31.

73.    As Telenor Mobile acknowledges, the December 22 Order has "cause[d] the Charter to be inconsistent with the express provisions of the Shareholders Agreement requiring, *inter alia*, a nine member board, five of whom are to be nominated by Telenor Mobile." *See* Telenor Mobile Amended Statement of Defense dated April 25, 2006 ("Telenor Mobile Am. Stmt. Defense") at ¶ 46. The December 22 Order, whose binding validity Telenor Mobile cannot dispute, requires the parties to conform the Charter to the relevant provisions of Ukrainian law. Here, Telenor Mobile seeks to turn the December 22 Order on its head, and asks this Tribunal for an order compelling Storm to agree to conform the Charter provisions to the Shareholders Agreement. Telenor should not be allowed to do an end run around the December 22 Order and obtain relief that has already been rejected by a court before which Telenor Mobile has previously appeared and lost.

B.    **As a Matter of Ukrainian Law, a Shareholder's Right to Participate in a Company's Managing Bodies Is Considered a Fundamental Right, But It Is Not Considered an Obligatory Duty**

74.    It is a well-settled principle of Ukrainian corporate law that a shareholder has a fundamental right to participate in the managing bodies of the company. Article 10(a) of the Business Law states: "the shareholder shall have the right to participate in the compan[y's] managing bodies as provided for by the Charter." *See* Magnus Op. at ¶ 24. The language of Article 10(a) thus bestows a fundamental right, rather than imposing a mandatory obligation. A shareholder's mandatory obligations

33

under Ukrainian law are set forth at Article 11 of the Business Law. *Id.* at ¶ 25. Nowhere among the provisions of Article 11 of the Business Law is the obligation to attend shareholders meetings or otherwise participate in the management of the company to be found. A shareholder thus has the "right" to participate in the company's managing bodies, but that shareholder is not obligated to exercise that right. Thus, Storm's decision to refrain from attending shareholders meetings was fully within its rights as a Kyivstar shareholder. *Id.*

## IV.   Even if the Shareholders Agreement Were Enforceable, the Non-Compete Provisions Thereof Are Invalid and Unenforceable as a Matter of Ukrainian Law

75.   Telenor Mobile seeks relief, *inter alia*, for Storm's alleged violation of section 6.02 of the Shareholders Agreement (the "Non-Compete Clause").[22]   Telenor Mobile claims that the acquisition by certain of Storm's "Affiliates" as that term is defined in the Shareholders Agreement,[23] of competing mobile telephony operators in the Ukraine, violates the terms of the Non-Compete Clause. The "Affiliates" at issue here are Alfa Telecom, Storm's parent, and certain subsidiaries of Alfa Telecom (the "Alfa Subsidiaries") that have no relationship whatsoever to Storm, other than the fact that they share the same parent. Under both New York and Ukrainian law, any agreement that

---

[22]     Telenor Mobile alleges that Storm has violated Section 6.02 of the Shareholders Agreement insofar as its parent, Alfa Telecom, has allegedly acquired a greater than 5% equity interest in entities engaged in the mobile telecommunications business in Ukraine. Section 6.02 provides, in relevant part, that: "No Shareholder or any of its Affiliates will ... own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person engaged in the [wireless mobile telecommunications business] in any region in Ukraine or ... permit any of its Controlled Affiliates ... to engage in the Business in any region in Ukraine or own or control, directly or indirectly, more than five (5%) of the voting capital stock in any Person engaged in the [wireless mobile telecommunications business] in Ukraine."

[23]     Section 1.01 of the Shareholders Agreement defines an "Affiliate" as "with respect to any Person, any other Person which directly or indirectly controls, or is in common control with, or is controlled by, such Person."

purports to bind a parent company or an unrelated subsidiary is invalid as a matter of basic contracts law, unless that parent or unrelated subsidiary is a signatory to the underlying contract or a separate agreement thereto that purports to bind that third party to such contract.[24]     It is undisputed that neither Alfa Telecom, nor any of the Alfa Subsidiaries, are signatories to the Shareholders Agreement or to any representation and warranty thereto that purports to grant Storm the authority to bind either Alfa Telecom and/or the Alfa Subsidiaries.

### A.     Storm Cannot, as a Matter of Both New York and Ukrainian Law, Bind Its Parent or the Alfa Subsidiaries

#### 1.     Ukrainian Law Does Not Recognize the Ability of a Subsidiary to Bind a Parent or Unrelated Subsidiaries Absent the Grant of Specific Authority From That Parent or Unrelated Subsidiary

76.     Under Ukrainian law, absent an explicit authorization stemming from either Alfa Telecom or the Alfa Subsidiaries enabling Storm to legally bind them, Storm has no power to so act. *See* Magnus Op. at ¶¶ 42-49. Such authority could have come in one of two forms, Alfa Telecom and/or the Alfa subsidiaries could have executed the Shareholders Agreement themselves, or, in accordance with their own Charters and corporate governance provisions, could have executed a power of attorney explicitly

---

[24]     The basic elements of contract formation are absent here vis-à-vis Alfa Telecom and the Alfa Subsidiaries, *i.e.*, offer and acceptance, and mutuality of obligation. Without the existence of offer and acceptance between parties, no contract will bind their relationship. "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. ... Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Robison v. Sweeney*, 301 A.D.2d 815, 817 (N.Y. App. Div. 2003) (quoting *Matter of Express Indus. & Term. Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589 (N.Y. 1999)). Moreover, an illusory contract, where one party has the ability to arbitrarily bind another party, is unenforceable. *See Harcourt Brace Jovanovich, Inc. v. Goldwater*, 532 F. Supp. 619, 624 (S.D.N.Y. 1982)(holding that it would be inappropriate for a party to have "absolutely unfettered license to act or not to act in any way it wishes ... [such a party could] simply make a contract and arbitrarily change its mind and that would be an illusory contract"). Here, absent a signature, there is no evidence of Alfa

authorizing Storm to bind them to the Shareholders Agreement. *See* Magnus Op. at ¶ 46.

Neither scenario applies to the facts here. Consequently, no such authority exists.[25]

### 2. New York Law Rejects the Ability of Subsidiary to Bind a Parent Absent Special Circumstances Not Present Here[26]

77.    Even if New York law could be found to apply to this matter, it is well

settled under New York law that a contract cannot bind the non-signatory parent of a

party to that contract unless the court finds reason to disregard corporate formalities. *See*

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 780 (2d Cir. 1995) (finding

that parent did not assume obligation in agreement between subsidiary and supplier even

though parent was aware when it acquired subsidiary that agreement purported to bind

parent to agreement as "affiliate" of subsidiary). To bind a non-signatory parent to a

subsidiary's agreement "short of requiring a *full* showing of some accepted theory under

agency or contract law imperils a vast number of parent corporations." *Id.*    Telenor

Mobile has not made any showing that either Alfa Telecom or the Alfa Subsidiaries

should be bound to the Shareholders Agreement via an alternative theory, such as

corporate veil-piercing or apparent authority, nevertheless, even if it had, neither theory

would avail them.

78.    Under New York choice of law principles, the question of whether it is

legally possible to ignore the corporate personhood of Storm requires an analysis of

---

Telecom's or the Alfa Subsidiaries' acceptance of the terms of the Shareholders Agreement, nor is there any evidence of their intent to be mutually bound by the obligations contained therein.

[25]    A considerable amount of time and resources have been spent in this and other fora to resolve the question of whether Mr. Nilov even had the authority bind Storm. Now, Telenor Mobile would have this Tribunal believe that Mr. Nilov had the authority to bind Alfa Telecom and the Alfa Subsidiaries as well, even though they are not even nominally signatories to the Shareholders Agreement.

[26]    The conflicts-of-laws analysis set forth above at Section I.B, also mandates application of Ukrainian law here.

Ukrainian law. *See, e.g., Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (the law of the place of incorporation determines whether or not a piercing of the corporate veil is warranted) *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (same). Telenor Mobile has introduced no evidence, as is its burden, to prove that Ukrainian law recognizes the doctrine of corporate veil piercing. *See Presbyterian Church of Sudan v. Talisman Energy Inc.*, No. Civ. A. 01-9882, 2006 WL 2602145, at *43 (S.D.N.Y. Sept. 12, 2006) (Court refused to investigate complex issue of foreign law relating to corporate veil piercing, noting that plaintiff had obligation to support its veil piercing theory with an adequate choice of law analysis and it failed to do so).

79.  Similarly, as noted above, New York courts look to the place of incorporation for the purposes of determining whether actual authority to bind a corporate parent exists. *See, e.g., Lehman Bros. Inc.* 1997 WL 403463, at *3 n.4 (applying law of place of incorporation (Argentina), to issue of actual authority). The issue of apparent authority also points to Ukrainian law. *See id.* at *3 (holding that the issue of apparent authority is governed by the law where the complaining party "relied" upon such authority).

80.  Telenor Mobile has failed to satisfy its burden that any of these elements are present here as a matter of Ukrainian law.

**B.    Ukrainian Antimonopoly Law Applies to the Adjudication of the Validity of the Non-Compete Clause**

81.  To the extent that the Tribunal determines that Alfa Telecom and the Alfa Subsidiaries are bound by the Non-Compete Clause, the question of the validity of that clause is beyond the scope of the Tribunal for two key reasons. *First*, because Alfa Telecom and the Alfa Subsidiaries are not signatories to the Shareholders Agreement,

they are not bound by the Arbitration clause, therefore any adjudication of their rights or obligations under that agreement should be heard in court. *Second*, under the Ukrainian constitution, competition-related issues are to be resolved exclusively by recourse to Ukrainian law. *See* Magnus Op. at ¶ 38. The regulatory agency vested with the *exclusive* jurisdiction for policing the Ukrainian markets is the Ukrainian Anti-Monopoly Committee ("AMC").[27]  To the extent therefore that a determination of the validity of the Non-Compete Clause must be made vis-à-vis Alfa Telecom and the Alfa Subsidiaries, such a decision must be made by the AMC, since that decision will affect not just the signatories to the Shareholders Agreement and their so-called "Affiliates," but the entire Ukrainian market for mobile telephony as well, including both market players and consumers.  Consequently, it is simply not possible under Ukrainian law for parties to regulate competition in Ukrainian markets by private contract.  To the extent any private law purports to exercise such a role, it is preempted by the Ukrainian antimonopoly law.[28]

**1.    New York Choice of Law Rules Mandate the Selection of Ukrainian Law for the Determination of the Validity of the Non-Compete Clause**

82.    Although Storm believes, as noted above, that the Tribunal does not even need to conduct a choice of law analysis in order to reach the conclusion that Ukrainian law must apply to the adjudication of the validity of the Non-Compete Clause, under such an analysis, the inescapable conclusion is that Ukrainian law would apply.  As noted *supra* at Section I.B, New York courts will not enforce a choice of law clause

---

[27]        *See* http://amc.gov.ua/amc/control/en/publish/article?art.id=44798.

[28]        Accordingly, as pointed out at ¶ 41 of the Magnus Op., under Art. V(1)(c) and V(2)(a) of the New York Convention, any award from the Tribunal arising from the Non-Compete Clause would be unenforceable because the award would deal with "a dispute not falling within the terms of the submission to arbitration [and t]he subject matter of that dispute is not capable of settlement by arbitration."

where enforcement of that clause would be contrary to the law or public policy of the state whose law would govern in the absence of the choice of law clause. *First*, there is no question that Ukrainian law would apply to the adjudication of the validity of the Non-Compete Clause absent the existence of the choice of law clause. As noted above, the Non-Compete Clause addresses only the Ukrainian market for telecommunications and has no relationship whatsoever to New York. *Second*, as also noted *supra*, there are few national interests stronger than the interest in regulating competition in domestic markets. As such, there is no question that the balance of interest here mandates the application of Ukrainian law to the disputed issues.

### 2. Even If New York Law Applies, the Shareholders Agreement Is Invalid and Unenforceable

83.     Even under New York law, the Non-Compete Clause is not enforceable. It is "uniformly agreed that in order to be valid, a promise imposing a restraint on trade must be reasonable." Samuel Williston and Richard A. Land, A Treatise on the Law of Contracts at §13:4 (4th ed. 1993). *See also, Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.,* 42 N.Y.2d 496, 499 (N.Y. 1977); *Airline Delivery Svcs. Corp. v. Lee,* 443 N.Y.S.2d 5, 6 (N.Y. App. Div. 1979). In cases where non-compete clauses are held to be valid, they are reasonably narrow in scope and restricted in time. *See* Williston on Contracts at §13:4. Where the restraint imposed on trade by the promisor is greater than is necessary for the legitimate interest of the convenantee, the non-compete clause will not be enforced. *See, e.g., American Institute of Chemical Engineers v. Reber-Friel Co.,* 682 F.2d 382, 390 (2d Cir. 1982) (restrictive covenant intended merely to shield covenantee from competition where there is no other legitimate interest is not reasonable). Here, the Non-Compete Clause purports to bind not just Storm, but its

parent company and all of its parent's subsidiaries – regardless of their geographic location – from engaging in competition in the Ukrainian Telephony market for all of time.  No New York court would ever enforce a restraint on trade as overbroad and unnecessary for the protection of Telenor Mobile or Kyivstar, which, it should be noted, has approximately a <u>45% share</u>[29] of the Ukrainian mobile telephony market and is therefore hardly in need of protection from competition.

## V.    Storm Did Not Violate the Arbitration Clause of the Shareholders Agreement by Litigating in the Ukrainian Courts

84.    Telenor Mobile claims in its Amended Statement of Claim that Storm has violated the arbitration clause contained in the Shareholders Agreement by bringing lawsuits in Ukraine instead of presenting them before the Arbitral Tribunal.  *See* Telenor Mobile Amended Statement of Claim at 44-45.  This claim must fail for any one of the reasons stated below.

85.    As a preliminary matter, Storm utterly fails to see what relief Telenor Mobile is seeking.  Telenor Mobile's principal claims regarding the corporate governance and non-compete issues are presently before the Arbitral Tribunal, and the parties are actively litigating those claims in arbitration, pursuant to Section 12.01 of the Shareholders Agreement.[30]  Storm fails to see what other relief Telenor Mobile may ask beyond having these claims arbitrated.

86.    Of the main Ukrainian litigations which Telenor Mobile claims violate the Shareholders Agreement, two were not within the scope of the Shareholders

---

[29]    http://www.telenor.com/ukraine/news/20060818.

[30]    Although Storm continues to believe that in light of the Alpren litigation results, there is no basis for the Tribunal's jurisdiction over Telenor Mobile's claims.

Agreement's arbitration clause, and as for the remaining litigation, Telenor Mobile fully participated in that lawsuit, without ever raising the existence of the arbitration clause.

87.    First, as concerns the April and May 2005 litigation, that action involved Alpren and Storm.    By definition, Alpren, as a non-signatory to the Shareholders Agreement, cannot be bound by its arbitration clause.    Neither Alpren nor Storm was obligated to arbitrate the dispute under the Shareholders Agreement. Moreover, Storm's principal defense at that point was precisely to raise the existence of the present arbitration, thereby objecting to the jurisdiction of the Ukrainian courts.    The Ukrainian courts rejected this argument, and went on to invalidate the Shareholders Agreement.    In light of this, Telenor Mobile cannot seriously state any claim for relief for the fact that Storm properly defended Alpren's claim in the Ukrainian courts at the time.[31]

88.    Notwithstanding Storm's jurisdictional defense at that time, what is important to note is that despite the non-arbitrability of the Alpren litigation, the result of the Ukrainian decisions now have wide-ranging consequences which affect and preclude Telenor Mobile's claims before this Tribunal.    The Clarification Order recently rendered by the Kyiv Appellate Commercial Court makes it very clear that the consequences of that litigation affect third parties, including Telenor Mobile.    By relying on Article 216 of the Ukrainian Civil Code, the Kyiv Appellate Commercial Court states in no uncertain terms that the invalidity of the Shareholders Agreement "does not entail any legal consequences, except for those related to its invalidity."    Clarification Order at 1.    The court goes on to explain that the legal consequence of that invalidity is absolute: "the parties cannot change the legal consequences of the invalidity of a void transaction, and

any agreements between the parties in connection therewith shall not have any legal effect." *Id*. at 2. Finally, the court clearly states that its May 25 Order has a binding effect on third parties, and consequently "shall apply and shall be binding also upon those entities that were not among the parties to the court proceedings"—*i.e.*, Telenor Mobile. *Id*.

89.    Next, as concerns the December 22 litigation, Telenor has waived any right to arbitrate that dispute, and cannot seriously claim any relief against Storm in this arbitration. As has been thoroughly developed in Storm's Motion to Dismiss, Telenor Mobile actively participated in that litigation, had a full opportunity to be heard, and even went so far as to obtain a reversal of the December 22 Order at one point. Telenor Mobile did not raise Section 12.01 as a defense at any point; its actions therefore constitute a waiver of arbitration. *See* Storm Mot. to Dismiss at 9.[32]

90.    Regardless of whether this waiver is total and precludes all of Telenor Mobile's claims, at the very minimum, Telenor Mobile cannot claim, in light of its actions, that Storm contravened the arbitration clause in the Shareholders Agreement by initiating the Ukrainian litigations. Accordingly, the Tribunal should dismiss its claim based on Section 12.01.

---

[31]    In addition, Telenor Mobile cannot claim that Storm violated the good faith clause of the shareholders Agreement, since at the time, Storm had clearly raised the arbitration clause as a defense during the Alpren litigation. *See* Telenor Mobile Statement of Defense at ¶ 44.

[32]    Because of its active participation in the December 22 litigation, and specifically in light of its *ex parte* application to reverse the December 22 Order, Telenor Mobile cannot rely on the case law it cites to the effect that defendants to court litigations are somehow exempted from waiver to arbitration. Thus, for example, Telenor's actions in the December 22 litigation easily constitute an 'aggressive participation in the litigation', which constitutes waiver of arbitration. *See Liberman v. Lieberman*, 149 Misc. 2d 983, 989, 566 N.Y.S. 2d 490, 395 (N.Y Sup. Ct. 1991) (cited in Telenor mobile's memorandum of Law in Opposition to Respondent Storm's Motion to Dismiss dated June 23, 2006 at 28). Moreover, as with the Alpren litigations above, Telenor Mobile cannot claim that Storm violated the good faith clause of the Shareholders Agreement by bringing this litigation before the Ukrainian courts, since Telenor Mobile itself actively participated in the litigation. *See* Telenor Mobile Statement of Defense at ¶ 44.

## CONCLUSION

91.    For the foregoing reasons, Storm respectfully requests that the Tribunal

deny in their entirety the claims brought by Telenor Mobile.

LOVELLS


By: _Pieter Van Tol / GSZ_

Pieter Van Tol
Gonzalo S. Zeballos
Lisa J. Fried
Eric Z. Chang

590 Madison Avenue
New York, New York 10022
Telephone: (212) 909-0600
Facsimile: (212) 909-0660

Attorneys for Respondent

# EXHIBIT 1

*[Letterhead of the Supreme Court of Ukraine]*

# RULING
## IN THE NAME OF UKRAINE

October 3, 2006                                                                  Kyiv

The Commercial Cases Court Chamber of the Supreme Court of Ukraine consisting of:

**Presiding judge:**          **I.B. Shytsky**
**Judges:**          **V.P. Barbara, V.S. Gul, P.I. Kolesnyk,**
          **T.O. Novikova, O.I. Potylchak, F.F. Chernohuz, S.O. Schiotka,**

upon review in an open court hearing of the cassation appeal of Limited Liability Company "Storm" ("LLC "Storm"") of the ruling issued by the Higher Commercial Court of Ukraine on June 27, 2006 upon the petition of Telenor Mobile Communications AS to review, based on newly discovered circumstances, the ruling of the Higher Commercial Court of Ukraine dated December 22, 2005 regarding case No. 46/501 initiated upon the claim of LLC "Storm" against Closed Joint Stock Company "Kyivstar G.S.M." ("CJSC "Kyivstar G.S.M."") and Telenor Mobile Communications AS ("Telenor"), seeking invalidation of the charter provisions, the Court Chamber,

### established that:

In August 2005, LLC "Storm" filed a claim against CJSC "Kyivstar G.S.M." and Telenor, seeking invalidation of the charter provisions.

The relief sought was substantiated by incompliance of the disputed provisions of the charter of CJSC "Kyivstar G.S.M." with the applicable law, namely: Article 46 of the Law of Ukraine "On Business Companies" where it determines which persons may serve on the supervisory board of a joint stock company;

Article 10 of the Law of Ukraine "On Business Companies" and Article 116 of the Civil Code of Ukraine, which relate to participation in the management of a company's activities, since [provisions of CJSC "Kyivstar G.S.M.""s charter]

envisage the unilateral appointment of a candidate nominated by Telenor as the president.

By its decision issued on October 12, 2005 and affirmed by the ruling of the Kyiv Commercial Court of Appeals dated November 11, 2005, the Kyiv City Commercial Court dismissed the claim.

By its ruling dated December 22, 2005, the Higher Commercial Court of Ukraine reversed the previous court decisions and granted the claim.

By its decree dated February 16, 2006, the Supreme Court of Ukraine denied the commencement of cassation proceedings to review the ruling issued by the Higher Commercial Court of Ukraine on December 22, 2005 upon the cassation appeals of CJSC "Kyivstar G.S.M." and Telenor.

On June 2006, Telenor approached the Higher Commercial Court of Ukraine with a petition to review the ruling of the Higher Commercial Court of Ukraine dated December 22, 2005 based on newly discovered circumstances.

The petition was substantiated by the fact that, by its decree dated May 16, 2006, the Kyiv City Court of Appeals had established the facts that were material to the case and had not been known to Telenor.

By its ruling dated June 27, 2006, the Higher Commercial Court of Ukraine reversed the ruling of the Higher Commercial Court of Ukraine dated December 22, 2005 upon its review based on newly discovered circumstances and affirmed the ruling issued by the Kyiv Commercial Court of Appeals on November 11, 2005.

By its decree dated July 27, 2006, the Supreme Court of Ukraine commenced cassation proceedings to review the ruling issued by the Higher Commercial Court of Ukraine on June 27, 2006 upon the cassation appeal brought by LLC "Storm".

The cassation appeal seeks reversal of the disputed ruling due to its non-conformity with the Constitution of Ukraine, the [Higher Commercial] court's violation of the procedural rules of law, as well as the apparent varied application by the Higher Commercial Court of Ukraine of one and the same provision of law in similar cases.

CJSC "Kyivstar G.S.M." did not take advantage of the right vested [in it] by the law to assign its representative to participate in the court hearing.

Having listened to the reporting judge, arguments of the representatives of LLC "Storm" and Telenor, having reviewed materials available in the case, the Commercial Cases Court Chamber of the Supreme Court of Ukraine has concluded that the cassation appeal should be granted on the basis of the following grounds.

Pursuant to Article 112 of the Code of Commercial Procedure of Ukraine, a commercial court may review its judicial decision, which has become effective,

based on newly discovered circumstances that are material to the case and could not have been known to the petitioner.

The ruling of the Higher Commercial Court of Ukraine dated June 27, 2006 does not meet the requirements of said Article.

As mentioned in Section 5 of the Resolution of the Plenum of the Supreme Court of Ukraine "On Court Practice Regarding Review of the Effective Decisions, Decrees and Rulings on Civil Cases Based on Newly Discovered Circumstances" dated February 27, 1981 No. 1, newly discovered circumstances cannot be deemed to include new circumstances, that is circumstances that have emerged or changed after a decision has been issued or circumstances that a person participating in a case referred to in its arguments or cassation appeal, or that could be established by a court acting in accordance with requirements of procedural law.

Similar guidance is set forth in Section 1.1 of the Clarification of the Presidium of the Higher Commercial Court of Ukraine dated May 21, 2002 No. 04-5/563 "On Certain Issues of Practice of Review of Decisions, Decrees, Rulings Based on Newly Discovered Circumstances", which provides that if new circumstances emerge or circumstances change after a dispute has been resolved, this cannot be a ground for changing or reversing a decision of a court under the rules of Chapter XIII of the Code of Commercial Procedure of Ukraine.

According to Section 1.3 of the same Clarification, circumstances established based on evidence that was not submitted by the parties on a timely basis cannot be deemed to be newly discovered, and if such evidence is submitted in the course of review of a court decision under the rules of Chapter XIII of the Code of Commercial Procedure of Ukraine, a commercial court shall issue a decree affirming the court decision.

The newly discovered circumstances the petitioner referred to was the decree of the Kyiv City Court of Appeals dated May 16, 2006 in which [the court] reversed the decision of the Pechersky District Court of the City of Kyiv and terminated the proceedings in the case initiated upon the petition of A.M. Kasogov, with LLC "Storm" as an interested party, on establishing legally significant facts, on the grounds that under Part 2 of Article 256 of the Code of Civil Procedure of Ukraine the petition brought by A.M. Kasogov was not subject to consideration in a civil proceeding. [In such decree, the court also] stated that A.M. Kasogov is a mere representative of one of the shareholders on the company's Board, and the charter of CJSC "Kyivstar G.S.M." was approved by a decision of the general meeting of shareholders of CJSC "Kyivstar G.S.M." that was not held to be unlawful according to the procedure envisaged by the law.

At the same time, the Higher Commercial Court of Ukraine did not consider the fact that the said circumstances were the subject of examination when the commercial courts considered the case in accordance with the jurisdiction established by the law, while the decree of the Kyiv City Court of Appeals dated

May 16, 2006 cannot be recognized as a newly discovered circumstance, because, having concluded that the case was out of general court's jurisdiction, the Kyiv City Court of Appeals resorted to assessment of the CJSC "Kyivstar G.S.M." charter provisions, contradicting its own decision on lack of competence to consider this case in general courts.

Considering the above, the ruling of the Higher Commercial Court of Ukraine dated June 27, 2006 should be reversed, and the ruling of the Higher Commercial Court of Ukraine dated December 22, 2005 should be affirmed.

Pursuant to Articles $111^{17}$ – $111^{20}$ and 112 of the Code of Commercial Procedure of Ukraine, the Court Chamber,

### has hereby ruled to:

Grant the cassation appeal of Limited Liability Company "Storm".

Reverse the ruling of the Higher Commercial Court of Ukraine dated June 27, 2006 regarding case No. 46/501, and affirm the ruling of the Higher Commercial Court of Ukraine dated December 22, 2005.

This ruling is final and may not be appealed.

[*Seal of the Supreme Court of Ukraine*]

| Presiding Judge: | [*signature*] | I.B. Shytsky |
| Judges: | [*signature*] | V.P. Barbara |
| | [*signature*] | V.S. Gul |
| | [*signature*] | P.I. Kolesnyk |
| | [*signature*] | T.O. Novikova |
| | [*signature*] | O.I. Potylchak |
| | [*signature*] | F.F. Chernohuz |
| | [*signature*] | S.O. Schiotka |

I, Oleksiy V. Didkovskiy, a translator, certify that the above is a true and correct translation of the Ruling of the Supreme Court of Ukraine dated October 3, 2006 of which I have seen the certified true copy of the original.

Kyiv, Ukraine
October 20, 2006



# ВЕРХОВНИЙ СУД УКРАЇНИ

### П О С Т А Н О В А
### ІМЕНЕМ УКРАЇНИ

03 жовтня 2006 року                                                    м. Київ

Судова палата у господарських справах Верховного Суду України у
складі:

**Головуючого:**              **Шицького І.Б.,**
**Суддів:      Барбари В. П., Гуля В .С., Колесника П.І.,**
      **Новікової Т.О., Потильчака О.І., Черногуза Ф.Ф., Щотки С.О.,**

розглянувши у відкритому судовому засіданні касаційну скаргу
товариства з обмеженою відповідальністю "Сторм" (далі – ТОВ
"Сторм") на постанову Вищого господарського суду України від 27
червня 2006 року за заявою Теленор Мобайл Ком'юнікейшнз АС щодо
перегляду за нововиявленими обставинами постанови Вищого
господарського суду України від 22 грудня 2005 року у справі № 46/501
за позовом ТОВ "Сторм" до закритого акціонерного товариства
"Київстар Дж.Ес.Ем" (далі – ЗАТ "Київстар Дж.Ес.Ем") та Теленор
Мобайл Ком'юнікейшнз АС (далі –Теленор) про визнання недійсними
положень статуту, Судова палата,

#### *в с т а н о в и л а :*

У серпні 2005 року ТОВ "Сторм" пред'явило в суді позов до ЗАТ
"Київстар Дж.Ес.Ем" та Теленор про визнання недійсними положень
статуту.

Позовні вимоги обґрунтовувались невідповідністю спірних
положень статуту ЗАТ "Київстар Дж.Ес.Ем" чинному законодавству, а
саме: статті 46 Закону України "Про господарські товариства" в частині
визначення кола осіб, що можуть входити до спостережної ради
акціонерного товариства;

статті 10 Закону "Про господарські товариства" та статті 116 ЦК
України щодо участі в управлінні справами товариства, оскільки

передбачають односторонне призначення президентом кандидата, запропонованого Теленор.

Рішенням господарського суду міста Києва від 12 жовтня 2005 року, залишеним без зміни постановою Київського апеляційного господарського суду від 11 листопада 2005 року, в позові відмовлено.

Постановою Вищого господарського суду України від 22 грудня 2005 року попередні судові рішення скасовано, а позов задоволено.

Ухвалою Верховного Суду України від 16 лютого 2006 року відмовлено у порушенні провадження з перегляду у касаційному порядку постанови Вищого господарського суду України від 22 грудня 2005 року за касаційними скаргами ЗАТ "Київстар Дж.Ес.Ем" та Теленор.

У червні 2006 року Теленор звернулось до Вищого господарського суду України з заявою про перегляд постанови Вищого господарського суду України від 22 грудня 2005 року за нововиявленими обставинами.

Заява вмотивована тим, що апеляційний суд міста Києва ухвалою від 16 травня 2006 року встановив факти, які мають істотне значення для справи і не були відомі Теленор.

Постановою Вищого господарського суду України від 27 червня 2006 року за наслідками перегляду за нововиявленими обставинами постанова Вищого господарського суду України від 22 грудня 2005 року скасована, а постанова Київського апеляційного господарського суду від 11 листопада 2005 року залишена без змін.

Ухвалою Верховного Суду України від 27 липня 2006 року за касаційною скаргою ТОВ "Сторм" порушено провадження з перегляду у касаційному порядку постанови Вищого господарського суду України від 27 червня 2006 року.

В касаційній скарзі ставиться питання про скасування оскаржуваної постанови з підстав її невідповідності Конституції України, порушення судом норм процесуального права, а також виявлення факту різного застосування Вищим господарським судом України одного й того ж положення закону в аналогічних справах.

ЗАТ "Київстар Дж.Ес.Ем" не використало наданого законом права на участь свого представника у судовому засіданні.

Заслухавши доповідача, пояснення представників ТОВ "Сторм" і Теленор та перевіривши матеріали справи, Судова палата у господарських справах Верховного Суду України дійшла висновку, що касаційна скарга підлягає задоволенню з таких підстав.

Відповідно до статті 112 Господарського процесуального кодексу України господарський суд може переглянути прийняте ним судове рішення, яке набрало законної сили, за нововиявленими обставинами,

що мають істотне значення для справи і не могли бути відомі заявникові.

Постанова Вищого господарського суду України від 27 червня 2006 року вимогам вказаної статті не відповідає.

Як вказано у пункті 5 постанови Пленуму Верховного Суду України "Про практику перегляду судами у зв'язку з нововиявленими обставинами рішень, ухвал і постанов у цивільних справах, що набрали законної сили" від 27 лютого 1981 року за №1 не можуть бути визнані нововиявленими нові, тобто такі, що виникли чи змінилися після постановлення рішення обставини, а також обставини, на які посилалася особа, яка брала участь у справі, у своїх поясненнях, касаційній скарзі або які могли бути встановлені при виконанні судом вимог процесуального закону.

Аналогічне роз'яснення міститься у пункту 1.1 Роз'яснення президії Вищого господарського суду України від 21 травня 2002 року за №04-5/563 "Про деякі питання практики перегляду рішень, ухвал, постанов за нововиявленими обставинами", відповідно до якого, виникнення нових або зміна обставин після вирішення спору не можуть бути підставою для зміни або скасування судового рішення за правилами Розділу XIII Господарського процесуального кодексу України.

Відповідно до пункту 1.3 цього ж Роз'яснення не можуть вважатися нововиявленими обставини, що встановлюються на підставі доказів, які не були своєчасно подані сторонами, у разі подання таких доказів у процесі перегляду судового рішення за правилами Розділу XIII Господарського процесуального кодексу України, господарський суд має прийняти ухвалу про залишення судового рішення без змін.

В якості нововиявлених обставин заявник послався на ухвалу апеляційного суду міста Києва від 16 травня 2006 року, якою скасовано рішення Печерського районного суду міста Києва та закрито провадження у справі за заявою Касогова А.М., зацікавлена особа ТОВ "Сторм" про встановлення фактів, що мають юридичне значення з мотивів того, що відповідно до частини 2 статті 256 ЦПК України заява Касогова А.М. не підлягає розгляду в порядку цивільного судочинства та зроблено посилання на те, що Касогов А.М. є лише представником одного з акціонерів у Раді товариства, а статут ЗАТ "Київстар Дж.Ес.Ем." був затверджений рішенням загальних зборів акціонерів ЗАТ "Київстар Дж.Ес.Ем.", яке у встановленому законом порядку незаконним не визнане.

При цьому Вищий господарський суд України не зважив на те, що названі обставини були предметом дослідження при розгляді справи господарськими судами згідно визначеної законом юрисдикції, а ухвала

апеляційного суду міста Києва від 16 травня 2006 року не може бути визнана нововиявленою обставиною, оскільки апеляційний суд міста Києва, дійшовши висновку щодо непідвідомчості справи загальному суду, вдався до оцінки положень статуту ЗАТ "Київстар Дж.Ес.Ем." всупереч визначеної ним же некомпетентності розглядати цю справу в загальних судах.

Враховуючи викладене, постанова Вищого господарського суду України від 27 червня 2006 року підлягає скасуванню, а постанова Вищого господарського суду України від 22 грудня 2005 року - залишенню в силі.

Керуючись статтями $111^{17}$-$111,^{20}$ 112 Господарського процесуального кодексу України, Судова палата,

### постановила:

Касаційну скаргу товариства з обмеженою відповідальністю "Сторм" задовольнити.

Постанову Вищого господарського суду України від 27 червня 2006 року у справі № 46/501 – скасувати, а постанову Вищого господарського суду України від 22 грудня 2005 року - залишити в силі.

Постанова остаточна і оскарженню не підлягає.

**Головуючий:**                                    **І.Б. Шицький**

**Судді:**                                              **В.П. Барбара**

                                                            **В.С. Гуль**

                                                            **П.І. Колесник**

                                                            **Т.О. Новікова**

                                                            **О.І. Потильчак**

                                                            **Ф.Ф. Черногуз**

                                                            **С.О. Щотка**

# EXHIBIT 2

[ON THE OFFICIAL LETTERHEAD OF THE KYIV APPELLATE COMMERCIAL COURT]
[seal]

**R U L I N G**

November 8, 2006

No. 40/242

**The panel of judges of the Kyiv Appellate Commercial Court** consisting of:

The Presiding Judge V.O. Zelenin, and

The Judges N.V. Kapatsyn, O.F. Synytsya,

**With participation of the parties' representatives:** not summoned.

**Having considered the application** filed by Storm Limited Liability Company (LLC) seeking an explanation for the resolution of the Kyiv Appellate Commercial Court issued in case No. 40/242 on May 25, 2006, **based on the claim** lodged by Alpren Limited, a legal entity under the laws of the Republic of Cyprus, **against** Storm LLC **regarding** invalidation and termination of certain acts.

**D E T E R M I N E D   A S   F O L L O W S :**

On April 25, 2006, the Kyiv Commercial Court held the decision to allow the claim brought by Alpren Limited against Storm LLC.

By its resolution of May 25, 2006, the Kyiv Appellate Commercial Court upheld the decision rendered by the Kyiv Commercial Court in case No. 40/242 on April 25, 2005.

On October 30, 2006, the Kyiv Appellate Commercial Court received an application filed by Storm LLC with a request to provide an explanation for the resolution of the Kyiv Appellate Commercial Court issued in case No. 40/242 on May 25, 2006, regarding the validity of the arbitration clause and the consequences of invalidating the Shareholders Agreement.

Being governed by Articles 86, 89, and 99 of the Commercial Procedural Code of Ukraine, –

**R U L E D   A S   F O L L O W S :**

To provide Storm Limited Liability Company with an explanation for the resolution of the Kyiv Appeal Commercial Court in case No. 40/242, dated May 25, 2006.

The court recognized the entire Shareholders Agreement as null and void, including the arbitration agreement included in the form of an arbitration clause in the Shareholders Agreement. The court relied both on the international treaties ratified by Ukraine, and on other legal regulatory acts, in particular, the Law of Ukraine "On International Commercial Arbitration". The court determined that, since the Shareholders Agreement violated the public order of Ukraine and since the representative of one of the parties to the agreement – Storm LLC – was not authorized to execute the said Shareholders Agreement and the arbitration clause contained therein as its integral part, the arbitration agreement contained in the Shareholders Agreement in the form of an arbitration clause is also void / invalid.

As regards the consequences of a void agreement, Article 216 of the Civil Code of Ukraine provides that an invalid deed does not entail any legal consequences, except for those related to its invalidity. Therefore, the Shareholders Agreement, as a void agreement, has not entailed any legal consequences for its parties since the time of its signing, that is, never. In such circumstances, since the invalidity of the void agreement does not require obtaining a respective

court decision (such decision would be a mere restatement of the fact), such agreement is invalid in view of its being void, and the parties had no grounds whatsoever to perform any acts on the basis of such agreement, including to resort to arbitration in connection therewith. The parties have to adjust their acts and act as they would act if there were no such Shareholders Agreement, and any continued acts based on the Shareholders Agreement, including its arbitration clause, in particular, the referral of a dispute for arbitration by three arbitrators in accordance with the applicable UNCITRAL Rules under such agreement shall be treated as a violation of Clause 4 of Article 216 of the Civil Code of Ukraine. According to Clause 4 of Article 216 of the Civil Code of Ukraine, the parties cannot change the legal consequences of the invalidity of a void transaction, and any agreements between the parties in connection therewith shall not have any legal effect.

Should the parties and the arbitrators, appointed in accordance with the Shareholders Agreement, ignore the above circumstances and render an award on the dispute, such acts shall constitute a violation of the court decision, the explanation for which is given herein.

As regards the binding nature of the court decision, according to Article 124 of the Constitution of Ukraine and Article 11 of the Law of Ukraine "On the Judicial System of Ukraine", court decisions that have entered into effect shall be binding on legal entities, individuals, citizens, state authorities, local government authorities, their officials, citizen unions, and other organizations. Therefore, the court decision shall apply and shall be binding also upon those entities that were not among the parties to the court proceedings.

|  |  |
|---|---|
| **Presiding Judge** | **V.O. Zelenin** |
| **Judges:** | **N.V. Kapatsyn** |
|  | **O.F. Synytsya** |

True copy of the original
Assistant Judge
[signature]
[seal]

*Цей переклад з української мови на англійську виконаний перекладачем Демченко Вікторією Вікторівною.*



# КИЇВСЬКИЙ АПЕЛЯЦІЙНИЙ ГОСПОДАРСЬКИЙ СУД

01025, м. Київ, пров. Рильський, 8

## У Х В А Л А

№40/242                                                      08. 11. 2006 р.

**Київський апеляційний господарський суд** у складі колегії суддів:
Головуючого судді – Зеленін В. О.
Суддів: Капацин Н. В., Синиця О. Ф.

**За участю представників сторін:** не викликались.

**Розглянувши заяву** Товариства з обмеженою відповідальністю (ТОВ) "Сторм" про роз'яснення постанови Київського апеляційного господарського суду від 25.05.2006 року у справі № 40/242
**за позовом** "Альпрен Лімітед", юридична особа за законодавством Республіки Кіпр
**до** ТОВ "Сторм"
**про** визнання дій незаконними та припинення дій.

## В С Т А Н О В И В :

25.04.2006 року Господарським судом м. Києва було прийнято рішення, яким було задоволено позов "Альпрен Лімітед" до ТОВ "Сторм".

Постановою Київського апеляційного господарського суду від 25.05.2006 року було залишено без змін рішення Господарського суду м. Києва від 25.04.2006 року у справі № 40/242.

30.10.2006 року до Київського апеляційного господарського суду надійшла заява ТОВ "Сторм" про роз'яснення постанови Київського апеляційного господарського суду від 25.05.2006 року у справі №40/242, щодо чинності арбітражного застереження та наслідків визнання Акціонерної угоди недійсною.

Керуючись ст. ст. 86, 89, 99 Господарського процесуального кодексу України, -

## У Х В А Л И В :

Роз'яснити Товариству з обмеженою відповідальністю "Сторм" постанову Київського апеляційного господарського суду від 25.05.2006 року у справі №40/242.

Акціонерну угоду судом визнано нікчемною в повному обсязі, включно з арбітражною угодою, викладеною у формі арбітражного застереження в тексті Акціонерної угоди. При цьому судом було взято до уваги як міжнародні конвенції, ратифіковані Україною, так і інші нормативні акти, зокрема Закон України "Про міжнародний комерційний арбітраж". Судом встановлено, що оскільки Акціонерна угода порушує публічний порядок України, а крім того представник однієї зі сторін угоди – ТОВ "Сторм" не мав повноважень на укладання вказаної Акціонерної угоди, та її невід'ємної в даному випадку складової частини – арбітражного застереження, то

1

...ражна угода, що викладена у формі арбітражного застереження в тексті Акціонерної ...ди є також нікчемною/недійсною.

Щодо наслідків недійсності нікчемної угоди, то згідно ст. 216 Цивільного Кодексу ...аїни недійсний правочин не створює юридичних наслідків, крім тих, що пов'язані з ...о недійсністю. Відповідно до цього Акціонерна угода, як нікчемний правочин, не ...орювала для її сторін жодних юридичних наслідків з моменту її підписання, тобто ...оли. За таких умов, оскільки для недійсності нікчемного правочину відсутня ...обхідність отримання відповідного судового рішення (рішення стосовно цього є ...нстатацією факту) -- він є недійсним в силу своєї нікчемності, у сторін були відсутні ...дь-які підстави для вчинення на його підставі будь-яких дій, у тому числі щодо ...рнення до арбітражу у відповідність з ним. Сторони повинні відкоригувати свою ...ведінку таким чином, як вони поводили б себе за відсутності Акціонерної угоди, а будь-...е продовження вчинення дій на підставі Акціонерної угоди, включаючи арбітражне ...стереження, зокрема передача спору на розгляд колегії у складі трьох арбітрів за ...очими правилами ЮНСІТРАЛ у відповідності до неї, буде вважатися порушенням п. 4 ... 216 ЦК України. Адже згідно з п. 4 ст. 216 ЦК України у сторін відсутня можливість ...інити правові наслідки недійсності нікчемного правочину, а будь-які угоди з цього ...иводу між сторонами не матимуть жодної юридичної сили.

Ігнорування цього сторонами, визначеним в акціонерній угоді арбітражем та ...хвалення ним рішення по спору буде порушенням рішення суду, що роз'яснюється.

Щодо питання про обов'язковість рішення суду, то згідно ст. 124 Конституції ...країни, ст. 11 Закону України "Про судоустрій України" рішення суду, які набули ...аконної сили, є обов'язковими для виконання юридичними особами, громадянами, ...рганами державної влади, органами місцевого самоврядування, їх посадовими особами, ...б'єднаннями громадян та іншими організаціями. Таким чином, дія судового рішення та ...ого обов'язковість поширюються також на особи, які не були сторонами процесу.

Голова колегії, суддя    З ОРИГІНАЛОМ ЗГІДНО   Зеленін В. О.

Судді:    ПОСАДА *Пом. судді*    Капацин Н. В.

    ПІДПИС    Синиця О. Ф.

2