# EXHIBIT U

1     IN THE MATTER OF AN ARBITRATION UNDER
     THE UNCITRAL ARBITRATION RULES BETWEEN

2

  TELENOR MOBILE       :
3  COMMUNICATIONS, AS,     :

                    :

4         Claimant,   :

                    :

5     vs.          :   TRANSCRIPT OF

                    :   PROCEEDINGS

6  STORM LLC,        :

                    :

7        Respondent. :

                    :

8 - - - - - - - - - - - - -X

9

10       TRANSCRIPT of the stenographic notes of

11  the proceedings in the above-entitled matter, as

12  taken by and before MARY G. VAN DINA  a Certified

13  Shorthand Reporter and Notary Public, held at the

14  office of LOVELLS, 590 Madison Avenue, New York, New

15  York, on Thursday, June 29, 2006, commencing at 11:05

16  in the forenoon.

17

18  B E F O R E:

19

20  KENNETH R. FEINBERG, CHAIRMAN

21  WILLIAM R. JENTES, ARBITRATOR

22  GREGORY B. CRAIG, ARBITRATOR

23

24

25

## Page 2

```
 1  A P P E A R A N C E S :
 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          666 Fifth Avenue
 3        New York, New York 10103-0001
          (212) 506-5110
 4        BY: ROBERT L. SILLS, ESQUIRES
              and
 5            ADAM S. ZIMMERMAN, ESQUIRE
              and
 6        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          Tower 42, Level 35
 7        25 Old Broad Street
          London, EC2N 1 HQ
 8        DX: 557 London/City
          +44(0)20 7562 5000
 9        BY: PETER O'DRISCOLL
          Attorneys for Claimant
10
          LOVELLS, ESQUIRES
11        590 Madison Avenue
          New York, New York 10002
12        BY: PIETER VAN TOL, ESQUIRE
              and
13            ERIC Z. CHANG, ESQUIRE
              and
14            LISA J. FRIED, ESQUIRE
          Attorneys for Respondent
15
   A L S O   P R E S E N T :
16
   BJORN HOGSTAD, ESQUIRE
17 Telenor
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            CHAIRMAN FEINBERG:  Good morning,
 2  everybody.  I think we're all present.
 3            I welcome you on behalf of the panel;
 4  Bill Jentes, Greg Craig, myself, the three
 5  arbitrators in this matter, Telenor Mobile
 6  Communications AS v. Storm, LLC.
 7            I would like to start off by just going
 8  around the table, and starting down here at the end,
 9  at my left, will everybody just mention your name and
10  your affiliation, so we know who the players are, and
11  then I would appreciate it if you could start a
12  sign-up sheet, so we can get it started with your
13  name and access phone number, so we know how to reach
14  you, and your affiliation.
15            MR. HOGSTAD:  Bjorn Hogstad is my name.
16  I come from Telenor.  I'm a corporate lawyer.
17            CHAIRMAN FEINBERG:  Here in the United
18  States?
19            MR. HOGSTAD:  No, back in Norway, so I'm
20  not licensed here in New York or anywhere in the
21  United States.
22            MR. O'DRISCOLL:  Peter O'Driscoll, a
23  partner at Orrick based in London, admitted in New
24  York.
25            MR. ZIMMERMAN:  I'm Adam Zimmerman with
```

## Page 4

```
 1  Orrick.
 2            CHAIRMAN FEINBERG:  Based in?
 3            MR. ZIMMERMAN:  New York.
 4            MR. SILLS:  I'm Bob Sills.  I'm a
 5  partner with Orrick Herrington here in New York.
 6            MS. LUNDY:  Rochelle Lundy, and I'm a
 7  summer associate here at Lovells.
 8            MS. FRIED:  Lisa Fried, and I'm an
 9  associate here at Lovells.
10            MR. CHANG:  Eric Chang, associate at
11  Lovells.
12            MR. VAN TOL:  Peter Van Tol, partner at
13  Lovells, and we're all from the New York office.
14            CHAIRMAN FEINBERG:  Very good.
15  Excellent.
16            The panel very much appreciates receipt
17  of the papers in this matter, Storm's Motion to
18  Dismiss and Telenor's response.
19            Here is what we propose, having caucused
20  amongst ourselves.  Here is what we propose in the
21  way of a schedule for today.
22            The first hour until noon, roughly, will
23  be devoted to 30 minutes each side oral argument on
24  the motion.
25            I'll keep time, 30 minutes.  You
```

## Page 5

```
 1  needn't -- either side needn't reserve any rebuttal
 2  time because, after the 30 minutes, each side, we'll
 3  then permit rebuttal on Storm's side, and Telenor's
 4  rerebuttal, surrebuttal, and as long as the panel
 5  believes it fruitful, we will permit some rebuttal
 6  exchange after the initial oral argument.
 7            That oral argument may be extended by
 8  the Chair based on questioning and active involvement
 9  or not by the panel.
10            Around 12:30, give or take, depending on
11  the arguments, that will conclude argument on the
12  motion, which, as I understand it, is really the only
13  issue before us today.
14            While lunch is served at 12:30, the
15  panel will deliberate, consider the arguments that
16  have been presented today, and then, don't go away at
17  12:30 because we'll deliberate over lunch, and then
18  we will report back to both sides as to what we
19  recommend, either in the way of a ruling for the
20  questions, further requests for information,
21  et cetera; and, hopefully, we will thereby be able to
22  adjourn early this afternoon.
23            The panel, while not in any way limiting
24  either side in what it wants to say, is primarily
25  interested in two issues.
```

Page 6

1    First, what is the impact on the merits
2 of this motion, if any, of Bob Sill's letter dated
3 June 27 forwarded to us by Adam Zimmerman, commenting
4 on: "The reversal earlier today of the December 22,
5 2005 decision of the Higher Commercial Court of
6 Ukraine," the December 22 order and, B, to respond
7 briefly to Storm's supplemental brief.
8    But what we're really interested is what
9 impact, if any, the June 27 Sills letter has on this
10 proceeding; and, second, of course, argument on the
11 Motion to Dismiss, to wit, the arbitrability of this
12 matter before this tribunal at this time, should we
13 go forward, exercise jurisdiction and arbitrate, or
14 should we defer to the Ukrainian courts and
15 proceedings.
16    It seems to us those are the two issues.
17 Now, there may be other issues you want to raise in
18 your argument; by all means, you're not circumscribed
19 by what I just said, but those are the issues, the
20 two issues that the panel is most interested in.
21    Any questions?
22    ARBITRATOR JENTES:  This is just a query
23 that follows up on issue number one, and that is, to
24 what extent do the counsel here today know what
25 happened at the Ukrainian court when this reversal

Page 7

1 took place?
2    And we understand there's going to be a
3 written opinion coming out on July 5, but if you have
4 any preview of what exactly was said by the Court or
5 indicated by the Court, we'd appreciate hearing that.
6    MR. VAN TOL:  Unfortunately, Storm does
7 not have any information about the ruling from the
8 Court.
9    The first we heard of it was from
10 Mr. Sills's letters, and I will get to that in my
11 remarks.
12    Our understanding is that it must have
13 been an ex parte application, but I have no other
14 information other what Mr. Sills told us.
15    MR. SILLS:  I don't want to argue that
16 because the court records show that it was on notice,
17 but as far as the informational point, and I spoke
18 only this morning to our Ukrainian counsel about
19 this, but it's regular Ukrainian practice to announce
20 a ruling in open court without distributing to the
21 parties anything in writing, and then within five
22 business days, which will be this Wednesday, July 5,
23 because there's an intervening Ukrainian national
24 holiday, a written opinion will be filed with the
25 court and then released to the parties.

Page 8

1    The order announced in open court, and
2 I've got a written narrative, is that the order of
3 December 22 has been vacated and reversed and that
4 the charter provisions that have been challenged have
5 now been upheld.
6    CHAIRMAN FEINBERG:  You mean, this
7 letter has been superseded by new developments?
8    MR. SILLS:  No, it was, in effect, a
9 rehearing.  It was done on regular Ukrainian notice
10 in accordance with Ukrainian procedures.
11    I don't want to pretend to be a
12 Ukrainian lawyer, but as I understand it from talking
13 with Ukrainian counsel this is the regular procedure.
14    There's argument following briefing and
15 there's -- then an announcement in court, and then
16 the Court, within five days, and, typically, on the
17 fifth business day, will file a written opinion, but
18 that the decision on the merits was announced, and
19 the decision is that this December 22 order, which is
20 featured in Storm's papers, has been vacated and
21 challenge charter provisions and Articles 9 and 10
22 have been upheld consistent with Ukrainian law.
23    ARBITRATOR JENTES:  Do I take it that
24 the decision that just occurred was by the same court
25 that issued the December 22, 2005 order?

Page 9

1    MR. SILLS:  It is the same court.
2 It's -- my understanding is that the correct name of
3 the Court is the Higher Commercial Court.
4    It's sometimes referred to in Storm's
5 paper as the Highest Commercial Court.  It's seems to
6 be a subtle point of Ukrainian/English translation,
7 but it's the same court, yes.
8    CHAIRMAN FEINBERG:  Okay.  Why don't we
9 begin now, hearing no other comment.  Craig,
10 anything?
11    Why don't we begin with Storm's Motion
12 to Dismiss, 30 minutes.
13    MR. VAN TOL:  Thank you, Mr. Chairman.
14    Storm's argument on the Motion to
15 Dismiss is much more straightforward than Telenor
16 makes it out to be.
17    To put it quite simply, Ukrainian courts
18 have held that the shareholders' agreement is "null
19 and void," including the arbitration clause.
20    Telenor has provided no legal or
21 factually supportable reason why the tribunal should
22 ignore the order of the Court in the first instance,
23 or the Appellate Court upholding it.
24    Now, before I get to the various attacks
25 that Telenor has leveled against Storm's reliance on

3

1  those decisions, let's look at the areas where I
2  think there is either no dispute or there can be
3  dispute.
4       First, it can't be disputed that
5  Ukrainian courts have jurisdiction to determine
6  whether the internal corporate procedures of a
7  Ukrainian corporation are valid and within their
8  laws.
9       Indeed, in the April 25 decision, you
10  will notice that the Kyiv Commercial Court said they
11  did have jurisdiction.  The Kyiv Appellate Commercial
12  Court affirmed that holding, so jurisdiction should
13  not be an issue.
14       Now, also, although it could have
15  attempted to intervene into the matters before the
16  Ukrainian courts after the Appellate Court affirmed,
17  Telenor made no effort to do so, despite having
18  notice of the Appellate Court decision, and instead,
19  it issued a press statement saying that it would not
20  challenge the decision, and I have that press release
21  with me today, and I'll circulate it later in my
22  remarks.
23       I'm assuming Mr. Sills has it, but if he
24  doesn't, I'll have my associate, Mr. Chang, hand it
25  to him.

1       ARBITRATOR JENTES:  When was the first
2  time that notice was given to Telenor that there were
3  these proceedings that resulted in the April and May
4  decisions?
5       MR. VAN TOL:  I don't know the answer to
6  when it first got noticed, but the date of the press
7  release was May 30, 2006, so it could have been no
8  later than May 30, 2006.
9       ARBITRATOR JENTES:  But it's their press
10  release, not yours?
11       MR. VAN TOL:  It is a news article
12  quoting the Telenor -- and you'll remember that the
13  Appellate Court decision was on May 25.
14       Our understanding of Ukrainian law is
15  that the parties have 30 days to appeal to the
16  Ukrainian Supreme Court.
17       Now, another point that's undisputed is
18  that, despite some grumblings about due process and
19  procedures of Ukrainian courts, nowhere in Telenor's
20  papers do they challenge the process in the Ukrainian
21  court, nor do they argue that what happened in the
22  Ukraine violated due process.
23       Where does that leave us?  We now have
24  conclusive judgments from the Ukraine that have not
25  been challenged by Telenor in the Ukraine, and those

1  conclusive judgments have held that the shareholders'
2  agreement, and the Court went out of its way to
3  include the arbitration clause, is a legal nullity
4  and cannot be enforced.
5       The inescapable conclusion is that this
6  tribunal is divested of jurisdiction and should
7  dismiss Telenor's claims.
8       To do otherwise would violate
9  well-established legal principles, including the
10  deference that panels and courts in the U.S.
11  routinely give to foreign judgments.
12       It would undermine the Ukrainian court
13  system, even though, as I've just said, there's been
14  no allegation by Telenor that the Ukrainian courts
15  did anything wrong.
16       Instead of focusing on the courts,
17  Telenor puts its attacks against Storm, and it tries
18  to convince the tribunal that the Ukrainian court's
19  order should be disregarded.
20       Now, the best way to think of their
21  arguments is as a three-legged stool.  If any of one
22  of those legs falter, they lose.
23       The three arguments that Telenor has put
24  forward in general fashion are, one, that the
25  Ukrainian orders are the product of collusion or

1  would violate U.S. due process to give deference to.
2       Secondly, Telenor says that the
3  tribunal, not the Ukrainian courts, should decide
4  whether the shareholders' agreement was validly
5  executed under Ukrainian law, or in accordance with
6  Storm's internal corporate procedures.
7       Third, Telenor argues that the tribunal
8  should determine the validity of the shareholders'
9  agreement under New York law or that, alternatively,
10  it should reinterpret Ukrainian law regarding the
11  validity of the agreement.
12       Now, I'll take these arguments one by
13  one, along with the sub-issues that spin out of them,
14  but the one thing I would like to emphasize to the
15  tribunal is that the burden here has to be on
16  Telenor.
17       Storm has made a prima facie showing
18  that there are court orders from competent courts
19  saying that this agreement is a legal nullity.
20       Telenor cannot rely on accusations,
21  speculation.  It's got to come forward with evidence.
22  It must show why the tribunal should not defer to an
23  earlier decision of two different courts interpreting
24  their own laws.
25       CHAIRMAN FEINBERG:  What type of

1  evidence? I mean, in your construct, what type of
2  evidence would you expect them to advance to overcome
3  your presumption?
4        MR. VAN TOL: I would expect them to
5  advance evidence of some kind of control of one party
6  over the other, which we don't have here because,
7  contrary to what they have said, Storm did appear.
8        It didn't put in a written statement of
9  claim, which it's not required to do. Instead, a
10  representative made an oral objection.
11       Secondly, I would be very surprised in a
12 collusion case if there were an appeal. Here there
13 was an appeal. Storm appealed the first decision to
14 the Appellate Court, and I would submit to the
15 tribunal, if this is collusion, it's a pretty poor
16 job of it.
17       CHAIRMAN FEINBERG: So you would expect
18 them to present evidence of collusion or absence of
19 due process as, under your construct, the necessary
20 evidence to try and overcome what you claim is a
21 presumption.
22       MR. VAN TOL: I would, and there has to
23 be a presumption that absent some egregious due
24 process procedural error in Ukrainian courts that
25 they haven't alleged, that something else was wrong

1  in this litigation, and they haven't come up with it.
2        ARBITRATOR JENTES: What was the
3  position of Storm, both in the lower court and on the
4  appeal, with regard to whether or not there was a
5  valid shareholders' agreement or not?
6        MR. VAN TOL: What I know about the
7  defense that Storm put forward is that the evidence
8  submitted by Alpren was not cognizable under
9  Ukrainian law.
10       They had an evidentiary objection. I
11 don't know what their argument was on the merits of
12 whether or not the the general director had
13 authority.
14       What I know from my clients is that
15 their understanding is the general director did not
16 have authority.
17       It doesn't sound like that can be a
18 contested factual matter. Instead, what Storm raised
19 on appeal and below was the fact that the evidence
20 submitted by the moving party was not cognizable.
21       ARBITRATOR JENTES: I'm not certain what
22 you mean by "not cognizable," but in any event, what
23 I really may have heard is, did Storm take the
24 position and was the issue litigated as to the
25 existence or not of the shareholders' agreement?

1        MR. VAN TOL: What was litigated was --
2  Storm took the position that the allegation that
3  there was no authority was incorrect, and that's all
4  I know.
5        I don't know the details of the legal
6  theory put forth for why they're saying that, but
7  there was an opposition.
8        The representative of Storm said, what
9  Alpren is saying about the authority is wrong, so it
10 opposed it in the court in the first instance, and it
11 opposed it on the appellate level.
12       CHAIRMAN FEINBERG: I'm a little
13 unclear, if Storm is your client, why don't you know
14 exactly what the arguments were below and what was
15 said in the Ukrainian courts?
16       MR. VAN TOL: My understanding is that
17 there was an effort, because of the allegations of
18 collusion, to maintain some separateness and let
19 Storm's representatives make their arguments, so we
20 wouldn't come back and have Telenor say, you know,
21 Altimo is the puppeteer behind this whole thing
22 engineering what is going on in the Ukraine.
23       I'm not aware of the details of what
24 Storm argued. I know it put forward a defense.
25       I know that the defenses were carefully

1  considered by the Ukrainian court, and if you look at
2  what the Ukrainian court did, it went out of its way
3  to say it went back, looked at the facts, looked at
4  the law.
5        There was no suggestion that this was a
6  rubber-stamping of anything that Alpren brought up at
7  all.
8        ARBITRATOR JENTES: Do you have access
9  to the record that was made before the Ukrainian
10 courts?
11       MR. VAN TOL: If you give me one minute,
12 I'll check with my associate to find out. He's been
13 dealing with our local counsel.
14       Again, keeping with the idea of an arm's
15 length transaction, the normal counsel that we used
16 in the Ukraine did not represent Storm in those
17 proceedings, but if the tribunal would like, we will
18 make an effort to find out what records we can obtain
19 through our local counsel in the Ukraine and the
20 client.
21       ARBITRATOR CRAIG: Can I ask a question
22 about Storm's position in front of the tribunal?
23       Putting aside the Alpren litigation and
24 the April and May orders, is it Storm's position
25 today that that that shareholders' agreement is

1  invalid because the director general did not have
2  authority to sign?
3       MR. VAN TOL:  It is.
4       ARBITRATOR CRAIG:  And why?
5       MR. VAN TOL:  The reason is, it has come
6  to light, since the shareholders' agreement, that
7  there needed to be what's called a meeting of the
8  participants to grant the authority for the director
9  general to execute the shareholders' agreement.
10      During 2005, it came to light that that
11 meeting did not take place.  Therefore, any of the
12 actions of the director general were ultra vires.
13      So similar to what you'll see in the
14 United States, you're all familiar with this, there
15 will be an action by a shareholder to say the actions
16 of the company were ultra vires because certain
17 corporate formalities were not followed.  That's
18 exactly where we are here today.
19      Is it unusual?  Yes.  Is it unheard of?
20 No.
21      To the extent that the questions you are
22 raising now, which are all very good questions, one
23 wonders why Telenor, given the opportunity, did not
24 raise the very same issues before the Ukraine Supreme
25 Court, and say, Hold on a minute.  We have some

1  issues.  We want to intervene.  We're a party in
2  interest.  We want to correct what we conceive to be
3  some sort of miscarriage of justice.  They didn't.
4       What they said instead was, we'd rather
5  go to the arbitration panel in New York, and I would
6  submit that that is an attempt by Telenor to gain
7  what it perceives to be a favorable jurisdiction and
8  collaterally attack the order of a court of competent
9  jurisdiction.
10      CHAIRMAN FEINBERG:  Anything else?
11      MR. VAN TOL:  If I may.
12      CHAIRMAN FEINBERG:  Go ahead.  You still
13 have time.
14      ARBITRATOR JENTES:  Sorry to interrupt.
15      MR. VAN TOL:  No. I thank the tribunal
16 for those questions.  They're, of course, always
17 helpful.
18      One other point I wanted to make about
19 what the record shows.  In addition to -- while I
20 think I've made these points already, I wanted to
21 emphasize that Telenor really presents at least a
22 half picture, if not a misleading one, when it says
23 that there was no statement of defense put in.
24      As I said, there was a defense.  It was
25 an oral submission.

1       We understand from local counsel that's
2  sufficient under Ukrainian law and, again, to
3  emphasize to the tribunal, there was an appeal, so
4  there was no reason to think that it was collusion if
5  a party defends and then appeals the adverse
6  decision.
7       I would like to quickly move on to the
8  due process argument, because I don't think that will
9  delay us too much because I've covered a lot of it.
10      Telenor says in its brief that it never
11 had the opportunity to challenge Alpren's and Storm's
12 contentions.
13      Well, I just told you that that's not
14 the case.  Telenor itself acknowledged, in a
15 statement that I referred to, the May 30 statement
16 that I'll make available to the tribunal, that it had
17 notice of the proceedings, and it acknowledged that
18 it had a right to intervene, but what it said was,
19 we're not going to pursue that appeal.
20      Now, that's consistent with the advice
21 that we have from the Ukrainian counsel, similar to
22 our system, if you come into a case on the appellate
23 level, you can at least make an application saying, I
24 wasn't aware of what occurred below.  I'd like to
25 intervene now.  My rights are being affected.

1       In its brief, Telenor tries to rely on
2  cases where there was no notice given and says you
3  can't enforce judgments against us.  I'm sure you all
4  recall these from law school, those are all --
5  Parklane Hosiery, Blonder Tongue, et cetera.  Those
6  are collateral estoppel cases.
7       I should be clear, we are not arguing
8  that Telenor is collaterally estopped because of the
9  April 25 and the May 25 orders.
10      We couldn't make that argument.  They
11 weren't a party.  What we are saying, though, is that
12 it's not at all unusual for a finding that there was
13 an ultra vires action to have effects on non-parties.
14      It does happen, but, again, if that is
15 what Telenor Mobile was concerned about, you have to
16 ask yourself why it didn't intervene at the Supreme
17 Court level.
18      ARBITRATOR JENTES:  I'm unclear as to
19 the timing issue.
20      The second of the rulings came out on
21 May 25.  If I heard you earlier, they didn't find out
22 about it, or at least they didn't issue anything
23 until May 30.  How would they intervene?
24      MR. VAN TOL:  There was another level of
25 appeal to the Ukrainian Supreme Court.

Page 22

1      The April 25 order was the Court of
2  original jurisdiction, in the first instance.
3      The second one was to the Kyiv Appellate
4  Court. Beyond that is the appeal to the Ukrainian
5  Supreme Court.
6      ARBITRATOR JENTES: Oh. Do we have any
7  documentation on this latter appeal? I mean, I
8  didn't know there was a further appeal.
9      CHAIRMAN FEINBERG: They could have
10 appealed.
11     ARBITRATOR JENTES: Oh, they could have
12 appealed.
13     MR. VAN TOL: Yes, they did not appeal.
14     ARBITRATOR JENTES: Okay.
15     MR. VAN TOL: Okay. Since we've been
16 talking about the May 30 press release, I think it
17 would be helpful to make copies available to the
18 tribunal.
19     I've already made my remarks about them,
20 but I would like to have it in front of the tribunal
21 if they would like to ask me or Mr. Sills any
22 questions about it.
23     Now, with the tribunal's permission, I
24 would like to move on to my other arguments.
25     Next, Telenor argues that the validity

Page 23

1  of the execution of the shareholders' agreement is
2  something that you should decide, rather than a
3  Ukrainian court, which to me is an unusual
4  proposition, given that the Ukrainian court already
5  decided it.
6      So it must be Telenor's position that
7  you sit as almost a quasi appellate court and are
8  going to redetermine or rejudge what the Ukrainian
9  court did.
10     I'm not familiar with any principle,
11 case or anything cited by Telenor that would allow
12 that to happen.
13     Now, they spend a lot of time saying
14 this panel has the jurisdiction to determine whether
15 it has jurisdiction, or has the power to determine
16 whether it has jurisdiction.
17     Storm does not disagree with that
18 proposition, and we say so in our brief, on page 3 of
19 the Motion to Dismiss, we say, in the first instance,
20 reserving our rights for later action, we believe
21 that you do have the power to decide whether you have
22 jurisdiction. That's why we made the motion to you
23 and are here today.
24     What we are saying is that whether or
25 not the execution of the shareholders' agreement was

Page 24

1  valid, that's something that the Ukrainian courts
2  have to decide, and it comes down to this issue,
3  after all of the supplemental submissions, if you
4  look at them and parse them out, the question is
5  twofold:
6      Is Storm alleging that the agreement is
7  void or voidable, and if it's the former, has Storm
8  provided some evidence, the key word is "some," that
9  the agreement is void.
10     I think there's common ground between
11 the parties that that's what the question is.
12     Look at the first issue, void versus
13 voidable. I can handle this quickly because Telenor
14 has not put in one scrap of evidence to show that
15 Storm is arguing that the agreement is voidable.
16     We're clearly saying it's void. We're
17 relying on arguments that say "null and void."
18     CHAIRMAN FEINBERG: What evidence is
19 there besides the orders that it's it's null and
20 void?
21     You say you're relying on Ukrainian
22 orders that say it's null and void.
23     MR. VAN TOL: Yes.
24     CHAIRMAN FEINBERG: What evidence is
25 there in the record that show that that was the

Page 25

1  intention of the parties?
2      What evidence is there that it should be
3  null and void, other than the opinion?
4      MR. VAN TOL: I think the evidence is
5  actually a lack of evidence that there was ever a
6  meeting of participants that would enable the
7  director general to enter into the shareholder
8  agreement.
9      That's what the Ukrainian court found.
10 Our client and no one else has heard any evidence to
11 the contrary.
12     I'm happy if Mr. Sills has some, but I
13 have never heard anyone come forward with any
14 evidence saying, yes, there was a meeting of the
15 participants; yes, the director general was
16 authorized; yes, what he did was within the authority
17 he was granted.
18     It's difficult because it's proving a
19 negative, but there is no evidence -- and, really,
20 what the cases say -- they don't make us, as the
21 proving party, prove our case ultimately.
22     They say you have to come forward with
23 some evidence that what you're alleging is voidance.
24 Then you go to a court --
25     ARBITRATOR CRAIG: No, but there's a

Page 26

1  different question here, the absence of evidence of a
2  meeting, versus evidence that there was no meeting,
3  and I would ask you that second question.
4        Is Storm prepared to provide evidence to
5  the tribunal, or did Storm provide evidence to the
6  Ukrainian court, that there was no such meeting that
7  authorized the director general?
8        MR. VAN TOL:  The latter question, I
9  don't know the answer to.
10        The first one, Storm is happy to provide
11  to the tribunal what we have in terms of evidence.
12        We have made inquiries of Storm and
13  anyone associated with it to find out if anyone knows
14  that there was a meeting that took place, and so far,
15  everyone has said it did not.
16        ARBITRATOR JENTES:  You're right on the
17  button in terms of the evidence or, rather, the test,
18  and I've read all of these cases, and the one that
19  seems to me we're most controlled by is the Second
20  Circuit decision in this Sphere Drake Insurance,
21  Limited, versus Claritan National.
22        MR. VAN TOL:  Storm agrees with that.
23        ARBITRATOR JENTES:  Okay.  Good.
24        And then if I turn over to page 6 of the
25  copy that we got attached to your materials --

Page 27

1        MR. VAN TOL:  Yes, I'm there.  Thank
2  you.
3        ARBITRATOR JENTES:  In the paragraph in
4  the 6-7 category.  "Accordingly, to defeat the
5  arbitration clause in the contract at issue, Sphere
6  Drake must allege that the contracts as a whole are
7  void, or that the arbitration clauses in the
8  contracts are voidable."
9        You've now alleged that.  Then the Court
10  goes on:  "Of course, it is not enough for Sphere
11  Drake to make allegations.  Sphere Drake must also
12  produce some evidence substantiating its claims."
13        Now, in the Sphere Drake case, as you
14  know, there was a fairly elaborate affidavit that
15  established that the company that supposedly had the
16  authority to enter into the contracts didn't, and I
17  guess following up on what Mr. Feinberg said is, what
18  evidence do we have from you that meets the test of
19  the Second Circuit?
20        MR. VAN TOL:  We would submit to the
21  tribunal that the best evidence there could ever be
22  is a finding of fact from a court of competent
23  jurisdiction.
24        So a court that looked into this very
25  issue, the issue in the Ukrainian court at the

Page 28

1  original level was, was there a meeting of
2  participants to authorize the director general, and
3  the Court didn't hesitate.  It said there was not.
4        CHAIRMAN FEINBERG:  What did it rely on
5  for making that finding of fact?
6        MR. VAN TOL:  That is something I will
7  have to provide to the tribunal.  I think,
8  absolutely, that's a fair question.
9        As I said before, it's been our position
10  that that should be enough, that a court found it,
11  but if the tribunal is inquiring of us, we're happy
12  to provide it.
13        CHAIRMAN FEINBERG:  I don't want to
14  mince words or disagree.  It's just that if you
15  listen to Bill's recitation of the case in the Second
16  Circuit, it sounds as if a court saying it doesn't
17  make it so, that it's relying on something more than
18  simply an allegation, which in your case is, well,
19  the Ukrainian court said it --
20        MR. VAN TOL:  Well --
21        CHAIRMAN FEINBERG:  -- and what better
22  evidence than the Ukrainian courts said it.
23        The better evidence is, maybe, what did
24  the Ukrainian court rely on when it said it.
25        MR. VAN TOL:  I understand your point

Page 29

1  and I take it -- I would just say that I think the
2  tribunal has to presume that the Ukrainian court
3  followed due process, followed good procedures in
4  evaluating the evidence, and I again hark back to
5  Telenor has never said to the contrary.
6        CHAIRMAN FEINBERG:  I'm not even
7  disagreeing with that statement.  I'll say that
8  statement is absolutely true.
9        I'm asking, not a subjective, but a very
10  objective question, what did they rely on?
11        That's the question.
12        You're saying, whatever they relied on,
13  we should give it full faith and credit.  I think
14  what Bill is saying that's not what the Second
15  Circuit said.
16        MR. VAN TOL:  I just want to make sure
17  we understand where we are because these points are
18  very well taken, but this test is almost a high-level
19  test to determine who's going to decide, ultimately,
20  the question whether it's void.
21        In other words, what you will do and
22  what a court will do is look at it and say, based on
23  the prima facie evidence out there, what is the party
24  moving for, are they moving for -- to say that it's
25  void or that it's voidable, and assuming they say

1 it's void, some evidence, they said -- in other
2 words, is it colorable, or they're just making that
3 allegation because they don't want the panel to
4 decide.
5        ARBITRATOR JENTES:  Let me be clear, so
6 you understand.  I think, as Mr. Feinberg has said,
7 we fully understand your position.
8        We are confronted with the position
9 presented by Telenor, which is you look at the
10 document on its face, that is, the shareholders'
11 agreement.
12        It certainly looks like a perfectly
13 valid, signed document, has all of the appropriate
14 recitations, and then on top of it, they have these
15 two documents attached to their briefs that say --
16 and the guy that signed it had the authority.
17        So our problem is, to overturn that,
18 we're looking to something that's a little bit more
19 objective, as Mr. Feinberg says, in order to overcome
20 what is a burden they didn't really have to come up
21 with, but it seems to me, they've at least, in
22 effect, put the burden back on to you.
23        MR. VAN TOL:  I understand your point.
24        ARBITRATOR JENTES:  We're not decided on
25 that, but that's what's troubling us.

1        MR. VAN TOL:  I understand.  I think the
2 tribunal is very helpful.
3        CHAIRMAN FEINBERG:  It's 30 minutes, but
4 go ahead for a few more because we've been asking
5 some questions.
6        MR. VAN TOL:  And they've subsumed a lot
7 of what I was going to say in probably a little more
8 entertaining fashion.
9        I'll move to my -- I think I've
10 covered -- if I may, just two points.  One is the
11 applicable law here.
12        It really is mystifying to me how
13 Telenor could be saying that New York law would
14 control the internal corporate procedures of Storm.
15        Storm is a Ukrainian corporation,
16 organized under the laws of the Ukraine.
17        The Ukrainian court found that the
18 procedures it had in place were limited and defined
19 by the charter under Ukrainian law and the Ukrainian
20 civil code.
21        There's no interest here that Telenor
22 can articulate that New York has in this case, in
23 this decision.
24        The cases it cites, like Indosuez, found
25 that there was a transaction in New York which gave

1 some nexus to New York.
2        There is no nexus between internal
3 corporate procedures under Ukrainian law and the
4 State of New York.  There is no reason why any law
5 should apply, other than Ukrainian law and we agree
6 with --
7        ARBITRATOR JENTES:  To what issue?
8        MR. VAN TOL:  To the issue of whether or
9 not the shareholders' agreement is valid, the
10 execution was valid, that was a Ukrainian law issue.
11        ARBITRATOR JENTES:  But let's assume we
12 got there.  Why can't we apply Ukrainian law?
13        MR. VAN TOL:  That was my next point.  I
14 don't dispute that you could apply Ukrainian law.  We
15 should be clear about that.
16        It's common that our panels will apply
17 the laws of another jurisdiction.  We would submit,
18 that in doing so, what's the best evidence that you
19 can find of what Ukrainian law is, two courts, a
20 trial court and an Appellate Court have told you what
21 Ukrainian law is.
22        Telenor has not put in any expert
23 evidence, nothing about what Ukrainian law is.
24 Instead, they're trying to bypass the issue.
25        Let me get to the last point, which

1 is -- I don't want to lose sight of two things.  We
2 have the other issues, which are the waiver and
3 estoppel issue.
4        Let me go to estoppel first because I
5 think it's impacted by the first thing that the
6 chairman identified.
7        To our mind, what's purportedly happened
8 recently with the December 22 order should not be
9 before the tribunal.
10        We don't know what happened.  I had no
11 notice of it.  My client was completely unaware of
12 it.  I think it's highly improper that we find out in
13 a letter from counsel.
14        To the extent that we've been accused of
15 any kind of misdeeds in the Ukraine, I find it ironic
16 that this ruling, of which we have no notice, is now
17 before the panel, and that Telenor is trying to make
18 use of it.
19        What I would submit on collateral
20 estoppel is that it be parked for now, since it is in
21 a bit of legal limbo.  We don't know what the
22 December 22 order -- what's going to happen to it.
23        My understanding is that, if this order
24 actually happened, that Storm will have an appeal
25 from that in the Supreme Court, so let's wait and see

Page 34

1   what happens is our suggestion.
2           Now, lastly, moving toward the waiver
3   point, I don't want that to be forgotten because
4   that's actually a very strong point.
5           You'll notice, in the press release that
6   we issued -- that was issued, that Telenor tauts its
7   victories in the Ukraine, and they're now coming to
8   you saying they obtained a reversal of the December
9   22 order.
10          So it's beyond comprehension how they
11  can come to the tribunal and say there's no waiver
12  here because we are in the Ukraine purely as a
13  defensive matter.  It's just not the case.
14          They have actively litigated it in the
15  Ukraine.  They have never once in those litigations
16  said that those issues should be arbitrated.
17          Under New York law, it's clear.  If you
18  act in a way that's inconsistent with your right to
19  arbitrate, you are deemed to have waived it.
20          Telenor makes an argument that there's
21  no such waiver for a Defendant.  If we look at the
22  cases cited, both of those are Defendants who have
23  been held to have waived the right to arbitrate.
24          ARBITRATOR CRAIG:  What's the evidence
25  you're relying upon to establish the claim that

Page 35

1   they've waived, inasmuch as you claim that they have
2   been active participants in litigation in the
3   Ukraine?  What is that record?
4           MR. VAN TOL:  In our statement of
5   defense and in our papers, we have put forward a
6   chart -- I don't think Telenor disagrees, they have
7   appealed several of the orders.  That's active
8   participation.
9           They have intervened when they can.
10  This is not the type of case -- let me give you an
11  example -- where the courts have said there's no
12  waiver.  The Defendants sued, it goes to the
13  Plaintiff and says, could you extend my time to
14  answer your Complaint because I want to put forward
15  defenses, and then it puts forward an arbitration
16  defense.
17          The courts have said, well, they can't
18  be penalized for that.
19          We're not there at all.  That's over
20  there.
21          We're over here with Telenor actively
22  participating, apparently going to the Higher
23  Commercial Court and obtaining a reversal of an
24  earlier order.  That's an advertent step that Telenor
25  takes in the Ukrainian litigations.

Page 36

1           CHAIRMAN FEINBERG:  What about this
2   quote in the press release?  "Telenor did not receive
3   a notice of hearing, did not manage to obtain a copy
4   of the Court decision and is not a party in the case.
5   Therefore, it will not appeal the decision in the
6   Ukraine, as the arbitration proceedings regarding the
7   violation of the Kyivstar shareholders' agreement are
8   being conducted in New York at the moment."
9           MR. VAN TOL:  It has never gone to a
10  court and said dismiss --  it could have done what
11  you just said.
12          It could have intervened, gone to the
13  Ukrainian Supreme Court and said, none of this should
14  have happened.  You should have reversed because
15  there's an arbitration proceeding in going on right
16  now in New York on these issues.
17          Now, we would submit that that would be
18  improper because, as I've said over and over, we
19  believe that it's for the Ukrainian courts to decide
20  it, but that could have been a step that Telenor
21  could take and it didn't.
22          CHAIRMAN FEINBERG:  Telenor might have
23  been concerned that by taking those steps, it would
24  have been acceding its jurisdiction to the Ukrainian
25  courts over the merits of this arbitration.

Page 37

1           MR. VAN TOL:  Well, there is an election
2   of remedies at some point that someone has to make,
3   or an election of forum.
4           This is a classic example of Telenor
5   waiting in wait and saying, let's see what happens,
6   and if I don't like it, I'm going to go to the
7   arbitration panel.
8           They are asking you to to look, relook,
9   review, reverse what the Ukrainian courts have done.
10          CHAIRMAN FEINBERG:  Anything else?
11          MR. VAN TOL:  No, gentlemen.  I
12  apologize for going over.
13          CHAIRMAN FEINBERG:  No, it's not your
14  fault.  You were very good.
15          Anybody else on the Storm side want to
16  say anything?
17          Bob, you have 30 minutes.
18          MR. ELLIS:  Thank you, Mr. Feinberg.
19          Let me return to the record, to the
20  facts and to what happened.
21          Storm is not an operating company.  It's
22  a Ukrainian limited liability company, which acts
23  solely as a holding company to hold the interest that
24  Altimo, formerly known as Alfa Telecom, holds in Kyiv
25  stock, which is the largest mobile operator in the

10

1  Ukraine, which is the subject of this.
2         Storm doesn't conduct operations.  It's
3  a creature of Altimo.  The way in which Altimo holds
4  its interest in Storm is it holds 50.1 percent of
5  that interest directly, and it holds 49.9 percent
6  through Alpren, which, like Storm, is a non-operating
7  company, entirely a creature of Altimo, organized
8  solely, for corporate or tax reasons, to hold that
9  minority interest.
10        Alpren and Storm are under common
11 ownership and control.  They are entirely creatures
12 of Altimo, which is an operating company, which holds
13 the telecommunications interest of the Alfa Group
14 consortium, which is a large multi-industrial combine
15 in Russia, controlled by a gentleman named Mikhail
16 Fridman, who is much in the news.
17        In effect, Storm sued itself, and they
18 did so in secret.  The same day that we had the last
19 meeting by telephone with the panel, there was some
20 discussion about -- and I'm sure the panel will
21 recall -- about whether or not there was a need for
22 interim relief, and we said that there had been this
23 blizzard of litigation, but it seemed to have come to
24 rest.
25        As it turns out, that same day, the

1  proceeding on which Storm now relies had been
2  commenced, and it's nothing more than Storm suing
3  itself.
4         Alpren is Storm's corporate parent.
5  They are both controlled by Altimo.
6         CHAIRMAN FEINBERG:  Why didn't you
7  actively go in and challenge all of this?
8         MR. SILLS:  We had no notice of it.
9         CHAIRMAN FEINBERG:  You eventually got
10 notice.  Why aren't you right now in the Ukraine
11 fighting this?
12        MR. SILLS:  Well, I think you made the
13 point precisely, Mr. Feinberg, when you asked one of
14 your last questions.
15        This case was brought in a trial court
16 in secret by Altimo against itself.  They got this
17 absurd judgment where no evidence seems to have been
18 put in, and where, according to the order we've been
19 presented with, no statement of defense was made, and
20 even if it's possible to show up and make an oral
21 application by way of a defense, and it doesn't sound
22 like much of a defense was put on, some sort of
23 evidentiary objection, it seems to me extraordinary
24 that Storm, which is obligated under the
25 shareholders' agreement that brings us here, to

1  defend the agreement, did nothing, put in no
2  statement.  We had no knowledge of that.
3         Then they took this collusive appeal,
4  and I think the answer to the question that was
5  raised is the appeal was raised to create an illusion
6  that is was a contested proceeding or to try and
7  create that illusion.
8         CHAIRMAN FEINBERG:  That may be --
9         MR. SILLS:  Why don't we intervene now?
10        CHAIRMAN FEINBERG:  Yes.
11        MR. SILLS:  Because those are not the
12 courts with jurisdiction, because under Prima Paint
13 and Buckeye, which controls here and is not cited
14 anywhere in their papers, this tribunal, under the
15 uncitral rules and under the shareholders' agreement,
16 has the jurisdiction to determine it's own
17 jurisdiction.
18        It's called, in European practice,
19 competenz-competenz, and I think it's helpful to look
20 at the words.
21        ARBITRATOR JENTES:  Before you get to
22 that, go back a moment to what you said about the
23 Ukrainian proceeding.  You said the orders were
24 issued without any evidence.
25        How do you know that?  How do we know

1  that?
2         MR. SILLS:  I only know literally what I
3  read in the papers and --
4         ARBITRATOR JENTES:  No, but I mean, if I
5  read those two decisions, they look like a very
6  typical civil law country ruling, and they recite at
7  least that they're -- it sounds like they're reciting
8  that they have had some evidence presented, and based
9  on that evidence, they've made some findings, and
10 what bothers me as to the position of Telenor, just
11 as it does with regard to Storm is, as the panel, we
12 don't have any of this, and we don't know what
13 happened.
14        MR. SILLS:  Well, there's nothing on the
15 face of those orders that describes any evidence.
16        The situation here is this:  Two years
17 after this agreement was negotiated and executed and
18 signed by the general director, the chief executive
19 officer of Storm, this claim is brought in April in
20 the Ukraine without notice to us and without notice
21 to Kyivstar, the two parties in interest, by Altimo
22 suing itself.
23        It seems to me that the burden is on
24 Storm to show something that appears entirely regular
25 on its face, and under which they've lived for two

1  years since it was executed, is somehow deficient,
2  and I put to one side for later the question of
3  whether ultra vires, even if they could establish
4  that there hadn't been this meeting, would be a
5  defense under New York law to a New York contract,
6  which it's not, but even if it made out a defense,
7  the burden is on them.
8        The evidence that we've been able to
9  obtain is a certificate from one of the most senior
10 officers of Altimo, Mr. Kosogov, who provided us with
11 comfort at the time this document was executed, and
12 that certificate says that all corporate formalities
13 have been complied with, that the document was
14 regular and had been executed with authority, and we
15 are entitled, under New York law, and so far as I
16 know, under the law of every other jurisdiction, to
17 rely on the signature of the chief executive officer.
18       Now, the fact of the matter is there was
19 a meeting, an organizational meeting, and it was
20 conducted by Mr. David Wack who is a partner at the
21 Squire Sanders Moscow office.
22       Was this put forward as collusive
23 evidence in the trial courts hearing this collusive
24 case in Ukraine, nothing on the face of the order
25 suggests that it was.

1        ARBITRATOR CRAIG:  All right.  You have
2  evidence that there was a participants' meeting that
3  authorized the director general to sign the
4  shareholder agreement?  Is that what you're saying?
5        MR. SILLS:  If there were a hearing, we
6  would call Mr. Wack to give testimony or obtain a
7  statement, yes.
8        There was a meeting organized -- and I
9  can ask Mr. O'Driscoll, who is a corporate lawyer in
10 my firm, who has been involved in the negotiation of
11 these documents to talk to that, but I didn't -- the
12 answer is yes.
13       There was such a meeting, and that's not
14 surprising.  That's how we got those two certificates
15 of incumbency and authority, which are the sort of
16 certificates, in effect, estoppel certificates that
17 are delivered in connection with most corporate
18 transactions.
19       Why did we ask for them?  Because we
20 didn't want to rely simply on the signature of the
21 chief executive officer, although we could have.
22       We got independent confirmation from one
23 of the most senior executives of Altimo, which is the
24 party that controls Storm and controls Alpren.
25       So what are they telling us?  They're

1  telling us that the certificate that was delivered by
2  their senior officer, who also happens to be now the
3  chairman of Altimo, according to the Alfa website,
4  and we put that into our papers, that he somehow
5  defrauded us, that he attested to the due execution
6  of the shareholders' agreement, at the time it was
7  executed, in order to give us comfort without any
8  basis for having done so.
9        It seems to me the case that's been
10 brought is so implausible, the notion that after two
11 years, they suddenly discovered that there was a
12 defermity and then rather than coming to us, rather
13 than coming to Kyivstar, which are the two parties to
14 the agreement, they sued themselves.
15       CHAIRMAN FEINBERG:  Well, implicit in
16 what you're saying, if everything that you say is
17 true, implicit in what you're saying, Telenor has no
18 confidence in the Ukrainian civil justice system.
19       Is that what you're saying?  That it ill
20 behooves Telenor to challenge Storm's position in
21 Ukrainian courts because Ukrainian courts simply are
22 colluding with Storm personnel?
23       Is that your position?
24       MR. SILLS:  I don't believe,
25 Mr. Feinberg, that -- I'm not an expert on the

1  Ukrainian court system.
2        Concerns have been raised about the
3  regularity and predictability of the Ukrainian court
4  system, for example, by the State Department in its
5  Country Notes, and they're available on the web,
6  called "Doing Business in Ukraine, Country Commercial
7  Guide For U.S. Companies," and the State Department
8  in that document has raised concerns about the
9  Ukrainian courts, but I don't think we need to reach
10 that.
11       Because of the concerns that the parties
12 jointly must have had at the time, they agreed to opt
13 out of the Ukrainian court system more than two years
14 ago.  They agreed that there would be arbitration in
15 New York, under New York law, regarding this
16 agreement.
17       Whether those concerns are right or
18 wrong, I mean, I'm not in a position to informally
19 testify as an expert on the Ukrainian court system.
20       I think, rather than asking what the
21 parties thought, we should look at what they did, and
22 what they did is they negotiated an elaborate
23 comprehensive agreement, and they chose New York law.
24       They opted out of the Ukrainian legal
25 system, and they opted out of the Ukrainian court

**Page 46**

1 system, and they opted out of the application of
2 Ukrainian or English or any other law, and they
3 settled on New York law, and that's something that
4 happens, as I'm sure every member of the panel knows,
5 every day in international arbitration.
6         There's got to be some law chosen, and
7 once the parties choose that law, it's well-settled
8 that that law determines the validity of the contract
9 being challenged.  That's the holding of Uzan.
10 That's the holding of Indosuez.
11         Both the state and federal courts in New
12 York have made it absolutely clear that the parties'
13 choice of law is what determines it.
14         CHAIRMAN FEINBERG:  Does the parties'
15 choice of law in this case refer just to the
16 arbitrability provision or the entire shareholders'
17 agreement?
18         MR. SILLS:  The entire shareholders'
19 agreement, including, without limitation, the
20 question of arbitrability.
21         CHAIRMAN FEINBERG:  No severability
22 clause.
23         MR. SILLS:  There is a severability
24 clause, so that even if there were some basis for the
25 assertion that despite what the parties agreed to,

**Page 47**

1 Ukrainian law and not New York law govern, this panel
2 would still have jurisdiction.
3         It would still have authority, and there
4 is no doctrine in arbitration that says because
5 somebody else might be better at interpreting
6 Ukrainian law, go off and have a determination in
7 front of them.
8         The parties agreed that this tribunal,
9 sitting here in New York, would make all decisions,
10 and as Mr. Jentes pointed out in one of his
11 questions, if, for some reason, a question of
12 Ukrainian law comes up, then this panel, I am
13 confident, will be able to determine it, and I don't
14 think that was disputed.
15         I think the response was that this panel
16 is fully capable of determining whatever question of
17 Ukrainian law might come up as an incidental matter,
18 but that's not what the parties agreed to.
19         CHAIRMAN FEINBERG:  Have you any idea
20 what evidence you have to support that position?  You
21 have the agreement.
22         Is there any parol evidence or any
23 witnesses, or anybody that you have available who
24 worked on the drafting of that agreement, which would
25 confirm, evidentiary, that would confirm New York

**Page 48**

1 applies?
2         MR. SILLS:  Well, he's sitting two seats
3 down from me, Mr. Feinberg, but as a matter of New
4 York law, this is an integrated contract.  New York,
5 as you know, is a four-corner state.
6         The contract is entire and complete and
7 integrated on its face.  It's got an integration
8 clause.  There's no ambiguity here.
9         CHAIRMAN FEINBERG:  Who drafted this
10 agreement?
11         MR. O'DRISCOLL:  I did, sir.
12         MR. SILLS:  I wasn't exaggerating.  He
13 is sitting two seats down from me, Mr. Feinberg.
14         CHAIRMAN FEINBERG:  Who drafted it from
15 the other side?
16         MR. O'DRISCOLL:  Storm and Alfa were
17 represented by a man named David Wack, who is a
18 partner at Squire Sanders in Moscow.
19         Now, one important piece of information
20 here that I'll put out for the panel's benefit, at
21 the time this agreement was entered into, Storm was
22 initially owned by a group of Ukrainian investors,
23 not connected to Alfa.
24         Alfa bought into Storm at the time this
25 agreement was being negotiated, and completed their

**Page 49**

1 acquisition of a controlling interest in Storm
2 immediately prior to entering into this agreement.
3         The Ukrainian investors, however, did
4 not play a role in the negotiation of this agreement.
5 That agreement was negotiated by Alfa's executives,
6 including Mr. Fridman, personally, and David Wack
7 from Squire Sanders.
8         Now, the reason we know that there was a
9 meeting of the members is that when this agreement
10 was negotiated, the Alfa guys had to get the
11 Ukrainians, who were still shareholders in Storm, to
12 approve it, so they had to have a members' meeting,
13 and Mr. Wack told us they had a members' meeting
14 because the Ukrainians wouldn't have permitted Alfa
15 just to sort of sign this up and bind them, unless
16 they knew what they were agreeing to.
17         MR. SILLS:  And those are the two
18 different certificates that were delivered.
19 Mr. Kosogov, the senior Altimo executive, actually
20 now the chairman of Altimo, delivered one of these
21 certificates of incumbency and authority.
22         The other certificate delivered by
23 Mr. Tumanov was delivered on behalf of the exiting
24 Ukrainian interests.
25         So that those were the pieces, and we

1  wouldn't have entered into this agreement without
2  that comfort.
3        But the fact of the matter is that what
4  the parties agreed to, the contract is that the
5  shareholders' agreement will be governed in its
6  entirety by New York law.
7        One black letter principle of New York
8  law is that a corporation cannot set up its own ultra
9  vires act in order to defeat a contract to which it's
10  a party.  I don't think there can be any dispute
11  about that.
12        ARBITRATOR JENTES:  Let me pursue that,
13  as I did with your opponent, but I'll shift the case,
14  this time to the Ninth Circuit decision in this Three
15  Valleys Municipal Water case, which is the number
16  five -- six case, and if I jump over to page 5, I
17  read the Ninth Circuit as saying that -- down at the
18  bottom of the first column if we have this, it says,
19  "A party who contests the making of a contract
20  containing an arbitration provision cannot be
21  compelled to arbitrate the threshold issue of the
22  existence," highlighted, "of an agreement to
23  arbitrate.  Only a court can make that decision," and
24  then the Ninth Circuit goes forward in the top of the
25  next page, "Ample case law supports this holding.  In

1  fact, there are at least four cases under the Federal
2  Arbitration Act where a court has held that the
3  question of whether a particular individual has
4  authority to bind a party must be determined by the
5  court, not by an arbitrator," and then they cite a
6  bunch of cases, and the first one is a case out of
7  the Third Circuit, and it's not a forgery-type case.
8        It's an authority type of case, and I
9  was also impressed by Judge Easterbrook's similar
10  decisions and discussion in the Sphere Drake
11  Insurance Company case that's under number five.
12        In any event, what's your answer on just
13  this legal proposition that this ought to be before
14  the court, whatever the court is, it's not for us?
15        MR. SILLS:  Well, I think, Mr. Jentes,
16  the answer is that each of those cases, the Three
17  Valleys case, the Easterbrook's case -- and I would
18  be reluctant to the extreme to go to war with Judge
19  Easterbrook on a point of law.
20        Each of those involved an agent in the
21  conventional sense, which we ordinarily think as an
22  agent, some stranger to the party purporting to act
23  on its behalf.
24        None of those cases involves a corporate
25  officer, let alone the most senior corporate officer

1  acting in the course of his ordinary duties,
2  executing a document on behalf of that corporation,
3  and that's a very different situation because
4  throughout the business world, and as a matter of New
5  York law, both under Section 302 of our business
6  corporation law, and under the limited liability
7  corporations law, which we cite in our papers, a
8  counterparty is entitled to rely on the signature of
9  a corporate officer.  It's presumed to be valid.
10        So that when a corporation attacks the
11  act of its own officer as unauthorized, that's, in
12  effect, setting up a claim of voidability, and the
13  test under New York law and in -- the contract here,
14  we're, in effect, looking outside whatever the
15  internal corporate arrangements of Storm might have
16  been, when they come to New York, opt into New York
17  law, we're entitled, and the cases we cite in our
18  papers, I think, make it very clear, we're entitled
19  to test the validity of that contract by New York
20  law.
21        When a contract is made, executed and
22  subject to New York law, whether or not, you know,
23  the directors should have sung the company song but
24  didn't when they passed the resolution, whether they
25  should have worn funny hats at the meeting because

1  that's imposed by some foreign law all becomes
2  irrelevant.
3        The counterparty is entitled to rely on
4  that signature.  So this is, at most, a claim of
5  voidability.  I don't think it's a cognizable claim
6  at all because of the New York rule that a
7  corporation can't assert its own ultra vires act.
8        But the burden is on the party attacking
9  the validity of that signature.  The burden is on the
10  party saying that, although it signed the contract
11  and lived under it for two years and this fellow is
12  indeed the senior officer --
13        ARBITRATOR JENTES:  Would you agree with
14  the Second Circuit that there's got to be "some
15  evidence"?
16        MR. SILLS:  Well, the answer is yes.  At
17  a minimum, I mean, assuming that it states a legal
18  cognizable claim, and we don't at all agree that it
19  does, but assuming that they can set up their own
20  ultra vires act at all, and under New York law, under
21  the statute, the test is not only that the act was
22  ultra vires, but that, at the time of execution, the
23  counterparty knew it was ultra vires.
24        That's evidence that they've got to come
25  forward with and show, but the fact of the matter is,

Page 54

1  I think the other rejoinder here is I would look at a
2  case cited in our supplemental letter, which is the
3  Board of County Commissioners of Lawrence County
4  versus Kimball, and that was --
5        ARBITRATOR JENTES:  That's the case from
6  the Sixth Circuit.
7        MR. SILLS:  That's exactly right, and
8  there, there was a claim of ultra vires raised, that
9  the contracts that were being arbitrated had not been
10  duly authorized, and the Sixth Circuit explicitly
11  held that that was a question for the arbitrators.
12  And that's the way Prima Paint works.
13        I mean, here there's no claim that this
14  Mr. Nilov had not signed the contract, that he had
15  been coerced into signing the contract or that the
16  document is a forgery --
17        CHAIRMAN FEINBERG:  You're saying that
18  the evidence required under the Second Circuit
19  opinion, the Sphere case, you're saying that evidence
20  of a legal binding shareholders' agreement -- you've
21  made that case already, based on the documentation
22  that you've advanced here today, the certificates,
23  the fact that there was a shareholders' meeting.
24        Am I correct?  That if we ask you for
25  evidence of legitimacy, you'd come right back with

Page 55

1  the very same evidence that you've advanced here in
2  your briefs?
3        MR. SILLS:  Well, probably in somewhat
4  more elaborate form, because it seems to me if Storm
5  were actually raising this challenge, as opposed to
6  adding, you know, one more case to this blizzard of
7  litigations.
8        CHAIRMAN FEINBERG:  They are actually
9  raising this challenge.
10        MR. SILLS:  But only by claiming --
11  they're not asking for a hearing.
12        If they came to this panel with a
13  colorable claim, it would be certainly within the
14  panel's discretion, I think, to say, we'll have a
15  hearing, and witnesses will be called.
16        CHAIRMAN FEINBERG:  If they are asked to
17  present evidence to corroborate their colorable
18  claim, and you're asked to present evidence to
19  corroborate your colorful claim, are you suggesting
20  that the evidence that you would offer in support of
21  your position as to the legitimacy of the agreement
22  is the very same evidence you have presented to us to
23  date?
24        We've got it already, or would you say,
25  uh-huh, we're going to go back and see Wack, and

Page 56

1  we're going to go back, and thank you very much.
2  We -- as I think you just suggested, we may, in a
3  more expansive way, advance our view.
4        MR. SILLS:  Well, but I think, with all
5  respect, Mr. Feinberg, that's getting it backwards.
6        It's their motion.  They're obligated to
7  come to this panel with a colorable claim.
8        CHAIRMAN FEINBERG:  I agree.
9        MR. SILLS:  And if they had done so, and
10  I don't think they have, but if they had, then I
11  think it would be fully within this panel's
12  jurisdiction to say let's have a hearing, let's hear
13  the witnesses and make a determination, both as a
14  matter of New York law, that is, whether they can set
15  up their ultra vires act at all, and assuming that
16  they made out a legal defense, let's hear the
17  evidence.  What is the evidence that they have that
18  there wasn't a meeting.
19        CHAIRMAN FEINBERG:  I'm only asking,
20  what would be your evidence at such a meeting?
21        MR. SILLS:  It would be the evidence we
22  put before you.
23        CHAIRMAN FEINBERG:  That's what I asked
24  you.
25        ARBITRATOR JENTES:  In fairness to the

Page 57

1  position that Storm takes and, again, it gets back to
2  what actually happened in the Ukrainian court.
3        If I look at the April 25, 2006 decision
4  of what is, I take it, the equivalent of the trial
5  court, it gets around it and it says, "The Court
6  established that the Defendants' meeting of
7  participants did not approve the agreement, that
8  there existed no other arrangements between the
9  Defendants' participants, other than those stipulated
10  in the constituent documents, and that there was no
11  evidence to suggest that the agreement was approved
12  by the Defendant at any time later."
13        It certainly sounds like there must have
14  been some evidence presented to this trial court in
15  the Ukraine.
16        MR. SILLS:  No, because it's -- I think,
17  with respect, Mr. Jentes, it's saying there's no
18  evidence because it would have been up to Storm,
19  which is -- in theory at least, bore the burden that
20  I think we carry here to put on that evidence.
21        But since they had no evidence, since it
22  was Storm attacking the shareholders' agreement that
23  it was supposedly defending there -- I mean, Storm
24  has been, in fact, attacking this agreement for well
25  over a year, so you have Storm, theoretically, the

Page 58

1 champion of this agreement in that court, but whose
2 interest -- and we know from the at least nine cases
3 they brought attacking various aspects of the
4 corporate deal they struck with Telenor in the
5 Ukraine, putting on a defense, although, apparently,
6 not much of a defense.
7       I think the answer is that case, without
8 needing to make a decision, I think, about the
9 quality of justice in the Ukraine, because the
10 Ukrainian judge is confronted with two parties.
11       But it's an entirely collusive case
12 between two holding companies in the same chain of
13 ownership and it's --
14       ARBITRATOR JENTES: But let me ask you
15 the same question I asked of your opponent. Do you
16 have access to the record that was made before the
17 Ukrainian trial court?
18       MR. SILLS: My understanding is that, as
19 a matter of Ukrainian procedure, we do not.
20       ARBITRATOR JENTES: Can you get it?
21       MR. SILLS: I believe the answer is no.
22 I don't believe -- I mean, and I don't want to speak
23 as an expert, but my understanding, because I've
24 asked some of these questions, my understanding is
25 that court records are generally -- they're not

Page 59

1 public records in the sense in which court records
2 would be the case here.
3       So if that case had been brought in
4 Chicago, in Washington, we could go into court, get
5 the transcripts and see the exhibits that had been
6 filed.
7       We would be able to somehow untangle
8 what had happened, but I think one of the questions
9 addressed to Storm earlier on sort of brought this
10 out.
11       They presumably are in control of their
12 own litigation. They've made this motion, and yet,
13 they come here and can't tell us what they did and
14 what they said in the case they now rely on, and it
15 seems to me, it's a little harsh to ask us what
16 happened in a case that we were strangers to, and
17 that, to put it charitably, was concealed from us,
18 and I don't believe we even could get it.
19       CHAIRMAN FEINBERG: Let's say we move
20 for you. Now what?
21       What are you going to do with it?
22 You're going to take it back to the Ukraine, a ruling
23 in your favor in this arbitration? What are you
24 going to do with that arbitration award?
25       MR. SILLS: We're going to enforce it in

Page 60

1 the Ukraine.
2       ARBITRATOR JENTES: Under the New York
3 Convention.
4       MR. SILLS: I think -- well, I mean, I
5 think that it ill behooves Storm, or any other party,
6 to say you shouldn't conduct the arbitration we've
7 agreed to conduct because we don't think it will be
8 enforceable elsewhere, but Ukraine -- as best I know,
9 Ukraine is a signatory to the New York Arbitration
10 Convention.
11       It's a signatory to the European
12 Arbitration Convention, and it's adopted the uncitral
13 model law which provides for enforcement.
14       If Storm has some trick up its sleeve in
15 Ukraine, we'll deal with that once there's been an
16 award in our favor, and I believe we'll be able to
17 deal with it.
18       Storm had been, to be sure, on what
19 looked like a winning streak in some of these
20 Ukrainian litigations.
21       I'm encouraged by the recent development
22 that we brought to the panel's attention.
23       Another of these cases which was
24 brought -- what's called a fact-finding Perchersky
25 case, again, which proceeded without involvement by

Page 61

1 my client or even notice to it, was reversed on
2 appeal.
3       So I'm not certainly able to say, before
4 we've had any hearing, that it's a futile act, but
5 also, it can be enforced elsewhere, and Storm and its
6 corporate parents have operations in the U.S. and
7 elsewhere.
8       They've submitted to New York
9 jurisdiction and to the jurisdiction of the Southern
10 District.
11       In the agreement, we could render -- we
12 could enforce that by way of getting a judgment, and
13 we can take that judgment around the world. We may
14 not be limited to Ukraine.
15       CHAIRMAN FEINBERG: Mr. Sills, we're
16 really badgering you a little bit.
17       ARBITRATOR CRAIG: May I interrupt
18 before you cut him off?
19       CHAIRMAN FEINBERG: No, no. Go ahead.
20       ARBITRATOR CRAIG: With respect to the
21 Second Circuit opinion in the Sphere Drake Insurance,
22 I would like to ask Telenor's position as to whether
23 it accepts that the standard we should be applying
24 here appears on page 6, and I'll read it to you.
25       "Under Prima Paint, a party is not

16

1 entitled to a trial on the arbitrability of a
2 voidable contract, unless the party alleges that the
3 arbitration clause itself is voidable and provides
4 some evidence in support of its allegation."
5      MR. SILLS:  That is our position, and I
6 believe it's been reinforced and expanded by the
7 decision earlier this year of the Supreme Court in
8 the Buckeye case.
9      ARBITRATOR CRAIG:  Let me ask you this:
10 If Storms comes forward and satisfies this tribunal
11 that it has evidence, some evidence to support its
12 allegation that the shareholders' agreement is
13 voidable and you, for Telenor, present evidence to
14 the contrary, would you challenge the tribunal's
15 decision on the basis of the evidence submitted as to
16 the arbitrability of the issue?
17      MR. SILLS:  I'm sorry, Mr. Craig.  I'm
18 not grasping your question.
19      You mean, would we challenge the power
20 of the tribunal to hold a hearing and reach a
21 determination?
22      ARBITRATOR CRAIG:  Yes.
23      MR. SILLS:  No, we think that, to the
24 extent that a colorable claim of invalidity of the
25 arbitration clause, because arbitration clauses are

1 severable under Prima Paint, if they could meet that
2 Sphere Drake test and present a prima facie or
3 colorable case, then I think it would be appropriate
4 to have a hearing, and we would not only not
5 challenge that, but we would welcome it because we
6 think we could more than carry the day.
7      We think that arbitration tribunals,
8 certainly acting under the uncitral rules, which
9 expressly give the tribunal the power to rule on the
10 existence or validity of the contract being
11 challenged, that's the deal the parties made when
12 they -- by referring to those rules, they make them a
13 part of their contract.
14      This tribunal has that power.  If you
15 were to determine that we can't enforce the
16 shareholders' agreement because, for some reason that
17 I can't fathom, there is no shareholders' agreement,
18 or it's invalid, then that's the decision of the
19 tribunal, and we would have whatever remedies we
20 would have on review, but this is the forum that
21 should make that determination, and I think we
22 understand, that under U.S. law and under New York
23 law, the review of any decision of this tribunal,
24 especially based on the evidence, is extremely
25 limited.

1      We don't think there is a colorable
2 claim.  We don't think that any kind of prima facie
3 showing has been made, and so there's no occasion to
4 have that hearing, but the decision isn't mine.  It's
5 the decision of you gentlemen.
6      If you decide to have a hearing, we're
7 confident as to how it will come out, and we think
8 this is the appropriate forum, and if this were not a
9 delaying tactic, we think that's where the claim
10 would have been brought, and we think the reason the
11 the claim hasn't been brought here, and we speculate
12 about the motives of our adversaries, but I think the
13 reason that Storm elected not to bring the claim here
14 is it knows it doesn't have a claim.
15      All the evidence shows that this
16 contract was fully negotiated, that it was duly
17 authorized, and we ought to get to the merits.  This
18 case has been pending since February.
19      CHAIRMAN FEINBERG:  Anything else,
20 Mr. Sills?
21      MR. SILLS:  I've exhausted my 30
22 minutes.
23      I think, as to these other points, I'll
24 rest on our brief.
25      I wouldn't object to holding over --

1 although I think, even were the December 22 order
2 still in effect, we don't see that it makes a
3 significant difference here, that we think it's
4 legally irrelevant to the relief we sought, but
5 obviously, because that order has been vacated, it
6 changes the the complexion of this case and the
7 relief we're seeking.
8      It makes the case much simpler because
9 what we're really left with is their failure to go to
10 shareholder -- when I say "they," I mean Storm's
11 failure to attend shareholder and Board of Directors'
12 meetings with the question of enjoining further
13 assaults on the agreement, in violation of the
14 arbitration clause, in the Ukrainian courts, and
15 we're now up to nine cases that they brought, and the
16 question of the non-compete.
17      And I would hope that we could discuss
18 some scheduling issues because those are really
19 distinct, and some are more pressing than others and
20 may not involve much in the way -- well, for example,
21 if, after the tribunal has retired over lunch and
22 considered, perhaps we can discuss whether it makes
23 sense to bifurcate the proceedings.
24      But I wouldn't oppose the suggestion
25 that we wait until a written order is entered because

17

1  I think that will be more clarifying than the report
2  I'm making based on what what a Ukrainian lawyer told
3  me she had observed in court.
4          ARBITRATOR JENTES:  One more precise
5  question, Mr. Sills, on this last matter.
6          I understand that Orrick and Telenor's
7  position is that the vacating of the December 22
8  order does have an impact on the question of waiver
9  and estoppel.
10         Is it your position, though, that the
11 vacating of the December 22 order has no impact on
12 the issue of arbitrability that we discussed more
13 largely in your original argument?
14         MR. SILLS:  That is our position.  It
15 might -- again, I'll rest on our papers as to the
16 waiver point because even if there had been a waiver,
17 it would be issue by issue.
18         ARBITRATOR CRAIG:  Well, putting that
19 aside.
20         MR. SILLS:  But putting that to one side
21 and, again, without wanting to go into the
22 infirmities in their collateral estoppel point, if,
23 in fact, the charter has now been upheld by the
24 Ukrainian courts, then the factual premise of their
25 estoppel argument falls away, and we don't need to

1  get to the specific legal issues.
2          As to the arbitrability and the question
3  of whether or not this Alpren order in which Altimo
4  sued itself is entitled to any weight, or any respect
5  at all, or has any legal effect, I don't think that's
6  affected by the recent reversal of the Court.
7          ARBITRATOR CRAIG:  That was my question.
8          CHAIRMAN FEINBERG:  Rebuttal.  Peter?
9          MR. VAN TOL:  Very brief.  Thank you.  I
10 was happy to hear the last colloquy on the legal
11 standard.
12         I think we're agreed, and I'll just say
13 quickly, there's the Prima Paint case, and then there
14 are cases that interpret it, and I think the majority
15 rule falls down to where Sphere Drake is, and I don't
16 think we need to belabor it.
17         It comes down to void versus
18 voidability.  So I think we can dispense of that
19 issue and set aside any findings by the Sixth Circuit
20 or other courts.
21         Now, getting back to the Sphere Drake
22 standard though, I'm struck by what the Ukrainian
23 court said in its opinion.
24         It said, "The Court established that the
25 Defendants' meeting of participants did not approve

1  the above agreement, that there existed no other
2  arrangement," and it goes on.
3          This is a finding of fact.  Now, I take
4  the tribunal's point that we want to see what was
5  submitted to the Court, but here we have a finding of
6  fact by a Ukrainian court that affects Telenor's
7  rights, they say, and its appeal.
8          Now Telenor comes to this panel, and I
9  was very surprised to hear this at a hearing and not
10 get any advance notice in the papers that they've got
11 somebody named Mr. Wack that says there was a meeting
12 of participants.
13         He doesn't say, and we haven't heard
14 what happened at that meeting of participants, I'm
15 sure it would be nice to know, but if they're armed
16 with this knowledge, and this ruling comes down from
17 an Appellate Court, I'm stunned to hear that they
18 didn't exercise their right to intervene and go to
19 the Ukrainian Supreme Court.
20         That's what you would do here.  The last
21 thing you would do is let a decision sit out there
22 and say, I'm just not going to challenge it.  I'm
23 going to go to the panel.
24         That is a very surprising turn of
25 events, and I think it shows that the forum Telenor

1  wants is this panel, and they want the panel to
2  decide something with evidence that Mr. Sills says
3  he'll provide later that he doesn't have here.
4          Now, what we've tried to provide to the
5  panel is what we think is a conclusive finding by the
6  Ukrainian courts, and there's no reason, based on
7  what we've heard, to penetrate below it, no
8  allegations of irregularity by the court.
9          If you have a judgment of a foreign
10 court, you must defer to it, unless there's some
11 reason not to give it deference, and I've heard no
12 reason here today.
13         Subject to any questions that the
14 tribunal has or other rebuttal, that is really it.
15 Thank you.
16         CHAIRMAN FEINBERG:  Anything else?
17         MR. SILLS:  I'll be very brief.  It's
18 time for lunch.
19         CHAIRMAN FEINBERG:  Brevity is a virtue.
20         MR. SILLS:  The argument we're hearing
21 is nothing but a bootstrap.  They sued themselves.
22 They won a victory against themselves.
23         Now they say we should have gone in and
24 intervened because we like this forum.  It's not that
25 we like this forum, that we think this would be a

## Page 70

1 more favorable jurisdiction.  This is the deal the
2 parties made.
3         The parties opted for arbitration with
4 the broadest possible arbitration clause.  They opted
5 for arbitration in New York.  They opted for New York
6 law to govern, and so the notion that having
7 commenced this improper and collusive lawsuit in the
8 Ukraine, we should now sort of hop in and abandon the
9 rights we have, that we negotiated for before this
10 forum makes no sence.
11        The argument is just chasing its own
12 tail, and I think it's entitled to no weight at all.
13        ARBITRATOR CRAIG:  Can I ask a question
14 about Telenor's thought process in dealing with this
15 attack on the shareholder agreement?
16        You claim that the arbitration provision
17 is an exclusive remedy for any disputes arising out
18 of the shareholders' agreement.
19        Why didn't Telenor at least go to the
20 Appellate Court, or when you found out the Appellate
21 Court's opinion, to the Supreme Court and say, this
22 is the exclusive remedy?
23        I'm not asking why Telenor didn't put on
24 Mr. Wack's testimony, or the evidence that,
25 apparently, Storm thinks is relevant to this.

## Page 71

1        I'm asking why Telenor didn't invoke the
2 existence of the arbitration provision as a basis for
3 urging the Ukraine court to stay away from this and
4 not rule on it?
5        MR. SILLS:  Well, we're not parties to
6 the Ukrainian proceeding, and what I was hearing
7 before was the suggestion that our remedy is not the
8 contractual remedy we have, but that we should
9 intervene and seek discretionary review with the
10 Supreme Court of Ukraine -- I mean, you can sort of
11 imagine if the situation had been reversed, somebody
12 had gone into an obscure court in the U.S., sued
13 himself, or arranged to be sued by his immediate
14 corporate parent, put up no defense, got an order --
15        ARBITRATOR CRAIG:  I understand your
16 theory.
17        MR. SILLS:  -- and then someone said,
18 well, you shouldn't be here before the arbitrators.
19 You should petition for certiorari.
20        ARBITRATOR JENTES:  In fairness to what
21 he's asking, it's a little bit different, that both
22 the arbitration rules, the European statute that
23 controls here says that just as with the FAA, you had
24 an ability to go, at any time, to the Ukrainian court
25 and say, hey, wrong place.  Stay the court

## Page 72

1 proceedings.  Go to the panel, the arbitration panel,
2 and the question is, why didn't you do that?
3        ARBITRATOR CRAIG:  And we were underway,
4 were we not, at this time?  We were underway.
5        You could have gone to the courts and
6 said, look, this is being considered and being
7 resolved in another forum.  Why did you not do that?
8        MR. SILLS:  Because we didn't know the
9 proceeding had been brought.  It was brought in
10 secret and kept in secret.
11        CHAIRMAN FEINBERG:  Why didn't you
12 eventually though?
13        MR. SILLS:  We only found out after it
14 was concluded.
15        CHAIRMAN FEINBERG:  Why didn't you seek
16 to reopen it?
17        MR. SILLS:  I don't know that we have
18 the right under Ukrainian law.
19        It seems to me, to the extent that
20 anyone at this table who can tell us that, as a
21 matter of Ukrainian procedure, we have the right to
22 intervene and appeal, we can't -- the fact that we
23 haven't done that, any more than the fact that we
24 haven't, as the contract allows us to do, gone into
25 the Southern District, and sought an anti-suit

## Page 73

1 injunction against these Ukrainian orders, which
2 would be a more logical remedy, I think, had we had
3 notice, and had we thought that this was anything
4 other than a collusive attack entitled to no
5 respect --
6        ARBITRATOR CRAIG:  You knew about it at
7 least by May 30?
8        MR. SILLS:  The game was already over,
9 and the thought that we should intervene following
10 not only a collusive case but a collusive appeal --
11        ARBITRATOR CRAIG:  But there was, in
12 fact, as of May 30, a deliberative process on the
13 part of Telenor and its lawyers to make a decision
14 about whether or not to attempt to intervene, and you
15 chose not to intervene.
16        MR. SILLS:  And that's because we
17 believed then and believe now that this tribunal is
18 the forum, that it has jurisdiction, that it wasn't
19 divested of jurisdiction, and that it should proceed,
20 that we were already in arbitration, already in a
21 forum that had the full power and authority to make
22 these determinations, had a colorable claim been
23 brought, and that is where we've chosen to have that
24 dispute.
25        ARBITRATOR CRAIG:  I understand.

19

1    MR. SILLS: I understand your question
2  now. It is -- our decision was to proceed as the
3  parties had agreed to proceed and not to be sucked
4  into a proceeding that we think is highly improper,
5  inaddition to being collusive, that the collateral
6  attack in an arbitration already underway in the
7  courts of Ukraine, especially when the parties had
8  agreed that there would be jurisdiction in the courts
9  here in New York.
10    CHAIRMAN FEINBERG: What's to prevent
11  you, if we rule against you and send you to the
12  Ukrainian court, the next day, you don't now run to
13  the Southern District of New York?
14    MR. SILLS: I think, Mr. Feinberg, if
15  that were to happen, we would consider our remedies,
16  I suppose.
17    CHAIRMAN FEINBERG: Why haven't you
18  already run to the Southern District --
19    MR. SILLS: Because I don't believe we
20  need to.
21    CHAIRMAN FEINBERG: You're consistent.
22    MR. SILLS: I don't believe we need to
23  because, here we are, and we're ready to proceed.
24    We're, of course, reserving our rights
25  to go to the Court that the parties agreed would have

1  jurisdiction here, but we don't see the need to do
2  that yet.
3    I'm reluctant to crank up the machinary
4  of the federal justice system if we don't need to.
5    ARBITRATOR JENTES: There's no reason
6  not to go to the Ukrainian court and seek exactly
7  what you would seek to do at Foley Square, isn't
8  there?
9    MR. SILLS: I suppose, or we could go to
10  the Norweigian court.
11    ARBITRATOR JENTES: You can just come in
12  and say, gee, there's an arbitration underway. We
13  ought to stay all these proceedings, and so any
14  enforcement of these two sets of rulings can't be
15  carried out in the Ukrainian courts.
16    MR. SILLS: If we were concerned,
17  Mr. Jentes, that -- if we had come to the conclusion,
18  and I hope you'll come to the conclusion that the
19  Ukrainian proceedings were null and entitled to no
20  respect, entitled to no weight, and we saw no reason
21  to intervene in them, to the extent we could, for
22  exactly that reason, let alone start a plenary
23  proceeding there, if we were going to go to court,
24  given that it's New York arbitration, governed by New
25  York law with a submission to New York jurisdiction,

1  we would be down at Foley Square.
2    But we don't see any reason for that at
3  this time either. Again, I want to be careful about
4  this, reserving our rights, Mr. Feinberg.
5    ARBITRATOR JENTES: It's there clearly
6  in the footnote.
7    MR. VAN TOL: That was ours.
8    CHAIRMAN FEINBERG: Well, both sides. I
9  can tell both sides, it's uncertain to me what our
10  ruling -- whatever our ruling, the impact on the
11  ultimate disposition of this, because I can see both
12  sides running back to court.
13    MR. VAN TOL: Well, Mr. Chairman, that
14  is exactly the point of having the void versus
15  voidable rule, to save everyone's time.
16    If there is a colorable claim that it's
17  void, in other words, and we're not just running here
18  making an allegation that the contract is void, if we
19  can make a colorable claim that it's void, a court
20  should decide this so the tribunal doesn't waste its
21  time.
22    CHAIRMAN FEINBERG: Peter, I assure you,
23  if we rule in a manner that you find unfavorable, you
24  may change your view on the role of the court in
25  deciding, and I would venture to say, I may even

1  predict which court, so we'll have to see.
2    Anybody else have anything to add?
3    MR. VAN TOL: We better not.
4    CHAIRMAN FEINBERG: If not, we thank you
5  for a vigorous and quite effective argument on both
6  sides.
7    We adjourn for lunch. Don't go away
8  because we will be reconvening with further
9  instructions.
10    Thank you.
11    (A luncheon recess is taken.)
12    CHAIRMAN FEINBERG: A unanimous panel
13  has conferred at length, and has decided unanimously
14  to defer, for the time being, Respondent Storm's
15  motion to dismiss the claims of Telenor.
16    The parties, both sides, are instructed
17  to make sure that they fully understand the Sphere
18  Drake Insurance decision in the Second Circuit, and
19  both sides are instructed to provide evidence on the
20  question of the alleged invalidity of the shareholder
21  agreement, consistent with the language in Sphere
22  Drake Insurance.
23    At the same time, the panel unanimously
24  decides to defer the estoppel and waiver issues
25  reflected in Mr. Sills' June letter, June 27 letter,

Page 78

1   and combine those issues of waiver and estoppel with
2   a hearing on the evidential underpinnings concerning
3   the invalidity of the shareholder agreement.
4           The panel proposes that a hearing be
5   conducted on -- proposes the week of August 14 and
6   suggests, one, perhaps two days on the evidentiary
7   hearing, Monday and Tuesday, August 14 and 15, August
8   15, the second day, being a safe day, just in case
9   the matter cannot be completed in one day, which we
10  hope it can.
11          One week before August 14, August 7, the
12  parties will exchange exhibits to be used at the
13  hearing, any witness statements, if either or both
14  parties wish to call witnesses, exchange witness
15  statements, and any evidentiary brief that they might
16  wish to submit to the panel should also be exchanged
17  by August 7.
18          That is the ruling of the panel, subject
19  to, first, my panelists, co-panelists adding anything
20  to it.
21          ARBITRATOR JENTES:  The only thing I'd
22  make clear is that the filings on the 7th could
23  include affidavits in lieu of evidentiary statements,
24  so that if you wanted to present your evidence via
25  affidavit, the panel will accept that.

Page 79

1           MR. VAN TOL:  Thank you.
2           MR. SILLS:  But I assume, from both
3   Mr. Feinberg's comment and yours, Mr. Jentes, that
4   there will be no direct testimony at the hearing,
5   that direct cases go in either via witness statements
6   or via affidavit.  Is that correct?
7           ARBITRATOR CRAIG:  No, if either side
8   wishes to call a witness to come and testify, the
9   witness would be welcome to come.
10          MR. SILLS:  I'm sorry.  This was really
11  a mechanical point.  I mean --
12          CHAIRMAN FEINBERG:  Do you want to ask
13  what do we mean by witness statements as opposed to
14  witness list?
15          ARBITRATOR CRAIG:  A description of what
16  the witness generally is going to be saying.
17          ARBITRATOR JENTES:  It's not the IBA
18  rules, where it's in lieu of direct testimony.
19          I think the panel is very interested in
20  the person presenting the evidence live and on
21  direct, as well as on cross.
22          The only thought is that let the other
23  side know a little bit about what that witness might
24  have to say.  That's what the, quote, witness
25  statement is designed to do.

Page 80

1           MR. SILLS:  Sort of like a witness
2   statement you would see in a pretrial order in
3   Federal Court.
4           CHAIRMAN FEINBERG:  Right.
5           MR. VAN TOL:  And to the extent that
6   someone puts in a witness affidavit, is it presumed
7   that that witness will be at the hearing present for
8   cross-examination?
9           ARBITRATOR CRAIG:  No.  You're welcome
10  to present a witness via affidavit, via live witness,
11  via documentation, videotape.
12          CHAIRMAN FEINBERG:  We didn't talk about
13  this, but let the chairman just take the view that I
14  am not suggesting for a minute a prioritization of
15  your evidence.
16          MR. VAN TOL:  I understand.  Thank you.
17          CHAIRMAN FEINBERG:  As far as I'm
18  concerned, an affidavit, a document has the same
19  weight as live testimony when presented to the panel
20  prior to August 14.
21          Now, what happens on August 14 is an
22  altogether different question, obviously.
23          ARBITRATOR CRAIG:  Let me just add two
24  things.
25          One, I think it's very important to all

Page 81

1   of the members of the panel that all of the parties
2   read very carefully the Second Circuit opinion to
3   understand what the standard is and what the quantum
4   of evidence or the quality of evidence will be,
5   because that is what we're using as our guidepost.
6           Secondly, because we have given you a
7   week of time between the exchange of affidavits,
8   descriptions of witness testimony, I would expect,
9   and I think probably the other members of the panel
10  would join me, that there may be efforts to respond
11  to that testimony a week later at the hearing, and
12  we're just going to have to go with that.  I mean,
13  there's going to be no advance notice.
14          CHAIRMAN FEINBERG:  Simultaneous
15  exchange, no opportunity to rebut prior to August 14.
16          ARBITRATOR CRAIG:  But on August 14,
17  there will be an opportunity to rebut.
18          CHAIRMAN FEINBERG:  I want to emphasize,
19  on behalf of the panel, because this, we did discuss,
20  the hearing is an evidentiary hearing.  It is not an
21  argument.
22          We've heard argument.  We'll permit, at
23  the end of the evidentiary hearing, each side an
24  opportunity to sum up its evidence, but I think
25  everybody -- this is a pretty sophisticated group,

Page 82

1   and I think everybody understands what troubles us
2   and what we seek in deferring the motion and seeking
3   evidence to buttress each side's respective
4   positions.
5           Hopefully, although we have no reason to
6   confirm this yet, hopefully, Lovells will be glad to
7   host the hearing.  If not, we'll find a New York
8   firm.
9           MR. SILLS:  Actually, we had reached an
10  agreement on that.  We settled the venue question by
11  flipping a coin, and we've agreed to alternate
12  hearing sites, so if it's okay, we'll be pleased to
13  host it, and we'll provide sandwiches at least as
14  tasty as those we were provided today.
15          CHAIRMAN FEINBERG:  May I suggest,
16  subject to Bill and Craig and the parties, is an
17  earlier start time of 9:00 a.m., or is it a Monday
18  morning and, therefore, 10:00 a.m., or what is
19  everybody's pleasure?
20          ARBITRATOR JENTES:  I might come out the
21  night before because I can't get here.
22          MR. SILLS:  Sooner is better.
23          CHAIRMAN FEINBERG:  9:00 a.m.?
24          ARBITRATOR CRAIG:  Yes.
25          MR. SILLS:  9:00 a.m. is fine with me.

Page 83

1           CHAIRMAN FEINBERG:  Obviously, to the
2   extent you guys can confer and accelerate and
3   expedite matters.
4           In the dog days of August, a one-day
5   hearing is preferable to a two-day hearing.  In fact,
6   a one-day hearing is preferable no matter if it's the
7   dog days of August or not, but if you guys can agree
8   to five hours each side total or something like that,
9   it would be very, very useful.
10          MR. VAN TOL:  Okay.
11          CHAIRMAN FEINBERG:  If not, the chair
12  and my co-arbitrators will make sure the trains run
13  on time, but it's useful if everyone would agree to
14  some sort -- we've all done it.  You know, you take
15  nine to one, and I'll take two to six or seven,
16  whatever it is, and that way, we'll wrap up.
17          Anything else?
18          ARBITRATOR JENTES:  The only thing I
19  would suggest is if the parties have any questions
20  for us, in light of where we are, I don't think we're
21  adverse to try to answer any questions you may have
22  of things that aren't covered by what Mr. Feinberg
23  has just said that you think we ought to be taking
24  action on or prepare a list.
25          MR. SILLS:  I did have one question, and

Page 84

1   I don't necessarily have a suggestion now, but it
2   seems to me, in a hearing like this,
3   cross-examination is critical because people can say
4   what they want in affidavits, and I think, I would
5   request the panel that, at least as far as any
6   evidence offered by affidavit, that on the request of
7   the adverse party, that witness has to be produced,
8   so that his testimony can be cross-examined, which
9   would avoid crafting an affidavit and then trying to
10  shield the witness from cross-examination.
11          It seems to me, putting to one side
12  questions of due process, it seems to be
13  fundamentally unfair that you should be able to put
14  on, in effect, a case that's not subject to
15  cross-examination.
16          I understand if a witness is here and
17  testifies on direct, that he or she is subject to
18  cross, but it seems to me, if there's an affidavit on
19  a critical point, and it's going to be given any
20  evidentiary weight at all, then the proponent of the
21  party offering that ought to be obligated, at least
22  at the request of the other party, to produce that
23  witness or have it disregarded.
24          CHAIRMAN FEINBERG:  I can give you my
25  view.

Page 85

1           Obviously, we have to talk about this,
2   and Bill and Craig are very experienced, and they'll
3   have their own view.  My view is that issue goes to
4   weight, not admissibility.
5           I'm reluctant to compel live testimony
6   in lieu of affidavits.  If somebody files an
7   affidavit and does not appear, and you have a witness
8   who does appear, or that witness directly contradicts
9   that affidavit in a number of respects, and we
10  evaluate the credibility of the live witness, it's a
11  weight question.
12          If somebody is a critical witness and
13  files an affidavit, then that party might think twice
14  about doing it by affidavit or not.
15          But I am really reluctant to anticipate
16  a blanket rule that requires, instead of four
17  affidavits which can be submitted and will save us
18  time, four live witnesses, some of whom may be
19  cumulative.
20          MR. SILLS:  I wasn't suggesting --
21          CHAIRMAN FEINBERG:  That's my view based
22  on my experience, but my fellow arbitrators may not
23  agree.
24          ARBITRATOR JENTES:  It seems to me, on
25  top of that, here I have a suspicion we may have

1  affidavits from people who aren't in the United
2  States, and it may be difficult for them to get here,
3  and I wouldn't want to foreclose hearing from them
4  just because they can't come to the United States and
5  testify live.
6        MR. SILLS:  On a related point, we would
7  request that, to the extent that the uncitral rules
8  and the Arbitration Act and Article 75 of the CPLR
9  govern, that we would be able to have subpoenas
10  issued by the panel to compel witnesses within the
11  subpoena power to show up and testify.
12       CHAIRMAN FEINBERG:  You can certainly
13  request that the panel exercise that power.  We will
14  take any written requests under advisement.
15       I think one -- I don't know -- again, in
16  terms of your conferring to make this an efficient
17  process, query, should we have a translator available
18  if needed?
19       That may depend on the two of you or
20  each side chatting about who's actually coming, if
21  anybody, or it might be affidavit.
22       If it's affidavits that are in a foreign
23  language, I hope, in that week, you will be
24  effectively translating that and making sure that the
25  other side and the arbitrators --

1        ARBITRATOR JENTES:  You guys have to
2  work that out.
3        CHAIRMAN FEINBERG:  So there we are.
4        ARBITRATOR JENTES:  Let me only mention,
5  having recently dealt on a couple of cases with
6  translators, make certain you get a good one.
7        There's nothing worse than having
8  someone that can't handle the give and take of
9  cross-examination.
10       CHAIRMAN FEINBERG:  Thank you all for a
11  very, very enlightening morning and for lunch.
12       The panel has expressed among themselves
13  admiration for the arguments and the effectiveness of
14  each side's presentation.
15       For this arbitrator, who's done a fair
16  number of arbitrations, this is rather unique in a
17  number of respects, some of the issues raised here,
18  and it was enormously helpful, the briefing and the
19  oral advocacy.
20       I think I speak for my fellow
21  arbitrators.
22       This arbitration is adjourned until 9:00
23  a.m. on Monday, August 14, with an exchange of
24  exhibits, witness summaries and evidentiary briefs on
25  August 7.  We're adjourned.

1        MR. VAN TOL:  Thank you.
2        (The hearing is adjourned at 1:36 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              CERTIFICATE.
2
3        I, MARY G. VAN DINA a Certified
4  Shorthand Reporter and Notary Public, do hereby
5  certify that the foregoing is a true and accurate
6  transcript of the testimony as taken stenographically
7  by and before me at the time, place and on the date
8  hereinbefore set forth.
9        I DO FURTHER CERTIFY that I am neither a
10  relative nor employee nor attorney nor counsel of any
11  of the parties to this action, and that I am neither
12  a relative nor employee of such attorney or counsel,
13  and that I am not financially interested in the
14  action.
15
16
        Notary Public
17  My Commission expires August 31, 2010
    License No. XI01903
18
        Dated:  July 13, 2006
19
20
21
22
23
24
25

## A

**abandon (1)**
70:8
**ability (1)**
71:24
**able (8)**
5:21 42:8 47:13 59:7
60:16 61:3 84:13
86:9
**above-entitled (1)**
1:11
**absence (2)**
14:18 26:1
**absent (1)**
14:23
**absolutely (3)**
28:8 29:8 46:12
**absurd (1)**
39:17
**acceding (1)**
36:24
**accelerate (1)**
83:2
**accept (1)**
78:25
**accepts (1)**
61:23
**access (3)**
3:13 17:8 58:16
**accurate (1)**
89:5
**accusations (1)**
13:20
**accused (1)**
33:14
**acknowledged (2)**
20:14,17
**acquisition (1)**
49:1
**act (11)**
34:18 50:9 51:2,22
52:11 53:7,20,21
56:15 61:4 86:8
**acting (2)**
52:1 63:8
**action (6)**
18:15 21:13 23:20
83:24 89:11,14
**actions (2)**
18:12,15
**active (3)**
5:8 35:2,7
**actively (3)**
34:14 35:21 39:7
**acts (1)**
37:22
**Adam (3)**
2:5 3:25 6:3

**add (2)**
77:2 80:23
**adding (2)**
55:6 78:19
**addition (1)**
19:19
**addressed (1)**
59:9
**adjourn (2)**
5:22 77:7
**adjourned (3)**
87:22,25 88:2
**admiration (1)**
87:13
**admissibility (1)**
85:4
**admitted (1)**
3:23
**adopted (1)**
60:12
**advance (5)**
14:2,5 56:3 68:10
81:13
**advanced (2)**
54:22 55:1
**adversaries (1)**
64:12
**adverse (3)**
20:5 83:21 84:7
**advertent (1)**
35:24
**advice (1)**
20:20
**advisement (1)**
86:14
**advocacy (1)**
87:19
**affidavit (14)**
27:14 78:25 79:6 80:6
80:10,18 84:6,9,18
85:7,9,13,14 86:21
**affidavits (7)**
78:23 81:7 84:4 85:6
85:17 86:1,22
**affiliation (2)**
3:10,14
**affirmed (2)**
10:12,16
**afternoon (1)**
5:22
**agent (2)**
51:20,22
**ago (1)**
45:14
**agree (7)**
32:5 53:13,18 56:8
83:7,13 85:23
**agreed (12)**

45:12,14 46:25 47:8
47:18 50:4 60:7
67:12 74:3,8,25
82:11
**agreeing (1)**
49:16
**agreement (61)**
9:18 12:2 13:4,9,11
13:19 15:5,25 17:25
18:6,9 23:1,25 24:6
24:9,15 25:8 30:11
32:9 36:7 39:25
40:1,15 41:17 43:4
44:6,14 45:16,23
46:17,19 47:21,24
48:10,21,25 49:2,4
49:5,9 50:1,5,22
54:20 55:21 57:7,11
57:22,24 58:1 61:11
62:12 63:16,17
65:13 68:1 70:15,18
77:21 78:3 82:10
**agrees (1)**
26:22
**ahead (3)**
19:12 31:4 61:19
**Alfa (8)**
37:24 38:13 44:3
48:16,23,24 49:10
49:14
**Alfa's (1)**
49:5
**allegation (7)**
12:14 16:2 28:18 30:3
62:4,12 76:18
**allegations (3)**
16:17 27:11 69:8
**allege (1)**
27:6
**alleged (3)**
14:25 27:9 77:20
**alleges (1)**
62:2
**alleging (2)**
24:6 25:23
**allow (1)**
23:11
**allows (1)**
72:24
**Alpren (9)**
15:8 16:9 17:6,23
38:6,10 39:4 43:24
67:3
**Alpren's (1)**
20:11
**alternate (1)**
82:11
**alternatively (1)**
13:9

**Altimo (15)**
16:21 37:24 38:3,3,7
38:12 39:5,16 41:21
42:10 43:23 44:3
49:19,20 67:3
**altogether (1)**
80:22
**ambiguity (1)**
48:8
**Ample (1)**
50:25
**announce (1)**
7:19
**announced (2)**
8:1,18
**announcement (1)**
8:15
**answer (11)**
11:5 26:9 35:14 40:4
43:12 51:12,16
53:16 58:7,21 83:21
**anticipate (1)**
85:15
**anti-suit (1)**
72:25
**anybody (4)**
37:15 47:23 77:2
86:21
**apologize (1)**
37:12
**apparently (3)**
35:22 58:5 70:25
**appeal (20)**
11:15 14:12,13 15:4
15:19 20:3,19 21:25
22:4,7,8,13 33:24
36:5 40:3,5 61:2
68:7 72:22 73:10
**appealed (4)**
14:13 22:10,12 35:7
**appeals (1)**
20:5
**appear (3)**
14:7 85:7,8
**appears (2)**
41:24 61:24
**appellate (14)**
9:23 10:11,16,18
11:13 14:14 16:11
20:22 22:3 23:7
32:20 68:17 70:20
70:20
**applicable (1)**
31:11
**application (2)**
7:13 20:23 39:21 46:1
**applies (1)**
48:1

**apply (4)**
32:5,12,14,16
**applying (1)**
61:23
**appreciate (2)**
3:11 7:5
**appreciates (1)**
4:16
**appropriate (3)**
30:13 63:3 64:8
**approve (3)**
49:12 57:7 67:25
**approved (1)**
57:11
**April (7)**
10:9 11:3 17:24 21:9
22:1 41:19 57:3
**arbitrability (7)**
6:11 46:16,20 62:1,16
66:12 67:2
**arbitrate (5)**
6:13 34:19,23 50:21
50:23
**arbitrated (2)**
34:16 54:9
**arbitration (40)**
1:1,1 9:19 12:3 19:5
27:5,7 35:15 36:6
36:15,25 37:7 45:14
46:5 47:4 50:20
51:2 59:23,24 60:6
60:9,12 62:3,25,25
63:7 65:14 70:3,4,5
70:16 71:2,22 72:1
73:20 74:6 75:12,24
86:8 87:22
**arbitrations (1)**
87:16
**arbitrator (67)**
1:21,22 6:22 8:23
11:1,9 15:2,21 17:8
17:21 18:4 19:14
21:18 22:6,11,14
25:25 26:16,23 27:3
30:5,24 32:7,11
34:24 40:21 41:4
43:1 50:12 51:5
53:13 54:5 56:25
58:14,20 60:2 61:17
61:20 62:9,22 66:4
66:18 67:7 70:13
71:15,20 72:3 73:6
73:11,25 75:5,11
76:5 78:21 79:7,15
79:17 80:9,23 81:16
82:20,24 83:18
85:24 87:1,4,15
**arbitrators (6)**
3:5 54:11 71:18 85:22

86:25 87:21
**areas (1)**
10:1
**argue (2)**
7:15 11:21
**argued (1)**
16:24
**argues (2)**
13:7 22:25
**arguing (2)**
21:7 24:15
**argument (19)**
4:23 5:6,7,11 6:10,18
8:14 9:14 15:11
20:8 21:10 34:20
66:13,25 69:20
70:11 77:5 81:21,22
**arguments (10)**
5:11,15 12:21,23
13:12 16:14,19
22:24 24:17 87:13
**arising (1)**
70:17
**armed (1)**
68:15
**arm's (1)**
17:14
**arranged (1)**
71:13
**arrangement (1)**
68:2
**arrangements (2)**
52:15 57:8
**article (2)**
11:11 86:8
**Articles (1)**
8:21
**articulate (1)**
31:22
**aside (3)**
17:23 66:19 67:19
**asked (6)**
39:13 55:16,18 56:23
58:15,24
**asking (9)**
29:9 31:4 37:8 45:20
55:11 56:19 70:23
71:1,21
**aspects (1)**
58:3
**assaults (1)**
65:13
**assert (1)**
53:7
**assertion (1)**
46:25
**associate (5)**
4:7,9,10 10:24 17:12

**associated (1)**
26:13
**assume (2)**
32:11 79:2
**assuming (5)**
10:23 29:25 53:17,19
56:15
**assure (1)**
76:22
**attached (2)**
26:25 30:15
**attack (4)**
19:8 70:15 73:4 74:6
**attacking (4)**
53:8 57:22,24 58:3
**attacks (2)**
9:24 12:17
**attacts (1)**
52:10
**attempt (2)**
19:6 73:14
**attempted (1)**
10:15
**attend (1)**
65:11
**attention (1)**
60:22
**attested (1)**
44:5
**attorney (2)**
89:10,12
**Attorneys (2)**
2:9,14
**August (15)**
78:5,7,7,11,11,17
80:20,21 81:15,16
83:4,7 87:23,25
89:17
**authority (16)**
15:13,16 16:3,9 18:2
18:8 25:16 27:16
30:16 42:14 43:15
47:3 49:21 51:4,8
73:21
**authorize (1)**
28:2
**authorized (5)**
25:16 26:7 43:3 54:10
64:17
**available (5)**
20:16 22:17 45:5
47:23 86:17
**Avenue (3)**
1:14 2:2,11
**avoid (1)**
84:9
**award (2)**
59:24 60:16

**aware (2)**
16:23 20:24
**a.m (5)**
82:17,18,23,25 87:23

___

**B**

**B (3)**
1:18,22 6:6
**back (14)**
3:19 5:18 16:20 17:3
29:4 30:22 40:22
54:25 55:25 56:1
57:1 59:22 67:21
76:12
**backwards (1)**
56:5
**badgering (1)**
61:16
**based (10)**
3:23 4:2 5:8 29:22
41:8 54:21 63:24
66:2 69:6 85:21
**basis (4)**
44:8 46:24 62:15 71:2
**behalf (5)**
3:3 49:23 51:23 52:2
81:19
**behooves (2)**
44:20 60:5
**belabor (1)**
67:16
**believe (11)**
23:20 36:19 44:24
58:21,22 59:18
60:16 62:6 73:17
74:19,22
**believed (1)**
73:17
**believes (1)**
5:5
**benefit (1)**
48:20
**best (4)**
12:20 27:21 32:18
60:8
**better (5)**
28:21,23 47:5 77:3
82:22
**beyond (2)**
22:4 34:10
**bifurcate (1)**
65:23
**Bill (4)**
3:4 29:14 82:16 85:2
**Bill's (1)**
28:15
**bind (2)**
49:15 51:4

**binding (1)**
54:20
**bit (5)**
30:18 33:21 61:16
71:21 79:23
**Bjorn (2)**
2:16 3:15
**black (1)**
50:7
**blanket (1)**
85:16
**blizzard (2)**
38:23 55:6
**Blonder (1)**
21:5
**Board (2)**
54:3 65:11
**Bob (3)**
4:4 6:2 37:17
**bootstrap (1)**
69:21
**bore (1)**
57:19
**bothers (1)**
41:10
**bottom (1)**
50:18
**bought (1)**
48:24
**Brevity (1)**
69:19
**brief (8)**
6:7 20:10 21:1 23:18
64:24 67:9 69:17
78:15
**briefing (2)**
8:14 87:18
**briefly (1)**
6:7
**briefs (3)**
30:15 55:2 87:24
**bring (1)**
64:13
**brings (1)**
39:25
**Broad (1)**
2:7
**broadest (1)**
70:4
**brought (15)**
17:6 39:15 41:19
44:10 58:3 59:3,9
60:22,24 64:10,11
65:15 72:9,9 73:23
**Buckeye (2)**
40:13 62:8
**bunch (1)**
51:6

**burden (8)**
13:15 30:20,22 41:23
42:7 53:8,9 57:19
**business (5)**
7:22 8:17 45:6 52:4,5
**button (1)**
26:17
**buttress (1)**
82:3
**bypass (1)**
32:24

___

**C**

**C (1)**
2:1
**call (3)**
43:6 78:14 79:8
**called (5)**
18:7 40:18 45:6 55:15
60:24
**capable (1)**
47:16
**careful (1)**
76:3
**carefully (2)**
16:25 81:2
**carried (1)**
75:15
**carry (2)**
57:20 63:6
**case (47)**
14:12 20:14,22 23:11
25:21 27:13 28:15
28:18 31:22 34:13
35:10 36:4 39:15
42:24 44:9 46:15
50:13,15,16,25 51:6
51:7,8,11,17,17
54:2,5,19,21 55:6
58:7,11 59:2,3,14
59:16 60:25 62:8
63:3 64:18 65:6,8
67:13 73:10 78:8
84:14
**cases (17)**
21:2,6 25:20 26:18
31:24 34:22 51:1,6
51:16,24 52:17 58:2
60:23 65:15 67:14
79:5 87:5
**category (1)**
27:4
**caucused (1)**
4:19
**certain (3)**
15:21 18:16 87:6
**certainly (6)**
30:12 55:13 57:13
61:3 63:8 86:12

certificate (5)
42:9,12 44:1 49:22
89:1
certificates (6)
43:14,16,16 49:18,21
54:22
Certified (2)
1:12 89:3
certify (2)
89:5,9
certiorari (1)
71:19
cetera (2)
5:21 21:5
chain (1)
58:12
chair (2)
5:8 83:11
chairman (77)
1:20 3:1,17 4:2,14 8:6
9:8,13 13:25 14:17
16:12 19:10,12 22:9
24:18,24 28:4,13,21
29:6 31:3 33:6 36:1
36:22 37:10,13 39:6
39:9 40:8,10 44:3
44:15 46:14,21
47:19 48:9,14 49:20
54:17 55:8,16 56:8
56:19,23 59:19
61:15,19 64:19 67:8
69:16,19 72:11,15
74:10,17,21 76:8,13
76:22 77:4,12 79:12
80:4,12,13,17 81:14
81:18 82:15,23 83:1
83:11 84:24 85:21
86:12 87:3,10
challenge (12)
8:21 10:20 11:20
20:11 39:7 44:20
55:5,9 62:14,19
63:5 68:22
challenged (4)
8:4 11:25 46:9 63:11
champion (1)
58:1
Chang (4)
2:13 4:10,10 10:24
change (1)
76:24
changes (1)
65:6
charitably (1)
59:17
chart (1)
35:6
charter (1)
8:4,21 31:19 66:23

chasing (1)
70:11
chatting (1)
86:20
check (1)
17:12
Chicago (1)
59:4
chief (3)
41:18 42:17 43:21
choice (2)
46:13,15
choose (1)
46:7
chose (2)
45:23 73:15
chosen (2)
46:6 73:23
Circuit (16)
26:20 27:19 28:16
29:15 50:14,17,24
51:7 53:14 54:6,10
54:18 61:21 67:19
77:18 81:2
circulate (1)
10:21
circumscribed (1)
6:18
cite (3)
51:5 52:7,17
cited (4)
23:11 34:22 40:13
54:2
cites (1)
31:24
civil (3)
31:20 41:6 44:18
claim (25)
14:9,20 34:25 35:1
41:19 52:12 53:4,5
53:18 54:8,13 55:13
55:18,19 56:7 62:24
64:2,9,11,13,14
70:16 73:22 76:16
76:19
Claimant (2)
1:4 2:9
claiming (1)
55:10
claims (3)
12:7 27:12 77:15
clarifying (1)
66:1
Claritan (1)
26:21
classic (1)
37:4
clause (10)

9:19 12:3 27:5 46:22
46:24 48:6 62:3,25
65:14 70:4
clauses (2)
27:7 62:25
clear (7)
21:7 30:5 32:15 34:17
46:12 52:18 78:22
clearly (2)
24:16 76:5
client (5)
16:13 17:20 25:10
33:11 61:1
clients (1)
15:14
code (1)
31:20
coerced (1)
54:15
cognizable (5)
15:8,20,22 53:5,18
coin (1)
82:11
collateral (4)
21:6 33:19 66:22 74:5
collaterally (2)
19:8 21:8
colloquy (1)
67:10
colluding (1)
44:22
collusion (6)
12:25 14:12,15,18
16:18 20:4
collusive (9)
40:3 42:22,23 58:11
70:7 73:4,10,10
74:5
colorable (10)
30:2 55:13,17 56:7
62:24 63:3 64:1
73:22 76:16,19
colorful (1)
55:19
column (1)
50:18
combine (2)
38:14 78:1
come (25)
3:16 13:21 15:1 16:20
18:5 20:22 25:13,22
30:20 34:11 38:23
47:17 52:16 53:24
54:25 56:7 59:13
64:7 75:11,17,18
79:8,9 82:20 86:4
comes (6)
24:2 47:12 62:10
67:17 68:8,16

comfort (3)
42:11 44:7 50:2
coming (5)
7:3 34:7 44:12,13
86:20
commenced (2)
39:2 70:7
commencing (1)
1:15
comment (2)
9:9 79:3
commenting (1)
6:3
Commercial (7)
6:5 9:3,5 10:10,11
35:23 45:6
Commission (1)
89:17
Commissioners (1)
54:3
common (3)
24:10 32:16 38:10
Communications (2)
1:3 3:6
companies (2)
45:7 58:12
company (9)
18:16 27:15 37:21,22
37:23 38:7,12 51:11
52:23
compel (2)
85:5 86:10
compelled (1)
50:21
competent (3)
13:18 19:8 27:22
competenz-compet...
40:19
Complaint (1)
35:14
complete (1)
48:6
completed (2)
48:25 78:9
completely (1)
33:11
complexion (1)
65:6
complied (1)
42:13
comprehension (1)
34:10
comprehensive (1)
45:23
concealed (1)
59:17
conceive (1)
19:2

concerned (4)
21:15 36:23 75:16
80:18
concerning (1)
78:2
concerns (4)
45:2,8,11,17
conclude (1)
5:11
concluded (1)
72:14
conclusion (3)
12:5 75:17,18
conclusive (3)
11:24 12:1 69:5
conduct (3)
38:2 60:6,7
conducted (3)
36:8 42:20 78:5
confer (1)
83:2
conferred (1)
77:13
conferring (1)
86:16
confidence (1)
44:18
confident (2)
47:13 64:7
confirm (3)
47:25,25 82:6
confirmation (1)
43:22
confronted (2)
30:8 58:10
connected (1)
48:23
connection (1)
43:17
consider (2)
5:15 74:15
considered (3)
17:1 65:22 72:6
consistent (4)
8:22 20:20 74:21
77:21
consortium (1)
38:14
constituent (1)
57:10
construct (2)
14:1,19
containing (1)
50:20
contentions (1)
20:12
contested (2)
15:18 40:6

**contests (1)**
50:19
**contract (20)**
27:5 42:5 46:8 48:4,6
50:4,9,19 52:13,19
52:21 53:10 54:14
54:15 62:2 63:10,13
64:16 72:24 76:18
**contracts (4)**
27:6,8,16 54:9
**contractual (1)**
71:8
**contradicts (1)**
85:8
**contrary (4)**
14:7 25:11 29:5 62:14
**control (4)**
14:5 31:14 38:11
59:11
**controlled (3)**
26:19 38:15 39:5
**controlling (1)**
49:1
**controls (4)**
40:13 43:24,24 71:23
**Convention (3)**
60:3,10,12
**conventional (1)**
51:21
**convince (1)**
12:18
**copies (1)**
22:17
**copy (2)**
26:25 36:3
**corporate (18)**
3:16 10:6 13:6 18:17
31:14 32:3 38:8
39:4 42:12 43:9,17
51:24,25 52:9,15
58:4 61:6 71:14
**corporation (7)**
10:7 31:15 50:8 52:2
52:6,10 53:7
**corporations (1)**
52:7
**correct (4)**
9:2 19:2 54:24 79:6
**corroborate (2)**
55:17,19
**counsel (11)**
6:24 7:18 8:13 17:13
17:15,19 20:1,21
33:13 89:10,12
**counterparty (3)**
52:8 53:3,23
**country (3)**
41:6 45:5,6

**County (2)**
54:3,3
**couple (1)**
87:5
**course (5)**
6:10 19:16 27:10 52:1
74:24
**court (115)**
6:5,25 7:4,5,8,16,20
7:25 8:1,15,16,24
9:1,3,3,5,7,22,23
10:10,12,16,18
11:13,16,21 12:2,12
13:18 14:14 15:3
16:10 17:1,2 18:25
19:8 21:17,25 22:1
22:4,5 23:3,4,7,9
25:9,24 26:6 27:9
27:22,24,25 28:3,10
28:16,19,24 29:2,22
31:17 32:20,20
33:25 35:23 36:4,10
36:13 39:15 45:1,3
45:13,19,25 50:23
51:2,5,14,14 57:2,5
57:5,14 58:1,17,25
59:1,4 62:7 66:3
67:6,23,24 68:5,6
68:17,19 69:8,10
70:20,21 71:3,10,12
71:24,25 74:12,25
75:6,10,23 76:12,19
76:24 77:1 80:3
**courts (36)**
6:14 9:17 10:5,16
11:19 12:10,14,16
13:3,18,23 14:24
16:15 17:10 24:1
28:22 32:19 35:11
35:17 36:19,25 37:9
40:12 42:23 44:21
44:21 45:9 46:11
65:14 66:24 67:20
69:6 72:5 74:7,8
75:15
**court's (2)**
12:18 70:21
**covered (3)**
20:9 31:10 83:22
**co-arbitrators (1)**
83:12
**co-panelists (1)**
78:19
**CPLR (1)**
86:8
**crafting (1)**
84:9
**Craig (29)**
1:22 3:4 9:9 17:21

18:4 25:25 34:24
43:1 61:17,20 62:9
62:17,22 66:18 67:7
70:13 71:15 72:3
73:6,11,25 79:7,15
80:9,23 81:16 82:16
82:24 85:2
**crank (1)**
75:3
**create (2)**
40:5,7
**creature (2)**
38:3,7
**creatures (1)**
38:11
**credibility (1)**
85:10
**credit (1)**
29:13
**critical (3)**
84:3,19 85:12
**cross (2)**
79:21 84:18
**cross-examination (...**
80:8 84:3,10,15 87:9
**cross-examined (1)**
84:8
**cumulative (1)**
85:19
**cut (1)**
61:18

———————————————
**D**

**date (3)**
11:6 55:23 89:7
**dated (2)**
6:2 89:18
**David (3)**
42:20 48:17 49:6
**day (9)**
8:17 38:18,25 46:5
63:6 74:12 78:8,8,9
**days (6)**
7:22 8:16 11:15 78:6
83:4,7
**deal (5)**
58:4 60:15,17 63:11
70:1
**dealing (2)**
17:13 70:14
**dealt (1)**
87:5
**December (11)**
6:4,6 8:3,19,25 33:8
33:22 34:8 65:1
66:7,11
**decide (10)**
13:3 23:2,21 24:2

29:19 30:4 36:19
64:6 69:2 76:20
**decided (3)**
23:5 30:24 77:13
**decides (1)**
77:24
**deciding (1)**
76:25
**decision (29)**
6:5 8:18,19,24 10:9
10:18,20 11:13
13:23 14:13 20:6
26:20 31:23 36:4,5
50:14,23 57:3 58:8
62:7,15 63:18,23
64:4,5 68:21 73:13
74:2 77:18
**decisions (5)**
10:1 11:4 41:5 47:9
51:10
**deemed (1)**
34:19
**defeat (2)**
27:4 50:9
**defend (1)**
40:1
**Defendant (2)**
34:21 57:12
**Defendants (5)**
34:22 35:12 57:6,9
67:25
**defending (1)**
57:23
**defends (1)**
20:5
**defense (15)**
15:7 16:24 19:23,24
35:5,16 39:19,21,22
42:5,6 56:16 58:5,6
71:14
**defenses (2)**
16:25 35:15
**defensive (1)**
34:13
**defer (5)**
6:14 13:22 69:10
77:14,24
**deference (3)**
12:10 13:1 69:11
**defermity (1)**
44:12
**deferring (1)**
82:2
**deficient (1)**
42:1
**defined (1)**
31:18
**defrauded (1)**

44:5
**delay (1)**
20:9
**delaying (1)**
64:9
**deliberate (2)**
5:15,17
**deliberative (1)**
73:12
**delivered (6)**
43:17 44:1 49:18,20
49:22,23
**Department (2)**
45:4,7
**depend (1)**
86:19
**depending (1)**
5:10
**describes (1)**
41:15
**description (1)**
79:15
**descriptions (1)**
81:8
**designed (1)**
79:25
**despite (3)**
10:17 11:18 46:25
**details (2)**
16:5,23
**determination (4)**
47:6 56:13 62:21
63:21
**determinations (1)**
73:22
**determine (8)**
10:5 13:8 23:14,15
29:19 40:16 47:13
63:15
**determined (1)**
51:4
**determines (2)**
46:8,13
**determining (1)**
47:16
**development (1)**
60:21
**developments (1)**
8:7
**devoted (1)**
4:23
**difference (1)**
65:3
**different (6)**
13:23 26:1 49:18 52:3
71:21 80:22
**difficult (2)**
25:18 86:2

**DINA (2)**
1:12 89:3
**direct (5)**
79:4,5,18,21 84:17
**directly (2)**
38:5 85:8
**director (11)**
15:12,15 18:1,8,12
  25:7,15 26:7 28:2
  41:18 43:3
**directors (2)**
52:23 65:11
**disagree (2)**
23:17 28:14
**disagreeing (1)**
29:7
**disagrees (1)**
35:6
**discovered (1)**
44:11
**discretion (1)**
55:14
**discretionary (1)**
71:9
**discuss (3)**
65:17,22 81:19
**discussed (1)**
66:12
**discussion (2)**
38:20 51:10
**dismiss (8)**
4:18 6:11 9:12,15
  12:7 23:19 36:10
  77:15
**dispense (1)**
67:18
**disposition (1)**
76:11
**dispute (5)**
10:2,3 32:14 50:10
  73:24
**disputed (2)**
10:4 47:14
**disputes (1)**
70:17
**disregarded (2)**
12:19 84:23
**distinct (1)**
65:19
**distributing (1)**
7:20
**District (4)**
61:10 72:25 74:13,18
**divested (2)**
12:6 73:19
**doctrine (1)**
47:4
**document (8)**

30:10,13 42:11,13
  45:8 52:2 54:16
  80:18
**documentation (3)**
22:7 54:21 80:11
**documents (3)**
30:15 43:11 57:10
**dog (2)**
83:4,7
**doing (3)**
32:18 45:6 85:14
**drafted (2)**
48:9,14
**drafting (1)**
47:24
**Drake (12)**
26:20 27:6,11,11,13
  51:10 61:21 63:2
  67:15,21 77:18,22
**due (9)**
11:18,22 13:1 14:19
  14:23 20:8 29:3
  44:5 84:12
**duly (2)**
54:10 64:16
**duties (1)**
52:1
**DX (1)**
2:8

———————
E
———————
**E (6)**
1:18,18 2:1,1,15,15
**earlier (7)**
6:4 13:23 21:21 35:24
  59:9 62:7 82:17
**early (1)**
5:22
**Easterbrook (1)**
51:19
**Easterbrook's (2)**
51:9,17
**EC2N (1)**
2:7
**effect (9)**
8:8 30:22 38:17 43:16
  52:12,14 65:2 67:5
  84:14
**effective (1)**
77:5
**effectively (1)**
86:24
**effectiveness (1)**
87:13
**effects (1)**
21:13
**efficient (1)**
86:16

**effort (3)**
10:17 16:17 17:18
**efforts (1)**
81:10
**egregious (1)**
14:23
**either (8)**
5:1,19,24 10:2 76:3
  78:13 79:5,7
**elaborate (3)**
27:14 45:22 55:4
**elected (1)**
64:13
**election (2)**
37:1,3
**ELLIS (1)**
37:18
**emphasize (4)**
13:14 19:21 20:3
  81:18
**employee (2)**
89:10,12
**enable (1)**
25:6
**encouraged (1)**
60:21
**enforce (4)**
21:3 59:25 61:12
  63:15
**enforceable (1)**
60:8
**enforced (2)**
12:4 61:5
**enforcement (2)**
60:13 75:14
**engineering (1)**
16:22
**English (1)**
46:2
**enjoining (1)**
65:12
**enlightening (1)**
87:11
**enormously (1)**
87:18
**enter (2)**
25:7 27:16
**entered (3)**
48:21 50:1 65:25
**entering (1)**
49:2
**entertaining (1)**
31:8
**entire (3)**
46:16,18 48:6
**entirely (4)**
38:7,11 41:24 58:11
**entirety (1)**

50:6
**entitled (11)**
42:15 52:8,17,18 53:3
  62:1 67:4 70:12
  73:4 75:19,20
**equivalent (1)**
57:4
**Eric (2)**
2:13 4:10
**error (1)**
14:24
**especially (2)**
63:24 74:7
**ESQUIRE (5)**
2:5,12,13,14,16
**ESQUIRES (2)**
2:4,10
**establish (2)**
34:25 42:3
**established (3)**
27:15 57:6 67:24
**estopped (1)**
21:8
**estoppel (10)**
21:6 33:3,4,20 43:16
  66:9,22,25 77:24
  78:1
**et (2)**
5:21 21:5
**European (3)**
40:18 60:11 71:22
**evaluate (1)**
85:10
**evaluating (1)**
29:4
**event (2)**
15:22 51:12
**events (1)**
68:25
**eventually (2)**
39:9 72:12
**everybody (4)**
3:2,9 81:25 82:1
**everybody's (1)**
82:19
**everyone's (1)**
76:15
**evidence (83)**
13:21 14:1,2,5,18,20
  15:7,19 24:8,14,18
  24:24 25:2,4,5,10
  25:14,19,23 26:1,2
  26:4,5,11,17 27:12
  27:18,21 28:22,23
  29:4,23 30:1 32:18
  32:23 34:24 39:17
  40:24 41:8,9,15
  42:8,23 43:2 47:20

47:22 53:15,24
  54:18,19,25 55:1,17
  55:18,20,22 56:17
  56:17,20,21 57:11
  57:14,18,20,21 62:4
  62:11,11,13,15
  63:24 64:15 69:2
  70:24 77:19 78:24
  79:20 80:15 81:4,4
  81:24 82:3 84:6
**evidential (1)**
78:2
**evidentiary (10)**
15:10 39:23 47:25
  78:6,15,23 81:20,23
  84:20 87:24
**ex (1)**
7:13
**exactly (7)**
7:4 16:14 18:18 54:7
  75:6,22 76:14
**exaggerating (1)**
48:12
**example (4)**
35:11 37:4 45:4 65:20
**Excellent (1)**
4:15
**exchange (6)**
5:6 78:12,14 81:7,15
  87:23
**exchanged (1)**
78:16
**exclusive (2)**
70:17,22
**execute (1)**
18:9
**executed (7)**
13:5 41:17 42:1,11,14
  44:7 52:21
**executing (1)**
52:2
**execution (5)**
23:1,25 32:10 44:5
  53:22
**executive (4)**
41:18 42:17 43:21
  49:19
**executives (2)**
43:23 49:5
**exercise (3)**
6:13 68:18 86:13
**exhausted (1)**
64:21
**exhibits (3)**
59:5 78:12 87:24
**existed (2)**
57:8 68:1
**existence (4)**
15:25 50:22 63:10

71:2
**exiting (1)**
49:23
**expanded (1)**
62:6
**expansive (1)**
56:3
**expect (4)**
14:2,4,17 81:8
**expedite (1)**
83:3
**experience (1)**
85:22
**experienced (1)**
85:2
**expert (4)**
32:22 44:25 45:19
58:23
**expires (1)**
89:17
**explicitly (1)**
54:10
**expressed (1)**
87:12
**expressly (1)**
63:9
**extend (1)**
35:13
**extended (1)**
5:7
**extent (9)**
6:24 18:21 33:14
62:24 72:19 75:21
80:5 83:2 86:7
**extraordinary (1)**
39:23
**extreme (1)**
51:18
**extremely (1)**
63:24

**F**

**F (1)**
1:18
**FAA (1)**
71:23
**face (5)**
30:10 41:15,25 42:24
48:7
**facie (4)**
13:17 29:23 63:2 64:2
**fact (16)**
15:19 27:22 28:5
42:18 50:3 51:1
53:25 54:23 57:24
66:23 68:3,6 72:22
72:23 73:12 83:5
**facts (2)**

17:3 37:20
**factual (1)**
15:18 66:24
**factually (1)**
9:21
**fact-finding (1)**
60:24
**failure (2)**
65:9,11
**fair (2)**
28:8 87:15
**fairly (1)**
27:14
**fairness (2)**
56:25 71:20
**faith (1)**
29:13
**falls (2)**
66:25 67:15
**falter (1)**
12:22
**familiar (2)**
18:14 23:10
**far (5)**
7:17 26:14 42:15
80:17 84:5
**fashion (2)**
12:24 31:8
**fathom (1)**
63:17
**fault (1)**
37:14
**favor (2)**
59:23 60:16
**favorable (2)**
19:7 70:1
**featured (1)**
8:20
**February (1)**
64:18
**federal (4)**
46:11 51:1 75:4 80:3
**Feinberg (83)**
1:20 3:1,17 4:2,14 8:6
9:8 13:25 14:17
16:12 19:10,12 22:9
24:18,24 27:17 28:4
28:13,21 29:6 30:6
30:19 31:3 36:1,22
37:10,13,18 39:6,9
39:13 40:8,10 44:15
44:25 46:14,21
47:19 48:3,9,13,14
54:17 55:8,16 56:5
56:8,19,23 59:19
61:15,19 64:19 67:8
69:16,19 72:11,15
74:10,14,17,21 76:4
76:8,22 77:4,12

79:12 80:4,12,17
81:14,18 82:15,23
83:1,11,22 84:24
85:21 86:12 87:3,10
**Feinberg's (1)**
79:3
**fellow (3)**
53:11 85:22 87:20
**fifth (2)**
2:2 8:17
**fighting (1)**
39:11
**file (1)**
8:17
**filed (2)**
7:24 59:6
**files (2)**
85:6,13
**filings (1)**
78:22
**financially (1)**
89:13
**find (9)**
17:12,18 21:21 26:13
32:19 33:12,15
76:23 82:7
**finding (6)**
21:12 27:22 28:5 68:3
68:5 69:5
**findings (2)**
41:9 67:19
**fine (1)**
82:25
**firm (2)**
43:10 82:8
**first (18)**
4:22 6:1 7:9 9:22 10:4
11:1,6 14:13 16:10
22:2 23:19 24:12
26:10 33:4,5 50:18
51:6 78:19
**five (5)**
7:21 8:16 50:16 51:11
83:8
**flipping (1)**
82:11
**focusing (1)**
12:16
**Foley (2)**
75:7 76:1
**followed (3)**
18:17 29:3,3
**following (3)**
8:14 27:17 73:9
**follows (1)**
6:23
**footnote (1)**
76:6

**foreclose (1)**
86:3
**foregoing (1)**
89:5
**foreign (4)**
12:11 53:1 69:9 86:22
**forenoon (1)**
1:16
**forgery (1)**
54:16
**forgery-type (1)**
51:7
**forgotten (1)**
34:3
**form (1)**
55:4
**formalities (2)**
18:17 42:12
**former (1)**
24:7
**formerly (1)**
37:24
**forth (2)**
16:6 89:8
**forum (10)**
37:3 63:20 64:8 68:25
69:24,25 70:10 72:7
73:18,21
**forward (14)**
6:13 12:24 13:21 15:7
16:24 25:13,22 35:5
35:14,15 42:22
50:24 53:25 62:10
**forwarded (1)**
6:3
**found (6)**
25:9 28:10 31:17,24
70:20 72:13
**four (3)**
51:1 85:16,18
**four-corner (1)**
48:5
**Fridman (2)**
38:16 49:6
**Fried (3)**
2:14 4:8,8
**front (3)**
17:22 22:20 47:7
**fruitful (1)**
5:5
**full (2)**
29:13 73:21
**fully (5)**
30:7 47:16 56:11
64:16 77:17
**fundamentally (1)**
84:13
**funny (1)**

52:25
**further (5)**
5:20 22:8 65:12 77:8
89:9
**futile (1)**
61:4

**G**

**G (2)**
1:12 89:3
**gain (1)**
19:6
**game (1)**
73:8
**gee (1)**
75:12
**general (12)**
12:24 15:12,15 18:1,9
18:12 25:7,15 26:7
28:2 41:18 43:3
**generally (2)**
58:25 79:16
**gentleman (1)**
38:15
**gentlemen (2)**
37:11 64:5
**getting (3)**
56:5 61:12 67:21
**give (12)**
5:10 12:11 13:1 17:11
29:13 35:10 43:6
44:7 63:9 69:11
84:24 87:8
**given (7)**
11:2 18:23 21:2 23:4
75:24 81:6 84:19
**glad (1)**
82:6
**go (30)**
5:16 6:13 19:5,12
25:24 31:4 33:4
37:6 39:7 40:22
47:6 51:18 55:25
56:1 59:4 61:19
65:9 66:21 68:18,23
70:19 71:24 72:1
74:25 75:6,9,23
77:7 79:5 81:12
**goes (5)**
27:10 35:12 50:24
68:2 85:3
**going (25)**
3:7 7:2 16:22 20:19
23:8 29:19 31:7
33:22 35:22 36:15
37:6,12 55:25 56:1
59:21,22,24,25
68:22,23 75:23
79:16 81:12,13

84:19
**good (7)**
3:1 4:14 18:22 26:23
29:3 37:14 87:6
**govern (3)**
47:1 70:6 86:9
**governed (2)**
50:5 75:24
**grant (1)**
18:8
**granted (1)**
25:17
**grasping (1)**
62:18
**Greg (1)**
3:4
**GREGORY (1)**
1:22
**ground (1)**
24:10
**group (3)**
38:13 48:22 81:25
**grumblings (1)**
11:18
**guess (1)**
27:17
**Guide (1)**
45:7
**guidepost (1)**
81:5
**guy (1)**
30:16
**guys (4)**
49:10 83:2,7 87:1

**H**

**half (1)**
19:22
**hand (1)**
10:24
**handle (2)**
24:13 87:8
**happen (4)**
21:14 23:12 33:22
74:15
**happened (12)**
6:25 11:21 33:7,10,24
36:14 37:20 41:13
57:2 59:8,16 68:14
**happens (5)**
34:1 37:5 44:2 46:4
80:21
**happy (4)**
25:12 26:10 28:11
67:10
**hark (1)**
29:4
**harsh (1)**

59:15
**hats (1)**
52:25
**hear (5)**
56:12,16 67:10 68:9
68:17
**heard (9)**
7:9 15:23 21:21 25:10
25:13 68:13 69:7,11
81:22
**hearing (34)**
7:5 9:9 36:3 42:23
43:5 55:11,15 56:12
61:4 62:20 63:4
64:4,6 68:9 69:20
71:6 78:2,4,7,13
79:4 80:7 81:11,20
81:20,23 82:7,12
83:5,5,6 84:2 86:3
88:2
**held (6)**
1:13 9:18 12:1 34:23
51:2 54:11
**helpful (5)**
19:17 22:17 31:2
40:19 87:18
**hereinbefore (1)**
89:8
**Herrington (3)**
2:2,6 4:5
**hesitate (1)**
28:3
**hey (1)**
71:25
**he'll (1)**
69:3
**Higher (3)**
6:5 9:3 35:22
**Highest (1)**
9:5
**highlighted (1)**
50:22
**highly (2)**
33:12 74:4
**high-level (1)**
29:18
**Hogstad (4)**
2:16 3:15,15,19
**hold (4)**
18:25 37:23 38:8
62:20
**holding (7)**
10:12 37:23 46:9,10
50:25 58:12 64:25
**holds (5)**
37:24 38:3,4,5,12
**holiday (1)**
7:24

**hop (1)**
70:8
**hope (4)**
65:17 75:18 78:10
86:23
**hopefully (3)**
5:21 82:5,6
**Hosiery (1)**
21:5
**host (2)**
82:7,13
**hour (1)**
4:22
**hours (1)**
83:8
**HQ (1)**
2:7

**I**

**IBA (1)**
79:17
**idea (2)**
17:14 47:19
**identified (1)**
33:6
**ignore (1)**
9:22
**ill (2)**
44:19 60:5
**illusion (2)**
40:5,7
**imagine (1)**
71:11
**immediate (1)**
71:13
**immediately (1)**
49:2
**impact (5)**
6:1,9 66:8,11 76:10
**impacted (1)**
33:5
**implausible (1)**
44:10
**implicit (2)**
44:15,17
**important (2)**
48:19 80:25
**imposed (1)**
53:1
**impressed (1)**
51:9
**improper (4)**
33:12 36:18 70:7 74:4
**inaddition (1)**
74:5
**inasmuch (1)**
35:1
**incidental (1)**

47:17
**include (2)**
12:3 78:23
**including (4)**
9:19 12:9 46:19 49:6
**inconsistent (1)**
34:18
**incorrect (1)**
16:3
**incumbency (2)**
43:15 49:21
**independent (1)**
43:22
**indicated (1)**
7:5
**individual (1)**
51:3
**Indosuez (2)**
31:24 46:10
**inescapable (1)**
12:5
**infirmities (1)**
66:22
**informally (1)**
45:18
**information (4)**
5:20 7:7,14 48:19
**informational (1)**
7:17
**initial (1)**
5:6
**initially (1)**
48:22
**injunction (1)**
73:1
**inquiries (1)**
26:12
**inquiring (1)**
28:11
**instance (4)**
9:22 16:10 22:2 23:19
**instructed (2)**
77:16,19
**instructions (1)**
77:9
**Insurance (5)**
26:20 51:11 61:21
77:18,22
**integrated (2)**
48:4,7
**integration (1)**
48:7
**intention (1)**
25:1
**interest (10)**
19:2 31:21 37:23 38:4
38:5,9,13 41:21
49:1 58:2

**interested (5)**
5:25 6:8,20 79:19
89:13
**interests (1)**
49:24
**interim (1)**
38:22
**internal (5)**
10:6 13:6 31:14 32:2
52:15
**international (1)**
46:5
**interpret (1)**
67:14
**interpreting (2)**
13:23 47:5
**interrupt (2)**
19:14 61:17
**intervene (14)**
10:15 19:1 20:18,25
21:16,23 40:9 68:18
71:9 72:22 73:9,14
73:15 75:21
**intervened (3)**
35:9 36:12 69:24
**intervening (1)**
7:23
**invalid (2)**
18:1 63:18
**invalidity (3)**
62:24 77:20 78:3
**investors (2)**
48:22 49:3
**invoke (1)**
71:1
**involve (1)**
65:20
**involved (2)**
43:10 51:20
**involvement (2)**
5:8 60:25
**involves (1)**
51:24
**ironic (1)**
33:15
**irregularity (1)**
69:8
**irrelevant (2)**
53:2 65:4
**issue (23)**
5:13 6:23 10:13 15:24
21:19,22 24:2,12
27:5,25,25 32:7,8
32:10,24 33:3 50:21
62:16 66:12,17,17
67:19 85:3
**issued (6)**
8:25 10:19 34:6,6

40:24 86:10
**issues (15)**
  5:25 6:16,17,19,20
  18:24 19:1 33:2
  34:16 36:16 65:18
  67:1 77:24 78:1
  87:17

_____
**J**

**J (1)**
  2:14
**Jentes (47)**
  1:21 3:4 6:22 8:23
  11:1,9 15:2,21 17:8
  19:14 21:18 22:6,11
  22:14 26:16,23 27:3
  30:5,24 32:7,11
  40:21 41:4 47:10
  50:12 51:15 53:13
  54:5 56:25 57:17
  58:14,20 60:2 66:4
  71:20 75:5,11,17
  76:5 78:21 79:3,17
  82:20 83:18 85:24
  87:1,4
**job (1)**
  14:16
**join (1)**
  81:10
**jointly (1)**
  45:12
**judge (3)**
  51:9,18 58:10
**judgment (4)**
  39:17 61:12,13 69:9
**judgments (4)**
  11:24 12:1,11 21:3
**July (3)**
  7:3,22 89:18
**jump (1)**
  50:16
**June (5)**
  1:15 6:3,9 77:25,25
**jurisdiction (29)**
  6:13 10:5,11,12 12:6
  19:7,9 22:2 23:14
  23:15,16,22 27:23
  32:17 36:24 40:12
  40:16,17 42:16 47:2
  56:12 61:9,9 70:1
  73:18,19 74:8 75:1
  75:25
**justice (4)**
  19:3 44:18 58:9 75:4

_____
**K**

**keep (1)**
  4:25
**keeping (1)**

17:14
**KENNETH (1)**
  1:20
**kept (1)**
  72:10
**key (1)**
  24:8
**Kimball (1)**
  54:4
**kind (3)**
  14:5 33:15 64:2
**knew (3)**
  49:16 53:23 73:6
**know (35)**
  3:10,13 6:24 11:5
  15:6,11,14 16:4,5
  16:13,20,24,25 22:8
  26:9 27:14 33:10,21
  40:25,25 41:2,12
  42:16 48:5 49:8
  52:22 55:6 58:2
  60:8 68:15 72:8,17
  79:23 83:14 86:15
**knowledge (2)**
  40:2 68:16
**known (1)**
  37:24
**knows (3)**
  26:13 46:4 64:14
**Kosogov (2)**
  42:10 49:19
**Kyiv (4)**
  10:10,11 22:3 37:24
**Kyivstar (3)**
  36:7 41:21 44:13

_____
**L**

**L (2)**
  2:4,15
**lack (1)**
  25:5
**language (2)**
  77:21 86:23
**large (1)**
  38:14
**largely (1)**
  66:13
**largest (1)**
  37:25
**lastly (1)**
  34:2
**law (61)**
  8:22 11:14 13:5,9,10
  15:9 17:4 20:2 21:4
  31:11,13,19 32:3,4
  32:5,10,12,14,19,21
  32:23 34:17 41:6
  42:5,15,16 45:15,23

46:2,3,6,7,8,13,15
47:1,1,6,12,17 48:4
50:6,8,25 51:19
52:5,6,7,13,17,20
52:22 53:1,20 56:14
60:13 63:22,23 70:6
72:18 75:25
**Lawrence (1)**
  54:3
**laws (4)**
  10:8 13:24 31:16
  32:17
**lawsuit (1)**
  70:7
**lawyer (4)**
  3:16 8:12 43:9 66:2
**lawyers (1)**
  73:13
**leave (1)**
  11:23
**left (2)**
  3:9 65:9
**legal (14)**
  9:20 12:3,9 13:19
  16:5 33:21 45:24
  51:13 53:17 54:20
  56:16 67:1,5,10
**legally (1)**
  65:4
**legitimacy (2)**
  54:25 55:21
**legs (1)**
  12:22
**length (2)**
  17:15 77:13
**letter (8)**
  6:2,9 8:7 33:13 50:7
  54:2 77:25,25
**letters (1)**
  7:10
**let's (8)**
  10:1 32:11 33:25 37:5
  56:12,12,16 59:19
**level (6)**
  2:6 16:11 20:23 21:17
  21:24 28:1
**leveled (1)**
  9:25
**liability (2)**
  37:22 52:6
**License (1)**
  89:17
**licensed (1)**
  3:20
**lieu (3)**
  78:23 79:18 85:6
**light (3)**
  18:6,10 83:20

**limbo (1)**
  33:21
**limitation (1)**
  46:19
**limited (6)**
  26:21 31:18 37:22
  52:6 61:14 63:25
**limiting (1)**
  5:23
**Lisa (2)**
  2:14 4:8
**list (2)**
  79:14 83:24
**listen (1)**
  28:15
**literally (1)**
  41:2
**litigated (3)**
  15:24 16:1 34:14
**litigation (5)**
  15:1 17:23 35:2 38:23
  59:12
**litigations (4)**
  34:15 35:25 55:7
  60:20
**little (7)**
  16:12 30:18 31:7
  59:15 61:16 71:21
  79:23
**live (7)**
  79:20 80:10,19 85:5
  85:10,18 86:5
**lived (2)**
  41:25 53:11
**LLC (2)**
  1:6 3:6
**LLP (2)**
  2:2,6
**local (3)**
  17:13,19 20:1
**logical (1)**
  73:2
**London (2)**
  2:7 3:23
**London/City (1)**
  2:8
**long (1)**
  5:4
**look (14)**
  10:1 17:1 24:4,12
  29:22 30:9 34:21
  37:8 40:19 41:5
  45:21 54:1 57:3
  72:6
**looked (4)**
  17:3,3 27:24 60:19
**looking (2)**
  30:18 52:14

**looks (1)**
  30:12
**lose (2)**
  12:22 33:1
**lot (3)**
  20:9 23:13 31:6
**Lovells (7)**
  1:14 2:10 4:7,9,11,13
  82:6
**lower (1)**
  15:3
**lunch (6)**
  5:14,17 65:21 69:18
  77:7 87:11
**luncheon (1)**
  77:11
**Lundy (2)**
  4:6,6

_____
**M**

**machinary (1)**
  75:3
**Madison (2)**
  1:14 2:11
**maintain (1)**
  16:18
**majority (1)**
  67:14
**making (6)**
  28:5 30:2 50:19 66:2
  76:18 86:24
**man (1)**
  48:17
**manage (1)**
  36:3
**manner (1)**
  76:23
**MARY (2)**
  1:12 89:3
**materials (1)**
  26:25
**matter (19)**
  1:1,11 3:5 4:17 6:12
  15:18 34:13 42:18
  47:17 48:3 50:3
  52:4 53:25 56:14
  58:19 66:5 72:21
  78:9 83:6
**matters (2)**
  10:15 83:3
**mean (17)**
  8:6 14:1 15:22 22:7
  41:4 45:18 53:17
  54:13 57:23 58:22
  60:4 62:19 65:10
  71:10 79:11,13
  81:12
**means (1)**

6:18
**mechanical (1)**
79:11
**meet (1)**
63:1
**meeting (27)**
18:7,11 25:6,14 26:2
26:2,6,14 28:1
38:19 42:4,19,19
43:2,8,13 49:9,12
49:13 52:25 54:23
56:18,20 57:6 67:25
68:11,14
**meetings (1)**
65:12
**meets (1)**
27:18
**member (1)**
46:4
**members (5)**
49:9,12,13 81:1,9
**mention (2)**
3:9 87:4
**merits (5)**
6:1 8:18 15:11 36:25
64:17
**Mikhail (1)**
38:15
**mince (1)**
28:14
**mind (1)**
33:7
**mine (1)**
64:4
**minimum (1)**
53:17
**minority (1)**
38:9
**minute (3)**
17:11 18:25 80:14
**minutes (7)**
4:23,25 5:2 9:12 31:3
37:17 64:22
**miscarriage (1)**
19:3
**misdeeds (1)**
33:15
**misleading (1)**
19:22
**mobile (4)**
1:2 3:5 21:15 37:25
**model (1)**
60:13
**moment (2)**
36:8 40:22
**Monday (3)**
78:7 82:17 87:23
**morning (4)**

3:1 7:18 82:18 87:11
**Moscow (2)**
42:21 48:18
**motion (13)**
4:17,24 5:12 6:2,11
9:11,14 23:19,22
56:6 59:12 77:15
82:2
**motives (1)**
64:12
**move (4)**
20:7 22:24 31:9 59:19
**moving (4)**
15:20 29:24,24 34:2
**multi-industrial (1)**
38:14
**Municipal (1)**
50:15
**mystifying (1)**
31:12

_____
          **N**
**N (2)**
2:1,15
**name (4)**
3:9,13,15 9:2
**named (3)**
38:15 48:17 68:11
**narrative (1)**
8:2
**national (2)**
7:23 26:21
**necessarily (1)**
84:1
**necessary (1)**
14:19
**need (8)**
38:21 45:9 66:25
67:16 74:20,22 75:1
75:4
**needed (2)**
18:7 86:18
**needing (1)**
58:8
**needn't (2)**
5:1,1
**negative (1)**
25:19
**negotiated (7)**
41:17 45:22 48:25
49:5,10 64:16 70:9
**negotiation (2)**
43:10 49:4
**neither (2)**
89:9,11
**never (5)**
20:10 25:13 29:5
34:15 36:9

**new (58)**
1:14,14 2:3,3,11,11
3:20,23 4:3,5,13 8:7
13:9 19:5 31:13,22
31:25 32:1,4 34:17
36:8,16 42:5,5,15
45:15,15,23 46:3,11
47:1,9,25 48:3,4
50:6,7 52:4,13,16
52:16,19,22 53:6,20
56:14 60:2,9 61:8
63:22 70:5,5 74:9
74:13 75:24,24,25
82:7
**news (2)**
11:11 38:16
**nexus (2)**
32:1,2
**nice (1)**
68:15
**night (1)**
82:21
**Nilov (1)**
54:14
**nine (3)**
58:2 65:15 83:15
**Ninth (3)**
50:14,17,24
**non-compete (1)**
65:16
**non-operating (1)**
38:6
**non-parties (1)**
21:13
**noon (1)**
4:22
**normal (1)**
17:15
**Norway (1)**
3:19
**Norweigian (1)**
75:10
**Notary (3)**
1:13 89:4,16
**notes (2)**
1:10 45:5
**notice (19)**
7:16 8:9 10:10,18
11:2 20:17 21:2
33:11,16 34:5 36:3
39:8,10 41:20,20
61:1 68:10 73:3
81:13
**noticed (1)**
11:6
**notion (2)**
44:10 70:6
**null (6)**
9:18 24:17,19,22 25:3

75:19
**nullity (2)**
12:3 13:19
**number (7)**
3:13 6:23 50:15 51:11
85:9 87:16,17

_____
          **O**
**O (2)**
1:18 2:15
**object (1)**
64:25
**objection (3)**
14:10 15:10 39:23
**objective (2)**
29:10 30:19
**obligated (3)**
39:24 56:6 84:21
**obscure (1)**
71:12
**observed (1)**
66:3
**obtain (4)**
17:18 36:3 42:9 43:6
**obtained (1)**
34:8
**obtaining (1)**
35:23
**obviously (4)**
65:5 80:22 83:1 85:1
**occasion (1)**
64:3
**occurred (2)**
8:24 20:24
**offer (1)**
55:20
**offered (1)**
84:6
**offering (1)**
84:21
**office (3)**
1:14 4:13 42:21
**officer (9)**
41:19 42:17 43:21
44:2 51:25,25 52:9
52:11 53:12
**officers (1)**
42:10
**Oh (2)**
22:6,11
**okay (6)**
9:8 22:14,15 26:23
82:12 83:10
**Old (1)**
2:7
**once (3)**
34:15 46:7 60:15
**one-day (2)**

83:4,6
**open (2)**
7:20 8:1
**operating (2)**
37:21 38:12
**operations (2)**
38:2 61:6
**operator (1)**
37:25
**opinion (9)**
7:3,24 8:17 25:3
54:19 61:21 67:23
70:21 81:2
**opponent (2)**
50:13 58:15
**opportunity (5)**
18:23 20:11 81:15,17
81:24
**oppose (1)**
65:24
**opposed (4)**
16:10,11 55:5 79:13
**opposition (1)**
16:7
**opt (2)**
45:12 52:16
**opted (6)**
45:24,25 46:1 70:3,4
70:5
**oral (7)**
4:23 5:6,7 14:10
19:25 39:20 87:19
**order (27)**
6:6 8:1,2,19,25 9:22
12:19 19:8 22:1
30:19 33:8,22,23
34:9 35:24 39:18
42:24 44:7 50:9
65:1,5,25 66:8,11
67:3 71:14 80:2
**orders (10)**
12:25 13:18 17:24
21:9 24:19,22 35:7
40:23 41:15 73:1
**ordinarily (1)**
51:21
**ordinary (1)**
52:1
**organizational (1)**
42:19
**organized (3)**
31:16 38:7 43:8
**original (3)**
22:2 28:1 66:13
**Orrick (6)**
2:2,6 3:23 4:1,5 66:6
**ought (5)**
51:13 64:17 75:13

83:23 84:21
**outside (1)**
52:14
**overcome (3)**
14:2,20 30:19
**overturn (1)**
30:17
**owned (1)**
48:22
**ownership (2)**
38:11 58:13
**O'Driscoll (6)**
2:9 3:22,22 43:9
48:11,16

_____
**P**

**P (3)**
2:1,1,15
**page (5)**
23:18 26:24 50:16,25
61:24
**Paint (5)**
40:12 54:12 61:25
63:1 67:13
**panel (43)**
3:3 4:16 5:4,9,15,23
6:20 19:5 23:14
30:3 33:17 37:7
38:19,20 41:11 46:4
47:1,12,15 55:12
56:7 68:8,23 69:1,1
69:5 72:1,1 77:12
77:23 78:4,16,18,25
79:19 80:19 81:1,9
81:19 84:5 86:10,13
87:12
**panelists (1)**
78:19
**panels (2)**
12:10 32:16
**panel's (4)**
48:20 55:14 56:11
60:22
**paper (1)**
9:5
**papers (11)**
4:17 8:20 11:20 35:5
40:14 41:3 44:4
52:7,18 66:15 68:10
**paragraph (1)**
27:3
**parent (2)**
39:4 71:14
**parents (1)**
61:6
**parked (1)**
33:20
**Parklane (1)**

21:5
**parol (1)**
47:22
**parse (1)**
24:4
**part (2)**
63:13 73:13
**parte (1)**
7:13
**participants (11)**
18:8 25:6,15 28:2
35:2 43:2 57:7,9
67:25 68:12,14
**participating (1)**
35:22
**participation (1)**
35:8
**particular (1)**
51:3
**parties (31)**
7:21,25 11:15 24:11
25:1 41:21 44:13
45:11,21 46:7,12,14
46:25 47:8,18 50:4
58:10 63:11 70:2,3
71:5 74:3,7,25
77:16 78:12,14 81:1
82:16 83:19 89:11
**partner (5)**
3:23 4:5,12 42:20
48:18
**party (22)**
14:5 15:20 19:1 20:5
21:11 25:21 29:23
36:4 43:24 50:10,19
51:4,22 53:8,10
60:5 61:25 62:2
84:7,21,22 85:13
**passed (1)**
52:24
**penalized (1)**
35:18
**pending (1)**
64:18
**penetrate (1)**
69:7
**people (2)**
84:3 86:1
**perceives (1)**
19:7
**percent (2)**
38:4,5
**Perchersky (1)**
60:24
**perfectly (1)**
30:12
**permission (1)**
22:23

**permit (3)**
5:3,5 81:22
**permitted (1)**
49:14
**person (1)**
79:20
**personally (1)**
49:6
**personnel (1)**
44:22
**Peter (5)**
2:9 3:22 4:12 67:8
76:22
**petition (1)**
71:19
**phone (1)**
3:13
**picture (1)**
19:22
**piece (1)**
48:19
**pieces (1)**
49:25
**PIETER (1)**
2:12
**place (6)**
7:1 18:11 26:14 31:18
71:25 89:7
**Plaintiff (1)**
35:13
**play (1)**
49:4
**players (1)**
3:10
**pleased (1)**
82:12
**pleasure (1)**
82:19
**plenary (1)**
75:22
**point (20)**
7:17 9:6 11:17 19:18
28:25 30:23 32:13
32:25 34:3,4 37:2
39:13 51:19 66:16
66:22 68:4 76:14
79:11 84:19 86:6
**pointed (1)**
47:10
**points (4)**
19:20 29:17 31:10
64:23
**poor (1)**
14:15
**position (21)**
15:3,24 16:2 17:22,24
23:6 28:9 30:7,8
41:10 44:20,23

45:18 47:20 55:21
57:1 61:22 62:5
66:7,10,14
**positions (1)**
82:4
**possible (2)**
39:20 70:4
**power (8)**
23:15,21 62:19 63:9
63:14 73:21 86:11
86:13
**practice (2)**
7:19 40:18
**precise (1)**
66:4
**precisely (1)**
39:13
**predict (1)**
77:1
**predictability (1)**
45:3
**preferable (2)**
83:5,6
**premise (1)**
66:24
**prepare (1)**
83:24
**prepared (1)**
26:4
**present (9)**
3:2 14:18 55:17,18
62:13 63:2 78:24
80:7,10
**presentation (1)**
87:14
**presented (7)**
5:16 30:9 39:19 41:8
55:22 57:14 80:19
**presenting (1)**
79:20
**presents (1)**
19:21
**press (7)**
10:19,20 11:6,9 22:16
34:5 36:2
**pressing (1)**
65:19
**presumably (1)**
59:11
**presume (1)**
29:2
**presumed (2)**
52:9 80:6
**presumption (3)**
14:3,21,23
**pretend (1)**
8:11
**pretrial (1)**

80:2
**pretty (2)**
14:15 81:25
**prevent (1)**
74:10
**preview (1)**
7:4
**prima (9)**
13:17 29:23 40:12
54:12 61:25 63:1,2
64:2 67:13
**primarily (1)**
5:24
**principle (2)**
23:10 50:7
**principles (1)**
12:9
**prior (3)**
49:2 80:20 81:15
**prioritization (1)**
80:14
**probably (3)**
31:7 55:3 81:9
**problem (1)**
30:17
**procedural (1)**
14:24
**procedure (3)**
8:13 58:19 72:21
**procedures (8)**
8:10 10:6 11:19 13:6
29:3 31:14,18 32:3
**proceed (4)**
73:19 74:2,3,23
**proceeded (1)**
60:25
**proceeding (9)**
6:10 36:15 39:1 40:6
40:23 71:6 72:9
74:4 75:23
**proceedings (11)**
1:5,11 6:15 11:3
17:17 20:17 36:6
65:23 72:1 75:13,19
**process (12)**
11:18,20,22 13:1
14:19,24 20:8 29:3
70:14 73:12 84:12
86:17
**produce (2)**
27:12 84:22
**produced (1)**
84:7
**product (1)**
12:25
**proponent (1)**
84:20
**propose (2)**

4:19,20
**proposes (2)**
78:4,5
**proposition (3)**
23:4,18 51:13
**prove (1)**
25:21
**provide (9)**
26:4,5,10 28:7,12
69:3,4 77:19 82:13
**provided (4)**
9:20 24:8 42:10 82:14
**provides (2)**
60:13 62:3
**proving (2)**
25:18,21
**provision (4)**
46:16 50:20 70:16
71:2
**provisions (2)**
8:4,21
**public (4)**
1:13 59:1 89:4,16
**puppeteer (1)**
16:21
**purely (1)**
34:12
**purportedly (1)**
33:7
**purporting (1)**
51:22
**pursue (2)**
20:19 50:12
**put (25)**
9:17 12:23 14:8 15:7
16:6,24 19:23 24:14
30:22 32:22 35:5,14
39:18,22 40:1 42:2
42:22 44:4 48:20
56:22 57:20 59:17
70:23 71:14 84:13
**puts (3)**
12:17 35:15 80:6
**putting (5)**
17:23 58:5 66:18,20
84:11
**p.m (1)**
88:2

**Q**

**quality (2)**
58:9 81:4
**quantum (1)**
81:3
**quasi (1)**
23:7
**query (2)**
6:22 86:17

**question (33)**
17:21 24:4,11 26:1,3
26:8 28:8 29:10,11
29:20 40:4 42:2
46:20 47:11,16 51:3
54:11 58:15 62:18
67:2,7 70:13 72:2
74:1 77:20 80:22
82:10 83:25 85:11
**questioning (1)**
5:8
**questions (15)**
5:20 6:21 18:21,22
19:16 22:22 31:5
39:14 47:11 58:24
59:8 69:13 83:19,21
84:12
**quickly (3)**
20:7 24:13 67:13
**quite (2)**
9:17 77:5
**quote (2)**
36:2 79:24
**quoting (1)**
11:12

**R**

**R (5)**
1:18,20,21 2:1,15
**raise (2)**
6:17 18:24
**raised (7)**
15:18 40:5,5 45:2,8
54:8 87:17
**raising (3)**
18:22 55:5,9
**reach (3)**
3:13 45:9 62:20
**reached (1)**
82:9
**read (6)**
26:18 41:3,5 50:17
61:24 81:2
**ready (1)**
74:23
**really (13)**
5:12 6:8 15:23 19:21
25:19 30:20 31:12
61:16 65:9,18 69:14
79:10 85:15
**reason (17)**
9:21 18:5 20:4 32:4
47:11 49:8 63:16
64:10,13 69:6,11,12
75:5,20,22 76:2
82:5
**reasons (1)**
38:8

**rebut (2)**
81:15,17
**rebuttal (5)**
5:1,3,5 67:8 69:14
**recall (2)**
21:4 38:21
**receipt (1)**
4:16
**receive (1)**
36:2
**recess (1)**
77:11
**recitation (1)**
28:15
**recitations (1)**
30:14
**recite (1)**
41:6
**reciting (1)**
41:7
**recommend (1)**
5:19
**reconvening (1)**
77:8
**record (6)**
17:9 19:19 24:25 35:3
37:19 58:16
**records (5)**
7:16 17:18 58:25 59:1
59:1
**redetermine (1)**
23:8
**refer (1)**
46:15
**referred (2)**
9:4 20:15
**referring (1)**
63:12
**reflected (1)**
77:25
**regard (2)**
15:4 41:11
**regarding (3)**
13:10 36:6 45:15
**regular (5)**
7:19 8:9,13 41:24
42:14
**regularity (1)**
45:3
**rehearing (1)**
8:9
**reinforced (1)**
62:6
**reinterpret (1)**
13:10
**rejoinder (1)**
54:1
**rejudge (1)**

23:8
**related (1)**
86:6
**relative (2)**
89:10,12
**release (6)**
10:20 11:7,10 22:16
34:5 36:2
**released (1)**
7:25
**relevant (1)**
70:25
**reliance (1)**
9:25
**relied (1)**
29:12
**relief (3)**
38:22 65:4,7
**relies (1)**
39:1
**relook (1)**
37:8
**reluctant (4)**
51:18 75:3 85:5,15
**rely (10)**
13:20 21:1 28:4,24
29:10 42:17 43:20
52:8 53:3 59:14
**relying (4)**
24:17,21 28:17 34:25
**remarks (3)**
7:11 10:22 22:19
**remedies (3)**
37:2 63:19 74:15
**remedy (5)**
70:17,22 71:7,8 73:2
**remember (1)**
11:12
**render (1)**
61:11
**reopen (1)**
72:16
**report (2)**
5:18 66:1
**Reporter (2)**
1:13 89:4
**represent (1)**
17:16
**representative (2)**
14:10 16:8
**representatives (1)**
16:19
**represented (1)**
48:17
**request (5)**
84:5,6,22 86:7,13
**requests (2)**
5:20 86:14

23:8
**required (2)**
14:9 54:18
**requires (1)**
85:16
**rerebuttal (1)**
5:4
**reserve (1)**
5:1
**reserving (3)**
23:20 74:24 76:4
**resolution (1)**
52:24
**resolved (1)**
72:7
**respect (6)**
56:5 57:17 61:20 67:4
73:5 75:20
**respective (1)**
82:3
**respects (2)**
85:9 87:17
**respond (2)**
6:6 81:10
**Respondent (3)**
1:7 2:14 77:14
**response (2)**
4:18 47:15
**rest (3)**
38:24 64:24 66:15
**resulted (1)**
11:3
**retired (1)**
65:21
**return (1)**
37:19
**reversal (5)**
6:4,25 34:8 35:23
67:6
**reverse (1)**
37:9
**reversed (4)**
8:3 36:14 61:1 71:11
**review (6)**
37:9 63:20,23 71:9
**right (14)**
20:18 26:16 34:18,23
36:15 39:10 43:1
45:17 54:7,25 68:18
72:18,21 80:4
**rights (6)**
20:25 23:20 68:7 70:9
74:24 76:4
**ROBERT (1)**
2:4
**Rochelle (1)**
4:6
**role (2)**
49:4 76:24

roughly (1)
4:22
routinely (1)
12:11
rubber-stamping (1)
17:6
rule (8)
53:6 63:9 67:15 71:4
74:11 76:15,23
85:16
rules (7)
1:1 40:15 63:8,12
71:22 79:18 86:7
ruling (10)
5:19 7:7,20 33:16
41:6 59:22 68:16
76:10,10 78:18
rulings (2)
21:20 75:14
run (3)
74:12,18 83:12
running (2)
76:12,17
Russia (1)
38:15

S

S (4)
2:1,5,15,15
safe (1)
78:8
Sanders (3)
42:21 48:18 49:7
sandwiches (1)
82:13
satisfies (1)
62:10
save (2)
76:15 85:17
saw (1)
75:20
saying (26)
10:19 13:19 16:6,9
20:23 21:11 23:13
23:24 24:16 25:14
28:16 29:12,14
31:13 34:8 37:5
43:4 44:16,17,19
50:17 53:10 54:17
54:19 57:17 79:16
says (13)
13:2 19:22 20:10 21:2
30:19 35:13 42:12
47:4 50:18 57:5
68:11 69:2 71:23
schedule (1)
4:21
scheduling (1)

65:18
school (1)
21:4
scrap (1)
24:14
seats (2)
48:2,13
second (14)
6:10 21:20 22:3 26:3
26:19 27:19 28:15
29:14 53:14 54:18
61:21 77:18 78:8
81:2
Secondly (3)
13:2 14:11 81:6
secret (4)
38:18 39:16 72:10,10
Section (1)
52:5
see (12)
18:13 13:25 37:5
55:25 59:5 65:2
68:4 75:1 76:2,11
77:1 80:2
seek (5)
71:9 72:15 75:6,7
82:2
seeking (2)
65:7 82:2
sence (1)
70:10
send (1)
74:11
senior (6)
42:9 43:23 44:2 49:19
51:25 53:12
sense (3)
51:21 59:1 65:23
separateness (1)
16:18
served (1)
5:14
set (5)
50:8 53:19 56:14
67:19 89:8
sets (1)
75:14
setting (1)
52:12
settled (2)
46:3 82:10
seven (1)
83:15
severability (2)
46:21,23
severable (1)
63:1
shareholder (8)

18:15 25:7 43:4 65:10
65:11 70:15 77:20
78:3
shareholders (28)
9:18 12:1 13:4,8 15:5
15:25 17:25 18:6,9
23:1,25 30:10 32:9
36:7 39:25 40:15
44:6 46:16,18 49:11
50:5 54:20,23 57:22
62:12 63:16,17
70:18
sheet (1)
3:12
shield (1)
84:10
shift (1)
50:13
Shorthand (2)
1:13 89:4
show (8)
7:16 13:22 24:14,25
39:20 41:24 53:25
86:11
showing (2)
13:17 64:3
shows (3)
19:19 64:15 68:25
side (16)
4:23 5:1,2,3,24 37:15
42:2 48:15 66:20
79:7,23 81:23 83:8
84:11 86:20,25
sides (7)
5:18 76:8,9,12 77:6
77:16,19
side's (2)
82:3 87:14
sight (1)
33:1
sign (3)
18:2 43:3 49:15
signatory (2)
60:9,11
signature (5)
42:17 43:20 52:8 53:4
53:9
signed (5)
30:13,16 41:18 53:10
54:14
significant (1)
65:3
signing (1)
54:15
sign-up (1)
3:12
Sills (72)
2:4 4:4,4 6:9 7:14,15
8:8 9:1 10:23 22:21

25:12 39:8,12 40:9
40:11 41:2,14 43:5
44:24 46:18,23 48:2
48:12 49:17 51:15
53:16 54:7 55:3,10
56:4,9,21 57:16
58:18,21 59:25 60:4
61:15 62:5,17,23
64:20,21 66:5,14,20
69:2,17,20 71:5,17
72:8,13,17 73:8,16
74:1,14,19,22 75:9
75:16 77:25 79:2,10
80:1 82:9,22,25
83:25 85:20 86:6
Sills's (1)
7:10
Sill's (1)
6:2
similar (3)
18:13 20:21 51:9
simpler (1)
65:8
simply (4)
9:17 28:18 43:20
44:21
Simultaneous (1)
81:14
sir (1)
48:11
sit (2)
23:7 68:21
sites (1)
82:12
sitting (3)
47:9 48:2,13
situation (3)
41:16 52:3 71:11
six (2)
50:16 83:15
Sixth (3)
54:6,10 67:19
sleeve (1)
60:14
solely (2)
37:23 38:8
somebody (5)
47:5 68:11 71:11 85:6
85:12
somewhat (1)
55:3
song (1)
52:23
Sooner (1)
82:22
sophisticated (1)
81:25
sorry (3)
19:14 62:17 79:10

sort (9)
19:3 39:22 43:15
49:15 59:9 70:8
71:10 80:1 83:14
sought (2)
65:4 72:25
sound (2)
15:17 39:21
sounds (3)
28:16 41:7 57:13
Southern (4)
61:9 72:25 74:13,18
speak (2)
58:22 87:20
specific (1)
67:1
speculate (1)
64:11
speculation (1)
13:21
spend (1)
23:13
Sphere (13)
26:20 27:5,10,11,13
51:10 54:19 61:21
63:2 67:15,21 77:17
77:21
spin (1)
13:13
spoke (1)
7:17
Square (2)
75:7 76:1
Squire (3)
42:21 48:18 49:7
standard (4)
61:23 67:11,22 81:3
start (4)
3:7,11 75:22 82:17
started (1)
3:12
starting (1)
3:8
state (5)
32:45:4,7 46:11
48:5
statement (13)
10:19 14:8 19:23
20:15,15 29:7,8
35:4 39:19 40:2
43:7 79:25 80:2
statements (5)
78:13,15,23 79:5,13
states (6)
3:18,21 18:14 53:17
86:2,4
statute (2)
53:21 71:22

**stay (3)**
71:3,25 75:13
**stenographic (1)**
1:10
**stenographically (1)**
89:6
**step (2)**
35:24 36:20
**steps (1)**
36:23
**stipulated (1)**
57:9
**stock (1)**
37:25
**stool (1)**
12:21
**Storm (62)**
1:6 3:6 7:6 12:17
13:17 14:7,13 15:3
15:7,18,23 16:2,8
16:13,24 17:16
23:17 24:6,7,15
26:4,5,10,12,22
31:14,15 33:24
37:15,21 38:2,4,6
38:10,17 39:1,2,24
41:11,19,24 43:24
44:22 48:16,21,24
49:1,11 52:15 55:4
57:1,18,22,23,25
59:9 60:5,14,18
61:5 64:13 70:25
**Storms (1)**
62:10
**Storm's (17)**
4:17 5:3 6:7 8:20 9:4
9:11,14,25 13:6
16:19 17:22,24
20:11 39:4 44:20
65:10 77:14
**straightforward (1)**
9:15
**stranger (1)**
51:22
**strangers (1)**
59:16
**streak (1)**
60:19
**Street (1)**
2:7
**strong (1)**
34:4
**struck (2)**
58:4 67:22
**stunned (1)**
68:17
**subject (7)**
38:1 52:22 69:13
78:18 82:16 84:14

84:17
**subjective (1)**
29:9
**submission (2)**
19:25 75:25
**submissions (1)**
24:3
**submit (7)**
14:14 19:6 27:20
32:17 33:19 36:17
78:16
**submitted (6)**
15:8,20 61:8 62:15
68:5 85:17
**subpoena (1)**
86:11
**subpoenas (1)**
86:9
**substantiating (1)**
27:12
**subsumed (1)**
31:6
**subtle (1)**
9:6
**sub-issues (1)**
13:13
**sucked (1)**
74:3
**suddenly (1)**
44:11
**sued (7)**
35:12 38:17 44:14
67:4 69:21 71:12,13
**sufficient (1)**
20:2
**suggest (3)**
57:11 82:15 83:19
**suggested (1)**
56:2
**suggesting (3)**
55:19 80:14 85:20
**suggestion (5)**
17:5 34:1 65:24 71:7
84:1
**suggests (2)**
42:25 78:6
**suing (2)**
39:2 41:22
**sum (1)**
81:24
**summaries (1)**
87:24
**summer (1)**
4:7
**sung (1)**
52:23
**superseded (1)**
8:7

**supplemental (3)**
6:7 24:3 54:2
**support (4)**
47:20 55:20 62:4,11
**supportable (1)**
9:21
**supports (1)**
50:25
**suppose (2)**
74:16 75:9
**supposedly (2)**
27:15 57:23
**Supreme (11)**
11:16 18:24 21:16,25
22:5 33:25 36:13
62:7 68:19 70:21
71:10
**sure (9)**
21:3 29:16 38:20 46:4
60:18 68:15 77:17
83:12 86:24
**surprised (2)**
14:11 68:9
**surprising (2)**
43:14 68:24
**surrebuttal (1)**
5:4
**suspicion (1)**
85:25
**SUTCLIFFE (2)**
2:2,6
**system (10)**
12:13 20:22 44:18
45:1,4,13,19,25
46:1 75:4

——————————
**T**

**T (1)**
2:15
**table (2)**
3:8 72:20
**tactic (1)**
64:9
**tail (1)**
70:12
**take (16)**
5:10 8:23 13:12 15:23
18:11 29:1 36:21
57:4 59:22 61:13
68:3 80:13 83:14,15
86:14 87:8
**taken (4)**
1:12 29:18 77:11 89:6
**takes (2)**
35:25 57:1
**talk (3)**
43:11 80:12 85:1
**talking (2)**

8:12 22:16
**tasty (1)**
82:14
**tauts (1)**
34:6
**tax (1)**
38:8
**Telecom (1)**
37:24
**telecommunication...**
38:13
**Telenor (57)**
1:2 2:17 3:5,16 9:15
9:20,25 10:17 11:2
11:12,25 12:14,17
12:23 13:2,7,16,20
16:20 18:23 19:6,21
20:10,14 21:1,8,15
22:25 23:11 24:13
29:5 30:9 31:13,21
32:22 33:17 34:6,20
35:6,21,24 36:2,20
36:22 37:4 41:10
44:17,20 58:4 62:13
68:8,25 70:19,23
71:1 73:13 77:15
**Telenor's (9)**
4:18 5:3 11:19 12:7
23:6 61:22 66:6
68:6 70:14
**telephone (1)**
38:19
**tell (3)**
59:13 72:20 76:9
**telling (2)**
43:25 44:1
**terms (3)**
26:11,17 86:16
**test (8)**
26:17 27:18 29:18,19
52:13,19 53:21 63:2
**testifies (1)**
84:17
**testify (4)**
45:19 79:8 86:5,11
**testimony (10)**
43:6 70:24 79:4,18
80:19 81:8,11 84:8
85:5 89:6
**thank (13)**
9:13 19:15 27:1 37:18
56:1 67:9 69:15
77:4,10 79:1 80:16
87:10 88:1
**theoretically (1)**
57:25
**theory (3)**
16:6 57:19 71:16
**thing (6)**

13:14 16:21 33:5
68:21 78:21 83:18
**things (3)**
33:1 80:24 83:22
**think (82)**
3:2 10:2 12:20 19:20
20:4,8 22:16 24:10
25:4 28:7 29:1,13
30:6 31:1,9 33:5,12
35:6 39:12 40:4,19
45:9,20 47:14,15
50:10 51:15,21
52:18 53:5 54:1
55:14 56:2,4,10,11
57:16,20 58:7,8
59:8 60:4,5,7 62:23
63:3,6,7,21 64:1,2,7
64:9,10,12,23 65:1
65:3 66:1 67:5,12
67:14,16,18 68:25
69:5,25 70:12 73:2
74:4,14 79:19 80:25
81:9,24 82:1 83:20
83:23 84:4 85:13
86:15 87:20
**thinks (1)**
70:25
**Third (2)**
13:7 51:7
**thought (5)**
45:21 70:14 73:3,9
79:22
**three (4)**
3:4 12:23 50:14 51:16
**three-legged (1)**
12:21
**threshold (1)**
50:21
**Thursday (1)**
1:15
**time (28)**
4:25 5:2 6:12 11:2
19:13 23:13 35:13
42:11 44:6 45:12
48:21,24 50:14
53:22 57:12 69:18
71:24 72:4 76:3,15
76:21 77:14,23 81:7
82:17 83:13 85:18
89:7
**timing (1)**
21:19
**today (12)**
4:21 5:13,16 6:4,24
10:21 17:25 18:18
23:23 54:22 69:12
82:14
**Tol (48)**
2:12 4:12,12 7:6 9:13

11:5,11 14:4,22
15:6 16:1,16 17:11
18:3,5 19:11,15
21:24 22:13,15
24:23 25:4 26:8,22
27:1,20 28:6,20,25
29:16 30:23 31:1,6
32:8,13 35:4 36:9
37:1,11 67:9 76:7
76:13 77:3 79:1
80:5,16 83:10 88:1
**told (5)**
7:14 20:13 32:20
49:13 66:2
**Tongue (1)**
21:5
**top (3)**
30:14 50:24 85:25
**total (1)**
83:8
**Tower (1)**
2:6
**trains (1)**
83:12
**transaction (2)**
17:15 31:25
**transactions (1)**
43:18
**transcript (3)**
1:5,10 89:6
**transcripts (1)**
59:5
**translating (1)**
86:24
**translation (1)**
9:6
**translator (1)**
86:17
**translators (1)**
87:6
**trial (7)**
32:20 39:15 42:23
57:4,14 58:17 62:1
**tribunal (37)**
6:12 9:21 12:6,18
13:3,7,15,22 14:15
17:17,22 19:15 20:3
20:16 22:18,20 26:5
26:11 27:21 28:7,11
29:2 31:2 33:9
34:11 40:14 47:8
62:10,20 63:9,14,19
63:23 65:21 69:14
73:17 76:20
**tribunals (1)**
63:7
**tribunal's (3)**
22:23 62:14 68:4
**trick (1)**

60:14
**tried (1)**
69:4
**tries (2)**
12:17 21:1
**troubles (1)**
82:1
**troubling (1)**
30:25
**true (1)**
29:8 44:17 89:5
**try (3)**
14:20 40:6 83:21
**trying (3)**
32:24 33:17 84:9
**Tuesday (1)**
78:7
**Tumanov (1)**
49:23
**turn (2)**
26:24 68:24
**turns (1)**
38:25
**twice (1)**
85:13
**two (27)**
5:25 6:16,20 13:23
30:15 31:10 32:19
33:1 41:5,16,21,25
43:14 44:10,13
45:13 48:2,13 49:17
53:11 58:10,12
75:14 78:6 80:23
83:15 86:19
**twofold (1)**
24:5
**two-day (1)**
83:5
**type (4)**
13:25 14:1 35:10 51:8
**typical (1)**
41:6
**typically (1)**
8:16

_____

U

**uh-huh (1)**
55:25
**Ukraine (33)**
6:6 11:22,24,25 16:22
17:16,19 18:24
31:16 33:15 34:7,12
34:15 35:3 36:6
38:1 39:10 41:20
42:24 45:6 57:15
58:5,9 59:22 60:1,8
60:9,15 61:14 70:8
71:3,10 74:7

**Ukrainian (105)**
6:14,25 7:18,19,23
8:9,10,12,13,22
9:17 10:5,7,16
11:14,16,19,20
12:12,14,18,25 13:3
13:5,10 14:24 15:9
16:15 17:1,2,9 20:2
20:21 21:25 22:4
23:3,4,8 24:1,21
25:9 26:6 27:25
28:19,22,24 29:2
31:15,17,19,19 32:3
32:5,10,12,14,19,21
32:23 35:25 36:13
36:19,24 37:9,22
40:23 44:18,21,21
45:1,3,9,13,19,24
45:25 46:2 47:1,6
47:12,17 48:22 49:3
49:24 57:2 58:10,17
58:19 60:20 65:14
66:2,24 67:22 68:6
68:19 69:6 71:6,24
72:18,21 73:1 74:12
75:6,15,19
**Ukrainians (2)**
49:11,14
**Ukrainian/English ...**
9:6
**ultimate (1)**
76:11
**ultimately (2)**
25:21 29:19
**ultra (11)**
18:12,16 21:13 42:3
50:8 53:7,20,22,23
54:8 56:15
**unanimous (1)**
77:12
**unanimously (2)**
77:13,23
**unauthorized (1)**
52:11
**unaware (1)**
33:11
**uncertain (1)**
76:9
**uncitral (5)**
1:1 40:15 60:12 63:8
86:7
**unclear (2)**
16:13 21:18
**undermine (1)**
12:12
**underpinnings (1)**
78:2
**understand (19)**
5:12 7:2 8:12 20:1

28:25 29:17 30:6,7
30:23 31:1 63:22
66:6 71:15 73:25
74:1 77:17 80:16
81:3 84:16
**understanding (9)**
7:12 9:2 11:14 15:15
16:16 33:23 58:18
58:23,24
**understands (1)**
82:1
**underway (4)**
72:3,4 74:6 75:12
**undisputed (1)**
11:17
**unfair (1)**
84:13
**unfavorable (1)**
76:23
**Unfortunately (1)**
7:6
**unheard (1)**
18:19
**unique (1)**
87:16
**United (5)**
3:17,21 18:14 86:1,4
**untangle (1)**
59:7
**unusual (3)**
18:19 21:12 23:3
**upheld (3)**
8:5,22 66:23
**upholding (1)**
9:23
**urging (1)**
71:3
**use (1)**
33:18
**useful (2)**
83:9,13
**Uzan (1)**
46:9
**U.S (6)**
12:10 13:1 45:7 61:6
63:22 71:12

_____

V

**v (1)**
3:6
**vacated (3)**
8:3,20 65:5
**vacating (2)**
66:7,11
**valid (7)**
10:7 15:5 24:1 30:13
32:9,10 52:9
**validity (7)**

13:8,11 22:25 46:8
52:19 53:9 63:10
**validly (1)**
13:4
**Valleys (2)**
50:15 51:17
**Van (50)**
1:12 2:12 4:12,12 7:6
9:13 11:5,11 14:4
14:22 15:6 16:1,16
17:11 18:3,5 19:11
19:15 21:24 22:13
22:15 24:23 25:4
26:8,22 27:1,20
28:6,20,25 29:16
30:23 31:1,6 32:8
32:13 35:4 36:9
37:1,11 67:9 76:7
76:13 77:3 79:1
80:5,16 83:10 88:1
89:3
**various (2)**
9:24 58:3
**venture (1)**
76:25
**venue (1)**
82:10
**versus (6)**
24:12 26:2,21 54:4
67:17 76:14
**victories (1)**
34:7
**victory (1)**
69:22
**videotape (1)**
80:17
**view (7)**
56:3 76:24 80:13
84:25 85:3,3,21
**vigorous (1)**
77:5
**violate (2)**
12:8 13:1
**violated (1)**
11:22
**violation (2)**
36:7 65:13
**vires (11)**
18:12,16 21:13 42:3
50:9 53:7,20,22,23
54:8 56:15
**virtue (1)**
69:19
**void (18)**
9:19 24:7,9,12,16,17
24:20,22 25:3 27:7
29:20,25 30:1 67:17
76:14,17,18,19
**voidability (3)**

52:12 53:5 67:18
**voidable (9)**
24:7,13,15 27:8 29:25
  62:2,3,13 76:15
**voidance (1)**
25:23
**vs (1)**
1:5

---
**W**
**Wack (7)**
42:20 43:6 48:17 49:6
  49:13 55:25 68:11
**Wack's (1)**
70:24
**wait (3)**
33:25 37:5 65:25
**waiting (1)**
37:5
**waived (3)**
34:19,23 35:1
**waiver (10)**
33:2 34:2,11,21 35:12
  66:8,16,16 77:24
  78:1
**want (21)**
6:17 7:15 8:11 19:1,2
  28:13 29:16 30:3
  33:1 34:3 35:14
  37:15 43:20 58:22
  68:4 69:1 76:3
  79:12 81:18 84:4
  86:3
**wanted (3)**
19:18,20 78:24
**wanting (1)**
66:21
**wants (2)**
5:24 69:1
**war (1)**
51:18
**Washington (1)**
59:4
**wasn't (5)**
20:24 48:12 56:18
  73:18 85:20
**waste (1)**
76:20
**Water (1)**
50:15
**way (14)**
4:21 5:19,23 12:2,20
  17:2 34:18 38:3
  39:21 54:12 56:3
  61:12 65:20 83:16
**web (1)**
45:5
**website (1)**

44:3
**Wednesday (1)**
7:22
**week (5)**
78:5,11 81:7,11 86:23
**weight (7)**
67:4 70:12 75:20
  80:19 84:20 85:4,11
**welcome (4)**
3:3 63:5 79:9 80:9
**well-established (1)**
12:9
**well-settled (1)**
46:7
**went (3)**
12:2 17:2,3
**weren't (1)**
21:11
**we'll (11)**
5:2,17 55:14 60:15,16
  77:1 81:22 82:7,12
  82:13 83:16
**we're (34)**
3:2 4:13 6:8 19:1
  20:19 24:16,16
  26:19 28:11 30:18
  30:24 35:19,21
  52:14,17,18 55:25
  56:1 59:25 61:15
  64:6 65:7,9,15
  67:12 69:20 71:5
  74:23,24 76:17 81:5
  81:12 83:20 87:25
**we've (14)**
22:15 31:4 33:14
  39:18 42:8 55:24
  60:6 61:4 69:4,7
  73:23 81:22 82:11
  83:14
**WILLIAM (1)**
1:21
**winning (1)**
60:19
**wish (2)**
78:14,16
**wishes (1)**
79:8
**wit (1)**
6:11
**witness (25)**
78:13,14 79:5,8,9,13
  79:14,16,23,24 80:1
  80:6,7,10,10 81:8
  84:7,10,16,23 85:7
  85:8,10,12 87:24
**witnesses (6)**
47:23 55:15 56:13
  78:14 85:18 86:10
**won (1)**

69:22
**wonders (1)**
18:23
**word (1)**
24:8
**words (5)**
28:14 29:21 30:2
  40:20 76:17
**work (1)**
87:2
**worked (1)**
47:24
**works (1)**
54:12
**world (2)**
52:4 61:13
**worn (1)**
52:25
**worse (1)**
87:7
**wouldn't (6)**
16:20 49:14 50:1
  64:25 65:24 86:3
**wrap (1)**
83:16
**writing (1)**
7:21
**written (7)**
7:3,24 8:2,17 14:8
  65:25 86:14
**wrong (5)**
12:15 14:25 16:9
  45:18 71:25

---
**X**
**X (1)**
1:8
**XI01903 (1)**
89:17

---
**Y**
**year (2)**
57:25 62:7
**years (5)**
41:16 42:1 44:11
  45:13 53:11
**York (57)**
1:14,15 2:3,3,11,11
  3:20,24 4:3,5,13
  13:9 19:5 31:13,22
  31:25 32:1,4 34:17
  36:8,16 42:5,5,15
  45:15,15,23 46:3,12
  47:1,9,25 48:4,4
  50:6,7 52:5,13,16
  52:16,19,22 53:6,20
  56:14 60:2,9 61:8
  63:22 70:5,5 74:9

74:13 75:24,25,25
  82:7

---
**Z**
**Z (1)**
2:13
**Zimmerman (5)**
2:5 3:25,25 4:3 6:3

---
**1**
**1 (1)**
2:7
**1:36 (1)**
88:2
**10 (1)**
8:21
**10:00 (1)**
82:18
**10002 (1)**
2:11
**10103-0001 (1)**
2:3
**11:05 (1)**
1:15
**12:30 (3)**
5:10,14,17
**13 (1)**
89:18
**14 (8)**
78:5,7,11 80:20,21
  81:15,16 87:23
**15 (2)**
78:7,8

---
**2**
**2005 (3)**
6:5 8:25 18:10
**2006 (5)**
1:15 11:7,8 57:3
  89:18
**2010 (1)**
89:17
**212 (1)**
2:3
**22 (11)**
6:4,6 8:3,19,25 33:8
  33:22 34:9 65:1
  66:7,11
**25 (8)**
2:7 10:9 11:13 21:9,9
  21:21 22:1 57:3
**27 (3)**
6:3,9 77:25
**29 (1)**
1:15

---
**3**
**3 (1)**

23:18
**30 (15)**
4:23,25 5:2 9:12 11:7
  11:8,15 20:15 21:23
  22:16 31:3 37:17
  64:21 73:7,12
**302 (1)**
52:5
**31 (1)**
89:17
**35 (1)**
2:6

---
**4**
**42 (1)**
2:6
**44(0)20 (1)**
2:8
**49.9 (1)**
38:5

---
**5**
**5 (3)**
7:3,22 50:16
**50.1 (1)**
38:4
**5000 (1)**
2:8
**506-5110 (1)**
2:3
**557 (1)**
2:8
**590 (2)**
1:14 2:11

---
**6**
**6 (2)**
26:24 61:24
**6-7 (1)**
27:4
**666 (1)**
2:2

---
**7**
**7 (3)**
78:11,17 87:25
**7th (1)**
78:22
**75 (1)**
86:8
**7562 (1)**
2:8

---
**9**
**9 (1)**
8:21
**9:00 (4)**
82:17,23,25 87:22

82:17,23,25 87:22