# EXHIBIT V

# Lovells

590 Madison Avenue
New York NY 10022
Tel: +1 212 909 0600
Fax: +1 212 909 0660

By E-mail and Overnight Mail

March 14, 2007

Direct line (212) 909-0661
pieter.vantol@lovells.com
Direct fax (212) 909-0660

Our ref NYPT/115078.01
Matter ref V2336/00016

Kenneth R. Feinberg, Esq.
The Feinberg Group LLP
The Willard Office Building
1455 Pennsylvania Ave., NW
Suite 390
Washington, DC 20004

William R. Jentes, Esq.
1500 North Lake Shore Drive
Suite 4C
Chicago, IL 60610

Gregory B. Craig, Esq.
Williams & Connolly LLP
725 Twelfth St., NW
Washington, DC 20005

RE: TELENOR MOBILE COMMUNICATIONS AS V. STORM LLC

Dear Messrs Feinberg, Jentes and Craig:

As counsel for Storm LLC ("Storm"), we write in response to the Tribunal's Interim Order Directing Further Briefing (the "Interim Order") in the above arbitration.

In accordance with the Tribunal's order of February 27, 2007, we approached the Ukrainian court for leave to file the further briefing referred to in the Interim Order. On March 13, 2007, the Golosiyiv District Court of Kyiv (the "Kyiv Court") entered a clarification order (the "Clarification Order") (enclosed as Exhibit A) in which it held that Storm may not respond to the Interim Order in the manner set forth by the Tribunal, *i.e.*, Storm may not provide extensive briefing in response to the Tribunal's questions. The Kyiv Court expressly pointed out that the December 1, 2006 Ruling and the underlying rulings of the Ukrainian courts remain in full force and effect.

However, it is important to note that the Kyiv Court held that Storm may submit the Clarification Order to the Tribunal and make reference to the points of Ukrainian law that are germane here, which we have done below. Also, it is our position that Storm may refer back to or amplify (where necessary) the pre-December 1, 2006 submissions, issues and arguments that we believe will assist the Tribunal in its resolution of this matter. For the Tribunal's convenience, we have briefly set forth those arguments below rather than merely cross-referencing our earlier submissions.

Alicante  Amsterdam  Beijing  Brussels  Chicago  Dusseldorf  Frankfurt  Hamburg  Ho Chi Minh City  Hong Kong  London  Madrid  Milan  Moscow
Munich  New York  Paris  Prague  Rome  Shanghai  Singapore  Tokyo  Warsaw   Associated offices: Budapest  Zagreb

Lawyers (USA) Solicitors Rechtsanwälte Avocats Advocaten Notarissen Avvocati Abogados

- 2 -                                                                                                          March 14, 2007

**Issues Pertaining the Tribunal's First Question**

1.    *Assuming New York law applies as an initial matter to this Arbitration pursuant to the parties' choice of that law in the Shareholders Agreement, and pursuant to Article 33 of the UNCITRAL Rules, do New York choice of law rules nonetheless direct this Tribunal to apply Ukrainian law to disputes affecting the governance of a Ukrainian corporation, like Storm, including disputes over the authority to contractually bind the corporation? (See Storm brief, Paragraphs 33-37.)*

Storm demonstrated, in its Pre-Hearing Brief, that New York law directs the application of Ukrainian law to the issues of both actual and apparent authority.[1]

The rule was clearly set forth by Judge Cote in *Lehman Bros. Inc., v. Tutelar, CIA Financiera S.A.*, No. 95 CIV 3772, 1997 WL 403463 (S.D.N.Y. July 17, 1997), which is a case that Telenor Mobile has not distinguished (and, indeed, cannot distinguish) from this matter. In *Tutelar*, Lehman Brothers, Inc. ("Lehman") sought to recover on a contract which, it alleged, provided a guarantee for a trading account maintained by a Uruguayan corporation. The guarantee was signed by the "Individual Defendants," who were officers and directors of Tutelar CIA Financiera S.A. ("Tutelar"), an Argentinean financial corporation. *Id.* at *1. Tutelar argued — just as Storm argues here — that the Individual Defendants did not have the actual or apparent authority to bind the company. *Id.* at *3. On the question of what law applied to those arguments, the court stated that:

> Because the issue of the <u>actual</u> authority of the Individual Defendants to bind Tutelar turns on Tutelar's internal corporate organization, ... the law of the place of incorporation, here Argentina, would govern. *See Lee v. Jenkins Bros.*, 268 F.2d 357, 363 (2d Cir. 1959). *See also Scottish Air Int'l, Inc. v. British Cale[d]onian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996) ("questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation"). The issue of <u>apparent</u> authority, however, is governed by the law where Lehman "relied upon such apparent authority." *Lee*, 268 F.2d at 363.

*Id.* n.4 (emphasis in original).[2]

The Tribunal should apply the same analysis from *Tutelar* to the actual and apparent authority issues here.

---

[1]    The parties have agreed, by citing to New York cases on choice of law, that as an initial matter New York conflicts principles govern here (assuming the requirements for the applicability of those principles have been met). It is Storm's view that an application of those principles leads to the conclusion that Ukrainian law controls on the issues discussed below.

[2]    As noted by the *Tutelar* court, the rule for actual authority is based on the long held "internal affairs" doctrine. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("As a general matter, the law of the state of incorporation normally determines issues relating to the <u>internal</u> affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation.") (emphasis in original); *U.S. v. Funds Held in the Name of or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000) ("Questions relating to the internal affairs of corporations — for profit or not-for-profit — are generally decided in accordance with the law of the place of incorporation.").

- 3 -                                                                March 14, 2007

    (a)    *Nilov's Actual Authority*

Storm is a Ukrainian corporation, so the question of whether Valeriy Nilov had the actual authority to bind Storm to the Shareholders Agreement must be resolved by reference to Ukrainian law. Such a result is in accord with the jurisprudential basis for the internal affairs doctrine, which is to protect the reasonable expectations of all parties with a legitimate interest in the corporation — not just shareholders, but other parties as well, including officers, directors, consumers, and even competitors. There is no evidence that the governing body of Storm, a Ukrainian company, understood that New York law applied to the matter of Mr. Nilov's authority to bind Storm to the Shareholders Agreement. Nor, for that matter, did Telenor, which in 2002 correctly demanded the requisite documentation <u>under Ukrainian law</u> to establish that Mr. Nilov had actual authority to contractually bind Storm. Telenor cannot now try to circumvent Ukrainian law in an effort to avoid the consequences of its failure to properly obtain the same authority in 2004.[3]

An application of the *Tutelar* rule on actual authority is also consistent with the mandatory provisions of Ukrainian law relating to the internal corporate governance of domestic corporations, as described by the Clarification Order:

> <u>Issues emerging from the relations between the shareholders and the company, or between the shareholders, are the subjects of internal corporate management and governed exclusively by the laws of the place of registration of the company.</u> Determination of the rights and obligations of a shareholder of a Ukrainian company is the matter of exclusive competence of Ukrainian law. According to the Article 14 of the Law of Ukraine On the Business Entities and the Article 81 of the Civil Code of Ukraine, the issues related to the legal status and activity of the Ukrainian company are governed exclusively by the Ukrainian law. Moreover, the Article 46 of the Law of Ukraine On the International Private Law stipulates that the Founding Agreement, being a statutory document of a legal entity with the foreign participation, is governed by the law of the state where such legal entity is founded.

(Ex. A at p.3; emphasis added.)

For these reasons, the Tribunal should apply Ukrainian law to the issue of actual authority and conclude, as did the Ukrainian courts, that Mr. Nilov lacked the requisite authority.

---

[3] Telenor Mobile has misleadingly cited an e-mail, dated August 23, 2002, from David Wack, an attorney involved in the negotiations for the 2002 agreements, to suggest that Ukrainian law is not applicable. (*See* Ex. B, Claimant's Proposed Findings of Fact and Conclusions of Law, dated January 19, 2007, at ¶ 56.) First of all, Mr. Wack is clearly referring to the Share Purchase and Option Agreements, and he was assuming that Swedish law applied. He is also discussing the "second signature" requirement, not whether Mr. Nilov needed authority from a meeting of participants. Moreover, the e-mail was several months before the parties determined that Mr. Nilov in fact needed approval from a meeting of participants to execute the 2002 Voting Agreement. Clearly, Mr. Wack or someone reached the conclusion prior to the execution of the 2002 Voting Agreement (and well after the Wack e-mail) that Storm Charter and the governing Ukrainian law required such a meeting and approval. If Ukrainian law were not applicable, the meeting of participants would not have been necessary.

- 4 -                                                                                                         March 14, 2007

  (b)  *Nilov's Apparent Authority*

The *Tutelar* court explained that "[t]he issue of <u>apparent</u> authority ... is governed by the law where [plaintiff] relied upon such apparent authority." 1997 WL 403463 at *3 (citations and internal quotations omitted; emphasis in original).[4] In *Tutelar*, the court found that because (1) the contract was addressed to a plaintiff in New York, (2) plaintiff was a New York-based corporation, and (3) payments made pursuant to the contract were to be made in New York, New York law should apply to the question of apparent authority. *See Tutelar*, 1997 WL 403463 at *3 n.4. No such ties to New York exist here.

In this case, the Shareholders Agreement purports to bind a Ukrainian corporation and a Norwegian corporation in connection with the corporate governance of Kyivstar, another Ukrainian company. The contract was negotiated and executed in Ukraine, and both parties were represented by Ukrainian counsel. (*See* Ex. C., Storm Pre-Hearing Br., at ¶ 40.) The evidence shows that, during the formation of the Shareholders Agreement, there was no nexus whatsoever to New York. Considering, by contrast, the overwhelming number of connections to Ukraine, it is wholly implausible to suggest that Telenor Mobile was relying on principles of New York law in relation to Mr. Nilov's execution of the Shareholders Agreement. Indeed, even Telenor Mobile's expert witness, Mr. Rabij, stated that Telenor Mobile must have been relying on Mr. Nilov's apparent authority under Ukrainian law. (*See* Ex. D, Rabij Op., at ¶ 30; Ex. C at ¶ 41.) Therefore, under the *Tutelar* test, Ukrainian law must be applied to the issue of apparent authority.

As Storm has pointed out in its submissions, Article 92(3) of the Ukrainian Civil Code provides that a party's reliance on another party's apparent authority must be reasonable under the circumstances and the relying party cannot cite to apparent authority it knew, or should have known, about limitations on that authority. (*E.g.*, Ex. D, Rabij Op., at ¶ 31.)[5] New York law is to the same effect. For example, in *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001), the Second Circuit noted that the doctrine of apparent authority does not apply where the relying party "knew, or should have known" of limitations on the agent's authority. *Id.* at 33. *See also Scientific Holding Co. Ltd. v. Plessey Inc.*, 510 F.2d 15, 24 (2d Cir. 1974) ("It is an accepted principle of the law of agency that a person with notice of a limitation which has been placed on an agent's authority cannot subject the principal to liability upon a transaction with the agent if he knows or should know that it is outside the scope of the agent's authority.") (cited in *Sphere Drake*).[6] Thus, there is a "false conflict" between Ukrainian and New York on the issue of

---

[4]  *Tutelar*'s focus on where the other party relied on the apparent authority is consistent with the general conflicts rule set forth in *Indosuez Int'l Finance B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 245-46, 774 N.E.2d 696, 700-01 (2002), which is that the New York courts will apply the law of the state with the most significant relationship to the issue. Despite the presence of choice of law clauses in the contracts before it, the *Indosuez* court determined the applicable law for the issue of apparent authority based on an evaluation of which state had the most significant contacts. *See id.* The *Indosuez* court did not simply defer to the choice of law provisions in the contracts, as Telenor Mobile would have the Tribunal do in this case.

[5]  Storm has demonstrated in its submissions that Article 92(3) does not apply under the circumstances of this case, which means that the issue of contract formation turns on actual authority alone. (*See, e.g.*, Ex, C at ¶ 41 (citing Ex. E, Maydanyk Op., at ¶¶ 31-32, 35-38).) For the sake of argument, however, we have assumed below that Article 92(3) applies here.

[6]  Telenor Mobile cannot now dispute this aspect of New York law. It has frequently cited *Indosuez Int'l Finance B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 246, 774 N.E.2d 696, 700 (2002), in which the New York Court of Appeals stated that a party may rely on an agent's apparent authority "only to the

- 5 -                                                                                                                         March 14, 2007

apparent authority (assuming, *arguendo*, Article 92(3) of the Ukrainian Civil Code applies). In short, the Tribunal does not need to resort to New York's conflicts principles because the outcome is the same under either law.

By now, the Tribunal is very familiar with Storm's arguments on apparent authority from its earlier submissions, so for convenience we will simply summarize what was stated previously. The evidence clearly demonstrates that Telenor Mobile knew, as early as 2002, that Mr. Nilov required authorization from a meeting of participants in order to bind Storm to agreements involving the transfer or disposition of Kyivstar shares. Armed with such knowledge, Telenor Mobile requested proof of Storm's authorization in connection with the execution of several contracts in 2002. It received proof in a written confirmation specifically spelling out that Mr. Nilov had been granted the authority to sign the 2002 agreements at a special meeting of participants.[7] Thus, Telenor Mobile cannot reasonably claim that it was unaware of such express limitations on Mr. Nilov's authority. The 2004 Shareholders Agreement, like the 2002 Voting Agreement, involved the disposition of Kyivstar shares and, accordingly, required specific authority from a meeting of participants.[8] Storm has also shown that the 2004 Shareholders Agreement was materially different, and Telenor Mobile could not have reasonably relied on the earlier authorization. Telenor Mobile had to make sure there was actual authority for Mr. Nilov from a meeting of participants, just as it had done two years earlier for the 2002 Voting Agreement. The consequences of Telenor Mobile's failure to follow corporate formalities properly in the 2004 transaction must rest with Telenor Mobile, not Storm.

**Issues Pertaining to the Tribunal's Second Question**

2.   *Making the same initial assumption, do New York choice of law rules nonetheless hold that the parties' choice of law is not binding where, among other factors, another state has more significant contacts with the transaction in question? Would application of New York law to the issue at bar be contrary to fundamental policy of that other state? Do these or other exceptions apply so that the parties' choice of New York law should be rejected in favor of Ukrainian law? (See Storm brief, Paragraphs 56-61.)*

The Tribunal's first question is answered by the *Indosuez* case. Citing, among other things, the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, the Court of Appeals stated in *Indosuez* that "New York choice of law principles require a court to apply the law of the state with the most significant relationship with the particular issue in conflict." 98 N.Y.2d at 245, 774 N.E.2d at 700. Thus, New

---

extent that such reliance is reasonable." Also, at the August 14, 2006 hearing, Mr. Sills conceded that Ukrainian law and New York law on apparent authority are the same. (*See* Ex. F, 8/14 Tr., at 28:3-5.)

[7]   Moreover, Telenor Mobile has acknowledged, both in its submissions and in the testimony of its witnesses, that it received a copy of Storm's charter well in advance of the parties' execution of the Shareholders Agreement. (*See* Ex. G, Telenor Mobile Evidentiary Br., at 10-11; Ex. F, Test. of Sigmund Ekhougen, 8/14 Tr., at 91:11-96:13, 97:5-10.)

[8]   Telenor Mobile argues that the Shareholders Agreement cannot be read as "a disposition or encumbrance of shares." (*See* Ex. B at ¶ 101.) This contention is directly contradicted by Telenor Mobile's own witness, Mr. Ekhougen, who admitted under oath that the Shareholders Agreement does indeed involve the disposition of Kyivstar shares: "Q. Okay. So, we have established so far that the voting agreement and whatever shareholders' agreement that is going to be entered into later has to do with the disposition of shares in Kyivstar; right? A. Not surprisingly, yes." (Ex. F at 98:10-15; *see also* Ex. E, Maydanyk Op., at ¶ 14 ("[I]t is my opinion that [Storm's Charter] expressly limits the power of the General Director to enter into the Shareholders Agreement precisely because it entails the disposal of Kyivstar Shares.").)

- 6 -                                                                                           March 14, 2007

York follows the rule of RESTATEMENT (SECOND) CONFLICTS OF LAW § 187. Under that rule, a court will enforce a contractual choice of law provision only where the state whose law is selected "has sufficient contacts with the transaction in question and the application of that state's law would not be contrary to any fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue at bar, and which would be the state of the applicable law in the absence of an effective choice of law by the parties." *Business Incentives Co., Inc. v. Sony Corp. of Am.*, 397 F. Supp. 63, 67 (S.D.N.Y. 1975). *See also Indosuez,* 98 N.Y.2d at 245-46, 774 N.E.2d at 700-01 (examining parties' contacts with New York despite presence of choice of law provisions selecting New York law).

Here, the main issues to be decided (other than whether a contract was formed) include (a) whether Storm breached the Shareholders Agreement when its representatives did not attend Kyivstar shareholder or board meetings and when it did not appoint candidates for election to the Kyivstar board on the grounds that the corporate governances set forth in the Shareholders Agreement violate Ukrainian law; (b) whether Storm's initiation of litigation in Ukraine — in which it argued that the Kyivstar Charter and parallel provisions in the Shareholders Agreement violate Ukrainian law — constitute a breach of the Shareholders Agreement; (c) whether Storm may be ordered to amend the Kyivstar Charter — a foundational document governed by Ukrainian law — to conform to the Shareholders Agreement; and (d) whether Storm's business activities in Ukraine violate the terms of the non-competition provision in the Shareholders Agreement, which in turn raises issues under Ukrainian competition law. As Storm explained in its Pre-Hearing Brief, none of foregoing issues implicates New York's laws or New York's interests. Moreover, the "transactions" involved — *i.e.*, the negotiation of the Shareholders Agreement, the establishment of Kyivstar under its Charter, Storm's actions in Ukraine on corporate governance issues and Storm's business activity in Ukraine — have absolutely nothing to do with New York. Those events simply cannot be deemed "sufficient contacts" with New York under the conflicts of law analysis.

The Tribunal has also asked whether an application of New York law would violate any fundamental policy of Ukraine. It is clear that it would. Storm has shown in its Pre-Hearing Brief and other submissions that Ukraine has a paramount interest in the regulation of the various corporate governance issues that are at the heart of this arbitration. The Clarification Order underscores that point because the Kyiv Court repeatedly stated that issues relating to Kyivstar Charter and shareholders' rights must be determined under Ukrainian law. (*See* Ex. A at 2-3.) Ukraine has a similar paramount interest in the regulation of companies doing business there, so Ukrainian law also governs any issues arising out of the non-competition provision. Finally, an application of Ukrainian law (and the concomitant recognition of the Ukrainian courts' orders in this matter) serves Ukraine's strong interest in protecting the integrity of its judicial system.

Telenor Mobile has attempted to evade the conflicts principles set forth in *Indosuez* (a case that Telenor Mobile repeatedly cites in its submissions) by arguing that the parties have the autonomy to choose New York law notwithstanding the lack of contacts with the forum. Telenor Mobile, for example, cites Section 5-1401 of New York's General Obligation Law, which, under certain circumstances, allows contracting parties to choose New York law "whether or not such contract … bears a reasonable relation to this state." As an initial matter, Section 5-1401 only applies to contracts for transactions greater than $250,000. Telenor Mobile, however, has admitted that "nothing in the Shareholders Agreement amounts to a transactional document." (Ex. B at ¶ 101.)

- 7 -                                                                                             March 14, 2007

Therefore, by Telenor Mobile's own admission, Section 5-1401 cannot apply to the Shareholders Agreement.[9]

Even assuming Telenor Mobile could rely on Section 5-1401, that provision is still limited by constitutional due process and public policy concerns. For example, in *Von Hundertmark v. Boston Professional Hockey Ass'n Inc.*, 1996 WL 118538 (E.D.N.Y. March 7, 1996), the court stated that choice of law provisions under Section 5-1401 are enforced "so long as there is a reasonable basis for the choice or the state whose law is selected has sufficient contacts with the transaction." *Id.* at *4. *See also In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 886 (E. & S.D.N.Y. 1991) (same), *vacated on other grounds*, 982 F.2d 721 (2d Cir. 1992). Likewise, in *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118 (S.D.N.Y. 2000), the court pointed out that Section 5-1401 "is not without limits" and the parties' choice of law "must still remain within constitutional bounds." *Id.* at 137; *see also id.* at 135 (stating that "[t]he power of courts to enforce [a New York choice of law provision] remains restricted within constitutional bounds"). "A court's power to apply its own state's law in a case that affects another U.S. state is limited by both due process and the Full Faith and Credit Clause. … It remains to be seen … whether a state with no connection to either the parties or the transactions could apply its own law, consonant with the Full Faith and Credit Clause, when doing so would violate an important public policy of a more-interested state." *Id.* at 137 (emphasis in original). The *Minmetals* court went on to note that the constitutional limits in cases involving the laws of foreign nations derive from the concept of comity rather than the U.S. Constitution. *Id.* In that case, however, the court found that there were no constitutional restrictions because the transaction and one of the parties had contacts with New York. *Id.* Moreover, the party opposing New York law had not raised any constitutional restrictions. *See id.* at 137-38.[10]

In this matter, by contrast, neither the parties nor the transaction has any connection with New York. In addition, the application of New York law (as shown above) would intrude on Ukrainian laws regarding the governance of its domestic corporations. Under New York conflicts rules and the doctrine of comity, the Tribunal should apply the law of Ukraine to the relevant issues.

---

[9] As discussed above, Telenor Mobile also maintains that the Shareholders Agreement does not involve the disposition of Kyivstar shares. While the Shareholders Agreement is not the transactional document under which the shares are transferred, its express terms require the subsequent disposition of shares. The Ukrainian courts cited these provisions in holding that a meeting of participants for Storm was required and the presence of the same provisions in the 2002 Voting Agreement caused the parties to obtain authorization from a meeting of participants at that time.

[10] Many commentators have similarly recognized that the mandatory rules and public policies of another jurisdiction act as a significant limit on the ability of arbitrators in international cases to apply the law chosen by the parties. *See, e.g.*, N. Voser, "Mandatory Rules of Law as a Limitation on the Law Applicable in International Commercial Arbitration," 7 AM. REV. OF INT'L ARB. 319, 356 (1996) ("[A]rbitrators not only can, but also should apply mandatory rules even if they are not part of the chosen law or the proper law of the contract. The parties have an interest in an award which is not challengeable and can be enforced. This interest may lead to the application of the state(s) where the award can be challenged and where it is likely to be enforced.").

**Issues Pertaining the Tribunal's Third Question**

3.      *If Ukrainian law must be applied by this Tribunal under either of the preceding two assumptions, does Ukrainian law provide that matters of corporate governance in a corporation's constituent documents cannot be modified by private contract? (See Storm brief, Paragraphs 56-61.)*

The Clarification Order directly addresses this question, noting that "Ukraine law does not provide for the possibility of regulating the formation, purview and decision-making procedures of an entity's bodies by any other documents, including private agreements such as the Shareholders Agreement." (Ex. A at 3.) This confirms the opinion of Storm's expert, Peter Magnus, who stated that matters relating to corporate governance could not be modified by private agreements. (*See* Ex. H, Legal Opinion of Peter Magnus, at ¶¶ 21-22.)

**Issues Pertaining the Tribunal's Fourth Question**

4.      *Making the same initial assumption as in paragraph 1, above, do New York choice of law rules require that conclusive effect be given by this Tribunal to the various decisions of the Ukrainian courts relied upon by Respondent, unless (a) the Ukrainian courts lack subject-matter or personal jurisdiction; (b) the judgments were fraudulently obtained; or (c) enforcement would offend New York public policy. Has Claimant established any of these purported grounds? (See Storm brief, Paragraphs 48-53).*

As established in our prior submissions, there is no question that a New York court would be required, under the doctrine of comity, to recognize the various decisions of the Ukrainian courts relied upon by Storm. New York courts have long adhered to the principle that "a final judgment obtained through sound procedures in a foreign country is generally conclusive as to its merits <u>unless</u>: (1) the foreign court lacked jurisdiction over the subject matter or the person of the defendant; (2) the judgment was fraudulently obtained; or (3) enforcement of the judgment would offend the public policy of the state in which enforcement is sought." *Ackerman v. Levine*, 788 F.2d 830, 837-38 (2d Cir. 1986) (emphasis in original). (*See also* Ex. C at ¶ 49 *et seq.* (citing further cases).) None of the three exceptions articulated by *Ackerman* is present here.

Only one of the exceptions — for fraudulent judgments — has even been raised. Telenor Mobile, however, put forward no evidence whatsoever, beyond its *ipse dixit*, that the judgments entered by the Ukrainian courts were the product of collusion. Thus, Telenor Mobile falls well short of the standard articulated in *Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaarkantoor B.V.*, 574 F. Supp. 367 (S.D.N.Y. 1983), where the court held that allegations of fraud, without the requisite evidentiary support, could not form the basis for finding that the rulings of a Dutch court had been fraudulently obtained. *Id.* at 372. It is significant, moreover, that the *Sea Dragon* court held that the proper forum for testing a claim of a fraudulent judgment was the Dutch judicial system. *Id.* Telenor Mobile has refused to challenge the April and May 2006 decisions in the Ukrainian courts, despite its frequent forays into the Ukrainian judicial system. In the Clarification Order, the Kyiv Court expressly confirmed that the earlier decisions followed Ukrainian law and proper procedures. (Ex. A at 2-3.) This finding is in accord with the Tribunal's own statement that there was "no evidence of any impropriety or violations of any Ukrainian procedures." (Ex. I, Oct. 22 Award, at 15.) In short, Telenor Mobile has not met — and cannot meet — its heavy burden of establishing <u>through evidence</u> that the Ukrainian judgments were obtained by fraud. As stated by the *Sea Dragon* court, "[a]bsent any evidence to the contrary, it is the firm and established policy of American courts to respect a valid foreign decree." 574 F. Supp. at 372.

The weight that Telenor Mobile places on the preliminary findings of Judge Lynch in the various applications for emergency relief is unfounded. Those findings were rendered solely for the purposes of determining the emergency motions before the Court and, as recognized by Judge Lynch, they would not even be binding on him in later proceedings (or any other court). (See Ex. J, Tr. for December 11, 2006 Hearing, at 35:1-13.)[11] Findings of fact made by a court granting a preliminary injunction are not binding in later proceedings because "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *RxUSA Wholesale, Inc. v. Dep't of Health and Human Serv.*, 467 F. Supp. 2d 285, 291 (E.D.N.Y. 2006), citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); see also *Bristol—Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1049 (2d Cir. 1992) (findings of fact at the preliminary injunction stage are not binding at trial on the merits). As such, the Tribunal is not bound by what Judge Lynch found, especially in light of its own conclusion that there were no irregularities associated with the Ukrainian decisions and the Kyiv Court's recent statement to the same effect. The Tribunal, in determining that the Ukrainian court decisions were not the product of collusion, had before it a wealth of evidence, including the expert opinions offered by Storm and the affidavit of Mr. Klymenko in which he explicitly stated that he had not been in contact with Alpren or any other related party in connection with the April and May 2006 decisions. Telenor Mobile offered the Tribunal no evidence of collusion, other than its rank speculation, and it similarly failed to present a shred of evidence in the proceedings before Judge Lynch. There is no reason for the Tribunal to alter its earlier finding on the propriety of the Ukrainian proceedings and judgments.

Without question, the Ukrainian courts are the most competent bodies to determine whether the Shareholders Agreement comports with Ukrainian law. Those courts have repeatedly held that the Shareholders Agreement violates Ukrainian law and is a nullity in its entirety. Under New York law, the Tribunal <u>must</u> give conclusive effect to the Ukrainian decisions. However, even if the Tribunal were to decide that it is not bound by the Ukrainian decisions, it should, at a minimum, accept those orders as strong evidence of Ukrainian law on the relevant issues. The various decisions of the Ukrainian courts further demonstrate that the opinions of Storm's experts on Ukrainian law are correct and, by contrast, that Mr. Rabij has misapprehended Ukrainian law.

**Issues Relating to Relief Claimed in Paragraph E of Telenor Mobile's Proposed Findings and Conclusions/Alternatives to December 22, 2005 Order**

The Tribunal has requested further discussion on whether it has the authority to order Storm to amend the Charter to conform to the Shareholders Agreement, as requested by Telenor Mobile in Paragraph E of its Proposed Findings and Conclusions. As Storm has stated previously, the Tribunal does <u>not</u> have that power. The Kyivstar Charter is governed by Ukrainian law and it does not contain any arbitration provisions. The Ukrainian courts have the exclusive authority to determine the issues relating to the Charter. Because the courts have determined, in the December 22, 2005 Order and thereafter, that the Charter violates Ukrainian law, it cannot be "conformed" to the Shareholders Agreement (especially since the similar provisions in the Shareholders Agreement were effectively invalidated by the same order).

---

[11] Alpren has appealed the rulings of Judge Lynch regarding the anti-suit injunction requested by Telenor Mobile. Among other things, Alpren has pointed out that Judge Lynch lacked subject matter jurisdiction over the proceedings. (See Ex. K, Alpren Appellate Br., at 22-27.) This provides another basis for the Tribunal to stand by its earlier conclusion rather than accepting the preliminary findings of Judge Lynch in a separate matter and on a different issue.

- 10 -                                                                March 14, 2007

Storm remains willing to discuss whether there are any alternatives to accomplishing the objectives articulated in the December 22, 2005 Order, but it must receive Telenor Mobile's commitment that it will not misconstrue any proposals made by Storm nor will it divulge confidential settlement discussions (both of which Telenor Mobile has done already in this arbitration). Telenor Mobile's lack of good faith with respect to those earlier discussions has impeded any further progress. Telenor Mobile must re-establish its good faith before Storm will agree to additional talks.

Conclusion

Storm regrets that due to the strictures of the Ukrainian injunction, it is unable to fully brief the issues put forward by the Tribunal. Nevertheless, even limited to the arguments previously articulated by the parties, Storm believes that the facts and law already put forward in this case overwhelmingly show that Telenor Mobile's claims in this arbitration should be denied.

Respectfully,

*Pieter Van Tol*

Pieter Van Tol

Enc.

cc:    Robert L. Sills, Esq.