# EXHIBIT A

**IN THE MATTER OF AN ARBITRATION UNDER
THE UNCITRAL ARBITRATION RULES BETWEEN:**


**TELENOR MOBILE COMMUNICATIONS AS,**
Claimant,

-and-

**STORM LLC,**
Respondent


## FINAL AWARD

We, the undersigned Arbitrators, having been designated in accordance with the January 30, 2004 arbitration agreement between the above-named Parties, having been duly sworn, and having heard the allegations, arguments and proofs of the Parties regarding (1) Respondent's Motion to Dismiss on the ground that the Tribunal assertedly does not have jurisdiction to hear this Arbitration and (2) the merits of the claims and defenses of the Parties, do hereby reaffirm their earlier Partial Final Award that they do have jurisdiction to hear this Arbitration and make the following Final Award:[1]

## A.    THE PARTIES AND THEIR CONFLICTING CLAIMS.

This Arbitration involves significant and highly contentious disputes between the majority and minority shareholders of CJSC "Kyivstar G.S.M." ("Kyivstar"), a Ukrainian closed joint stock company that is the largest mobile telecommunications company in Ukraine, with over 18 million subscribers and

---

[1] Although some portions of this Final Award repeat earlier findings and conclusions of the Partial Final Award, they are restated here to avoid excessive cross-referencing.

TEL000099

annual revenues exceeding one billion United States dollars.   At the heart of the Parties' disputes are differences over the validity and implementation of a Shareholders Agreement between the Parties, dated January 30, 2004 (the "2004 Shareholders Agreement"), which sets forth their rights and obligations regarding the governance and operation of Kyivstar.  The Parties' differences have led not only to this Arbitration, but also to related litigation in the courts of Ukraine and the United States.

### 1.    The Parties and Their Affiliates.

Claimant Telenor Mobile Communications AS ("Telenor") is a Norwegian corporation headquartered in Fornebu, Norway.  It is a subsidiary of Telenor ASA, also a Norwegian company, which is the largest provider of telecommunications services in Norway and the provider of such services to over 50 million subscribers in a total of 12 countries.  Claimant owns approximately 56.5 % of the issued and outstanding shares of Kyivstar, with single shares owned by each of four of its wholly-owned subsidiaries.

Respondent Storm LLC ("Storm") is a Ukrainian limited liability company headquartered in Kyiv, Ukraine. Storm owns the remaining approximately 43.5 % of Kyivstar shares.  At the times relevant to this Arbitration, Storm was, in turn, owned 50.1% by Hardlake Limited ("Hardlake"), a Cyprus corporation, and 49.9% by Alpren Limited ("Alpren"), another Cyprus corporation.   Hardlake and Alpren were, themselves, wholly-owned by Altimo Holdings & Investments Limited ("Altimo"), a British Virgin Islands company.  At the top of this ownership pyramid

2

was – and remains -- a large Russian financial-industrial conglomerate known as the Alfa Group Consortium ("Alfa").

### 2.    The Factual Background of the Parties' Disputes.

The course of events that ultimately led to the Parties' disputes in this Arbitration and the related court litigation dates back to 1998, when the ownership of Kyivstar was divided among a somewhat different group of shareholders than today.  At that time, the shareholders were Kyivstar itself, Telenor, Storm (before the Alfa entities were in control), Omega LLC, Sputnik IV L.P. and Sputnik V Holdings Ltd. (the last two together, "Sputnik's Holdings"). The present disputes arose from a series of often complicated negotiations and agreements relating to the transfer of control of Kyivstar from its former owners to its present owners -- Telenor and its subsidiaries, and Storm – and to the execution and implementation of the 2004 Shareholders Agreement governing the relationships among Telenor, Storm and Kyivstar.

The Tribunal includes the following detailed description of this course of dealings -- which is based on the extensive evidentiary record in this Arbitration -- because it supports the Tribunal's conclusion that the Parties engaged  in a lengthy course of bargaining and negotiation that lasted almost six years in order to agree upon their mutual rights and obligations regarding Kyivstar; that they conducted those negotiations in good faith; that the Parties ultimately agreed upon and executed the 2004 Shareholders Agreement; that they also entered into other arrangements along the way that involved a meeting of the minds and resolved various situations that arose; and that the Parties, during this course of

conduct, never challenged the validity of their various agreements and arrangements but, to the contrary, were diligent in complying with all the terms and conditions of their obligations, including the 2004 Shareholders Agreement, until shortly before the initiation of this Arbitration.

        **a.**    **The 1998 Shareholders Agreement and the initial transfer of minority interests.**  On March 26, 1998, the then owners of Kyivstar entered into a Shareholders Agreement concerning the corporate governance and management of the company (the "1998 Shareholders Agreement").  Among other things, that Agreement gave Sputnik's Holdings an option to put its shares to Telenor.  Shortly after receiving notice of the exercise of this option, Telenor approached Storm and expressed a desire to negotiate a new shareholders agreement that would reflect Telenor's acquisition of the Sputnik holdings and the change in the ownership interest that would result.  On January 17, 2003, the Parties met, and Storm told Telenor that it was willing to terminate the 1998 Shareholders Agreement and enter into a new shareholders agreement on the assumption that Storm would succeed in its effort to purchase Omega's minority shares

      In February 2002, Alfa entered the picture. Its representatives met with Telenor and expressed an interest in becoming a shareholder in Kyivstar through Storm.  Alfa told Telenor that it accepted that Telenor would be the dominant shareholder in Kyivstar.  In March 2002, Alfa reached an agreement with Storm's Ukrainian shareholders in which Alfa was allowed to purchase a majority stake in Storm.

4

Thereafter, in March 2002, Storm initiated steps to acquire Omega's shares in Kyivstar, a transaction which, when completed, would render Storm the holder of 40% or more of the shares in Kyivstar. Under Ukrainian law, holders of not less than 60% of the voting shares are required to be present for there to be a quorum at a general meeting of shareholders. Thus, the holder of 40% or more of an ownership interest is able to block certain decisions.

**b.    The 2002 Letter Agreement.**  On March 20, 2002, representatives of Telenor traveled to Moscow and met with Alfa to begin discussions about a new agreement to replace the 1998 Shareholders Agreement and to define the parties' interests in Kyivstar going forward. The negotiations continued during the spring of 2002 with the Chairman of the Supervisory Board of Alfa heading the Alfa team.

On April 29, 2002, the Alfa and Telenor representatives entered into a Letter Agreement that set out the expected arrangement between Telenor and Storm once they became the sole shareholders of Kyivstar. In Annex B to the Letter Agreement, the parties agreed that Storm would own 43.48 percent of Kyivstar and Telenor would own 56.5 percent. In the Letter Agreement, the parties also agreed to enter into a new Shareholders Agreement which would include specific provisions set forth in a term sheet attached as Annex A.

According to the term sheet, the new Shareholders Agreement would provide for a nine-member board of directors with Telenor having the right to appoint five of the directors and Alfa and Storm having the right jointly to appoint four directors. The term sheet also provided that the new Shareholders

Agreement would include the following provisions: a non-competition provision prohibiting any shareholder from owning any interest in a competing telecommunications operator in Ukraine; a choice of law provision that the Shareholders Agreement would be governed by the laws of the State of New York; and an arbitration provision that the Shareholders Agreement would contain a clause providing for UNCITRAL arbitration.

The First Deputy Chairman of the Executive Board of Storm, Andrei Kosogov, signed the Letter Agreement for Storm.[2] The evidence established that Telenor relied on the representations of Alfa and Storm that Kosogov was authorized to sign the Letter Agreement on their behalf. Storm has never asserted that Telenor's reliance was misplaced, nor has Storm ever argued that Kosogov did not have the authority to bind Alfa and Storm to the terms of the Letter Agreement.

c.    **The 2002 Share Purchase, Voting and Shareholders Agreements.** Following the execution of the April 29, 2002 Letter Agreement, it developed that Telenor's acquisition of the Sputnik holdings was proceeding as planned, but that Storm's effort to purchase the Omega shares would take longer. On June 28, 2002, Storm wrote a letter to Telenor expressing concern that, if it failed to purchase Omega's shares in Kyivstar, Storm would have less than a 40% interest in Kyivstar. Notwithstanding Storm's concern, Telenor proceeded on July 9, 2002 to purchase all of Sputnik's shares, which amounted to 16.5% of the outstanding shares of Kyivstar.

---

[2] Kosogov is currently Chairman of the Board of Directors of Alfa Asset Management and of Altimo

On July 16, 2002, Kosogov wrote Telenor asserting that Telenor's acquisition of the Sputnik holdings prior to Storm's acquisition of the Omega shares dropped Storm's ownership interest below 40% and violated the Letter Agreement.  Storm demanded that Telenor sell Alfa or an Alfa affiliate a portion of the Kyivstar shares purchased from Sputnik.   To allay Storm's concern about having less than a 40% interest in Kyivstar, Telenor agreed to enter into a Share Purchase Agreement with Storm under which Telenor would sell Storm 7.7% of the shares of Kyivstar, which would keep Storm's ownership interest over 40%. The Share Purchase Agreement went on to provide that Storm, after completing its acquisition of Omega's shares, would sell back to Telenor whatever shares were necessary to achieve the shareholder structure to which the parties had originally agreed: i.e., Telenor at 56.5% and Storm at 43.5%.

While the Share Purchase Agreement would take care of Storm's concerns pending its acquisition of the Omega shares, it left Omega as a Kyivstar holder and prevented the Parties from entering into the new Shareholders Agreement contemplated by the April 29, 2002 Letter Agreement. Accordingly, as an interim "bridge", the Parties negotiated a Voting Agreement which dealt with the governance of Kyivstar in the meantime and which provided for the execution of a new Shareholders Agreement immediately upon Storm's acquisition of Omega's shares.  A form of the new Shareholders Agreement was negotiated between July 26 and August 15, 2002 -- along with the Share Purchase Agreement and the Voting Agreement -- and attached to the latter.  On August 30, 2002, the parties exchanged final copies of the agreements, including

the form of Shareholders Agreement.  On September 2, 2002, the parties exchanged signature pages for the Share Purchase Agreement and the Voting Agreement.

          **d.**     **The 2002 authorization for the signature of the Shareholders Agreement.**  In accordance with the Share Purchase Agreement, Telenor sold a 7.7% interest in Kyivstar to Storm on October 29, 2002.  That same day, Storm presented certificates to Telenor (the "October 29, 2002 Certificates") stating that Valeriy Nilov, Storm's General Director, was authorized to sign all the above-described documents on behalf of Storm.  These included a "Certificate of Senior Officer of Purchaser", accompanied by copies of resolutions of Storm's Participants authorizing Storm to enter into the Share Purchase Agreement, the Voting Agreement and the form of new Shareholders Agreement. The document was signed by Storm's General Director, Valeriy Nilov, and by Storm's Chairman, Yuri Tumanov.

        As reflected by the Nilov and Tumanov Certificate, Storm's Participants authorized Nilov's execution of the Voting Agreement and the Share Purchase and Shareholders Agreements on two occasions:  First, in a written polling of Participants that occurred on August 30, 2002, and second, in a unanimous live vote that took place at a meeting of Participants held on October 7, 2002.  The precise wording of those authorizations deserves attention, because Storm provided that wording to Telenor in a "Notice Regarding Resolutions Adopted by Written Polling."  Storm attached that Notice to the October 29, 2002 Certificates as a "true, complete and correct English translation of a unanimous written

consent of the participants of [Storm] approving the Share Purchase Agreement, the other Transaction Agreements, and the transactions contemplated thereby, dated August 30, 2002."

The resolutions adopted by the written polling on August 30, 2002 state that Storm's Participants unanimously approved several resolutions relating to the Shareholders Agreement and gave Nilov broad authority to act on Storm's behalf.  The Notice specifically informed Telenor that Nilov had the authority to execute, on Storm's behalf, the Voting Agreement.  See Section 1 (c).

Importantly, the Notice further informed Telenor that Nilov had the authority to execute, on behalf of the Company, "the Shareholders Agreement to be entered into between Telenor and the Company regarding voting and disposition of shares in Kyivstar, on the terms and conditions set forth in the draft Shareholders Agreement."  See Section 1(h).  Finally, the Notice informed Telenor that Nilov was authorized "to take or cause to be taken any and all other actions as are required or desirable in connection with this Resolution and the above-referenced agreements."  See Section _ (?) _.

In addition to the August 30, 2002 polling of Participants, Storm held an actual meeting of Participants on October 7, 2002, at which the resolutions adopted on August 30, 2002 were specifically approved by live vote.  Further, at the same time that Storm provided Telenor with the October 29, 2002 Certificates, Storm also attached to it a document entitled "Minutes No. 19 of the Extraordinary General Meeting of Participants" dated October 7, 2002, which

9

reported that all of the "aforementioned resolutions have been approved by a unanimous vote of the participants of the Company."

      **e.**    **The 2004 Shareholders Agreement.** As it turned out, it took over a year from the foregoing events for Storm finally to acquire the Omega shares. Storm's purchase of the Omega shares occurred on December 13, 2003. That event triggered Section 2.05 of the 2002 Voting Agreement requiring the parties to terminate the 1998 Shareholders Agreement within three business days and to enter into the new Shareholders Agreement attached to the Voting Agreement. Because more time was needed to liquidate Omega, the parties entered into a letter of agreement on December 17, 2003, which extended the deadline to January 31, 2004.

On December 11, 2003, Storm asked Telenor to accept three changes in the form of Shareholders Agreement, each of which favored Storm. Initially – on December 16, 2003 – Telenor rejected all of Storm's proposed amendments. On December 18, 2003, Messrs Tumanov and Kosogov intervened on Storm's behalf and persuaded Telenor to change its position. On January 20, 2004, Telenor agreed to negotiate new language dealing with material breach. See Section 11.02 "Termination for Material Breach," of the 2004 Shareholders Agreement. As part of that new language, Storm proposed – on January 26, 2004 -- that the material breach figure be lowered from $50 million to $5 million. Telenor refused. On January 28, 2004, Alexey Khoudyakov, an official within the Alfa Group negotiating for Storm, came back again, this time suggesting that the material breach figure be reduced to US $30 million. Telenor held firm.

According to Khoudyakov: "In the end, Telenor Mobile won on this point, and the final Shareholders Agreement kept the US $50 million amount."

Although Telenor prevailed and kept the material breach figure at US $50 million, Storm did succeed in amending the 2002 Draft Shareholders Agreement with the compromise language that now appears as Section 11.02 -- "Termination for Material Breach" – of the 2004 Shareholders Agreement. There is no such provision in the 2002 Draft Shareholders Agreement. This amendment – made at Storm's request and in Storm's favor – constitutes the only substantive change in the text of the 2002 draft as compared to the final 2004 Shareholders Agreement.

On January 28, 2004, Telenor circulated a final draft of the Shareholders Agreement to Telenor. The following day, January 29, 2004, Alexey Khudyakov sent an email to Telenor stating: "Storm reviewed the language of the New Shareholders Agreement that you distributed yesterday and agreed to it. We are ready to sign it tomorrow." Khudyakov is currently Vice President of Altimo, which is the Alfa subsidiary holding control of Storm through Hardlake and Alpren.

On January 30, 2004, the Parties executed the new Shareholders Agreement. Nilov signed for Storm; Sigmund Ekhougen signed for Telenor; and Igor Lytovchenko signed for Kyivstar. In connection with the execution, Storm and Telenor exchanged customary certificates that each signatory possessed full authority to sign on its behalf. In Storm's case, it delivered to Telenor two identical documents entitled "Certificates of Incumbency and Authority", dated

11

January 30, 2004. One was signed by Andrei Kosogov; the other by Yuri

Tumanov. Tumanov's Certificate recited that he was the Chairman of Storm LLC

and certified that Nilov:

> (i) is the duly elected, qualified and acting General Director of Storm; and

> (ii) is duly authorized to sign, on behalf of Storm, individually, (A) all
> instruments as necessary to terminate the Shareholders Agreement dated
> March 26, 1998 … and, (B) the Shareholders Agreement dated January
> 30, 2004 between and among Telenor, Storm and Kyivstar.

In the course of the arbitration, Andrei Kosogov submitted an affidavit in

which he confirmed that he had signed a January 30, 2004 Certificate of

Incumbency and Authority. He did so, he said, "because this was a fairly routine

business practice in transactional matters," and because he "was not aware that

a special resolution of Storm's participants was necessary to authorize Mr. Nilov

to enter into the Shareholders Agreement." Mr. Kosogov stated further: "I signed

the Certificate by relying on my knowledge of provisions of Ukrainian law giving

the General Director of a Ukrainian company general authority to act on behalf of

the company, including entering into agreements on behalf of the company."

Kosogov Affidavit, Paragraphs 5-6.

> **f.      The Arbitration and Choice of Law Provisions of the**
> **2004 Shareholders Agreement.** As signed, the text of the January 30, 2004

Shareholders Agreement differed in only one respect from the form of

Shareholders Agreement that had been attached as Exhibit B – "Draft of New

Shareholders Agreement" -- to the Voting Agreement and approved in 2002;

namely, the inclusion of Section 11.02, a provision requested by Storm,

negotiated, compromised and ultimately entitled "Termination for Material

Breach." Otherwise, the 2004 Agreement remained identical in all respects to the 2002 form Agreement.

One of the key provisions that remained unchanged was Section 12.01 of the January 30, 2004 Shareholders Agreement, entitled Arbitration: Consent to Jurisdiction, which provides in pertinent part:

> (a)    Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a Panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules then in force (the "UNCITRAL Rules") in accordance with the following terms and conditions:
>
> > (i)    In the event of any conflict between the UNCITRAL Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail.
> >
> > (ii)    The place of the arbitration shall be New York, New York, United States of America.
> >
> > *    *    *
> >
> > (v)    The arbitrators shall have the power to grant any remedy or relief that they deem just and equitable and that is in accordance with the terms of the Agreement, including specific performance, and including but not limited to injunctive relief, whether interim or final, and any such relief ...ordered by the arbitrators may be specifically enforced by any court of competent jurisdiction.[3]

Another important provision that remained unchanged is Section 13.06, entitled Governing Law, which states in its entirety:

---

[3] Interestingly, of the changes to the Term and Termination provisions in Article XI of the Shareholders Agreement -- which was the only altered Article -- one was to include the following arbitration clause in Section 11.02(c), which provides in pertinent part: "If a Shareholder disputes whether a Material Breach has occurred or whether it has been cured, such Shareholder may commence an arbitration proceeding in accordance with Section 12.01." Thus, the modified Article XI in 2004 reaffirmed, at Storm's instigation, the Parties' on-going commitment to arbitration pursuant to Section 12.01.

"This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction.

g.    **The Parties' further actions leading up to this**

**Arbitration.** In March 2004, Telenor exercised its rights under the Share

Purchase Agreement to buy back the Kyivstar shares it had previously sold to

Storm, thereby ensuring that Telenor would have 56.5 % of Kyivstar's shares and

Storm would have 43.5%.

Telenor and Storm performed their respective obligations under the 2004

Shareholders Agreement for over a year.  At the annual meeting of Kyivstar

shareholders on April 27, 2004, for example, the two Parties voted in favor of an

amended Kyivstar Charter that brought it into compliance with the Shareholders

Agreement.  This Charter was duly registered with the appropriate Ukrainian

authorities.

During 2005, however, increasing friction developed between the Parties.

In March 2005, Storm and its designated representatives stopped attending

Kyivstar shareholder and general board meetings.  Thereafter, Storm affiliates in

the Alfa consortium commenced several lawsuits in the Ukrainian courts

challenging various aspects of its relationship with Telenor.   Storm's affiliates

also purchased interests in excess of 5% in two telecommunications operators in

Ukraine.

3.    <u>**Summary of Telenor Claims and Requested Relief**</u>

On February 7, 2006, Telenor commenced this Arbitration pursuant to

Section 12.01 of the Shareholders Agreement, and the UNCITRAL Arbitration

Rules, by filing a Notice of Arbitration and Statement of Claim against Storm. On

April 25, Telenor filed an Amended Notice of Arbitration and Statement of Claim.

As amended, Telenor's Notice and Statement of Claim seek a declaration that

Storm is in breach of the Shareholders Agreement in three principal respects:

> (a) by Storm's failure to attend annual and extraordinary shareholder meetings of Kyivstar, its failure to appoint candidates for election to the Kyivstar board of directors, and the failure of the Storm directors to attend board meetings, in breach of Section 2.05 and other provisions of the Shareholders Agreement;

> (b) by the ownership by Storm affiliates of an interest in excess of 5% in two telecommunications operators in Ukraine, in violation of the non-competition provision in Section 6.02 of the Agreement; and

> (c) by the initiation of litigation in Ukraine aimed at invalidating the rights and obligations of the Parties under the Shareholders Agreement, in breach of the arbitration provisions of Section 12.01.

In addition to a declaration that Storm is in breach of the Shareholders

Agreement in the foregoing respects, Telenor seeks an award requiring Storm to

comply in the future with the Agreement's requirements relating to shareholder

and board meetings, granting Telenor appropriate relief against the breaches of

the non-competition provision of the Agreement, enjoining court actions in

violation of the Agreement's arbitration provisions, and requiring Storm to take

steps to amend the Charter to conform to the Shareholders Agreement and a

December 22, 2005 Order of the High Commercial Court of Ukraine (the

"December 22 Order"). Finally, Telenor's Amended Statement of Claim seeks an

award of damages for Storm's breaches of the Agreement, plus attorney's fees

and costs.

4.    **Summary of Storm Defense and Requested Relief.**

On May 30, 2006, Storm filed its Statement of Defense to Telenor's
Amended Notice and Statement of Claim.  In summary, Storm takes issue with
each of Telenor's claims, alleging that:

(a) Storm was justified in bringing actions in the Ukrainian courts
because the Kyivstar Charter was violative of Ukrainian law, as confirmed
by the December 22, 2005 Order of the High Commercial Court of
Ukraine;

(b) Storm and its nominated directors were, accordingly, justified in
not attending Kyivstar shareholder and board meetings;

(c) Storm is not required to accept amendments to the Kyivstar
Charter proposed by Telenor because they are governed by Ukrainian law
and must be heard by the Ukrainian courts;

(d) Storm did not breach the arbitration provisions of the
Shareholders Agreement because Telenor waived those provisions by
failing to raise them in the Ukrainian court proceedings; and

(e) Storm and its affiliates did not violate the non-competition
provision of the Shareholders Agreement because the provision is
overbroad and unenforceable.

Storm's Defense prays for a declaration that Storm's nominees to the
Kyivstar board were justified in not attending meetings; that Storm was justified in
not attending shareholder meetings; that Storm has not violated the non-
competition provision of the Shareholders Agreement; and that Telenor has
waived and is estopped from seeking relief under the arbitration provision. Storm
also prays for its fees and costs in connection with this Arbitration, plus interest.

Storm's Defense alleges "as an alternative ground' that the Tribunal
should "dismiss Telenor Mobile's claim and even the arbitration in its entirety"
because the Kyiv Commercial Court had declared on April 25, 2006, that "the

16

entire Shareholders Agreement is invalid because it was entered into without the requisite authority and fails to comply with the registration and execution requirements of Ukrainian law." (p. 3.)   Storm further alleges that, "An appellate court recently upheld the April 25 Order." (p. 6.)

Storm's May 30, 2006 Statement of Defense was the first notice given to the Tribunal that Storm and one of its affiliates had been in litigation in Ukraine where the affiliate challenged the validity of the Shareholders Agreement and its arbitration provisions.  The Tribunal learned shortly thereafter that Telenor also had no notice of the Ukrainian proceedings until after the order of the Ukrainian appellate court, because Telenor had not been made a party to the proceedings that resulted in the April 25, 2006 Order, or its affirmance.

**B.    THE COURSE OF THE ARBITRATION AND THE RELATED COURT PROCEEDINGS THROUGH THE PARTIAL FINAL AWARD.**

**1.    The Arbitration and Court Proceedings Leading Up to Storm's Motion to Dismiss.**

Because the April-May 2006 Ukrainian court proceedings came as a surprise both to the Tribunal and to Telenor, and because Storm relied upon these proceedings to challenge this Tribunal's jurisdiction, it is appropriate to review what had occurred in this Arbitration prior to the filing of Storm's Statement of Defense and its subsequent Motion to Dismiss the Arbitration.

As previously noted, Telenor initiated this Arbitration with the filing of its original Notice of Arbitration and Statement of Claim on February 7, 2006. Promptly thereafter, Telenor selected William R. Jentes as its arbitrator to serve on the Tribunal, and Storm selected Gregory B. Craig.  On March 31, 2006, the

two party-appointed arbitrators selected Kenneth R. Feinberg to serve as Chair. All of the arbitrators agreed that they would serve as neutral members of the Tribunal and so notified the Parties.

The Tribunal's first order of business was to ask the Parties to supply names of all affiliates, parents and subsidiaries related to the parties, along with the names of all officers and executives who were likely to be mentioned in the proceeding, to be certain there would be no disabling relationships with the Tribunal members. Both Parties complied with that request, the Tribunal disclosed no conflicts, and its members were accepted.

On April 14, 2006, the Tribunal held its first pre-hearing conference with the Parties to consider their views on a schedule for the Arbitration. During the conference, Storm notified the Tribunal that it intended to file a motion to dismiss asserting that the 2004 Shareholders Agreement was invalid, and that the Tribunal accordingly lacked jurisdiction to decide Telenor's claim. No mention was made by Storm that one of its affiliates either had initiated, or was about to initiate, court proceedings in Ukraine. Instead, the Parties agreed to a schedule for briefing and hearing Storm's proposed motion, which was approved by the Tribunal..

Storm filed its Motion to Dismiss on June 7, 2006, a week after filing its Statement of Defense on May 30, 2006. Storm's Motion was predicated on the "alternative ground" in its Statement of Defense, contending that the Tribunal had "no authority to decide the merits of Telenor's claim because the Ukrainian courts had ruled, among other things, that the January 30, 2004 Shareholders

18

Agreement was 'null and void in full, including the arbitration clause,'" (quoting Decision of Kyiv Commercial Court, April 25, 2006 (translation, p. 3); aff'd Kyiv Appellate Commercial Court, May 25, 2006 (translation, p. 3)). Storm prayed that the Arbitration be dismissed in its entirety for lack of jurisdiction.

Telenor filed its Opposition to Storm's Motion on June 23, 2006, contending that the Ukrainian litigation was "collusive", having been brought against Storm by one of its own affiliates, Alpren; that Telenor was not notified of, or made a party to, the Ukrainian litigation; and, therefore, that Telenor was not bound by the Ukrainian decisions. Telenor further contended that, pursuant to the choice of law provision in the Shareholders Agreement, New York law, not Ukrainian law, governed the issue of whether the Shareholders Agreement was valid.

### 2.    The Proceedings on Storm's Motion to Dismiss.

On June 29, 2006, the Tribunal held the first of three hearings on Storm's Motion to Dismiss. The first hearing consisted largely of oral argument by the Parties' counsel concerning the two Ukrainian decisions of April 25 and May 25, 2006 (the "Alpren litigation"), and the background of the Voting Agreement of September 2, 2002, the attached form of Shareholders Agreement and the 2004 Shareholders Agreement. At the end of the argument, the Tribunal concluded the Parties needed to make further evidentiary submissions regarding both the background of the 2004 Shareholders Agreement and what evidence and arguments had been presented to the Ukrainian courts concerning its validity, including the arbitration provision. Accordingly, the Tribunal ordered such

19

submissions and scheduled a second hearing for August 14, 2006.  Following the

August 14 hearing, the Tribunal held a third hearing on September 5, 2006, in

response to Storm's concerns about the unavailability of certain of its witnesses

for the August 14 hearing.

In the course of the three hearings, the Tribunal received extensive

evidence regarding the background, negotiation, approval and execution of the

2004 Shareholders Agreement and its predecessors -- from which the recitation

in Section A.2 is derived -- and about what of this evidence, if any, was submitted

to the Ukrainian courts.  The evidence presented to the Tribunal consisted of live

testimony and declarations from Telenor and Storm officials and counsel,

documents relating to the negotiation, approval and signing of the relevant

corporate documents, including emails and letters exchanged between the

parties and their representatives, and the official court records from the Ukrainian

courts and English translations of those records. The evidence before this

Tribunal also included affidavits and supporting documents submitted by

Ukrainian legal experts.[4]

With regard to the proceedings in the Ukrainian courts, the evidence

submitted to this Tribunal established that on April 14, 2006, Alpren brought suit

against Storm in the Kyiv Commercial Court, claiming among other things that

Storm's 2004 Shareholders Agreement with Telenor had not been executed by

---

[4] Because the evidence presented during the three hearings also bears on the merits of the
claims in this Arbitration, it is further discussed in the later Sections of this Final Award dealing
with those claims.

an authorized representative and was accordingly invalid.[5]   As previously noted, Alpren and Storm were under the direct or indirect control of Altimo, and the ultimate control of Alfa.  It was undisputed that Telenor received no notice of this proceeding or of the subsequent appeal until after the Commercial Appellate Court later rendered its decision.

On April 21, 2006, the Kyiv Commercial Court held a 20-minute hearing at which Storm submitted no statement of defense.  Its representative did advise the Court of the arbitration clause and of the existence of this Arbitration, but made no argument that the arbitration clause commits "any and all disputes" to the arbitral tribunal for resolution and that the governing UNCITRAL Rules provide for the severability of the arbitration clause from the Shareholders Agreement.  Storm's representative also made no attempt to present to the Ukrainian court the extensive evidence received by this Tribunal regarding the background, approval and affirmation of the 2004 Shareholders Agreement, including its arbitration and choice of law provisions.

On April 25, 2006, the Kyiv Commercial Court rendered its decision in which it determined that Storm's participating shareholders had not properly approved the 2004 Shareholders Agreement; that Storm's General Director Nilov had "acted unlawfully and in excess of [his] powers"; and that the Shareholders Agreement was "null and void in full, including the arbitration clause, from the time of their execution." ( p. 3.)

The record before this Tribunal disclosed that Storm filed an appeal from the April 25 Order, in which it repeated that the dispute was currently in

---

arbitration in New York and argued that it was not "examinable" by the Kyiv Commercial Court. However, Storm once more presented none of the extensive evidence submitted to this Tribunal concerning the approval of the 2004 Shareholder Agreement, nor regarding the certification by Storm officials on repeated occasions of the authority of Storm's General Director and others to sign the Agreement on its behalf. Storm also made no argument regarding the severability of the arbitration clause, nor did it supply the evidence heard by this Tribunal of Storm's clear intent to submit any and all disputes with Telenor to arbitration.

On May 25, 2006, the Appellate Commercial Court held a 15-minute hearing, at which Alpren was represented by two lawyers from a Ukrainian law firm, while Storm was represented by an inside official who was not a lawyer and who proferred no factual submissions. Telenor was not present or notified of the hearing. Immediately following the hearing, the court issued a decision affirming the lower court's ruling that Storm's General Director had "acted unlawfully" and "in excess of his authority" in signing the January 30, 2004 Shareholders Agreement, and that the Agreement, including its arbitration provision, was "null and void" from the outset. (pp. 2-3.) The Court further ruled that the lower court had jurisdiction to proceed because any arbitration agreement was not between Alpren and Storm.

### 3.    The Tribunal's Partial Final Award Regarding Jurisdiction.

Based on the record before it, this Tribunal concluded that Storm's Motion to Dismiss presented two issues: <u>First</u>, did the Tribunal have jurisdiction to

decide the question of whether it has jurisdiction to hear this Arbitration, or is that a decision for a court?  Second, assuming the Tribunal has jurisdiction to decide this first issue, did it, in fact, have authority to proceed to hear the issues raised by Claimant's Amended Notice of Arbitration and Statement of Claim?  For the reasons spelled out more fully in its Partial Final Award Regarding Jurisdiction, issued on October 22, 2006 and re-issued in corrected form on December 22, 2006 ("Partial Award"), the Tribunal unanimously answered both questions in the affirmative.

As to the first question, the Tribunal's Partial Award pointed out that Storm, itself, had repeatedly conceded that the Tribunal had authority to decide the issue of its own jurisdiction.  For example, Storm counsel stated at the June 29, 2006 Hearing:

> Now, [Claimant] spend[s] a lot of time saying that this panel has the jurisdiction to determine whether it has jurisdiction, or has the power to determine whether it has jurisdiction.  Storm does not disagree with that proposition . . . . We believe that you do have the power to decide whether you have jurisdiction.  That's why we made the motion to you and are here today. *Hearing* on June 29, 2006; Tr. at p. 23, 13-23.

The Partial Award underscored that Storm's concession is consistent with the applicable case law, citing *Shaw Group, Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 123 (2d Cir. 2003).   That case stands for the proposition that where, as here, the question of jurisdiction to arbitrate is delegated in clear and unmistakable language to the Tribunal, it is the Tribunal – not a court – that has the authority to decide its jurisdiction to proceed.  In this matter, Section 12.01 of the Shareholders Agreement plainly states that "any and all disputes and

controversies arising under, relating to or in connection with this Agreement shall

be settled by arbitration." Moreover, Article 21 of the UNCITRAL Rules, which

Section 12.01 expressly adopts, is equally clear that:

    1.    The arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement.

    2.    The arbitral tribunal shall have the power to determine the existence or the validity of the contract of which an arbitration clause forms a part. For the purposes of Article 21, an arbitration clause which forms part of a contract and which provides for arbitration under these Rules shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause

The Tribunal, having concluded that it had jurisdiction to decide its own

jurisdiction, next unanimously concluded that it did, in fact, have jurisdiction to

hear the merits of this Arbitration. It reached this conclusion notwithstanding the

decisions of the Ukrainian courts declaring the 2004 Shareholders Agreement,

including the arbitration clause, to be "null and void". The Partial Award

explained that the record showed that the Ukrainian courts had never adequately

addressed the severability of the arbitration clause from the rest of the

Shareholders Agreement, or the separate validity of the arbitration clause.

Indeed, those courts never referenced Article 21 of the UNCITRAL Rules, which

expressly provides for the severability of the arbitration clause and further

provides that a decision that the underlying Shareholders Agreement is invalid

"shall not entail ipso jure the invalidity of the arbitration clause". The Partial Award stressed that the Tribunal had developed a full record on these issues. Based on the extensive evidence before it, the Partial Award found that Storm and Telenor had a clear intent to have their disputes resolved through arbitration; that Nilov confirmed that intention by executing agreements that contained a broad arbitration clause and that incorporated the UNCITRAL Rules; and that none of the reasons assigned by the Ukrainian courts for invalidating the Shareholders Agreement applied to the arbitration clause.  In fact, there is nothing in those decisions suggesting that the General Director of a Ukrainian company could not enter into a binding agreement to arbitrate.

The Tribunal made clear in its Partial Award that it was not ignoring the decisions of the Ukrainian courts.  Nor was it impugning the integrity of those courts or their decisions.  To the contrary, the Tribunal found no evidence of any impropriety or violations of any Ukrainian procedures.  Instead, the Tribunal rested the conclusions in its Partial Award on the fact that the Ukraine courts had lacked the full record presented to the Tribunal on the issues of arbitrability and the validity of the arbitration clause.  Unlike the Ukrainian court proceedings, both the Claimant and Respondent had been afforded a full and complete opportunity to present their evidence and arguments on those issues.  Furthermore, Claimant and Respondent had expressly stated that there was no further evidence or legal argument they wished to present.

The Partial Award observed that it was understandable that the Ukrainian courts never gave meaningful consideration to whether the validity of the

25

arbitration clause might be severable from the Shareholders Agreement, since neither Alpren nor Storm raised those issues with the courts, and Telenor had no ability to do so because it was never notified of, or made a party to, the Ukrainian proceedings. In some respects, the Tribunal felt this failure reinforced the Parties' intention that those issues were for this Arbitration.

In the latter regard, the Tribunal found it significant that this Arbitration was initiated in February 2006, two months before Alpren commenced its Ukrainian litigation. The Tribunal was fully constituted by the end of March with Storm's concurrence, and held its first pre-hearing conference where Storm gave no indication that its affiliate intended to proceed before the Ukrainian courts. Instead, Storm agreed to a schedule for filing its Motion to Dismiss and made no attempt to seek a court stay of the Arbitration. Instead, Storm was steadfast in its effort to secure a ruling on its Motion from this Tribunal.

Finally, the Tribunal pointed out that its Partial Award was not deciding whether the Shareholders Agreement, as opposed to the arbitration clause, is valid or not. That decision, the Tribunal stressed, must await the further arbitration hearing then scheduled in New York City for December 7 and 8, 2006, when Storm would have an opportunity to present whatever additional evidence it wished on the issue.

In sum, based on the record before it, the Tribunal's Partial Award: (a) denied Storm's Motion to Dismiss, (b) concluded the Tribunal should proceed to final hearing on the claims raised by Claimant's Amended Notice of Arbitration and Statement of Claim, and (c) denied Storm's then pending request for a

continuance of the hearing and ruled that it should go forward as scheduled on December 7 and 8, 2006 in New York City.

**C.    THE COURSE OF THE ARBITRATION AND THE RELATED COURT PROCEEDINGS AFTER THE PARTIAL FINAL AWARD.**

### 1.    The Subsequent Ukrainian Court Decisions.

On October 26, 2006, four days after the Partial Award was first issued on October 22,  Alpern returned to the Kyiv Appellate Commercial Court with an application to "clarify" that Court's May 25, 2006 Order.  The application was an effort to have the Court  deal, after the fact, with several of the critical deficiencies in the May 25 ruling on the arbitration clause that were identified in the Partial Award.  Once again, Alpern gave no notice of its application to Telenor and made no effort to supply the Court with the record before this Tribunal.  Nor did Alpern or Storm present any of the evidence before this Tribunal that had led to its Partial Final Award.

On November 8, 2006, the appellate court issued a Ruling that reiterated its earlier position that the Shareholders Agreement was void *ab initio*, and that this included the arbitration clause.   However, the Ruling made no attempt to respond to the findings in the Partial Award that led the Tribunal to conclude that the arbitration clause was severable from the Shareholders Agreement and reflected an enforceable agreement between the Parties.  In fact, the Ruling nowhere discussed the severability issue.  Nor did it provide any authority for the proposition that the General Director of a Ukrainian company could not enter into a binding arbitration agreement on the company's behalf.  As for the UNCITRAL

27

Rules, the Court's only mention was its statement that "the referral of a dispute for arbitration by three arbitrators in accordance with the applicable UNCITRAL Rules under such agreement shall be treated as a violation of Clause 4 of Article 216 of the Civil Code of Ukraine."

The November 8 Ruling did seek to cure Alpren's failure to join Telenor as a party by announcing that the May 25, 2006 Order "shall apply and be binding also upon those entities that were not among the parties to the court proceedings". (p.2.) The Court also ruled that, "Should the parties and the arbitrators, appointed in accordance with the Shareholders Agreement, ignore the above circumstances and render an award on the dispute, such acts shall constitute a violation of the court decision,..." *Id.*

Storm notified Telenor and the Tribunal of the November 8, 2006 Ruling on November 15, and sought an indefinite postponement of this Arbitration. The Tribunal denied the postponement and reaffirmed the December 7 and 8 hearing dates. Alpern returned once more to the Ukrainian courts without notice to Telenor, and secured an injunction from the Golosiyiv District Court of the City of Kyiv, dated December 1, 2006, barring Telenor, Storm and Storm's current General Director, Vadim Klymenko, from participating in any way in this Arbitration. Three days later, on December 4, 2006, Storm again sought to halt these proceedings on the basis of the December 1 injunction. The Tribunal denied this latest request and ordered the hearing to proceed as scheduled.

2.    **Proceedings in New York State Court and United States District Court (SDNY)**

In yet another collateral attack on the Tribunal's Partial Award, Storm commenced an action on November 13, 2006 in New York Supreme Court, New York County, seeking to vacate the Tribunal's Award and enjoining the parties from proceeding with the arbitration.  The following day, Telenor removed the action to the United States District Court (SDNY) where the case was assigned to Judge Gerard E. Lynch.

At an emergency hearing convened the following day (November 15, 2006), Judge Lynch inquired of the parties whether either party challenged the federal court's jurisdiction.  Telenor stated that jurisdiction was proper under the New York Convention.  Storm raised no question as to the jurisdiction of the federal court.

Thereafter, the District Court denied Storm's Motion for a Preliminary Injunction on the ground that the Tribunal's October 22, 2006 order was an interlocutory order and not a final award.  On November 22, 2006, Judge Lynch issued an opinion and order denying Storm's motion to vacate the Panel's award and rejecting Storm's request for a preliminary injunction that would halt the arbitration proceeding.

On December 5, 2006, Telenor asked Judge Lynch to issue an anti-suit injunction against Storm, Altimo and Alpren because of efforts by those parties – in Ukraine – to enjoin officials from Kyivstar, Storm and Telenor from participating in the New York arbitration proceedings. Judge Lynch held a hearing on December 7, 2006 to consider Telenor's motion, and on December 11 and 15,

29

2006, Judge Lynch held additional hearings, in part on the question of his own jurisdiction and in part on the merits of Telenor's request for relief.

In a December 15, 2006 Opinion and Order, Judge Lynch concluded that Telenor "will likely succeed in establishing that Storm, Alpren and Altimo are alter egos of one another" and "for purposes of the present dispute, the same entity" and therefore bound by Storm's agreement to submit to the Court's jurisdiction. Judge Lynch further found that Telenor would likely prevail in establishing that Storm's General Director (Nilov), "had at least apparent authority to sign the Shareholders Agreement and to thereby bind Storm to the Agreement's arbitration clause."   The Court went on to observe that, "The foreign litigation here has been conducted in the most vexatious way possible."  Judge Lynch concluded that continued litigation in Ukraine "raises the distinct specter of delay, inconvenience, expense, inconsistency and an unseemly race to judgment" and an "acute" risk of "inconsistent adjudications."   Since, in the Court's view, "It is a fair inference . . . that Storm colluded in the bringing of this [Ukrainian] litigation against itself, it can therefor be enjoined from continuing with such actions."

In sum, the Court granted Telenor's motion for an anti-suit injunction against Storm, Altimo and Alpren and issued an order prohibiting them from "attempting to cause the enforcement of any legal action in Ukraine that would disrupt, delay or hinder in any way the arbitration proceedings between Telenor and Storm in New York."

### 3.    Further Pre-Hearing and Hearing Proceedings.

The arbitration hearing originally scheduled to occur in New York City on December 7-8, 2006 took place ten days later on December 18-19, 2006. Prior to the hearing, Storm took the position that, because of the Ukrainian court's order of December 1, 2006 enjoining the parties from continuing the arbitration proceeding in New York City, Storm was prohibited from participating in the hearing in any way. At the hearing on December 18, Storm asked the Tribunal to reconsider its Partial Award and "to adjourn this hearing until such time as the Ukrainian Court action has run its course."

The Tribunal denied Storm's application and stated it would proceed on June 18 to take further evidence on the merits of Telenor's underlying claim against Storm. In response, counsel for Storm said, "Because of the December 1 ruling [in Ukraine], Storm feels that its hands are tied and that it cannot go forward on the merits." Storm physically withdrew from the hearing room and did not participate in the hearing. At the hearing, Telenor presented two witnesses and submitted one new affidavit into evidence.

The first witness was Jay Moland, a Norwegian citizen, who is Chief Financial Officer at Telenor, Deputy Chairman of the Board of Kyivstar and a member of that board since 1998. Among other things, Moland testified about the failure of Storm's members of the Kyivstar Board of Directors to attend board meetings beginning on March 18, 2005 and continuing to the present. He described the damage caused to Kyivstar that resulted from Storm's boycott, and testified that Storm – up until the commencement of the arbitration – had never

31

explained their Board members' absence by claiming that the 2004

Shareholder's Agreement was invalid.

The second witness was Fredrik Lykke, in house counsel for Telenor from

1999 to 2006. Lykke described the drafting and negotiation of the 2002 form of

Shareholders Agreement, the fact that there was no objection to identifying the

law of the State of New York in the choice of law provision, and the importance to

Telenor of having a non-competition provision included in the Agreement.

In sum,  during the hearings on Storm's Motion to Dismiss and during the

December 2006 hearing, the Tribunal heard or received testimony from eighteen

different witnesses by live appearance and by affidavit.  It received hundreds of

exhibits and thousands of pages of other documentary submissions.  The Parties

also submitted lengthy pleadings, briefs, letters and submissions of legal

authorities in which they analyzed the facts, discussed the relevant law and

argued their positions without interruption or limitation.  Thus, the evidentiary

record and legal authority available to this Tribunal has been voluminous and

comprehensive, dwarfing the limited record made available to the Ukrainian

courts. .

### 4.    Post-evidentiary hearing submissions.

The Tribunal requested post-evidentiary hearing briefs, and Telenor filed

its brief in timely fashion.  Storm declined to submit any post-evidentiary brief and

did not file any additional argumentation either on the law or on the merits. On

February 12, 2007, the Tribunal issued an Interim Order Directing Further

Briefing by February 28, 2007 concerning four issues relating to the governing

law to be applied.  The Parties requested additional time and the deadline was extended to March 14, 2007.  During that time, Storm received permission to participate – with certain limiting conditions – in the final briefing of the case and did so.

      5.     **The Hearing Is Closed.**

On May 8, 2007, the Tribunal issued an Order Closing the Hearing pursuant to Article 29 of the UNCITRAL Arbitration Rules.  In that Order, the Tribunal informed the parties: "Absent special permission from the Tribunal, no further submissions of any type will be delivered to the Tribunal."

**D.**     **THE TRIBUNAL REAFFIRMS ITS JURISDICTION TO HEAR AND RESOLVE THIS ARBITRATION.**

As previously explained, the Tribunal made a two-fold decision in its Partial Award on the basis of the record then before it: the Tribunal first ruled that it had jurisdiction to decide its own jurisdiction to hear this Arbitration, and then it concluded that it did, in fact, have that authority.  Nothing that has since transpired, either in this Arbitration or in the collateral judicial proceedings in Ukraine or the United States, has caused the Tribunal to change its earlier decisions.  Quite the opposite.   The intervening judicial developments and the record developed in connection with the December hearing in this Arbitration have actually reinforced the Tribunal's prior conclusions and now lead it to reaffirm its Partial Award and to proceed to the resolution of the merits of the Parties' claims, defenses and prayers for relief in this Arbitration.

The November 8, 2006 Ruling of the Kyiv Appellate Commercial Court actually convinces the Tribunal that the Court in Kyiv failed to take into account several crucial factors bearing on a determination of the validity of the arbitration clause in Section 12.01 of the Shareholders Agreement. For example, except for passing mention of the UNCITRAL Rules (without even acknowledging their adoption by Ukraine), the Court provided no response to the key provisions of Article 21, which expressly recognize the severability of the arbitration clause from the Shareholders Agreement and that any decision that the latter Agreement is null and void shall not *ipso jure* entail the invalidity of the arbitration clause. Likewise, despite the explicit mention of the point in the Partial Award, the Court cited no law supporting the unusual proposition that the General Director of a Ukrainian company purportedly has no authority to enter into an arbitration agreement.

The force of the November 8, 2006 Ruling is further reduced by the fact that Telenor (again) did not receive notice of the proceeding before the Ruling was rendered, and by the fact that Alpren did not provide the Court with the extensive evidentiary record bearing on the validity of the 2004 Shareholders Agreement that had been compiled and submitted to this Tribunal. One example is the evidence relating to Storm's "changes" to the 2004 Shareholders Agreement, which included the incorporation into Section 11.02 of the arbitration procedures from Section 12.01, a change that reconfirmed Storm's clear intent to have its disputes with Telenor resolved through arbitration. Indeed, as set out fully in Section F *infra*, the totality of the record before and after the Partial Award

supports the Tribunal's conclusion that the 2004 Shareholders Agreement, as well as its arbitration clause, are valid and binding on both Parties, thus removing a key underpinning for the Alpren decisions.

In reaching its decision to proceed with this Arbitration, the Tribunal carefully considered the injunction issued by the Golosiyic District Court of Kyiv on December 1, 2006, which purported to bar Storm and Storm's current General Director from participating in this Arbitration. The Tribunal notes that the injunction does not apply to the Tribunal, and notes further that the Ukrainian injunction was shortly followed by a countervailing order issued by the federal court in New York enjoining the Parties and their affiliates from making any effort to impede this Arbitration. Taking the two orders together, the Tribunal concludes that there is no direct bar to its proceeding, and that continuing with the Arbitration was and is fully consistent with the directives of the UNCITRAL Rules, the Parties' intent as reflected in the Shareholders Agreement, and well-settled international commercial arbitration practice.

In the latter regard, the Tribunal points out that international commercial arbitration is a centerpiece of dispute resolution in today's global economy, where Ukraine and Norway are active participants. For commercial arbitration to succeed in this international environment, an arbitral tribunal must be free to proceed in accordance with the arbitration rules selected by the Parties. Accordingly, this Tribunal firmly believes that the Parties to this proceeding, their affiliates and the countries where they operate are all best served by allowing this Arbitration to complete its course and reach a conclusion in accordance with the

Arbitration Rules prepared by the United Nations Commission on International

Trade, Rules which were expressly selected by the Parties and have been widely

adopted by the international community, including Norway and Ukraine.

## E.  NEW YORK LAW GOVERNS THIS ARBITRATION.

### 1.  Controlling International and New York Law Mandates the Application of the Parties' Choice of Law.

The Tribunal has already underlined that the arbitration clause in Section

12.01 of the Shareholders Agreement specifically adopts the UNCITRAL Rules,

and that by doing so the Parties made those Rules an integral part of their

agreement.  Particularly significant to the issue of what law the Tribunal should

apply to this proceeding is Article 33 of the Rules, which expressly mandates

that, "The arbitral tribunal shall apply the law designated by the parties as

applicable to the substance of the dispute." (emphasis added.)  Here, the Parties

were explicit in Section 13.06 of the Shareholders Agreement that:

> This Agreement shall be governed by, and in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction.  (emphasis added.)[6]

The principle embodied in UNCITRAL Article 33 that the arbitral tribunal

must apply the law chosen by the parties is a basic tenet of international

commercial arbitration.  As one leading treatise states:

> Party autonomy in international contracts has been well recognized and developed in national laws for many years…. In

---

[6] Significantly, the choice of New York provision is one of those that remained unchanged from its first appearance in the 2002 form of Shareholders Agreement through the Agreement's execution in 2004. In fact, the evidence disclosed that Storm never voiced any objection to the application of New York law.

> the context of international commercial arbitration, <u>the right of
> parties to determine the law applicable to the merits of their
> dispute is undisputed.</u>

Julian D. M. Lew, et al.. *Comparative International Commercial Arbitration*, at 413-

14. (citations omitted; emphasis added).

Consistent with accepted international practice, the European Convention

on International Commercial Arbitration, to which Ukraine and Norway are

signatories and which Storm itself noted serves as a governing provision in this

dispute, provides in Article VII that "[t]he parties shall be free to determine, by

agreement, the law to be applied by the arbitrators to the substance of the

dispute."

The decisions of state and federal courts applying New York law are fully in

accord with this established international law and practice. In fact, New York has

reinforced the binding effect of the parties' contractual choice of law by the special

statutory provisions of New York General Obligations Law § 5-1401. That statute

expressly authorizes parties to a contract involving a transaction in excess of

$250,000 to select New York law, even if the contract bears no relation to New

York. The statute states in pertinent part:

> The parties to any contract, agreement or undertaking, contingent or
> otherwise, in consideration of, or relating to any obligation arising out
> of a transaction covering in the aggregate not less than two hundred fifty
> thousand dollars, including a transaction otherwise covered by subsection
> one of section 1-105 of the uniform commercial code, may <u>agree that the law
> of this state shall govern their rights and duties in whole or in part, whether or
> not such contract agreement or undertaking bears a reasonable relation to
> this state.</u>

N.Y. Gen. Oblig. Law. § 5-1401 (McKinney Supp. 1984-85) (emphasis added).

As emphasized in *Bank of America Nat'l Trust and Sav. Ass'n v. Envases Venezolanos,* 740 F. Supp. 260, 264 (S.D.N.Y. 1990), the Section's passage "explicitly eliminated the 'contacts' analysis of choice of law provisions" that once applied in New York. In short, Section 5-1401 was drafted "to leave no doubt that New York substantive law applies to contracts that specify it in their choice of law clauses." *Supply & Building Co. v. Estee Lauder Intern. Inc..* 2000 WL 223838, at *3 n. 6 (S.D.N.Y. Feb. 25,2000), Accordingly, "[i]f the requirements of section 5-1401 are met, a contract's choice of law provision is given binding effect." *Id.* at *2. Here, there is no question that § 5-1401 applies because the Shareholders Agreement arises out of the Parties' investment in Kyivstar, which is valued at over US$3 billion.

In addition to settled caselaw and statutory mandate, sound policy supports giving binding effect to the parties' choice of law. As articulated in the leading case of *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 51 (2d Cir. 2004):

> [W]here the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping. This is especially true of contracts between transnational parties, where applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses within the numerous countries that have signed the New York Convention.

### 2.   Storm's Arguments Against the Parties' Choice of New York Law Find no Support in Established Legal Authority.

In an effort to counter the overwhelming weight of authority directing application of the Parties' choice of New York law, Storm has advanced four arguments, all designed to substitute Ukrainian law. The Tribunal has carefully weighed Storm's arguments and found them contrary to well-settled precedent.

Storm's first argument is that, where the issue is an agent's authority contractually to bind a corporate principal, New York courts supposedly apply a conflicts of law principle that looks to the law of the place of incorporation. This argument is confounded by the express language of Section 13.08 of the Shareholders Agreement that New York law is to govern "without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction." Furthermore, where the agent is clothed with <u>apparent</u> authority, as the Tribunal finds was true of Storm's General Director who signed the Shareholders Agreement (*see* Section F *infra*), the New York courts have repeatedly applied the parties' choice of law.

In *Sphere Drake Ins. Ltd, v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001), for example, the Second Circuit held the parties' choice of New York and New Jersey law in two sets of contracts with a British company governed the latter's claim that it was not bound by an arbitration agreement that its agent had signed while allegedly acting beyond its agency. The Court held that "we consider New York and New Jersey law, as appropriate, for questions relating to contract formation," including the issue of agent authority. *Id.* at 32 n. 3.

In *Motorola Credit Corp, supra*, the Second Circuit confirmed that in *Sphere Drake* it had applied the parties' "choice-of-law clauses to one party's claim that it was not bound by an arbitration agreement that its agent had signed while purportedly acting outside the scope of agency." 388 F. 3d at 50. The Court went on to state:" More generally, a choice-of-law clause in a contract will apply to

disputes about the existence or validity of that contract." *Id.*[7]  *See also, Int'l Minerals & Res.. S.A. v. Pappas.* 96 F.3d 586, 592 (2d Cir. 1996) (applying an English choice-of-law clause to an issue of contract formation); *Seetransport Wiking Trade Schiffarht Gcsellschuft MBH & Co. v. Rep, of Romania.* 123 F. Supp. 2d 174, 184-5 (S.D.N.Y. 2000) (applying parties' choice of New York law to contract between German corporation and the Romanian government, where Romanian government claimed that the official who had executed the contract lacked authority to do so).[8]

Storm's second argument against application of the Parties' choice of New York law is a variant on its first.  Storm contends that whether Storm's General Director could bind it to the Shareholders Agreement is governed by Ukrainian law under another of New York's conflicts of law rules relating to the "internal affairs doctrine."  Here, too, Storm's argument is undercut by the explicit language of Section 13.08 excluding application of such conflicts rules.  Of equal importance, it has long been recognized that, "Different conflicts principles apply … where the rights of third parties external to the corporation are at issue." *First Nat'l City Bank v. Banco para el Comercio Exterior de C*uba, 462 U.S. 611,621 (1983) (emphasis in original).   Telenor is not a shareholder, officer or employee of Storm, and the issue of whether Storm's General Director has authority to enter into a contract with such a third party "external to the corporation" is not one where the "internal affairs

---

[7] *Motorola Credit Corp.* was also an instance, like the present, where the choice-of-law clause included a provision that it was to be applied without regard to the conflicts laws of the chosen jurisdiction. *Id.* at 43.

[8] Against this wealth of authority supporting application of the Parties' choice of New York law, Storm placed its principal reliance on cases pre-dating Section 5-1401 and on a footnote in the unreported decision *in Lehman Bros. Inc. v. Tutelar. CIA Financiera. S.A.*, 1997 WL 403463, at *3 n.4 (S.D.N.Y. May 17, 1997).  However, that case predates the key Second Circuit decisions discussed in the text and relied on a 1959 decision under Connecticut's choice of law rules. *Id.* at*4-5.

40

doctrine" is implicated. *See Roselink Investors L.L.C. v. Shenkman.* <u>386</u> F. Supp.2d 209, 225 (S.D.N.Y. 2004).

Storm's third argument against the Parties' choice of New York law is that such a step would allegedly violate a "fundamental policy" of Ukrainian law. Once again, Storm's argument is met with the undoubted fact that there is no "public policy" exception where the contract is governed by § 5-1401. As stated in *Sun Forest, supra,* 152 F.Supp. 2d at 388, "Section 5-1401 does not provide for any exceptions that would permit a court to decline to enforce a choice-of-law clause if the clause would infringe a fundamental public policy of the conflicting jurisdiction." *See also, Supply & Building Co. supra.* 2000 WL 223838 at *2-3; *Lehman Bros. Comm. Corp. v. Minmetals Int'l.* 179 F. Supp. 2d 118, 137-38 (S.D.N.Y. 2000).

Furthermore, the Tribunal finds no "fundamental" public policy of Ukraine that could support the rejection of New York law. The "public policy exception" is reserved for those foreign laws "that are truly obnoxious." *Welsbach Elec. Corp. v. MasTec North America. Inc..* 7 N.Y.3d 624, 630; 859 N.E.2d 498 (2006) (noting that the exception applies where the "chosen law violates some fundamental principle of justice, some prevalent conception of good morals, [or] some deep-rooted tradition of the common weal.") (internal quotations omitted). Storm relied on a presumed conflict between the Shareholders Agreement and the December 22 Order of the High Commercial Court regarding Storm directors. That Order made no mention of the Shareholders Agreement, however, and Section F *infra* shows the two are reconcilable.

Storm's final argument against application of New York law contends that the Tribunal is obligated to give conclusive effect to the decisions of the Ukrainian courts,

41

regardless of what contrary results might be reached under New York law. The Tribunal has already explained the reasons why it has declined to accept those Ukrainian decisions in connection with the issue of its jurisdiction to hear this Arbitration.  Essentially the same reasons lead the Tribunal to reject those decisions in favor of the application of  New York law to the merits of this controversy.

Because Telenor  was not named as a party to those lawsuits, nor notified of them until after an appeal had already been rendered, the decisions have no *res judicata* or collateral estoppel effect on Telenor.  Indeed, granting them binding force would violate fundamental principles of due process under both federal and New York law. *See Parklane Hosiery Co.. Inc. v. Shore*, 439 U.S. 322,327 n.7 1979); *Gramatan Home Investors Corp. v. Lopez*, 46 N.Y.2d 481,486;  414 N.Y.S.2d 308,327 (1979).

Additionally, Telenor's absence means that the Alpren decisions were not the product of an adversary proceeding, which further undermines their conclusive, or even persuasive, force.  *See Judson v. Flushing Jockey Club*, 14 Misc. 350, 357 (S. Ct. N.Y. Co. 1895) ("Courts of judicature are organized only to decide real controversies between actual litigants.").  As stated long ago in *Lord v. Veazie*, 49 U.S. 251, 255 (1850):

> The objection in the case before us is … that there is no real conflict of interest between them [the parties]; that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be.

*See also, Rough Spring Hill Gold Mining Co. v. Armador Medean Gold Mining Co.,* 145 U.S. 300 (1892) (dismissing lawsuit where the parties were parent and subsidiary corporations under common ownership and control).

The Tribunal finds unpersuasive Storm's contention that Telenor could have countered the non-adversarial nature of the Ukrainian proceedings by intervening on appeal after the initial decisions had already been rendered. "[P]ost- judgment intervention. . . is generally disfavored because it usually creates delay and prejudice to existing parties … and undermines the orderly administration of justice." *United States v. Yonkers Bd. of Ed.,* 801 F.2d 593, 596 (2d Cir. 1986) 9internal citations omitted). More fundamentally, any experienced litigant knows that first appearing after the case has already been decided is hardly consistent with the fair administration of justice.[9]

In summary, the Tribunal finds that none of Storm's arguments against application of New York law withstands analysis, whereas the explicit language of the UNCITRAL Rules, the Parties' clearly expressed intent, and well-accepted international commercial arbitration law and practice, all support the Tribunal's conclusion that New York law governs this Arbitration.

## F.   THE 2004 SHAREHOLDERS AGREEMENT WAS VALIDLY EXECUTED AND BINDS THE PARTIES UNDER NEW YORK LAW.

The Parties' dispute over the validity of the 2004 Shareholders Agreement is at the center of this Arbitration. Storm claims that the Agreement is not valid,

---

[9] For reasons discussed more fully in Section G *infra,* the Tribunal also rejects Storm's argument that Telenor waived its right to arbitration because it litigated other issues in the Ukrainian courts. None of those other litigations involved the validity or enforceability of the 2004 Shareholders Agreement where invocation of arbitration under Section 12.01 would have been required.

and that it need not comply with its terms, because the Ukrainian courts  – in their various decisions – have ruled that the Agreement is null and void under Ukrainian law  and  this Tribunal should give effect to those rulings.  Telenor counters that the officials at Storm and its parent entities who negotiated and executed the 2004 Shareholders Agreement had actual as well as apparent authority to bind Storm.  Telenor further maintains that the confirmatory actions of Storm and its controlling entities, both before and after the execution of the Agreement, estop Storm from challenging the Agreement and constitute a ratification of its terms.

The Tribunal is unanimous in reaching the conclusion that the 2004 Shareholders Agreement is valid and binding on the Parties.  For the reasons detailed in Section E *supra*, the Tribunal concludes that New York, not Ukrainian, law governs the issue of the validity of the 2004 Shareholders Agreement and that the decisions of the Ukrainian courts are not binding on that question. Turning to New York law, the Tribunal concludes that the 2004 Shareholders Agreement was validly executed and is binding on the Parties for four separate and  reinforcing reasons: (1) the person who executed the Agreement on Storm's behalf – its General Director, Valeriy Nilov -- had actual authority to do so; (2) he also had apparent authority; (3) the actions of Storm and its controlling entities estop it from challenging the Agreement's validity; and (4) Storm ratified the Agreement by its subsequent actions.

1.    **Nilov Had Actual Authority to Execute the 2004 Shareholders Agreement.**

Under New York law, actual authority is "the authority that a principal invests in its agent, which, upon its exercise, binds the principal." *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 51 F. Supp.2d 457, 472 (S.D.N.Y. 1990). Such authority "is created by direct manifestations from the principal to the agent," *Peltz v. SHB Commodities, Inc.,* 115 F.2d 1082, 1088 (2d Cir. 1997). Such authority may "be established by any action that reasonably indicates to the agent that the principal wants the agent to perform a certain task," *Seetransport Wiking Trader, v. Republic of Romania,* 123 F. Supp.2d 174, 185 (S.D.N.Y. 2000), but it can also be "inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." *In re Artha Management, Inc.,* l91 F.3d 326, 329 (2d Cir. 1996). "The extent of the agent's actual authority is interpreted in light of all the circumstances . . . including the customs of business, the subject matter, any formal agreement between the parties and the facts of which both parties are aware." *Peltz v. SHB Commodities, Inc., supra.*

In making a determination as to whether Valeriy Nilov possessed actual authority to execute the 2004 Shareholders Agreement and to bind Storm, the touchstone is whether there is evidence that Storm – by "direct manifestations" or by "words or conduct" – invested Nilov with the authority to execute that Agreement. The Tribunal has no difficulty in concluding that Nilov did have such authority. The Tribunal finds that Nilov's authority was specific, it was explicit, it was in writing, and it came directly from Storm's Participants.

45

Moreover, under New York law, "certain agents possess authority which is inherent or incidental to the ordinary scope of authority associated with their position. Such implied authority may be inferred solely from the designation of the principal as the kind of agent who ordinarily possesses certain powers." *Seetransport Wiking Trader v. the Rep. of Rom., supra.* The Tribunal finds that, under New York law, Mr. Nilov, by virtue of his position as General Director of Storm, also had the inherent authority to sign the 2004 Shareholders Agreement and, in doing so, to bind Storm.

Although Storm places its principal reliance on Ukrainian law as announced by the Ukrainian courts, it also argues that General Director Nilov had no actual authority even under New York law to sign the 2004 Shareholders Agreement. Storm does not dispute that Nilov may have been duly authorized to sign the 2002 Voting Agreement and the attached form of Shareholders Agreement, but contends that he had no comparable authority to sign the actual 2004 Shareholders Agreement without its being formally approved at a Meeting of Storm's Participants. Since no such Meeting occurred, Storm argues, and since the Participants never formally approved the 2004 Shareholders Agreement – either by written poll or by live vote – Nilov lacked actual authority to bind Storm. Storm argues further that, while it is true that an agreed-upon form of Shareholders Agreement was attached as an exhibit to the 20002 Voting Agreement, the form Agreement was materially changed during the negotiations preceding the execution of the 2004 Agreement. Because of that change, Storm claims, a new Meeting of the Participants and a new blessing of the new

Shareholders Agreement was required before Nilov could validly execute the 2004 Shareholders Agreement on Storm's behalf..

Storm claims further that Telenor knew or should have known that Nilov lacked the requisite authority, pointing out that Article 12 of Storm's Charter inescapably requires approval of a Meeting of Participants whenever, among other things, the General Director is planning to enter into an agreement that involves the disposition of, or encumbrance upon, Storm's shares "or any other assets of the Company."[10]   Storm argues that, inasmuch as the 2004 Shareholders Agreement involves voting and governance and the disposition of Kyhivstar shares, it is just such an agreement.  Accordingly, a meeting of Storm's Participants was absolutely required to approve the new Agreement before anyone could validly bind the company.

The Tribunal concludes that there are critical legal and factual flaws in Storm's challenges to Nilov's actual authority.   The Tribunal finds that the broad language of the resolutions dated August 30, 2002 – first  adopted by a written polling and thereafter ratified by unanimous live vote in an October 7, 2002 meeting of the Participants – clearly authorized Nilov to execute, on Storm's behalf, the January 2004 Shareholders Agreement.   In one of the resolutions authorizing  Nilov to sign the 2002 Voting Agreement, the Participants specifically authorized  Nilov – by name – "to execute and deliver the above-referenced agreements" and also "to take or cause to be taken any and all other actions as are required or desirable in connection with this Resolution and the above-

---

[10] Storm also points out that Section 145 of the Ukrainian Civil Code provides that the corporate charter shall determine all issues pertaining to corporate governance.

referenced agreements." There can be no doubt that "the above-referenced agreements" included – and were intended to include – the form of Shareholders Agreement that had been negotiated and approved by the Parties. Equally, there can be no doubt that the language authorizing Nilov "to take or cause to be taken any and all other actions as are required or desirable  in connection with this Resolution and in the above-referenced agreements" authorized Nilov to negotiate changes in the terms of the form Shareholders Agreement, and ultimately to sign the amended agreement.

Consequently, even if Telenor was on notice in 2004 – as Storm claims – that a Meeting of the Participants was required to approve any agreement that involved the disposal of Storm assets, that approval had already been obtained in 2002. It is not just a question of what Telenor was told, what Telenor knew, or what Telenor could reasonably assume. The fact is that the Storm Participants in no uncertain terms specifically authorized Nilov to do whatever was "required or desirable" to put in effect a new shareholders agreement, and this plainly included execution of the 2004 Agreement. In short, the Tribunal concludes that the resolutions adopted by the Meeting of Storm's Participants in 2002 bestowed, as a matter of New York law, actual authority on Nilov to enter into the 2004 Shareholders Agreement on behalf of Storm.

### 2.     Nilov Also Had Apparent Authority to Execute the 2004 Shareholders Agreement.

When it comes to apparent authority, New York law is no less clear:

"Apparent authority is based on the principle of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds

the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized."

*Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 665 (2d Cir. 1964). See also

*Marfia v. T.c. Ziraat Bakasi, New York Branch,* 100F.3d 243, 251 (S.D.N.Y. 1996)

And when it comes to determining whether an agent did or did not act with

apparent authority, thereby binding his principal, the New York Court of Appeals

held:

"Essential to the creation of apparent authority are words or conduct of the principal communicated to a third party, that give rise to the appearance and belief that the agent possess authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority."

*Hallock v. State,* 64 N.Y.2d 224, 231; 485 N.Y.S.2d 510, 513; 474 N.aE.2d 1178

(1984). See generally, *Old Republic Insurance Company v, Hansa World Cargo*

*Service, supra* at 474-475..

Unlike the situation that pertains to actual authority where the evidentiary

inquiry is focused on communications between principal and agent, the inquiry

with respect to apparent authority is focused on communications between the

principal and third parties, *i.e.,* in this case, communications between Storm and

Telenor.[11] Did Storm, by its words or its acts, tell Telenor that Valeriy Nilov was

authorized to sign the 2004 Shareholders Agreement thereby vesting him with

apparent authority to do so? Did Telenor rely upon that information? Was it

reasonable for Telenor to rely upon that information? If all the answers to those

---

[11]  As the court wrote in *Seetransport Wiking Rader v. Rep. of Rom., supra,* "An agent has apparent authority when his principal represents through words or acts to a third party that the agent has the principal's consent to perform a certain action. (Citation omitted.)" 123 F.Supp.2d at 190.

questions are in the affirmative, Nilov was vested with apparent authority, and whether or not he was invested with actual authority, he could still bind Storm.

Again, the Tribunal has no difficulty concluding that Storm, by its words and its deeds, invested Valeriy Nilov with apparent authority to sign the 2004 Shareholders Agreement on behalf of Storm. The evidence is clear: Storm's communications to Telenor as to Nilov's authority were unambiguous. Storm told Telenor that Nilov was duly authorized to sign the document. Telenor relied upon that representation and would not have signed the Agreement without it. Finally, Telenor's reliance was reasonable under the circumstances. The Tribunal concludes that, when he signed the 2004 Shareholders Agreement, Valeriy Nilov was acting with apparent authority, and when he signed that document, he bound Storm to the terms and conditions of that Agreement.

As with its challenge to Nilov's actual authority, Storm rests its attack on his apparent authority principally on Ukrainian law and the rulings of the Ukrainian courts. Nevertheless, Storm also challenges Nilov's apparent authority under New York law. Storm argues that Telenor knew that there needed to be a Meeting of Storm's Participants to approve the proposed 2004 Shareholders Agreement, and that Nilov did not have that approval. Storm claims that Telenor knew this fundamental truth because (1) Telenor had received a copy of Storm's Charter well in advance of the Parties' execution of the 2004 Agreement and was presumed to had read Article 12 of that document, and (2) Telenor knew from the 2002 transactions that approval conferred by a special meeting of Storm's shareholders was required for any transaction involving the disposition of Storm's

assets, including Kyivstar stock. Accordingly, Storm argues, Telenor could not reasonably rely on Nilov's apparent authority to sign the 2004 Shareholders Agreement on Storm's behalf.

Once again, the Tribunal concludes that there are serious flaws in Storm's position, both from a factual and legal standpoint under New York law. Storm's arguments simply ignore the critical role that Nilov, as Storm's General Director, played in virtually all the proceedings leading up to and ending with the signing of the 2004 Shareholders Agreement. The Tribunal finds that Telenor was fully justified in relying (a) on Nilov's own representations as to his authority; (b) the representations of other Storm officials as to Nilov's authority; and (c) the actual terms of the resolution adopted by the Meeting of Participants in 2002 which explicitly authorized Nilov, by name, to "take or cause any and all other actions as are required or desirable in connection with this Resolution and the above-referenced agreements."

The Tribunal is particularly impressed by the affidavit of Storm's own Chairman, Andrei Kosogov. See the discussion *supra*, at pp. 11-12. His affidavit confirms that, while he was unaware that any Meeting of Participants of Storm's shareholders had taken place to approve the new Shareholders Agreement, he nonetheless signed a Certificate of Incumbency and Authority on January 30, 2004, explicitly authorizing Nilov to sign the new Shareholders Agreement. In that affidavit, Kosogov states that "I signed the Certificate at Telenor Mobile's request and agreed to do so because this was a fairly routine business practice in transactional matters." Kosogov went on to state: "Until recently I was not

aware that a special resolution of Storm's participants was necessary to authorize Mr. Nilov to enter into the Shareholders Agreement."

If Kosogov believed that Nilov was authorized to enter into the 2004 Shareholders Agreement on behalf of Storm, the Tribunal concludes that Telenor can hardly be faulted for reaching the same conclusion. The Tribunal's conclusion is further buttressed by the fact that Nilov, himself, also signed a Certificate on January 30, 2004 that he had the requisite authority to sign the 2004 Agreement and bind Storm.[12] In the face of this evidence, Storm's argument that Telenor knew, or should have known, that Nilov did not have the requisite authority is unconvincing.

The Tribunal also finds it significant that Storm never presented any evidence from Nilov to rebut his authority to sign the 2004 Shareholders Agreement. From the earliest days of this arbitration, the Tribunal identified Nilov as a person whose testimony would be important to the ultimate disposition of this particular issue. The Tribunal went out of its way to give Storm the opportunity to obtain Nilov's testimony by scheduling hearings to accommodate what it was told was his schedule. Then, when Nilov assertedly could not attend on those dates, the Tribunal re-scheduled the hearing dates in an effort to accommodate him. Still he did not appear. Nor did Storm secure his affidavit.

---

[12] The Tribunal can only assume that Nilov knew about the provisions contained in Storm's Charter requiring certain types of agreements to be presented to and approved by Storm's Participants. The Tribunal also assumes that Nilov knew that a written polling and live vote of Storm's participants had been taken in 2002 approving the 2002 Shareholders Agreement, and that the Participants had not re-convened to approve the 2004 Shareholders Agreement. The Tribunal finds it instructive that knowing all this, Nilov nonetheless felt himself authorized to sign the 2004 Shareholders Agreement.

Nilov's failure to appear was a serious blow to Storm's case.  His failure to offer any testimony whatsoever – even by affidavit – compounded that blow. Nilov's absence left many of Telenor's most critical assertions unrefuted.  His absence compels the Tribunal to draw the adverse conclusion that, had he testified, he would have damaged Storm's case.

In sum, the Tribunal concludes that Telenor  was entitled to rely, and did rely, on the two Certificates of Incumbency and Authority signed by the Chairman of Storm and by a member of Storm's Board of Directors as providing Nilov with the authority to enter into the 2004 Shareholders Agreement on behalf of Storm. The straightforward language of those certificates and the oral representations that accompanied them plainly entitled Telenor to believe that Nilov had both actual and apparent authority to sign the agreement as a binding obligation of Storm.

### 3.  Storm Is Estopped From Challenging the Validity of the 2004 Shareholders Agreement .

To determine whether Storm is estopped from challenging the validity of the 2004 Shareholders Agreement on the ground that Nilov did not have the requisite authority, the Tribunal is required to answer three questions: [13]

First, did Storm by intentional acts of commission or omission create an appearance that Nilov had the authority to enter into the 2004 Shareholders Agreement on behalf of Storm?  The Tribunal has no problem concluding that Storm did create such an appearance.  As far back as the April 29, 2002 Letter

---

[13] See *Am. Fed'n of Musicians and Employers' Pension fund v. Steven Scott Enters., Inc.*, 40 F. Supp.2d 503, 508 (S.D.N.Y. 1990)

Agreement, Storm explicitly represented that Nilov was authorized to sign a new Shareholders Agreement and confirmed that he was "prepared to do so." In conjunction with Storm's execution of the 2002 Voting Agreement, Storm provided Telenor with the October Certificates that clearly confirmed that Nilov was authorized not only to enter into the 2002 Voting Agreement but also to take whatever steps were necessary to conclude the new Shareholders Agreement, which was attached to the Voting Agreement as an exhibit. Finally, in the Certificates of Incumbency that Storm provided to Telenor in January 2004, Storm expressly confirmed that Nilov was authorized to enter into the 2004 Shareholders Agreement.

Second, did Telenor reasonably and in good faith rely upon Storm's representations that Nilov was authorized to sign the Shareholders Agreement? For the reasons already spelled out above, the Tribunal has no difficulty concluding that Telenor did rely upon Storm's representations, and that Telenor's reliance was in fact reasonable.

Finally, did Telenor rely on Nilov's authority to its detriment? Again, the Tribunal has no difficulty answering in the affirmative. The evidence is clear that, in reliance on Storm's representations and promises, Telenor sold sufficient Kyivstar shares to Storm to allow Storm to obtain an interest in Kyivstar that exceeded 40%, which allowed Storm to block Telenor from taking important corporate action.

### 4.     Storm Ratified the 2004 Shareholders Agreement.

Finally, the record establishes that Storm ratified the 2004 Shareholders Agreement by its actions following the Agreement's execution. Storm lived with the 2004 Shareholders Agreement and complied with its terms for over a year after the parties entered into that Agreement. Storm never raised any concerns or questions about the validity of the Agreement during this period. To cite two examples, Storm officials attended meetings of the Kyivstar board and participated in Kyivstar shareholder meetings for at least one year after the Agreement was executed in January 2004.

Indeed, with its record of compliance, Storm ratified each and every agreement that it entered into on the way to the 2004 Shareholders Agreement. More specifically, there is no dispute that Storm complied with the terms of the April 29, 2002 Letter Agreement, the 2002 Share Purchase Agreement and the 2002 Voting Agreement. At no time did Storm ever raise any concerns or questions as to the validity of these agreements until after the commencement of this Arbitration.

### G.     STORM HAS BREACHED, AND IS CONTINUING TO BREACH, THE 2004 SHAREHOLDERS AGREEMENT.

The record in this Arbitration demonstrates conclusively that Storm has breached the 2004 Shareholders Agreement in the following three respects: (1) Storm has breached the contractual provisions relating to Board of Directors and Shareholder governance of Kyivstar; (2) Storm, through its affiliates, has breached the non-competition provisions of the 2004 Agreement; and (3) Storm has breached the Agreement's arbitration requirements. The record further

establishes that each of these breaches is material and that Storm has

evidenced a clear intent to continue its breaches. In fact, Storm does not

seriously deny its on-going breaches, but seeks to excuse its actions. The

Tribunal unanimously rejects Storm's excuses as unsupported by the evidence

and contrary to a plain reading of the 2004 Shareholders Agreement.

### 1.    Storm's Breach of the Governance Provisions of the 2004 Shareholders Agreement.

The 2004 Shareholders Agreement imposes explicit obligations on Storm

to participate in good faith in the governance and operation of Kyivstar. Section

2.01(b) of the Shareholders Agreement states unambiguously that Storm must

"take all action necessary ... to (1) ensure the election of candidates and (2)

maintain the membership of the Board." Section 2.05 (b) goes on to impose a

requirement on Storm:

(i)    to comply with its obligations under this Agreement;

(ii)    to act in a good faith and constructive manner such as to give effect to the provisions of this Agreement, including, without limitation, through participating in and voting at the GMS [General Meeting of Shareholders] and the Board; and

(iii)    not to take, or permit any of its Affiliates to take, any action permitted by Ukrainian law which would allow Storm to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.03(b) as an action for which Storm is required to vote its Voting Securities and cause the Directors nominated by it to vote in favor of approving.

Despite these unambiguous obligations, it is undisputed that Storm has

failed to maintain its membership on the Board. In addition, it has obstructed

Telenor's attempts to reconstitute the Board in conformity with the December 22,

2005 Order of the High Commercial Court of Ukraine, as discussed hereafter.

Equally undisputed is the evidence that Storm and its nominees failed to attend Board of Directors meetings, as well as Shareholder meetings, despite the fact that the Shareholders Agreement provides that the Parties will give effect to the provisions of the Agreement in good faith by participating and voting at Shareholder and Board meetings. (See Section 2.05(b)(ii)).

Storm has not denied that it and its nominees have absented themselves from Kyivstar Board and Shareholder meetings since the spring of 2005. Moreover, it has made it clear by its statements and its actions that it has no intention of attending future meetings. Storm's affiliate, Alpern, has even gone so far as to sue two of Storm's representatives on the Kyivstar Board to prevent them from attending Board meetings. As a result, the Board has been paralyzed. It has been unable to achieve a quorum necessary to hold a meeting or to conduct critical corporate business.

Storm seeks to excuse its failure to attend Board and Shareholder meetings by claiming that it relied in good faith on the December 22, 2005 Order of the High Commercial Court of Ukraine. Storm's claim is undermined by two uncontroverted facts. Storm began its boycott of Board meetings in March 2005, nine months *before* the December 22, 2005 Order. It likewise began its boycott of Shareholder meetings in April 2005, eight months before the December 22 Order. Plainly, its actions could not have been in good faith reliance on a court ruling that did not exist.

Not only is Storm's "good faith" plea undercut by the course of events, but an examination of the December 22, 2005 Order discloses that the court did not

even address the validity of the 2004 Shareholders Agreement. Rather, the court's sole focus was on Kyivstar's Charter and, in particular, on its provisions regarding the eligibility for membership on the Kyivstar Board. On that issue, the court ruled that only Kyivstar shareholders could serve as Directors, a point that is not covered by the Shareholders Agreement.

Moreover, contrary to Storm's claim that the December 22, 2005 Order provided an excuse from attending Board and Shareholder meetings, the ruling did just the opposite. The court in Ukraine ruled that Telenor and Storm were obligated "to amend the text of the charter in conformity with the applicable legislation of Ukraine" as interpreted by the court, and the only way the Parties could carry out such an amendment was through a vote at a Shareholders meeting. (See Section 6.03 of the Shareholders Agreement). Yet, by boycotting such meetings, Storm prevented this from occurring, contrary to the manifest requirement of the December 22, 2005 Order. In short, Telenor has consistently sought to conform the Kyivstar Charter with the December 22 Ruling, but it has been Storm that has made this impossible by its breach of its obligation to participate in good faith in Kyivstar Shareholders meetings.

**2. Storm's Breach of the Non-Competition Provisions of the Shareholders Agreement.**

Section 6.02 of the 2004 Shareholders Agreement contains a broadly worded provision barring the Parties and their affiliates from engaging, directly or indirectly, in competing telecommunications business in Ukraine:

> [N]o Shareholder *or any of its Affiliates* will, without the prior written consent of the Company and the other Shareholders, (i) engage in the Business in any

region in Ukraine, (ii) own or control, directly or
indirectly, more than five percent (5%) of the voting
capital stock in any Person (other than [Kyivstar] or
any of its Controlled Affiliates) engaged in the
Business in any region in Ukraine or (iii) permit any of
its Controlled Affiliates (other than [Kyivstar] or any of
its Controlled Affiliates) to engage in the Business in
any region in Ukraine or own or control, directly or
indirectly, more than five percent (5%) of the voting
capital stock in any Person (other than [Kyivstar] or
any of its Controlled Affiliates) engaged in the
Business in any region in Ukraine.
(Emphasis added)

Section 1.01 defines an "Affiliate" as "any other Person which directly or indirectly

controls, or is under common control with, or is controlled by, such Person ...." It

defines "Business" as "the wireless mobile telecommunications business."

The Tribunal finds that a plain reading of the definition of "Affiliate"

includes the various entities that directly or indirectly have a controlling interest in

Storm, and that this includes Alfa. Accordingly, Storm became in breach of the

non-competition provision of the 2004 Shareholders Agreement on November

25, 2005, when Alfa acquired a 13.2 percent interest in Turkcell, a wireless

mobile telecommunications company which maintains a majority stake in Astelit,

LLC., a wireless mobile telecommunications operator that describes itself as "a

pioneering digital communications technology and service provider" in Ukraine.

Storm continues in breach of the non-competition provision because Alfa's

ownership continues.

Storm became in further breach of the non-competition provision in March

2006, when Alfa, acting through its subsidiary Russian Technologies, secured a

40 percent ownership interest in Ukrainian High Technologies, which offers

broadband wireless mobile telecommunications to businesses and consumers in Ukraine and which has a mandate "to become a national broadband wireless multiservice operator."

In both of these instances, Storm "Affiliates" acquired substantial interests exceeding five percent in companies engaged in the wireless mobile telecommunications business without first securing the consent of Telenor. They continue to compete with Telenor in the lucrative Ukrainian wireless market. While Storm contends that only its own conduct, and not that of any other affiliated entity, can violate Section 6.02, this argument is contrary to the plain language of the 2004 Shareholders Agreement , which, as already indicated, speaks in terms of "affiliates."

Storm maintains that Telenor's interpretation of the non-compete language in the Shareholders Agreement is too sweeping. The Tribunal disagrees. If Storm desired to limit the scope of the non-compete language, it could have negotiated a more limited application; indeed, it did so when it negotiated with Telenor to permit Alfa's investment in Golden Telecom notwithstanding the non-compete language. In that instance, Telenor agreed to exclude Alfa's investment provided that none of Alfa's nominees on the Golden Telecom board would simultaneously serve on the Kyivstar board. The Shareholders Agreement reflects this compromise by carving out Alfa's investment in Golden Telecom.

Nor did Storm ever communicate to Telenor the argument that the non-compete language of the 2004 Shareholders Agreement was limited only to Storm and not its "affiliates." The Shareholders Agreement is clear on its face,

was the product of careful negotiation, and was binding on the parties once lawfully executed.  Representatives of Alfa, not Storm, were primarily responsible for the negotiations leading up to the 2004 Shareholders Agreement; if Alfa's representatives at the negotiation table had sought a more restrictive non-compete clause, limited only to Storm, they could have made such a demand. Nothing in the record of this proceeding has been offered in support of Storm's claim concerning the limited application of the non-compete language.  In sum, the non-compete language should be interpreted according to its unambiguous terms.  The Shareholders Agreement is clear on its face, was the product of arms length negotiation and was warranted by Storm to be "binding upon … and enforceable by the parties … ." (Section 13.05).

### 3.    Storm's Breach of the Arbitration Provision of the Shareholders Agreement.

The Tribunal has previously underscored the sweeping arbitration clause in the 2004 Shareholders Agreement, which requires that, "Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration . . ." (See Section 12.01.)  For the reasons explained earlier, that language plainly obligated Storm to arbitrate the issue of the validity of the 2004 Agreement before this Tribunal, rather than in the Ukrainian courts.  Yet, the Tribunal finds that Storm breached that obligation by its steadfast efforts before this Tribunal to block the resolution on the merits of Telenor's claims, particularly when allied with Storm's half-hearted opposition to the Ukrainian litigation brought by its affiliate, Alpern.

61

Storm has similarly breached Section 12.01 in connection with more recent and on-going litigation in the Ukrainian courts which is preventing Kyivstar from having its financial statements audited and certified by Ernst & Young, or from publishing its financial statements. In the first case, filed by Storm itself in December of 2006, Storm sought an injunction against Kyivstar demanding that agreements between Kyivstar and Ernst & Young be declared "null and void." A second similar suit was filed by Alpern, again seeking to prevent Ernst & Young from performing its auditing and accounting services on behalf of Kyivstar. Finally, on February 16, 2007, Alpern filed yet another suit in the Kiev City Commercial Court and secured an injunction to prevent Kyivstar, Ernst & Young and "any other individuals or legal entities" from: "taking any actions aimed at performance of any contracts …"

As a result of these three separate litigations involving Kyivstar and its auditor, Ernst & Young, Kyivstar's financial statements for 2006 have not been audited and it cannot publish its final financial results. Nor has Telenor been able to examine the Kyivstar books. As a result, on March 21, 2007, Telenor announced that it would deconsolidate Kyivstar's financial results from Telenor ASA's parent corporation's financial results and that it would "qualify" all pertinent Kyivstar financial information. This announcement had an immediate adverse impact in Telenor ASA share price.

In addition, the pending Ukrainian Ernst & Young litigation threatens to compel Kyivstar to default on certain bond obligations totaling over $400 million; as to these bonds, Kyivstar is required to deliver to the lender both an auditor's

compliance certificate and audited year-end financial statements through April 30, 2007. It has been unable to do so. On March 26, 2007, Standard & Poor's issued a notice stating that it may suspend Kyivstar's credit rating if the Company does not provide financial statements to its creditors and shareholders. Similarly, on March 29, 2007, Moody's Investors Service issued a notice stating that it was placing Kyivstar on review for a possible downgrade in its credit rating because of Kyivstar's inability to provide financial information to third parties as a result of the Ukrainian Court injunction.

Storm argues that Telenor's application to enjoin the Ernst & Young litigation now pending in the Ukraine is not arbitrable because it involves "collateral disputes" and does not involve "a violation of any obligations imposed by the Shareholders Agreement." This is incorrect. First, the Ernst & Young litigation in Ukraine is not "collateral" to this arbitration; it is directly related to other of the claims asserted by Telenor before this Tribunal. For example:

- The inability of Kyivstar's Board to meet and approve the Ernst & Young contract flows directly from Storm's failure to maintain its membership on the Board.

- Because of the Ernst & Young litigation, Kyivstar was not allowed to certify its financial statements by April 30, 2007, resulting in an "event of default" under the relevant bond agreements, in violation of Storm's express obligations under the Shareholders Agreement (See Section 2.03(b); 2.05(b)(ii).

- Kyivstar cannot even provide financial information to its majority owner, Telenor, or publish its financial results because of the Ukrainian injunction issued in the Ernst & Young litigation. This constitutes a separate violation of the Shareholders Agreement.

In short, Telenor's request to this Tribunal to enjoin the Ukrainian Ernst & Young litigation is intimately related to issues already submitted to the Tribunal and fully within the broad scope of the Tribunal's jurisdiction.

Second, even though Storm maintains that the Ernst & Young litigation does not involve the violation of any obligation imposed by the Shareholders Agreement, the Tribunal cannot ignore the "good faith" language that is expressly incorporated into Section 2.05 of that Agreement. The language of Section 2.05 is broadly worded and does not in any way limit Storm's general duty to act in good faith when it comes to Telenor or Kyivstar. As already indicated, the Ernst & Young litigation arises directly out of Storm's breach of the provisions of the Shareholders Agreement; this fact, coupled with the good faith language of Section 2.05, disposes of Storm's argument.

Finally, Storm maintains that Telenor has waived its right to rely on the arbitration provisions of the 2004 Shareholders Agreement because it defended itself in the Ukrainian proceeding that led to the December 22, 2005 Order. Storm argues that Telenor never sought an order compelling arbitration in that proceeding, nor raised Section 12.01 as a defense. As a result, Storm contends that, because Telenor participated in the proceeding that gave rise to the December 22, 2005 Order, Telenor has lost its right to invoke the arbitration clause and to compel arbitration in this proceeding.

The Tribunal disagrees. In the first place, the dispute leading to the December 22, 2005 Order was not one that arose "under, related to or in connection with" the 2004 Shareholders Agreement. The dispute involved the

64

applicability of Ukraine law to Kyivstar's Charter and whether a non-shareholder could be a board member.

Second, even if the arbitration clause could be interpreted as covering that particular disagreement, it is well settled that a party's failure to compel arbitration with respect to one matter does not result in a wholesale waiver of that party's contractual rights to compel arbitration in another matter. This is especially true where the validity of the 2004 Shareholders Agreement was not at issue in that proceeding. In fact, prior to this arbitration, Telenor has not been a party to any litigation where either the interpretation of a provision in the Agreement or the validity of the 2004 Shareholders Agreement itself has been at issue. Under those circumstances, Telenor's failure to invoke Section 12.01 can hardly be viewed as a waiver.

## H.    **CONCLUSION AND AWARD.**

Based on the foregoing findings of fact and conclusions of law, the Tribunal **DECLARES, ORDERS AND FINALLY AWARDS** as follows:

1.    The Tribunal adopts and reaffirms its Partial Final Award Regarding Jurisdiction, dated October 22, 2006, and re-issued as corrected on December 22, 2006, that the Tribunal has jurisdiction to hear and resolve the claims raised by Claimant's Amended Notice of Arbitration and Statement of Claim.

2.    The Tribunal declares that the Shareholders Agreement, dated January 30, 2004, between Claimant Telenor Mobile Communications AS ("Telenor"), Respondent Storm LLC ("Storm") and Closed Joint Stock Company "Kyivstar "G.S.M." ("Kyivstar") was validly executed and is binding on these

parties, and that Respondent Storm has breached such Shareholders Agreement, and continues to breach such Shareholders Agreement, in the following particulars:

    a.    by failing to appoint candidates for election to the Kyivstar Board of Directors and by failing to cause Storm-nominated members of the Kyivstar Board of Directors to attend its meetings and to participate in the direction of Kyivstar's business;

    b.    by failing to attend annual and extraordinary meetings of the Kyivstar shareholders;

    c.    by owning or controlling, directly or indirectly through its affiliates, more than five percent of the voting capital stock of entities engaged in the wireless mobile telecommunications business in Ukraine, without the prior written consent of Claimant , and

    d.    by failing to settle any and all disputes and controversies arising under, relating to or in connection with the Shareholders Agreement, dated January 30, 2004, by arbitration under the UNCITRAL Arbitration Rules.

3.    In its original claim,Telenor prayed for an award of damages. In the course of this proceeding, it has established that, as a result of Storm's breaches of the 2004 Shareholders Agreement, it has suffered and continues to suffer significant injury. Although Claimant Telenor has failed to prove an amount of damages with sufficient specificity to support an award of damages, the Tribunal orders Respondent Storm to take the following actions in order to preclude further serious injury to Claimant Telenor from Respondent Storm's continuing breaches of the 2004 Shareholders Agreement:

    a.    Respondent Strom shall transfer at least one of its Kyivstar shares to three newly-formed affiliated companies so that it is in a position to designate and nominate a total of four candidates for election to the Kyivstar Board of Directors, and it shall designate and nominate those candidates for election to the Kyivstar Board of Directors.;

b.     Respondent Storm shall take such steps as are necessary to assure that its nominated candidates are elected to the Kyivstar Board of Directors, attend all future Board meetings and participate in good faith in the direction and management of Kyivstar's business;

c.     Respondent Storm shall cause its duly authorized representatives to attend all future annual and extraordinary meetings of the Kyivstar shareholders while it remains a Kyivstar shareholder;

d.     Respondent Storm shall take such steps as are necessary to amend the Charter to conform it both to the December 22, 2005 Order of the High Commercial Court of Ukraine, the Shareholders Agreement, dated January 30, 2004, and the ownership of Kyivstar shares by Claimant Telenor and by its affiliates, Telenor Ukraina I AS, Telenor Ukraina II AS, Telenor Ukraina III AS and Telenor Ukraina IV AS. Claimant Telenor and Respondent Storm, and all persons to whom they transfer Kyivstar shares shall vote to approve an amendment to the Kyivstar Charter that provides that Kyivstar's shareholders are (a) Storm, together with its three newly-formed corporate affiliates, each of which will hold at least one Kyivstar share; and (b) Telenor , and its existing four corporate affiliates, each of which holds one Kyivstar share.  Together, the persons designated and nominated as members of the Kyivstar Board of Directors by these nine entities will be elected as Directors.

4.     The Tribunal further orders Respondent Storm to sell its shares in Kyivstar to a person other than a Storm affiliate within one hundred and twenty (120) days of this Final Award, unless prior to that time Storm and any affiliated entities divest their holdings in Turkcell and Ukrainian High Technologies that exceed five percent.

5.     Finally, the Tribunal orders that:

a.     Respondent Storm, and anyone acting in concert with it, is enjoined from the commencement or prosecution of any and all court actions concerning any disputes or controversies under, relating to, or in connection with, any obligations described in the Shareholders Agreement, including all of the existing litigations currently pending in the Ukraine and described herein.

b.     Respondent Storm, and anyone acting in concert with it, are enjoined from enforcing the December 29, 2006 Injunction or its attendant Enforcement Order.

c.     Respondent Storm, and anyone acting in concert with it, are enjoined from taking any actions to hinder or preclude Claimant Telenor, Ernst & Young and their related entities from carrying out their rights and obligations under the Shareholders Agreement or other pertinent agreements with Kyivstar.

6.     Each party shall bear its own fees and costs, including attorneys' fees relating to this Arbitration.

7.     This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All relief requested but not granted is expressly denied.

8.     This Award may be signed by the members of the Tribunal in counterparts.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

_____

Kenneth R. Feinberg
Chair
July 2, 2007

_____

Gregory B. Craig
July 2, 2007

_____

William R. Jentes
July 2, 2007

c.   Respondent Storm, and anyone acting in concert with it, are enjoined from taking any actions to hinder or preclude Claimant Telenor, Ernst & Young and their related entities from carrying out their rights and obligations under the Shareholders Agreement or other pertinent agreements with Kyivstar.

6.   Each party shall bear its own fees and costs, including attorneys' fees relating to this Arbitration.

7.   This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All relief requested but not granted is expressly denied.

8.   This Award may be signed by the members of the Tribunal in counterparts.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

Kenneth R. Feinberg
Chair
July 2, 2007

Gregory B. Craig
July 2, 2007

William R. Jentes
July 2, 2007

68