# EXHIBIT J

Westlaw.

Slip Copy                                                                                                       Page 1
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
(Cite as: Slip Copy)

Telenor Mobile Communications AS v. Storm LLC
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
TELENOR MOBILE COMMUNICATIONS AS,
Petitioner,
v.
STORM LLC, Respondent.
No. 07 Civ. 6929(GEL).

Nov. 2, 2007.

Robert L. Sills and Jay K. Musoff, Orrick, Herrington
& Sutcliffe LLP, New York, NY, for petitioner.
Peter Van Tol, Gonzalo S. Zeballos, Johanne
Houbouyan, and Lisa J. Fried, Lovells LLP, New
York, NY, for respondent.

### OPINION AND ORDER

GERARD E. LYNCH, District Judge.
*1 Telenor Mobile Communications AS ("Telenor"),
a Norwegian telecommunications company, and
Storm LLC ("Storm"), a company organized under
the laws of Ukraine, jointly own Kyivstar G.S.M.
("Kyivstar"), a Ukrainian telecommunications
venture. Telenor and Storm are engaged in a dispute
over, inter alia, the validity and effect of a 2004
shareholders' agreement (the "Shareholders'
Agreement" or "Agreement") related to the corporate
governance and management of Kyivstar. To resolve
the dispute, Telenor invoked the arbitration provision
of the Shareholders' Agreement. The parties appeared
before the arbitrators ("the arbitrators" or "the
Tribunal") at a series of hearings held during
December 2006. On August 1, 2007, the Tribunal
issued a unanimous final award (the "Final Award"
or "Award"), granting various relief to Telenor,
including conditional divestiture of Storm's Kyivstar
shares and an anti-suit injunction. The case is before
this Court on (1) Telenor's petition to confirm the
arbitration award pursuant to 9 U.S.C. §§ 9 and 207,
and (2) Storm's cross-motion to vacate the Award.
For the following reasons, Telenor's petition will be
granted, and Storm's motion will be denied.

### BACKGROUND

Many of the following facts have already been set
forth in a prior decision by the Court. See Storm LLC

v. Telenor Mobile Comm'ns AS, No. 06 Civ. 13157,
2006 WL 3735657 (S.D.N.Y. Dec. 15, 2006).
However, because the instant motion requires an
independent determination of the arbitrability of the
dispute, see Discussion, Part II.A.2, infra, the
relevant facts will be recited again here.

#### The 2004 Agreement

The 2004 Agreement is the product of a series of
negotiations and transactions which arose from the
desire of Alfa Telecommunications, a predecessor
company of Altimo Holdings & Investment Limited
("Altimo"), to acquire a significant share in Kyivstar.
(Zeballos Decl. Ex. E ¶¶ 16, 21.) Ownership of
Kyivstar had previously been divided up among a
group of shareholders, including both Telenor and
Storm. (Award at 3.) In 2002, Alfa purchased a
majority interest in Storm, and used Storm in turn as
the vehicle to acquire an interest in Kyivstar. (Id. 4.)
Because Storm obtained over 40% of the Kyivstar
shares-which under Ukrainian law gave it substantial
rights in corporate governance-Telenor negotiated an
agreement obligating Storm not to exercise its rights
in certain ways. (Zeballos Decl. Ex. E ¶ 22; see id. ¶
17 (stating that Telenor currently owns
approximately 56.5% and Storm owns approximately
43.5% of the Kyivstar shares).) [FN1] Wary of the
Ukrainian legal system, Telenor also negotiated an
arbitration clause (the "Arbitration Agreement"),
which provided that "[a]ny and all disputes and
controversies arising under, relating to or in
connection with" the Shareholders Agreement would
be resolved by a tribunal of three arbitrators in New
York in accordance with the Arbitration Agreement
and the United Nations Commission on International
Trade Law ("UNCITRAL") Arbitration Rules.
(Agreement § 12.01.)

> FN1. Though the Agreement is nominally
> between Storm and Telenor, Storm is merely
> a holding company with no business other
> than holding the shares of Kyivstar for its
> ultimate corporate parent Altimo, which
> owns 50.1% of Storm through Hardlake, a
> Cyprus entity that is 100% owned by
> Altimo, and the remaining 49.9% through
> Alpren Limited, which is also 100% owned
> by Altimo. (See Zeballos Decl. Ex. H at 2.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**\*2** Telenor received several assurances that Storm's purchase of the Kyivstar shares was authorized by Storm's shareholders and management. During negotiations between the parties in 2002, Storm provided documents warranting that its general director, Valeriy Vladimirovich Nilov, who signed the agreement on its behalf, was legally authorized to do so. (Zeballos Decl. Ex. E ¶ 41.) In addition, a resolution passed by unanimous consent of Storm's shareholders on October 7, 2002, specifically authorized the general director to enter the Shareholders Agreement on behalf of Storm. (*Id.* ¶ 32.)Furthermore, upon execution of the final agreement on January 30, 2004, Storm and Telenor exchanged customary certificates that each signatory possessed full authority to sign on its behalf. (*Id.* ¶¶ 40, 41.)[FN2]Storm delivered to Telenor two identical documents entitled "Certificates of Incumbency and Authority," one of which was signed by Yuri Tomanov, the Chairman of Storm, who certified that Nilov "is duly authorized to sign" the Agreement on behalf of Storm. (*Id.* ¶ 41.)

> [FN2.] The Agreement was first drafted in 2002 and customary certificates were also exchanged at that time (*id.* ¶ 31), but final execution of the Agreement was delayed by the parties' dispute over potential liability for material breach. (*Id.* ¶ 37.)The final agreement, including the Arbitration Agreement, was identical to the 2002 draft in all respects except for the material breach term, which was amended pursuant to a request by Storm. (Award at 12-13.)

### The Initiation of Arbitration and Ukrainian Court Proceedings

Telenor and Storm performed their respective obligations under the Agreement for over a year. During 2005, however, increasing friction developed between the parties, and Telenor now accuses Storm of violating the Shareholders Agreement in ways that effectively paralyze Kyivstar. Specifically, Telenor claims that Storm has violated the Shareholders Agreement by failing to (1) attend shareholder meetings, (2) appoint candidates for election to the Kyivstar board, (3) attend board meetings, and (4) participate in the management of Kyivstar, including enforcement and amendment of the Kyivstar Charter. (Award at 15; *see* Sills Decl. I, Ex. B ¶¶ 25-28.) Telenor also claims that the partial ownership of two

competing Ukrainian telecommunications companies by Alfa, the direct parent of Altimo, and Russian Technologies, a subsidiary of Alfa, violates the Agreement's non-compete clause. (Sills Decl. I, Ex. B ¶¶ 29-33.)

On February 7, 2006, Telenor sought redress for these alleged violations by invoking the arbitration clause. Telenor requested several forms of relief, including an order requiring Storm to comply with the Agreement's requirements relating to shareholder and board meetings, appropriate relief against the breaches of the non-competition provision of the Agreement, a permanent injunction against court actions instituted in violation of the Agreement's arbitration provisions, and an order requiring Storm to take steps to amend the Kyivstar Charter to conform both to the Shareholders Agreement and to a December 22, 2005, Order of the High Commercial Court of Ukraine.[FN3](*Id.*) Telenor also requested an award of damages for Storm's alleged breaches of the Agreement. (*Id.*)

> [FN3.] The High Commercial Court found that the Kyivstar Charter was invalid due to the failure of Kyivstar to comply with Ukrainian laws regarding, inter alia, shareholders' rights and the election of Board members. (Zeballos Decl. Ex. R.)

Storm responded to the arbitration demand by appointing an arbitrator and participating in proceedings before the arbitrators. (Award at 18.) However, notwithstanding the fact that Storm was simultaneously participating in the arbitration proceedings, on April 14, 2006, legal proceedings were instituted in the Ukrainian Commercial Court. In the Ukrainian proceedings, Alpren, the 49.9% owner of Storm, sought a declaration of the invalidity of the Shareholders Agreement. (Zeballos Decl. Ex. B.) Telenor was not named as a defendant in the suit, and neither Telenor nor the arbitrators were advised of its pendency. Storm did not retain counsel or file written opposition to the action. (Sills Decl. I, Ex. B ¶ 38.) Instead, its general director, Vadim Klymenko, appeared in person and registered oral opposition to Alpren's demands, a method of proceeding that Storm contends is permissible, and not unusual, in Ukraine. (Zeballos Decl. Exs. C, F.)

**\*3** Whether or not unusual under Ukrainian custom, the proceeding had a number of curious features. Although Klymenko, who acted for Storm in the

Slip Copy                                                                                                    Page 3
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

matter, is not a lawyer, a resume submitted by him in connection with the arbitration notes that he is a Vice President of Altimo, the ultimate parent both of Storm and of Alpren, and that his responsibilities in that role include the management of "litigation[,] arbitration, representation and implementation of shareholders' interests."(Zeballos Decl. Ex. C.) The initial Ukrainian proceeding appears to have lasted all of twenty minutes (Award at 21), suggesting that Klymenko's oral opposition was somewhat perfunctory. As a result, on April 25, 2006, the Ukrainian court declared the Shareholders Agreement invalid, finding that Nilov had "acted unlawfully and in excess of [his] powers" by executing the Agreement. (Zeballos Decl. Ex. B at 3.)

Storm appealed the result to the Ukrainian Appellate Commercial Court, again without submitting any substantial defense of its position.[FN4]Instead Storm only made a cursory argument that the Agreement was not examinable by the Ukrainian court because of the pending New York arbitration, and presented no evidence regarding the authority of Nilov to enter into the Agreement, nor any other factual submissions. (Award at 22.) Once again, Telenor was not present or notified of the hearing. (*Id.; see* Sills Decl. Ex. B ¶ 70 ("Telenor Mobile first learned of [the Ukrainian decisions] through an Altimo press release, issued after the Ukrainian appellate court issued its judgment ....").) Immediately following the hearing, on May 25, 2006, the appellate court affirmed the lower court's decision against Storm. (Zeballos Decl. Ex. D.) In addition, although Storm made no argument regarding the severability of the arbitration clause to the appellate court, the appellate court broadened the lower court's ruling by finding specifically that the Arbitration Agreement was invalid. (*Id.*)

> FN4. Telenor argues that Storm only appealed the trial court's decision because an "appeal gives a special enforceable status, at least as a formal matter of Ukrainian law, to the judgment."(12/11/06 Tr. 61.)

On May 30, 2006, Storm filed its Statement of Defense to Telenor's claims in the arbitration proceeding, taking issue with each of Telenor's claims. Specifically, Storm argued that it did not violate the Agreement because (1) it was justified in not attending the shareholder and board meetings; (2) the Kyivstar Charter is violative of Ukrainian law, and therefore, Telenor's attempts to enforce and

amend it were improper; (3) the non-compete clause of the Agreement is overbroad and unenforceable; and (4) it was not required to submit to arbitration because Telenor waived its right to arbitration by failing to raise the issue in the prior Ukrainian court proceedings-even though Telenor was not a party to, and had never been notified of, those proceedings. (Award at 16.) In the alternative, Storm argued that the Agreement itself was invalid "because it was entered into without the requisite authority and fails to comply with the registration and execution requirements of Ukrainian law."(*Id.* 16-17.)

### *Storm's Motion to Dismiss and the Partial Final Award*

**\*4** Although Storm submitted a Statement of Defense and appointed an arbitrator to the Tribunal, on June 7, 2006, Storm moved to dismiss the arbitration on the alternative ground presented in its Statement of Defense, specifically, that the Tribunal had "no authority to decide the merits of Telenor's claim because the Ukrainian courts had ruled ... that the January 30, 2004 Shareholders Agreement was 'null and void in full, including the arbitration clause.' " (*Id.* 18-19.)

The Tribunal, composed of Kenneth R. Feinberg, Gregory B. Craig, and William R. Jentes, held a series of hearings on Storm's motion to dismiss during the summer of 2006. On October 22, 2006, the arbitrators entered a "Partial Final Award" rejecting Storm's jurisdictional argument. (Zeballos Decl. Ex. H.) As an initial matter, the Tribunal found that it had authority to determine its own jurisdiction. (*Id.* 12-13, citing *Sphere Drake Ins. v. Clarendon Nat'l Ins., 263 F.3d 26 (2d Cir.2001).*) Next, the Tribunal considered whether it was precluded by the Ukrainian court decisions from determining the merits of the dispute. The arbitrators did not accept the Ukrainian courts' conclusions as binding on them, finding instead that those conclusions were based on an incomplete record and collusive litigation. (*Id.* 14-16.)Though reserving to later hearings the questions regarding the validity of the Shareholders Agreement (*id.* 15), the arbitrators declared that whether or not Nilov had authority to enter into the Shareholders Agreement itself, he at least had the authority to enter the Arbitration Agreement. (*Id.*) Furthermore, the Tribunal determined that the Ukrainian courts had not given "meaningful consideration" to the severability of the arbitration clause because neither Alpren nor Storm raised that issue with those courts. (Award at

Slip Copy                                                                                                                Page 4
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

26.) Accordingly, the Tribunal denied Storm's motion to dismiss, and scheduled the arbitration hearing for December 7 and 8, 2006. (Zeballos Decl. Ex. H at 16.)

### *Further Attempts to Avoid Arbitration and the Preliminary Injunction*

After losing its motion to dismiss before the Tribunal, Storm's attempts to avoid arbitration proceeded in two fronts, in both the Ukrainian and American courts. First, on November 8, 2006, Storm obtained a "clarification" from the Ukrainian courts that broadened the scope of their initial rulings by specifically stating that the arbitration clause of the Shareholders Agreement was invalid, apparently in response to the arbitrators' suggestion that the Ukrainian courts had not considered the possible severability of the Arbitration Agreement. (Zeballos Decl. Ex. K.) In addition, the November 8 ruling sought to cure Alpren's failure to join Telenor as a party in the earlier proceedings by announcing that the court's earlier order "shall apply and be binding also upon those entities that were not among the parties to the [original] court proceedings."(*Id.*) The Ukrainian court also ruled that "[s]hould the parties and the arbitrators ... ignore the above circumstances and render an award on the dispute, such acts shall constitute a violation of the court decision."(*Id.*) Storm again returned to the Tribunal, arguing that the November 8 ruling precluded it from appearing at the upcoming arbitration hearing and requesting postponement of that hearing, but the Tribunal denied the postponement and reaffirmed the December hearing dates. (Award at 28.)

**\*5** Meanwhile, on November 13, 2006, Storm filed a petition in New York state court to enjoin the arbitration from continuing, and seeking to vacate the Partial Final Award. Telenor removed the action to this Court, asserting subject matter jurisdiction under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention" or "Convention").*See* 9 U.S.C. §§ 203, 205. On November 22, 2006, this Court denied preliminary relief, holding that the Court could not review an interlocutory order of an arbitral panel, and that to the extent Storm relied on the general equitable power of the Court, it was insufficiently likely to prevail on the merits, given the likely correctness of the arbitrators' ruling, the apparently collusive nature of the Ukrainian litigation, and the

lack of conflict between the arbitrators' decision and the Ukrainian judgment, given that Storm had not been prohibited by the Ukrainian court from participating in the arbitration. (*See* 11/22/06 Tr. 19-38.)

Following this decision, the Ukrainian parties returned to court. This time, Alpren once again threw its hat into the ring, and sued not Storm but Klymenko himself as general director of Storm. On December 1, 2006, again without notice to Telenor, Alpren secured an injunction from the Ukrainian court barring Telenor, Storm, and Klymenko from participating in any way in the arbitration-notwithstanding that Telenor had again not been notified of the action nor named as a party to it. (Award at 28; *see, e.g.,* Sills Decl. I, Ex. C at 1.) Telenor was not served in Ukraine with the order of the Ukrainian court; it obtained a copy of the judgment only via New York counsel for Storm in connection with the arbitration proceedings and this litigation. (Sills Decl. I, Ex. B ¶ 41.) Three days later, on December 4, 2006, Storm again sought to halt the arbitration on the basis of the December 1 injunction. (*Id.*) The Tribunal again denied the request, and ordered the hearing to proceed as scheduled. (Award at 28.)

After this ruling, Telenor sought relief from this Court, counterpetitioning to compel arbitration, and simultaneously seeking an anti-suit injunction against Storm, Alpren, and Altimo to prevent further litigation in the Ukraine. *Storm, 2006 WL 3735657, at \*4.* On December 7, 2006, the Court granted a temporary restraining order, and held an evidentiary hearing on Telenor's motion for a preliminary anti-suit injunction. *Id.* On December 15, 2006, the Court, finding that the Ukrainian judgments had been "conducted in the most vexatious way possible" and that Nilov "had at least apparent authority to sign the Shareholders Agreement and thereby to bind Storm to the Agreement's arbitration clause," granted Telenor's petition to compel arbitration and preliminarily enjoined "Storm, Altimo and Alpren ... from bringing or attempting to cause the enforcement of any legal action in the Ukraine that would disrupt, delay or hinder in any way the arbitration proceedings between Telenor and Storm in New York."*Id.* at \* 14.[FN5]

> FN5. Altimo and Alpren appealed the Court's order to the Second Circuit. That appeal is currently pending.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                            Page 5
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
(Cite as: Slip Copy)

### The Arbitration Hearings

*6 Despite Storm's attempts to indefinitely postpone the arbitration proceedings, the arbitration hearings took place on December 18-19, 2006. At the beginning of the hearing, Storm requested that the Tribunal "adjourn [the] hearing until such time as the Ukrainian Court action has run its course," arguing once again that the Ukrainian action prohibited Storm from participating in the arbitration proceedings. (Award at 31.) When the Tribunal denied Storm's application, counsel for Storm stated that, "[b]ecause of the December 1 ruling [in Ukraine], Storm feels that its hands are tied and that it cannot go forward on the merits."(*Id.*) Storm then physically withdrew from the hearing room and did not participate in the hearing. (*Id.*)

At the hearing, Telenor presented two witnesses and submitted one new affidavit into evidence. The first witness was Jay Moland, Chief Financial Officer at Telenor and Deputy Chairman of the Board of Kyivstar. (*Id.*) Moland testified about the failure of Storm's members of the Kyivstar Board of Directors to attend board meetings beginning on March 18, 2005, and continuing to the present. (*Id.*) He described the damage caused to Kyivstar that resulted from Storm's boycott, and testified that Storm-up until the commencement of the arbitration-had never explained their Board members' absence by claiming that the Shareholders Agreement was invalid. (*Id.* 31-32.)The second witness was Fredrik Lykke, former in-house counsel for Telenor. (*Id.* 32.)Lykke described the drafting and negotiation of the Agreement, the fact that there was no objection to identifying the law of the State of New York in the choice of law provision, and the importance to Telenor of having a non-compete provision included in the Agreement. (*Id.*)

In total, over the course of all of its hearings, the Tribunal heard or received testimony from eighteen different witnesses by live appearance and by affidavit. (*Id.*) It received hundreds of exhibits and thousands of pages of other documentary submissions. (*Id.*) Both Storm and Telenor also submitted lengthy pleadings, briefs, letters, and submissions of legal authorities in which they analyzed the facts, discussed the relevant law, and argued their positions. (*Id.*) The Tribunal also received post-hearing briefs from both parties, although only Telenor filed a post-hearing brief. (*Id.*)

However, in response to an order directing further briefing on the choice of law issue, Storm participated in the final briefing of the case. (*Id.; see* Sills Decl. I, Exs. R & T.) On May 8, 2007, the Tribunal closed the hearings. (Sills Decl. I, Ex. U.)

### The Final Award

On August 1, 2007, the Tribunal issued a unanimous final award. First, the Tribunal reaffirmed the Partial Final Award, finding that "[n]othing that has ... transpired" since the Partial Final Award "has caused the Tribunal to change its earlier decisions."(Award at 33.) Instead, the arbitrators found that the November 8 ruling of the Ukrainian court "actually convince[d]" them "that the [Ukrainian] Court ... failed to take into account several crucial factors bearing on a determination of the validity of the arbitration clause."(*Id.* 34.)In addition, the Tribunal found that the persuasive force of the November 8 ruling is "further reduced by the fact that Telenor (again) did not receive notice of the proceeding before the [r]uling was rendered," and by the limited evidentiary record submitted to the Ukrainian court in support of that ruling. (*Id.*) Specifically, the Tribunal noted that the Ukrainian court did not consider certain evidence of Storm's "clear intent to have its disputes with Telenor resolved with arbitration, ... thus removing a key underpinning for the *Alpren* decisions."(*Id.* 34-35.)The arbitrators also rejected the December 1 injunction as not binding on the Tribunal, and found that their proceedings were consistent not only with the anti-suit injunction entered by this Court, but with "the directives of the UNCITRAL Rules, the Parties' intent as reflected in the Shareholders Agreement, and well-settled international commercial arbitration practice."(*Id.* 35;*see, e.g., id.*("[T]he Tribunal points out that international commercial arbitration is a centerpiece of dispute resolution in today's global economy .... For commercial arbitration to succeed in this international environment, an arbitral tribunal must be free to proceed in accordance with the arbitration rules selected by the Parties.").)

*7 Next, the Tribunal determined that New York law governed the arbitration, as "designated by the parties" in the arbitration clause. (*Id.* 36, quoting Agreement § 13.06.) The Tribunal rejected Storm's attempts to apply Ukrainian law, finding that application of New York law was consistent both with the terms of the arbitration clause, and with New York, federal, and international law. (Award at 39-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

42.) In addition, the Tribunal again rejected Storm's argument that it should "give conclusive effect to the decisions of the Ukrainian courts, regardless of what contrary results might be reached under New York law."(*Id.* 41-42.)The Tribunal found that "the same reasons" that led the Tribunal to "decline[ ] to accept those ... decisions in connection with the issues of its jurisdiction," including the collusive nature of the Ukrainian litigation and the fact that Telenor was not named as a party to that litigation or notified of it until after the appeal had been rendered, also led it "to reject those decisions in favor of the application of New York law to the merits of this controversy."(*Id.* 42.)

Applying New York law, the Tribunal found that the 2004 Shareholders Agreement was validly executed and binding on the parties. In so finding, the Tribunal determined that Nilov had both actual and apparent authority to execute the 2004 Agreement. (*Id.* 45-53.)The Tribunal also found that, because Storm had intentionally created an appearance that Nilov had the authority to enter into the Agreement, and because Telenor relied on that representation to its detriment, Storm was estopped from challenging the validity of the Agreement.(*Id.* 53-54.)

Finally, the Tribunal found that Storm had breached, and continues to breach, the Agreement by "fail[ing] to maintain its membership on the [Kyivstar] Board"(*id.* 56), and by impeding arbitration through "its steadfast efforts before this Tribunal to block the resolution on the merits of Telenor's claims" in violation of the Agreement's arbitration clause (*id.* 61). The Tribunal also found that Storm had breached the Agreement's non-compete clause when Storm's affiliates, Alfa and Russian Technologies, acquired an interest in competing Ukrainian telecommunications companies (*id.* 58-61). Furthermore, the Tribunal found that Storm had also breached the Arbitration Agreement by instituting litigation in Ukraine for the sole purpose of enjoining Ernst & Young from providing auditing services to Kyivstar (the "E & Y actions"), which Ernst & Young had agreed to provide pursuant to an agreement with Kyivstar (*id.* 62-64;*see* Zeballos Decl. Exs. T-V).[FN6]

> FN6. The Tribunal found that the result of the E & Y actions has been an "immediate adverse impact in Telenor ASA share price," and a possible default by Kyivstar on certain bond obligations totaling over $400 million.

(Award at 62-63.)

Because the Tribunal found that Telenor had failed to prove an amount of damages, the Tribunal did not award damages to Telenor as a result of Storm's breach. (Award at 66.) However, based on its findings, the Tribunal ordered that Storm: (1) transfer certain of its Kyivstar shares to "newly-formed affiliated companies" that can nominate members for the Board of Directors; (2) "take such steps as are necessary to assure that its nominated candidates are elected to the" Board of Directors; (3) "cause its duly authorized representatives to attend" all meetings of Kyivstar; and (4) "take such steps as are necessary" to amend the Kyivstar Charter in compliance with the December 22, 2005, Ukrainian court order. (Award at 66-67.) In addition, the Tribunal ordered that Storm must divest its Kyivstar shares within 120 days unless Storm, and any affiliated entities, divest their holdings in the competing telecommunications companies that exceed five percent. (*Id.*) Finally, the Tribunal ordered the entry of an anti-suit injunction against Storm, prohibiting Storm and "anyone acting in concert with it" from initiating any suit "relating to, or in connection with, any obligations described in the Shareholders Agreement," as well as prohibiting the continued prosecution of "any existing litigations currently pending in the Ukraine," including the E & Y actions. (*Id.* 67-68.)

**\*8** On August 1, 2007, Telenor filed a petition to confirm the Tribunal's Final Award with this Court.[FN7]Storm responded and cross-moved to vacate the award on August 24, 2007, and Telenor responded to Storm's cross motion on August 30, 2007. Both motions were fully briefed as of September 12, 2007. [FN8]

> FN7. Petitions to confirm arbitral awards are treated as motions. *See*9 U.S.C. § 6 ("Any application to the court ... shall be made and heard in the manner provided by law for the making and hearing of motions ...."); *see, e.g., IFC Interconsult, AG v. Safeguard Int'l Partners, LLC,* 438 F.3d 298, 307-08 (3d Cir.2006) (noting that an "application to the District Court for confirmation of the arbitration award was a motion, not a pleading").

> FN8. After the motions were fully briefed, Storm informed the Court that, "in response to an application made by Storm," a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 7
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
(Cite as: Slip Copy)

Ukrainian court had issued a decision refusing to recognize the Final Award, essentially for the same reasons Storm argues for non-recognition here. (Letter from Pieter Von Tol to the Court, dated Oct. 23, 2007, at 1.) However, Storm concedes that the Ukrainian judgment is not binding on this Court, and does not "in any way ... limit this Court's ability to decide Telenor Mobile's pending petition to confirm or Storm's motion to vacate the Final Award."(*Id.*) Indeed, even if Storm had not conceded the point, the only court with authority to vacate an international arbitration award is one at the seat of arbitration, *see Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111, 115 n. 1 (2d Cir.2007); Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 23 (2d Cir.1997)*, and therefore, only this Court has jurisdiction to determine whether the Award should be set aside. Nevertheless, depending on the result of any further decisions by the Ukrainian courts, the Ukrainian judgment certainly may affect Telenor's ability to enforce the Award in Ukraine, if such enforcement proves necessary. (*Compare* Letter from Robert L. Sills to the Court, dated Oct. 25, 2007, at 4 (suggesting that "a judgment based on the Award-which grants only specific relief-can be enforced *in personam* here"), *with* Zeballos Decl. Ex. F, at 7 (positing that "[a]n award in the present dispute ... may run into enforcement problems in Ukraine).)

**DISCUSSION**

**I. *Legal Standards***

In order to ensure that "the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation" are met, arbitration awards are subject only to "very limited review." *Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir.1993)*. "Normally, confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir.2006)* (citation and internal quotation marks omitted). Only "a barely colorable justification for the outcome reached" by

the arbitrators is necessary to confirm the award. *Landy Michaels Realty Corp. v. Local 32B-32J, Serv. Employees Int'l Union, 954 F.2d 794, 797 (2d Cir.1992)* (citation and internal quotation marks omitted). Accordingly, "[t]he showing required to avoid summary confirmation of an arbitration award is high, and a party moving to vacate the award has the burden of proof." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir.1997)* (citations omitted).

Telenor's application for enforcement of the arbitral award against Storm is governed by the New York Convention, which was enacted into law by Chapter 2 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 201 *et seq.* Section 207 of the FAA provides that a party to an arbitration may apply for an order confirming an award made pursuant to the New York Convention "[w]ithin three years after [the] arbitral award ... is made." 9 U.S.C. § 207. Section 207 further provides that "the court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specific in the" Convention. *Id.*

The New York Convention, in turn, sets out narrowly limited bases upon which the Court may decline to recognize and enforce an award. Under Article V, a district court may refuse to confirm a foreign arbitration award upon a showing that one or more of the following enumerated grounds exist:
(a) The parties to the agreement ... were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced[.]

*9 New York Convention art. V(1). Recognition and

Slip Copy                                                                                                                                                          Page 8
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

enforcement of an arbitral award may also be refused where "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country," or where "[t]he recognition or enforcement of the award would be contrary to the public policy of that country."*Id.* art. V(2). These provisions of the Convention have been implemented by the FAA. *See* 9 U.S.C. § 207.

Storm invokes each of the aforementioned statutory grounds for vacatur in support of its motion to vacate the Final Award. In addition, Storm argues that the award was in "manifest disregard" of the applicable law, a non-statutory defense to enforcement. *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 23-25 (2d Cir.1997); *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 203-204 (2d Cir.1998).

## II. *The Standards Applied*

### A. Manifest Disregard

Storm's principal argument in support of its motion to vacate is that the Tribunal acted in "manifest disregard" of controlling law when it issued the Final Award. Specifically, Storm argues that the arbitrators were required as a matter of law to follow the prior decisions of the Ukrainian courts which found the Arbitration Agreement invalid. Alternatively, Storm argues that the Final Award should be vacated "as a result of the Tribunal's manifest disregard of clear Second Circuit precedent providing for a jury trial on the existence of the Shareholders Agreement, including the agreement to arbitrate."(Resp.Mem.13.) Telenor argues that the Ukrainian decisions are not binding on the arbitrators, and that there is no factual dispute that would call for a jury trial here. The Court agrees.

Relying on an observation by the Supreme Court in *Wilko v. Swan,* 346 U.S. 427, 436-37 (1953), overruled on other grounds in *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477 (1989), the Second Circuit has recognized that an arbitration award may be vacated if it is in "manifest disregard of the law." *See Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.,* 888 F.2d 260, 265 (2d Cir.1989); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986). However, the reach of the doctrine is "severely limited." *Gov't of India v. Cargill, Inc.,* 867

F.2d 130, 133 (2d Cir.1989). Indeed, the Circuit has cautioned that manifest disregard "clearly means more than error or misunderstanding with respect to the law."*Bobker,* 808 F.2d at 933. To modify or vacate an award on this ground, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir.1997).

### 1. The Ukrainian Decisions

**\*10** Storm argues that the arbitrators were bound by law to follow the holdings of the Ukrainian courts, which found that "the Shareholders Agreement was null and void in full, including the arbitration clause, from the time of [its] execution."(Resp. Mem. 5 (citation and internal quotation marks omitted).) According to Storm, both a trial court and an appellate court in Ukraine found the Shareholders Agreement, including the arbitration clause, to be invalid. (Resp. Mem. 7; *see* Zeballos Decl. Ex. K at 1-2 (reiterating and clarifying the Ukrainian decisions "in light of the [Tribunal's] Partial Final Award").) Thus, Storm asserts that comity "militates against disregard" of the Ukrainian decisions (Resp. Mem. 9, citing *Sea Dragon, Inc. v. Gebr. Van Weedle Scheepvaartkantoor B.V.,* 574 F.Supp. 367, 372 (S.D.N.Y.1983)), and therefore, that the Tribunal's decision to reject the Ukrainian judgments as non-binding constitutes "manifest disregard" of controlling law. Conversely, Telenor argues, and the Tribunal found, that the collusive nature of the Ukrainian litigation rendered those judgments inconclusive, unpersuasive, and non-binding. The Court agrees.

First, Storm argues that "the allegedly non-adversarial nature of a foreign matter does not provide a basis for ignoring an otherwise valid foreign decree."(Resp.Mem.11.) Storm is incorrect. Although it is "well established that a state may not require a person to do an act in another state that is prohibited by the law of that state,"*Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 61 (2d Cir.2004), quoting Restatement (Third) of Foreign Relations Law § 441 (1987), "[i]t is also well established ... that orders of foreign courts are not entitled to comity if the litigants who procure them have 'deliberately courted legal impediments' to the enforcement of a federal court's orders,"*id.,* quoting *Societe*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                     Page 9
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
(Cite as: Slip Copy)

*Internationale v. Rogers,* 357 U.S. 197, 208-09 (1958).*See, e.g., Bridgeway Corp. v. Citibank,* 201 F.3d 134, 142 (2d Cir.2000) (rejecting Liberian judgments as non-binding); *see also Laker Airways v. Sabena, Belgian World Airlines,* 731 F.2d 909, 939-40 (D.C.Cir.1984) (refusing to respect English court's order where the "defendants involved in the American suit had ... gone into the English courts to generate interference with the American courts"). Thus, where foreign proceedings are instituted in order to "undermine federal judgments," comity considerations "have no bearing" on a court's consideration of whether to enforce an arbitral award under the New York Convention. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 127 (2d Cir.2007).

Indeed, far from exhibiting manifest disregard for established legal authority, by rejecting the Ukrainian decisions as non-binding, the Tribunal followed the longstanding legal rule against "friendly" litigation: "A judgment entered under such circumstances, and for such purposes, is a mere form .... A judgment in form, thus procured, in the eye of the law is no judgment of the court. It is a nullity." *Lord v. Veazie,* 49 U .S. 251, 256 (1850).*See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 n. 7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who is not a party or privy and, therefore, never had an opportunity to be heard."); *see also* Charles A. Wright and Arthur R. Miller, 13 Fed. Prac. & Proc. § 3530 (3d ed.2004) (characterizing the "rule against suits brought by cooperating interests for the purpose of affecting the interests of nonparties" as "fundamental"). This longstanding rule was recently applied by the Circuit in *Uzan,* where the Circuit declined to give effect to a Turkish judgment which it found to be the result of collusive litigation between parties in a "very close relationship." 388 F.3d at 60. Thus, the rule against collusive litigation has deep roots in our legal system, and trumps any relevant comity concerns here.

*11 Next, Storm argues that, even if collusion is an adequate basis for setting aside a foreign judgment, "[t]here is no evidence that Storm cooperated with Alpren in the Ukrainian litigation," and therefore the Ukrainian proceedings could not be characterized as collusive. (Resp.Mem.11.) Storm made an identical argument to this Court twice before, in support of its November 2006 preliminary judgment motion, and in opposition to Telenor's December 2006 motion for an anti-suit injunction. The Court rejected that argument

on both occasions. The definition of collusion has not changed during the intervening months. Despite Storm's repeated protestations to the contrary, the Ukrainian decisions are just as collusive now as they were then. It is unnecessary to recite again the factual basis for the collusiveness determination. The Final Award contains a detailed discussion of the factual basis for that determination (Award at 33-36), and the Court's own consideration of the same issue in its prior rulings resulted in a conclusion identical to the Tribunal's findings. *See*2006 WL 3735657, at *6 ("The real parties in interest in the Ukrainian lawsuit are essentially the same entities that are involved in the arbitration."); 11/22/06 Tr. 30 ("The Ukrainian judgments ... can have no binding effect on Telenor in any subsequent proceeding."); 12/15/06 Tr. 29 (finding that the Ukrainian court was "presented with no adversarial issues" and that Storm "basically sue[d][it]self"). Storm has presented no new evidence, either to this Court or to the Tribunal, undermining that determination.

Storm also argues that the Ukrainian litigation can not be characterized as having the purpose of "undermining federal judgments" because that litigation was instituted before the arbitration proceedings were complete, and because Storm did not "conceal" the Ukrainian judgments from the Tribunal. (Resp. Reply 2-3.) Thus, Storm argues that this case is unlike *Uzan,* in which the Turkish judgments that purported to enjoin the parties to the arbitration proceeding from complying with "imminent orders by the district court" were obtained in secret only after the arbitral award had been rendered and the arbitration had been completed. (*Id.* 3.)*See*388 F.3d at 60 (noting that the Turkish injunctions were obtained "just before the Court rule on the preliminary injunction motion," and characterizing "defendants' concealment of the Turkish injunctions" as "most telling"). However, even if the Turkish proceedings in *Uzan* could be characterized as a more transparent attempt to undermine the federal proceedings in that case than the Ukrainian proceedings here, Storm's pre-emptive strike on the arbitration proceedings should not be condoned simply because Storm had the foresight to attack the award before it was even rendered. Even if the temporal relationship between the foreign and federal judgments is more attenuated here than it was in *Uzan,* the Circuit nowhere indicated that such a close relationship is necessary to find that a foreign judgment was collusively obtained. Instead, the Circuit simply considered the close temporal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                     Page 10
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
(Cite as: Slip Copy)

relationship as evidence of the collusivness of the Turkish judgments. Different, yet similarly substantial and "telling," evidence led the Tribunal, and the Court, to find collusion here; thus, the Tribunal properly found that the Ukrainian proceedings were instituted "to thwart" a potentially adverse federal judgment, *id.,* and the resulting judgments were non-binding.

**\*12** In addition, although Storm did not "conceal" the Ukrainian decisions from the Tribunal (Resp. Reply 3), it is undisputed that Telenor did not receive notice of the Ukrainian litigation until after the Ukrainian courts had rendered their decisions. Storm argues that Telenor could have intervened during the appellate proceedings; however, as the Tribunal found, "[p]ost-judgment intervention" is not a substitute for being a named adversary in the underlying litigation, as such intervention results in "delay" and "prejudice to existing parties," and is not consistent "with the fair administration of justice."(Award at 43, citing *United States v. Yonkers Bd. of Educ.,* 801 F.2d 593, 596 (2d Cir.1986).) Thus, Storm "undermined" the arbitral award-and the resulting federal proceedings to enforce that award-by concealing the Ukrainian litigation from Telenor until after Telenor was foreclosed from fully participating in the Ukrainian proceedings.

The remainder of Storm's arguments rely on inapposite and unpersuasive case law. For example, Storm argues that "[t]he courts have long held that a final judgment obtained through sound procedures in a foreign country is generally conclusive as to its merits unless" the foreign court lacked jurisdiction to hear the dispute, the judgment was "fraudulently obtained," or "enforcement of the judgment would offend the public policy of the state in which enforcement is sought."*Ackermann v. Levine,* 788 F.2d 830, 837 (2d Cir.1986). Storm argues that the Tribunal specifically rejected a finding that the Ukrainian decisions were "fraudulently obtained," and that none of the other exceptions apply. (Resp.Mem.8-12.) However, a foreign judgment may only be deemed conclusive if it is obtained through "sound procedures." *Ackermann,* 788 F.2d at 837;*see Bridgeway Corp.,* 201 F.3d at 142 (foreign judgment not conclusive where it was not obtained through "impartial justice"). As previously discussed, the Ukrainian judgments were obtained through collusive litigation; therefore, they were not obtained through "sound procedures," and the judgments are not binding on the Tribunal, regardless of whether they

satisfied any of the preconditions set out in *Ackermann.*

Storm devotes a significant portion of its brief to a discussion of *Sea Dragon,* 574 F.Supp. 367. In *Sea Dragon,* the petitioner, a vessel owner, moved to confirm an arbitration award ordering respondent, charterer of the same vessel and a Dutch corporation, to pay petitioner a portion of freight due under an affreightment contract. 574 F.Supp. at 369. In the arbitration, the respondent admitted the debt, but argued that the arbitral tribunal was precluded from rendering an award in favor of petitioner because one of respondent's creditors had obtained an order from the Dutch court in an unrelated proceeding, in which respondent actively participated, that froze respondent's funds. *Id.* at 369-70.The Dutch court's attachment order against respondent covered the funds it owed to petitioner under the contract.*Id.* The arbitration tribunal rejected the Dutch order as non-binding and issued an award in petitioner's favor, but the district court vacated the award, finding that the arbitrators were bound to follow the Dutch court's decision, and that the award impermissibly required respondent to "violate the Dutch decree." *Id.* at 372.Storm argues that this case parallels *Sea Dragon,* as the arbitral award here would force Storm to choose between obeying the arbitration award or the Ukrainian decisions. Accordingly, Storm argues that the Ukrainian decisions bound the arbitrators, and that their rejection of those decisions constitutes manifest disregard of controlling law. (Resp.Mem.13.)

**\*13** Storm's application of *Sea Dragon* is unavailing. First, *Sea Dragon* is not controlling law, as it does not bind this Court, was decided over two decades ago, and has not been relied upon for the relevant proposition since it was decided. *See Chemical Overseas Holdings, Inc. v. Republica Oriental Del Uruguay,* No. 05 Civ. 260, 2005 WL 1123897, at \*1 (S.D.N.Y. May 10, 2005) (finding *Sea Dragon* inapposite); *Arbitration Between Smithkline Beecham Biologicals, S.A. v. Biogen, Inc.,* No. 95 Civ. 4988, 1996 WL 209897, at \*6 (S.D.N.Y. Apr. 29, 1996) (same). In addition, although Storm claims that the facts of this case "parallel[ ]" those in *Sea Dragon* (Resp.Mem.8), the facts of *Sea Dragon* vary significantly from the facts of this case. While the district court in *Sea Dragon* found that the petitioner in that case had been given adequate notice and an opportunity to be heard in the Dutch proceedings, 574 F.Supp. at 372 n. 2, Telenor had neither notice

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 11
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

nor an opportunity to respond in the Ukrainian proceedings. Moreover, while the *Sea Dragon* court specifically found that the Dutch order was obtained "in compliance with ... American due process standards,"*id.* at 372, the Ukrainian litigation, which was undertaken in a collusive and vexatious manner, did not comply with those standards.

Storm also argues that the Court should follow *Sea Dragon'* s lead and find that "the purportedly non-adversarial nature of a foreign proceeding does *not* provide a basis for disregarding the entire judgment."(Resp. Reply 4 (emphasis in original).) Storm argues that the respondent in *Sea Dragon* voluntarily participated in the Dutch proceedings, just as Storm participated in the Ukrainian proceedings, but in that case, participation in the foreign proceedings was not found to be a basis for setting aside the foreign judgment. Insofar as *Sea Dragon* can be characterized as so finding, that finding has been nullified by the Circuit in a series of decisions, including *Uzan* and *Karaha Bodas.*Moreover, even if the Dutch proceedings in *Sea Dragon* could be characterized as "non-adversarial," unlike the Ukrainian proceedings, the Dutch proceedings were not found to be vexatious, collusive, or taken with the purpose of undermining the arbitration proceedings. Instead, those proceedings were brought by a third party that was not in any way connected to the arbitration proceeding, and that was acting to protect its own interests as a separate creditor of the respondent. See 574 F.Supp. at 372 n. 2. Conversely, the Ukrainian proceedings were brought essentially by Storm against itself, and thus were not entitled to comity.

Finally, Storm attempts to impugn the Tribunal's reasoning by arguing that it was contradictory for the Tribunal to state that it was not criticizing "the integrity of [the Ukrainian] courts or their decisions," and that it had "found no evidence of any impropriety or violations of any Ukrainian procedures" (Resp.Mem.9-10), but nevertheless to find that the decisions should not be given conclusive effect. By attempting to shift focus from the parties' misdeeds to the validity of the Ukrainian legal system, Storm is attempting a legal bait and switch, relying on what may be an otherwise fair legal system to exonerate them for their unfair *abuse* of that system. The Tribunal's determination that the Ukrainian litigation was collusive does not impugn the Ukrainian legal system itself; instead, it only impugns the way in which the parties used-and abused-that system. There

were no "impropriet[ies] or violation[s]" of Ukrainian procedure by the Ukrainian courts because Storm and its cohorts made it virtually impossible for the Ukrainian courts to adequately consider the issues before it, as the collusive nature of the litigation left those courts with a woefully inadequate, one-sided record. In contrast, the arbitrators were privy to a complete record on the issues, and were thereby able to identify the collusive nature of the Ukrainian litigation. Although it is impossible to know whether the outcome of the Ukrainian litigation would have changed if the parties had not engaged in collusion, the resulting uncertainty is certainly sufficient to strip those decisions of any conclusive effect.[FN9]

> FN9. The Tribunal also found the Ukrainian decisions to be non-binding because those decisions did not "adequately address[ ] the severability of the arbitration clause from the rest of the Shareholders' Agreement" (Award at 24), and because those decisions "ha[d] no res judicata or collateral estoppel effect on Telenor" as a result of Telenor's non-participation in the underlying litigation (*id.* 42). Because the Court finds that the collusive nature of the Ukrainian litigation was a sufficient ground for the Tribunal to reject the Ukrainian decisions as non-binding, it is unnecessary to determine whether the Tribunal's alternative grounds were similarly sufficient. *See Wallace v. Buttar,* 378 F.3d 182, 190 (2d Cir.2004) (finding that an arbitral award should be enforced "if there is a barely colorable justification for the outcome reached").

**\*14** Accordingly, the arbitrators were not bound to follow the Ukrainian decisions, and their rejection of those decisions as non-binding did not constitute manifest disregard of the law.

2. Jury Trial

Next, Storm asserts that the Tribunal acted in manifest disregard of the law by allegedly depriving Storm of a jury trial on the validity of the arbitration agreement, as required by *Sphere Drake,* 263 F.3d 23,abrogated by *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440 (2006). Telenor argues that Storm waived its right to a jury trial by agreeing to be bound by an arbitration agreement under which the arbitrators were permitted to determine their own jurisdiction. Alternatively, Telenor argues that there

is no factual dispute that would call for a jury trial in this case. Although the Court concludes that it must make an independent determination of the arbitrability of the dispute, the Court agrees with Telenor that Storm has not presented sufficient evidence to require a jury trial.

In the Second Circuit, a party challenging the existence or formation of an agreement from which an arbitration proceeding derives is entitled to have those issues decided in court, rather than by the arbitral tribunal, if the party (1) presents "some evidence" in support of its claim; and (2) has unequivocally denied that an agreement was made. *Sphere Drake,* 263 F.3d at 30, citing *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.,* 462 F.2d 673, 676 (2d Cir.1972) and *Almacenes Fernandez, S.A. v. Golodetz,* 148 F.2d 625, 628 (2d Cir.1945). The party challenging contract formation has the right to a jury trial when the *Sphere Drake* prerequisites have been met.*Golodetz,* 148 F.2d at 628. *See, e.g.,*9 U.S.C. § 4 (referring to right to jury trial regarding making of arbitration agreement).

### a. Independent Determination

Consideration of Storm's argument requires two steps. First, the Court must decide whether the Tribunal's arbitrability determination is entitled to deference, or whether the Court must make an independent determination on that issue. Telenor argues that Storm cannot invoke its right to a jury trial because it specifically agreed in the Arbitration Agreement that the arbitrators would rule on their own jurisdiction, and the Court must defer to that agreement. (Pet.Mem.15.) Telenor asserts that, by incorporating the UNCITRAL Arbitration Rules in the arbitration agreement, which provide that "[t]he Arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or the separate arbitration agreement," Storm agreed to give the Tribunal, rather than a court, "the authority to determine whether an arbitration agreement was reached, and whether the arbitration is the correct forum to hear any particular dispute."(Pet. Mem. 16, citing UNCITRAL Arb. R. Art. 21(1).) According to Telenor, when parties incorporate such language in an arbitration clause, courts have "consistently found that this serves as 'clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.' " (*Id.,* quoting *Contec Corp. v. Remote Solution Co., Ltd.,*

398 F.3d 205, 208 (2d Cir.2005).)

*15 The Court disagrees. Telenor primarily relies on *Contec Corp.,* 398 F.3d at 208, and *Shaw Group, Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 123 (2d Cir.2003), in support of its argument that the UNCITRAL language is "clear and unmistakable evidence" that the parties intended to submit the issue of arbitrability to the Tribunal. (Pet.Mem.15.) However, neither case dealt with an arbitration agreement that incorporated the UNCITRAL language. *See Contec Corp.,* 398 F.3d at 208 (considering the incorporation of the American Arbitration Association ("AAA") rules in the contract); *Shaw Group,* 322 F.3d at 123 (considering the incorporation of the International Chamber of Commerce ("ICC") rules in the contract). The ICC rules are clearly more sweeping than the UNCITRAL language at issue here. *See* ICC Rule 6.2 ("[A]ny decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself ."). Moreover, while the AAA rules provide arbitrators with general, unrestricted authority to "rule on [their] jurisdiction," *see* AAA Rule R-7(a), the UNCITRAL rules only allow arbitrators to rule on *objections* to that authority. Thus, while incorporation of the ICC and AAA rules may be "clear and unmistakable evidence" that the parties intended for the arbitrators to have sole jurisdiction over the arbitrability of the dispute, the UNCITRAL language, standing alone, is insufficient to strip Storm of its ability to "present evidence of [the agreement's] ... invalidity" to this Court. *China Minmetals Materials Import and Export Co., Ltd. v. Chi Mei Corp.,* 334 F.3d 274, 289 (3d Cir.2003).

Moreover, there is a strong presumption in favor of judicial rather than arbitral resolution on the issue of arbitrability. *Shaw Group,* 322 F.3d at 120, citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944-45 (1995). As the Supreme Court has stated, "the 'who' (primarily) should decide arbitrability question ... is rather arcane," and "[a] party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers" when they enter into an arbitration agreement.*First Options,* 514 U.S. at 945. Arbitration itself is a "matter of contract," *Shaw Group,* 322 F.3d at 120, quoting *AT & T Techs. v. Commcn's Workers of Am.,* 475 U.S. 643, 648 (1986), and, just as a party can only be forced to arbitrate the *merits* of a dispute where it is clear that they agreed to arbitrate those merits, a party can only be forced to arbitrate the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*arbitrability* of a dispute where it can be said with certainty that the parties agreed to arbitrate the issue of arbitrability. *See id.* A reviewing court should not "force" the parties "to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options,* 514 U.S. at 945. *See China Minmetals,* 334 F.3d at 288 (noting that "every country" that allows arbitrators to determine their own jurisdiction also "allows some form of judicial review of the arbitrator's jurisdictional decision where the party seeking to avoid enforcement of an award argues that no valid arbitration agreement ever existed"). *See, e.g., Encyclopaedia Universalis, S.A. v. Encyclopaedia Britannica, Inc.,* No. 03 Civ. 4363, 2003 WL 22881820, at *6 n. 54 (S.D.N.Y. Dec. 4, 2003) (citing *China Minmetals* with approval).

**\*16** Nor is the Court persuaded to defer to the Tribunal's findings on the arbitrability of the dispute by Storm's prior concessions that the Tribunal had jurisdiction to determine its own jurisdiction. (*See* Resp. Mem. 16 n. 2, citing Sills Aff. II, Ex. 202 at 12, & Ex. 188 at 21-22.) Storm's concession that the Tribunal had jurisdiction to determine its own jurisdiction, under the doctrine of "competence-competence," which in turn is the basis for the UNCITRAL rules (Resp. Reply 6; *see* 11/15/06 Tr. 11, 14), did not restrict its ability to later request that this Court independently review the Tribunal's arbitrability decision. Instead, under the competence-competence doctrine, "the arbitrators' jurisdictional decision is subject to judicial review at any time before, after, or during arbitration proceedings." *China Minmetals,* 334 F.3d at 288. The Tribunal found that it had such jurisdiction before the arbitration proceedings began in its Partial Final Award, and the Court upheld that finding when it denied Storm's motion for a preliminary injunction. But Storm never conceded during the arbitration proceedings that the underlying claim was arbitrable (11/15/06 Tr. 14 (Q: "They conceded, am I right, that the arbitrators had jurisdiction to decide the jurisdictional question; they didn't concede the merits that ... this was ... an arbitrable claim." A: "That's true, your Honor.")), and it is that claim that Storm asks the Court to independently review at this later date. Such review no more constitutes permitting Storm to take more than "one bite at the apple" than any other broad-based appellate review. (*See* 11/15/06 Tr. 16.)

Furthermore, Telenor's insistence that Storm waived its right to a jury trial by conceding jurisdiction over

the arbitrability issue to the Tribunal · is counterbalanced by Storm's repeated insistence to the arbitrators that they "did *not* want the arbitrators to have binding authority" over the issue of arbitrability. *First Options,* 514 U.S. at 946. *Compare with Arbitration Between Halcot Navigation Ltd. P'ship and Stolt-Nielsen Transp. Group, BV,* 491 F.Supp.2d 413, 419 (S.D.N.Y.2007) (rejecting independent review of arbitrability decision where petitioner never objected to the arbitrators' authority over the arbitrability of the dispute)."If the arbitrators' findings are challenged, as here, we cannot merely defer to these findings." *Stolt-Nielsen Transp. Group B.V. v. Edible Oil Trading Corp.,* No. 06 Civ. 0703, 2007 WL 194182, at *2 (S.D.N.Y. Jan. 24, 2007). Instead, such a challenge to the arbitrators' jurisdiction militates against deference to the arbitrators' judgment, and in favor of an independent inquiry into the arbitrability of the dispute, as the Court has an "independent obligation to determine the threshold issue of arbitrability." *Id.,* citing *Sarhank Group v. Oracle Corp.,* 404 F.3d 657 (2d Cir.2005). Thus, the Court will not "merely defer to" the Tribunal's findings on the issue of arbitrability, *id.,* and Storm is entitled to an independent determination on that issue.

**b. Application of *Sphere Drake* Standard**
051 Extra cent-Y found within cent-Y markup.
**\*17** The Court must therefore consider independently Storm's argument that it satisfied the *Sphere Drake* standard. To be entitled to a jury trial, Storm must show (1) that it challenged the validity of the arbitration agreement, *see Buckeye Check Cashing,* 546 U.S. at 444;*Rubin v. Sona Int'l Corp.,* 457 F.Supp.2d 191, 193 (S.D .N.Y.2006) (noting that *"Buckeye Check Cashing* makes clear that [a party] may only avoid arbitration if it can successfully challenge the validity of the arbitration clause itself," as opposed to the validity of the entire contract), and (2) that it presented sufficient evidence by which a jury may find in favor of it on the merits of its claim that Nilov lacked authority to enter into that agreement. *See Sphere Drake,* 263 F.3d at 30. Although the *Sphere Drake* standard is not onerous, *see, e.g., In re Azores Int'l Shipping, Inc.,* No. 99 Civ. 850, 1999 WL 493380, at *2 (S.D.N.Y. July 9, 1999) (finding standard to be met on the basis of an affidavit), it is not nonexistent, and a party resisting arbitration cannot simply rely on bare allegations to satisfy the evidentiary requirement. *Sphere Drake,* 263 F.3d at 43, citing *Interbras Caymon Co. v. Orient Victory Shipping Co., S.A.,* 663 F.2d 4, 7 (2d

Cir.1981) (per curiam).

Storm has not satisfied either prong of the *Sphere Drake* standard. First, although Storm contends that it "consistently argued throughout the arbitral proceedings that the Shareholders Agreement is void because its signatory to the agreement lacked the requisite authority for its execution (including the authority to agree to a severable arbitration clause)" (Resp.Mem.14), Storm has presented no evidence supporting its argument. Instead, the record shows that Storm *conceded* that there was no evidence that Nilov lacked authority to enter into the arbitration agreement insofar as that clause was severable from the Agreement as a whole. (9/5/06 Tr. 98 ("I have no indication that Mr. Nilov lacked authority under the charter to enter into a separate arbitration agreement."); *see* Letter from Robert L. Sills to the Court, dated Sept. 18, 2007, at 2 (alleging that Storm specifically disavowed this argument during the arbitration proceeding), citing 9/5/06 Tr. 97-99.) Thus, Storm's current objections to Nilov's authority are insufficient to satisfy the *Sphere Drake* and *Buckeye* standard.

Second, even assuming arguendo that Storm contested the validity of the arbitration agreement during arbitration, Storm has not presented sufficient evidence to warrant a jury trial on that issue. In its motion to vacate the Final Award, Storm merely states in a footnote, in the most conclusory manner possible, that "[t]here can be no doubt that Storm would have satisfied the *Sphere Drake* standard."(Resp. Mem. 16 n. 12.) But, as previously noted, *Sphere Drake* makes it clear that "it is not enough for [a party] to make allegations" that an arbitration clause is invalid; instead, the party "must also produce some evidence substantiating its claim."263 F.3d at 232. *See Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 130 (2d Cir.1997) (Feinberg, J.) ("Although a party may demand a jury trial when issues respecting arbitrability are in issue, we have cautioned that a party resisting arbitration ... bears the burden of showing that he is entitled to a jury trial ... [by] submit[ting] evidentiary facts showing that there is a dispute of fact to be tried.") (citations and internal quotation marks omitted). Thus, Storm's bare allegations of invalidity in its motion to vacate are insufficient to satisfy the "some evidence" standard.

*18 Nevertheless, because the Court must make an independent determination on the issue of arbitrability, it must conduct its own analysis of whether Storm actually agreed to arbitrate the dispute. It is undisputed that the parties extensively negotiated the Arbitration Agreement, and agreed both that New York law controlled their relationship and that the parties would arbitrate any dispute in accordance with New York law. Under New York law, the agreement to arbitrate is severable, *see Weinrott v. Carp,* 32 N.Y.2d 190, 198 (1973), and the issue of arbitrability depends on whether the parties agreed to arbitrate. Thus, the relevant inquiry is not whether Nilov had authority to agree to the Shareholders Agreement generally, but whether Nilov had authority to agree to the arbitration clause specifically.

The record does not support Storm's argument that Nilov lacked either actual or apparent authority to enter into the Arbitration Agreement. Under New York law, actual authority is "the authority that a principal invests in its agent, which, upon its exercise, binds the principal."*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Rep. of Romania,* 123 F.Supp.2d 174, 185 (S.D.N.Y.2000). Such authority "is created by direct manifestations from the principal to the agent,"*Peltz v. SHB Commodities, Inc.,* 115 F.3d 1082, 1088 (2d Cir.1997), and may "be established by any action that reasonably indicates to the agent that the principal wants the agent to perform a certain task."*Seetransport,* 123 F.Supp.2d at 185. Actual authority can also be "inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act."*In re Artha Mgmt., Inc.,* 91 F.3d 326, 329 (2d Cir.1996) (citation and internal quotation marks omitted)."[T]he extent of the agent's actual authority is interpreted in light of all the circumstances ... including the customs of business, the subject matter, any formal agreement between the parties and the facts of which both parties are aware."*Peltz,* 115 F.2d at 1088.

Nilov clearly had actual authority to bind the company to arbitrate a contractual dispute. Storm does not dispute that Nilov was given actual authority by the shareholders to sign the 2002 version of the Shareholders Agreement.[FN10]Instead, Storm's only argument is that Nilov did not have the actual authority to sign the revised Agreement in 2004 without formal approval by the shareholders. But it is uncontested that the 2002 version of the Agreement included the Arbitration Agreement. As the Arbitration Agreement is severable from the rest of

the Agreement, when Nilov signed the 2002 version of the Shareholders Agreement-which, as conceded by Storm, he did with actual authority-he bound Storm to the arbitration clause within the Agreement. Thus, Storm's argument that Nilov lacked authority to execute the 2004 version of the Agreement, which contained the exact same arbitration clause as the 2002 version, is irrelevant; if Nilov had the authority to enter into the arbitration agreement in 2002, then he also had the same authority in 2004, regardless of whether he also had the authority to bind Storm to the Shareholders Agreement in 2004.[FN11]

> FN10. Nilov also had actual authority to bind Storm to the arbitration agreement simply by virtue of his status as Storm's General Director. *See Seetransport,* 123 F.Supp.2d at 185-86 ("[C]ertain agents possess authority which is inherent or incidental to the ordinary scope of authority associated with their position.").

> FN11. The Tribunal also found that Nilov had actual authority to bind Storm to the 2004 Shareholders Agreement as well. The Tribunal's findings on that issue were well-reasoned and thorough (*see* Award at 45-48), and are adopted by the Court.

**\*19** Nilov in any event had apparent authority to bind Storm to the arbitration agreement. Under New York law, apparent authority is created "when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess."*Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 665 (2d Cir.1964); *see Marfia v. T.C. Ziraat Bankasi, N.Y. Branch,* 100 F.3d 243, 251 (2d Cir.1996). Where a third party "holds the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized."*Id.* Apparent authority arises from "words or conduct of the principal" that "imbue" the agent with such authority. *Hallock v. State,* 64 N.Y.2d 224, 231 (1984).

In this case, Storm, by its words and conduct, communicated to Telenor that Nilov was authorized to sign the arbitration agreement, and Telenor reasonably relied upon that information. For example, the resolution adopted by the shareholders' meeting held in 2002 explicitly authorized Nilov, by name, to "take or cause any and all other actions as

are required or desirable in connection with this Resolution and the above-referenced documents," including, by association, the arbitration agreement. (Sills Decl. II, Ex. 264.) Moreover, Storm communicated to Telenor that a written polling and live vote of Storm's participants had been taken in 2002 approving the 2002 Shareholders Agreement, again, including the arbitration clause. (*Id.*) The clear purpose of these actions was to induce Telenor to enter into the Agreement at closing. (*See* Zeballos Decl. Ex. E ¶¶ 32, 34 (stating that, "[s]hortly before" the original closing date for the Agreement, Storm specifically communicated to Telenor the participants' "unanimous" approval of the Agreement).) There is also no dispute that Telenor relied on all of these actions, made by Storm's directors and shareholders, when it entered into the Arbitration Agreement. Such reliance was "entirely reasonable," *Hallock,* 64 N.Y.2d at 232, and therefore, the Tribunal properly found Storm estopped from challenging the Arbitration Agreement on the ground that Nilov lacked authority to bind Storm.

Once it is determined that Nilov had authority to bind Storm to the Arbitration Agreement, Storm's remaining arguments against arbitrability of the dispute are easily disposed of. For example, Storm argues that the Ukrainian decisions that declared the Shareholders Agreement to be null and void are alone sufficient evidence that the Arbitration Agreement is invalid to warrant a jury trial. This argument fails for at least three reasons. First, the Ukrainian decrees are not *evidence* of anything. They raise at most questions of law for a court, not questions of fact for a jury. The Ukraine judgments are based on Ukrainian law. But since Ukrainian law is not controlling here, the only potential questions in this case concern the existence of Nilov's actual or apparent authority, as defined by New York law, to enter an arbitration agreement. The Ukrainian decisions neither constitute nor imply the existence of any evidence on that question.

**\*20** Second, even if court decisions applying inapplicable law could be taken as evidence of something, the collusive nature of the Ukrainian decisions render them neither binding on this Court nor persuasive authority, and defeat any inference that might otherwise be derived from the existence or content of those decisions.

Third, even if the decisions had not been collusively

Slip Copy                                                                                                    Page 16
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

obtained, the Ukrainian courts never considered the severability issue, but instead declared the entire Shareholders Agreement null and void. Storm argues that the subsequent Clarification Order gave "meaningful consideration" to the severability issue (Resp. Mem. 10 n. 8), but that order shows no such consideration. Instead of considering Nilov's authority to enter into the arbitration agreement as a separate and distinct issue from his authority to enter into the Shareholders Agreement, the clarifying court merely voided the arbitration clause as part and parcel of the Agreement in toto: "[S]ince the Shareholders Agreement violated the public order of Ukraine and since the representative of one of the parties to the agreement ... was not authorized to execute [it] and the arbitration clause contained therein *as its integral part,* the arbitration agreement ... is also void/invalid."(Zeballos Decl. Ex. K at 2 (emphasis added).) Thus, the Ukrainian decisions could be, at most, evidence of the Shareholders Agreement's invalidity, and not of the invalidity of the separate arbitration clause. Such "evidence" is insufficient to satisfy *Sphere Drake* .

Similarly, the affidavit from Vadim Klymenko, the General Director of Storm, is insufficient to warrant a jury trial on the arbitrability issue, and actually argues in favor of Telenor's position. Klymenko testified, not that Nilov lacked authority to enter into the Arbitration Agreement, but that Nilov lacked authority to enter into the Shareholders Agreement as a whole. (Zeballos Decl. Ex. C ¶ 8.) Indeed, according to Klymenko, Storm defended itself in the Ukrainian proceedings by arguing that the Arbitration Agreement was *valid.*(*Id.* ¶ 6.) Thus, it is unsurprising that Storm is unable to point to any evidence in the record that it ever argued against the validity of the Arbitration Agreement, as Storm argued the exact opposite to the Ukrainian court.

Finally, Storm argues that it was not permitted to fully present its *Sphere Drake* defense during the arbitration because the Ukrainian decisions foreclosed it from participating in the arbitration proceedings. Thus, Storm argues that "[t]he record that was before the Tribunal is not adequate for the Court's independent assessment," and that the lack of discovery on the issue provides an "independent basis for vacatur of the Final Award."(Resp. Reply 7 n. 2.) This argument is patently disingenuous. First, Storm presented a vigorous defense to the Tribunal, notwithstanding its physical absence from the December 2006 hearings. (Award at 32.) Moreover,

the Tribunal gave Storm every possible opportunity to present its case, notwithstanding its refusal to appear (*id.*), an opportunity Telenor was not provided by the Ukrainian courts. Finally, for Storm to boldly request that the Court set aside the Award because it did not have a full opportunity to participate in the arbitration proceedings, while simultaneously arguing that the Ukrainian proceedings-during which its own vexatious tactics resulted in Telenor having *no* opportunity to defend itself at all-should bind Telenor, is an exercise in complete and total contradiction.

**\*21** Accordingly, Storm is not entitled to a jury trial on the arbitrability of the dispute, and the motion to vacate the Award on that ground is denied.

### B. Statutory Grounds

Next, Storm argues that several of the New York Convention's statutory grounds for vacatur apply here. Storm argues primarily that the Final Award violates New York's public policy, and that the relief granted exceeded the scope of the Tribunal's powers. Telenor argues that enforcement of the Award would serve, and not undermine, New York's public policy, and that the arbitrators acted within the scope of the powers bestowed upon them by the Shareholders Agreement in ordering the disputed relief.

#### 1. Public Policy

First, Storm asserts that "an enforcement of the Final Award would force Storm to violate the Ukrainian Judgments," which in turn would be contrary to New York's "well accepted and deep-rooted public policy" against the enforcement of arbitration awards that compel a violation of law. (Resp. Reply at 4-5, citing *Sea Dragon,* 574 F.Supp. at 372.) *See Diapulse Corp. of Am. v. Carba, Ltd.,* 626 F.2d 1108, 1110 (2d Cir.1980) (stating that "an award may be set aside if it compels the violation of law"). Therefore, Storm argues that the Award should be vacated pursuant to Article V(2)(b) of the New York Convention, which allows for vacatur where "recognition or enforcement of the award would be contrary to ... public policy."Telenor counters that the Award is fully consistent with New York's public policy. (Pet.Mem.10.) The Court agrees.

The public policy exception in Article V(2)(b) of the Convention is very narrow, and applies only where

enforcement of the award would violate "the most basic notions of morality and justice" of the forum where enforcement is sought. *Europcar Italia S.p.A. v. Maiellano Tours, Inc.,* 156 F.3d 310, 315 (2d Cir.1998) (citation and internal quotation marks omitted). The party opposing enforcement of the arbitration award has the burden of proving that enforcement would violate New York's public policy. *Id.* at 313."When construing this section, the Court of Appeals for the Second Circuit has noted the 'pro-enforcement bias' of the Convention."*MGM Prods. Group, Inc. v. Aeroflot Russian Airlines,* No. 03 Civ. 0500, 2003 WL 21108367, at *3 (S.D.N.Y. May 14, 2003), quoting *Geotech Lizenz AG v. Evergreen Sys., Inc.,* 697 F.Supp. 1248, 1254 (E.D.N.Y.1988), citing in turn *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA),* 508 F.2d 969, 973 (2d Cir.1974)."Public policy arguments, such as those presented here, should be accepted with caution, so as not to discourage enforcement of United States arbitration awards by courts of other countries."*Id.,* citing *Sarhank Group v. Oracle Corp.,* No. 01 Civ. 1285, 2002 WL 31268635, at *6 n. 6 (S.D.N.Y. Oct. 9, 2002).

Storm argues that, unlike the Tribunal, the Ukrainian courts found that "the Agreement ... is null and void."(Resp.Mem.13.) Thus, Storm argues that the Tribunal's decision directly conflicts with Ukrainian law, and therefore, that it cannot comply with the Final Award-which is based on Storm's non-compliance with the Agreement-without violating that law. Storm also argues that the conditional divestiture order, which is based on Storm's violation of the non-compete clause, is unenforceable in Ukraine because such clauses are specifically prohibited by Ukrainian antimonopoly law. (*See* Khomyak Decl. ¶¶ 6, 11.) Storm contends that these conflicting directives violate New York's public policy against enforcement of arbitral awards that compel a violation of law.

*22 First, it is unclear whether the Final Award even conflicts with Ukranian law. The Ukrainian courts only held that the Shareholders Agreement was null and void; the Ukrainian courts never ordered Storm to take any specific actions in the future that would conflict with any directives in the Final Award. For example, although Storm alleges that the non-compete clause is unenforceable under Ukrainian law, the Ukrainian courts never discussed the possibility that the non-compete clause violated Ukrainian law, even though those courts were given

several opportunities during the course of the Ukrainian litigation to address that issue. Similarly, the Ukrainian courts did not prohibit Storm from ceasing the E & Y actions, or taking any other specific action with respect to the Agreement. Although the Final Award and the Ukrainian decisions involve overlapping issues, the relevant inquiry is not whether the issues in both proceedings overlap, or whether the reasoning of the different adjudications was inconsistent, but whether the resulting decisions are "directly contrary" in such a way as to make compliance with one *necessarily* a violation of the other. *See Chemical Overseas,* 2005 WL 1123897, at *1. That does not appear to be the case here; the relief ordered by the Tribunal, though not *required* under Ukrainian law pursuant to the decisions of the Ukrainian courts, is not clearly *prohibited* by that law.

In any event, even if there is a direct conflict between Ukranian law and the Final Award, New York's public policy does not call for vacatur here. First, it is unclear whether an established public policy against enforcement of arbitral awards that compel a violation of foreign law even exists in New York. Storm cites no authoritative New York precedent, relying principally on only two district court cases from the previous two decades that cite such a policy. *See Sea Dragon,* 574 F.Supp. at 371-72;*A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.,* No. 88 Civ. 4500, 1989 WL 115941, at *2 (S.D.N.Y. Sept. 27, 1989) (citing *Sea Dragon* ). The single Second Circuit case it cites merely states that "an award may be set aside if it compels the violation of law," and not that such an award violates public policy. *Diapulse,* 626 F.2d at 1110.

Moreover, even if such a policy exists, it is outweighed in this case by the public policy in favor of encouraging arbitration and enforcing arbitration awards. New York courts have explicitly cautioned against allowing a party to "escape from [its contract] obligation on the pretext of public policy."*Miller v. Continental Ins. Co.,* 40 N.Y.2d 675, 679 (1974). While the existence of a public policy against enforcement of arbitral awards that compel a violation of law is unclear, New York has a strong policy in favor of "enforcing contracts and encouraging arbitration ." (Pet. Mem. 10, citing *Smith Barney Shearson Inc. v. Sacharow,* 91 N.Y.2d 39, 49 (1997) (recognizing New York's "long and strong public policy favoring arbitration").) New York's policy is also consistent with the well established

Slip Copy                                                                                                         Page 18
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

federal public policy which "favor[s] arbitration of disputes, particularly in the international context."*Sarhank Group*, 2002 WL 31268635, at *6 n. 6.

**\*23** Storm principally relies on *Sea Dragon* in support of its argument for vacatur on public policy grounds. (Pet.Mem.12-13.) However, as discussed above, *Sea Dragon*, in which the foreign judgment was secured in compliance with American due process standards, 574 F.Supp. at 372, has little relevance where foreign judgments were obtained through collusive litigation that violated a party's due process rights. Even if there exists a clear public policy in New York against arbitration awards that are in tension with foreign judgments, such a policy cannot trump the well-established and centuries-old policy against enforcement of judgments gained through collusive litigation, whether they be foreign or domestic. A contrary holding would directly undermine that policy, and reward Storm for its collusive tactics.

*American Construction Machinery & Equipment Corp. Ltd. v. Mechanised Construction of Pakistan Ltd.*, 659 F.Supp. 426 (S.D.N.Y.1987), is instructive here. In that case, a Pakistani concern, known as MCP, initially appeared in an arbitration proceeding, but then sought and obtained a Pakistani judgment invalidating both the arbitration and the arbitration clause of the relevant agreement. *Id.* at 426.The arbitration nonetheless proceeded, and an award was rendered against MCP. *Id.*On petitioner's motion to confirm the award, the court rejected MCP's argument that confirmation of the award-which directly conflicted with the Pakistani judgment-would violate public policy. Specifically, the court in *American Construction Machinery* found that, because the Pakistani litigation was conducted in a vexatious manner to undermine the arbitration proceedings, "[i]n fact, public policy would be violated if the Court *declined* to confirm the Award."*Id.* at 429 (emphasis added). The same concerns that led the court in *American Construction Machinery* to reject MCP's public policy argument also guide this Court. Like MCP, Storm "had agreed to arbitrate, appeared in the proceeding, and then sought to circumvent the process."*Id.* Therefore, enforcing the Final Award "in no way violates this forum's notions of justice."*Id.*

Accordingly, enforcement of the arbitral award would not violate "the most basic notions of morality

and justice" in New York, *Europcar*, 156 F.3d at 315, and therefore the Award will not be vacated as contrary to public policy.

### 2. Scope of Arbitral Award

Storm also argues that the Tribunal acted improperly by ordering the conditional divestiture of Storm's shares in Kyivstar, and by entering an anti-suit injunction against Storm and its affiliates, thereby enjoining the E & Y actions currently pending in Ukraine. Telenor argues that the Tribunal "acted well within the powers conferred upon it by the Shareholders Agreement and governing law."(Pet.Mem.18.) Telenor is correct.

"Arbitrators ... enjoy broad discretion to create remedies unless the parties' agreement specifically limits this power."*Arbitration Between Millicom Int'l V N.V. v. Motorola, Inc. & Proempres Panama, S.A.*, No. 01 Civ. 2668, 2002 WL 472042, at *6 (S .D.N.Y. Mar. 28, 2002)."While an arbitrator's award must 'draw its essence' from the parties' agreement ... the effectiveness of arbitration in resolving complicated commercial disputes would be severely undermined if arbitrators were limited to the mechanical application of contested contractual provisions."*Id.* at *7. If the arbitration clause does not include any limit on the arbitrators' powers to craft a remedy, a respondent must "overcome a powerful presumption that the arbitral body acted within its powers."*Id.* at *6, quoting *Parsons*, 508 F.2d at 976. Accordingly, while an arbitrator may not award relief expressly forbidden by the agreement of the parties, an arbitrator may award relief not sought by either party, so long as the relief lies within the broad discretion conferred by the FAA. *See Carte Blanche*, 888 F.2d at 266;*Sanluis Devs., L.L.C. v. CCP Sanluis, L.L.C.*, No. 06 Civ. 11531, 2007 WL 2219115, at *6 (S.D.N.Y. Aug. 2, 2007).

**\*24** Here, far from limiting the remedial powers of the Tribunal, the Arbitration Agreement provides the arbitrators with "the power to grant any remedy or relief that they deem just and equitable."(Agreement § 12.01(a)(v).) Specifically, the Arbitration Agreement permits the arbitrators to order "specific performance, and including, but not limited to injunctive relief, whether interim or final."(*Id.*) That power is granted with regard to "[a]ny and all disputes and controversies arising under, relating to or in connection with" the Shareholders Agreement. (*Id.* § 12.01(a).)

Slip Copy                                                                                              Page 19
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

### a. Conditional Divestiture

Storm contends that the conditional divestiture order falls outside the arbitrators' powers. Pursuant to that order, Storm must divest its shares in Kyivstar, unless its affiliates-Alfa and Russian Technologies-divest their shares in two competing Ukrainian telecommunications companies, Turkcell Iletisim Hizmetleri A.S. ("Turkcell") and Ukrainian High Technologies ("UHT"), within 120 days. (Award at 67.) According to Storm, Telenor sought only money damages in the arbitration, "and included in its submission only a boilerplate, cursory request referring to equitable relief."(Resp.Mem.19.) Moreover, Storm argues that, even if Telenor did seek equitable relief, only money damages are permitted under the Agreement as a remedy for breach of the non-compete clause. Finally, Storm argues that only its conduct, and not that of Alfa and Russian Technologies, could violate the non-compete clause of the Shareholders Agreement, and therefore that the Tribunal was not permitted to bind those companies to the conditional divestiture order. Storm's arguments are meritless.

First, Storm is incorrect that Telenor sought only money damages in the arbitration. In its Proposed Findings of Fact and Conclusions of Law, Telenor requested an award "declaring that the non-competition clause has been violated, and that the violation will be cured if Altimo's interests in Turkcell and UHT are divested within a reasonable time to be fixed by the Panel."(Sills Decl. I, Ex. B at 68.) Thus, Telenor specifically requested essentially the relief granted by the Tribunal, and Storm had a full and fair opportunity to argue against such relief during the arbitration proceedings.

Second, even if Telenor had not specifically requested equitable relief, the Tribunal was granted the power to order such relief by the broad language of the Arbitration Agreement, which provided the arbitrators with the authority to order any remedy that they found to be "just and equitable." (Agreement § 12.01(a)(v).) Such broad language has been consistently upheld as valid and binding on parties by courts in this Circuit. *See, e.g., Millicom,* 2002 WL 472042, at *7 (upholding arbitration clause as binding where potential remedies for contract violations were unlimited); *Orlogin, Inc. v. U.S. Watch Co.,* No. 90 Civ. 1106, 1990 WL 364470, at *4 (S.D.N.Y. June 25, 1990) (same). Thus, the

Tribunal was not restricted either by the Agreement or by law to grant only monetary relief.

*25 Storm also argues that the Award should be vacated because the alleged "draconian remedy" imposed by the Tribunal violates the Agreement's right of first refusal clause. (Resp.Mem.19.) Specifically, Storm alleges that "[o]rdering Storm to sell its shares to a third party is directly contrary to the parties' intent in entering into the Shareholders Agreement because it would give Telenor an opportunity to take complete control of the company," which Storm argues is in violation of the right of first refusal contained in the Agreement. (*Id.*) Therefore, Storm argues that the "only available remedy for any breach [of the non-compete clause] was money damages."(Resp. Reply 9.)

Storm's argument is unavailing. Even if the divestiture order results in Telenor's complete control of Kyivstar, that result does not conflict with the Agreement's right of first refusal clause. The right of first refusal clause merely provides any shareholder-including both Storm and Telenor-with the "first right and option to elect to purchase" the offered shares prior to their sale to a third party. (Agreement § 4.05.) The right of first refusal clause does not otherwise impose any restrictions on who may ultimately purchase those shares. Indeed, although Storm claims that the right of first refusal clause implicitly indicates that the parties did not "contemplate [ ]" the possibility that Telenor or Storm might take "complete control" over Kyivstar (Resp.Mem.19), the language of the clause itself directly contradicts Storm's argument-according to the clause, "[i]f Telenor Mobile determines to Transfer *all or any portion* of its [Kyivstar shares] ... Storm shall be entitled to assign all or a portion of its right to purchase such [shares] ... to Alfa."(Agreement § 4.05(f) (emphasis added).) Thus, the right of first refusal clause specifically considers the possibility that Telenor might sell *all* of its shares at some future time, and provides Storm with the option to transfer its right of first refusal to Alfa under such circumstances. If the intention behind the right of first refusal clause was to prevent complete ownership by either party, the Agreement would not have included a contingency that contemplates exactly that scenario.

More importantly, under the terms of the conditional divestiture order, Storm is not *required* to sell its Kyivstar shares at all. Instead, the alternative form of

relief means that Storm will not have to sell its shares, as long as Alfa and Russian Technologies divest their interests in Turkcell and UHT. Thus, the right of first refusal clause is not even necessarily implicated by the conditional divestiture order.

In any event, even if the conditional divestiture order did conflict with other provisions of the Agreement, the Tribunal was fully authorized by the Arbitration Agreement to order whatever remedy it deemed "just and equitable" (Agreement § 12.01(a)(v)), regardless of whether the remedy imposed is consistent with the other terms of the Shareholders Agreement. While an arbitrator's award must "draw its essence" from the parties' agreement, and may not simply reflect the arbitrator's "own brand of justice," *Local 1199, Drug. Hosp. & Health Care Employees Union v. Brooks Drug Co.,* 956 F.2d 22, 25 (2d Cir.1992), the scope of potential arbitration relief is not restricted by other contract terms, *unless those terms expressly limit that relief. See Orlogin,* 1990 WL 364470, at *4 (finding that arbitrators enjoy broad discretion to create remedies unless the parties' agreement specifically limits this power by an *"express* contractual limitation on the arbitrators' power to fashion appropriate relief") (emphasis added). The Agreement's right of first refusal clause does not in any way limit the scope of the arbitrators' powers, and there is "no [other] express contractual limitation" in the Agreement "on the arbitrators' power to fashion appropriate relief."*Id.; see id.* (enforcing arbitration award dissolving partnership where arbitrators had the power to resolve "any dispute or controversy arising between or among the parties," even though the prerequisites for dissolution had not been fulfilled). Instead, the arbitrators were given wide discretion by the parties to fashion appropriate relief for violations of the Shareholders Agreement, and "[w]hen parties contemplate that arbitrators will determine the appropriate remedies for contract violations, 'courts have no authority to disagree with the arbitrator['s] honest judgment in that respect.'" *Id.,* quoting *Synergy Gas Co. v. Sasso,* 853 F.2d 59, 64 (2d Cir.1988) (alterations in original).

**\*26** Storm's alternative argument is similarly unpersuasive. Storm argues that the conditional divestiture order is "an attempt by the Tribunal to force Alfa and Russian Technologies, two non-signatories, to divest their shares in Turkcell and UHT, and "thus effectively be bound by the Final Award."(Resp.Mem.19.) Specifically, Storm argues

that because UHT is partially owned by Russian Technologies, a subsidiary of Alfa, and because Turkcell is partially owned by Alfa itself, Storm's compliance with the conditional divestiture order is contingent, not on its own conduct, but on the conduct of Alfa and Russian Technologies. However, Storm misinterprets the basis for the conditional divestiture order; Alfa and Russian Technologies are "bound" to comply with the order, to the extent they can be said to be bound at all, not as non-signatories to the Agreement, but as affiliates of Storm.

The non-compete clause specifically provides that "no Shareholder *or any of its Affiliates* will, without the prior written consent of the Company and the other Shareholders, ... engage in Business in any region in Ukraine [or] ... own, or control, directly or indirectly, more than five percent (5%) of the voting capital stock" in a competing business. (Agreement § 6.02 (emphasis added).) Section 1.01 of the Agreement further defines "Affiliate" as "any other Person which *directly or indirectly controls, or is under common control with,* or is controlled by, such Person."It is undisputed that UHT, a provider of "WiMax" wireless telecommunications services that compete with Kyivstar in Ukraine,[FN12] is partially owned by Russian Technologies, which in turn is a subsidiary of Alfa, and it is undisputed that Alfa itself maintains partial ownership of Turkcell, another competing telecommunications provider in Ukraine. Furthermore, it is undisputed that Alfa was at the time of the execution of the Shareholders Agreement, and remains today, "[a]t the top of th [e] ownership pyramid" that includes both Storm and Russian Technologies. (Award at 2-3.) Indeed, as Storm's indirect parent, Alfa was intimately involved in the contract negotiations between Storm and Telenor.[FN13]Therefore, Alfa is an "[a]ffiliate" of Storm as its indirect parent, and Russian Technologies is an affiliate of Storm as both Storm and Russian Technologies operate "under [the] common control" of Alfa.[FN14]Because the non-compete clause specifically prohibits Storm's affiliates from owning more than 5% of a competing Ukrainian telecommunications company without prior consent, and because Alfa and Russian Technologies maintain such ownership without receiving such consent, Alfa and Russian Technologies were properly bound to comply with the divestiture order.

FN12. Storm argued to the Tribunal that WiMax services do not fall within the scope

of the non-compete clause, but that question was resolved against Storm by the Tribunal (Award at 58-61), and Storm has not asked the Court to review that resolution here.

FN13.*See* Award at 5 ("On April 29, 2002, the Alfa and Telenor representatives entered into a Letter Agreement that set out the expected arrangement between Telenor and Storm ...."); *id.*(noting that the Agreement allowed Storm *and* Alfa the right to jointly appoint four directors to Kyivstar's board); *id.* at 7 (discussing Storm's insistence during contract negotiations that Telenor sell certain shares to Alfa or an Alfa affiliate).

FN14.*See* Award at 59 ("[A] plain reading of the definition of 'Affiliate' includes the various entities that directly or indirectly have a controlling interest in Storm, and ... this includes Alfa"); *id.* (noting that Alfa secured its ownership in UHT "acting through its subsidiary Russian Technologies).

In any event, Storm's claim that the Final Award improperly attempts to bind Alfa and Russian Technologies misconceives the Award. The Tribunal did not direct Alfa and Russian Technologies to do anything, and a judgment of this Court enforcing that Award would not be directed to Alfa or Russian Technologies, who are not parties to this action. Alfa and Russian Technologies may divest themselves of their investments in Turkcell and UHT or not, as they choose, without violating any directive of the arbitrators or of this Court. The Award binds Storm, by requiring it to sell its shares in Kyivstar-albeit only conditionally, in that Storm need not comply if certain actions are taken by its affiliates. That the arbitrators provided for an alternative contingency by which Storm and those who control it could bring Storm into compliance with the Agreement does not render their Award invalid, or constitute overreaching, or mean that the Tribunal attempted to bind non-parties to the Arbitration Agreement. Indeed, the relief awarded by the arbitrators would appear to be precisely the kind of relief reasonable parties would have contemplated in imposing contractual obligations on Storm "or any of its Affiliates." (Agreement § 6.02.)

*27 In support of its argument that the conditional divestiture order constitutes an overreaching by the

Tribunal, Storm engages in a detailed discussion of *Thomson-CSF, S.A. v. American Arbitration Association,* 64 F.3d 773 (2d Cir.1995). In *Thomson,* the Circuit set out the conditions under which a non-signatory party may be bound to an arbitration agreement. *See*69 F.3d at 777 (recognizing "five theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel"). Storm argues that, by ordering conditional divestiture of Turkcell and UHT, the Tribunal has bound Alfa and Russian Technologies, non-signatories to the Agreement, to comply with the Award, but that none of the conditions for binding non-signatories to an arbitration agreement laid out in *Thomson* are satisfied. However, *Thomson* is inapposite here. As previously noted, Alfa and Russian Technologies are not bound to the conditional divestiture order as non-signatories to the Agreement; they are either not bound at all, or are bound at most indirectly by virtue of their affiliate relationship with Storm. Thus, it is unnecessary to determine whether one of the exceptions set out in *Thomson* apply here. Storm made its rights under the Shareholders Agreement contingent on compliance by it and its affiliates, including Alfa and Russian Technologies, with the non-compete clause, and Storm having made that bargain, it is not the Court's responsibility, nor does the Court have the authority, to undo it.

As the Tribunal noted, "[i]f Storm desired to limit the scope of the non-compete language, it could have negotiated a more limited application."(Award at 60.) Indeed, the record shows that the non-compete clause was actively negotiated. In particular, as the Tribunal noted, Storm negotiated for, and received, an exemption from the non-compete clause for what was then Alfa's, and is now Altimo's, investment in Golden Telecom, Inc. ("Golden"). (Sills Decl. I, Ex. HH at 60; Agreement, Sched. 4.) It is undisputed that Storm itself does not have, and never had, an interest in Golden. (Pet. Mem. 20 n. 19.) Thus, it is clear from Storm's insistence on this exemption that Storm was aware of the broad sweep of the non-compete clause, which limited certain investments not just by Storm, but by Alfa, Russian Technologies, and Storm's other affiliates.

Having breached the Agreement by violating the non-compete clause, Storm must suffer the consequences for its violation, and the Tribunal was empowered by Storm and Telenor to impose those consequences.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 22
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Accordingly, the divestiture order was not outside the scope of the arbitrators' authority, and is entitled to recognition and enforcement by the Court.[FN15]

> FN15. Storm also suggests that the divestiture order is "in manifest disregard of the law" and that it "cannot be enforced on public policy grounds because it compels a violation of the law," but cites no case law in support of either argument. (Resp. Mem. 22 .) These throwaway suggestions are simply another last-ditch attempt by Storm to vacate the Award. As discussed *supra*, the divestiture order does not ignore any controlling law, but instead was a proper exercise of the arbitrators' power bestowed upon them by the Agreement. Therefore, the manifest disregard standard does not apply here. Furthermore, Storm's public policy argument is unpersuasive for the same reasons discussed in Part II.B.1, *supra*.

### b. Anti-Suit Injunction

Finally, Storm argues that the Tribunal acted in manifest disregard of the law and exceeded the scope of their powers by ordering an anti-suit injunction as part of the Final Award. Pursuant to the anti-suit injunction, Storm, "and anyone acting in concert with it," is enjoined from instituting or prosecuting "any and all court actions concerning any disputes or controversies" related to the Agreement, "including all of the existing litigations currently pending in the Ukraine."(Award at 67.) In addition, the anti-suit injunction specifically enjoins the continuation of the pending E & Y actions. (*Id.* 68.)Storm argues that the Tribunal disregarded controlling law by failing to consider the preconditions for an anti-suit injunction laid out in *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 35 (2d Cir.1987). Alternatively, Storm argues that the "[e]ntities involved in the E & Y Actions are not parties to the Shareholders Agreement," and therefore the arbitrators acted outside the scope of their powers by holding them liable "for the acts of its affiliate."(Resp.Mem.23-24.) Telenor counters that the Arbitration Agreement gave the arbitrators "broad equitable powers" that encompass entry of the anti-suit injunction, and that the E & Y actions are "in direct violation of [Storm's] express obligation of good faith performance of the Shareholders Agreement."(Pet.Mem.23.) Once again, Telenor is correct.

**\*28** The anti-suit injunction at issue here involves a series of agreements between Kyivstar and two Ernst & Young entities for the provision of auditing services (the "E & Y Agreements"). (Zeballos Decl., Exs. P & Q.) According to Storm, Kyivstar was prohibited from entering into a contract for auditing services by the December 2005 order of the Ukrainian court, in which that court invalidated the procedures set forth in the Kyivstar Charter regarding election of members to the Kyivstar Board. (*Id.* Ex. R.) Pursuant to that order, Storm commenced an action in Ukraine seeking to invalidate the E & Y Agreements on the grounds that the Kyivstar executive who signed the E & Y Agreements lacked authority to do so. (*Id.* Ex. S at 3-4.) Shortly after the injunction issued in Storm's E & Y action was vacated, two other actions ensued, each filed by Alpren against the same Ernst & Young entities. (*Id.* Exs. U & V.)

First, Storm argues that the Tribunal acted "without regard to ... controlling law" because the arbitrators did not consider the preconditions to entry of an anti-suit injunction, as laid out by the Circuit in *China Trade,* 837 F.2d 33. (Letter from Pieter Von Tol to the Court, dated Sept. 20, 2007, at 2.) Specifically, Storm claims that, in order to enter an anti-suit injunction, the Tribunal was required to find that "the parties are the same in both matters, and ... resolution of the case before the enjoining court is dispositive of the action to be enjoined."*China Trade,* 837 F.2d at 35. Storm argues that, because the E & Y actions involve parties other than Storm and Telenor, *China Trade* has not been satisfied and an anti-suit injunction was therefore improper.

Storm misunderstands the relevant issue here. The proper inquiry is not when a court may enter an anti-suit injunction in order to protect its own jurisdiction. Rather, the proper inquiry is whether the parties agreed to give the arbitrators the power to enter such an injunction. Where, as here, arbitrators are given extremely broad authority to order any relief they deem "just and equitable" (Agreement § 12.01(a)(v)), the applicable test for arbitral jurisdiction is not whether the preconditions of *China Trade* are satisfied, but whether the arbitral award "touch[es] matters" within the contract. *Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co.,* 307 F.3d 24, 26-28 (2d Cir.2002); *see Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 225 (2d Cir.2001) ("When parties use

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

expansive language in drafting an arbitration clause, presumably they intend all issues that touch matters within the main agreement to be arbitrated.") (internal quotation marks omitted).

It is undisputed that the litigation being pursued by Storm and its affiliate Alpren has "halted Kyivstar's efforts to have its 2006 financial statements audited and have prevented Kyivstar from providing financial information to" Telenor, thereby violating the Shareholders Agreement and causing severe economic repercussions to Kyivstar. (Pet.Mem.23.) Specifically, it is undisputed that, due to the E & Y actions, Kyivstar might be forced to default on certain debts totaling over $400 million, and its credit rating has been downgraded and might be suspended. (Award at 62-63.) Moreover, the purported basis for the E & Y actions is that Kyivstar was prohibited from entering into a contract for auditing services because Kyivstar's officer was not authorized to sign the auditing contract. But, assuming arguendo that Kyivstar's officer lacked such authority, it is undisputed that Kyivstar's officer lacked that authority only because Kyivstar's Charter violates Ukrainian law, and Kyivstar's Charter in turn only violates Ukrainian law because Storm refuses both to participate in Kyivstar's governance and to amend the Charter as ordered by the Ukrainian court, both of which constitute violations of the Shareholders Agreement. Thus, the E & Y actions are simply an aspect of Storm's continued non-compliance with the Shareholders Agreement.

**\*29** In addition, as the Tribunal noted that, "even though Storm maintains that the [E & Y actions do] not involve the violation of any obligation imposed by the Shareholders Agreement," Storm's conduct, at a minimum, violates the "good faith" obligation that is expressly incorporated into the Agreement. (Agreement § 2.05.) Section 2.05 of the Agreement is broadly worded, and requires Storm to act in good faith with respect to both Telenor and Kyivstar. By instituting litigation that prevents Kyivstar from successfully operating and threatens to severely debilitate its functioning, Storm has breached its good faith obligation under the Agreement.

Accordingly, the E & Y actions are "intimately related to issues ... submitted to the Tribunal," and the anti-suit injunction was "fully within the broad scope of the Tribunal's jurisdiction."(Award at 64.) Indeed, when viewed through this lens, the anti-suit injunction is not simply "related" to those issues, but

is a necessary and proper remedy to prevent Storm from subverting the Agreement again in the future. As the E & Y actions themselves are a violation of the Agreement, their continued prosecution also constitutes a continued violation of the Agreement. Therefore, the entry of an anti-suit injunction against Storm was a proper exercise of the arbitrators' powers, and will not be disturbed by the Court.

However, the Court's inquiry does not end there. The anti-suit injunction does not only prohibit Storm from pursuing the E & Y actions; it also binds "anyone acting in concert with it," and specifically Alpren, from pursuing those actions. (*Id.* 68) Storm argues that, even if the Tribunal was authorized to enjoin Storm from pursuing its E & Y action pursuant to the broad powers of the Arbitration Agreement, it could not similarly bind Alpren because Alpren was not a signatory to the Arbitration Agreement. Storm claims that, in order for Alpren to be bound to the Arbitration Agreement, the Tribunal was required to find one of the conditions for binding a non-signatory to an arbitration clause satisfied, as laid out in *Thomson,* 64 F.3d 773. Accordingly, Storm argues that the arbitrators' failure to make any specific findings on this issue renders their entry of an anti-suit injunction against Alpren improper.

Storm's argument is unpersuasive. As an initial matter, the Tribunal's lack of specific findings is not a sufficient basis for a reviewing court to refuse to enforce an arbitral award. *See Porzig v. Dresdner, Kleinwort, Benson, North Am. LLC,* 497 F.3d 133, 143 (2d Cir.2007); *Halligan,* 148 F.3d at 204 ("We have stated repeatedly that arbitrators have no obligation to [explain an arbitral award].") An arbitration panel's failure to explain its reasoning is only a consideration in a motion to confirm an arbitral award where "a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law."*Halligan,* 148 F.3d at 204. As previously discussed, far from being "inclined" to hold that the Tribunal acted in manifest disregard of the law, the Court has determined that the Tribunal adequately and comprehensively considered the applicable law in this case. Instead of requiring specific findings by the arbitrators to confirm the award, only "a barely colorable justification for the outcome reached" by the arbitrators is necessary here. *Landy Michaels Realty,* 954 F.2d at 797.

**\*30** The potential "justification[s]" for binding Alpren to the anti-suit injunction are more than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 24
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)
(Cite as: Slip Copy)

"barely colorable"-they are eminently reasonable and persuasive. For example, the Tribunal could have found that Alpren was acting as the alter ego of Storm when it instituted its E & Y actions, thereby finding that Alpren was properly bound as a non-signatory to the Arbitration Agreement. According to *Thomson*, a non-signatory may be bound to an arbitration clause where "the corporate relationship between a parent and its subsidiary are sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other."*64 F.3d at 777*. Specifically, under New York law, as a parent corporation of Storm, Alpren can be bound to the Arbitration Agreement if Alpren (1) exercised such control over Storm that Storm is "a mere instrumentality" of Alpren, and (2) such control has been used to commit fraud or other wrong, which resulted in "an unjust loss or injury" to Telenor. *Wm. Passalacqua Builder, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir.1991)* (citation omitted)."Veil piercing determinations are fact specific" and require an examination of the "totality of the circumstances," including whether Alpren and Storm dealt "at arms length with each other."*Thomson, 64 F.3d at 777-78*. *See Wm. Passalacqua, 933 F.2d at 139* ("The [veil piercing] doctrine ... is invoked to prevent fraud or to achieve equity.") (citation and internal quotation marks omitted).

The Tribunal could have found this standard met here. The E & Y actions, instituted in violation of the Shareholders Agreement, clearly constitute a "wrong" that has caused an "unjust ... injury" to Telenor. *Id.* In addition, the Circuit has often held that "shell" companies are "mere instrumantalit [ies]" of their parents for purposes of piercing the corporate veil. *Id.; see id.*("The critical question is whether the corporation is a 'shell' being used by the individual shareowners to advance [their own interests]."); *Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d Cir.1984)* (corporate veil pierced where jury found subsidiary to be a "shell" corporation). The Tribunal could have found that Storm is such a corporation, as it is undisputed that Storm was purchased by Alfa, not for Storm's assets or to further Storm's interests, but solely for the purpose of obtaining a significant share of Kyivstar. Indeed, such a finding has support in this Court's prior rulings in this case. *See Storm, 2006 WL 3735657, at *13* (finding that Storm is "essentially [a] shell compan[y] that exist[s] for the purpose of holding shares for" its parent corporations).

Furthermore, as both the Tribunal and this Court have found, Alpren and Storm have identical interests in this litigation, and have proceeded in the Ukrainian courts to further those interests through collusive and vexatious litigation. For example, Alpren only instituted its E & Y actions after Storm's E & Y action failed to succeed, thereby showing that Alpren's E & Y actions are merely a transparent attempt by Alpren to further Storm's interests. Thus, it is clear that Alpren and Storm "do not deal at arms length with each other,"*Thomson, 64 F.3d at 777-78*, but instead act only in accordance with each other's interests.

*31 Although Storm argues that the Tribunal could not make a proper veil-piercing determination during the arbitration proceedings because "the evidentiary record [is] undeveloped on matters that would be critical to an expeditious alter ego analysis" (Resp.Mem.21), the evidentiary record is more than ample to make such a determination. The evidence of collusion between Alpren and Storm is substantial, and has been recounted several times both by this Court and the Tribunal. Indeed, the Tribunal may have simply found that it was not necessary to make a specific veil piercing determination, as it had previously determined that Alpren and Storm had identical interests which they had pursued through the collusive Ukrainian litigation. In addition, it is undisputed that there is significant overlap between the corporate ownership and management of Altimo, Alpren's parent, and Storm. For example, Klymenko is both Storm's general director *and* Altimo's Vice-President, and the corporate ownership of Storm overlaps with that of Alpren by virtue of Alpren's status as Altimo's subsidiary. Accordingly, "the totality of the circumstances" reveals that Alpren and Storm had identical interests and have only acted in concert with each other to pursue those interests, *Thomson, 64 F.2d at 777*, and therefore the Tribunal could have reasonably found that "equity" can only be "achieved" if Alpren is held bound to the Arbitration Agreement under an alter ego theory. *Wm. Passalacqua, 933 F.2d at 139*.

In addition to the veil piercing determination, the Tribunal could have determined that an anti-suit injunction, such as this one, whose purpose is enjoining litigation being pursued in derogation of an arbitration agreement-whether that litigation is being pursued by the parties to the arbitration or by third parties-is not an inappropriate, or even unusual,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remedy. *See Storm*, 2006 WL 3735657, at *14;*Indosuez Int'l Finance, B.V. v. Nat'l Reserve Bank*, 758 N.Y.S.2d 308, 310-11 (2d Dep't 2003) (affirming grant of permanent injunction against foreign litigation in light of "defendant's repeated and relentless resort to foreign forums" despite arbitration clause). Instead, arbitrators may enjoin acts by third parties where those acts violate the rights of one of the arbitrating parties, and where, as here, such an injunction is "an essential part of the remedy in the arbitrable dispute."*Rintin Corp., S.A. v. Domar, Ltd.*, 476 F.3d 1254, 1261 (11th Cir.2007). The Tribunal appropriately entered its order, not only against Storm, but against those who act in concert with it. The record in this case amply supports the arbitrators' apparent conclusion that Storm's and Alpren's actions were taken in concert. Thus, although two of the E & Y actions were instituted by Alpren and not Storm, Alpren's conduct may be enjoined alongside Storm's, as the anti-suit injunction is "essential" to the continued operation of Kyivstar and therefore is a key component of the relief sought by Telenor. *Id.*

**\*32** Accordingly, entry of the anti-suit injunction neither constituted manifest disregard of the law, nor was outside the scope of the arbitrators' authority.

### 3. Remaining Statutory Grounds

Finally, Storm argues that the Award should be vacated because there exists "an incapacity that renders the arbitration agreement void," and because Storm was "unable to present [its] case" to the Tribunal. (Resp. Mem. 12 n. 8, citing Convention Art. V(1)(a)-(b).) Storm devotes a grand total of one footnote to both these arguments, reflecting their complete lack of merit.

Article V(1) (a) of the New York Convention provides that "[r]ecogition and enforcement may be refused" where "[t]he parties to the agreement ... were, under the law applicable to them, under some incapacity" pursuant to "the law to which the parties have subjected it."Storm argues that the Ukrainian decisions "render the Shareholders Agreement void *ab initio,*" and therefore that the Award should be vacated because the Arbitration Agreement is incapable of enforcement. (*Id.*) What Storm neglects to mention, however, is that Article V(1)(a) only applies where the agreement is incapable of being enforced *"under the law·to which the parties have subjected it."*Convention, Art. V(1)(a) (emphasis added).*See Arbitration Between Overseas Cosmos,*

*Inc. and NR Vessel Corp.*, No. 97 Civ. 5898, 1997 WL 757041, at *3 (S.D.N.Y. Dec. 8, 1997). The Arbitration Agreement clearly provides that New York law governs the arbitration proceedings. (*See* Agreement § 13.06.) Therefore, even assuming arguendo that the Arbitration Agreement cannot be enforced in Ukraine, that incapacity has no bearing whatsoever on whether the agreement can be enforced in New York. Instead, as set out aboye, the Arbitration Agreement is valid and enforceable under New York law notwithstanding the Ukrainian decisions, and accordingly, Article V(1)(a) does not apply.

Storm's final attempt to vacate the Award is equally futile. Despite the voluminous record, including the reception into evidence of statements of eleven witnesses presented by Storm during the arbitration proceedings, Storm contends that the Award should be vacated because the Ukrainian order obtained by Storm against itself purporting to enjoin its participation in the arbitration rendered Storm unable to present its case, requiring vacatur under Article V(1)(b) of the Convention.

Article V(1) (b) of the New York Convention provides that "[r]ecognition and enforcement may be refused ... [upon] proof that ... [t]he party against whom the award is invoked was ... unable to present his case."The governing standard under Article V(1)(b) of the Convention is the forum state's standard of due process. *See Parsons*, 508 F.2d at 975. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."*Ukrvenshprom State Foreign Econ. Enter. v. Tradeway, Inc.*, No. 95 Civ. 10278, 1996 WL 107285, at *5 (S.D.N.Y. Mar. 12, 1996) (internal citations and quotation marks omitted). Accordingly, to obtain relief under Article V(1)(b), Storm bears the burden of proving that it was denied a full and fair opportunity to be heard. *See Europcar*, 156 F.3d at 313.

**\*33** It is clear from the Final Award, as well as the Partial Final Award, that Storm was afforded an ample opportunity to be heard regarding all of the issues in the arbitration, and that it took full advantage of that opportunity. (*See* Sills Decl. II, Ex. HH at 19-20.) Although Storm physically withdrew from one hearing before the Tribunal, its purported basis for that withdrawal was its claim that remaining in the proceeding would have violated the Ukrainian injunction. However, because Storm had, in effect,

obtained that injunction against itself, the injunction did not provide an adequate or proper basis for not proceeding with the arbitration. (*See* Sills Decl. II, Ex. 191 at 34.) Once again, a contrary holding would reward Storm for its patently improper conduct before the Ukrainian courts.

Moreover, even after Storm physically withdrew, the Tribunal proceeded with scrupulous care for Storm's rights. It stated on the record that no default would be entered against Storm, and that Telenor remained obligated to carry its burden of proof. (*See* Sills Decl. II, Ex. 189 at 33.) In fact, in connection with the December 18 hearing, the Tribunal admitted into the record, and considered, four additional witness statements and numerous documents offered by Storm, although neither they nor any other of Storm's eleven witnesses were ever produced for cross-examination. The Tribunal likewise considered Storm's pre-hearing brief on the merits, and directed the parties to submit further briefs on certain of the issues raised by Storm. Indeed, in its presentation to the Court, Storm nowhere refers to any evidence or arguments it was supposedly barred from presenting to the Tribunal. Despite its professed need to comply with the Ukrainian injunction, Storm in fact submitted additional briefing after the hearing from which it had voluntarily absented itself. (*See* Sills Decl. I, Exs. K, Q, & S; *id.* Ex. HH at 32-33.)

Thus, Storm had a "meaningful" opportunity to present its case, *Tradeway,* 1996 WL 107285, at *5, and the Tribunal gave "careful consideration" to Storm's position in rendering the Final Award. *Phoenix Aktiengesellschaft v. Ecoplas, Inc.,* 391 F.3d 433, 438 (2d Cir.2004). Accordingly, Storm's invocation of Article V(1)(b) is unavailing.[FN16]

> [FN16.] An arbitral award may be vacated under Article V(1)(e) of the Convention where it "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Storm did not invoke this ground in its motion to vacate, presumably because no court or other "authority" had rendered a decision on the Award prior to the briefing of its motion. Although a Ukrainian court recently issued a decision refusing to recognize the Final Award, *see* n. 8, *supra,* Storm may not rely on that decision for vacatur of the Award pursuant to Article V(1)(e), as the Award was made, not in

Ukraine under Ukrainian law, but in the United States under New York law. Thus, the Ukrainian court's decision to set aside the Award is irrelevant to Article V(1)(e), and Storm cannot rely on that decision for vacatur here. *See, e.g., Karaha Bodas,* 500 F.3d at 115 n. 1 (finding that an arbitration award may only be set aside by an authority in "the country in which, or under the [arbitration] law of which," the award was made).

### CONCLUSION

Storm and its corporate owners deliberately entered a carefully-negotiated agreement with Telenor. Central to the bargain was an arbitration clause providing for the resolution of disputes in a fair, neutral international arbitration forum. Storm provided every conceivable assurance to Telenor that its signatory officers were empowered to bind it to that agreement. When Storm breached the agreement, it was provided with precisely the fair and impartial hearing it had bargained for, by a distinguished panel of arbitrators, despite making repeated efforts to renege on its agreement and to torpedo the proceeding by collusive and vexatious litigation. The arbitral Tribunal carefully considered Storm's every argument, and by unanimous vote-including the vote of the arbitrator Storm itself had appointed-decisively rejected those arguments and correctly awarded appropriate relief to Telenor.

**\*34** Accordingly, for the foregoing reasons, Storm's motion is denied, and Telenor's petition for enforcement of the Final Award is granted. Storm is hereby ordered to comply with the directives of the Final Award.

SO ORDERED.

S.D.N.Y.,2007.
Telenor Mobile Communications AS v. Storm LLC
Slip Copy, 2007 WL 3274699 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151
Attorneys for Petitioner

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- x
                                 :

**TELENOR MOBILE COMMUNICATIONS AS,**
                                 :

                Petitioner,
                                 :

      -against-
                                 :       07 Civ. 6929 (GEL)

**STORM LLC,**
                                 :       ECF Case

                Respondent,
                                 :

      -and-
                                 :       **DECLARATION OF**
                                              **ROBERT L. SILLS**

**ALTIMO HOLDINGS & INVESTMENTS**
**LIMITED, HARDLAKE LIMITED AND ALPREN** :
**LIMITED,**

                                 :

                Additional Contemnors.
                                 :

--------------------------------------------------------------- x

     **ROBERT L. SILLS** declares the following to be true:

           1.      I am a member of the bar of this Court and of the firm of Orrick,

Herrington & Sutcliffe LLP, attorneys for Petitioner Telenor Mobile Communications AS

("Telenor Mobile" or "Petitioner").  I submit this declaration pursuant to 28 U.S.C. § 1746 in

support of Telenor Mobile's motion to hold Storm LLC ("Storm"), and its alter egos, Altimo

Holdings & Investments ("Altimo"), Alpren Limited ("Alpren"), and Hardlake Limited

("Hardlake" and, together with Altimo and Alpren, collectively, the "Altimo Entities"), in

contempt of this Court's November 2, 2007 Opinion and Order (the "November 2 Order")

confirming the Final Award in the arbitration between Telenor Mobile and Storm, issued on

August 1, 2007 (the "Final Award").  As counsel for Telenor Mobile, I am familiar with the facts

set forth in this declaration.

        2.      Attached hereto as Exhibit A is a copy of the Final Award.

        3.      On August 22, 2007, Storm filed an application with the Pechersky

District Court of the City of Kyiv (the "Pechersk Court"), seeking to bar recognition of the Final

Award in Ukraine.  Storm also sought, and was granted, an expedited hearing on its application.

        4.      Because of the expedited hearing secured by Storm, the Pechersk Court

granted Storm's application on October 5, 2007, almost a month before this Court confirmed the

Final Award.  A copy of the Pechersk Court's ruling is attached hereto as Exhibit B, together

with its English translation.  A copy of a letter e-mailed on October 23, 2007 from Pieter Van

Tol, counsel for Storm, and a copy of my e-mail in response dated October 25, 2007, collectively

detail Storm's application to the Perchersk Court and its subsequent ruling, and are attached

hereto as Exhibits C and D, respectively.

        5.      In addition to the Perchersk Court's ruling, Mr. Vadim Klymenko,

Storm's General Director and an Altimo executive, obtained an order from the Shevchenkivskiy

Court of Kyiv (the "Shevchenkivskiy Court") dated October 10, 2007, which purported to

invalidate resolutions passed at a meeting of Storm's shareholders.  If implemented, these

resolutions, proposed by Storm's only shareholders, Alpren and Hardlake, would have brought

the Altimo Entities into compliance with the Final Award. A copy of the Shevchenkivskiy

Court's ruling, translated into English, as provided by Storm is attached hereto as Exhibit E.

6.    The action that resulted in the Shevchenkivskiy Court's ruling was

brought by Mr. Klymenko, an Altimo executive, against Storm, Alpren and Hardlake, which are

wholly owned and controlled by Altimo. A copy of Mr. Klymenko's affidavit submitted to the

arbitration tribunal (the "Tribunal"), which describes his status as a Vice President of Altimo, is

attached hereto as Exhibit F.

7.    Telenor Mobile first learned of the Shevchenkivskiy Court's ruling from a

letter to this Court from Pieter Van Tol, counsel to Storm, dated October 23, 2007. That letter

also notified this Court regarding the Pechersk Court's ruling. A true and correct copy of Mr.

Van Tol's October 23, 2007 letter, without attachments, is attached hereto as Exhibit G.

8.    Attached hereto as Exhibit H are true and correct copies of e-mails

exchanged between David Wack, Esq., an attorney for Altimo (then named Alfa Telecom

Limited), and lawyers from Coudert Brothers LLP, former counsel to Telenor Mobile,

concerning Storm's sale to Telenor Mobile of a small number of shares in Kyivstar. In an e-mail

dated September 4, 2002, Mr. Wack wrote ". . . since Alfa acquired Storm back in July, Storm

means Alfa . . . Approval by Jmak in respect of Storm is meaningless unless Alfa has signed

off."

9.    Attached as Exhibit I is a true and correct copy of another e-mail, dated

October 28, 2002, in which Mr. Wack, Altimo's attorney tenders Storm's acceptance of a revised

loan document, stating "the changes are acceptable to Storm.".

10.   The day after the Final Award was finally released on August 1, 2007,

Altimo issued a press release stating that the Final Award would "not have any impact on the

legal situation around Kyivstar . . ." and demonstrating contempt for the Tribunal's directives.  A true and correct copy of that press release is attached hereto as Exhibit J.

        11.     On November 2, 2007, this Court confirmed the Final Award in the 64-page November 2 Order.  A true and correct copy of the November 2 Order is attached hereto as Exhibit K.

        12.     On August 14, 2007, Telenor Mobile sent a letter to all of the Altimo Entities pointing out their continued failure to comply with the terms of the Final Award and the November 2 Order.  A true and correct copy of Telenor Mobile's August 14, 2007 letter is attached hereto as Exhibit L.

        13.     Mr. Klymenko responded to Telenor Mobile by letter dated November 15, 2007, in which he informed Telenor Mobile, *inter alia*, that Storm believed that this Court's confirmation of the Final Award was erroneous and that Storm would not comply with the November 2 Order while Storm's appeal was pending.  A true and correct copy of Mr. Klymenko's November 15, 2007 letter is attached hereto as Exhibit M.

        14.     Shortly after this Court denied Storm's motion to stay the November 2 Order, Telenor Mobile again notified Storm and the Altimo Entities, in writing, of their obligations under the Final Award and the November 2 Order.  A true and correct copy of Telenor Mobile's letter, dated November 27, 2007 is attached hereto as Exhibit N.  A true and correct copy of Storm's response is attached hereto as Exhibit ___.

        15.     The reason this application is brought on by order to show cause is that Telenor Mobile seeks a hearing on its motion for an order of contempt, and limited expedited discovery in advance of that hearing.  As set forth in the accompanying memorandum, such discovery will insure that Telenor Mobile's motion is heard on a complete record.

16.    No previous application for the relief sought on this motion or for similar relief has been made to this or to any other court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 22, 2008 at New York, New York.

_____
Robert L. Sills