## CERTIFICATE OF EXHIBITS TO THE
## DECLARATION OF DANIEL GERARD WISE

I hereby certify that these are the documents referred to in the Declaration of Daniel Gerard Wise marked, respectively, Exhibits A, B, C and D, and sworn on the 22nd day of January, 2008.

Before me:

..................................................

**Commissioner for Oaths**



# Exhibit A

**Number:** 178274



# THE BRITISH VIRGIN ISLANDS
## The International Business Companies Act

## MEMORANDUM
## AND
## ARTICLES OF ASSOCIATION
## OF

### Altimo Holdings & Investments Ltd.

Incorporated the 12th day of March, 1996
Amended the 24th day of March, 2006



Abacus Trust and Management Services Limited
George Place, 2nd Floor, 333 Waterfront Drive
Road Town, Tortola, British Virgin Islands



TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT

(Cap. 291)

MEMORANDUM OF ASSOCIATION

OF ALTIMO HOLDINGS & INVESTMENTS LTD.

**1      Name**

The name of the Company is Altimo Holdings & Investments Ltd.

**2      Registered office**

The registered office of the Company will be at the premises of Abacus Trust and Management Services Limited.

**3      Registered agent**

The registered agent of the Company will be Abacus Trust and Management Services Limited whose offices are located at P.O. Box 3339, Wickhams' Cay 1, Road Town, Tortola, British Virgin Islands.

**4      General objects and powers**

4.1     The object of the Company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands;

4.2     The Company may not:

   4.2.1     carry on business with persons resident in the British Virgin Islands;

   4.2.2     own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph 4.3.5;

   4.2.3     carry on banking or trust business, unless it is licensed to do so under the Banks and Trust Companies Act, 1990;

   4.2.4     carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorising it to carry on that business;

   4.2.5     carry on the business of company management, unless it is licensed under the Company Management Act 1990; or

   4.2.6     carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

4.3    For the purposes of paragraph 4.2.1, the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if:

    4.3.1    it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

    4.3.2    it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

    4.3.3    it prepares or maintains books and records within the British Virgin Islands;

    4.3.4    it holds meetings of its Directors or members within the British Virgin Islands;

    4.3.5    it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

    4.3.6    it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Act or under the Companies Act; or

    4.3.7    shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act or under the Companies Act.

4.4    The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands, irrespective of corporate benefit, to perform all acts and engage in all activities necessary or conducive to the conduct, promotion or attainment of the object of the Company.

5    **Currency**

    Shares in the Company shall be issued in the currency of the United States of America.

6    **Authorised share capital**

    The authorised share capital of the Company is US$19,163.32.

7    **Classes, number and par value of shares**

    The authorised share capital is made up of one class and one series of shares divided into 1,916,332 shares of US$0.01 each.

8    **Designations, powers, preferences, etc. of shares**

    8.1    All shares shall:

        8.1.1    subject to the following provisions have one vote each:

            (i)    at a meeting of members, every member who is present in person or by proxy shall have one vote, for every share of which he is the holder; provided that if at any meeting of members any Shareholder is not present in person or by proxy the votes exercisable in respect of the shares of the same class held by members present in person or by proxy shall be *pro tanto* increased (fractions of a vote by any member being permitted) so that such shares shall together entitle such members to the same aggregate number of votes as could be cast in respect of all the shares of that class if

all the holders thereof were present. A Shareholder shall have one vote for every share of which he is a holder in respect of any written resolution;

(ii)    unless the Directors otherwise determine, no member shall be entitled in respect of any share held by him to vote either personally or by proxy at a meeting of members or to exercise any other right conferred by membership in relation to meetings of members if any sum presently payable by him to the Company in respect of that share remains unpaid and until so paid such suspension shall continue;

(iii)   where in England, the British Virgin Islands or elsewhere a guardian, receiver or other person (by whatever name called) has been appointed by any court claiming jurisdiction in that behalf to exercise powers with respect to the property or affairs of any member on the ground (however formulated) of mental disorder, the Directors may in their absolute discretion, upon or subject to production of such evidence of the appointment as the Directors may require, permit such guardian, receiver or other person on behalf of such member to vote in person or by proxy at any meeting of members or to exercise any other right conferred by membership in relation to meetings of members;

(iv)   no objection shall be raised as to the admissibility of any vote except at the meeting or adjourned meeting at which the vote objected to is or may be given or tendered and every vote not disallowed at such meeting shall be valid. Any such objection shall be referred to the chairman of the meeting whose decision shall be final and conclusive; and

(v)   the following shall apply in respect of joint ownership of shares:

(a)   if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member;

(b)   if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners; and

(c)   if two or more of the joint owners are present in person or by proxy they must vote as one;

8.1.2   be subject to redemption, purchase or acquisition by the Company for fair value (as that term is interpreted under BVI law) unless otherwise permitted by the terms of the Articles of Association; and

8.1.3   have the same rights with regard to dividends and distributions upon liquidation of the Company.

## 9   Rights not varied by the issue of shares *pari passu*

The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue shares of that class, be deemed to be varied by the creation or issue of further shares ranking *pari passu* therewith.



**10      Registered shares**

Shares in the Company may be issued as registered shares only as determined by a Resolution of Directors and may not be exchanged for shares issued to bearer.

**11      Transfer of shares**

Shares in the Company may be transferred subject to the relevant provisions of the Articles.

**12      Amendment of Memorandum and Articles**

12.1     No amendment to the Articles or this Memorandum which materially prejudices (as interpreted in paragraph 12.3) the following rights under the Articles or this Memorandum of any Shareholder shall be made except with the approval of a Unanimous Vote:

  12.1.1     voting rights (including, for the avoidance of doubt, any dilution of the percentage voting rights of a Shareholder);

  12.1.2     the right to nominate Directors pursuant to Article 68 and the right to have the Group managed in accordance with Articles 39, 41, 47, 48, 53 to 56, 63, 67 to 70, 73 to 75, 78 and 82 to 85 and paragraph 12 of this Memorandum;

  12.1.3     put or call option rights in accordance with Articles 6 to 10, 25 or 57 to 62;

  12.1.4     tag-along rights in accordance with Articles 19 to 24;

  12.1.5     pre-emption rights in accordance with Articles 12 to 18;

  12.1.6     minimum and *pro rata* dividend rights in accordance with the Memorandum and Articles 95 and 96; and

  12.1.7     pro rata economic rights (on a liquidation of the Company or otherwise).

12.2     Any amendment to the Articles or this Memorandum other than changes requiring unanimous Shareholder consent in accordance with paragraph 12.1 shall be decided by a simple majority vote of the votes eligible to be cast at a validly convened meeting of the members.

12.3     For the purposes of paragraph 12.1, when determining whether an amendment causes material prejudice:

  (i)     all previous amendments shall be aggregated with the amendment in question;

  (ii)    amendments of a purely technical nature shall not be considered to cause material prejudice;

  (iii)   a reasonableness test shall be applied which takes into account all relevant circumstances; and

  (iv)    neither: (a) a change to the capital of the Company which does not reduce the percentage votes of a Shareholder, or negatively affect such Shareholder's economic rights; nor (b) a Capital Issue in accordance with Articles 6-10 shall be considered a material prejudice to that Shareholder's voting rights.

**12.4**    For the avoidance of doubt, any decision of the members to amend to the Articles or this Memorandum pursuant to paragraphs 12.1 and 12.2 or this Memorandum may be taken by the appropriate Written Resolution.

**13**    **Definitions**

The meanings of words in this Memorandum are as defined in the Articles .

We, the undersigned, of the address stated below, for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association this 12th day of March, 1996 in the presence of the undersigned witness:

NAME AND ADDRESS OF WITNESS                    SUBSCRIBER

Sgnd. Linda Douglas                            Sgnd. Lenia Lettsome

Linda Douglas                                  Trident Trust Company (B.V.I.) Limited
c/o P.O. Box 146,                              P.O. Box 146,
Road Town, Tortola,                            Wickham's Cay 1,
British Virgin Islands                         Road Town, Tortola,
                                               British Virgin Islands.



TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT

(Cap. 291)

ARTICLES OF ASSOCIATION

OF

ALTIMO HOLDINGS & INVESTMENTS LTD.

PRELIMINARY

1    Interpretation

In these Articles, if not inconsistent with the subject or context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively:

| | |
|---|---|
| "Acceptance Notice" | Has the meaning set out in Article 16.1.1. |
| "Acceptance Period" | Has the meaning set out in Articles 15.2 and 87.2. |
| "Act" | The International Business Companies Act (Cap. 291) including any modification, extension, re-enactment or renewal thereof and any regulations made there under. |
| "Affiliates" | In relation to any Person, an Associated Company of such Person, such Person's Beneficial Owner or such Person's Beneficial Owner's relatives or family trust(s), any Person which any of the foregoing Persons controls, or any Person which has a significant influence over its operating and financial policy. |
| "Aija" | Aija Investments Limited, a company incorporated in the British Virgin Islands and whose registered office is at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. |
| "Article 86.12 Share Value" | Has the meaning set out in Article 86.12. |
| "Articles" | These Articles of Association as from time to time amended. |
| "Assenting Shareholders" | Has the meaning set out in Article 61. |
| "Associated Company" | In relation to any Person, a Subsidiary or Parent of such Person, a joint venture if not a Subsidiary, a Subsidiary of such Parent or such Person's associate. |

| "Auditors" | Any of PricewaterhouseCoopers, Deloitte & Touche, Ernst & Young or KPMG who shall be appointed and who shall have accepted the appointment to carry out the audit of the Consolidated Accounts. |
|---|---|
| "Bardsley" | Bardsley Investment Corporation, a company incorporated in the British Virgin Islands and whose registered office is at Akara Building, 24 De Castro Street, Wickhams' Cay 1, Road Town, Tortola, British Virgin Islands. |
| "BCL" | Bardsley, Cotesmore and Laketown. |
| "BCL Call Notice" | Has the meaning set out in Article 58. |
| "BCL Call Option" | Has the meaning set out in Article 57. |
| "Beneficial Owner" | In respect of any Person, the Person(s) with ultimate effective control over that Person, mutually agreed, in relation to the Shareholders, as such by the Shareholders from time to time. |
| "Board" | The board of Directors. |
| "Business Day" | A day, other than a Saturday or Sunday, on which commercial banks in general are open for business in the British Virgin Islands, London, Luxembourg, Moscow and New York. |
| "Business" | The business of telecommunications including the business of acting as a holding company of a telecoms group. |
| "Call Option Completion Date" | Has the meaning set out in Article 62.1.1. |
| "Capital" | The sum of the aggregate par value of all outstanding Shares with par value of the Company and Shares with par value held by the Company as Treasury Shares plus the aggregate of the amounts designated as capital of all outstanding Shares without par value of the Company and Shares without par value held by the Company as Treasury Shares, and the amounts as are from time to time transferred from Surplus to capital by a Resolution of Directors. |
| "Capital Issue" | Has the meaning set out in Article 7. |
| "Change of Control Notice" | Has the meaning set out in Articles 87.1 and 87.2. |
| "Company Valuer(s)" | Has the meaning set out in Article 86.7. |

"Consolidated Accounts"

The audited accounts of the Company prepared on a consolidated basis in accordance with the requirements of IFRS for the financial year ending on the relevant balance sheet date and comprising:

(i)    a consolidated balance sheet dealing with the state of affairs of the Group; and

(ii)   a consolidated profit and loss account dealing with the profit and loss of the Group.

"Controlling Interest"

The direct or indirect control by a Person and its Affiliates of Shares holding more than 50 per cent. of the total voting rights conferred by all the Shares (excluding Treasury Shares).

"Cotesmore"

Cotesmore Holdings Limited, a company incorporated in the Bahamas under number 46.8246 and whose registered office is at 1st Floor, Kings Court, Bay Street N-3944, Nassau, Bahamas.

"CTF"

CTF Holdings Limited, a company incorporated in Gibraltar with number 58115 and whose registered office is at Suite 2, 4 Irish Place, Gibraltar.

"Deadlock Purchaser"

Has the meaning set out in Article 57.

"Deadlock Put Notice"

Has the meaning set out in Article 60.1.

"Deadlock Put Option"

Has the meaning set out in Article 59.

"Dendar"

Dendar Investment Fund Limited, a company incorporated in Gibraltar with number 62307 and whose registered office is at 57/63 Line Wall Road, Gibraltar.

"Directors"

The directors of the Company from time to time appointed in accordance with these Articles and "Director" means any one of them.

"Dissenting Shareholder"

Has the meaning set out in Article 57.

"Escrow Agent"

One of the following banks: UBS Warburg, Morgan Stanley Dean Witter & Co., Goldman Sachs Group, Inc., JP Morgan Chase & Co., and Merrill Lynch & Co., Inc.

"Fairacre"

Fairacre Limited, a company incorporated in the Isle of Man with number 75552C and whose registered office is at 8 Prospect Hill, Douglas, Isle of Man, IM1 1EJ.

"Fair Value A"

Has the meaning set out in Article 86.

"Fair Value B"

Has the meaning set out in Article 86.

"Grand"

Grand Financial Holding S.A., a company incorporated in Luxembourg under number 80481 and whose registered office is at L-2449 Luxembourg, 11, Boulevard Royal.

| "Group" | The Company, its Subsidiaries, joint ventures if not Subsidiaries and any of its or their associates and "Group Company" means any one of them. |
| --- | --- |
| "Group Reporting Package" | The group reporting package prepared in respect of the Group in accordance with IFRS and reviewed in connection with the audit of CTF's consolidated accounts and approved by the Auditors. |
| "Guarantee" | A freely assignable guarantee and indemnity from CTF or the Company substantially in a form agreed in writing between the Shareholders. |
| "Holdco" | Means a non-operational, wholly owned subsidiary of the Company, formed solely for the purpose of holding Shares or assets in the Group. |
| "IFRS" | The International Financial Reporting Standards issued by the International Accounting Standards Board (as amended, supplemented or re-issued from time to time). |
| "Incapacity Buyout Completion Date" | Has the meaning set out in Article 25.3.1 . |
| "Incapacity Call Notice" | Has the meaning set out in Article 25.1.2. |
| "Incapacity Put Notice" | Has the meaning set out in Article 25.1.1. |
| "Independent Accountant" | Any firm of accountants listed in the definition of Auditors other than a firm which at the relevant time has been appointed as auditors of the Group. |
| "Indirect Change of Control" | Has the meaning set out in Article 87.1. |
| "Laketown" | Laketown Services Limited, a company incorporated in the Isle of Man and whose registered office is at P.O. Box 95, 1A Lord Street, Douglas, Isle of Man, IM99 1HP. |
| "Major Transaction Threshold" | Means US$250,000,000. |
| "Major Transactions" | The matters listed in Articles 54.1.1 to 54.1.6. |
| "member" | A person who holds Shares (other than Treasury Shares) in the Company. |
| "Memorandum" | The Memorandum of Association of the Company as amended from time to time. |
| "Newco" | A non-operational entity (formed solely for the purpose of owning Shares) whose Beneficial Owner is some or all of the Beneficial Owners on 16 March 2004 of Alja, Dendar, Fairacre, Grand and R&B. |
| "Offer" | Has the meaning set out in Article 14. |
| "Person" | Any natural person, corporation, partnership, limited liability company, proprietorship, other business |

|  | organisation, trust, union, association or governmental or regulatory authority, whether incorporated or unincorporated. |
|---|---|
| "Purchaser" | Has the meaning set out in Article 14. |
| "Put Option" | Has the meaning set out in Article 8.1. |
| "Put Notice" | Has the meaning set out in Article 9.1. |
| "Put Option Completion Date" | Has the meaning set out in Article 10.1.1. |
| "R&B" | R&B Investments Limited, a company incorporated in the British Virgin Islands with number 358381 and whose registered office is at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. |
| "Register" | The register of members of the Company. |
| "Registered Agent" | The registered agent of the Company as set out in the Memorandum. |
| "Remaining Shareholders" | Has the meaning set out in Article 15.1. |
| "Remuneration" | Emoluments of every description including, without limitation, salaries, directors' fees, bonuses, commissions, profit Shares or Shares under any incentive scheme, pension contributions (and also including benefits in kind) payable by any Group Company but excluding lawfully awarded dividends of the Company. |
| "Reorganisation Agreement" | An agreement dated 9 February 2004 between the Parties and various other Persons setting out, *inter alia*, the terms on which the parties thereto shall contribute assets to the Company. |
| "Resolution of Directors" | (a) A resolution approved at a duly convened and constituted meeting of the Board of Directors by the affirmative vote of a simple majority of Directors present at the meeting or approved as a written resolution in accordance with Article 79. For the avoidance of doubt, each Director shall have one vote save in the event where the number of affirmative votes is equal to the number of negative votes in which case the Director who has been elected Chairman pursuant to Article 77 shall have two votes; and |
|  | (b) With respect to calling a meeting of directors, a resolution consented to in writing by any one director and notified to all other directors. |
| "Second Valuer(s)" | Has the meaning set out in Article 86.6. |
| "securities" | Shares and debt obligations of every kind, and options, warrants and rights to acquire Shares. |

| | |
|---|---|
| "Selling Shareholder" | Has the meaning set out in Article 15.1. |
| "Shareholder" | A person, whose name is entered in the Register as the holder of Shares in the Company (which may include the Company, Newco and/or Holdcos in their capacity as Shareholders of the Company but excluding the Escrow Agent in respect of shares held in accordance with Articles 10.1.5, 25.3.4 or 62.1.5). |
| "Shareholder Tag-along Acceptance" | Has the meaning set out in Article 19.2.2(i). |
| "Shares" | The issued shares of the Company and any shares issued in exchange therefor by way of conversion or reclassification and any shares representing or deriving from such shares as a result of any increase in or reorganisation or variation of the Capital of the Company. |
| "Seal" | Any seal which has been duly adopted as the seal of the Company in accordance with Article 89. |
| "Sold Shareholder" | Has the meaning set out in Article 87.1. |
| "Special Commission" | Has the meaning set out in Article 85. |
| "Surplus" | The excess, if any, at the time of the determination, of the total assets of the Company over the sum of its total liabilities, as shown in its books of account, plus the Company's Capital. |
| "Tag-along Acceptance" | Has the meaning set out in Article 19.2.1 |
| "Tag-along Completion Date" | Has the meaning set out in Article 21. |
| "Tag-along Notice" | Has the meaning set out in Article 19.1. |
| "Transfer Completion Date" | Has the meaning set out in Article 16.1.1(ii). |
| "Transfer Notice" | Has the meaning set out in Article 15.1. |
| "Treasury Shares" | Shares in the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled. |
| "Unanimous Vote" | The passing of a resolution by all the Shareholders in a meeting of members by unanimous vote. |
| "US$" | United States Dollars or the legal tender from time to time of the United States of America. |
| "Valuer(s)" | The Auditors and/or an independent Accountant and/or one of the following internationally recognised independent investment banks: USB Warburg, Morgan Stanley Dean Witter & Co., Goldman Sachs Group, Inc., JP Morgan Chase & Co., and Merrill Lynch & Co., Inc., as the case may be and includes the "Company Valuer(s)" and the "Second Valuer(s)". |

| "written" | or any term of like import includes words type written, printed, painted, engraved, lithographed, photographed or represented or reproduced by any mode of reproducing words in a visible form, including telex, facsimile, telegram, cable or other form of writing produced by electronic communication. |
|---|---|
| "Written Resolution" | Has the meaning set out in Article 52.1. |
| "1-Year US $ LIBOR" | In respect of any period: |

(i)     the rate which is quoted as of 11:00 a.m. in London on the first day of such period on page "3750" on the Telerate Monitor (or such other page or service as may replace it for the purpose of displaying London inter-bank offered rates of leading reference banks) as being the interest rate offered in the London inter-bank market for US dollar deposits for one year; or

(ii)    if no such rate appears on the relevant page, the rate shall be the rate at which Barclays Bank plc is offering US$ deposits for one year to leading banks in the London inter-bank market at around 11.00 a.m. in London on the first day of the relevant period.

| "75 per cent. Vote" | The passing of a resolution by the Shareholders in a meeting of members by a majority comprising 75 per cent. or more of the total voting rights conferred by all Shares (excluding Treasury Shares). |
|---|---|

1.1    The expressions "associate", "control", "joint venture", "Parent", "Subsidiary " or "Subsidiaries" shall be interpreted in accordance with the provisions of International Accounting Standard IAS 27, International Accounting Standard IAS 28 and International Accounting Standard IAS 31 (as amended, supplemented or re-issued from time to time).

1.2    Whenever the singular or plural number, or the masculine, feminine or neuter gender is used in these Articles, it shall equally, where the context admits, include the others.

1.3    A reference to money in these Articles is, unless otherwise stated, a reference to the currency in which Shares in the Company shall be issued according to the provisions of the Memorandum.

1.4    Unless the context otherwise requires, any reference to a statutory provision shall include such provision as from time to time modified or re-enacted or consolidated.

1.5    References to any English legal or accounting term shall (unless otherwise specified) in respect of any jurisdiction other than England be deemed to include what most approximates in that jurisdiction to the English legal or accounting term concerned.

1.6    Subject to the terms of these Articles, the Company shall conform to internationally accepted standards of corporate governance and transparency.

## SHARE CERTIFICATES

**2**     **Share certificates**

2.1     Every member holding Shares in the Company whose name is entered in the Register shall be entitled to a certificate without payment specifying the Share or Shares held by him upon the issue or transfer to him of such Shares after allotment or after registration of the transfer. Every Share certificate shall be executed by the Company in such manner as the Directors may decide (which may include use of the Seal and/or manual or facsimile signatures by one or more Directors) provided that the certificates are either signed by two Directors or two officers or by one Director and one officer or under the common seal of the Company with or without the signature of a Director or officer.

2.2     Any member receiving a Share certificate for Shares shall indemnify and hold the Company and its Directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a Share certificate is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a Resolution of Directors.

**3**     **Joint holders**

The Company shall not be bound to issue more than one certificate in the case of a Share held jointly by several persons and delivery of a certificate to one of the joint holders shall be sufficient delivery to all. If several persons are registered as joint holders of any Shares, any one of such persons may give an effective receipt for any dividend payable in respect of such Shares.

## ISSUES OF SHARES

**4**     **Issues of Shares**

4.1     Subject to the provisions of these Articles, the unissued Shares of the Company shall be at the disposal of the Board who may, without limiting or affecting any rights previously conferred on the holders of any existing Shares or class or series of Shares, offer, allot, grant options over or otherwise dispose of Shares to such persons, at such times and upon such terms and conditions as the Company may by Resolution of Directors determine.

4.2     No Share in the Company may be issued until the consideration in respect thereof is fully paid, and when issued the Share is for all purposes fully paid and non-assessable save that a Share issued for a promissory note or other written obligation for payment of a debt may be issued subject to forfeiture in the manner prescribed in these Articles.

4.3     Shares in the Company shall be issued for money, services rendered, personal property, an estate in real property, a promissory note or other binding obligation to contribute money or property or any combination of the foregoing as shall be determined by a Resolution of Directors.

4.4     Shares in the Company may be issued for such amount of consideration as the Directors may from time to time by Resolution of Directors determine, except that in the case of Shares with par value, the amount shall not be less than the par value, and in the absence

of fraud the decision of Directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved. The consideration in respect of the Shares constitutes Capital to the extent of the par value and the excess constitutes surplus.

4.5    A Share issued by the Company upon conversion of, or in exchange for, another Share or a debt obligation or other security in the Company, shall be treated for all purposes as having been issued for money equal to the consideration received or deemed to have been received by the Company in respect of the other share, debt obligation or security.

4.6    Treasury Shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with these Articles and, for the avoidance of doubt, subject to the provisions of Articles 14 to 22) as the Company may by Resolution of Directors determine.

4.7    The Company may issue fractions of a Share and a fractional Share shall have the same corresponding fractional liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole Share of the same class or series of Shares.

## PURCHASE OF OWN SHARES

5    **Purchase of own Shares**

5.1    The Company may purchase, redeem or otherwise acquire and hold its own Shares only out of Surplus or in exchange for newly issued Shares of equal par value.

5.2    Subject to provisions to the contrary in:

5.2.1    the Memorandum or these Articles;

5.2.2    the designations, powers, preferences, rights, qualifications, limitations and restrictions with which the Shares were issued; or

5.2.3    the subscription agreement for the issue of the Shares,

the Company may not purchase, redeem or otherwise acquire its own Shares without the consent of the member(s) whose Shares are to be purchased, redeemed or otherwise acquired.

5.3    No purchase, redemption or other acquisition of Shares shall be made unless the Directors determine that immediately after the purchase, redemption or other acquisition:

5.3.1    the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business; and

5.3.2    and the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its Capital and, in the absence of fraud, the decision of Directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

5.4    A determination by the Directors under Article 5.3 is not required where Shares are purchased, redeemed or otherwise acquired:

5.4.1    pursuant to a right of a member to have his Shares redeemed or to have his Shares exchanged for money or other property of the Company;

5.4.2   by virtue of a transfer of Capital pursuant to Article 38;

5.4.3   by virtue of the provisions of Section 83 of the Act; or

5.4.4   pursuant to an order of the Court.

5.5   Shares that the Company purchases, redeems or otherwise acquires pursuant to these Articles may be cancelled or held as Treasury Shares.

5.6   Where Shares in the Company are held by the Company as Treasury Shares, such Shares of the Company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose except for purposes of determining the Capital of the Company. For the avoidance of doubt, nothing in this Article 5.6 prevents the transfer of Shares held by the Company in accordance with the provisions of these Articles.

5.7   The Company may purchase, redeem or otherwise acquire its Shares at a price lower than the fair value (as that term is interpreted under BVI law) if permitted by, and then only in accordance with, the terms of:

5.7.1   the Memorandum or these Articles; or

5.7.2   a written agreement for the subscription for the Shares to be purchased, redeemed or otherwise acquired.

5.8   The Company may by a Resolution of Directors include in the computation of Surplus for any purpose the unrealised appreciation of the assets of the Company, and, in the absence of fraud, the decision of the Directors as to the value of the assets is conclusive, unless a question of law is involved.

## CAPITAL ISSUES

6   **Duty to seek alternative finance**

The Company may only make a Capital Issue when required to do so in order to raise finance for a transaction of the Group approved, subject to Articles 53 and 54, by a Resolution of Directors, in circumstances where the Company holds insufficient cash resources for such transaction and after the Board has used all reasonable endeavours to find, subject to Article 54.1.4, credit finance on terms acceptable to the Company.

7   **Allotment or Issues of Shares or any financial instrument**

Any allotment or issue of any Shares in the Capital of the Company or the issue of any financial instrument conferring a right to acquire, whether by conversion, exchange or otherwise, Shares or a similar interest in the Capital of the Company (a "Capital Issue") shall be made at fair market value and shall first be offered to the Shareholders, who shall have a pre-emptive right to acquire such Shares or financial instruments *pro rata* to their existing shareholdings in the Company. Any Shares or financial instruments not taken up by the Shareholders shall then be offered to Bardsley, Cotesmore and Laketown (on the one hand) and Alja, Dendar, Fairacre, Grand, R&B or Newco (on the other) *pro rata* to their shareholdings relative to each other. Any Shares or financial instruments not taken up by one or more of Alja, Dendar, Fairacre, Grand, R&B or Newco (as may be agreed between them) within 20 Business Days shall be offered to Bardsley, Cotesmore and Laketown who may take them up at their sole discretion *pro rata* or as otherwise agreed between them.

8   **Put Option**

8.1    Any Shareholder which:

    8.1.1    votes against, or abstains from voting in respect of, a Shareholder resolution approving a Capital Issue passed at a validly-convened meeting of members, or does not attend such meeting; and

    8.1.2    on the date the Shareholder resolution approving the Capital Issue is passed holds, or would, as a result of such Capital Issue (assuming for this purpose it does not take up its entitlement but the Capital Issue is fully subscribed) hold 10 per cent. or less of all Shares in the Company (excluding Treasury Shares),

shall have the option (a "Put Option") to require the Company (or at the Company's discretion, a Holdco) to purchase all such Shareholder's Shares for an amount equal to Fair Value B of those Shares determined in accordance with Article 86.2.

9      Exercise of Put Option

9.1    The day following the date the Shareholder resolution approving the Capital Issue is passed, the Company shall deliver a copy of such resolution to all Shareholders. The Put Option shall be exercisable by written notice from a relevant Shareholder to the Company (a "Put Notice") during a period of 10 Business Days commencing from the date the notice from the Company containing the Shareholder resolution approving the Capital Issue is delivered to the relevant Shareholder in accordance with Article 97.

9.2    Upon receipt of a Put Notice, the relevant Shareholder shall be obliged to sell and the Company or Holdco (as applicable) shall be obliged to purchase all the Shares owned by that Shareholder.

9.3    Further upon receipt of a Put Notice, the Company shall be obliged to transfer or procure the transfer of:

    9.3.1    50 per cent. of the net proceeds of the Capital Issue received by the Company (or if it is a lesser sum, such percentage thereof as is equal to any Article 86.12 Share Value calculation which is produced, multiplied by the number of Shares to be sold) within 10 Business Days of the date of the Put Notice (or, if later, the date of receipt); and

    9.3.2    a percentage of the proceeds received prior to the Put Option Completion Date from any sale of Shares which takes place after receipt of the Put Notice held by the Company (or any Holdco) equal to the percentage of the Share capital of the Company that the Shares to be sold under the Put Option represented prior to such Capital Issue,

into a separately designated interest-bearing account, to remain free from any encumbrance, set-off or counterclaim, such monies (and accruing interest) to be held on trust for the selling Shareholder(s) then applied in satisfaction of the Company's (or Holdco's) obligations pursuant to Articles 10.1.3 or 10.1.4 (as the case may be) and Article 103. Any surplus remaining after satisfaction or termination of the Company's (or Holdco's) obligations pursuant to Article 10.1.3 (and Article 103) shall no longer be held on trust for the selling Shareholder(s). If there is more than one selling Shareholder such monies shall be applied pro rata to the selling Shareholders' shareholdings relative to each other.

9.4    For such period as Bardsley, Cotesmore and Laketown (and/or CTF) hold more than 50 per cent. of the total voting rights conferred by all Shares, during any period following the service of a Put Notice to satisfaction in full or termination of the Company's (or Holdco's)

obligations pursuant to Articles 10.1.3 or 10.1.4 (and Article 103), no payment may be made by the Company or a Holdco to Bardsley, Cotesmore and Laketown (and/or CTF) for the purchase of Shares held by Bardsley, Cotesmore and Laketown (and/or CTF).

10    **Completion**

10.1   A sale of Shares in accordance with this Article shall be made on the following terms:

10.1.1   completion of the transfer of the Shares being sold shall be completed 20 Business Days after the date on which the Valuer(s) determine the Fair Value B of those Shares In accordance with Article 86, (the "Put Option Completion Date") at the registered office of the Company at 11:00 a.m. on the Put Option Completion Date;

10.1.2   each selling Shareholder must deliver to the Company, Holdco or Escrow Agent (as applicable) in respect of the Shares which it is selling on the Put Option Completion Date all documents necessary to transfer title to the Shares;

10.1.3   the Company or Holdco (as applicable) must, if the conditions described in Article 10.1.4 are not satisfied, pay or procure payment (by applying the sums in the interest-bearing account described in Article 9.3 and otherwise) of the consideration due for the Shares (plus interest of 1-Year US$ LIBOR plus 3 per cent. per annum accruing daily thereon from the day which is 120 Business Days after the date of exercise of the Put Notice to the Put Option Completion Date (both dates inclusive)) to each selling Shareholder by telegraphic transfer to the bank account of that Shareholder notified to it for the purpose on the Put Option Completion Date;

10.1.4   payment for the Shares may be deferred if the sum equal to 50 per cent. of the net proceeds of the Capital Issue is less than the total consideration payable to the selling Shareholder(s) and, in the case of a purchase by Holdco, if each selling Shareholder is provided with a separate and enforceable Guarantee executed by the Company In favour of each selling Shareholder and subject to the identity and the terms of appointment of the Escrow Agent having been agreed in accordance with Article 10.1.5 (in each case on or before the Put Option Completion Date), and in the event of deferral as aforesaid, the Company or Holdco must:

(i)    on the Put Option Completion Date, pay or procure payment (by applying the sums in the interest-bearing account described in Article 9.3 and otherwise) of a sum equal to 50 per cent. of the net proceeds of the Capital Issue via the Escrow Agent in partial settlement of the Company's or Holdco's debt to the selling Shareholder(s), *pro rata* to their shareholdings relative to each other; and

(ii)    procure (via the Escrow Agent) payment of the remaining consideration payable for the Shares (plus interest of 1-Year US$ LIBOR plus 3 per cent. per annum accruing daily on any outstanding sum from the day following the Put Option Completion Date to the date of payment (both dates inclusive)) to the selling Shareholder(s) within one year of the Put Option Completion Date;

10.1.5   in the event that the Company or Holdco propose the deferment of the payment of consideration as contemplated by Article 10.1.4, the Shares to be sold and any sums in the interest-bearing account after payment from such account of the amounts in Article 10.1.4(i) shall, on the Put Option Completion Date, be

transferred to an escrow account to be maintained by the Escrow Agent on terms materially consistent with such Escrow Agent's standard terms and conditions to be agreed between the selling Shareholder(s) and the Company (acting reasonably), provided that:

(i)     all fees and costs of the Escrow Agent in relation to the escrow arrangements are to be for the Company's account;

(ii)    the Shares transferred into escrow are to be released to the Company or Holdco only as and when the consideration (and interest) payable for the Shares of the selling Shareholder(s) have been paid in full;

(iii)   all monies received by the Escrow Agent are to be immediately disbursed to the relevant selling Shareholder(s) pro-rata to their shareholdings relative to each other. If following discharge of the payment obligations of the Company (or Holdco, as applicable) any surplus remains, such surplus shall promptly be remitted to the Company (or Holdco, as applicable);

(iv)    the benefit of all economic rights (including pursuant to Articles 90 to 96) attaching to the Shares from the Put Option Completion Date to the date of release of the Shares shall be paid to the Escrow Agent to be held for the benefit of the Company (or Holdco as applicable) provided that they shall, pursuant to Article 10.1.5(iii), be applied by the Escrow Agent in settlement of the selling Shareholder('s)(s') entitlements under Article 10.1.4;

(v)     a percentage of the proceeds received from any sale (which takes place on or after the Put Option Completion Date) of Shares held by the Company or any Holdco equal to the percentage of the share capital of the Company that the Shares to be sold under the Put Option represented prior to the Capital Issue are transferred into the escrow account and applied in accordance with Article 10.1.5(iii);

(vi)    the Escrow Agreement shall provide that the Escrow Agent will exercise any rights conferred pursuant to Article 68 to nominate Director(s) (who shall not be citizens of the Russian Federation and who are independent of the Shareholders and their Affiliates). If the Escrow Agent refuses (or has refused) to agree to accept or exercise such a power of nomination, or does not nominate within the time limits set out in Article 67.3 and if all Shareholders fail subsequently to agree upon the candidate(s) within 2 Business Days of the expiry of such time limit, then the candidate(s) nominated by the Director General for the time being of the Institute of Directors, 116 Pall Mall, London shall be deemed nominated by the Escrow Agent and shall be included in the relevant notice of general meeting. For the avoidance of doubt, the Escrow Agent shall act in the capacity of agent;

(vii)   any independent director nominated pursuant to this Article 10.1.5 shall exercise all voting rights exercisable in respect of the relevant sold Shares acting at all times in the best interests of the Company (which rights shall continue until satisfaction or termination of the Company's (or Holdco's) obligations under this Article as if the Escrow Agent was a Shareholder and/or the selling Shareholder(s) had not transferred the Shares to the Escrow Agent);

(viii)   all costs of appointing any independent director described above shall be borne by the Company;

10.1.6   the Escrow Agreement shall provide that the assignee of any Guarantee may become a party to the Escrow Agreement in substitution of the selling Shareholder that has assigned the benefit of such Guarantee to it;

10.1.7   the Escrow Agreement will further provide that no Escrow Agent shall accept an appointment as a Valuer pursuant to these Articles for so long as it is acting as an Escrow Agent; and

10.1.8   subject to the terms set out in Article 22.

10.2   If BCL or CTF sell or agree to sell Shares at any time between the date of receipt of the Deadlock Put Notice and the settlement of the selling Shareholder('s)(s') entitlements under Articles 10.1.3 or 10.1.4, BCL (or CTF, as applicable) shall inform the purchaser of such Shares of the existence and amount of the Company's (or Holdco's) obligation to the relevant selling Shareholder(s) under Articles 10.1.3 or 10.1.4.

## TRANSFER OF SHARES

### 11   Transfer of Shares

11.1   Subject to any limitations in the Memorandum and/or these Articles, Shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the Directors may accept such evidence of a transfer of Shares as they consider appropriate.

11.2   The Company shall not be required to treat a transferee of a Share in the Company as a member until the transferee's name has been entered in the Register.

11.3   Subject to any limitations in the Memorandum and/or these Articles, the Company must on the application of the transferor or transferee of a registered Share in the Company enter in the Register the name of the transferee of the Share save that the registration of transfers may be suspended and the Register closed at such times and for such periods as the Directors may from time to time determine provided always that such registration shall not be suspended and the Register closed for more than 60 days in any period of 12 months.

### 12   General prohibition against Share transfers

No Shareholder shall, or shall agree to sell, transfer or otherwise dispose of all or part of its shareholding to a party (which, for the avoidance of doubt, includes another Shareholder) otherwise than in accordance with Articles 12 to 18 or pursuant to Articles 6 to 10, 19 to 25, 57 to 62 and 87. Transfers of Shares under Articles 6 to 10, 19 to 25, 57 to 62 and 87 are not subject to Articles 12 to 18.

### 13   Permitted transfers: intra-group transfers; transfers amongst minority Shareholders; and transfers to Newco or CTF

13.1   Any Shareholder may transfer all or some of its Shares to its Subsidiary, its Parent or a Subsidiary of its Parent on giving prior written notice to the other Shareholder(s) on condition that such company is placed under an obligation to retransfer its Shares to the

Shareholder or Subsidiary or Parent of that Shareholder immediately if it ceases to be its Subsidiary, its Parent or a Subsidiary of its Parent.

13.2 Until [●] 2005 any of Alja, Dendar, Fairacre, Grand and R&B may transfer all or some of their Shares to each other on giving prior written notice to BCL and CTF or, in the case of Grand, until [●] 2011 to CTF.

13.3 Until [●] 2005 some or all of Alja, Dendar, Fairacre, Grand and R&B may each transfer all of their Shares to Newco and Newco shall have the right to enjoy all the rights held however and whatever by Alja, Dendar, Fairacre, Grand and R&B pursuant to these Articles.

13.4 The transfer to CTF of the Shares owned by Grand which are subject to a put option under an agreement dated 17 March 2004 between CTF and Grand in relation to Shares owned by Grand will not give rise to pre-emption rights or tag along rights under these Articles.

## 14    Offers

A Shareholder may transfer some or all of its Shares to a proposed transferee (the "Purchaser") only if it receives an offer (the "Offer"):

14.1.1    which is a bona fide offer in writing;

14.1.2    which is a firm commitment from the offeror to acquire the relevant Shares and is in all respects a credible and serious offer taking into account the identity of the offeror;

14.1.3    which, if the acquisition of the Shares specified would result in the Purchaser acquiring a Controlling Interest, states that it is also an offer for all of the Shares of the other Shareholder(s) for a price per Share set out in the Offer, or if higher, at the weighted average price per Share at which the Purchaser or its Associated Companies have acquired Shares in the preceding 12 months;

14.1.4    which has not been made during the valid exercise of a Put Option in accordance with Articles 5-10 or the BCL Call Option in accordance with Articles 57 to 62 or the exercise of rights arising in accordance with Article 87 or the exercise of tag-along rights in accordance with Articles 19 to 24 or the buy out of an incapacitated Beneficial Owner in accordance with Article 25;

14.1.5    which is for cash consideration or the non-cash equivalent on the date payment is due in freely traded and sellable securities or debt obligations which are traded in sufficient volumes that their sale will not materially affect their quoted price; and

14.1.6    which contains all material terms and conditions (including the price, payment terms and the intended completion date of the offer).

## 15    Notice of Offers

15.1 If a Shareholder (the "Selling Shareholder") receives an Offer which it wishes to accept, it must immediately give written notice (the "Transfer Notice") to each other Shareholder(s) (excluding, if applicable, the Purchaser) (the "Remaining Shareholders") offering to sell those Shares which are the subject of the Offer to the Remaining Shareholders in proportion to their shareholdings (relative to each other) at the same cash price as set out in the Offer, and on terms which are no less favourable than those contained in the Offer.

15.2 The Transfer Notice must also state:

15.2.1  the number of Shares being offered to each Remaining Shareholder;

15.2.2  that the period within which the offer to sell the Shares shall remain open to be accepted shall be 20 Business Days from the date of the Transfer Notice (the "Acceptance Period"); and

15.2.3  full details of all other terms and conditions of the Offer.

## 16   Options of the Remaining Shareholders

16.1  Once a Remaining Shareholder has received a Transfer Notice it may either:

16.1.1  send a written notice to all other Shareholders (an "Acceptance Notice") within the Acceptance Period:

(i)  stating that it (or the Company, in the case of Bardsley, Cotesmore and Laketown where their purchase of the Shares offered in the Transfer Notice would result in them owning, between them, all Shares, at Bardsley, Cotesmore and Laketown's election but subject to the restrictions of British Virgin Islands law) is willing to purchase all the Shares offered in the Transfer Notice on the terms set out in the Transfer Notice;

(ii)  specifying a date (the "Transfer Completion Date") 60 Business Days after the expiry of the Acceptance Period or, if later, the date of intended completion specified in the Offer, on which the sale of the number of Shares specified in the Acceptance Notice is to be completed, provided that all actions necessary to permit the purchase to be lawfully undertaken have been completed by the Transfer Completion Date; and

(iii)  which, if the acquisition by that Remaining Shareholder of all the Shares being sold by the Selling Shareholder would result in that Shareholder acquiring a Controlling Interest, states that the Acceptance Notice is also an offer to purchase all of the Shares of the other Shareholder(s) (including, if applicable, the Shares of the Purchaser) and any Shares of the Selling Shareholder not subject to the Offer for the price per Share set out in the Transfer Notice, or if higher, the weighted average price per Share at which that Shareholder or its Associated Companies have acquired Shares in the preceding 12 months and otherwise on the terms of the Transfer Notice; or

16.1.2  send a written notice to the Selling Shareholder within the Acceptance Period declining the offer set out in the Transfer Notice; or

16.1.3  neither send an Acceptance Notice nor reply to the Transfer Notice within the Acceptance Period. In this case, the offer set out in the Transfer Notice shall be deemed not to have been accepted.

## 17   Consequences of Transfer Notice

17.1  If all Remaining Shareholders issue an Acceptance Notice the Selling Shareholder shall sell the relevant Shares to the Remaining Shareholders as set out in the Transfer Notice.

17.2  If an Acceptance Notice is given by one or more, but not all Remaining Shareholders within the Acceptance Period either:

17.2.1  all Remaining Shareholders who submitted an Acceptance Notice shall purchase the Shares offered to them in the relevant Transfer Notice and all the Shares

offered to but not taken up by any Remaining Shareholder in proportion to their shareholdings relative to each other (or in such other proportion as is agreed between them in writing or, failing agreement, if Bardsley, Cotesmore or Laketown submitted an Acceptance Notice, Bardsley, Cotesmore and Laketown may at their discretion purchase all such Shares); or

17.2.2     no Remaining Shareholder shall purchase any Shares.

17.3     Accordingly, if an Acceptance Notice is given by any but not all Remaining Shareholders:

17.3.1     the Selling Shareholder shall within three Business Days of the expiry of the Acceptance Period, inform all Remaining Shareholders who submitted an Acceptance Notice of the number of Shares they may elect to acquire in accordance with Article 17.2.1. Within a further five Business Days, the relevant Remaining Shareholders shall inform the Selling Shareholder and the Company whether they do or do not wish to purchase the Shares offered to them in the Transfer Notice and the Shares not taken up by any Remaining Shareholder on the above terms. A failure to respond to the Selling Shareholder and the Company shall be deemed an election not to purchase Shares;

17.3.2     if the Remaining Shareholder(s) elect not to purchase the Shares offered to them in accordance with Article 17.3.1, the Selling Shareholder shall sell the relevant Shares to the Purchaser; and

17.3.3     if the relevant Remaining Shareholders elect to purchase all the Shares offered to them in accordance with Article 17.3.1 the Selling Shareholder shall sell the Shares to those Remaining Shareholders on the Transfer Completion Date.

17.4     The Shareholders shall take all such actions as are necessary to permit the completion of the purchase and shall consent to the holding at short notice of any meeting of Shareholders required to be held.

17.5     If, in respect of all Remaining Shareholders, no Acceptance Notice is given or the offer set out in the relevant Transfer Notice is deemed not to have been accepted or those Remaining Shareholders are not lawfully able to acquire the Shares on the Transfer Completion Date, the Selling Shareholder may accept the Offer in respect of the Shares offered to the Remaining Shareholders and sell such Shares to the Purchaser on the terms and conditions of the Offer.

18     Completion of transfer – no Tag-along Notice issued

18.1     If no Tag-along Notice has been issued, a sale of Shares in accordance with Articles 12 to 18 shall be made on the following terms:

18.1.1     completion of the transfer of the Shares shall be completed on the Transfer Completion Date at such reasonable time and place as the Selling Shareholder and the purchasing Remaining Shareholder(s) agree or, failing which, at the registered office of the Company at 11.00 a.m. on the Transfer Completion Date;

18.1.2     the Selling Shareholder must deliver to the purchasing Remaining Shareholder(s) in respect of the Shares which it is selling on the Transfer Completion Date all documents necessary to transfer title to the Shares to the purchasing Remaining Shareholders;

18.1.3 each purchasing Remaining Shareholder must pay the total consideration due (plus interest of 1-Year US$ LIBOR plus 3 per cent. per annum accruing daily on any outstanding sum from the day which is 60 Business Days after the date of the Transfer Notice to the Transfer Completion Date (both dates inclusive)) for the Shares to the Selling Shareholder by telegraphic transfer to the bank account of the Selling Shareholder notified to it for the purpose on the Transfer Completion Date, and

subject to the terms set out in Article 22.

18.2    If a Tag-along Notice has been issued, the terms of Articles 19 to 21 shall apply.

## TAG ALONG ON CHANGE OF CONTROL

19    **Tag-along on change of control**

19.1    If, in accordance with the provisions of Articles 87.1 and 87.2 and to the extent the provisions of this Article 19 apply by virtue of Article 87.3, or Article 18, the Selling Shareholder agrees to sell or must sell sufficient Shares to a Purchaser or to a Remaining Shareholder such that on completion of such sale the Purchaser or Remaining Shareholder would acquire a Controlling Interest, then, within 20 Business Days of the expiry of the Acceptance Period, the Selling Shareholder shall issue notice to all other Shareholders of the intended acquisition by the Purchaser or the relevant Remaining Shareholder of a Controlling Interest (a "Tag-along Notice").

19.2    Once a Tag-along Notice is issued:

19.2.1    if a Controlling Interest is to be acquired by a Purchaser, each Remaining Shareholder may send a written notice to the Selling Shareholder (a "Tag-along Acceptance") within 20 Business Days electing to sell all of its Shares to the Purchaser on the terms of the Offer on the Tag-along Completion Date; or

19.2.2    if a Controlling Interest is to be acquired by a Remaining Shareholder:

(i)    each Shareholder (other than the Selling Shareholder but, if the Purchaser is a Shareholder, including the Purchaser) may send a written notice to that Remaining Shareholder (a "Shareholder Tag-along Acceptance") within 20 Business Days electing to sell all its Shares to the relevant Remaining Shareholder on the terms of its Acceptance Notice on the Tag-along Completion Date; and

(ii)    the Selling Shareholder may send a Shareholder Tag-along Acceptance to the acquiring Remaining Shareholder within 20 Business Days electing to sell any of its Shares which are not subject to the Offer to that Remaining Shareholder on the terms of its Acceptance Notice on the Tag-along Completion Date; or

19.2.3    each Shareholder may send a written notice to the Selling Shareholder and (in the case of the Selling Shareholder) the acquiring Remaining Shareholder within 20 Business Days declining the offer set out in the Tag-along Notice; or

19.2.4    each Shareholder may neither send a Tag-along Acceptance nor a Shareholder Tag-along Acceptance nor reply to the Tag-along Notice within 20 Business Days.

In this case, the Shareholder shall be deemed not to have accepted the offer referred to in the Tag-along Notice.

**20      Consequence of Tag-along Notice**

20.1    If a Tag-along Acceptance is given by a Shareholder within 20 Business Days of the Tag-along Notice date, that Shareholder must sell all its Shares to the Purchaser at the price per Share set out in the Offer, or if higher, at the weighted average price per Share at which the Purchaser or its Affiliates have acquired Shares in the preceding 12 months, and otherwise on the terms of the Offer on the Tag-along Completion Date unless such Shareholder cannot lawfully sell them on the Tag-along Completion Date. In addition, the Selling Shareholder shall sell the Shares subject to the Offer to the Purchaser on the Tag-along Completion Date at the price of the Offer.

20.2    If a Shareholder Tag-along Acceptance is given by a Shareholder within 20 Business Days of the Tag-along Notice date:

20.2.1    if that Shareholder is a Remaining Shareholder or Purchaser, it must sell all its Shares; and

20.2.2    if that Shareholder is the Selling Shareholder it must sell its Shares which are not subject to the Offer,

to the acquiring Remaining Shareholder at the price per Share set out in the Offer, or (in respect of a Tag-along Notice not issued as a result of an Indirect Change of Control) if higher, at the weighted average price per Share at which the acquiring Remaining Shareholder or its Affiliates have acquired Shares in the preceding 12 months, and otherwise on the terms of the Transfer Notice on the Tag-along Completion Date unless such Shareholder cannot lawfully sell them on the Tag-along Completion Date. In addition, the Selling Shareholder shall sell the Shares subject to the Offer to the acquiring Remaining Shareholder on the Tag-along Completion Date at the price of the Offer.

20.3    The Shareholders shall take all such actions as are necessary to permit the completion of the sale described in Articles 20. 1 and 20. 2 and shall consent to the holding at short notice of any meeting of Shareholders required to be held.

20.4    If, in respect of any Shareholder, no Shareholder Tag-along Acceptance or Tag-along Acceptance is given or the offer set out in the Tag-along Notice is not deemed to have been accepted or that Shareholder is not lawfully able to acquire the Shares on the Tag-along Completion Date, the Selling Shareholder shall sell its Shares to the Purchaser or the Remaining Shareholder (as applicable) on the Tag-along Completion Date.

**21      Completion of transfer**

21.1    Any sale of Shares in accordance with Articles 19 to 24 shall be made on the following terms:

21.1.1    completion of the transfer of the Shares shall be completed 30 Business Days after the date of the Tag-along Notice (the "**Tag-along Completion Date**") at such reasonable time and place as the selling Shareholder(s) and the purchaser agree, or failing which, at the registered office of the Company at 11:00 a.m. on the Tag-along Completion Date;

21.1.2  the Selling Shareholder(s) must deliver to the purchaser in respect of the Shares which it/they is/are (as the case may be) selling on the Tag-along Completion Date all documents necessary to transfer title to the Shares to the purchaser;

21.1.3  the purchaser of Shares must pay the total consideration due for the Shares (plus interest of 1-Year US$ LIBOR plus 3 per cent. per annum accruing daily on any outstanding sum from the day which is 30 Business Days after the date of the Tag-along Notice to the Tag-along Completion Date (both dates inclusive)) to the Selling Shareholder(s) by telegraphic transfer to the bank account of the Selling Shareholder(s) notified to it for the purpose on the Tag-along Completion Date, and

subject to the terms of Article 22

## 22    Terms of transfer

22.1  Any sale and/or transfer of Shares between the Company (or a Holdco) or an Escrow Agent and a Shareholder or between the Shareholders pursuant to Articles 6 to 10, 12 to 25, 57 to 62 and/or 87 shall be on terms that those Shares:

22.1.1  are transferred free from all claims, pledges, equities, liens, charges and encumbrances; and

22.1.2  are transferred with the benefit of all rights attaching to them as at the Put Option Completion Date, Call Option Completion Date, Change of Control Notice date, Transfer Completion Date, Tag-along Completion Date or Incapacity Buyout Completion Date (as applicable).

### BCL

## 23    BCL

23.1  For the purposes of Articles 12 to 24, Bardsley, Cotesmore and Laketown may, if they so specify in the relevant notice, elect:

23.1.1  in relation to a Transfer Notice, to be treated as a single Selling Shareholder and/or together or in any combination to give a joint Transfer Notice. Any such joint Transfer Notice shall be treated as if it had been issued by a single Selling Shareholder;

23.1.2  in relation to an Acceptance Notice, to act together with the Company, jointly, singly or in any combination as they may specify in their Acceptance Notice(s) in relation to their respective purchase of the Shares offered pursuant to the Transfer Notice; to be treated as a single Remaining Shareholder or not as the case may be; and/or together or in any combination to give a joint Acceptance Notice. To the extent that all or any of Bardsley, Cotesmore or Laketown so provide in any such joint Acceptance Notice the providers of such joint Acceptance Notice shall for the purposes of Articles 12 to 24 be treated as a single Remaining Shareholder;

23.1.3  in relation to a Tag-along Notice, to be treated as a single Selling Shareholder and/or together or in any combination to give a joint Tag-along Notice. Any such joint Tag-along Notice shall be treated as if it had been issued by a single Selling Shareholder; and

23.1.4  in relation to a Shareholder Tag-along Acceptance Notice to act jointly, singly or in any combination as they may specify in their Shareholder Tag-along Acceptance

Notice(s) in relation to their respective sale of the Shares for which an offer has been made pursuant to the Tag-along Notice; to be treated as a single Selling Shareholder or not as the case may be; and/or together or in any combination to give a joint Shareholder Tag-along Acceptance Notice. To the extent that all or any of Bardsley, Cotesmore or Laketown so provide in any such joint Shareholder Tag-along Acceptance Notice the providers of such joint Shareholder Tag-along Acceptance Notice shall for the purposes of Articles 12 to 24 be treated as a single Selling Shareholder.

**24     Bardsley, Cotesmore, Laketown and CTF**

If, in accordance with Article 13, Bardsley, Cotesmore and Laketown transfer all or substantially all the Shares they hold to CTF, the Parties agree that all references to Bardsley, Cotesmore, and Laketown in Articles 7, 16, 17, 57, 58, 68 and this Article 24 and otherwise in these Articles shall be deemed to include CTF and CTF shall have the right to enjoy all the rights and to perform all the obligations held and/or owed however and whenever by and to Bardsley, Cotesmore and Laketown under these Articles.

## INCAPACITY OF BENEFICIAL OWNER

**25     Incapacity of Beneficial Owner**

25.1    In the event of the death or substantial incapacity due to illness of a Shareholder's Beneficial Owner (except in relation to the Company or a Holdco):

25.1.1    for the period of administration of that Beneficial Owner's estate, or (if shorter), two years from the death of that Beneficial Owner or the period of two years commencing after one year of continued incapacity of that Beneficial Owner, the Shareholder controlled at the time of such death or incapacity by that Beneficial Owner shall have the option to require the Company (or, at the Company's discretion, a Holdco) to purchase all such Shareholder's Shares for an amount equal to the Fair Value B of those Shares determined in accordance with Article 86.2 on written notice from the relevant Shareholder (an "**Incapacity Put Notice**"); and

25.1.2    for a period of one year commencing:

(i)    one year after the death of that Beneficial Owner; or

(ii)    on the date following one year of continued incapacity of that Beneficial Owner,

the Company shall have the option to require that Shareholder to sell to the Company (or a Holdco) all such Shareholder's Shares for an amount equal to the Fair Value A of those Shares determined in accordance with Article 86.1 on written notice from the Company to the relevant Shareholder (an "**Incapacity Call Notice**").

25.2    Further upon receipt of an Incapacity Put Notice or Incapacity Call Notice, the Company shall be obliged to transfer or procure the transfer of a percentage of the proceeds received prior to the Incapacity Buyout Completion Date from any sale of any Shares which takes place after receipt of the Incapacity Put Notice or Incapacity Call Notice held by the Company (or any Holdco) equal to the percentage of the Share capital of the