Company that the Shares to be sold under the Incapacity Put Notice or Incapacity Call Notice represented on the date of the relevant notice into a separately designated interest-bearing account, to remain free from any encumbrance, set-off or counterclaim, such monies (and accruing interest) to be held on trust for the selling Shareholder(s) then applied in satisfaction of the Company's (or Holdco's) obligations pursuant to Articles 25.3.3 and/or 25.3.4 (as the case may be) and Article 103. Any surplus remaining after satisfaction or termination of the Company's (or Holdco's) obligations pursuant to Article 25.3.3 (and Article 103) shall no longer be held on trust for the selling Shareholder(s). If there is more than one selling Shareholder such monies shall be applied pro rata to the selling Shareholders' shareholdings relative to each other.

25.3    A sale of Shares in accordance with this Article 25 shall be made on the following terms:

25.3.1    completion of the transfer of the Shares being sold shall be completed 20 Business Days after the date on which the Valuer(s) determine the Fair Value A or Fair Value B (as applicable) of those Shares in accordance with Article 86, (the "Incapacity Buyout Completion Date") at the registered office of the Company at 11:00 a.m. on such date;

25.3.2    the Selling Shareholder must deliver to the Company, Holdco or Escrow Agent (as applicable) in respect of the Shares which it is selling on the Incapacity Buyout Completion Date all documents necessary to transfer title to the Shares;

25.3.3    the Company or Holdco (as applicable) must, if the conditions described in Article 25.3.4 are not satisfied, pay or procure payment (by applying the sums in the interest–bearing account described in Article 9.3 and otherwise) of the consideration due for the Shares (plus interest of 1-Year US$ LIBOR plus 3 per cent. per annum accruing daily thereon from the day which is 120 Business Days after the date of the Incapacity Put Notice or the Incapacity Call Notice (as applicable) to the Incapacity Buyout Completion Date (both dates inclusive)) to each Selling Shareholder by telegraphic transfer to the bank account of that Shareholder notified to it for the purpose on the Incapacity Buyout Completion Date;

25.3.4    payment for the Shares may be deferred if the total consideration payable by the Company (or Holdco) to the selling Shareholder(s) is greater than US$30,000,000 and, in the case of a purchase by Holdco, if the selling Shareholder(s) is/are provided with a separate and enforceable Guarantee executed by the Company in favour of each selling Shareholder and subject to the identity and the terms of appointment of the Escrow Agent having been agreed in accordance with Article 25.3.5 (in each case on or before the Incapacity Buyout Completion Date) the Company or Holdco must:

(i)    pay or procure payment (by applying the sums in the interest-bearing account described in Article 9.3 and otherwise) of the sum equal to 25 per cent. of the consideration due to the selling Shareholder to the Escrow Agent in partial settlement of the Company's or Holdco's debt to the selling Shareholder on the Incapacity Buyout Completion Date; and

(ii)    procure (via the Escrow Agent) payment of the remaining consideration payable for the Shares (plus interest of 1-Year US$ LIBOR plus 3 per cent. per annum accruing daily on any outstanding sum from the day following

the Incapacity Buyout Completion Date to the date of payment (both dates inclusive)), to the selling Shareholder(s) according to the following:

(a)    a sum equal to 50 per cent. of the consideration due to the selling Shareholder shall be paid within two years of the Incapacity Buyout Completion Date; and

(b)    the remainder of the consideration due to the selling Shareholder shall be paid within three years of the Incapacity Buyout Completion Date;

25.3.5    In the event that the Company or Holdco propose the deferment of the payment of consideration as contemplated by Article 25.3.4, the Shares to be sold and any sums in the interest-bearing account after payment from such account of the amounts in Article 25.3.4(i) shall, on the Incapacity Buyout Completion Date, be transferred to an escrow account to be maintained by the Escrow Agent on terms materially consistent with such Escrow Agent's standard terms and conditions to be agreed between the selling Shareholder(s) and the Company (acting reasonably), provided that:

(i)    all fees and costs of the Escrow Agent in relation to the escrow arrangements are to be for the Company's account;

(ii)    the Shares transferred into escrow are to be released to the Company or Holdco only as and when the consideration (and interest) payable for the Shares of the selling Shareholder(s) have been paid in full;

(iii)    all monies received by the Escrow Agent are to be immediately disbursed to the relevant selling Shareholder(s) pro-rata to their shareholdings relative to each other. If following discharge of the payment obligations of the Company (or Holdco, as applicable) any surplus remains, such surplus shall promptly be remitted to the Company (or Holdco, as applicable);

(iv)    the benefit of all economic rights (including pursuant to Articles 90 to 96) attaching to the Shares from the Put Option Completion Date to the date of release of the Shares shall be paid to the Escrow Agent to be held for the benefit of the Company but provided that they shall, pursuant to Article 25.3.5(iii) be applied by the Escrow Agent in settlement of the selling Shareholder('s)(s') entitlements under Article 25.3.4;

(v)    a percentage of the proceeds received from any sale (on or after the Incapacity Buyout Completion Date) of Shares held by the Company or any Holdco equal to the percentage of the share capital of the Company that the Shares to be sold under the Incapacity Put Notice or Incapacity Call Notice represented on the date of exercise are transferred into the escrow account and applied in accordance with Article 25.3.5(iii);

(vi)    the Escrow Agreement shall provide that the Escrow Agent will exercise any rights conferred pursuant to Article 68 to nominate Director(s) (who shall not be citizens of the Russian Federation and who are independent of the selling Shareholder(s) and their Affiliates). If the Escrow Agent refuses (or has refused) to agree to accept or exercise such a power of nomination, or does not nominate within the time limits set out in Article 67.3 and if all Shareholders fail subsequently to agree upon a the candidate(s) within 2

Business Days of the expiry of such time limit, then the candidate(s) nominated by the Director General for the time being of the Institute of Directors, 116 Pall Mall, London shall be deemed nominated by the Escrow Agent; and shall be included in the relevant notice of general meeting. For the avoidance of doubt, the Escrow Agent shall act in the capacity of agent;

(vii)    any independent Director nominated pursuant to this Article 25.3.5 shall exercise all voting rights exercisable in respect of the relevant sold Shares (which rights shall continue until satisfaction or termination of the Company's (or Holdco's) obligations under this Article as if the Escrow Agent was a Shareholder and/or the selling Shareholder had not transferred the Shares to the Escrow Agent) acting at all times in the best interests of the Company; and

(viii)    all costs of appointing the any independent director described above shall be borne by the Company;

25.3.6    the Escrow Agreement shall provide that the assignee of any Guarantee shall become a party to the Escrow Agreement in substitution of the selling Shareholder that has assigned the benefit of such Guarantee to it;

25.3.7    the Escrow Agreement will further provide that no Escrow Agent shall accept an appointment as a Valuer or as a Second Valuer pursuant to these Articles for so long as it is acting as an Escrow Agent; and

25.3.8    subject to the terms set out in Article 22.

25.4    If BCL (or CTF) sell or agree to sell Shares at any time between the date of receipt of the Incapacity Put Notice or Incapacity Call Notice and the settlement of the selling Shareholder('s)(s') entitlements under Articles 25.3.3 or 25.3.4, BCL (or CTF) shall inform the purchaser of such Shares of the existence and amount of the Company's (or Holdco's) obligation to the relevant selling Shareholder(s) under Articles 25.3.3 or 25.3.4.

25.5    For such period as Bardsley, Cotesmore and Laketown (and/or CTF) hold more than 50 per cent. of the total voting rights conferred by all Shares, during any period following the service of an Incapacity Put Notice or Incapacity Call Notice to satisfaction in full or termination of the Company's (or Holdco's) obligations pursuant to Articles 25.3.3 or 25.3.4 (and Article 103), no payment may be made by the Company or a Holdco to Bardsley, Cotesmore and Laketown (and/or CTF) for the purchase of Shares held by Bardsley, Cotesmore and Laketown (and/or CTF).

26    **Transmission of Shares**

26.1    The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognised by the Company as having any title to his Share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in this Article.

26.2    The production to the Company of any document which is evidence of probate of the will, or letters of administration of the estate, or confirmation as executor, of a deceased member or of the appointment of a guardian of an incompetent member or the trustee of a bankrupt member shall be accepted by the Company even if the deceased, incompetent or bankrupt member is domiciled outside the British Virgin Islands if the document evidencing the grant of probate or letters of administration, confirmation as executor, appointment as

guardian or trustee in bankruptcy is issued by a foreign court which had competent jurisdiction in the matter. For the purpose of establishing whether or not a foreign court had competent jurisdiction in such a matter the Directors may obtain appropriate legal advice. The Directors may also require an indemnity to be given by the executor, administrator, guardian or trustee in bankruptcy.

26.3    Any person becoming entitled by operation of law or otherwise to a Share or Shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the Directors.

26.4    What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.

## MORTGAGES AND CHARGES OVER SHARES

27    **Mortgage and charges over Shares**

27.1    Members may from time to time mortgage or charge their Shares in the Company and upon satisfactory evidence thereof the Company shall give effect to the terms of any valid mortgage or charge except insofar as it does not conflict with any requirements herein contained for consent to the transfer of Shares.

27.2    In the case of the mortgage or charge of Shares there may be entered in the Register at the request of the registered holder of such Shares:

27.2.1    a statement that the Shares are mortgaged or charged;

27.2.2    the name of the mortgagee or chargee; and

27.2.3    the date on which the aforesaid particulars are entered in the Register.

27.3    Where particulars of a mortgage or charge are registered, such particulars shall be cancelled:

27.3.1    with the consent of the named mortgagee or chargee or anyone authorised to act on his behalf;

27.3.2    upon evidence satisfactory to the Directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the Directors shall consider necessary or desirable; or

27.3.3    where these Articles require a transfer of Shares to be on the terms of transfer set out in Article 22.1.

27.4    Whilst particulars of a mortgage or charge are registered, no transfer of any Share comprised therein shall be effected without the written consent of the named mortgagee or chargee or anyone authorised to act on his behalf except where these Articles require such transfer to be on the terms of transfer set out in Article 22.1.

## REGISTER OF CHARGES

28    **Register of charges**

28.1    The Company may determine by a Resolution of Directors to maintain at its registered office a register of mortgages, charges and other encumbrances in which there shall be entered the following particulars regarding each mortgage, charge and other encumbrance:

    28.1.1    the sum secured;

    28.1.2    the assets secured;

    28.1.3    the name and address of the mortgagee, chargee or other encumbrancer;

    28.1.4    the date of creation of the mortgage, charge or other encumbrance; and

    28.1.5    the date on which the particulars specified above in respect of the mortgage, charge or other encumbrance are entered in the register.

28.2    The Company may further determine by a Resolution of Directors to register a copy of the register of mortgages, charges or other encumbrances with the Registrar of Corporate Affairs in the British Virgin Islands.


### FORFEITURE AND LIEN

### 29    Forfeiture

When Shares issued for a promissory note or other written obligation for payment of a debt have been issued subject to forfeiture, Articles 30 to 31 shall apply.

### 30    Notice on failure to pay

30.1    Written notice specifying a date for payment to be made and the Shares in respect of which payment is to be made shall be served on the member who defaults in making payment pursuant to a promissory note or other written obligations to pay a debt.

30.2    The written notice specifying a date for payment shall:

    30.2.1    name a further date not earlier than the expiration of 14 Business Days from the date of service of the notice on or before which payment required by the notice is to be made; and

    30.2.2    contain a statement that in the event of non-payment at or before the time named in the notice the Shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

### 31    Forfeiture for non-compliance

31.1    Where a written notice has been issued and the requirements have not been complied with within the prescribed time, the Directors may at any time before tender of payment forfeit and cancel the Shares to which the notice relates. The forfeiture shall include all dividends or other moneys payable in respect of the forfeited Share and not actually paid before forfeiture.

31.2    The Company is under no obligation to refund any moneys to the member whose Shares have been forfeited and cancelled pursuant to these provisions. Upon forfeiture and cancellation of the Shares the member is discharged from any further obligation to the Company with respect to the Shares forfeited and cancelled.

**32    Lien**

The Company shall have a first and paramount lien on every Share issued for a promissory note or for any other binding obligation to contribute money or property or any combination thereof to the Company, and the Company shall also have a first and paramount lien on every Share standing registered in the name of a member, whether singly or jointly with any other person or persons, for all the debts and liabilities of such member or his estate to the Company, whether the same shall have been incurred before or after notice to the Company of any interest of any person other than such member, and whether the time for the payment or discharge of the same shall have actually arrived or not, and notwithstanding that the same are joint debts or liabilities of such member or his estate and any other person, whether a member of the Company or not. The Company's lien on a Share shall extend to all dividends payable thereon. The Directors may at any time either generally, or in any particular case, waive any lien that has arisen or declare any Share to be wholly or in part exempt from the provisions of this Article 32.

**33    Sale of Shares subject to liens**

In the absence of express provisions regarding sale in a promissory note or other binding obligation to contribute money or property, the Company may sell (subject to the provisions of Articles 12 to 18), in such manner as the Directors may by Resolution of Directors determine, any Share on which the Company has a lien, but no sale shall be made unless some sum in respect of which the lien exists is presently payable nor until the expiration of 14 Business Days after a notice in writing, stating and demanding payment of the sum presently payable and giving notice of the intention to sell in default of such payment, has been served on the holder for the time being of the share.

**34    Proceeds of sale of Shares subject to lien**

The net proceeds of the sale by the Company of any Shares on which it has a lien shall be applied in or towards payment of discharge of the promissory note or other binding obligation to contribute money or property or any combination thereof in respect of which the lien exists so far as the same is presently payable and any residue shall (subject to a like lien for debts or liabilities not presently payable as existed upon the Share prior to the sale) be paid to the holder of the Share immediately after such sale. For giving effect to any such sale the Directors may authorise some person to transfer the Share sold to the purchaser thereof. The purchaser shall be registered as the holder of the Share and he shall not be bound to see to the application of the purchase money, nor shall his title to the Share be affected by any irregularity or invalidity in the proceedings in reference to the sale.

## SHARE CAPITAL

**35    Reduction or increase in authorised capital**

Subject to paragraph 12 of the Memorandum, the Company may amend the Memorandum to increase or reduce its authorised capital and in connection therewith the Company may in respect of any unissued Shares increase or reduce the number of such Shares, increase or reduce the par value of any such Shares or effect any combination of the foregoing.

**36    Consolidation or subdivision**

**36.1    The Company may amend the Memorandum to:**

38.1.1    divide the Shares, including issued Shares, of a class or series into a larger number of Shares of the same class or series; or

38.1.2    combine the Shares, including issued Shares, of a class or series into a smaller number of Shares of the same class or series,

provided, however, that where Shares are divided or combined in accordance with this Article, the aggregate par value of the new Shares must be equal to the aggregate par value of the original Shares.

### 37    Increases of Capital

The Capital of the Company may by a Resolution of Directors be increased by transferring an amount of the Surplus of the Company to Capital.

### 38    Reductions of Capital

38.1    Subject to the Company having repurchased, redeemed or otherwise acquired the requisite number of Shares immediately prior to any proposed reduction of Capital and to the provisions of Articles 38.2 and 38.3, the Capital of the Company may by Resolution of Directors be reduced by transferring an amount of the Capital of the Company to Surplus.

38.2    No reduction of Capital shall be effected that reduces the Capital of the Company to an amount that immediately after the reduction is less than the aggregate par value of all outstanding Shares with par value and all Shares with par value held by the Company as Treasury Shares and the aggregate of the amounts designated as Capital of all outstanding Shares without par value and all Shares without par value held by the Company as Treasury Shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

38.3    No reduction of Capital shall be effected unless the Directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realisable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company and its remaining Capital, and, in the absence of fraud, the Resolution of Directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

## GENERAL MEETINGS

### 39    Convening meeting of members

39.1    The Directors may convene meeting of members at such times and in such manner and places within or outside the British Virgin Islands as the Directors consider necessary or desirable.

39.2    Upon the written request of a member or members holding 10 per cent. or more of the issued Shares of the Company (excluding any Treasury Shares) the Directors shall convene a meeting of members.

### 40    Annual meeting of members

An annual meeting of members shall be held once in every year not later than six months after the end of the relevant financial year at such time and place as may be determined by the Directors.

## NOTICE OF GENERAL MEETINGS

**41**    **Notice of meeting of members**

**41.1**    The Directors shall give not less than 10 Business Days' notice of a meeting of members to those persons on the Register as at the date of such notice and who are entitled to vote at the meeting.

**41.2**    The Directors may fix the date that notice is given of a meeting of members as the record date for determining those Shares that are entitled to vote at the meeting.

**41.3**    A meeting of members of the Company may be called on short notice with the written consent of all of the members of the Company.

**41.4**    Subject to Article 48, the fact that a member has not received notice, does not invalidate the meeting.

**42**    **Contents of notice of a meeting of members**

Every notice calling a meeting of members shall specify the time and place of the meeting and the general nature of the business to be transacted at the meeting. If any resolution is to be proposed as requiring a Unanimous Vote or a 75 per cent. Vote, the notice shall contain a statement to that effect. In the case of an annual meeting of members, the notice shall also specify the meeting as such.

## PROXIES

**43**    **Representation by proxy**

A member (being an individual) may be represented at a meeting of members by a proxy, who need not be a member of the Company, who may speak and vote on behalf of the member.

**44**    **Receipt of proxy form**

The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to speak and/or vote.

**45**    **Form of proxy**

**45.1**    An instrument appointing a proxy shall be in substantially the following form or such other form as the Directors may approve or as the chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy:

"[Name of Company]

I/We being a member of the above Company with Shares HEREBY APPOINT [•] of [•]or failing him [•] of [•] to be my/our proxy to vote for me/us at the meeting of members to be held on the day of and at any adjournment thereof.

(Any restrictions on voting to be inserted here)

Signed this [•] day of [•]

.........................................

[Name of member]"

45.2    The instrument appointing a proxy must, in the case of an individual, either be signed by the appointor or his attorney or comply with Article 99 or, in the case of a corporation, either be given under its common seal or be signed on its behalf by an attorney or a duly authorised officer of the corporation or comply with Article 99.

## PROCEEDINGS AT GENERAL MEETINGS

### 46    Participation by telephone

A member shall be deemed to be present in person at a meeting of members if he participates by telephone or video-conference link and all members participating in the meeting are able to hear each other.

### 47    Quorum

47.1    The quorum at a meeting of members where there is no Major Transaction on the agenda shall be one or more person(s), present in person or by proxy who together hold(s) 50 per cent. of the issued Shares of the Company (excluding any Treasury Shares). If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid decision of the members.

47.2    The quorum at a meeting of members where a Major Transaction is on the agenda of the Company shall be two or more persons present in person or by proxy who together hold 75 per cent. or more of the issued Shares of the Company (excluding any Treasury Shares).

### 48    Lack of quorum

48.1    If within two hours from the time appointed for a meeting of members where there is no Major Transaction on the agenda a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved; in any other case it shall be reconvened after five Business Days. The quorum for such reconvened meeting shall be one or more person(s) present in person or by proxy who together hold(s) 50 per cent. or more of the issued Shares of the Company.

48.2    If within two hours from the time appointed for a meeting of members where there is a Major Transaction on the agenda a quorum is not present the meeting shall be reconvened after five Business Days. The notice for such reconvened meeting shall be delivered by hand and shall include a phrase identical in all material respects to "Shareholders are reminded that failure to attend this reconvened meeting will have the same effect as a vote against the Major Transaction(s) on this meeting's agenda for the purposes of the articles of association of the Company and the shareholders' agreement between all shareholders and may result in the exercise of the BCL Call Option against any non-attending shareholder". The quorum for such reconvened meeting shall be one or more person(s) present in person or by proxy who together hold(s) 50 per cent. or more of the issued Shares of the Company (excluding any Treasury Shares).

**49 Chairman**

At every meeting of members, the chairman of the Board shall preside as chairman of the meeting. If there is no chairman of the Board or if the chairman of the Board is not present at the meeting, the members present shall choose one of their number to be the chairman. If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting Shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair.

**50 Adjournment**

The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place. No business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting is adjourned for 14 Business Days or more, at least seven Business Days' notice of the adjourned meeting shall be given in like manner as in the case of the original meeting. In all other cases, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

**51 Appointment of representatives**

51.1 Any person other than an individual shall be regarded as one member and subject to the specific provisions hereinafter contained for the appointment of representatives of such persons the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence. In case of doubt, the Directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the Directors may rely and act upon such advice without incurring any liability to any member.

51.2 Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company. The person so authorised shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise if it were an individual member of the Company and such person shall for the purposes of these Articles be deemed to be present in person at any such meeting if a person so authorised is present thereat.

51.3 The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within seven days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

**52 Written resolutions**

52.1 An action that may be taken by the members at a meeting may also be taken by written resolution signed by or on behalf of members representing the level of votes required to pass the appropriate resolution (as determined in accordance with Articles 53 to 55 and paragraph 12 of the Memorandum) had it been proposed at a meeting of members with all Shareholders entitled to vote in attendance, without the need for any notice, and shall be valid and effective as a resolution duly passed at a meeting of members duly convened and held and may consist of several documents in the like form each signed by one or more members (a "**Written Resolution**"). For the avoidance of doubt, a Written Resolution

may be used in circumstances where the Articles and/or the Memorandum require a Unanimous Vote or a 75 per cent. Vote.

52.2   If any Written Resolution is adopted otherwise than by the unanimous written consent of all members, a copy of such resolution shall forthwith be sent to all members who have not consented to such resolution.

52.3   In the case of a corporation, a Written Resolution may be signed on its behalf by a Director or company secretary thereof or by its duly appointed attorney or duly authorised representative.

## MATTERS REQUIRING SHAREHOLDER APPROVAL

**53      Decisions to be made by Shareholders by 75 per cent. Vote**

The Shareholders shall use all reasonable endeavours to procure, so far as it is in their power, that no action shall be taken or resolution passed by the Company and, where specified, by any other Group Company except with the approval of a 75 per cent. Vote in respect of the following matters. It shall be the responsibility of the Company and the Board to put in place adequate controls and reporting requirements within the Group to ensure that the following matters do not occur without the opportunity for the Shareholders to give (or withhold) their prior approval.

**54      Major Transactions**

54.1   The matters to be decided by Shareholders by 75 per cent. Vote, pursuant to Article 53, are:

54.1.1   the sale or disposition of an asset, business or undertaking or of any interest in an asset, business or undertaking by a Group Company (including the transfer of control over any Group Company), other than between wholly-owned Subsidiaries of the Company, where the fair market value of the asset, business or undertaking or interest therein or the consideration paid is more than the Major Transaction Threshold;

54.1.2   the acquisition of an asset, business or undertaking or of any interest in an asset, business or undertaking by a Group Company (including the transfer of control over any Group Company), other than between wholly-owned Subsidiaries of the Company, where the fair market value of the asset, business or undertaking or interest therein or consideration paid exceeds the Major Transaction Threshold;

54.1.3   the liquidation, placing into receivership or administration of the Company (or the equivalent under British Virgin Islands law);

54.1.4   the admission, settlement, compromise or assumption of a liability, (by way of guarantee, security, indemnity, encumbrance, CAPEX, borrowing, credit advance, lending or otherwise) whether present, future, actual or contingent, by any Group Company which exceeds or may exceed the Major Transaction Threshold;

54.1.5   any transaction, arrangement or agreement entered into by any Group Company with or for the benefit of any Shareholder or its Affiliates where the contract value (or equivalent) exceeds or may exceed the Major Transaction Threshold; and————

54.1.6   the establishment of new Subsidiaries or Associated Companies by Group Companies where the net asset or enterprise value exceeds or may exceed the Major Transaction Threshold.

54.2   The matters listed in Articles 54.1.1 to 54.1.6 shall together be referred to as "Major Transactions". For the purpose of determining whether the Major Transaction Threshold has been exceeded under Articles 54.1.1 to 54.1.6, a transaction which forms part of a series of related transactions shall be aggregated with the related transactions.

55   **Decisions to be made by Shareholders by simple majority vote**

55.1   Save as required by applicable law, the following decisions shall be decided by a simple majority vote of the votes eligible to be cast at a validly convened meeting of members:

55.1.1   appointment (and terms of appointment) or dismissal of the Auditors (provided that any appointments are on reasonable terms and in accordance with International best practice);

55.1.2   subject to paragraph 12.1.7 of the Memorandum of Association, liquidation of the Company following the transfer of all the Company's assets to another entity;

55.1.3   approval of any changes to the accounting principles of the Group provided that the same are consistent with IFRS and do not result in any financial year being otherwise than a period of 12 calendar months;

55.1.4   subject to paragraph 12 of the Memorandum of Association and Articles 53 and 54, any decision which is referred by the chairman of the Board to the Shareholders;

55.1.5   the appointment and dismissal of the Directors of the Company (but subject to Articles 67 to 69);

55.1.6   a decision to make a Capital Issue; and

55.1.7   a direction to the Board to appoint and dismiss the CEO and/or CFO of the Company and/or members of the managing board of the Company (if any).

56   **Decisions to be delegated to the management of the Company**

The Board of the Company may delegate any decision of a value, liability or contingent liability of a sum to be set by the Board from time to time to the management of the Company (including the CEO and CFO) save as required by applicable law or as otherwise directed by the Shareholders.

## DEADLOCK

57   **Deadlock**

If a Major Transaction is presented to a validly convened meeting of members for approval by 75 per cent. Vote in accordance with the terms of Article 53, but is not approved at that meeting, the Shareholders shall have a 20 Business Day reconciliation period in which to resolve their disagreement. If the Shareholders do not resolve their disagreement within this time Bardsley, Cotesmore and/or Laketown shall, subject to Article 61, have the option (the "BCL Call Option") of purchasing all of the Shares owned by any or all Shareholder(s) who voted not to approve that Major Transaction or abstained from voting in respect of that Major Transaction or who, following the reconvening of a quorate meeting of members, in

accordance with the last sentence of Article 48.2 either: voted not to approve that Major Transaction; or abstained from voting in respect of such Major Transaction; or did not attend that meeting of members (in each case, a "Dissenting Shareholder") for an amount equal to the Fair Value A of those Shares, determined in accordance with Article 86.1. If all Shareholders other than BCL are Dissenting Shareholders and are subject to a BCL Call Option or exercise a Deadlock Put Option, the Company or a Holdco, at BCL's discretion (subject to the restrictions of British Virgin Islands law) may exercise the BCL Call Option (as the case may be and as specified in the BCL Call Notice or as specified by BCL in response to a Deadlock Put Notice (the "Deadlock Purchaser")).

58      Exercise of the BCL Call Option

Failing agreement to the contrary, the BCL Call Option shall be exercisable by written notice from Bardsley, Cotesmore and/or Laketown to any Dissenting Shareholder with a copy to all remaining Shareholders and the Company (a "BCL Call Notice") during a period of 10 Business days commencing 20 Business Days from the date of the Shareholders' meeting at which the relevant Major Transaction was not approved by the Shareholders. Upon receipt of a BCL Call Notice a Dissenting Shareholder shall be obliged to sell and the Deadlock Purchaser shall, subject to Article 61,be obliged to purchase all the Shares owned by that Dissenting Shareholder in the proportions set out in the BCL Call Notice.

59      Put option for remaining Dissenting Shareholders

Any Dissenting Shareholder in respect of which the BCL Call Option is not exercised shall have the option (a "Deadlock Put Option") to require the relevant Deadlock Purchaser, subject to Article 61, to purchase all such Dissenting Shareholder's Shares for an amount equal to the Fair Value A of those Shares determined in accordance with Article 86.1.

60      Exercise of Deadlock Put Option

60.1    The Deadlock Put Option shall be exercisable by written notice from a relevant Dissenting Shareholder to the Deadlock Purchaser with a copy to all remaining Shareholders (a "Deadlock Put Notice") during a period of 10 Business Days from the day after the last date upon which the corresponding BCL Call Notice could have been served.

60.2    Upon receipt of a Deadlock Put Notice, the relevant Dissenting Shareholder shall be obliged to sell and the relevant Deadlock Purchaser shall, subject to Article 61, be obliged to purchase all the Shares owned by that Dissenting Shareholder.

60.3    Further upon receipt of a Deadlock Put Notice, the Deadlock Purchaser and/or the Assenting Shareholder(s) shall be obliged to transfer or procure the transfer of a percentage of the proceeds received prior to the Call Option Completion Date from any sale of any Shares which takes place after receipt of the Deadlock Put Notice held by the Deadlock Purchaser or the Assenting Shareholder(s) (as the case may be) equal to the percentage of the Share capital of the Company that the Shares to be sold under the BCL Call Option and Deadlock Put Option represented on the date of exercise into separately designated interest–bearing accounts, to remain free from any encumbrance, set-off or counterclaim, such monies (and accruing interest) to be held, on trust for the selling Dissenting Shareholder(s) then applied in satisfaction of the Deadlock Purchaser's and/or Assenting Shareholder('s)(s') obligations pursuant to Articles 62.1.3 or 62.1.4 (as the case may be) and Article 103. Any surplus remaining after satisfaction or termination of the Deadlock Purchaser's and/or Assenting Shareholder's obligations  pursuant to Article

62.1.3 (and Article 103) shall no longer be held on trust for the selling Shareholder(s). If there is more than one selling Shareholder such monies shall be applied *pro rata* to the selling Shareholders' shareholdings relative to each other.

60.4 Where the Deadlock Purchaser is the Company or a Holdco, for such period as Bardsley, Cotesmore and Laketown (and/or CTF) hold more than 50 per cent. of the total voting rights conferred by all Shares, during any period following the service of a Deadlock Put Notice to satisfaction in full or termination of the Deadlock Purchaser's obligations pursuant to Article 62.1.3 or 62.1.4 (and Article 103) no payment may be made by the Company or a Holdco to Bardsley, Cotesmore and Laketown (and/or CTF) for the purchase of Shares held by Bardsley, Cotesmore and Laketown (and/or CTF).

61    Participating rights of Assenting Shareholders

Any or all Shareholders other than BCL who voted to approve the Major Transaction ("**Assenting Shareholders**") shall have the right, within 10 Business Days of a BCL Call Notice, to give written notice to the relevant Deadlock Purchaser (with a copy to all remaining Shareholders) of its or their intention to purchase (in such proportions as they shall agree between themselves if more than one) such percentage of the selling Dissenting Shareholder('s)(s') Shares as represented (expressed as a percentage) by the number of Shares owned by Shareholders other than BCL divided by the total number of Shares.

62    Completion

62.1   Any sale of Shares in accordance with Articles 57 to 62 shall be made on the following terms:

62.1.1   completion of the transfer of the Shares being sold shall be completed 20 Business Days after the date on which the Valuer(s) determine the Fair Value A of those Shares in accordance with Article 86.1 (the "**Call Option Completion Date**") at such reasonable time and place as the Dissenting Shareholder and the Deadlock Purchaser and/or the Assenting Shareholder(s) agree or, failing which, at the registered office of the Company at 11:00 a.m. on the Call Option Completion Date;

62.1.2   each selling Dissenting Shareholder must deliver to the Deadlock Purchaser and/or the Assenting Shareholder(s) or the Escrow Agent (as applicable) in respect of the Shares which it is selling on the Call Option Completion Date all documents necessary to transfer title to the Shares;

62.1.3   the Deadlock Purchaser and/or the Assenting Shareholder(s) (as applicable) must, if the conditions described in Article 62.1.4 are not satisfied, pay or procure payment (by applying the sums in the interest-bearing accounts described in Articles 9.3 and otherwise) of the consideration due for the Shares (plus interest of 1-Year US$ LIBOR plus three per cent. per annum accruing daily thereon from the day which is 120 Business Days after the date of the BCL Call Notice or Deadlock Put Notice (as applicable) to the Call Option Completion Date (both dates inclusive)) to each selling Shareholder by telegraphic transfer to the bank account of that Shareholder notified to it for the purpose on the Call Option Completion Date;

62.1.4   payment for the Shares may be deferred if the total consideration payable by the Deadlock Purchaser and/or Assenting Shareholder(s) to the selling Shareholder(s) is greater than US$30,000,000 and if each selling Shareholder is provided with a

separate and enforceable Guarantee executed by the Company (if the Deadlock Purchaser is a Holdco) or CTF (if the Deadlock Purchaser is BCL) in favour of each selling Shareholder from which the Deadlock Purchaser is purchasing Shares (in respect of the amount due from the Deadlock Purchaser) and subject to the identity and the terms of appointment of the Escrow Agent having been agreed in accordance with Article 62.1.5 (in each case on or before the Call Option Completion Date), the Deadlock Purchaser and/or Assenting Shareholder(s) must:

(i)     pay or procure payment (by applying the sums in the interest-bearing accounts described in Article 60.3 and otherwise) of the sum equal to 25 per cent. of the total amount due to the selling Shareholder(s) (up to US$75,000,000) in partial settlement of the Deadlock Purchaser's and/or the Assenting Shareholder('s)(s') debt to the selling Shareholder(s), *pro rata* to their shareholdings relative to each other on the Call Option Completion Date; and

(ii)    procure (via the Escrow Agent) payment of the remaining consideration payable for the Shares (plus interest of 1 Year US$ LIBOR plus 3 per cent. per annum accruing daily on any outstanding sum from the day following the Call Option Completion Date to the date of payment (both dates inclusive)) to the selling Shareholder(s) within one year of the Call Option Completion Date;

62.1.5  in the event that the Deadlock Purchaser and/or Assenting Shareholder(s) propose the deferment of the payment of consideration as contemplated by Article 62.1.4, the Shares to be sold and any sums in the interest-bearing accounts after payment from such accounts of the respective amounts in Article 62.1.4(i) shall, on the Call Option Completion Date, be transferred to separate escrow accounts (for the Deadlock Purchaser and each Assenting Shareholder) to be maintained by the Escrow Agent on terms materially consistent with such Escrow Agent's standard terms and conditions to be agreed between the selling Shareholder(s), the Deadlock Purchaser and any Assenting Shareholder(s) (acting reasonably), provided that:

(i)     all fees and costs of the Escrow Agent in relation to the escrow arrangements are to be for the Company's account;

(ii)    the Shares being sold to the Deadlock Purchaser shall be transferred into one escrow account and the Shares being sold to the Assenting Shareholder(s) shall be transferred into a/several separate escrow account(s) in respect of each Assenting Shareholder(s);

(iii)   the Shares transferred into escrow which are being purchased by the Deadlock Purchaser are to be released to the Deadlock Purchaser only as and when the consideration (and interest) payable for such Shares have been paid in full;

(iv)    the Shares transferred into escrow which are being purchased by any Assenting Shareholder are to be released to such Assenting Shareholder only as and when the consideration (and interest) payable for such Shares have been paid in full;

(v) all monies received by the Escrow Agent are to be immediately disbursed to the relevant selling Shareholder(s) pro-rata to their shareholdings relative to each other. If following discharge of the payment obligations of the Deadlock Purchaser and/or Assenting Shareholder(s) (as applicable) any surplus remains, such surplus shall promptly be remitted to the Deadlock Purchaser and/or the relevant Assenting Shareholder(s) (as applicable);

(vi) the benefit of all economic rights (including pursuant to Articles 90 to 96) attaching to the Shares from the Call Option Completion Date to the date of release of the Shares shall be paid to the Escrow Agent to be held for the benefit of the Deadlock Purchaser and each Assenting Shareholder in respect of the Shares it is purchasing provided that they shall, pursuant to Article 62.1.5(v), be applied by the Escrow Agent in settlement of the selling Shareholder('s)(s') entitlements under Article 62.1.4;

(vii) a percentage of the proceeds received from any sale (on or after the Call Option Completion Date) of Shares held by the Deadlock Purchaser or the Assenting Shareholder(s) equal to the share capital of the Company that the shares to be sold under the BCL Call Option and Deadlock Put Option represented on the date of exercise are transferred into the escrow account and applied in accordance with Article 62.1.5(v);

(viii) the Escrow Agreement shall provide that the Escrow Agent will exercise any rights conferred pursuant to Article 68 to nominate Director(s) (who shall not be citizens of the Russian Federation and who are independent of the selling Shareholder(s) and their Affiliates). If the Escrow Agent refuses (or has refused) to agree to accept or exercise such a power of nomination, or does not nominate within the time limits set out in Article 67.3 and if all Shareholders fail subsequently to agree upon the candidate(s) within 2 Business Days of the expiry of such time limit, then the candidate(s) nominated by the Director General for the time being of the Institute of Directors, 116 Pall Mall, London shall be deemed nominated by the Escrow Agent and shall be included in the relevant notice of general meeting. For the avoidance of doubt, the Escrow Agent shall act in the capacity of agent;

(ix) any independent Director nominated pursuant to this Article 62.1.5 shall exercise all voting rights exercisable in respect of the relevant sold Shares acting at all times in the best interests of the Company (which rights shall continue until satisfaction or termination of the Deadlock Purchaser's and/or relevant Assenting Shareholder('s)('s) obligations under this Article as if the Escrow Agent was a Shareholder and/or the selling Shareholder(s) had not transferred the Shares to the Escrow Agent); and

(x) all costs of appointing any independent director described above shall be borne by the Company;

62.1.6 the Escrow Agreement shall provide that the assignee of any Guarantee shall become a party to the Escrow Agreement in substitution of the selling Shareholder that has assigned the benefit of such Guarantee to it;

62.1.7 the Escrow Agreement will further provide that no Escrow Agent shall accept the appointment as a Valuer pursuant to these Articles for so long as it is acting as an Escrow Agent; and

62.1.8    subject to the terms of Article 22.

62.2    If, in accordance with these Articles 57 to 62, the Deadlock Purchaser is the Company or a Holdco and BCL (or CTF) sell or agree to sell Shares at any time between the date of receipt of the Deadlock Put Notice and settlement of the selling Shareholder('s)(s') entitlements under Articles 10.1.3 or 10.1.4, BCL (or CTF) shall inform the purchaser of such Shares of the existence and amount of the Company's (or Holdco's) obligation to the relevant selling Shareholder(s) under Articles 62.1.3 or 62.1.4.

## DIRECTORS

### 63    Number of Directors

The Board of the Company shall at all times comprise five Directors, except where a vacancy has arisen which the Shareholders have not filled by exercising the power conferred upon them by these Articles.

### 64    Register of Directors

64.1    The Company shall keep a register of Directors containing:

64.1.1    the names and addresses of the persons who are Directors;

64.1.2    the date on which each person whose name is entered in the register was appointed as a Director;

64.1.3    the date on which each person named as a Director ceased to be a Director; and

64.1.4    such other information as may be prescribed under the Act

64.2    A copy thereof shall be kept at the registered office of the Company and the Company may determine by Resolution of Directors to register a copy of the register with the Registrar of Companies.

### 65    Share qualification

A Director shall not be required to hold any Shares of the Company by way of qualification. A Director who is not a member of the Company shall nevertheless be entitled to attend and speak at meeting of members.

### 66    Directors which are body corporate

Any Director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the Board.

## ELECTION AND REMOVAL OF DIRECTORS

### 67    Election of Directors

67.1    The composition of the Board shall be determined at general meetings of the Company to be convened in accordance with these Articles to give effect to Articles 67 to 69.

67.2    If Bardsley, Cotesmore, Laketown (and/or CTF) together hold equal to or less than 50 per cent or less of the total voting rights conferred by all Shares (excluding Treasury Shares) the following provisions shall apply:

67.2.1   the Directors shall be elected to the Board at a meeting of members by cumulative vote of the Shareholders;

67.2.2   for the purpose of cumulative voting, each Shareholder shall have allocated to him a number of votes equal to the number of Shares held by him multiplied by the total number of Directors to be elected. A Shareholder shall be entitled to give all such votes in favour of one candidate or to distribute them among several candidates. The candidates receiving the most votes shall be elected to the Board, so that if, for example, there are five vacancies, the five persons with the largest number of votes shall be elected; and

67.2.3   Directors elected as a result of nominations pursuant to Article 68 shall be removed by the members and shall leave office and be replaced by those elected pursuant to this Article 67.2 at and with effect from the end of the relevant general meeting.

67.3   Not less than 15 Business Days before a notice convening a meeting of members at which the business will include the election of Directors is approved by the Board for dispatch to the Shareholders, the Board shall, where appropriate, notify the relevant Shareholder(s) that such a notice is to be considered by the Board and shall invite the appropriate Shareholder(s) to nominate candidates for election. The appropriate Shareholder(s) shall be entitled to make such nominations at any time thereafter provided that they are received by the Board no later than five Business Days before the date when the Board meeting is to be held. The Board shall include the names of such candidates in the notice convening the meeting of members. In the circumstances contemplated by Article 67.2 above, any Shareholder shall be entitled to nominate candidates for election.

67.4   The continuing Directors may act notwithstanding any vacancy in the Board, save that if their number is reduced to their knowledge, below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of the Board of Directors, the continuing Directors may act only for the purpose of electing Directors to fill any vacancy that has arisen or for summoning a meeting of members.

67.5   For the avoidance of doubt, any right to nominate a director pursuant to the procedures set out in either Articles 67 or 68 is a right to vote by such Persons voting separately from the other Shares in the Company otherwise than as a class for the purpose of nomination (not election) of Directors only.

68   **Nomination of Directors where Bardsley, Cotesmore and Laketown (and/or CTF) hold more than 50 per cent. of the voting rights**

68.1   For such period as Bardsley, Cotesmore and Laketown (and/or CTF) hold more than 50 per cent. of the total voting rights conferred by all Shares (excluding Treasury Shares) the following provisions shall apply:

68.1.1   Bardsley, Cotesmore and Laketown shall together have the right to nominate three directors to the Board.

68.1.2   for such period as Grand (or any transferee other than Newco of sufficient Shares such that Grand subsequently holds less than five per cent. of the total voting rights conferred by all Shares (excluding Treasury Shares)) holds five per cent. or more of the total voting rights conferred by all Shares (excluding any Treasury Shares) Grand shall have the right to nominate at least one Director to the Board.

68.1.3 for such period as Alja, Dendar, Fairacre and R&B together (or any transferees other than Newco of sufficient Shares such that Alja, Dendar, Fairacre and R&B together hold subsequently less than five per cent. of the total voting rights conferred by all Shares (excluding Treasury Shares)) hold five per cent. or more of the total voting rights conferred by all Shares (excluding Treasury Shares), they shall have the right to nominate at least one director to the Board.

68.1.4 the nominating Shareholder(s) may, subject to this Article 68, nominate another Director in place of any Director nominated by them who is removed from the office of Director.

68.1.5 for such period as Newco holds Shares, it shall for each five per cent. holding of Shares, have the right to nominate one Director to the Board, provided that Newco shall have the right to nominate a maximum of two Directors to the Board; and

68.1.6 for the avoidance of doubt, the total number of Directors which any or all of Alja, Dendar, Fairacre, Grand, R&B or Newco (or their transferees) may nominate to the Board shall never exceed two.

68.2 Following nomination in accordance with Article 68.1 the members shall elect any nominated director at the meeting of members called for such purpose.

69 **Removal of Directors**

69.1 The office of a Director shall be vacated if:

69.1.1 subject to the relevant Director having been elected pursuant to Article 68, he is removed from office by his/her nominating Shareholder(s) by notice in writing to Company and the other Shareholders and such removal shall be deemed an act of the Company. In such event the Shareholders shall remove such Director at a meeting of members called for such purpose from his position at and with effect from the end of the meeting of members. The relevant nominating Shareholder(s) may nominate another Director in his or her place to be elected by the Shareholders at and with effect from the end of the same meeting of members;

69.1.2 subject to the relevant Director having been elected pursuant to Article 68, if the Shareholder or group of Shareholders who have the right to nominate a Director pursuant to Article 68 cease to hold sufficient Shares in the Company to have the right to nominate a director, any Director elected by the members following nomination by such Shareholder or group of Shareholders shall be removed by the members from office at and with effect from the end of the general meeting called for such purpose and such removal shall be deemed to be an act of the Company. If in such circumstances no shareholder has a right to nominate a replacement Director pursuant to Article 68, the Directors may nominate a replacement Director in place of such removed Director who shall be elected by the members;

69.1.3 he resigns by notice to the Company;

69.1.4 he is prohibited by law from acting as a Director;

69.1.5 he becomes bankrupt or makes any arrangement or composition with his creditors generally in which case he shall be removed by the members; or

69.1.6 in England, the British Virgin Islands or elsewhere an order shall be made by any court claiming jurisdiction in that behalf on the ground (however formulated) of

mental disorder for his detention or for the appointment of a guardian or receiver or other person (by whatever name called) to exercise powers with respect to his property or affairs.

69.2    The Directors shall not be subject to retirement by rotation.

## POWERS OF DIRECTORS

**70    General powers**

70.1    The Board shall be responsible for deciding all matters which are not required to be decided by the Shareholders by the terms of these Articles, unless the chairman of the Board considers it appropriate to refer the matter to the Shareholders for decision or the Board delegates such decision to the Company's managers in accordance with Article 56.

70.2    The matters to be decided by the Board include but are not limited to:

70.2.1    approval of business plans or budget(s) of Group Companies and any changes to those business plans or budget(s);

70.2.2    the establishment of new Subsidiaries, joint ventures or associates by Group Companies except to the extent the net asset or enterprise value thereof exceeds the Major Transaction Threshold;

70.2.3    subject to Article 54.1.4, initiating and conducting material court proceedings (including decisions on bringing claims and actions and also execution of settlement agreements);

70.2.4    decisions relating to the management of Subsidiaries, joint ventures and associates of the Company and its Associated Companies, in particular, voting on matters on the agenda of meetings of shareholders of Subsidiaries, joint ventures and associates of the Company and its Associated Companies;

70.2.5    vesting any Person (to the extent permitted by the applicable law) with the power to appoint any director or officer of a Group Company (other than the Company), or to enter into any agreement governing the management of such Group Company; and

70.2.6    appointment and dismissal of senior management of the Company other than the chief executive officer and chief financial officer.

**71    Appointment of agents**

71.1    The Directors may appoint any person, including a person who is a Director, to be an officer or agent of the Company. The Resolution of Directors appointing an agent may authorise the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

71.2    Every officer or agent of the Company has such powers and authority of the Directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the Resolution of Directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the matters requiring a Resolution of Directors under these Articles.

**72    Borrowing powers**

72.1    The Directors may by Resolution of Directors exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings and property or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

72.2    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by Resolution of Directors.

## MEETINGS AND PROCEEDINGS OF DIRECTORS

**73    Proceedings of Directors**

The Shareholders and the Company shall use all reasonable endeavours, so far as it is in their power, to procure that the Directors shall meet not less than four times in every year at intervals of not more than three months. In addition, the Directors of the Company may meet at such times as the Directors may determine to be necessary or desirable.

**74    Quorum**

The quorum for Board meetings shall be four Directors present in person or by telephone or video-conference link. If a Board meeting is adjourned for want of a quorum, such Board meeting shall be reconvened within 10 Business Days and shall be quorate if any three Directors are present.

**75    Notice of Directors' meetings**

Unless otherwise agreed in writing by each Director, not less than ten Business Days' notice shall be given to each of the Directors of all meetings of the Board at the address notified from time to time by each Director to the Company. Each such notice shall contain, *inter alia*, an agenda specifying in reasonable detail the matters to be discussed at the relevant meeting and shall be sent by courier or by fax. Any papers supporting the agenda may be delivered with the agenda or distributed separately provided that they are received by the Directors not less than ten Business Days before the meeting. The inadvertent failure to give notice of a meeting to a Director, or the fact that a Director has not received the notice, does not invalidate the meeting.

**76    Alternate Directors**

A Director may by a written instrument appoint an alternate who need not be a Director and an alternate is entitled to attend meetings in the absence of the Director who appointed him and to vote or consent in place of the Director.

**77    Chairman**

The chairman of the Board shall be appointed by a Resolution of Directors from one of their number. If the chairman is not present at any Board meeting, the Directors present may appoint any one of their number to act as chairman for the purpose of the meeting. The Board may by Resolution of Directors remove the chairman at any time and appoint another person in his place.

**78    Advisers to the Board**

The chairman of the Board may at his sole discretion invite the Shareholders to nominate a number of expert advisers to attend, observe and provide advice to meetings of the Board. Such advisers will not have the right to vote at Board meetings.

**79    Written resolutions**

An action that may be taken by the Directors at a meeting may also be taken by a Resolution of Directors consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication by all Directors without the need for any notice. The consent may consist of several documents in the like form each signed by one or more members.

**80    Minutes of meetings**

80.1    The Directors shall cause the following corporate records to be kept:

80.1.1    minutes of all meetings of Directors and members;

80.1.2    copies of all resolutions consented to by Directors or members; and

80.1.3    such other accounts and records as the Directors consider necessary or desirable in order to reflect the financial position of the Company.

80.2    The books, records and minutes shall be kept at the registered office of the Company, its principal place of business or at such other place as the Directors determine.

## DIRECTORS' INTERESTS

**81    Conflict of interests**

81.1    No agreement or transaction between the Company and one or more of its Directors or any person in which any Director has a financial interest or to whom any Director is related including as a Director of that other person, is void or voidable for this reason only or by reason only that the Director is present at the meeting of Directors that approves the agreement or transaction or that the vote or consent of the Director is counted for that purpose if the material facts of the interest of each Director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other Directors.

81.2    A Director who has an interest in any particular business to be considered at a meeting of Directors or members may be counted for purposes of determining whether the meeting is duly constituted.

## GROUP MANAGEMENT

**82    Group management**

The Board and Shareholders will be responsible for deciding matters which are of such significance to the Group as a whole that it would be inappropriate for the decision to be made solely by the management bodies of the Group Companies. In relation to all other matters, however, decisions will be taken at Group Company level.

83    **Group budgets**

The Board shall be responsible for specifying the format and frequency of Group financial reports and the other types of information to be made available to the Board by the Group in order to facilitate the proper monitoring of the Group's activities and to plan the development of the Business.

84    **Financial information**

84.1    Any Shareholder may request the Company to provide information on the business or financial position of the Group and the Company shall, subject to compliance with any obligations of confidentiality, comply with such a request to the extent that it has or can obtain the information in the format requested.

84.2    The Company shall furnish Shareholders with:

84.2.1    consolidated unaudited quarterly financial statements which consolidate Holdcos on the basis of current quarter information and consolidate Group Companies which are not Holdcos on the basis of financial statement information (audited if available, unaudited if not) as at the end of the previous financial year; and

84.2.2    to the extent available to the Company, quarterly unaudited financial information on any Group Company which is not a Holdco including a balance sheet and profit and loss statement for each such Group Company,

within 30 Business Days of the end of each quarter and with Consolidated Accounts within six months of the end of each financial year.

85    **Special Commission**

85.1    On the request of any Shareholder the Board shall establish a commission of five members (the "**Special Commission**"). The provisions of Articles 67 to 69, relating to the appointment and removal of Directors, shall apply *mutatis mutandis* to the members of the Special Commission. The function of the Special Commission shall be to provide assurance to Shareholders in relation to the financial management of the Group. The Shareholders and the Company shall procure that on the reasonable request of any Shareholder in respect of any financial matter within the Group, the Special Commission shall promptly investigate and report on such matter to all Shareholders and make recommendations to the Board. The Board shall consider such recommendations and, where it sees fit, act thereon accordingly.

## DETERMINATION OF FAIR VALUE

86    **Determination of Fair Value**

86.1    The "**Fair Value A**" of the Shares (which may be less than fair value as that term is interpreted under BVI law) shall be a price which represents the market value of the Shares as at (save as stated in Article 86.1.3(ii)) the date of the BCL Call Notice, Deadlock Put Notice or Incapacity Call Notice (as the case may be) calculated as follows:

86.1.1    the value of the Shares shall be calculated on the basis of the consolidated assets and liabilities of the Company;

86.1.2  if any Group Company's assets or the Shares are quoted on a recognised stock exchange or market or the quotation of such asset is determined on an over-the-counter market by the Valuer (who for this purpose shall be an investment bank, which is an independent market-maker in such asset) then the value of such assets shall be calculated as the average of the closing sales price quoted on the recognised stock exchange or over-the-counter market over the period of three months immediately before the relevant valuation date (being the date of the BCL Call Notice, Deadlock Put Notice or Incapacity Call Notice (as the case may be)). If there exists more than one recognised stock exchange or over-the-counter market for a certain asset, then only the recognised stock exchange or over-the-counter market having the larger trading volumes shall be used and if there exists more than one quotation for a certain asset on a recognised stock exchange or over-the-counter market, then the value of the asset shall be determined as the average of the two highest quoted sales prices offered on such market; and

86.1.3  if some or all of any Group Company's assets or the Shares are not quoted on a recognised stock exchange or an over-the-counter market the value shall be the higher of either:

(i)    a valuation carried out by the Valuer (who for this purpose shall be an investment bank); or

(ii)   the book value of the asset or the Shares as of the end of the reporting period as set out in the most recently produced IFRS audited consolidated accounts of the Group or, if IFRS audited consolidated accounts of the Group are in draft form and are likely to be produced and approved within the period specified in Article 86.5.1, as at the end of the reporting period of those accounts, as determined by the Valuer, who for this purpose shall be (at the election of the relevant selling Shareholder(s) in its/their sole discretion (acting together if more than one)) the Auditors or an Independent Accountant.

86.2   The "Fair Value B" of the Shares (which may be less than fair value as that term is interpreted under BVI law) for the purposes of these Articles shall be a price which represents the value of the Shares (save as stated in Article 86.2.2) as at the date of the Put Notice, Change of Control Notice or Incapacity Put Notice (as the case may be), calculated as follows:

86.2.1  If any of the Group Company's assets or the Shares are quoted on a recognised stock exchange or market or the quotation of such asset is determined on an over-the-counter market by the Valuer(s) (who for this purpose shall be an investment bank, which is an independent market-maker in such asset) then the value of the Shares or such assets shall be calculated as 90 per cent. of the figure calculated applying the provisions of Article 86.1.2 save that the relevant valuation date shall be the date of the Put Notice, Change of Control Notice or Incapacity Put Notice (as the case may be).

86.2.2  If some or all of any Group Company's assets or the Shares are not quoted on a recognised stock exchange or an over-the-counter market the value shall be calculated by applying the provisions of Article 86.1.3(ii).

86.3   Fair Value A and Fair Value B shall be a sum calculated in accordance with the following formula:

$(X / Y) \times Z$

Where:

$X$ = the number of Shares to be sold.

$Y$ = the total number of Shares at the date of the relevant notice.

$Z$ = the value of all Shares at the date of the relevant notice as determined in accordance with Articles 86.1 or 86.2.

86.4    Within 30 Business Days of receipt of a BCL Call Notice, a Deadlock Put Notice, a Put Notice, a Change of Control Notice, an Incapacity Call Notice, or an Incapacity Put Notice, the Company (having consulted with the selling Shareholder regarding the identity of the Valuer(s) pursuant to Articles 86.1.2 and 86.1.3(ii) and/or having received an election pursuant to Articles 86.1.3(ii) and 86.2.2 or 86.1.3) shall instruct the Valuer(s) to determine the Fair Value A or the Fair Value B (as applicable) of the Shares or other assets as at the date of the relevant notice.

86.5    The Valuer(s) shall be instructed to:

86.5.1    produce a valuation within 120 Business Days of the date of the Put Notice, BCL Call Notice, Deadlock Put Notice, Change of Control Notice, Incapacity Call Notice or Incapacity Put Notice (as applicable);

86.5.2    provide a fairness opinion in favour of all Shareholders in respect of their valuation and to provide a draft of their findings to the Board for comment prior to producing a final valuation; and

86.5.3    in respect of any valuation contemplated by Articles 86.1.3(i) or 86.2.2 to include in their valuation, if considered relevant, an appropriate liquidity discount or premium and take into account the fact that payment for the Shares or other assets may be deferred in accordance with Articles 6-10, 57-62 and 25 and any other factors (as the case may be) and the terms of agreement with the Valuer(s) shall submit jurisdiction for disputes relating to such agreement to a single court or seat of arbitration.

86.6    If the Valuation contemplated by Articles 86.1.2, 86.1.3(ii) or 86.2.1 is not completed within the period set out in Article 86.5.1 the selling Shareholder(s), acting through the Shareholder with the largest holding of Shares relative to the others, (who the other selling Shareholder(s) shall be deemed to have appointed as their attorney for the purposes of this Article 86.6) may instruct a Valuer(s) (the "Second Valuer(s)") to determine the Fair Value A or the Fair Value B or relevant parts thereof (as applicable) of the Shares or other assets as at the date of the relevant notice.

86.7    The Second Valuer(s) shall be instructed to:

86.7.1    produce a valuation within 120 Business Days on the same mandate as the relevant Valuer(s) appointed in accordance with Article 86.4 (the "Company Valuer(s)"); and

86.7.2    provide a fairness opinion in favour of all Shareholders in respect of their valuation and to provide a draft of their findings to Board for comment prior to producing a final valuation;    ⸻

for a fee not exceeding that agreed to be paid to the Company Valuer(s) and in all other respects on terms equivalent to the terms of appointment of the Company Valuer(s).

86.8 If the Company Valuer(s) complete their Valuation prior to the Second Valuer(s), then the determination of the Company Valuer(s) shall (subject to Article 86.11), in the absence of manifest arithmetical error, be final and binding for all purposes of Article 86. If the Second Valuer(s) complete its/their Valuation prior to the Company Valuer(s) then the Valuation of the Second Valuer(s) shall (subject to Article 86.11), in the absence of manifest arithmetical error, be final and binding for all purposes of this Article 86.

86.9 The costs of any valuation shall be borne by the Company (and, for the avoidance of doubt, any fees of the Second Valuer(s) paid by a selling Shareholder pursuant to Article 86.6 shall be reimbursed within 30 Business Days of presentation of evidence of payment of the same). The Shareholders and the Company shall provide the Valuer(s) with such assistance and information as they may reasonably require to complete the valuation. Any information shall be made available on the condition that the Valuer(s) observe such restrictions on use of confidential information as the Company considers appropriate in the circumstances.

86.10 The Valuer(s) will give notice of Fair Value A or Fair Value B to all Shareholders by sending them a copy of their written determination (including a statement of any liquidity discount or premium applied) which shall be deemed to be served in accordance with the notice provisions set out in these Articles.

86.11 If in connection with a BCL Call Option, a Put Option, an Incapacity Call Notice or an Incapacity Put Notice either:

86.11.1 the relevant Valuer(s) apply a liquidity discount of more than 25 per cent.; or

86.11.2 the relevant Valuer(s) findings are declared invalid by the court or arbitral tribunal to which jurisdiction to consider a dispute between the relevant Valuer('s)(s') and the Shareholders has been submitted under the terms of agreement between them, prior to the date of completion in relation to the Shares being sold;

then any relevant selling Shareholder (but for the avoidance of doubt none of Bardsley, Cotesmore, Laketown and CTF) may (provided that the relevant selling Shareholder(s) have not accepted the valuation of a Valuer(s) by proceeding to completion pursuant to Articles 6 to 10, 57 to 62, 87 or 25) elect not to sell its Shares, but such selling Shareholder shall, in the case of a BCL Call Option or Deadlock Put Option, vote its Shares in favour of the relevant Major Transaction or Capital Issue at the next general meeting of Shareholders, where that Major Transaction or Capital Issue is on the agenda.

86.12 Within 10 Business Days of receipt of the Put Notice the Company shall calculate the Article 86.12 Share Value which, for the purpose of Article 9.3.1, shall be calculated as follows:

86.12.1 if any Group Company's assets or the Shares are quoted on a recognised stock exchange or an over-the-counter market the value of such assets shall be calculated as the average of the closing sales price quoted on the recognised stock exchange or over-the-counter market over the period of three months immediately before the date of the BCL Call Notice. If there exists more than one recognised stock exchange or over-the-counter market for a certain asset, then only the recognised stock exchange or over-the-counter market having the larger trading volumes shall be used and if there exists more than one quotation for a certain

asset on a recognised stock exchange or over-the-counter market, then the value of the asset shall be determined as the average of the two highest quoted sales prices offered on such market; and

88.12.2  if some or all or any Group Company's assets or the Shares are not quoted on a recognised stock exchange or an over-the-counter market the value shall be the book value of the asset or the Shares as of the end of the reporting period as set out in the most recently produced consolidated quarterly accounts of the Group (prepared as envisaged by Article 55.1.3).

86.13  The Company agrees and the Parties agree to procure that the Valuer elected pursuant to Articles 86.1.3(ii) or 86.2.2, shall, at the election of the selling Shareholder(s), acting through the Shareholder with the largest holding of Shares relative to the others (who the other selling Shareholder(s) shall be deemed to have appointed as their attorney for the purposes of this Article 86.13) within the time period set out in Article 86.4, undertake an IFRS audit of the most recently available consolidated quarterly accounts of the Group (prepared as envisaged by Article 55.1.3) and that these shall be used as the basis for any valuation pursuant to Articles 86.1.3(ii) or 86.2.2.

## INDIRECT CHANGE OF CONTROL

87  **Indirect change of control**

87.1  Save as otherwise agreed in writing between the Shareholders, if the Beneficial Owner of a Shareholder (other than the Company or a Holdco) ceases to hold, sells, agrees to sell, transfers, grants an option over, enters into a voting arrangement in respect of, or otherwise disposes of, directly or indirectly, the Shares, voting rights or equivalent or any interest therein in such Shareholder from time to time (provided that this Article 87 shall not apply to any changes as aforesaid to a transfer of Shares to the Escrow Agent in accordance with Articles 10.1.5, 62.1.5 or 25.3.5 nor if a Beneficial Owner is a natural person, a transfer amongst the Beneficial Owner's relatives or family trusts and all other Shareholders have given their consent to such transfer in writing, such consent not to be unreasonably withheld) such that its holding of Shares or voting rights or equivalent in such Shareholder (the "**Sold Shareholder**") falls below 50 per cent. (an "**Indirect Change of Control**"), without preference to any of their other rights or remedies, the Sold Shareholder shall be deemed to offer all Shares it owns to the other Shareholders, *pro rata* to their shareholdings relative to each other, at a price equal to the Fair Value B of those Shares (calculated in accordance with Article 86.2). The Sold Shareholder shall immediately prior to any Indirect Change of Control and irrespective of any duty of confidentiality to the acquiring party or any third party send a written notice to the Company disclosing the Indirect Change of Control and providing a full description and supporting documentation of the manner in which such interest in the Sold Shareholder is held (the "**Change of Control Notice**").

87.2  On receipt of a Change of Control Notice, or if the Company otherwise becomes aware of an Indirect Change of Control, the Company shall inform all Shareholders of the Indirect Change of Control and of the number of Shares of the Sold Shareholder each Shareholder may elect to purchase (also a "Change of Control Notice"). Each relevant Shareholder shall, within 20 Business Days (the "Acceptance Period"), inform the Company and the Sold Shareholder in writing if it wishes to accept the offer in respect of the Shares of the Sold Shareholder. Any Shares not taken up shall be offered to those Shareholders who

elected to purchase Shares, who may purchase them *pro rata* to their shareholdings relative to each other.

87.3 If, in accordance with the provisions of Articles 87.1 and 87.2, a Shareholder elects to purchase sufficient Shares such that on completion of such sale the Shareholder would acquire a Controlling Interest, the provisions of Article 19 to 24 shall apply, *mutatis mutandis*, as if the Sold Shareholder were a Selling Shareholder, the acquiring Shareholder were a Remaining Shareholder and Fair Value B were the price offered for the Shares of the Sold Shareholder in the Offer. Otherwise, a sale of Shares in accordance with this Article 87 shall be made on the following terms:

87.3.1 completion of the transfer of the Shares shall be completed 20 Business Days after the date on which the Valuer(s) determine the Fair Value B of those Shares in accordance with Article 86 at such reasonable time and place as the Sold Shareholder and the acquiring Shareholder(s) agree or, failing which, at the registered office of the Company at 11:00 a.m. on such date ("**Change of Control Completion Date**");

87.3.2 the Sold Shareholder must deliver to the acquiring Shareholder(s) in respect of the Shares which it is selling on the Change of Control Completion Date all documents necessary to transfer title to the Shares to the acquiring Shareholder(s);

87.3.3 each acquiring Shareholder must pay the total consideration due for the Shares (plus interest of 1-Year US$ LIBOR plus 3 per cent. per annum accruing daily on any outstanding sum from the day which is 120 Business Days after the date of the Change of Control Notice to the Change of Control Completion Date (both dates inclusive)) to the Sold Shareholder by telegraphic transfer to the bank account of the Sold Shareholder notified to it for the purpose on the Change of Control Completion Date; and

87.3.4 subject to the terms set out in Article 22.

## INDEMNITY

88 **Indemnity**

88.1 Subject to the limitations hereinafter provided the Company may indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings by any person who:

88.1.1 is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a Director, an officer or a liquidator of the Company; or

88.1.2 is or was, at the request of the Company, serving as a Director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

88.2 The Company may only indemnify a person if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

88.3    The decision of the Directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.

88.4    The termination of any proceedings by any judgment, order, settlement, conviction or any other means does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

88.5    If a person to be indemnified has been successful in defence of any proceedings referred to above the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

88.6    The Company may purchase and maintain insurance in relation to any person who is or was a Director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a Director, an officer or a liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability as provided in these Articles.

## SEAL

89    Seal

The Company may have more than one Seal and references herein to the Seal shall be references to every Seal which shall have been duly adopted by Resolution of Directors. The Directors shall provide for the safe custody of the Seal and for an imprint thereof to be kept at the registered office. Except as otherwise expressly provided herein the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of a Director or any other person so authorised from time to time by Resolution of Directors. Such authorisation may be before or after the Seal is affixed, may be general or specific and may refer to any number of sealings. The Directors may provide for a facsimile of the Seal and of the signature of any Director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## ANNUAL ACCOUNTS

90    Preparation of Consolidated Accounts

The Auditors shall be instructed (at the expense of the Company) to:

90.1.1    prepare Consolidated Accounts in respect of each financial year which shall be laid before the Shareholders at the annual meeting of members of the Company following the end of the relevant financial year; and

90.1.2    report the amount of the profits for the relevant financial year which are available for distribution by the Company in accordance with British Virgin Islands law at the

same time as they sign their report on the Consolidated Accounts for the relevant financial year.

## DISTRIBUTIONS AND DIVIDENDS

**91    Dividends**

91.1    Notwithstanding Articles 95 and 96, the Company may by a Resolution of Directors:

91.1.1    declare and pay dividends in money, Shares, or other property, but dividends shall only be declared and paid out of Surplus.  In the event that dividends are paid *in specie* the Directors shall have responsibility for establishing and recording in the Resolution of Directors authorising the dividends, a fair and proper value for the assets to be so distributed; and

91.1.2    declare and pay such interim dividends as appear to the Directors to be justified by the profits of the Company.

**92    Obligation to satisfy liabilities as they become due**

No dividend shall be declared and paid unless the Directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its Capital. In the absence of fraud, the decision of the Directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

**93    Notice of distributions**

Notice of any dividend that may have been declared shall be given to each member in the manner hereinafter mentioned and all dividends unclaimed for three years after having been declared may be forfeited by Resolution of Directors for the benefit of the Company.

**94    General distribution provisions**

94.1    No dividend shall bear interest as against the Company and no dividend shall be paid on Treasury Shares or Shares held by another company of which the Company holds, directly or indirectly, Shares having more than 50 per cent. of the vote in electing Directors.

94.2    A Share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the Surplus that is transferred to Capital upon the issue of the share.

94.3    In the case of a dividend of authorised but unissued Shares with par value, an amount equal to the aggregate par value of the Shares shall be transferred from Surplus to capital at the time of the distribution.

94.4    A division of the issued and outstanding Shares of a class or series of Shares into a larger number of Shares of the same class or series having a proportionately smaller par value does not constitute a dividend of Shares.

94.5    For the avoidance of doubt, dividends may be made by the Company pursuant to Articles 95 and 96 in excess of the  minimum amounts calculated in accordance with Articles 95 and 96.

94.6    Subject to Article 5.6, any dividend made by the Company shall be distributed to all Shareholders (and, as applicable, the Escrow Agent in accordance with Articles 10.1.5(iv), 25.3.5(iv) and 62.1.5(iv)) *pro rata* to their shareholdings at the relevant time.

94.7    Subject to Article 5.6, all dividends declared shall be paid out to Shareholders (and, as applicable, the Escrow Agent in accordance with Articles 10.1.5(iv), 25.3.5(iv) and 62.1.5(iv)).

95      **Distributions at the annual meeting of members**

95.1    At the annual meeting of members of the Company, the Company shall, subject to the Company holding sufficient Surplus and the requirements of British Virgin Islands law, declare a cash dividend of an amount at least equal to 15 per cent. of a figure calculated as follows:

95.1.1    all cash dividends received by the Company as set out in the Consolidated Accounts for the preceding financial year plus net cash proceeds of any disposals of assets made by the Company in the preceding financial year; less

95.1.2    all liabilities (including but not limited to debt) of the Company (non-consolidated), all liabilities (including but not limited to debt) of all Holdcos, all expenses, operational costs and interest payments of the Company and any amounts due under Article 96, in respect of the preceding financial year, as set out in the Group Reporting Package and for the avoidance of doubt, all sums due to any Shareholder under Article 25,

and that such dividend is paid within two months of the date of the annual meeting of members at which it is declared.

96      **Distributions on 30 September and 31 December**

96.1    Subject to the Company holding sufficient Surplus and the requirements of British Virgin Islands law, between 30 September and 31 December of each financial year the Company shall declare an interim cash dividend of an amount at least equal to a figure calculated as follows:

96.1.1    the Company's cash balances (non-consolidated) at 30 September of that financial year as evidenced by the Company's financial statements or relevant bank statements; less

96.1.2    cash receipts of the Company for the period from 1 January to 30 September of that financial year evidenced by the Company's financial statements or relevant bank statements and the budgeted operating expenses of the Company and all Holdcos for the 12 months following 30 September of that year and all liabilities of the Company and all Holdcos (including but not limited to debt) evidenced by reference to the Company's financial statements or relevant bank statements and any payments due under Article 95 and/or Article 25 at 30 September and any sums allocated by a decision of the Board prior to 30 September for the purposes of new acquisitions or investments into existing assets,

and that such dividend is paid before 31 December of the same financial year.

## NOTICES

**97    Notices**

97.1    Notices, demands or other communications required or permitted to be given or made or in connection with these Articles or with any arbitration or intended arbitration under these Articles shall be in writing and delivered personally or sent by legible telefax addressed to the intended recipient, in the case of the Company, to its registered office or to the Registered Agent or, in the case of the member holding Shares, to the address shown in the register or to such other address or telefax number as any Shareholder or the Company may from time to time duly notify to the others.

97.2    To be effective any such notice or other communication must, if delivered, be delivered by hand or by an international courier service during normal business hours on a Business Day and, if sent, must be sent by means of a fax machine which produces a paper record of transmission. Such notice or other communication shall be deemed to be received, in the case of delivery by hand or courier service, on the same Business Day as the notice or other communication is delivered, and in the case of sending by fax, on the same Business Day the fax is transmitted. If, however, a fax is transmitted after normal business hours in the place where the recipient is located, the fax shall be deemed to have been received on the next Business Day.

## ARBITRATION

**98    Arbitration**

All disputes arising out of or in connection with these Articles shall be referred to and finally resolved by arbitration in London by three arbitrators appointed under the rules of the London Court of Arbitration which are deemed to be incorporated by reference into this Article. The arbitration shall be conducted in the English language and the parties to such arbitration shall use all reasonable endeavours to ensure that any arbitration shall be expeditiously determined.

## ELECTRONIC COMMUNICATIONS

**99    Signature of documents**

Where these Articles require a document to be signed by a member or other person then, if that document is in the form of an electronic communication, to be valid it must incorporate the electronic signature or personal identification details (which may be details previously allocated by the Company) of that member or other person, in such form as the Directors may approve by Resolution of Directors, or be accompanied by such other evidence as the Directors may require to satisfy themselves that the document is genuine. The Company may designate mechanisms for validating any such document, and any such document not so validated shall be deemed not to have been received by the Company.

**100    Electronic communication**

100.1    A member may notify the Company of an address for the purpose of his receiving electronic communications from the Company. If a member does so, he shall be deemed to have agreed to receive from the Company notices and other documents of the kind to which the address relates by electronic communication.

100.2   Any amendment or revocation of a notification given to the Company under this Article 100 shall only take effect if in writing, signed by the member and on actual receipt by the Company of it.

100.3   An electronic communication shall not be treated as received by the Company if it is rejected by computer virus protection arrangements.

101   **English and Russian Versions**

These Articles of Association have been prepared in English and Russian language versions. In the event of any inconsistency between the two, the English language version shall prevail.

102   **Payments**

Every payment payable under these Articles shall be made in full without any set-off or counterclaim howsoever arising.

103   **Default**

If any Shareholder fails to pay any amount due and payable by it within the time periods specified under these Articles or under any award or judgment in connection with these Articles, such Shareholder shall, in addition to such amount, be liable to pay to the Shareholder or Shareholders to whom the same is due, an aggregate amount of interest (which shall accrue from day to day) on such overdue payment from the due date until the date of actual payment, after as well as before award or judgement, at a rate of 1-Year US$ LIBOR plus 6 per cent. per annum.

We, the undersigned, of the address stated below, for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association this 12th day of March, 1996 in the presence of the undersigned witness.

NAME AND ADDRESS OF WITNESS                    SUBSCRIBER

Sgnd. Linda Douglas                            Sgnd. Lenia Lettsome

Linda Douglas                                  Trident Trust Company (B.V.I.) Limited
c/o P.O. Box 146,                              P.O. Box 146,
Road Town, Tortola,                            Wickham's Cay 1,
British Virgin Islands                         Road Town, Tortola,
                                               British Virgin Islands

# INDEX

1   Interpretation.................................................................................................. 1

2   Share certificates............................................................................................ 8

3   Joint holders .................................................................................................... 8

4   Issues of Shares ............................................................................................. 8

5   Purchase of own Shares................................................................................ 9

6   Duty to seek alternative finance .................................................................. 10

7   Allotment or issues of Shares or any financial instrument ........................ 10

8   Put Option ..................................................................................................... 10

9   Exercise of Put Option ................................................................................. 11

10  Completion..................................................................................................... 12

11  Transfer of Shares ....................................................................................... 14

12  General prohibition against Share transfers ............................................. 14

13  Permitted transfers: intra-group transfers; transfers amongst minority Shareholders; and transfers to Newco or CTF ......................................................................... 14

14  Offers ............................................................................................................. 15

15  Notice of Offers............................................................................................. 15

16  Options of the Remaining Shareholders.................................................... 16

17  Consequences of Transfer Notice ............................................................. 16

18  Completion of transfer – no Tag-along Notice issued .............................. 17

19  Tag-along on change of control.................................................................. 18

20  Consequence of Tag-along Notice ............................................................ 19

21  Completion of transfer................................................................................. 19

22  Terms of transfer .......................................................................................... 20

23    BCL ................................................................................................................. 20

24    Bardsley, Cotesmore, Laketown and CTF .................................................. 21

25    Incapacity of Beneficial Owner ................................................................... 21

26    Transmission of Shares ............................................................................... 24

27    Mortgage and charges over Shares ........................................................... 25

28    Register of charges ...................................................................................... 25

29    Forfeiture ....................................................................................................... 26

30    Notice on failure to pay ............................................................................... 26

31    Forfeiture for non-compliance .................................................................... 26

32    Lien ................................................................................................................ 27

33    Sale of Shares subject to liens ................................................................... 27

34    Proceeds of sale of Shares subject to lien ................................................ 27

35    Reduction or increase in authorised capital .............................................. 27

36    Consolidation or subdivision ...................................................................... 27

37    Increases of Capital ..................................................................................... 28

38    Reductions of Capital ................................................................................... 28

39    Convening meeting of members .................................................................. 28

40    Annual meeting of members ........................................................................ 28

41    Notice of meeting of members .................................................................... 29

42    Contents of notice of a meeting of members ............................................. 29

43    Representation by proxy .............................................................................. 29

44    Receipt of proxy form ................................................................................... 29

45    Form of proxy ................................................................................................ 29

46    Participation by telephone ........................................................................... 30

47    Quorum................................................................................................30

48    Lack of quorum....................................................................................30

49    Chairman.............................................................................................31

50    Adjournment.........................................................................................31

51    Appointment of representatives ..........................................................31

52    Written resolutions...............................................................................31

53    Decisions to be made by Shareholders by 75 per cent. Vote ...............32

54    Major Transactions..............................................................................32

55    Decisions to be made by Shareholders by simple majority vote ...........33

56    Decisions to be delegated to the management of the Company............33

57    Deadlock..............................................................................................33

58    Exercise of the BCL Call Option ..........................................................34

59    Put option for remaining Dissenting Shareholders ...............................34

60    Exercise of Deadlock Put Option .........................................................34

61    Participating rights of Assenting Shareholders .....................................35

62    Completion...........................................................................................35

63    Number of Directors.............................................................................38

64    Register of Directors............................................................................38

65    Share qualification................................................................................38

66    Directors which are body corporate......................................................38

67    Election of Directors.............................................................................38

68    Nomination of Directors where Bardsley, Cotesmore and Laketown (and/or CTF)
hold more than 50 per cent. of the voting rights .........................................39

69    Removal of Directors ...........................................................—..........40

70     General powers ................................................................................................. 41

71     Appointment of agents ...................................................................................... 41

72     Borrowing powers .............................................................................................. 42

73     Proceedings of Directors ................................................................................... 42

74     Quorum ............................................................................................................... 42

75     Notice of Directors' meetings ............................................................................ 42

76     Alternate Directors ............................................................................................. 42

77     Chairman ............................................................................................................ 42

78     Advisers to the Board ........................................................................................ 43

79     Written resolutions ............................................................................................ 43

80     Minutes of meetings .......................................................................................... 43

81     Conflict of interests ........................................................................................... 43

82     Group management ............................................................................................ 43

83     Group budgets .................................................................................................... 44

84     Financial information ......................................................................................... 44

85     Special Commission ........................................................................................... 44

86     Determination of Fair Value .............................................................................. 44

87     Indirect change of control ................................................................................. 48

88     Indemnity ............................................................................................................ 49

89     Seal ..................................................................................................................... 50

90     Preparation of Consolidated Accounts ............................................................ 50

91     Dividends ............................................................................................................ 51

92     Obligation to satisfy liabilities as they become due ....................................... 51

93     Notice of distributions ....................................................................................... 51

94    General distribution provisions ............................................................... 51

95    Distributions at the annual meeting of members ................................. 52

96    Distributions on 30 September and 31 December ................................ 52

97    Notices .................................................................................................. 53

98    Arbitration ............................................................................................. 53

99    Signature of documents ....................................................................... 53

100    Electronic communication ................................................................... 53

101    English and Russian Versions ............................................................ 54

102    Payments .............................................................................................. 54

103    Default ................................................................................................... 54