Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Petitioner

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                      :

**TELENOR MOBILE COMMUNICATIONS AS,**
                      :

              Petitioner,
                      :

     -against-
                      :

**STORM LLC,**                              07 Civ. 6929 (GEL)

              Respondent,        :        ECF Case

     -and-
                      :

**ALTIMO HOLDINGS & INVESTMENTS**
**LIMITED, ALPREN LIMITED AND HARDLAKE** :
**LIMITED,**

                      :

              Additional Contemnors.
                      :
-------------------------------------------------------------- x

**MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION**
**TO HOLD DEFENDANT AND ADDITIONAL CONTEMNORS IN CONTEMPT**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

PRELIMINARY STATEMENT .......................................................................... 1

FACTS ................................................................................................................ 2

    A.    Storm Has Failed To Comply With The Corporate
            Governance Provisions Of The Final Award. ...................................... 2

    B.    Storm And The Altimo Entities Have Violated The
            Final Award's Anti-Suit Injunction ...................................................... 3

ARGUMENT ...................................................................................................... 6

I.    STORM AND THE ALTIMO ENTITIES ARE IN CONTEMPT OF THE
    NOVEMBER 2 ORDER ............................................................................... 6

    A.    The November 2 Order Is Clear And Unambiguous ............................. 7

    B.    The Evidence of Storm's Non-Compliance With this Court's Order is
            Clear  and Convincing ........................................................................ 8

         1.    Storm Has Failed to Comply With the Corporate Governance
                 Provisions of the Award ............................................................. 8

         2.    Storm Has Continued Its Campaign of Collusive Litigation .................... 9

    C.    Storm and the Altimo Entities  Have Not Reasonably and Diligently
            Attempted to Comply with the November 2 Order ................................ 9

    D.    Storm Cannot Carry Its Burden to Show Impossibility of Compliance ............. 12

    E.    The Altimo Entities Are Co-Contemnors ........................................... 15

         1.    The Altimo Entities Are Acting in Concert With Storm ........................ 15

         2.    The Altimo Entities Are Legally Identified With Storm ........................ 17

II.    THIS COURT SHOULD SET A PROMPT HEARING FOLLOWING A BRIEF
    PERIOD FOR EXPEDITED DISCOVERY ................................................. 22

CONCLUSION .................................................................................................. 24

## INTRODUCTION

Petitioner Telenor Mobile Communications AS ("Petitioner" or "Telenor Mobile") respectfully submits this memorandum in support of its motion to: (1) hold Defendant Storm LLC ("Storm") in contempt of this Court's November 2, 2007 Order (the "November 2 Order"); (2) hold Additional Contemnors Altimo Holdings & Investments Limited ("Altimo"), Hardlake Limited ("Hardlake") and Alpren Limited ("Alpren" and, together with Altimo and Hardlake, the "Altimo Entities") in contempt of the November 2 Order; and (3) obtain accelerated discovery in connection with its motion for contempt.

## PRELIMINARY STATEMENT

Storm has ignored the directives of the arbitral tribunal (the "Tribunal") in its Final Award, dated July 2, 2007 (the "Final Award"), since it was released on August 1, 2007, and the November 2 Order of this Court since its issuance.[1]  Storm's continued willful avoidance of its obligations to Telenor Mobile and the authority of this Court more than justifies a finding of contempt.  Because the Altimo Entities are acting in concert with Storm and are legally identified  with it, they are in contempt, as well.

In the Final Award, the Tribunal directed Storm (1) to attend and cause its representatives to attend all meetings of shareholders and the board of directors of Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar"); (2) to take specified steps to amend Kyivstar's charter (the "Charter") to conform it to the Shareholders Agreement dated January 30, 2004 (the "Shareholders Agreement") among Telenor Mobile, Storm and Kyivstar; and (3) to divest its shares in Kyivstar within 120 days of the date of the Final Award, unless Storm and its affiliated entities divested their holdings in excess of 5% in Turkcell Iletisim Hizmetleri A.S. ("Turkcell")

---

[1] On November 29, 2007, Storm obtained an *ex parte* temporary stay of the Court's November 2 Order from a single judge of the Court of Appeals.  That motion was argued on December 18, 2007, and the Court of Appeals denied Storm's motion for a stay pending appeal on December 20, 2007.

and Ukrainian High Technologies ("UHT"), two mobile telecommunication companies that compete with Kyivstar, to "person[s] other than a Storm affiliate." The Tribunal also entered an anti-suit injunction enjoining Storm and "anyone acting in concert with it" from initiating any suit "relating to, or in connection with, any obligations described in the Shareholders Agreement" and requiring the withdrawal of actions already pending in Ukraine. (Declaration of Robert L. Sills, dated January 22, 2008 ("Sills Decl."), Exh. A at p. 66-67).

As set forth below, Storm continues to boycott Kyivstar shareholders meetings, has failed to take the necessary steps to amend the Charter, has done nothing to create the affiliated companies required by the Final Award, and has failed to withdraw at least one Ukrainian litigation while initiating another through a proxy. Moreover, the purported transfers of Storm's affiliates' holdings in Turkcell and UHT appear to be either shams or transfers to affiliates, with the consequence that Storm remains obligated to divest its Kyivstar shares, and is in contempt for having failed to do so.

## FACTS

The history of the dealings between the parties, the arbitration proceeding itself (the "Arbitration"), and the campaign of Ukrainian litigation waged by Storm and the Altimo Entities are set out, in detail, in the Final Award and in the November 2 Order. The facts relevant to this motion and the events that have occurred since the Tribunal issued the Final Award are briefly set out below.

### A.    Storm Has Failed to Comply With the Corporate Governance Provisions of the Final Award.

The Final Award and the November 2 Order require Storm to attend Kyivstar's shareholders meetings. Since the Final Award was released on August 1, 2007, Kyivstar, has convened six Extraordinary General Meetings of its shareholders (the "Extraordinary

Meetings"): two on October 1, 2007 at 10:00 a.m. and 2:00 p.m.; two on November 1, 2007 at 10:00 a.m. and 4:00 p.m.; on November 23, 2007; on December 3, 2007; and on January 18, 2008. (Declaration of Oleksiy Didkovskiy, dated January 22, 2008 ("Didkovskiy Decl."), ¶¶ 3-7). Contrary to the directives of the Final Award, Storm has not sent a representative to any of these meetings. (Didkovskiy Decl., ¶ 7).[2]

Storm also has failed to take the steps to amend the Charter required by the Final Award. Storm is required by the Final Award to form three new affiliates, to transfer at least one of its shares in Kyivstar to each of them, and to cause each such affiliate to execute and deliver an endorsement in accordance with Sections 4.02(b) and 4.09 of the Shareholders Agreement. (Sills Decl., Exh. A at p. 66-67). Each of those three affiliated companies, together with four such affiliates of Telenor Mobile, are then to be elected as directors of Kyivstar, thereby restoring the governance arrangements set out in the Shareholders Agreement.[3] Storm has failed to transfer shares to these affiliates as required by the Award (Didkovskiy Decl., ¶¶ 8-13). Indeed, apparently nothing has been done, either by Storm or its affiliates, to form such affiliates. (Didkovskiy Decl., ¶ 12).

**B.      Storm and the Altimo Entities Have Violated the Final Award's Anti-Suit Injunction**

Storm claims that it "faces legal constraints" in Ukraine that supposedly prevent it from complying with the corporate governance provisions of the Final Award. While somewhat unclear, the "legal constraints" to which it refers are apparently injunctions recently issued as a result of its own collusive litigation. (Sills Decl., ¶ 5; Didkovsky Decl., ¶¶ 20-25). Far from

---

[2] In its Reply Memorandum in support of its Motion for Stay before the Second Circuit, Storm asserted that it "faces legal constraints in Ukraine that prevent it from complying with the corporate governance provisions of the Award.") (Storm LLC's Reply in Further Support of Motion for Stay Pending Appeal ("Storm Reply Memo") at p. 1–2).

[3] The four Telenor Mobile affiliates were all created in 2006, and each holds one Kyivstar share.

constituting a justification for its non-compliance, those Ukrainian actions are further acts of contempt.

While Storm and the Altimo Entities appear to have withdrawn, or at least ceased prosecution of, several of the collusive litigations they initiated in Ukraine (Didkovsky Decl., ¶¶ 14-25), at least one remains in effect.[4] On October 10, 2007, while Telenor Mobile's motion to confirm was <u>sub judice</u> before this Court, Mr. Vadim Klymenko, Storm's General Director, brought a suit against Alpren and Hardlake, as well as against Storm itself, in the Shevchenkivskiy Court of Kyiv (the "Shevchenkivskiy Court"), seeking to prevent Storm, Alpren and Hardlake from complying with the Final Award. As this Court is aware, in addition to his role as Storm's General Director, Mr. Klymenko is an Altimo executive, and is now the director general of Altimo in Ukraine. (Sills Decl., Exh. F). Not surprisingly, the Shevchenkivskiy Court granted the relief sought by Mr. Klymenko in an order dated October 10, 2007, which purported to invalidate resolutions allegedly passed at a meeting of Storm's shareholders in a supposed effort by Storm and its shareholders, Alpren and Hardlake, to take steps to comply with the Final Award.[5] (Sills Decl., ¶ 5, Exh. E). In keeping with their past practice, neither Storm nor any of the Altimo Entities notified Telenor Mobile of the Shevchenkivskiy litigation. That litigation has not been withdrawn, and apparently now forms at least part of the basis for Storm's claims that it "faces legal constraints" that prevent it from complying with the Final Award and the November 2 Order.

Second, on November 29, 2007, one day after Storm moved before the Court of

---

[4]In addition, on August 22, 2007, Storm applied to the Pechersky District Court of the City of Kyiv (the "Pechersk Court"), purportedly seeking to have the Final Award recognized or rejected in Ukraine. (Sills Decl., Exh. B). Telenor Mobile was named as an "interested party" in the action, but never received notice of the action and did not appear. <u>Id.</u> The Pechersk Court purported to refuse to recognize the Final Award.

Appeals for a stay of this Court's November 2 Order, a Swiss company called EC Venture Capital S.A. ("EC Venture") obtained a sweeping injunction from the Kyiv Region Commercial Court (the "EC Order"), purporting to enjoin Storm from taking *any* action at all, "including making decisions, entering into any transactions, issuing powers of attorney . . . holding general meeting . . . participating in general meetings of a company, whose shares belong to Limited Liability Company 'Storm'." (Didkovsky Decl., Exh. X).[6]

EC Venture is a former shareholder of Storm, which, according to the EC Order, sold its interest in Storm to Alpren in July 2004.[7] (Didkovskiy Decl., Exh. X).[8]    Then, in September 2006, EC Venture's shareholder(s) took steps to dissolve EC Venture.[9] (Declaration of Carlo Lombardini dated January 22, 2008 ("Lombardini Decl."), ¶ 8).  On November 29, 2007, the same day Storm moved before the Second Circuit for a stay pending appeal, the shareholder(s) of EC Venture abruptly reconstituted EC Venture.[10] (Lombardini Decl., ¶ 9).  The same day that the company was reconstituted, after remaining dormant for more than three years, EC Venture applied for and obtained the EC Order.

The basis of the EC Order is that the July 2004 contract between EC Venture, a

---

[5] The basis for the relief sought was the series of judgments issued in earlier collusive litigations purporting to invalidate the Shareholders Agreement or enjoin the Arbitration.

[6] November 29, 2007 was also the last day for Storm to comply with the divestiture provisions of the Final Award and November 2 Order, counting from the August 1 date on which the Final Award was released.

[7] According to press reports, following the sale to Alpren, EC Venture's bank accounts holding all or a portion of the proceeds of such sale were seized by Austrian and German police.  (Declaration of Peter S. O'Driscoll ("O'Driscoll Decl."), Exh K).

[8] EC Venture is identified in the Shareholders Agreement as holding a 5.93945% interest in Storm on January 30, 2004, the date on which Storm entered into the Shareholders Agreement.  The EC Order states that EC Venture sold a 23.98467% interest in Storm to Alpren.  (Didkovskiy Decl., Ex. X).

[9] All shares of EC Venture are issued in bearer form, and there is, therefore, no record of the identity of EC Venture's shareholders.  (Lombardini Decl., ¶ 2).

[10] As a matter of Swiss law, the liquidation of a Swiss company cannot be reversed if its assets have been distributed.  (Lombardini Decl., ¶ 4).

Swiss corporation, and Alpren, a Cypriot corporation, was not written in Ukrainian, so that the contract is supposedly invalid[11]. There is no such requirement in Ukrainian law for contracts between non-Ukrainian parties, and any such claim would be time-barred under Ukraine's three-year statute of limitations for such claims . (Didkovskiy Decl., ¶¶ 23-24). Moreover, the contract in question is apparently governed by New York law and provides for disputes to be resolved in state or federal courts in New York. Most strikingly, there is no plausible basis, either as a matter of Ukrainian law or common sense, why the former holder of a less than 6% interest in Storm attempting to reclaim that interest should be able to enjoin all corporate action by Storm, or attach all of its assets, even if the July 2004 sale were somehow invalid.

As with the other Ukrainian lawsuits intended to frustrate the Arbitration and with which this Court is familiar, the sweeping injunction in the EC Venture case was granted *ex parte*. It also appears that, to date, no efforts have been made by Storm or Alpren to appear at hearings, vacate the injunction, to appeal, or otherwise defend themselves. (Didkovskiy Decl., ¶ 22). Accordingly, the EC Venture proceeding has all the hallmarks of the collusive litigations that are a favored tactic of Storm and its affiliates. Indeed, Telenor Mobile has been informed that Altimo or one of its affiliates purchased EC Venture prior to commencing the action that resulted in the EC Order. (Declaration of Trond Moe, dated January 22, 2008, ¶ 5).

## ARGUMENT

## I.   STORM AND THE ALTIMO ENTITIES ARE IN CONTEMPT OF THE NOVEMBER 2 ORDER

"The distinguishing characteristic of civil contempt is that it is designed to coerce a non-compliant actor into obeying court decrees." <u>Experience Hendrix, LLC v. Chalpin</u>, No. 06

---

[11] Alpren initially made a similar claim that the Shareholders Agreement was not written in Ukrainian in attacking the Shareholders Agreement.

Civ. 9926, 2007 WL 541620, *2 (S.D.N.Y. Feb. 15, 2007); see also Nye v. United States, 313

U.S. 33, 41-43 (1941); Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995). A finding

of civil contempt is appropriate when (1) the order a party has allegedly failed to comply with is

clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the

violating party has not reasonably and diligently attempted to comply with the order. See

Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., 369 F.3d 645, 655

(2d Cir. 2004). The movant need not establish that the violation was willful. Donovan v.

Sovereign Sec. Ltd., 726 F.2d 55, 59 (2d Cir. 1984).[12] As set forth below, the actions of Storm

and the Altimo Entities more than meet that test.

### A.    The November 2 Order is Clear and Unambiguous

The requirement of a contempt finding is that "[t]he court's order must leave 'no

uncertainty in the minds of those to whom it is addressed,' . . . and 'the party enjoined must be

able to ascertain from the four corners of the order precisely what acts are forbidden.'" Yash Raj

Films (USA) Inc. v. Bobby Music Co. and Sporting Goods, Inc., No. 01 CV 8378 JFB CLP,

2006 WL 2792756 at *6 (E.D.N.Y. Sept. 27, 2006) (citations omitted); see also Drywall Tapers

& Pointers of Greater N.Y., Local 1974 of I.B.P.A.T. AFL-CIO v. Local 530 of Operative

Plasterers & Cement Masons Int'l Ass'n, 889 F.2d 389, 395 (2d Cir. 1989).

This Court could not have been any clearer in its November 2 Order:

> The arbitral Tribunal carefully considered Storm's every argument,
> and by unanimous vote – including the vote of the arbitrator Storm
> itself had appointed – decisively rejected those arguments and
> correctly awarded appropriate relief to Telenor.
> Accordingly . . . Storm is hereby ordered to comply with the
> directives of the Final Award.

---

[12] This Court, of course, retains the power to enforce an order under appellate review, including enforcement by civil contempt. See Red Ball Interior Demolition Corp. v. Palmadessa, 947 F. Supp. 116, 120-21 (S.D.N.Y. 1996). Both this Court and the Court of Appeals have denied Storm's application for a stay pending appeal.

2007 WL 3274699 at *33-34. In turn, the obligations imposed on Storm by the Final Award are explicitly set forth in five numbered paragraphs on pages 65 through 68 of the Final Award. Storm has never claimed that the requirements of the Final Award are in any way unclear or uncertain, nor could it do so.

**B.    The Evidence of Storm's Non-Compliance With this Court's Order is Clear and Convincing**

1.    Storm Has Failed to Comply With the Corporate Governance Provisions of the Award.

Storm does not, and cannot, dispute that it has failed to comply with the corporate governance provisions of the Final Award.[13]   Storm has failed to take any of the required steps to amend the Charter, and has failed to attend Kyivstar shareholder meetings.  Since the issuance of the Final Award, Kyivstar has held six Extraordinary Meetings, all properly noticed to Storm. The most recent such meeting was held on January 18, 2008.  (Didkovsky Decl., ¶¶ 4-7).  As it has since 2005, Storm has failed to attend any of those meetings, and gives every indication that it will continue to boycott shareholders meetings in the future.  Indeed, on December 20, 2007, Alexey Reznikovich, Altimo's chief executive officer, stated that "Storm would probably not consider attending Kyivstar's shareholder meetings until an appeal against the Court's judgment was concluded."  (O'Driscoll Decl., Exh. M).

Further, Storm was ordered in the Final Award to transfer at least one of its shares in Kyivstar to each of three newly-formed companies affiliated with Storm and cause each such affiliate to execute and deliver an endorsement in accordance with Sections 4.02(b) and 4.09 of the Shareholders Agreement. (Sills Decl., Exh. A at p. 66-67).  Storm has neither created those

---

[13]Strikingly, Storm argued its own non-compliance to the Second Circuit in support of its motion for a stay pending appeal. (Storm Reply Memo. at p. 1-2).  Additionally, on November 15, 2007, Mr. Klymenko, Storm's General Director (as well as a vice-president of Altimo), sent a letter to Telenor Mobile asserting that Storm was not required to comply with the November 2 Order while it was on appeal.  (Sills Decl., Exh.L).

affiliates nor transferred the required shares. (Didkovsky Decl., ¶ 12). Accordingly, Storm is in clear breach of the commands of the Final Award and this Court.

     2.    <u>Storm Has Continued Its Campaign of Collusive Litigation</u>

As discussed above, the Shevchinkivskiy suit brought by Mr. Klymenko, Storm's General Director, against Storm, Alpren and Hardlake, seeking to prevent compliance with the Final Award by those entities, has not been withdrawn. Although Storm – and by extension, its General Director, Mr. Klymenko – are under a clear order to withdraw that litigation, they have not done so. Moreover, Storm apparently consented to the relief sought by Mr. Klymenko, and neither Alpren nor Storm has done anything since October 10, 2007 to defend the case. Instead, the injunction granted in that case is apparently the basis upon which Storm argues that it is legally constrained from complying with the Final Award and the November 2 Order.

In addition, it appears Storm has once again collusively resorted to the Ukrainian courts through the litigation ostensibly initiated by EC Venture. The circumstances of that case are described above. Quite simply, there is no explanation for those actions other than that EC Venture is now under the control of one or more of the Altimo Entities or their affiliates and is acting as their proxy.[14]

    A.    **<u>Storm and the Altimo Entities Have Not Reasonably and Diligently Attempted to Comply with the November 2 Order</u>**

From the moment of issuance of the Final Award, Storm and the Altimo Entities have made it clear that they have no intention of honoring the directives of the Tribunal. In an August 2, 2007 press release, Altimo "reconfirmed" that "the [Final] award issued . . . by the New York Arbitration Tribunal will not have any impact on the legal situation around Kyivstar."

---

[14] The EC Venture Order was entered in Ukraine on November 29, 2007. During the afternoon of November 29 in New York, a single Judge of the Court of Appeals granted a temporary stay of the November 2 Order, based solely on Storm's papers. Because Ukraine is in the Eastern European time zone, seven hours ahead of New York, it is evident that the EC Venture case was brought while the November 2 Order was in full force and effect.

(Sills Decl., Exh. I). In October 2007, Storm made similar statements about the Final Award, noting that "no award made by the New York Tribunal in the arbitration with Telenor had any sufficient legal effect . . ." The only change since Altimo and Storm made those statements has been their respective attempts to create the appearance of partial compliance, while continuing their campaign of attacking the Final Award.

Altimo's purported "sale" of one-half of its interest in Turkcell appears to be nothing more than an elaborate charade meant to create the illusion of compliance with the divestiture provisions of the Final Award, while retaining the asset in question.[15] The transaction documents entered into and to be entered into by the Altimo affiliates purportedly divesting Altimo's Turkcell shares in the event the sale is completed (copies of which were attached as an exhibit to a filing by Altimo on Schedule 13D with the Securities and Exchange Commission) give the relevant Altimo affiliate not only the absolute right to repurchase the purportedly transferred shares, but also the economic rights in those shares during the period in which they are held by the purported purchaser, strongly suggesting that Altimo remains the true beneficial owner of those shares. (O'Driscoll Decl., ¶¶ 6-8).[16] Indeed, the shares are not actually to be transferred, but held in escrow for two years.

---

[15] The Final Award requires divestiture of Kyivstar unless Altimo's Turkcell and UHT stakes are divested "within one hundred and twenty (120) days of this Final Award." The relevant period expired on either October 30, 2007, counting from July 2, 2007, the date of the Final Award, or November 29, 2007, counting from the date on which the Final Award was released after Storm paid the arbitrators' past-due invoices.

[16] Under those agreements, (1) Alfa Finance, the seller of the interest in Turkcell through the sale of shares in intermediate holding company Alfa Telecom Turkey Limited ("ATTL"), maintains a call option on the ownership interest; (2) despite its 50% post-sale ownership interest in ATTL, Alfa Finance will receive 100% of all dividends paid by ATTL, except to the extent that a dividend is paid by Astelit, Turkcell's Ukrainian subsidiary, to its shareholders, in which case such dividend will be shared by the parties in proportion to their respective ownership interests in ATTL; (3) despite the purchaser's purported ownership of 50% of ATTL, neither the purchaser nor the escrow agent holding legal title to the shares of ATTL will have any other rights to participate in ATTL in relation to its income or capital, including on its winding up; and (4) for a two year period following completion of the transaction, neither the escrow agent nor the purchaser may assign, transfer or otherwise dispose of in whole or in part the legal or beneficial interest in the shares of ATTL to any person without obtaining the prior written consent of Alfa Finance. (O'Driscoll Decl., ¶¶ 6-7)

Further, the $20 million purchase price for one-half of Altimo's interest in Turkcell is an insubstantial fraction of the market value of that interest, which was approximately $1.6 billion on the date of the transaction.[17] (Id., ¶ 9). In fact, on December 5, 2007, Dow Jones, quoting <u>Vedomosti</u>, the leading Russian business newspaper (a joint venture between the <u>Wall Street Journal</u> and the <u>Financial Times</u>), reported that "[a]n Altimo spokesman told the paper that the company is only selling the right to vote the stake and not the economic interest in Turkcell." <u>See</u> "Altimo to Sell Turkcell Stake worth $1.6B for $20M." (Sills Decl., Exh. O). Similarly, another Russian business journal quoted Altimo's Vice President Kirill Babaev, who "explained the apparent 'giveaway' sale price by saying that the price is so low because 'Alfa has preserved its economic interest in Turkcell and will receive the dividends in such volume as if it remained the only shareholder of its Turkish daughter company.'" (Sills Decl., Exh. P). All of the available evidence shows that Altimo remains the true owner of the 50% interest in Turkcell it purportedly "sold" and that such shares are, at best, merely being "parked" in order to create the appearance of compliance with the divestiture portion of the Final Award.

Altimo's purported sale of UHT to an entity referred to in its press release as "Intec Holding Limited", (O'Driscoll Decl., Exh. B), is likewise suspect.[18] "Intec Holding Limited"[19] appears to be affiliated with Mikhail Gamzin, a member of the Alfa Group Consortium's Supervisory Board and "principal founder and Managing Partner" of Russian

---

[17] Turkcell is a public company whose shares and ADSs are traded on the Istanbul Stock Exchange and the New York Stock Exchange, respectively.

[18] Other than that press release and an equally conclusory letter from Storm's attorneys in this proceeding, Altimo has disclosed nothing about the UHT transaction.

[19] A search of British Virgin Islands, Russian and Cypriot company registers suggests that the correct name of this entity may be "Intec Holdings Limited". <u>See</u> O'Driscoll Decl., ¶ 3. Intec Holdings Limited is a Cypriot company, registration number 106904, formed on December 2, 1999. For tax reasons, Cypriot companies are often used to hold interests in Ukrainian companies.

Technologies Venture Fund, the Alfa Group entity that held shares in UHT immediately prior to the purported transfer.  (O'Driscoll Decl., ¶ 4).  Mr. Gamzin's biography on the Alfa Group's website states that "[p]rior to forming Russian Technologies, Mr. Gamzin served as Chairman of the Board of Directors of <u>Intec Group</u>, a sugar and grain business which in 2001 merged with Alfa Group's sugar business to create United Food Company."  (<u>Id</u>., ¶ 4, Exh. C) (emphasis added).[20]

       If, as appears to be the case, Intec Holdings Limited is owned or controlled by Mikhail Gamzin or another affiliate of the Alfa Group Consortium ("Alfa Group"), the ultimate parent of Altimo, then it is an affiliate of Storm, Russian Technologies' purported transfer of shares of UHT to Intec Holdings Limited is a transfer to an affiliate; and the purported sale was therefore not in compliance with the Final Award or the November 2 Order.  Because, both with respect to Turkcell and UHT, the conditions that would excuse Storm from the obligation to divest its shares in Kyivistar have not been met, and Storm's retention of those shares is a contempt.

B.    **<u>Storm Cannot Carry Its Burden to Show Impossibility of Compliance</u>**

       In correspondence from Storm's counsel, in the press, and in its papers before the Court of Appeals, Storm has asserted that its compliance with the Final Award and the November 2 Order is impossible because, as it stated to the Court of Appeals on its unsuccessful

---

[20] Mr. Gamzin's biography on the Russian Technologies Venture Fund's website is more expansive, stating that:

> In 1999 Mr.Gamzin founded Intec Group which invested in sugar and grain businesses in southern Russia. In 2000 Intec Group merged its business with Alfa Group's Kubanskhar to create United Food Company (UFC) – one of the leading sugar and grain producers in Russia with an annual turnover of $100 million and 10 thousand employees. Mr.Gamzin headed the company and joined the Supervisory Board of Directors of Alfa Group. *** In 2003 Mr.Gamzin founded Russian Technologies with investments from Alfa Group and Intec Group.

(<u>Id</u>., ¶ 4, Exh.D).

application for a stay, "it faces legal constraints in Ukraine that prevent it from complying with the corporate governance portions of the [Final] Award."

      Storm bears the burden of showing it cannot comply with the Final Award and the November 2 Order. See United States v. Rylander, 460 U.S. 752, 757 (1983). As the Court of Appeals held in Huber v. Marine Midland Bank, 51 F.3d 5 (2d Cir. 1995):

> [T]he alleged contemnor's burden is to establish his inability clearly, plainly, and unmistakably . . . . Thus, in order to hold the alleged contemnor in contempt, the court need only (1) have entered a clear and unambiguous order, (2) find it established a clear and convincing evidence that that order was not complied with, and (3) find that the alleged contemnor has not clearly established his inability to comply with the terms of the order.

Id at 10 (Citations omitted). See United States v. Chusid, 752 F.3d 113, 117 (2d Cir. 2004); Securities and Exchange Comm'n v. Universal Express, Inc., 2007 WL 2469452, *9 (S.D.N.Y. Aug. 31, 2007)(Lynch, J.).

      With regard to the Shevchinkivskiy litigation, Storm and the Altimo Entities cannot possibly make that showing. Rather, the record shows that the action brought by Mr. Klymenko, the Altimo executive who also serves as Storm's general director, against Storm itself, and its two corporate parents, Alpren and Hardlake, is simply another in the long series of collusive actions in the Ukrainian courts through which Storm and its affiliates have sought to frustrate the Arbitration.[21] In fact, the first category of relief sought in that case was "Invalidation of the acts of Alpren Limited and Hardlake Limited related to making resolutions in respect of performance of the Resolution dated July 02, 2007 of New-York Court of

---

[21] As this Court is aware from prior proceedings, in earlier cases, Alpren sued Mr. Klymenko, ostensibly to prevent him from participating in the Arbitration, and Mr. Klymenko, as Storm's lay representative, supposedly defended the arbitration agreement in the Ukrainian courts. Here, Altimo's December 3 Press release asserts that "Altimo has been clearly and persistently instructing Storm . . . to attend all shareholders meetings convened for Kyivstar, but that "orders from the Ukrainian courts" were frustrating those efforts. However, the orders in question to which Altimo refers were obtained by Mr. Klymenko, its senior executive in Ukraine. (O'Driscoll Decl., Exh. A)

Arbitration . . . ." (Sills Decl., Exh. E). Moreover, far from opposing that request, the decree entered on October 10, 2007, reflects that "the Representative of Defendants [Storm] (Attorney R.V. Marchenko) recognized [that is, conceded] the claimed demands of the Claimant [Klymenko].[22] (Id.).

      With regard to the EC Venture litigation, Storm fares no better.[23] First, that case, which was commenced *ex parte* in an obscure Ukrainian court, has all the hallmarks of the collusive actions with which this Court is all too familiar. In the six weeks that have passed since the EC Order was entered, neither Alpren nor Storm has taken any action to defend the case. Indeed, neither Storm nor Alpren nor their counsel appeared at the hearing scheduled for December 17, 2007, at which time defenses could have been presented. (Didkovskiy Decl., ¶ 22). The parties' conduct is explicable only if Storm and its affiliates are following their regular practice of litigating collusively in Ukraine in hopes of losing, and then using those Ukrainian judgments against themselves in an effort to frustrate the Arbitration or the Final Award.

      Moreover, even were EC Venture proceeding not yet another collusive action, it still would provide no justification for Storm's non-compliance with the Final Award. The rule is that:

> Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure on the grounds that he was unable to comply . . . Parties subject to a court's order demonstrate an inability to comply only by showing that they have made 'in good faith all reasonable efforts to comply.' To meet this burden, the contemnor must do more than merely assert an inability to comply . . . Rather, the contemnor must 'produce detailed evidence

---

[22] Mr. Marchenko is a member of Ilyashev & Partners, the Ukrainian law firm that has played a key role in Storm and the Altimo Entities' campaign of collusive litigation.

[23] The case was brought in the Kyiv Region Commercial Court, which is distinct from the courts with jurisdiction over Kyiv itself. The stated basis for venue there is the alleged domicile of Alpren in "Bila Tverska, Kyiv region" a small city approximately 45 miles from Kyiv.

specifically explaining why he cannot comply' with the court's order . . . .

Western Union Holdings, Inc. v. Eastern Union, Inc., 2007 WL 2683714, *4 (N.D. Ga. Sept. 7, 2007). See Huber v. Marine Midland Bank, 51 F.3d 5, 12-13 (2d Cir. 1995) (impossibility must be shown "clearly, plainly and unmistakably").

To the extent that Storm's apparent claim of impossibility is founded on the EC Order, its conduct does not even begin to approach the standard of "all reasonable efforts to comply." Most significantly, neither Alpren nor Storm has done anything at all to defend itself in Ukraine, to the extent of failing even to appear at a scheduled hearing on December 17, at which defenses could have been presented. (Didkovskiy Decl., ¶ 22). That failure to make any effort to comply at all, let alone "all reasonable efforts," makes the defense of impossibility unavailable.

C.    **The Altimo Entities Are Co-Contemnors**

In addition to Storm, its two shareholders, Alpren and Hardlake, and their corporate parent, Altimo, are in contempt, as well. The basis upon which that finding should be made are that the Altimo Entities are acting in concert with Storm, and that they are legally identified with it.

1.    The Altimo Entities Are Acting in Concert With Storm

"[A] person not a party may be punished . . . when he has helped to bring about . . . what [the decree] has power to forbid . . ." Levin v. Tiber Holding Corp., 277 F.3d 243, 250 (2d. Cir. 2002), quoting Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 832-33 (2d Cir. 1930). A court's contempt power extends to nonparties who have notice of the court's order and the responsibility to comply with it. Independent Federation of Flight Attendants v. Cooper, 134 F.3d 917, 920 (8th Cir. 1998). Further, "anyone who takes steps deliberately to thwart the

enforcement of a judicial decree can be hauled into court and dealt with summarily even though he is not named in the decree or acting in concert with someone that is, or violating any source of legal obligations other than the decree itself." U.S. v. Board of Educ. Of City of Chicago, 11 F.3d 668, 673 (7th Cir. 1993).

The rule is that "under Federal Rule of Civil Procedure 65(d), civil contempt sanctions may be assessed against nonparties who had actual notice of the order in effect at the time in question and who acted in concert with defendants in violating the order." New York State Nat. Organization for Women v. Terry, 952 F.Supp. 1033, 1037 n.3 (S.D.N.Y. 1997); see also Techcapital Corp. v. Amoco Corp., No. 99 Civ. 5093, 2001 WL 267010, *6 (S.D.N.Y. Mar. 19, 2001) (holding that arbitral panel did not exceed its authority by enjoining nonparties "acting in concert" because the arbitral panel incorporated the language of Rule 65(d) by specifically prohibiting affiliates and persons acting in active concert or participation with enjoined party).

This Court has already held that "[t]he record in this case amply supports the arbitrators' apparent conclusion that Storm's and Alpren's actions were taken in concert." 2007 WL 3274699 at *31. See id. ("Alpren and Storm had identical interests and have only acted in concert with each other to pursue those interests"). The record is clear that the Altimo Entities, to the extent that they are not simply parts of a single larger entity, continue to act in concert with Storm in disregard of the Final Award and the November 2 Order.[24] Indeed, the day after the Final Award was issued, Altimo, and not Storm, responded in a press release that "reconfirmed" that "the [Final] award issued . . . by the New York Arbitration Tribunal will not have any impact on the legal situation around Kyivstar." (Sills Decl., Exh. I). Less than three weeks later, the Altimo Entities renewed their campaign of collusive litigation with the Shevchenkivskiy and

---

[24] Formal written notice of the November 2 Order was provided to Altimo, Alpren and Hardlake by letters dated November 13, 2007. (Sills Decl., Exh. R).

then the EC Venture litigations. Those cases involve varied combinations of Storm, Alpren and Hardlake, all evidently coordinated by Mr. Klymenko, Altimo's senior executive in Ukraine and Storm's General Director. (Sills Decl., Exh. F). Moreover, the sham sales of Turkcell and UHT were orchestrated by Altimo, which announced those purported sales in a press release available on its website that refers to "Kyivstar's shareholders – Altimo and Telenor." (O'Driscoll Decl., ¶ 2, Exh. A). Because the Altimo Entities are acting in concert to frustrate the Final Award and the November 2 Order, they should likewise be held in contempt.

        2.    <u>The Altimo Entities Are Legally Identified With Storm</u>

The ostensibly separate corporate forms of the Altimo Entities should be disregarded for purposes of this motion, so that the Altimo Entities should be held in contempt because they are "legally identified" with Storm. <u>See</u> <u>Alemite</u>, 42 F.2d at 833; <u>People of State of New York by Vacco v. Operation Rescue Nat.</u>, 80 F.3d 64, 70 (2d Cir. 1996); <u>Vuitton et Fils S.A. v. Carousel Handbags</u>, 592 F.2d 126, 129-30 (2d Cir. 1979).

This Court's jurisdiction arises under Section 203 of the Federal Arbitration Act, 9 U.S.C. § 203, which provides federal question jurisdiction for actions falling under the New York Arbitration Convention. 9 U.S.C. § 203.[25] That jurisdiction equally applies to proceedings to enforce an award against the alter ego of a party to the arbitration. <u>See</u> <u>Sarhank Group v. Oracle Corporation</u>, 404 F.3d 657, 660 (2d Cir. 2005); <u>See</u> <u>Builders Federal (Hong Kong) Ltd. v. Turner Construction</u>, 655 F. Supp. 1400 (S.D.N.Y. 1987) ("If the prevailing party's award is

---

[25] This Court's jurisdiction to hear this application is not affected by Storm's notice of appeal of the November 2, 2007 Opinion and Order. "The filing of a notice of appeal only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal." <u>New York State National Organization for Women v. Terry</u>, 886 F.2d 1339, 1350 (2d Cir. 1989). <u>See also</u> <u>Motorola Credit Corp. v. Uzan</u>, 388 F.3d 39, 53 (2d Cir. 2004) (appeal of order denying motion to compel arbitration did not divest district court of jurisdiction to proceed with trial on the merits). This Court's confirmation of the Final Award against Storm, the subject of the notice of appeal, does not involve the question of whether the Final Award should be confirmed against the Altimo Entities.

not satisfied by the other party, the prevailing party may subsequently proceed against the non-signatory . . . on an alter ego theory.")

When a court exercises jurisdiction under Chapter 2 of the FAA, it has "compelling reasons to apply federal law, which is already well developed" to questions of enforcement of an arbitration award or agreement.  Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 96 (2d Cir. 1999).  The issue of who is a proper party to an enforcement proceeding is just such a question.  See Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation, 361 F.3d 676, 691-92 (2d Cir. 2004) (Jacobs, J. concurring) ("The Supreme Court's interpretation of the FAA requires the application of federal common law to determine who is a proper 'party' to a confirmation proceeding brought pursuant to § 207."); see also Certain Underwriters at Llloyd's London v. Argonaut Insurance Co., 500 F.3d 571, 578-580 (7th Cir. 2007) (holding federal law applies to issue arising under the Convention).[26]

The factors to be considered in deciding whether to pierce the corporate veil under federal law are as follows:

> The Second Circuit has identified a number of factors that are relevant in evaluating alter ego claims (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guidance of

---

[26] In an analogous context, the question of piercing the corporate veil in admiralty cases is governed by federal law. For example, in Dolco Investments v. Moonriver Development, Ltd., 486 F.Supp. 2d 261 (S.D.N.Y. 2007), the Court held, with respect to an application to disregard the corporate personalities of two defendants as follows:
> [I]t is the federal common law – not New York law – which governs this admiralty case.  In the Second Circuit, federal common law requires that plaintiff allege only domination to state a claim for alter ego liability.

Id. at 271 (citation omitted).

the corporation's debts by the dominating entity, and (10)
intermingling of property between the entities.

Dolco, supra, 486 F.Supp. 2d at 271-72 (citation omitted).

This Court has already held, on two separate occasions, that there is sufficient

evidence to pierce Storm's corporate veil. The record shows that Altimo is a part of the Alfa

Group, and holds the Alfa Group's telecommunications interests, including its interest in

Kyivstar. Altimo's interests in Storm are held through two wholly owned subsidiaries, Alpren

(which holds 49.9%) and Hardlake (which holds 50.1%). Alpren is a Cyprus shell company with

its "office" at the offices of Abacus Limited ("Abacus"), an offshore services company located in

Nicosia, Cyprus.[27] (Declaration of Christodoulos G. Pelaghias dated January 22, 2008

("Pelaghias Decl.,) ¶¶ 3-16). Alpren's Articles of Association limit its business activities to the

ownership of its interests in Storm, stating that:

> Notwithstanding anything contained in the Memorandum of
> Association of the Company the sole subject of activity of the
> Company shall be the holding of participants interests in Storm
> LLC a limited liability company registered in Ukraine as company
> number 23163325 ("Storm"), the exercise of any and all rights and
> obligations associated with or related to such shareholding and the
> entry into documents in connection with borrowing from Credit
> Suisse, London Branch and the lenders from time to time under the
> Loan Agreement. The Company shall not engage into or carry out
> any other business activity of any nature whatsoever.

(Pelaghias Decl., ¶ 7) (emphasis added). Alpren's only directors are Stella Herodotou and

Charalambos Michaelides, both Cypriot nationals and employees of Abacus. (Pelaghias Decl.,

¶¶ 4-5). The secretary of Alpren, its only officer, is Abacus Secretarial Ltd., a subsidiary of

Abacus. (Pelaghias Decl., ¶ 5). According to its website, Abacus provides "corporate

administration." (Sills Decl., Exh. Q). The Abacus website goes on to state the following:

---

[27] Altimo, a British Virgin Islands company, likewise has its "office" at the office of an apparent Abacus affiliate in
Road Town, Tortola, B.V.I. (Declaration of Daniel Gerard Wise, dated January 22, 2008, ¶ 3)

> We apply an extremely strict system of internal controls covering all partners and staff and ensure absolute protection and security of all assets entrusted to us by our clients. <u>All actions regarding a client's business or assets are taken only in accordance with the authorisation procedures agreed in advance between Abacus and the client.</u> No single person within the firm has power to take any unauthorised action and all work is supervised directly by the Abacus partners at all times.

(<u>Id.</u>) (emphasis added). While the "authorisation procedures" agreed to between Altimo and Abacus are not publicly available, it is inconceivable that they do anything other than bind Abacus to act only on and in accordance with Altimo's instructions.

Hardlake is Alpren's twin, the only difference being that it holds 50.1% of Storm's shares for Altimo. It shares an address with Alpren, and Charalambos Michaelides is likewise one of its two officers. (Pelaghias Decl., ¶¶ 10-12). Like Alpren, Abacus Secretarial Ltd. serves as the secretary for Hardlake, (<u>Id.</u> at ¶ 12), and, like Alpren, Hardlake lacks independent officers, directors or personnel. (<u>Id.</u>). Hardlake's "personnel" act only at Altimo's instructions.

Given the direct control exerted over Storm's immediate parent companies, it is not surprising that Storm's only employee, officer, or director is Mr. Klymenko, who serves as a Vice President of Altimo, and who was recently appointed as Director General (and principal representative) of Altimo in Ukraine. (Sills Decl., Exh. F). One of Mr. Klymenko's responsibilities is supervising Altimo's litigation strategy, a position which, as this Court has already found, apparently requires the orchestration of lawsuits against Storm and other Altimo subsidiaries. Mr. Klymenko is also the current General Director of Storm.

This Court has already found – albeit in the context of finding a sufficient basis for personal jurisdiction to grant a preliminary injunction – that Telenor Mobile was likely to be able to show "Storm, Alpren and Altimo are mere alter egos of one another" and "for purposes of the present dispute, the same entity." 2006 WL 3735657 at *14. Similarly, in the November 2

20

Order, "[t]he potential 'justifications' for binding Alpren to the anti-suit injunction are more than "barely colorable" – they are eminently reasonable and persuasive." 2007 WL 3274699 at *30. In the words of Altimo's own attorney, at the time that Altimo acquired its interest in Kyivstar, "Storm means Alfa . . . [a]pproval . . . in respect of Storm is meaningless unless Alfa has signed off." (Sills Decl., Exh. G). Indeed, Altimo's attorneys approved a critical loan document on behalf of Storm, as no independent counsel for Storm was hired. (Sills Decl., Exh. H).

The other factors are equally as telling. Storm and Altimo share common office space in Kyiv, as well as common telephone and facsimile numbers. Storm's most recent letter to Telenor Mobile shows its address as 59 Zhilyanska Street, Office 318, Kyiv 01033. (Sills Decl., Exh. L). This is the same address Altimo shows as its Kyiv headquarters on its website. (Sills Decl., Exh. S).

There can be little debate that Storm has no discretion to act other than as Altimo instructs it. As this Court has already found, Storm has no independent function beyond holding shares for Altimo. Storm, 2006 WL 3735657 at 13. It was not Storm, but Altimo, the real party in interest, that negotiated the Shareholders Agreement with Telenor Mobile in the first place. Id. at 14. As noted above, Alpren and Hardlake also lack any discretion to act without explicit direction from Altimo.

The dealings between and among the Altimo Entities are never at arm's length. The series of collusive litigations coordinated by Altimo and Klymenko is a particularly telling piece of evidence in this regard. And finally, neither Storm, Alpren nor Hardlake are independent profit centers. None of the entities has any function or business beyond holding

shares for Altimo and carrying out its will, and, consistent with this Court's holding in the November 2 Order, all are "legally identified" with each other for purposes of this proceeding.[28]

## II.    THIS COURT SHOULD SET A PROMPT HEARING FOLLOWING A BRIEF PERIOD FOR EXPEDITED DISCOVERY

The record is clear that Storm has done nothing to comply with the corporate governance provisions of the Final Award and the November 2 Order. Rather, through the Shevchenkivskiy and EC Venture proceedings, it has actively sought to frustrate them, acting in concert with the Altimo Entities.

Storm's continuation of the boycott of Kyivstar shareholders meetings that it began in 2005 continues to cause direct and substantial harm to Telenor Mobile. Telenor Mobile is still prevented from consolidating Kyivstar's financial results because of Storm's contempt. (Declaration of Trond Westlie, dated January 22, 2008, ¶¶ 8-9). Second, Storm's actions prevent Telenor Mobile from participating in and directing its multi-billion dollar subsidiary. Third, Storm is damaging Kyivstar itself, which cannot take important corporate decisions because of Storm's acts in violation of the orders of the Tribunal and of this Court.

Accordingly, a prompt hearing should be scheduled on Telenor Mobile's motion for contempt. Telenor Mobile recognizes that contempt is "a potent weapon," Universal Express, 2007 WL at *11; however, the campaign of obstruction and non-compliance being waged by Storm and the Altimo Entities since issuance of the Final Award and the November 2 Order leaves no other alternative if this Court's orders are to be obeyed.

---

[28] Were New York law to be applied, the result would be the same. While New York law requires both control of the subsidiary sufficient to show that it is a "mere instrumentality" of the parent and use of that control to commit a fraud or other wrong. See W. Passalaqua Builder, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991), the acts of the Altimo Entities clearly constitute a wrong to Telenor Mobile, depriving it of the benefits of the Shareholders Agreement, the Final Award and this Court's November 2 Order.

A District Court has broad discretion to design a remedy that will bring about compliance, Perfect Fit Inds., Inc. v. Acme Quilting Co. 673 F.2d 53, 57, (2d Cir.) cert. denied, 459 U.S. 832, 74 L. Ed. 2d 71, 103 S. Ct. 73 (1982). When imposing civil contempt sanctions for the purpose of coercing compliance with the court's order, a District Court should consider (1) the character and magnitude of the harm threatened by continued contempt; (2) the probably effectiveness of the proposed sanction; and (3) the financial consequences of the sanction upon the contempt and the consequent seriousness of the burden of the sanction upon him. See, e.g., In re Grand Jury Witness, supra 835 F.2d at 443, Dole Fresh Fruit Co. v. United Banana, Inc., 821 F.2d 106, 110 (2d Cir. 1987). Because Telenor Mobile's goal is compliance by Storm, Telenor Mobile respectfully suggests that the court impose an escalating coercive fine on Storm. See United States v. Yonkers, 856 F.2d 444, 459-60 (2d Cir.), cert. denied, 486 U.S. 1055 (1988). Given that Altimo, Alpren and Hardlake, through Storm, hold an interest in Kyivstar worth billions of dollars, Telenor Mobile suggests that the fine begin at $100,000 per day for thirty days, and double in daily amount for every thirty days of non-compliance.[29]

While Telenor Mobile has presented more than a prima facie case of contempt against both Storm and the Altimo Entities, a brief period of expedited discovery would enable the motion to be heard on a complete record. Discovery may be ordered in aid of a contempt proceeding. State of New York v. Shore Realty Corp., 763 F.2d 49, 53 (2d Cir. 1985), including, proceedings seeking contempt for violation of an injunction. See, e.g., United States v. Conces, 507 F.3d 1028, 1040 (6th Cir. 2007) (affirming order for post-judgment discovery to aid in enforcement of injunction, finding that the Federal Rules "expressly authorize discovery in aid of a judgment" and that the "scope of postjudgment discovery is very broad".)

---

[29] According to Altimo's website, the market value of its holdings exceeds $30 billion.

For example, for the reasons described in Section II. C., supra, the record strongly suggests that the purported sales of Turkcell and UHT do not fulfill the requirements of the Final Award and the November 2 Order.  Discovery into the details of those transactions is appropriate.  Discovery is similarly appropriate with respect to the EC Order which was granted under highly suspicious circumstances; the underlying documents and facts in that case are inaccessible to Telenor Mobile, but must be in the possession, custody or control of Alpren and Storm, parties in that case.  Telenor Mobile requires discovery to ascertain the facts surrounding those suspect activities.

A third example is the web of relationships among Storm, Alpren, Hardlake and Altimo.  While Telenor Mobile has provided more than a prima facie case for treating all of those companies as a single enterprise, discovery to complete the record in advance of a hearing on the merits is appropriate.  The relevant documents and testimony could easily be produced by Storm and the Altimo Entities, and should be made available to Telenor Mobile and this Court.

## CONCLUSION

For the foregoing reasons, Telenor Mobile's motion should be granted in its entirety.

Dated:  New York, New York
       January 22, 2008       Respectfully submitted,
                ORRICK, HERRINGTON & SUTCLIFFE LLP

By: Robert L. Sills

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
666 Fifth Avenue
New York, New York  10103
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151
Attorneys for Petitioner Telenor Mobile
Communications AS