UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TELENOR MOBILE COMMUNICATIONS AS,

                                        Petitioner,

            vs.

STORM LLC,

                                        Respondent,                    07 Civ. 6929 (GEL)
                                                                       ECF ACTION
            and

ALTIMO HOLDINGS & INVESTMENTS
LIMITED, ALPREN LIMITED and HARDLAKE
LIMITED,

                        Additional Contemnors.

---

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF ALTIMO HOLDINGS & INVESTMENTS LIMITED, ALPREN LIMITED AND HARDLAKE LIMITED

April 9, 2008

# TABLE OF CONTENTS

Page

CITATION CONVENTIONS ................................................................................... i

PROPOSED FINDINGS OF FACT ........................................................................1

I.      THE PARTIES.............................................................................................1

II.     BACKGROUND ........................................................................................2

III.    THE ACTION...............................................................................................4

IV.     THE RELATIONSHIP AMONG STORM AND THE ALTIMO ENTITIES...................8

V.      THE WITHDRAWN OR DISCONTINUED LITIGATIONS..........................................13

VI.     THE ALTIMO ENTITIES' RESPONSE TO THE CORPORATE
        GOVERNANCE PROVISIONS ........................................................15

VII.    THE KLYMENKO LITIGATION ................................................17

VIII.   THE E.C. VENTURE LITIGATION ................................................20

IX.     THE DIVESTITURE TRANSACTIONS ........................................................33

PROPOSED CONCLUSIONS OF LAW ......................................................................42

I.      TELENOR HAS FAILED TO SHOW THAT STORM IS IN CONTEMPT, AND
        THUS THE ALTIMO ENTITIES CANNOT BE HELD IN CONTEMPT ....................42

II.     TELENOR HAS FAILED TO SHOW THAT THE ALTIMO ENTITIES ACTED
        IN "ACTIVE CONCERT" WITH STORM TO VIOLATE THE ORDER ....................42

III.    THE DIVESTITURE TRANSACTIONS COMPLY WITH THE FINAL
        AWARD ......................................................................................49

IV.     THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE
        ALTIMO ENTITIES ........................................................................53

V.      THE CORPORATE VEIL-PIERCING CLAIM FAILS ..................................................57

## CITATION CONVENTIONS

The following conventions will be used throughout the Proposed Findings of Fact and Conclusions of Law:

"Altimo": the Memorandum of Altimo Holdings & Investments Limited, Alpren Limited, and Hardlake Limited in Opposition to Telenor Mobile Communications AS's Motion for an Order of Contempt, dated February 25, 2008.

"Aug. 30, 2007 Sills Decl.": the Declaration of Robert L. Sills (I) submitted in support of Telenor Mobile Communications AS's Memorandum in Opposition to Respondent's Motion to Vacate and in Support of Petitioner's Motion to Confirm, dated August 30, 2007.

"Award" or "Final Award": the Final Award issued at the conclusion of the New York arbitration between Telenor Mobile Communications AS and Storm LLC, dated July 2, 2007 and released August 1, 2007.

"Didkovskiy Decl.": the Declaration of Oleksiy Didkovskiy submitted in support of Telenor Mobile Communications AS's Memorandum in Support of Petitioner's Motion to Hold Defendant and Additional Contemnors in Contempt, dated January 22, 2008.

"Hearing Tr.": the transcript of the March 11, 2008 hearing before the Court.

"Herodotou Decl.": the Declaration of Stella Herodotou submitted in support of the Supplemental Memorandum of Altimo Holdings & Investments Limited, Alpren Limited, and Hardlake Limited in Opposition to Telenor Mobile Communications AS's Motion for an Order of Contempt, dated March 7, 2008.

"Jmak Decl.": the Declaration of Vladimir Jmak, dated January 29, 2008.

"Khomyak Decl.": the Declaration of Anna-Marta Khomyak submitted in support of Storm's Memorandum of Law in Opposition to Telenor Mobile's Motion for an Order of Contempt, dated February 25, 2008.

"Kim Decl.": the Declaration of Vladislav Kim, dated February 22, 2008.

"Klymenko Decl.": the Declaration of Vadim Klymenko submitted in support of Storm's Memorandum of Law in Opposition to Telenor Mobile's Motion for an Order of Contempt, dated February 25, 2008.

"Klymenko Tr.": the deposition transcript of Vadim Klymenko, who was deposed on February 26, 2008, submitted as Exhibit A to the March 6, 2008 Declaration of Peter O'Driscoll.

"Krasnenkova Decl.": the Declaration of Natalya Krasnenkova, dated March 21, 2008, submitted with Ronald S. Rolfe's letter to the Court, dated March 25, 2008.

"Lefor Decl.": the Declaration of G.I. Lefor, dated March 24, 2008, submitted with Ronald S. Rolfe's letter to the Court, dated March 25, 2008.

"Malis Tr.": the deposition transcript of Oleg Malis, who was deposed on March 3, 2008, submitted as Exhibit B to the March 6, 2008 Declaration of Peter O'Driscoll.

"Mar. 12, 2007 Didkovskiy Decl.": the Declaration of Oleksiy Didkovskiy, submitted in support of Telenor Mobile Communications AS's Memorandum in Support of Counterclaimant's Motion to Hold Counterclaim-Defendant and Relief Defendants in Contempt, dated March 12, 2007.

"Merezhko Decl.": the Declaration of Oleksandr Merezhko, dated February 25, 2008.

"Moe Decl.": the Declaration of Trond Moe submitted in support of Telenor Mobile Communications AS's Memorandum in Support of Petitioner's Motion to Hold Defendant and Additional Contemnors in Contempt, dated January 22, 2008.

"Moe Tr.": the deposition transcript of Trond Moe, who was deposed on February 14, 2008, submitted as Exhibit 2 with the February 25, 2008 Declaration of Ronald S. Rolfe.

"Musatov Decl.": the Declaration of Yuri Musatov, dated February 25, 2008.

"Musatov Tr.": the deposition transcript of Yuri Musatov, who was deposed as the 30(b)(6) witness for Altimo Holdings & Investments Limited, Alpren Limited and Hardlake Limited on February 12, 2008, submitted as Exhibit 1 with the February 25, 2008 Declaration of Ronald S. Rolfe.

"O'Driscoll Decl.": the Declaration of Peter S. O'Driscoll submitted in support of Telenor Mobile Communications AS's Memorandum in Support of Petitioner's Motion to Hold Defendant and Additional Contemnors in Contempt, dated January 22, 2008.

"Order": the Court's November 2, 2007 Order confirming the Final Award.

"Parden Decl.": the Declaration of Nick Parden, dated February 25, 2008.

"Rep.": Telenor's Reply Memorandum in Support of Petitioner's Motion to Hold Respondent and Additional Contemnors in Contempt, dated March 6, 2008.

"Reply Didkovskiy Decl.": the Reply Declaration of Oleksiy Didkovskiy submitted in support of Telenor Mobile Communications AS's Reply Memorandum in Support of Petitioner's Motion to Hold Respondent and Additional Contemnors in Contempt, dated March 6, 2008.

"Reply O'Driscoll Decl.": the Declaration of Peter O'Driscoll submitted in support of Telenor Mobile Communications AS's Reply Memorandum in Support of Petitioner's Motion to Hold Respondent and Additional Contemnors in Contempt, dated March 6, 2008.

"Rolfe Decl.": the Declaration of Ronald S. Rolfe, dated February 25, 2008.

"SHA": the 2004 Shareholders Agreement among Telenor Mobile Communications AS, Storm LLC and Closed Joint Stock Company Kyivstar G.S.M.

"Sills Decl.": the Declaration of Robert L. Sills submitted in support of Telenor Mobile Communications AS's Memorandum in Support of Petitioner's Motion to Hold Defendant and Additional Contemnors in Contempt, dated January 22, 2008.

"Storm": Storm's Memorandum of Law in Opposition to Telenor Mobile Communication AS's Motion for an Order of Contempt, dated February 25, 2008.

"Supp. Altimo":  the Supplemental Memorandum of Altimo Holdings & Investments Limited, Alpren Limited and Hardlake Limited in Opposition to Telenor Mobile Communications AS's Motion for an Order of Contempt, dated March 10, 2008.

"Supp. Khomyak Decl.":  the Supplemental Declaration of Anna-Marta Khomyak submitted with Pieter Van Tol's letter to the Court, dated March 25, 2008.

"Supp. Klymenko Decl.": the Supplemental Declaration of Vadim Klymenko submitted in support of Storm LLC's Sur-Reply on Motion for Contempt, dated March 10, 2008.

"Tel.": Telenor Mobile Communications AS's Memorandum in Support of Petitioner's Motion to Hold Defendant and Additional Contemnors in Contempt, dated January 22, 2008.

Altimo Holdings & Investments Limited ("Altimo"), Alpren Limited ("Alpren") and Hardlake Limited ("Hardlake") (for convenience, collectively the "Altimo Entities"), respectfully propose the following Findings of Fact and Conclusions of Law with respect to the motion of Telenor Mobile Communications AS ("Telenor") to hold Storm LLC ("Storm") and the Altimo Entities in contempt.

**PROPOSED FINDINGS OF FACT**

### I.    THE PARTIES

1.    Telenor is a Norwegian company.  Final Award 2.

2.    Telenor is a subsidiary of Telenor ASA, a Norwegian telecommunications company operating in twelve countries and the largest provider of telecommunications services in Norway.  Final Award 2.

3.    Altimo is a British Virgin Islands company.  Musatov Decl. ¶ 5.

4.    Altimo is the telecommunications arm of Alfa Group Consortium ("Alfa Group"), one of Russia's largest private equity conglomerates.  Musatov Decl. ¶¶ 2, 4.

5.    Altimo has more than thirty subsidiaries, including Alpren and Hardlake. Musatov Decl. ¶ 4.

6.    Alpren and Hardlake are Cyprus companies.  Musatov Decl. ¶ 7.

7.    Alpren and Hardlake own 49.9% and 50.1%, respectively, of Storm. Musatov Decl. ¶ 11.

8.    Storm is a Ukraine company.  Musatov Decl. ¶ 12.

9.      Storm and Telenor are the principal shareholders of Closed Joint Stock Company Kyivstar G.S.M. ("Kyivstar"), a Ukraine telecommunications company.  Final Award 14.

## II.    BACKGROUND

10.      On January 30, 2004, Storm, Telenor and Kyivstar signed a Shareholders Agreement (the "SHA") that, inter alia, relates to the management of Kyivstar, and contains an arbitration clause providing that disputes between Storm and Telenor arising out of the SHA will be arbitrated in New York.  Final Award 11.

11.      None of the Altimo Entities was a signatory to the SHA.

12.      In 2005, a dispute arose between Storm and Telenor over, inter alia, the management of Kyivstar and the validity and effect of the SHA.  *See* Order 4,  5.

13.      On February 7, 2006, Telenor commenced arbitration in New York ("the Arbitration") pursuant to the arbitration clause in the SHA.  *See* Order 4.

14.      On August 1, 2007, the arbitral tribunal (the "Tribunal") issued the Final Award.

15.      That same day, Telenor filed a petition to confirm the Final Award with this Court.  Storm opposed Telenor's petition, and cross-moved to vacate the Final Award.  Order 15.

16.      On November 2, 2007, this Court issued the Order confirming the Final Award.  Storm has appealed that decision, and attempted to stay enforcement of the

Order pending resolution of the appeal. On December 20, 2007, the Court of Appeals denied the motion to stay pending resolution of the appeal. Storm 9.

17.    In the Final Award, the Tribunal directed Storm (1) to form three affiliates of Storm and transfer one share of Kyivstar stock to each to ensure that Storm can nominate four candidates for the Kyivstar Board; (2) to ensure that its Board nominees attend Board meetings and participate in the good faith management and direction of Kyivstar's business; (3) to ensure that its duly authorized representatives attend all future annual and extraordinary meetings of the Kyivstar shareholders; (4) to amend Kyivstar's Charter to conform it to the SHA; and (5) to divest its shares in Kyivstar within 120 days, unless Storm's affiliated entities divested their holdings in excess of 5% in Turkcell Iletisim Hizmetleri A.S. ("Turkcell") and Ukrainian High Technologies ("UHT"). These provisions were directed solely at Storm. Final Award 66-67.

18.    The Final Award also enjoined Storm and "anyone acting in concert with it" from (1) the "commencement or prosecution" of court actions concerning disputes under the SHA including certain litigations pending in Ukraine at the time of the Final Award, (2) enforcing a December 29, 2006 Ukraine court injunction that prohibited Ernst & Young from providing audit services to Kyivstar, or (3) taking any action to hinder or preclude Telenor, Ernst & Young or related entities from carrying out their rights and obligations under the SHA and other agreements with Kyivstar. Final Award 67-68.

19.    This Court's Order directed only Storm to comply with the Final Award. Order 64 ("Storm is hereby ordered to comply with the directives of the Final Award").

20.     The Order did not purport to bind nonparties.  Order 50 ("a judgment of this Court enforcing that Award would not be directed to Alfa or Russian Technologies, who are not parties to this action").

21.     None of the Altimo Entities was a party to the Arbitration that led to the Final Award or the proceedings before this Court that led to the Order, and thus none is a party to this contempt proceeding.

III.     **THE ACTION**

22.     On January 22, 2008, Telenor filed a motion for contempt against Storm and the Altimo Entities.

23.     The Altimo Entities voluntarily participated in this contempt proceeding, preserving their argument that this Court does not have personal jurisdiction over them. Altimo 23; Hearing Tr. 8.

24.     After Telenor filed its motion for contempt, the Court permitted Telenor to take discovery, and the parties conducted document and witness discovery on an expedited basis.

> 24.1.   On February 12, 2008, the Altimo Entities voluntarily produced Yuri Musatov, Chief Legal Officer of LLC Altimo, as a 30(b)6 witness for each of them (Rolfe Decl. Ex. 1), and, on March 3, 2008, voluntarily produced Oleg Malis, Senior Vice President of LLC Altimo (Reply O'Driscoll Decl. Ex. B).

24.2.   On February 14, 2008, Telenor produced Trond Moe, a Telenor executive, who had submitted a declaration in support of Telenor's motion for contempt.  Rolfe Decl. Ex. 2.

24.3.   On February 26, 2008, Storm produced Vadim Klymenko, General Director of Storm.  Reply O'Driscoll Decl. Ex. A.

25.     On February 25, 2008, the Altimo Entities and Storm filed Memoranda in Opposition to Telenor's motion for contempt.

26.     On March 6, 2008, Telenor filed a Reply Memorandum in support of its motion for contempt.

27.     On March 10, 2008, the Altimo Entities and Storm submitted Supplemental Memoranda in Opposition to Telenor's motion for contempt.

28.     On March 11, 2008, the Court held a hearing.  Telenor presented one witness, Oleksiy Didkovskiy, Telenor's outside counsel in Ukraine, who testified about the process for obtaining certified copies of court decisions in Ukraine; he was cross-examined by counsel for the Altimo Entities on behalf of Respondents.  Telenor, Storm and the Altimo Entities presented oral argument.  The parties stipulated that the deposition record, declarations and exhibits could be used by the Court as part of the record in this case.  Hearing Tr. 10, 30-31.  The Court deferred ruling.

29.     Telenor argues that Storm violated the Order in three ways.

30.     First, Telenor claims that Storm violated the Order by failing to fulfill the corporate governance requirements of creating affiliates, attending Kyivstar shareholder meetings and amending the Kyivstar Charter to conform it to the SHA.  Tel. 2-3.

31.     Second, Telenor claims that Storm violated the anti-suit component of the Order, citing two lawsuits brought in Ukraine courts—one by Storm's General Director, Vadim Klymenko, and the other by a Swiss company called E.C. Venture Capital S.A. ("E.C. Venture").  Tel. 3-5.

32.     Third, Telenor claims that Storm violated the divestiture requirements of the Order by retaining its Kyivstar shares, because transactions by Storm's affiliates executed to comply with the Order do not satisfy the non-compete provisions.  Tel. 9-12.

> 32.1.   Storm affiliate Altimo Finance Holdings ("AFH") divested its interest in Astelit LLC ("Astelit"), a Ukraine telecom company indirectly owned by Turkcell, to 5%.  Telenor argues that AFH was required instead to divest its interest in Turkcell, and thus that the transaction does not comply with the Order.  Rep. 6-7; Hearing Tr. 130-33.

> 32.2.   Storm affiliate Russian Technologies ("RT") sold UHT to Baltone Holdings Limited ("Baltone").  Telenor argues that the transaction was a sale to an "Affiliate", as that term is defined in the SHA, and thus does not comply with the Order.  Tel. 12; Rep. 8-9; Hearing Tr. 139-41.

32.3.    Telenor generally alleges that both divestiture transactions were not real sales, but "sham" transfers, and thus do not comply with the Order.  Rep. 9.

33.    Telenor further alleges that the Altimo Entities should be held in contempt, because they are "acting in concert" with Storm in these alleged violations and, in the alternative, that the Court should pierce Storm's corporate veil and hold the Altimo Entities liable for Storm's actions.  Tel. 15, 17.

34.    Storm contends that the two Ukraine lawsuits cited by Telenor are not evidence of contempt, but rather one reason that it should not be held in contempt.  Storm 13-14.  Relying on the defense of impossibility, Storm argues that the injunctions issued in the lawsuits preclude it from executing the corporate governance directives.  Storm 13. Telenor contends that both actions are "collusive", and thus cannot serve as a defense against contempt.  Rep. 4.  Storm further argues that even without those injunctions, it cannot comply without violating Ukraine law, and contempt cannot be used to force a party to violate the law of a foreign jurisdiction.  Hearing Tr. 70.

35.    The Altimo Entities contend the Court does not have personal jurisdiction over them and that because Storm cannot be held in contempt, they cannot be held in contempt as a matter of law.  Altimo 8-9, 23.

36.    Moreover, the Altimo Entities contend that there is no evidence that they have been "acting in concert" with Storm to violate the Order or Final Award, and that the evidence shows the opposite: that they have been diligent in their efforts to get Storm to comply.  Thus, as nonparties, they cannot be held liable for any violation by Storm.

7

Altimo 9-10.  Likewise, the Altimo Entities argue that Telenor has failed to make the requisite legal and factual showings to pierce Storm's corporate veil.  Altimo 18-23.

37.     Finally, the Altimo Entities contend that the two divestiture transactions by the Storm affiliates comply with the non-compete provisions of the Order, and that no contempt can lie for Storm's retention of its Kyivstar shares.  Altimo 12-15.

38.     As noted in the Proposed Conclusions of Law, Telenor has the burden of proof and must persuade the Court as to the existence of jurisdiction, submit clear and convincing evidence of Storm's alleged violations, and present clear and convincing evidence that the Altimo Entities were in "active concert" with Storm as to those alleged violations, or that Storm's separate corporate form should be disregarded, for the Altimo Entities to be held in contempt.

39.     For the reasons discussed below, the Court holds that no contempt can lie against the Altimo Entities.

## IV.     THE RELATIONSHIP AMONG STORM AND THE ALTIMO ENTITIES

40.     Each of Storm, Alpren, Hardlake and Altimo is separately incorporated and has its own charter.  Musatov Decl. ¶ 16.  None of Storm's officers is also a director or officer of the Altimo Entities.  *Id.* ¶ 13.  It is undisputed that the Altimo Entities are foreign corporations with no business or property in New York. *See id.* Exs. 5, 7.

41.     Storm's office is located in Kyiv, Ukraine.  Klymenko Tr. 8.

42.     Altimo does not have an office in Ukraine (Malis Tr. 33; Klymenko Tr. 45-46), but does list Storm's office address on its website (Sills Decl. Ex. S).  Altimo

employees use Storm's office when visiting Ukraine, but Altimo does not share the office with Storm.  Klymenko Decl. ¶ 28.

43.    Mr. Klymenko and his secretary use email addresses that end in "altimo.ru".  There is no Storm email address or Storm website.  Klymenko Tr. 18-19, 44, 47.

44.    Storm has its own bank accounts and is sufficiently capitalized to carry out acts authorized by its Charter.  Klymenko Decl. ¶ 26.  The "Statutory Fund" of Storm, representing its initial capitalization, was approximately $70 million.  *Id.* Ex. B.  Storm hires and pays its own employees.  *Id.* ¶ 27; Musatov Decl. ¶ 18.

45.    Storm holds it own shareholder meetings and has its own auditors. Klymenko Decl. ¶ 25; Musatov Decl. ¶¶ 14, 18, 20.

46.    Representatives of Alpren and Hardlake attend Storm shareholder meetings, maintain minutes of the meetings and vote on shareholder resolutions proposed by Alpren and Hardlake and agenda items proposed by Mr. Klymenko.  *See* Klymenko Decl. ¶¶  25, 30; Musatov Decl. ¶ 14.  The record contains evidence of several shareholders meetings, including meetings in November 2005 and February 2006 relating to Mr. Klymenko's employment with Storm; a meeting in February 2006 regarding an amendment to Storm's Charter; a meeting in May 2007 relating to a loan facility for Alpren and Hardlake; a meeting in August 2007 relating to Storm's compliance with the Final Award; and meetings in October 2007 relating to agreements involving Alfa Bank and third parties.  *See* Klymenko Decl. ¶ 25, Exs. C-D; Supp. Klymenko Decl. ¶ 6, Exs. 6-7.

46.1.   In light of this evidence, Telenor concedes that Storm does follow some corporate formalities, but asserts that Altimo has "manufactured evidence of corporate action by Storm" citing the minutes of the Storm shareholders meeting on October 11, 2007. Rep. 13-14.  Telenor argues that Mr. Klymenko testified that he did not attend any meeting on October 11, 2007 and that no such meeting took place, even though, according to the minutes, Mr. Klymenko "purportedly chaired" a meeting on that date.  Rep. 13; Klymenko Tr. 155, 156.

46.2.   The record shows that two Storm shareholders meetings were in fact held on October 11, 2007.  Mr. Klymenko did not attend. Supp. Klymenko Decl. ¶¶ 5, 8.  Rather, Alpren and Hardlake directors attended the meetings.  Herodotou Decl. ¶¶ 3, 4.

46.3.   The meetings were conducted pursuant to two notices that Mr. Klymenko sent out on September 27, 2007.  Herodotou Decl. ¶¶ 2, 6.  The notices proposed approval of actions relating to two agreements involving Alfa Bank and third parties.  Herodotou Decl. Ex. 1.

46.4.   Because the notices provided a detailed description of the items that were ultimately considered and approved at the October 11, 2007, meetings, it was not necessary for Mr. Klymenko to attend. Supp. Klymenko Decl. ¶¶ 10, 12.  The shareholders approved the

proposals in the notices, which the minutes explicitly reflect. *Compare* Herodotou Decl. Ex. 1 *with* Ex. 2.

46.5.    Although Mr. Klymenko's name is listed in the minutes, the minutes do not say that Mr. Klymenko "chaired" the meetings or even that he was present.  Supp. Klymenko Decl. ¶¶ 8-11.  In fact, Sophia Ioannou, the Hardlake director, was appointed Chairman of both meetings.  Herodotou Decl. Ex. 2.

46.6.    The English translations of the minutes state, "Heard were: the Speaker—Klimenko V.V."  *Id.*  The original Ukrainian word that was translated as "Speaker" refers to a person who makes a report that is either written or oral.  Supp. Klymenko Decl. ¶ 10.

46.7.    The fact that Mr. Klymenko did not attend the October 11, 2007, meetings does not, as Telenor suggests (Rep. 14), show a "complete disregard" for Storm's corporate form.

47.    Mr. Klymenko's duties as General Director of Storm are governed by Ukraine law and by Storm's Charter.  Klymenko Decl. ¶ 13.

48.    Any instruction from Alpren and Hardlake to Mr. Klymenko as Storm's General Director is communicated by requesting the convening of a shareholders meeting and passing written shareholder resolutions.  Musatov Tr. 137; Musatov Decl. ¶ 17.

49.    Mr. Klymenko follows the formal shareholder resolutions of Alpren and Hardlake, as long as those directives do not violate Ukraine law.  Klymenko Decl. ¶ 20.

11

50.     Mr. Klymenko is not a director or officer of Altimo, Alpren or Hardlake. Musatov Decl. ¶ 13.

51.     Although Mr. Klymenko listed "Altimo" on his CV and at the beginning of his career with Storm used a business card calling himself "Vice President" with the "Altimo" name and brand (Klymenko Decl. ¶¶ 17-18), Mr. Klymenko is not an employee of Altimo or on the payroll of Altimo or any Alfa entity other than Storm.  Musatov Tr. 47-53, 56-62; Klymenko Decl. ¶¶ 11, 19.

> 51.1.   Mr. Klymenko was first hired in November 2005.  Klymenko Decl. ¶ 9.
>
> 51.2.   The record shows that Mr. Klymenko's undated CV (Sills Decl. Ex. F) is inaccurate.  *See* Musatov Tr. 50-52, 57-62.  Although Mr. Klymenko's CV lists his responsibilities as including asset management for Golden Telecom and Vimpelcom, Mr. Klymenko has had no role in asset management for either company since taking his position with Storm, although such responsibilities were considered at the beginning of his employment.  Malis Tr. 30-31; Klymenko Tr. 86.
>
> 51.3.   Mr. Klymenko no longer uses the "Altimo" business card. Klymenko Decl. ¶ 19.
>
> 51.4.   Mr. Malis testified that he was surprised by the fact Mr. Klymenko listed himself as a "vice president of Altimo" on his business card,

but that his position as Director General of Storm was sufficiently senior.  Malis Tr. 36-39.

52.     Mr. Klymenko is responsible for litigation at Storm, and Yuri Musatov, Chief Legal Officer of LLC Altimo, is responsible for litigation at Altimo.  Musatov Tr. 44-46; Klymenko Decl. ¶¶ 15, 34.

53.     Mr. Klymenko does not report to anyone at Altimo.  Klymenko Decl. ¶ 20.

54.     Mr. Klymenko regularly consults with Oleg Malis, Senior Vice President of LLC Altimo, on business matters relating to Storm.  Klymenko Decl. ¶ 21; Malis Tr. 48-49.

## V.     THE WITHDRAWN OR DISCONTINUED LITIGATIONS

55.     It is undisputed that after the Final Award was issued, Alpren did not prosecute the litigations it had brought in Ukraine that were pending at the time of the Final Award.  In fact, Alpren made efforts to withdraw the Ukraine litigations.

56.     In September 2007, Alpren withdrew the two litigations that it had brought in Ukraine relating to the audit of Kyivstar by Ernst & Young.  Musatov Decl. ¶¶ 21-22; Musatov Decl. Exs. 13-18.

57.     On April 25, 2006, the Kyiv Commercial Court ruled in a case brought by Alpren ("Case No. 40/242") that the SHA is null and void under Ukraine law, and on May 25, 2006, the Kyiv Appellate Court affirmed that ruling.  Klymenko Decl. Exs. K-L.

58.     After the Final Award was released, Alpren filed a withdrawal with the Kyiv Appellate Court for Case No. 40/242 stating that, "[i]n keeping with the award of

the arbitration . . . Alpren Limited would like to notify the court of its exercise of the right [under the Code of Commercial Procedure of Ukraine to withdraw a claim] and renounces the claim earlier brought". Rolfe Decl. Ex. 11; Musatov Tr. 232-34. On October 24, 2007, the Court responded that Alpren could not renounce the claim because judgment had already been entered. Rolfe Decl. Ex. 12; Musatov Tr. 72-73, 233. Under the Code of Commercial Procedure of Ukraine, the case was *res judicata*, and could be reopened only if there was new and material evidence. *See* Khomyak Decl. ¶ 9, n.2.

59.    On December 1, 2006, the Golosiyivsky District Court of the City of Kyiv issued a preliminary ruling and injunction prohibiting Storm and its agents and Telenor from participating in the Arbitration based on the decisions in Case No. 40/242. *See* Lefor Decl. ¶¶ 3-4, 6; Musatov Decl. ¶ 23.

60.    On May 10, 2007, before the Final Award was issued, the Golosiyivsky Court cancelled the injunctive relief and left the claim without consideration in response to a petition by Alpren. Musatov Decl. ¶ 23, Ex. 20. To withdraw the claim after the Final Award was issued, Alpren would have had to resubmit the claim. *Id.*

61.    With respect to the anti-suit provisions of the Final Award, Telenor's contempt motion is based on the suit filed by Mr. Klymenko, (the "Klymenko Litigation") and the suit filed by E.C. Venture ("the E.C. Venture Litigation").

## VI.    THE ALTIMO ENTITIES' RESPONSE TO THE CORPORATE GOVERNANCE PROVISIONS

62.    On August 2, 2007, the day after the Final Award was released, Altimo issued a press release stating that the Final Award "will not have any impact on the legal situation around Kyivstar".  Sills Decl. Ex. I.

63.    However, the Altimo Entities later made the decision that Alpren and Hardlake should instruct Storm to comply with the Final Award.  Musatov Tr. 77.  As Mr. Musatov testified, this was a "hard decision" to make because there were business and reputational risks for the Altimo Entities if Storm did not comply with the Final Award, and there were business and legal risks in Ukraine for Storm and Mr. Klymenko if Storm did comply with the Final Award.  Musatov Tr. 81-82.

64.    In mid-August 2007, Alpren and Hardlake sent Mr. Klymenko a request to convene a shareholders meeting to discuss Storm's compliance with the Final Award.  Klymenko Decl. Ex. I.  The request outlined 12 resolutions designed to bring Storm into full compliance with the Final Award.  *Id.*  The Shareholders resolved to have Storm:

1.    Take necessary action to fulfill the Arbitral Award.

2.    Establish three subsidiary enterprises of Storm to hold one share each of Kyivstar stock.

3.    Approve the charters of the three subsidiaries.

4.    Appoint the directors of the three subsidiaries.

5.    Transfer one share of Kyivstar to each subsidiary.

6.    Entrust the General Director of Storm and the directors of the subsidiaries: to nominate four candidates to the Kyivstar Board of Directors; to ensure that the candidates are elected to the Kyivstar Board; and to ensure that they attend all future meetings of the

Board and participate in good faith in the management and administration of Kyivstar.

7.    Appoint an authorized representative of Storm for the General Meeting of Kyivstar.

8.    Entrust S.M. Petrashevych to attend all future annual and extraordinary meetings of the shareholders of Kyivstar, as long as Storm remains a Kyivstar shareholder.

9.    Authorize measures to amend the Kyivstar Charter.

10.    Authorize the sale of Storm's Kyivstar shares within 120 days if Storm's affiliates did not divest their shares in Turkcell and UHT that exceed five percent.

11.    Refrain from court actions concerning any disputes or controversies under, relating to, or in connection with any obligations described in the SHA.

12.    Withdraw all actions, claims, complaints or injunctions initiated by Storm and related to the SHA, particularly, the claim in case No. 40/37.

65.    After receiving the proposed resolutions from Alpren and Hardlake, Mr. Klymenko obtained independent legal advice on the legality of complying with the Final Award from two Ukraine law professors, Professor Vasyl Norr and Professor Roman Maydanyk.  Klymenko Decl. ¶¶ 56-57.

66.    Both Professor Norr and Professor Maydanyk informed Mr. Klymenko that complying with the Final Award and executing the August 27 Resolutions would violate Ukraine law in light of, inter alia, the prior judgments issued by the Ukraine courts in Case No. 40/242, and subject him to civil and criminal sanctions.  Klymenko Decl. Exs. K-L.

67.     On August 27, 2007, Alpren and Hardlake held an Extraordinary General Meeting of Storm and discussed the twelve resolutions (the "August 27 Resolutions"). Klymenko Decl. Ex. M.

68.     At the request of Mr. Klymenko, Anna-Marta Khomyak, a Ukraine lawyer, attended the meeting and explained that Storm and Mr. Klymenko would risk civil and criminal sanctions if Storm executed the resolutions.  Klymenko Decl. Ex. M.

69.     Alpren and Hardlake nonetheless approved each resolution.  Klymenko Decl. Ex. M.

## VII.    THE KLYMENKO LITIGATION

70.     Based on the legal advice he had obtained, on September 3, 2007, Mr. Klymenko filed a claim in the Shevchenkivskiy District Court of Kyiv against Alpren and Hardlake, with Storm as a nominal party, to invalidate the August 27 Resolutions. Klymenko Decl. ¶ 64, Ex. N.

71.     On September 5, 2007, the Shevchenkivskiy District Court issued a temporary injunction prohibiting Mr. Klymenko from executing the August 27 Resolutions and scheduled a hearing for September 18, 2007.  Klymenko Decl. Ex. O. The hearing was adjourned until October 10, 2007, at the request of Alpren and Hardlake, which did not receive the statement of claim until just prior to the scheduled hearing. Rolfe Decl. Ex. 4.

72.     Alpren and Hardlake, each represented by its own counsel, defended the litigation.  Hardlake argued, among other things, that the SHA was valid, that Mr.

Klymenko was not a proper petitioner, and that the August 27 Resolutions were valid. Rolfe Decl. Ex. 5. Alpren filed an objection to the statement of claim, arguing that the Final Award was valid. *Id.* Ex. 6.

73.     On October 10, 2007, the Shevchenkivskiy District Court ruled that the August 27 Resolutions were invalid, based on the previous rulings from the Ukraine courts that the SHA is void under Ukraine law. Sills Decl. Ex. E.

74.     Hardlake appealed to the Kyiv Appellate Commercial Court. Rolfe Decl. Exs. 7-8.

75.     On January 15, 2008, the Appellate Commercial Court sustained the District Court's decision and dismissed the appeal. Rolfe Decl. Ex. 9.

76.     On February 8, 2008, Alpren filed a cassation appeal from the Appellate Court's dismissal. Rolfe Decl. Ex. 10. There has been no final decision from the Ukraine courts.

77.     Neither the Altimo Entities nor any person in any Alfa Group company instructed or advised Mr. Klymenko to bring the lawsuit. Musatov Tr. 62, 76-77; Klymenko Decl. ¶¶ 61-63. To the contrary, the evidence shows the Altimo Entities' opposition to the suit.

78.     When Mr. Klymenko decided to bring the suit challenging the August 27 Resolutions, he contacted Mr. Malis and informed him of his decision. Klymenko Tr. 128.

78.1.   Mr. Klymenko testified that when he told Mr. Malis of his intent to file the suit, Mr. Malis told Mr. Klymenko he believed Mr. Klymenko was acting improperly.  Klymenko Tr. 129.

78.2.   Mr. Malis testified that he believes Mr. Klymenko's lawsuit is not in the best interests of the Altimo Entities.  Malis Tr. 55-56.

79.     Lacking evidence of collusion, Telenor argues that the Altimo Entities should be held in contempt for the Klymenko Litigation because they did not fire Mr. Klymenko for filing the suit.  Rep. 14.  As discussed in the Proposed Conclusions of Law (*see infra* Proposed Conclusions of Law ¶¶ 8-12), the law does not support that as a justification for holding the Altimo Entities in contempt.

80.     The Altimo Entities did consider firing Mr. Klymenko because of the suit. Musatov Tr. 123.

81.     However, the Altimo Entities chose not to fire Mr. Klymenko because, in their view, any successor would face the same dilemma of not complying with the Final Award or violating Ukraine law.  Musatov Tr. 79, 123.  As Mr. Musatov testified, the Altimo Entities concluded that firing Mr. Klymenko to look for a replacement willing to violate Ukraine law was not a reasonable way to do business with its Ukraine subsidiary. Musatov Tr. 79.

82.     Moreover, as Mr. Klymenko testified, there is Ukraine legislation that protects him from being fired without cause, such as for refusing to violate Ukraine law. Klymenko Tr. 48-49.

82.1.   Contrary to Telenor's assertion that Mr. Malis testified that Mr. Klymenko could be "discharged at will" (Rep. 15), Mr. Malis testified that if Storm's assets diminished in value, "I think we will be firing him in the shortest period of time"—a termination relating to poor performance.  Malis Tr. 54.

83.    In December 2007, Altimo issued a press release stating, "Altimo has been clearly and persistently instructing Storm . . . to attend all shareholders' meetings convened for Kyivstar.  We recognize that, being a Ukrainian company, Storm has difficulties navigating between clear instructions from its shareholders and orders from the Ukrainian courts for fear of being found acting in contempt of court."  O'Driscoll Decl. Ex. A.

## VIII.   THE E.C. VENTURE LITIGATION

84.    E.C. Venture is a Swiss company and a former Storm shareholder.  In July 2004, E.C. Venture sold its 23.98467% interest in Storm to Alpren (the "2004 Sale Agreement") for $120 million.  Rolfe Decl. Ex. 13.  E.C. Venture now seeks to nullify the 2004 Sale Agreement and reclaim its interest in Storm, which is worth about $1 billion today.  (Kyivstar is worth between $9 and $10 billion (*see* Hearing Tr. 155), and E.C. Venture seeks to recover 23.98467% of Storm's 43.5% of Kyivstar (*see* Rolfe Decl. Ex. 13; Order 3).)

85.    On November 29, 2007, E.C. Venture filed its lawsuit in the Commercial Court of Kyiv Region against Alpren, naming Storm as an interested third party.  Rolfe Decl. Ex. 13.

85.1.  In its suit E.C. Venture claims, inter alia, that the civil code of Ukraine requires agreements to be executed in Ukrainian; that E.C. Venture executed the Sale Agreement under influence of mistake; and that E.C. Venture's representative exceeded its authority in executing the Sale Agreement.  Rolfe Decl. Ex. 13.

86.  With its statement of claim, E.C. Venture filed an application to freeze Storm's assets and to enjoin Storm from taking any action that might jeopardize its claim. Rolfe Decl. Ex. 14.

87.  The Kyiv Court granted E.C. Venture's application and issued a broad order calling for the seizure of all Storm assets and enjoining Storm officials from taking any action on behalf of Storm (the "E.C. Venture Order").  Didkovskiy Decl. Ex. X.

88.  The Kyiv Court issued the Order *ex parte* (Didkovskiy Decl. Ex. X), and scheduled a hearing on the merits for December 17, 2007.  Rolfe Decl. Ex. 15.

89.  None of the parties appeared on December 17, and the hearing was adjourned until January 28, 2008.  Rolfe Decl. Ex. 16.

90.  Although E.C. Venture's claim was reported in the press, the Altimo Entities did not respond to the claim until after they had received the court papers relating to the E.C. Venture Litigation in mid-January.  Musatov Tr. 153-54.

91.  On January 28, 2008, Alpren, Storm and E.C. Venture filed motions with the Kyiv Court.

92.     Alpren filed a motion to dismiss on the ground that Ukraine courts lack jurisdiction over the 2004 Sale Agreement, because it provides that New York is the exclusive jurisdiction for resolving disputes.  Rolfe Decl. Ex. 17.

93.     Storm filed a motion to lift the Kyiv Court's injunction on the basis that it violated the Commercial Procedure Code of Ukraine.  Klymenko Decl. Ex. S.  Storm also filed a motion arguing that E.C. Venture's claim was barred by the statute of limitations. Klymenko Decl. Ex. R.

94.     E.C. Venture filed a motion requesting a forensic examination of the Alpren signature on the 2004 Sale Agreement, claiming that it was signed by an unknown person.  Reply Didkovskiy Decl. Ex. I.

95.     Although there is no ruling in the record from the Kyiv Court on the various motions filed on January 28, 2008, Telenor contacted the Kyiv Court and was informed that the E.C. Venture case file had been sent to an expert for forensic examination.  Reply Didkovskiy Decl. ¶ 12.

96.     Although Telenor could have intervened in the E.C. Venture Litigation as an interested party under Ukraine law, it chose not to do so.  *See* Hearing Tr. 88-90.

97.     On March 10, 2008, Credit Suisse informed the Altimo Entities that the E.C. Venture Litigation constitutes an event of default under a $750 million credit facility between Alpren and Hardlake and Credit Suisse, which is guaranteed by Altimo.  Credit Suisse agreed to waive any event of default if the Altimo Entities agreed to, inter alia, prepay $200 million of the loan on or before March 28, 2008.  (March 10, 2008 Letter

from Irina Borisova, Vice President Credit Suisse, London Branch, to Franz Wolf; *see also* Musatov Tr. 159-60.)  The Altimo Entities have paid off $200 million, and must pay the rest of the loan ($550 million) by the end of April 2008.

98.     The E.C. Venture Litigation and Credit Suisse default could also trigger a cross-default provision in a $2 billion credit facility between Altimo and Deutsche Bank. Musatov Tr. 234-35.

99.     Prior to the March 10, 2008 letter, Altimo had told Credit Suisse that it believes E.C. Venture's claim is "baseless" and should be dismissed.  O'Driscoll Decl. Ex. L.  Telenor, which argues that E.C. Venture's claims are baseless, makes much of the fact that Altimo also questions the merits.  Rep. 11; Hearing Tr. 62.  Whatever Altimo's view of the merits, the Kyiv Court entered a sweeping injunction, which has not been lifted and thus must be obeyed.

100.    Despite the fact that Alpren is defending the suit and the E.C. Venture Order is causing obvious difficulties for the Altimo Entities, Telenor argues that the E.C. Venture Litigation "has all the hallmarks of the collusive litigation by Storm and its affiliates".  Rep. 4.

> 100.1.  To support its argument, Telenor cites (i) the testimony of Trond Moe that Vladimir Jmak, a Kyivstar executive, told him that Vladimir Kishenin had told Mr. Jmak that E.C. Venture had been sold to the Alfa Group, (ii) documents submitted by E.C. Venture with its statement of claim that allegedly could have come "only" from Storm or Alpren, (iii) its own assertion that there is "no other

explanation" for the suit, and (iv) the "course of proceedings", which allegedly show collusion.  Tel. 6, 9; Rep. 4-5, n.7.

101.    Without the testimony of Telenor executive Trond Moe, which is double hearsay and directly contradicted by the declaration of Vladimir Jmak, there is no support for Telenor's allegation that any Alfa Group company owns or controls E.C. Venture.

102.    Mr. Moe stated in his declaration that Mr. Jmak, a Kyivstar executive, said that he had spoken to Vladimir Kishenin, the former owner of E.C. Venture, and Mr. Kishenin had told him that "representatives of the Alfa Group Consortium . . . had approached Mr. Kishenin recently, offering to buy E.C. Venture".  Moe Decl. ¶ 5.  Mr. Moe further stated that Mr. Jmak had told him that, "because the price offered by the Alfa Group was attractive and E.C. Venture had no assets, Mr. Kishenin saw no reason not to sell E.C. Venture to the Alfa Group and later did so".  *Id.*  Mr. Moe concluded that, based on his conversation with Mr. Jmak and the E.C. Venture Order, he had "no doubt" that E.C. Venture is owned and controlled by the Alfa Group.  *Id.*

103.    Mr. Jmak was given a copy of Mr. Moe's declaration and declared that Mr. Moe's description of the December 20 conversation is inaccurate.  Jmak Decl. ¶ 2. In fact, Mr. Jmak explicitly denies telling Mr. Moe that Mr. Kishenin had told him that Alfa representatives had offered to buy E.C. Venture.  *Id.* ¶ 9.  Mr. Jmak also stated in his declaration that he had not spoken to Mr. Kishenin in more than a year, and he told Mr. Moe that.  *Id.* ¶ 8.

104.    Email correspondence between Mr. Moe and Mr. Jmak shows only that the two had a conversation on December 20 about whether the authority of Kyivstar's

director general had been suspended as a result of the E.C. Venture Order (Jmak Decl. Ex. A), a topic on which Mr. Jmak would have first-hand knowledge as a Kyivstar executive.

105.    At his deposition, Mr. Moe testified that his conversation with Mr. Jmak on December 20, 2007, lasted only 89 seconds, and was the sole basis for his declaration that he had "no doubt" that the Alfa Group had bought E.C. Venture.  Moe Tr. 35-36, 65-66, 70.

106.    Mr. Moe also testified that he had a second phone conversation with Mr. Jmak on January 25, 2008, concerning Mr. Moe's declaration.  Mr. Moe testified that Mr. Jmak told him "you should have warned me" about filing the declaration, and that Mr. Jmak said that now he will have problems with Alfa representatives, who were waiting in Mr. Jmak's office.  Moe Tr. 58.  Mr. Moe further testified that Mr. Jmak said that he would deny giving Mr. Moe the "information".  *Id.* 59.

107.    Telenor claims that Mr. Moe's testimony about the December 20 conversation and the January 25 conversation is corroborated by one email sent "almost immediately" after each conversation.  Rep. 5 n.8.  The December 20 email is from Mr. Moe to, among others, Oleksiy Didkovskiy, Telenor's outside Ukraine lawyer, and states:

> "Vladimir Jmak in Kyivstar just called me about this issue.  He had also read the articles and since he knows the owner of EC Venture Capital (from the old Storm days), he had called him to check about it.  The former owner of EC Venture Capital (Vladimir gave me the name on the phone, but if necessary I can get it in writing), told him that Alfa guys approached him a month ago and offered to buy his company.  Since this company was completely empty, and they offered a good price, he saw no reason to not sell it.  So we

can confirm that this company is now owned by Alfa, *which just confirms what Oleksiy informed.*

I think we should inform interested journalists that this is indeed just another collusive action by Alfa. . ."  Reply O'Driscoll Decl. Ex. H (emphasis added).

108.    Mr. Moe sent his email in response to an email from Mr. Didkovskiy. Reply O'Driscoll Decl. Ex. H.  Telenor redacted Mr. Didkovskiy's email as privileged. At the hearing, counsel for the Altimo Entities questioned Mr. Didkovskiy about the December 20 email, and what he had "informed" Mr. Moe about the Alfa Group and the E.C. Venture Litigation prior to the conversation with Mr. Jmak.  Hearing Tr. 27-29.

108.1.  Mr. Didkovskiy initially answered that he did not "inform" anyone at Telenor that E.C. Venture was owned by an Alfa company, but then acknowledged that "we discussed this with Mr. Moe". Hearing Tr. 28.

108.2.  Mr. Didkovskiy denied that he had had a conversation with Mr. Moe regarding ownership of E.C. Venture *prior* to Mr. Moe's discussion with Mr. Jmak referenced in the email.  Hearing Tr. 28.

109.    The January 25 email is from Mr. Moe to Bjorn Hogstad, Telenor's inside counsel.  In the email, Mr. Moe stated that Mr. Jmak had just called on his way to the office where Alfa representatives were waiting to ask him what he had told Mr. Moe. Reply O'Driscoll Decl. Ex. I.  Mr. Moe further stated that Mr. Jmak said "he would deny having told me about this".  *Id.*

109.1.  As the Altimo Entities point out (Supp. Altimo 1 n.2), both emails from Mr. Moe are self-serving.  The December 20 email was sent about a month before Telenor filed the contempt motion and after Telenor had indicated it was considering doing so.  Sills Decl. Ex. M.  The January 25 email was sent three days after Telenor had filed the motion.

109.2.  In addition, the December 20 email shows motive by Mr. Moe to fabricate—Telenor wanting to issue press releases implicating Alfa Group in "another collusive" litigation to harm Telenor.  *See* Reply O'Driscoll Decl. Ex. H.

110.    The Altimo Entities provided testimony (also hearsay), directly contrary to Mr. Moe's testimony, that Mr. Kishenin had in fact sold E.C. Venture to one Konstantin Shadryn, who acknowledges that he filed the E.C. Venture Litigation to get money from Altimo.

111.    Mr. Musatov testified that during a January 30, 2008, phone call Mr. Kishenin told Altimo and Altimo's counsel that he sold E.C. Venture to Mr. Shadryn, who has no affiliation with Altimo or any Alfa Group company.  Musatov Tr. 145-48, 235-36.

112.    Mr. Malis testified at length about his conversation with Mr. Kishenin, and about his telephone conversation and meeting with Mr. Shadryn.  Malis Tr. 66-68, 71-73, 78-81.

112.1.  Mr. Kishenin told Mr. Malis he had not spoken to Mr. Jmak in "more than two years".  Malis Tr. 79.  Mr. Jmak told Mr. Malis that he had not spoken to Mr. Kishenin for several years.  *Id.* 84.

112.2.  Mr. Shadryn confirmed to Mr. Malis that he owned E.C. Venture, that he initiated the suit and that he would withdraw the suit for money.  Malis Tr. 67-68.

112.3.  Mr. Shadryn was aware that the suit threatened the $750 million credit facility with Credit Suisse and the instant litigation.  Mr. Shadryn demanded $500 million, and Mr. Malis refused.  Malis Tr. 67-68, 73.

113.    In sum, there is no direct credible evidence that the Alfa Group owns or controls E.C. Venture.

114.    Nor is there circumstantial evidence of any involvement by the Altimo Entities in the filing of the E.C. Venture Litigation—E.C. Venture did not submit documents with its claim that could have come *only* from Storm, Alpren or their attorneys.

115.    When E.C. Venture filed its claim, it submitted documents, including certified copies of Ukraine court decisions and copies of the passport of Oleksiy Melnyk, a Ukraine lawyer, and a power of attorney issued by Alpren for Mr. Melnyk.  These documents could conceivably have come from Storm, Alpren or their attorneys.

28

115.1.  At the hearing, the focus was on the court decisions in Case No. 40/242.

115.2.  The court stamps on the certified copies of the decisions in Case No. 40/242 submitted by E.C. Venture and the court stamps on the certified copies of the decisions in the possession of Storm appear to be in the same place.  Hearing Tr. 50-51, 108-109.

116.    There is no evidence in the record as to how or from whom E.C. Venture obtained the documents or why E.C. Venture submitted the documents with its claim.

117.    Mr. Didkovskiy, Telenor's witness on the E.C. Venture exhibits, testified that he does not know how E.C. Venture got the documents (Hearing Tr. 15) and does not know why E.C. Venture submitted the documents with its statement of claim (*id.* 18).

118.    Mr. Didkovskiy conceded that Telenor itself had certified copies of the court decisions in Case No. 40/242.  Hearing Tr. 18-19.

119.    Mr. Didkovskiy acknowledged that an "interested party", not just a party to the action, but a party with a legitimate interest in the proceedings, can obtain certified copies of court decisions from the court clerk in Ukraine.  Hearing Tr. 24.  It is also "not uncommon" for people to gain access to court files and to obtain court documents and decisions from the clerk even if they are not an interested party, though it is against Ukraine procedure.  *Id.* 25.

120.    Indeed, there are a number of sources, including several Ukraine court files, from which E.C. Venture could have obtained copies of the court decisions that appear identical to copies in the possession of Storm.

120.1.    Copies of the April and May decisions from Case No. 40/242, with the court stamps in the same place as the court stamps on the E.C. Venture exhibits, are on file with the Pechersk State Enforcement Service in the case file for Case No. 2/105, the suit Alpren filed in 2006 against Kyivstar and Ernst & Young.  Supp. Khomyak Decl. ¶ 4;[*] *compare id.* Ex. A (copy from case file for Case No. 2/105) *with id.* Ex. B (copy from E.C. Litigation case file).

120.2.    Copies of the April and May 2006 decisions from Case No. 40/242, with the court stamps in the same place as the court stamps on the E.C. Venture exhibits, are on file with the Golosiyivsky District Court in the case file for Case No. 2-5613/06, the suit Alpren filed in 2006 seeking to enjoin Mr. Klymenko, Storm and Telenor from participating in the Arbitration.  Lefor Decl. ¶¶ 3-4; *compare id.* Ex. A (copy from Case No. 2-5613/06) *with* Supp. Khomyak Decl. Ex. B (copy from E.C. Venture Litigation case file).  Telenor itself had access to that file and in fact "reviewed the case file" in March 2007.  Mar. 12, 2007 Didkovskiy Decl. ¶ 10.

_____

[*] These declarations were submitted after the close of the evidence.  The Court concludes even without them that the evidence is insufficient to find that the E.C. Venture exhibits could

120.3.   Copies of the April and May 2006 decisions from Case No.
40/242, with the court stamps in the same place as the court stamps
on the E.C. Venture exhibits, were also distributed to the Ukraine
press.  Krasnenkova Decl. *¶¶ 2-3; compare id.* Ex. A (copy
distributed to press) *with* Supp. Khomyak Decl. Ex. B. (copy from
E.C. Venture Litigation case file).

121.    As to the Melnyk documents, Mr. Melnyk represented Alpren in the
Klymenko Litigation, and that fact was made public in the October 10, 2007 decision.
*See* Sills Decl. Ex. E.  Presumably copies of Mr. Melnyk's passport and the power of
attorney were in the case file and could have been obtained through the clerk's office.
*See* Hearing Tr. 24-25.  There is no evidence that E.C. Venture got the Melnyk
documents from Alpren or Storm.

122.    Finally, contrary to Telenor's allegations (Rep. 4-5), there is a plausible
explanation for the E.C. Venture Litigation, and the "course of proceedings" does not
evidence collusion.

122.1.   This Court notes that E.C. Venture is seeking to recover a
23.98467% interest in Storm—not a less than 6% interest as
Telenor suggests (Tel. 6)—worth $1 billion as against the $120
million sale price.  *See supra* Proposed Findings of Fact ¶ 84.

---

"only" have come from Storm or Alpren.  Nonetheless, in light of the presentation of Telenor's
counsel at the hearing, the Court accepts them as part of the record.

122.2.   Moreover, as Mr. Malis' testimony shows, another explanation for the suit is simple: it is an attempt to extort a payment from Altimo. Malis Tr. 67-68, 73.

122.3.   As to the "course of proceedings", Telenor makes much of the fact that Alpren did not present its defense until January 28, 2008—five days after Telenor filed its contempt motion arguing that Alpren had failed to defend itself.  However, the January 28 date was set by the Kyiv Court on December 17 (Rolfe Decl. Ex. 16), long before Telenor filed its motion.

122.4.   Because the Altimo Entities are actively defending the E.C. Venture litigation, Telenor's only theory of collusion requires an inference that the Ukraine courts gave a "wink and a nod" to the alleged collusion.  Hearing Tr. 60.  Telenor offers no evidence that would support such an inference.

122.5.   Although the E.C. Venture Order is broad, there is no evidence that the Kyiv Court acted improperly in granting E.C. Venture's request for an injunction.

122.6.   Nor is there any evidence that the Kyiv Court acted improperly in granting E.C. Venture's request for a forensic examination of the Alpren signature, or that Alpren was given the opportunity to object to the request.

32

IX.    **THE DIVESTITURE TRANSACTIONS**

    A.    **The Astelit Transaction**

    123.    The Tribunal concluded that Storm breached the non-compete provisions of the SHA when "Alfa acquired a 13.2 percent interest in Turkcell, a wireless mobile telecommunications company which maintains a majority stake in Astelit, LLC, a wireless telecommunications operator that describes itself as a 'pioneering digital communications technology and service provider' in Ukraine".  Final Award 59.

    124.    Telenor argues that the Final Award should be read literally to require a Storm affiliate to divest any interest over 5% of Turkcell based on one sentence in the Final Award that refers to "Turkcell" without mentioning Astelit.  In paragraph 4 of the decretal section, the Tribunal orders Storm to sell its Kyivstar shares unless "Storm and any affiliated entities divest their holdings in Turkcell and Ukrainian High Technologies that exceed five percent".  Final Award 67.  The Court concludes, however, that Astelit, not Turkcell, is the relevant company for purposes of the non-compete provisions of the SHA and the divestiture requirements.  Such a reading would fulfill the underlying purpose of the SHA—to eliminate management control and economic benefit above 5% of the competing Ukrainian telecom entity.

    125.    The Final Award is based on the SHA.  The SHA limits to 5% Storm's and Telenor's ownership of companies "engaged in the Business in any region in Ukraine".  SHA § 6.02.  The SHA defines the "Business" as "the wireless mobile telecommunications business".  SHA § 1.01.  The non-compete clause of the SHA provides that:

"[N]o Shareholder or any of its Affiliates will, without the prior written consent of the Company and the other Shareholders (i) engage in the Business in any region in Ukraine, (ii) own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than [Kyivstar] or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine or (iii) permit any of its Controlled Affiliates (other than [Kyivstar] or any of its Controlled Affiliates) to engage in the Business in any region in Ukraine or own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than [Kyivstar] or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine."  SHA § 6.02.

126.    Astelit is a "mobile telecommunications operator" in Ukraine, and is described as such in the Final Award.  *See* Final Award 59.

127.    As Telenor has conceded, Turkcell operates in Turkey, not Ukraine.  Hearing Tr. 139.  It is not "engaged" in the "Business" in Ukraine.

128.    This Court has previously recognized that the non-compete clause implicates Ukraine telecommunications companies.  *See* Order 14 ("The Tribunal also found that Storm had breached the Agreement's non-compete clause when Storm's affiliates, Alfa and Russian Technologies, acquired an interest in competing *Ukrainian* telecommunications companies.") (emphasis added).

129.    Telenor itself has recognized Astelit as the relevant company.  In Telenor's Proposed Findings of Fact and Conclusions of Law submitted to the Tribunal, "Astelit", not "Turkcell", is the title of the section discussing AFH's offending interest.  In that section, Telenor describes Astelit as a "pioneering digital communications technology and service provider in Ukraine" and provides details about Astelit's subscriber base.  Aug. 30, 2007 Sills Decl. Ex. B, ¶ 31.

130.    There is no evidence in the record as to what percentage of Turkcell's revenue comes from Astelit.   At the hearing, counsel said 3% (the Altimo Entities) and 10% (Telenor).  Hearing Tr. 139.  Whatever the percentage, it would not change the Court's conclusion that the SHA does not reach Turkcell.

131.    At the time of the Final Award, AFH, through Alfa Telecom Turkey Limited ("ATTL"), indirectly owned a 13.2% stake in Turkcell and a 7.272% stake in Astelit.  Final Award 59.

132.    Following the issuance of the Final Award, AFH executed a transaction with Nadash International Holdings Inc. ("Nadash"), to cut its interest in Astelit to the 5% threshold allowed by the SHA (the "Astelit Transaction").

133.    The Astelit Transaction was specifically designed to comply with the non-compete provisions of Final Award and this Court's Order.  Parden Decl. ¶ 4; Kim Decl. ¶ 8; Musatov Tr. 195.

134.    AFH divested 50% of ATTL, so that AFH's indirect voting interest in Astelit was cut to 3.636%, and ATTL is no longer an "Affiliate" or "Controlled Affiliate" for purposes of the SHA.  Parden Decl. ¶¶ 23, 26.

135.    AFH also eliminated its economic interest in Astelit above 5% as required, by transferring a 2.272% economic interest in Astelit (including any dividend distributed by Astelit) to Nadash.  Parden Decl. ¶¶ 23, 26.  AFH, through ATTL, is entitled to the remaining 5% economic interest in Astelit.  *Id*. ¶ 23.

136.    Telenor argues that the $20 million price paid by Nadash shows that the sale was not a "real" sale because AFH's interest in Turkcell was worth approximately $1.6 billion on the date of the transaction.  Tel. 11.  The $20 million purchase price paid by Nadash reflects the value of the 2.272% economic interest in Astelit, the relevant company, that was transferred to Nadash.  Parden Decl. ¶ 26; Kim Decl. ¶ 15.

137.    Telenor claims further evidence that the transaction was a "sham" sale is the fact that AFH has the right to "repurchase the purportedly transferred shares" by exercising a call option.  Tel. 10.

138.    AFH indeed has the right to repurchase the ATTL shares by exercising a call option under certain circumstances.  Kim Decl. ¶ 16; Parden Decl. ¶ 17.  Nadash has a parallel put option.  Kim Decl. ¶ 16; Parden Decl. ¶¶ 18-19.

138.1.  AFH may exercise the call option if AFH "determin[es] in its sole discretion that the exercise and completion of the Call Option shall not violate the Kyivstar Shareholders Agreement".  Kim Decl. Ex. A at 2.

138.2.  The call option allows AFH to reverse the transaction in the event that the Court of Appeals reverses this Court's Order or Telenor and Storm resolve their dispute.  Parden Decl. ¶ 17.

138.3.  The call option is set at a price based upon the then-market prices of various specified publicly traded telecoms.  Parden Decl. ¶ 22.

138.4.  Nadash may exercise the put option only if it provides AFH with a legal opinion from a leading international law firm that exercising the option would not violate the SHA.  Kim Decl. ¶ 16; Parden Decl. ¶ 18.

139.    Subject to the put and call options, Nadash may not transfer the ATTL shares for two years.  After two years, Nadash has the ability to transfer the shares to a third party.  Kim Decl. ¶ 17; Parden Decl. ¶ 19.  If Nadash exercises its right to do so, AFH must use reasonable efforts to find a buyer within six months that is not affiliated with Alfa.  Kim Decl. ¶ 17; Parden Decl. ¶ 19.

140.    To facilitate the potential exercise of the put and call options, Nadash's shares are held by an escrow agent.  Kim Decl. ¶ 10; Parden Decl. ¶ 20.  Although the escrow agent holds legal title to the shares, Nadash beneficially owns them.  Kim Decl. ¶ 10; Parden Decl. ¶ 21.

141.    Telenor argues (Rep. 7) that AFH "never intended to sell its interest either in Turkcell or Astelite [sic]" and cites to a November 8, 2007, email from Mr. Musatov to an investment banker at Deutsche Bank.  Reply O'Driscoll Decl. Ex. J.

141.1.  That email concerns a deal that never happened, and thus it is not relevant.  The executed documents for the Astelit Transaction show that AFH has sold its interest in Astelit in excess of 5%.

141.2.  Moreover, the email does not evidence any bad intent or that AFH never intended to sell its interest in Astelit above 5%.  As reflected

37

in the email, Mr. Musatov thought that the transaction proposed by
Deutsche Bank was too complicated.  Mr. Musatov explained at
his deposition that "ABC's for you [the bankers] and Chinese for
Lynch" was expressing that Telenor would challenge this deal, and
Altimo wanted to avoid complicated investment banker structures
so that it would be clear the sale complies with the Final Award.
Musatov Tr. 213-17.

### B.    The UHT Transaction

142.    Russian Technologies Limited ("RT") completed a transaction in response
to the Tribunal's conclusion that Storm had breached the non-compete clause when RT
acquired an interest in Ukrainian High Technologies ("UHT"), a Ukraine
telecommunications company.  Final Award 59-60.

143.    RT is owned by Alfa Group affiliate CTF Holdings Limited (80%) and
Intec Holdings Limited ("Intec") (20%).  Musatov Decl. ¶ 26.

144.    When Altimo approached RT about the divestment, RT was already
negotiating with several potential purchasers and investors interested in UHT.  Musatov
Tr. 180-81.

145.    With those negotiations pending, RT approached Mikhail Gamzin, RT's
Managing Partner and a member of the Alfa Group Consortium Supervisory Board, who
beneficially owns Intec.  Musatov Decl. ¶¶ 27, 29-30.

145.1.  The eleven-member Alfa Group Supervisory Board represents the interests of the three main shareholders of the Alfa Group.  Mr. Gamzin is not one of the main shareholders, and his only interest is 20% of RT, held by Intec.  Musatov Decl. ¶¶ 26, 29.

146.    On November 29, 2007, RT and Baltone, a wholly-owned subsidiary of Intec, executed a share purchase agreement for the sale of RT's interest in UHT. Musatov Decl. Ex. 21; Musatov Tr. 178.  Alexey Kousmichoff, the Chairman of RT's Board, negotiated the transaction on behalf of RT.  Musatov Tr. 179-80.

147.    The agreed purchase price was $40 million, the best offer RT had received from any potential purchaser in the negotiations that took place before RT approached Mr. Gamzin.  Musatov Tr. 179-82.

148.    Because Baltone lacked sufficient funds for the purchase price, RT agreed that Baltone could pay by a promissory note accruing interest at 7% per annum, payable by the end of 2010.  Musatov Decl. ¶ 30.

149.    A pre-existing shareholders agreement between RT and Intel Capital Corporation ("Intel Capital"), which owns 20% of UHT, provides Intel Capital certain rights in the event RT sells its interest in UHT.  Musatov Decl. ¶ 32, Ex. 22.  Before selling its interest in UHT to RT, the shareholders agreement required RT to provide Intel Capital with a right of first refusal and a co-sale right.  *Id.*  The right of first refusal allowed Intel Capital to purchase the shares for cash at the fair market value of the promissory note offered to Baltone.  Musatov Decl. Ex. 22, § 11.2 (e).  The co-sale right allowed Intel Capital to sell its shares "for the same consideration and on the same terms

and conditions" offered to Baltone.  *Id.* § 11.3 (c).  On February 11, 2008, Intel Capital

executed a waiver of both rights.  Musatov Decl. ¶ 33, Ex. 23.

150.    Noting that Baltone purchased RT's interest in UHT using a non-recourse

promissory note (rather than cash outright), Telenor contends the deal employed a

"sweetheart structure" with a purchase price that was "too high" and that RT sold its

interest to Intec "for the right to receive whatever the company [UHT] was worth three

years hence or to recoup the shares which is their only remedy".  Hearing Tr. 142.

However, Telenor misapprehends both the terms of the divestiture and the nature of Intel

Capital's co-sale right.  First, the promissory note was for $40 million accruing interest at

7% per annum, payable by the end of 2010—UHT's market value in 2010 was irrelevant

to the value of the promissory note.  Second, there is no evidence that $40 million with a

promissory note was "too high".  If it was, one would have expected Intel Capital, a

company with no tie to Intec or any Alfa Group company, to exercise its co-sale right and

force RT to buy its shares "for the same consideration and on the same terms and

conditions" offered to Baltone if Baltone refused to buy those shares itself on the same

terms.  Musatov Decl. Ex. 22, § 11.3 (c).  Intel Capital waived that right.

151.    It is possible that Telenor means to suggest that the $40-million purchase

price was intentionally set "too high" to dissuade Intel Capital from exercising its right of

first refusal, but Intec was permitted to purchase the shares using a promissory note (with

a present value significantly less than $40 million cash).  This argument also makes no

sense.  In exercising its right of first refusal, Intel Capital would not have been obligated

to pay the same per-share price in cash that Intec paid through a promissory note.  Rather,

Intel Capital's per-share purchase price would have been the "fair market value" of the

per-share value of the Intec deal—promissory note and all.  Musatov Decl. Ex. 22, § 11.2 (e).

152.    As discussed in the Proposed Conclusions of Law (*see infra* Proposed Conclusions of Law ¶¶ 26-34), neither Mr. Gamzin nor his wholly-owned companies control any Alfa Group company within the meaning of the SHA definition of Affiliate.

152.1.  Mr. Gamzin's membership on the eleven-person Alfa Group Supervisory Board confers on him no ownership interest, and does not give Mr. Gamzin the power to control any Alfa Group company.  *See* Musatov Decl. ¶ 29.

152.2.  Nor does that membership give Alfa Group any right to direct Mr. Gamzin's personal companies, including Intec and its subsidiaries.

152.3.  Intec owns only 20% of RT, and thus does not control RT. Although Telenor originally invoked the fact that Intec was part of a joint venture in the sugar business with Alfa Group (Tel. 12), it failed to note that that relationship ended in September 2002. Neither Intec nor Baltone has any relationship with any Alfa Group company.  *See* Musatov Decl. ¶¶ 25, 28.

## PROPOSED CONCLUSIONS OF LAW

**I.    TELENOR HAS FAILED TO SHOW THAT STORM IS IN CONTEMPT, AND THUS THE ALTIMO ENTITIES CANNOT BE HELD IN CONTEMPT**

1.    This Court concludes that Storm cannot be held in contempt, because it is unable to comply with the Order.  *See* Storm's Proposed Findings of Fact and Conclusions of Law, Section I.

2.    No theory of law permits a nonparty to be held in contempt if the party to the injunction is not itself in contempt.  "[T]he only occasion when a person not a party may be punished, is when he has helped bring about, not merely what the decree has forbidden . . . but what it has the power to forbid, an act of a party."  *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930).  If the party to the injunction has not violated it, "the decree has not been disobeyed", and thus no one can be held in contempt.  *Id.*

3.    Because Storm cannot be held in contempt on this record, the Altimo Entities cannot be held in contempt.  *See, e.g.*, *Paramount Pictures Corp. v. Carol Pub. Group, Inc.*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) (primary contempt violation required for nonparty to be liable).

4.    Even if this Court were to find Storm in contempt, the Altimo Entities cannot be held in contempt.

**II.    TELENOR HAS FAILED TO SHOW THAT THE ALTIMO ENTITIES ACTED IN "ACTIVE CONCERT" WITH STORM TO VIOLATE THE ORDER**

5.    To hold a nonparty liable for contempt, a movant must present clear and convincing evidence that the nonparty acted in "active concert" with the enjoined party in evading the order.  Fed. R. Civ. P. 65(d); *Levin v. Tiber Holding Corp.*, 277 F.3d 243,

250 (2d Cir. 2002); *Alemite Mfg. Corp.*, 42 F.2d at 832 ("a person who knowingly assists

a defendant in violating an injunction subjects himself to civil . . . proceedings for

contempt"); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112

(1969) (non-party parent not properly enjoined when no separate determination was made

that parent was in active concert with wholly-owned subsidiary).

### A.    There Is No Evidence of Collusion as to the Corporate Governance Provisions

6.    Telenor has neither alleged nor offered proof of any action taken by the

Altimo Entities to violate the corporate governance provisions of the Final Award.

      6.1.    To the contrary, the evidence shows that after the Final Award was

issued Alpren and Hardlake instructed Storm to comply with the

Final Award, although they recognized the risk that compliance

could violate Ukraine law.  *See supra* Proposed Findings of Fact ¶¶

63-64.

### B.    There Is No Evidence of Collusion as to the Klymenko Litigation

7.    Telenor has not offered evidence of collusion as to the Klymenko

Litigation.

      7.1.    It is undisputed that Mr. Klymenko filed the suit to invalidate the

August 27 Resolutions passed by Alpren and Hardlake on the basis

of independent legal advice he obtained.  *See supra* Proposed

Findings of Fact ¶ 70.

7.2.    It is undisputed that Alpren and Hardlake are defending against the litigation.  *See supra* Proposed Findings of Fact ¶¶ 72-76.

7.3.    There is no evidence that the Altimo Entities instructed Mr. Klymenko to file the suit.  *See supra* Proposed Findings of Fact ¶¶ 77-78.

8.    Telenor's only argument that the Altimo Entities acted "in concert" with Storm as to the Klymenko Litigation is that the Altimo Entities did not fire Mr. Klymenko when he filed the suit.  Rep. 14.

9.    The cases Telenor cites do not support this argument in support of a contempt finding.  Nor do they support Telenor's suggestion that shareholders of a corporation "are bound in the same way as the directors and officers of that corporation".  Hearing Tr. 151.  Indeed, Telenor cites no case in which a court has held a parent company in contempt, because that parent was in "active concert" with a subsidiary by failing to act.

10.    *Electrical Workers Pension Trust Fund v. Gary's Electric Service Co.*, 340 F.3d 373 (6th Cir. 2003) (cited at Rep. 14), involved a collective bargaining dispute between a union pension trust fund and Gary's Electric Service ("Gary's").  The Sixth Circuit held that the owner and sole shareholder of Gary's could be held in contempt based on his role as an officer (president) of the enjoined corporation, placing him well within the purview of Fed. R. Civ. P. 65(d).  The Court conducted no analysis of the "active concert" standard that applies here.

10.1.    In May 1999, the district court confirmed an arbitral award in favor

of the union pension trust fund.  *Id*. at 376.  By mid-November

1999, Gary's had closed down.  *Id*. at 377, n.5.  The trust fund filed

a motion for contempt, which the district court temporarily

disposed of by ordering Gary's to take certain actions.  *Id*. at 377.

In December 2000, the trust fund sought re-hearing on its contempt

motion, and alleged that Pipia had wasted corporate assets to avoid

making the court-ordered payments by, inter alia, tripling his

salary; taking bonuses and loans from Gary's; and paying all

creditors except for the trust fund.  *Id*. at 377, 384.  The district

court found Gary's in contempt but refused to hold Pipia in

contempt because "he was not an actual defendant in the action".

*Id*. at 375.  The Sixth Circuit held that Pipia, as an officer of the

corporation and the one responsible for its affairs, was subject to

the confirmation order just as the corporation was itself.  *Id*. at 382.

Because Pipia either "prevent[ed] compliance or fail[ed] to take

appropriate action within [his] power for the performance of the

corporate duty", Pipia could be held in contempt.  *Id*.

11.    In *United States v. City of Yonkers*, 856 F.2d 444, 458 (2d Cir. 1988)

(cited at Rep. 14), the contemnor city was a party to the consent decree that was the basis

of the contempt proceeding.  The court found that, "for purposes of taking official

governmental action, the City of Yonkers is the City Council and vice versa", and

emphasized that "[t]he City bound itself to take necessary legislative action when it

45

agreed to the Consent Judgment . . . .  Having made that commitment, the City may

properly be subjected to the coercive force of civil contempt sanctions until compliance

with its commitment occurs."  *Id.* at 458.  Thus, *Yonkers* does not stand for Telenor's

offered proposition that a *non-party's* failure to remove the officer of a party bound by a

court order constitutes "acting in concert" for purposes of contempt.  Rather, it stands for

the proposition that a *party* must do "everything it can. . . to obtain compliance with the

orders of the District Court", which, in *Yonkers*, included contacting the Governor to

request that he remove local officials for misconduct.  *Id.  See also Spallone v. United

States*, 493 U.S. 265, 275 (1990) (reversing *Yonkers* in part and noting that the city was a

party to the action from the beginning).

12.     Because Telenor has offered no proof of active concert, and no legal

authority for its "failure to act" theory, this Court will not hold a nonparty parent

company in contempt for failing to fire an executive of its foreign subsidiary for refusing

to violate the law of its jurisdiction.  Thus, this Court concludes that the Altimo Entities

cannot be held in contempt based on the Klymenko Litigation.

### C.     There Is No Evidence that the Altimo Entities Initiated or Assisted the E.C. Venture Litigation

13.     There is no credible evidence that Alpren or any Alfa Group entity owns

or controls E.C. Venture or initiated or participated in the prosecution of the E.C. Venture

Litigation.  To the contrary, the record shows that the E.C. Venture litigation is contrary

to the Altimo Entities' interest, and that Alpren is defending the lawsuit, and attempting

to vacate the injunction.  *See supra* Proposed Findings of Fact ¶¶ 97-98.

14.    The double hearsay testimony of Mr. Moe does not provide an evidentiary basis for Telenor's allegations, especially when contradicted by other hearsay testimony. *See supra* Proposed Findings of Fact ¶¶ 101-109.

14.1.    Even if the Court admitted the hearsay evidence offered by both sides on the issue of who owns E.C. Venture, this Court's ruling—that there is no factual basis to conclude that Storm or the Altimo Entities own or control E.C. Venture or initiated the E.C. Venture Lawsuit—would not change.

14.2.    In the context of the surrounding circumstances, the Court finds the testimony of Mr. Jmak, Mr. Musatov and Mr. Malis to be more credible than the testimony of Mr. Moe. *See supra* Proposed Findings of Fact ¶¶ 110-12.

15.    Likewise, the record does not support Telenor's contention that E.C. Venture submitted documents with its statement of claim that could have come *only* from Storm, Alpren or their attorneys. *See supra* Proposed Findings of Fact ¶¶ 114-21.

16.    Telenor's argument that there is "no other explanation" for the E.C. Venture suit other than that the Altimo Entities orchestrated it is not sufficient. Telenor must provide concrete—clear and convincing—evidence. *See Latino Officers Ass'n City of New York v. City of New York*, 519 F. Supp. 2d 438, 443 (S.D.N.Y. 2007) ("[T]o prevail on a civil contempt motion, . . . proof of noncompliance [must be] clear and convincing."). Moreover, the "no other explanation" argument fails on the facts. *See supra* Proposed Findings of Fact ¶ 122.

17.    As to the "course of proceedings", it is undisputed that Alpren did not receive the papers relating to the E.C. Venture Litigation until the middle of January.  *See supra* Proposed Findings of Fact ¶¶ 90, 122.  This Court can draw no inference of collusion based on when Alpren submitted its defense, the strength of E.C. Venture's claims, or the decision of the Kyiv Commercial Court to issue the E.C. Venture Order or grant E.C. Venture's motion for forensic examination.

17.1.    Telenor's assertion at the hearing that the Ukraine court was involved in a "wink and nod" charade (*see supra* Proposed Findings of Fact ¶ 122) is unsupported.  Our Court of Appeals has been "reluctant to find foreign courts 'corrupt' or 'biased'" in the absence of substantial evidentiary submissions.  *In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz Of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002) (refusing to find Ukraine court inadequate alternative forum for arbitration parties).  Here, as concluded by the Tribunal and this Court previously, there is no evidence that the Ukraine courts are in any way acting improperly.  Final Award 25; Order 26.

17.2.    There is no evidentiary basis on which the Court could conclude that Alpren can do anything more than what it is already doing to convince the Ukraine court to vacate its injunction and dismiss E.C. Venture's claim.

18.    Indeed, the Altimo Entities' potential default on the $750 million credit facility because of the E.C. Venture Litigation, and the subsequent agreement to pay off the facility make it highly unlikely that the E.C. Venture Litigation was stage managed by the Altimo Entities.  *See supra* Proposed Findings of Fact ¶¶ 97-98.

19.    Because Telenor has failed to provide clear and convincing evidence that the Altimo Entities have anything to do with the prosecution of the E.C. Venture Litigation, no contempt can lie on the basis of that suit.

## III.    THE DIVESTITURE TRANSACTIONS COMPLY WITH THE FINAL AWARD

20.    The Final Award ordered Storm to divest its shares in Kyivstar within 120 days of the Final Award, unless Storm affiliates AFH and RT divested their holdings in excess of 5% in Turkcell and UHT.  Final Award 67.

21.    AFH and RT executed transactions specifically designed to satisfy the Order's divestiture requirements.  *See supra* Proposed Findings of Fact ¶¶ 123-52.  The Altimo Entities argue that, through these transactions, the condition precedent of divestiture in the competing entities has been satisfied, thus obviating the need for Storm to divest its interest in Kyivstar.  As discussed below, this Court agrees.

### A.    The Astelit Transaction

22.    This Court concludes that the Astelit Transaction complies with the Order because Astelit, not Turkcell, is the relevant company for purposes of complying with the non-compete provisions.  *See Acquaire v. Can. Dry Bottling,* 906 F. Supp. 819, 840 (E.D.N.Y. 1995) (citing *Haskell v. Kan. Natural Gas Co.,* 224 U.S. 217, 223 (1912) ("the decree must be read in view of the issues made and the relief sought and granted")).

49

Telenor sought relief under the non-compete provision of the SHA, which is specifically limited to companies doing business in Ukraine. *See supra* Proposed Findings of Fact ¶¶ 123-24, 128. Telenor itself acknowledged Astelit as the relevant company in its papers to the Tribunal. *See supra* Proposed Findings of Fact ¶ 129.

23. This Court further concludes that Telenor's argument that the sale to Nadash was a "charade" and not a real sale fails. Telenor makes much of the fact that AFH has the right to repurchase the shares through a call option and emphasizes that AFH may exercise the call option if AFH "determin[es] in its sole discretion that the exercise and completion of the Call Option shall not violate the Kyivstar Shareholders Agreement". Kim Decl. Ex. B at 2.

24. Telenor's argument puts the proverbial cart before the horse. Even if AFH can regain the shares at some point in the future in violation of the SHA, that possibility does not provide a basis for finding that the transaction fails to comply with the Order now.

25. As this Court noted at the hearing, should AFH reacquire the shares in violation of the SHA, Telenor would then be able to bring a contempt proceeding. Hearing Tr. 124-25.

**B.    The UHT Transaction**

26. This Court concludes that the UHT Transaction complies with the Order because neither Mr. Gamzin nor Intec is an "Affiliate" within the meaning of the SHA.

26.1.   The SHA defines a person's "Affiliates" to include any person that "directly or indirectly controls, or is under common control with, or is controlled by" that person.  SHA § 1.01.

26.2.   Control is defined as "the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through *ownership* of securities or partnership or *other ownership interests*, by contract or otherwise) of a Person".  SHA § 1.01 (emphasis added).

27.    Mr. Gamzin is not an "Affiliate", because he does not have power to control any Alfa Group company, and Mr. Gamzin's position with RT does not give Alfa Group any right to direct Mr. Gamzin's personal investments, including Intec and its subsidiaries.  *See supra* Proposed Findings of Fact ¶ 152.

28.    Intec is not an "Affiliate" because it owns only 20% of RT, and, with an Alfa company owning 80% of RT, it cannot control RT.  *See supra* Proposed Findings of Fact ¶ 152.3.

29.    If this Court were to adopt Telenor's theory that Intec is an "Affiliate" because it is owned by Mr. Gamzin, *any* independent company owned by an officer of an "Affiliate" would also be an "Affiliate" of the Alfa Group.  Such a definition would be too broad and inconsistent with the terms of the SHA.

30.    Telenor's counsel suggested at the hearing that because the SHA definition also says "or otherwise", a controlling ownership interest is not required, and thus Mr. Gamzin could be considered an "Affiliate".  Hearing Tr. 142.

31.    The law does not support the suggestion that "otherwise" has such a broad meaning so as to include Mr. Gamzin or companies of which he is the sole beneficial owner.

32.    Under the parties' choice of law provision, the SHA is construed in accordance with New York law.  SHA § 13.06.

33.    New York courts employ the interpretive canon of *ejusdem generis*, under which "the general term 'otherwise' does not expand upon the meaning of its more specific predecessors".  *Sweeney v. Herman Mgmt., Inc.*, 447 N.Y.S.2d 164, 167 n.* (1st Dep't 1982) (where contract defined "Employer" as "seller, lessor, transferor, assignor or otherwise", meaning of the term "otherwise" does not expand "beyond the concept of ownership control"); *see also Hall Street Assocs., L.L.C. v. Mattel, Inc.*, --- S. Ct. ----, No. 06-989, 2008 WL 762537, at *6 (Mar. 25, 2008) (under *ejusdem generis*, interpreting a "series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows").

34.    Applying this principle to the SHA, "or otherwise" refers to other ways of holding "ownership interests" and cannot be interpreted more broadly.  *See Sweeney*, 447 N.Y.S. 2d at 167 n.*; *Hall Street Assocs.*, 2008 WL 762537, at *6.  Moreover, even if one reads the SHA to preclude other elements of "control" Mr. Gamzin's position at RT does not permit him to control that company within the meaning of the SHA.

35.     Telenor also argues that "the sale itself is a sham. . . . whereby a senior Alfa Group executive is holding the UHT shares for three years, without any economic exposure". Rep. 9. Despite this characterization, it is undisputed that Baltone paid the purchase price with an interest-bearing promissory note. *See supra* Proposed Findings of Fact ¶ 150.

36.     Telenor also ignores the fact that Intel waived its right of first refusal and co-sale right. *See supra* Proposed Findings of Fact ¶¶ 149-51.

37.     In sum, despite Telenor's various complaints about the details of the transaction, RT transferred its entire interest in UHT to Baltone, satisfying the non-compete provisions of the Order.

## IV.   THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE ALTIMO ENTITIES

38.     The Altimo Entities were not parties to the action to confirm the Final Award and are not parties to this contempt proceeding. *See Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 452-453 (1932). Therefore, Telenor must establish personal jurisdiction over the Altimo Entities in this proceeding.

39.     Telenor bears the burden of establishing personal jurisdiction over the Altimo Entities. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). Telenor has failed to meet this burden.

40.     Even if this Court were to conclude that the Altimo Entities acted in concert with Storm to violate the Order, such a finding would not itself create personal jurisdiction over the Altimo Entities. Acting in concert with an alleged contemnor is

insufficient to bring a non-party under a court's jurisdiction. *See Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 40 (2d Cir. 1989) ("A district court cannot exercise personal jurisdiction over a nonparty to a litigation, on the basis that the nonparty is acting 'in active concert or participation,' within the meaning of Fed. R. Civ. P. 65(d), with a party who is subject to an injunction, unless personal jurisdiction is established over the nonparty."); *see also Heyman v. Kline*, 444 F.2d 65, 65-66 (2d Cir. 1971) (where a non-party has an independent interest tied to the subject matter of an order, Rule 65(d) does not automatically create a basis for personal jurisdiction over that non-party).

41.    Similarly, this Court's personal jurisdiction over Storm based on the SHA does not automatically create personal jurisdiction over the Altimo Entities.

42.    As the court noted in *Doctor's Associates, Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 304 & n.5 (2d Cir. 1999), jurisdiction over an agent does not provide a court with jurisdiction to bind the principal. Otherwise, "one would never need to obtain jurisdiction over a principal in order to obtain a binding injunction over her. It would be sufficient to sue and enjoin her agent". *Id*.

42.1.    In *Doctor's Associates*, franchisees had engaged in numerous lawsuits against a franchisor, forcing the franchisor to move repeatedly to compel arbitration pursuant to a franchise agreement. In an attempt to stop the franchisees' suits, the district court issued an injunction prohibiting, inter alia, franchisees from filing future suits. The broad injunction was based on the district court's theory

54

that certain defendant franchisees were "agents or servants ('virtual representatives')" of the nonparty franchisees, thus conferring personal jurisdiction over the nonparties. *Id.* The Court of Appeals rejected this reasoning, holding that, even if the defendant franchisees were agents of the nonparties, that would not provide a jurisdictional basis for extending the injunction to bind the nonparty virtual principals. *Id.* ("An order forbidding the principal to do an act on her own would normally be understood to bar the principal's servants or agents from doing the act for the principal's benefit. It is quite different for an injunction against an agent or servant also to bind the principal.").

    42.2.   That reasoning applies here where it is alleged that Altimo is Storm's principal, and Storm is doing its bidding.

43.    It is undisputed that the Altimo Entities are foreign corporations with no business or property in New York. *See supra* Proposed Findings of Fact ¶ 40.

44.    Telenor does not allege that the Altimo Entities have committed a tortuous act sufficient to bring them within the New York long-arm statute, N.Y. C.P.L.R. § 302, which governs this Court's jurisdictional inquiry. *See Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990).

45.    Thus, the Court may hold that it has personal jurisdiction over the Altimo Entities only if it finds that the Altimo Entities and Storm were alter egos of one another at the time of the alleged contempt. *See American Protein Corp. v. AB Volvo*, 844 F.2d

56, 60 (2d Cir. 1988) ("The parent must exercise complete domination 'in respect to the transaction attacked' so that the subsidiary 'had at the time' no separate will of its own." (citation omitted)).

46.    For personal jurisdiction purposes, to establish alter ego status, Telenor has the burden to show that, at the time of Storm's alleged violations, (1) there was common ownership, (2) Storm was financially dependent on the Altimo Entities, (3) Storm and the Altimo Entities ignored corporate formalities, and (4) the Altimo Entities controlled the marketing and operational policies of Storm. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984).

47.    Although common ownership of Alpren, Hardlake and Storm by Altimo is undisputed, that fact alone does not establish alter-ego status. *See Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d. Cir. 1998) (foreign defendant's ownership of three US subsidiaries did not provide basis for jurisdiction); *Moreau v. RPM, Inc.*, 799 N.Y.S.2d 113, 114 (2d Dep't 2005) ("Mere ownership by a parent company of a subsidiary that is subject to personal jurisdiction is insufficient to establish jurisdiction over the parent.").

48.    As the Court concludes *infra*, there is no proof that Storm is financially dependent on the Altimo Entities.

49.    Furthermore, the Court is persuaded that Storm and the Altimo Entities observe corporate formalities. *See infra* Proposed Conclusions of Law ¶¶ 75-79.

50.    Moreover, as it relates to the transaction that brings us here, the alleged non-compliance with the Court's Order, the Altimo Entities have interests different from

Storm, which is a Ukraine corporation subject to Ukraine law, while its parents and grandparent are not.  It is also the case that for this purpose, the Altimo Entities do not control or dominate Storm.

51.    Therefore, Storm's corporate form should not be disregarded.

52.    This Court, therefore, finds that it does not have personal jurisdiction over the Altimo Entities.

## V.    THE CORPORATE VEIL-PIERCING CLAIM FAILS

53.    Telenor asks the Court to pierce Storm's corporate veil to find the Altimo Entities in contempt.

54.    Telenor's reliance on this Court's conclusion for purposes of determining personal jurisdiction at the preliminary injunction proceeding that Storm and the Altimo Entities were alter egos is misplaced.

54.1.    The Court found only that Telenor would be likely to succeed in showing that Storm, Altimo and Alpren were alter egos.  The Court made no final adjudication of this question, however.

54.2.    In addition, a lesser standard applied for that analysis than applies now.  *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (personal jurisdiction test is "less onerous standard"); *Lanvin, Inc. v. Colonia, Inc.*, 776 F. Supp. 125, 127 (S.D.N.Y. 1991) (findings and conclusions from preliminary injunction motion are not binding in subsequent proceedings).

55.    For the reasons set forth below, Telenor has failed to make the factual and legal showings necessary under this more demanding standard to permit this Court to pierce Storm's corporate veil.

### A.    Ukraine Law Governs Telenor's Veil-Piercing Claim

56.    The Court concludes that Ukraine law applies to determine whether the Altimo Entities should be liable for the alleged violations of Storm.

57.    Telenor argues that federal common law should govern this inquiry. However, federal common law applies when there is an "important federal interest in consistent and uniform interpretation of [arbitration] agreements governed by the [New York] Convention". *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co*, 500 F.3d 571, 578-79 (7th Cir. 2007).

58.    The Court is faced with no such federal interest here.  In determining whether to pierce Storm's corporate veil to hold Storm's corporate parents and grandparent liable for its alleged violations of the Order in Ukraine, the Court is not interpreting the arbitration agreement between Telenor and Storm.

       58.1.    Telenor's cases do not indicate otherwise.  None involves a contempt proceeding, and thus none can demonstrate the requisite federal interest to support the application of federal common law. (Tel. 17-18 (citing *Certain Underwriters at Lloyd's London*, 500 F.3d at 571 (motion to confirm panel of arbitrators); *Sarhank Group v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005) (motion to confirm award); *Compagnie Noga d'Importation et d'Exportation,*

*S.A. v. Russian Fed'n*, 361 F.3d 676 (2d Cir. 2004) (motion to

confirm award); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v.*

*Smith Cogeneration Int'l Inc.*, 198 F.3d 88 (2d Cir. 1999) (motion

to compel arbitration); *Builders Fed. (H.K.) Ltd. v. Turner Constr.*,

655 F. Supp. 1400 (S.D.N.Y. 1987) (motion to compel arbitration);

*Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261

(S.D.N.Y. 2007) (motion to dismiss admiralty claim)).

59.     No other federal interest is relevant.  Where there is no substantive federal

provision relevant to the legal issue at hand, "[t]he 'normal federal disposition,' . . . is for

'federal courts [to] *incorporate state law* as the federal rule of decision." *Pescatore v.*

*Pan American World Airways, Inc.*, 97 F.3d 1, 9 (2d Cir. 1996) (citations omitted).

60.     When the issue is whether to pierce the corporate veil, the fact that a

court's jurisdiction is predicated on a federal question does not mean that a federal

interest is relevant.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453

F. Supp. 2d 633, 681-83 (S.D.N.Y. 2006) (applying New York choice of law to

determine law governing veil-piercing in Alien Tort Statute suit).

61.     Even if federal interests required that federal common law govern the

choice-of-law analysis, federal common law would require the Court to look to Ukraine

law to determine whether to pierce Storm's corporate veil, just as New York law would.

*See Presbyterian Church of Sudan*, 453 F. Supp. 2d at 683 n.101 ("Since choice of law

rules seek to insure that a case will be resolved under the same rules of conduct whatever

the forum, and that rights of foreign sovereigns will be respected . . . it is difficult to

59

believe that federal choice of law rules would not require the application of the law of the state of incorporation to a determination of whether to ignore the corporate form.").

62.    Thus, the Court finds that New York conflicts law is the rule of decision for determining what law governs the veil-piercing analysis.

63.    New York law directs the Court to the law of the state of incorporation to determine whether a corporation's veil may be pierced.  *See Fletcher v. Atex Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).

64.    Because Storm is a Ukraine corporation, Ukraine law governs the analysis of whether to pierce Storm's corporate veil.

65.    Ukraine law does not permit veil piercing under these circumstances. Merezhko Decl. ¶¶ 2-11.  Telenor has offered no evidence of Ukraine law to the contrary.

**B.    Telenor's Veil-Piercing Argument Fails Under New York Law**

66.    Even if the Court found that the federal interests animating the New York Convention predominated here, the Court would abide by the intent of the parties and apply the choice-of-law provision in the arbitration agreement between Telenor and Storm.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004) (when parties invoke arbitration clause, agreement's choice-of-law provision governs).  That clause would require the application of New York substantive law.  SHA § 13.06.

67.    New York law requires a "party seeking to pierce the corporate veil to make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was

used to commit a fraud or wrong that injured the party seeking to pierce the veil".
*American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

68.    Courts look to several factors in undertaking this analysis: overlap in ownership, officers, directors and personnel; inadequate capitalization; commingling of assets; and absence of corporate formalities.  *Island Seafood Co. v. Golub Corp.*, 759 N.Y.S.2d 768, 769-70 (3d Dep't 2003).

### *Overlap in Ownership, Officers, Directors and Personnel*

69.    Common ownership is undisputed, but it alone does not permit this Court to pierce Storm's corporate veil.  *See Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777-78 (2d Cir. 1995) (reversing veil piercing even though parent owned and actually controlled subsidiary).

70.    None of Storm's officers is also a director or officer of the Altimo Entities. *See supra* Proposed Findings of Fact ¶ 40.

71.    Contrary to Telenor's allegations, Mr. Klymenko is not an Altimo employee.  *See supra* Proposed Findings of Fact ¶ 51.  Even if Mr. Klymenko held a position with Altimo at the time of the alleged contempt, that fact would not be determinative.  *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts"); *Porter v. LSB Indus., Inc.*, 600 N.Y.S.2d 867, 873 (4th Dep't 1993) (refusing to pierce corporate veil even though "directors and officers of the two entities overlap to an extent").

### *Inadequate Capitalization/Commingling of Assets*

72.      Telenor has offered no evidence that Storm is financially dependent on any of the Altimo Entities, or that any of the Altimo Entities lends money to Storm.

73.      Storm has its own bank accounts in Ukraine and is sufficiently capitalized to carry out authorized acts under its Charter.  *See supra* Proposed Findings of Fact ¶ 44.

74.      Because Telenor has failed to show that Storm is financially dependent on the Altimo Entities or that Storm and any of the Altimo Entities' assets are commingled, this factor counsels against piercing Storm's corporate veil.

### *Corporate Formalities*

75.      Storm and the Altimo Entities follow corporate formalities, a point Telenor concedes in part.  Rep. 13.

76.      Each company is incorporated separately; each company has its own charter; Storm has its own office in Ukraine; Storm holds its own shareholders meetings and has its own auditors; and Storm, not Altimo, Alpren or Hardlake, pays Storm's employees and officials.  *See supra* Proposed Findings of Fact ¶¶ 40-41, 44-45.

77.      Alpren and Hardlake instruct Storm through corporate procedures: any instruction from Alpren and Hardlake to Mr. Klymenko is communicated by calling a shareholders meeting and passing written resolutions.  *See supra* Proposed Findings of Fact ¶ 48.

78.      Telenor has thus failed to offer the required proof that Storm and the Altimo Entities do not observe corporate formalities.

79.    Telenor's reliance on the fact that Storm uses "altimo.ru" email addresses; that the Altimo website lists Storm's office address as Altimo's Kyiv office; and that Mr. Klymenko used the Altimo symbol on his business card at the beginning of his career fails.  In *Arzoomanian v. British Telecommunications*, *PLC,* Civ. No. 03-374 (JLL) (D.N.J. Aug. 17, 2004), the court addressed the argument that a subsidiary and its parent, Unilever, should be considered "alter egos" because, among other things, they shared a common website and because an employee of the subsidiary used a business card that listed the Unilever logo and a Unilever email address.  *See id*. at 18-19.  The court rejected both arguments.  The use of a common website did not change the fact that the entities observed corporate formalities.  *Id.* at 18.  As to the business card, it was undisputed that the employee was an employee of the subsidiary.  The court concluded that "[a]ny unintentional blurring of the corporate structure that may have incidentally arose based on [the] business card does not change the actual underlying corporate structure and does not rise to the formation of an alter ego relationship in light of the substantial evidence to the contrary".  *Id.* at 19.

79.1.    *See also Soanes v. Baltimore & O.R. Co.,* 89 F.R.D. 430, 431-32 (E.D.N.Y. 1981) (refusing to pierce corporate veil where parent and subsidiary shared officers and directors and service address, and where employee of subsidiary used business cards naming parent but not subsidiary); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 157-58 (S.D.N.Y. 2004) ("the fact that subsidiaries share a logo [with parent], or that the parent decides to present several corporations on a website in a unified fashion, is

insufficient to show lack of formal separation between two

entities"); *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp.

2d 544, 550 (S.D.N.Y. 2001) (failure to distinguish between parent

and subsidiary on website insufficient to indicate lack of formal

separation: "[a]n advertising strategy deciding not to present to its

consumers the existence of a parent-subsidiary relationship is not

equivalent to a showing that the parent corporation exercises any

control over its subsidiary's operational or marketing activities").

### *Use of Domination for Fraud*

80.     Even if Telenor had made the requisite factual showing on the *Island*

*Seafood* factors, the Court would not pierce Storm's corporate veil because Telenor has

not proven that the Altimo Entities dominated Storm with the purpose of committing a

fraud that injured Telenor.

81.     Telenor is a large, sophisticated holding company that was represented by

counsel in its negotiation of the SHA.

82.     At the time of the negotiation, Telenor knew that Altimo held an indirect

controlling stake in Storm.  It chose to include Storm's affiliates in specific clauses of the

SHA, such as the non-compete provision.  However, it made no effort to bind any of

Storm's affiliates to the SHA as a whole.

83.     Telenor cannot revisit its negotiation strategy three years later.  *Cf.*

*Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979) (plaintiff could not pierce

corporate veil when it "was aware or should have known" that defendant corporation had limited assets and obtained "what it bargained for").

84.     There is no evidence that suggests the corporate structure was created for an illegitimate purpose.

85.     That Storm and the Altimo Entities are holding companies is irrelevant to the Court's analysis of domination for fraud.  Telenor has presented no case suggesting that holding company status is relevant to the veil-piercing analysis.  To the contrary, courts have often analyzed alter-ego status with respect to holding companies, and none has found holding company status relevant.  *See Abbott Labs. v. CVS Pharmacy, Inc.*, 290 F.3d 854, 858 (7th Cir. 2002) (holding companies entitled to full veil-piercing analysis); *Lyons v. Philip Morris Inc.*, 225 F.3d 909, 915 (8th Cir. 2000) (requiring full veil-piercing analysis to find holding company parent liable for acts of subsidiary); *In re Rowe Cos.*, No. 06-11142-SSM, 2007 WL 4418143, at *2 (Bankr. E.D. Va. Dec. 14, 2007) (holding company status does not compel different veil-piercing analysis).

86.     Indeed, to find otherwise would defeat one of the purposes for which holding companies exist.

87.     Because Telenor has failed to offer proof that the Altimo Entities dominated Storm, much less dominated Storm to injure Telenor, the Court will not pierce Storm's corporate veil.

### C.    Telenor's Argument That the Altimo Entities Are "Legally Identified" with Storm Fails

88.    Telenor argues that the Altimo Entities can be held in contempt if they are "legally identified" with Storm.  Rep. 11.  This argument provides no alternative to Telenor's insufficient veil-piecing argument.  Telenor's cases do not explain what this phrase means or apply it to hold an entity in contempt.  The only case Telenor cites in support on this point, *Connolly v. J.T. Ventures*, 851 F.2d 930 (7th Cir. 1988), holds that non-party officers of an enjoined corporation may be held in contempt when they are "officially responsible" for the corporation's contumacious conduct.  *Id.* at 935.  Here, the Altimo Entities are not officers of Storm, nor are they "officially responsible" for any alleged contumacious conduct.  Additionally, *Connolly* relies on *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29 (1st Cir. 1980), where the court likened the analysis to determine whether a non-party officer was legally identified with an enjoined corporation to veil-piercing analysis.  *Connolly*, 639 F.2d at 935 (citing *G. & C. Merriam Co.*, 639 F.2d at 39).

89.    This Court notes that Telenor recognizes this point, couching its argument that the Altimo Entities are "legally identified" with Storm in veil-piercing terms.  Rep. 12-14.

90.    Thus, Telenor's argument that the Altimo Entities are legally identified with Storm suffers from the same fatal defects as Telenor's veil-piercing claim.

April 9, 2008

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

by

/s/Ronald S. Rolfe
Ronald S. Rolfe
Tara Tune

Attorneys for Additional Contemnors
Altimo Holdings & Investments
Limited, Hardlake Limited and Alpren
Limited
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000
rrolfe@cravath.com
ttune@cravath.com