UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
                                                    :
TELENOR MOBILE COMMUNICATIONS AS,                   :
                                                    :
                                    Petitioner,     :
                                                    :
                    -against-                       :
                                                    :
STORM LLC,                                          :     07 Civ. 6929 (GEL)
                                                    :
                                    Respondent,     :     ECF Case
                                                    :
                    -and-                           :
                                                    :
ALTIMO HOLDINGS & INVESTMENTS,                      :
LIMITED, HARDLAKE LIMITED AND ALPREN                :
LIMITED,                                            :
                                                    :
                        Additional Contemnors.      :
                                                    :
-----------------------------------------------------------------------x

## STORM'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

LOVELLS LLP

Pieter Van Tol (PVT-2445)
Gonzalo S. Zeballos (GZ-5994)

590 Madison Avenue
New York, New York 10022
Tel: (212) 909-0600
Fax: (212) 909-0660
pieter.vantol@lovells.com

*Attorneys for Respondent Storm LLC*

## Table of Contents

**Page**

**Findings of Fact**................................................................................................1

    *The Parties*..............................................................................................1

    *Storm's Relationship to Altimo, Alpren and Hardlake* ........................2

    *Background on Kyivstar and the Shareholders Agreement*...................4

    *The December 22 Action* .......................................................................5

    *The 2006 Ukrainian Decisions* .............................................................9

    *Issuance of the Final Award* ...............................................................10

    *Confirmation of the Final Award* ........................................................12

    *Storm's Shareholders Seek to Compel Compliance with the Final Award*.......................13

    *The Pechersk Action* ...........................................................................15

    *The Recommendation of the Presidium of the Highest Commercial Court*.......................16

    *The Shevchenko Action* .......................................................................17

    *The EC Venture Action* ........................................................................19

    *Telenor's Motion for Contempt*...........................................................21

    *The Antisuit Provisions* .......................................................................21

    *The Divestiture Provisions* ..................................................................22

    *Corporate Governance Provisions*......................................................22

**Conclusions of Law** ......................................................................................23

    *The Contempt Standard* .......................................................................23

    Section I ...................................................................................................25

    *Storm's Present Inability to Comply with the November 2 Order* ........25

    Section II ..................................................................................................32

    *Alleged Violations of the November 2 Order Predating the EC Venture Order*....................32

        *Corporate Governance Provisions*.................................32

        *Antisuit Provisions* ........................................................34

        *Divestiture Provisions* ...................................................36

        *Storm's Compliance with the Final Award Would Cause It to Violate Ukrainian Law in Ukraine* .................37

        *The Ukrainian Decisions*................................................38

*The December 22 Order* ........................................................................38

*The Ukrainian Anti-Monopoly Law* ....................................................38

## Table of Authorities

**Page**

**Cases**

*A.V. by Versace Inc. v. Gianni Versace S.p.A.*,
   87 F. Supp. 2d 281 (S.D.N.Y. 2000) ....................................................... 23

*Application of Chase Manhattan Bank*,
   297 F.2d 611 (2d Cir. 1962) ................................................................... 37

*Boylan v. Detrio*,
   187 F.2d 375 (5th Cir. 1951) ................................................................. 26

*Chao v. Gotham Registry, Inc.*,
   514 F.3d 280 (2d. Cir. 2008) ................................................................. 36

*Combs v. Ryan's Coal Co., Inc.*,
   785 F.2d 970 (11th Cir. 1986) ............................................................ 24-25

*D.H. Blair & Co., Inc. v. Gottdiener*,
   462 F.3d 95 (2d Cir. 2006) ..................................................................... 32

*Fotochrome, Inc. v. Copal Co. Ltd.*,
   517 F.2d 512 (2d Cir. 1975) ................................................................... 32

*Huber v. Marine Midland Bank*,
   51 F.3d 5 (2d Cir. 1995) ......................................................................... 24

*Ings v. Ferguson*,
   282 F.2d 149 (2d Cir. 1960) ................................................................... 37

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) ........................................................................... 25-26

*Johnston v. Compagnie Generale Transatlantique*,
   152 N.E. 121 (N.Y. 1926) ....................................................................... 27

*Levin v. Tiber Holding Corp.*,
   277 F. 3d 243 (2d Cir. 2002) ................................................................. 24

*Maggio v. Zeitz*,
   333 U.S. 56 (1948) ................................................................................. 24

*Massen v. Cliff*,
   No. 02 Civ. 9282, 2003 WL 2012404 (S.D.N.Y. May 1, 2003) .............. 32

*Rogers v. Koons*,
   960 F.2d 301 (2d Cir. 1992) ................................................................... 34

*S.E.C. v. Musella*,
   818 F. Supp. 600 (S.D.N.Y. 1993) ......................................................... 27

*Shillitani v. U.S.*,
   384 U.S. 364 (1966) ......................................................................... 23, 26

*Societe Internationale v. Rogers*,
    357 U.S. 197 (1958) .................................................................................................. 36-37

*State of New York v. Shor Realty Corp.*,
    763 F.2d 49 (2d Cir. 1985) .......................................................................................... 34

*Telenor Mobile Commc'ns. AS v. Storm LLC,*
    No. 07 Civ. 6929 (GEL), 2007 WL 3274699 (S.D.N.Y. Nov. 2, 2007) .................... 12

*U.S. v. First Nat'l City Bank*,
    396 F.2d 897 (2d Cir. 1968) ........................................................................................ 37

*U.S. v. Rylander*,
    460 U.S. 752 (1983) ..................................................................................................... 24

*United States v. Local 180401 Int'l Longshoreman's Ass'n*,
    44 F.3d 1091 (2d Cir. 1995) ........................................................................................ 23

*Walt Disney Co. v. Video 47 Inc.*,
    972 F. Supp. 595 (S.D. Fla. 1996) .............................................................................. 27

Storm LLC ("Storm") respectfully proposes the following Findings of Fact and Conclusions of Law regarding the motion by Telenor Mobile Communications AS ("Telenor") for an order of contempt against Storm, Altimo Holdings and Investments Ltd. ("Altimo"), Alpren Ltd. ("Alpren") and Hardlake Ltd. ("Hardlake") (collectively, the "Altimo Entities").

## Findings of Fact

*The Parties*

  1. Storm is a company organized under the laws of Ukraine.  (*See* arbitral award issued August 1, 2007 (the "Final Award" or "Award"), annexed as Ex. A to the Declaration of Robert L. Sills, dated January 22, 2008 (the "Sills Decl.") at 2*.*)

  2. Storm is indirectly wholly-owned by Altimo, a company organized under the laws of the British Virgin Islands.  (*See id.*)

  3. Altimo wholly owns Storm's two shareholders, Alpren and Hardlake, each a corporation duly organized under the laws of Cyprus.   (*Id.*)

  4. Altimo is the telecommunications arm of the Alfa Group Consortium (the "Alfa Group"), a Russian private equity conglomerate.  (*See* the Declaration of Yuri Musatov, dated February 25, 2008 (the "Musatov Decl.") at ¶¶ 2, 4.)

  5. Alpren and Hardlake own 49.9% and 50.1%, respectively, of Storm.  (*See* Ex. A to Sills Decl. at 2.)

  6. Telenor is a corporation organized under the laws of Norway, with its principal place of business in Fornebu, Norway.   (*See id.*)

*Storm's Relationship to Altimo, Alpren and Hardlake*

7.     Storm, Altimo, Alpren, and Hardlake each have their own separate charter and/or Memorandum and Articles of Association.  (*See* Musatov Decl. at ¶ 16.)

8.     Storm's office is located in Kyiv, Ukraine.  (*See* Deposition Transcript of Vadim Klymenko, dated February 26, 2008 (the "Klymenko Tr.") at 8:2-22.)

9.     Altimo has no office in Ukraine.  (*See* the Deposition Transcript of Oleg Malis, dated March 3, 2008 (the "Malis Tr.") at 33:17-20.  *See also* the Klymenko Tr. at 45:25-46:3.)

10.     Storm has separate bank accounts and sufficient independent capital to carry out the acts authorized by Storm's charter.  (*See* Declaration of Vadim Klymenko, dated February 25, 2008 (the "Klymenko Decl.") at ¶ 26.)

11.     Storm holds its own shareholders meetings and observes the proper corporate formalities under Ukrainian law.  (*See id.* at ¶ 25.)

12.     Storm does not co-mingle its funds with any other Alfa Group company.  (*Id.* at ¶ 26.)

13.     Storm does not co-mingle its property with that of Altimo, Alpren, and Hardlake.  (*Id.* at ¶ 30.)

14.     Storm does not share any officers, directors, or employees with Altimo, Alpren, or Hardlake.  (*See* Musatov Decl. at ¶ 13.)

15.     Storm has wide latitude under its charter to manage its own affairs.  (*See* Klymenko Decl. at ¶ 29.) [1]

---

[1]     Telenor contends that Storm's charter prevents Mr. Klymenko from spending more than $10,000 without shareholders approval. (*See* Telenor's Reply Memorandum in Support of its Motion for Contempt, dated March 6, 2008 (the "TM Reply Br.") at 12.)  *See also* the transcript of the hearing before the Hon. Gerard E. Lynch in the Southern District of New York dated March 11,

16.     Storm's General Director, Mr. Vadim Klymenko, accepts directives on the management of Storm only from duly authorized resolutions passed by Storm's shareholders. (*See id.* at ¶¶ 20, 30.)

17.     Storm does not accept instructions from Altimo.  (*see id.*)

18.     Mr. Klymenko's duties as Storm's General Director are governed by Storm's charter and Ukrainian law.  (*Id.* at ¶ 13.)

19.     Although Mr. Klymenko listed "Altimo" on his *curriculum vitae* ("CV") at the beginning of his career with Storm and formerly used a business card with the "Altimo" symbol, Mr. Klymenko is not now, nor has he ever been, an employee of Altimo.  (*Id.* at ¶¶ 17-19.  *See also* Deposition Transcript of Yuri Musatov dated February 12, 2008 (the "Musatov Tr." at 47:14-20, 50:3-21.  *See also* Malis Tr. at 36:3-9.)

20.     Mr. Klymenko testified that when he was hired, Storm was not a known commodity in Ukraine, while "Altimo" was a well-known brand, and that the reference to "Altimo" was simply to build recognition for Storm as part of the "Altimo" brand. (*See* Klymenko Decl. at ¶¶ 16-19.)  His resume, which he used professionally and for marketing purposes during the early stages of his employment with Storm, inaccurately describes Mr. Klymenko as an "Altimo" vice-president, but he was not and never has been, a vice-president of Altimo.  (*See* Klymenko Tr. at 160:15-161:25.  *See also* Klymenko Decl. at ¶¶ 16-19.)

21.     In addition, Mr. Klymenko testified that when he first prepared his resume, he knew that he had been hired to work for an Altimo-affiliated company, but he did not know

---

2008 (the "March 2008 Tr.") at 148:19-150:2.)  Telenor's assertion is incorrect.  (*See* Storm Charter, annexed as Ex. 1 to the Supplemental Declaration of Vadim Klymenko, dated March 10, 2008 (the "Klymenko Supp. Decl.") at 11.4(n)(i).  *See also* the Klymenko Tr. at 57:3-58:13.)  The provision at issue, section 11.4(n)(i), on its face provides that the $10,000 limit applies to situations <u>only</u> where Storm is a borrower or grantor or seeks to dispose of assets, and not to payments of $10,000 or more made in the ordinary course of business.

precisely what his role would be.  Accordingly, his resume contains his incorrect speculation that

he was also to be given responsibility for managing the Ukrainian assets of VimpelCom and

Golden Telecom.  (*See* Klymenko Tr. at 86:14-87:9.)

*Background on Kyivstar and the Shareholders Agreement*

22.    Telenor and Storm are engaged in a dispute over, *inter alia*, the validity and

effect of a 2004 shareholders agreement (the "Shareholders Agreement" or "Agreement") related

to the corporate governance of Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar").

(*See* Ex. A to Sills Decl. at 1-2.)

23.    Kyivstar is the largest mobile telecommunications company in Ukraine.

(*See* Storm Statement of Defense, dated May 30, 2006, annexed as Ex. F to the Declaration of

Pieter Van Tol dated November 15, 2007 (the "November 2007 Van Tol Decl.") at ¶ 4.)

24.    Telenor and Storm are the only two shareholders of Kyivstar.  (*See id.*)

25.    Telenor owns approximately 56.5% of the issued and outstanding shares of

Kyivstar, and Storm owns approximately 43.5%.  (*Id.*)

*The December 22 Action*

26.    By late 2004, Altimo, both directly and indirectly, had acquired 100% of

Storm's issued and outstanding shares, including a 23.98467% stake acquired by Alpren from

EC Venture Capital, S.A. ("EC Venture"), a Swiss corporation, for about $120 million. (*See* Ex.

13 to the Declaration of Ronald Rolfe S. Rolfe, dated February 25, 2008 (the "Rolfe Decl.") at 1;

the transcript of the hearing before the Hon. Gerard E. Lynch, dated March 11, 2008 (the "March

2008 Tr.") at 95:2-3.)

27.    Shortly thereafter, Altimo conducted an audit of the various assets it held

(the "Audit").  (*See* Altimo Press Release, dated May 29, 2006, Doc. No. 146 on Ex. A to

Declaration of Robert L. Sills II, dated August 30, 2007, (the "2007 Sills II Decl.") (enclosing a CD-ROM with the portions of the arbitration record).)  During the Audit, Altimo discovered that certain provisions of Kyivstar's charter relating to the nomination of Kyivstar directors violated Ukrainian law.  (*See id.  See also* Affidavit of Pavel Kulikov, dated November 22, 2006 ("Kulikov Aff."), Doc. No. 34 on Ex. A to 2007 Sills II Decl. at ¶ 5; Second Affidavit of Alexei Khudyakov ("Khudyakov II Aff."), dated November 22, 2006, Doc. No. 177 on Ex. A to 2007 Sills II Decl. at ¶ 5.)

28.    Altimo also learned in early 2005 that Storm's signatory to the Shareholders Agreement, Mr. Valeriy Nilov, lacked the requisite legal authority to bind Storm to that agreement.  (*See* Kulikov Aff., Doc. No. 34 on Ex. A to 2007 Sills II Decl. at ¶ 6; Khudyakov II Aff., Doc. No. 177 on Ex. A to 2007 Sills II Decl. at ¶ 6.)

29.    On August 19, 2005, Storm commenced an action in Ukraine seeking a declaratory judgment that several provisions of the Kyivstar charter were invalid (the "December 22 Action").  (*See* Telenor Amended Statement of Claim, Doc. No. 4 on Ex. A to 2007 Sills II Decl. at 14-15.  *See also* Ex. R to the Declaration of Gonzalo S. Zeballos, dated August 16, 2007 (the "Zeballos Decl.") at 1.)

30.    Telenor was not originally served in this action, nor was it required to be under Ukrainian law.  Telenor nevertheless participated fully in this action by virtue of its intervention in the case.  (*See* Storm's Motion to Dismiss Claims of Claimant Telenor Mobile Communications AS, dated June 5, 2006 ("Storm Mot. to Dismiss"), annexed as Ex. G to November 2007 Van Tol Decl. at 3-4.)

31.    The Ukrainian courts addressed the question of whether the Kyivstar charter, which allowed Storm and Telenor to nominate representative directors to the Kyivstar

board that were unaffiliated with either Storm or Telenor, violated Article 46 of the Law of

Ukraine "On Commercial Entities" ("Art. 46"), which states that the board of a joint-stock

company such as Kyivstar must be composed only of company shareholders. (*See* Ex. R to

Zeballos Decl. at 2-3.)

33.    On December 22, 2005, consistent with Art. 46, the Highest Commercial

Court of Ukraine issued an order (the "December 22 Order") in favor of Storm, invalidating

Section 9.1 of Kyivstar's charter, which required Telenor and Storm to vote their shares each

year so as to ensure the election of the five candidates for director nominated by Telenor and the

four candidates for director nominated by Storm. (*See id.* 3-4.)

34.    The December 22 Order, in accordance with Art. 46, also limited Storm and

Telenor to the nomination of only one director each to Kyivstar's board of directors. (*See* Ex. R

to Zeballos Decl. at 2-3. *See also* Ex. F to November 2007 Van Tol Decl. at ¶ 6.)

35.    In addition, the December 22 Order declares Section 10.3 of Kyivstar's

charter, which relates to the appointment of Kyivstar's president, to be invalid. (*See* Ex. R to

Zeballos Decl. at. 4-5.)[2]

36.    The Shareholders Agreement, at sections 2.01 and 2.02, contains provisions

that are materially identical to the sections of the Kyivstar charter that were invalidated by the

---

[2]    Telenor successfully reversed the December 22 Order in June 2006. (*See* letter dated June 27, 2006 from R. Sills to Tribunal, Doc. No. 8 on Ex. A to 2007 Sills II Decl. at 1. On October 3, 2006, the Ukrainian Supreme Court reinstated the December 22 Order. (*See* October 3, 2006 Ruling of the Ukrainian Supreme Court, Doc. No. 168 on Ex. A to 2007 Sills II Decl.) On December 28, 2006, the Highest Commercial Court of Ukraine issued another order clarifying that the December 2005 election of the Kyivstar board of directors was null and void as a matter of Ukrainian law. (*See* December 28, 2006 Ruling of the Highest Commercial Court of Ukraine, Doc. No. 203 on Ex. A to 2007 Sills II Decl.)

December 22 Order. (*Compare* §§ 2.01 and 2.02 of the Shareholders Agreement, Doc. No. 105 on Ex. A on 2007 Sills II Decl to §§9.1 *with* 10.3 of Kyivstar's Charter, Doc. No. 197 on Ex. A to 2007 Sills II Decl.)

37.    Under Article 203(1) of the Ukrainian Civil Code, neither the charter of a joint-stock company nor any shareholders agreement entered into by shareholders of such a company may violate Ukrainian law.  (*See* Exhibit F to November 2007 Van Tol Decl. at ¶ 8.)

38.    Article 215 of the Civil Code of Ukraine establishes that any such agreement may be found invalid by the Ukrainian courts or is invalid *ab initio*.  (*Id.*)

39.    Accordingly, sections 2.01 and 2.02 of the Shareholders Agreement, as written, violate Ukrainian law in the same manner as the invalidated parallel provisions of Kyivstar's charter. (*Id.*)

40.    The December 22 Order, thus confirmed Storm's position that it was not required to attend Kyivstar shareholders meetings and that the Storm-nominated Kyivstar directors were not required to attend Kyivstar board meetings.

41.    In addition to invalidating provisions of the Kyivstar charter, the December 22 Order instructed the parties to amend the Kyivstar charter in accordance with applicable law. (*See* Ex. R to Zeballos Decl. at 4.)

42.    The parties' dispute over the proposed amendments must be resolved by the Ukrainian courts, which have exclusive jurisdiction over matters relating to a Ukrainian company's charter.   (*See* Declaration of Anna-Marta Khomyak dated February 25, 2008, the "Khomyak Decl.") at ¶ 51.  *See also* Ex. G to November 2007 Van Tol Decl. at 13.)  However, as discussed below, Telenor sought a resolution of the dispute relating to the charter through arbitration rather than through the Ukrainian courts.

*The Arbitration*

43.    On February 7, 2006, pursuant to Article 12.01 of the Shareholders

Agreement, Telenor commenced an *ad hoc* UNCITRAL arbitration in New York City (the

"Arbitration").  (*See* Ex. A to Sills Decl. at 14-15.)

44.    In its amended Statement of Claim in the Arbitration, Telenor alleged that

Storm had violated the Shareholders Agreement in three principal ways:

    a.  By Storm's failure to attend annual and extraordinary shareholder meetings of
Kyivstar, its failure to appoint candidates for election to the Kyivstar board of
directors, and the failure of Storm directors to attend board meetings, in breach of
Section 2.01 of the Shareholders Agreement;

    b.  By the ownership by Storm affiliates of an interest in excess of 5% in two
telecommunications operators in Ukraine, in violation of the non-competition
provision in Section 6.02 of the Agreement;[3] and

    c.  By the initiation of litigation in Ukraine aimed at invalidating the rights and
obligations of the parties under the Shareholders Agreement, in breach of the
arbitration provisions of Section 12.01.

(*See id.* at 15.)

45.    Storm contended that the December 22 Order fully justified Storm's

decision to refrain from participating in Kyivstar's board and shareholders meetings.  (*See* Ex. F

to November 2007 Van Tol Decl. at ¶¶ 6-8.)

46.    Storm argued that it did not violate the Shareholders Agreement's non-

compete provisions because those provisions are impermissibly overbroad and therefore

unenforceable.  (*See id*. at ¶ 16. *See also* Ex. A to Sills Decl. at 16.)

47.    Storm also argued that the Shareholders Agreement itself was void *ab initio*

as the result of a series of decisions issued by the Ukrainian courts in April and May 2006

---

[3]    Telenor identified the two competing entities as Astelit LLC & Ukrainian High Technologies
("UHT").  (*See* Exhibit B to Declaration of Robert L. Sills I, dated August 30, 2007, at ¶ 31.)

(collectively, the "2006 Ukrainian Decisions") in a dispute involving Storm and one of its

shareholders.  (*See* Ex. G to November 2007 Van Tol Decl. at 1, 4-8. *See also* Ex. A to Sills

Decl. at 16-17.)

*The 2006 Ukrainian Decisions*

48.    As discussed above, Altimo discovered in 2005 that Mr. Nilov lacked the

proper authority under Storm's charter and Ukrainian law to bind Storm to the Agreement.  (*See*

*supra* at ¶ 28.)

49.    In April 2006, one of Storm's shareholders, Alpren, commenced an action

(the "April 2006 Action" or "Case No. 40/242") against Storm before the Kyiv Commercial

Court in Ukraine seeking to invalidate the Shareholders Agreement on the grounds that (1)

Storm's signatory to the Shareholders Agreement, Mr. Valeriy Nilov, lacked the legal authority

to bind Storm to that Agreement and (2) the Shareholders Agreement was not properly registered

with the Ukrainian authorities in the Ukrainian language.  (*See* the Kyiv Commercial Court

Order dated April 25, 2006 (the "April 2006 Order"), annexed as Ex. B to Zeballos Decl., at 2-

3.)

50.    Alpren was not required, under Ukrainian procedural rules, to give notice to

Telenor of the commencement of Case No. 40/242.  (*See* Supplemental Legal Opinion of Lybov

Logush, dated August 9, 2006, Doc. No. 185 on Ex. A to 2007 Sills II Decl. at ¶ 4.)  Telenor was

free to intervene in that action, as it had done in the December 22 Action and other Ukrainian

actions.  (*See* Legal Opinion of Lybov Logush, dated July 28, 2006, Doc. No. 131 on Ex. A to

2007 Sills II Decl. at ¶¶ 16-19.)

51.    The Kyiv Commercial Court issued the April 2006 Order holding that (1)

Mr. Nilov's authority to sign the Shareholders Agreement on behalf of Storm required express

approval at a shareholders meeting; (2) there was no evidence that such a meeting ever took

place; (3) Mr. Nilov, therefore, did not have authority to sign the Agreement; and (4) the

Agreement was "null and void in full, including the arbitration clause, from the time of [its]

execution."  (*See* Ex. B to Zeballos Decl. at 2-3.)

52.    The Ukrainian court also held that the Shareholders Agreement was not

registered with the proper authorities in the Ukrainian language, which is a requirement for

documents that affect a Ukrainian company's foundational documents.  (*See id.* at 3.)

53.    The April 2006 Order was confirmed following an appeal by Storm in May

2006 (the "May 2006 Order").  (*See* May 2006 Order, Ex. D to Zeballos Decl.)

54.    Alpren attempted to withdraw the April 2006 Action in the fall of 2007, but

was unable to do so.  (*See* Exs. 11 & 12 to Rolfe Decl. *See also* Musatov Tr. at 232:5-234:2.)

55.    The 2006 Ukrainian Decisions are now *res judicata* as a matter of Ukrainian

law and can neither be appealed nor withdrawn.  (*See* Khomyak Decl. at ¶ 9.)

*Issuance of the Final Award*

56.    On August 1, 2007, the Tribunal issued the Final Award.  (*See* Ex. A to Sills

Decl.)

57.    In the Final Award, the Tribunal denied Telenor's request for damages, but

granted several forms of equitable relief.  (*See id.* at 66.)  In particular, the Final Award orders

the following:

  a.    Respondent [Storm] shall transfer at least one of its Kyivstar shares to three
        newly-formed affiliated companies so that it is in a position to designate and
        nominate a total of four candidates for election to the Kyivstar Board of
        Directors, and [Respondent] shall designate and nominate those candidates for
        election to the Kyivstar Board of Directors;

  b.    Respondent Storm shall take such steps as are necessary to assure that
        [Storm's] nominated candidates are elected to the Kyivstar Board of Directors,

10

attend all future shareholders meetings and participate in good faith in the direction and management of Kyivstar's business;

c.    Respondent Storm shall cause its duly authorized representatives to attend all future annual and extraordinary meetings of the Kyivstar shareholders while it remains a Kyivstar shareholder;

d.    Respondent Storm shall take such steps as are necessary to amend the [Kyivstar] Charter to conform it both to the December 22 Order . . . , the Shareholders Agreement . . . , and the ownership of shares by Telenor and its [four newly-created] affiliates. . . .   Telenor and . . .  Storm, and all persons to whom they transfer Kyivstar shares shall vote to approve an amendment to the Kyivstar Charter that provides that Kyivstar's shareholders are (a) Storm, together with its three newly-formed corporate affiliates, each of which will hold at least one Kyivstar share; and (b) Telenor, and its existing four corporate affiliates, each of which holds one Kyivstar share.  Together, the persons designated and nominated as members of the Kyivstar Board of Directors by these nine entities will be elected as Directors.

[e.]   Respondent Storm shall sell its shares in Kyivstar to a person other than a Storm affiliate within one hundred and twenty (120) days of this Final Award, unless prior to that time Storm and any affiliated entities divest their holdings in Turkcell and Ukrainian High Technologies that exceed five percent.

[f.]   [] Storm, and anyone acting in concert with it, is [sic] enjoined from the commencement or prosecution of any and call court actions concerning any disputes or controversies under, relating to, or in connection with, any obligations described in the Shareholders Agreement, including all of the existing litigations currently pending in the Ukraine and described [in the Final Award].

[g.]   [] Storm, and anyone acting in concert with it, are enjoined from enforcing the December 29, 2006 injunction or its attendant Enforcement Order.

[h.]   [] Storm, and anyone acting in concert with it, are enjoined from taking any actions to hinder or preclude . . . Telenor, Ernst & Young and their related entities from carrying out their rights and obligations under the Shareholders Agreement or other pertinent agreements with Kyivstar.

(*Id*. at 66-68.)

58.    Paragraphs a-d above, concern the corporate governance of Kyivstar (the "Corporate Governance Provisions").  Paragraph e deals with the conditional sale of Storm's interest in Kyivstar, provided that a divestiture of certain of Storm's affiliates does not take place

11

within 120 days of the confirmation of the Final Award (the "Divestiture Provisions").

Paragraphs f-h deal with the filing of lawsuits by Storm or anyone acting in concert with it that

would interfere with the arbitration in any way (the "Antisuit Provisions").

        59.     In rendering the Final Award, the Tribunal did not give weight to the 2006

Ukrainian Decisions.  In so finding, however, the  Tribunal made clear that:

> [I]t was not ignoring the decisions of the Ukrainian courts, Nor was it
> impugning the integrity of those courts or their decisions.  To the
> contrary, the Tribunal found no evidence of impropriety or violations of
> any Ukrainian procedures.  Instead, the Tribunal rested [its conclusions]
> on the fact that the Ukraine courts had lacked the full record presented to
> the Tribunal on the issues of arbitrability and the validity of the
> arbitration clause [contained in the Shareholders Agreement].

(*Id.* at 25.)  The Tribunal rested its conclusions solely on the fact that, in its opinion, the

Ukrainian courts had failed to consider the question of severability.  (*Id.*)

*Confirmation of the Final Award*

        60.     On August 1, 2007, Telenor moved this court to confirm the Final Award.

(*See* Telenor's Petition to Confirm the Arbitration, dated August 1, 2007.)

        61.     On August 16, 2007, Storm opposed Telenor's motion for confirmation and

moved to vacate the Final Award.  (*See* Storm's Notice of Motion to Vacate Arbitration Award,

dated August 16, 2007.)

        62.     On November 2, 2007, this Court entered an order, *Telenor Mobile*

*Commc'ns. AS v. Storm LLC,* No. 07 Civ. 6929 (GEL), 2007 WL 3274699 at *8 (S.D.N.Y. Nov.

2, 2007) (the "November 2 Order") confirming the Final Award.

        63.     Storm then entered a notice of appeal on November 6, 2007, and applied for

a stay of the November 2 Order with this court on November 15, 2007.  (*See* Storm's Notice of

Appeal, dated November 6, 2007;  Storm's Motion to Stay, dated November 15, 2007.)

64.     This Court denied Storm's stay application on November 26, 2007.  (*See* Memorandum of Endorsement Denying Motion to Stay, dated November 26, 2007.)

65.     On November 28, 2007, Storm applied for a stay pending appeal to the Second Circuit.  (*See* Storm's letter to the Hon. Gerard E. Lynch and attachment thereto, dated November 30, 2007.)

66.     The Second Circuit entered a temporary stay on November 29, 2007, which was in effect until December 20, 2007.  (*See id.*)

*Storm's Shareholders Seek to Compel Compliance with the Final Award*

67.     On or about August 16, 2007, Alpren and Hardlake instructed Storm's General Director, Mr. Vadim Klymenko, to notice and convene an extraordinary general meeting of Storm's shareholders for August 27, 2007 (the "August 27th EGM").  (*See* Klymenko Decl. at ¶ 52, and Ex. I annexed thereto.)

68.     The stated purpose for the August 27 EGM was for passing resolutions ordering compliance with the Final Award.  (*See id.*)

69.     On August 27, 2007 Mr. Klymenko conducted the August 27 EGM as instructed.  (*See id.* at ¶ 59 and Ex. M thereto.)

70.     Upon receipt of the instruction to notice and convene the August 27th EGM, Mr. Klymenko undertook significant due diligence in order to evaluate the legal impact, both on a corporate and an individual level, of complying with the November 2 Order.  (*See id.* at ¶¶ 52-58.)

71.     Specifically, Mr. Klymenko instructed several Ukrainian lawyers and legal experts to explore Storm's options with regard to the enforceability of the Final Award and the consequences of Storm's compliance.  (*See id.*)

72.     Mr. Klymenko received written opinions from two of the legal advisors. (*See* Exs. K & L to Klymenko Decl.)

73.     Collectively, the legal advisors informed Mr. Klymenko that, should he decide to comply with the Final Award, he would be risking civil and criminal sanctions in his personal capacity, and that Storm would be exposed to civil penalties, for contravening the earlier Ukrainian orders (including the 2006 Ukrainian Decisions) invalidating the Shareholders Agreement as well as several statutory provisions of the Ukrainian civil and criminal codes (including the Ukrainian antimonopoly law and other statutes).  The advisors also pointed to other cases where similar arbitral awards had not been recognized.  (Klymenko Decl. at ¶¶ 53-58, and Exs. K  & L thereto.)

74.     Based on this uniform legal advice, Mr. Klymenko determined that neither he nor Storm could comply with the Final Award without violating Ukrainian law.  (*Id.* at ¶ 58.)

75.     At Mr. Klymenko's request, Ukrainian counsel, Anna-Marta Khomyak, attended the August 27 EGM to provide a legal opinion on any potential civil or criminal exposure that Storm or Mr. Klymenko, respectively, would face if Storm were to comply with any aspect of the Final Award.  (*Id.* at ¶¶ 55, 59.  *See also* Khomyak Decl. at ¶¶ 6-25.)

76.     Consistent with her previous legal advice, Ms. Khomyak opined at the August 27 EGM that Storm would violate Ukrainian law and face civil liability if it were to comply with the Final Award.  (*See* Khomyak Decl. at ¶¶ 9-13.)

77.     Moreover, Ms. Khomyak stated that Mr. Klymenko could face criminal liability in the event Storm were to comply. (*See id.* at ¶ 14.)

78.     Alpren and Hardlake nevertheless voted in favor of the resolutions ordering compliance with the Final Award.  (*See* Ex. M to Klymenko Decl.  *See also* Khomyak Decl. at ¶¶ 18, 22, 23, 25.)

*The Pechersk Action*

79.     Five days prior to the August 27 EGM on August 22, 2007, in accordance with the aforementioned legal advice of his and Storm's lawyers, Mr. Klymenko instructed counsel to file an action in the Pechersk District Court of Kyiv concerning the enforceability of the Final Award in the territory of Ukraine (the "Pechersk Action").  (*See* Klymenko Decl. at ¶ 54 and Ex. J thereto.  *See also* Khomyak Decl. at ¶¶ 26-31.)

80.     Though the Pechersk Action was styled as an enforcement proceeding, Storm was seeking an order to determine whether the Final Award was unenforceable in the territory of Ukraine.  (*See* Khomyak Decl. at ¶¶ 26-27.)

81.     Storm was legally entitled to bring such an action because Telenor had refused to enforce the Final Award in Ukraine, while at the same time relying on that Award to Storm's detriment.  (*See id.* at ¶¶ 27-28.)

82.     Telenor Mobile was named as an "interested party" in that action and pursuant to Ukrainian procedure, the Pechersk District Court sent two notices of the Pechersk Action to Telenor in Ukraine, which notices were received and signed for.  (*Id.* at ¶ 29, Exs. W & X.)[4]

---

[4]     Telenor Mobile claims that it did not receive the notices of the Pechersk Action.  (*See* Telenor's Memorandum in Support of its Motion for Contempt dated January 11, 2008 (the "TM Br."), at 4, n. 4.)  Such notices, however, were sent to 19A Khreschatyk, Kiev and 19 Khreschatyk respectively.  Telenor Mobile has stated that it once had a representative office at 19 Khreschatyk (*see* Ex. D to the Sills Decl. at ¶2.)  Public sources, however, currently list 19A Khreschatyk as the address for Telenor Mobile's representative office.  (*See* Ex. A to the Van Tol Decl.)  Thus there is some confusion as to the correct address, but it appears that the Pechersk District Court made a good faith effort to notify Telenor Mobile by sending the documents to both addresses.

83.     On October 5, 2007, the Pechersk District Court ruled that the Final Award could be neither recognized nor enforced in Ukraine.  (See Ex. B to Sills Decl.  *See also* Khomyak Decl. at ¶ 31.)

84.     The Pechersk District Court held that the Ukrainian courts had already found in the 2006 Ukrainian Decisions that the Shareholders Agreement — including the arbitration clause contained therein — is null and void in its entirety.  (See Ex. B to Sills Decl. at 5-6.)

85.     The Pechersk District Court further found that recognition of the Final Award would violate the Ukrainian public policy that foreign arbitral awards will not be recognized or enforced if they conflict with prior Ukrainian court decisions.  (*See id*. at 6-7.)

*The Recommendation of the Presidium of the Highest Commercial Court*

86.     Enforcing the Final Award would also conflict with the Recommendation of the Presidium of the Highest Commercial Court of Ukraine, dated December 28, 2007 (the "Recommendation"), which is a restatement of an area of law based on an analysis of the entire body of Ukrainian decisions, without focusing on any one case.  (*See* Khomyak Decl. at ¶¶ 44, 46, 49-58.)

87.     Such recommendations, which are periodically issued by the Presidium of the Highest Commercial Court of Ukraine, function as *de facto* mandatory guidelines for judges of the lower commercial courts.  (*See id*. at ¶ 46.)

---

Moreover, Telenor was aware of the decision in the Pechersk Action less than three weeks after the issuance of that ruling—well within the time frame to intervene—and obtained access to the case file.  (*See* Ex. D to Sills Decl.; Khomyak Decl. at ¶ 30.)  As far this Court is aware, Telenor Mobile has never complained to the Pechersk District Court about a lack of notice, nor has it attempted to appear in that action for any purpose.

88.     The Recommendation explicitly states, *inter alia*, that issues of corporate governance are governed exclusively by Ukrainian law and cannot be determined under foreign law (as the Shareholders Agreement purports to do).  (*Id.* at ¶ 51.)

89.     The Final Award cannot, therefore, be enforced in Ukraine because it seeks to implement the Shareholders Agreement, which in turn states that New York law applies to corporate governance procedures.  The Recommendation makes it clear that issues of corporate governance must be determined under Ukrainian law.  (*Id.* at ¶¶ 51, 57-58.)

*The Shevchenko Action*

90.     After the conclusion of the August 27th EGM, Mr. Klymenko, following what he believed to be his fiduciary obligation to Storm, initiated an action to invalidate the resolutions passed by Alpren and Hardlake ordering compliance with the Final Award so that he and Storm would not be forced to violate Ukrainian law.  (*See* Ex. N to Klymenko Decl. at ¶ 63. *See also* Khomyak Decl. at ¶¶ 32-39.)

91.     Upon learning of Mr. Klymenko's intent to file such an action, Mr. Oleg Malis, a senior vice president at Altimo, told Mr. Klymenko that he was acting improperly and recommended that Mr. Klymenko refrain from bringing the action and comply with the directives issued at the August 27 EGM.  (*See* Klymenko Tr. at 128:21-130:7.)

92.     Mr. Klymenko nevertheless commenced a lawsuit in the Shevchenko District Court on September 3, 2007, against Altimo, Alpren and Hardlake as well as Storm (as a nominal party) seeking to invalidate the resolutions undertaken at the August 27 EGM (the "Shevchenko Action").  (*See* Ex. N to Klymenko Decl.)

93.     Mr. Klymenko and Storm hired separate outside counsel to litigate the action.  (*See* Klymenko Tr. at 125:18-126:3.)

94.    Because the lawsuit, however styled, was essentially an action between Mr. Klymenko and Storm's shareholders, Mr. Klymenko instructed Storm's counsel to "remain neutral in the action and not to interfere with Alpren's and Hardlake's presentation of their case." (*See* Klymenko Decl. at ¶ 64.)

95.    The Shevchenko District Court issued a ruling on October 10, 2007 (the "Shevchenko Order") that invalidated the resolutions passed at the August 27 EGM.  (*See* Ex. E to Sills Decl.).

96.    The Shevchenko District Court based its ruling on the fact that the Ukrainian courts had previously ruled that the Shareholders Agreement is a void instrument; rendering the Arbitration a legal nullity.  (*See id.* at 4-5.)

97.    The Shevchenko Court further held that compliance with the Final Award would be an unlawful violation of the prior rulings of the Ukrainian courts, which is a criminal offense in Ukraine.  (*See id.* at 7-8.)

98.    Hardlake appealed from the Shevchenko Order (*see* Klymenko Decl. at ¶ 68), but the Appellate Court dismissed the appeal on January 15, 2008.  (*See id.*, Ex. Q.)

99.    Alpren filed a cassation appeal from the appellate court's dismissal.  (*Id.*) That appeal remains pending.

*The EC Venture Action*

100.    On November 29, 2007, Storm's former shareholder, EC Venture, filed in the Kyiv Oblast Commercial Court (the "EC Venture Court") a lawsuit seeking to unwind the 2004 transaction pursuant to which EC Venture sold its 23.98467% interest in Storm to Alpren (the "EC Venture Action").  (*See* Ex. 13 to Rolfe Decl.)

101.     EC Venture claims (1) that its signatory to the underlying 2004 sales agreement between EC Venture and Alpren, pursuant to which Alpren acquired EC Venture's interest in Storm (the "EC Venture Sales Agreement"), lacked authority to bind EC Venture to that Agreement; (2) that EC Venture executed the EC Venture Sales Agreement under the influence of mistake; and (3) that the Ukrainian civil code requires documents in a transaction involving the sale of a Ukrainian Company to be in Ukrainian.  (*See id.* at 1-3.)

102.     As a part of its lawsuit, EC Venture filed an *ex parte* request for injunctive relief, also dated November 29, 2007, to secure any judgment granted by the EC Venture Court. (*See* Ex. 14 to Rolfe Decl.)

103.     A hearing was initially scheduled for December 17, 2007; however, none of the parties to the EC Venture Action appeared at that hearing, which was then adjourned until January 28, 2008 (the "January 28 Hearing").  (*See* Ex. 16 to Rolfe Decl.)

104.     Although Storm became aware of the existence of the EC Venture Action in late December (after the canceled December 17, 2008 hearing), it did not receive a copy of the case file in that action until mid-January 2008.  (*See* Musatov Tr. at 153:2-154:4.)

105.     At the January 28 hearing, each of Storm and Alpren made oral representations and filed defensive motions with the EC Venture Court.  (*See* Klymenko Decl. at ¶ 71; Ex. 17 to Rolfe Decl.)

106.     Specifically, Storm filed (1) a motion to dismiss EC Venture's claims due to the expiry of the applicable statute of limitations; (2) a motion to cancel the EC Venture Injunction; and (3) a motion to transfer the case to the Kyiv Commercial Court.  (*See* Exs. R, S, & T to Klymenko Decl.)

107.    Alpren, in turn, filed a motion to dismiss on jurisdictional grounds pursuant to an exclusive New York choice of forum clause in the EC Venture Sales Agreement.  (*See* Ex. 17 to Rolfe Decl.)

108.    At the January 2008 hearing, EC Venture filed a motion for forensic examination of Alpren's signature to the underlying sales agreement.  That motion remains currently pending.  (*See* March 2008 Tr. at 101:11-20.)

109.    Although EC Venture's motivation in this suit is speculative, it is apparent that EC Venture seeks, through its return of its original stake in Storm (just under 24%), the acquisition of the equivalent stake of Storm's interest in Kyivstar—a stake worth approximately $1 billion, *i.e.*, about $900 million more than the consideration EC Venture initially received from Alpren for its stake in Storm.  (*See* Ex. 13 to Rolfe Decl. at 1 (EC Venture's original stake was 23.98467%); March 2008 Tr. at 55:2-3 (EC Venture received $120 million for the sale of its stake in Storm);  March 2008 Tr. at 155:6-8 (Kyivstar is worth $9-10 billion).)

110.    On November 29, 2007, the EC Venture Court granted EC Venture's request for injunctive relief (the "EC Venture Injunction").  (*See* Ex. X to the Declaration of Oleksiy Didkovskiy, dated January 22, 2008 (the "Didkovskiy Decl.") at 2.)

111.    In order to protect its interest in Storm's stake in Kyivstar, the EC Venture Injunction is extremely broad, prohibiting Storm "from taking any actions, including making decisions, entering into any transactions, issuing powers of attorney … , holding general meetings of participants of [Storm] … [and] participating in general meetings of a company … whose shares belong to [Storm]."  (*See id.* at 2.)

112.    The EC Venture Action had an immediate negative impact on Storm's affiliates, constituting an "event of default" under one credit facility worth $750 million that led

to an accelerated repayment of that loan; and potentially triggering a cross-default under a second credit facility worth about $2 billion.  (*See* Musatov Tr. at 158:3-14; 234:15-235:4.)

113.    Storm's motions to dismiss the EC Venture Action remain pending.  (*See* Khomyak Decl. at ¶ 42.)  Absent any new development in the EC Venture Action, Storm accordingly remains subject to the restrictions set forth in the EC Venture Injunction.  (*See id.* at ¶ 41.)

*Telenor's Motion for Contempt*

114.    On January 22, 2008, Telenor moved this Court by order to show cause for an order of contempt against Storm and additional contemnors based on Telenor's contention that Storm has completely failed to comply with the Final Award, and therefore the November 2 Order.  (*See* Telenor's Order to Show Cause, dated January 22, 2008.)

*The Antisuit Provisions*

115.    Telenor identifies two suits that it alleges remain pending in violation of the Antisuit Provisions:  (1) the Shevchenko Action (*see* TM Br. at 4, 9); and (2) the EC Venture Action (*id.* at 4-5, 9).

116.    Storm alleges that (1) the Shevchenko Action falls outside the scope of the Shareholders Agreement because it is an internal dispute concerning whether Storm may be compelled by its shareholders to violate Ukrainian law (*see* Storm's Memorandum in Opposition to Motion for Contempt, dated February 25, 2008 ("Storm's Memo in Opp.") at 17-18) and (2) the EC Venture case does not violate the Shareholders Agreement because it was initiated by a third-party unconnected to Storm.  (*See id.* at 13-14.)

*The Divestiture Provisions*

117.     Telenor further alleges that the divestiture by two Storm affiliates of their respective interests in Astelit LLC ("Astelit") and Ukrainian High Technologies ("UHT") (the "Divestitures"), both of which engage in the mobile telephony business in Ukraine, were sham transactions.  (TM Br. at 9-12.)

118.     Storm alleges that the Divestitures were undertaken in a good faith effort to comply with the Final Award and further alleges that the Divestitures do comply with the Final Award, obviating the need for a sale of its Kyivstar shares.  (*See* Storm's Memo in Opp. at 3-4.)

*Corporate Governance Provisions*

119.     Kyivstar has held seven EGMs since the issuance of Final Award.  Telenor initially alleged that Storm's failure to attend any of these meetings constituted a violation of the Corporate Governance Provisions of the Final Award.  (*See* TM Br. at 2-3.)

120.     These EGMs took place as follows: (1) October 1, 2007 at 10:00am; (2) October 1, 2007 at 2:00pm; (3) November 1, 2007 at 10:00am; (4) November 1, 2007 at 4:00pm; (5) November 23, 2007 at 10:00am; (6) December 3, 2007 at 10:00am; and (7) January 18, 2008 at 10:00am.  (*See* Didkovskiy Decl. at ¶ 4.)

121.     Telenor has subsequently conceded that Storm was under no obligation to attend the four meetings that predated the November 2 Order.  (*See* March 2008 Tr. at 35:19-36:1.)  Furthermore, Telenor also concedes that the December 3, 2008 meeting took place while the temporary stay granted by the Second Circuit was in effect.  (*See id.* at 36:9-14.)

122.     Accordingly, only two EGMs provide a basis for Telenor's allegations of contempt, the meeting of November 23, 2007 and the meeting of January 18, 2008.  Of these, the November 23, 2007 meeting took place while Storm's petition to this Court for a stay of

enforcement of the November 2 Order pending appeal the Second Circuit was *sub judice*.  (*See i.e., supra,* at ¶¶ 63-64; *infra* at ¶ 175.)

123.    With respect to the January 18, 2008 Kyivstar board meeting specifically, and the Corporate Governance Provisions generally, Storm concedes that it has not complied with the Final Award, but argues that its ability to comply is impossible due to (1) the existence of the EC Venture Injunction and (2) the fact that the Ukrainian courts have repeatedly confirmed that compliance with the Final Award would be a violation of Ukrainian law, that would result in civil and criminal penalties against Storm and its General director, respectively. (*See* Storm's Memo. in Opp. at 10-12, 14, 16.)

## Conclusions of Law

*The Contempt Standard*

124.    Courts have inherent power to enforce compliance with their lawful orders through civil contempt.  *See, e.g., Shillitani v. U.S.,* 384 U.S. 364, 370 (1966).   However, that power is "significantly circumscribed" in this Circuit.  *See, e.g., United States v. Local 180401 Int'l Longshoreman's Ass'n,* 44 F.3d 1091, 1095 (2d Cir. 1995).

125.    A party seeking an order of contempt in this Circuit must satisfy the following three elements:  (1) the order allegedly violated by the contemnor must be "clear and unambiguous"; (2) the proof of non-compliance by the contemnor must be "clear and convincing"; and (3) the contemnor must not have been reasonably diligent in attempting to comply with the relevant order.  *A.V. by Versace Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 288 (S.D.N.Y. 2000).

126.    The party moving for contempt bears the ultimate burden of establishing the foregoing elements.  *Levin v. Tiber Holding Corp.*, 277 F. 3d 243, 250 (2d Cir. 2002).

127.    A civil contempt order is not a punitive device.  *Huber v. Marine Midland Bank*, 51 F.3d 5 (2d Cir. 1995).  Rather, it is intended to be coercive and to encourage eventual compliance with the applicable judicial order.  *Id.* at 10.

128.    Accordingly, "a party's complete inability . . . to comply with an order . . . is a defense to a charge of civil contempt."  *Id.*  The burden of producing evidence of an inability to comply with an order rests on the alleged contemnor.  *Id.*

129.    This burden of production requires the alleged contemnor to establish, "clearly, plainly, and unmistakably" the impossibility of compliance.  *Id.*  Where such a showing is made, "punishment may not be imposed in a civil contempt proceeding."  *Id.*

130.    Thus, in order to hold an alleged contemnor in civil contempt, this Court must find both that the elements proving contempt of a valid court order have been met <u>and</u> that "the alleged contemnor has not clearly established his inability to comply with the terms of the order."  *Id.*

131.    Because the purpose of a civil contempt order is to coerce, rather than to punish, the temporal focus of a party's ability to comply with a prior order must be on the present.  *See U.S. v. Rylander*, 460 U.S. 752, 757 (1983) ("In a civil contempt proceeding such as this, of course, a defendant may assert a *present* inability to comply with the order in question.") (emphasis in original);  *Maggio v. Zeitz*, 333 U.S. 56, 74-75 (1948) (acknowledging that present lack of possession of property subject to turnover order was valid defense to contempt action seeking to enforce such order); *Combs v. Ryan's Coal Co., Inc.*, 785 F.2d 970 (11th Cir. 1986) ("The party seeking the contempt citation retains the ultimate burden of proof, but once he makes

out a *prima facie* case, the burden of production shifts to the alleged contemnor, who must then come forward with evidence to show a present inability to comply. . . .") (emphasis added). Therefore, any past violation of the November 2 Order is not relevant for purposes of Storm's present ability to comply.

I.

*Storm's Present Inability to Comply with the November 2 Order*

132.    Storm argues that it is presently unable to comply with the Final Award due to the existence of a Ukrainian court order, the EC Venture Injunction, which currently freezes Storm's ability to take any corporate action.  (*See* Storm Memo. in Opp. at 13-15.)

133.    Telenor argues that the EC Venture Injunction is the fruit of a collusive action and therefore meaningless.  (*See* TM Br. at 6, 14.)

134.    Telenor also argues that even if the EC Venture Action were a legitimate adversarial lawsuit, this would nevertheless fail to provide an adequate defense against an order of contempt because there is no question that Storm did not comply with the Corporate Governance provisions of the Final Award during the three weeks in November 2007 when the Final Award was fully enforceable against Storm.  (*See id.* at 14.)

135.    Setting aside for the moment the question of whether Storm was under an obligation to comply with the Final Award at any time prior to the filing of the EC Venture Action, it is clear that the overarching purpose of a contempt citation would not be met if this Court were to enter an order of contempt against Storm for any allegedly contumacious actions it has taken in the past if Storm is currently prohibited from complying with the Final Award.  To do so would serve a punitive, rather than coercive, purpose, which is not the function of a contempt order.  *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994) (citation omitted) (reversing civil contempt order for past violations of court order on

25

grounds that sanction on a past prohibited action had no coercive effect). *See also Boylan v. Detrio*, 187 F.2d 375 (5th Cir. 1951) (overturning finding of civil contempt based on defendant's delay in adhering to court order and resultant loss in plaintiff's stock value because finding was based upon past delays that could not be remedied).

136.    Indeed, this Court expressly stated at the March 11, 2008 hearing, in reference to Telenor's discussion of allegedly contumacious acts that took place between November 2 and November 29, 2007, that "[t]he contempt you [Telenor] are seeking is civil contempt.  That is, you are not, as I understand it, seeking to punish Storm for violating the Court's order in November of 2007.  You are seeking contempt sanctions that will force Storm to comply with those provisions [going forward]."  (*See* March 2008 Tr. at 65:12-16.)

137.    Consequently, the question of whether Storm should be found in civil contempt of this Court's November 2 Order, hinges on the question of whether Storm has a present ability to comply with that order.  For the reasons set forth below, this Court finds that it does not.

138.    As noted above, Courts in this Circuit will not hold a party in civil contempt if compliance with the order at issue is impossible.  *See Shillitani*, 384 U.S. at 371.

139.    The EC Venture Injunction on its face stops Storm from engaging in any of its regular business activities, including holding shareholders meetings (and therefore from passing the resolutions that are required in order to comply with the Corporate Governance Provisions).  It follows that if the EC Venture Injunction is a valid court order, Storm cannot comply with the Final Award.  (*See* Ex. X to Didkovskiy Decl. at 2.)

140.    Storm has produced a copy of the EC Venture Injunction.  (*See id.*)

141.    Telenor does not dispute that the EC Venture Injunction is a valid order emanating from a Ukrainian court whose jurisdiction over the matter has not been questioned. *See Johnston v. Compagnie Generale Transatlantique*, 152 N.E. 121, 122 (N.Y. 1926) ("a foreign judgment is conclusive on the merits . . . and [it] can be impeached only by proof that the court in which it was rendered [did not have] jurisdiction of the subject matter.")

142.    Given that Telenor does not dispute the legal validity of the EC Venture Injunction, Storm has satisfied its burden of production with regard to the question of impossibility arising from the existence of the EC Venture Injunction and need not do anything more. *Id.*

143.    As this court noted at the March 2008 hearing, "it doesn't make sense to say that a party that has presented a court order has, in the ordinary course, some further burden of showing affirmatively that it is a legitimate court order.  It seems to me somehow I have to be persuaded that it isn't real."  (*See* March 2008 Tr. at 77:1-5.)

144.    Once the contemnor satisfies its burden of production, the movant is obliged to demonstrate that the contemnor's claims of impossibility have been insufficiently established in order to prevail, and thus have the burden of producing evidence to do so.  *See Walt Disney Co. v. Video 47 Inc.*, 972 F. Supp. 595 (S.D. Fla. 1996) (shifting burden of production back upon movant to produce evidence that the defendant is able to comply with the underlying order).[5]

145.    Telenor urges this court to ignore the EC Venture Injunction on the ground that it is the fruit of a collusive action between Storm, Storm's affiliates, and EC Venture itself. (*See* TM Br. at 4, 14.)  As evidence of such collusion, Telenor points to the fact that (a) EC

---

[5]    For example, in *S.E.C. v. Musella*, 818 F. Supp. 600, 610-11 (S.D.N.Y. 1993), the SEC was able to refute the Defendant's assertion that it was unable to comply with a money judgment by presenting evidence of the contemnor's assets that proved a present ability to pay.  Here, Telenor has made no such showing.

Venture was a dormant company that was in the process of filing for insolvency, only to be purchased and revived a few weeks shortly after confirmation of the Final Award (*See* TM Br. at 5); (b) the EC Venture Injunction was obtained around the time that the divestiture of Kyivstar could theoretically have been triggered, as set forth in the Final Award (*see* TM Reply Br. at 4-5); (c) the EC Venture Injunction is specifically tailored to prevent compliance with the Final Award (*see* March 2008 Tr. at 57:24-25.); (d) the legal arguments made by EC Venture essentially track the arguments made in the April 2006 Action (*see* TM Br. at 6, n.11; March 2008 Tr. at 57:1-9); (e) the files contained in the EC Venture litigation could only have come from Storm itself (*see* TM Reply Br. at 5; March 2008 Tr. at 47:19-53:25); and (f) neither Storm nor Alpren took any steps to defend themselves in that case (*see* TM Br. at 6).

146.    With respect to the first three factors, EC Venture's resurrection, the timing of the EC Venture Injunction, and the scope of the EC Venture Injunction, it must be recalled that what EC Venture seeks is the return of its stake in Storm.  (*See* March 2008 Tr. at 97:9-15.) And since Storm's *raison d'être* is to hold shares of Kyivstar, EC Venture also therefore seeks an equal percentage of Storm's stake in Kyivstar itself — a stake worth approximately $1 billion, or almost $900 million dollars more than EC Venture received as consideration from Alpren for the sale of its stake in Storm in 2004.  (*See supra* at ¶ 109.)

147.    The economic interest for EC Venture in filing this action is clear, as is EC Venture's desire to prevent Storm from alienating the interest in Kyivstar that it currently seeks.

148.    Given the tremendous publicity surrounding the parties' bitterly contested dispute (which included statements by Telenor on when the Divestitures must take place), it is not surprising that EC Venture would time its lawsuit to coincide with Storm's potential

requirement to dispose of the Kyivstar shares that EC Venture seeks to take back through the reacquisition of its interest in Storm.

149.    Indeed, there is good reason why the EC Venture Action would be timed to coincide with and seek to block a potential obligation by Storm to comply with the Final Award. This is because compliance with that award would eliminate Storm's value, rendering meaningless EC Venture's suit.  The connection of the EC Venture Suit to the Final Award is not, therefore, unusual or suspicious in this context.

150.    With respect to Telenor's next argument, namely that EC Venture's arguments track Storm's arguments in the April 2006 Action (Case No. 40/242) litigation (*see* TM Br. at 6, n. 11), this is not sufficient to give rise to a presumption of collusion in light of the fact that Alpren was successful in that case.

151.    EC Venture would have every reason to make the same arguments that Alpren made in the April 2006 Action to the extent that such an argument was available to it. Furthermore, the publicity given to this dispute by both Storm and Telenor makes clear that any interested party would be well aware of the arguments made by the parties in earlier proceedings.

152.    Finally, with respect to the Telenor's final point, which is that EC Venture appears to have used copies of the Ukrainian Decisions previously available only to Storm (*see* TM Reply Br. at 5; *see also* March 2008 Tr. at 47:19-53:25), the fact that EC Venture had such files in its possession in and of itself means nothing, because there are any number of ways in which EC Venture could have obtained access to such materials.

153.    As this Court noted in the March 11 hearing, "I am still not sure I understand why the fact that EC Venture somehow got its hands on a copy of something that was

once in the possession of Storm means that EC Venture[] is controlled by Storm or controlled by Alpren or anything else.  It is just a fact about these documents."  (March 2008 Tr. at 111:19-23.)

154.    Indeed, Storm presented evidence to this Court that identical copies of the Ukrainian Decisions to those present in the EC Venture case file are available from other case files in Ukraine, which Telenor's own witness, Oleksiy Didkovskiy testified, are easily accessible through extra-official channels.  (*See* Storm's letter to J. Lynch, dated March 25, 2008 at 2.  *See also* Supplemental Declaration of Anna-Marta Khomyak, dated March 25, 2008 (the "Supp. Khomyak Decl.") and Exs. A & B thereto.  *See also* March 2008 Hearing Tr. at 18:16-19, 24:7-25:18.)

155.    In addition, the Ukrainian Decisions were put in the public domain by Altimo as the result of their distribution to members of the Ukrainian press as part of a public relations campaign.  (*See* Altimo Entities' letter to the Hon. Gerard E. Lynch, dated March 25, 2008.  *See also* Declaration of G.I. Lefor, dated March 24, 2008 at ¶¶ 4-6; Declaration of Natalya Krasnenkova, dated March 21, 2008.)

156.    In sum, whatever this Court may think of the underlying April 2006 Action, the similarity between that action and the EC Venture Action is insufficient to justify a finding that EC Venture colluded with Storm or any other party in order to bring the EC Venture Action.

157.    In addition, Storm's affiliates presented unrebutted testimony that the EC Venture litigation constituted an event of default under a credit facility valued at $750 million, leading to an accelerated repayment of the loan, and could trigger a cross-default on another separate credit facility valued at $2 billion.  (*See* Musatov Tr. at 158:3-4; 234:15-235:4.)

158.    It is unlikely that Storm or its affiliates would collude with another party to bring about the EC Venture Action where to do so would cause such significant financial harm to Storm's affiliates.

159.    Telenor's allegation that Storm has not defended itself in the EC Venture Action is incorrect.  Storm has filed no less than three defensive motions including a motion to dismiss the action, vacate the injunction, and transfer the case to the Kyiv City Commercial Court.  (*See* March 2008 Tr. at 85:23-86:4.  *See also* Exs. R, S, & T to Klymenko Decl.)

160.    Finally, Altimo vice-president Oleg Malis testified that EC Venture's owner, a Mr. Konstantyn Shadryn, contacted Mr. Malis and asked for $500 million to "recall this suit from the court." (*See* Malis Tr. at 67:16-68:11.)

161.    Thus, it appears that the EC Venture Action is nothing more than classic greenmail/corporate raider suit.

162.    Accordingly, the circumstantial evidence presented by Telenor to refute Storm's evidence of a valid Ukrainian order precluding Storm's ability to comply with the Final Award is not sufficient to show that the EC Venture Action is collusive and therefore fails to overcome Storm's showing of impossibility of compliance.

## II.

*Alleged Violations of the November 2 Order Predating the EC Venture Order*

163.    Although the unchallenged validity of the EC Venture Injunction is sufficient for a finding of impossibility, Telenor raised several additional allegations that shall be addressed below for the sake of completeness.

164.    Notwithstanding the fact that Telenor's allegations of past violations of the November 2 Order are irrelevant for the purposes of this civil contempt action, none of Storm's actions prior to the entry of the EC Venture Injunction may be considered contumacious.

*Corporate Governance Provisions*

165.    Telenor alleges Storm failed to comply with the November 2 Order by (1) failing to attend no less than seven Kyivstar shareholders meetings; and (2) failing to incorporate three Storm subsidiaries and transfer one Kyivstar share to each.  (*See* TM Br. at 2-3.)

166.    It is well-settled in this district, and Telenor does not contend otherwise, that arbitral awards are not self-executing.  *See D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) ("Because [a]rbitration awards are not self-enforcing, they must be given force and effect by being converted to judicial orders by courts; these orders can confirm and/or vacate the vacate the award, either in whole or in part.") (citation and internal quotation omitted). *See also Fotochrome, Inc. v. Copal Co. Ltd.*, 517 F.2d 512, 516 (2d Cir. 1975) ("The [arbitral] award itself is inchoate until enforced by judgment."); *Massen v. Cliff*, No. 02 Civ. 9282, 2003 WL 2012404, at *2 (S.D.N.Y. May 1, 2003) ("[T]he nature of an arbitration award is such that further judicial action is inevitably necessary in order for the award to be enforceable. Arbitration awards are not self-executing.") (citations omitted).

167.    Indeed, at the March 2008 Hearing, counsel for Telenor itself conceded, "I don't think that it can be disputed that arbitration awards in the United States are not self-executing."  (March 2008 Tr. at 35:19-21.)

168.    Of the seven Kyivstar board meetings Telenor alleges Storm contumaciously failed to attend, four of these took place *before* this Court's confirmation of the Final Award.  (*See* Didkovskiy Decl. at ¶ 4.)

169.    As a result, Telenor's concession that the Final Award was not enforceable until after the entry of the November 2 Order means that Storm was under no obligation whatsoever to attend those meetings. (*See* March 2008 Tr. at 35:22-36:1.)

170.    Of the remaining three Kyivstar board meetings, one took place while the Second Circuit's temporary stay was in place, meaning that, as Telenor also concedes, Storm was under no obligation to attend that meeting either. (*See id.* at 36:9-14.)

171.    Another of these meetings post-dates the entry of the EC Venture Injunction, which renders compliance impossible, leaving just one Kyivstar Board meeting the occurrence of which took place while the Final Award was briefly enforceable (between November 2, 2007 and November 29, 2007) against Storm.

172.    That meeting, which took place on November 23, 2007, transpired while Storm's application for a stay of enforcement of the November 2 Order was *sub judice*.

173.    Further, it was during this period between November 2, 2007 and November 29, 2007, that Telenor alleges that Storm should have (1) incorporated three subsidiaries and (2) transferred one Kyivstar share to each of those subsidiaries. (*See* TM Br. at 3.) Had Storm taken these actions, it would have mooted the basis for its stay application and surrendered substantive arguments that were still being considered.

174.    In this context, it cannot be argued that Storm was acting in bad faith when it refused to comply on the ground, as it repeatedly informed Telenor that its application for a stay was pending. (*See* Letter from Mr. Klymenko, dated November 15, 2007, annexed as Ex. L to Sills Decl. *See also* letter from Mr. Van Tol to Mr. Sills, dated December 3, 2007, annexed as Ex. N to Sills Decl.)

175.    Indeed, even where courts in this Circuit enter an order of civil contempt against a party, they routinely refuse to include into their remedial calculus events that took place when a stay application was pending.  *See Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992) (contempt penalties not enforced against period during which appeal was pending); *State of New York v. Shor Realty Corp.*, 763 F.2d 49, 51-52 (2d Cir. 1985) (affirming contempt penalties from date party found in contempt as opposed to date when underlying judgment issued).

176.    Such a policy is consistent with the general purpose of a civil contempt action, which, as noted above, is not to punish a party for past failure to comply with an existing judicial order, but is instead supposed to persuade such party into prompt compliance <u>going forward</u>.  *See supra* at ¶¶ 135-36.

177.    Indeed, there are no reported cases that this Court is aware of, where civil contempt has been awarded against a party on the sole basis of a past failure to comply where present compliance was demonstrably impossible.

*Antisuit Provisions*

178.    By its very terms, the Antisuit Provisions do not extend to litigation concerning the enforcement of the Final Award or matters that are unrelated to the parties' rights under the Shareholders Agreement.

179.    Telenor does not assert that the Pechersk Action violates the Final Award's Antisuit Provisions because it cannot.  This action is indisputably an action relating to the enforceability of the Final Award.  (*See* Khomyak Decl. at ¶¶ 26-31.)  That it seeks an order declaring the Award to be unenforceable in the territory of Ukraine does not render that action a violation of the Final Award any more than Storm's counter motion to vacate the Final Award or Storm's appeal to the Second Circuit.

180.    Indeed, this Court has previously noted on several occasions that an enforcement action in Ukraine was an inevitable outcome of these proceedings.  (*See* Ex. P to November 2007 Van Tol Decl. at 19:23-20:2 ("Unlike an award of damages, which at least conceivably . . . could be enforced somewhere else in the world, aren't all these forms of relief [that Telenor Mobile is seeking] things that at the end of the day you are going to have to go back and enforce in Ukraine?").)

181.    The Tribunal itself made the same observation at various points in the Arbitration proceedings.  (*See* excerpt from the transcript of the August 14, 2006 hearing before the Arbitral Tribunal at 227:21-228:9, annexed hereto as Ex. C to the Declaration of Pieter Van Tol dated February 25, 2008 (the "Van Tol Decl."); excerpt from the transcript of the June 29, 2006 hearing before the Arbitral Tribunal at 59:19-24, annexed hereto as Ex. D to Van Tol Decl.)

182.    Even counsel for Telenor Mobile has conceded that Telenor Mobile would have to try to enforce the arbitral award in Ukraine.  (See Ex. D to Van Tol Decl. at 59:25-60:1; Ex. C to Van Tol Decl. at 204:7-12, 228:13-14, 232:6-7; excerpts from the transcript of the December 18, 2006 hearing before the Arbitral Tribunal at 20:13-14, 20:24-21:8, annexed hereto as Ex. E to Van Tol Decl.  ("[W]e would seek to enforce that award . . . in the Ukraine").)

183.    There is no evidence that the Tribunal wanted to extend the reach of the anti-suit injunction to enforcement proceedings and there is no evidence that Storm waived such a vital right.  Thus, the Pechersk Action cannot be construed as a violation of the anti-suit injunction.

184.    The same is true for the Shevchenko Action.  In broad terms, the Shevchenko Action involves the issue of whether Mr. Klymenko and Storm may be forced to

violate Ukrainian law and contradict Ukrainian precedent.  (*See* Khomyak Decl. at ¶¶ 35-38.
*See also* Klymenko Decl. at ¶ 63.)  The specific matter that the Shevchenko District Court ruled
on was whether Alpren and Hardlake's actions at the August 27 EGM used Storm's corporate
governance procedures to violate internal Ukrainian law, which is not an issue that was before
the Tribunal.  (*See* Ex. E to Sills Decl. at 4-8.)

185.    Instead of showing how the anti-suit injunction extends to the Shevchenko
Action, Telenor Mobile falls back on its oft-repeated (but never proven) assertion that the
Shevchenko Action is collusive.  (*See* Letter from Robert L. Sills, dated Nov. 27, 2007, Ex. M to
Sills Decl. at 2-3.)  Telenor Mobile, however, cannot legitimately label the Shevchenko Action
"collusive," given that, as discussed above, Alpren and Hardlake opposed the relief and have
filed appeals from adverse rulings.

*Divestiture Provisions*

186.    Storm is not in violation of the Divestiture Provisions because the
divestitures transacted by its affiliates with respect to UHT and Astelit satisfy the requirements
of the Final Award.  *See* Altimo, Alpren and Hardlake Proposed Findings of Fact and
Conclusions of Law at ¶¶ 20-37.  *See Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291, 293 (2d.
Cir. 2008) (contempt inappropriate where party had made diligent efforts to comply, including
obtaining advice of counsel and conducting negotiations with involved parties, even though
proposed contemnor had not exhausted all available means of compliance).

*Storm's Compliance with the Final Award Would Cause It to Violate Ukrainian Law in Ukraine*

187.    It is well settled that the courts may not order a party to take action (under
penalty of contempt or other sanctions) where such an order would cause the party to violate
foreign civil or criminal law in a foreign territory.  *See, e.g.*, *Societe Internationale v. Rogers*,

357 U.S. 197, 211-12 (1958) (holding that sanctions for non-production of documents were not warranted and that fear of criminal prosecution in foreign jurisdiction was a "weighty excuse" for failure to produce); *Application of Chase Manhattan Bank*, 297 F.2d 611, 613 (2d Cir. 1962) (refusing to order compliance with subpoena where the party risked the imposition of sanctions that were the equivalent of criminal penalties); *Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960) ("[U]pon fundamental principles of international comity, our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures."). *Cf. U.S. v. First Nat'l City Bank*, 396 F.2d 897, 901-902 (2d Cir. 1968) (noting that "a court of one country should make an effort to minimize possible conflict between its orders and the law of a foreign state affected by its decision" and that a party opposing compliance does not have to show that it would suffer criminal liability in a foreign country because "[t]he vital national interests of a foreign nation, especially in matters relating to economic affairs, can be expressed in ways other than through the criminal law").

188.    Here, a contempt order may not issue because, as set forth below, compliance with the Final Award would cause Storm to violate Ukrainian law in Ukraine.

*The Ukrainian Decisions*

189.    The Ukrainian courts have consistently concluded that the Shareholders Agreement, and the arbitration clause therein, are void. While this Court has held that the 2006 Ukrainian Decisions are not enforceable judgments under New York law (*see* Ex. J. to Sills Decl. at *10-14), it has also noted that those decisions are evidence of the law to be applied in Ukraine. (*See* Ex. P to November 2007 Van Tol Decl. at 28:19-23.) Moreover, it is undisputed that the 2006 Ukrainian Decisions are now *res judicata* in Ukraine. Thus, Storm would be in direct

contravention of the 2006 Ukrainian Decisions, in Ukraine, if it were to comply with the provisions of the Final Award.  (*See* Khomyak Decl. at ¶ 9.)

*The December 22 Order*

190.    Storm would also violate the December 22 Order if it were to comply with the provisions in the Final Award ordering it to (a) nominate candidates to the Kyivstar board; (b) take the necessary steps to ensure those candidates are elected to the Kyivstar board, and (c) amend the Kyivstar charter to allow Storm to take the foregoing measures.

191.    As discussed above (*see supra* at ¶ 36), the provisions in the Shareholders Agreement relating to the nomination and election of candidates to the Kyivstar board are materially the same as the provisions in the Kyivstar charter that the Ukrainian court voided in the December 22 Order.  Under Ukrainian law, the provisions of a charter control on corporate governance issues.  Thus, Storm's compliance with the provisions in the Shareholders Agreement that are parallel to the abrogated provisions in the Kyivstar charter would cause Storm to violate Ukrainian law, as embodied in the December 22 Order.

192.    Furthermore, the Ukrainian courts have exclusive jurisdiction over whether any amendment to the Kyivstar charter complies with Ukrainian law governing Ukrainian companies.  If, therefore, Storm were to amend the Kyivstar charter, as directed by the Final Award, it would again violate Ukrainian law.

*The Ukrainian Anti-Monopoly Law*

193.    As set forth in the legal opinion that Storm and Mr. Klymenko obtained from Professor Roman Maydanyk (which Telenor has not rebutted in this proceeding), compliance with the Final Award's non-compete provisions would violate Ukrainian anti-monopoly legislation.  Professor Maydanyk points out that non-compete clauses — which are

concerted actions by competitors that, by definition, restrict competition — infringe several sections of the Ukrainian anti-monopoly law.  *See* Legal Opinion of Judicial Science Doctor Roman Maydanyk, dated February 9, 2008 (the "Maydanyk Op."), annexed as Ex. L to Klymenko Decl. at ¶¶ 33-35.)[6]

194.    Non-compete clauses are impermissible in an agreement among competitors in Ukraine unless they are approved in advance by the Ukrainian anti-monopoly committee ("AMC").  (*See* Ex. L to Klymenko Decl. at ¶¶ 35-36.  *See also* Khomyak Decl. at ¶ 13.)

195.    Telenor and Storm did not file the requisite application for approval of the non-compete clause before the AMC.  (*See* Ex. L to Klymenko Decl. at ¶ 36.)

196.    Accordingly, Storm's compliance with the non-compete provisions of the Shareholders Agreement, in Ukraine, would constitute a concerted action by competitors to restrict market competition, which is a *per se* violation of Ukrainian competition law, punishable by a fine of up to 10% of each of Telenor's and Storm's annual turnover in the year preceding the violation.  (*See* Art.10 of the Law of Protection of Economic Competition, Ex. I to Khomyak Decl.; Khomyak Decl. at ¶13.  *See also* Ex. L to Klymenko Decl. at ¶ 35 n.14.)

197.    Thus, the illegality of the non-compete provisions in the Shareholders Agreement, as a matter of Ukrainian law, provides another basis for the Court's conclusion that it cannot compel Storm to comply with the Final Award.

---

[6]    The Tribunal did not reach the issue of whether the non-compete provision violates Ukrainian law because it held that New York law governs the Shareholders Agreement.  Below, the Court addresses a separate issue, which is whether compliance with the non-compete provision, in Ukraine, would cause Storm to violate Ukrainian law.

Dated:  April 9, 2008

Respectfully submitted,

LOVELLS LLP

By: _____/s/ Pieter Van Tol_____
     Pieter Van Tol (PVT-2455)
     Gonzalo S. Zeballos (GZ-5994)

590 Madison Avenue
New York, New York 10022
Telephone: (212) 909-0600
Facsimile: (212) 909-0660
pieter.vantol@lovells.com
gonzalo.zeballos@lovells.com

Attorneys for Respondent Storm LLC