UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                         :

TELENOR MOBILE COMMUNICATIONS AS,  :

                         :

          Petitioner,     :

                         :       07 Civ. 6929 (GEL)

   -v.-                      :

                         :

STORM LLC,                 :       **OPINION AND ORDER**

                         :

         Respondent,   :

                         :       **FINDINGS OF FACT**

   -and-                  :           **AND**

                         :   **CONCLUSIONS OF LAW**

ALTIMO HOLDINGS & INVESTMENTS,    :
LIMITED, ALPREN LIMITED, and HARDLAKE :
LIMITED,                :

                         :

        Additional Contemnors._____:

                         :
-------------------------------------------------------------x

Robert L. Sills and Jay K. Musoff,
Orrick, Herrington & Sutcliffe LLP
New York, NY, for petitioner.

Pieter Van Tol, Gonzalo S. Zeballos, and Eric Z.
Chang, Lovells LLP, New York, NY, for respondent.

Ronald S. Rolfe and Tara Tune,
Cravath, Swaine & Moore LLP, New York, NY,
for additional contemnors.

GERARD E. LYNCH, District Judge:

      Telenor Mobile Communications AS ("Telenor"), a Norwegian telecommunications

company, and Storm LLC ("Storm"), a company organized under the laws of Ukraine, jointly

own Kyivstar G.S.M. ("Kyivstar"), a Ukrainian telecommunications venture.  Telenor and Storm

had a dispute over, inter alia, the validity and effect of a 2004 shareholders' agreement related to

the corporate governance and management of Kyivstar (the "Shareholders Agreement" or "Agreement").  That dispute was resolved by an August 1, 2007, arbitration award (the "Final Award" or "Award"), granting various relief to Telenor.  On November 2, 2007, this Court confirmed the Award (the "November 2 Order").  See Telenor v. Storm, 524 F. Supp. 2d 332, 369 (S.D.N.Y. 2007) ("Telenor").  Now Telenor moves the Court to hold Storm and its corporate parents, Altimo Holdings & Investments Limited ("Altimo"), Alpren Limited ("Alpren"), and Hardlake Limited ("Hardlake") (Altimo, Alpren, and Hardlake collectively, the "Altimo Entities"), in civil contempt for failing to comply with the November 2 Order.  That motion will be granted.

## FACTUAL FINDINGS

### I.    The Parties and the Dispute

Telenor, a Norwegian telecommunications company headquartered in Fornebu, Norway, and Storm, a Ukranian company headquartered in Kiev, Ukraine, are the sole owners of Kyivstar, the largest mobile telecommunications company in Ukraine, with over 18 million subscribers and one billion dollars in revenue.  (Petitioner's Proposed Findings of Fact and Conclusions of Law ("Telenor Findings") ¶¶ 7, 8, 10.)  Telenor owns approximately 56.5% of the issued and outstanding shares of Kyivstar, and Storm owns approximately 43.5%.  (Id. ¶ 8.) Storm is wholly owned by Alpren and Hardlake, two Cypriot corporations that are, in turn, wholly owned by Altimo.  (Id. ¶ 10.)

The Shareholders Agreement between Telenor and Storm was the product of a series of negotiations arising from the desire of Alfa Telecommunications, a predecessor company to Altimo, to acquire a significant share in Kyivstar.  Telenor, 524 F. Supp. 2d at 336.  In 2002,

Alfa Telecommunications purchased a majority interest in Storm and used Storm as a vehicle to acquire an interest in Kyivstar.  Id.  Because Storm obtained over 40% of the Kyivstar shares – which under Ukrainian law gave it substantial rights in corporate governance – Telenor negotiated an agreement obligating Storm not to exercise its rights in certain ways.  Id.  Wary of the Ukrainian legal system, Telenor also negotiated an arbitration clause, which provided that "[a]ny and all disputes and controversies arising under, relating to, or in connection with" the Shareholders Agreement would be resolved by a tribunal of three arbitrators in New York.  Id.

Telenor and Storm performed their respective obligations under the Agreement for over a year.  Id. at 337.  During 2005, however, tension developed between the parties, and Telenor accused Storm of violating the Shareholders Agreement in ways that significantly obstructed governance of Kyivstar.  Id.  In particular, Telenor claimed that Storm had failed to (1) attend shareholder meetings, (2) appoint candidates for election to the Kyivstar board, (3) attend board meetings, and (4) participate in the management of Kyivstar, including enforcement and amendment of the Kyivstar Charter.[1]  Id.  Telenor also claimed that the partial ownership of two competing Ukrainian telecommunications companies by Alfa Group, the direct parent of Altimo, and Russian Technologies, a subsidiary of Alfa Group, violated the Agreement's non-compete clause.  Id.  In February 2006, Telenor sought redress for these alleged violations by invoking the arbitration clause, and the parties appointed arbitrators and began proceedings before the

---

[1] Amendment was made necessary by a December 22, 2005, Order of the High Commercial Court of Ukraine that found that the Kyivstar Charter was invalid due to the failure of Kyivstar to comply with Ukrainian laws regarding, inter alia, shareholders' rights and the election of board members.  Telenor, 524 F. Supp. 2d at 337 n.3.

tribunal (the "Tribunal").[2] Id.

## II.   History of Collusive and Vexatious Litigation

Despite the agreement to submit all disputes to arbitration, Storm and its affiliates undertook extensive litigation – often vexatious and collusive – in an attempt to prevent the arbitration from occurring and, after it occurred, from being enforced.

In April 2006, Alpren, the 49.9% owner of Storm, petitioned a Ukrainian court for a declaration that the Shareholders Agreement was invalid. Id. The proceeding had a number of curious features. The plaintiff in the suit, Alpren, was challenging an agreement to which it was not a party. Telenor, which is a party to the Agreement, was not named as a defendant in the suit, and neither Telenor nor the arbitrators were advised of its pendency. Id. at 338. Storm, the nominal defendant in the suit, did not retain counsel or file written opposition to the action. Id. Its general director, Vadim Klymenko, who is not a lawyer, appeared in person and registered oral opposition to Alpren's demands. Id. The bona fides of this opposition is undermined by the fact that Storm was a subsidiary of Alpren, that Klymenko was a Vice President of Altimo, the ultimate parent of both Storm and Alpren,[3] and that the proceeding lasted all of about twenty minutes. Id. Not surprisingly, the Ukrainian court declared the Shareholders Agreement invalid. Id.

---

[2] The Tribunal was composed of Kenneth R. Feinberg, Gregory B. Craig, and William R. Jentes. Telenor, 524 F. Supp. 2d at 339.

[3] Storm and The Altimo Entities contend that Klymenko is not and never was a Vice President of Altimo. However, the Court finds that Klymenko was an employee of Altimo. (See V., infra.)

4

The reason given by the court was that Valeriy Nilov, the general director of Storm at the time it entered into the Agreement, "acted unlawfully and in excess of [his] powers" by executing the Agreement.  Id.  It held this despite the facts that Storm's shareholders had passed a resolution by unanimous consent authorizing its general director to enter into the Shareholders Agreement on Storm's behalf, and that, upon execution of the Agreement, Storm delivered to Telenor a document signed by Yuri Tomanov, the Chairman of Storm, certifying that Nilov possessed full authority to sign on Storm's behalf.  Id. at 336-37.  Klymenko did not present any of this evidence to the Ukrainian court, purportedly because he was unable to locate it in his review of Storm's files and because he "had not been told by anyone at Storm that there was a [meeting] granting Mr. Nilov the required authority."[4]  (1/22/08 Sills Decl. Ex. F ¶ 8.)

Storm appealed the result to the Ukrainian Appellate Commercial Court, again without submitting any substantial defense of its position.  Telenor, 524 F. Supp. 2d at 338.  Instead, Storm made only a cursory argument that the Agreement was not examinable by the Ukrainian court because of the pending New York arbitration, again presenting no evidence of Nilov's authority to enter into the Agreement.  Id.  Once again, Telenor was not present or notified of the hearing.  Id.  Immediately following the hearing, on May 25, 2006, the appellate court not only affirmed the lower court's decision against Storm, but held sua sponte that the arbitration clause in the Agreement was specifically invalid.  Id.

_____

[4] Notably, Klymenko does not say that he did not *know* about the authorization.  Indeed, it is not clear who "at Storm" Klymenko might have expected to tell him about the meeting authorizing Nilov to sign the Shareholders Agreement, as Klymenko is Storm's sole officer, and its only other employees, according to Klymenko, are a secretary and a driver.  (Telenor Findings ¶¶ 12, 116.)

On the basis of these Ukrainian court rulings, on June 7, 2006, Storm asked the Tribunal to dismiss the arbitration.  Id. at 339.  After a series of hearings, the Tribunal rejected Storm's argument, finding in an October 22, 2006, "Partial Final Award" that, inter alia, the Ukrainian courts' conclusions were not binding on them and, in any event, were based on an incomplete record and collusive litigation.  Id.

After losing its motion to dismiss, Storm's attempts to avoid arbitration proceeded on two fronts.  First, on November 8, 2006, it obtained a "clarification" from the Ukrainian courts that the arbitration clause was invalid, and that the court's earlier order "shall apply and be binding also upon those entities that were not among the parties to the [original] court proceedings," apparently as an attempt to cure Alpren's failure to join Telenor as a party in the earlier proceedings.  Id.  The Ukrainian court also ruled that "[s]hould the parties and the arbitrators . . . ignore the above circumstances and render an award on the dispute, such acts shall constitute a violation of the court decision."  Id.  Storm returned to the Tribunal and argued that the November 8 ruling precluded it from appearing at the upcoming arbitration hearing and requested its postponement, but the Tribunal denied the postponement and reaffirmed the December hearing dates.  Id.

Second, Storm filed a petition in New York state court to enjoin arbitration and vacate the Partial Final Award.  Storm v. Telenor, No. 06 Civ. 13157, 2006 WL 373657, at *3 (S.D.N.Y. Dec. 15, 2006) ("Storm").  Telenor removed the action to this Court, which denied preliminary relief, holding that Storm was insufficiently likely to prevail on the merits, given the likely correctness of the arbitrators' ruling, the apparently collusive nature of the Ukrainian litigation, and the fact that the Ukrainian judgment did not prohibit Storm from participating in

the arbitration.  (Id.)

Following this decision, the Ukrainian parties returned to court.  Alpren once again filed suit, this time against Klymenko as general director of Storm.  Telenor, 524 F. Supp. 2d at 340. On December 1, 2006, again without notice to Telenor, Alpren secured an injunction from the Ukrainian court barring Telenor, Storm, and Klymenko from participating in the arbitration.  Id. Three days later, on December 4, 2006, Storm again sought to halt the arbitration on the basis of the December 1 injunction.  Id.  The Tribunal again denied the request and ordered the hearing to proceed as scheduled.  Id.

After this ruling, Telenor sought relief from this Court, counterpetitioning to compel arbitration and seeking an anti-suit injunction against the Storm, Altimo, and Alpren to prevent further litigation in the Ukraine.  See Storm, 2006 WL 3735657, at *1.  The Court held several days of hearing and argument, at which all parties appeared, represented by counsel.[5]  Id.  On December 15, the Court found that the Ukrainian litigation had been "conducted in the most vexatious way possible," id. at *9, and that Nilov "had at least apparent authority to sign the Shareholders Agreement and thereby bind Storm to the Agreement's arbitration clause," id. at *8.  The Court granted Telenor's petition to compel arbitration and preliminarily enjoined "Storm, Altimo and Alpren . . . from bringing or attempting to cause the enforcement of any legal action in the Ukraine that would disrupt, delay or hinder in any way the arbitration proceedings between Telenor and Storm in New York."[6]  Id. at *14.[7]

---

[5] Altimo and Alpren entered only a limited appearance to contest the Court's personal jurisdiction over them.  Storm, 2006 WL 3735657, at *13.

[6] The Court further noted:

**III.     The Arbitration and the Final Award**

Despite Storm's attempts to halt or delay the arbitration proceedings, hearings took place on December 18-19, 2006.  Telenor, 524 F. Supp. 2d at 340.  Storm showed up to request that the Tribunal adjourn the proceedings until the Ukrainian court action had run its course, but the Tribunal denied Storm's application.  Id. at 340-41.  Storm subsequently physically withdrew from the hearing room and did not participate further in the hearing.  Id. at 341.

The arbitration went forward.  The Tribunal heard or received testimony from eighteen different witnesses and received hundreds of exhibits and thousands of pages of other documentary submissions.  Id.  Both Storm and Telenor had previously submitted lengthy pleadings, briefs, letters, and submissions of legal authorities in which they analyzed the facts, discussed the relevant law, and argued their positions.  Id.  The Tribunal also received post-hearing briefs from both parties, though Storm's brief limited itself to addressing four issues relating to the governing law to be applied.  (Final Award at 32-33.)

---

> After every setback in the arbitration or in this Court, parties
> associated with Storm have proceeded to the Ukrainian courts,
> seeking and obtaining broad rulings without any meaningful
> opposition.  Telenor seeks to arbitrate the dispute in a neutral
> forum; Storm and its parents seek to coopt that process by
> resorting to a forum in which their home-court advantage is
> magnified by their willingness to play the game without letting the
> other team show up.

Storm, 2006 WL 3735657, at *10.

[7] Altimo and Alpren appealed this Court's decision.  The appeal was withdrawn as moot, however, when the arbitration was completed, a Final Award entered, and the Award confirmed by this Court before the appeal was argued.

On August 1, 2007, the Tribunal unanimously issued the Final Award.  The Tribunal reaffirmed the Partial Final Award, holding that it had jurisdiction to hear the dispute despite the Ukrainian court judgments, and noting that the Ukrainian courts had failed to consider evidence of Storm's "clear intent to have its disputes with Telenor resolved with arbitration."  Telenor, 524 F. Supp. 2d at 341-42.  The Tribunal also determined that New York law governed the arbitration, as "designated by the parties" in the arbitration clause.  Id. at 342.  The Tribunal rejected Storm's argument that it should give conclusive effect to the decisions of the Ukrainian courts, because of the collusive nature of the Ukrainian litigation and because Telenor was not named as a party to that litigation or notified of it until after the appeals court had rendered its decision.  Id.  Applying New York law, the Tribunal next found that the Shareholders Agreement was validly executed and binding on the parties.  Id.  In so finding, the Tribunal determined that Nilov had both actual and apparent authority to execute the Agreement.  Id.  Finally, the Tribunal found that Storm had breached and was continuing to breach the Agreement.  Id.  As a result, Telenor "suffered and continues to suffer significant injury."  (Final Award 66.)  In particular, Storm's failure to attend Kyivstar board and shareholder meetings "paralyzed" the Kyivstar board, and prevented it from conducting "critical corporate business."  (Id. 57.)

The Tribunal did not award damages, as Telenor had not proven a specific amount, but it did order Storm to take steps to comply with its contractual obligations.  Telenor, 524 F. Supp. 2d at 342.  Specifically, the Tribunal ordered Storm to: (1) transfer certain of its Kyivstar shares to "newly-formed affiliated companies" that can nominate members for the Board of Directors; (2) take steps necessary to assure that its nominated candidates are elected to the Board of Directors; (3) "cause its duly authorized representatives to attend" all meetings of Kyivstar; (4)

take steps necessary to amend the Kyivstar Charter in compliance with the December 22, 2005, Ukrainian court order (collectively, the "Corporate Governance Provisions"). Id. at 342-43. The Tribunal also ordered Storm to divest its Kyivstar shares within 120 days unless Storm and any affiliated entities divested their holdings in the competing telecommunications companies that exceed five percent (the "Divestiture Provision"). Id. at 343. Finally, the Tribunal entered an order prohibiting Storm and "anyone acting in concert with it" from initiating any suit "relating to, or in connection with, any obligations described in the Shareholders Agreement," as well as prohibiting the continued prosecution of "any existing litigations currently pending in the Ukraine" (the "Anti-Suit Injunction"). Id.

On August 1, 2007, Telenor petitioned this Court to confirm the Final Award. Id. On November 2, 2007, over Storm's opposition, the Court confirmed the Final Award, finding that Storm and its owners "deliberately entered a carefully-negotiated agreement with Telenor" that included an arbitration clause "providing for the resolution of disputes in a fair, neutral international arbitration forum." Id. at 369. The Court found that Nilov had both "actual" and "apparent" authority to bind Storm to arbitrate disputes arising out of the Shareholders Agreement. Id. at 353-54. The Court rejected Storm's arguments that the Ukrainian judgments declaring the Shareholders Agreement null and void and prohibiting Storm's participation in the arbitration should prevent confirmation of the Final Award. Id. at 345. The Court found that Storm had "presented a vigorous defense to the Tribunal, notwithstanding its physical absence from the December 2006 hearings," id. at 356, and that the Tribunal had provided Storm "with precisely the fair and impartial hearing it had bargained for, by a distinguished panel of arbitrators, despite [Storm's] making repeated efforts to renege on its agreement and to torpedo

10

the proceedings by collusive and vexatious litigation," id. at 369.  Accordingly, the Court ordered Storm "to comply with the directives of the Final Award."  Id.  Storm appealed the Court's order, and the Second Circuit entered a temporary stay of the order on November 29, 2007.  That stay was vacated on December 20, 2007, after argument, and the appeal remains pending.

On January 23, 2008, Telenor moved for contempt sanctions against Storm and the Altimo Entities for failing to comply with this Court's order confirming the Final Award.  The parties briefed the issues extensively, and a hearing was held on March 11, 2008.

**IV.    Non-Compliance with the Award**

A.    The Corporate Governance Provisions

Storm has not complied with the Corporate Governance Provisions of the Final Award, which required it to (1) transfer Kyivstar shares to newly-formed affiliates that can nominate members for the Board of Directors; (2) nominate and elect candidates to the Kyivstar Board of Directors; (3) cause its representatives to attend all meetings of Kyivstar; and (4) amend the Kyivstar Charter in compliance with the December 22, 2005, Ukrainian court order.  None of these required actions have been taken.  No affiliates have been incorporated, no shares have been transferred to them, and no members have been elected to the Kyivstar Board of Directors. (Telenor Findings ¶ 15.)  Between October 1, 2007, and March 14, 2008, eight extraordinary meetings of Kyivstar shareholders were noticed, and Storm attended none of them.  (Id. ¶¶ 16-18.)  Four of these meetings were noticed for dates following this Court's confirmation of the Final Award, although one was scheduled during the period in which the Second Circuit's stay was in effect.  (Id. ¶ 17.)  As a consequence of Storm's failure to attend these meetings,

Kyivstar's charter has not been amended to comply with the requirements of the Final Award. (Id. ¶ 19.)

        B.      <u>The Divestiture Provision</u>

Storm has also not complied with the Final Award requirement that it divest its Kyivstar shares within 120 days unless "Storm and any affiliated entities divest their holdings in Turkcell and Ukrainian High Technologies that exceed five percent."  (Final Award 67.)

        1.     *The Turkcell Holdings*

Turkcell is a Turkish wireless telecommunications company that maintains a majority stake in Astelit, LLC ("Astelit"), a Ukrainian wireless telecommunications company that competes with Kyivstar.  (Final Award 59.)  At the time of the Final Award, Alfa Finance Holdings S.A. ("Alfa Finance"), a Storm affiliate, owned 100% of Alfa Telecom Turkey Limited ("ATTL"), which indirectly owned 13.2% of Turkcell, which in turn owned 55% of Astelit. (Telenor Findings ¶¶ 76, 79.)  This gave Alfa Finance an indirect interest in Turkcell of 13.2% and in Astelit of 7.3%.  (Proposed Findings of Fact of the Altimo Entities ("Altimo Findings") ¶ 131.)

Following the issuance of the Final Award, Alfa Finance executed a transaction purportedly intended to bring itself into compliance with the Divestiture Provision.  (Altimo Findings ¶¶ 132-33.)  It sold 50% of its shares in ATTL to Nadash International Holdings Inc. ("Nadash"), but did so in a way that allowed it to retain most of its economic interest in ATTL. (Altimo Findings ¶ 134.)  The net effect of the arrangement was to decrease Alfa Finance's economic interest in Astelit – that is, the percentage of Astelit's dividends to which it was entitled – by 2.3% to exactly 5.0%, and its control interest – that is, the percentage of Astelit's

voting shares it indirectly controls – to 3.6%.[8]  (Parden Decl. ¶ 23.)

However, the Divestiture Provision directs Storm and its affiliates to "divest their holdings in Turkcell" – not Astelit – "that exceed five percent."  (Final Award 67.)  Following Alfa Finance's sale of 50% of its shares in ATTL to Nadash, it retained approximately a 6.6% control interest in Turkcell, and an even greater economic interest.  The Altimo Entities acknowledge that the divestiture transaction fails to comply with the literal terms of the Divestiture Provision.  (3/11/08 Tr. 117-20.)  However, the Altimo Entities point out that the non-competition provision in the Shareholders Agreement forbids ownership greater than five percent of any entity "engaged in the [wireless telecommunications business] in any region in Ukraine."  (Final Award 58-59.)  Turkcell's primary telecommunications operations are in Turkey; its only Ukrainian interest is its ownership in Astelit.  (3/11/08 Tr. 117-20.)  The Altimo Entities argue that, in the context of the non-competition provision, it becomes clear that the Tribunal meant that Storm and its affiliates should divest their holdings of "Turkcell's Ukrainian operation," that is, Astelit, not Turkcell as a whole.  (3/11/08 Tr. 120.)

The Altimo Entities' argument is not persuasive.  First, the text of the Final Award does not support their position.  The relevant decretal paragraph unambiguously refers to Turkcell, not Astelit.  Nor is there any indication elsewhere in the Award that the Tribunal intended "Turkcell" to mean "Turkcell's Ukrainian operations."  The Award states that Storm breached the non-competition clause when "Alfa acquired a 13.2 percent interest in Turkcell, . . . which

---

[8] Under the agreement, Nadash is entitled to ATTL dividends only to the extent that they are attributable to Astelit dividends, and then only up to 2.3% of such Astelit dividends. (1/22/08 O'Driscoll Decl. Ex. H at 22 ¶¶ 5.1-5.2.)  Otherwise, Nadash gets no economic benefit from ATTL or its holdings, which flow instead to Alfa Finance.  (Parden Decl. ¶ 23.)

maintains a majority stake in Astelit." (Final Award 59.) By specifying the "13.2 percent" interest Alfa acquired in Turkcell, but only generally describing the "majority" interest in Astelit, the Award suggests that it is Alfa's interest in Turkcell, not its interest in Astelit, that is offensive to the non-competition provision.

This interpretation of the Final Award is reasonable. A company that owns a majority stake in another controls that company's operations, even if it does not have 100% ownership. The Tribunal could reasonably have interpreted the non-competition provision as prohibiting five percent ownership of companies doing business in Ukraine directly, or doing business in Ukraine through majority-owned subsidiaries.

Second, while the Court believes the non-competition provision is amenable to such an interpretation, the meaning of the agreement is not for the Court to decide. "'[C]ourts play only a limited role when asked to review the decision of an arbitrator' and may not 'reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract.'" First Nat'l Supermarkets, Inc. v. Retail, Wholesale & Chain Store Food Employees Union Local 338, 118 F.3d 892, 896 (2d Cir. 1997), quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987). A court may not "reverse an arbitral award that draws its essence from the agreement, even if it contains factual errors or erroneous interpretations of contract provisions." First Nat'l Supermarkets, 118 F.3d at 896. There is no evidence that the Award's order that Storm affiliates divest interests in Turkcell meant anything other than what it appears to mean. Even if this order is based on an erroneous interpretation of the Shareholders Agreement – which the Court does not believe to be the case – there is no basis for overturning that order here.

14

Third, even if there *were* a basis to challenge the Tribunal's conclusion, the time to do so was when Telenor moved to confirm the Final Award before this Court. Neither Storm nor the Altimo Entities did so at that time, and they therefore waived any argument that the Tribunal should have ordered divestiture of Astelit rather than Turkcell.[9] The Court, without objection on this point, found the Final Award "entitled to recognition and enforcement by the Court." Telenor, 524 F. Supp. 2d at 359-63. Therefore, the issue before the Court now is not whether Storm and its affiliates should have been ordered to divest their interest in Turkcell, but rather whether, having been ordered to do so, they have complied with that order.

They have not. There is no dispute that Alfa Finance retains a 6.6% control interest in Turkcell, and an even greater economic interest. Accordingly, the Court finds that Storm has not complied with the Divestiture Provision because its affiliates have not divested "their holdings in Turkcell . . . that exceed five percent."[10]

### 2.   *The UHT Holdings*

Ukrainian High Technologies ("UHT") competes with Kyivstar by offering broadband wireless mobile telecommunications to businesses and consumers in Ukraine. (Final Award 59-60.) At the time of the Final Award, UHT was 80% owned by Russian Technologies Limited ("Russian Technologies"), which was 80% owned by CTF Holdings Limited, an Alfa Group

---

[9] The Altimo Entities did not appear to oppose confirmation of the Final Award, but they could have done so as a matter of right given their undeniable "interest relating to the property or transaction" that was in dispute. See Fed. R. Civ. P. 24(a).

[10] Telenor also argues, for a number of reasons, that the Turkcell divestiture is "an elaborate charade meant to create the illusion of compliance with the [Final Award], while retaining the asset in question." (Telenor Mem. 10.) As the Court finds that Storm is in breach because of its 6.6% ownership of Turkcell, it need not address the other issues Telenor raises.

affiliate, and 20% owned by Intec Holdings Limited ("Intec").  (Musatov Decl. ¶¶ 25-26.)  The

Tribunal found that Russian Technologies's ownership of UHT violated the non-competition

provision, and ordered its divestiture.  (Final Award 59-60, 67.)

Following the issuance of the Final Award, Russian Technologies sold its 80% interest in

UHT to a company called Baltone.  (Musatov Decl. ¶¶ 30-31.)  Baltone is wholly owned by

Intec, the 20% owner of Russian Technologies.  (Id. ¶ 27.)  Intec, in turn, is wholly owned by

Mikhail Gamzin, so the transaction made Gamzin the indirect owner of the 80% UHT stake, as

well as the 20% Russian Technologies stake.  (Id.)  Gamzin is also the managing partner of

Russian Technologies.  (Id.)  As managing partner, Gamzin has a role that an Altimo executive

described as equivalent to being its "chief executive officer."  (Rolfe Decl. Ex. 1 at 180.)

Gamzin is also a member of the eleven-member Alfa Group Supervisory Board, which "sets the

strategic direction of the Alfa Group" and is comprised of the "main" Alfa Group shareholders

and representatives of the "main" subholdings of the Alfa Group.  (Musatov Decl. ¶¶ 3, 29.)

Gamzin is not one of the "main" shareholders of the Alfa Group.  (Id. ¶ 29.)  Telenor argues that

Storm remains in breach of the Divestiture Order because a Storm "affiliate" – namely, Gamzin

– remains in control of UHT.  (3/11/08 Tr. 140-44.)

The Final Award does not elaborate on the definition of "affiliate," but the Shareholders

Agreement defines an entity's affiliate is any other entity that "directly or indirectly controls, or

is under common control with, or is controlled by," that entity.  (Shareholders Agreement §

1.01.)  The Agreement also defines "control":

> [C]ontrol (including, with its correlative meanings, 'controlled by'
> and 'under common control with') shall mean, with respect to any
> Person, the possession, directly or indirectly, of power to direct or
> cause the direction of management or policies (whether through

> ownership of securities or partnership or other ownership interests,
> by contract or otherwise) of a Person.

(Id.)  Thus, Gamzin is a Storm affiliate if he, directly or indirectly, controls Storm, is controlled by Storm, or is, together with Storm, under common control by third entity.

Under this definition, Gamzin is clearly a Storm affiliate.  First, as a member of the Alfa Group Board of Supervisors, Gamzin possesses the power to direct or cause the direction of management or policies of Storm.  Alfa Group is Storm's ultimate parent, and the Board of Supervisors is the body responsible for making Alfa Group's strategic decisions.  This puts Gamzin in a position to wield great influence over the direction of Alfa Group and its subsidiaries, including Storm, even if Gamzin is not himself a "major" shareholder in Alfa Group.  Second, as an officer of Russian Technologies, Gamzin is under the control of Alfa Group, which owns 80% of Russian Technologies.  Even if Alfa Group could not formally direct Gamzin regarding his personal investment in UHT, it could undoubtedly exercise significant influence over him, since it could remove him as an officer of Russian Technologies.  Alfa Group has further influence over Gamzin by virtue of the fact that Gamzin is a minority shareholder in Russian Technologies, and minority shareholders have an undeniable interest in avoiding unnecessary disputes with their majority partners.  Because Alfa Group also controls Storm, Gamzin and Storm are under "common control," and are therefore affiliates.

Contrary to the Altimo Entities' argument, the Agreement's definition of control contemplates control exercised through means other than ownership interests.  The definition of control states that the "power to direct" may arise from "ownership of securities or partnership or other ownership interests, by contract or otherwise."  The phrase could be read, as the Altimo Entities assert, as limited to powers arising out of ownership interests.  In this reading, "by

17

contract or otherwise," specifies the source of the ownership rights, and "otherwise" refers to sources of ownership rights other than contract. However, the phrase could also be read, as Telenor suggests, as a list of the sources of the "power to direct." That is, the power to direct may arise either through "ownership of securities or partnerships or other ownership interests," through "contract," or "otherwise." In this reading, the "power to direct" is not limited to powers arising out of ownership interests. Instead, such powers may also arise through "contract" or "otherwise."

Telenor's interpretation is the more reasonable one. First, the Altimo Entities' proposed interpretation gives "by contract or otherwise" an awkward and cramped meaning. The specification of the ownership interests as being "ownership of securities or partnerships or other ownership interests" is clear on its own. The addition of the phrase "by contract or otherwise" adds little, if any, clarity to the scope of the ownership interests. It also suggests that ownership interests normally arise out of contract, but in fact they more often arise out of ownership of shares, or out of a partnership, than out of contract. Moreover, aside from property, partnership, and contract, it is not obvious how ownership interests might "otherwise" arise. Read as the Altimo Entities would have it, the phrase is either redundant or obfuscating, adding nothing but confusion to the definition.

Second, Telenor's interpretation more reasonably defines "control." Ownership is not the only way in which one person or entity may control another. Contractual arrangements, such as shareholder agreements, employment contracts, or agency or other commercial contracts, can allow one entity to wield significant power over another. It would not be consistent with the purposes of the non-competition provision for the parties to prohibit Alfa Group from directly or

indirectly owning shares of a competing telecommunications venture, but to control one through

another person or entity that was, for some reason other than ownership, its puppet.

This conclusion is fortified by the fact that the contractual provision appears to be

modeled on other legal documents that define "control" broadly, for similar purposes.  Thus,

Telenor's interpretation squares with the interpretation of the almost identical definition of

"control" used by the SEC in defining the scope of "control person" liability under the Securities

Exchange Act of 1934, 15 U.S.C. § 78t(a).  The SEC definition is:

> The term "control" (including the terms "controlling," "controlled
> by" and "under common control with") means the possession,
> direct or indirect, of the power to direct or cause the direction of
> the management and policies of a person, whether through the
> ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12b-2.  The only material difference between this definition and the one

contained in the Shareholders Agreement is that the Shareholders Agreement broadens "voting

securities" to "ownership of securities or partnership or other ownership interests," apparently to

better specify the types of ownership interests contemplated.[11]  Applying the SEC definition,

---

[11] One other difference, which is perhaps illuminating, is that the Shareholders
Agreement drops the comma after "by contract" and before "or otherwise."  The use of a comma
before a conjunction joining the last two items in a list – the so-called "serial" or "Oxford"
comma – is not universal, though it is "strongly recommend[ed]" by at least one authority, "since
it prevents ambiguity."  The Chicago Manual of Style (University of Chicago Press, 15th ed.
2003).  Indeed, the omission of the serial comma in the Shareholders Agreement definition of
"control" accounts for much, if not all, of the confusion here.  Had the Agreement incorporated
the serial comma – i.e., control is power to direct "through ownership of securities or partnership
or other ownership interests, by contract, or otherwise" – it would have been substantially clearer
that non-ownership types of control are contemplated.  The Shareholders Agreement omits the
serial comma elsewhere, for example, in the text of the non-competition provision, see Section
6.02.  This pattern of omitting the serial comma, together with the overwhelming consistency
between the Agreement's definition and the SEC's definition, suggests that the omission of the
comma was either inadvertent or a stylistic choice not intended to affect the meaning of
"control" under the Agreement.

courts have widely held that directors and officers, not just controlling shareholders, may

"control" their companies.  See, e.g., In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d

247, 307 (S.D.N.Y. 2008) (CEO, President, and CFO may be in "control"); Katz v. Image

Innovations Holdings, Inc., 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (directors, CEO, and a

member of the audit committee may be in "control"); 380544 Canada, Inc. v. Aspen Tech., Inc.,

544 F. Supp. 2d 199, 203, 230-31 (S.D.N.Y. 2008) (Executive Vice President, Co-Chief

Operating Officer, President, and CEO may be in "control"); In re Refco, Inc. Sec. Litig., 503 F.

Supp. 2d 611, 640 (S.D.N.Y. 2007) (directors may be in "control").  The converse is also true: "a

corporation is presumed to control its officers and directors."  Energy Factors Inc. v. Nuevo

Energy Co., No. 91 CIV. 4273, 1992 WL 170683, at *6 (S.D.N.Y. Jul. 7, 1992).[12]  Consequently,

it is reasonable to interpret the Shareholders Agreement as contemplating that directors and

officers may "control" their corporations and/or be controlled by them.

It is unnecessary to decide whether the Shareholders Agreement contemplates that all

directors and officers necessarily control and/or are controlled by their companies.  But on the

facts presented here, in which Gamzin has a senior supervisory position within Alfa Group, and

is the chief executive officer and minority shareholder in one of its "major" operating units, there

is sufficient evidence to convince this Court that he exerts sufficient control over Storm and is

---

[12] Directors and officers are also considered to "control" their companies in the context of
the Securities Act of 1933, which uses the same definition of control as the Exchange Act of
1934. See SEC v. Cavanagh, 445 F.3d 105, 111 & n.12 (2d Cir. 2006) (for purposes of
registration requirements, an "affiliate" of an issuer includes "an officer, director, or controlling
shareholder"); 17 C.F.R. § 230.144(a)(1) (defining the affiliate of an issuer to be a person that
"directly, or indirectly through one or more intermediaries, *controls*, or is *controlled by*, or is
under *common control* with, such issuer") (emphasis added); id. § 230.405 (defining "control"
the same way as under the 1934 Exchange Act).

under sufficient common control (with Storm) by Alfa Group to be considered Storm's "affiliate."  Accordingly, Storm has not complied with the Divestiture Provision of the Final Award because it retains its interest in Kyivstar while an affiliate owns more than five percent of a competing Ukrainian venture.

C.      <u>Continuing Ukrainian Litigation</u>

Conceding that it has not complied with the Corporate Governance Provisions of the Final Award and of the November 2 Order, Storm claims that its non-compliance is excused by two Ukrainian court orders that it contends have prohibited it from complying.

1.      *The "Klymenko Action"*

On September 3, 2007 – after the Final Award but before its confirmation – Klymenko, Storm's general director, commenced an action in Ukrainian court against Storm, Alpren, and Hardlake (the "Klymenko Action").[13]  (Telenor Findings ¶ 31.)  The week before, on August 27, 2007, Storm's parents Alpren and Hardlake had called an extraordinary general meeting at which a resolution was approved (the "August 27 Resolution") directing Storm to take steps necessary to comply with the provisions of the Final Award.  (<u>Id</u>. ¶ 21.)  Klymenko's suit sought a court order to "recognize as invalid and annul" the August 27 Resolution.  (<u>Id</u>. ¶ 31.)[14]

_____

[13] Storm also filed suit, on August 22, 2007, seeking a declaration as to the legal effect of the Final Award within the territory of Ukraine.  (1/22/08 Sills Decl. Ex. B at 1.)  On October 5, 2007, the Court declared that it "refuse[d] to recognize" the Final Award.  (<u>Id</u>. at 7.)

[14] Storm contends that Klymenko commenced this litigation based on the advice of legal advisors who informed him that his implementation of the August 27 Resolution could expose him personally to civil and criminal liability, and Storm to civil liability.  They contended that such implementation, by bringing Storm into compliance with the Final Award, would contravene the April 2006 Ukrainian order that had invalidated the Shareholders Agreement, and hence the arbitration and the Final Award.

This reasoning is strained, to say the least.  First, the April 2006 order is a judgment in

Altimo was aware of Klymenko's intention to bring the Klymenko Action.  (3/6/08

O'Driscoll Decl. Ex. B at 56.)  Although Altimo could have prevented Klymenko from

undertaking the lawsuit by terminating his employment or otherwise, it chose not to do so.  (Id.

at 53-55.)  In fact, Altimo did not even tell Klymenko not to bring the litigation, ostensibly

because it accepted at face value without independent investigation Klymenko's representation

that he would risk criminal liability for doing so.  (Id. at 57-58.)

The litigation had all the hallmarks of the earlier collusive litigation.  Telenor once again

was not present for the proceeding.[15]  Klymenko was suing the company of which he was the

sole officer.  Hence, he was in the position of directing one attorney to litigate the action, on his

---

favor of Alpren against Storm.  Thus, Storm's contention is that Klymenko's compliance with a
resolution Alpren approved would violate a judgment in favor of Alpren.  The legal opinions do
not attempt to explain who would have standing to enforce the April 2006 order.  Presumably,
Alpren would not seek to enforce it, as it swears before this Court an utmost desire to comply
with the Final Award, and in any event would be prevented from taking any action by the Anti-
Suit Injunction.  The legal opinions do not state that a Ukrainian court could – or would – seek to
enforce such an order sua sponte.  (2/25/08 Klymenko Decl. Exs. K, L.)

Second, the argument that the invalidation of an agreement *prohibits* a party from taking
steps consistent with such an agreement is a non sequitur.  Instead, as one of the advisory
opinions acknowledges, the effect of the invalidation is to allow the parties "to act as if the
Shareholders Agreement does not exist." (2/25/08 Klymenko Decl. Ex. K at 2.)  The Ukrainian
court orders apparently freed Storm from the obligation, under Ukrainian law, of complying with
the Shareholders Agreement and of the Final Award.  They did not say – nor does it logically
follow – that Storm was prohibited from doing so.  This argument was already trotted out and
rejected by this Court.  See Telenor, 524 F. Supp. 2d at 357.

The opinions appear to be nothing more than a sham, a pseudo-legal excuse for Storm
and the Altimo Entities to continue to refuse to do what they have all along refused to do.  It is
outrageous, though not surprising given their prior conduct in this matter, that Storm and the
Altimo Entities would construct such a sham.  It is both outrageous and surprising that their
counsel – two esteemed New York law firms – would represent that sham to the Court,
unexamined, as a bona fide basis for their clients' refusal to comply with the Final Award.

[15] There is a dispute as to whether Telenor received notice of this proceeding.  It is not
necessary to resolve that dispute in order to resolve the legal issues presented here.

behalf, and another attorney to litigate the defense, on behalf of Storm.  (3/6/08 O'Driscoll Decl.

Ex. A at 125-131.)  Not surprisingly, Storm did not enter any objection to the suit.  (Telenor

Findings ¶¶ 33-34.)  Alpren and Hardlake did file objections to the suit,[16] but on October 10,

2007, the Ukrainian court ruled in favor of Klymenko and invalidated the August 27 Resolution.

(Id. ¶ 36.)[17]

The holding was recently vacated on appeal, and Klymenko's claim was eventually

dismissed.  (See 9/8/08 Van Tol Letter to Court.)  However, in the interim, another Ukrainian

court proceeding, the "EC Venture Action," had taken its place in purporting to prevent Storm

from complying with the Final Award.

---

[16] Alpren and Hardlake's arguments in the Ukrainian litigation appear to have been ill-conceived.  They argued that despite the earlier Ukrainian court rulings finding the Shareholders Agreement null and void and enjoining the arbitration, the Ukrainian court should nevertheless enforce the Final Award as confirmed by this Court.  (1/22/08 Sills Decl. Ex. E at 4.)  Aside from the fact that this would apparently require the court to ignore prior Ukrainian court rulings, the argument does not address why the enforceability of the Final Award is relevant to the lawfulness of the August 27 Resolution.  Alpren and Hardlake apparently did not argue that the August 27 Resolution was lawful *regardless* of the enforceability of the Final Award.

[17] The court's reasoning differed from the legal opinions solicited by Klymenko.  The court held that Storm could not be directed to send representatives to attend Kyivstar board meetings because the December 22, 2005, decision invalidated the Kyivstar charter, see supra, note 1, and therefore Kyivstar's board no longer existed.  The court did not address the fact that the August 27 Resolution directed Storm to remedy the defects that caused the charter to be invalid.  (1/22/08 Sills Decl. Ex. E.)  It also held that Storm could not be directed to sell its Kyivstar shares, even to wholly owned subsidiaries, because its charter allowed it only to "hold" Kyivstar shares.  The court did not address the fact that the charter also allowed Storm to "exercis[e] any and all rights and performance of obligations related" to holding Kyivstar shares.  (Id.)  The court also held that the resolutions violated the Ukrainian constitutional provision against "[f]orced disposal" of private property.  The court did not explain how private actors directing the sale of property they effectively own amounts to an unconstitutional "forced disposal."  (Id.)

2.      *The "EC Venture Action"*

On November 29, 2007 – less than a month after the confirmation of the Final Award – a company called EC Venture removed itself from liquidation in Switzerland and filed suit in Ukraine against Alpren, with Storm listed as a "respondent's side" party.  (Telenor Findings ¶ 40.)  EC Venture had been a participant in Storm, but it had sold its interest in Storm to Alpren in 2004, and dissolved itself in 2006.  (Id. ¶¶ 37-38.)  EC Venture's suit asserted that the 2004 sale of its minority interest in Storm to Alpren had been invalid because the sale agreement was not written in Ukrainian, and because Alpren's signatory had lacked the authority to sign it.  (Id. ¶ 41.)

On the basis of this claim, the court issued an ex parte order attaching all of Storm's "movable and immovable property and other assets, including shares which belong to" Storm, and enjoining Storm from "accepting decisions, entering any agreements, issuing powers of attorneys . . . , holding a general meeting . . . , [or] taking part in general meetings of [any] enterprise, [the] shares of which belong to" Storm.  (Rolfe Decl. Ex. 14.)

A hearing on the injunction and the claim was scheduled for December 17, 2007; however, none of the parties appeared at that hearing,[18] and the hearing was adjourned to January 28, 2008.  (Storm's Proposed Findings of Fact and Conclusions of Law ("Storm Findings") ¶ 103.)  At that time, Storm and Alpren filed objections to the injunction and the claim.  (Id. ¶¶ 106-07.)  However, EC Venture filed a motion for forensic examination of Alpren's signature to the 2004 sale agreement based on the fact that the name of the person who signed the agreement

_____

[18] Storm contends that it did not learn of the EC Venture Action until "late December." (Storm's Proposed Findings of Fact and Conclusions of Law ¶ 104.)

"is not indicated near the signature," which "gives reasons to doubt that the signature in the agreement" is valid.  (4/9/08 Sills Decl. Ex. D.)  There is no record of any objection from Storm or Alpren.  (Id.)  The Ukrainian court has apparently sent the EC Venture materials to an expert for a forensic examination, but there is, nine months later, no determination, and the injunction remains in place.  (3/6/08 Didkovskiy Decl. ¶ 12.)

The shares of EC Venture are issued in bearer form, so there is no record of who owns the company.  (Telenor Findings ¶ 39.)  However, Telenor argues that the EC Venture Action is being "orchestrated and controlled by the Altimo [E]ntities."  (Id. ¶ 72.)  There is substantial evidence that Storm and/or the Altimo Entities are colluding in this litigation.

First, the relief granted to EC Venture is exactly aligned with Storm's and the Altimo Entities' long-held position because it prevents Storm from undertaking any of the measures ordered by the Final Award.  Their contention that this is mere coincidence is undermined by the extraordinary breadth of the injunction in relation to the underlying EC Venture claim.  The purported interest at stake in the lawsuit is the value of Storm's shares, and yet the injunction essentially prevents Storm from taking *any* corporate action, even action necessary to protect the value of those shares.  Indeed, since inaction by Storm prevents Kyivstar from holding any meetings of its board and undertaking critical corporate decisions, the injunction appears decidedly antithetical to the purported purpose of the suit.  While it *could* be coincidence that the relief sought and granted exactly aligns with the position taken by Storm and the Altimo Entities in this litigation, the alignment of interests nevertheless supports an inference that the litigation was undertaken precisely to advance the interests of Storm and the Altimo Entities.

Second, the timing of the lawsuit is suspicious.  EC Venture sold its interest in Storm in 2004, three years prior to undertaking this lawsuit.  EC Venture could have initiated its lawsuit at any time during those three years.  Instead, it waited until November 29, 2007, less than a month after the confirmation of the Final Award.  The Altimo Entities suggest that the purpose for the EC Venture Action is to recover a share in Storm worth $1 billion (versus the $120 million sale price) and/or to extort a payment from Altimo.  (Altimo Findings ¶ 122.)  But the Altimo Entities do not assert that Storm's value increased precipitously in November 2007.  Rather, it is almost certain that Storm had been worth something substantially more than $120 million during a significant portion of the three years between when EC Venture sold its stake and November 2007.  Again, the fact that the litigation was commenced, and the injunction issued, precisely as the Final Award became enforceable could have been coincidence, but the suspicious timing nevertheless supports an inference that the litigation was intended to forestall enforcement of the Final Award.[19]

Third, the identity of the owner of EC Venture remains conveniently unknown, despite Storm's and Alpren's having been engaged in litigation against EC Venture for nearly a year.  Yuri Musatov, the senior legal officer for Altimo, testifies that the identify of the owner was revealed to him in January 2008 by the prior owner of EC Venture, who sold his interest to the

---

[19] Storm contends that the confirmation of the Final Award may have motivated the filing of the suit to confirm the Final Award because compliance with the Award would "eliminate Storm's value" by forcing Storm to alienate its shares in Kyivstar, thereby rendering any contemplated suit "meaningless." (Storm Findings ¶¶ 146-49.)  This is nonsense.  The Final Award requires the sale of only a nominal number of shares (provided Storm's affiliates comply with the Divestiture Provision), but even if it did require a significant sale, Storm would receive cash or other consideration from any buyer, and hence would not likely see its value diminished, let alone eliminated.

purported current owner.  (Rolfe Decl. Ex. 1 at 145-48.)  But the Altimo Entities submit no admissible evidence – e.g., a declaration from the seller, a declaration from the buyer, or documentation of the transaction – identifying the present owner.  Oleg Malis, an Altimo senior vice president, testifies that he had two conversations with the purported owner of EC Venture, but again Altimo offers no admissible evidence of his identity.  The Altimo Entities have had ample opportunity to present the Court with evidence of the identity of the present owner of EC Venture and his or her affiliations, if any, with Storm or Altimo.  That they have chosen not to do so supports an inference that Storm or the Altimo Entities are, in fact, controlling the EC Venture Action.[20]

Fourth, there is circumstantial evidence linking this suit to prior litigation by Storm and the Altimo Entities.  The EC Venture Action raises the same argument about the authority of a signatory to the agreement that had been raised by Alpren in its April 2006 litigation seeking to invalidate the Shareholders Agreement.  More significantly, the papers filed in the EC Venture Action include copies of non-public documents to which Storm, Alpren, and/or their attorneys had access.  These documents include: (1) certified copies of the April 2006 and May 2006 decisions (see 3/6/08 Didkovskiy Decl. ¶ 5, Exs. C and D); (2) photocopies of the passport of Oleksiy Melnyk, Alpren's legal representative, and a power of attorney, both of which were filed in the Klymenko Action (see 3/6/08 Didkovskiy Decl. ¶¶ 3-4, Exs. A and B); (3) a copy of an unrelated decision in a Ukrainian case (the "Aviant decision"), in which one of the parties was represented by an attorney at a Ukrainian firm that does legal work for Alpren and Storm (see

---

[20] The Altimo Entities do submit testimony purporting to identify the present owner of EC Venture, but the statements are all inadmissible hearsay.  (See Rolfe Decl. Ex. 1 at 145-48; 3/6/08 O'Driscoll Decl. Ex. B at 66-73.)

27

3/6/08 Didkovskiy Decl. ¶ 10).  According to Ukrainian law, court documents such as these are

only made available to the parties in the case, or to third parties with a legal interest in the case,

and not to unrelated third parties such as EC Venture.  (See 3/6/08 Didkovskiy Decl. ¶¶ 4, 6-8,

10.)  The Altimo Entities suggest alternative means by which EC Venture might have obtained

copies of these documents.[21]  (See Altimo Findings ¶¶ 120-21.)  However, while these

alternatives are *possible* sources of these non-public documents, there is no evidence that EC

Venture did, in fact, obtain the documents from these alternative sources, or that they could have

easily and legally done so.  By contrast, it is undisputed that all of these documents were easily

---

[21] Storm initially suggested that the copies of the April 2006 and May 2006 decisions
could have come from the public files of this Court, since copies of those decisions were
provided by Storm and the Altimo Entities to Telenor during discovery and publicly filed during
the proceedings to confirm the Final Award.  (See Storm Sur-Reply 3.)  However, a comparison
of the copies of those decisions with the copies in the EC Venture Action case file revealed
beyond doubt that the former could not have been the source of the latter.  (See 3/11/08 Tr. 48-
53.)  That comparison also suggested, based on the apparently identical placement of a
certification stamp, that the copies in the EC Venture case file came from the copies in Storm's
and the Altimo Entities' possession, and not from a third source.  (See id. 53-54.)

Now the Altimo Entities suggest that the copies in the EC Venture case file, while
admittedly exact copies of those in Storm's and the Altimo Entities' possession, may have been
obtained from intermediaries who had in turn obtained copies of the decisions from Storm and
the Altimo Entities.  For example, copies with an identically placed certification are present in
the case files of the 2006 suit by Alpren against Kyivstar and Ernst & Young and the 2006 suit
that purported to enjoin the arbitration in this case.  (Altimo Findings ¶ 120.)  However, the
Altimo Entities do not suggest a plausible motivation for the parties in those suits (besides Storm
and Alpren), who would have had access to the case files, to share the documents with EC
Venture.  While Oleksiy Didkovskiy, Telenor's counsel, conceded that it is sometimes possible
for non-interested third parties to obtain court decisions and papers (3/11/08 Tr. 25), to do so
would be "contrary to the established laws and procedures in Ukraine."  (Id.)  In addition,
Altimo provided a declaration from a publicist who says that, in May 2006, Altimo provided her
with copies of the April 2006 and May 2006 decisions, and that she forwarded them on to "a
number of Ukrainian journalists."  (Krasnenkova Decl. ¶¶ 2-3.)  Even assuming that this release
in May 2006 provided EC Venture with the decisions it attached to its complaint eighteen
months later, it does not explain how EC Venture obtained the other non-public legal documents
at issue.

and legally accessible by Storm and/or Altimo, suggesting, at a minimum, that they are the more plausible source.  Accordingly, the presence of these documents supports an inference that Storm and/or Altimo aided in the prosecution of the EC Venture Action.

Fifth, there are questions about whether the efforts by Storm and Alpren to defend the EC Venture Action have been bona fide.  To begin with, Storm and Alpren's interests are not adverse to EC Venture's, since the injunction justifies their continued non-compliance with the Final Award.  Moreover, their advocacy has been both lackluster and unsuccessful.  The sweeping injunction was entered on November 29, 2007, but Storm and Altimo took no steps to defend against it for almost two months until the postponed court hearing on January 28, 2008. At that time, Storm apparently filed an objection to the injunction entered by the court (see 2/25/08 Klymenko Decl. Ex. S), but the court declined to rule on that objection and considered instead EC Venture's motion for a forensic examination of the signature (3/11/08 Tr. at 101). There is no evidence that Storm or Alpren opposed that motion, which was apparently granted. Nine months have now passed – during which time the injunction remains in place – without news either of the results of that forensic examination, or of any efforts by Storm or Alpren to get the injunction lifted or the claim otherwise resolved.  That Storm and Alpren have thus far failed in their advocacy, and that their interests are actually served by their continued failure, supports an inference that Storm and Alpren are not contesting the EC Venture Action in good faith.

Finally, the EC Venture lawsuit is consistent with the Altimo Entities' and Storm's modus operandi of using the Ukrainian courts to avoid compliance with their legal obligations. At every juncture in this dispute, Storm and the Altimo Entities have brought questionable

claims in Ukrainian courts that have – through a combination of procedural unfairness, the absence of bona fide opposition, and poorly reasoned decisions – purported to vindicate Storm's and the Altimo Entities' interests.  Another party in a different case might be able to convince this Court that the confluence of suspicious circumstances surrounding the EC Venture Action is nothing but an unfortunate coincidence.  Through their prior conduct, the Altimo Entities and Storm have forfeited that opportunity.  Rather, their extensive and brazen history of "collusive and vexatious litigation," Telenor, 524 F. Supp. 2d at 369, used to avoid compliance with their legal obligations, supports an inference that they are complicit too in this latest chapter.[22]

## V.     The Relationship Between Storm, Alpren, Hardlake, and Altimo

Storm and the Altimo Entities act as alter egos of one another in a number of ways. Altimo exercises complete control over Alpren, Hardlake, and Storm.  Alpren and Hardlake are shell companies that exist solely for the purpose of holding Altimo's interest in Storm. (Pelaghias Decl. ¶¶ 7, 9, 14, 16.)  They have no employees and their directors are employees of a

---

[22] The Altimo Entities' and Storm's only argument against the inference that they have colluded in the EC Venture litigation – aside from the argument that the suspicious circumstances are mere coincidence – is based on the fact that the litigation has put them in default of a $750 million loan facility with Credit Suisse.  (Altimo Findings ¶ 97.)  The Altimo Entities argue that they would not have undertaken a collusive lawsuit in light of such weighty consequences.  (3/11/08 Tr. at 104-06.)   There is evidence that Credit Suisse offered to waive an event of default if Altimo prepaid $200 million of the loan by March 28, 2008, and agreed to pay an additional 1.5% interest rate on the balance.  (3/10/08 Letter from Irina Borosova to Franz Wolf.)  There is no evidence that Altimo actually did pay the $200 million, but even if it did, it does not demonstrate that the continuation of the EC Venture Action is not in its interests. Altimo has been willing to forgo hundreds of millions in potential dividends from Kyivstar – which cannot declare them without the corporate governance changes ordered by the Final Award – as part of its effort to prevail in its dispute with Telenor.  (See 9/5/08 Letter from Robert L. Sills to Court ¶ 3 & Ex. D.)  It follows that Altimo would be willing to absorb whatever refinancing costs are associated with prepayment of part or all of the Credit Suisse credit facility.

Cypriot company called Abacus, which provides corporate administration services to some 700 clients, including Altimo. Storm, 2006 WL 3735657 at *13. Abacus takes direction exclusively from Altimo in directing corporate acts by Alpren and Hardlake. Id. (See also 1/22/08 Sills Decl. Ex. Q.)

Similarly, Storm's activities are limited by its charter to holding Altimo's interest in Kyivstar. (2/25/08 Klymenko Decl. Ex. B at arts. 5 & 6.) Storm has no board of directors. (Id. art. 10.) Its "senior decision-making body" is comprised solely of Alpren and Hardlake. (Id. art. 11.) Storm's sole officer is Klymenko, who holds the title of General Director. (Id. art. 10.) The Director General's powers are limited, and he may not sell or otherwise dispose of Storm's interest in Kyivstar, or encumber those shares in any way, or conclude any deed, transaction or agreement that imposes on Storm an obligation exceeding $10,000, without express prior authorization from Alpren and Hardlake. (Id. §§ 11.4(n)(1), 12.4.)

Storm and the Altimo Entities do not conduct their affairs at arm's length. Altimo's web site represents Storm not as Storm but as Altimo's "Kiev headquartners." (3/6/08 O'Driscoll Decl. Ex. A at 45-47.) More substantively, Altimo negotiated the entire transaction that gave rise to this dispute, agreed to the arbitration clause demanded by Telenor as part of that bargain, and negotiated the Shareholders Agreement on behalf of Storm. Storm, 2006 WL 3735657, at *14. Altimo has also paid Storm's legal fees arising out of the disputes growing out of the Agreement, including the proceedings here. (3/6/08 O'Driscoll Decl. Ex. A at 72-73.) The companies' financial obligations are intermingled in other ways. For example, Storm's assets are surety for a $900 million loan facility for Alpren and Hardlake. (2/25/08 Klymenko Decl. Ex. D.)

31

Storm's adherence to corporate formalities is mixed.  Storm has held some extraordinary meetings of its shareholders when needed.  (See, e.g., 3/10/08 Klymenko Decl. Exs. 5, 6.) However, Storm concedes (Storm Sur-Reply 6 n.3) that it has not held regular general meetings every year, as required by its charter (2/25/08 Klymenko Decl. Ex. B § 11.3.1).

Moreover, Storm's sole officer, Klymenko, is an employee of Altimo.  In an affidavit submitted for the arbitration, Klymenko declared, under penalty of perjury, that he was both an employee of Altimo and Director General of Storm, stating that he "joined Storm soon after joining its parent company, Altimo, in November 2005 as a Vice President."  (3/6/08 O'Driscoll Decl. Ex. C ¶ 1.)  He also attached to that affidavit a copy of his C.V. listing his current employer as "Altimo" and his current position as "Vice President, General representative in Ukraine, LLC 'Storm' – Director General."  (Id. at 6.)  Klymenko now submits a declaration stating that "I am not currently, nor have I ever been, employed by Altimo or any Alfa entity other than Storm."  (2/25/08 Klymenko Decl. ¶ 11.)  He claims that his C.V. and business cards were false and that he held himself out as an Altimo Vice President "for marketing and networking purposes" only.  (Id. ¶¶ 17-18.)  He contends that "the wording" in his earlier sworn declaration "was not quite correct" and that he meant instead that his position at Storm was "the equivalent to my being vice president of Altimo."  (3/6/08 O'Driscoll Decl. Ex. A at 161.)

Klymenko's earlier declaration is the more credible.  First, his declaration was written and he had ample opportunity to correct any ambiguities or inaccuracies prior to submitting it. Klymenko's affidavit regarding his dual role was cited twice by this Court, see Telenor, 524 F. Supp. 2d at 338, 367; Storm, 2006 WL 3735657, at *13, and during neither proceeding did Storm or Altimo deny Klymenko's dual role.  Indeed, Altimo and Alpren acknowledged

Klymenko's dual role in their appeal from the December 2006 order.  (See 4/9/08 Sills Decl. Ex. A at 40; 4/9/08 Sills Decl. Ex. B at 14.)

Second, Klymenko's explanation for his earlier testimony does not make sense on its own terms.  He stated in his earlier affidavit that he "joined Storm *soon after* joining its parent company, Altimo, in November 2005, as a Vice President" (emphasis added).  If being Director General at Storm were "equivalent" to being a Vice President at Altimo, his assumption of a Vice President-equivalent position would have occurred at the same time, not "soon after," joining Storm.

Third, at the time of the arbitration, there was little, if any, apparent legal consequence of Klymenko's formal employment status, and he thus had no reason to misrepresent it.  Now, however, since the relationships among Storm and the Altimo Entities have become significant in these proceedings, he has an interest in disguising his connection to Altimo.  The earlier declaration, given without consideration of legal consequence, accordingly deserves more weight.

Moreover, whether or not Klymenko was formally an employee of Altimo is of little consequence (except as evidence that he has perjured himself), since he effectively acts as one.  As already discussed, Klymenko has held himself out as an employee of Altimo "for marketing and networking purposes."  This includes using business cards with an Altimo logo, an Altimo telephone number, street address, and email address.  (3/6/08 O'Driscoll Decl. Exs. E, F.) Klymenko negotiated the terms of his employment with Alexey Reznikovich, Altimo's chief executive, and Oleg Malis, an Altimo senior vice president.  (3/6/08 O'Driscoll Decl. Ex. A at 74-75, Ex. B at 30, 32.)  Klymenko "regularly" seeks the "advice" of Malis, and this advice is

"usually" followed.  (3/6/08 O'Driscoll Decl. Ex. B at 50.)  If circumstances warrant, Malis

could decide to terminate Klymenko's employment.  (Id. at 52-54; Rolfe Decl. Ex. A at 71.)

Thus, Malis effectively hired, currently supervises, and could decide to fire Klymenko.  These

circumstances amply support a finding that Klymenko serves a dual role as sole officer of Storm

and employee of Altimo.

## LEGAL CONCLUSIONS

### I.     Contempt Against Storm

    A.     <u>Legal Standard</u>

      Civil contempt is intended to "coerce the contemnor into future compliance with the

court's order."  <u>New York State Nat'l Org. for Women v. Terry</u>, 886 F.2d 1339, 1352 (2d Cir.

1989).  It is appropriate where (1) the order a party fails to comply with is clear and

unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the violating party

has not been reasonably diligent and energetic in attempting to accomplish what was ordered.

<u>EEOC v. Local 638, Local 28 of Sheet Metal Workers' Int'l Ass'n</u>, 753 F.2d 1172, 1178 (2d

Cir.1985), aff'd, 478 U.S. 421 (1986).  It is not necessary to show that the violating party

disobeyed the court's orders willfully.  Id.

    B.     <u>The Corporate Governance Provisions</u>

      Storm's failure to comply with the Corporate Governance Provisions is in contempt of

the November 2 Order.  First, that Order is "clear and unambiguous." An order is "clear and

unambiguous" where it is "specific and definite enough to apprise those within its scope of the

conduct that is being proscribed" or required.  <u>Nat'l Org. for Women</u>, 886 F.2d at 1352.  This

Court stated simply that "Storm is hereby ordered to comply with the directives of the Final

Award."  The Final Award, in turn, stated Storm's obligations with admirable specificity and

definiteness: (1) "Storm shall transfer at least one of its Kyivstar shares to three newly-formed

affiliated companies" so that they can each nominate a member for the Board of Directors; (2)

"Storm shall take such steps as are necessary to assure that its nominated candidates are elected

to the Kyivstar Board of Directors, attend all future Board meetings and participate in good faith

in the direction and management of Kyivstar's business"; (3) "Storm shall cause its duly

authorized representatives to attend all annual and extraordinary meetings of Kyivstar"; (4)

"Storm shall take such steps as are necessary to amend the [Kyivstar] Charter" in compliance

with the December 22, 2005, Ukrainian court order.  (Final Award 66-67.)  None of the parties

dispute that these orders are clear and unambiguous.

Second, the evidence of Storm's non-compliance with the November 2 Order is "clear

and convincing."  Storm does not and cannot dispute that it has failed to comply with any of the

Corporate Governance Provisions.[23]  (See Factual Findings IV.A., supra.)

---

[23] Storm does argue that it was not obliged to comply with the Order until December 20, 2007, when Storm's motion for a stay pending the resolution of the appeal was denied.  (Storm Opp'n 12-13.)  This argument is baseless.  The Court's order was entered November 2, 2007, and was in effect until the entry of the Second Circuit's temporary stay, on November 29.  Storm cites Rogers v. Koons, 960 F.2d 301 (2d Cir. 1992), for the proposition that a party need not comply with a court order while its stay application is pending.  (Storm Opp'n 13.)  Rogers says nothing about when a court's order becomes enforceable.  Rather, in Rogers, the Second Circuit simply noted that it "delayed the commencement of the daily fine" arising from a district court's contempt finding while the Circuit considered a stay application.  960 F.2d at 306.  Should Storm seek a stay application of this Court's imposition of a fine, it can similarly petition the Second Circuit for a temporary stay while the stay application is pending.  But this Court can find no authority – in Rogers or elsewhere – suggesting that a court's order does not take effect during the pendency of a stay application.  Moreover, even if Storm was not obliged to comply with the Court's order until December 20, it has disobeyed the Court's order since that date, and therefore remains in contempt.

Third, Storm has not been reasonably diligent in attempting to comply with the November 2 Order.  The approval of the August 27 Resolution by Alpren and Hardlake directing Storm to carry out the dictates of the Final Award does not show reasonable diligence toward compliance, since Alpren and Hardlake declined to order Klymenko, Storm's sole officer, to carry out its dictates.  In any event, Klymenko's refusal to do so has meant that Storm has taken no steps toward compliance, despite ample opportunity to do so.

Storm argues that it is unable to comply with the Corporate Governance Provisions because of the Klymenko Action, and subsequently, the EC Venture Action.  (Storm Opp'n 13.) "Inability to comply is . . . a long-recognized defense to a civil contempt citation." Donovan v. Sovereign Sec., Ltd., 726 F.2d 55, 59 (2d Cir. 1984).  However, the alleged contemnor must prove "clearly, plainly, and unmistakably" that "compliance is impossible." Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995).  "[C]ompliance must be beyond the realm of possibility, not just difficult to achieve, before a party will be exonerated in a contempt proceeding." Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc., 289 F. Supp. 2d 373, 377 (S.D.N.Y. 2003).  Put differently, contempt is excused where "compliance is literally impossible and, as a result, any attempts at coercion are pointless." Badgley v. Santacroce, 800 F.2d 33, 37 (2d Cir. 1986).  A contemnor's burden of proving impossibility is particularly high "where the defendants have a long history of delay and the plaintiffs' needs are urgent." Id. at 36.

The Klymenko Action has been dismissed, and no longer presents any impediment to Storm's compliance with the Final Award.  The EC Venture Action is still in place and purports to prevent Storm from taking any corporate action, including that directed by the Final Award.

36

As a preliminary matter, a foreign court order prohibiting compliance with this Court's order does not make compliance impossible.  In <u>United States v. Chase Manhattan Bank, N.A.</u>, 590 F. Supp. 1160 (S.D.N.Y. 1984), the court held Chase in contempt of an order to turn over summoned documents to the IRS, despite the existence of an injunction from a Hong Kong court barring Chase from surrendering the documents.  <u>Id</u>. at 1161-63.  The court explained that "Chase's predicament is due to its having chosen to do business in a jurisdiction in which the laws are at odds with those of its home jurisdiction," and that "the bank must either surrender to one sovereign or the other in return for the privileges it receives or alternatively accept the consequences."  <u>Id</u>. at 1163.  The Court finds this reasoning – which has been cited with approval by the Second Circuit, see <u>Badgley</u>, 800 F.2d at 38 n.2 – persuasive.  Storm agreed to resolve disputes with Telenor by arbitration in New York, knowing that this might present conflicts with the laws and courts in Ukraine.  Consequently, it must now "accept the consequences" for the privileges it sought from the protection of New York law.

Moreover, Storm has not remotely met its burden of proving "clearly, plainly, and unmistakably," that it or an affiliate cannot withdraw, successfully defend, or otherwise resolve the EC Venture Action, and therefore remove the impediment of the court order.[24]  Indeed, the suspicious circumstances of that litigation, the circumstantial evidence linking Storm and Altimo to EC Venture's court filings, and Storm's and its affiliates' long history of using "collusive and

---

[24] Storm argues that having offered evidence of a legally valid court order prohibiting compliance, the "burden of production" shifts back to Telenor to offer evidence that the underlying litigation was collusive.  (Storm Findings ¶ 144.)  Storm cites no relevant circuit authority on the point, but even if the proposition were true, Telenor has satisfied this burden by producing extensive evidence that the underlying litigation is collusive.  (<u>See</u> Factual Findings IV.C.2, supra.)  Storm does not and cannot contest that it continues to carry the ultimate burden of *persuasion* on the question of impossibility.  <u>See</u> <u>Huber</u>, 51 F.3d at 10.

vexatious" litigation in the Ukrainian courts give rise to an inference that Storm and its affiliates are colluding in the EC Venture Action.[25]  Given that evidence of collusion, this Court is a long way from concluding that the imposition of civil contempt sanctions would be "pointless" in coercing Storm's compliance.

Storm next argues that contempt is not warranted because courts may not order a party to take any action that would violate the civil or criminal law of foreign country.  (Storm Opp'n 15.)  The argument that the Final Award should not be enforced because it is contrary to Ukrainian law was previously raised, and rejected by the Court in its November 2 Order.  See Telenor, 524 F. Supp. 2d at 356-58.  The decisions in the Klymenko Action and the EC Venture Action came after that order, but neither gives reason to reconsider its reasoning.  The decision in the Klymenko Action has, of course, been vacated and the lawsuit dismissed, so it has no continuing relevance.  The EC Venture Action does not concern the enforceability of the Final Award, and the court has made no rulings with respect to its legality or illegality.  While the injunction issued in the EC Venture Action does purport to prohibit any corporate action by Storm, and hence, actions in compliance with the Final Award, for the reasons discussed above, the mere existence of this injunction does not excuse Storm's non-compliance.  Consequently, no development since the November 2 Order provides a basis for revisiting the question of conflicts with Ukrainian laws.

---

[25] Telenor has abandoned its argument that Storm and/or the Altimo Entities are in contempt of the Anti-Suit Injunction by orchestrating the EC Venture Action.  (See generally Telenor Findings.)  Accordingly, the Court need not consider whether the evidence of their collusion is established by "clear and convincing" evidence.

C.      The Divestiture Provision

_____This Court's order directing Storm to comply with the Divestiture Provision of the Final Award was "clear and unambiguous."  It directed Storm to divest its shares in Kyivstar unless "Storm and any affiliated entities divest their holdings in Turkcell and Ukrainian High Technologies that exceed five percent."  (Final Award 67.)  Moreover, as discussed in Factual Findings IV.B., supra, there is "clear and convincing" evidence that Storm has failed to comply with this provision.

However, contempt sanctions are not warranted because it has not been established that Storm has not been "reasonably diligent" in attempting to accomplish what was ordered.  Storm and its affiliates did undertake steps to comply with the Divestiture Provision of the Final Award.  Alfa Finance tried to and did reduce its interest in Astelit to no more than five percent, and Russian Technologies tried to and did divest its interests in UHT to Mikhail Gamzin, a party it may have believed not to be an "affiliate" of Storm.  In both cases, the actions fell short of the requirements of the Final Award.  In the first case, the action fell short because the Final Award requires that Alfa Finance reduce its interests in Turkcell, not Astelit, to no more than five percent.  However, the Altimo Entities offered a colorable – if ultimately unpersuasive – argument that the Final Award meant to refer to the Astelit interest, despite its literal reference to the Turkcell interest.  This suggests an effort to comply with the spirit of the Final Award, if not with the letter of its requirements.

In the second case, the action fell short because Gamzin is, in fact, an "affiliate" of Storm, by virtue of his senior role within Alfa Group and his role as chief executive and minority shareholder of one of Alfa's "major" subsidiaries.  The Altimo Entities offered a colorable – if

39

ultimately unpersuasive – argument why the definition of "affiliate" did not reach an individual like Gamzin, despite the influence and control he obviously wields within Alfa Group. This suggests an effort to comply with the letter, if not the spirit, of the Final Award.

The technical and narrow ways in which Storm and its affiliates sought to comply with the Divestiture Provision in no way suggest a more general good faith effort to comply with the Final Award as a whole. However, given the material steps taken, and the colorable arguments put forth as to why those steps were sufficient, the Court does not conclude that Storm and its affiliates have not been "reasonably diligent" in their attempts at compliance. Accordingly, they are not in contempt for their failure to comply with the Divestiture Provision.

Nevertheless, it is plain that Storm is not in compliance with the Divestiture Provision and this Court's Order. There is no remaining excuse for its failure to comply. While the Court has bent over backwards to indulge the inference that Storm tried in good faith to comply with the Divestiture Provision, despite the many ways in which Storm and the Altimo Entities have colluded and contrived to avoid complying with their legal obligations, it will hardly be possible for the Court to countenance another attempt to "divest" by shifting ownership to friendly affiliates or devising structures to retain indirect control or beneficial ownership of competing entities. Accordingly, Storm will be ordered yet again to comply promptly and conclusively with those provisions.

## II.    Personal Jurisdiction Over the Altimo Entities

The Altimo Entities argue that the Court lacks personal jurisdiction over them because they have not consented to jurisdiction, do not transact business in New York, and have not committed tortious acts that would bring them within the New York long-arm statute. However,

in the related <u>Storm</u> action, in which Telenor sought and obtained a preliminary anti-suit

injunction against Altimo and Alpren, this Court already held that it has personal jurisdiction

over Altimo and Alpren by virtue of their being "alter egos" of Storm, which consented to

jurisdiction in the Shareholders Agreement.  <u>See</u> 2006 WL 3735657 at *13.  Nothing relevant

has changed in the interim to justify reconsidering that holding.  Moreover, the standard for

finding a shareholder to be an alter ego for purposes of personal jurisdiction is "a less stringent

standard than that necessary to pierce the corporate veil for purposes of liability."  <u>Id.</u> at *13 n.8,

citing <u>Marine Midland Bank, N.A. v. Miller</u>, 664 F.2d 899, 904 (2d Cir. 1981).  Since the Court

finds that Altimo, Alpren, and Hardlake are alter egos of Storm for purpose of veil-piercing, <u>see</u>

III, infra, it follows, a fortiori, that they are alter egos for purposes of personal jurisdiction.

## III.   Contempt Against the Altimo Entities

The Final Award directed Storm to take certain actions with regard to its governance,

which it has not done, thus placing itself in contempt of this Court.  Telenor moves to hold the

Altimo Entities in contempt as well, on two grounds.  First, Telenor argues that the Altimo

Entities "acted in concert" with Storm in violating the court order.  (Telenor Mem. 15-17.)

Second, Telenor argues that the Altimo Entities are "alter egos" of Storm, and hence that

Storm's corporate veil should be pierced.  (<u>Id</u>. 17-21.)  Because the Court finds that the Altimo

Entities are "alter egos" of Storm, it need not address whether the Altimo Entities "acted in

concert" with Storm.[26]

---

[26] As discussed above, this Court has held that Altimo and Alpren are alter egos of Storm
for purposes of personal jurisdiction.  In addition, the Court has held that the Tribunal "could
have found" Alpren to be acting as the alter ego of Storm in filing lawsuits aimed at preventing
Kyivstar from taking certain corporation actions.  <u>See</u> <u>Telenor</u>, 524 F. Supp. 2d at 366 (Storm is
"essentially a shell company that exists for the purpose of holdings shares" for the Altimo

As the parties' choice of law under the Shareholders Agreement, New York law governs

the question of veil-piercing for purposes of enforcing the Final Award.  See Motorola Credit

Corp. v. Uzan, 388 F.3d 39, 51 (2d Cir. 2004) (applying contractual choice of law to determine

applicability of arbitration agreement to nonparties).[27]  New York law permits veil-piercing

where (1) "the owner exercised complete domination over the corporation with respect to the

transaction at issue," and (2) "such domination was used to commit a fraud or wrong that injured

the party seeking to pierce the veil."[28]  MAG Portfolio Consultant, GMBH v. Merlin Biomed

Group LLC, 268 F.3d 58, 63 (2d Cir. 2001).

The first prong requires consideration of a number of factors: (1) disregard of corporate

formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership,

---

Entities.).  The circumstances of those holdings and the legal standards applied are slightly
different from those applied here.  For example, the standard for finding a shareholder to be an
alter ego for purposes of personal jurisdiction is "a less stringent standard than that necessary to
pierce the corporate veil for purposes of liability."  Storm, 2006 WL 3735657, at *13 n.8, citing
Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981).  Similarly, the Court's
holding about what the Tribunal "could have found" required only that the Court find the
Tribunal's conclusion "barely colorable," although the Court went on to say that it found the
conclusion "eminently reasonable and persuasive."  Telenor, 524 F. Supp. 2d at 366.

[27] Telenor argues that federal common law governs the issue of veil-piercing.  However,
in the authorities it cites, federal law governed only because the agreement in question was silent
on choice of law.  See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Intern.,
Inc., 198 F.3d 88, 96 (2d Cir. 1999); Certain Underwriters at Lloyd's London v. Argonaut Ins.
Co., 500 F.3d 571, 575 (7th Cir. 2007).  Here, the Shareholders Agreement unambiguously
specifies that New York law governs.  (Shareholders Agreement § 13.06.)

[28] Some decisions of the Second Circuit seem to regard the second prong as unnecessary
if the first prong is satisfied.  See Itel Containers Intern. Corp. v. Atlanttrafik Exp. Service Ltd.,
909 F.2d 698, 703 (2d Cir. 1990) ("New York law allows the corporate veil to be pierced either
when there is fraud or when the corporation has been used as an alter ego."); Gartner v. Snyder,
607 F.2d 582, 586 (2d Cir. 1979) (New York courts "disregard corporate form . . . when the form
has been used to achieve fraud, or when the corporation has been so dominated by an individual
or another corporation . . . that it . . . can be called the other's alter ego"; emphasis added.)  The
Court proceeds here under the assumption that the second prong is necessary.

officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.  Id.  The second prong can be satisfied either by showing outright fraud, or another type of "wrong," such as a "breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights." Electronic Switching Indus., Inc. v. Faradyne Electronics Corp., 833 F.2d 418, 424 (2d Cir. 1987).

　　　　For the reasons discussed at length in Factual Findings V, supra, the first prong is satisfied.  Storm, Alpren, and Hardlake exist entirely for the purpose of holding shares of Kyivstar for Altimo, with no independent operations.  Storm exercises no meaningful discretion in its operations, but is instead wholly owned, dominated, and controlled by Altimo, both through the shell intermediaries, Alpren and Hardlake, which are Storm's owners, and through Klymenko, Storm's general director, who is or has been both formally and effectively an Altimo employee.  Storm is held out by Altimo as its "Kiev headquarters."  While some of Storm's corporate formalities are respected, others, such as the requirement of a regular annual meeting, are not.  There is intermingling of financial obligations and funds, with Storm's assets used to secure loans to its corporate parents, and Storm's legal bills paid by Altimo.  Finally, their repeated efforts at conducting collusive litigation provides ample evidence that Storm and the Altimo Entities do not operate at arm's length from one another.

The wrongs attributable to this domination are obvious.  First, Storm's refusal to comply with the Final Award has prevented Telenor from taking part in corporate decision-making in the multi-billion dollar company in which it is the majority shareholder, and from collecting hundreds of millions in potential dividends.[29]  Wrongs committed by a dominated subsidiary justify piercing the corporate veil.  See, e.g., Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985) (unlawful acts undertaken by subsidiary ordered by parent are a "wrong" justifying veil-piercing).

Second, the domination has facilitated the extensive and ongoing collusive litigation, which has resulted in court orders that effectively prevent Telenor from enforcing the Final Award and this Court's orders in Ukraine.  Since Storm's operations and assets are located only in Ukraine, the effect of the collusive litigation has been to make Storm "judgment proof."  This too is a wrong sufficient to justify piercing the corporate veil.  See, e.g., Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Intern., Inc., 758 F. Supp. 908, 917 (S.D.N.Y. 1991) (stripping the assets of the subsidiary by the parent to render it "judgment proof" constitutes "fraud or wrong").

---

[29] The fact that the Altimo Entities formally directed Storm, through the August 27 Resolution, to comply with the Final Award is immaterial to the question of whether they are legally responsible for Storm's refusal, since they proved unwilling to terminate and replace Klymenko, or take other steps to force compliance.  They claim that they did not do so because Klymenko professed to face criminal sanctions for complying with the Final Award.  For reasons discussed in note 14, supra, Klymenko's professed belief is not credible.  However, even if it was credible, it would be relevant only to the question of whether Storm's non-compliance was legally excusable, not whether the Altimo Entities sought to comply with the Final Award.  Given Altimo's dominance of Storm, its claim that Storm exercised independent judgment in not implementing the August 27 Resolution is not credible.

**IV.**     **Remedy**

    A district court has "broad discretion to design a remedy that will bring about compliance" from a recalcitrant contemnor.  Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 673 F.2d 53, 57 (2d Cir. 1982).  In creating an appropriate remedy, the Court should consider "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him."  Dole Fresh Fruit Co. v. United Banana Co., Inc., 821 F.2d 106, 110 (2d Cir. 1987).  In addition, a court "may award appropriate attorney fees and costs to a victim of contempt," particularly where the violation of the court order was "willful."  Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996).

    The magnitude of the harm for Storm and the Altimo Entities continued contempt of the November 2 Order is great.  Kyivstar, a multi-billion dollar enterprise, is paralyzed from taking important corporate action, including disbursement of hundreds of millions of dollars in potential dividends.  Moreover, Storm and the Altimo Entities have enormous financial resources and have shown a willingness to incur significant expense – including foregoing hundreds of millions in potential dividends and prepayment of a $200 million loan – in order to avoid their legal obligations.  Under these circumstances, a substantial daily fine is required to compel compliance.  Moreover, the harm to Telenor increases with time, and it is unclear just how high is the tolerance of Storm and the Altimo Entities for financial penalty.  This suggest a daily fine that increases over time.

Accordingly, an initial contempt sanction of $100,000 per day, doubling to $200,000 per day thirty days thereafter, and to $400,000 per day thirty days after that, and continuing to double every thirty days until compliance is achieved, is an appropriate remedy to ensure probable compliance with this Court's orders.  In addition, because Storm's and the Altimo Entities' non-compliance with the Court's order has been willful, Telenor shall recover the attorneys' fees and disbursements it has incurred in this contempt proceeding.

## CONCLUSION

For the foregoing reasons:

1.      Storm, Alpren, Hardlake, and Altimo are in contempt of this Court's November 2, 2007, Order that they comply with the Corporate Governance Provisions of the Final Award.

2.      Storm, Alpren, Hardlake, and Altimo shall, commencing ten days from the date of this Order, be jointly and severally liable for a payment to Telenor of $100,000 per day, doubling to $200,000 per day thirty days thereafter, and to $400,000 per day thirty days after that, and continuing to double every thirty days until they are no longer in contempt.

3.      Storm shall, within 90 days, sell its shares in Kyivstar, unless, within that period, it satisfies the Divestiture Provision of the Final Award, as clarified by this Order.

4.      Storm shall, within seven days, deposit all of its Kyivstar shares, together with an executed blank share transfer form, with the Clerk of this Court, in order to secure compliance with the Divestiture Provision of the Final Award.

46

5.    Storm, Alpren, Hardlake, and Altimo are liable for the costs and attorneys' fees

incurred by Telenor in connection with its contempt application.  Telenor shall,

within 30 days of this order, submit to the Court documentation of its reasonable

attorneys' fees and costs in connection with its motion for contempt.


SO ORDERED.

Dated: New York, New York
       November 19, 2008

_____
GERARD E. LYNCH
United States District Judge

47